IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| CARL CHATMAN | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|         v. | ) |
| | ) |
| City of Chicago, Chicago Police | ) |
| Detective John Roberts, Chicago | ) |
| Police Detective Thomas McGreal, | ) |
| Chicago Police Detective Maria | ) |
| Pena, Chicago Police Detective | ) |
| Jack Boock, Chicago Police | ) |
| Detective Rita Mischka, Chicago | ) |
| Police Detective Barbara Midona, | ) |
| Chicago Police Sergeant Dennis | ) |
| Walsh, Chicago Police Officer | ) |
| Michael Karczewski, Chicago Police | ) |
| Officer Richard Griffin, Chicago | ) |
| Police Lieutenant Joseph Joria, | ) |
| Chicago Police Sergeant Bryan | ) |
| Holy, Cook County Sheriff's Deputy | ) |
| Michael Cokeley, Cook County | ) |
| Sheriff's Deputy Joseph Prince, | ) |
| Cook County Sheriff's Deputy | ) |
| Sergeant Maria Mokstad, Cook | ) |
| County Sheriff's Deputy Lieutenant | ) |
| Burrough Cartrette, Assistant | ) |
| State's Attorney Brian Holmes and | ) |
| unknown Chicago Police Officers | ) |
| and unknown Cook County Sheriff's | ) |
| Deputies, the County of Cook, | ) |
| Thomas Dart, in his official | ) |
| capacity as Sheriff of Cook | ) |
| County, and Anita Alvarez, in her | ) |
| official capacity as Cook County | ) |
| State's Attorney, and Susan Riggio,) | |
| | ) |
|     Defendants. | )    **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff, CARL CHATMAN, by his attorneys, Loevy & Loevy, for his complaint against the Defendants, City of Chicago, Chicago Police Detective John Roberts, Chicago Police Detective Thomas McGreal, Chicago Police Detective Maria Pena, Chicago Police Detective Jack Boock, Chicago Police Detective Rita Mischka, Chicago Police Detective Barbara Midona, Chicago Police Sergeant Dennis Walsh, Chicago Police Officer Michael Karczewski, Chicago Police Officer Richard Griffin, Chicago Police Lieutenant Joseph Joria, Chicago Police Sergeant Bryan Holy, and unknown Chicago Police Officers, along with the County of Cook, Assistant State's Attorney Brian Holmes, Cook County Sheriff's Deputy Michael Cokeley, Cook County Sheriff's Deputy Joseph Prince, Cook County Sheriff's Deputy Sergeant Maria Mokstad, Cook County Sheriff's Deputy Lieutenant Burrough Cartrette, unknown Cook County Sheriff's Deputies, Thomas Dart in his official capacity as Sheriff of Cook County, and Anita Alvarez in her official capacity as Cook County State's Attorney; together with Susan Riggio, states as follows:

### Introduction

1.   Carl Chatman spent more than eleven years in prison for a rape he did not commit.

2

2.    Not only did Mr. Chatman not commit the rape for which he was wrongfully convicted, but the rape never even occurred at all. The purported victim made up an account of having been raped in Chicago's Daley Center so that she could bring a law suit for money damage against the company responsible for the building's security.

3.    This marked the second time this same woman had fabricated rape charges in order to bring a legal action against a building security company for illicit financial gain.

4.    After the purported rape victim made up the story of having been attacked in the Daley Center, the Defendants proceeded to "solve" the crime. Specifically, in their zealousness to obtain a swift conviction in a high-profile case, the Defendant Chicago Police Officers took advantage of Mr. Chatman's mental instability and coerced him to falsely confess to a crime that never actually happened.

5.    In this way, and based on the resulting false "confession," these Defendants caused Mr. Chatman to be wrongfully convicted to a crime that never even occurred.

6.    The State of Illinois eventually came to recognize that Mr. Chatman's confession was false, and that his conviction was wrongful. In September 2013, the Cook County State's Attorney's Office voluntarily dismissed all charges against Mr.

Chatman, and the State of Illinois granted Mr. Chatman a Certificate of Innocence.

7.    Mr. Chatman's exoneration came after he spent over eleven years as an innocent man in prison. Given his mental state, Mr. Chatman was particularly vulnerable to the worst elements of prison, and his experience there was devastating to his emotional health.

8.    Through this lawsuit, Mr. Chatman seeks accountability and compensation for losing more than a decade of his life due to Defendants' misconduct.

### Jurisdiction and Venue

9.    This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

10.   This Court has jurisdiction over federal claims pursuant to 28 U.S.C. 1331 and state law claims pursuant to 28 U.S.C. 1367.

11.   Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district and Defendant City of Chicago is a municipal corporation located here. Additionally, the events giving rise to the claims asserted herein occurred within this judicial district.

**The Parties**

12. Plaintiff Carl Chatman is 59 years old. He is a veteran of the United States Army.

13. Defendant Susan Riggio is a resident of Illinois.

14. At all relevant times, Defendants John Roberts, Thomas McGreal, Maria Pena, Jack Boock, Rita Mischka, Barbara Midona, Michael Karczewski, Richard Griffin, Sergeant Dennis Walsh, Lieutenant Joseph Joria, Sergeant Bryan Holy, and unknown Chicago police officers were Chicago police officers employed by the City of Chicago and acting within the scope of their employment and under color of law.

15. At all relevant times, Defendants Michael Cokeley, Joseph Prince, Sergeant Maria Mokstad, Lt. Burrough Cartrette, and unknown Deputies of the Cook County Sheriff's Department were Deputies employed by the Cook County Sheriff and acting within the scope of their employment and under color of law.

16. At all relevant times, Defendant Brian Holmes was an Assistant State's Attorney employed by the Cook County State's Attorney's Office and acting within the scope of his employment and under color of law.

17. Defendants John Roberts, Thomas McGreal, Maria Pena, Jack Boock, Rita Mischka, Barbara Midona, Michael Karczewski, Richard Griffin, Sergeant Dennis Walsh, Sergeant Bryan Holy,

Lieutenant Joseph Joria, Michael Cokeley, Joseph Prince, Sergeant Maria Mokstad, Lt. Burrough Cartrette, unknown Chicago police officers and unknown Deputies of the Cook County Sheriff's Department are referred to collectively as the "Law Enforcement Defendants."

18.  The Defendant City of Chicago is a municipal corporation under the laws of the State of Illinois.

19.  Defendant Thomas Dart is the current Sheriff of Cook County, Illinois. He is sued in his official capacity.

20.  Defendant Anita Alvarez is the current State's Attorney for Cook County, Illinois. She is sued in her official capacity.

21.  Defendant Cook County is a county of the State of Illinois. Cook County is obligated by Illinois statute to pay any judgment entered against Defendant Dart or Defendant Alvarez in their official capacities.

### Factual Background

22.  Carl Chatman was born in 1954 and grew up in Chicago with his two sisters and brother.

23.  At the age of 20, Mr. Chatman married and enlisted in the military. At the conclusion of his military service, Mr. Chatman returned to Chicago, where he and his wife had a son.

24.  By the turn of the new millennium, Mr. Chatman had

6

fallen on hard times. He was an easily confused and extremely vulnerable man.

## Defendant Riggio Targets Mr. Chatman

25. During the week of May 20, 2002, Mr. Chatman went to the Daley Center to investigate how to file a small claims suit.

26. At the Daley Center, Mr. Chatman eventually made his way to the 21st floor.

27. At the time, Defendant Susan Riggio, age 50 at the time, worked as a scheduling clerk for Judge Bartkowicz, who sat in courtroom 2101 at the Daley Center.

28. By happenstance, Mr. Chatman entered Judge Bartkowicz's courtroom looking for assistance. There, he encountered Defendant Riggio.

29. After a very brief interaction, Mr. Chatman left without incident. At the time, he was wearing a Blackhawks jacket and street clothes.

30. Based on this encounter, Defendant Riggio knew what Mr. Chatman looked like, and also knew that he was a defenseless and guileless individual, who would not fare well if falsely accused. He was, in short, the perfect target for her plan.

## Riggio's Plan

31. Shortly before May 20, 2002, Defendant Riggio had received notice from the IRS that she was to be audited for her

prior tax filings.

32.  At the time, Defendant Riggio was also under severe financial pressures. She and her husband had been gambling heavily, and had experienced over $500,000 in losses in the year 2000 alone. Defendant Riggio was also intent on divorcing her husband.

33.  Faced with these financial pressures, Defendant Riggio concocted a plan to falsely claim that she had been raped inside the Daley Center, thereby enabling her to sue various entities responsible for the Daley Center's security.

34.  Defendant Riggio had engaged in the exact same scheme some 20 years earlier. In 1979, facing different financial pressures, Defendant Riggio falsely claimed that she was raped inside a downtown office building in the early morning hours, before anyone else had arrived to work. Defendant Riggio then sued the building's management and received a cash settlement.

35.  Having succeeded in the 1970s with a bogus civil suit against a building manager based on a false accusation of rape, Defendant Riggio decided to pull the same scam all over again. This time, Mr. Chatman was her victim.

### The False Allegation

36.  On May 24, 2002, Defendant Riggio went to work very early. Although not scheduled to work until 8:30 a.m., she

8

arrived at the Daley Center at 7 a.m., long before any of her co-workers arrived. She did so notwithstanding that it was the Friday before the Memorial Day weekend holiday, and the judge for whom she worked was out of town.

37. Defendant Riggio claimed that at approximately 7:20 a.m., while she was alone in her office behind courtroom 2101, Mr. Chatman appeared with his penis exposed and said words to the effect of, "the judge fucked me and now I'm going to fuck you, bitch."

38. According to Defendant Riggio, she fought with her attacker, screaming for help, and was then raped in her vagina and anus. She claimed that during the altercation, she fought for her life with her attacker and had her head beaten against a table and scissors held to her throat.

39. When one of Defendant Riggio's co-workers, Jeannette Neibauer, arrived for work, Riggio told her about the alleged attack, whereupon Neibauer called the police.

40. When the police officers arrived, Defendant Riggio falsely claimed that Mr. Chatman was the man who raped her, and provided the responding officers with a description of an African American man in the Blackhawks jacket (Mr. Chatman) who had been seen on her floor earlier in the week.

9

**Mr. Chatman's Arrest**

41.    Shortly after Defendant Riggio reported the crime, a flash message went out to members of the police department, alerting them to look for a potential suspect in the Loop area described as a black male with salt and pepper hair wearing a Blackhawks jacket.

42.    Before long, Mr. Chatman was located walking around the downtown area wearing his Blackhawks jacket. He is African American and had salt and pepper hair.

43.    After finding him, Officers arrested Mr. Chatman at approximately 8:30 a.m.

44.    At the time he was arrested, Defendant Officers Griffin and Karczewski falsely claimed that Mr. Chatman said he was coming from the Daley Center. This allegation was false. Mr. Chatman was not at the Daley Center on the morning of the 24th, and he did not claim that he was.

**Mr. Chatman's Vulnerabilities**

45.    When not properly medicated, Mr. Chatman suffers from a mental illness that interferes with his ability to function properly. He experiences disorganized thoughts, pressured speech, and an inability to think in a linear or logical matter at times.

46.    At the time of his interrogation sessions with the

various Defendants, Mr. Chatman was having difficulty communicating in a logical and linear fashion due to his then-existing mental condition.

47. As a result of Mr. Chatman's inability to communicate in a normal manner, it was immediately obvious to any person who questioned Mr. Chatman at any point on May 24 or May 25, 2002, that he was suffering from cognitive deficiencies and symptoms of unmedicated mental illness.

### Mr. Chatman's False "Confession"

48. Following his 8:30 a.m. arrest, Mr. Chatman was brought to Area 4 Detective Headquarters and questioned by Defendant Detectives Mischka and Boock.

49. Mr. Chatman had never in his life previously been accused of a crime involving violence, and has never committed one.

50. During his interrogation by Defendants Mischka and Boock, Mr. Chatman initially maintained his innocence and did not implicate himself.

51. At approximately 10:30 p.m., Defendant Detective Roberts began interrogating Mr. Chatman.

52. When Defendant Roberts began his interrogation, the pressure to obtain a confession from Mr. Chatman was mounting. Per her plan, Defendant Riggio publicized the (false) attack.

11

The rape of a woman inside the Daley Center in the heart of the Loop had by then generated a tremendous amount of media attention. There existed a belief among each of Defendants Roberts, Holmes, Mischka, Boock, Midona, and Walsh that getting Mr. Chatman to confess was the surest way to obtain a speedy resolution.

53.  During the interrogation, Defendant Roberts used force and threats of force to coerce Mr. Chatman to confess.

54.  Before Mr. Chatman confessed, Defendants ASA Holmes, Detective Midona, and Sergeant Walsh joined Defendant Roberts in his interrogation of Mr. Chatman.

55.  Defendants Roberts, Holmes, Midona, and Walsh observed Mr. Chatman's obvious cognitive deficiencies and symptoms of mental illness. Rather than take steps to ensure Mr. Chatman was truly and freely agreeing to confess, these Defendants took advantage of his diminished capacity and mental vulnerabilities, and continued their interrogation in a manner intended to force Mr. Chatman to falsely confess.

56.  Eventually, Defendants Roberts, Holmes, Mischka, Boock, Midona, and Walsh overcame Mr. Chatman's will through improper means, and thereby succeeded in coercing him to sign a false confession to the alleged rape.

57.  Mr. Chatman's resulting confession included various

12

factual details that could only have been known by someone who committed the crime, had it actually occurred, or by someone with access to the police reports describing the alleged crime.

58. Mr. Chatman had no personal knowledge of the facts and circumstances surrounding the alleged rape contained in his confession. Instead, Mr. Chatman was fed details of the crime by Defendants Roberts, Holmes, Mischka, Boock, Midona, and Walsh. Being totally innocent, and having no knowledge of Defendant Riggio's allegations, Mr. Chatman could not have provided the information contained in his confession without those Defendants having provided this information to him during the course of his interrogation.

59. Not only did the Defendants feed Mr. Chatman all of the details of the alleged crime, but Defendants Holmes, Roberts, Midona, and Walsh walked Mr. Chatman through the crime scene to ensure that he had first-hand knowledge of the crime scene. These Defendants were subjectively aware that Mr. Chatman had no information about the alleged rape, and they walked him through the crime scene in order to provide him with the relevant facts and circumstances to bolster his "confession."

### The Forensic Evidence

60. Not only did Mr. Chatman not commit the crime to which he "confessed," but there is no physical evidence to corroborate

13

his supposed confession, or even the rape itself.

61. For example, Defendant Riggio claimed to have been badly beaten by Mr. Chatman during what she claimed was a vaginal and anal rape. However, the thorough medical examination that Defendant Riggio underwent immediately after the alleged assault revealed no tears, scrapes, bleeding, bruises, cuts, lacerations, abrasions, or other injuries to her body, genitals, or rectum.

62. Defendant Riggio's clothing and swabs taken from her body were subjected to clinical scrutiny, including DNA testing. Neither Mr. Chatman's semen, hair, nor any other genetic material from Mr. Chatman (nor anyone else, for that matter) was found on Defendant Riggio's vagina, rectum, other body parts, or clothing.

63. Mr. Chatman's clothing was also collected shortly after the alleged assault and analyzed by forensic scientists, including by subjecting it to DNA testing. Despite an exhaustive search, Defendant Riggio's genetic material was not found anywhere on Mr. Chatman's body or clothing.

64. Defendant Riggio also claimed to have urinated on Mr. Chatman and bit him on the left shoulder of his coat, and a pool of urine was discovered at the crime scene. Extensive DNA testing revealed that none of Defendant Riggio's urine or saliva

14

appeared anywhere on Mr. Chatman's clothing.

65.   Mr. Chatman's fingerprints were not found anywhere at the scene, even on the items the attacker allegedly touched, such as the scissors allegedly held to Riggio's neck.

66.   In sum, none of the forensic testing linked Mr. Chatman to the alleged sexual assault. None of the forensic testing suggested that a sexual assault occurred at all.

### Mr. Chatman's Impossible "Escape"

67.   Defendant Riggio claimed that her sexual assault occurred at approximately 7:20 a.m. According to Riggio, the entire incident, beginning when Chatman appeared at her office door, lasted seven minutes.

68.   As stated above, Defendant Riggio told one of her co-workers, Jeannette Neibauer, about the alleged attack when Neibauer arrived at work. Neibauer, who did not see Mr. Chatman, reported Defendant Riggio's purported attack to the authorities at 7:37 a.m., some ten minutes after it supposedly ended.

69.   By 7:41 a.m., the Sheriff's Department locked down the entire building, notifying all security posts to close the building and prevent anyone from entering or exiting.

70.   The Sheriff's Department and a private security company then conducted a floor-by-floor search for Defendant Riggio's alleged attacker.

15

71.  The search failed to locate anyone. More specifically, Mr. Chatman was not seen anywhere inside the building, nor leaving it.

72.  The fact that Mr. Chatman was never found in or leaving the building is particularly noteworthy. The Daley Center was closed to the public before 8 a.m. At the time Defendant Riggio claimed to be attacked, only authorized court personnel were allowed in the building. Moreover, there were very few people using the entrances or exits early that morning, which was the Friday before Memorial Day weekend.

73.  Any person attempting to enter or leave the Daley Center during this time period would have been observed. Between 7 a.m. and 8 a.m., every exit from the Daley Center was guarded by at least one Sheriff's deputy, and video cameras were stationed to record the exits.

74.  Neither Mr. Chatman nor anyone fitting his description appeared on security video taken of the Daley Center exits between 6:30 and 8:20 a.m. on May 24, 2002. Not one of the ten deputy sheriffs at the six doors exiting the Daley Center between 7:00 and 8:00 a.m. saw Mr. Chatman leaving the building or anywhere near the building.

**Riggio's 1979 Allegations Against Edward Szymczak**

75.  As previously stated, Mr. Chatman's case was not the

16

first time that Defendant Riggio claimed that she had been raped early in the morning in a large office building. Unbeknownst to investigators on May 24, 2002, Defendant Riggio had made identical allegations against another innocent man 20 years before.

76. On October 23, 1979, Defendant Riggio claimed that she was raped at her workplace.

77. In that alleged 1979 attack, as in the new one, Defendant Riggio claimed that she arrived to work in the early morning hours when none of her co-workers were present to witness the events at a downtown office building. In the 1979 version, Defendant Riggio said she arrived between 6:45 and 7:00 a.m., whereupon one of the building's janitors, Edward Szymczak, supposedly showed her a knife, pushed her into the bathroom, and attacked her.

78. Defendant Riggio claimed that Szymczak repeatedly asked her name and told her to look at him, told her to remove her clothing, and eventually sexually assaulted her. Defendant Riggio said that she and Szymczak struggled before the rape. Defendant Riggio further claimed that Szymczak kept asking her name and told her to be quiet as he raped her. When the assault ended, Defendant Riggio claimed that Szymczak told her to stay in the bathroom, and he left, presumably to go back to work.

79.  Defendant Riggio claimed her alleged attacker spoke to her in English, and she did not recall him having an accent.

80.  Unbeknownst to Defendant Riggio, however, Szymczak was a Polish immigrant who spoke no English and needed a Polish translator for police interviews and later court proceedings.

81.  Based on Defendant Riggio's allegations, Szymczak was charged with rape and unlawful restraint. He maintained his innocence, insisting that he had nothing to do with Defendant Riggio, and had raped no one.

82.  Defendant Riggio retained legal counsel by November 6, 1979, less than two weeks after accusing Szymczak. She proceeded to file a civil suit based on her allegations against Szymczak, seeking in excess of four million dollars in damages. Her lawsuit named as defendants the office building owners, the building management company, the contracted janitorial service, the contracted security company, and others.

83.  In connection with the civil lawsuit Defendant Riggio filed against the building and its security company arising out of her allegations about the purported Szymczak rape, Defendant Riggio ultimately settled her case and received a cash payment.

84.  Due to the false accusations against him, Szymczak fled to Poland and was never tried. After Defendant Riggio filed her high-profile law suit, Szymczak sent a letter to the court

18

proclaiming his innocence. The English translation of the letter

reads:

> To the Court of the State of Illinois:
>
> I have been charged with raping citizen Susan, without any
> evidence or basis for such accusation. I did not even know
> her. Because I have been in the United States for only a
> short period of time and do not have money for an attorney,
> I am forced to leave the country. I am very sorry to do
> that. Please forward this letter to citizen Susan, so she
> may once more think about what she is doing. If someone did
> rape her, they should be convicted and sentenced. However,
> if she has only made this whole thing up to make some
> money, she should earn money honestly and not like this.
> She should know that she will answer to God for her
> actions. I also ask that this Court not let this incident
> constitute a black mark on the record of my stay in the
> United States and on my life.
>
> > Sincerely,
> >
> > Edward Szymczak

85.  People who knew and worked with Szymczak were shocked

by the allegations against him; by all accounts, he was an

excellent employee who worked well with others and had no

reputation for behaving violently, abusively, or inappropriately

toward women or other people. Indeed, Szymczak's employer,

Millard Maintenance, sent the following letter to the Polish

Consulate and the ACLU asking for assistance with exonerating

Szymczak:

> Can you be of assistance to a[n] employee of ours, who is
> [a] Polish immigrant, limited English, excellent work
> record, was switched to a different location, 625 N.

Michigan, and is being accused of rape. He cannot shoulder the financial payment of $6000 legal. The company is not in a position to defend him. We feel it is a bum rap. What are his alternatives.

86.  Like Mr. Chatman, Szymczak's life has been devastated by Defendant Riggio's false accusation of rape. Not only was he forced to abandon his dream of working hard to make a life for himself and his family in the United States, but he lives the rest of his days under a cloud of Defendant Riggio's false accusations.

## Riggio's Financial Motivations in 2002

87.  Before Defendant Riggio made her allegations against Mr. Chatman, she had again begun experiencing serious financial problems.

88.  Specifically, on April 29, 2002, less than one month before her allegations against Mr. Chatman, Defendant Riggio and her husband received a letter from the United States Internal Revenue Service ("IRS"), notifying them that their tax return for tax year 2000 was being audited.

89.  The IRS audit frightened Defendant Riggio and her husband; together, they had nearly $550,000 in gambling winnings in 2000, which they had failed to report on their tax return (and which they subsequently lost through even more gambling).

90.  Less than one month after Defendant Riggio received

20

notification that the IRS would audit her tax return, Defendant Riggio claimed that she was attacked in the Daley Center. In her lawsuit filed just after the claimed attack, Defendant Riggio falsely inflated her damages.

91. When Defendant Riggio was first examined by a doctor on May 24, 2002, she had no evidence of injury anywhere on her body.

92. Four years later, however, at a deposition in the civil litigation, Defendant Riggio claimed to have sustained serious injuries as a result of Chatman's alleged sexual assault, including permanent damage to her internal and external genitalia, which caused her genitals to hurt and to feel "dead" and numb.

93. Defendant Riggio further claimed she suffered ongoing damage to her groin muscle, broken teeth, and scarring to her hip. None of these alleged injuries were noted in any of Defendant Riggio's medical visits in the months following the alleged assault.

94. As of 2006, Defendant Riggio claimed that she was no longer able to work for a living because she was unable to perform any job as a result of her claimed sexual assault.

95. This was not the first time that Defendant Riggio exaggerated her injuries in a lawsuit, just as this was not the

first time that Defendant Riggio had falsely claimed rape and sued. In 1989, Defendant Riggio was in a car accident. In the subsequent legal action, she claimed that she contracted Parkinson's disease as a result of the impact.

96.    Miraculously, Defendant Riggio's Parkinson's disease somehow cured itself in the intervening years, to the point where she no longer requires any treatment for it.

### Defendants' Additional Misconduct

97. Although Defendant Riggio set the ball in motion, Mr. Chatman's wrongful conviction could not have occurred without the other Defendants' malfeasance.

98.    The Law Enforcement Defendants committed one or more of the following types of misconduct: coercing a false confession from Mr. Chatman; withholding material exculpatory evidence from Mr. Chatman; destroying exculpatory evidence; and fabricating inculpatory evidence that was used to help convict Mr. Chatman.

99.    As stated above, Mr. Chatman was coerced to falsely confess to a crime he did not commit by Defendants Holmes, Walsh, Boock, Roberts, Mischka, and Midona. According to these Defendants, Mr. Chatman freely confessed in detail to a violent rape that he did not commit.

100. What makes these Defendants' misconduct even more

egregious is that they took advantage of a mentally-compromised and damaged individual in the process. Although civilian witnesses who interacted with Mr. Chatman even for brief periods of time during the week of May 20, 2002, described him as "incoherent," the Law Enforcement Defendants concealed any suggestion of Mr. Chatman's cognitive deficits from their reports.

101. Rather, Defendants Roberts and Holmes both maintained that they had absolutely no difficulty in understanding Mr. Chatman and that he had no problems communicating with them. These representations were totally false.

102. Upon being admitted to the Cook County Jail, Mr. Chatman was given a five-minute screening of his physical and mental health, during which intake personnel immediately perceived that something was seriously wrong with Mr. Chatman, who was promptly admitted to the acute care unit of the Jail. Detainees are placed in the acute care unit only if they are expressing mental health symptoms that require 24-hour psychiatric care.

### Further Withholding Of Exculpatory Evidence

103. Due to Defendants' misconduct, Mr. Chatman was deprived of crucial evidence that could have avoided his wrongful conviction, including but not limited to the existence

of a witness who could testify the rape never occurred, and certainly not in the manner Defendant Riggio claimed.

104. In particular Defendant Riggio claimed that she engaged in an all-out fight for her life, screaming at least three times for a deputy to come to her assistance.

105. When responding officers, including Defendants Deputy Sergeant Maria Mokstad, Deputy Joseph Prince, and Deputy Michael Cokeley, arrived at the crime scene, it turned out by chance that a building employee, Cook County Sheriff's Deputy Michael Copeland, was fast asleep in the room directly next door to the crime scene with his shirt off.

106. Despite having been in the room next door to the alleged attack, Copeland told the responding officers that he heard no sign of any struggle whatsoever. In fact, the first indication Deputy Copeland had that something was amiss was when he heard the radios of other officers responding to a 911 call about the supposed attack, well after the "attack" ended.

107. On the morning of May 24, 2002, Defendants Cokeley, Prince, Mokstad, and Deputy Lieutenant Cartrette all knew that Deputy Copeland had been sleeping in the room next door to where Defendant Riggio claimed to have been attacked.

108. Indeed, that same morning, Defendant Cartrette had Deputy Copeland handwrite a statement acknowledging that he was

sleeping in room 2103A, next door to room 2101A, and that he heard nothing until officers began responding to the allegation that Defendant Riggio had been assaulted.

109. Defendant Detectives McGreal and Pena interviewed Defendants Cokeley, Prince, Mokstad, and Cartrette on May 24, 2002. Although each of these Defendants learned that Deputy Copeland knew information that would exculpate Mr. Chatman, these Defendants hid that information from the criminal justice system and, as a result, from Mr. Chatman.

110. In particular, there is no mention of Deputy Copeland's existence, let alone his nearby presence at the time of the alleged attack, in any of the police reports tendered to Mr. Chatman or his criminal defense counsel. Nor was there any way for Mr. Chatman to discover this information once it was hidden from him by these Defendants.

111. Specifically, Defendant Cokeley communicated to Defendant McGreal that he had seen Deputy Copeland sleeping in the room next to where the crime alleged took place, and Defendant McGreal proceeded to withhold that information from the criminal prosecutors and Mr. Chatman's defense.

112. Pleading in the alternative, Defendant Cokeley did not tell Defendant McGreal the information referenced in the preceding paragraph, and instead intentionally suppressed it.

113. Defendant Prince communicated to Defendant Pena that he had seen Deputy Copeland sleeping in the room next to where the crime alleged took place, and Defendant McGreal proceeded to withhold that information from the criminal prosecutors and Mr. Chatman's defense.

114. Pleading in the alternative, Defendant Prince did not tell Defendant Pena the information referenced in the preceding paragraph, and instead intentionally suppressed it.

115. Defendant Mokstad communicated to Defendant Pena that he had seen Deputy Copeland sleeping in the room next to where the crime alleged took place, and Defendant McGreal proceeded to withhold that information from the criminal prosecutors and Mr. Chatman's defense.

116. Pleading in the alternative, Defendant Mokstad did not tell Defendant Pena the information referenced in the preceding paragraph, and instead intentionally suppressed it.

117. Mr. Chatman lost over a decade of his life before he was finally exonerated. During that time, his wife divorced him, family members died, and Mr. Chatman was falsely branded a rapist and incarcerated alongside some of the most dangerous prisoners in our penal system.

118. Mr. Chatman now seeks to vindicate his rights by holding those responsible for his injuries accountable for their

actions.

**COUNT I**

**42 U.S.C. § 1983 – Coerced and False Confession**
**(Fifth Amendment)**

119. Plaintiff incorporates each paragraph of this
Complaint as if fully restated here.

120. In the manner described more fully above, Defendants
Holmes, Roberts, Walsh, Boock, Mischka, and Midona, acting as
investigators, individually, jointly, and in conspiracy with one
another, as well as under color of law and within the scope of
their employment, forced Plaintiff to incriminate himself
falsely and against his will, in violation of his rights secured
by the Fifth and Fourteenth Amendments.

121. The false statements drafted by the Defendants and
attributed to Plaintiff were used against Plaintiff to his
detriment in a criminal case.

122. The misconduct described in this Count was objectively
unreasonable and was undertaken intentionally, with malice, with
reckless indifference to the rights of others, and in total
disregard of the truth and Plaintiff's innocence.

123. As a result of Defendants' misconduct described in
this Count, Plaintiff suffered loss of liberty, physical and
emotional pain and suffering, and other grievous and continuing

injuries and damages as set forth above.

124. The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that Chicago Police officers regularly used coercive measures to obtain inculpatory statements from criminal suspects.

125. This widespread practice of obtaining statements in violation of the Fifth Amendment was so well-settled as to constitute de facto policy in the Chicago Police Department, and was allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

126. Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because the City of Chicago declined to implement sufficient training and/or any legitimate mechanism for oversight or punishment, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

127. As a direct and proximate result of the City's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

**COUNT II**

**42 U.S.C. § 1983 – Coerced and False Confession
(Fourteenth Amendment)**

28

128. Plaintiff incorporates each paragraph of this
Complaint as if fully restated here.

129. In the manner described more fully above, Defendants
Holmes, Roberts, Walsh, Boock, Mischka, and Midona, acting as
investigators, individually, jointly, and in conspiracy with one
another, as well as under color of law and within the scope of
their employment, forced Plaintiff to incriminate himself
falsely and against his will, in violation of his right to due
process secured by the Fourteenth Amendment.

130. As described in detail above, the misconduct described
in this Count consisted of physical and psychological coercion.
This misconduct to cause an obviously mentally-disabled
individual to falsely implicate himself in a vicious rape that
never occurred, was so severe as to shock the conscience, it was
designed to injure Plaintiff, and it was not supported by any
conceivable governmental interest.

131. The misconduct described in this Count was objectively
unreasonable and was undertaken intentionally, with malice, with
reckless indifference to the rights of others, and in total
disregard of the truth and Plaintiff's clear innocence.

132. As a result of Defendants' misconduct described in
this Count, Plaintiff suffered loss of liberty, physical and
emotional pain and suffering, and other grievous and continuing

injuries and damages as set forth above.

133. The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that Chicago Police Department officers regularly used coercive measures to obtain inculpatory statements from criminal suspects.

134. This widespread practice of obtaining statements in violation of the Fourteenth Amendment was so well-settled as to constitute de facto policy in the Chicago Police Department, and was allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

135. Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because the City of Chicago declined to implement sufficient training and/or any legitimate mechanism for oversight or punishment, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

136. As a direct and proximate result of the City's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

## COUNT III

### 42 U.S.C. § 1983 – Federal Malicious Prosecution[1]

137. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

138. In the manner described above, Defendant Holmes and the Law Enforcement Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, falsely accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

139. In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

140. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total

---

[1] Plaintiff recognizes that this Circuit currently holds that malicious prosecution is not actionable under 42 U.S.C. § 1983 in Illinois. Other Courts of Appeals have taken the opposite position. Plaintiff pleads the claim here to preserve the issue for reconsideration in the Seventh Circuit Court of Appeals or review in the Supreme Court of the United States.

disregard of the truth and Plaintiff's innocence.

141.   As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

142. The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that Chicago Police Department officers regularly used unconstitutional measures to falsely implicate criminal suspects, including by coercing false confessions, withholding exculpatory evidence, fabricating inculpatory evidence, and otherwise instituting and continuing prosecutions maliciously and without probable cause.

143. This widespread practice of instituting and continuing prosecutions maliciously and without probable cause through the use of false confessions, fabrication of inculpatory evidence, and withholding of exculpatory evidence was so well-settled as to constitute de facto policy in the Chicago Police Department, and was allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

144. Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because the City

of Chicago declined to implement sufficient training and/or any legitimate mechanism for oversight or punishment, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

145. As a direct and proximate result of the City's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

**COUNT IV**

**42 U.S.C. § 1983 – Due Process**

146. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

147. As described in detail above, the Law Enforcement Defendants and Defendant Holmes, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

148. In the manner described more fully above, the Law Enforcement Defendants and Defendant Holmes deliberately withheld exculpatory evidence from Plaintiff and from the prosecutors, among others.

149. In addition, the Law Enforcement Defendants and Defendant Holmes, acting as investigators, fabricated evidence and solicited false evidence, including testimony that they knew

to be false and perjured, and fabricated reports implicating Plaintiff in the crime, obtained Plaintiff's conviction using that false evidence, and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

150. The Law Enforcement Defendants and Defendant Holmes' misconduct directly resulted in the unjust criminal conviction of Plaintiff, thereby denying his constitutional right to a fair trial guaranteed by the Fifth and Fourteenth Amendments. Absent this misconduct, the prosecution of Plaintiff could not have and would not have been pursued.

151. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

152. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

153. The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that Chicago Police Department officers regularly used unconstitutional measures to falsely implicate criminal

suspects, including by coercing false confessions, withholding exculpatory evidence, and fabricating inculpatory evidence.

154. This widespread practice was so well-settled as to constitute de facto policy in the Chicago Police Department, and was allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

155. Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because the City of Chicago declined to implement sufficient training and/or any legitimate mechanism for oversight or punishment, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

156. As a direct and proximate result of the City's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

**COUNT V**

**42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights**

157. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

158. Prior to Plaintiff's conviction, all of the individual Defendants, excepting those sued in their official capacity, acting in concert with other co-conspirators, known and unknown,

reached an agreement among themselves to frame Plaintiff for a crime he did not commit and thereby to deprive him of his constitutional rights, all as described in the various paragraphs of this Complaint.

159. In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

160. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

161. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

162. As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VI

### 42 U.S.C. § 1983 – Failure to Intervene

163. Plaintiff incorporates each paragraph of this

Complaint as if fully restated here.

164. In the manner described above, during the constitutional violations described herein, one or more of the Law Enforcement Defendants and Defendant Holmes stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

165. As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

166. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

167. The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that Chicago Police Department officers regularly failed to intervene to prevent the violation of suspects' constitutional rights.

168. This widespread practice of failing to intervene to prevent the violation of suspects' constitutional rights was so well-settled as to constitute de facto policy in the Chicago

37

Police Department, and was allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

169. Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because the City of Chicago declined to implement sufficient training and/or any legitimate mechanism for oversight or punishment, thereby leading officers to believe that they ignore the violation of citizens' constitutional rights with impunity.

170. As a direct and proximate result of the City's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

## Count VII – 42 U.S.C. § 1983

### Supervisory Liability

171. Each paragraph of this Complaint is incorporated as if restated fully herein.

172. Plaintiff's malicious prosecution and wrongful conviction were caused by the intentional misconduct by the supervisory defendants, including Defendants Walsh, Holy, and Joria, or when they were deliberately, recklessly indifferent to their subordinates' misconduct, knowing that turning a blind eye to that misconduct would necessarily violate Mr. Chatman's constitutional rights.

173. Specifically, these supervisory defendants were aware of and facilitated, condoned, and oversaw the coercive tactics used by some of the Defendants to obtain Plaintiff's false confession, or were deliberately, recklessly indifferent to their subordinates' unconstitutional tactics.

174. Moreover, these supervisory Defendants were aware of and facilitated, condoned, and oversaw the withholding of exculpatory evidence, including but not limited to the existence of the sleeping deputy referenced above, but failed to disclose that information, or were deliberately, recklessly indifferent to their subordinates' unconstitutional actions in withholding exculpatory evidence.

175. In addition, these supervisory Defendants were aware of and facilitated, condoned, and oversaw the fabrication of inculpatory evidence, or were deliberately, recklessly indifferent to their subordinates' unconstitutional actions in fabricating exculpatory evidence.

176. The personal involvement of the defendant supervisors, through their actions and omissions, proximately and directly caused the constitutional deprivations and grievous personal injuries suffered by Plaintiff, including the above-mentioned injuries and damages.

177. The misconduct described in this Count was objectively

unreasonable, and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's clearly established constitutional rights.

## COUNT VIII

### State Law Claim – Malicious Prosecution

178. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

179. In the manner described above, the individual Defendants, excepting those sued in their official capacity, acting as investigators, individually, jointly, or in conspiracy with one another, as well as within the scope of their employment, falsely accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

180. In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

181. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total

40

disregard of the truth and Plaintiff's innocence.

182. As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT IX

### State Law Claim – Intentional Infliction of Emotional Distress

183. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

184. The actions, omissions, and conduct of the individual Defendants, excepting those sued in their official capacity, as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

185. As a direct and proximate result of the Defendants' actions, Plaintiff suffered and continues to suffer emotional distress and other grievous and continuing injuries and damages as set forth above.

## COUNT X

### State Law Claim – Civil Conspiracy

186. Plaintiff incorporates each paragraph of this

Complaint as if fully restated here.

187. As described more fully in the preceding paragraphs, the individual Defendants, excepting those sued in their official capacities, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

188. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

189. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

190. As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT XI

### State Law Claim – Defamation

191. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

192. Defendant Riggio published and caused to be published intentionally false statements about or concerning Plaintiff that she knew to be false, including repeatedly falsely accusing Plaintiff of rape, and in so doing committed defamation per se.

193. By engaging in the misconduct described in this Count, Defendant Riggio made demonstrably false statements about and concerning Plaintiff to third parties, and she caused those statements to be widely published in major public newspapers distributed throughout the entire world. The things Defendant Riggio said about or concerning Plaintiff were malicious, shocking, outrageous, and offensive, and Defendant Riggio made these statements knowing that they were entirely false.

194. The statements made by Defendant Riggio described above are wholly untrue accusations of rape, which is a crime that constitutes defamation per se in Illinois.

195. Defendant Riggio acted with actual malice, reckless intent and gross indifference to the false and misleading nature of her statements about and concerning Plaintiff when she made them to third parties.

196. These defamatory falsehoods were made with actual malice by Defendant Riggio inasmuch as she knew of their falsity or recklessly disregarded their truth or falsity.

197. As a result of Defendant Riggio's misconduct described in this Count, Plaintiff suffered injuries, including but not limited to reputational damages, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

198. In particular, Defendant Riggio's defamatory publications have injured and continue to injure Plaintiff in the following ways, among others: (a) by impugning Plaintiff's personal reputation in the community such that individuals who Plaintiff interacts with question whether he is a rapist; (b) by limiting Plaintiff's employment options and his future career prospects; (c) by causing Plaintiff to be prosecuted and convicted for a crime he did not commit and spend over 11 years wrongfully imprisoned; and (d) by subjecting Plaintiff to harassment and additional persecution for a crime he did not commit.

199. The actions and omissions of Defendant Riggio set forth in this Count demonstrate malice, egregious defamation, and insult. Defendant Riggio's actions and omissions were

undertaken either with malice, spite, ill will, vengeance, or deliberate intent to harm Plaintiff, or with reckless disregard to the falsity of the speech and its effect on Plaintiff. Accordingly, Plaintiff is entitled to punitive damages and attorneys' fees beyond those damages, described above, that will compensate Plaintiff for injuries resulting from Defendant Riggio's conduct.

## COUNT XII

### State Law Claim – Respondeat Superior

200. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

201. While committing the misconduct alleged in the preceding paragraphs, Defendant Holmes and the Law Enforcement Defendants were employees, members, and agents of the City of Chicago, the Cook County Sheriff's Department, and the Cook County State's Attorney's Office, acting at all relevant times within the scope of their employment.

202. Defendants City of Chicago, Sheriff Dart, State's Attorney Alvarez, are liable as principals for all torts committed by their agents.

## COUNT XIII

### State Law Claim – Indemnification

203. Plaintiff incorporates each paragraph of this

Complaint as if fully restated here.

204. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment.

205. Defendant Holmes and the Law Enforcement Defendants were employees, members, and agents of the City of Chicago, the Cook County Sheriff's Department, and/or the Cook County State's Attorney's Office, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

206. Cook County is obligated by Illinois statute to pay any judgment entered against the Sheriff of Cook County in his official capacity.

207. Cook County is obligated by Illinois statute to pay any judgment entered against Defendants Holmes or Alvarez.

WHEREFORE, Plaintiff CARL CHATMAN, respectfully requests that this Court enter a judgment in his favor and against Defendants City of Chicago, Chicago Police Detective John Roberts, Chicago Police Detective Thomas McGreal, Chicago Police Detective Maria Pena, Chicago Police Detective Jack Boock, Chicago Police Detective Rita Mischka, Chicago Police Detective Barbara Midona, Chicago Police Sergeant Dennis Walsh, Chicago

Police Officer Michael Karczewski, Chicago Police Officer Richard Griffin, Chicago Police Lieutenant Joseph Joria, Chicago Police Sergeant Bryan Holy, and unknown Chicago Police Officers, along with the County of Cook, Assistant State's Attorney Brian Holmes, Cook County Sheriff's Deputy Michael Cokeley, Cook County Sheriff's Deputy Joseph Prince, Cook County Sheriff's Deputy Sergeant Maria Mokstad, Cook County Sheriff's Deputy Lieutenant Burrough Cartrette, unknown Cook County Sheriff's Deputies, Thomas Dart in his official capacity as Sheriff of Cook County, and Anita Alvarez in her official capacity as Cook County State's Attorney; together with Susan Riggio, awarding compensatory damages, attorneys' fees and costs against each Defendant, punitive damages against each of the individual Defendants, excepting those sued in their official capacities, and any other relief this Court deems just and appropriate.

JURY DEMAND

Plaintiff, CARL CHATMAN, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

Russell Ainsworth
One of Plaintiff's Attorneys

Arthur Loevy
Jon Loevy
Russell Ainsworth
Elizabeth Wang
LOEVY & LOEVY
312 N. May St., Ste. 100
Chicago, IL 60607
(312) 243-5900