## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| CARL CHATMAN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 14 CV 2945 |
| | ) | Judge John Z. Lee |
| CITY OF CHICAGO, et al. | ) | |
| | ) | |
| Defendants. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |

### SHERIFF DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S SECOND AMENDED COMPLAINT

NOW COME Cook County Sheriff's Deputy Lieutenant Burrough Cartrette, Cook County Sheriff's Deputy Sergent Maria Mokstad and Cook County Sheriff's Deputy Michael Cokeley ("Individual Sheriff Defendants") and Defendant Thomas Dart, in his Official Capacity as Sheriff of Cook County, (the "Sheriff" or the "Sheriff's Office")(the Sheriff, together with the Individual Defendants, "Sheriff Defendants"), by and through their undersigned counsel, and for their Answer and Affirmative Defenses to Plaintiff's Second Amended Complaint, state as follows:

1.     Carl Chatman spent more than eleven years in prison for a rape he did not commit.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

2.     Not only did Mr. Chatman not commit the rape for which he was wrongfully convicted, but the rape never even occurred at all. The purported victim made up an account of having been raped in Chicago's Daley Center so that she could bring a law suit for money damage against the company responsible for the building's security.

**ANSWER:**    Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

3.    This marked the second time this same woman had fabricated rape charges in order to bring a legal action against a building security company for illicit financial gain.

**ANSWER:**    Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

4.    After the purported rape victim made up the story of having been attacked in the Daley Center, the Defendants proceeded to "solve" the crime. Specifically, in their zealousness to obtain a swift conviction in a high-profile case, the Defendant Chicago Police Officers took advantage of Mr. Chatman's mental instability and coerced him to falsely confess to a crime that never actually happened.

**ANSWER:**    This allegation is not directed toward the Sheriff Defendants, and the Sheriff's Defendants therefore make no answer to this allegation.  To the extent the Court requires an answer, Sheriff Defendants deny that they were part of any investigation to "solve" the crime, and lack knowledge or information sufficient to form a belief about the truth of the remaining allegations, and therefore, deny the same.

5.    In this way, and based on the resulting false "confession," these Defendants caused Mr. Chatman to be wrongfully convicted to a crime that never even occurred.

**ANSWER:**    This allegation is not directed toward the Sheriff Defendants, and the Sheriff Defendants therefore make no answer thereto.  To the extent the Court requires an answer, Sheriff Defendants deny that they were part of any investigation to "solve" the crime, deny that the Individual Defendants have ever had any contact with Mr. Chatman, and deny any and all remaining allegations against the Sheriff Defendants in this paragraph.  The Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations against the non-Sheriff defendants, and therefore, deny the same.

131224550v1 0964585

6.     The State of Illinois eventually came to recognize that Mr. Chatman's confession was false, and that his conviction was wrongful. In September 2013, the Cook County State's Attorney's Office voluntarily dismissed all charges against Mr. Chatman, and the State of Illinois granted Mr. Chatman a Certificate of Innocence.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

7.     Mr. Chatman's exoneration came after he spent over eleven years as an innocent man in prison. Given his mental state, Mr. Chatman was particularly vulnerable to the worst elements of prison, and his experience there was devastating to his emotional health.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

8.     Through this lawsuit, Mr. Chatman seeks accountability and compensation for losing more than a decade of his life due to Defendants' misconduct.

**ANSWER:**     Sheriff Defendants deny the allegations contained in paragraph 8.

### Jurisdiction and Venue

9.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

**ANSWER:**     Sheriff Defendants admit Plaintiff purports to bring this action pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution, but deny any corresponding liability.

10.     This Court has jurisdiction over federal claims pursuant to 28 U.S.C. § 1331 and state law claims pursuant to 28 U.S.C. § 1367.

**ANSWER:**     Sheriff Defendants admit that this Court has jurisdiction over federal claims and has discretion to hear the state law claims during the pendency of the federal claims.

11.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district and Defendant City of Chicago is a municipal corporation located here. Additionally, the events giving rise to the claims asserted herein occurred within this judicial district.

**ANSWER:**     Except for those allegations directed toward the City of Chicago, to which the Sheriff Defendants make no answer, Sheriff Defendants admit the allegations contained in paragraph 11.

## The Parties

12.     Plaintiff Carl Chatman is 59 years old. He is a veteran of the United States Army.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

13.     Defendant Susan Riggio is a resident of Illinois.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

14.     At all relevant times, Defendants John Roberts, Thomas McGreal, Maria Pena, Jack Boock, Rita Mischka, Barbara Midona, Michael Karczewski, Richard Griffin, Kriston Kato, Dennis Walsh, Bryan Holy, and unknown Chicago police officers were Chicago police officers employed by the City of Chicago and acting within the scope of their employment and under color of law. They are sued in their individual capacities.

**ANSWER:**     This allegation is not directed toward the Sheriff Defendants, and the Sheriff Defendants therefore make no answer thereto.

15.     At all relevant times, Defendants Michael Cokeley, Sergeant Maria Mokstad, Lt. Burrough Cartrette, and unknown Deputies of the Cook County Sheriff's Department were Deputies employed by the Cook County Sheriff and acting within the scope of their employment and under color of law. They are sued in their individual capacities.

**ANSWER:**     Sheriff Defendants admit the allegations contained in paragraph 15, except that as to the "unknown Deputies of the Cook County Sheriff's Department," the Sheriff lacks

131224550v1 0964585

knowledge or information sufficient to form a belief about the truth of the allegation as to these "unknown Deputies," and therefore, denies the same.

16.     At all relevant times, Defendant Brian Holmes was an Assistant State's Attorney employed by the Cook County State's Attorney's Office and acting within the scope of his employment and under color of law. He is sued in his individual capacity.

**ANSWER:**     This allegation is not directed toward the Sheriff Defendants, and the Sheriff Defendants therefore make no answer thereto.

17.     Defendants John Roberts, Thomas McGreal, Maria Pena, Jack Boock, Rita Mischka, Barbara Midona, Michael Karczewski, Richard Griffin, Kriston Kato, Sergeant Dennis Walsh, Sergeant Bryan Holy, Michael Cokeley, Sergeant Maria Mokstad, Lt. Burrough Cartrette, unknown Chicago police officers and unknown Deputies of the Cook County Sheriff's Department are referred to collectively as the "Law Enforcement Defendants." They are sued in their individual capacities.

**ANSWER:**     Sheriff Defendants deny that these defendants should be referenced collectively, as the Individual Sheriff's Defendants have distinct defenses to Plaintiff's claims that are not shared by the other defendants referenced in paragraph 17 above;  furthermore, Plaintiff has distinct theories of liability and factual allegations against the non-Sheriff defendants listed above which are not alleged against the Individual Sheriff Defendants.

18.     Defendant Karen Wojtczak was an investigator for the Office of Professional Standards, including from February 2004 to October 2004.

**ANSWER:**     This allegation is not directed toward the Sheriff Defendants, and they therefore make no answer thereto.

19.     Defendant Millicent Willis was the Acting Chief Administrator of the Office of Professional Standards from January 2002 through July 2002. She is sued in her individual capacity.

131224550v1 0964585

**ANSWER:** This allegation is not directed toward the Sheriff Defendants, and they therefore make no answer thereto.

20. Defendant Lori Lightfoot was the Chief Administrator of the Office of Professional Standards from August 1, 2002 until July 2004. She is sued in her individual capacity.

**ANSWER:** This allegation is not directed toward the Sheriff Defendants, and they therefore make no answer thereto.

21. Defendant Tisa Morris was Chief Administrator of the Office of Professional Standards from August 2004 until 2006. She is sued in her individual capacity. Wojtczak, Baird, Willis, Lightfoot, and Morris are henceforth collectively referred to as the "O.P.S. Defendants."

**ANSWER:** This allegation is not directed toward the Sheriff Defendants, and they therefore make no answer thereto.

22. The Defendant City of Chicago is a municipal corporation under the laws of the State of Illinois. The City operates the Chicago Police Department ("CPD"), and it operated the Office of Professional Standards ("O.P.S."). The City is responsible for the policies and practices of the City, the CPD, and O.P.S.

**ANSWER:** This allegation is not directed toward the Sheriff Defendants, and they therefore make no answer thereto.

23. Defendant Thomas Dart is the current Sheriff of Cook County, Illinois. He is sued in his official capacity.

**ANSWER:** Sheriff Defendants admit that Thomas Dart is the current Sheriff of Cook County, Illinois, and that Plaintiff purports to sue him in his official capacity, but deny any corresponding liability.

24. Defendant Anita Alvarez is the current State's Attorney for Cook County, Illinois. She is sued in her official capacity.

6

**ANSWER:** This allegation is not directed toward the Sheriff Defendants, and they therefore make no answer thereto.

25. Defendant Cook County is a county of the State of Illinois. Cook County is obligated by Illinois statute to pay any judgment entered against Defendant Dart or Defendant Alvarez in their official capacities.

**ANSWER:** The Sheriff Defendants admit the allegations as to Defendant Dart, and further state that the allegations regarding Defendant Alvarez are not directed toward the Sheriff Defendants and they therefore make no answer thereto.

**Factual Background**

26. Carl Chatman was born in 1954 and grew up in Chicago with his two sisters and brother.

**ANSWER:** Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

27. At the age of 20, Mr. Chatman married and enlisted in the military. At the conclusion of his military service, Mr. Chatman returned to Chicago, where he and his wife had a son.

**ANSWER:** Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

28. By the turn of the new millennium, Mr. Chatman had fallen on hard times. He was an easily confused and extremely vulnerable man.

**ANSWER:** Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

131224550v1 0964585

**Defendant Riggio Targets Mr. Chatman**

29.     During the week of May 20, 2002, Mr. Chatman went to the Daley Center to investigate how to file a small claims suit.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

30.     At the time, Defendant Susan Riggio, age 50 at the time, worked as a scheduling clerk for Judge Bartkowicz, who sat in courtroom 2101 at the Daley Center.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

31.     Defendant Riggio claims that, while Mr. Chatman was at the Daley Center early in the week of May 20, 2002, she encountered Mr. Chatman.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

32.     At the time, Mr. Chatman was wearing a Blackhawks jacket and street clothes.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

33.     Based on this encounter, Defendant Riggio knew what Mr. Chatman looked like, and also knew that he was a defenseless and guileless individual, who would not fare well if falsely accused. He was, in short, the perfect target for her plan.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

**Riggio's Plan**

34.     Shortly before May 20, 2002, Defendant Riggio had received notice from the IRS that she was to be audited for her prior tax filings.

131224550v1 0964585

__ANSWER:__     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

35.     At the time, Defendant Riggio was also under severe financial pressures. She and her husband had been gambling heavily, and had experienced over $500,000 in losses in the year 2000 alone. Defendant Riggio was also intent on divorcing her husband.

__ANSWER:__     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

36.     Faced with these financial pressures, Defendant Riggio concocted a plan to falsely claim that she had been raped inside the Daley Center, thereby enabling her to sue various entities responsible for the Daley Center's security.

__ANSWER:__     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

37.     Defendant Riggio had engaged in the exact same scheme some 20 years earlier. In 1979, facing different financial pressures, Defendant Riggio falsely claimed that she was raped inside a downtown office building in the early morning hours, before anyone else had arrived to work. Defendant Riggio then sued the building's management and received a cash settlement.

__ANSWER:__     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

38.     Having succeeded in the 1970s with a bogus civil suit against a building manager based on a false accusation of rape, Defendant Riggio decided to pull the same scam all over again. This time, Mr. Chatman was her victim.

__ANSWER:__     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

### The False Allegation

39.     On May 24, 2002, Defendant Riggio went to work very early. Although not scheduled to work until 8:30 a.m., she arrived at the Daley Center at 7 a.m., long before any of

131224550v1 0964585

her co-workers arrived. She did so notwithstanding that it was the Friday before the Memorial Day weekend holiday, and the judge for whom she worked was out of town.

**ANSWER:** Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

40. Defendant Riggio claimed that at approximately 7:20 a.m., while she was alone in her office behind courtroom 2101, Mr. Chatman appeared with his penis exposed and said words to the effect of, "the judge fucked me and now I'm going to fuck you, bitch."

**ANSWER:** Defendants Mokstad and Cokeley admit only that after the incident, Ms. Riggio stated something about "fuck the judge," but lack knowledge or information sufficient to form a belief about the truth of the remaining allegations, and therefore, deny the same. Defendant Cartrette admits only that after the incident, Ms. Riggio said something about being "fucked by the judge," but lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations, and therefore, denies the same.

41. According to Defendant Riggio, she fought with her attacker, screaming for help, and was then raped in her vagina and anus. She claimed that during the altercation, she fought for her life with her attacker and had her head beaten against a table and scissors held to her throat.

**ANSWER:** Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

42. When one of Defendant Riggio's co-workers, Jeannette Neibauer, arrived for work, Riggio told her about the alleged attack, whereupon Neibauer called the police.

**ANSWER:** Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

43. When the police officers arrived, Defendant Riggio falsely claimed that Mr. Chatman was the man who raped her, and provided the responding officers with a

131224550v1 0964585

description of an African American man in the Blackhawks jacket (Mr. Chatman) who she claimed to have seen on her floor earlier in the week.

**ANSWER:**    Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of what Defendant Riggio told the responding police officers, and therefore, deny the same.

### Mr. Chatman's Arrest

44.    Shortly after Defendant Riggio reported the crime, a flash message went out to members of the police department, alerting them to look for a potential suspect in the Loop area described as a black male with salt and pepper hair wearing a Blackhawks jacket.

**ANSWER:**    Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

45.    Before long, Mr. Chatman was located walking around the downtown area wearing his Blackhawks jacket. He is African American and had salt and pepper hair.

**ANSWER:**    Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

46.    After finding him, Defendants Griffin and Karczewski arrested Mr. Chatman at approximately 8:30 a.m.

**ANSWER:**    Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

47.    At the time he was arrested, Defendant Officers Griffin and Karczewski falsely claimed that Mr. Chatman said he was coming from the Daley Center. This allegation was false. Mr. Chatman was not at the Daley Center on the morning of the 24th, and he did not claim that he was.

**ANSWER:**    Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

131224550v1 0964585

**Mr. Chatman's Vulnerabilities**

48.     When not properly medicated, Mr. Chatman suffers from a mental illness that interferes with his ability to function properly. He experiences disorganized thoughts, pressured speech, and an inability to think in a linear or logical matter at times.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

49.     At the time of his interrogation sessions with the various Defendants, Mr. Chatman was having difficulty communicating in a logical and linear fashion due to his then existing mental condition.

**ANSWER:**     The Individual Sheriff Defendants deny that they ever interacted with Mr. Chatman at any time, and the Sheriff Defendants therefore lack knowledge or information sufficient to form a belief about the truth of the allegation, and as a result, deny the same.

50.     As a result of Mr. Chatman's inability to communicate in a normal manner, it was immediately obvious to any person who questioned Mr. Chatman at any point on May 24 or May 25, 2002, that he was suffering from cognitive deficiencies and symptoms of unmedicated mental illness.

**ANSWER:**     The Individual Sheriff Defendants deny that they ever interacted with Mr. Chatman at any time, and the Sheriff Defendants therefore lack knowledge or information sufficient to form a belief about the truth of the allegation, and as a result, deny the same.

**Mr. Chatman's False "Confession"**

51.     Following his 8:30 a.m. arrest, Mr. Chatman was brought to Area 4 Detective Headquarters and questioned by Defendant Detectives Mischka and Boock.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

52.     Mr. Chatman had never in his life previously been accused of a crime involving sexual violence, and has never committed one.

12

**ANSWER:** Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

53. During his interrogation by Defendants Mischka and Boock, Mr. Chatman initially maintained his innocence and did not implicate himself.

**ANSWER:** Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

54. At approximately 10 p.m., Defendant Detective Kato began interrogating Mr. Chatman.

**ANSWER:** Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

55. When Defendant Kato began his interrogation, the pressure to obtain a confession from Mr. Chatman was mounting. Per her plan, Defendant Riggio publicized the (false) attack. The rape of a woman inside the Daley Center in the heart of the Loop had by then generated a tremendous amount of media attention. There existed a belief among each of Defendants Roberts, Holmes, Mischka, Boock, Midona, Kato, and Walsh that getting Mr. Chatman to confess was the surest way to obtain a speedy resolution.

**ANSWER:** The Sheriff Defendants admit only that there was media attention in relation to this incident and lack knowledge or information sufficient to form a belief about the truth of the remaining allegations, and therefore, deny the same.

56. During his interrogation, Defendant Kato used force and threats of force to coerce Mr. Chatman to confess.

**ANSWER:** Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

57. Before Mr. Chatman confessed, Defendants Kato, Roberts, ASA Holmes, Detective Midona, and Sergeant Walsh also interrogated Mr. Chatman.

**ANSWER:**   Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.


58.   Defendants Kato, Roberts, Holmes, Midona, and Walsh observed Mr. Chatman's obvious cognitive deficiencies and symptoms of mental illness. Rather than take steps to ensure Mr. Chatman was truly and freely agreeing to confess, these Defendants took advantage of his diminished capacity and mental vulnerabilities, and continued their interrogation in a manner intended to force Mr. Chatman to falsely confess.

**ANSWER:**   Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.


59.   Eventually, Defendants Kato, Roberts, Holmes, Mischka, Boock, Midona, and Walsh overcame Mr. Chatman's will through improper means, and thereby succeeded in coercing him to sign a false confession to the alleged rape.

**ANSWER:**   Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.


60.   Mr. Chatman's resulting confession included various factual details that could only have been known by someone who committed the crime, had it actually occurred, or by someone with access to the police reports describing the alleged crime.

**ANSWER:**   Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.


61.   Mr. Chatman had no personal knowledge of the facts and circumstances surrounding the alleged rape contained in his confession. Instead, Mr. Chatman was fed details of the crime by Defendants Kato, Roberts, Holmes, Mischka, Boock, Midona, and Walsh. Being totally innocent, and having no knowledge of Defendant Riggio's allegations, Mr. Chatman could not have provided the information contained in his confession without those Defendants having provided this information to him during the course of his interrogation.

**ANSWER:**   Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

131224550v1 0964585

62.    Not only did the Defendants feed Mr. Chatman all of the details of the alleged crime, but Defendants Holmes, Roberts, Midona, and Walsh walked Mr. Chatman through the crime scene to ensure that he had first-hand knowledge of the crime scene. These Defendants were subjectively aware that Mr. Chatman had no information about the alleged rape, and they walked him through the crime scene in order to provide him with the relevant facts and circumstances to bolster his "confession."

**ANSWER:**    Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

## The Forensic Evidence

63.    Not only did Mr. Chatman not commit the crime to which he "confessed," but there is no physical evidence to corroborate his supposed confession, or even the rape itself.

**ANSWER:**    Sheriff Defendants did not investigate the crime and, as such, they lack knowledge or information sufficient to form a belief about the truth of the allegation and therefore deny the same.

64.    For example, Defendant Riggio claimed to have been badly beaten by Mr. Chatman during what she claimed was a vaginal and anal rape. However, the thorough medical examination that Defendant Riggio underwent immediately after the alleged assault revealed no tears, scrapes, bleeding, bruises, cuts, lacerations, abrasions, or other injuries to her body, genitals, or rectum.

**ANSWER:**    Sheriff Defendants did not investigate the crime and, as such, they lack knowledge or information sufficient to form a belief about the truth of the allegation and therefore deny the same.

65.    Defendant Riggio's clothing and swabs taken from her body were subjected to clinical scrutiny, including DNA testing. Neither Mr. Chatman's semen, hair, nor any other genetic material from Mr. Chatman (nor anyone else, for that matter) was found on Defendant Riggio's vagina, rectum, other body parts, or clothing.

15

**ANSWER:**    Sheriff Defendants did not investigate the crime and, as such, they lack knowledge or information sufficient to form a belief about the truth of the allegation and therefore deny the same.

66.    Mr. Chatman's clothing was also collected shortly after the alleged assault and analyzed by forensic scientists, including by subjecting it to DNA testing. Despite an exhaustive search, Defendant Riggio's genetic material was not found anywhere on Mr. Chatman's body or clothing.

**ANSWER:**    Sheriff Defendants did not investigate the crime and, as such, they lack knowledge or information sufficient to form a belief about the truth of the allegation and therefore deny the same.

67.    Defendant Riggio also claimed to have urinated on Mr. Chatman and bit him on the left shoulder of his coat, and a pool of urine was discovered at the crime scene. Extensive DNA testing revealed that none of Defendant Riggio's urine or saliva appeared anywhere on Mr. Chatman's clothing.

**ANSWER:**    Defendants Mokstad and Cokeley admit only that they noticed urine at the crime scene, but lack knowledge or information sufficient to form a belief about the truth of the remaining allegations, and therefore, deny the same.  Defendant Cartrette lacks knowledge or information sufficient to form a belief about the truth of the allegations, and therefore, denies the same.

68.    Mr. Chatman's fingerprints were not found anywhere at the scene, even on the items the attacker allegedly touched, such as the scissors allegedly held to Riggio's neck.

**ANSWER:**    Sheriff Defendants did not investigate the crime and, as such, they lack knowledge or information sufficient to form a belief about the truth of the allegation and therefore deny the same.

16

69.     In sum, none of the forensic testing linked Mr. Chatman to the alleged sexual assault. None of the forensic testing suggested that a sexual assault occurred at all.

**ANSWER:**     Sheriff Defendants did not investigate the crime and, as such, they lack knowledge or information sufficient to form a belief about the truth of the allegation and therefore deny the same.

### Mr. Chatman's Impossible Escape

70.     Defendant Riggio claimed that her sexual assault occurred at approximately 7:20 a.m. According to Riggio, the entire incident, beginning when Chatman appeared at her office door, lasted seven minutes.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

71.     As stated above, Defendant Riggio told one of her coworkers, Jeannette Neibauer, about the alleged attack when Neibauer arrived at work. Neibauer, who did not see Mr. Chatman, reported Defendant Riggio's purported attack to the authorities at 7:37 a.m., some ten minutes after it supposedly ended.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

72.     By 7:41 a.m., the Sheriff's Department locked down the entire building, notifying all security posts to close the building and prevent anyone from entering or exiting.

**ANSWER:**     Sheriff's Defendants (except Cokeley) admit only that Defendant Cartrette issued a notification to prevent anyone from entering and exiting the building shortly after 7:41 a.m., but deny any remaining or contradictory allegation.  Defendant Cokeley admits only that sometime when they were at the crime scene, Defendant Cartrette or Mokstad directed first floor personnel to stop people from entering or exiting the building, but denies any remaining or contradictory allegation.

17

73.    The Sheriff's Department and a private security company then conducted a floor-by-floor search for Defendant Riggio's alleged attacker.

**ANSWER:**    Defendant Cartrette admits only that members of the private security company and certain sheriff's deputies conducted a search to ensure that the attacker was not still in the building so that they could reopen the building, but deny any remaining allegations. The remaining Individual Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations, and therefore, deny the same.

74.    The search failed to locate anyone. More specifically, Mr. Chatman was not seen anywhere inside the building, nor leaving it.

**ANSWER:**    Defendant Cartrette admits only that the search did not locate anyone, but lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations, and therefore, deny the same. The remaining Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph, and therefore, deny the same.

75.    The fact that Mr. Chatman was never found in or leaving the building is particularly noteworthy. The Daley Center was closed to the public before 8 a.m. At the time Defendant Riggio claimed to be attacked, only authorized court personnel were allowed in the building. Moreover, there were very few people using the entrances or exits early that morning, which was the Friday before Memorial Day weekend.

**ANSWER:**    Sheriff Defendants admit only that the Daley Center was closed to the general public before 8 a.m. on May 24, 2002, but deny any remaining or inconsistent allegation.

76.    Any person attempting to enter or leave the Daley Center during this time period would have been observed. Between 7 a.m. and 8 a.m., every exit from the Daley Center was guarded by at least one Sheriff's deputy, and video cameras were stationed to record the exits.

131224550v1 0964585

**ANSWER:** The Sheriff Defendants deny the allegations contained in this paragraph, except that Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations regarding the video cameras and therefore deny the same.

77. Neither Mr. Chatman nor anyone fitting his description appeared on security video taken of the Daley Center exits between 6:30 and 8:20 a.m. on May 24, 2002. Not one of the ten deputy sheriffs at the six doors exiting the Daley Center between 7:00 and 8:00 a.m. saw Mr. Chatman leaving the building or anywhere near the building.

**ANSWER:** The Sheriff's Defendants did not investigate the crime, as such, the Individual Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation and therefore deny the same. The Sheriff's Office denies that deputy sheriffs were stationed directly at the Daley Center doors, denies that paragraph 77 represents an accurate number of deputy sheriff's located at the posts on the lobby level of the Daley Center between 7:00 and 8:00 am on May 24, 2002, and denies that paragraph 77 represents the accurate number of doors on the lobby level of the Daley Center. The Sheriff's Office lacks knowledge or information sufficient to form a belief about the truth of any remaining allegation and therefore denies the same.

### Riggio's 1979 Allegations Against Edward Szymczak

78. As previously stated, Mr. Chatman's case was not the first time that Defendant Riggio claimed that she had been raped early in the morning in a large office building. Unbeknownst to investigators on May 24, 2002, Defendant Riggio had made identical allegations against another innocent man 20 years before.

**ANSWER:** Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

79. On October 23, 1979, Defendant Riggio claimed that she was raped at her workplace.

19

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

80.     In that alleged 1979 attack, as in the new one, Defendant Riggio claimed that she arrived to work in the early morning hours when none of her co-workers were present to witness the events at a downtown office building. In the 1979 version, Defendant Riggio said she arrived between 6:45 and 7:00 a.m., whereupon one of the building's janitors, Edward Szymczak, supposedly showed her a knife, pushed her into the bathroom, and attacked her.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

81.     Defendant Riggio claimed that Szymczak repeatedly asked her name and told her to look at him, told her to remove her clothing, and eventually sexually assaulted her. Defendant Riggio said that she and Szymczak struggled before the rape. Defendant Riggio further claimed that Szymczak kept asking her name and told her to be quiet as he raped her. When the assault ended, Defendant Riggio claimed that Szymczak told her to stay in the bathroom, and he left, presumably to go back to work.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

82.     Defendant Riggio claimed her alleged attacker spoke to her in English, and she did not recall him having an accent.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

83.     Unbeknownst to Defendant Riggio, however, Szymczak was a Polish immigrant who spoke no English and needed a Polish translator for police interviews and later court proceedings.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

131224550v1 0964585

84.     Based on Defendant Riggio's allegations, Szymczak was charged with rape and unlawful restraint. He maintained his innocence, insisting that he had nothing to do with Defendant Riggio, and had raped no one.

**<u>ANSWER:</u>**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

85.     Defendant Riggio retained legal counsel by November 6, 1979, less than two weeks after accusing Szymczak. She proceeded to file a civil suit based on her allegations against Szymczak, seeking in excess of four million dollars in damages. Her lawsuit named as defendants the office building owners, the building management company, the contracted janitorial service, the contracted security company, and others.

**<u>ANSWER:</u>**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

86.     In connection with the civil lawsuit Defendant Riggio filed against the building and its security company arising out of her allegations about the purported Szymczak rape, Defendant Riggio ultimately settled her case and received a cash payment.

**<u>ANSWER:</u>**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

87.     Due to the false accusations against him, Szymczak fled to Poland and was never tried. After Defendant Riggio filed her high-profile law suit, Szymczak sent a letter to the court proclaiming his innocence. The English translation of the letter reads:

To the Court of the State of Illinois:

I have been charged with raping citizen Susan, without any evidence or basis for such accusation. I did not even know her. Because I have been in the United States for only a short period of time and do not have money for an attorney, I am forced to leave the country. I am very sorry to do that. Please forward this letter to citizen Susan, so she may once more think about what she is doing. If someone did rape her, they should be convicted and sentenced. However, if she has only made this whole thing up to make some money, she should earn money honestly and not like this. She should know that she will answer to God for her actions. I also ask that this Court not let this incident constitute a black mark on the record of my stay in the United States and on my life.

Sincerely,

131224550v1 0964585

Edward Szymczak

**ANSWER:** Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

88. People who knew and worked with Szymczak were shocked by the allegations against him; by all accounts, he was an excellent employee who worked well with others and had no reputation for behaving violently, abusively, or inappropriately toward women or other people. Indeed, Szymczak's employer, Millard Maintenance, sent the following letter to the Polish Consulate and the ACLU asking for assistance with exonerating Szymczak:

> Can you be of assistance to a[n] employee of ours, who is [a] Polish immigrant, limited English, excellent work record, was switched to a different location, 625 N. Michigan, and is being accused of rape. He cannot shoulder the financial payment of $6000 legal. The company is not in a position to defend him. We feel it is a bum rap. What are his alternatives.

**ANSWER:** Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

89. Like Mr. Chatman, Szymczak's life has been devastated by Defendant Riggio's false accusation of rape. Not only was he forced to abandon his dream of working hard to make a life for himself and his family in the united States, but he lives the rest of his days under a cloud of Defendant Riggio's false accusations.

**ANSWER:** Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

**Riggio's Financial Motivations in 2002**

90. Before Defendant Riggio made her allegations against Mr. Chatman, she had again begun experiencing serious financial problems.

**ANSWER:** Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

91. Specifically, on April 29, 2002, less than one month before her allegations against Mr. Chatman, Defendant Riggio and her husband received a letter from the United States Internal

22

Revenue Service ("IRS"), notifying them that their tax return for tax year 2000 was being audited.

**ANSWER:** Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

92. The IRS audit frightened Defendant Riggio and her husband; together, they had nearly $550,000 in gambling winnings in 2000, which they had failed to report on their tax return (and which they subsequently lost through even more gambling).

**ANSWER:** Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

93. Less than one month after Defendant Riggio received notification that the IRS would audit her tax return, Defendant Riggio claimed that she was attacked in the Daley Center. In her lawsuit filed just after the claimed attack, Defendant Riggio falsely inflated her damages.

**ANSWER:** Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

94. When Defendant Riggio was examined by a doctor on May 24, 2002, she had no evidence of injury anywhere on her body.

**ANSWER:** Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

95. Four years later, however, at a deposition in the civil litigation, Defendant Riggio claimed to have sustained serious injuries as a result of Chatman's alleged sexual assault, including permanent damage to her internal and external genitalia, which caused her genitals to hurt and to feel "dead" and numb.

**ANSWER:** Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

131224550v1 0964585

96.     Defendant Riggio further claimed she suffered ongoing damage to her groin muscle, broken teeth, and scarring to her hip. None of these alleged injuries were noted in any of Defendant Riggio's medical visits in the months following the alleged assault.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

97.     As of 2006, Defendant Riggio claimed that she was no longer able to work for a living because she was unable to perform any job as a result of her claimed sexual assault.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

98.     This was not the first time that Defendant Riggio exaggerated her injuries in a lawsuit, just as this was not the first time that Defendant Riggio had falsely claimed rape and sued. In 1989, Defendant Riggio was in a car accident. In the subsequent legal action, she claimed that she contracted Parkinson's disease as a result of the impact.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

99.     Miraculously, Defendant Riggio's Parkinson's disease somehow cured itself in the intervening years, to the point where she no longer requires any treatment for it.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

### Defendants' Additional Misconduct

100.     Although Defendant Riggio set the ball in motion, Mr. Chatman's wrongful conviction could not have occurred without the other Defendants' malfeasance.

**ANSWER:**     Sheriff Defendants deny that they engaged in any malfeasance, and lack knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in this paragraph, and therefore, deny the same.

24

101.    The Law Enforcement Defendants committed one or more of the following types of misconduct: coercing a false confession from Mr. Chatman; withholding material exculpatory evidence from Mr. Chatman; destroying exculpatory evidence; and fabricating inculpatory evidence that was used to help convict Mr. Chatman.

**ANSWER:**    Sheriff Defendants deny that they engaged in any of the allegations contained in this paragraph.

102.    As stated above, Mr. Chatman was coerced to falsely confess to a crime he did not commit by Defendants Kato, Holmes, Walsh, Boock, Roberts, Mischka, and Midona. According to these Defendants, Mr. Chatman freely confessed in detail to a violent rape that he did not commit.

**ANSWER:**    The allegations contained in this paragraph are not directed to the Sheriff Defendants, and they therefore make no answer thereto.

103.    What makes these Defendants' misconduct even more egregious is that they took advantage of a mentally-compromised and damaged individual in the process. Although civilian witnesses who interacted with Mr. Chatman even for brief periods of time during the week of May 20, 2002, described him as "incoherent," the Law Enforcement Defendants concealed any suggestion of Mr. Chatman's cognitive deficits from their reports.

**ANSWER:**    The Individual Sheriff Defendants deny that they ever had any contact with Mr. Chatman and deny any allegations lodged against them in this paragraph.

104.    Rather, Defendants Roberts and Holmes both maintained that they had absolutely no difficulty in understanding Mr. Chatman and that he had no problems communicating with them. These representations were totally false.

**ANSWER:**    The allegations contained in this paragraph are not directed to the Sheriff Defendants, and they therefore make no answer thereto.

105.    Upon being admitted to the Cook County Jail, Mr. Chatman was given a five-minute screening of his physical and mental health, during which intake personnel immediately perceived that something was seriously wrong with Mr. Chatman, who was promptly admitted to the acute care unit of the Jail. Detainees are placed in the acute care unit only if they are expressing mental health symptoms that require 24-hour psychiatric care.

131224550v1 0964585

**ANSWER:**     The Sheriff denies that the physical and mental health screening lasted five minutes and admits only that pursuant to the Cermak records, on May 26, 2002, Mr. Chatman was admitted to 2 West, and was subsequently admitted to 2 East on May 28, 2002, which is an acute care unit for detainees that may require 24-hour psychiatric care.  At this time, the Sheriff's Office lacks knowledge or information sufficient to form a belief about the truth of any remaining allegation, and therefore, denies the same.  The Individual Sheriff's Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph, and therefore, deny the same.

**Further Withholding of Exculpatory Evidence**

106.     Due to Defendants' misconduct, Mr. Chatman was deprived of crucial evidence that could have avoided his wrongful conviction, including but not limited to the existence of a witness who could testify the rape never occurred, and certainly not in the manner Defendant Riggio claimed.

**ANSWER:**     Sheriff Defendants deny the allegations contained in this paragraph.

107.     In particular Defendant Riggio claimed that she engaged in an all-out fight for her life, screaming at least three times for a deputy to come to her assistance.

**ANSWER:**     Sheriff Defendants deny that this paragraph represents a full and accurate account of Defendant Riggio's response, and therefore, deny the allegations contained in this paragraph.

108.     When responding officers, including Defendants Deputy Sergeant Maria Mokstad and Deputy Michael Cokeley, arrived at the crime scene, it turned out by chance that a building employee, Cook County Sheriff's Deputy Michael Copeland, was fast asleep in the room across the hall from the crime scene with his shirt off.

**ANSWER:**     Sheriff Defendants deny that the Individual Sheriff Defendants can be characterized as "responding officers."   Further answering, Sheriffs Defendants deny the

26

allegations contained in paragraph 103, except that Defendant Cokeley has no knowledge whatsoever about Deputy Copeland's presence on the 21st floor on May 24, 2002, and therefore lacks knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, denies the same.

109.    Despite having been in the room across the hall from the alleged attack, Copeland told the responding officers that he heard no sign of any struggle whatsoever. In fact, the first indication Deputy Copeland had that something was amiss was when he heard the radios of other officers responding to a 911 call about the supposed attack, well after the "attack" ended.

**ANSWER:**    Sheriff Defendants deny that the Individual Sheriff Defendants can be characterized as "responding officers" and deny all allegations contained in this paragraph, except that Defendant Cartrette admits only that after the incident, Deputy Copeland told Cartrette that he was asleep in room 2103A, awoke to the sound of radios and did not hear any other noises, and denies all other allegations contained in this paragraph.

110.    On the morning of May 24, 2002, Defendants Cokeley, Mokstad, and Deputy Lieutenant Cartrette all knew that Deputy Copeland had been sleeping across the hall from where Defendant Riggio claimed to have been attacked.

**ANSWER:**    Defendant Mokstad admits only that on the morning of May 24, 2002, Defendant Mokstad saw Deputy Copeland awake in a room down the hall from where Defendant Riggio claimed to have been attacked, but denies all remaining allegations or inconsistent allegations contained in this paragraph.  Defendant Cartrette admits only that after the incident on May 24, 2002, Deputy Copeland told Defendant Cartette that Deputy Copeland was asleep in room 2103A, but denies all remaining or inconsistent allegations contained in this paragraph. Defendants Cokeley denies that he knew any information about Deputy Copeland on May 24, 2002, and lacks knowledge or information sufficient to form a belief about the truth of what each of the other Individual Sheriff Defendants knew, and therefore, denies the same.

27

111.    Indeed, that same morning, Defendant Cartrette had Deputy Copeland handwrite a statement acknowledging that he was sleeping in room 2103A, across the hall from room 2101A, and that he heard nothing until officers began responding to the allegation that Defendant Riggio had been assaulted.

**ANSWER:**    Defendant Cartrette admits only that Defendant Cartette had Deputy Copeland write a statement about why Copeland was on the 21st floor before hours, and that Deputy Copleand wrote a statement indicating that he was asleep in room 2103A, awoke to the sound of radios and did not hear any other noises. Defendant Cartrette denies any remaining or inconsistent allegations contained in this paragraph. The remaining Individual Sheriff's Officers lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

112.    Defendant Detectives McGreal and Pena interviewed Defendants Cokeley, Mokstad, and Cartrette on May 24, 2002. Although each of these Defendants learned that Deputy Copeland knew information that would exculpate Mr. Chatman, these Defendants hid that information from the criminal justice system and, as a result, from Mr. Chatman.

**ANSWER:**    Defendant Cartrette admits only that he was interviewed by Detective McGreal and that Defendant Cartrette relayed information known to him about Deputy Copeland to Detective McGreal on May 24, 2002, but denies the remaining allegations contained in this paragraph. The remaining Sheriff Defendants admit only that they were each interviewed by Detective McGreal or Pena on May 24, 2002, but deny the remaining allegations contained in this paragraph.

113.    In particular, there is no mention of Deputy Copeland's existence, let alone his nearby presence at the time of the alleged attack, in any of the police reports tendered to Mr. Chatman or his criminal defense counsel. Nor was there any way for Mr. Chatman to discover this information once it was hidden from him by these Defendants.

**ANSWER:**    Sheriff Defendants were not part of the investigation into this crime and lack knowledge or information sufficient to form a belief about the truth of the allegations

28

regarding what was contained in the police reports tendered to Mr. Chatman or his criminal defense counsel, and therefore, deny the same. Further answering, Sheriff Defendants deny that there was no way for Mr. Chatman to discover Deputy Copeland's existence and deny that the information was hidden from him by the Sheriff Defendants.

114.    Specifically, Defendant Cokeley communicated to Defendant McGreal that he had seen Deputy Copeland sleeping near to where the crime alleged took place, and Defendant McGreal proceeded to withhold that information from the criminal prosecutors and Mr. Chatman's defense.

**ANSWER:**    Defendant Cokeley did not see or learn about the presence of Deputy Copeland, and therefore the Sheriff Defendants deny the allegations contained in this paragraph.

115.    Pleading in the alternative, Defendant Cokeley did not tell Defendant McGreal the information referenced in the preceding paragraph, and instead suppressed it.

**ANSWER:**    Defendant Cokeley admits only that he did not tell Defendant McGreal about the presence of Deputy Copeland because Defendant Cokeley had no knowledge of the presence of Deputy Copeland, and denies any inconsistent or remaining allegations contained in this paragraph.

116.    Defendant Mokstad communicated to Defendant Pena that he [*sic*] had seen Deputy Copeland sleeping near to where the crime alleged took place, and Defendant Pena proceeded to withhold that information from the criminal prosecutors and Mr. Chatman's defense.

**ANSWER:**    Defendant Mokstad admits only that she may have communicated to Defendant Pena that she had seen Deputy Copeland in a room down the hall from where the crime allegedly took place, but denies seeing Deputy Copeland sleeping, and, denies any inconsistent allegations. Further answering, Defendant Mokstad lacks knowledge or information

sufficient to form a belief about the truth of what Defendant Pena or McGreal told the criminal prosecutors and Mr. Chatman's defense [*sic*], and therefore denies the same.

117.    Pleading in the alternative, Defendant Mokstad did not tell Defendant Pena the information referenced in the preceding paragraph, and instead suppressed it.

**ANSWER:**    Defendant Mokstad admits only that she may have communicated to Defendant Pena that she had seen Deputy Copeland in a room down the hall from where the crime allegedly took place, but denies any inconsistent or remaining allegations contained in this paragraph.

118.    Defendant Cartrette communicated to Defendant McGreal that he had seen Deputy Copeland sleeping near to where the crime alleged took place, and Defendant McGreal proceeded to withhold that information from the criminal prosecutors and Mr. Chatman's defense.

**ANSWER:**    Defendant Cartette admits only that he told Defendant McGreal that he learned that there was a deputy sleeping on the 21st floor at the time of the incident, and denies any remaining or inconsistent allegation directed toward Defendant Cartrette.    Defendant Cartrette lacks knowledge or information sufficient to form a belief about the truth of what Defendant McGreal told the criminal prosecutors and Mr. Chatman's defense [*sic*].

119.    Pleading in the alternative, Defendant Cartrette did not tell Defendant McGreal the information referenced in the preceding paragraph, and instead suppressed it.

**ANSWER:**    Defendant Cartette denies that he did not tell Defendant McGreal about the "sleeping deputy" and denies that he suppressed any information.    With regard to relaying information referenced in the preceding paragraph, Defendant Cartrette denies that he saw Deputy Copeland sleeping near to where the crime allegedly took place, and denies that he told Defendant McGreal the same.    Further answering, and as explained in the answer to the

preceding paragraph, Defendant told Defendant McGreal that he learned that there was a deputy sleeping on the 21st floor at the time of the incident.

## Withholding of Exculpatory Evidence
## by OPS Defendants and Defendant City

120.    On May 27, 2002, just two days after Defendant Kato used physical force to coerce Mr. Chatman into falsely confessing to a crime that he did not commit, a Chicago police detective submitted an anonymous memo to the Defendant City corroborating Mr. Chatman's account of being physically forced into a false confession.

**ANSWER:**    Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

121.    In his/her memo, the anonymous Chicago police detective stated in part:

On or about May 25, 2002, Detective Kato beat a suspect into signing a confession. The suspect is homeless and was apprehended for the assault/rape of a woman in the Daley Center. The suspect denied the rape and said he was no way near the Daley Center. Detective Kato hit the suspect and shouted "tell me you did it!" The homeless suspect said one last time "did what? I didn't do nothing. I don't, don't, don't know what you are talking about." Detective Kato hit the suspect with such a blow that last time that the suspect groaned from sheer pain and doubled over grasping for air. That blow I thought would kill him for sure. The suspect then said "what-what-what-what do you want me to say? Kato said "I want you to say you raped that woman." By this time, Kato had the assault/rape victim's total account of the assault. Kato took the victims account of the assault, word for word and laid it out for the homeless suspect to sign. The suspect didn't even read it and didn't know what he was signing. The suspect was denied a phone call, instead Kato told the suspect "you are homeless. Who are you going to call, the other homeless people at the Gardens?

It is a well known fact from questioning and the suspects condition that he did not commit this assault. However Kato stated that "they wanted someone to be accountable, so I gave them someone. He's homeless anyway, at least now (laughingly) he'll get three meals a day. That's my contribution to help feed the homeless."

**ANSWER:**    Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

131224550v1 0964585

122.     This Chicago police detective, who maintained anonymity out of fear of reprisal from his/her fellow officers, sent a memo through inter-departmental mail to Millicent Willis, who was then the Acting Chief Administrator of the Defendant City's Office of Professional Standards ("O.P.S.").

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

123.     Upon receiving this memo on or about May 27, 2002, Defendant Willis took no action. Defendant Willis did not open or initiate a Complaint Register, begin or assign anyone to begin an investigation, or disclose the memo corroborating Mr. Chatman's account to any prosecutors, Mr. Chatman's defense, or any competent authority.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

124.     The anonymous memo constituted material, exculpatory evidence.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

125.     Defendant Willis withheld this material, exculpatory evidence as a result of policies and widespread practices of O.P.S. and the Defendant City, including policies and widespread practices instituted and maintained by Callie L. Baird, who was the Chief Administrator of O.P.S. from 1998 through December 2001, and continued by Defendants Willis, Lightfoot, and Morris.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

126.     Among other things, O.P.S. and Defendant City had a policy or widespread practice of not disclosing allegations or complaints of officer misconduct to criminal defendants, their defense attorneys, prosecutors, or any competent authority.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

131224550v1 0964585

127.     The Defendants' suppression of the anonymous memo continued even after Mr. Chatman's conviction and through the time that his direct appeal and post-conviction proceedings were pending.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a

belief about the truth of the allegation, and therefore, deny the same.


128.     Nearly two years later, in February 2004, after Mr. Chatman was convicted at his criminal trial but during the time that his direct appeal was pending, the anonymous Chicago police detective re-submitted his/her memo to the Defendant City because no action had been taken on the complaint when it was originally submitted in 2002. This time, the anonymous detective sent the memo to Karen Rowan, who was an assistant deputy superintendent with Internal Affairs.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a

belief about the truth of the allegation, and therefore, deny the same.


129.     Internal Affairs forwarded the complaint to O.P.S., and O.P.S. initiated an investigation into the anonymous complaint.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a

belief about the truth of the allegation, and therefore, deny the same.


130.     Defendant Karen Wojtczak was the O.P.S. investigator in charge of investigating the anonymous Chicago police detective's complaint against Kato concerning Mr. Chatman. The Complaint Register investigation was open from February 2004 until October 2004.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a

belief about the truth of the allegation, and therefore, deny the same.


131.     Defendant Wojtczak, O.P.S. and Defendant City took no action to investigate the identity of the anonymous Chicago police detective.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a

belief about the truth of the allegation, and therefore, deny the same.

131224550v1 0964585

132.     Defendant Wojtczak, O.P.S. and Defendant City did not interview Defendant Kato concerning the anonymous complaint, even though O.P.S. had determined from the Attendance and Assignment sheets that Defendant Kato was, in fact, on duty at Area 4 at the time of the alleged events, as the anonymous Chicago police detective stated in his/her memo.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

133.     Besides interviewing Mr. Chatman, whose account of his interrogation was largely corroborated by the anonymous detective's, Defendant Wojtczak, O.P.S. and Defendant City did not interview a single other witness before they summarily determined that the anonymous complaint was unfounded.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

134.     Despite the clearly material and exculpatory nature of the anonymous memo, no one at O.P.S. or at the Defendant City disclosed the anonymous memo to Mr. Chatman, his defense counsel, prosecutors, or any competent authority.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

135.     Defendant Lightfoot was the O.P.S. Administrator at the time the O.P.S. investigation was initiated in February 2004 and investigated. Lightfoot facilitated, approved, condoned or deliberately ignored the actions of Defendant Wojtczak and other City employees, who knew of and withheld the anonymous detective's complaint.

**ANSWER:**     Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

136.     Defendant Morris was the O.P.S. Administrator during the time the O.P.S. investigation was conducted and through the time that it was closed in October 2004. Morris facilitated, approved, condoned or deliberately ignored the actions of Defendant Wojtczak and other City employees, who knew of and withheld the anonymous detective's complaint.

131224550v1 0964585

**ANSWER:** Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

### Defendant Kato's History of Abuse

137. Unfortunately, Mr. Chatman is not the only victim of Defendant Kato's misconduct.

**ANSWER:** Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

138. Over many years prior to the anonymous detective's complaint against Defendant Kato in May 2002, Defendant Kato has perpetrated abuses on several unrelated victims. Kato had racked up nearly two dozen other complaints from other individuals who alleged that he had used excessive force on them while they were being interrogated by him or in his custody.

**ANSWER:** Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

139. Despite being on notice of these abuses, the City and O.P.S. never took any action to discipline Kato.

**ANSWER:** Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

140. Pursuant to their policy and widespread practices, the City and O.P.S. did not consider any of these other complaints against Defendant Kato in determining whether the anonymous complaint in Mr. Chatman's case had merit.

**ANSWER:** Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

141. As discussed above, the anonymous detective's complaint in Mr. Chatman's case was summarily dismissed.

131224550v1 0964585

**ANSWER:**    Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

### City of Chicago and O.P.S.'s Inadequate
### Policies, Practices, Training and Discipline

142.    The City's inaction regarding Defendant Kato is just one example of the City's widespread failure to control its officers. The City maintains a de facto policy, practice, and custom of failing to train, supervise, discipline and control its police officers.

**ANSWER:**    Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

143.    For some time prior to the misconduct alleged herein, municipal policymakers had long been aware of the City's policy and practice of failing to properly train, monitor, and discipline its police officers:

a.    In January 2000, the Chairman of the Committee on Police and Fire of the Chicago City Council submitted an official resolution recognizing that "[Chicago] police officers who do not carry out their responsibilities in a professional manner have ample reason to believe that they will not be held accountable, even in instances of egregious misconduct."

b.    A study performed a year later by the Justice Coalition of Greater Chicago ("JCGC"), a coalition of more than a hundred community groups, confirmed that resolution. Specifically, the JCGC study concluded that the Chicago Police Department lacked many of the basic tools necessary to identify, monitor, punish and prevent police misconduct and brutality. The JCGC findings were presented to the City's policymakers.

c.    Two years later, *Garcia v. City* of *Chicago, 2003* WL 22175618, at *2 (N.D. Ill. Sept. 19, 2003), affirmed that the City's police misconduct investigations were systematically "incomplete, inconsistent, delayed, and slanted in favor of the officers" and as a result, fostered a culture of impunity within the Chicago Police Department.

d.    Indeed, by its own accounting, in 2004 the City sustained only four percent of the complaints brought against police officers for use of excessive force. An even smaller percentage of officers were actually disciplined for such conduct.

**ANSWER:**    Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations, and therefore, deny the same.

131224550v1 0964585

144.    Although the City had long been aware that its policies, practices, supervision, training and discipline of police officers was entirely inadequate, it did not enact any measures to address that failure, at any time relevant to the events alleged herein. Indeed, the O.P.S. Defendants and the City failed to reform the broken system in any meaningful way.

**ANSWER:**    Sheriff Defendants lack knowledge or information sufficient to form a

belief about the truth of the allegations, and therefore, deny the same.


145.    In 1996, the City of Chicago intentionally abandoned a program designed to track police officers repeatedly acting in an abusive manner because of opposition by the Police Union. The City promptly deleted all data contained in the program, including the list of problem officers.

**ANSWER:**    Sheriff Defendants lack knowledge or information sufficient to form a

belief about the truth of the allegations, and therefore, deny the same.


146.    In 2000 and 2001, the City continued to refuse to implement a system allowing for detection of repeat police officer-offenders, despite the fact that the Commission on Accreditation for Law Enforcement Agencies adopted a standard mandating such a detection system for large agencies such as Chicago.

**ANSWER:**    Sheriff Defendants lack knowledge or information sufficient to form a

belief about the truth of the allegations, and therefore, deny the same.


147.    In 2003, although the City and the Police Union negotiated a new contract allowing the Chicago Police Department to use unsustained O.P.S. cases "to identify patterns of suspected misconduct about which the public and regulatory agencies are so intensely and legitimately concerned," no such pattern analysis was ever implemented.

**ANSWER:**    Sheriff Defendants lack knowledge or information sufficient to form a

belief about the truth of the allegations, and therefore, deny the same.


### Damages

148.    Mr. Chatman lost over a decade of his life before he was finally exonerated. During that time, his wife divorced him, family members died, and Mr. Chatman was falsely branded a rapist and incarcerated alongside some of the most dangerous prisoners in our penal system.

131224550v1 0964585

**ANSWER:**  Sheriff Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation, and therefore, deny the same.

149.  Mr. Chatman now seeks to vindicate his rights by holding those responsible for his injuries accountable for their actions.

**ANSWER:**  Sheriff Defendants deny that they are responsible for any of Mr. Chatman's alleged injuries.

## COUNT I

### 42 U.S.C. § 1983 - Coerced and False Confession
### (Fifth Amendment)

150.  Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:**  Sheriff Defendants incorporate each paragraph of their Answer as if fully restated here.

151.  In the manner described more fully above, Defendants Kato, Holmes, Roberts, Walsh, Boock, Mischka, and Midona, acting as investigators, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, forced Plaintiff to incriminate himself falsely and against his will, in violation of his rights secured by the Fifth and Fourteenth Amendments.

**ANSWER:**  Count I is not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.

152.  The false statements drafted by the Defendants and attributed to Plaintiff were used against Plaintiff to his detriment in a criminal case.

**ANSWER:**  Count I is not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.

131224550v1 0964585

153.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

**ANSWER:**    Count I is not directed toward the Sheriff Defendants, and they, therefore,

make no answer thereto.

154.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:**    Count I is not directed toward the Sheriff Defendants, and they, therefore,

make no answer thereto.

155.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that Chicago Police officers regularly used coercive measures to obtain inculpatory statements from criminal suspects.

**ANSWER:**    Count I is not directed toward the Sheriff Defendants, and they, therefore,

make no answer thereto.

156.    This widespread practice of obtaining statements in violation of the Fifth Amendment was so well-settled as to constitute de facto policy in the Chicago Police Department, and was allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

**ANSWER:**    Count I is not directed toward the Sheriff Defendants, and they, therefore,

make no answer thereto.

157.    Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because the City of Chicago declined to implement sufficient training, discipline, and/or any legitimate mechanism for oversight or punishment, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

**ANSWER:**    Count I is not directed toward the Sheriff Defendants, and they, therefore,

make no answer thereto.

131224550v1 0964585

158.    As a direct and proximate result of the City's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

**ANSWER:**    Count I is not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.

## COUNT II

### 42 U.S.C. § 1983 - Coerced and False Confession
### (Fourteenth Amendment)

159.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:**    Count II is not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.

160.    In the manner described more fully above, Defendants Kato, Holmes, Roberts, Walsh, Boock, Mischka, and Midona, acting as investigators, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, forced Plaintiff to incriminate himself falsely and against his will, in violation of his right to due process secured by the Fourteenth Amendment.

**ANSWER:**    Count II is not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.

161.    As described in detail above, the misconduct described in this Count consisted of physical and psychological coercion. This misconduct to cause an obviously mentally-disabled individual to falsely implicate himself in a vicious rape that never occurred, was so severe as to shock the conscience, it was designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

**ANSWER:**    Count II is not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.

162.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

131224550v1 0964585

**ANSWER:**     Count II is not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.

163.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:**     Count II is not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.

164.     The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that Chicago Police Department officers regularly used coercive measures to obtain inculpatory statements from criminal suspects.

**ANSWER:**     Count II is not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.

165.     This widespread practice of obtaining statements in violation of the Fourteenth Amendment was so well-settled as to constitute de facto policy in the Chicago Police Department, and was allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

**ANSWER:**     Count II is not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.

166.     Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because the City of Chicago declined to implement sufficient training, discipline, and/or any legitimate mechanism for oversight or punishment, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

**ANSWER:**     Count II is not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.

167.     As a direct and proximate result of the City's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

131224550v1 0964585

**ANSWER:**     Count II is not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.


## COUNT III

### 42 U.S.C. § 1983 - Federal Malicious Prosecution

168.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:**     The Sheriff Defendants incorporate each paragraph of their Answer as if fully restated here.


169.     In the manner described above, Defendant Holmes and the Law Enforcement Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, falsely accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

**ANSWER:**     Count III was dismissed by the Court on March 14, 2015. Therefore, the Sheriff Defendants make no answer thereto, unless further so directed by the Court.


170.     In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

**ANSWER:**     Count III was dismissed by the Court on March 14, 2015. Therefore, the Sheriff Defendants make no answer thereto, unless further so directed by the Court.


171.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

**ANSWER:**     Count III was dismissed by the Court on March 14, 2015. Therefore, the Sheriff Defendants make no answer thereto, unless further so directed by the Court.

131224550v1 0964585

172.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:**     Count III was dismissed by the Court on March 14, 2015.  Therefore, the

Sheriff Defendants make no answer thereto, unless further so directed by the Court.

173.     The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that Chicago Police Department officers regularly used unconstitutional measures to falsely implicate criminal suspects, including by coercing false confessions, withholding exculpatory evidence, fabricating inculpatory evidence, and otherwise instituting and continuing prosecutions maliciously and without probable cause.

**ANSWER:**     Count III was dismissed by the Court on March 14, 2015.  Therefore, the

Sheriff Defendants make no answer thereto, unless further so directed by the Court.

174.     This widespread practice of instituting and continuing prosecutions maliciously and without probable cause through the use of false confessions, fabrication of inculpatory evidence, and withholding of exculpatory evidence was so well-settled as to constitute de facto policy in the Chicago Police Department, and was allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

**ANSWER:**     Count III was dismissed by the Court on March 14, 2015.  Therefore, the

Sheriff Defendants make no answer thereto, unless further so directed by the Court.

175.     Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because the City of Chicago declined to implement sufficient training, discipline, and/or any legitimate mechanism for oversight or punishment, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

**ANSWER:**     Count III was dismissed by the Court on March 14, 2015.  Therefore, the

Sheriff Defendants make no answer thereto, unless further so directed by the Court.

176.     As a direct and proximate result of the City's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

131224550v1 0964585

**ANSWER:**    Count III was dismissed by the Court on March 14, 2015.  Therefore, the Sheriff Defendants make no answer thereto, unless further so directed by the Court.


### COUNT IV

### 42 U.S.C. § 1983 - Due Process

177.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:**    The Sheriff Defendants incorporate each paragraph of their Answer as if fully restated here.


178.    As described in detail above, the Law Enforcement Defendants, Defendant Holmes, and the O.P.S. Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial and to due process of law.

**ANSWER:**    The Individual Sheriff Defendants deny any allegations against them contained in this paragraph.


179.    In the manner described more fully above, the Law Enforcement Defendants, Defendant Holmes, and the O.P.S. Defendants deliberately withheld exculpatory evidence from Plaintiff and from the prosecutors, among others.

**ANSWER:**    The Individual Sheriff Defendants deny any allegations against them contained in this paragraph.


180.    In addition, the Law Enforcement Defendants and Defendant Holmes, acting as investigators, fabricated evidence and solicited false evidence, including testimony that they knew to be false and perjured, and fabricated reports implicating Plaintiff in the crime, obtained Plaintiff's conviction using that false evidence, and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

**ANSWER:**    The Individual Sheriff Defendants deny that they were acting as investigators and deny any allegations against them contained in this paragraph.

181.     The Law Enforcement Defendants, Defendant Holmes' Defendant Willis', and Defendant Baird's misconduct directly resulted in the unjust criminal conviction of Plaintiff, thereby denying his constitutional right to a fair trial guaranteed by the Fifth and Fourteenth Amendments.  Absent this misconduct, the prosecution of Plaintiff could not have and would not have been pursued.

**ANSWER:**     The Individual Sheriff Defendants deny any allegations against them contained in this paragraph.

182.     The misconduct of Defendants Wojtczak, Lightfoot, and Morris directly resulted in the continued withholding of material, exculpatory evidence during the pendency of Plaintiff's criminal appeal, thereby denying his constitutional right to due process guaranteed by the Fourth, Fifth, and Fourteenth Amendments.

**ANSWER:**     The allegations contained in this paragraph are not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.

183.     The O.P.S. Defendants' misconduct denied Plaintiff his constitutional right to due process.

**ANSWER:**     The allegations contained in this paragraph are not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.

184.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

**ANSWER:**     The Individual Sheriff Defendants deny any allegations against them contained in this paragraph.

185.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:**     The Individual Sheriff Defendants deny any allegations against them contained in this paragraph.

131224550v1 0964585

186.     The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that Chicago Police Department officers regularly used unconstitutional measures to falsely implicate criminal suspects, including by coercing false confessions, withholding exculpatory evidence, and fabricating inculpatory evidence.

**ANSWER:**     The allegations contained in this paragraph are not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.

187.     Furthermore, the misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that O.P.S. investigators and other City employees involved in reviewing O.P.S. investigators regularly withheld exculpatory evidence such as allegations or complaints of officer misconduct.

**ANSWER:**     The allegations contained in this paragraph are not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.

188.     These widespread practices were so well-settled as to constitute de facto policy in the Chicago Police Department and O.P.S., and were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

**ANSWER:**     The allegations contained in this paragraph are not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.

189.     Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because the City of Chicago and O.P.S. declined to implement sufficient training and/or any legitimate mechanism for oversight or punishment, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

**ANSWER:**     The allegations contained in this paragraph are not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.

190.     As a direct and proximate result of the City's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

**ANSWER:**     The allegations contained in this paragraph are not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.

131224550v1 0964585

WHEREFORE, Defendants Burrough Cartette, Maria Mokstad, and Michael Cokeley deny that Plaintiff is entitled to any judgment against them and respectfully request that this Honorable Court enter an order dismissing Plaintiff's Second Amended Complaint against the Sheriff Defendants with prejudice and for all other relief that his equitable and just.

## COUNT V

### 42 U.S.C. § 1983 - Conspiracy to Deprive Constitutional Rights

191.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:**    The Sheriff Defendants incorporate each paragraph of their Answer as if fully restated here.

192.    Prior to Plaintiff's conviction, all of the individual Defendants, excepting those sued in their official capacity, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and thereby to deprive him of his constitutional rights, all as described in the various paragraphs of this Complaint.

**ANSWER:**    The Individual Sheriff Defendants deny the allegations against them contained in this paragraph.

193.    In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

**ANSWER:**    The Individual Sheriff Defendants deny the allegations against them contained in this paragraph.

194.    In furtherance of their conspiracy, each of these coconspirators committed overt acts and were otherwise willful participants in joint activity.

47

**ANSWER:** The Individual Sheriff Defendants deny the allegations against them contained in this paragraph.

195. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

**ANSWER:** The Individual Sheriff Defendants deny the allegations against them contained in this paragraph.

196. As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:** The Individual Sheriff Defendants deny the allegations against them contained in this paragraph.

WHEREFORE, Defendants Burrough Cartette, Maria Mokstad, and Michael Cokeley deny that Plaintiff is entitled to any judgment against them and respectfully request that this Honorable Court enter an order dismissing Plaintiff's Second Amended Complaint against the Sheriff Defendants with prejudice and for all other relief that his equitable and just.

## COUNT VI

### 42 U.S.C. § 1983 - Failure to Intervene

197. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:** The Sheriff Defendants incorporate each paragraph of their Answer as if fully restated here.

198. In the manner described above, during the constitutional violations described herein, one or more of the Law Enforcement Defendants, Defendant Holmes, and the O.P.S. Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

48

**ANSWER:** To the extent any allegation in this paragraph is directed toward the Individual Sheriff Defendants, this allegation is denied.

199. As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:** To the extent any allegation in this paragraph is directed toward the Individual Sheriff Defendants, this allegation is denied.

200. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

**ANSWER:** To the extent any allegation in this paragraph is directed toward the Individual Sheriff Defendants, this allegation is denied.

201. The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that Chicago Police Department officers regularly failed to intervene to prevent the violation of suspects' constitutional rights.

**ANSWER:** This allegation is not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.

202. Furthermore, the misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that O.P.S. investigators and other City employees involved in reviewing O.P.S. investigations regularly failed to intervene to prevent the violation of persons' constitutional rights.

**ANSWER:** This allegation is not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.

203. These widespread practices of failing to intervene to prevent the violation of persons' constitutional rights were so well-settled as to constitute de facto policy in the Chicago Police Department and O.P.S., and were allowed to exist because municipal policymakers with

49

authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

**ANSWER:**    This allegation is not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.

204.    Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because the City of Chicago declined to implement sufficient training, discipline, and/or any legitimate mechanism for oversight or punishment, thereby leading officers to believe that they ignore the violation of citizens' constitutional rights with impunity.

**ANSWER:**    This allegation is not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.

205.    As a direct and proximate result of the City's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

**ANSWER:**    This allegation is not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.

WHEREFORE, Defendants Burrough Cartette, Maria Mokstad, and Michael Cokeley deny that Plaintiff is entitled to any judgment against them and respectfully request that this Honorable Court enter an order dismissing Plaintiff's Second Amended Complaint against the Sheriff Defendants with prejudice and for all other relief that his equitable and just.

### Count VII - 42 U.S.C. § 1983

### Supervisory Liability

206.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:**    The Sheriff Defendants incorporate each paragraph of their Answer as if fully restated here.

50

131224550v1 0964585

207.     Plaintiff's malicious prosecution, wrongful conviction, and deprivation of due process were caused by the intentional misconduct by the supervisory defendants, including Defendants Walsh, Holy, Baird, Lightfoot, Willis, and Morris, or when they were deliberately, recklessly indifferent to their subordinates' misconduct, knowing that turning a blind eye to that misconduct would necessarily violate Mr. Chatman's constitutional rights.

**ANSWER:**     This Count is not directed toward the Sheriff Defendants, and they,

therefore, make no answer thereto.


208.     Specifically, supervisory defendants, including Defendants Walsh and Holy were aware of and facilitated, condoned, and oversaw the coercive tactics used by some of the Defendants to obtain Plaintiff's false confession, or were deliberately, recklessly indifferent to their subordinates' unconstitutional tactics.

**ANSWER:**     This Count is not directed toward the Sheriff Defendants, and they,

therefore, make no answer thereto.


209.     Moreover, supervisory Defendants, including Defendants Walsh and Holy, were aware of and facilitated, condoned, and oversaw the withholding of exculpatory evidence, including but not limited to the existence of the sleeping deputy referenced above, but failed to disclose that information, or were deliberately, recklessly indifferent to their subordinates' unconstitutional actions in withholding exculpatory evidence.

**ANSWER:**     This Count is not directed toward the Sheriff Defendants, and they,

therefore, make no answer thereto.


210.     Defendants Lightfoot and Morris were aware of and facilitated, condoned, and oversaw the withholding of exculpatory evidence, including but not limited to the anonymous Chicago detective's memo referenced above, but failed to disclose that information, or were deliberately, recklessly indifferent to their subordinates' unconstitutional actions in withholding exculpatory evidence.

**ANSWER:**     This Count is not directed toward the Sheriff Defendants, and they,

therefore, make no answer thereto.


211.     In addition, the supervisory Defendants, including Defendants Walsh and Holy were aware of and facilitated, condoned, and oversaw the fabrication of inculpatory evidence, or

were deliberately, recklessly indifferent to their subordinates' unconstitutional actions in fabricating inculpatory evidence.

> **ANSWER:** This Count is not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.

212. The personal involvement of the defendant supervisors, through their actions and omissions, proximately and directly caused the constitutional deprivations and grievous personal injuries suffered by Plaintiff, including the above-mentioned injuries and damages.

> **ANSWER:** This Count is not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.

213. The misconduct described in this Count was objectively unreasonable, and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's clearly established constitutional rights.

> **ANSWER:** This Count is not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.

## COUNT VIII

### State Law Claim - Malicious Prosecution

214. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

> **ANSWER:** The Sheriff Defendants incorporate each paragraph of their Answer as if fully restated here.

215. In the manner described above, the individual Defendants, excepting Defendant Kato, the O.P.S. Defendants, and those sued in their official capacity, acting as investigators, individually, jointly, or in conspiracy with one another, as well as within the scope of their employment, falsely accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

131224550v1 0964585

**ANSWER:**    Sheriff Defendants deny that they were acting as investigators and deny any allegations against them contained in this paragraph.

216.    In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

**ANSWER:**    Sheriff Defendants deny that they were acting as investigators and deny any allegations against them contained in this paragraph.

217.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

**ANSWER:**    Sheriff Defendants deny that they were acting as investigators and deny any allegations against them contained in this paragraph.

218.    As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:**    Sheriff Defendants deny that they were acting as investigators and deny any allegations against them contained in this paragraph.

WHEREFORE, Defendants Burrough Cartette, Maria Mokstad, and Michael Cokeley deny that Plaintiff is entitled to any judgment against them and respectfully request that this Honorable Court enter an order dismissing Plaintiff's Second Amended Complaint against the Sheriff Defendants with prejudice and for all other relief that his equitable and just.

131224550v1 0964585

## COUNT IX

### State Law Claim - Intentional Infliction of Emotional Distress

219.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:**     This Count was dismissed by the Court on March 14, 2015.  Therefore, the

Sheriff Defendants make no answer thereto.

220.     The actions, omissions, and conduct of the individual Defendants, excepting Defendant Kato and those sued in their official capacity, as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

**ANSWER:**     This Count was dismissed by the Court on March 14, 2015.  Therefore, the

Sheriff Defendants make no answer thereto.

221.     As a direct and proximate result of the Defendants' actions, Plaintiff suffered and continues to suffer emotional distress and other grievous and continuing injuries and damages as set forth above.

**ANSWER:**     This Count was dismissed by the Court on March 14, 2015.  Therefore, the

Sheriff Defendants make no answer thereto.

## COUNT X

### State Law Claim - Civil Conspiracy

222.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:**     Sheriff Defendants incorporate each answer to this Complaint as if fully

restated here.

223.     As described more fully in the preceding paragraphs, the individual Defendants, excepting Defendant Kato and those sued in their official capacities, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an

131224550v1 0964585

unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

**ANSWER:** Sheriff Defendants deny the allegations against them contained in this paragraph.

224. In furtherance of their conspiracy, each of these coconspirators committed overt acts and were otherwise willful participants in joint activity.

**ANSWER:** Sheriff Defendants deny the allegations against them contained in this paragraph.

225. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

**ANSWER:** Sheriff Defendants deny the allegations against them contained in this paragraph.

226. As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:** Sheriff Defendants deny the allegations against them contained in this paragraph.

WHEREFORE, Defendants Burrough Cartette, Maria Mokstad, Michael Cokeley and Sheriff Dart, in his official capacity as Sheriff of Cook County, deny that Plaintiff is entitled to any judgment against them and respectfully request that this Honorable Court enter an order dismissing Plaintiff's Second Amended Complaint against the Sheriff Defendants with prejudice and for all other relief that his equitable and just.

131224550v1 0964585

## COUNT XI

## State Law Claim - Defamation

227.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:**    This Count is not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.


228.    Defendant Riggio published and caused to be published intentionally false statements about or concerning Plaintiff that she knew to be false, including repeatedly falsely accusing Plaintiff of rape, and in so doing committed defamation per se.

**ANSWER:**    This Count is not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.


229.    By engaging in the misconduct described in this Count, Defendant Riggio made demonstrably false statements about and concerning Plaintiff to third parties, and she caused those statements to be widely published in major public newspapers distributed throughout the entire world. The things Defendant Riggio said about or concerning Plaintiff were malicious, shocking, outrageous, and offensive, and Defendant Riggio made these statements knowing that they were entirely false.

**ANSWER:**    This Count is not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.


230.    The statements made by Defendant Riggio described above are wholly untrue accusations of rape, which is a crime that constitutes defamation per se in Illinois.

**ANSWER:**    This Count is not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.


231.    Defendant Riggio acted with actual malice, reckless intent and gross indifference to the false and misleading nature of her statements about and concerning Plaintiff when she made them to third parties.

131224550v1 0964585

**ANSWER:** This Count is not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.

232. These defamatory falsehoods were made with actual malice by Defendant Riggio inasmuch as she knew of their falsity or recklessly disregarded their truth or falsity.

**ANSWER:** This Count is not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.

233. As a result of Defendant Riggio's misconduct described in this Count, Plaintiff suffered injuries, including but not limited to reputational damages, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

**ANSWER:** This Count is not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.

234. In particular, Defendant Riggio's defamatory publications have injured and continue to injure Plaintiff in the following ways, among others: (a) by impugning Plaintiff's personal reputation in the community such that individuals who Plaintiff interacts with question whether he is a rapist; (b) by limiting Plaintiff's employment options and his future career prospects; (c) by causing Plaintiff to be prosecuted and convicted for a crime he did not commit and spend over 11 years wrongfully imprisoned; and (d) by subjecting Plaintiff to harassment and additional persecution for a crime he did not commit.

**ANSWER:** This Count is not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.

235. The actions and omissions of Defendant Riggio set forth in this Count demonstrate malice, egregious defamation, and insult. Defendant Riggio's actions and omissions were undertaken either with malice, spite, ill will, vengeance, or deliberate intent to harm Plaintiff, or with reckless disregard to the falsity of the speech and its effect on Plaintiff. Accordingly, Plaintiff is entitled to punitive damages and attorneys' fees beyond those damages, described above, that will compensate Plaintiff for injuries resulting from Defendant Riggio's conduct.

**ANSWER:** This Count is not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.

## COUNT XII

### State Law Claim - Respondeat Superior

236. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:** Sheriff Defendants incorporate each answer to this Complaint as if fully restated here.

237. While committing the misconduct alleged in the preceding paragraphs, Defendant Holmes and the Law Enforcement Defendants were employees, members, and agents of the City of Chicago, the Cook County Sheriff's Department, and the Cook County State's Attorney's Office, acting at all relevant times within the scope of their employment.

**ANSWER:** Sheriff Defendants deny any alleged misconduct, but admit that they were acting, at all relevant times, within the scope of their employment. Sheriff Defendants make no answer as to other Defendants.

238. Defendants City of Chicago, Sheriff Dart, State's Attorney Alvarez, are liable as principals for all torts committed by their agents.

**ANSWER:** As to the Sheriff's Defendants, the allegations contained in this paragraph are denied as they does not reflect an accurate and complete statement of the law.

WHEREFORE, Defendants Burrough Cartette, Maria Mokstad, Michael Cokeley and Sheriff Dart, in his official capacity as Sheriff of Cook County, deny that Plaintiff is entitled to any judgment against them and respectfully request that this Honorable Court enter an order dismissing Plaintiff's Second Amended Complaint against the Sheriff Defendants with prejudice and for all other relief that his equitable and just.

131224550v1 0964585

## COUNT XIII

### State Law Claim - Indemnification

239.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:**    Sheriff Defendants incorporate each answer to this Complaint as if fully restated here.

240.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment.

**ANSWER:**    Sheriff Defendants admit the allegations contained in this paragraph.

241.    Defendant Holmes and the Law Enforcement Defendants were employees, members, and agents of the City of Chicago, the Cook County Sheriff's Department, and/or the Cook County State's Attorney's Office, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

**ANSWER:**    Sheriff Defendants deny committing any misconduct in connection with Plaintiff's Second Amended Complaint, and admit only that the Individual Sheriff Defendants were employees of the Cook County Sheriff's Office acting within the scope of their employment at all relevant times in this Second Amended Complaint.

242.    Cook County is obligated by Illinois statute to pay any judgment entered against the Sheriff of Cook County in his official capacity.

**ANSWER:**    Sheriff Defendants admit the allegations contained in this paragraph.

243.    Cook County is obligated by Illinois statute to pay any judgment entered against Defendants Holmes or Alvarez.

**ANSWER:**    This allegation is not directed toward the Sheriff Defendants, and they, therefore, make no answer thereto.

131224550v1 0964585

WHEREFORE, Defendant Burrough Cartette, Maria Mokstad, Michael Cokeley and Sheriff Dart, in his official capacity as Sheriff of Cook County, deny that Plaintiff is entitled to any judgment against them and respectfully request that this Honorable Court enter an order dismissing Plaintiff's Second Amended Complaint against the Sheriff Defendants with prejudice and for all other relief that his equitable and just.

## AFFIRMATIVE DEFENSES

### 1. Qualified Immunity

At all times during the events alleged against the Individual Sheriff Defendants, a reasonable sheriff's deputy, objectively viewing the facts and circumstances then confronting the particular deputy at issue during the actions that provide the basis for Mr. Chatman's case against them, could have reasonably believed that the actions taken by them were objectively reasonable and were within constitutional limits that were clearly established at the time. Each Individual Sheriff Defendant, therefore, is entitled to qualified immunity.

### 2. Qualified Immunity – Alternative 2

To the extent that the Court determines that the Individual Sheriff Defendants may have had a *Brady* obligation, the law was not clearly established at the time, such that it was not clear that law enforcement officers who were interviewed solely as witnesses by a separate investigating law enforcement agency, could violate the constitution in the form of a *Brady* violation, based on the information conveyed or omitted to the separate investigating agency. Each Individual Sheriff Defendant, therefore, is entitled to qualified immunity.

### 3. Qualified Immunity – Alternative 3

To the extent that the Court considers that the Individual Sheriff Defendants may have had *Brady* obligations, the law was not clearly established at the time, such that the specific tasks

60

undertaken (or omitted) by each individual deputy in this case would subject the particular individual deputy to a *Brady* obligation/constitutional violation. Each Individual Sheriff Defendant, therefore, is entitled to qualified immunity.

### 4. 745 ILCS 10/2-102 Punitive Damages Not Allowed

As this action is brought directly against the Sheriff's Office by Mr. Chatman, the Sheriff's Office is not obligated to pay any punitive or exemplary damages.

### 5. 745 ILCS 10/2-106 Oral Promise or Misrepresentation

The Sheriff is not liable for any injury caused by an oral promise or misrepresentation of its employee, whether or not such promise or misrepresentation is negligent or intentional.

### 6. 745 ILCS 10/2-109 Act or Omission of Employee

Pursuant to the Illinois Tort Immunity Act, the Sheriff cannot be liable for Mr. Chatman's alleged injuries where the Individual Sheriff Defendants are not liable.

### 7. 745 ILCS 10/2-201 Discretionary Acts

At certain times relevant to this suit, Individual Sheriff Defendants were performing discretionary acts within the scope of their employment and, therefore, are immune from liability pursuant to this section of the Illinois Tort Immunity Act.

### 8. 745 ILCS 10/2-204 Acts or Omission of Another Person

Pursuant to the Illinois Tort Immunity Act, each Individual Sheriff Defendant cannot be liable for injuries caused by the act or omission of another person.

### 9. 745 ILCS 10/2-205 and 745 ILCS 10/2-103 Adoption or Failure to Adopt Enactment

Pursuant to the Illinois Tort Immunity Act, the Sheriff Defendants (both the Sheriff's Office and the Individual Sheriff Defendants) are not liable for any injury caused by their

131224550v1 0964585

adoption of an enactment, failure to adopt an enactment, or their enforcement or failure to enforce any law.

### 10. 745 ILCS 10/2-208  Prosecution of Judicial or Administrative Proceeding

The Individual Sheriff Defendants were acting in the scope of their employment, did not act maliciously and/or willfully or wantonly, or without probable cause, and are, therefore, not liable for any injury caused by instituting or prosecuting any judicial or administrative proceeding.

### 11. 745 ILCS 10/2-210  Misrepresentation or False Information

The Individual Defendants, acting in the scope of their employment, are not liable for an injury caused by any negligent misrepresentation or the provision of information in connection with this matter.

### 12. 745 ILCS 10/8-101  Statute of Limitations

To the extent Mr. Chatman seeks recovery under state law for any acts or omissions by the Individual Sheriff Defendants that accrued more than one year prior to the filing of this lawsuit, the Sheriff Defendants are immune from suit.

### 13. *Res Judicata* and Collateral Estoppel

Plaintiff's claims in this Complaint are barred by the doctrines of *res judicata* and collateral estoppel.

### 14. Comparative Fault

To the extent any injuries or damages claimed by Mr. Chatman were proximately caused, in whole or in part, by the conduct of Mr. Chatman, any verdict or judgment obtained by Mr. Chatman must be reduced by an amount commensurate with the degree of fault attributed to Mr. Chatman by the jury in this case.

131224550v1 0964585

### 15. Mitigation of Damages

To the extent Plaintiff failed to mitigate any of his claimed injuries or damages, any verdict or judgment obtained by Mr. Chatman must be reduced by the application of the principle that a plaintiff has a duty to mitigate his damages.

## JURY DEMAND

Defendants Burrough Cartrette, Maria Mokstad, Michael Cokeley and Sheriff Dart, in his official capacity as Sheriff of Cook County, respectfully request a trial by jury.

Respectfully submitted,

**HINSHAW & CULBERTSON LLP**

/s/V. Brette Bensinger
One of Attorneys for the Sheriff Defendants

Robert T. Shannon
James M. Lydon
V. Brette Bensinger
Hinshaw & Culbertson LLP
222 North LaSalle Street, Suite 300
Chicago, IL 60601-1081
Telephone:312-704-3000
Facsimile:312-704-3001

131224550v1 0964585