IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CARL CHATMAN, | ) | |
| | ) | |
| Plaintiff, | ) | 14 C 2945 |
| | ) | |
| v. | ) | Judge John Z. Lee |
| | ) | |
| CITY OF CHICAGO, CHICAGO | ) | |
| POLICE DETECTIVES JOHN | ) | |
| ROBERTS, THOMAS MCGREAL, | ) | |
| MARIA PENA, JACK BOOCK, RITA | ) | |
| MISCHKA, BARBARA MIDONA, | ) | |
| and KRISTON KATO, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Carl Chatman filed a 42 U.S.C. § 1983 suit against the City of Chicago and various individual defendants alleging constitutional violations arising from his false conviction. Defendants Millicent Willis, Tisa Morris, Lori Lightfoot, and Karen Wojtczak, who worked for the Office of Professional Standards (OPS Defendants), filed a motion to dismiss [343]. For the reasons discussed below, the Court grants the motion in part and dismisses Counts IV, V, VI, and VII against the OPS Defendants.

**Factual and Procedural Background**[1]

Plaintiff Carl Chatman was convicted of rape even though he was innocent. Following his arrest, Chatman was interrogated by Chicago Police Detective

---

[1] When reviewing a motion to dismiss, the Court assumes the alleged facts in the complaint are true and draws all possible inferences in Chatman's favor. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

Kriston Kato who used force to coerce Chatman into confessing. *See* 2d Am. Compl. ¶¶ 54–56, ECF No. 324. Two days later, a detective submitted an anonymous memorandum describing Kato's misconduct and the resulting false confession. *See id.* ¶¶ 120–21. The memo was sent through inter-departmental mail to Millicent Willis, who at the time was the acting Chief Administrator for the Office of Professional Standards (OPS)—an agency in charge of investigating police misconduct. *See id.* ¶ 122.

Initially, the memo did not prompt any form of investigation from OPS. *See id.* ¶ 123. Based on the false confession, Chatman was convicted of rape. While his case was on direct appeal, the anonymous detective once again submitted the memo. This time, OPS began an investigation into the alleged misconduct. *See id.* ¶¶ 128–33. The OPS investigation, which included interviewing Chatman himself, was closed a few months later when the anonymous memo was determined to be unfounded. *See id.* ¶ 133. The memo was never turned over to the prosecutors or Chatman's criminal attorney. *See id.* ¶ 134.

After spending eleven years in prison, Chatman was exonerated by the State of Illinois. *See id.* ¶¶ 1, 6. He then filed this civil rights lawsuit against various defendants asserting constitutional violations based on the investigation and prosecution of his criminal case. In his Second Amended Complaint, Chatman included claims against Millicent Willis, Tisa Morris, Lori Lightfoot, and Karen Wojtczak—who were all employees of OPS—based on the failure to disclose the anonymous memo to the prosecution or Chatman's defense counsel.

## Legal Standard

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must accept "all well-pleaded factual allegations as true and view them in the light most favorable to the plaintiff." *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013) (citing *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1027 (7th Cir. 2013)). Mere legal conclusions, however, "are insufficient to survive a Rule 12(b)(6) motion." *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 885 (7th Cir. 2012) (citing *Iqbal*, 556 U.S. at 678).

## Analysis

Chatman's core claim against the OPS Defendants stems from their failure to turn over the anonymous memo to the prosecution or Chatman's attorney during his criminal proceeding. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). The OPS Defendants contend they do not have a duty to disclose under *Brady* because they are not part of the prosecution team. Alternatively, they argue that, even if such a duty were to exist, they are entitled to qualified immunity because, at the time, there was no clearly established law creating such a duty.

"The qualified immunity defense requires us to consider only two limited questions at this stage: first, whether plaintiff has alleged a violation of his

3

constitutional rights, and second, whether the violation was clearly established in the law at the time of the defendant's conduct." *Armstrong v. Daily*, 786 F.3d 529, 537 (7th Cir. 2015). The Court has discretion to decide a case under the second step without resolving whether the purported duty exists. *See Dibble v. Quinn*, 793 F.3d 803, 807 (7th Cir. 2015) (citing *Pearson v. Callahan*, 555 U.S. 223, 227 (2009)). The Court takes that approach here.

The OPS Defendants argue, that even if they had a duty to disclose exculpatory material, such an extension of *Brady* was not clearly established at the time of Chatman's criminal proceedings. "To determine whether a right is clearly established we look to controlling precedent from both the Supreme Court and this circuit, and if there is no such precedent we cast a wider net and examine all relevant case law to determine whether there was such a clear trend in the case law that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 731 (7th Cir. 2013). Although the right must be clearly established in a particularized sense, there need not be a case directly on point. *See id.* "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

Initially, only the members of the prosecution bore the obligation to disclose material, exculpatory evidence to defense counsel. *See Brady*, 373 U.S. at 87. Subsequently, *Brady* was extended so that the prosecutor's duty to disclose reached evidence in the hands of police officers, even if the information was not known to

4

the prosecutor. *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995). Although the rule was articulated in terms of a duty by the prosecutor to learn of information held by the police, it has also been understood to establish an independent duty on the part of police officers to disclose such information. *See Steidl v. Fermon*, 494 F.3d 623, 630–33 (7th Cir. 2007) (holding that the duty of police officers to disclose exculpatory information—which is enforceable under § 1983—has been clearly established since *Kyles*).

That said, neither the Seventh Circuit nor the Supreme Court has addressed whether governmental agencies that are in charge of investigating the police officers themselves—as opposed to the criminal defendant—are also subject to the duty to disclose under *Brady*. The closest the Seventh Circuit has come to this question is *United States v. Morris*, 80 F.3d 1151 (7th Cir. 1996).

In *Morris*, the court held that federal prosecutors did not have the responsibility to search for and disclose exculpatory evidence held by the United States Office of Thrift Supervision, the Securities Exchange Commission, or the Internal Revenue Service. *See id.* at 1169. Although these agencies had acquired evidence relevant to the prosecution, they had done so solely as part of their own separate investigations. *See id.* at 1169 & n.14. The court concluded, "[N]either *Kyles* nor [*United States ex rel. Smith v. Fairman*, 769 F.2d 386 (7th Cir. 1985)] can be read as imposing a duty on the prosecutor's office to learn of information possessed by other government agencies that have no involvement in the

5

investigation or prosecution at issue." *Id.* at 1169.[2] The Seventh Circuit went on to distinguish the agencies in question with "the prosecution team, which included investigating officers and agents [who] had no knowledge of the specific documents" that were the basis of the *Brady* challenge. *Id.* at 1170.

"Exactly who constitutes a member of the prosecution team is determined using a 'case-by-case analysis of the extent of interaction and cooperation between' a potential member of the team and the prosecutor." *United States v. Linder*, Case No. 12-CR-22, 2013 WL 812382, at *34 (N.D. Ill. Mar. 5, 2013) (citation omitted). However, "[a]t its core, member of the team perform investigative duties and make strategic decisions about the prosecution of the case." *Id.* "Among many others, these circumstances include whether the individual actively investigates the case, acts under the direction of the prosecutor, or aids the prosecution in crafting trial strategy." *Id.*

In this case, the second amended complaint is bereft of any allegations that the OPS Defendants actively investigated the case against Chatman, acted under the Assistant State's Attorney's supervision, or were involved in crafting trial strategy. In short, there is no indication in the second amended complaint that the OPS Defendants were part of the prosecution team against Chatman. The inquiry that was sparked by the anonymous memo focused on uncovering misconduct by Officer Kato rather than investigating the allegations of rape against Chatman. In

---

[2] It is worth noting that, in *Morris*, the court's focus was on the prosecutor's duty to search out information in the hands of agencies outside the prosecution team; the court did not consider whether the agencies themselves had an affirmative duty to disclose under *Brady*.

6

contrast, the instances in which the Seventh Circuit has entertained a *Brady* claim under § 1983 against individuals other than prosecutors all evince a close relation between the defendant and the underlying investigation and prosecution. *See, e.g.*, *Steidl*, 494 F.3d at 630–32 (holding that the investigating police officers can be liable under § 1983 for a *Brady* violation); *Carvajal v. Dominguez*, 542 F.3d 561, 566–67 (7th Cir. 2008) (DEA agent); *Bielanski v. Cty. of Kane*, 550 F.3d 632, 634 (7th Cir. 2008) (DCFS investigators working with police to investigate child sexual abuse); *Manning v. Miller*, 355 F.3d 1028, 1034 (7th Cir. 2004) (FBI agent part of investigators subject to *Brady*'s disclosure requirement). Because the OPS Defendants were not part of the prosecution team behind Chatman's arrest and conviction (at least, as they are portrayed in the second amended complaint), there was no clearly established law in this circuit tasking them with a duty to disclose the anonymous memo to the defense.[3]

Chatman relies heavily on the fact that OPS was formally part of the Chicago Police Department. As a result, argues Chatman, the OPS Defendants' duty to disclose under *Brady* is coextensive with that of the police—which has been clearly established since *Kyles*. *See* Pl.'s Resp. at 18, ECF No. 356. But Chatman's reliance upon the organizational relationship between the OPS and the Chicago Police

---

[3] Chatman's reliance on *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988), is misplaced. The Seventh Circuit in that case upheld a verdict against the city because of the practice of keeping and failing to disclose "street files"—records that were kept separate from the police department's regular files. *Id.* at 989, 995. Unlike the OPS Defendants, the officers that had been keeping the clandestine files were the police officers directly investigating the underlying crime. Nothing in *Jones* suggests that the duty to disclose extends to an agency in charge of investigating the police itself.

7

Department ignores the functional inquiry utilized in cases like *Morris* that asks whether the individual in question participated in the investigation and prosecution of the underlying crime.[4] In fact, OPS has since been replaced by the Independent Police Review Authority, which is an entity separate from the Chicago Police Department. *See* City of Chicago, http://www.cityofchicago.org/city/en/depts/ipra.html (last visited Aug. 15, 2016). To rely entirely on CPD's internal organizational structure to determine the bounds of *Brady*, as Chatman urges here, would invite the type of formalistic departmental compartmentalization denounced in *Morris*. *See Morris*, 80 F.3d at 1169 (noting it would be improper for a prosecutor's office to remain ignorant about evidence by compartmentalizing information).

With no Supreme Court or Seventh Circuit cases on point, Chatman turns to out-of-circuit cases to argue that the OPS Defendants clearly had a duty to disclose. The cases he relies on, however, all turn on the prosecutor's duty to search for information held by other government agencies as opposed to the agencies' independent duty to disclose. *See United States v. Brooks*, 966 F.2d 1500, 1500–04 (D.C. Cir. 1992); *United States v. Perdomo*, 929 F.2d 967, 971 (3d Cir. 1991); *United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980); *Martinez v. Wainwright*, 621 F.2d

---

[4] The functional test for determining the prosecution team is similar to what is used to determine whether a prosecutor is protected by absolute prosecutorial immunity or qualified immunity for investigative work. *See Fields v. Wharrie*, 740 F.3d 1107, 1113–15 (7th Cir. 2014).

184, 186–87 (5th Cir. 1980).[5] Take, for example, the Fifth Circuit's decision in *Auten*. In that case, the prosecutor had not run a search on the National Crime Information Center and had thus failed to disclose prior convictions of one of its witnesses. *See Auten*, 632 F.2d at 480–81. The court imputed knowledge of the exculpatory evidence on the prosecutor and held that the he had violated his duty under *Brady*. *See id.*

Here, Chatman seeks to extend the holding of these cases to impose a constitutional duty to disclose on government employees who were responsible for investigating police officers, but had no part in investigating or prosecuting the criminal defendant. None of the cited cases go so far. To establish the type of duty Chatman seeks to impose on the OPS Defendants, a case like *Auten* would have to say that the employees of the National Crime Information Center had a duty to disclose the impeachment material to the prosecutor or Auten's attorney. It does not do so.

For these reasons, the Court holds that the duty at issue in this case (assuming that one exists) was not clearly established at the relevant time period. The Court takes no position as to the appropriateness of imposing a duty to disclose on the OPS Defendants under these circumstances, particularly given that they plainly were aware of the ongoing criminal proceedings against Chatman. What is

---

[5] In his brief, Chatman describes the holding from *Brooks* as: "*Brady* applies to internal affairs investigators." This broad construction is incorrect. The D.C. Circuit in *Brooks* held that the prosecutor had a duty to search the police department's homicide and Internal Affairs Division files. *See Brooks*, 966 F.2d at 1503.

9

clear, however, is that such a duty was not clearly established at the time the proceedings were taking place.

Lastly, Chatman contends that the Court should refrain from deciding the question of qualified immunity until the OPS Defendants have been deposed. Until then, Chatman argues, he will not be able to know whether they withheld the memo because they believed in good faith that they were immune. *See* Pl.'s Resp. at 18 n.9. Although qualified immunity is often a fact-intensive inquiry, it does not depend on the defendant's subjective, good-faith belief that they were immune. *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987). In any event, at the motion to dismiss stage, the Court's inquiry is bounded by the allegations in the second amended complaint.

Accordingly, the Court grants the OPS Defendants' motion to dismiss the *Brady* claim against them. Because the remaining constitutional claims against them are derivative of the *Brady* violation, Counts V, VI, and VII against the OPS Defendants also are dismissed. *See Cefalu v. Vill. of Elk Grove*, 211 F.3d 416, 423 (7th Cir. 2000) (holding that a § 1983 conspiracy claim requires an underlying constitutional violation); *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) (failure to intervene); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 597 (7th Cir. 1997) (supervisor liability).[6]

The state law claims are a different matter. Chatman's complaint includes a claim of intentional infliction of emotional distress (IIED) and a state law conspiracy claim. *See* 2d Am. Compl. ¶¶ 219–26. Initially, the OPS Defendants

---

[6] Chatman does not argue in his brief that any of these § 1983 claims are based on constitutional deprivations other than the *Brady* claim.

contend that these state law claims are untimely. But "a motion to dismiss based on failure to comply with the statute of limitations should be granted only where the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense." *See Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 613–14 (7th Cir. 2014). As demonstrated by his response brief, Chatman plans to rely on the discovery rule to show that his state law claims against the OPS Defendants were timely. *See* Pl.'s Resp. at 19. In response, the OPS Defendants cite to a passage from *Bridewell v. Eberle*, 730 F.3d 672, 678 (7th Cir. 2013), where the Seventh Circuit noted that a claim of intentional infliction of emotional distress "accrues on the date of the arrest." But, in that case, the plaintiff alleged that the defendants committed the tort at the time that they arrested her and recommended her prosecution. Here, Chatman alleges that the OPS Defendants committed the tort when they failed to disclose the anonymous memo during the proceedings against him. Because the "standard rule" is that an IIED claim accrues "when the victim first suffers injury *and* knows its cause," *Bridewell*, 730 F.3d at 678 (emphasis added), and Chatman asserts that he only became aware of the memo's existence in 2015, the Court declines to dismiss the claim based upon the statute-of-limitations defense at this time.

The OPS Defendants further argue that the IIED claim should be dismissed because it is predicated upon a finding that they violated *Brady*, which—they argue—Chatman's allegations do not establish. To state an IIED claim, a plaintiff must show that "1) the defendant's conduct was extreme and outrageous; 2) the

defendant intended to inflict severe emotional distress, or knew there was a high probability its conduct would do so; and 3) the defendant's conduct caused severe emotional distress." *See Franciski v. Univ. of Chi. Hosps.*, 338 F.3d 765, 769 (7th Cir. 2003). Accordingly, it is not necessary for Chatman to prove a *Brady* violation (or even the existence of a constitutional duty to disclose under *Brady*) in order to meet the elements of his IIED claim, so long as he can show that the OPS Defendants acted in an extreme and outrageous manner by knowingly withholding exculpatory information, even though they were aware that there was a high likelihood that disclosure of the information would impact Chatman's trial and appeal. *See Garrison v. Burke*, No. 91 C 20150, 1993 WL 29909, at *4 (N.D. Ill. 1993) ("[T]his court reads Count IX to be a state law claim for intentional infliction of emotional distress, for which no constitutional violation is needed."). For these reasons, the OPS Defendants' motion to dismiss the state law claims is denied.

## Conclusion

For the reasons stated herein, the Court grants the OPS Defendants' motion to dismiss [343] Counts IV, V, VI, and VII. The remainder of the motion is denied.

**IT IS SO ORDERED.**   **ENTERED   9/12/16**

_____
**John Z. Lee**
**United States District Judge**