**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CARL CHATMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14-cv-2945 |
| | ) | |
| CITY OF CHICAGO, et al., | ) | The Honorable John Z. Lee |
| | ) | |
| Defendants. | ) | |

**SHERIFF'S DEFENDANTS' CORRECTED RULE 56.1 STATEMENT OF
UNDISPUTED MATERIAL FACTS**

**JURISDICTION AND VENUE**

1. This Court has subject matter and supplemental jurisdiction, pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367, respectively, and venue is proper as this action alleges acts and omissions occurring within this judicial district. (Second Amended Complaint "SAC", Dkt. 324 at ¶¶ 9-11).

**DESCRIPTION OF PARTIES AND OTHERS INVOLVED**

**Court Clerks**

2. Defendant Susan Riggio ("Ms. Riggio" or "Riggio"), worked for a Cook County Judge on the 21st floor of the Daley Center, and claimed that on May 24, 2002, she was sexually assaulted at work. (SAC, Dkt. 324 at ¶ 30 and Ex. B, Riggio Dep., pp. 153:24; 154:1-3, 158:1-24; 184:15-17).

3. Jeanette Neibauer ("Clerk Neibauer" or "Neibauer") worked as a court clerk at the Daley Center and first discovered Susan Riggio after the incident. (Ex. C, Neibauer Dep., pp. 5:19-24, 7:13-8:1; Ex. D, Bryant Dep., pp. 67:23-24, 68:1-5).

4. Pearl Bryant ("Clerk Bryant" or "Bryant") also worked as a court clerk on the same floor of the Daley Center as Jeanette Neibauer and Susan Riggio. (Ex. D, Bryant Dep., pp. 14:1-4, 46:13-18).

**Responding Deputies**

5. At all times relevant to this lawsuit, Michael Cokeley was a Cook County Sheriff's Deputy on May 24, 2002 ("Deputy Cokeley" or "Cokeley"), and is an individually named defendant in this lawsuit. (SAC, Dkt. 324 ¶ 15).

6. At all times relevant to this lawsuit, Maria Mokstad was a Cook County Sheriff's Deputy Sergeant ("Deputy Sgt. Mokstad" or "Mokstad"), and is an individually named defendant in this lawsuit. (SAC, Dkt. 324 at ¶ 15).

7. Deputy Cokeley, Deputy Prince and Deputy Sgt. Mokstad responded to the crime scene together on May 24, 2002. (Ex. E, Mokstad Dep, p. 27:1-4; Ex. F, Prince Dep., pp. 31:5-14, 31:18-22).

8. At all times relevant to this lawsuit, Burrough Cartrette was a Cook County Sheriff's Deputy Lieutenant ("Deputy Lt. Cartrette" or "Cartrette"), is an individually named defendant in this lawsuit (SAC, Dkt. 324 at ¶ 15), and arrived at the scene after Mokstad and Cokeley. (Ex. G, Cartrette Dep., pp. 133:6-21, 134:17-20, 138:14-18).

9. On May 24, 2002, Sheriff's Deputy Michael Copeland was a Cook County Sheriff's Deputy ("Deputy Copeland," the "Sleeping Deputy" or "Copeland"), and as of approximately 5:30 in the morning on the date of the incident, more than two hours before his shift, he was sleeping in an antechamber room approximately 30-40 feet away from where the incident occurred. (Ex. H, Copeland Dep., pp. 8:21-24, 9:1-2, 19:9, 43:3-13, 93:10-18; Ex. E, Mokstad Dep., pp. 110:23-111:3).

### Responding Private Security

10. Charles Roe was the Director of Security for the Daley Center ("Security Director Roe") and reported to Kathleen Morro, the General Manager of the Daley Center, and worked for MB Real Estate. (Ex. I, Morro Dep., pp. 6:12-18, 7:22-24, 8:1-5, 13:13-24; 96:11-13).

11. Security Director Roe managed approximately 10-15 security guards who worked in shifts around the clock at the Daley Center, and were part of a private, subcontracted security company called Argus Security. (Ex. J, Roe Dep., pp. 12:5-16, 127:7-12; Ex. I, Morro Dep., pp. 13:6-12, 14:1-4).

### Responding Chicago Police Officers

12. Chicago Police Sergeant Bryan Holy was responsible for assigning the detectives to investigate the Susan Riggio rape at the Daley Center on May 24, 2002, and assigned CPD Detectives Thomas McGreal and Maria Pena to the crime scene; CPD Detectives O'Connor, Kukulka and McCarthy to the crime scene to assist CPD Detectives McGreal and Pena; and CPD Detectives Rita Mischka and Barb Midona to the hospital to interview Ms. Riggio. (Ex. K, Holy Dep., pp. 55:6-9, 55:12-24, 56:7-11, 57:13-58:3).

13. Chicago Police Officer Casey Stadnicki was the first police officer to arrive to the crime scene, and he spoke to Susan Riggio on a limited basis before she left for the hospital, and spoke to Clerk Neibauer to get a description of the offender. (Ex. L, McGreal Dep., pp. 135:1-3, 138:13-139:10; Ex. A, Stadnicki Interview in Case Supplemental Report).

14. Chicago Police Officer Stadnicki sent out a flash message of the description over the police radio. (Ex. L, McGreal Dep., pp. 138:13-139:7; Ex. A, Stadnicki Interview in Case Supplemental Report).

**EVENTS OF THE MORNING OF MAY 24, 2002**

15. On the morning of May 24, 2002, a co-worker found Susan Riggo lying on her desk in urine, whimpering, mumbling and crying, with her skirt pulled up and scissors lying on her underwear. (Ex. C, Neibauer Dep., pp. 36:1-13, 36:15-18, 37:5-9, 39:1-5, 39:16-19, 39:24-40:8, 40:20-24, 71:22-72:1).

16. After Neibauer found Ms. Riggio in the distressed state, Neibauer quickly went down the hall to get help from her co-worker Pearl Bryant; they decided on a course of action and Neibauer called 911. (Ex. C, Neibauer Dep., pp. 41:1-11, 42:17-24, 43:1-10, 78:8-20; Ex. D Bryant Dep., p. 70:5-16).

17. When Neiubauer was going back and forth to and from Bryant's office on the morning of May 24, 2002, Neibauer noticed a deputy who was sleeping behind a glass door in the antechamber between where Neibauer was assigned and the antechamber of the chambers where Bryant was assigned. (Ex. C, Neibauer Dep., pp. 41: 22-42:16, 80:8-81:10; Ex. H, Copeland Dep., p. 96:11-14).

18. Clerk Neibauer passed by the antechambers of the sleeping deputy a couple of times that morning and the deputy remained asleep. Neibauer first saw the deputy awake when the paramedics and deputies were there, among the flurry of activity (Ex. C, Neibauer Dep., pp. 81:17-82:11, 88:5-14).

19. Clerk Bryant did not notice the deputy who was sleeping in the antechambers next door, even though Clerk Bryant had to pass by the antechambers where the deputy was sleeping in order to respond to Sue Riggo that morning. (Ex. D, Bryant Dep., p. 54:17-20)(Ex. C, Neibauer Dep., p. 42:1-16).

20. After a call came in about a problem on the 21st floor, Deputy Cokeley, Deputy Sgt. Mokstad and Deputy Prince responded to the scene. (Ex. E, Mokstad Dep., pp. 24: 8-15, 27:1-3).

21. When the Deputies got to the back hallway on the 21st floor, they saw a female clerk down the hallway who directed Deputy Cokeley towards her. (Ex. N, Cokeley Dep., p. 58:5-24; Ex. E, Mokstad Dep., pp. 40:22-41:24).

22. Deputy Sgt. Mokstad followed Deputies Cokeley and Prince down the hallway to the victim. (Ex. E, Mokstad Dep., p. 39:9-17).

23. Neither Deputies Prince nor Cokeley noticed Deputy Copeland inside a judge's antechambers when they responded to the crime scene. (Ex. F, Prince Dep., pp. 60:24-61:2) (Ex. N, CokeleyDep., p. 59:7-22).

3

24. After she saw the clerk, Deputy Sgt. Mokstad noticed Deputy Copeland sitting in one of the Judge's antechambers. (Ex. E, Mokstad Dep., p. 40:7-20).

25. At the time that Deputy Sgt. Mokstad noticed Deputy Copeland; he was awake, and was sitting in the antechambers with the door shut. (Ex. E, Mokstad Dep, pp. 61:4-10, 63:18-20, 64:6-18).

26. Deputy Sgt. Mokstad did not see either Deputy Cokeley or Deputy Prince acknowledge Deputy Copeland when she was following them to the crime scene. (Ex. E, Mokstad Dep, pp. 78:19-79:2)

27. Deputy Sgt. Mokstad followed [Cokeley] [*sic*] into the room where Riggio was located, and noticed Riggio on top of a desk in distress, gasping and having difficulty breathing, with her skirt pushed up above her waist and scissors sticking in her pantyhose in her crotch area. (Ex, E, Mokstad Dep., pp. 25:2-8, 42:4-8, 42:9-12, 46:21-23, 47:2-11, 102:4-6; Ex. N, Cokeley Dep., pp. 64:7-14, 65:6-7, p. 68:10-20, 125:20-24, 126:4-10).

28. Mokstad and Cokeley attempted to help Ms. Riggio; Mokstad rolled her on her side and removed the scissors so that the wound not puncture her. (Ex. E, Mokstad Dep., pp. 103:18-20, 104:3-6)

29. Security Director Roe responded to the incident as Ms. Riggio was still laying on her desk gasping for air. (Ex. J, Roe Dep., pp. 53:19-24, 54:1).

30. Even though she was having trouble speaking, Riggio told those in the room she had been assaulted and provided a brief description of the offender. (Ex. N, Cokeley Dep., pp. 71:18-23, 73:3-5; Ex. G, Cartrette Dep., pp. 139:5-24, 140:1).

31. Cokeley briefly looked in the victim's purse for identification. (Ex. N, Cokeley Dep., pp. 115:15-116:3).

32. One of the Deputies radioed the description of the offender to the security people downstairs and then instructed a subordinate to "shut down" the building and not let anyone in or out. (Ex. G, Cartrette Dep., p. 142:11-18).

33. Shortly thereafter, as the paramedics and police were coming in, Deputy Lt. Cartrette called down to instruct Deputy Sgt. Rodriguez to get as many people as possible to start searching the building in case the offender was still inside. (Ex. G, Cartrette Dep., p. 144:16-23).

34. A search of the building for the offender was conducted by members of the private security team headed by Security Director Roe and non-defendant deputies. None of the defendant Courtroom Deputies personally participated in the search. (Ex. E, Mokstad Dep., pp. 55:5-7; Ex. S, Mokstad 2006 Dep., p. 140:2-5; Ex. N, Cokeley Dep., p. 93:9-16; Ex. G, Cartrette Dep., p. 145:1-18).

35. When the paramedics arrived, the Deputies moved aside and let them do their job. (Ex. E, Mokstad, p. 48:2-4; Ex. N, Cokeley Dep., 80:15-17).

36. When the Chicago police department arrived, they took over the scene. (Ex. N, Cokeley Dep., p. 80:20-23; Ex. G, Cartrette Dep., p. 170:1-5).

37. After Cokeley left the hearing room, he walked around 21st floor on his own, and may have looked in rooms or courtrooms to see if anyone was there who was not supposed to be. (Ex. N, Cokeley Dep., pp. 82:8-11, 88:11-21, 90:3-8).

38. After the police took over the scene, the Sheriff's Office may have provided a guard to prevent people from entering the floor. (Ex. G, Cartrette Dep., p. 170:1-11).

### CPD INVESTIGATES THE SEXUAL ASSAULT AT THE DALEY CENTER

39. Sgt. Holy, who was responsible for assigning the CPD detectives to the investigation, remained at the crime scene while the interviews were conducted and while the lab processed the scene. (Ex. K, Holy Dep., pp. 23:23-24:21).

40. When Detective Pena interviewed the Deputies, she considered them in the "witness" category. (Ex. O, Pena Dep., pp. 179:17-23, 180:1-2).

41. After receiving a call regarding an incident occurring at the Daley Center, Forensic Investigator Mary Cosgrove responded to process the crime scene by photographing the scene, talking to detectives, dusting for fingerprints and collecting evidence with her partner on May 24, 2002. (Ex. P, Cosgrove Dep., p. 29:19-22, 17:6-11, 18:21-14, 19:1-8, 57:5-12, 34:4-9).

42. Sergeant Bryan Holy indicated that the Cook County Sheriff's Department was not involved in the criminal investigation of the rape of Susan Riggio. (Ex. K, Holy Dep., p. 137:2-7).

43. CPD Detectives McGreal and Pena, as well as CPD Sgt. Holy, and CPD Forensic Investigator Cosgrove all could not identify any task that the Sheriff's Office participated in with respect to the Riggio rape investigation. (Ex. L, McGreal Dep., pp. 209:19-210:1; Ex. O, Pena Dep., p. 179:12-16; Ex. K, Holy Dep., p. 137:21-24; Ex. P, Cosgrove Dep., pp. 53: 20-23, 54:2).

44. The afternoon of May 24, 2002, Security Director Roe escorted CPD evidence technicians and detectives through the Daley Center to search conduct a search of the building, but none of the Courtroom Deputies participated in the search of the building with the police and Security Director Roe. (Ex. J, Roe Dep., pp. 67:14-68:2, 70:6-14; Ex. G, Cartrette Dep., pp. 165:24-166:6; Ex. E Mokstad Dep., p. 55:5-7; Ex. S, Mokstad 2006 Dep., p. 140:2-5; Ex. N Cokeley Dep., p. 93:1-16).

45. In the early morning hours the day after the incident, Security Director Roe returned to the Daley Center at the request of the police department to escort the suspect, the police, as well as a prosecutor, for a walkthrough in the Daley Center, but the Courtroom Deputies did not participate in the walkthrough. Another member of Security Director

5

Roe's private security team may have accompanied them in the walkthrough. (Ex. J, Roe Dep., pp. 71:16-72:11, 73:10-21; 74:4-16).

46. CPD Detective Pena knew of no evidence suggesting that the investigation of the Susan Riggio sexual assault was a joint investigation between CPD and the Cook County Sheriff's Department. (Ex. O, Pena Dep., pp. 178:22-179:3).

## COURTROOM DEPUTY FOLLOW-UP

47. Each of the three Deputies wrote a to/from memo to the Chief of Courts that provided a brief summary documenting their response to the incident. (Ex. E, Mokstad Dep., pp. 59: 8-11, 31:3-7; Ex. G, Cartrette Dep., p. 157:1-5; Ex. N, Cokeley Dep., p. 95:15-18).

48. The Deputies did not interview witnesses in connection with the incident. (Ex. C, Neibauer Dep., p. 57:8-13; Ex. Q, Cernick Dep., pp. 68:19-69:1).

## THE SLEEPING DEPUTY

49. In 2002, Deputy Copeland would typically arrive at 5:30 am, more than two hours before his shift, and sleep in an antechamber of an upper floor before reporting for duty. (Ex. H, Copeland Dep., pp. 43:3-13, 53:19-22, 54:5-7, 56:14-24, 58:8-11).

50. On May 24, 2002, Deputy Copeland arrived at the Daley Center around 5:30 am, went into one of the judge's antechambers and fell asleep, with his feet up on the desk and the door to the hallway shut. (Ex. H, Copeland Dep, pp. 93:10-18, 96:11-14; Ex. C, Neibauer Dep., pp. 42:1-7, 81:6-10; Ex. E, Mokstad Dep., p. 63:18-20).

51. On May 24, 2002, Deputy Copeland awoke at the time he normally wakes up, around 7:50 am, and heard radios, saw some Deputies and a supervisor, and proceeded to the elevators. (Ex. H, Copeland Dep., pp. 98:12-24, 99:1-3, 183:1-3).

52. When Deputy Lt. Cartrette responded, he saw Deputy Copeland, the Sleeping Deputy, approaching an elevator in full uniform. (Ex. G, Cartrette Dep., pp. 190:21-23, 191:20-22).

53. Mokstad informed Cartrette that she saw Deputy Copeland in an antechambers. (Ex. E, Mokstad Dep., p. 70:7-18).

54. Mokstad never had a conversation with Deputy Cokeley about having seen Deputy Copland that morning. (Ex. E, Mokstad Dep., p. 89:22-90:3; Ex. N, Cokeley Dep., p. 60:16-19)

55. Prior to being sued in this case, Deputy Cokeley was not aware of that Deputy Copeland was on the 21st floor of the Daley Center the morning of the incident. (Ex. N, Cokeley Dep., p. 60:12-15).

6

## CPD DETECTIVE McGREAL BECOMES AWARE OF THE SLEEPING DEPUTY

56. CPD Detective McGreal became aware that there was a deputy sheriff sleeping in the area of the 21st floor, near the crime scene. (Ex. L., McGreal Dep, pp. 158:9-159:1).

57. CPD Detective McGreal learned the information about the Sleeping Deputy from Deputy Lt. Cartrette. Specifically, Deputy Cartrette informed McGreal that "he had information that there was a sheriff's deputy sleeping in the area on the 21st floor of where this thing happened, near the crime scene." (Ex. L, McGreal Dep., pp. 158:8-20, 162:1-22, 165:10-15).

58. On December 17, 2014, Deputy Lt. Cartrette testified that on the date of the incident, he informed Detective McGreal that there was a deputy on the 21st floor who was observed sleeping. (Ex. G, Cartrette Dep., pp. 67:3-12, 68:1-11, 70:16-71:2; 74:12-17).

59. Deputy Lt. Cartrette approached Detective McGreal and asked McGreal to interview the Sleeping Deputy. (Ex. L, McGreal Dep., p. 158:9-17).

60. CPD Detective McGreal believed that the sleeping deputy issue was an internal Sheriff's disciplinary matter, chose not to get involved and did not interview the Sleeping Deputy, and believed that the Sleeping Deputy could not provide relevant information because all he could say was that he was sleeping. (Ex. L, McGreal Dep., p. 162:15-163:3, 205:1-9).

## COURTROOM DEPUTY LT. CARTRETTE MEETS WITH
## THE SLEEPING DEPUTY

61. Deputy Lt. Cartrette met with the Sleeping Deputy on the day of the incident. (Ex. G, Cartrette Dep., p. 90:10-17).

62. The Sleeping Deputy informed Cartrette that he was in a room on the 21st floor asleep. (Ex. G, Cartrette Dep., pp. 90:14-17).

63. Deputy Lt. Cartrette had the Sleeping Deputy write a statement about what happened in his own writing. Cartrette wanted Deputy Copeland to admit whether or not he was sleeping. (Ex., G, Cartrette Dep., pp. 118:17-24; 119:1-17).

64. Deputy Lt. Cartrette submitted the statement and information about the Sleeping Deputy up his chain of command for disciplinary action. (Ex. G, Cartrette Dep., p. 183:4-23, 184:1-15, 189:20-190:19).

65. Cartrette was interviewed by IAD about the Sleeping Deputy's discipline one month after the incident, but until the initiation of this lawsuit had no previously ever seen the IAD file. (Ex. G, Cartrette Dep., p. 183:1-13; Ex. R, IAD File).

66. The Sheriff's IAD did not interview Deputies Mokstad or Cokeley in connection with discipline of the Sleeping Deputy, and Mokstad was not aware that the Sleeping Deputy was facing disciplinary action. (Ex. E, Mokstad Dep., p. 52:24-53:2; 53:7-12; Ex. R, IAD File).

131650950v1 0964585

### POLICE STATION INTERVIEWS AND CARL CHATMAN TRIAL

67. Deputy Lt. Cartrette went to the police station later on May 24, 2002, and again met with Detective McGreal but did not meet with prosecuting attorney Holmes, never testified in Carl Chatman's criminal case, never saw any police reports about the incident, and had no further involvement with CPD on this matter after the date of the incident. (Ex. G, Cartrette Dep., p. 68:2-11, 109:20-110:9, 168:7-13, 168:22-169:1-9, 219:21-23).

68. Mokstad and Cokeley went to the police department, as did other Daley Center employees. (Ex. E, Mokstad Dep., p. 56:1-3; Ex. N, Cokeley Dep., p. 95:8-12; Ex. D, Bryant Dep., p. 80:8-18; Ex. C, Neibauer Dep., p. 46:11-20).

69. Cokeley testified as a fact witness at Carl Chatman's trial and met with ASA Rubenstein only to prepare for Cokeley's testimony at trial. (Ex. N, Cokeley Dep., p. 74:19-22; p. 118:6-13).

70. Mokstad never testified in the criminal case. (Ex. N, Cokeley Dep., p. 73:8-10).

### COURTROOM DEPUTY TRAINING AND DUTIES

71. Before becoming a deputy sheriff, individuals are required to attend a 10 week Training Academy that is geared toward teaching them how to serve as a deputy sheriff in one of the court buildings. (Ex. N, Cokeley Dep., p. 22:17-23).

72. The Deputies who responded to the scene on May 24, 2002 were not members of the Sheriff's Police Department. In order to be a member of the Sheriff's Police Department, a sheriff's deputy was required to take a test and pass a separate evaluation process as well as complete 10 weeks at the Police Academy, separate from the Training Academy required for deputy sheriffs. They must also complete 12-16 weeks of practical field training with a field training officer. (Ex. N, Cokeley Dep., pp. 28:8-11, 29:13-30:4).

73. The process in medical emergency at the Daley Center is to call 911 and the Office of the Building, not the Sheriff's Department. (Ex. J, Roe Dep., pp. 52:17-53:8).

74. Clerk Neibauer testified in Carl Chatman's criminal trial. (Ex. C, Neibauer Dep., pp. 25:24-26:1-2).

131650950v1 0964585