IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CARL CHATMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 14 C 2945 |
| | ) | |
| CITY OF CHICAGO, Chicago Police Detectives | ) | Judge John Z. Lee |
| JOHN ROBERTS, THOMAS MCGREAL, | ) | |
| MARIA PENA, JACK BOOCK, RITA MISCHKA, | ) | |
| BARBARA MIDONA, AND KRISTON KATO, | ) | |
| Chicago Police Sergeants DENNIS WALSH and | ) | |
| BRYAN HOLY, Chicago Police Officers MICHAEL | ) | |
| KARCZEWSKI and RICHARD GRIFFIN, | ) | |
| Cook County Sheriff's Deputies MICHAEL | ) | |
| COKELEY and BURROUGH CARTRETTE, | ) | |
| Sheriff's Deputy Sergeant MARIA MOKSTAD, | ) | |
| Assistant State's Attorney BRIAN HOLMES, | ) | |
| UNKNOWN CHICAGO POLICE OFFICERS, | ) | |
| UNKNOWN COOK COUNTY SHERIFF'S | ) | |
| DEPUTIES, THE COUNTY OF COOK, | ) | |
| THOMAS DART, in his official capacity as Sheriff | ) | |
| of Cook County, ANITA ALVAREZ, in her official | ) | |
| capacity as Cook County State's Attorney, | ) | |
| SUSAN RIGGIO, KAREN WOJTCZAK, former | ) | |
| Office of Professional Standards Investigator, | ) | |
| MILLICENT WILLIS, former Acting Chief | ) | |
| Administrator of the Office of Professional Standards, | ) | |
| and LORI LIGHTFOOT and TISA MORRIS, former | ) | |
| Chief Administrators of the Office of Professional | ) | |
| Standards, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

After spending over a decade in prison for sexual assault, Plaintiff Carl Chatman was

declared innocent, and his conviction was vacated.  Based on his false conviction, Chatman has

sued the individuals and entities he believes violated his rights under the Fourth, Fifth, and

Fourteenth Amendments to the United States Constitution, as well as federal and state laws.  He

alleges that certain Defendants coerced and fabricated his confession, manufactured evidence, failed to disclose exculpatory evidence, conspired to deprive him of his constitutional rights, failed to intervene to prevent the deprivation of his constitutional rights, maliciously prosecuted him, and intentionally inflicted on him emotional distress.

Defendants generally fall within four categories: "the Sheriff Defendants," "the Officer Defendants," "the State's Attorney's Office (SAO) Defendants," and "the Office of Professional Standards (OPS) Defendants."[1] The Officer Defendants properly titled their motion as one for partial summary judgment.[2] Each other category of Defendants has titled their motion as one for summary judgment. But because every motion omits one or more counts, the Court construes each as a motion for partial summary judgment.[3] For the reasons provided below, each of the motions is granted in part and denied in part.

---

[1] "The Sheriff Defendants" include Cook County Sheriff's Deputies Michael Cokeley and Burrough Cartrette, Cook County Sheriff's Deputy Sergeant Maria Mokstad, the County of Cook, and Thomas Dart in his official capacity as Sheriff of Cook County. "The Officer Defendants" are Chicago Police Detectives John Roberts, Thomas McGreal, Maria Pena, Jack Boock, Rita Mischka, Barbara Midona, and Kriston Kato; Chicago Police Sergeants Dennis Walsh and Bryan Holy; Chicago Police Officers Michael Karczewski and Richard Griffin, and the City of Chicago. "The SAO Defendants" include Assistant State's Attorney Brian Holmes and Anita Alvarez in her official capacity as Cook County State's Attorney. "The OPS Defendants" are Karen Wojtczak, Office of Professional Standards (OPS) Investigator, Millicent Willis, Former Acting Chief Administrator of OPS, and Lori Lightfoot and Tisa Morris, former Chief Administrators of OPS. Although Chatman has also sued Susan Riggio, her unopposed motion for partial summary judgment has been granted by the Court, and only Count VIII (Malicious Prosecution–State Law) remains for trial as to her. *See* 2/14/18 Minute Entry, ECF No. 525.

[2] The Officer Defendants' motion is properly titled because it omits Count I (Coerced Confession/Fabricated Evidence–5th Am.), Count II (Coerced Confession/Fabricated Evidence–14th Am.), Count III (Detention–Fourth Am., reinstated on 2/14/18), Count IV (Exculpatory Evidence based on 24-Hour Surveillance Tape & Coerced Confession/Fabricated Evidence–14th Am.), Count V (Exculpatory Evidence based on 24-Hour Surveillance Tape & Coerced Confession/Fabricated Evidence–Conspiracy), Count VI (Failure to Intervene as to all underlying counts), Count VII (Supervisory Liability, as to unaddressed counts), Count VIII (Malicious Prosecution–State Law), Count IX (Intentional Infliction of Emotional Distress–State Law), and Count X (Conspiracy–State Law, as to unaddressed counts).

[3] For example, the Sheriff Defendants' motion omits Counts III and VIII. However, after the motion was fully briefed, Plaintiff and the Sheriff Defendants stipulated that only Counts IV, V, X, XII, and XIII remain, subject to their summary judgment motion. *See* Stipulation of Dismissal, ECF No. 526.

# Factual Background[4]

## I. The Incident

On Friday, May 24, 2002, Susan Riggio arrived to work between 6:45 and 7:00 a.m. at the Circuit Court of Cook County in the Daley Center. Pl.'s Ex. 31, Riggio Dep. (Riggio Dep.) at 128:19–21. It was the Friday before Memorial Day weekend, and the judge for whom she worked was out of town, and her co-worker, Jeannette Neibauer, typically arrived at 7:30 a.m. Def. Officers' Ex. 6, Midona Dep. (Midona Dep.) at 182:19–20; Def. Officers' Ex. 19, Neibauer Dep. (Neibauer Dep.) at 16:21–17:1, 33:12–16.

Riggio claims that at 7:20 a.m., while she was alone in her office in room number 2101, a man attacked her, beat her head against a table, and sexually assaulted her. Riggio Dep. at 158:8–181:23. According to Riggio, with the door to her office open, she screamed loudly for help at least three times during the attack and picked up a chair and hit the assailant with it. Riggio Dep. at 168:14–169:7, 173:16–21; Pl.'s LR 56.1(b)(3)(B) Stmt. (Sheriff Defs.) ¶ 15.

## II. The "Sleeping Deputy"

When Neibauer arrived for work, she saw Riggio lying on her desk and heard Riggio crying and mumbling. Def. Officers' Ex. 19, Neibauer Dep. at 40:2–24. Neibauer then walked down the hall to co-worker Pearl Bryant's office to alert her that something had happened. Neibauer Dep. at 40:3–11, 41:22–42:7; Pl.'s Ex. 5, Floor Diagram. On the way to Bryant's office, Neibauer saw a sheriff's deputy asleep with his feet on a desk in a room located nearby,

---

The SAO Defendants' motion omits Counts III, IV (Exculpatory Evidence based on 24-Hour Surveillance Tape), and VIII, and the OPS Defendants' motion omits Count VIII. *See generally* Defs.' Mems. Law Supp. Mots. Summ. J., ECF Nos. 459, 462, 465, 479 (failing to address these counts or a portion of the counts).

[4] Unless noted otherwise, these facts are undisputed and viewed in the light most favorable to Chatman, the party opposing summary judgment. *See Baptist v. Ford Motor Co.*, 827 F.3d 599, 599 (7th Cir. 2016).

which she thought was odd. Neibauer Dep. at 40:3–11, 41:22–42:7; Pl.'s Ex. 5, Floor Diagram.

When Neibauer reached Bryant's office, Neibauer told Bryant that something had happened to

Riggio and asked Bryant to come with her. Def. Officers' Ex. 21, Bryant Dep. (Bryant Dep.) at

63:8–14. When they entered Riggio's office, Bryant saw that Riggio was still lying on the desk,

and Bryant told Neibauer to call the Sheriff's department to send someone to the 21st floor.

Bryant Dep. at 63:23–64:18; Neibauer Dep. at 43:1–10.

Cook County Sheriff's Deputy Michael Cokeley and Cook County Sheriff's Deputy

Sergeant Maria Mokstad responded to the call and took the judges' elevator to a non-public

hallway on the 21st floor. Def. Officers' Ex. 16, Mokstad Dep. (Mokstad Dep.) at 33:16–22,

37:16–38:4. As Mokstad walked down the hallway, the first person she saw was Cook County

Sheriff's Deputy Michael Copeland (who is not a defendant) in room 2103A, which is located

near Riggio's office. *Id.* at 39:12–40:20. Mokstad called via internal radio for Cook County

Sheriff's Deputy Lieutenant Burrough Cartrette to come to the 21st floor. *See* Officers Defs.'

Ex. 17, 12/17/14 Cartrette Dep. (Cartrette Dep.) at 132:11–23. Cartrette arrived shortly

thereafter, and, according to Cartrette, Mokstad told him at that time that she had seen Copeland

sleeping in 2103A. *See* Cartrette Dep. at 88:1–88:5; 133:14; Pl.'s Ex. 5 (21st Floor Diagram);

Sheriff Defs.' Ex. 29, Copeland Disciplinary Report at Plaintiff 005144. Mokstad, however,

denies that she saw Copeland sleeping or that she told Cartrette she had seen Copeland sleeping.

Mokstad Dep. at 64:6–65:1. Prior to being sued in the instant case, Cokely was not aware that

Copeland was on the 21st floor that morning. Sheriff Defs.' LR 56.1(a)(3) Stmt. ¶ 55.

Cokely, Mokstad, and Cartrette then interviewed Riggio and others and asked Riggio for

a description of the assailant, whom she briefly described as a black male wearing a red

Blackhawks jacket. *Id.* ¶ 30. Riggio stated that she recognized her assailant because she,

Neibauer, and co-worker Virginia Cernick had briefly interacted with him on a previous occasion at the Daley Center when he was looking for a psychiatrist and the Social Security Administration office. *See* Def.'s LR 56.1(a)(3) Stmt. ¶¶ 15–16; Officer Defs.' Ex. 20, Cernick Dep. at 27:22–30:18; *id.* Ex. 19, Neibauer Dep. at 24:7–25:5. The man had been wearing a Blackhawks jacket at the time. Sheriff Defs.' LR 56.1(a)(3) Stmt. ¶ 14.

Cartrette then called Sheriff's Deputy Sergeant Rodriguez (also not a defendant here), gave him the description of the suspect, and instructed him to initiate a search of the building in case the suspect was still inside. *Id.* ¶ 33. Meanwhile, Cokely searched the 21st floor. *Id.* ¶ 37. The Sheriff's deputies guarded the 21st floor until CPD officers arrived at the scene. *Id.* ¶ 38.

CPD Sergeant Bryan Holy then arrived, along with CPD detectives. *Id.* ¶ 39. Holy was responsible for assigning detectives to the investigation, and he remained at the crime scene while detectives conducted interviews of potential witnesses and lab technicians processed the scene for evidence. *Id.*

After the CPD detectives arrived, Neibauer stated, and Defendants dispute, that she told Detective Maria Pena that she had seen Copeland sleeping on her way to Bryant's office to get help. *Compare* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 34, *and* Neibauer Dep. at 49:3–49:7; 120:3–120:9, *with* Defs.' Joint Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 34, *and* Officer Defs.' Ex. 3, Pena Dep. (Pena Dep.) at 98:2–6, 10–12. It is further disputed whether Charles Roe, Daley Center's Director of Security, told Pena that a custodian had also seen the deputy sleeping in the area near where the incident allegedly occurred. Pl.'s Ex. 15, Roe Dep. (Roe Dep.) at 137:19–138:13. When the disputed facts are viewed in Chatman's favor, it appears that Pena was informed of the nearby sleeping deputy by Neibauer and Roe, but Pena neither interviewed Copeland nor included the information in her General Progress Report ("GPR"). Def. Officers' Ex. 27, Pena's

GPR at 9. Pena admits that if she had been told that there was a deputy who had been sleeping near the crime scene, she would have wanted to know the information that person had because it might have been pertinent to the investigation. Defs.' Joint Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 28.

In addition, Cartrette says that he interviewed Copeland to confirm that he had been sleeping nearby and then shared the information with Detective Thomas McGreal. Cartrette Dep. at 86:20–90:13; *id.* Ex. 2, McGreal Dep. (McGreal Dep.) at 154:12–158:17, 159. But when Cartrette and Mokstad went to the police station to provide their official statements over the course of several hours regarding their knowledge of the events on May 24, neither mentioned the sleeping deputy. Cartrette Dep. at 115:5–24; Mokstad Dep. at 64:19–21. Mokstad denies ever telling anyone about the sleeping deputy, and Cartrette later denied that he had any knowledge of the sleeping deputy. Mokstad Dep. at 64:19–21; Pl.'s Ex. 61, 1/31/07 Cartrette Dep. at 105:15–23, 107:5–7; *see* Cartrette Dep at 27:2–15. McGreal never told anyone about the sleeping deputy and did not include this fact in his police reports. *See* McGreal Dep. at 156:10–13; Officer Defs.' Ex. 31, Case Supplemental Report at 8.

## III.    24-Hour Surveillance Video from Exterior Cameras at Daley Center

On the day of the incident, Detective Susan Barrett (a non-defendant) was assigned to review the Daley Center's exterior surveillance videos. Pl.'s Ex. 58, Barrett Dep. (Barrett Dep.) at 32:1–5. She was assisted by Daley Center's Director of Security Roe. *Id.* at 59:5–13.

The Daley Center had been closed to the public before 8:00 a.m. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 7. During that time, attorneys, court employees, and building workers could enter the building only if they had sheriff- or building-issued identification. *Id.* Even then, they could

enter or exit only through two of the four doors on the first floor, which were guarded by a sheriff's deputy between 7:00 and 8:00 a.m. *Id.*

Barrett spent a few hours reviewing digital video images captured by four surveillance cameras from 6:30 to 8:20 a.m., including one fixed to the southwest corner of the building, to see if she could see a black male wearing a Blackhawks jacket. *Id.* ¶ 10; Barrett Dep. at 31:21–23, 32:1–13, 59:5–13. Detective Barrett did not see anyone matching the suspect's description in the videos. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 10; Barrett Dep. at 32:15–18. Roe agreed to make a copy of the surveillance camera images for the previous 24 hours for the detectives working on the case. *See* Defs.' Joint Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 83. Barrett then walked up to Sergeant Holy at the Daley Center, told him that the surveillance videos did not capture an individual matching the description, and handed him her GPR that stated Roe would make a copy of the surveillance video. *Id.* ¶ 84; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 11.

Lieutenant Dennis Walsh, who supervised the investigation, stated that it was the responsibility of the detectives who worked on the case to obtain the video from Roe. *Id.* ¶ 87. The detectives who worked on the case were John Roberts, Thomas McGreal, Maria Pena, Jack Boock, Rita Mischka, and Barbara Midona. Officer Defs.' LR 56.1(a)(3) Stmt. ¶ 3. Lieutenant Walsh also states that it was his responsibility, as well as that of Sergeant Bryan Holy, as supervisors, to ensure that the video was obtained from Roe. Defs.' Joint Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 87. There is no evidence that any detective or supervisor ever obtained the video from Roe. *Id.* ¶ 85.

## IV.    Chatman's Arrest and Detention

Based on interviews with Riggio about her alleged assailant, the CPD transmitted a message via radio to patrol officers that there had been a sexual assault at the Daley Center.

Officer Defs.' LR 56.1(a)(3) Stmt. ¶ 21. The message described the suspect as a 5'7" tall, 200-pound, 50 year-old, black male with salt-and-pepper hair, wearing a Blackhawks jacket, hat, and silver belt buckle. *Id.*; Pl.'s Ex. 44, Crim. Trial Tr. at Plaintiff 10186. Due to heightened media attention, it was considered a high-profile, high-pressure "heater" case. *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 41; *see also* Officer Defs.' Ex. 10, Karczewski Dep. at 74:3; *id.* Ex. 12, Griffin Dep. (Griffin Dep.) at 54:15–55:9; *id.* Ex. 4, Boock Dep. (Boock Dep.) at 201:22–202:9; Pl.'s Ex. 23, Mischka Dep. at 85:18–24; *id.* Ex. 62 Kato Dep. at 104:7–21.

The Officer Defendants assert that Officer Richard Griffin saw a man matching the description walking southbound on Clark Street in downtown Chicago. Officer Defs.' LR 56.1(a)(3) Stmt. ¶ 22. That man was Chatman. *Id.* ¶ 28. Chatman is 6'2", was not wearing a silver belt buckle, and was not wearing a hat, despite the fact that it was raining. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. (Officer Defs.) ¶ 22; *see* Griffin Dep. at 88:5–6. Furthermore, it is undisputed that Chatman had been diagnosed with bi-polar disorder and schizophrenia and had had a long and well-documented history of experiencing symptoms of schizophrenia since 1981. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 37. Additionally, Chatman was assessed in 2003 as having an IQ of 68, which meant that his overall intellectual functioning was equal to or better than only two percent of individuals his age. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 37.

When Officer Griffin stopped Chatman, Officer Michael Karczewski approached them. Officer Defs.' LR 56.1(a)(3) Stmt. ¶ 24. It is disputed whether Chatman appeared incoherent, confused, and delusional when the officers encountered him. *Id.* ¶¶ 25–27, 31–33. The officers claim that Chatman told them that he was coming from the Daley Center, but this is hotly contested. *See id.* ¶ 22.

The officers proceeded to arrest Chatman at 8:34 a.m. at 151 West Van Buren. *Id.* ¶ 28. They brought him to the police station at Harrison and Kedzie, handcuffed him to an iron ring on the wall of an interview room, and asked him basic questions about himself. *Id.* ¶¶ 30, 33; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 43. Whenever he was in an interview room, Chatman was handcuffed to the ring, and he could not lie down because the ring was too high on the wall. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 44.

Detectives Jack Boock and Rita Mischka interrogated Chatman for two hours in the room shortly thereafter. Boock Dep. at 96; OPS Defs.' Ex. 14, Fraction Dep. at 52:18–20. In addition, after identification lineups,[5] they interrogated him a second time for about an hour. Officer Defs.' LR 56.1(a)(3) Stmt. ¶ 49; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 43. Although he requested a lawyer, a phone call to his mother, and his medication, his requests were denied. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 50–51.

At around noon, Assistant State's Attorney ("ASA") Brian Holmes, who had been assigned to the case for felony review, arrived at the Harrison and Kedzie police station, spoke to Detectives Pena, Mischka, and Barbara Midona for a rundown, and read any GPRs that were relevant and available. Pl.'s LR 56.1(b)(3)(B) Stmt. (SAO Defs.) ¶ 46; Holmes Dep. at 148:6–10, 148:24–149:12. Holmes also spoke to ASA Tracey Gleason, who shared information from her interview of Riggio, including that Riggio had claimed that she had been sexually assaulted in an office building on a previous occasion. Holmes Dep. at 163:17–20. Holmes then obtained statements from the civilian witnesses, including Neibauer, Bryant, and Cernick, as well as the

---

[5]     Riggio positively identified Chatman as the assailant, Cernick identified him as the person she had seen on the prior occasion, and Neibauer could not positively identify him as the same person. Officer Defs.' LR 56.1(a)(3) Stmt. ¶ 49; Officer Defs.' Ex. 20, Cernick Dep. at 57:22–24; *id.* Ex. 19, Neibauer Dep. at 48:10–12.

sheriff witnesses, including Mokstad, Cokely, and Cartrette. *Id.* at 176:7–16; 188:23–189:17, 252:3–10; Cartrette Dep. at 108:23–109:9.

After he completed the interviews, Holmes, along with Boock and Mischka, interrogated Chatman in the interview room. Boock Dep. at 96:1–4. It is disputed whether Chatman appeared incoherent, confused, and delusional during the interview and whether his ability to function was severely impacted by a significant mental health disorder and cognitive deficiencies. Pl.'s LR 56.1(b)(3)(B) Stmt. (Officer Defs.) ¶¶ 25, 50–51, 60–61. To the contrary, each Officer Defendant who had prolonged interactions with Chatman attests that each was unaware that Chatman suffered from any psychological issues or cognitive deficiencies. That said, it took less than 10 minutes for intake staff member at Cook County Jail to determine that Chatman should be admitted for an indefinite period into the Mental Health Acute Care Unit, which served only one half of one percent of the jail population. Pl.'s LR 56.1(b)(3)(B) Stmt. (Officer Defs.) ¶¶ 25, 50–51, 60–61; Pl.'s LR 56.1(b)(3)(B) Stmt. (SAO Defs.) ¶¶ 53–54.

During the interrogations at the police station, Chatman never stated that he attacked Riggio, that he committed the rape, or that he was at the Daley Center on May 24, 2002. Boock Dep. at 145:17–24. By 7:45 p.m., the crime lab results indicated that Riggio's rape kit and clothing tested negative for the presence of semen. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 99. The lab was still processing Riggio's underwear. *Id.*; *see id.* ¶ 103 (reported at 10:45 a.m. on 5/25/02 that underwear tested negative). Holmes left the police station at 8 p.m., without having approved charges against Chatman. Pl.'s LR 56.1(b)(3)(B) Stmt. (SAO Defs.) ¶ 48.

At 9:30 p.m., Chatman was taken to the lockup. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 53. At 9:55 p.m., Lieutenant Walsh brought Chatman from the lockup to a different room, stating that the reason for signing him out of lockup was an "interview." *Id.* ¶ 58. At that point, Chatman

had been in custody for about twelve hours without anything to eat or drink.[6]  *Id.* ¶ 54; Boock

Dep. at 133:22–134:11, 135:2–4; *see* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 52; *see also* Officer Defs.'

Ex. 1, Roberts Dep. at 116:23–117:13, 118:5–9.

The parties dispute what occurred next.  According to Chatman, a "Chinese-looking"

officer—who is presumably Defendant Kriston Kato, the only officer of Asian descent on duty at

the Harrison and Kedzie police station that night—entered the room, and Kato and Chatman

were the only people in the room.[7]  Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 59–60; Pl.'s LR

56.1(b)(3)(B) Stmt. (Officer Defs.) ¶ 55.  Kato proceeded to threaten, intimidate, and abuse

Chatman, who was handcuffed to the ring on the wall and could not move.    Pl.'s LR

56.1(b)(3)(B) Stmt. (Officer Defs.) ¶¶ 52, 79; *see* Defs.' Joint Resp. Pl.'s LR 56.1(b)(3)(C) Stmt.

¶ 59.

Chatman contends that Kato made the following statements to him.  First Kato said, "you

know you did the crime raping Susan Riggio and don't tell me that you didn't because I know

you did it."  Pl.'s Ex. 3, Chatman Dep. pt. 1, at 277:19–21, 278:19–24.  Kato angrily scolded

him, saying, "[Y]ou know you did the crime of rape . . . and pulled her panties down, bumped

her head all against the desk," and threatened her with scissors.  *Id.* at 280:8–13; SAO Defs.' Ex.

B, Chatman Dep. at 57:14–18.  But Chatman did not agree.  Pl.'s Ex. 3, Chatman Dep. pt. 1, at

280:8–13; SAO Defs.' Ex. B, Chatman Dep. at 57:14–18.  Kato ordered Chatman to admit to

Holmes and the others that he had raped Riggio.  Pl.'s Ex. 1, Chatman Dep. pt. 2, at 17:7–9; Pl.'s

---

[6]    Detectives were responsible for ensuring that Chatman was fed at Area 4 on May 24, but neither Boock nor Roberts saw anybody give him food and they had no knowledge whether he was fed that day. Boock Dep. at 133:22–134:11, 135:2–4; *see* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 52; *see also* Officer Defs.' Ex. 1, Roberts Dep. at 116:23–117:13, 118:5–9.  When a suspect is in an interview room, detectives have to purchase a meal for the person in custody out of his or her own pocket.  Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 46.

[7]    Kato had not been assigned to the investigation, and his name does not appear on any reports.  *Id.* ¶ 79.

Ex. 3, Chatman Dep. pt. 3, at 281:3–5. According to Chatman, "[a]fter I wouldn't say . . . what he wanted me to say as far as the lie that I did it[,] he used physical abuse to me," Pl.'s Ex. 3, Chatman Dep. pt. 1, at 279:1–7, because Kato was "very angry" that Chatman wouldn't go along with what Kato was saying, *id.* at 280:7–282:11. He contends that Kato struck him in the head on the left side of his face. *Id.* at 278:4–11. After Kato struck Chatman, Chatman slumped over, his whole body went numb from the blow, and he almost fainted. *Id.* at 282:12–283:10. Chatman was nervous and afraid. Pl.'s LR 56.1(b)(3)(B) Stmt. (Officer Defs.) ¶ 52.

When Kato looked like he was going to strike Chatman a second time, Pl.'s Ex. 3, Chatman Dep. pt. 3, at 282:5–6, Chatman agreed that he would say he had done it, but he says he did not actually confess. *Id.* at 281:3–5. According to Chatman, "I stopped him because I didn't want him to beat my brains out." *Id.* at 279:22–24. Kato then told Chatman everything that supposedly took place and coached him as to what he should say to Holmes and the officers when he admitted to the crime. *Id.* at 282:6–11, 284:5–11. Defendants deny that Kato ever spoke to Chatman. Defs.' Joint Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 59.

At 10:00 p.m., Walsh assigned Detective Roberts to the case. Pl.'s LR 56.1(b)(3)(B) Stmt. (Officer Defs.) ¶ 56; Officer Defs.' Ex. 1, Roberts Dep. at 69:19–20. Defendants assert, and Chatman denies, that shortly after 10:30 p.m., Chatman confessed to Roberts. Officer Defs.' LR 56.1(a)(3) Stmt. ¶ 56; Officer Defs.' Ex. 1, Roberts Dep. at 69:19–20; 84:21–85:2; 86:11–87:17;149:9–151:20; 153:15–154:8. Chatman states that he did not speak to anyone in the room after Kato, and that after Kato left, Chatman overheard a phone conversation during which Holmes was told to return to the station. Pl.'s LR 56.1(b)(3)(B) Stmt. (Officer Defs.) ¶ 56; Pl.'s Ex. 1, Chatman Dep. pt. 2 at 18:22–19:1. It is undisputed that Roberts called Holmes at midnight. Holmes Dep. at 277:21–22. As such, viewing the record in Chatman's favor, it is

reasonable to infer that Kato interrogated Chatman for approximately two hours, from 9:55 p.m. until midnight.

The parties also dispute what occurred when Holmes returned to the police station at 1:00 a.m. on May 25, 2002. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 50. Defendants state, and Chatman contests, that he orally confessed to Holmes regarding the details of the crime. Pl.'s LR 56.1(b)(3)(B) Stmt. (SAO Defs.) ¶ 53. According to Chatman, he did not confess to Holmes or anyone that night, and the officers and Holmes then forced him to go to the Daley Center against his wishes. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 66; Pl.'s Ex. 1, Chatman Dep. pt. 2 at 23:5–8. At this point, Holmes had not approved any charges against Chatman. Pl.'s LR 56.1(b)(3)(B) Stmt. (SAO Defs.) ¶ 47.

It is undisputed that, at approximately 2:00 a.m., Holmes, Roberts, Midona, and Walsh (the "Walkthrough Defendants") took Chatman, in handcuffs and leg irons, to the Daley Center for a "walk-through" that lasted over an hour. *Id.* ¶ 58; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 66. But the parties' versions of what transpired while at the Daley Center diverge. According to Defendants, Chatman led the Walkthrough Defendants to various places in the Daley Center, explaining where he had been on the morning of May 24, as well as where and how he had raped Riggio.[8] SAO Defs.' LR 56.1(a)(3) ¶¶ 59–62. According to Chatman, he told the Walkthrough Defendants that he was nowhere near the area but they would not listen, and the Walkthrough Defendants physically directed him where to go and coached him with non-public information as to what to say. Pl.'s LR 56.1(b)(3)(B) Stmt. (SAO Defs.) ¶¶ 41, 58–62; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 69; Pl.'s Ex. 15, Roe Dep. 140:22–24; Pl.'s Ex. 16, Note from Roe. Chatman told the Walkthrough Defendants that the "Chinese-looking" officer had beaten him and that the officer

---

[8] ASA Holmes and the detectives claim that Chatman told them that he exited (and entered the previous day) the Daley Center at the southwest corner, near the fountain, closest to Washington and Clark Streets. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 8.

had told him what to say step by step. Pl.'s LR 56.1(b)(3)(B) Stmt. (SAO Defs.) ¶ 62; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 70; Pl.'s Ex. 1, Chatman Dep. pt. 1 at 47:3–9, 13–15; 48: 18–22; 56:6–8. According to Holmes, this was the only occasion during his entire career that he had walked a suspect through a crime scene. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 79.

After departing the Daley Center and having been in custody for about 19 hours, the Walkthrough Defendants finally, for the first time, gave Chatman something to eat and drink and brought him back to the police station at Harrison and Kedzie. *Id.* ¶ 91. Roberts locked Chatman in an interview room, rather than the lock-up, where he could not lie down or make a phone call. *Id.* ¶ 93. At this time, Holmes still had not approved charges against Chatman. Pl.'s LR 56.1(b)(3)(B) Stmt. (SAO Defs.) ¶ 47.

## V.    Chatman Is Charged

When Chatman awoke in the interview room on May 25, 2002, he was shown a 9-page statement of confession that Holmes had handwritten. *Id.* ¶¶ 104, 107. In Defendants' view, Chatman had already confessed to Holmes prior to the walk-through at the Daley Center, and Holmes had drafted the statement based solely on what Chatman had told him during that confession. Defs.' Joint Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 94–128. According to Chatman, he had not previously confessed to Holmes, and the written confession was fabricated to include information that Holmes and the detectives had learned from witnesses and the forensic lab results. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 94–128. It is disputed whether it was obvious to Holmes that Chatman was unable to read or understand the statement before he signed it. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 106, 108–09; *see* Pl.'s LR 56.1(b)(3)(B) Stmt. (SAO Defs.) ¶¶ 53–54. Holmes approved the charges against Chatman on May 25, 2002. Pl.'s LR 56.1(b)(3)(B) Stmt. (SAO Defs.) ¶ 47.

## VI. Anonymous Detective/Officer's Letter Regarding Chatman's Coerced Confession

Chatman was found guilty after a jury trial on January 29, 2004. OPS Defs.' LR 56.1(a)(3) ¶ 18. After Chatman's jury trial, but before he was to be sentenced on March 4, 2004, Administrative Sergeant Matthew Brown of the CPD Internal Affairs Division (also not a defendant here) received an envelope in February 2004. *Id.* ¶¶ 16, 22. The envelope contained three documents: (1) a memorandum, dated May 27, 2002, from an "Anonymous Officer/Detective" to "Internal Affairs" and "Office of Professional Standards/Melissa Willis"; (2) a photocopy of the front of an envelope marked "Inter-Departmental Correspondence"; and (3) a page with a single sentence stating, "As you can see, I initially sent this report via inter-office mail, but to no avail." *Id.* ¶¶ 24–25.

The memorandum stated the following:

> I would like to remain anonymous. I too am an officer/detective at the 11th District Harrison/Kedzie Station, so it would not be in my best interests to reveal my identity. Majority of the officers and detectives are knowledgeable about Detective Kato's brutality towards suspects held in custody. The complaints alleged against Kato are numerous, however, what I am about to tell you is not a district norm.

> On or about May 25, 2002, Detective Kato beat a suspect into signing a confession. The suspect is homeless and was apprehended for the assault/rape of a woman in the Daley Center. The suspect denied the rape and said he was no way near the Daley Center. Detective Kato hit the suspect and shouted "tell me you did it!" The homeless suspect said one last time "did what? I didn't do nothing. I don't, don't, don't know what you are talking about." Detective Kato hit the suspect with such a blow that last time that the suspect groaned from sheer pain and doubled over grasping for air. That blow I thought would kill him for sure. The suspect then said "what–what–what–what do you want me to say? Kato said "I want you to say you raped that woman." By this time, Kato had the assault/rape victim's total account of the assault. Kato took the victims [sic] account of the assault, word for word and laid it out for the homeless suspect to sign. The suspect didn't even read it and didn't know what he was signing. The suspect

15

> was denied a phone call, instead Kato told the suspect, "you are homeless. Who are you going to call, the other homeless people at the Gardens?["]
>
> It is a well known fact from questioning and the suspects [sic] condition that he did not commit the assault. However Kato stated that "they wanted someone to be accountable, so I gave them someone. He's homeless anyway, at least now (laughingly) he'll get three meals a day. That's my contribution to help feed the homeless."

OPS Defs.' Ex. 13, Command Channel Review ("OPS Review") at City Def. CC012448.

After reading the contents of the envelope, Brown initiated a Complaint Register ("CR") investigation with the Office of Professional Standards ("OPS") that same morning. OPS Defs.' LR 56.1(a)(3) ¶ 26. Brown called OPS, obtained CR number 296034 for the file, typed up an initiation report, attached the envelope and its contents to the initiation report, and sent all of the documents to OPS. *Id.*

The OPS investigates specific kinds of police officer misconduct, including the use of excessive force. *Id.* ¶ 18. OPS officers investigate CRs and classify complaints in one of four groups: (1) "Unfounded," when the allegation is false or not factual; (2) "Exonerated," when the incident occurred but the actions of the accused were lawful and proper; (3) "Not Sustained," when there is insufficient evidence either to prove or disprove the allegation; or (4) "Sustained," when the allegation is supported by substantial evidence to justify disciplinary action. *Id.* ¶ 19.

As part of the investigation into CR 296034, OPS Investigator Nichelle Fraction (not a defendant here) conducted an interview of Chatman at Cook County Jail on March 16, 2004. *Id.* ¶ 28. Fraction asked Chatman to describe the circumstances leading to his confession. *Id.* ¶ 29. Chatman told her that, while he was seated in a room at the police station, a "Chinese" officer threatened to beat him and then struck Chatman on the left side of his temple. OPS Review at City Def CC 012443. Chatman said that he had told the officer he would admit to committing

the rape because he did not want to get hit again. *Id.* Chatman related to Fraction that the officer told Chatman all of the details of the rape and that the officer told him what to say in his statement. *Id.*

Defendant Karen Wojtczak, an OPS investigator at the time, was assigned to the investigation on April 16, 2004, and prior to that date, she had been unaware of the alleged rape incident at Daley Center. *Id.* ¶ 36. During the course of her investigation, Wojtczak read the police department reports, reviewed evidence in the CR investigative file, and obtained Attendance & Assignment ("A&A") sheets that confirmed that Kato was on duty at the Harrison and Kedzie police station at the time of the alleged coerced confession. Pl.'s LR 56.1(b)(3)(B) Stmt. (OPS Defs.) ¶¶ 36, 49.

After reviewing all of these materials, Wojtczak concluded, on October 1, 2004, that the CR was "unfounded," which meant she found the complaint "false or not factual." *See* OPS Defs.' LR 56.1(a)(3) ¶¶ 50 52. Wojtczak made this determination for three reasons. First, although she knew about the May 27, 2002 memorandum stating that Kato had used force to obtain Chatman's confession, Wojtczak nonetheless concluded that the complaint was false because the memorandum had not been resubmitted until February 2004, two years after Chatman's arrest. Pl.'s LR 56.1(b)(3)(B) Stmt. (OPS Defs.) ¶ 50. Second, despite the memorandum having corroborated Chatman's account, a photo of Chatman taken *before* the alleged beating took place showed no injury. *Id.* Third, although Wojtczak was aware that Kato had been at the same police station when the beating allegedly occurred and that both Chatman and the anonymous detective/officer had described Kato as having beaten Chatman, she determined that the complaint was false because Kato's name did not appear on any police reports in the case.. *Id.*

Wojtczak then recommended that the investigation be terminated. *See* OPS Defs.' LR 56.1(a)(3) Stmt. ¶¶ 50, 52. Wojtczak's conclusion and recommendation were approved by her supervisors, Elizabeth Carmody, Commander Steve Peterson, and Deputy Chief Richard Kobel (neither of whom are defendants), in October–November 2004. *Id.* ¶¶ 51, 54. Wojtczak does not recall any instance when she disagreed with any finding of the investigator while she was a Deputy Chief of OPS. OPS Defs.' Ex. 5, Wojtczak Dep. at 36:14–20.

Chatman's conviction and sentence were affirmed on appeal in March 2006, and his conviction became final in December 2006. OPS Defs.' LR 56.1(a)(3) Stmt. ¶ 17. After the Cook County State's Attorney's Office reinvestigated Chatman's case in 2013, however, the charges against him were dismissed, and Chatman was released from prison. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 4. Chatman was granted a Certificate of Innocence. *Id.*; *see People v. Chatman*, 66 N.E.3d 415, 418 (Ill. App. Ct. 2016) (holding that Riggio is not a "victim" within the meaning of the Illinois Rights of Crime Victims and Witnesses Act).

## Legal Standard

 "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court gives "the non-moving party the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013). "At summary judgment a court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005). The nonmovant "must establish some

genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

<u>**Analysis**</u>

## I. Officer Defendants

Chatman claims that the Officer Defendants, by withholding exculpatory evidence that a deputy was sleeping nearby when the sexual assault allegedly occurred, violated his due-process rights under *Brady v. Maryland*, 373 U.S. 83, 87 (1963).[9]  Pursuant to *Brady*, the government violates the Due Process Clause of the Fourteenth Amendment when it "fails to disclose evidence materially favorable to the accused." *Mosley v. City of Chi.*, 614 F.3d 391, 397 (7th Cir. 2010) (citing *Youngblood v. West Virginia*, 547 U.S. 867, 869 (2006)).  The duty to disclose "extends to the police and requires that they similarly turn over exculpatory/impeaching evidence to the prosecutor." *Carvajal v. Dominguez*, 542 F.3d 561, 566 (7th Cir. 2008) (citing *Youngblood*, 547 U.S. at 870); *see Kyles v. Whitley*, 514 U.S. 419, 433–34 (1995); *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001), *abrogated on other grounds by Manuel v. City of Joliet*, 137 S. Ct. 911, 920 (2017); *Jones v. Chicago*, 856 F.2d 985, 995 (7th Cir. 1988) ("[I]nformation undermining the credibility of a government witness is within the scope of *Brady*'s rule.").

---

[9]    Chatman has also sued the Officer Defendants for withholding exculpatory evidence about the 24-hour Daley Center surveillance video recording, which does not show anyone fitting his description entering or leaving the Daley Center.  *See* 2d Am. Compl. ¶¶ 76–77, 177–79, 181.  The Officer Defendants have been given sufficient notice of the *Brady* claim based on the video, see *id.*; Defs.' Ex. 8, Walsh Dep. at 112:17–124:5; id. Ex. 9, Holy Dep. at 17:11–20:17; Roe Dep. at 135:22–136:1, 141:22–149:24; *id.*, Ex. 58, Barrett Dep. at 59:23–70:3, and they failed to address the issue in their opening brief.  Accordingly, the Court deems the issue waived for purposes of summary judgment.  *See Silais v. Sessions*, 855 F.3d 736, 742 n.5 (7th Cir. 2017), *cert. denied*, 2018 WL 942440 (Feb. 20, 2018).  Therefore, Count IV based on the 24-hour Daley Center surveillance video recording remains for trial.  In addition, because Count V (Conspiracy), Count VI (Failure to Intervene), and Count VII (Supervisor Personal Involvement) are based on the video recording, these counts also remain for trial.

The elements of a *Brady* violation are: "(1) the evidence at issue is favorable to the accused, either being exculpatory or impeaching; (2) the evidence must have been suppressed by the government, either willfully or inadvertently; and (3) there is a reasonable probability that prejudice ensued—in other words, 'materiality.'" *Carvajal*, 542 F.3d at 566–67 (quotations omitted) (citing *Youngblood*, 547 U.S. at 869–70); *see United States v. Bagley*, 473 U.S. 667, 676 (1985). Evidence is "favorable to the accused" if it "'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Saunders–El v. Rohde*, 778 F.3d 556, 561 (7th Cir. 2016) (quoting *Kyles*, 514 U.S. at 435). "Patent exculpatory evidence" that is exculpatory on its face is *Brady* material, whereas "[l]atent exculpatory evidence" that "requires processing or supplementation to be recognized as exculpatory," is not. *United States v. Gray*, 648 F.3d 562, 567 (7th Cir. 2011). "Evidence is "suppressed" where it is not disclosed "in time for the defendant to make use of it" and it "was not otherwise available to the defendant through the exercise of reasonable diligence." *Carvajal*, 542 F.3d at 567.

The Officer Defendants contend that the evidence of Copeland sleeping next door (1) is not exculpatory or impeaching, (2) was not intentionally suppressed, and (3) was otherwise available through the exercise of reasonable diligence.[10] In addition, they argue that there is insufficient evidence of a conspiracy to violate Chatman's *Brady* rights under either federal or state law. As a result, the Officer Defendants, in their individual capacities, contend that they are entitled to qualified immunity.

---

[10] The Sheriff Defendants adopt the Officer Defendants' arguments that the evidence of a sleeping deputy is not exculpatory or impeaching and was otherwise available through the exercise of reasonable diligence. *See* Sheriff Defs.' Mem. Law Supp. Summ. J. at 2.

## A. Whether the Evidence is Exculpatory or Impeaching

The Officer Defendants assert that, because the sleeping deputy did not see another person hanging around or sexually assaulting Riggio, the sleeping deputy's testimony has no exculpatory or impeaching value whatsoever. They rely on *Bielanski v. County of Kane*, in support. 550 F.3d 632, 643–45 (7th Cir. 2008).[11] In *Bielanski*, the plaintiff, who had been acquitted of sexually assaulting a child, sued investigators, alleging that they had violated her rights under *Brady* by withholding evidence that the child had been medicated for ADHD, assigned to special education classes, was difficult to control and discipline, and had previously disrobed himself and others. *Id.* at 643. The Seventh Circuit affirmed the district court's granting of a motion to dismiss based on qualified immunity, stating that, while the evidence could have been used to impeach the child, it was not exculpatory and would not have resulted in a dismissal of the charges. *Id.*

But the circumstances here are quite different. Viewed in Chatman's favor, the facts show that Riggio's office door was open during the attack, she screamed "Deputy, Deputy" loudly at least three times, and she hit the assailant with a chair as she fought for her life, all of which occurred before the Daley Center was open to the public when ambient noise would have been minimal. Pl.'s LR 56.1(b)(3)(B) Stmt. (Sheriff Defs.) ¶ 15; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 7; Riggio Dep. at 158:8–181:23, 168:14–169:7, 173:16–21. Meanwhile, Copeland was sleeping in an office 10 yards away and was awakened by the sound of radios as deputies arrived later. Pl.'s LR 56.1(b)(3)(B) Stmt. (Sheriff Defs.) ¶ 9. This is not a case in which inference upon inference must be made in order for the evidence to be exculpatory. Rather, this evidence is

---

[11] It is questionable whether *Bielanski*'s holding remains viable, given the Seventh Circuit's holding in *Bianchi v. McQueen*, 818 F.3d 309, 320 (7th Cir. 2016), that a person acquitted at trial can never establish the prejudice required under *Brady*.

exculpatory on its face. If given the opportunity, Chatman's defense counsel could have called Copeland as a witness at trial to show that the attack did not happen.

Moreover, the importance of Copeland's testimony is further magnified by the absence of physical evidence. There were no fingerprints, palm prints, DNA, semen, hairs, blood, fibers, shoe prints, skin under Riggio's fingernails, or any other physical evidence on Riggio, her clothes, or elsewhere that tied Chatman to the crime scene, or to anywhere in the Daley Center for that matter. The only person who was present near the scene of the alleged crime and who could contradict Riggio's testimony was Deputy Copeland. In the same vein, Copeland's testimony could also have been used to more effectively cross-examine the government's expert, Dr. Temple. Although Dr. Temple explained away the absence of physical evidence tying Chatman to the crime, Chatman's counsel could have asked Dr. Temple whether, based on Copeland's testimony, another plausible reason for the absence of Chatman's DNA was that the crime never happened. Accordingly, the Court denies the Officer Defendants' summary judgment on this ground.

### B. Whether the Evidence Was Suppressed

The Officer Defendants also contend that there is no evidence that they intentionally suppressed this evidence.[12] However, to prove a section 1983 *Brady* claim, a plaintiff need not prove that a defendant acted intentionally but, rather, must establish that the defendant "act[ed] either knowingly or with deliberate, reckless indifference." *Steidl v. Fermon*, 494 F.3d 623, 631 (7th Cir. 2007) (citing *Jones*, 856 F.2d 992–93); *see* Pattern Civil Jury Instructions of the Seventh Circuit 7.14 (2017).

---

[12] The Officer Defendants' summary judgment motion, memorandum, and statements of fact do not address whether the Officer Defendants, other than McGreal and Pena, knowingly suppressed the sleeping deputy evidence, and thus the argument is deemed waived for purposes of summary judgment. *See McKinney v. Office of Sheriff of Whitley Cty.,* 866 F.3d 803, 808 (7th Cir. 2017) (stating that "[t]he district court was entitled to seek specific guidance through the record").

According to the Officer Defendants, McGreal second-guessed Cartrette's reason for telling him about the sleeping deputy and speculated that Cartrette merely was seeking McGreal's assistance in disciplining the deputy.  Officer Defs.' LR 6.1(a)(3) ¶ 38.  But there is evidence in the record from which a reasonable jury could conclude that both McGreal and Pena knowingly suppressed the evidence because the CPD detectives had decided to pin the crime on Chatman.

First, viewing the disputed facts in Chatman's favor, the record shows that on May 24, 2002, Cartrette told McGreal, and Neibauer and Roe told Pena, about the sleeping deputy.  Defs.' Joint Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 17; Defs.' Joint Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 23, 25.   When Cartrette asked McGreal, and Roe asked Pena, to interview the deputy, both McGreal and Pena indicated there was no need to speak to the deputy because the police had a suspect in custody.  Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 21, 26; Officer Defs.' Ex. 17, Cartrette Dep. at 112:11–113:19; Pl.'s Ex. 15, Roe Dep. at 138:14–139:11.  A reasonable jury could infer from the officers' identical responses that there was a concerted effort to suppress Copeland's account. Moreover, McGreal further explained to Cartrette at around 5:00 p.m. that day that the suspect had confessed and that it was a "done deal."  Officer Defs.' Ex. 17, Cartrette Dep. at 112:11–13; *see* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 48 (undisputed that Chatman had not confessed at that time). What is more, although McGreal and Pena were aware of the sleeping deputy, neither of them documented the information about Copeland in their police reports.  Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 27.  A rational jury could conclude from these facts that McGreal and Pena knowingly concealed exculpatory and impeaching evidence because they did not want to stymie the investigation's singular focus on Chatman.

## C. Whether the Evidence Was Otherwise Available

Next, the Officer Defendants argue that the existence of the sleeping deputy could have been discovered by Chatman's criminal defense counsel, had he exercised reasonable diligence. "[T]he government will not be found to have suppressed material information if that information also was available to a defendant through the exercise of reasonable diligence." *Snow v. Pfister*, 880 F.3d 857, 867 (7th Cir. 2018). Reasonable diligence, however, does not require defense attorneys to seek evidence they "had no reason to believe existed." *Boss v. Pierce*, 263 F.3d 734, 743 (7th Cir. 2001). "[D]efense counsel cannot be expected to ask witnesses about matters completely unrelated to the witness's role in the case. A contrary conclusion would require defense counsel to conduct a fishing expedition with every . . . potential defense witness . . . . Reasonable diligence does not require such a practice." *Id.* at 741.

In the present case, no police report mentioned the sleeping deputy. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 20, 24, 27. 31, 32, 33; Cartrette Dep. at 115:5–24; Mokstad Dep. at 64:19–21. Absent clairvoyance, Chatman's counsel had no reason to believe that the sleeping deputy existed. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 152, 154, 158–59. Because the police reports did not state that anyone had mentioned the sleeping deputy, a rational jury could find that Chatman's counsel was not required to question every potential defense witnesses about subject matter outside of his or her designated role. Accordingly, the Court declines to grant summary judgment on this basis.

## D. Conspiracy to Violate Chatman's *Brady* Rights

The Officer Defendants further argue that there are no triable issues of fact regarding Chatman's federal and state conspiracy claims based on their withholding exculpatory evidence. "To establish conspiracy liability in a § 1983 claim, the plaintiff must show that (1) the

individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015). Under Illinois law, "the elements of a civil conspiracy are: (1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnston*, 807 N.E.2d 461, 470 (Ill. 2004).

The Officer Defendants provide a single citation in support of their argument. *See* Officer Defs.' Mem. Supp. Summ. J. at 15–17; Officer Defs.' Reply at 13–15. They point to a portion of the Second Amended Complaint, ECF No. 324, in which Chatman alleges that Riggio had targeted Chatman as the fall guy for a lawsuit scheme. From this, they postulate that there can be no conspiracy to suppress exculpatory evidence if the victim is motivated to falsely accuse someone. But just as the nonmovant is required to go beyond the pleadings to survive summary judgment, see *Celotex v. Catrett*, 477 U.S. 317, 324 (1986), so must the movant. *See McKinney*, 866 F.3d at 808–09 (stating that the party seeking . . . summary judgment must support his factual assertions . . . with citations to particular parts of the materials in the record" (internal quotations omitted)). "[W]hen a party fails to develop the factual basis . . . and draws instead on bare conclusions, the argument is deemed waived." *Poirier v. Doyle*, 40 F. App'x 211, 213 (7th Cir. 2002). Because their brief fails to point to any relevant evidence in support of this argument, the Court deems waived the Officer Defendant's argument in support of their motion for summary judgment as to Chatman's federal and state law conspiracy claims in Counts V and X.

### E.    Qualified Immunity

"Qualified immunity protects officers performing discretionary functions from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights that a reasonable person would know about." *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015) (internal quotation marks omitted).  When a defendant raises qualified immunity as a defense, the plaintiff has the burden of establishing that the defense is inapplicable.  *Mustafa v. City of Chi.*, 442 F.3d 544, 548 (7th Cir. 2006).   "[T]wo questions are pertinent to the defense of qualified immunity:  whether the facts alleged show that the state actor violated a constitutional right, and whether that right was clearly established."  *Hanes v. Zurick*, 578 F.3d 491, 493 (7th Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).  With respect to a *Brady* claim, the qualified immunity issue is not whether the officer knew he had to disclose exculpatory information; rather, the question is whether it was clearly established that the information the plaintiff claims the police failed to disclose was exculpatory or impeaching. *Carvajal*, 542 F.3d at 569; *Bagley*, 473 U.S. at 676–77.

For the reasons discussed above, Chatman has met his burden of establishing that the qualified immunity defense is inapplicable at the summary judgment stage.  Viewing the disputed and undisputed facts in the record in Chatman's favor, it was clear at the time that the sleeping deputy evidence was exculpatory or impeaching.  In addition, whether McGreal and Pena knowingly suppressed the evidence depends on disputed issues of fact.  Lastly, a reasonable jury could view the record and conclude that the evidence was otherwise unavailable.  For these reasons, the Court denies the Officer Defendants' motion for summary judgment as to Count IV and that portion of the Sheriff Defendants' motion that adopts the Officer Defendants' arguments.

## II. Sheriff Defendants

Chatman also asserts a *Brady* claim against the Sheriff Defendants based on the sleeping deputy. These Defendants include Sheriff's Deputies Michael Cokely, Maria Mokstad, and Burrough Cartrette. The Sheriff Defendants contend that they owed no duty under *Brady* because they were not part of the prosecutorial team. They also contend that they did not knowingly suppress the evidence about Copeland. Based on these arguments, the Sheriff Defendants, in their individual capacity, assert that they are entitled to qualified immunity.

### A. Duty Under *Brady*

The Court first addresses the Sheriff Defendants' argument that Cartrette, Cokely, and Mokstad did not owe a duty under *Brady* because they were not part of the prosecutorial team. In support, the Sheriff Defendants rely on *Ienco v. Angarone*, 291 F. Supp. 2d 755, 760 n.4 (N.D. Ill. 2003). In *Ienco*, the district court held that local police officers owed no duty under *Brady* with regard to the plaintiff's federal criminal trial because they played no part in the federal investigation. *Id.* at 760–61.

But even if the Court were to find *Ienco* persuasive, the Seventh Circuit has stated that "[t]he government's duty to disclose favorable evidence extends beyond evidence in its immediate possession to evidence in the possession of other actors assisting the government in its investigation." *United States v. Walker*, 746 F.3d 300, 306 (7th Cir. 2014) (citation omitted); *see Kyles*, 514 U.S. at 433–34. Here, *Walker* is the more apposite case because the Sheriff Defendants assisted the investigation by securing the crime scene, interviewing Riggio, obtaining a description of the alleged perpetrator, interviewing other witnesses, and providing information to CPD detectives with the goal of prosecuting the perpetrator for the sexual assault. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 34–36; Pl.'s LR 56.1(b)(3)(B) Stmt. (Sheriff Defs.) ¶¶ 32–34, 37, 38, 43,

48. 61–63.  Because a reasonable jury could find that the Sheriff Defendants assisted the CPD in its sexual assault investigation, the Court declines to grant summary judgment on this ground.

### B.      Whether the Evidence Was Suppressed

Defendants Cartrette and Mokstad next focus on the second *Brady* requirement—that the evidence be suppressed.   As noted above, a plaintiff asserting a *Brady* claim must establish that the defendant "act[ed] either knowingly or with deliberate, reckless indifference."  *Steidl v. Fermon*, 494 F.3d 623, 631 (7th Cir. 2007) (citing *Jones*, 856 F.2d 992–93); *see* Pattern Civil Jury Instructions of the Seventh Circuit 7.14 (2017).

As an initial matter, Chatman concedes that Sheriff Deputy Michael Cokely was not aware of Copeland's presence prior to this litigation.  *See* Pl.'s LR 56.1(b)(3)(B) Stmt. (Sheriff Defs.) ¶ 55.  Accordingly, the Court grants the Sheriff Defendants' summary judgment motion as to Chatman's *Brady* and conspiracy claims against Cokely based on the sleeping deputy in Counts IV and V, respectively.

Mokstad and Cartrette argue that they did not suppress evidence for different reasons. Mokstad states that she did not tell anyone about Copeland, Sheriff Defs.' Ex. E, 2/10/15 Mokstad Dep. at 64:19–21, but that is because she was never aware of him, Sheriff Defs.' Ex. E, 2/10/15 Mokstad Dep. at 64:12–18.  By contrast, Cartrette contends that Mokstad knew about the sleeping deputy, told Cartrette about it, Cartrette Dep. at 88:1–88:5; 133:14; see Sheriff Defs.' Ex. R, Copeland Disciplinary Report at Chatman/CCSO 00847, and, in turn, Cartrette fulfilled his disclosure responsibilities by telling Detective McGreal.  *See* Cartrette Dep. at 109:1–110:4, 111:14–113:23; Pl.'s Ex. 61, 1/31/07 Cartrette Dep. at 105:15–23, 107:5–7.  But when ASA Holmes interviewed Cartrette and Mokstad for a statement about their knowledge of the case,

neither of them mentioned Copeland. *See* Holmes Dep. at 188:23–189:17, 252:3–10; Cartrette Dep. at 108:23–109:9.

As such, as to Mokstad, when the disputed and undisputed facts are viewed in Chatman's favor, Mokstad told Cartrette about Copeland, but she withheld that information from Holmes. A rational jury could find that she suppressed exculpatory evidence by doing so.

And as for Cartrette, the summary judgment record supports that, although he spoke to McGreal about the sleeping deputy in the morning of May 24, 2002, Cartrette Dep. at 67:3–12, Cartrette also withheld the information from Holmes. A rational jury could find that he too suppressed exculpatory evidence by doing so.

Mokstad and Cartrette assert that they are shielded, in their individual capacities, from Chatman's due process claim by qualified immunity. As noted, in the context of a *Brady* claim, the qualified immunity issue is not whether the officer knew he had to disclose exculpatory information; rather, the question is whether it was clearly established that the information the plaintiff claims the police failed to disclose was exculpatory or impeaching. *Carvajal*, 542 F.3d at 569; *Bagley*, 473 U.S. at 676–77.

For the reasons discussed above, Chatman has satisfied his burden of showing, at least at this stage of the litigation, that Mokstad and Cartrette should not be afforded qualified immunity. As explained above, it was clearly established that the sleeping deputy evidence was exculpatory or impeaching, and a reasonable jury could view the record and conclude that the evidence was otherwise unavailable. In addition, whether Mokstad and Cartrette knowingly suppressed the evidence depends on disputed issues of fact.

The Court grants the Sheriff Defendants' motion as to in Counts IV and V against Cokley. Because no other claim remains against him, the Court dismisses Cokely as a defendant.

The Court, however, denies the Sheriff Defendants' motion as to Count IV as to Mokstad and Cartrette. Because the Sheriff Defendants' summary judgment arguments as to Counts V, X, XII, and XIII hinge on the complete lack of viability of Count IV, the motion is denied as to those counts as well.

## III.    SAO Defendants

Chatman alleges that Holmes coerced his confession in violation of his Fifth Amendment right against self-incrimination (Count I) as well as his Fourteenth Amendment substantive due process rights (Count II). In addition, Chatman asserts that Holmes detained him without probable cause in violation of the Fourth Amendment prohibition against unreasonable seizures (Count III). Chatman also claims that Holmes fabricated evidence by creating the false report of Chatman's confession and withheld exculpatory evidence regarding the sleeping deputy and the 24-hour surveillance tape, all in violation of his Fourteenth Amendment procedural due process rights (Count IV). Chatman additionally asserts that Holmes conspired with investigators and failed to intervene to prevent their violation of Chatman's constitutional rights (Counts V and VI). Finally, Chatman accuses Holmes of maliciously prosecuting him, intentionally inflicting on him emotional distress, as well as conspiring with others to do so in violation of Illinois law (Counts VIII, IX, and X). According to Chatman, Defendant Alvarez (sued in her official capacity as State's Attorney) and Cook County are liable based on *respondeat superior* and indemnification (Counts XII and XIII).

The SAO Defendants raise numerous grounds as to why summary judgment should be granted in their favor. They initially contend that Defendant Holmes did not coerce Chatman's confession or fabricate evidence (Counts I and II). Second, they assert that, because Defendant Holmes acted as a prosecutor at all relevant times, absolute prosecutorial immunity bars all

claims against him, and he thus had no duty to intervene in the actions of the Officer Defendants. Third, in the alternative, they opine that Holmes should be provided qualified immunity as to the *Brady* claim (Count IV). Fourth, they argue that because summary judgment should be granted as to all underlying claims against Defendant Holmes, the section 1983 conspiracy claim, as well as the *respondeat superior* and indemnification claims, also fail (Counts V, XII, and XIII).[13]

### A.    Chatman's Confession

Holmes argues there is no evidence that Chatman's confession was coerced or that Holmes participated in the coercion. On the other hand, Chatman asserts that the facts show that Holmes directly extracted an involuntary confession.

"The voluntariness of a confession depends on the totality of circumstances, including both the characteristics of the accused and the nature of the interrogation." *Hurt v. Wise*, 880 F.3d 831, 845 (7th Cir. 2018) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). Factors relevant to determining whether a confession is voluntary are: "the defendant's age, education, intelligence level, and mental state; the length of the defendant's detention; the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment, including deprivation of food or sleep." *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001). "In assessing voluntariness, courts must weigh the tactics and setting of the interrogation alongside any particular vulnerabilities of the suspect." *Dassey v. Dittmann*, 877 F.3d 297, 304 (7th Cir. 2017).

---

[13]    As noted earlier, the SAO Defendants' summary judgment motion omits Counts III, IV (Exculpatory Evidence based on 24-Hour Surveillance Tape), and VIII. *See supra*, n.3. And although the SAO Defendants state that they seek summary judgment as to Chatman's state-law intentional infliction of emotional distress (IIED) (Count IX) and conspiracy (Count X) claims, they merely incorporate the Officer Defendants' arguments. *See* SAO Defs.' Mem. Law Supp. Mot. Summ. J. at 21. The Officer Defendants' arguments, however, do not address the state-law IIED and state-law conspiracy claims. *See generally* Officer Defs.' Mem. Law Supp. Mot. Summ. J. Accordingly, the Court need not address Counts III, IV (surveillance tape), VIII, IX, or X against the SAO Defendants.

"Physical abuse may be the ultimate coercion, but the Supreme Court has long acknowledged the potency of psychological coercion as well." *Id.* In fact, an involuntary confession "can serve as a basis of a § 1983 claim against the police officers responsible even though no physical force was used in the extraction of the confession." *White v. Rochford*, 592 F.2d 381, 383 (7th Cir. 1979). "Whether police have employed sufficiently coercive tactics to render a confession involuntary is a legal question. But the answer depends on underlying historical facts." *Hurt*, 880 F.3d at 846 (citation omitted). Only where a "defendant[] accept[s] all historical facts [construed] favorably to the [plaintiff] and argue[s] that those facts do not show that . . . [the plaintiff's] confession was involuntary, . . . [is a court] in a position to answer the ultimate legal question." *Id.*

As for Chatman's mental condition, the parties dispute whether he was noticeably cognitively impaired, confused, incoherent, and delusional when Holmes interacted with him. Pl.'s LR 56.1(b)(3)(B) Stmt. (SAO Defs.) ¶¶ 54, 55; Defs.' Joint Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 37–40, 109, 112, 123. According to Holmes, he had no difficulty understanding or communicating with Chatman. SAO Defs.' LR 56.1(a)(3) ¶ 54. According to Chatman, he has a long and well documented history of schizophrenia and experiencing symptoms of schizophrenia, dating back to at least 1981, as well as bipolar disorder. Defs.' Joint Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 38. Additionally, Chatman's IQ was 68, which is in the "mild mental retardation range," and his overall intellectual functioning was equal to or better than only two percent of individuals of the same age. *Id.* Chatman also points to Neibauer's and Cernick's description of the man they had seen days earlier wearing a Blackhawks jacket as being confused, very hard to understand, and incoherent. Pl.'s LR 56.1(b)(3)(B) Stmt. (SAO Defs.) ¶ 54. In addition, when Chatman was processed into Cook County Jail, it took only 10 minutes for

intake personnel to determine that he was schizophrenic and delusional and to refer him indefinitely to the mental health acute care unit, which served only one half of one percent of the jail population. *Id.*

The parties also disagree about the nature of the interrogation. The following is the SAO Defendants' version of events. Chatman was given food to eat, cigarettes to smoke, and he was allowed to use the washroom whenever he wished while at the police station. Defs.' LR 56.1(a)(3) Stmt. ¶ 69. Before Holmes left the police station at 8:00 p.m. on May 24, 2002, Chatman told Holmes that he had been treated fine and that he did not need anything before Holmes left. *Id.* ¶ 55. Roberts called Holmes at midnight requesting that he return to the police station because Chatman had confessed to Roberts. *Id.* ¶¶ 49, 58. Holmes returned to the station at 1:00 a.m. on May 25, 2002, and had Chatman sign a *Miranda* waiver. *Id.* ¶¶ 50, 51. While at the police station, Chatman did not tell Holmes or any other officer that the "Chinese-looking" officer had hit him. *Id.* ¶ 57. Holmes and the detectives brought Chatman to the Daley Center at 2:00 a.m. and followed him around as Chatman recounted how he had committed the crime. *Id.* ¶ 58. At 10:00 a.m. on May 25, 2002, Chatman voluntarily signed a written confession that Holmes had drafted. *Id.* ¶ 64. Chatman also signed his initials next to corrections that Chatman himself had made to the written statement. *Id.* ¶ 66.

By contrast, Chatman's account of the interrogation is as follows. After Chatman was arrested at 8:45 a.m. on May 24, 2002, he was held in custody for over 24 hours, and during the first 19 hours, he was not given any food or drink. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 54, 69. Chatman was unable to lie down for any significant length of time due to being handcuffed to a ring on a wall. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 43, 64. Although he requested a lawyer, a phone call to his mother, and his medication, his requests were denied. *Id.* ¶¶ 50–51. Chatman was

interrogated by Boock and Mischka twice and Boock, Mischka, and Holmes as a group, once. *Id.* ¶¶ 47–52; Boock Dep. at 95:2–100:15 (cited in Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 55). He was then interrogated and beaten by a "Chinese-looking" officer until he promised to confess to Holmes. *Id.* ¶¶ 58–61. When Holmes returned to the station, Chatman still did not confess, and Holmes still did not approve charges. Pl.'s LR 56.1(b)(3)(B) Stmt. (SAO Defs.) ¶ 47. Rather, Holmes told Chatman that Holmes, Roberts, Walsh, and Midona were taking him to the Daley Center, and they forced him to go against his wishes. *Id.* ¶ 50. Shackled and handcuffed, Chatman followed them around the Daley Center. *Id.* ¶¶ 50, 58–62. During the walkthrough, Chatman denied committing the crime and told them that he was innocent and that the "Chinese-looking" officer had beaten him and had told him what to say step by step. *Id.* ¶ 62; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 70; Pl.'s Ex. 1, Chatman Dep. pt. 1 at 47:3–9, 13–15; 48: 18–22; 56:6–8. Nonetheless, Holmes coached Chatman on where to go and what to say from approximately 2:00 to 4:00 a.m. Pl.'s LR 56.1(b)(3)(B) Stmt. (SAO Defs.) ¶¶ 58–62; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 69; Roe Dep. at 140:22–24; Pl.'s Ex. 16, Note from Roe. After the walkthrough, Chatman was finally given something to eat and drink. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 91. When he was brought back to the station, rather than taking Chatman to the lock-up where he could make a phone call and lie down, the officers took him to an interrogation room and handcuffed to a ring on the wall. *Id.* ¶ 93. Five hours later, Holmes had Chatman sign a written statement of confession fabricated by Holmes and place his initials next to corrections that Holmes had made without Chatman's input. *Id.* ¶¶ 94–120. Prior to signing it, Chatman told Holmes he did not understand the written statement, and he was unable to read any portion of the statement out loud. *Id.* ¶ 109. Afterwards, Holmes approved the charges against Chatman based on his signed confession. Pl.'s LR 56.1(b)(3)(B) Stmt. (SAO Defs.) ¶ 47.

Because the material facts are disputed, the Court cannot conclude, as a matter of law, that Chatman's confession was voluntary. *See Hurt*, 880 F.3d at 846 (stating that immunity is precluded where a jury could find coercion based on disputed facts). Whether physical and psychological coercive tactics rendered Chatman's confession involuntary, especially given Chatman's disputed mental state, necessarily depends on the credibility of the witnesses.

Furthermore, a reasonable jury could conclude from the above facts that Holmes: (1) saw that Chatman was plainly incoherent and delusional due to his unmedicated, schizophrenic condition; (2) knew that Chatman had been repeatedly interrogated, but still professed his innocence and never confessed to anyone that he had raped Riggio; (3) was aware that a "Chinese-looking" officer had beaten Chatman and had told Chatman what to say to Holmes; (4) heard Chatman declare his innocence during the walkthrough; (5) nonetheless fed and coached Chatman during the walkthrough with incriminating information about the crime; (6) fabricated Chatman's written statement of confession based on details he learned from the detectives and lab results; (7) had Chatman sign a confession that Holmes knew Chatman did not understand; (8) fabricated corrections to the confession and had Chatman sign his initials next to them in order to create the false appearance that Chatman had understood the written statement; and (9) fabricated a report that stated he had witnessed Chatman voluntarily confess. Accordingly, the Court denies summary judgment based on the argument that Holmes neither coerced Chatman to confess nor fabricated evidence.

## B.  Absolute Prosecutorial Immunity

The SAO Defendants next argue that absolute prosecutorial immunity bars Chatman's section 1983 claims against Holmes. Chatman counters that his section 1983 claims are based on Holmes' conduct as an investigator, not as a prosecutor.

"[I]n initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983." *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976). That said, "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). "When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other." *Id.* (internal quotation marks omitted). Where a prosecutor searches for clues and corroboration in order to establish probable cause to initiate judicial proceedings, he or she is not protected by absolute immunity, but rather, qualified immunity. *See id.* "[T]he official seeking absolute immunity bears the burden of showing that it is justified by the function in question." *Burns v. Reed*, 500 U.S. 478, 478 (1991).

In addition to the disputed facts discussed above, the parties present conflicting accounts as to when Holmes had probable cause to approve the charges against Chatman. Although Chatman had been identified by Riggio in a lineup, Holmes had not approved the charges against Chatman by the time that Holmes left the station at 8:00 p.m. Pl.'s LR 56.1(b)(3)(B) Stmt. (SAO Defs.) ¶¶ 47–48. Holmes states that, before he returned to the station at 1:00 a.m., Chatman had confessed to Roberts, and then after he returned, Chatman confessed to him, which provided all of the probable cause he needed to approve the charges. Defs.' LR 56.1(a)(3) ¶¶ 49, 53, 58. Chatman, on the other hand, asserts that he did not confess to anyone that he had raped Riggio that night. Pl.'s LR 56.1(b)(3)(B) (SAO Defs.) ¶ 49. Holmes' notes indicate that, rather than approving the charges, he continued the investigation by taking Chatman to the Daley Center. Pl.'s Ex. 19, Holmes Dep. at 195:1–17. In Chatman's view, Holmes continued the investigation

in order to obtain clues and corroboration to establish probable cause that Chatman had raped Riggio. Pl.'s LR 56.1(b)(3)(B) (SAO Defs.) ¶¶ 44–45, 47, 49, 53, 58; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 69, 71–73. It is undisputed Holmes did not approve the charges until after Chatman had signed the written statement at 10:00 a.m. Pl.'s LR 56.1(b)(3)(B) (SAO Defs.) ¶ 47; Pl.'s Ex. 20, Gleason Dep. at 141:2–6. It is clear that the issue of when probable cause existed to charge Chatman turns on hotly disputed questions of fact. Because the determination of whether Holmes should be afforded prosecutorial immunity, or put differently, whether Holmes was performing an investigatory or prosecutorial function when he allegedly coerced Chatman's confession and fabricated evidence, rests on these disputed issues of fact, the Court denies summary judgment on this ground.[14] *See Hill v. Coppleson*, 627 F.3d 601, 605–06 (7th Cir. 2010) (stating district court properly denied summary judgment because absolute immunity depended on a probable-cause question which turned on a disputed issue of fact regarding when the confession occurred).

### C. *Brady* Claims

The SAO Defendants move for summary judgment as to Chatman's *Brady* claims against Holmes. First, although the SAO Defendants, as well as the Officer Defendants, believe that Chatman has asserted a *Brady* claim based on the contention that Holmes and the Officers withheld Chatman's cognitive deficiencies from Chatman himself, Chatman unsurprisingly does not oppose summary judgment in this regard because this was never the basis of his claims.

---

[14] Holmes also argues that, while acting in his role as a prosecutor, he had no duty to intervene to prevent the detectives from coercing Chatman's confession and fabricating evidence and that he should therefore be afforded qualified immunity. Because these arguments rest on the same disputed facts, the Court declines to grant summary judgment on these grounds. *See Colbert v. City of Chi.*, 851 F.3d 649, 664 (7th Cir. 2017), *cert. denied*, 138 S. Ct. 657 (2018) ("It is well established that an officer may be liable if she witnesses another officer violating a civilian's constitutional rights, has a reasonable opportunity to intervene, and fails to do so."); *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir .2012) ("The only question is whether a prosecutor who is acting in an investigatory capacity is subject to rules that are any different. We think not.").

Second, to the extent that Chatman has asserted a *Brady* claim against Holmes based on Copeland, it is undisputed that Holmes was never aware of the sleeping deputy, *see* Defs.' Joint Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 33, and accordingly, the Court grants summary judgment in Holmes' favor as to that portion of the claim in Count IV. Third, the SAO Defendants have not addressed Chatman's *Brady* claim based on the failure to disclose the 24-hour surveillance tapes from the Daley Center in their opening or reply brief or statements of fact; therefore, that claim must be adjudicated at trial.

Accordingly, the Court grants the SAO Defendants' motion for summary judgment as to Count IV, but only to the extent that Chatman has asserted a *Brady* claim against Holmes based on the sleeping deputy. In all other respects, the Court denies the SAO Defendants' motion to dismiss Count IV.

### D. Counts V (§ 1983 Conspiracy), XII (*Respondeat Superior*), and XIII (Indemnification)

Chatman also brings a claim for a section 1983 conspiracy based on the underlying federal claims, as well as claims for *respondeat superior* and indemnification based on the underlying state-law tort claims. The SAO Defendants have moved for summary judgment as to these counts as being derivative of the underlying claims, and their supporting arguments have presumed that summary judgment would be granted as to the underlying claims. The Court grants the SAO Defendants' motion to the extent that Counts V, XII, and XIII are based on Chatman's *Brady* claim regarding the sleeping deputy. In all other respects, the motion is denied.

## III. OPS Defendants

The OPS Defendants—Karen Wojtczak, Millicent Willis, Lori Lightfoot, and Tisa Morris—have moved for summary judgment as to Chatman's intentional infliction of emotional

distress ("IIED") claim (Count IX) and state law conspiracy claim based on the IIED claim (Count X).[15]  Chatman does not oppose the motion as to either claim with regard to Willis, Lightfoot, and Morris, and he does not oppose the motion as to the conspiracy claim with regard to Wojtczak.  Accordingly, the Court addresses the only remaining cause of action against any of the OPS Defendants:  the IIED claim against Wojtczak.

Under Illinois law, the tort of IIED has three components: (1) the conduct involved must be truly extreme and outrageous; (2) the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress; and (3) the conduct must in fact cause *severe* emotional distress. *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988).  IIED requires more than "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."  *Id.* (internal quotation marks omitted).  A defendant's conduct is "evaluated on an objective standard based on all of the facts and circumstances."  *Graham v. Commonwealth Edison Co.*, 742 N.E.2d 858, 866 (Ill. App. Ct. 2000).

Wojtczak first argues that Chatman's IIED claim is time-barred.  The Illinois Tort Immunity Act requires civil actions against local entities or their employees to be commenced "within one year from the date that the injury was received or the cause of action accrued."  745 Ill. Comp. Stat. 10/8–101(a).  Illinois courts apply "the standard rule that a claim accrues when the victim first suffers injury and knows its cause."  *Bridewell v. Eberle*, 730 F.3d 672, 678 (7th Cir. 2013).  In other words, the action must be commenced within the appropriate statute of limitations from the time the person bringing the action knew or reasonably should have known

---

[15]    The OPS Defendants have not moved for summary judgment as to Count VIII (Malicious Prosecution–State Law).

of the injury for which damages are sought. *See Sanders v. JGWPT Holdings, Inc.*, No. 14 C 9188, 2016 WL 4009941, at *8 (N.D. Ill. July 26, 2016).

Chatman is seeking damages based on the injury caused by the conduct of Wojtczak, who was assigned to investigate the anonymous memo. Because Wojtczak was assigned to the investigation on April 16, 2004, it would have been impossible for Chatman to have known the injury caused by Wojtczak prior to that date because the tort had not yet occurred.[16] OPS Defs.' LR 56.1(a)(3) Stmt. ¶ 36. Nor was the existence of Wojtczak's involvement in the investigation known to Chatman until the C.R. file was disclosed during discovery in this case on June 4, 2015. Pl.'s LR 56.1(b)(3)(C) ¶¶ 147–48. Because Chatman filed his claim against Wojtczak less than a year later, on November 9, 2015, his IIED claim against Wojtczak is timely. 2d Am. Compl., ECF No. 316 (later corrected on 11/25/14, ECF No. 324).

Next, Wojtczak resurrects an argument previously pressed by the OPS Defendants in their motion to dismiss. According to her, she had no duty, under *Brady* or any other law, to turn over the memo to Chatman. Not so. Intentional infliction of emotional distress is an independent cause of action in Illinois. *Robbins v. Kass*, 516 N.E.2d 1023, 1027 (Ill. App. Ct. 1987). Thus, "the duty not to commit the intentional tort of intentional infliction of emotional distress exists on its own." *Zuidema v. Raymond Christopher, Inc.*, 866 F. Supp. 2d 933, 940 (N.D. Ill. 2011); *see Bannon v. Univ. of Chi.*, 503 F.3d 623, 630 (7th Cir. 2007) (viewing basis for an IIED claim as being independent of any duty imposed by another law). Therefore, courts do not require a violation of the Constitution or any other law in order to prove an IIED claim.

---

[16] It is disputed whether Fraction told Chatman she was from OPS and was investigating a complaint on his behalf when she interviewed him in March 2004. Pl.'s LR 56.1(b)(3)(B) Stmt. (OPS Defs.) ¶ 29. It is undisputed that Fraction did not provide Chatman with a copy of the memo that had triggered the C.R. investigation. *Id.*; Pl.'s Ex. 10, Chatman Decl. ¶ 9; *see* Pl.'s Ex. 24, Fraction Dep. at 34:22–36:7, 46:12–47:5, 65:14–18. In any event, without the memo, there was insufficient information for a reasonable person to know that Wojtczak would engage in tortious conduct in the future. Pl.'s LR 56.1(b)(3)(B) Stmt. (OPS Defs.) ¶¶ 30–33, 35.

*See, e.g., Chatman v. City of Chi.*, No. 14 C 2945, 2016 WL 4734361, at *5 (N.D. Ill. Sept. 12, 2016) ("[I]t is not necessary for Chatman to prove a *Brady* violation (or even the existence of a constitutional duty to disclose under *Brady*) in order to meet the elements of his IIED claim . . . .); *Garrison v. Burke*, No. 91 C 20150, 1993 WL 29909, at *4 (N.D. Ill. 1993) ("[T]his court reads Count IX to be a state law claim for intentional infliction of emotional distress, for which no constitutional violation is needed.").

Wojtczak also contends that no triable issues of fact exist as to Chatman's IIED claim. The Court disagrees. The record, viewed in the light most favorable to Chatman, shows that Wojtczak was aware of the memo, which stated that an officer at the Harrison and Kedzie police station (1) knew Detective Kato's reputation for brutality toward suspects in custody, (2) witnessed Kato beating Chatman into signing a confession, and (3) reported that officers were aware, from questioning and Chatman's condition, that he did not commit the assault. Defs.' LR 56.1(a)(3) ¶ 50; Pl.'s LR 56.1(b)(3)(C) ¶ 149; OPS Defs.' Ex. 13, 5/27/02 Memorandum at City Def. CC 012448. A reasonable jury could conclude that Wojtczak abused her power and authority by withholding the memo from Chatman while his criminal proceedings were still ongoing. Pl.'s LR 56.1(b)(3)(C) ¶ 151. It may also be reasonably inferred from the summary judgment record that Wojtczak had the power to free an innocent man and to ensure that he received a new trial, armed with this exculpatory evidence. *Id.* ¶ 150. A rational jury could also find that she did so knowing there was a high probability that Chatman would experience severe emotional distress and that Chatman experienced severe emotion distress by spending over a decade in prison for a crime he did not commit. *Id.* ¶ 4. Based on these facts, a reasonable jury could find Wojtczak liable for IIED. Accordingly, the OPS Defendants' motion for summary judgment is denied as to Count IX against Wojtczak.

## Conclusion

For the foregoing reasons, the Court denies the Officer Defendants' summary judgment motion [457] and grants in part and denies in part the Sheriff Defendants', the SAO Defendants', and the OPS Defendants' summary judgment motions [465][461][477]. To the extent that Counts IV, V, and VI against the Officer Defendants are based on the sleeping deputy, the motion is denied as to McGreal and Pena, and the motion is also denied in all other respects. The Sheriff Defendants' motion is granted as to all claims against Micheal Cokely, who is hereby dismissed as a defendant, and it is denied in all other respects. The SAO Defendants' motion is granted as to Counts IV, V, XII, and XIII, but only to the extent that those claims are reliant on Chatman's *Brady* claim against Holmes based on the sleeping deputy, and it is denied in all other respects. The OPS Defendants' summary judgment motion is granted as to Count IX against Millicent Willis, Lori Lightfoot, Tisa Morris; granted as to Count X against Millicent Willis, Lori Lightfoot, Tisa Morris and Karen Wojtczak; and denied as to Count IX against Karen Wojtczak.

**SO ORDERED**                    **ENTERED    3/28/18**

_____
**John Z. Lee**
**United States District Judge**

42