

# THE FORENSIC PANEL

224 W. 30ᵀᴴ ST., SUITE. 806  NEW YORK, NY 10001  TEL: 212.535.9286  FAX: 212.535.3259  MICHAEL WELNER, M.D., CHAIRMAN

Krista Stalf, Esq.
Borkin & Scahill, Ltd.
Two First National Plaza
20 South Clark St., Suite 1700
Chicago, IL 60603

Re: **Carl Chatman**

October 31, 2016

Dear Ms. Stalf,

Pursuant to your request, I have conducted an assessment of a number of issues raised in the civil litigation of the above claimant. Mr. Chatman, now 62 years old, was arrested, tried, and convicted for the May 24, 2002 rape of Susan Riggio.

On September 10, 2013, the Chicago State's Attorney, Anita Alvarez, moved to dismiss Mr. Chatman's charges. Mr. Chatman filed a civil suit against the City of Chicago, individual prosecutors and police, and Mrs. Riggio on April 24, 2014, asserting malicious prosecution.

In support of his claim, Mr. Chatman has presented a July 7, 2016 expert report from Melissa Russano, Ph.D. Dr. Russano asserted a number of opinions, premised on the reference point that Mr. Chatman did not rape Mrs. Riggio. Dr. Russano's report listed what she termed "major risk factors for false confession:"

- "Tunnel vision," or confirmation bias, a focus on evidence that supports investigator's beliefs in Mr. Chatman's guilt, ignoring evidence to the contrary.
- Suspect vulnerabilities – specifically, Mr. Chatman's intelligence, his mental illness and mental state.
- Situational risk factors associated with the interrogation itself, specifically his "prolonged custody," "isolation," the length of his interrogations, Mr. Chatman's lack of sleep, his having been slapped in the back of his head, Mr. Chatman's facing multiple interrogators and residing in custody on a hard bench and handcuffed to a wall.
- Interrogation tactics that included accusatorial questioning, Mr. Chatman having been "repeatedly confronted with false evidence of his guilt," and minimization.
- Dr. Russano opines that Mr. Chatman was fed details of the crime by law enforcement investigators who essentially informed his detailed statement and contaminated it with information available to them about the crime. This included their decision to walk Mr. Chatman through the location of the complaint to review his admissions to them.

EXHIBIT B

Re: **Carl Chatman**
*The Forensic Panel - Michael Welner, M.D.*
October 31, 2016

Page 2

Dr. Russano also provided her own analysis of the "post-admission narrative," based upon guiding points for which she asserted general scientific acceptance.

The case is referred to my review to assess the following forensic psychiatric questions:

1) *What is the basis of behavioral science opinion on disputed confessions?*
2) *How are false confessions established, as a foundation for behavioral science opinion?*
3) *Does the available psychiatric evidence of Mrs. Riggio and Mr. Chatman demonstrate her to have falsely accused the plaintiff? Why or why not?*
4) *Does evidence reflect upon investigators and prosecutors handicapped by tunnel vision in this case?*
5) *Did Mr. Chatman possess vulnerabilities that contribute to a risk of false confession?*
6) *Were there situational factors that contributed to a risk of false confession?*
7) *Is there evidence from the interrogation methods of techniques known to cause false confession?*
8) *What evidence is there, for or against, the contention that Mr. Chatman was fed details with which to incorporate into his statement? How does this relate to the walk through of the location of the complaint?*
9) *Is there research or other study or foundation to have established a methodology for the analysis of a "post-admission narrative?"*

## SOURCES OF INFORMATION

1. Police reports
2. Notes of interview of Mark Pharr, May 24, 2002
3. Notes of interview of Maria Mokstad, May 24, 2002
4. Notes of interview of Mike Karczewski, May 24, 2002
5. Notes of interview of Susan Riggio, May 24, 2002
6. Notes of interview of Michael Cokeley, May 24, 2002
7. Notes of interview of Richard Griffin, May 24, 2002
8. Notes of interview of Burrough Cartrette, May 24, 2002
9. Hinsdale Hospital Records
10. Crime scene reports
11. Statement of Carl Chatman, May 25, 2002
12. Complaint investigation of Sgt. Michael Copeland
13. Motion to Suppress Confession, May 2, 2003
14. Memorandum for Motion to Suppress Confession, October 3, 2003
15. Transcript of suppression hearing, August 13 & September 8 & 9, 2003
16. Trial transcript, January 28 & 29, 2004
17. Press release re: dismissal of charges, Cook County SAO, September 10, 2013

Re: **Carl Chatman**
*The Forensic Panel - Michael Welner, M.D.*
October 31, 2016

Page 3

18. Loevy & Loevy press release on Certificate of Innocence, January 13, 2014
19. Second Amended Complaint, November 9, 2015
20. Kriston Kato excessive force complaints appendix
21. Records from MacNeal Memorial Hospital
22. Records from Chicago Read Mental Health Center
23. Records from Loretto Hospital
24. Corrections records
25. Incident scene photos
26. SERI reports
27. Mrs. Riggio's Dental records
28. Deposition of Kriston Kato, June 11, 2015
29. Work order, May 23, 2002
30. Documents from dissolution of marriage of Carl and Versie Chatman
31. Records of Fantus Health
32. Records of Cermak Health
33. Criminal investigative reports of 1979 incident
34. Letter of psychiatrist John Adams, M.D., June 24, 1981
35. Deposition of Dianella Dizon, M.D., March 24, 2015
36. Deposition of Norma Berlin, March 26, 2015
37. Deposition of Susan Riggio, Octber 6, 1983
38. Deposition of Susan Riggio, January 12, 2006
39. Deposition of Susan Riggio, October 7, 2014
40. Deposition of Jack Boock, February 4, 2015
41. Diagram of 21st floor, Daley Center
42. Kato file from Office of Professional Standards
43. Memo, Querrey and Harrow, November 4, 2005
44. Deposition of Carl Chatman, February 26 & May 7, 2015
45. Deposition of Phillip Pan, M.D., April 1, 2015
46. Deposition of Lt. Denis Walsh, November 7, 2014
47. Deposition of Tisa Morris, February 18, 2016
48. Deposition of Thomas Brandstrader, May 28, 2015
49. Deposition of Daniel Gasca, III, September 19, 2015
50. Deposition of Frederick Seaton, September 25, 2015
51. Deposition of Michael Waslewski, September 25, 2015
52. Report of Melissa Russano, Ph.D., July 7, 2016
53. Deposition of Melissa Russano, Ph.D., September 13, 2016
54. Report of Dr. Gerald McMenamin, July 7, 2016
55. Military records of Carl Chatman, 1975-1976
56. Deposition of Dr. Gerald McMenamin, September 28, 2016
57. Dental records of Susan Riggio, Nils Sandstrom, DDS, 2004-2006

Re: **Carl Chatman**
*The Forensic Panel - Michael Welner, M.D.*
October 31, 2016

Page 4

## THE CRIMINAL COMPLAINT AND AFTERMATH

On May 24, 2002 and shortly before 7:30 AM, Jeanette Neibauer discovered her coworker Susan Riggio splayed on top of her office desk on the 21st floor of the Daley Center. Mrs. Riggio was delirious and semi-conscious, sitting in what was later demonstrated to be her own urine, with her clothes tousled and nylons ripped, scissors stuck through her skirt, her office chair toppled, and her desk phone, papers and other items scattered on her floor.

The first officers to respond to the call to the scene, described Mrs. Riggio as "gasping for air," "distraught," "quietly weeping," "coughing," "in and out of awareness," and "red in the face." Mrs. Riggio, a Case Coordinator for Judge Ronald Bartkowicz, told officers that she had been sexually assaulted by someone she recognized from having been in the judge's courtroom earlier in the week.

She described her alleged assailant as a slow speaking black male with salt and pepper hair, smelling of alcohol, 5'7 and 200 pounds and 50-60 years old, wearing a knit cap, a large shiny silver belt buckle, and a Chicago Black Hawks jacket. At the time she was discovered, Mrs. Riggio indicated that she did not know if she had been sexually penetrated. In the course of struggling with her assailant, added Mrs. Riggio, he had slammed her head on her desk several times. She related that she had cried out during the attack. She was silenced, noted the complainant, by her assailant picking up scissors and threatening her.

Mrs. Riggio was subsequently examined at Northwestern University Hospital by Emergency Medicine attending physician Brigham Temple, M.D. Dr. Temple would later testify that Mrs. Riggio presented as "visibly shaken." Mrs. Riggio did not exhibit abrasions or cuts, no genital lacerations, and a rape examination did not produce sperm.[1] She was released.

Police dispatched the description of the assailant to local units. By 8:30 AM, police officers Richard Griffin and Michael Karczewski, on patrol in the area, identified a pedestrian fitting the description, stopped him, and within minutes placed Carl Chatman under arrest. Mr. Chatman, 5'10, 180 pounds, with salt and pepper hair, and slow speaking, was attired in a Black Hawks jacket. During initial questioning, according to Officers Griffin and Karczewski, Mr. Chatman told them he was coming from the Daley Center. There, he states, he picked up a copy of "Rules for the Road," hoping to reinstate his driver's license. Mr. Chatman was not in possession of any such book. Mr. Chatman also told police he was homeless, and had stayed the night before at the Pacific Garden Mission. A subsequent police interview of Mark Pharr, the Mission's Director of Security, yielded that Mr. Chatman had not been seen at the Mission for some time.

---

[1] Dr. Temple would later testify that only 10% of rape victims demonstrate physical signs of trauma.

Re: **Carl Chatman**
*The Forensic Panel - Michael Welner, M.D.*
October 31, 2016

Page 5

At noon, police transferred Mr. Chatman to where he was presented in a lineup to Mrs. Riggio and two coworkers until approximately 12:45 PM. Detective Jack Boock related that he and Detective Rita Mischka met with Mr. Chatman at approximately 1:30 PM. He would deny responsibility for the rape in that interview.

At approximately 8:45-9:00 PM, Detectives Boock and Mischka again interviewed Mr. Chatman. At that time, they confronted him with his having been identified in lineups by the reported victim as her assailant, identified by a coworker of the victim (Virginia Cernick), and his alibi of being in the Mission the night before being contradicted. Mr. Chatman reportedly responded sarcastically with, "if the lady says I did it, then I did it." Approximately 15 minutes later, ASA Brian Holmes briefly sat down with Mr. Chatman, along with Detectives Boock and Mischka. The examinee reportedly responded to Mr. Holmes' confronting him with the above in a similarly terse manner.

Detective John Roberts came on duty at 10:00-10:30 PM and interviewed Mr. Chatman. According to Detective Roberts, Mr. Chatman asked for a cigarette. Then, he spoke at length to Detective Roberts and gave him a self-incriminating statement over the next 30-45 minutes. ASA Holmes then returned and questioned Mr. Chatman after 1:00 AM, with Detective Roberts present. Mr. Chatman reportedly provided an account similar to that which he gave Detective Roberts.

ASA Holmes arranged to take Mr. Chatman to the Daley Center to walk through his movements. Initially, police (Sgt. Walsh, Detective Roberts, Detective Midona), had difficulty gaining access to the building when they arrived before 2:00AM. While they waited to gain entry to the Daley Center, Mr. Chatman reportedly guided ASA Holmes and police officers to the liquor store and his other movements subsequent to the reported attack.

Once inside the Daley Center, Mr. Chatman, ASA Holmes, and law enforcement officers advanced through each of his reported stops in the building spanning May 23 and 24, ending the visit in the office where the reported rape had taken place.

After the Daley Center visit, police took Mr. Chatman for a White Castle meal, before returning to the police station. There at 4:30 AM, Mr. Chatman went to sleep and awakened to have breakfast at approximately 9:30 AM. He reportedly ate breakfast and then met with ASA Holmes, who wrote out a confession that Mr. Chatman reviewed and signed.

It was 10:25 AM on May 25 when Carl Chatman signed off on a self-incriminating statement. In it, among other things, he related that he went to the Daley Center and scouted for a woman to have sex with, whom he intended to rape. Making his way into the 21st floor courtroom with a ruse of asking how he could acquire benefits, he stated that he

Re: **Carl Chatman**
*The Forensic Panel - Michael Welner, M.D.*
October 31, 2016

Page 6

identified Mrs. Riggio as the woman he wanted. He indicated that he entered the Daley Center late in the day on May 23rd, aiming to be alone with her. Mr. Chatman ultimately hid in a sixth floor bathroom stall, exited the bathroom after the surroundings grew silent, ascended an escalator to the seventh floor and then, an elevator to the 21st floor.

According to his statement, Mr. Chatman entered courtroom 2101, hid behind the judge's chair until a light from a nearby office went out, and then slept under a bench in the courtroom gallery. He added that he was awakened the next morning by the sounds of Mrs. Riggio opening a side door from the courtroom leading into her office. Mr. Chatman stated that he emerged from under the bench and went over to the office, sexually aroused, and proceeded to attack Mrs. Riggio.

According to Mr. Chatman, he penetrated Mrs. Riggio and "got my freak on," but did not ejaculate. After she urinated and began to gasp, he stopped. He added that he urinated on himself and in a cup. He zipped up his trousers, picked up money he saw on the floor of the office. Mr. Chatman recounted that he exited the building and along the way discarded the cup with the urine in a garbage can.

From the Daley Center, according to Mr. Chatman, he went to Cal's Liquors attempting to buy gin. The store was not yet open, he noted, so he went to a nearby VA building and cleaned himself of sperm and urine before returning to Cal's Liquors, purchasing his gin. Soon after he left Cal's Liquors, police spotted him walking down the street and stopped him. According to Detective Roberts, when shown a photograph of Mrs. Riggio, Mr. Chatman responded, "That's her. I love her." Fingerprint and hair evidence discovered at the scene did not implicate Mr. Chatman[2] or any other assailant.

At the time of his arrest, Mr. Chatman noted no medical needs or acute concerns. He was examined by several medical staff in the ensuing days, who documented recent and remote medical history that he provided. Mr. Chatman did not tell any of these examiners and interviewers that he had been physically abused or beaten.

Mr. Chatman disclosed a psychiatric history of treatment for "depression." The day after his arrest, he was transferred for psychiatric evaluation. He related his medication history, and noted a history of cocaine abuse. Assessed in custody to have a psychotic disorder, Eric Neu, Psy.D. experienced Mr. Chatman to have an Axis V, which corresponds to level of function, that was exceptionally low (15, on a scale of 1-100). Doctors prescribed Mr. Chatman significant doses of antipsychotic (beginning with Zyprexa 15 mg a day) going forward.

---

[2] Later testimony by the analyzing technician, Mark Nowak, indicated that hair transfer occurs only 17 percent of the time in intercourse.

Re: **Carl Chatman**
*The Forensic Panel - Michael Welner, M.D.*
October 31, 2016

Page 7

Mrs. Riggio presented on May 27, 2002 at Hinsdale Hospital with complaints of constant, global headache, blurred vision, dizziness, shoulder pain, nausea, and a bump on the back of her head.

Thomas Brandstrader, Mr. Chatman's criminal defense attorney, filed a motion to suppress his self-incriminating statement on May 2, 2003. In it, Mr. Brandstrader cited Mr. Chatman's being in custody for over 24 hours, including his interrogation, before signing a confession. The motion asserted that he lacked the capacity to waive his Miranda rights. Finally, Mr. Chatman asserted that he was threatened with violence and struck on the back of the head by an officer, causing him to be fearful of further abuse and prompting him into a confession.

In the hearing that followed, testimony from expert mental health professionals of both sides differed in estimations of Mr. Chatman's intelligence. Dr. Stone, a psychologist retained by the defense, diagnosed Mr. Chatman with Mild Mental Retardation. Dr. Phillip Pan, a psychiatrist called by the prosecution, experienced Mr. Chatman to have "reasonably normal intelligence." Dr. Pan diagnosed Mr. Chatman with Chronic Paranoid Schizophrenia. The court declined to suppress Mr. Chatman's confession.

Mr. Chatman was tried, convicted, and sentenced to thirty years in prison. The appeal of his conviction was denied.

Mrs. Riggio later filed a personal injury suit against the building in connection with the effects of the incident on her. In testimony in the years following the attack, Mrs. Riggio indicated that her assailant tried to place his penis in her mouth, and that she had thwarted him; that he had penetrated her rectally first; then, after a struggle, had penetrated her vaginally.

At the time the reported attack took place, Sgt. Michael Copeland was sleeping in a nearby office on the 21st floor. Sgt. Copeland later related that he heard no cries for help. Sgt. Copeland's presence at that time, and his recollections, were not disclosed to the defense prior to trial and not for a number of years.

This information had never been shared with the defense team, and an investigation of Copeland was unearthed by the Conviction Integrity Unit after Mr. Chatman had filed an unsuccessful appeal. On September 10, 2013, Chicago State Attorney Anita Alvarez dismissed the conviction of Mr. Chatman, citing the Copeland evidence. On November 19, 2013, the Cook County Circuit Court granted Mr. Chatman a Certificate of Innocence, enabling his record to be expunged and for him to proceed with a compensation claim.

Re: **Carl Chatman**
*The Forensic Panel - Michael Welner, M.D.*
October 31, 2016

Page 8

On May 24, 2014, Mr. Chatman filed the aforementioned civil suit. Among his assertions:

- Mrs. Riggio filed a false rape claim
- Mrs. Riggio had filed a false charge in 1979 asserting that she was raped at her workplace at that time
- Mrs. Riggio was motivated in 2004 to file a false claim by gambling losses exceeding 500 thousand dollars
- Mrs. Riggio, having encountered Mr. Chatman earlier in the week of the alleged rape, knew he was defenseless and guileless
- Sgt. Copeland was sleeping on the 21st floor at the time of the alleged attack and did not hear Mrs. Riggio's reported screams
- Mr. Chatman had not been observed on security cameras leaving the building
- Arresting officers made false claims that Mr. Chatman had been at the Daley Center when he had not
- Officers should have observed his obvious cognitive difficulties and obvious symptoms of mental illness and did not
- Mr. Chatman was interrogated by an Officer Kriston Kato at 10 PM, and Officer Kato beat Mr. Chatman and was at least one of those who fed him details for a subsequent confession. The plaintiff asserted that Officer Kato struck him on the left side of the temple, and that he went numb. Mr. Chatman then agreed to say he committed the rape in order to avoid further abuse
- An anonymous complaint implicating Officer Kato's physical beating of Mr. Chatman – he was hit "with such a blow that last time that the suspect groaned from sheet pain and doubled over grasping for air" – was not disclosed to the defense prior to trial
- Reports of Sgt. Copeland, who did not hear Mrs. Riggio's reported screams although he was on the 21st floor at the time of the alleged attack, were never disclosed to the defense
- Mrs. Riggio exaggerated her physical injuries in a later civil proceeding she had filed in connection with the attack – specifically broken teeth, scarring to her hip, groin muscle problems and deadening of her genital area.

## PERTINENT BACKGROUND INFORMATION

Mr. Chatman has a longstanding history of treatment for schizophrenia with different antipsychotics. This includes numerous inpatient hospitalizations for psychotic behavior and disorganization, both before and after this incarceration.

For example, on June 18 and June 19, 1981, Mr. Chatman spoke openly about killing others. On October 27, 1983, Mr. Chatman spoke of seeing naked women, referenced

Re: **Carl Chatman**
*The Forensic Panel - Michael Welner, M.D.*
October 31, 2016

Page 9

himself in connection with rape, and stated, "since I can't make love to them, I kill them." He demonstrated an elevated blood alcohol at the time of this examination.

On January 4, 1986, Mr. Chatman was admitted to Chicago Read Mental Health Center. He related at that time that he was "raping women and the police have not caught him – says he feels like killing women because they won't have sex with him."

Notes from his corrections chart depict him to have been "sexually preoccupied" during treatment at an arrest at the beginning of June 2001.

Subsequent to his release in this case, he was hospitalized at MacNeal Hospital on October 22, 2014. At that time, he had been non-compliant with his psychotropics and had been threatening to kill his sister. Moreover, blood testing revealed him to be using cocaine at the time of his arrest. After admission, he threatened to attack staff.

*-*

Susan Riggio called police from her workplace on October 23, 1979, and reported that she had been raped in the women's room. Records indicate that an alleged perpetrator accosted her as she was leaving the restroom, ordered her back inside at knifepoint, and then ordered her to have intercourse with him. Mrs. Riggio reportedly notified a coworker when she returned from the restroom. Police were immediately called and initiated an investigation. She identified the assailant as a white male who spoke to her with brief commands and had no accent to his English.

In a later lineup, Mrs. Riggio identified Edward Szymczak, who worked in her building as both a janitor and someone providing building security. Mr. Szymczak, who reportedly spoke no English, fled the country to his native Poland, and continued to assert his innocence from abroad.

Medical records from 1981 indicate Mrs. Riggio was treated for an extended period for Posttraumatic Stress Disorder. She had taken leave from work, was experiencing withdrawal, and was not interested in sex. Mrs. Riggio filed a civil suit against the building, which ultimately led to a settlement.

**FORENSIC PSYCHIATRIC ASSESSMENT**

1) *What is the basis of behavioral science opinion on disputed confessions?*

In order to understand the progress and limitation of the study of disputed confessions, one must recognize that false confessions in the context of police interrogation are very rarely confirmed events. When they have occurred, careful deconstruction of these

Re: **Carl Chatman**
*The Forensic Panel - Michael Welner, M.D.*
October 31, 2016

Page 10

undisputed false confessions has contributed far more to our understanding than any other source.

The study of confirmed cases of false confession has demonstrated how a suspect's unique vulnerabilities, the distinctive approach of the involved interrogators, and the context in which interrogation takes place interplay. In some cases, a suspect's individual vulnerabilities contribute heavily to the false confession. In other cases, the interrogation technique used exploits a suspect's vulnerability and leads to the false confession. In other examples, the context of questioning is a key ingredient.

Part of the reason that false confessions are so hard to detect is that the above interplay is identical to what yields true and legitimate confessions. False confessions that arise in police interrogation reflect the byproduct of something exceptional about the suspect's sensitivity, how police questioning related to that quality, or the contextual backdrop of that interrogation. Otherwise, that false confession, rare as they are, would not have occurred.

False confessions are hard to detect, in part, because they usually resemble the confessions of truly guilty suspects. This is why false confessions are usually identified backwards – a convicted individual is determined to be innocent, by DNA, other physical evidence, or admissions from another perpetrator or witness. If the original conviction is therefore overturned because of said exculpatory evidence, the confession of the innocent serves to educate the academic community and the public about false confessions, and perhaps, how better to prevent them.

To date, only a few hundred cases of false confessions are confirmed to have occurred over the past several decades, drawing from the entire United States. There are a few published studies that have contributed islands of understanding in a sea of ambiguity. To illustrate the lack of scientific clarity in this area, consider that:

- **There is no research to establish what interrogation practices cause false confessions to rape or other major crimes.**
- **There is no research to establish what interrogation practices cause false confessions with actual rape suspects.**
- **There is no research to establish the degree to which there is increased risk for false confessions from any interrogation practice, suspect vulnerability, or context of questioning. For example, if false confessions occur once in every 1000 interrogations, if a practice significantly increases the likelihood of false confessions, that technique may still cause false confessions only once in 100 interrogations. No research has been conducted to embed courts with an appreciation of what "risk" and "increased risk" mean.**

Re: **Carl Chatman**
*The Forensic Panel - Michael Welner, M.D.*
October 31, 2016

Page 11

- **There is no research to resolve which factors, when more than one is present, have greater impact on causing false confessions.**
- **There is no research to resolve how interrogation factors that may increase risk interplay with qualities that protect one from giving false confessions.**
- **No research has ever established that any technique, including physical coercion, can cause a person to make true or false admissions when that person has protective factors that would make one not likely to make admissions.**
- **No research accounts for the reality that there are a multiplicity of interrogation techniques in every encounter, and the techniques responsible for one confession may be irrelevant to another.**
- **There exists no accounting for error rate of expert witnesses offering opinions diminishing the credibility of admissions.**

It is especially feasible to study these questions now that so many jurisdictions, including the federal government, require complete videotaping of major violent crime interrogations. There is no ethical impediment to resolving the above questions with the quality of data now available for years. That work has not been done, however.

Until this work is done, the above shortcomings limit the relevant, reliable, and valid application of scientific understandings to disputed confession cases. One of the greatest challenges to the behavioral science assessment of disputed confessions is to avoid speculation and to avoid presumptions that are guided by adversarial bias rather than the framework of what has been established.

Even the study of confirmed cases is handicapped by the quality of research of said false confessions. Some reviews, for example, compile data that is heavily reliant upon news media accounts. No serious science accepts news media, particularly in this era of advocacy journalism, as ground truth.

Other studies derive data from websites that essentially promote the litigation agenda of one of the parties. The inability to account for objective data seriously compromises the case applicability of these case reviews.

Dr. Russano writes also of false confession researchers' reliance upon "specific studies relevant to the topic of interviewing, interrogation, and confession in the forensic context, including observational studies, survey research, field research, content analysis, and laboratory studies." The latitude with which academics and researchers can find relevance in source materials is far looser than the expectations for clinicians and forensic examiners aiming at fidelity to the facts of a given case.

Re: **Carl Chatman**
*The Forensic Panel - Michael Welner, M.D.*
October 31, 2016

Page 12

In actuality, the body of literature addressing disputed confessions is heavily influenced by a small coterie of police interrogation critics who publish polemics making broad but unsubstantiated pronouncements based on published studies that provide little data one can actually apply to casework. One useful example of this is the reliance on research derived from the scientifically-labeled "laboratory experiments."

These "laboratory experiments," championed by social psychologist Dr. Saul Kassin and the students he has influenced, engage mock interrogation scenarios of college students provided with college credit. The most well-known of these studies involved simulated computer crashes and subsequent staged interrogations by professors or other designates. Dr. Kassin and other colleagues who subscribe to these protocols extrapolate various presumptions about interrogations of actual suspects from staged experiments with students seeking college credit. The computer-crash experiments have morphed to a variety of iterations in the years since, including Dr. Russano's adaptation to employ a "cheating" scenario, and continue to be the identity of false confession research.

To equate the exercise of a mock interrogation of college students with the interrogation of a suspect in a rape investigation has no contextual validity, however:

- A college student adopting a role-play does not face the unconscious pressures coursing through the mind of a suspect being interrogated for rape.
- A student adopting the role play of involvement in crashing a computer does not experience the gravity of one confronting the consequences of accountability for rape.
- A person who participates in an experiment for class credit is not the same as a suspect detained and powerless in a momentous situation for which they have no control.
- A person participating in a mock exercise of being accused of theft does not experience the same pressure of facing penalty for a sex assault.
- A person participating in a mock project operates with the inherent trust that the role-play is managed by a person with a responsible interest in their experience, rather than an officer who can place them under arrest and take away one's freedom.

Dr. Richard Ofshe is himself one of the most prolific police critics who has led this aforementioned coterie. He mentored Richard Leo and authored with him and cited to others who cited to him, including Dr. Kassin. He has also testified hundreds of times, by his own admission, in support of criminal defendants' charges that their confessions were coerced.

Re: **Carl Chatman**
*The Forensic Panel - Michael Welner, M.D.*
October 31, 2016

Page 13

Yet in 2007, asked about the "laboratory experiments" while he testified under oath on behalf of a defendant in *State vs. Hayes*,[3] Dr. Ofshe replied:

> *Prosecutor: Is that the computer crash test?*
>
> *Dr. Ofshe: What?*
>
> *Prosecutor: The computer crash test. You're familiar with that, aren't you?*
>
> *Dr. Ofshe: Oh, I know about that, yes.*
>
> *Prosecutor: Could you explain that to the court, please?*
>
> *Dr. Ofshe: That's a silly piece of research that I think is laughable, incompetent, and the kind of thing that people like you keep bringing up because it is so stupid.*
>
> *Prosecutor: Well, why don't you explain it to the Court?*
>
> *Dr. Ofshe: Oh, I'll be happy to explain it to the Court. Somebody thought he could simulate interrogation by setting up an experimenting which someone crashed a computer and was told they had hit the wrong key on the key board and when that person was gotten to admit to that, somehow this was offered as an example of eliciting a false confession. It is a terribly naïve, incompetent piece of research which I have criticized in courtrooms all over this country and to the author of the work.*
>
> *Prosecutor: This Dr. Redlich apparently cites as part of her testimony.*
>
> *Dr. Ofshe: Then she doesn't know what she's doing.*
>
> *Prosecutor: OK. So you disagree with her on that?*
>
> *Dr. Ofshe: That's a laughable piece of research. If a graduate student gave me that piece of research, I'd give the graduate student a "D" and recommend that they be dropped from graduate school."*

The uselessness of the mock college student experiments and the broad theories attributed to their data renders psychology a laughingstock in the criminal courts, as reflected in Dr. Ofshe's testimony in *State v. Hayes*. To this day (with the notable exception of Dr. Ofshe's glimpse of candor), the community of academics of the minute community of those

---

[3] *State of Louisiana vs. Hayes*, 97-3780, October 13, 2006

Re: **Carl Chatman**
*The Forensic Panel - Michael Welner, M.D.*
October 31, 2016

Page 14

psychologists and social scientists who know this disputed confession research, have covered for the vacuousness of computer-crash research as one does the emperor with no clothes. This is no charitable exercise on the part of the coterie.

It is instructive that Dr. Russano touts a 2010 "White Paper" to represent "generally accepted views and findings." However, specific reference to this article warrants a proper historical account.

In 1997, while he was an actively hired expert witness for criminal defense attorneys, Dr. Saul Kassin wrote a review article published in *The American Psychologist*. In that article, Dr. Kassin wrote of the discipline of false confessions:

> *"the topic of confession evidence has largely been overlooked by the scientific community. As a result of this neglect, the current empirical foundation may be too meager to support recommendations for reform or qualify as a subject of "scientific knowledge" according to the criteria recently articulated by the U.S. Supreme Court (Daubert v. Merrell Dow Pharmaceuticals, Inc., 1993). To provide better guidance in these regards, further research is sorely needed."*[4]

That passage of Dr. Kassin's became a repeatedly cited passage for cross examination of Dr. Kassin and others who would testify about the reliability of confessions. Along the way, their testimony would liberally venture from what has been studied into broad presumptions about police work, interrogation practices, how to tell when a confession is reliable, and creative explanations in the guise of scientific testimony on why a given confession is false. These expert witnesses have been, over the years, repeatedly excluded in subsequent *Daubert* and *Frye* hearings.

Dr. Kassin and other members of this oft-excluded coterie then began to publish review articles in psychological journals that they would organize with particular relevance to admissibility questions. None of these articles disclosed that the authors had a personal financial interest in putting a stop to courts excluding this cadre from testifying.

Reports from the above experts would affix the article in a pre-emptive effort to stave off *Daubert* exclusion. The exclusions continued, however, to the degree that testimony overstated the boundaries of the science. And as the exclusions in *Daubert* and *Frye* hearings have continued, so, too have these witnesses rewarmed articles to renew their assertion that there is general acceptance to their interpretations.

---

[4] Kassin S **The psychology of confession evidence** *Am Psychol* (1997) 52:3 pp 221-233

Re: **Carl Chatman**
*The Forensic Panel - Michael Welner, M.D.*
October 31, 2016

Page 15

It is therefore not at all surprising that Dr. Kassin proposed this "White Paper" article to colleagues who were likewise excluded time and again. Among its authors, the *"White Paper"* no longer included Dr. Ofshe, he of the Hayes testimony. And conspicuously, the article did not canvass the input of any of those whose critical testimony has resulted in exclusion of those authors. If a field has any interest in establishing consensus standards why not bring everyone together?

According to Dr. Russano, she "created one of the most oft-used and influential laboratory paradigms for studying true and false confessions." Her claim speaks to the inadequacy of other paradigms in place prior to 2005 – and it still clings to comparing outcomes on studies of "cheating" experiments using "interrogation" of volunteer undergraduates with the dynamics of a suspect being interrogated by law enforcement for rape. Dr. Russano's claim of the state of the art demonstrates how, notwithstanding pronouncements about "one hundred years" of this and that, the study of false confessions is truly in its infancy.

2)  *How are false confessions established, as a foundation for behavioral science opinion? How does this relate to the criminal complaint of Susan Riggio?*

False confessions are established by physical evidence that demonstrates conclusively a person could not have committed the crime in question, either as a direct participant or as an accessory. Examples of such physical evidence include DNA that implicates another totally unrelated person, and during a time course in which no other encounter could have taken place. Alternatively, physical evidence, from a note or credit card left behind, to fingerprints, to photographic evidence that establishes such an incompatibility can likewise demonstrate a confession for said crime was false.

Verifiable records of one's whereabouts can establish an alibi separating a confessed perpetrator from a crime scene. Digital timestamping, smartphone data and cell towers are examples of evidence that safeguard against confusion caused by potentially sloppy documentation of time.

Much rarer still are crimes that do not occur, for which (false) confessions are elicited. Among the case reports of established false confessions elicited by police interrogation, false confessions to crimes that never happened exist principally in the hypothetical.

It is therefore incumbent on the scientific community to inform the court that while a scenario of a false confession in a crime that never actually happened is theoretically possible, it is so rare relative to the already rare frequency of false confessions. When one asserts as a conclusion the Loch Ness Monster, there are two possibilities: that the Loch Ness Monster has been sighted, or the examiner had the tunnel vision to conclude, by

Re: **Carl Chatman**
*The Forensic Panel - Michael Welner, M.D.*
October 31, 2016

Page 16

confirmation bias, a Loch Ness Monster sighting. These dilemma are best resolved by adequate diligence.

There is no psychological test to ascertain the truth of a confession, or of an accusation. Any "analysis" of a "post-admission narrative," is idiosyncratic to the individual examiner and does not rely on a studied or researched methodology that has demonstrated efficacy or applicability across the many nuances of different interrogations and confessions.

Mr. Chatman contends, and Dr. Russano accedes, that Mrs. Riggio made a false complaint altogether.

The absence of DNA, sperm, or physical evidence obtained from Mr. Chatman and Mrs. Riggio does not translate into a conclusion that no rape took place. The Emergency Department physician who examined Mrs. Riggio noted that findings are absent 90% of the time. The technician who testified about hair and other physical evidence testified that in 83% of cases, no physical evidence is recovered. The absence renders the question inconclusive from a physical standpoint. Rape is not disproved by an absence of physical evidence.

Mr. Chatman's reported egress from the Daley Center was not captured on camera. However, the cameras were not positioned to have accounted for all traffic emerging from the building. The absence of videotaped evidence of Mr. Chatman leaving the Daley Center does not resolve his movements one way or the other.

Deputy Copeland was sleeping, by his account, when the attack reportedly took place. He indicates that he was awakened by the sound of police radios of those responding to the alert of the incident on the 21st floor. The reported attack was only rooms away, and through walls separating the locations. It is no given that brief cries for help, otherwise extinguished by active struggling, would have penetrated his slumber across the walls and distance that separated him from Mrs. Riggio's office. One cannot equate the potential value of evidence a jury could have considered when they deliberated Mr. Chatman's guilt at his criminal trial with how a jury would have appraised such evidence. This evidence, too, is inconclusive to establish innocence.

That the Cook County State's Attorney's Office provided a Certificate of Innocence to Mr. Chatman does not equate with scientific thresholds for demonstrating a person to have been involved. A range of considerations impact prosecutorial decision making, and the decision of State's Attorney Ms. Alvarez was an exercise of her leadership, taking all considerations into account. A Certificate of Innocence, without more, has large legal implications, but is not hard science.

Re: **Carl Chatman**
*The Forensic Panel - Michael Welner, M.D.*
October 31, 2016

Page 17

The only way to demonstrate that no rape took place here is by an admission by Mrs. Riggio that no rape or attempted rape took place, or by videotaped or other clear physical evidence that demonstrates Mrs. Riggio staged a crime. The available physical evidence from this case does not resolve this question one way or the other.

### 3) Does the available psychiatric evidence of Mrs. Riggio and Mr. Chatman demonstrate her to have falsely accused the plaintiff? Why or why not?

Apart from the physical evidence, Mr. Chatman and Dr. Russano assert behavioral evidence to support a conclusion that 1) Mrs. Riggio staged a rape claim, and 2) Mr. Chatman could not have raped her.

Dr. Russano cites discrepancies in Mrs. Riggio's statements as evidence for her having fabricated the charges. In a theoretical world, there should be no discrepancy between a credible account and the facts of an event. However, there are a variety of reasons for how memory can be distorted. Mrs. Riggio was found incoherent; she was demonstrably confused, and this would have some impact on aspects of her recollection.[5]

By Mrs. Riggio's account, she had sustained several blows to the head; she presented for medical attention three days later with post-concussive symptoms. Her recollection for the period spanning these blows would be vulnerable to error.[6] Mrs. Riggio also exhibited symptoms of posttraumatic stress disorder in the aftermath of the event. Fragmentation of memory can take place in the aftermath of acute trauma as well.[7]

Mrs. Riggio interacted with a number of medical and mental health professionals after the May 24, 2002 incident. Neither Dr. Temple nor Nancy Berlin – both of whom were unconnected to the adversarial litigation of this case – experienced professional assessed Mrs. Riggio as disingenuous. Neither experienced her report, whether forthcoming or withholding, as indicative of a fabricated story. If medical professionals who deal with victims, including the sexually assaulted, did not appraise her to have been disingenuous, how would expectations be any different for investigators?

There are well established methodologies for ascertaining whether a litigant is embellishing psychopathology, including trauma.[8] Psychological testing of malingering supplements

---

[5] Mason, F., & Lodrick, Z. (2013). Psychological consequences of sexual assault. *Best Practice & Research Clinical Obstetrics & Gynaecology*, *27*(1), 27-37.
[6] Evered, L., Ruff, R., Baldo, J., & Isomura, A. (2003). Emotional risk factors and postconcussional disorder. *Assessment*, *10*(4), 420-427.
[7] Hardy, A., Young, K. & Holmes, E. A. (2009). Does trauma memory play a role in the experience of reporting sexual assault during police interviews? An exploratory study. *Memory*, 17(8), 783-788. doi: 10.1080/09658210903081835
[8] Ali, S., Jabeen, S., & Alam, F. (2015). Multimodal approach to identifying malingered Posttraumatic Stress Disorder: A review. *Innovations in clinical neuroscience*, *12*(1-2), 12.

Re: **Carl Chatman**
*The Forensic Panel - Michael Welner, M.D.*
October 31, 2016

Page 18

available historical data.[9] However, Dr. Russano's support for the assertion that Mrs. Riggio fraudulently claimed a traumatic event does not rely on any of the well-established testing methodologies for studying trauma claims. She did not interview Mrs. Riggio and did not perform any malingering testing.

Historical data would inform questions of malingering with evidence of contradiction with reported symptoms of major psychiatric illness. Dr. Russano does not cite to any evidence that Mrs. Riggio is functioning far better than she claims to be as a behavioral basis to support fabrication. As is the case with Dr. Russano's not employing psychological testing, her lack of reliance upon history is not reflective of standards of forensic or of clinical practice.

The plaintiff cites other behavioral evidence to assert that Mrs. Riggio's claims are fraudulent. One of these is her litigation history, specifically her suing successfully for damages from the 1979 rape claim. Is there a scientific study to show that rape, and being affected by rape, is limited to one experience per person? Would it not be reassuring if the experience of being raped once meant one could live one's years knowing it would never happen again. In actuality, just as the same unfortunate person who makes a claim on flood insurance may one day make another flood claim, one does not negate the second claim arbitrarily for its unexpected recurrence. The notion that a person who was victimized in 1979 could not have been victimized a second time is unfounded.

Revictimization has been described in the psychiatric literature of those with PTSD. Those who have been previously victimized are even described to be at greater risk of revictimization.[10] The traumatic impact of revictimization is distinct.[11]

As for Mrs. Riggio being an earlier litigant, she settled her claim in connection with the 1979 case. Both sides of that litigation had opportunity to diligence the issue before the settlement; her fundamental claims that she ought not to have been raped in her workplace are understandable. So, too, is the point that a woman should not be unsafe enough to be raped while working on the 21st floor of a courthouse.

As for the 2002 incident at the Daley Center itself, Mrs. Riggio's presentation bears closer consideration. She was a valued employee for a judge, and maintained respected relationships with peers. These peers found her splayed on a desk in a pool of urine, clothes tousled, babbling incoherently about a man who smelled of alcohol telling her he was "going to fuck you" and to give her AIDS.

---

[9] Ibid.
[10] Najdowski, C. J., & Ullman, S. E. (2011). The effects of revictimization on coping and depression in female sexual assault victims. *Journal of traumatic stress, 24*(2), 218-221.
[11] Ibid.

Re: **Carl Chatman**
*The Forensic Panel - Michael Welner, M.D.*
October 31, 2016

Page 19

What particularly contrasts about this debased scene is that Mrs. Riggio's 1979 rape claim, which resulted in a financial settlement, involved an incident that reportedly occurred in a bathroom. She returned to her work area and needed to inform her peers what had happened. Mrs. Riggio would have known, from that experience, that there was no need to create a theatrical production to engender the belief in others that she was raped. Furthermore, for Mrs. Riggio to stage her own semiconsciousness and an attack in the openness of her office, rather than the privacy of a restroom in which (by previous experience) she would not be discovered, defies a sensible analysis.

There is no behavioral evidence available to suggest that Mrs. Riggio is a masochistic personality who sought her own humiliation. Absent this, the dramatic setting of the 2002 complaint contradicts a narrative that it was staged based on the influence and secondary gain of the 1979 event.

The 1979 rape complaint is not demonstrably false. Even if one subscribes to the idea that Mr. Szymczak was innocent, Mrs. Riggio's selecting him from a lineup speaks only to her capabilities as an eyewitness at that time as opposed to whether she concocted a false claim.

Psychological records reflect that Mrs. Riggio sought treatment for psychological sequelae of the 1979 incident. Her psychiatrist at the time, Dr. John Adams, noted on June 24, 1981 that she had been referred many months earlier by an internist and gynecologist for symptoms of Posttraumatic Stress Disorder, rather than by her attorney looking for a supportive expert witness in the context of civil litigation.

Pressures of litigation may influence a litigant to distort or embellish one's account. It is possible, in this climate, that Mrs. Riggio's account of the 2002 event, in which she stated at an earliest point that she was unsure whether she had been penetrated, and later offered that she had been both anally and vaginally violated, was embellished. However, this question exists independently of whether a rape occurred at all.

Evidence for elaboration that emerges in a damages lawsuit is not proof of fabrication. In trauma victims, explicit recall memory may elaborate and increase in the natural course of how the brain structures process memory.[12]

Even as the plaintiff asserts that Mrs. Riggio made a false complaint in 1979, Versie Chatman, the plaintiff's estranged wife, charged on December 3, 2015 that either he or his sister had committed fraud. The notion that a person who has been allegedly fraudulent at another time would therefore be fraudulent here cannot scrutinize Mrs. Riggio in a vacuum

---

[12] Mason, F., & Lodrick, Z. (2013). Psychological consequences of sexual assault. *Best Practice & Research Clinical Obstetrics & Gynaecology, 27*(1), 27-37.

Re: **Carl Chatman**
*The Forensic Panel - Michael Welner, M.D.*
October 31, 2016

Page 20

that presumes Mr. Chatman to be chaste. On the contrary, it is his estranged wife who contends that Mr. Chatman committed fraud; Mrs. Riggio's adversaries in litigation are the ones who accuse her.

The plaintiff referenced Mrs. Riggio's gambling as evidence for her motivation to fraudulently claim rape, in order to create a civil claim to recoup her losses of over 500,000 dollars. However, the Riggios had earlier posted gains of approximately 500,000 dollars; they lost it all, and not much more. Whatever their losses, or debts to the IRS, the couple was financially comfortable enough for the losses to not have created financial desperation.

If anything, Mrs. Riggio's account of gambling as an escape is supported by established research that draws a clear association between gambling in women and Posttraumatic Stress Disorder.[13,14,15]

Without explanation, the plaintiff does not entertain the possibility that Mr. Chatman was an innocent man misidentified as the perpetrator of a rape that happened. The possibility of Mr. Chatman's innocence does not require that no rape occurred.

Supporting Mr. Chatman's claim that his confession was false, the plaintiff asserted that he was "docile." Yet Mr. Chatman's previous history included a dishonorable discharge from the Army for an assault. He had been arrested for domestic battery one year before. He had several hospitalizations in which he spoke openly of homicidal thinking. And in particular, on one admission he characterized himself as a person who had raped and had gotten away with it.

Much of this information was unavailable to investigators who had to make a decision of whether to charge Carl Chatman on the basis of his confessions and the Mrs. Riggio's identification of him. But there are rapists with schizophrenia, and quite a few. Were police and prosecutors to have more thoroughly diligenced Mr. Chatman, the remarkable aspects of his behavior or even the relevance of his ideas could have supported their conclusions that he would have been a realistic suspect.

It is always helpful, from an objectivity standpoint, to consider such judgment calls on the other foot. Were we to be dealing with a rape case of a man who asserted he was innocent, and his attorney were to have offered Carl Chatman as an alternative suspect, Mr. Chatman's past history would have provided credence to such an argument. Therefore, it is

[13] Kausch, O., Rugle, L., & Rowland, D. Y. (2006). Lifetime histories of trauma among pathological gamblers. *American Journal on Addictions*, 15(1), 35-43.
[14] Milosevic, A., & Ledgerwood, D. M. (2010). The subtyping of pathological gambling: A comprehensive review. *Clinical Psychology Review*, 30(8), 988-998.
[15] Ledgerwood, D. M., & Petry, N. M. (2006). Posttraumatic stress disorder symptoms in treatment-seeking pathological gamblers. *Journal of traumatic stress*, 19(3), 411-416.

Re: **Carl Chatman**
*The Forensic Panel - Michael Welner, M.D.*
October 31, 2016

Page 21

my professional opinion that investigators' diligence into his background would only have presented clinical evidence supporting the decision to prosecute Mr. Chatman.

In his confession, Mr. Chatman spoke of urinating in a cup and then discarding it before leaving the Daley Center. Dr. Russano, on Mr. Chatman's statement, pointed to no such cup of urine being found in waste baskets to support her contention that this was a false confession.

In a theoretical utopia, all details from confessions would fit into the available physical evidence and factual history. The urine detail was not borne out in follow up investigation. Mr. Chatman made other assertions as well, including a contention that he did not ejaculate because it "would have been rude." There are many well-recognized reasons why suspects offer self-incriminating statements and details do not coincide with evidence. Examples include:

- A desire to minimize more depraved aspects of a case
- A desire to convey emotional disorganization rather than coldness or malevolence
- An inability to remember certain details, yet to try to respond to certain specific investigative questions of interest to the interrogator
- Distortion of memory over time
- Distortion of memory by intoxication at the time of the offense
- Disorganized thinking of a person with a psychotic disorder

The possibility of psychotic thinking encroaching upon accurate historical accounting does not mean that a person is innocent. Those with schizophrenia, like Carl Chatman, may have illogical communications intermingled with factual and accurate expression. That does not preclude the possibility that a suspect with a psychotic disorder is making an effort to recount his criminal behavior.

Mr. Chatman's psychotic condition at the time of his arrest neither negates his ability to inform nor his inclination to rape. Ultimately, there is no evidence to have yet emerged that demonstrates that discrepancies of Mr. Chatman's account demonstrate his confession to be false. Again, false confessions are established by physical findings rather than the statements themselves, or the limited substance of such statements.

### 4) *Does evidence reflect upon investigators and prosecutors handicapped by tunnel vision in this case?*

Based on examining the complete record of scores of disputed confessions, including actual confirmed false confessions, my experience bears out that the "tunnel vision" of law enforcement is not a specific risk factor for false confessions. Dr. Russano's theory has neither been researched nor empirically supported.

Re: **Carl Chatman**
*The Forensic Panel - Michael Welner, M.D.*
October 31, 2016

Page 22

Law enforcement tasked with interrogating suspects expect denials and work around those denials with requisite determination. When suspect denials persist, some interrogators relent, even as some of those who stand down may be convinced with single mindedness that suspects are guilty. It is not their tunnel vision that causes false confession, however; it is the misconduct or the nature of how interrogators act on that tunnel vision.

In certain respects, investigators in the Chatman matter considered the possibility of Mr. Chatman's innocence. Detectives Thomas McGreal and Maria Pena went to Pacific Garden Shelter, where Mr. Chatman claimed to have been living, to consider his alibi. More than one potential witness was sought out to review him in a lineup. When aspects of Mr. Chatman's eventual confession left them perplexed, Det. Roberts and ASA Holmes undertook the step of bringing Mr. Chatman to the Daley Center to cross check his account with the physical layout of the several floors cited.

No other suspects have been suggested by the plaintiff, and no other suspects were presented during the criminal proceeding. Thus there was no alternative that investigators were ignoring because of said tunnel vision.

The only explanation provided as an alternative to the conclusion that Mr. Chatman raped Mrs. Riggio is that her claim was fabricated. Asserting tunnel vision by investigators and prosecutors that overlooked the possibility that Mrs. Riggio's claim was fabricated presupposes that an open-minded person would have seriously considered this possibility. But the fabrication scenario is so rare and requires such speculation that Mr. Chatman's own criminal attorneys were not making this claim even as they defended him.

Investigators who did not consider the alternative explanation that the claim was fabricated did not overlook any evidence available from the criminal complaint and the investigation of the scene. One cannot implicate tunnel vision to explain how one's purview did not include a probability that was the size of a speck.

### 5) *Did Mr. Chatman possess vulnerabilities that contribute to a risk of false confession?*

Yes. Carl Chatman has chronic schizophrenia. Schizophrenia is not a per se risk factor for false confession, nor is psychosis. There is no overrepresentation of psychotic suspects among the legacy of proven false confessions. However, Mr. Chatman's medical records show that he has demonstrated sexual preoccupation and homicidal thinking while psychotic. It is not clear (based on information yet provided to me), whether his previous assertions that he had raped without being caught are true or are psychotic thinking. There exists potential for Carl Chatman's blurring reality with delusional thinking to have affected his interpretation of interrogation in connection with a sexual assault or other violent crime.

Re: **Carl Chatman**
*The Forensic Panel - Michael Welner, M.D.*
October 31, 2016

Page 23

Research cited by Dr. Russano, that those offenders with psychiatric illness have confessed falsely at nearly double the rate of those without illness, does not specifically account for the different diagnoses. Nor does it resolve what diagnoses in particular are overrepresented among proven false confessions.

Mr. Chatman scored low on IQ testing administered to him while he was heavily medicated with antipsychotics. However, he graduated high school well above a large percentage of his peers; enlisted in the army and therefore scored high enough on the ASVAB to admit; and had been married to a person with adult level maturity. He was skeptical of police and avoided them before his arrest, and provided them with an alibi and an explanation for his movements.

Notwithstanding his poor performance on intellectual testing, there is no evidence that Carl Chatman was suggestible or otherwise easily led – the relevant vulnerability that is more commonly found in those with intellectual deficiency.[16] Records from his stint in the Army earlier in adulthood revealed him to be confrontational to authority rather than compliant. Moreover, his IQ, at 80, does not appreciably differ from much of the inmate population – mean IQ of prisoners is in the range of 90.[17]

Dr. Russano points out that a study of individuals with mild mental retardation showed that 50% could not paraphrase even one component of the Miranda warnings correctly. But Mr. Chatman demonstrated that he could. Dr. Russano spoke of how people with low IQ have the need "to please authority figures," and are "more likely to acquiesce to leading questions," but Mr. Chatman did not have these qualities. Ultimately, Mr. Chatman's intellect did not contribute to his confession, or to his vulnerability to confess falsely.

Mr. Chatman resisted investigators' early confrontation and accusations of him. It was only once he was confronted with having been identified by the victim, and Mrs. Riggio having detailed their encounter, and his alibi having been unsupported, that Mr. Chatman confessed.

Mr. Chatman asserts that he confessed because he was physically abused. If he were to have been imperiled, his intellect as a risk factor for false confessions is irrelevant.

### 6) Were there situational factors that contributed to a risk of false confession?

Mr. Chatman signed his confession close to 26 hours after he came into custody. To suggest, however, that he was interrogated for 26 hours is grossly misleading. Within the 26

---

[16] Gudjonsson, G. H. (2003). The psychology of interrogations and confessions: A handbook. West Sussex, England: John Wiley & Sons.
[17] Diamond, B., Morris, R. G., & Barnes, J. C. (2012). Individual and group IQ predict inmate violence. *Intelligence*, *40*(2), 115-122.

Re: **Carl Chatman**
*The Forensic Panel - Michael Welner, M.D.*
October 31, 2016

Page 24

hours spanning May 24-25, 2002, Mr. Chatman was alone for long stretches of time, including approximately 4.5 hours of sleep. His custodial interrogation was broken up by transfer to the lineup area and much later, to the Daley Center and its surroundings. None of his interrogations exceeded 2 hours.

There is no disputing that Mr. Chatman gave his first self-incriminating statement at approximately 10:30PM to Detective Roberts. He therefore confessed before he was potentially deprived of sleep. Then, he gave his final statement, as written up by ASA Holmes, shortly after awakening from four hours of sleep. Mr. Chatman did not confess because he was sleep deprived.

Wrote Dr. Russano, "A fatigued suspect is at marked disadvantage of maintaining innocence." There is no study to demonstrate why a fatigued suspect does not merely fall off to sleep rather than to continue to participate in an interrogation. Aversive conditions are created in an interrogation when a suspect is forced to remain awake. There is no evidence that Mr. Chatman was handled in such a fashion.

Within his first 14 hours of custody preceding his confession, Carl Chatman was alone and undisturbed for long stretches of time. It is my professional opinion that the length of his custody did not contribute to his decision to confess.

Mr. Chatman's isolation during his period in custody did not contribute to his decision to confess. Isolation is altogether irrelevant to confession; were it to be a factor of any consequence, police could simply leave someone in a single cell for hours on end and let the confessions pour forth. This does not happen.

Dr. Russano references Mr. Chatman sitting on a hard bench as a situational factor. There is no research or study to demonstrate that furniture choices influence false confessions.

Nor do handcuffs, even prolonged periods in handcuffs, lead to false confessions. Restraint is common in the custodial setting, and restraint neither produces true or false confessions to rape. Handcuffs are unwanted, but not aversive to the degree that they cause confessions without being used to torture the suspect. There is no evidence that this was done here.

Likewise, there is no research to demonstrate that rotating interviewers and interrogators causes false confession.

The situational "factors" raised for consideration are not demonstrated by any scientific study to cause false confessions, and speak more to the aesthetics of hospitality.

Re: **Carl Chatman**
*The Forensic Panel - Michael Welner, M.D.*
October 31, 2016

Page 25

### 7) *Is there evidence from the interrogation methods of techniques known to cause false confession?*

Among the interrogation techniques Dr. Russano critiques is minimization. Minimization refers to the interrogator diminishing the significance of the offending behavior, rationalizing, or otherwise rendering it more palatable and understandable in their questioning of the suspect. To date, there is not research demonstrating minimization to cause false confession to rape. The research to which Dr. Russano cites is based upon staged experiments with students, with minimal repercussions and for "offenses" that pale in comparison to rape and its legal consequences.[18]

More importantly, minimization is a particularly common technique employed by those who interview sex offenders in the investigative and treatment context. The shame attached to sex offending and the offender's awareness of legal consequences – even among those more intellectually limited – creates barriers to communication and openness. Minimization includes techniques of rapport building that eases the obstacle of shame and stigma and engenders in the examinee a sense that the questioner is non-judgmental. Employing such empathic and non-judgmental approaches in a forensic or investigative interview, or in a clinical setting, is good practice.[19]

Another standard procedure is the confrontation by police of a defendant of the evidence against them. Dr. Russano insinuates that this practice is coercive, particularly when the significance of that evidence, overall, is overstated. Yet there is no demonstrable evidence of a person confessing falsely to rape because of claims they were identified in a lineup and their alibi did not check out, without the existence of a significant vulnerability that was primarily responsible for the risk of false confession.

Dr. Russano also contends that Mr. Chatman was physically abused. Detective Kato, in particular, is cited by the plaintiff for striking Mr. Chatman and intimidating him into confessing. If this did occur, then it would be an example of an interrogation approach that can increase risk of false confession.

In support of this argument, Mr. Chatman raises an anonymous complaint dated May 27, 2002, delivered to the OPS and received in February 2004, asserting that Mr. Kato beat Mr. Chatman, causing him to double over in pain, to go numb, and gasp for air. According to the complaint, Mr. Kato demanded, "I want you to say that you raped that woman." The

---

[18] Horgan, A. J., Russano, M. B., Meissner, C. A., & Evans, J. R. (2012). Minimization and maximization techniques: Assessing the perceived consequences of confessing and confession diagnosticity. *Psychology, Crime, & Law, 18,* 65-78.
[19] Gudjonsson, G. H. (2006). Sex offenders and confessions: How to overcome their resistance during questioning. *Journal of Clinical Forensic Medicine*, 13(4), 203-207.

Re: **Carl Chatman**
*The Forensic Panel - Michael Welner, M.D.*
October 31, 2016

Page 26

memo and the investigation of it had never been provided to the Chatman criminal defense team prior to trial or his appeal.

Records show that the complaint, which purported to be prepared by a detective in Precinct 11, described multiple blows inflicted on Mr. Chatman, causing him to double over, gasp for air, and to be numb. The complaint also referred to Mr. Chatman signing a document, which he did not do until the next morning with ASA Holmes.

In addition to the findings of the investigative report, Mr. Chatman's medical records, detailed though they may be of history that he provided, contain no reference to having been struck, gasping for air, or going numb. Even when Mr. Chatman conveyed his experience to Dr. Pan and to his attorney, he asserted being struck in the back of the head and nothing more. The assertions in the complaint are physically inconsistent with what Mr. Chatman reported – when he eventually reported being struck. Interviewed on March 16, 2004 about the events, Mr. Chatman related that he was punched once in the temple, when earlier he stated he had been hit in the back of the head.

Given the intimacy of interrogation, were Mr. Chatman to not assert abuse after arrest – even months later – and were Detective Kato not to have chronicled an interview, from where would such a memo originate? Were someone else in the room who could actually witness this abuse, there would be no need for anonymity. And there is no indication from Mr. Chatman that anyone else was witness to Detective Kato striking him.

The complaint was examined internally, and assessed to be unfounded. Dr. Gerald McMenamin, an expert in forensic linguistics, evaluated the anonymous complaint and concluded in a report of July 7, 2016 that it was "probable" that the memo had been authored by Versie Chatman, the plaintiff's ex-wife.

Carl Chatman has claimed – without any influence of interrogation – to have raped and to have avoided prosecution. Does a forensic examiner take him at his word, given his schizophrenia, without betraying bias to whomever one consults? By the same token, he asserted, beginning seven months after his arrest, that he was struck on the back of his head by an interrogating detective. If one is to discount Carl Chatman as an informant that he has raped before, there is no different approach to be applied in considering his claims of physical abuse. Without more contemporaneous evidence of his mental state when his statements are taken, one either chooses to believe him, or not.

Dr. Russano asserts that because Mr. Chatman's interview and custody were not videotaped, we are unable to resolve the ground truth of his questioning. Many interrogations are not videotaped, and it does not have reflected on sinister aims of police one way or the other. It is correct that videotaping is informative evidence of the process of how a suspect moves from denial to acceptance of responsibility for a rape.

Re: **Carl Chatman**
*The Forensic Panel - Michael Welner, M.D.*
October 31, 2016

Page 27

It is also correct that in disputed confession litigation, an equally important issue is how a suspect moves from his confession to retracting that confession. The influences on that decision are not videotaped, either, but directly inform disputed confession cases and the merit they may or may not deserve.

Unlike the absence of a videotape, however, there does exist a record that informs the question of how a suspect came to retract his confession. Notes of the criminal defense attorney preserve history of the discussion of the confession closest in time to its occurrence. It is these notes that may have particular validity and reliability in revealing the influences and motivations driving a suspect's willingness to confess. For Mr. Chatman in particular, these notes would also help to explain why, for seven months, he did not assert any history of physical abuse during interrogation.

8) *What evidence is there, for or against, the contention that Mr. Chatman was fed details with which to incorporate into his statement? How does this relate to the walk through of the location of the complaint?*

Carl Chatman, by the testimony of Dr. Stone, has mild mental retardation. Those with mild mental retardation, or intellectual disability, as it is now known, have great difficulty learning new material.

Moreover, there is evidence that on May 24, 2002, Mr. Chatman experienced psychotic symptoms of schizophrenia. It is difficult to envision his internalizing so many fed details about a crime he did not commit were he to have been in a psychotic state.

The theory that Mr. Chatman learned the particulars of his statement by officers or investigators feeding him details also must factor in that questioners did not spend particularly long stretches with him. An hour, a bit more or less, here and there, with other time spent idling for hours, would not be enough to prep Carl Chatman for the sheer volume of his confession. It is far too complex a statement to have fed such a limited suspect. Were Mr. Chatman to have been so intellectually limited as to be vulnerable to a false confession, he would be too intellectually limited to learn all of that content. One cannot have it both ways and maintain intellectual honesty.

The existence of previous complaints against Detective Kato' does not establish that he was abusive to this inmate or fed details to him. There is no evidence to suggest that Mr. Kato had any investigative role in the Chatman matter. Mr. Chatman's criminal defense attorney, Thomas Brandstrader, offered his suspicions of Detective Kato based on unrelated experience, but conceded in his deposition that he had no evidence available to him that Detective Kato had any involvement in this investigation, other than being the presumptive "Chinese officer" mentioned by his client.

Re: **Carl Chatman**
*The Forensic Panel - Michael Welner, M.D.*
October 31, 2016

Page 28

No testimony has even suggested that an investigator parachutes into a case that is not his own and take the very controlling step of beating and feeding details for another investigator's case. If this were not Detective Kato's case, how would he come to know all of the fine details to feed them to Mr. Chatman?

ASA Holmes was not familiar with the precise layout of the alleged crime scene, nor were other officers who accompanied them to the building. Dr. Russano presumes that because Mr. Chatman's confession tracked Mrs. Riggio's to a degree, that confession must have been fed, and by exposure to the location of the criminal complaint.

This scenario gains credence from Mr. Brandstrader's later recollection in deposition that his client was too limited to have produced such a detailed confession statement. If there was neither the face time, nor the exposure to a single investigator for any extended period, and if the suspect was intellectually limited, being exposed to the scene could have allowed him to absorb details where feeding him could not.

ASA Holmes' made the unusual (by his own admission) decision to bring Mr. Chatman to the Daley Center just before 2:00AM and before recording a statement. This choice makes more sense when considering that if Mr. Chatman given a detailed statement, as Mr. Holmes recalled, the disorganized communication of his psychosis may have made it harder to crystallize for those aiming to understand what had happened in the courthouse and how. Notably, Charles Roe, Director of Security at the Daley Center who accompanied the group, observed of Mr. Chatman that "sometimes you could understand [him], sometimes you couldn't."

Sergeant Walsh, one of the officers who also went, indicated that authorities were wondering whether Mr. Chatman had actually been living in the Daley Center, and Mr. Roe recalled that Sgt. Walsh had asked that the entire thirty floors of the building be searched. The evidence demonstrates that law enforcement and the ASA were trying to make sense of certain aspects of the case, even as Mr. Roe recalls that Mr. Chatman was volunteering information about his movements, and that he had struggled with the reported victim. Whatever the plaintiff's limitation, according to Mr. Roe, he witnessed Mr. Chatman volunteering essential elements of the account later documented – that he had slept under the bench in the courtroom, was awakened by Mrs. Riggio, and then grabbed her and exposed himself to her.

Dr. Russano's suggestion of contamination in the course of the scene visit is still possible. It is unclear to what degree that contamination could be accounted for in the overall statement. For a man who may have been psychotic to varying degrees spanning May 23-24, 2002, visiting the scene could just as soon have filled in holes, mental (psychosis or intoxication) and/or physical (absence). There is no medical certainty here, only the certainty that numerous possibilities exist as to the range of impacts of the site visit.

Re: **Carl Chatman**
*The Forensic Panel - Michael Welner, M.D.*
October 31, 2016

Page 29

However, passive absorbing of details, given his mental state and the timing of his interactions with officers, is more supported by the evidence than his being responsive to suggestions or orders of what an officer wanted him to say.

9) *Is there research or other study or foundation to have established a methodology for the analysis of a "post-admission narrative?"*

The interrogation itself is a fundamental tension between the approaches a questioner introduces to draw out a confession (or information leading to the implication of the real perpetrator) and the internal pressures a suspect experiences to not confess. If the allegations are non-criminal, but relate merely to some demerit (detention or small fine), there is far less pressure on the suspect to not confess than the pressures reinforcing silence in the rape suspect. Generalizing the interrogation context from low stakes cases to high stakes cases (murder, rape, terrorism) is not possible because there is a completely different dynamic.

These competing tensions impact the statement that a suspect gives, including his confession. An admission and even a confession is not de facto proof that a suspect has abandoned any efforts to present himself in the best light possible. One would expect, especially in a confession that emerged from initial denials, that a suspect would stake out a position that defends his interests as well as possible.

A review of the confession and its narrative must take this into account. Suspects who give statements do not lose all inclination to look out for their self-interest and seek to minimize their punishment. It is for this reason that confessions may offer little additional detail, offer little insight into the sequence of events, and may conceal or even distort facts known to the perpetrator. Confessing is not to be equated with the suspect's need to prove that he is being forthcoming.

Dr. Russano asserts that "researchers analyze the extent to whether the details contained in the narrative are consistent with the facts of the case." As noted above, there are numerous reasons why, in a confession that is wholly legitimate, the details do not.

The conspicuously murky aspect of the "analysis" that "reliable" confessions should contain details known only to the police is that an expert witness is able to assert that a statement containing such details must have been fed to the suspect. When one operates under the presumption of misconduct, these thresholds are expediently reconfigured.

Mr. Chatman included many details in his confession to police. Whether these details were later corroborated or not, such as his movements within the Daley Center, was unclear. Dr. Russano cites to whether the post-admission narrative contained details not known to police at the time the statement was taken but were later corroborated. This type of

Re: **Carl Chatman**
*The Forensic Panel - Michael Welner, M.D.*
October 31, 2016

Page 30

additional data increases confidence in the merit of the statement. However, the absence of such details does not demonstrate that the statement is invalid.

Occasionally a confessor has an opportunity to provide a statement in which new information of consequence emerges, be it the whereabouts of a weapon, another planned crime, or a previous victim. These are particularly fruitful confessions represent the exception and are more possible in the fact patterns of some crimes relative to others. Aspirations for the most informative confessions are not to be equated with a threshold for validity.

I am continuing to review documents from the case file, and will advise of any impact on these opinions should they arise. Please contact me if you have any further questions.

Very truly yours,

Michael Welner, M.D.