MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 1

1         IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF ILLINOIS,
2                  EASTERN DIVISION

3

4

5   ********************************

6   CARL CHATMAN,

7                 Plaintiff,

8   vs.                        CA NO. 14 CV 2945

9   CITY OF CHICAGO, et al.,

10

                 Defendants
11   ********************************

12

13

14           VIDEOTAPED DEPOSITION OF:

15      MELISSA BETH RUSSANO RODRIGUEZ, PH.D.

16            CATUOGNO COURT REPORTING

17              155 South Main Street

18            Providence, Rhode Island

19        September 13, 2016        9:40 a.m.

20

21

22              Darlene M. Coppola

23            Registered Merit Reporter

24           Certified Realtime Reporter

EXHIBIT C

MELISSA RODRIGUEZ, PH.D.                          September 13, 2016

Page 2

```
 1   APPEARANCES:

 2                        .

 3   Representing the Plaintiff:

 4        LOEVY & LOEVY

 5        312 North May Street

 6        Suite 100

 7        Chicago, IL 60607

 8        BY:  RUSSELL AINSWORTH, ESQUIRE

 9        T 312.243.5900

10        E-mail:  russell@loevy.com

11   Representing the Defendants Chicago Police

12   Detectives John Roberts, Thomas McGreal,

13   Maria Pena, Jack Boock, Rita Mischka, Barbara

14   Midona and Kriston Kato; Chicago Police

15   Sergeants Denis Walsh and Brian Holy; chicago

16   Poice Officers Michael Karczewski and Richard

17   Griffin:

18        BORKAN & SCAHILL LTD.

19        Two First National Plaza

20        20 South Clark Street

21        Suite 1700

22        Chicago,IL 60603

23        BY:  KRISTA E. STALF, ESQUIRE

24        T 312.580.1030
```

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 3

1         E-mail:  KStalf@borkanscahill.com

2    APPEARANCES (Continued):

3    Representing the Defendants City of Chicago,

4    Karen Wojtczak, Former Office of Professional

5    Standards Investigator; Millicent Willis,

6    Former Acting Chief Administartor of the

7    Office of Professional Standards; and Lori

8    Lightfoot and Tisa Morris, Former Chief

9    Administartors of the Office of Professional

10   Standards:

11   (Via videoconference)

12        DYKEMA GOSSETT PLLC

13        10 South Wacker Drive

14        Suite 2300

15        Chicago, IL 60606

16        BY:  PAUL A. MICHALIK, ESQUIRE

17        T 312.876.1700

18        E-mail:  pmichalik@dykema.com

19

20

21

22

23

24

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 4

1

2    APPEARANCES (Continued):

3    Representing the Defendants The County of

4    Cook, Thomas Dart in his Official Capacity as

5    Sheriff of Cook County, and Anita Alvarez in

6    her Official Capacity as Cook County State's

7    Attorney:

8    (Via videoconference)

9         OFFICE OF THE STATE'S ATTORNEY

10        50 West Washington

11        Suite 500

12        Chicago, IL 60602

13        BY:  THOMAS E. NOWINSKI, ESQUIRE

14        T 312.603.4327

15        E-mail: Thomas.Npowinski@cookcountyil.gov

16

17

18

19

20

21

22

23

24

MELISSA RODRIGUEZ, PH.D.                        September 13, 2016

Page 5

```
 1   APPEARANCES (continued):

 2   Representing Defendants Cook County Sheriff's

 3   Deputies Michael Cokeley and Burrough

 4   Cartrette, Sheriff's Deputy Sergeant Maria

 5   Mokstad:

 6   (via videoconference)

 7        HINSHAW & CULBERTSON LLP

 8        222 N. LaSalle Street

 9        Suite 300

10        Chicago, IL 60601

11        BY:  V. BRETTE BENSINGER, ESQUIRE

12        T 312.704.3000

13        E-mail:  bbensinger@hinshawlaw.com

14

15   Representing the Defendant Susan Riggio:

16   (via videoconference)

17        Bollinger Connolly Krause, LLC.

18        500 W. Madison Street

19        Suite 2430

20        Chicago, Illinois

21        BY:  RACHEL D. KILEY, ESQUIRE

22        T 312.253.6200

23        E-mail:  rkiley@bollingertrials.com

24   Also Present:  Garner Willis, Videographer
```

MELISSA RODRIGUEZ, PH.D.                          September 13, 2016

```
                                                        Page 6
 1                           INDEX

 2                        EXAMINATION

 3   Witness Name                                         Page

 4       Direct By Ms. Stalf ............................. 9

 5       Cross By Mr. Michalik ......................... 170

 6       Cross By Ms. Kiley ............................ 195

 7       Cross By Mr. Nowinski ......................... 222

 8

 9                         EXHIBITS

10   Exhibit       Description                        Page

11   A             Expert Report                      11

12   B             Invoice Dated July 28,             24
                   2015
13
     C             Complaint                          64
14
     D             Second Amended Complaint           67
15

16

17

18

19

20

21

22

23

24
```

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

```
 1              THE VIDEOGRAPHER:  We are now

 2  recording and on the record.  My name is

 3  Garner Willis, and I'm a certified legal

 4  video specialist on behalf of US Legal

 5  Support, Incorporated.

 6              Today is September 13, 2016, and the

 7  time is 9:40 a.m.

 8              This is the deposition of Dr. Melissa

 9  B. Russano in the matter of Carl Chatman,

10  Plaintiff, versus the City of Chicago, et

11  al., Defendants, in the Court of U.S.

12  District Court for the Northern District of

13  Illinois, Case No. 14 CV 2945.

14              This deposition is being taken at 155

15  South Main Street, Providence, Rhode Island

16  02903 on behalf of the defendant.

17              The court reporter is Darlene

18  Coppola.

19              Counsel will now state their

20  appearances on the stenographic record.

21              MR. AINSWORTH:  Russell

22  Ainsworth appearing on behalf of the

23  plaintiff.

24              MS. STALF:  Krista Stalf on
```

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 8

1    behalf of the individual defendant Chicago

2    police officers.

3                    MR. MICHALIK:  Paul Michalik on

4    behalf of defendant City and the OPS

5    defendants.

6                    MS. KILEY:  Rachel Kiley on

7    behalf of defendant Susan Riggio.

8                    MR. NOWINSKI:  Thomas Nowinski

9    on behalf of the State Attorneys's Office.

10                   MS. BENSINGER:  Brette

11   Bensinger on behalf of the sheriff

12   defendants.

13

14        MELISSA BETH RUSSANO RODRIGUEZ, Ph.D.,

15          a witness called for examination by

16   counsel for the Defendants John Roberts,

17   Thomas McGreal, Maria Pena, Jack Boock, Rita

18   Mischka, Barbara Midona, Kriston Kato;

19   Chicago Police Sergeants Denis Walsh and

20   Brian Holy; Chicago Police Officers Michael

21   Karczewski and Richard Griffin, being first

22   duly sworn by the Notary Public, was examined

23   and testified as follows:

24

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

1                    DIRECT EXAMINATION

2    BY MS. STALF:

3         Q.   Could you please state your full name

4    and spell it for our court reporter.

5         A.   My full legal name is Melissa Beth

6    Russano Rodriguez.  M-e-l-i-s-s-a, B-e-t-h,

7    R-u-s-s-a-n-o, R-o-d-r-i-g-u-e-z.

8              But professionally, I just use

9    Russano.

10                    MS. STALF:  For the record,

11   this is the deposition of Melissa Beth

12   Russano Rodriguez, taken pursuant to

13   subpoena, Federal Rules of Civil Procedure

14   and all applicable local rules.

15   BY MS. STALF:

16        Q.   Dr. Russano, have you ever given a

17   deposition before?

18        A.   No.

19        Q.   Okay.  I'm going to go over some

20   ground rules for you to get you oriented to

21   this new situation.

22              The court reporter is taking down

23   everything that's being said here.  So all of

24   our responses need to be verbal.  She can't

MELISSA RODRIGUEZ, PH.D.                     September 13, 2016

Page 10

1    down any shakes of the head.

2            If I ask a question that you don't

3    understand, please feel free to let me know

4    you don't understand, and I'm more than happy

5    to rephrase it for you.

6            If you answer a question, I'm going

7    to assume you understand it.

8            Is that fair?

9    A.    Uh-huh, yes.

10   Q.    If you need to take a break for any

11   reason, please let me know and I'm happy to

12   accommodate you.  I would just ask that you

13   answer any pending questions.

14           Okay?

15   A.    Okay.

16   Q.    What is your business address?

17   A.    Roger Williams University, School of

18   Justice Studies, One Old Ferry Road, Bristol,

19   Rhode Island, 02809.

20   Q.    What is your date of birth?

21   A.    9/9/77.

22               MS. STALF:  I'm going to mark

23   as Exhibit A to your deposition a copy of

24   your CV in this matter -- I mean a copy of

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 11

1    your report, rather.

2

3                    (Exhibit A marked for

4                    identification.)

5

6    BY MS. STALF:

7        Q.    Doctor, the court reporter has just

8    handed you what we've marked as Exhibit A to

9    your deposition, which is a copy of report

10   that we received from Mr. Ainsworth in the

11   Carl Chatman matter.

12              If you could just turn to Page 45.

13              Page 45 begins a copy of your

14   curriculum vitae; is that correct?

15       A.    Correct.

16       Q.    Is that a current and up-to-date

17   version of your curriculum vitae?

18       A.    (Witness reviews document.)

19              There is a new grant that I was

20   awarded that is not reflected on this version

21   of my CV.

22       Q.    Okay.  And what is that grant?

23       A.    It's a grant by the U.S. Department

24   of Justice by the detainee interrogation

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 12

1    group, which is under the umbrella of the

2    funding of the Federal Bureau of

3    Investigation.

4         Q.    When did you receive that grant?

5         A.    The start date is approximately

6    October 1st, so it's starting this -- this

7    year and it will run until the following

8    October.  So it will be a 2016-2017 grant.

9         Q.    Other than the grant that you've just

10   described, is there anything else that should

11   be contained on your curriculum vitae that is

12   not?

13        A.    Not to my knowledge at this time.

14        Q.    And your curriculum vitae encompasses

15   Pages 45 through 55 of Exhibit A; is that

16   correct?

17        A.    Yes.

18        Q.    Pages 56 through the end of the

19   report at Exhibit A -- I'm sorry -- through

20   57, that's a list of your publications,

21   correct?

22        A.    (Witness reviews document.)

23              Correct.

24        Q.    Are there any publications that need

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

1    to be added to that list of publications to

2    make it current?

3        A.    No.

4              I do have -- one of the publications

5    that's listed on the CV that was listed under

6    "Revised and Resubmitted" is in a status

7    where it would appear we are close to being

8    under -- in press.  So it has received a

9    favorable review and with minor revisions

10   should be in press.

11       Q.    And which is that?

12       A.    That's the -- on Page 47, it's the

13   first one listed under "Publications," the

14   most recent, Houston, Russano, Ricks.

15       Q.    Okay.  Are you relying on any

16   qualifications to render your expert opinions

17   today other than what's noted in your CV?

18                   MR. AINSWORTH:  Object to the

19   form of the question.

20             You can answer.

21       A.    Other than what's listed on my CV?

22             Well, there's my own personal work

23   listed on the CV, but I am relying on a body

24   of scientific knowledge that I am trained and

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

1    have familiarity with and expertise with.

2    BY MS. STALF:

3         Q.    And your training is in psychology,

4    correct?

5         A.    Correct.

6         Q.    Do you have any training in

7    psychiatry?

8         A.    No.

9         Q.    Did you attend medical school?

10        A.    No.

11        Q.    Do you have any medical training?

12        A.    No.

13        Q.    Do you currently treat patients as a

14   psychologist?

15        A.    No.

16        Q.    Have you ever at any point in your

17   career treated patients as a psychologist?

18        A.    No.

19        Q.    Do you have any professional training

20   in clinical psychology?

21        A.    No.

22        Q.    Do you consider yourself to be a

23   social scientist?

24        A.    Yes.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 15

1        Q.    Have you been retained in any cases
2   as an expert witness other than the Carl
3   Chatman case?
4        A.    Yes.
5        Q.    How many times have you been so
6   retained?
7        A.    I would have to check my notes for an
8   exact number, but -- well, can I -- can I ask
9   you a clarification question?
10       Q.    Sure.  Absolutely.
11       A.    Do you mean that has resulted in
12  testimony?  Or as a consultant --
13       Q.    Let's start --
14       A.    -- on a case?
15       Q.    -- as a consultant first.
16       A.    Without checking my notes, to the
17  best of my knowledge, I would say ten to --
18  approximately ten cases.
19       Q.    And on how many occasions have you
20  been retained where it resulted in
21  testimony?
22       A.    One.
23       Q.    And is that the State of New York v.
24  Claude Bird case?

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 16

```
 1      A.    Yes.

 2      Q.    Was the Bird case a criminal case?

 3      A.    Yes.

 4      Q.    Did you testify on behalf of Claude

 5  Bird in that matter?

 6      A.    Yes.

 7      Q.    Were you retained by his attorney to

 8  render expert opinions?

 9      A.    Yes.

10      Q.    Were you paid for your services in

11  the Claude Bird case?

12      A.    I was.

13      Q.    How much were you paid?

14      A.    I would have to check my notes or it

15  would be a guess.

16      Q.    Do you have an approximation?

17      A.    Between 3- and 4,000.

18      Q.    What was the crime that Mr. Bird had

19  been accused of committing in that case?

20      A.    It was a bank robbery.  I believe it

21  was armed bank robbery.

22      Q.    And what was the outcome of the

23  charges that were brought against Mr. Bird?

24      A.    He was acquitted.
```

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 17

1      Q.    And what was the nature of the

2   testimony that you provided in that case?

3      A.    It was a bench trial.  So in this

4   case, I helped provide education to the judge

5   about the phenomenon of interrogation and

6   confession and the likely factors that are

7   associated with false confessions.

8      Q.    Was it your opinion in that case that

9   Mr. Bird had given a false confession?

10      A.    I didn't offer that opinion.

11      Q.    Was -- did you offer an opinion in

12   that case that there was something improper

13   about an interrogation that Mr. Bird was

14   subjected to?

15      A.    No.

16           What I did was I discussed the

17   factors that are associated with false

18   confessions.

19      Q.    Was there a suppression hearing in

20   that case to suppress a confession given by

21   Mr. Bird?

22      A.    I don't know.  I wasn't involved in

23   any such suppression hearing.

24      Q.    Was Mr. Bird, via his attorney,

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

1    asserting in that case that he had given a

2    false confession?

3        A.    He was.

4        Q.    And during the process of your

5    examination of that case, did you consider --

6    or did you determine that any specific

7    factors went into producing a false

8    confession in Mr. Bird's case?

9        A.    Well, I didn't opine as to whether

10   the confession was true or false.

11            What I did was I discussed factors

12   that are associated with an increased risk of

13   false confession.

14            And the factors that may or may not

15   have been present in his case were certainly

16   factors that I would have addressed in my

17   testimony.

18       Q.    Did you address both factors that

19   were present and factors that may have been

20   present?

21       A.    Without looking back specifically at

22   my testimony, it would be hard to say, but I

23   would have addressed relevant factors to his

24   case that are associated with false

MELISSA RODRIGUEZ, PH.D.                        September 13, 2016

Page 19

1   confessions.

2       Q.   And what were the relevant factors in

3   his case that were associated with false

4   confessions?

5       A.   Let's see.   This is a memory test.

6            Well, he was subjected to a

7   prolonged, lengthy interrogation where he was

8   deprived of sufficient amounts of food.

9            There were, I believe, threats about

10  if he did not confess that he would receive

11  harsher punishment.

12           But I would have to go back to the

13  record to be more specific than that.

14      Q.   Have you ever testified in Federal

15  Court?

16      A.   No.

17      Q.   And on how many occasions have you

18  authored an expert report for purposes of

19  litigation?

20      A.   One.

21      Q.   And is that the Carl Chatman case?

22      A.   It is.

23      Q.   For how many years have you been

24  providing consulting services for litigation

MELISSA RODRIGUEZ, PH.D.                          September 13, 2016

Page 20

1   purposes?

2        A.   The first case I consulted on,

3   although that was more of an informal

4   consulting, was back when I was in graduate

5   school.  So that would have been roughly

6   2003, perhaps.

7        Q.   Do you have any cases that you're

8   currently reviewing to determine if you can

9   render an expert opinion?  And that's for

10  litigation purposes as well.

11       A.   No.

12       Q.   In all of the cases that you've been

13  asked to consult for litigation purposes,

14  were you asked to render opinions on behalf

15  of someone who has confessed to a crime?

16       A.   Can you repeat the question?

17       Q.   Sure.  In all of the cases where

18  you've been asked to consult for litigation

19  purposes, were you asked to consult on behalf

20  of someone who has confessed to a crime?

21       A.   So are you asking me if it's always

22  been -- the defendants are asking me to

23  consult?

24       Q.   Right.  Either the defendant in a

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 21

1    criminal case or a plaintiff in a civil

2    rights case alleging that there was some sort

3    of improper interrogation?

4        A.    Yes.

5             However, the one case that I was

6    referring to, that early case that I

7    consulted on in graduate school, was actually

8    on behalf of the prosecution in that case.

9             Although, I was not the original

10   person they contacted.  It was a -- another

11   professor at the university who then, in

12   turn, asked me to consult with him.

13       Q.    And were you able to provide opinions

14   on behalf of the prosecution in that case in

15   approximately 2003?

16       A.    I was able to provide feedback to the

17   professor I was working with about my

18   thoughts involving the case.

19             I did not have contact directly with

20   the attorneys.

21       Q.    Have you ever been asked to review a

22   case on behalf of law enforcement --

23             MR. AINSWORTH:  Object to

24   the -- I'm sorry.  Continue.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 22

 1      Q.    -- pertaining to interrogation

 2   processes?

 3                  MR. AINSWORTH:   Object to the

 4   form of the question.

 5      A.    On -- on a specific case?

 6   BY MS. STALF:

 7      Q.    Yes.

 8      A.    No.

 9      Q.    Have you ever been retained by the

10   law firm of Loevy & Loevy other than in the

11   Carl Chatman case?

12      A.    No.

13      Q.    Have you ever been retained on prior

14   occasions to review a case to potentially

15   provide opinions against the Chicago Police

16   Department?

17      A.    No.

18      Q.    Have you ever been retained on prior

19   occasions to potentially provide opinions

20   against Chicago police officers?

21      A.    No.

22      Q.    *In any of the publications that you

23   have authored, have you considered statistics

24   or data that you've gleaned from the Chicago

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 23

 1   Police Department?

 2       A.   Can you repeat that one more time.

 3               MS. STALF:  Sure.

 4               Could you read the question

 5   back, please.

 6

 7               *(Question read.)

 8

 9       A.   No.

10   BY MS. STALF:

11       Q.   Have you ever considered any

12   statistics or data that were considered by

13   another source that were initially derived

14   from the Chicago Police Department?

15       A.   No, I don't believe so.

16       Q.   When were you first retained in the

17   Carl Chatman case?

18       A.   Can I refer to my report?

19       Q.   Sure.  Absolutely.

20               And that's another rule for the

21   deposition.  If at any time you need to refer

22   to your report or if there's any other

23   document that you need, please feel free to

24   let us know.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 24

1      A.   Okay.   Thank you.

2           It was on Friday, May 22nd, that was

3   2015, that I was first contacted.

4      Q.   And who were you first contacted by?

5      A.   Mr. Ainsworth.

6                MS. STALF:   I'm going to mark

7   Exhibit B.

8

9                (Exhibit B marked for

10                identification.)

11

12   BY MS. STALF:

13      Q.   The court reporter has just handed

14   you what we've marked as Exhibit B to your

15   deposition, and I'll represent that this is a

16   document that we received from Mr.

17   Ainsworth's office.

18           And this invoice is dated

19   July 28, 2015, correct?

20      A.   Correct.

21      Q.   Does this -- is this an invoice that

22   you prepared?

23      A.   It is.

24      Q.   Does this invoice contain all of the

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

 1    charges for your work in this case to date?

 2         A.   No.

 3         Q.   What is -- what have you done in this

 4    case that's not reflected on this

 5    July 28, 2015 invoice?

 6         A.   There were some revisions and

 7    additions to my report, consultations with

 8    Mr. Ainsworth, preparation for today's

 9    deposition.

10         Q.   Anything else?

11         A.   Not that I can remember.

12         Q.   Is there an updated invoice or

13    supplementary invoice in addition to that

14    July 2015 invoice?

15         A.   There is not yet.

16         Q.   Okay.  And according to your invoice

17    and your report, your charge is $295 an hour

18    for your consultation services, correct?

19         A.   Correct.

20         Q.   And does that 295 apply across the

21    board to document review and preparation of

22    report?

23         A.   It does.  It doesn't apply to

24    deposition.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 26

1      Q.    And what is your charge for

2   deposition?

3      A.    It is five- -- I'd have to go back

4   and double-check, but I believe it's 590 per

5   hour.

6      Q.    And do you have a separate fee for

7   hours of testimony at trial?

8      A.    No.

9      Q.    Is it 590 per hour for trial

10  testimony as well?

11     A.    No, I believe it's 295.

12     Q.    And as of the July 28, 2015 invoice,

13  your total charges were $21,325, correct?

14     A.    Correct.

15     Q.    Do you have an approximation of how

16  much your additional charges total?

17     A.    I haven't added it up yet.  Although,

18  I briefly glanced at it last night and I

19  believe it's between -- well, I don't know

20  the charges, but between ten and twelve

21  hours, so you can do the math on it.

22     Q.    You're currently a professor of

23  criminal justice at the School of Justice

24  Studies at Roger Williams University,

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 27

1    correct?

2        A.    Correct.

3        Q.    What percentage of your work deals

4    with consulting for litigation purposes?

5        A.    What percentage of my --

6        Q.    Your total work, all the work you

7    perform.

8        A.    It's difficult to answer that without

9    knowing what year we're talking about.

10       Q.    Okay.  How about in 2015?

11       A.    In 2015, an incredibly small

12   fraction, you know.

13           So in 2015, my consulting work

14   consisted of roughly 85 hours of work on this

15   case.

16           So if you figure I work 40 hours a

17   week or more, typically, around the calendar

18   year, I would have to do the math of what

19   percentage that would constitute, but a very

20   small fraction.

21       Q.    Do you advertise your consulting

22   services?

23       A.    I do not.

24       Q.    When is the last time that you

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

1   reviewed the report that you prepared in the

2   Carl Chatman case?

3       A.    Last night and for a few minutes this

4   morning.

5       Q.    Are there any errors or revisions

6   that you caught that you would need to make

7   to the report in your most recent reviews?

8       A.    Other than a few typos, there's one

9   that -- I wouldn't call it an error, but I

10  would phrase something differently if I was

11  to go back.

12           On Page 7, the last sentence of the

13  first paragraph that starts with, "Moreover,

14  minimum and maximization techniques."

15      Q.    Okay.  How would you change that?

16      A.    So, the only thing I would change is

17  I would add, at the end of that sentence, it

18  would read -- so if I'm starting in the

19  middle of the sentence, "...laboratory

20  research to increase the likelihood of false

21  confessions from the innocent and decrease

22  the likelihood of true confessions from the

23  guilty relative to minimization and

24  maximization techniques that do not

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 29

1    manipulate a suspect's perception of the

2    consequences."

3         Q.    And why did you believe that that

4    revision was necessary?

5         A.    Just in reading back, if I'm being

6    very technical about the methodology of the

7    study, it's a more accurate description of

8    what we found.

9         Q.    Other than the addition of that

10   phrase, are there any other additions that

11   you would deem necessary to report?

12        A.    I don't believe so.

13        Q.    Other than what you have listed on

14   Pages 2 and 3 of your report, did you review

15   any other materials in preparation to draft

16   this report?

17        A.    No.

18        Q.    Did you rely on any sources or

19   publications other than what's listed on

20   Pages 37 through 43 of your report?

21        A.    (Witness reviews document.)

22             Well, in drafting the report, I rely

23   on my body of knowledge that I've accumulated

24   over many years, which consists of hundreds

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 30

1  of studies and psychologic -- basic

2  psychological studies, not all of which are

3  listed, obviously, in the report.

4         These are the direct sources I relied

5  upon.

6     Q.   Did you conduct interviews of any

7  witnesses in your examination of this case?

8     A.   No.

9     Q.   Did you meet with Carl Chatman?

10    A.   No.

11    Q.   Why not?

12    A.   It's not necessary for the type of

13  assistance that I can provide in a case like

14  this.

15    Q.   Before drafting your report, did you

16  discuss the facts of the case with

17  Mr. Ainsworth?

18              MR. AINSWORTH:  I'm going to --

19  that asks for privileged information, so.

20  We're going to assert a privilege for that.

21              MS. STALF:  Whether she

22  discussed facts is not -- is not a privileged

23  topic.

24              MR. AINSWORTH:  So, let me read

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 31

1    the rule.

2              Rules 26(b)3(a) and (b):  "Protect

3    communications between the party's attorney

4    and any witness required to provide a report

5    under Rule 26(a)2(b) regardless of the form

6    of the communications, except to the extent

7    that the communications relate to

8    compensation of the expert study or

9    testimony, identify facts or data that the

10   party's attorney provided and that the expert

11   considered in forming the opinions to be

12   expressed or identified assumptions that the

13   party's attorney provided and that the expert

14   relied on in forming the opinions to be

15   expressed."

16             So what I'm -- I think that you could

17   phrase the question, did Mr. Ainsworth

18   identify any facts to you that you relied

19   upon in forming the opinions to be expressed?

20             That would be a fair question.

21             Or did Mr. Ainsworth give you any

22   assumptions that you relied on in forming the

23   opinions to be expressed?

24                  MS. STALF:  My question was

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 32

1    just whether you provided any facts.

2                      That's not going into any

3    privileged area at all.  It's a yes or no

4    question as to whether any facts were

5    provided.  It's a foundational question

6    leading up to the question that you just

7    suggested.

8                      MR. AINSWORTH:  No.  And the

9    flaw in your -- so it's a communication

10   that's privileged.  And so what we discussed

11   is privileged, unless I'm providing facts to

12   her that she's relying upon.

13                     MS. STALF:  Okay.  Well, I

14   disagree, but let's move on.

15   BY MS. STALF:

16      Q.   Did Mr. Ainsworth ever provide you

17   with any facts that you did not consider in

18   the formulation of your opinions in this

19   case?

20                     MR. AINSWORTH:  Objection.

21   That's -- that's privileged.  That's exactly

22   what she can't answer.

23                     MS. STALF:  She -- I have to

24   establish whether or not any facts were

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 33

1    provided.

2                     MR. AINSWORTH:  No, you don't.

3    All you -- you can just ask if -- so,

4    revealing whether there are facts discussed

5    is revealing privileged communication.

6                     MS. STALF:  I disagree with

7    that wholly.

8                     MR. AINSWORTH:  I understand,

9    but I'm -- I'm pretty sure I'm right on this

10   one.

11         But you're certainly allowed to ask

12   her the converse of the question you just

13   asked, which is, did Mr. Ainsworth provide

14   any facts to you that you then relied upon in

15   forming your opinions in this case.

16                     MS. STALF:  Are you instructing

17   her not to answer the questions that I've

18   already posed?

19                     MR. AINSWORTH:  I am.

20   BY MS. STALF:

21      Q.   Are you going to follow your

22   attorney's instructions and refuse to answer

23   those questions?

24      A.   I am.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 34

1       Q.   Did Mr. Ainsworth provide you with

2    any facts that you relied upon in the

3    formulation of your opinions?

4       A.   Mr. Ainsworth provided me with plenty

5    of documents that I reviewed to form the

6    basis of my opinions.

7       Q.   But that's not my question.

8            Did he provide you with any facts

9    that you considered in formulating your

10   opinions?

11                   MR. AINSWORTH:  So, and just --

12                   MS. STALF:  No, no, no.  What's

13   your objection, Russell?

14           Are you going to talk through the

15   whole deposition?  We're going to be here for

16   the full seven hours.

17           I mean, if you're going to talk for

18   the whole time -- you can make an objection.

19   It has to be succinctly stated.  You know the

20   rules.  You don't get to make speaking

21   objections.

22           What's your objection?

23           Let's move along.

24                   MR. AINSWORTH:  It's super

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 35

1   rude.  I mean, come on.

2                   Listen, I'm trying to be

3   helpful here.

4                   MS. STALF:  You --

5                   MR. AINSWORTH:  The problem --

6                   MS. STALF:  I actually -- I

7   actually don't need your help, respectfully.

8           Make your objection and move along.

9           If you're going to make your

10  objection and instruct her not to answer,

11  then that's the way we can do things.  That's

12  how you do things under the rules.

13                  MR. AINSWORTH:  We're going to

14  speak one at a time.  It's my turn now.

15          The problem with the question was you

16  mean verbal facts, right?  Not documentary

17  facts?

18          Because you didn't limit your

19  question.

20          So that's the problem with the

21  question.  And so, to the extent --

22                  MS. STALF:  The distinction was

23  already made by the witness, Russell.

24          I asked her if she was provided

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 36

1   facts.  She said that she was provided with

2   documents.

3           So based upon her -- I'm asking based

4   upon her definition to give me a

5   clarification.

6                   MR. AINSWORTH:  And then you

7   said, that's not my question, here's the

8   facts.

9           So I'm just saying --

10                  MS. STALF:  Okay.  Are you

11  instructing your witness not to answer the

12  question, Russell?

13                  MR. AINSWORTH:  No, I'm

14  identifying the flaw.

15                  MS. STALF:  So what's your

16  objection, your actual legal basis?

17                  MR. AINSWORTH:  Object to the

18  form of the question.

19                  MS. STALF:  There you go.

20  There it is.

21  BY MS. STALF:

22     Q.   Did Mr. Ainsworth provide you with

23  any facts verbally that you relied upon in

24  the formation of your opinions?

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 37

```
 1      A.   I can't remember any facts that he
 2  provided to me verbally that I didn't rely
 3  upon from documents.
 4          So, I don't remember there to be any
 5  specific facts that I relied upon that I
 6  didn't -- that I wouldn't have also seen
 7  through documentation.
 8      Q.   Was there any documentation that you
 9  gleaned facts from that you relied upon in
10  formulating your opinions that is not listed
11  on Pages 2 and 3 of your report?
12      A.   That I relied upon in the basis of
13  writing my report?
14      Q.   Correct.
15      A.   No.
16      Q.   Prior to submitting your final
17  report, did you submit any drafts to
18  Mr. Ainsworth?
19              MR. AINSWORTH:  I'm going to
20  direct you not to answer that question.
21  BY MS. STALF:
22      Q.   Are you going to follow his advice?
23              MR. AINSWORTH:  As a privileged
24  communication.
```

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 38

1   BY MS. STALF:

2       Q.   Are you going to follow your

3   attorney's advice and not answer?

4       A.   Yes.

5       Q.   In the event that you did submit any

6   drafts to Mr. Ainsworth, did he make any

7   edits to those drafts?

8               MR. AINSWORTH:  I'm going to

9   instruct you not to answer that question.

10          That's a privileged communication.

11  BY MS. STALF:

12      Q.   Are you going to follow your

13  attorneys's advice and not answer that

14  question?

15      A.   I am.

16      Q.   Do you have any prior drafts of your

17  report saved?

18               MR. AINSWORTH:  I'm -- the

19  problem that I have with that question is

20  that it calls for -- it asks whether there

21  are drafts.

22          I suppose you can ask that question.

23          You can answer that question.

24      A.   I would have to check, but probably.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 39

 1    BY MS. STALF:

 2        Q.    And in the event that you do have

 3    drafts saved, in what form are they saved?

 4        And what I mean by that is hard copy or

 5    digitally.

 6        A.    Digitally.

 7        Q.    After you were formally retained by

 8    Mr. Ainsworth's firm, did his firm send you

 9    the materials that are listed on Pages 2

10    and 3 of your report?

11        A.    Yes.

12        Q.    Were all of those materials that are

13    listed sent at the same time?

14        A.    No.

15        Q.    In looking at the list of materials

16    on Pages 2 and 3 of your report, do you

17    recall which of the materials were added

18    after the first -- the initial submission of

19    materials to you by Mr. Ainsworth's firm?

20        A.    I would have to go back and

21    double-check.

22            I know there were some materials that

23    were added later.

24            I am fairly confident that the

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 40

1    allegations regarding Officer Kato's use of

2    excessive force came after the initial batch.

3    Possibly the Querrey memo.  Possibly the

4    deposition of Mrs. Riggio.  I don't know if

5    I'm pronouncing her name correctly.

6         Q.    You are.  Riggio.

7         A.    Those are my best guesses.

8               Certainly, the documents related to

9    the OPS's investigation into the abuse

10   allegations, I believe, also were submitted

11   later or before my report.

12        Q.    Sure.

13              Were there any materials that you

14   specifically requested from Mr. Ainsworth to

15   assist you in formulating the opinions that

16   are contained in your report?

17        A.    Other than after -- after I received

18   the initial batch of materials?

19        Q.    Yes.

20        A.    Possibly.

21              For example, I may have asked to see

22   the deposition of Mrs. Riggio.  I think

23   perhaps it hadn't been taken yet at the time

24   of the initial batch.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 41

 1             There may have been others, but I

 2   can't remember.

 3      Q.    Do you recall the date of which you

 4   received the initial batch of records from

 5   Mr. Ainsworth's law firm?

 6      A.    I do not.

 7      Q.    Are all the opinions that you're

 8   giving here today to a reasonable agree of

 9   scientific certainty?

10      A.    The opinions I'm giving here today, I

11   am confident, have a strong basis in support

12   of my field.

13      Q.    Looking at Page 1 of your report,

14   under "Professional Qualifications," about

15   midway down, it states, "I have been

16   conducting research in the area of

17   interrogations and confessions since 2002,

18   I've published numerous scholarly

19   peer-reviewed articles and chapters on these

20   topics, and I created one of the most oft

21   used and influential laboratory paradigms for

22   studying true and false confessions."

23             Do you see that there?

24      A.    I do.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 42

1      Q.    What specifically did you create?

2      A.    I created a laboratory paradigm for

3   studying interrogations and confessions.

4      Q.    And could you explain that laboratory

5   paradigm?

6      A.    Sure.

7            So, in this paradigm, what we do is

8   we're trying to model the process of

9   interrogation and the process that suspects

10  are or the situation that suspects are placed

11  in in the laboratory.

12           And so what we do is we bring

13  students -- typically students into a

14  laboratory where they are -- they believe

15  they're going to participate in a study on

16  decision-making.

17           When they arrive at the laboratory,

18  they are paired up with somebody they believe

19  to be another participant but who is actually

20  a confederate of our study.

21           A confederate in our terminology

22  means somebody who's in on the research.

23  They're working -- they're a research

24  assistant working for us.

MELISSA RODRIGUEZ, PH.D.                          September 13, 2016

Page 43

 1            And they are told they are going to

 2     participate in a study on whether individuals

 3     versus groups or pairs make -- who makes

 4     better decisions:  people working

 5     individually or people working in groups.

 6            And so, they are placed in a room,

 7     and they are given a series of logic

 8     problems, some of which they are instructed

 9     to solve individually and some of which they

10     are instructed to solved as a team and they

11     alternate between solving these individual

12     and team problems.

13            And I can certainly go into all this

14     in more detail.  But in brief, what happens

15     is we manipulate whether or not the

16     participants are guilty or innocent of

17     breaking an experimental rule, which in this

18     case is cheating.  So this is cheating in an

19     academic context.

20            So, for -- they are told ahead of

21     time that for the individual problems, they

22     have to work alone, they cannot discuss the

23     problems with one another at all.  And for

24     the team problems, they have to work

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 44

 1    together.

 2             In the guilty condition, where

 3    students would be randomly assigned to be

 4    either innocent or guilty, the confederate

 5    would -- pretends to be struggling with

 6    solving a particular individual problem or

 7    target problem, and at -- and they are

 8    trained at a certain time to ask assistance

 9    from the actual participant for the answer.

10    So, essentially, they initiate cheating.

11             Most of our students, for better or

12    for worse, engage in the misconduct, the

13    academic misconduct, and they assist the

14    confederate.  So they become guilty of

15    breaking this experimental rule or academic

16    misconduct, cheating, in the context of an

17    university setting.

18             In the innocent condition, this never

19    occurs.  There's no initiation of cheating.

20    So they are innocent of breaking any

21    experimental rule.

22             They are then subsequently confronted

23    with an allegation that they have cheated.

24    And we confront both innocent and guilty

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 45

1    participants.  Because, remember, half of

2    them have cheated and half of them haven't.

3            And then we can use this paradigm to

4    examine various factors.

5            So it can be the types of

6    interrogation techniques used.  That's

7    primarily what we've done with the paradigm,

8    but the paradigm itself can be used to model

9    many, many different things, the length of

10   interrogation, dispositional factors that

11   might be associated with confessions.

12           And we use the paradigm to examine --

13   to try and identify techniques that are

14   associated with both true and false

15   confessions.

16           The goal of my paradigm, when I

17   developed it, was not just to examine what

18   causes false confessions but also to find

19   out, how do we get true confessions from

20   guilty people.

21           So what we're looking to do is

22   identify diagnostic interrogation techniques,

23   meaning maximize the number of confessions or

24   information you can get out of guilty persons

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 46

 1    while minimizing the risk of getting false

 2    confessions or false information from

 3    innocent persons.

 4         Q.    Would you agree that it's not

 5    possible to re-create a real-world

 6    interrogation in a laboratory for research

 7    purposes?

 8         A.    I would agree that it's not ethical.

 9         Q.    Would you agree that it's not

10    possible?

11         A.    I -- I would agree it's not possible

12    under the constraints of which we work, the

13    ethical constraints of which we work, and we

14    wouldn't want to re-create that for moral and

15    ethical reasons.

16         Q.    Do you believe that the severity of

17    the offense that an individual is being

18    accused of is relevant to how that individual

19    would react in an interrogation setting?

20         A.    Yes, potentially.

21         Q.    Have you ever performed a laboratory

22    experiment where you put the subjects in a

23    situation where they're being accused of

24    sexual assault?

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 47

```
 1      A.   No.  That would be unethical, most
 2  likely.
 3      Q.   Are you aware of any such studies
 4  where that's been done?
 5      A.   Where participants have been accused
 6  of sexual assault?
 7      Q.   Yes.
 8      A.   I don't believe, not to my knowledge.
 9      Q.   *Are the students that participate in
10  the laboratory studies that you just
11  described performing or participating in
12  those studies for purposes of obtaining
13  college credit?
14      A.   Can you repeat the question?
15               MS. STALF:  Could you read it
16  back, please.
17
18                 *(Question read.)
19
20      A.   Sometimes, but not all.
21  BY MS. STALF:
22      Q.   Are the participants in those
23  laboratory studies ever compensated for their
24  participation?
```

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 48

 1      A.    Sometimes, but not all the time.

 2            And by college credit, we don't mean

 3      academic credit for a course.  We mean credit

 4      as in they have to perform a certain number

 5      of hours in a research study.

 6      Q.    And that's for purposes of obtaining

 7      ultimately their degree, correct?

 8      A.    Their grade in a course.

 9      Q.    Looking back at that phrase from

10      Page 1 of the report, you state that you've

11      "created one of most oft used and influential

12      laboratory paradigms."

13            Who has this laboratory paradigm been

14      used by?

15      A.    Many researchers have adopted the use

16      of this paradigm subsequent to my developing

17      and publishing it.

18      Q.    And who specifically has adopted the

19      paradigm?

20      A.    So, Saul Kassin has used the paradigm

21      in his laboratory.

22            Lindsay Malloy at Florida

23      International University.

24            Kate Houston at -- in collaboration

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 49

 1   with me, but also separately, has used it.

 2   She's at Texas A&M International University

 3   currently.

 4            Kris Kato who was a collaborator on

 5   the original paradigm, his lab continually

 6   used it.

 7            Stephanie Madon out of Iowa State,

 8   and others.

 9            But I would have to refer back to

10   notes and publications to list them all.

11       Q.   And you state that it's influential.

12            Who has the laboratory paradigm

13   influenced?

14       A.   It's influential to the state of the

15   research.  So it has changed the way that we

16   study interrogations and confessions.

17            And I would argue that the data that

18   is borne out of the paradigm, the information

19   that we have learned has started to influence

20   recommendations and the state of the

21   knowledge about interrogations and

22   confessions.

23       Q.   You're -- you keep stating "we."

24            Who is "we"?

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 50

1        A.    The research community.

2        Q.    What research community?

3        A.    The research -- the social scientists

4   that are involved in the study of

5   interrogations and confessions.

6        Q.    Has any of the data that's come out

7   of your laboratory studies been used in any

8   way?

9        A.    Can you clarify the question?

10       Q.    Sure.

11             You said that it's -- let me ask a

12   better question.

13             In what way have the individuals that

14   you've identified used the data that's come

15   out of this laboratory paradigm?

16       A.    Well, the original study itself where

17   I introduced the paradigm is heavily cited.

18   It was published in one of the most

19   prestigious journals in psychology.

20             And I would have to look at -- the

21   impact factor of that journal is quite high,

22   and you can tell by citations of, in part,

23   how influential it has been.

24             Many different laboratories have

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 51

1    adopted the paradigm and have used the

2    paradigm.  They've tweaked the paradigm.  But

3    the basis of the paradigm was the one that I

4    created.

5          And so they're using it in their

6    research to study various factors associated

7    with interrogations and confessions.

8          I don't know if that answers your

9    question fully.

10    Q.    It does.  Thank you.

11          The phrase indicates that "the

12    laboratory paradigm has been used for

13    studying true and false confessions,"

14    correct?

15    A.    Correct.

16    Q.    Have you yourself studied true

17    confessions?

18    A.    Yes.

19    Q.    Have you studied real-life true

20    confessions or just laboratory true

21    confessions?

22    A.    Can you explain what you mean by

23    "studied real-life true confessions?"

24    Q.    Sure.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

1              In your report, you say, "I created

2     one of the most oft used and influential

3     laboratory paradigms for studying true and

4     false confessions."

5              What do you mean by "studying true

6     and false confessions"?

7       A.   So, in the paradigm that I've

8     created, we can model the process of

9     interrogation and identify factors that cause

10    true confessions to occur.

11      Q.   And have you applied that data to

12    studying true confessions?

13      A.   I have studied true confessions -- I

14    have studied factors that lead to true

15    confessions.

16      Q.   And have you applied that to

17    real-life true confessions outside of the

18    context of the laboratory?

19      A.   I don't know what you mean by

20    "applied to real-life true confessions."

21      Q.   Have you ever taken any of the data

22    or information that you've gleaned from your

23    laboratory paradigms and applied it in the

24    analysis of a real-life true confession?

MELISSA RODRIGUEZ, PH.D.                        September 13, 2016

1       A.   I don't know if this is the answer to

2    the question you're looking for, but, for

3    example, I have taken the data that we have

4    gleaned from the use of this paradigm and it

5    helped to train law enforcement professionals

6    on how to obtain true confessions.

7            So that's a real-life use of the

8    research.

9       Q.   Have you ever applied it to a

10   confession and made the determination that a

11   real-life confession was a true confession?

12      A.   I don't generally make determinations

13   of whether a confession is true or false.

14           So that isn't -- that's why the

15   question isn't making much sense to me.

16      Q.   Okay.  Would you agree that when

17   you're undertaking the study of a particular

18   real-life confession case, it's important for

19   you to have an understanding of the factual

20   record?

21      A.   Yes.

22      Q.   And why is that?

23      A.   So when I -- when I'm consulting on a

24   case?

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 54

 1      Q.   Yes.

 2      A.   Because part of being able to decide

 3  whether I can even be helpful in the case

 4  would be to determine whether or not I think

 5  there are concerning factors that raise red

 6  flags for me about an increased likelihood of

 7  a false confession, or if I was being

 8  consulted by the prosecution, whether there

 9  are factors that are associated with true

10  confessions present in the case.

11      Q.   And in your report in this case,

12  you're applying the facts that you've gleaned

13  from your review of the records noted on

14  Pages 2 and 3 to various psychological

15  principles, correct?

16      A.   Yes.

17      Q.   Would you agree that you don't know

18  what actually happened during the course of

19  any of the interviews that Mr. Chatman had

20  with detectives?

21      A.   I would agree that the decision of a

22  police officer not to record the

23  interrogation deprives anyone of knowing

24  exactly what happened other than the people

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 55

1    who were in the room.

2        Q.    Would you agree that you don't know

3    what happened during any of the

4    interrogations?

5        A.    I only know what I've been able to

6    glean from the documents.

7        Q.    Do you agree that your opinions are

8    based on factual assumptions?

9        A.    Some.

10       Q.    *If there's materials in evidence in

11   this case that you did not read that brought

12   up additional facts that could potentially

13   change your opinions, could that change the

14   application of your research, facts or

15   psychological principles?

16       A.    Could that change the -- can you read

17   back that question?

18                 MS. STALF:  Could you read it

19   back, please.

20

21                 *(Question read.)

22

23       A.    It wouldn't -- the factors the basic

24   research that -- the factors that are

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 56

1    associated with false confession wouldn't

2    change depending on the facts of the case.

3           It's possible that if there was new

4    information that I didn't review that that

5    could bring up additional points of

6    information that would be relevant to an

7    analysis, but it doesn't change the

8    underlying research findings.

9        Q.   Does it change the manner in which

10   you apply the underlying research findings?

11       A.   No, I don't believe so.

12       Q.   How do you define a false confession?

13       A.   A false confession is when an

14   innocent person confesses to a crime that

15   they did not actually commit.

16       Q.   Looking at Page 3 of your report, in

17   the "Background" section, in the first -- the

18   second sentence you state, "Most people

19   cannot possibly imagine themselves confessing

20   to a crime that they could (sic) not commit";

21   is that correct?

22                   MR. AINSWORTH:  "...did not

23   commit."

24   BY MS. STALF:

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

 1      Q.    They did not commit, yes.

 2      A.    That's correct.

 3      Q.    And you cite in that paragraph to a

 4   number of studies that talk about percentages

 5   of false confession among cases that were

 6   studied in the situation of DNA exonerations,

 7   correct?

 8      A.    Correct.

 9      Q.    Do you know of studies that you've

10   cited to, and I guess specifically looking at

11   footnote 7.

12           Did that study include only cases

13   where there was a confession to committing

14   the underlying offense?

15      A.    Can you -- I'm sorry.  Can you say

16   that again.

17      Q.    Sure.

18           Did those studies include only cases

19   where the subject admitted to committing the

20   underlying offense?

21                MR. AINSWORTH:  Are you talking

22   about footnote 7?

23                MS. STALF:  Yes.

24                MR. AINSWORTH:  So just that --

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

 1                    MS. STALF:  Yes.

 2                    MR. AINSWORTH:  -- study?

 3                    MS. STALF:  Yes.

 4                    MR. AINSWORTH:  Not studies,

 5     plural?

 6                    MS. STALF:  Right.  Study.

 7                    MR. AINSWORTH:  Okay.

 8     A.   Well footnote 7, Gudjonsson 2010, is

 9     a book that reviews hundreds and hundreds of

10     articles written on theory and study.

11              So the Gudjonsson study, that's not

12     the specific cite of the percentages that are

13     cited in that particular sentence, but what

14     those -- the "Self-reported confession rates

15     in community samples range from 1.2 percent

16     to 13.8 percent," that sentence is referring

17     to multiple studies where they have asked

18     people how often -- if they've ever falsely

19     confessed, and they've asked different

20     populations of people.

21              So those are ranges of estimates from

22     studies where they've asked that question.

23     Q.   And do those studies include

24     situations where individuals made admissions

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 59

1   rather than fully confessing to committing

2   the underlying offense?

3       A.   I would have to go back and look to

4   see if they made a distinction between a full

5   confession and a partial admission.

6            And as I'm reading that, I would

7   clarify, it should read "Self-reported false

8   confession rates in community samples."

9       Q.   Looking about midway down in the

10  paragraph under "Background" on Page 3, it

11  states, "Self-reported confession rates in

12  community samples range from 1.2 percent to

13  13.8 percent and from 0 percent to 24 percent

14  in samples of prisoners in those with serious

15  mental illness."

16           Is that correct?

17      A.   Yes.

18      Q.   And for purposes of that -- those

19  statistics that you cite, what serious mental

20  illnesses were considered?

21      A.   I would have to go back and look at

22  the original studies.

23      Q.   And in your reviewing of the factual

24  materials in this case, did you attempt to

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

1    try to get an accurate understanding of what

2    led up to Mr. Chatman confessing to the

3    sexual assault of Susan Riggio?

4        A.   Yes.

5        Q.   Did you make any credibility

6    determinations when you reviewed these

7    materials?

8        A.   Regarding?

9        Q.   Who was telling the truth and who was

10   lying.

11       A.   I used the materials to try and

12   establish as much of a factual basis of what

13   occurred as I could.

14            I did not make a determination of

15   lying or credibility per se on any particular

16   person.

17       Q.   In reviewing -- I'm sorry.  Did I cut

18   you off?

19       A.   Yeah.  Person, witness.  I was trying

20   to think of the right word.

21       Q.   Okay.  In your review of the

22   evidence, did you come across any conflicting

23   pieces of information?  So, for example,

24   where one person said that X happened and the

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 61

1    other person said that it didn't?

2        A.   Yes.

3        Q.   And in those instances where you came

4    across that conflicting information, did you

5    set out to try to determine who was telling

6    the truth and who did not?

7        A.   I tried to establish, as best as I

8    could, what -- what appeared to have

9    occurred.

10           Some of my analysis is -- you can

11   think of it essentially as if this occurred,

12   here is -- here are factors associated with

13   false confessions.  So assuming this

14   occurred, this is potentially a risk factor.

15           I didn't necessarily set out to or

16   make correct assessments of who was lying or

17   telling the truth.

18       Q.   When you performed your analysis, did

19   you try to do the inverse of that, where you

20   tried to adopt the other version of facts

21   that would support the absence of risk

22   factors for false confession?

23       A.   I certainly considered all of the

24   documents that I reviewed, yes.

MELISSA RODRIGUEZ, PH.D.                     September 13, 2016

Page 62

1      Q.    Would you agree that the passage of

2   time can have an adverse effect on one's

3   memory of events?

4      A.    Yes.

5      Q.    And a person's memory of events can

6   change over time, correct?

7      A.    Correct.

8      Q.    What is your understanding of who was

9   involved in interrogating Mr. Chatman?

10     A.    My understanding is that multiple

11  people were involved in interrogating

12  Mr. Chatman, including Detectives Boock,

13  Mischka, Detective Roberts, ASA Holmes, the

14  Chinese-looking police officer that

15  Mr. Chatman refers to who may be Officer

16  Kato.

17     Q.    Is it your understanding that there

18  was a physical component of coercion involved

19  in Mr. Chatman's interrogation?

20     A.    Is it my understanding that

21  Mr. Chatman says that he was physically

22  assaulted.

23     Q.    And what is your understanding, after

24  reviewing the records in this case, as to who

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 63

1   used physical coercion during the course of

2   Mr. Chatman's interrogations?

3       A.   Mr. Chatman claims that a

4   Chinese-looking police officer used physical

5   coercion, who, from the documents I reviewed,

6   may be Officer Kato.

7       Q.   And is it your opinion that

8   Mr. Chatman has consistently alleged that it

9   was the Chinese-looking officer who

10  physically coerced him during the course of

11  his interrogation?

12      A.   Yes.

13      Q.   Did you see any information in your

14  review of records to conflict that opinion --

15  that conflict with that opinion, rather?

16      A.   From Mr. Chatman?

17      Q.   Any record.  Any record that

18  conflicts with --

19      A.   Well, the OPS reports reject the --

20  they concluded that no abuse had occurred.

21      Q.   Were you ever provided with a copy of

22  the complaint that was filed by Mr. Chatman

23  in this case?

24      A.   I don't know.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 64

1        Q.    Is it on your list of records on

2    Pages 2 and 3?

3        A.    The complaint that Mr. Chatman filed?

4        Q.    Yes, in this civil suit.

5        A.    This may be my unfamiliarity with

6    "complaint," the form of a complaint.

7        Q.    Sure.

8        A.    So beyond what I've listed here, I

9    did not receive anything.

10                  MS. STALF:  I'm going to mark

11   Exhibit C to the deposition.

12              I don't have another copy, Russell.

13   It's the first complaint that you filed.

14   One.

15

16                  (Exhibit C marked for

17                   identification.)

18

19   BY MS. STALF:

20       Q.    Doctor, the court reporter has handed

21   to you what we've marked as Exhibit C to your

22   deposition, which I'll represent to you is a

23   copy of the complaint filed by Mr. Chatman in

24   this matter in Federal Court.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 65

1              Have you ever seen this document

2    before?

3        A.    (Witness reviews document.)

4              I don't believe so.

5                    MR. AINSWORTH:  Just for the

6    record, when was that complaint filed?

7                    MS. STALF:  I -- it's on the

8    top of the document.  It should be the

9    Federal Court filing information.

10                   MR. AINSWORTH:  April 24, 2014.

11   Okay.

12   BY MS. STALF:

13       Q.    Turning your attention, Doctor, to

14   Page 12, Paragraph 53 of Exhibit C, the

15   plaintiff's complaint, could you read that

16   paragraph to yourself.

17             Let us know when you've completed.

18       A.    (Witness complying.)

19             Okay.

20       Q.    In that paragraph, it's alleged that

21   Detective Roberts used physical coercion to

22   gain Mr. Chatman's confession, correct?

23       A.    Correct.

24       Q.    In your review of records, have you

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

1    seen anything else to suggest that Detective

2    Roberts used physical coercion to obtain

3    Mr. Chatman's confession?

4         A.    Not that I can remember.

5         Q.    And looking at Pages 11 through 13 of

6    that complaint, please take a look.

7         A.    You want me to read the whole thing?

8         Q.    Yes, please.

9         A.    (Witness complying.)

10   Okay.

11        Q.    In the pages that you've just read of

12   Exhibit C, the plaintiff's complaint, are

13   there allegations that anyone else other than

14   Detective Roberts used force or threats of

15   force against Mr. Chatman?

16        A.    No.

17        Q.    Turning to the very first page of

18   Exhibit C, the first -- the cover page.

19        A.    Okay.

20        Q.    You were right the first time.

21             On the cover page, the caption of the

22   case is contained there, correct?

23        A.    Uh-huh, yes.

24        Q.    And in the list of defendants, do you

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

1    see Detective Kato's name listed there?

2         A.   (Witness reviews document.)

3              No.   But it's my understanding that

4    Detective Kato's name didn't come up until

5    after this report or this complaint was

6    authored --

7         Q.   Okay.

8         A.   -- come up from the documentation,

9    from the OPS report.

10                   MS. STALF:   Okay.   I'm going to

11   mark Exhibit D.

12

13                   (Exhibit D marked for

14                   identification.)

15

16                   MS. STALF:   This is the second

17   amended complaint.   Russell, I don't have

18   another copy.   And this is a second amended

19   complaint filed on November 25, 2015.

20   BY MS. STALF:

21        Q.   Doctor, the court reporter has handed

22   you what we've marked as Exhibit D, which

23   I'll represent to you is the second amended

24   complaint filed by Mr. Chatman in his federal

MELISSA RODRIGUEZ, PH.D.                        September 13, 2016

Page 68

1    lawsuit.

2              Have you ever seen this document

3    before?

4         A.   (Witness reviews document.)

5              Not to my knowledge.

6         Q.   Turning to Page 12, paragraph 56,

7    it's alleged in that paragraph that Detective

8    Kato used physical coercion to gain

9    Mr. Chatman's confession, correct?

10        A.   Correct.

11        Q.   *And could you please look at Pages

12   11 through 14 and let me know if there are

13   any allegations that anyone other than

14   Detective Kato used physical force or threats

15   of force against Mr. Chatman.

16        A.   (Witness reviews document.)

17             Okay.  Can you repeat your question.

18                  MS. STALF:  Could you read it

19   back, please.

20

21                  *(Question read.)

22

23        A.   There are not.

24   BY MS. STALF:

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 69

 1       Q.    Okay.  You can set that aside.  We
 2   don't need that one anymore.
 3           Looking at Page 4 of your report, in
 4   the second paragraph, just after footnote 12
 5   and before footnote 13, you reference a 2010
 6   American Psychology Law Society white paper,
 7   correct?
 8       A.    Correct.
 9       Q.    And because I have no idea, what is a
10   white paper?
11       A.    A white paper is a paper that is
12   written at a time where the body of
13   literature on a particular topic is
14   sufficiently well established and generally
15   accepted to merit, essentially, an official
16   statement, an official treatise, of the state
17   of the knowledge of the field.
18       Q.    And who is this body of information
19   that you reference in your report generally
20   accepted by?
21       A.    By the relevant scientific community,
22   in this case, the social science community,
23   that studies interrogation-related issues.
24       Q.    Were any of the viewpoints of

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

1    individuals critical of that body of

2    scientific research considered in the white

3    paper?

4        A.   I don't know what individuals you

5    would be referring to.

6        Q.   You don't know anyone who's critical

7    of the type of research that you perform?

8        A.   I know of people -- certainly, people

9    who I wouldn't consider are a part of the

10   relevant scientific community that are

11   critical of the research.

12       Q.   And who would that be?

13       A.   Well, there's Paul Cassell, who

14   critiques some of the research.  I don't know

15   specifically my research necessarily.

16           There are others that may be

17   critical, but they are generally not

18   considered part of the scientific community.

19   They don't have Ph.D.s.  They don't have

20   training in social science methodology.  So

21   they're not particularly equipped to be

22   critiquing methodology in the underlying

23   science.

24       Q.   What -- who do you consider to be

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 71

 1    part of the relevant scientific community?

 2        A.    Certainly, people who have a Ph.D. in

 3    social science, so psychology or a closely

 4    related field; who have training in social

 5    science methodology; and those who study in

 6    this general area of influence, persuasion,

 7    interrogations, confessions, decision-making,

 8    memory.

 9        Q.    Have you ever had any manuscripts or

10    other publications on false confession-type

11    issues rejected for publication?

12        A.    No.   There's one manuscript that had

13    nothing to do with confessions or

14    interrogations that we got a revise and

15    resubmit, and we never did.

16            So I wouldn't say that was rejected,

17    but it was not related to interrogations and

18    confessions.

19            Other than that, no.

20        Q.    Have any of your manuscripts on false

21    confession-type issues been written but not

22    been published for any other reasons?

23        A.    No, not to my knowledge.

24        Q.    And all the publications that you've

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 72

1    listed on Pages 37 through 43, you've read

2    all of those at one point, correct?

3        A.    Are you talking about from my CV?

4        Q.    Yes, from --

5        A.    Oh, from the report?

6        Q.    -- your report, yeah.

7        A.    (Witness reviews document.)

8              I've read all of them in their

9    entirety or in sections at some point or

10   another, yes.

11       Q.    And you're generally familiar with

12   the content of those authorities, correct?

13       A.    Yes.

14       Q.    Would you consider all of those

15   sources that you've listed to be

16   authoritative texts in your field?

17       A.    Well, when you say "authoritative

18   text," I generally think of that as an

19   accumulation of knowledge, so a book or a --

20   some sort of review chapter.

21             So I -- I don't know that I would

22   refer to individual studies as authoritative

23   texts.

24       Q.    Do you have any opinions that you

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 73

 1    rendered in this case that aren't contained

 2    in your report?

 3         A.    No, I don't believe so.

 4         Q.    Would you agree that the conviction

 5    and punishment of guilty people is an

 6    important societal goal?

 7         A.    Absolutely.

 8         Q.    And would you agree that the

 9    conviction and punishment of rapists is an

10    important societal goal?

11         A.    Yes.

12         Q.    Would you agree that obtaining

13    confessions from guilty people is a necessary

14    and desirable outcome of a criminal

15    investigation?

16         A.    I would agree that -- I agree with

17    that, and probably not every player in the

18    criminal justice system would agree with

19    that, perhaps not defense attorneys, but I

20    would agree that it is a desirable goal.

21         Q.    Would you agree that the presence of

22    a confession from a guilty person reduces the

23    chances that the guilty person will beat

24    their criminal charges and be free?

MELISSA RODRIGUEZ, PH.D.                          September 13, 2016

1      A.    I would agree that a confession from

2    a guilty person would very likely lead to a

3    conviction, whether through a plea bargain or

4    at trial.

5      Q.    Would you agree that it's often

6    difficult to convince a guilty suspect to

7    tell the truth about his or her involvement

8    in a criminal offense?

9      A.    I don't know that it's all that

10   difficult to convince a guilty person, as

11   evidenced by the fact that interrogations

12   result in confessions in a high percentage of

13   cases.

14          So, the fact that many people confess

15   to their crimes would suggest it's not

16   incredibly difficult.

17     Q.    *Would you agree that it's human

18   nature for a guilty person to have a strong

19   psychological inclination to deny their own

20   involvement in a criminal activity?

21                MR. AINSWORTH:  Object to the

22   form of the question.

23                THE WITNESS:  I still answer

24   when that happens, right?

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 75

 1                    MR. AINSWORTH:  Please do.

 2       A.   Okay.  Human nature -- I do

 3    believe -- can you repeat that?

 4                    MS. STALF:  Can you read it

 5    back, please.

 6

 7                    *(Question read.)

 8

 9       A.   It's against self-interest to confess

10    to a crime, both for guilty and innocent

11    people.  So I would agree with that.

12             I don't know that that's specific to

13    human nature.  But certainly, we -- we have

14    an interest in protecting ourself, and to the

15    extent that it is usually not in your best

16    interest in an interrogation, that it runs

17    counter to that.

18             However, in an interrogation, part of

19    the process is convincing the person that it

20    is in their best interest to confess.

21    BY MS. STALF:

22       Q.   And on that note, would you agree

23    that, generally, suspects have to be given

24    some sort of incentive to admit their

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

1    involvement in a criminal offense?

2        A.    Not necessarily.

3              There's actually some research,

4    particularly out of England, I want to say

5    Ray Bull's lab -- Ray Bull, B-u-l-l -- that

6    suggests that a sizable percentage, maybe a

7    third -- and I would have to go back and

8    double-check that -- of suspects decide prior

9    to the start of an interrogation that they

10   will confess.

11             So it is not always necessary to

12   provide an incentive.

13       Q.    Is it sometimes necessary?

14       A.    I would say that for some people --

15   people who are not inclined to confess

16   freely -- that it is often the case that an

17   incentive is what encourages them to confess.

18       Q.    Assuming that what Mr. Chatman has

19   said about his interrogations is true, do you

20   believe that the police used highly

21   suggestive or persuasive interrogation

22   techniques leading up to his confession?

23       A.    Assuming what he says is true and

24   based on the review of the records, I would

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

1    say that a number of the techniques that the

2    police used are associated with a higher

3    likelihood of a false confession.

4        Q.   Would you agree that highly

5    suggestive or persuasive techniques can be

6    effective at getting guilty people to confess

7    to their involvement in crimes?

8        A.   Yes.

9        Q.   Would you agree that on the whole,

10   guilty people confess to crimes more often

11   than innocent persons?

12       A.   Yes, I would hope so.

13       Q.   Is there any sort of consensus in

14   your field of study as to what types of cases

15   should be considered to be false confession

16   cases for scientific purposes?

17                  MR. AINSWORTH:  Objection to

18   the form of the question.

19       A.   So, are you asking me how do we --

20   how do we -- can you -- can you rephrase?

21   BY MS. STALF:

22       Q.   Sure.

23            Let me ask it a different way.

24            Are there any researchers that -- who

MELISSA RODRIGUEZ, PH.D.                      September 13, 2016

 1   exclude all cases, other than DNA exoneration

 2   cases, from being considered as false

 3   confession cases?

 4       A.   I don't know of any specific

 5   researchers that would take that specific of

 6   an inclusion criteria.  But there might be.

 7   Not that I can think of.

 8       Q.   If it hasn't been established that an

 9   exoneree is factually innocent, do you agree

10   that their case should not be considered a

11   false confession case for scientific

12   purposes?

13       A.   What is the criteria for factually

14   innocent in your question?

15       Q.   Whatever the criteria would be for

16   your -- you to consider the case to be a

17   false confession case.

18       A.   Well, generally, for a case to be

19   considered a proven false confession case, we

20   would look for, for example, it turns out

21   that the crime has never occurred, so that

22   evidence comes to light that the crime had

23   never occurred; or that it was a physical

24   impossibility for the person to have

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 79

1    committed the crime, for example, the person

2    was in prison at the time that the crime

3    occurred; that the -- the true perpetrator

4    was identified; or that they were exonerated,

5    typically through DNA evidence.

6        Q.   Were any of those factors present in

7    the Carl Chatman case?

8        A.   Well, I'm not here to opine on

9    whether it's -- whether the confession was

10   true or false in this case.

11            But it is my understanding that there

12   is some question about whether or not the

13   actual assault occurred.

14            And it's also my understanding that

15   all of the DNA evidence that has been

16   provided in this case or tested, the DNA has

17   excluded Mr. Chatman as the perpetrator, if

18   there was a perpetrator.

19       Q.   *Can you assign a certain percentage

20   to the level of certainty that is necessary

21   to determine whether or not there's factual

22   innocence?

23       A.   Can you repeat that?

24                 MS. STALF:  Can you read it

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 80

1    back, please.

2

3                    *(Question read.)

4

5       A.   I'm not sure I understand the

6    question.  But if you're asking me whether --

7    I don't know what you're asking me.  I'm

8    sorry.

9    BY MS. STALF:

10      Q.   Sure.

11           Well, in your studies, you're looking

12   to examine cases where the exonoree is

13   factually innocent to determine if there's

14   various factors present in their

15   interrogation to determine how, why, if the

16   ultimate confession was somehow coerced,

17   correct?

18      A.   When you say "my studies," do you

19   mean studies that I've personally conducted?

20      Q.   Both, what you've conducted and

21   what's been conducted in what you've

22   identified as your community of scientific

23   researchers.

24      A.   Okay.  So there are -- there are case

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 81

1    studies of proven false confession cases

2    where we examine those -- other researchers,

3    not myself, this isn't the type of research I

4    generally do -- but other researchers have

5    examined what false confession -- what these

6    false confession cases look like, factors

7    that were present.  And that -- usually that

8    body of literature helps to feed into other

9    scientific studies.

10           So, for example, we might find in the

11   Drizin & Leo study of 125 documented false

12   confession cases, they found that, for

13   example, approximately 22 percent of the

14   false confessors fell in the mental

15   retardation range.

16           So that tells us something, right?

17   That they are -- that people with mental

18   retardation are over-represented in these

19   false confession cases.

20           And we can then turn to other bodies

21   of research other than literature to

22   understand why that might be the case and

23   also to investigate that further, using other

24   methodologies.

MELISSA RODRIGUEZ, PH.D.                          September 13, 2016

Page 82

```
 1      Q.   For those studies that you've

 2  identified, with what level of certainty does

 3  it need to be proven that the confession was

 4  false?

 5      A.   I don't know that that's a quantified

 6  statement.

 7           So as I said, the four criteria that

 8  are generally used to determine whether

 9  something's a proven false confession is

10  that, one, it's determined the crime had

11  never occurred; two, it's a physical

12  impossibility that the person could have

13  committed the crime; three, the true

14  perpetrator was identified; or four, the

15  person was excluded, usually via DNA

16  evidence.

17      Q.   In your opinion, should every case

18  that involves a false confession where there

19  has been an acquittal be considered a false

20  confession for research purposes?

21      A.   Every case where there was an alleged

22  false confession that resulted in an

23  acquittal?

24      Q.   Yes.
```

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 83

1      A.    I would not consider an acquittal

2   necessarily indicative of those four

3   criteria.

4           So, no, I would need to know more.

5      Q.    Do you believe that every case where

6   there's a -- where a confession is suppressed

7   prior to trial, the case should be considered

8   a false confession?

9      A.    Confessions get suppressed for many

10  reasons.  It might not have anything to do

11  with reliability.

12     Q.    And the suppression or an acquittal

13  can be based on a number of things that are

14  not related to factual innocence, correct?

15     A.    Yes.

16     Q.    Is there any way to determine the

17  frequency with which false confessions occur?

18     A.    No, no one knows for sure what

19  percentage of confessions are false versus

20  true.  It's impossible to know that.

21          But we can make some estimates and we

22  can look -- for example, we can survey

23  law enforcement, and when we ask them what

24  percentage of innocent people confess in your

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 84

1    experience, in one study, investigators

2    report that approximately 5 percent of

3    innocent people confess.

4              But that gets at the issue.  But no,

5    we can't get a definitive determination.

6       Q.   Would you agree that setting any

7    percentage on the frequency of false

8    confessions in society at large would be

9    based on speculation?

10      A.   It would be based on unknowable data.

11   We don't track it.

12             But, frankly, the fact that we don't

13   know the specific percentage of false versus

14   true confessions doesn't change the

15   underlying factors associated with false

16   confession.

17      Q.   Are you aware of any authorities

18   within your field that have compared the

19   frequency of claims of false confession

20   versus verified false confessions?

21      A.   Claims of false confessions versus --

22   do you mean the -- can you re- -- can you

23   rephrase?

24      Q.   Sure.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 85

 1          A lot of people say that they've

 2     confessed falsely, correct?

 3          A.    Sure.

 4          Q.    And are you aware of any studies that

 5     have distinguished a claim of false

 6     confession from a verified false confession?

 7          A.    So I'm aware of studies that make

 8     determinations of whether a confession is

 9     true or false.

10          Q.    Comparing the frequency of just a

11     claimed false confession versus a verified

12     false confession.

13          A.    No, because it's virtually impossible

14     to know.  Nobody tracks that.

15          It would be great if police

16     departments would track and report every

17     single interrogation and the outcome and

18     provide all of their case materials.  That

19     would allow for that analysis, but I think

20     it's unlikely to occur.

21          Q.    As a researcher, would it be helpful

22     for you to know how often there are claims of

23     false confession versus how often there's

24     verified false confessions?

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 86

1      A.   I wouldn't say it would be unhelpful,

2   but it wouldn't change most of the research

3   that I do and the conclusions that I make.

4      Q.   Do you believe that false claims of

5   confession -- false claims of false

6   confession occur with more or less frequency

7   than verified false confessions?

8      A.   I -- I know of no research that would

9   allow me a basis to answer that.

10      Q.   Do you believe that false claims of

11   false confession are societal problem?

12      A.   I don't -- a societal problem?

13          I mean, it's certainly a problem for

14   the -- maybe the criminal justice system,

15   parts of the criminal justice system.

16          I don't know that it's an

17   overarching, pressing problem as much as

18   innocent people being convicted of crimes

19   that they didn't commit because they falsely

20   confessed.

21          I wouldn't put it on that scale of

22   societal problem.

23      Q.   Do you agree that false claims of

24   false confession could potentially free

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 87

1    guilty people?

2        A.   Could it potentially?

3             So if somebody was claiming that they

4    falsely confessed and if that claim of a

5    false confession was believed, could that

6    lead to someone being not convicted at trial?

7        Q.   Yes.

8        A.   It could be, but it's unlikely.  The

9    research would suggest that it's unlikely,

10   because most confessions are believed.

11            So it's very rare that a jury does

12   not convict when a confession is present,

13   because most jurors assume that if you

14   confessed, you did it.  And that's why false

15   confessions also lead to wrongful

16   convictions.

17            Possible?  Yes.

18            Likely?  Not often.

19                 MS. STALF:  Can we take just a

20   two-minute break, off the record.

21                 THE VIDEOGRAPHER:  The time is

22   now 11:15, and we are off the record.

23

24

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 88

```
 1                (Recess taken from 11:15 a.m.

 2                to 11:29 a.m.)

 3

 4                THE VIDEOGRAPHER:  The time is

 5    now 11:29, and we are back on the record.

 6    BY MS. STALF:

 7        Q.   Doctor, turning to Page 7 of your

 8    report, just after footnote 33, in the first

 9    paragraph there, you state, "In fact, Reid

10    and colleagues are correct in their

11    assumption that certain themes communicate

12    information to suspects about their likely

13    treatment within the criminal justice system.

14    Research supports the notion that certain

15    common minimization tactics are the

16    functional equivalent of direct promises of

17    leniency."

18            Could you just describe briefly what

19    a minimization tactic is, in your opinion, as

20    you define it?

21        A.   Sure.

22            So minimization tactics are tactics

23    that -- it's a constellation of tactics, so

24    it's an umbrella term -- that include tactics
```

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

1    that downplay the seriousness of the offense

2    and typically imply leniency.

3          So they tend to lull the suspect into

4    a false sense of security.

5          It's -- it includes things like

6    providing face-saving excuses, and many of

7    them, as you just read, imply leniency,

8    although there may not be an explicit offer

9    of leniency.

10    Q.   Can you give any specific examples of

11    a minimization tactic being used where it is

12    the functional equivalent of a direct promise

13    of leniency?

14    A.   Sure.

15          Most face-saving excuses, for

16    example, so, blaming the victim, blaming a

17    co-conspirator, downplaying the seriousness

18    of the offense by suggesting, for example,

19    that it was not that big a deal or that the

20    offense was common.  All of those would be

21    tactics that communicate -- that there's an

22    implied communication of leniency.

23    Q.   Can you cite to any specific cases

24    where it was demonstrated that a minimization

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

 1   tactic was the cause, in fact, of a false

 2   confession?

 3        A.   Are you talking about real-world

 4   cases?

 5        Q.   Yes.

 6        A.   Well, in any given case, you can't

 7   say that it's one specific thing that caused

 8   the false confession.  But certainly, there

 9   are cases in which -- that minimization

10   tactics are used and are present in false

11   confession cases.

12        Q.   And similarly, are there cases where

13   minimization tactics are present as one of

14   the factors that leads to a true confession?

15        A.   Yes.

16        Q.   And the next part of that sentence on

17   Page 7, after footnote 33, you state that

18   "Certain common maximization tactics are the

19   functional equivalent of direct threats of

20   harsher punishment."

21             Can you give examples of maximization

22   tactics being the functional equivalents of

23   direct threats of harsher punish?

24        A.   Sure.  When you exaggerate the

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 91

1   seriousness of the offense, when you

2   exaggerate the potential consequences of the

3   offense.  Those would be examples of that.

4        Q.   And can you cite to any real-life

5   cases where maximization tactics were used to

6   gain a false confession?

7        A.   Well, again, I would refer back to

8   the same answer where you can't say

9   definitively in this particular case, this

10  caused the false confession.  But there are a

11  wealth of examples from real-life cases where

12  maximization techniques are present in false

13  confession cases.

14           For example, another example of a

15  maximization-type technique that can

16  communicate would be the presentation of

17  false evidence.

18           So if you looked at a case like Jeff

19  Deskovic who was convicted of raping and

20  murdering a classmate, in his interrogation,

21  he was told that he failed a polygraph exam,

22  that if -- essentially, if he didn't confess,

23  the punishment would be much worse, but that

24  was implied.  That would be an example of a

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 92

1    real-life false confession case where those

2    were used.

3        Q.    And maximization techniques used in

4    the course of an interrogation can also lead

5    to a true confession correct?

6        A.    They can.

7        Q.    And that sentence goes on to state,

8    "In other words, certain minimization and

9    maximization techniques that manipulate a

10   suspect's perceptions of the consequences of

11   confessing pragmatically imply leniency for

12   confessing and harsher punishment for

13   continued denial."

14          What do you mean by "pragmatically

15   imply leniency"?

16       A.    So pragmatic implication -- I'm

17   sorry.

18          Pragmatic implication is a term we

19   use to describe when we essentially read

20   between the lines.

21          So if I say -- if a police officer

22   says, for example, I really think it's in

23   your best interest to confess, I really think

24   you could help yourself out here by

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 93

1   confessing, the police officer isn't

2   necessarily saying, hey, you're going to be

3   better off, you're going to get a more

4   lenient sentence.  But we read between the

5   lines, and what that communications to

6   suspects is if you cooperate, things are

7   going to go better for you.

8          So it's the phenomenon of reading

9   between the lines, that something that's not

10  explicitly stated but implicitly implied.

11      Q.   And isn't it true that there are

12  cases where a suspect may, indeed, be given

13  some degree of leniency as a result of

14  providing a confession?

15      A.   Whether an actual deal is offered

16  during the confession?  Or do you mean the

17  outcome of their case?

18          I mean, prosecutors -- my

19  understanding of the legal system is

20  prosecutors, obviously, can plea bargain a

21  case in which they offer leniency in exchange

22  for a confession.

23          However, since police officers are

24  not in a position to make that offer, it

MELISSA RODRIGUEZ, PH.D.                          September 13, 2016

Page 94

1   generally wouldn't be happening in the

2   context of a police officer interrogating, or

3   it shouldn't be.

4        Q.   On Page 8 of your report, you mention

5   the Juan Rivera case?

6        A.   Uh-huh.

7        Q.   And you indicate that in the Juan

8   Rivera case, one of the interrogators was

9   someone who was employed by John E. Reid and

10  Associates, correct?

11       A.   Correct.

12       Q.   Are you aware of any other cases

13  where Reid employees were involved in an

14  interrogation that resulted in a false

15  confession?

16       A.   Not that I can think of off the top

17  of my head, where there's been a direct -- a

18  known direct involvement.

19       Q.   On Page 8, you also talk about

20  investigator -- investigative bias or tunnel

21  vision.

22            What is your definition of "tunnel

23  vision"?

24       A.   Tunnel vision or investigator bias,

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 95

 1   in this context, is when police officers

 2   develop a hypothesis, usually that a

 3   particular person is guilty, and they then

 4   process the evidence and the information that

 5   they receive in a way that they tend to focus

 6   more on the information that confirms that

 7   hypothesis and pay less attention to

 8   information that disconfirms that hypothesis.

 9        Q.   Would you agree that tunnel vision is

10   only a risk factor for false confession if

11   investigators have the wrong suspect?

12        A.   Well, nothing could be a risk factor

13   for false confession unless there's actually

14   an innocent person involved in the case.

15        Q.   If there is a guilty person, then you

16   can't get -- by definition, a guilty person

17   can't give a false confession.

18             Did you come across any evidence, in

19   your review of the records in the Carl

20   Chatman case, that there were other suspects

21   that were ignored by investigators?

22        A.   My review of the records would

23   suggest that there's no evidence that police

24   ever seriously considered any other suspects

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 96

1    other than Carl Chatman.

2        Q.   Was there any evidence that there

3    were other potential suspects?

4        A.   Not that I saw in the review of the

5    records.

6        Q.   Would you agree that suspect

7    vulnerabilities could lead to false

8    confession absent any wrongdoing by police?

9        A.   So dispositional characteristics,

10   such as mental retardation and mental

11   illness, are you asking me if those factors

12   alone can cause a false confession?

13       Q.   Any suspect vulnerabilities.

14            You mentioned a number in the course

15   of your report.

16       A.   Well, there is a phenomenon, as I

17   described in my report, of voluntary false

18   confessions.

19            So that's a situation where, absent

20   any pressure from external forces, there are

21   some people who voluntarily falsely confess

22   to something they didn't do, and sometimes

23   the reason for that could be related to

24   individual vulnerabilities.  So a desire for

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 97

1    notoriety, a distortion of reality, perhaps.

2            So it is possible that dispositional

3    factors can lead to a voluntary false

4    confession.

5       Q.   Turning to Page 16 of the report, you

6    mention on this page the existence of a

7    deputy that had been sleeping in the room

8    near where the assault occurred, correct?

9       A.   Yes.

10      Q.   Did you read the transcript of the

11   deposition of Deputy Cokeley?

12      A.   (Witness reviews document.)

13           I don't have it listed, I don't

14   believe, in the materials I reviewed.

15           So if it's not listed, then no, I did

16   not.

17      Q.   Did you read the transcript of the

18   deposition of Detective Thomas McGreal?

19      A.   (Witness reviews document.)

20           It's not on my list of materials

21   reviewed, so I do not believe so.

22      Q.   Do you know if Detective McGreal took

23   any steps to determine what, if anything, the

24   sleeping deputy heard during the sexual

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 98

1   assault?

2       A.   I -- my understanding is that

3   security manager, Mr. Roe, informed Detective

4   Pena, I believe, that there had been a deputy

5   sleeping nearby, and she told Mr. Roe or one

6   of the detectives later told Mr. Roe that

7   there was no need to interview him because

8   they had already had a suspect in custody.

9            That's my understanding of how that

10  occurred.

11      Q.   *Are you aware that Detective McGreal

12  interviewed the sleeping deputy's supervisor?

13      A.   *What's the supervisor's name?

14      Q.   *Burrough Cartrette.

15      A.   I --

16                MR. AINSWORTH:  Did somebody in

17  object in Chicago?

18                MS. BENSINGER:  No, no.

19      A.   I believe in the Querrey memo,

20  perhaps, that I reviewed there was -- at some

21  point, he was -- I'm sorry.  Can you read

22  back the question?

23                MS. STALF:  Can you read it

24  back, please.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 99

1

2                    *(Record read.)

3

4      A.   When -- when was this interview?

5   BY MS. STALF:

6      Q.   Are you aware of Detective McGreal

7   interviewing Burrough Cartrette at any point

8   of the investigation?

9      A.   I'm not sure.  I would have to go

10   back to the -- to the notes.

11      Q.   So you're not aware of the fact that

12   Detective McGreal interviewed Burrough

13   Cartrette on the morning of the sexual

14   assault?

15      A.   I can't remember right now.

16      Q.   Are you aware that, on the day of the

17   sexual assault, Detective McGreal was aware

18   of the fact that the sleeping deputy had not

19   heard anything during the sexual assault?

20      A.   I -- I don't -- I don't remember

21   specifically.

22           It's been almost a year since I

23   reviewed most of these documents, so I would

24   have to go back.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 100

1       Q.    On Page 16, just after footnote 104,

2    it states, "Finally, there's no indication

3    that police or prosecutors seriously

4    investigated Mrs. Ruggio's overall

5    credibility, especially in light of her

6    previous 1979 allegation of sexual assault,

7    which allegedly occurred under startlingly

8    similar circumstances."

9           Do you see that there?

10      A.    I do.

11      Q.    Was there anything in the documents

12   that you reviewed to suggest that

13   investigators were aware of the 1979 rape

14   allegation during their investigation of the

15   Carl Chatman incident in 2002?

16      A.    Yes.

17          In at least one of the depositions, I

18   believe either Detective Roberts or ASA

19   Holmes, they said that they were aware of

20   that allegation.

21      Q.    Is it your opinion that if a sexual

22   assault victim indicates that they had been

23   victimized on a prior occasion that should

24   prompt further investigation by detectives?

MELISSA RODRIGUEZ, PH.D.                          September 13, 2016

Page 101

1      A.    Regarding what?

2      Q.    Regarding their credibility.

3      A.    I don't know that I would say that as

4  a general rule.

5            But given the circumstances of this

6  particular allegation, and the incredibly

7  similar circumstances that it appeared to

8  have occurred under, and the fact that there

9  was so much about the evidence that did not

10  implicate Mr. Chatman at the time, it

11  probably would have been a good idea to at

12  least explore it further.

13      Q.    *What are the startling similar

14  circumstances that you cite to in your

15  report?

16      A.    *My understanding of the previous

17  allegation was that, similar to in this case,

18  Mrs. Riggio said that she had arrived to work

19  early, approximately around the same time I

20  even believe, and she was raped by a

21  stranger, although she knew -- this person

22  she specifically identified, I don't know if

23  by name, but she knew that it was, I believe,

24  a janitor in the building.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

```
 1            But the fact that there was a

 2   stranger rape that occurred forcibly at her

 3   workplace early morning is pretty consistent

 4   and similar.

 5      Q.   *Are you aware of any studies that

 6   discuss the frequency with which sexual

 7   assault victims --

 8                 MS. KILEY:  Krista?  Krista,

 9   I'm sorry.  The witness's answer, we couldn't

10   hear it.  So could that be read back.  It

11   went out, for whatever reason.

12                 MS. STALF:  Sure.

13

14           *(Record read.)

15

16                 MS. KILEY:  Thank you.

17   BY MS. STALF:

18      Q.   Are you aware of any studies that

19   suggest that or that -- I'm sorry.  Read back

20   what I said earlier.

21

22                   *(Question read.)

23

24   BY MS. STALF:
```

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

 1      Q.   ...are sexually assaulted on more

 2   than one occasion?

 3      A.   There very likely may be literature

 4   out there in that area, but that's not a

 5   literature base that I'm familiar with off

 6   the top of my head.

 7           I certainly have the skills and

 8   capability to find that out for you, though.

 9      Q.   Are you aware of any studies that

10   suggest that sexual assault victims are, in

11   fact, highly likely to be sexually assaulted

12   on a subsequent occasion?

13      A.   Again, this isn't my direct

14   literature of expertise, but I would be happy

15   to research that for you if you would like.

16      Q.   Looking at Page 17 of the report,

17   here you go into a review of Mr. Chatman's

18   intelligence and cognitive functioning,

19   correct?

20      A.   Correct.

21      Q.   Is it your opinion that investigators

22   should ignore inculpatory statements made by

23   someone who has a low IQ?

24      A.   Ignore them as in always discard

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 104

1   them?

2        Q.   Yes.

3        A.   That would be silly, so no.

4        Q.   And is it -- was there anything that

5   you saw in the documents that you reviewed to

6   suggest that the detectives were aware that

7   Mr. Chatman had a low IQ at the time that

8   they interrogated him?

9        A.   Yes.

10       Q.   What was that?

11       A.   Can I read from my report?

12       Q.   Sure.

13       A.   So, Mr. Chatman's cognitive

14  impairment is corroborated by several people

15  who interacted with him and who called him

16  slow, including Detective Midona; confused,

17  Ms. Cernick; slow talker, Detective Barbara

18  Midona; and incoherent, Mr. Roe.

19            It would suggest that the people who

20  interacted with him could pick up on the fact

21  that he had cognitive impairments.  So

22  it's -- it would be surprising that anybody

23  who interacted with him that day could not

24  have picked up on that same thing.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

 1      Q.   Is that interpretation dependent on

 2   an assumption that the people who use the

 3   word "slow" were using that to explain some

 4   sort of cognitive impairment?

 5      A.   I think it's a reasonable assumption,

 6   yes.

 7      Q.   And that's an assumption that you've

 8   made in rendering your opinions, correct?

 9      A.   Well, partially.  I mean, that's just

10   supporting what we already know about his

11   intelligence based on his evaluation by

12   Dr. Stone as well as by Dr. Pan.

13      Q.   And the individuals who are cited --

14   who are mentioned in that portion of report,

15   Miss Cernick -- Miss Cernick didn't have any

16   interacted with Mr. Chatman on the day of the

17   sexual assault; isn't that correct?

18      A.   That is correct, to my understanding.

19      Q.   And Miss Neibauer did not have any

20   interactions with Mr. Chatman on the day of

21   the sexual assault either, correct?

22      A.   Yes.  But cognitive impairment is a

23   pretty stable phenomenon.  So the fact that

24   they described him on that Monday, his IQ

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 106

1    probably wouldn't have changed much by the

2    time Friday rolled around or Thursday.

3        Q.    How do you define "cognitive

4    impairment"?

5        A.    Well, in this case, Mr. Chatman's IQ,

6    his overall functioning was a 68 on the full

7    IQ scale.  Mental retardation is defined as

8    below 70.

9            So I don't define it, the -- it's

10   defined by intelligence scales.

11       Q.    *Is there anything in the records

12   that you reviewed that suggests that or

13   explains any particular behaviors that

14   Mr. Chatman engaged in in the course of his

15   interrogations that would lead someone to

16   believe that he was cognitively impaired?

17       A.    Can you repeat that?

18                   MS. STALF:  Would you read it

19   back, please.

20

21                   *(Question read.)

22

23       A.    Well, we don't have an --

24   unfortunately, the interrogation is not

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 107

1    recorded.  So we don't have a full record of

2    what was said.  And if we did have that

3    record, we would be better able to evaluate

4    this particular issue.

5            But one thing that comes to mind is

6    if you look to Mr. Roe's statements about

7    Mr. Chatman's demeanor and during the

8    walk-through, he described him as incoherent

9    and slow.

10           So, yes, I would say that those are

11   indications of his cognitive impairment

12   during that time.

13   BY MS. STALF:

14       Q.   Is someone with an IQ of 68 capable

15   of confessing to a crime?

16       A.   Yes.

17           Mr. Chatman confessed to a crime.  It

18   doesn't mean it's true, but...

19       Q.   Is somebody with an IQ of 68 capable

20   of confessing to a crime that they did, in

21   fact, commit?

22       A.   I would think so, yes.

23       Q.   You read the deposition testimony of

24   Detective Roberts, correct?

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 108

1        A.    Correct.

2        Q.    Was there anything that Detective

3    Roberts indicated in his deposition testimony

4    that suggests that Mr. Chatman displayed

5    symptoms of cognitive impairment during the

6    course of Detective Roberts' interrogation?

7        A.    I would have to go back and reread

8    Detective Roberts' interrogation, but off the

9    top of my head, I can't remember him

10   indicating that he saw signs of cognitive

11   impairment.

12       Q.    Did you read the deposition testimony

13   of Detective Boock?

14       A.    (Witness reviews document.)

15             Yes.

16       Q.    Did Detective Boock testify that

17   there were any particular signs or symptoms

18   that led him to believe that Mr. Chatman was

19   cognitively impaired?

20       A.    Again, I would have to go back and

21   read the details.  It was over a year since

22   I've read those depositions.

23       Q.    Do you recall whether Detective

24   Mischka testified about any signs or symptoms

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 109

1    that led her to believe that Carl Chatman was

2    cognitively impaired?

3        A.   I would have to go back to the

4    record.

5        Q.   And certainly, Mr. Roe wasn't present

6    for any interrogations of Mr. Chatman,

7    correct?

8        A.   He was present for the walk-through.

9    So to the extent that the walk-through was

10   part of the process of interrogation, then

11   you could argue that he was there for that.

12       Q.   *And what information did Mr. Roe

13   provide suggesting that he thought

14   Mr. Chatman was cognitively impaired?

15       A.   I'm going to find that section of my

16   report, if that's okay.

17       Q.   Sure.

18       A.   (Witness reviews document.)

19            I probably should have wrote a

20   shorter report; easier to find.

21            (Witness reviews document.)

22            Okay.  So I'm on Page 13.

23            Can you read back the question so I

24   know what I'm answering?

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

 1

 2                    *(Question read.)

 3

 4       A.    Okay.  So Mr. Roe claimed that -- he

 5   described Mr. Chatman as pretty incoherent,

 6   that Mr. Chatman had to be directed

 7   physically where to go, that he wasn't

 8   walking and taking the lead.

 9   BY MS. STALF:

10       Q.    And is it your assumption, based upon

11   those statements by Mr. Roe, that Mr. Roe

12   believed Chatman was cognitively impaired?

13       A.    Yes.  And in addition to that, he

14   also referred to him previously -- we were

15   talking about it -- I believe he described

16   him as -- right, incoherent, yes.

17       Q.    And in your opinion, is coherent

18   synonymous with cognitively impaired?

19       A.    It's a symptom of cognitively

20   impaired, like looseness of association and

21   flights of thought.

22       Q.    Can incoherence be a symptom of

23   anything other than cognitive impairment?

24       A.    Sleep deprivation.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

1       Q.    Anything else?

2       A.    Sure.   Not that we know that it's

3   relevant necessarily to this case, but

4   somebody who is, for example, intoxicated is

5   often incoherent.   There's no evidence that

6   Mr. Chatman was intoxicated at the time of

7   the walk-through, however.

8       Q.    In your review of the records, were

9   you provided with any information about

10  Mr. Chatman's criminal record prior to his

11  arrest for the sexual assault of Miss Riggio?

12      A.    I can't remember.

13      Q.    Do you know if Mr. Chatman had ever

14  been read his Miranda rights prior to being

15  read his rights in conjunction with the Carl

16  Chatman case?

17      A.    Again, I would have to go back to the

18  record.

19            I feel like I -- I may remember that

20  he had been arrested previously, and had he

21  been arrested previously, I would assume that

22  he had been Mirandized at some point

23  previously, but I would have to go back.

24      Q.    Would you agree that a low IQ would

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

1   make someone more likely to falsely confess

2   of a crime based upon the naivety that comes

3   with having a low IQ?

4       A.   Absent any other external factors?

5       Q.   Yes.

6       A.   Well, in most of the research on how

7   IQ is related to false confessions, what we

8   see is the relationship, because there is a

9   higher level of suggestibility, they're more

10  likely to weigh short-term consequences more

11  than long-term consequences.  So this is part

12  of a decision-making process that almost

13  always comes in the context of an

14  interrogation where there is external forces

15  at play, situational forces at play.

16          I don't know of many studies or many

17  cases in which a cognitively impaired person,

18  absent any other pressure, falsely confessed.

19          Mental illness perhaps, but not

20  cognitive impairment.

21      Q.   *Would you agree that the presence of

22  a low IQ alone would not impair somebody's

23  ability to knowingly waive Miranda rights?

24      A.   I'm sorry.  Can you repeat that.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 113

1                    MS. STALF:  Could you read it
2    back, please?
3
4                    *(Question read.)
5
6        A.   It would absolutely impair their
7    ability.  There's plenty of research
8    indicating that Miranda comprehension, among
9    the cognitively impaired, is problematic.
10   BY MS. STALF:
11       Q.   Did you read the deposition
12   transcript of Janine Bostic?
13       A.   (Witness reviews document.)
14            It's not on my list of materials.  So
15   I don't believe so.
16            Can you remind me how she's related
17   to the case.  The name is certainly familiar.
18       Q.   Janine Bostic interviewed
19   Mr. Chatman's mother and sister in the course
20   of analyzing Mr. Chatman to determine if he
21   was fit to stand trial.
22       A.   Okay.  No, I don't believe I read her
23   deposition.
24       Q.   And are you aware of the fact that

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

 1   Mr. Chatman's mother and sister told Miss

 2   Bostic that Mr. Chatman would have no problem

 3   understanding and knowingly waiving his

 4   Miranda rights?

 5        A.   I don't know that I came across that

 6   information.

 7             But my reaction to that is they're in

 8   no position to evaluate Miranda

 9   comprehension, because, A, most -- there's

10   plenty of research that suggests even people

11   with ordinary intelligence have trouble

12   comprehending Miriam -- comprehending their

13   Miranda rights.

14             So their evaluation of whether he

15   could understand his Miranda rights, I would

16   question their own ability to do that.

17             How would they know that?

18        Q.   So as laypeople, it would be

19   difficult for them to identify what or what

20   not Mr. Chatman was capable of understanding,

21   correct?

22        A.   I would suggest that they don't have

23   any particular -- well, you know what, I

24   don't know if they are familiar with the

MELISSA RODRIGUEZ, PH.D.                        September 13, 2016

 1    literature on people with cognitive

 2    impairments, understanding of Miranda.

 3              It's possible that they are familiar

 4    with that literature, but I don't think the

 5    average layperson is.

 6              Police officers, on the other hand,

 7    should be.

 8       Q.    On Page 19 of your report, in the

 9    second paragraph that begins with "Like

10    cognitive impairment," you indicate in the

11    second sentence that "Offenders with mental

12    illness self-report than (sic) they have

13    falsely confessed in their lifetime at nearly

14    double the rate of offenders without mental

15    illness."

16              Is that correct?

17       A.    Yes.

18       Q.    And in the study that you cite to

19    there, was there any analysis of the types of

20    mental illness that the self-reporting

21    suspects were suffering from?

22       A.    There may have been.  And if you have

23    a copy of the study, I would be happy to look

24    it up.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 116

1       Q.    I do not.

2             Does the study take any steps to

3    determine whether the self-reported false

4    confession was, indeed, a false confession in

5    each of these instances?

6       A.    I would want to view the particulars

7    of the study, but typically, not in these

8    type of self-report studies.

9             In these type of self-report studies,

10   you are asking people if they had ever

11   falsely confessed, and you're not determining

12   ground proof, necessarily.  So that's why we

13   use multiple methodologies to study these

14   issues.

15            But the important point is that they

16   self-report falsely confessing at a much

17   higher rate than people with -- without

18   mental illness.

19      Q.    Are you aware of any cases that

20   involve individuals with schizophrenia

21   providing a false confession?  Documented

22   cases.

23      A.    I would -- I am -- it's very likely

24   that in the archives of documented false

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

 1   confession cases that there are people that

 2   have schizophrenia, but I would have to look

 3   that up.

 4           I don't have that knowledge off the

 5   top of my head.

 6           Schizophrenia is one of our more

 7   severe illnesses, however.

 8   Q.   What level of cognitive impairment do

 9   you believe an individual has to be at to be

10   more prone to provide a false confession?

11   A.   We don't -- that's -- with all due

12   respect, that's not the right way to approach

13   this.

14           There is a higher risk of false

15   confession with cognitive impairment.  The

16   more cognitively impaired a person is,

17   certainly you would expect that there's even

18   a higher likelihood of false confession, but

19   it's not an absolute that they've hit this

20   number and, therefore, they falsely confess.

21           In studies of false confession cases,

22   the average IQ of people who falsely confess

23   is 80, which is actually quite a bit higher

24   than Mr. Chatman.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

1              But where that cutoff is, it doesn't

2      work like that.

3              And Mr. Chatman has multiple risk

4      factors here.  It's not just mental

5      impairment.  It's mental illness as well.

6         Q.   Page 20 of your report, you discuss

7      prolonged custody, isolation and

8      interrogation as one of the factors that

9      contributes to false confession, correct?

10        A.   Correct.

11        Q.   In analyzing this case, did you

12     consider whether any of those specific

13     factors actually incentifies Mr. Chatman to

14     give a false confession?

15        A.   In analyzing this case, I noted that

16     there was prolonged custody, isolation and

17     interrogation.  And we know that that is a

18     known risk factor for false confessions.

19        Q.   And in this case, in the evidence

20     that you reviewed, was there anything to

21     suggest that prolonged custody in and of

22     itself motivated Mr. Chatman to give a false

23     confession?

24        A.   Well, again, referring back to it's

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 119

1    not my job to say that this was a false

2    confession or not a false confession.  So, I

3    can't say that X caused Y in this case.

4            But we have multiple risk factors of

5    false confession in this case, and that's one

6    of them.

7        Q.   Did you see any testimony from

8    Mr. Chatman that said, I decided to confess

9    because I was in custody for so long?

10       A.   I'd have to go back and review his

11   testimony during the trial -- I'm sorry --

12   during his deposition and his other

13   statements to know whether or not he

14   specifically cited that.

15           I remember him citing that part of

16   the reason why he falsely confessed is that

17   he felt like no matter what he said, they

18   weren't going to believe him.  He was scared.

19   He didn't want to be physically abused.

20           I don't remember -- I would have to

21   go back and look if he specifically cited how

22   long he had been in custody.

23       Q.   Did he specifically cite that

24   isolation drove him to falsely confess to the

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

1    sexual assault of Miss Riggio?

2         A.    Not that I can remember, but I would

3    have to go back and look.

4         Q.    Did he specifically state that

5    multiple -- the fact that there were multiple

6    interrogators led him to falsely confess?

7         A.    Not that I remember, but I would want

8    to go back and double-check.

9         Q.    Would you agree that when a person is

10   charged with a serious criminal offense, they

11   have a strong psychological incentive to

12   retract a true confession and claim it was

13   false?

14        A.    A strong psychological incentive?

15        Q.    Yes.

16        A.    Is that what you said?

17        Q.    Yes.

18                    MR. AINSWORTH:  Object to the

19   form of the question.

20             You can answer if you can.

21        A.    Can you define what you mean by

22   "psychological incentive"?

23   BY MS. STALF:

24        Q.    Sure.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

 1            For example, could the potential

 2    confinement in prison be a reason that

 3    someone may want to retract a true confession

 4    and claim it was false?

 5        A.    Right.  So the reason I was asking

 6    for clarification, I don't know that I would

 7    call that a psychological incentive.  I would

 8    call it a systematic incentive.

 9            So, you know, retracting a confession

10    which will very likely be used against you,

11    by definition, is not going to be helpful to

12    your case, at least at a trial.

13            So to the extent there may be a

14    systemic incentive, I would agree to that.

15        Q.    Could the suspect's perception that,

16    perhaps, their reputation in the community

17    will be tarnished lead them to retract a true

18    confession?

19        A.    I suppose that's possible.

20            I don't know that I would -- yeah, I

21    suppose that's possible.

22        Q.    Would you agree that someone who's

23    been convicted of a serious crime has

24    incentive to claim that they gave a false

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 122

 1    confession when, in fact, the confession was

 2    true?

 3         A.    They may have incentive.

 4         Q.    What incentives could possibly exist

 5    for that to happen?

 6         A.    I don't know.  I guess I'll turn that

 7    back to you.

 8              What do you have in mind?  I'll tell

 9    you whether I think that's reasonable.

10         Q.    How about money?

11              Is money an incentive for people to

12    act in a particular way?

13         A.    Generally speaking, is money an

14    incentive?  Can money be an incentive for a

15    person to act in any particular way?

16              Sure.

17              I don't know that -- how that's

18    relevant to this situation, so if you could

19    give me an example in the interrogation, the

20    confession context.

21         Q.    Are you aware that Mr. Chatman is

22    seeking financial compensation in his civil

23    suit?

24         A.    Yes.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 123

```
 1        Q.    On Page 20 in your report, you

 2   indicate -- I guess the general proposition

 3   is that prolong periods of custody and

 4   isolation increase the risk of false

 5   confession, correct?

 6        A.    Correct.

 7        Q.    Do prolonged isolation and custody

 8   also lead to false confession in general?

 9        A.    True confessions?

10        Q.    Yes.

11        A.    There's every reason to believe that.

12        Q.    Is there anything unique about

13   physical isolation that would lead to false

14   confession as opposed to a true confession?

15        A.    Well, isolation from -- from a

16   support system, from contact with people

17   other than your interrogators leads to -- it

18   deprives people of their fundamental need for

19   affiliation and social support.

20             So the longer that goes on, the more

21   intense the need is to escape the aversive

22   situation.

23             That is certainly true for both

24   guilty and innocent people.
```

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 124

1            But -- yes, that's certainly true for

2    both guilty and innocent people, but we know

3    that most confessions occur in a relatively

4    short time period, whereas, most documented

5    false confessions were prolonged

6    interrogation.

7            So in one study, the average length

8    of false confessions was 16.3 hours, whereas,

9    the average length of -- I'm sorry --

10   interrogations.  The average interrogation of

11   a false confession is 16.1 or .3 hours,

12   whereas, the typical interrogation lasts 1.6

13   hours.

14        Q.   Which study is that?

15        A.   So, the Drizin & Leo documented the

16   average length of a false confession.  And

17   the 1.6 hours for the average interrogation

18   comes from Kassin, et al., the 2007 survey of

19   police officers.

20        Q.   Does the Drizin & Leo study calculate

21   time based on time in custody or time

22   actually being interrogated?

23        A.   It's a good question.

24            I need to go back and look at the

MELISSA RODRIGUEZ, PH.D.                        September 13, 2016

Page 125

1    specifics of how they calculated it.  But

2    isolation -- custody and interrogation go

3    hand in hand.

4            So just because you're not being

5    questioned doesn't mean that the amount of

6    time that you've been in custody, say

7    shackled in a room for seven hours, doesn't

8    factor in and intensify the situation.

9        Q.   Does the Kassin study break down

10   interrogation time as opposed to total time

11   in custody?

12       A.   Again, I would want to go back and

13   ask how specifically they asked the question.

14            I believe they asked it as what is

15   the average length of an interrogation.

16       Q.   Would you agree that it's commonly

17   accepted that criminal suspects are to be

18   interrogated in private places?

19       A.   That is certainly the recommendation,

20   by Reid and associates and many other common

21   interrogation schools.

22       Q.   Are you aware of any recommendation

23   that criminal suspects be interrogated in

24   public places?

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

1       A.   By "public," do you mean parks?

2       Q.   In the presence of someone other than

3    the investigators.

4       A.   Well, certainly, I would imagine

5    defense attorneys would suggest to their

6    clients that they have a lawyer present.

7            There are states that require that

8    juveniles have a parent present or some sort

9    of guardian.

10           And there are -- I believe there are

11   certainly policy recommendations that

12   somebody with mental illness or cognitive

13   impairment should have somebody there as

14   well.

15           Over in England, it is a requirement,

16   I believe, that people with mental illness

17   and cognitive impairment have somebody else

18   present as an advocate.

19      Q.   It's fair to say that you don't know

20   the total time that Mr. Chatman was actually

21   interrogated for, correct?

22      A.   Since we don't have a recording, no

23   one can know for sure exactly how long the

24   questioning portion, the multiple sessions of

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 127

1    questioning lasted.

2        Q.   So it's fair to say that you don't

3    know how long each individual interrogation

4    session lasted, correct?

5        A.   Well, I can only know what I've been

6    able to glean from the police reports as well

7    as testimony from various people.

8        Q.   Have you attempted to piece it

9    together to obtain a total time of

10   interrogation?

11       A.   I've certainly -- in my report, I

12   have a timeline of what seems to have

13   occurred.  I don't know that I've calculated

14   it, but I could quickly calculate what seems

15   to be the amount of time.

16       Q.   What is that?

17       A.   You'll have to give me a few minutes.

18       Q.   Sure, sure.

19       A.   (Witness reviews document.)

20            So, according to Mr. Chatman, after

21   arriving at the Harrison and Kedzie station,

22   he believes he was interrogated for

23   approximately two hours.

24            After he was placed in multiple

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 128

1    lineups, there was another interrogation by

2    Detectives Boock and Mischka.  It -- there

3    isn't a good record on how long that

4    particular interrogation lasted.  So, I would

5    be guessing at how long that was.

6              But based on the timeline, if the

7    lineup started at approximately 12:00, then

8    according to Detective Boock, at 1:30,

9    Mr. Chatman was alone in the room.  So we can

10   speculate and say the interrogation was

11   perhaps 45 minutes.

12             So now we've got two hours, plus 45

13   minutes.

14             Then later, the next documented

15   interrogation occurred around 8:00 or 9:00.

16             ASA Holmes interrogated Mr. Chatman

17   for about 15 to 20 minutes, according to

18   Detective Boock, after that 8:00 to 9:00

19   interrogation by Boock and Mischka.

20             And then we have the interrogation by

21   Detective Roberts starting between 10:00 and

22   10:30.

23             Somewhere in between, Mr. Chatman

24   says that the Chinese-looking police officer

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 129

1    interrogated him.  It's not clear how long

2    that lasted.

3            So it's difficult to piece this

4    together.

5            But then we have the interrogation by

6    Detective Roberts.

7            Then we have the reinterrogation by

8    ASA Holmes, plus the walk-through, plus the

9    interrogations the next morning.

10           I think cumulative questioning time

11   has -- it's -- a good estimate might be 10,

12   12 hours, but that's speculation based on

13   trying to piece all of this together.

14           And I would want to go back really

15   and sit down and do the math more carefully

16   to be sure -- more sure.

17      Q.   On Page 21 of your report at the top

18   of the page, you indicate, "It was clear to

19   this expert that he experienced custody,

20   isolation and interrogation length that put

21   him well within the danger zone for providing

22   a false confession."

23      A.   Uh-huh.

24      Q.   What is "the danger zone for

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 130

1    providing a false confession"?

2        A.   Well, as I said, in Drizin & Leo's

3    study of proven false confessions, the

4    average length was 16.3 hours with

5    approximately 70-plus percentage of the

6    interrogations lasting more than 6 hours.

7             The average interrogation of --

8    interrogations in general last less than two

9    hours, so between 30 minutes and two hours.

10            Pete Blair, who is a former Reid

11   interrogator, believes that any interrogation

12   lasting over six hours is de facto coercive.

13            Reid themselves indicate that there

14   should be concern about any interrogation

15   that lasts over four hours.

16            So there's no question in my mind

17   that we've got a situation here of prolonged

18   custody and interrogation that increases the

19   likelihood that a suspect would falsely

20   confess, particularly given his

21   vulnerabilities.

22       Q.   On that same page, you discuss sleep

23   deprivation as a risk factor for false

24   confession, correct?

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 131

1        A.    Yes.

2        Q.    Is there anything unique about sleep

3   deprivation that leads to false confession as

4   opposed to confession in general?

5        A.    Sleep deprivation could likely

6   contribute to a true confession as well as a

7   false confession.

8              One added potential factor is that

9   sleep deprivation leads to confusion.  So to

10  the extent there are documented false

11  confession cases where people start to

12  believe that they committed the crime, they

13  start to doubt their own innocence even

14  though they are innocent, you might expect

15  that to be associated with sleep deprivation,

16  whereas, that confusion would not be present

17  in a true confession because in that case,

18  they would have actually committed the

19  crime.

20       Q.    In reviewing the materials in this

21  case, were you able to piece together how

22  much time Chatman slept while he was in

23  custody?

24       A.    Based on the record, it would suggest

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 132

1    that Chatman slept for approximately four to

2    five hours.

3        Q.   When did that -- when did those four

4    to five hours of sleep occur?

5        A.   Based on the record, somewhere

6    between the time of 4:30 and 9:30 a.m. on

7    May 25th.

8        Q.   Did you read the transcripts of the

9    deposition of Carl Chatman in this case?

10       A.   I did.

11       Q.   Did you read both transcripts, as he

12   gave depositions on two different dates?

13       A.   I did.

14                 MS. STALF:  Let's go off for

15   one minute, please.

16                 THE VIDEOGRAPHER:  The time is

17   now 12:24, and we are off the record.

18

19                 (Recess taken from 12:24 p.m.

20                 to 12:37 p.m.)

21

22                 THE VIDEOGRAPHER:  The time is

23   now 12:37, and we are back on the record.

24

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 133

```
 1   BY MS. STALF:

 2       Q.   Doctor, are you aware of any studies

 3   that specifically sought to determine how

 4   much sleep deprivation was necessary in order

 5   for sleep deprivation to be a factor in

 6   giving a false confession?

 7       A.   Well, much like my answer to when we

 8   were discussing what level of cognitive

 9   impairment, it doesn't really -- we don't

10   quantify it like that.

11           So we know that sleep deprivation is

12   associated with a host of impaired

13   functioning.  And the longer the sleep

14   deprivation, the more impairment you would

15   expect to see.

16       Q.   How would you define "sleep

17   deprivation"?

18       A.   I would define "sleep deprivation" as

19   not -- not receiving the amount of sleep

20   necessary to start experiencing the effects

21   of lack of sleep.

22       Q.   Can the amount of sleep necessary

23   vary from individual to individual?

24       A.   Yes.
```

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 134

1        Q.    Do you know anything about
2    Mr. Chatman's regular sleep habits around the
3    time of the interrogation?
4        A.    I do not.
5        Q.    Do you know if Mr. Chatman typically
6    got most of his hours of sleep during the day
7    as opposed to at night?
8        A.    I'm not aware of any information in
9    the records that would give me insight into
10   that, other than the fact that he reported
11   sleeping at Missions at night.  But there was
12   some suggestion that that was a regular
13   occurrence, and so I would imagine that is
14   when he would be most likely to sleep.
15       Q.    Is there anything specifically in the
16   records that led you to conclude that sleep
17   deprivation led to Mr. Chatman falsely
18   confessing?
19       A.    Well, in the record, there is
20   evidence that he -- that sleep deprivation
21   was at play here, because he only slept for
22   that period that we discussed, that
23   potentially four to five hours, and he was up
24   until 4:30 in the morning.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 135

1          So I noted that there is a presence

2     of the risk factor of sleep deprivation, and

3     that's associated with a higher likelihood of

4     false confession.

5     Q.   If Mr. Chatman testified that he was

6     able to sleep on 5/24 while in custody in

7     addition to sleeping on 5/25 while in

8     custody, would that potentially change your

9     opinions about sleep deprivation being a

10    factor in Mr. Chatman's confession?

11    A.   I would certainly want to see that

12    information, and I would want to know more

13    about how long he had slept and also the

14    conditions in which he had slept.

15         So, as we all know, quality of sleep

16    can differ quite dramatically.

17         So if he was sleeping, for example,

18    shackled, trying to sleep sitting up, I don't

19    know that that would be quality sleep.

20         And so, you would need to know a lot

21    more about the conditions.

22    Q.   Turning to your opinions on Pages 21

23    through 23 that focus on physical discomfort

24    specifically.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

 1      A.    Uh-huh.

 2      Q.    Are you aware of any studies that

 3   analyze the relationship between physical

 4   discomfort and false confession?

 5      A.    Well, we -- physical discomfort or

 6   physical abuse?

 7            Are you making a distinction?

 8      Q.    Yes.  I mean, in -- let me clarify.

 9            It appears in your report that you

10   make a distinction between physical abuse and

11   physical discomfort; is that correct?

12      A.    Right.  So, I make the distinction

13   that it would appear that Mr. Chatman was

14   shackled for long periods of time in the

15   interrogation room, and I wouldn't -- I'm

16   making a distinction between that and the

17   physical abuse that Mr. Chatman says he

18   suffered.

19            Some might say that being shackled

20   for long periods of time is a form of

21   physical abuse.

22            Albert Graves (phonetic) might

23   suggest that, so shackling of detainees, for

24   example, to cause physical discomfort.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

1              So, I did make a distinction in my

2     report to discuss those things separately,

3     but some would argue that they're not

4     necessarily as clearly distinct all the

5     time.

6          Q.   Going back to my initial question,

7     are you aware of any studies that

8     specifically study the relationship between

9     physical discomfort and false confession?

10         A.   Well, depending -- well, let me

11    answer it this way:  we don't have laboratory

12    studies where we inflict pain on people and

13    then look to see, for example, in the

14    paradigm I was discussing, we don't use that

15    to then associate it with true or false

16    confessions.

17             But we have plenty of reason to

18    believe that there is a relationship between

19    false confessions and physical pain and

20    discomfort.

21             People who have been tortured

22    routinely report that that is the reason why

23    they falsely confessed.

24             So if you look at studies, case

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 138

1   analyses and case studies of cases like that,

2   it would reveal an association between

3   physical discomfort, pain and false

4   confession.

5        Q.   Do those studies specifically look

6   into instances of acute pain as opposed to

7   chronic pain?

8        A.   Studies of -- on -- well, as I said,

9   I was referencing cases where people say

10  that they've been subjected to pain.

11            So, it's not a laboratory study where

12  we vary the amount of pain.

13            There are studies that look at

14  discomfort but not necessarily specific to

15  false confessions.  But we don't

16  experimentally manipulate, we don't

17  experimentally physically abuse participants

18  in the laboratory, because that would be

19  unethical.

20            But the courts have recognized that

21  physical discomfort and pain is -- should be

22  a concern when it comes -- not only

23  voluntariness, but the reliability of a

24  confession.

MELISSA RODRIGUEZ, PH.D.                        September 13, 2016

Page 139

1      Q.    And what specific facts do you rely

2  on for your conclusion that Mr. Chatman

3  experienced discomfort?

4      A.    Well, assuming that what Mr. Chatman

5  says is true, that he was physically

6  assaulted by a Chinese-looking police

7  officer, he said he was struck with a blow to

8  the head, and that that allegation is

9  supported by the OPS report, the anonymous

10 detective, that is what I am relying on that

11 he was in physical pain and physical

12 discomfort, those two things together.

13          In addition to that, there are

14 reports by the police officers to indicate

15 that he was shackled for long periods of

16 time.  And I'm using, in part, common sense

17 that being shackled for long periods of time

18 would most likely lead to physical discomfort

19 over time.

20     Q.    Focusing in specifically on the

21 alleged physical abuse and threats of harm,

22 what's your understanding of the specific

23 physical abuse that Mr. Chatman

24 experienced?

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 140

1       A.   My understanding of the physical

2   abuse is that he was hit very hard on the

3   side of his head.  He reported that it was so

4   hard that he went numb.

5            The OPS description of that -- of

6   that blow was that it was so severe that the

7   complaining officer, the anonymous detective,

8   said he thought it would kill him for sure,

9   indicating it was a severe blow.

10           And my -- I think that answers your

11  question.

12      Q.   Yes.  In your anonymous -- oh, in

13  your anonymous.  Strike that.

14           In your review of the materials in

15  this case, did you review the anonymous

16  memorandum that was submitted to OPS?

17      A.   I did.

18      Q.   Did you note inconsistencies between

19  the anonymous detective officer's account of

20  the interaction between the Chinese detective

21  and Chatman and the account that Chatman

22  described?

23      A.   I read both accounts, and there are

24  certainly slight variations, I would say, in

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 141

```
 1    the way that they were described, but it was

 2    clear to me that they were -- it seemed clear

 3    to me that they were reporting on the same

 4    incident.

 5        Q.   Mr. Chatman testified that he was hit

 6    one time, correct?

 7        A.   Correct.

 8        Q.   And the anonymous memo reported that

 9    Mr. Chatman was hit multiple times,

10    correct?

11        A.   I would have to go back and

12    double-check.

13        Q.   If the anonymous memorandum was

14    reported that Mr. Chatman was hit multiple

15    times, would you say that that's a slight

16    variation?

17        A.   I would say it's a variation.  I

18    don't know that I would quantify it.

19             But if Mr. Chatman was hit so hard

20    that he went numb briefly from the blow and

21    that it was such a severe blow that the

22    person describing it would describe it as

23    thinking it would kill him, it's possible

24    that that may have led to difficulty in
```

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 142

1    remembering and describing the event.

2        Q.   Is there anything to suggest that

3    Mr. Chatman had difficulty describing the

4    event?

5        A.   In that -- well, Mr. Chatman has

6    cognitive impairment and mental illness.

7             So, communication in general may be

8    difficult.  But there's no indication that

9    he -- he was very consistent and clear that

10   he had been abused starting from when he was

11   evaluated by Dr. Pan.

12       Q.   And that was consistent with the

13   account of the abuse that he gave to the OPS

14   investigator, correct?

15       A.   What was consistent?

16       Q.   What Chatman told Dr. Pan is

17   consistent with what he told the OPS

18   investigator?

19       A.   To my recollection, generally, yes.

20       Q.   Is there anything that you saw in the

21   records to suggest that Mr. Chatman had

22   difficulty remembering the interaction

23   between himself and the Chinese-looking

24   detective?

MELISSA RODRIGUEZ, PH.D.                          September 13, 2016

```
 1        A.   He indicated in the OPS report that

 2   he thought the officer was referred to as

 3   Kato.  So he -- if you describe that as

 4   difficulty that he wasn't sure what the

 5   officer's name was, perhaps, but other than

 6   that, no.

 7        Q.   Is there anything -- strike that.

 8             Did you consider the anonymous memo

 9   to be a reliable source of information when

10   you were reviewing the materials in this

11   case?

12        A.   I considered it a piece of

13   information that was consistent with what

14   Mr. Chatman had reported.

15        Q.   Did you take it at face value?

16        A.   I take it as it was consistent.  So

17   if this occurred, it's a risk factor for a

18   false confession.

19        Q.   Where there were inconsistencies

20   between Mr. Chatman's account of the

21   interaction with Detective Kato and the

22   anonymous memo's account of the interaction

23   with Detective Kato, which did you adopt as

24   fact for purposes of your evaluation?
```

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 144

```
 1      A.   I didn't see significant differences

 2   between the two reports.

 3           I would describe the differences as

 4   relatively minor because it was clear to me

 5   that they were -- they seemed to be

 6   describing the same incident.

 7           So, what I did was, if you assume as

 8   facts that this occurred, I discussed the

 9   association between physical abuse and the

10   likelihood -- the increased likelihood of a

11   false confession.

12      Q.   Does likelihood of a false confession

13   increase with the intensity or duration of

14   physical abuse that the suspect endures?

15      A.   It seems reasonable to assume that

16   the more intense the physical abuse, the

17   higher the danger zone for a false

18   confession, much like sleep deprivation, the

19   risk of it increases, although, it may level

20   off at some point.

21           So it may be that it increases up to

22   a certain point, and then once you've hit

23   that certain point, it becomes relatively

24   stable.
```

MELISSA RODRIGUEZ, PH.D.                        September 13, 2016

Page 145

1           But that's -- I would suggest at a

2     certain point it doesn't matter how much more

3     intense it gets.  It's hit that point.

4           Q.   Did you see anything in your review

5     of the records in this case that suggested

6     who the anonymous individual was that drafted

7     the memorandum?

8           A.   Other than that it was an anonymous

9     detective who worked, I believe, at the

10    Harrison and Kedzie station, I don't think I

11    saw anything that indicated a name or the

12    identity.

13          It was sent -- my understanding is

14    that it was originally sent in the

15    interoffice mail and that that was reflected

16    on the envelope that it was sent in.  So that

17    gives credence that it was a detective from

18    the -- or somebody from the inside who would

19    have access to interoffice mail.

20          Q.   Did you read the portion of

21    Mr. Chatman's deposition testimony where he

22    indicated that he was alone with the

23    Chinese-looking detective when he was struck?

24          A.   I believe so.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

1      Q.    Did that make you wonder how the

2   anonymous officer/detective observed

3   everything -- anything if the anonymous

4   detective was not in the room at the time

5   that the abuse took place?

6      A.    Well, the fact that Mr. Chatman

7   wasn't aware that somebody else might have

8   been watching does not change the fact that

9   someone may have been watching.

10          I don't know the setup or layout of

11   the interrogation room that Mr. Chatman was

12   in.

13          I don't know if there was a one-way

14   mirror or even more likely that there was an

15   open door in which this occurred.

16      Q.    Were you provided with the transcript

17   of the deposition of Mr. Chatman's ex-wife

18   Versie Chatman?

19      A.    I don't believe -- I don't believe

20   so, but let me check first.

21          No.

22      Q.    Are you aware that Versie Chatman was

23   asked if she authored the anonymous

24   memorandum?

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 147

1      A.    Am I aware that she was asked that

2    during a deposition?

3      Q.    Yes.

4      A.    No.

5      Q.    Are you aware that Miss Versie

6    Chatman did not deny writing the anonymous

7    memo when she was asked at her deposition?

8                 MR. AINSWORTH:  Object to the

9    form of the question.

10               You can answer the question.

11     A.    Well, given that I didn't read her

12   deposition, I can't know the particulars of

13   what she was asked.

14   BY MS. STALF:

15     Q.    Well, nobody told you that, did they?

16     A.    That she did not --

17     Q.    That she did not deny drafting the

18   anonymous memorandum.

19     A.    Nobody told me that.

20     Q.    You indicate in your report that

21   Mr. Chatman filed a motion to suppress his

22   confession on the basis that it was procured

23   partially via physical abuse.

24               I'm looking at Page 22, just after

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 148

1    footnote 155.

2              Is that correct?

3        A.    (Witness reviews document.)

4              Yes.

5        Q.    You read the transcript from the

6    suppression hearing in your review of the

7    records in this case, correct?

8        A.    Correct.

9        Q.    *And you're aware that Mr. Chatman's

10   counsel did not actually argue that the

11   confession should be suppressed based upon

12   any allegations of physical abuse, correct?

13       A.    Can you repeat that?

14             MS. STALF:  Could you read it

15   back, please.

16

17                  *(Question read.)

18

19             MR. AINSWORTH:  Object to the

20   form of the question.

21             Mischaracterizes the record.

22             You can answer the question, if you

23   understand it.

24       A.    My understanding is that, in that

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

1    motion to suppress, there was described the

2    physical abuse that Mr. Chatman suffered.

3    BY MS. STALF:

4        Q.   Is it your understanding that the

5    physical abuse was made a part of the

6    argument during the hearing on that motion?

7        A.   I think, perhaps, you're asking me a

8    legal distinction.  And I'm not a JD, so it's

9    my understanding that the discussion of the

10   physical abuse was in the motion to suppress.

11           And so, I've characterized that as

12   filing a motion to suppress on -- partly on

13   the basis of that.

14           But we may be -- I'm getting a sense

15   that we're talking about a legal distinction

16   that I'm not familiar with.

17       Q.   When you read the transcript from the

18   suppression hearing, did you see

19   Mr. Chatman's counsel argue anything about

20   physical abuse?

21       A.   I would have to go back and actually

22   read the transcript again.

23       Q.   Did you read the transcript of the

24   deposition that Mr. Chatman's criminal

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 150

1    counsel gave in this case?

2            His name is Thomas Brandstrader.

3        A.   I do not believe so, but let me

4    double-check.

5            (Witness reviews document.)

6            No.

7        Q.   Turning to Page 25 of your report,

8    "Interrogation Tactics."

9            Do you believe that it's a proper

10   interrogation technique to confront a suspect

11   with some evidence of his guilt to induce him

12   to confess?

13       A.   It can be, depending on how it's

14   done.

15           And by "proper," do you mean legal,

16   or do you mean -- can you clarify what you

17   mean by "proper"?

18       Q.   Proper in your field.

19       A.   In my field, there are ways to

20   present evidence, to confront evidence

21   with -- of guilt to a suspect that I think

22   can be done well.

23           But there are almost never times -- I

24   would say it is not proper -- it would not be

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

1   proper within my field to confront a suspect

2   with false evidence of their guilt.

3       Q.   Are you claiming that Ms. Riggio's

4   identification of Carl Chatman as her

5   attacker is the false evidence?

6       A.   Well, if you assume that Mr. Chatman

7   is innocent, if you take his certificate of

8   innocence and the exculpatory DNA evidence as

9   evidence of his innocence, then if he's

10  innocent, then it was a false identification.

11          And when that was presented to him as

12  the victim in this case has identified you,

13  then by definition, that would be false

14  evidence, regardless of whether the police

15  officers believed it to be false evidence or

16  not.

17      Q.   What is your understanding of what

18  the certificate of innocence is?

19      A.   My understanding of a certificate of

20  innocence is not only has his conviction been

21  overturned, but the issuing body, which I

22  believe is the State of Illinois -- I could

23  be mistaken about that -- has -- has ruled

24  that he is factually innocent or has made

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 152

 1   some sort of determination of that.

 2        Q.   Is it your belief that there was some

 3   sort of a judicial determination that

 4   Miss Riggio was lying when she identified

 5   Carl Chatman as her attacker?

 6        A.   Was there some sort of what --

 7        Q.   Determination by the court.

 8        A.   My understanding is that the

 9   conviction integrity unit, I believe it's

10   called, when that unit -- when that unit

11   reviewed the case, that they expressed

12   concern about the credibility of

13   Miss Riggio's story.

14        Q.   And do you know what that concern was

15   based upon?

16        A.   I believe it was based upon, one, the

17   evidence that there had been a sleeping

18   deputy and Miss Riggio claimed she had been

19   yelling multiple times during the attack, not

20   only in general, but also specifically, for

21   the deputy.  And there is no evidence -- and

22   he -- the deputy reported that he heard

23   nothing during this violent -- allegedly

24   violent and loud attack.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 153

```
 1              And also, the similarities between
 2    the -- her rape allegations in this case and
 3    the 1979 case.
 4              And I believe there was also
 5    discussion about the fact that she was in
 6    some sort of financial situation.  So, the
 7    implication being that, I understand that she
 8    received a financial settlement in that 1979
 9    case, and I believe that is the case here as
10    well.
11        Q.   Are all of your opinions predicated
12    on the fact that the certificate of innocence
13    was issued to Mr. Chatman?
14        A.   No.
15        Q.   If Mr. Chatman had never been issued
16    the certificate of innocence, would you still
17    come to the conclusion that there were
18    factors present that could have led to a
19    false confession in Mr. Chatman's case?
20        A.   Absolutely.
21        Q.   If the certificate of innocence was
22    never issued, could you have come to the
23    conclusion that there were factors that were
24    present that led Mr. Chatman to give a true
```

MELISSA RODRIGUEZ, PH.D.                          September 13, 2016

Page 154

1    confession?

2         A.   Well, many of the same factors --

3    some of the same factors that are associated

4    with a false confession are also associated

5    with true confessions.  So there's that.

6              But my analysis of this case would

7    be -- would have been exactly the same had he

8    not been granted a certificate of innocence,

9    because what I'm doing is I'm looking at the

10   case and noting what are the potential risk

11   factors for false confession here.

12             And all of those risk factors remain,

13   regardless of whether the certificate of

14   innocence was granted.

15        Q.   *Are any of the factors that you have

16   noted as risk factors for false confession

17   risk factors that are unique to false

18   confession and are never associated with true

19   confessions?

20        A.   One more time.

21                  MS. STALF:  Read it back.

22

23                  *(Question read.)

24

MELISSA RODRIGUEZ, PH.D.                          September 13, 2016

Page 155

1      A.   This is going to get very technical,

2   but -- so if you recall, I talked about

3   minimization and maximization techniques that

4   manipulate a suspect's perception of

5   consequences of confessing.

6           And what we have found is that those

7   techniques that manipulate a suspect's

8   perception of the consequences of confessing

9   are -- lead to a higher -- cause false

10  confessions, and actually decrease the

11  likelihood of true confessions, relative to

12  minimization and maximization techniques that

13  do not manipulate a suspect's perception of

14  the consequences.

15  BY MS. STALF:

16     Q.   So, is it your testimony that

17  minimization and maximization techniques are

18  unique to false confession situations?

19     A.   That's not how I would characterize

20  my testimony.

21          What I would say is that there are

22  certain minimization and maximization

23  techniques, specifically those that

24  manipulate a suspect's perception of

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 156

```
 1   consequences, that are associated with a
 2   higher likelihood of false confession, and in
 3   at least one study, a lower likelihood of
 4   true confessions as compared to minimization
 5   and maximization techniques that do not
 6   manipulate a suspect's perception of
 7   consequences.
 8        Q.   Are any of those certain minimization
 9   and maximization techniques that are
10   associated with a higher risk of false
11   confession present in the Carl Chatman case?
12        A.   That manipulate a suspect's
13   perception of consequences, are they present?
14        Q.   Yes.
15        A.   Yes, based on the record, yes.
16        Q.   Which of those -- which of the
17   certain techniques are present in the Carl
18   Chatman case?
19        A.   Presentation of false evidence.  And
20   Detective Roberts indicates that, although he
21   doesn't remember specifically downplaying the
22   seriousness of the offense, that would be
23   something that he would likely do.
24             So if you assume that that occurred
```

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 157

 1    here, that would be an example of that type

 2    of technique.

 3            There was -- I would have to look up

 4    the specific reference to it.

 5            (Witness reviews document.)

 6            Mr. Chatman indicated in his report

 7    to the -- to OPS that the two people who took

 8    his confession -- so presumably that's

 9    Detective Roberts and ASA Holmes -- were

10    joking around saying that Mr. Chatman was

11    just looking for someone to get my freak on,

12    which would be an example of minimizing the

13    seriousness of the offense, both in the

14    statement and the tone in which it was

15    delivered.

16            That would be an example of a

17    minimization technique that manipulates a

18    suspect's perception of consequences.

19            It's reasonable to believe that

20    somebody who hears that would believe that

21    what he was doing is wasn't that big of a

22    deal, and that communicates leniency.

23    Q.    Do you contend that detectives, at

24    the time of the interrogations, believed that

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 158

1    the positive identification given by

2    Miss Riggio was false evidence?

3        A.   Well, I can't pretend to have a

4    crystal ball into the minds of the police

5    officers at that time.

6            I would be surprised if they believed

7    that it was false evidence.

8            But it doesn't matter, because

9    whether or not they believed it was true or

10   false, the effect on an innocent suspect of

11   having false evidence presented doesn't

12   change.

13           I would like to assume that the

14   police officers in this case would not --

15   well, sometimes police do present false

16   evidence, but I think they -- it's reasonable

17   that they believed at the time that it was a

18   true identification.

19       Q.   So as factors that were considered in

20   the certificate -- in the granting of the

21   certificate of innocence, you cite to the

22   existence of the sleeping deputy,

23   similarities between the 2002 and the 1979

24   sex assaults, and some financial concerns

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 159

1    with Miss Riggio, correct?

2        A.    Correct.

3        Q.    Beyond those, are there any other

4    specific factors that you're aware of that

5    went into the granting of the certificate of

6    innocence?

7        A.    Not that I can remember off the top

8    of my head.  There may have been.

9        Q.    Were there any factors that were

10   considered that showed that Mr. Chatman

11   conclusively did not sexually assault

12   Miss Riggio?

13       A.    Well, my understanding of the DNA

14   evidence that was analyzed is that there was

15   no association at all, found no evidence of

16   Mr. Chatman found on Miss Riggio.

17            And so, there's nothing linking --

18   DNA-wise linking either Miss Riggio to

19   Mr. Chatman or Mr. Chatman to Miss Riggio.

20            So that is consistent with my

21   understanding that everything about those

22   analyses are exculpatory.

23       Q.    Is it your opinion that with every

24   sexual assault, there must be a transfer of

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 160

1    DNA?

2        A.    I'm not a DNA expert.  My

3    understanding is that there does not have to

4    be a transfer.

5            However, in this case, my

6    understanding also is that, you know, there

7    was -- there was semen found on Mr. Chatman's

8    pants and female DNA, but Miss Riggio was

9    excluded from that DNA.

10           There were, I believe -- I believe

11   there was semen -- or there's some DNA

12   evidence that Miss Riggio had had sexual

13   intercourse, but it excluded Mr. Chatman.

14       Q.    And does that tell you definitively

15   that the sexual assault of Miss Riggio by

16   Carl Chatman did not occur?

17       A.    It tells me that there is no forensic

18   evidence supporting it.

19       Q.    On Page 31 of your opinion, the last

20   paragraph begins, "Moreover, this case is one

21   of the most egregious examples of

22   contamination I have ever seen, namely, the

23   walk-through and detailing of the alleged

24   crime at the crime scene itself prior to

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

1    Mr. Chatman's confession being memorialized

2    in writing."

3              is that correct?

4    A.    Correct.

5    Q.    Why do you believe that the

6    walk-through was the most egregious example

7    of contamination you have ever seen?

8    A.    Why is it the most egregious example?

9              Because it is.

10             I have never seen, in any case that

11   I've -- I've personally examined, anything

12   that I would consider worse than that.

13             So, typical sources of contamination

14   might be showing crime scene photographs.  It

15   might be -- it's often leading questions.

16             But in this case, by taking

17   Mr. Chatman to the crime scene, walking --

18   and then having him walk through the alleged

19   crime, there is no way to later determine

20   whether or not what is in the confession

21   statement was based on what he knew because

22   he actually committed the crime or was

23   because he went to the crime scene and saw it

24   for himself.

MELISSA RODRIGUEZ, PH.D.                          September 13, 2016

Page 162

1          So, the fact that he could describe,

2    allegedly, where he slept, we don't know if

3    that's because that's actually where he slept

4    or because that's what he saw at the crime

5    scene.

6          So it makes it -- we can't tell later

7    whether he committed the actual offense or if

8    he's remembering because of the

9    walk-through.

10     Q.   In order to come to the conclusion

11   that the walk-through was an example of

12   contamination, do you have to discredit the

13   testimony by ASA Holmes and Detective Roberts

14   indicating that they decided to go on the

15   walk-through to corroborate Mr. Chatman's

16   statement?

17     A.   No.

18     Q.   Why not?

19     A.   Because the contamination occurs

20   regardless of their motivation for it to

21   happen.

22          Even if Mr. Chatman had committed --

23   assume for a minute that he had committed

24   this offense.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 163

 1          You still wouldn't want to take a

 2   guilty party to a crime scene and walk them

 3   through that crime scene before memorializing

 4   their confession in writing, because even a

 5   guilty person is going to be exposed to

 6   details at that -- at that walk-through.

 7          What you would want to do is take the

 8   confession and get the details.  And then if

 9   you want to corroborate it, I suppose you

10   could take them to the crime scene, but

11   you've already -- you already have a record

12   of what they knew prior to that walk-through.

13          They didn't do that here.

14      Q.   Did you read the portion of Detective

15   Roberts' deposition testimony where he

16   indicated that he had, in fact, had taken a

17   confession from Mr. Chatman before the

18   walk-through?

19      A.   He had taken a verbal confession.

20      Q.   What's the significance of that?

21      A.   What's the significance of a verbal

22   confession?

23      Q.   What's the significance of the fact

24   that the confession was verbal rather than

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 164

1    memorialized in writing?

2        A.   Well, there's no objective record of

3    the confession.

4        Q.   What's the significance of that?

5        A.   What's the significance of having an

6    objective record of something?

7        Q.   Yes.

8        A.   An objective record allows fact

9    finders to go back later and evaluate what

10   was memorialized at that point in time.

11       Q.   Does the absence of an objective

12   record mean that information was fed to

13   Mr. Chatman at the time of the walk-through?

14       A.   The absence of an objective record

15   precludes fact finders from being able to

16   determine the extent to which Mr. Chatman --

17   the details that Mr. Chatman provided in his

18   written confession were known to him because

19   he actually committed the crime versus

20   because his memory was contaminated.

21       Q.   So your conclusion that Mr. Chatman's

22   memory was potentially contaminated during

23   the walk-through is predicated on the fact

24   that there was no written memorialization of

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 165

1    the confession that he gave to Detective

2    Roberts?

3         A.   No.

4              Contamination is the phenomenon when

5    a person is -- in this case, a suspect is

6    exposed to crime-relevant information.  And

7    it doesn't matter whether or not -- the

8    contamination still occurs at the

9    walk-through even if they had an objective

10   record, because you've now exposed them to

11   rich visual and contextual details.

12             What we can't do is rule out that any

13   of the information that Mr. Chatman provided

14   in his written statement was not due to

15   contamination.

16        Q.   If an individual has already

17   confessed and it's a true confession, what's

18   the harm in taking them through the scene of

19   the crime?

20        A.   If they've already provided a written

21   confession?

22        Q.   Yes.

23        A.   Or a verbal confession?

24        Q.   A written confession.

MELISSA RODRIGUEZ, PH.D.                                September 13, 2016

Page 166

  1      A.   Well, you -- if they've already

  2  provided a written confession, a detailed

  3  written confession, where there's an

  4  objective record, from a memory standpoint or

  5  a reliability analysis, I'm not sure that I

  6  have significant concerns about that.

  7           Now, whether there are concerns

  8  regarding police protocol and the law, there

  9  may be, but I'm not typically aware of.

 10      Q.   What if a suspect provides a written

 11  confession and then is taken to the scene of

 12  the crime and is able to provide further

 13  information to detectives?

 14           Is that information somehow

 15  unreliable?

 16      A.   It may or may not be.

 17      Q.   Should the detectives discount that

 18  information because it was given after the

 19  time of the written confession?

 20      A.   I don't know if they should discount

 21  it, but we should always remember that we

 22  don't know if the person knew that because

 23  they were exposed to it at the crime scene or

 24  if they knew it because they actually

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 167

1    remembered it from the event itself.

2         Q.    *What is the harm in a suspect

3    remembering information based upon exposure

4    to the crime scene?

5         A.    *Before or after a confession?

6         Q.    *After.

7         A.    Are we assuming a true confession

8    here?

9         Q.    Let's go true first.

10        A.    I'm going to need the question with

11   the true assumption.

12                    MS. STALF:  Could you read back

13   the question.

14

15                    *(Record read.)

16

17   BY MS. STALF:

18        Q.    So the question is -- could you --

19   what is the harm in a suspect remembering

20   information based upon a walk-through of the

21   crime scene after they've given a true

22   confession?

23        A.    I don't know if there's a harm with

24   respect to -- from a reliability analysis

MELISSA RODRIGUEZ, PH.D.                        September 13, 2016

1    perspective, if it's important to know

2    whether they remembered the information from

3    the event itself, assuming guilt, versus from

4    the walk-through, if -- if that would somehow

5    be important to the case, then the harm would

6    be that it would then be very difficult to

7    know later on whether or not they knew that

8    before or after walking through the crime

9    scene.

10           Given that it's very unusual, at

11   least by Detective Roberts' own admission,

12   that you would ever take a suspect back to a

13   crime scene and walk them through, he had

14   only done it, I believe he testified, in one

15   other case, there may be other -- I would --

16   I would think that there is some other harm

17   to it potentially, because otherwise maybe

18   police would do it more frequently.

19           But that's -- that would be my

20   response to that.

21   BY MS. STALF:

22      Q.   Are you aware of any studies that go

23   about analyzing cases in which police

24   investigators take suspects back to crime

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

1    sense after a confession?

2        A.   To my knowledge, there are no studies

3    directly relevant to that topic.

4             But there are a wealth of basic

5    social -- psychological studies showing that

6    when you expose people to information after

7    some event, for example, another witness's

8    story or crime scene photographs or any other

9    source of information, that that later can

10   affect the person's memory for the actual

11   event.

12                  MS. STALF:  I need to look over

13   my notes, but I may actually be done.

14                  MR. AINSWORTH:  Why don't we

15   stop here for lunch.

16                  MS. STALF:  That sounds good.

17                  MR. AINSWORTH:  Is that okay,

18   Chicago?  Just give a thumbs up.

19                  MR. MICHALIK:  We're good.

20   That would be fine.

21                  MR. AINSWORTH:  Let's go off

22   the record.

23                  THE VIDEOGRAPHER:  The time is

24   now 1:17, and we are off the record.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 170

 1

 2                    (Recess taken from 1:17 p.m.

 3                    to 2:03 p.m.)

 4

 5                    THE VIDEOGRAPHER:  The time is

 6    now 2:03, and we are back on the record.

 7

 8                    CROSS-EXAMINATION

 9    BY MR. MICHALIK:

10       Q.   Doctor, my name is Paul Michalik.  I

11    represent the City of Chicago and the OPS

12    defendants in this matter.

13            I'm going to be skipping around a

14    little bit.  So if I -- if we get lost in

15    translation here, especially because it's by

16    videoconference, please let me know so we can

17    be sure we're on the same page.

18            Okay?

19       A.   Okay.

20       Q.   All right.  First off, I wanted to

21    follow up on something.  It was related to

22    Page 20 of your report regarding the timeline

23    of interrogation that you testified about

24    earlier.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 171

1           Do you recall that testimony?

2      A.   Generally, yes.

3      Q.   Okay.  I think you told us that there

4  was an interrogation by Detectives Boock and

5  Mischka around 8:00 or 9:00 and then followed

6  by an interrogation by Holmes that lasted 15

7  or 20 minutes?

8      A.   Yes.

9      Q.   Is that -- am I correct?

10     A.   Yes.

11     Q.   And then you said Roberts came in at

12  10:00 or 10:30 and conducted an

13  interrogation.

14          Do you recall that testimony?

15     A.   Yes.

16     Q.   Yes.

17          I think we're having communication

18  issues here.

19     Q.   All right.  You also said that in

20  between, a Chinese-looking officer

21  interrogated Mr. Chatman, correct?

22     A.   My understanding of the timeline is

23  that is correct.

24     Q.   And what do you base that on, about

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 172

    1   the Chinese-looking officer interrogating

    2   Mr. Chatman between the times that Holmes

    3   interrogated him and before Detective Roberts

    4   interrogated him?

    5       A.   My understanding of -- that's piecing

    6   together the timeline from various documents.

    7   And based on the information we had of the

    8   various documents, it seemed most likely that

    9   that encounter would have occurred at that

   10   time.

   11            Also, that is the -- that is where

   12   the change was.  So, when Detective -- when

   13   ASA Holmes interrogated and questioned

   14   Mr. Chatman at approximately 10:30,

   15   Mr. Chatman was still maintaining his

   16   innocence.  And it wasn't until Detective

   17   Roberts interviewed him that he made

   18   incriminating statements.

   19            And given that Mr. Chatman says that

   20   the -- the impetus for his incriminating

   21   statements was the abuse by the

   22   Chinese-looking officer, it makes sense that

   23   it would be in that time frame.

   24       Q.   So, in other words, there's no

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 173

1  document that you could point me to that

2  would show when that interrogation occurred,

3  correct?

4      A.   As far as I know, there's no official

5  documentation that police recorded when that

6  encounter occurred.

7      Q.   If it occurred?

8      A.   Yes.

9      Q.   And there's nothing in Mr. Chatman's

10 deposition testimony as to when he said that

11 the interrogation took place with the

12 Chinese-looking officer, correct?

13     A.   I'd have to go back and look.

14          I don't recall specifically if he

15 stated a time frame or before or after the

16 various encounters.

17     Q.   Also, on Page 20, you referred to the

18 line in your report that "At least one

19 retrained former investigator considers any

20 interrogation lasting over six hours

21 coercive."

22          Do you recall that testimony?

23     A.   Yes.

24     Q.   In that study, was the investigator

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 174

 1    talking about a single session of an

 2    interrogation session?

 3        A.   Well, it wasn't a study that was --

 4    so Pete Blair is a former Reid interrogator,

 5    and he wrote an article in which he stated

 6    this; that in his opinion, an interrogation

 7    over six hours is -- should be considered

 8    coercive.

 9             So, you're asking me if he's talking

10    about interrogation or custody versus

11    interrogation?

12        Q.   Yeah.  What I'm asking is, is he

13    talking about a six-hour -- a single

14    interrogation session lasting six hours, or

15    is he talking about a number of interrogation

16    sessions that add up to six hours?

17        A.   I'd have to go back and reread how he

18    specifically worded it.

19        Q.   Is there any evidence of any

20    interrogation session in this case that

21    lasted six hours?

22        A.   Without a break?

23        Q.   Correct.

24        A.   There is no -- nothing in the record

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

1    that would suggest to me that there was a

2    six-hour interrogation without any breaks.

3              However, cumulatively, the effect of

4    the multiple interrogation sessions is

5    noteworthy.

6         Q.   I just want to go through the list of

7    sources that you were provided with as a

8    basis for your opinion and some of the things

9    you did not review.

10             Just so that I'm clear, you did not

11   review the deposition transcript of former

12   assistant state's attorney Tracy Gleason; is

13   that correct?

14        A.   (Witness reviews document.)

15             That is correct.

16        Q.   All right.  You did not review the

17   deposition transcript of Kris Kato this case;

18   is that also correct?

19        A.   That is correct.

20        Q.   Did you review the deposition

21   transcript of Mark Pharr, P-h-a-r-r?

22        A.   No, I did not.

23        Q.   Did you review the transcript of the

24   former assistant state's attorney Robert

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 176

1    Hovey, H-o-v-e-y?

2        A.    No, I did not.

3        Q.    On Page 16 of your report, in the

4    first full paragraph, you refer to

5    Mr. Chatman's alibi in terms of where he

6    spent the night May 23rd.

7              Do you find that part in your report?

8        A.    Yes.

9        Q.    According to your report, "Mr. Mark

10   Pharr, from Pacific Garden Mission, indicated

11   he had not seen Mr. Chatman in months, but he

12   could have entered the building after

13   10:00 p.m. on May 23rd."

14             Did I read that accurately?

15       A.    Yes.

16       Q.    And then you indicate, "There is no

17   indication in the police reports that police

18   took steps to further investigate his

19   alibi."

20             Is that also what you say in your

21   report?

22       A.    Yes.

23       Q.    And according to your report, "The

24   police interpreted Mr. Pharr's statement as

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 177

1    evidence that Mr. Chatman had lied about his

2    whereabouts."

3            Correct?

4    A.    Yes.

5    Q.    So, this particular notation is

6    critical of the police for failing to further

7    investigate Mr. Chatman's alibi; am I

8    interpreting that correctly?

9    A.    I am -- I'm using this as an

10   illustration of the possible tunnel vision

11   that was going on in this particular case.

12   Q.    Okay.  And it's based on what you

13   believe to be the police interpretation of

14   what Mark Pharr told them with respect to

15   Mr. Chatman's alibi?

16   A.    Yes.

17   Q.    But you did not review Mr. Pharr's

18   deposition transcript, correct?

19                MR. AINSWORTH:  Objection.

20   Asked and answered.

21            Go ahead and answer.

22   BY MR. MICHALIK:

23   Q.    All right.  So you don't know what

24   Mark Pharr said about Carl Chatman's alibi at

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 178

1   his deposition, do you?

2       A.   I know what was in -- at his

3   deposition?  No.

4            I know what was in his police

5   reports, what was reported -- that the police

6   reported that.

7       Q.   And that's in the police reports but

8   not in Mr. Pharr's deposition transcript?

9       A.   I have not reviewed his deposition

10  transcript.

11      Q.   Do you hold yourself out to be an

12  expert on police practices?

13      A.   I hold myself out as an expert in

14  police interrogation practices, yes.

15      Q.   All right.  But as to other police

16  practices, you do not; is that accurate?

17      A.   Not on all police practices, no.

18      Q.   Okay.  Is it your opinion that the

19  Chicago Police Department should have

20  videotaped the interrogation of Carl Chatman

21  in May of 2002?

22      A.   I'm sorry.  Was that a question or a

23  statement?

24      Q.   It was a question.

MELISSA RODRIGUEZ, PH.D.                      September 13, 2016

Page 179

 1      A.    Is it my opinion that they should
 2   have videotaped it?
 3            It certainly would have been helpful.
 4      Q.    Do you know what the standard
 5   practice was of police departments in 2002
 6   with respect to videotaping interrogations of
 7   suspects?
 8      A.    I do.  As indicated in my report, at
 9   that time Reid -- Reid, for example, was not
10   recommending video-recording and most
11   departments, a large portion of departments
12   were not recording and were not mandated to
13   record.
14      Q.    Do you know -- do you know whether or
15   not the Chicago Police Department had the
16   capability to videotape suspect's
17   interrogations in 2002?
18      A.    I do not know.
19            It's 2002, so it's possible that they
20   could have either video or audio recorded
21   it.
22      Q.    Is it your understanding that
23   interrogations and confessions of suspects
24   are videotaped today by many police

MELISSA RODRIGUEZ, PH.D.                          September 13, 2016

Page 180

1    departments?

2         A.    By many police departments, yes.

3         Q.    Do you know if that's a standard

4    practice of police departments?

5         A.    It depends on the jurisdiction.  In

6    many places it is now standard practice.

7              For example, here in Rhode Island, it

8    is best practice to video record all

9    custodial interrogations in capital cases.

10             So it depends on where, but yes, many

11   police departments have adopted the

12   requirements.

13             In fact, Reid now supports recording

14   of interrogations.

15        Q.    Is there any study or literature to

16   indicate whether or not the videotaping of

17   interrogations and confessions has eliminated

18   the risk of false confessions?

19        A.    Well, the factors associated with

20   false confessions that occur are not

21   necessarily eliminated.

22             It doesn't necessarily eradicate or

23   eliminate the possibility of a false

24   confession from occurring.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

 1              What it does is make it more likely
 2    that the fact finders can examine an
 3    objective record and identify the possible
 4    issues of concern in that particular
 5    interrogation.
 6              Now, to the extent of that recording
 7    might discourage police from engaging in
 8    illegal tactics, say, for example, abusing a
 9    suspect, to the extent that if they were
10    being recorded that they would be less likely
11    to do that, you would -- you could reasonably
12    argue that that would reduce the likelihood
13    of false confessions due to that.
14        Q.    And my question was, is there -- have
15    there been any studies or literature that
16    support that presumption?
17        A.    The presumption that it reduces the
18    likelihood of false confession?
19        Q.    Correct.
20        A.    I would say there's no direct studies
21    on whether it reduces false confessions, no.
22              I would be curious to see how you
23    would design that study.
24        Q.    If I could direct your attention to

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

1    Page 27 of your report and, specifically,

2    footnote 177.

3        A.    Okay.

4        Q.    Four lines down, you indicate that,

5    "Even witnesses who are not motivated to

6    provide as much detail as possible to police

7    about some event will not remember certain

8    details the first time they tell their

9    story."

10            Do you see that there?

11       A.    Yes.

12       Q.    Okay.   What's the significance of

13   that statement?

14       A.    With respect to why I made it in the

15   report?

16       Q.    Yes.   Why is it in your report?

17       A.    It's in my report because, according

18   to Detective Roberts and ASA Holmes, from the

19   time of the initial incriminating verbal

20   confession that Detective Roberts says that

21   Carl Chatman gave him during his first

22   interrogation with him, all the way through

23   the multiple interrogations, including the

24   walk-through and the next morning through the

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 183

1    written confession statement, there were few,

2    if any, additional details provided by

3    Mr. Chatman, which would be surprising from a

4    human memory perspective.

5        Q.   All right.  So this particular

6    reference here is to the consistency of the

7    statements that were provided by Mr. Chatman

8    to police and the state's attorney?

9        A.   According to them, it was very

10   consistent, right.  He didn't add many

11   details over time, if any, details that were

12   particularly relevant to the interrogation.

13            I believe -- I believe ASA Holmes

14   testified that he added some biographical

15   details, his wife's name perhaps, and -- but

16   not details regarding the alleged incident.

17       Q.   And I guess, then, my question is you

18   would have expected there to be less

19   information provided by Mr. Chatman in his

20   earlier statements in more detail as he

21   remembered things later?

22       A.   I would have expected more details to

23   emerge, yes.

24       Q.   Would the same be true about Susan

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

 1    Riggio and her providing details of what

 2    happened to her to police?

 3        A.    It could be, but it would depend on

 4    the type of details.

 5        Q.    All right.  Is there a different

 6    standard that you would hold Susan Riggio to

 7    as opposed to Carl Chatman in terms of

 8    remembering details?

 9        A.    It's not a different standard.

10              Let me give you an example.

11              Susan Riggio, from my understanding,

12    at the time the initial reports after her --

13    after the alleged assault was that she wasn't

14    sure if she had been penetrated.

15              By the time she testified at trial,

16    she testified that she had been anally

17    penetrated.

18              This is not the type of detail that

19    we would expect to not have been remembered

20    at an initial telling and then at a

21    subsequent telling.

22              There's a difference between

23    remembering central and peripheral details of

24    an event.  And whether or not someone had

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 185

1    been anally penetrated would definitely be

2    considered a central detail.

3           So that would not surprise me -- that

4    would be very surprising that that detail

5    would not have emerged sooner.

6    Q.    *What would your basis be for saying

7    that that -- that anal penetration would be a

8    detail that she would definitely remember?

9    A.    It's a. --

10             MR. AINSWORTH:  Object to --

11   object to the form of the question.

12          It mischaracterizes the witness's

13   statement.

14          Please answer the question.

15             THE WITNESS:  Can you repeat

16   back the question.

17

18                *(Question read.)

19

20   A.    My testimony is that central details

21   are -- to an event -- where we would expect

22   there to be additional details in subsequent

23   retelling would be in more peripheral

24   details.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 186

```
 1            Whether or not somebody had been
 2    anally penetrated I would characterize as a
 3    central detail, that would be unlikely to
 4    fall into the category of a peripheral
 5    detail.
 6    BY MR. MICHALIK:
 7       Q.   Do you have any criticism -- strike
 8    that.
 9            Are there any other instances of
10    central details that Miss Riggio did not
11    provide in her initial statements to the
12    police that you believe she would have?
13       A.   Well, there are a number of examples
14    of details that were not in her original
15    report that she later testified to at trial
16    or during her deposition.
17            The fact that there is some
18    additional detail adding in subsequent
19    retelling is not particularly surprising, but
20    it is informative to look at whether central
21    events, events that were central to the
22    episode, if they were not recalled at the
23    time, that would be -- that would be more
24    surprising.
```

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 187

1          So you really need to have a more

2     nuanced approach to the type of information

3     that is produced in subsequent retellings of

4     a story.

5          In Mr. Chatman's case, it is

6     incredibly surprising that not a single

7     additional detail about the assault would

8     have come up in any of the subsequent

9     retellings, particularly after going through

10    a highly salient context restatement, which

11    we know increases recall of details, and that

12    would have been the walk-through.

13    Q.   Is it your belief that Miss Riggio

14    was not credible in relating the details of

15    events over time?

16    A.   I'm not making an assessment of

17    Miss Riggio's credibility.

18    Q.   All right.  Doctor, I think you told

19    us or you told Miss Stalf earlier on that

20    your opinions in this case are not predicated

21    on the certificate of innocence.

22          Is that correct?

23    A.   They don't -- they wouldn't change if

24    the certificate of innocence were not in

MELISSA RODRIGUEZ, PH.D.                                    September 13, 2016

Page 188

```
 1   place.  But that's a fact that I considered

 2   in forming my opinions.

 3       Q.   You told Miss Stalf that in one of

 4   your opinions, there were certain techniques

 5   that were used by the police and the state's

 6   attorney in this case that presented risk

 7   factors for false confessions, correct?

 8       A.   I believe so, yes.

 9       Q.   All right.  And that's when you were

10   talking about minimization and maximization?

11       A.   We talked about that, yes.

12       Q.   All right.  And one of the things

13   that you identified for us is the

14   presentation of false evidence to a suspect?

15       A.   Correct.

16       Q.   Correct?

17       A.   Yes.

18       Q.   And in this particular case, that

19   false evidence would have been Susan Riggio's

20   identification of Carl Chatman as her

21   assailant, true?

22       A.   Yes, and the tentative identification

23   by Miss Cernick, I believe.

24       Q.   And I think you also told us that
```

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 189

1    your assumption that that was false evidence

2    was that Susan Riggio's identification of

3    Mr. Chatman must have been false because

4    Mr. Chatman was innocent of this crime.

5         A.    Well, if Mr. Chatman is innocent of

6    this crime, if you take the certificate of

7    innocence, if you assume that as fact, and

8    supported by the exculpatory DNA evidence,

9    then an identification by Miss Riggio would,

10   by definition, be a presentation of false

11   evidence.

12        Q.    So then one of the bases for that

13   assumption is the certificate of innocence?

14        A.    If you assume innocence, then it is

15   presentation of false evidence, yes.

16        Q.    So your opinions are predicated on

17   the certificate of innocence, at least in

18   part?

19        A.    My opinion on the effect of false

20   evidence on the likelihood of confession

21   is -- is based on the research.

22             So, we know from multiple sources,

23   multiple studies that the presentation of

24   false evidence increases the likelihood of a

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 190

 1   false confession.

 2            So in this case, assuming a set of

 3   facts that Mr. Chatman is innocent, then if

 4   that occurred, if they presented him with

 5   that false evidence, then that increases the

 6   likelihood of a false confession.

 7       Q.   All right.  On Page 31 of your

 8   report, the first full paragraph, it starts

 9   out by saying, "Given the fact that

10   Mr. Chatman is actually innocent in this

11   case, by definition, any details contained in

12   the confession statement that coincide with

13   known facts or evidence must be a product of

14   contamination."

15            Did I read that accurately?

16       A.   I believe so, yes.

17       Q.   And there you say, "Given the fact

18   that Mr. Chatman is actually innocent."

19            Should that be "assuming the fact

20   that Mr. Chatman is actually innocent"?

21       A.   Assuming that set of facts, then

22   my -- what I'm -- what I'm doing here is

23   explaining the process of contamination and

24   how it must have occurred if you assume the

MELISSA RODRIGUEZ, PH.D.                          September 13, 2016

Page 191

1    set of facts that he is innocent.

2        Q.   Okay.  I guess my question related to

3    the specific language that you used here,

4    which says "Given the fact that Mr. Chatman

5    is actually innocent."

6             So, it should really read "Assuming

7    the fact that Mr. Chatman is actually

8    innocent"?

9        A.   Well --

10       Q.   Is that right?

11                 MR. AINSWORTH:  Object to the

12   form of the question.

13             You can answer.

14       A.   I -- I am assuming a set of facts in

15   this situation, which is that Mr. Chatman is

16   innocent, as a way to explain the reliability

17   analysis at play here.

18   BY MR. MICHALIK:

19       Q.   All right.  Back on Page 14 of your

20   report, the last paragraph at the bottom, and

21   I'll read it:  "As such, the following

22   analysis of Mr. Chatman's interrogation and

23   confession is predicated on Mr. Chatman's

24   actual innocence and the fact that a false

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 192

```
 1    confession was elicited from him which, in

 2    turn, contributed significantly to his

 3    wrongful conviction."

 4           Did I read that accurately?

 5       A.    You did.

 6       Q.    All right.  And again, I thought you

 7    had testified earlier that you were not

 8    offering an opinion as to whether or not

 9    Mr. Chatman provided a false confession in

10    this case, correct?

11       A.    Correct.

12       Q.    And once again, you are assuming a

13    set of facts regarding Mr. Chatman providing

14    a false confession?

15       A.    I assumed that set of facts as part

16    of my analysis for writing this report.

17           But I am not opining, and it is not

18    my job to look at a particular confession and

19    say whether it is true or false.

20       Q.    All right.  On Page 26 of your

21    report, the last paragraph at the bottom of

22    the page, I think it's the third sentence, it

23    says, "In my opinion, given that Mr. Chatman

24    has been declared factually innocent of
```

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

1    raping Mrs. Riggio, Detective Roberts'

2    version of events can only be accurate if

3    Mr. Chatman had been provided all the details

4    about the crime by the investigators who had

5    previously interrogated Mr. Chatman, i.e.,

6    Detectives Boock, Mischka and the

7    Chinese-looking officer."

8         Did I read that correctly?

9    A.   Yes.

10   Q.   And again, it's your -- it's your

11   testimony that that opinion is not predicated

12   on the certificate of innocence, but it

13   assumes certain facts as a basis?

14             MR. AINSWORTH:  Object to the

15   form of the question.

16             Please answer the question.

17   A.   Can you re- -- can you repeat that.

18             MR. MICHALIK:  Yes, let me

19   break that down.  That was a poor question.

20   Russell's right for once.

21   BY MR. MICHALIK:

22   Q.   All right.  It says, "Given the fact

23   that Mr. Chatman has been declared factually

24   innocent of raping Mrs. Riggio."

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 194

```
 1           You are not opining whether or not

 2   Mr. Chatman is innocent, correct?

 3       A.   Correct.

 4       Q.   You are not opining as to whether or

 5   not Mr. Chatman provided a false confession?

 6       A.   Correct.

 7       Q.   Correct?

 8       A.   Correct.

 9       Q.   Are you not opining that Susan Riggio

10   should not be believed or lacks credibility

11   in this case, correct?

12       A.   I'm not making a credibility

13   assessment of Mrs. Riggio.

14       Q.   Just a couple more things.  I think

15   I'm almost finished.

16           Going back to Page 15 of your report,

17   in about the middle of -- actually, the last

18   sentence of the first paragraph of section A,

19   you say, "In this case, there were two

20   fundamental questions:  One, did the assault

21   actually occur, and two, if yes, was

22   Mr. Chatman the actual perpetrator."

23           Do you see that in the report?

24       A.   I do.
```

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 195

1       Q.    Are you offering any opinion as to

2   whether or not the sexual assault actually

3   occurred?

4       A.    No.

5       Q.    Are you offering any opinion as to

6   whether Carl Chatman was the actual

7   perpetrator?

8       A.    No.

9                    MR. MICHALIK:  Thank you,

10  Doctor.

11          That's all I have.

12                    THE WITNESS:  Thanks.

13

14                    CROSS-EXAMINATION

15  BY MS. KILEY:

16      Q.    Hi.  My name's Rachel Kiley.  I

17  represent Susan Riggio.  I just have a few

18  questions for you as well.

19          Following up with respect to your

20  testimony about adding details, I think you

21  stated that it would be surprising to you

22  that Miss Riggio would not know, at the time

23  that she was interrogated by medical

24  professionals and police officers, whether or

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

 1   not she had been anally penetrated; is that

 2   correct?

 3       A.   It's surprising to me that that

 4   detail did not emerge until her trial

 5   testimony.

 6       Q.   *Okay.  And would you agree with me

 7   that, because you're not opining on the

 8   credibility of witnesses, what is surprising

 9   to you does not formulate the basis of any of

10   your opinions?

11                MR. AINSWORTH:  Object to the

12   form of the question.

13       A.   Can you rephrase?

14                MS. KILEY:  Can you read back

15   the question, please.

16

17                *(Question read.)

18

19       A.   I -- the opinions regarding the

20   factors associated with false confession, no.

21            But what I was talking about was

22   general principles of memory.  I believe I

23   was asked a question about whether that is

24   consistent with what I know about memory.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 197

```
 1              And it's surprising to me, based on

 2   what I know about memory, that that would

 3   not -- that that detail would not have

 4   emerged sooner.

 5   BY MS. KILEY:

 6       Q.   What studies have you conducted on

 7   rape victims and what their memories are in

 8   the immediate aftermath of a sexual assault?

 9       A.   I have not conducted any direct

10   studies on rape victims' memories.

11       Q.   Would you agree that you are not a

12   rape expert?

13       A.   I am not a rape expert.

14       Q.   Do you hold yourself out --

15       A.   But I do have training in cognitive

16   psychology, which includes principles of

17   memory.

18       Q.   Would you agree that you are not an

19   expert on rape victims?

20       A.   I am not an expert on rape victims.

21       Q.   And you don't hold yourself out as an

22   expert on rape victims; is that correct?

23       A.   No, I do not hold myself out as an

24   expert on rape victims, but I have expertise
```

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 198

1    in human memory.

2         Q.    But you have not conducted any

3    studies regarding human memory of rape

4    victims in the immediate aftermath of the

5    assault; is that correct?

6         A.    That is correct.

7         Q.    Would you agree with me that because

8    your opinions relate to factors that increase

9    the chances of a false confession, whether or

10   not in your opinion Miss Riggio's deposition

11   testimony, many years after the confession

12   was obtained, your opinion that some of her

13   statements changed really have no bearing to

14   your opinions that you're offering in this

15   case?

16                    MR. AINSWORTH:  Object to the

17   form of that question.

18        A.    That was really long.  I'm going to

19   need you to rephrase it more succinctly.

20   BY MS. KILEY:

21        Q.    Sure, sure.  Hold on one second.

22              I'm going to direct you to Page 33 of

23   your report.  And in the last full paragraph,

24   do you see the hyphen there?

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 199

 1      A.   (Witness reviews document.)

 2      Q.   And then the language is, "Of note,

 3   these states evolved quite significantly over

 4   time and there were large differences between

 5   her last statement on May 25th, 2002 and her

 6   trial testimony on January 8th, 2004."

 7           Do you see that?

 8      A.   I actually don't.

 9                   MR. AINSWORTH:  What page?

10                   MS. KILEY:  Page 33.

11                   MR. AINSWORTH:  In which

12   paragraph?

13                   MS. KILEY:  It's the last full

14   paragraph.

15                   MR. AINSWORTH:  So underneath

16   "Details unknown to police but later

17   collaborated -- corroborated"?  Sorry.

18                   MR. MICHALIK:  No.  It looks

19   like we have two different versions of this.

20   Hang on a second.

21                   THE WITNESS:  I think I found

22   it.  It's on my Page 32.

23                   MR. AINSWORTH:  Our Page 32,

24   perhaps.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 200

```
 1             Oh, yes, in the first full paragraph
 2   on Page 32 of Exhibit A.
 3   BY MS. KILEY:
 4      Q.   Okay.  And that first full paragraph
 5   starts with the words, "Another way to
 6   examine the issue of reliability of the
 7   confession"?
 8                   MR. AINSWORTH:  Yes.
 9      A.   Yes.
10   BY MS. KILEY:
11      Q.   Is that correct?  I want to make sure
12   we're talking about the same thing.
13             That's what you have as well?
14      A.   Yes.
15      Q.   And then if you go about halfway down
16   that paragraph, there's a statement "At the
17   time of the confession statement, Mrs. Riggio
18   had provided five different statements about
19   the alleged assault to various law
20   enforcement and medical personnel.  Of note,
21   these statements evolved quite significantly
22   over time and there were large differences
23   between her last statement on May 25, 2002
24   and her trial testimony on January 8, 2004."
```

MELISSA RODRIGUEZ, PH.D.                     September 13, 2016

Page 201

1          Is that correct?

2          Did I read that correctly?

3     A.   Yes.

4     Q.   Okay.  Would you agree with me that

5  the fact that, according to you, her

6  testimony at the criminal trial was different

7  than the statement she provided to police

8  really serves no relevance to your opinion as

9  to what practices increase the likelihood of

10 obtaining a false confession?

11    A.   So, the inconsistencies in her

12 statement are not a direct risk factor for

13 false confessions, but it is helpful to

14 examine that when you're looking at the

15 reliability of the post-confession

16 narrative.

17    Q.   Okay.  And her criminal trial

18 testimony occurred after the confession was

19 obtained, correct?

20    A.   Correct.

21    Q.   You talked a little bit about the

22 1979 rape.

23          And I just want to put on the record,

24 I am going to ask the questions about this

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 202

1    expert's opinions related to the 1979 rape.

2    But we will be filing a motion in limine with

3    respect to the 1979 rape, and these questions

4    are not served to waive that at all.

5            Did you review any police reports

6    from the 1979 rape?

7        A.   No.

8        Q.   Did you review the hospital records

9    or the rape kit after the 1979 rape?

10       A.   No.

11       Q.   Were you aware that the individual

12   arrested for the 1979 rape posted bond and

13   then fled the country?

14       A.   Yes.

15       Q.   What document did you read that

16   informed you of that?

17       A.   (Witness reviews document.)

18            I believe, if you turn to Page 3 of

19   my report, there are two hyperlinks to

20   websites.  I believe it came from one of

21   those two sources.

22            It also is possible that that was

23   mentioned in the Querrey memo, but I would

24   have to go back and check.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 203

1      Q.   So just to be clear, why don't you go

2   through for me, then, what pieces of

3   information or documentation you reviewed

4   that in any way relate to the 1979 rape.

5      A.   Let's see.  I believe there was a

6   reference to the 1979 rape in ASA Holmes'

7   deposition, but I would have to go back and

8   check.

9           There may have been reference to it

10   as well in Detective Roberts' deposition.

11          Certainly, Miss Riggio's deposition

12   discussed it.

13          The two hyperlinks that I just

14   suggested or I just told you about, they may

15   have been in there.

16          The Querrey memo, to my best

17   recollection, discussed it.

18          And without going back further

19   through these documents, that's -- that's all

20   I can speculate about right now.

21      Q.   I believe that you testified that the

22   1979 rape and the 2002 rape occurred under

23   "incredibly similar circumstances"; is that

24   correct?

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 204

1      A.    Yes.

2      Q.    Is that your testimony?

3      A.    Yes.

4      Q.    What forms the basis of that

5   statement that the rapes occurred under

6   incredibly similar circumstances?

7      A.    Well, from my understanding of the

8   circumstances surrounding the 1979 rape, as I

9   addressed earlier in this deposition, they

10  were both rapes by someone -- not a friend or

11  a family member or someone known to -- more

12  than an acquaintance.  I believe in the 1979

13  rape, it was janitor.  I don't know how

14  familiar they were with each other prior to

15  that.

16          It happened in the early morning

17  hours when Miss Riggio had shown up to work

18  by -- approximately 7:00 a.m.

19          My understanding is that in both of

20  these cases, there was eventually lawsuits

21  where Miss Riggio secured -- I believe sued

22  the security companies and received

23  settlements for their -- what I assume to be

24  her allegations that they did not provide the

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 205

1   security they should have.

2       Q.   Did you provide or did you review her

3   testimony from that civil lawsuit?

4       A.   No, I don't believe I did.  No.

5       Q.   Did you review -- did you review any

6   of the testimony from that civil lawsuit?

7       A.   No, I did not.

8       Q.   I think earlier you talked about the

9   fact that she received a settlement from that

10  civil lawsuit.

11           Do you know what that settlement

12  amount was?

13      A.   From the 1979 --

14      Q.   Yes.

15      A.   -- allegation?

16      Q.   Yes.

17      A.   I don't, and my vague recollection is

18  that it was an undisclosed amount.  But I

19  could be wrong about that.

20      Q.   Did anyone ever tell you that it was

21  approximately $2,000?

22      A.   No.  As I just said, as far as I

23  know, it was an undisclosed amount.

24      Q.   Did you review any of Miss Riggio's

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 206

1    counseling records after the 1979 rape?

2        A.   No, but somewhere in the materials I

3    reviewed -- no, I guess in her deposition,

4    there was reference to those -- those

5    counseling sessions, but I didn't review any

6    documents directly emanating from them.

7        Q.   So the answer would be no?

8        A.   No.

9        Q.   Is it your opinion that a female

10   cannot be raped twice in her lifetime?

11       A.   Of course not.

12       Q.   Is it your opinion that a female

13   cannot be raped twice in her lifetime under

14   what you characterize as incredibly similar

15   circumstances?

16       A.   No, but the statistical likelihood of

17   it, I would suggest, is fairly small.  And

18   no, I don't know --

19       Q.   What statistics are you referring to?

20       A.   I don't know the exact percentage.

21   I'm not sure that anybody could present that.

22            But the statistical likelihood of two

23   very similar rapes out of the universe of

24   rapes, of multiple rapes, in particular, I

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 207

 1   would imagine to be quite small.

 2       Q.   And would you agree that what you

 3   imagine to be quite small has no relevance to

 4   this case?

 5       A.   Well, you asked me the question, so

 6   I'm assuming you had -- that you thought it

 7   had some relevance.

 8       Q.   You don't know any statistics on that

 9   issue, do you?

10       A.   No, but I could find out if you would

11   like me to.

12       Q.   So your testimony that you think that

13   there's low statistical probability that

14   women raped twice in their lifetime under

15   similar circumstances is based on pure

16   speculation?

17              MR. AINSWORTH:  Object to the

18   form of the question.

19          But you can answer that question.

20       A.   My understanding, and I am not an

21   expert on rape statistics, but my

22   understanding is that if you look at the

23   universe of rape, that rape by a nonfamiliar

24   person as defined by friend, family member,

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 208

1   some sort of romantic acquaintance, is less

2   likely -- occurs far less than -- I'm sorry,

3   rape by a nonacquaintance occurs far less

4   than acquaintance rape.

5           So it is common sense that the

6   statistical likelihood of being raped twice

7   in one person's lifetime by a nonacquaintance

8   under startlingly similar circumstances is

9   low.  Yes, that's my testimony.

10  BY MS. KILEY:

11      Q.   And again, I'll ask you, because

12  you -- you referred to statistics, what

13  statistics are you referring to?

14      A.   As I said, I'd have to get back to

15  you on that.

16          I could look up that documentation to

17  see if anyone has done that particular study.

18      Q.   All right.  You've stated repeatedly

19  that you're not rendering any opinions on

20  anyone's credibility in this case; is that

21  correct?

22      A.   That's correct.

23      Q.   I'd like to refer you to Page 15 of

24  your report.

MELISSA RODRIGUEZ, PH.D.                        September 13, 2016

Page 209

1          A.    Okay.  I mean --

2          Q.    I'm looking at the section on Page 15

3     that's titled, "Analysis of interrogation and

4     confession of Mr. Chatman," and I understand

5     that you might have --

6                     MR. MICHALIK:   It's Page 14.

7          Q.    -- page numbers.

8     BY MS. KILEY:

9          Q.    So it's your Page 14.

10         A.    Okay.

11         Q.    Okay.  At the last sentence of that

12    first paragraph, you state, "In addition

13    State's Attorney Alvarez indicated that

14    Mrs. Ruggio's account of the rape lacked

15    credibility."

16              Did I read that correctly?

17         A.    Yes.

18         Q.    And you have the source of that

19    information being a Chicago Tribune newspaper

20    article.

21              Is that accurate?

22         A.    Yes.

23         Q.    Did Mr. Ainsworth provide you with

24    that article?

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 210

1      A.    He did not.

2      Q.    You found that on your own?

3      A.    Yes.

4      Q.    Do you know when you found that

5    article?

6      A.    I do not.

7      Q.    Do you know about -- if it was a half

8    a year or so after you were retained or was

9    it initially after you were retained?

10     A.    It would have been most likely around

11   the time that I was retained.  Somewhere in

12   July of 2015 would be most likely.  But I

13   don't even know the date of the article

14   offhand.

15          So I think it was in -- it most

16   likely was in July of 2015.

17     Q.    Okay.  Did you rely on that newspaper

18   article in formulating any of your opinions?

19     A.    I just -- I'm just citing that as an

20   explanation for the decision to grant the

21   certificate of innocence.

22     Q.    Did you read anyone's testimony from

23   the conviction integrity unit?

24     A.    Testimony in what?

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 211

```
 1        Q.    Did you read anyone's testimony who

 2   was a member of the conviction integrity

 3   unit?

 4        A.    In this case, is what I'm asking.

 5   Were they deposed?  Are you telling me that

 6   they were deposed, and are you asking me if

 7   I've read that?

 8        Q.    They were deposed.  Did you review

 9   any of that testimony?

10        A.    Can you tell me their names?  I don't

11   believe so, but can you tell me their names

12   so I can be sure.

13        Q.    James Papa?

14        A.    No.

15        Q.    Robert Hovey?

16               MR. AINSWORTH:  Robert Hovey,

17   H-o-v-e-y.

18          Asked and answered.

19          You can answer again.

20        A.    No.

21   BY MS. KILEY:

22        Q.    Did you review the transcript from

23   the certificate of innocence proceedings?

24        A.    No.
```

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 212

1      Q.   Did you review any of the

2    post-conviction material, or did you review

3    any of the post-conviction materials?

4      A.   Can you be more specific?

5      Q.   Do you remember reading any briefs

6    that were filed during the post-conviction

7    proceedings?

8      A.   I don't believe so, but I -- I -- it

9    would be helpful to me -- I'm not a lawyer --

10   for you to specify what briefs you're talking

11   about.

12           Post-conviction materials are -- all

13   these depositions to me are post-conviction

14   materials.

15           So I'm not trying to be difficult.  I

16   just want to make sure I understand what

17   you're asking.

18     Q.   Did you review any briefs filed by

19   attorneys in this case?

20     A.   Everything I've reviewed is listed in

21   my report in preparation -- anything I

22   reviewed in preparation of this report.

23           So, that -- that's an exhaustive list

24   of what I reviewed prior to preparing my

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 213

 1    report.

 2        Q.   So the answer would be no, then,

 3    correct?

 4        A.   I -- I don't know if any of -- if the

 5    lawyers in the room would categorize any of

 6    these materials as briefs.

 7        Q.   Did you review any opinions authored

 8    by the trial court in the criminal proceeding

 9    with respect to the post-conviction

10    proceedings?

11        A.   I don't believe so.

12        Q.   Did you review any appellate court

13    decisions whereby they upheld Mr. Chatman's

14    conviction?

15        A.   I don't believe so.

16        Q.   Would you agree that a newspaper

17    article that purports to indicate that

18    State's Attorney Alvarez had indicated that

19    Mrs. Ruggio's account of the rape lacked

20    credibility has no bearing on your opinions

21    here today as to factors that may or may not

22    have been present that would increase the

23    odds of a false confession in this case?

24        A.   I would agree with that.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 214

1      Q.    You talked about the Querrey & Harrow

2   document.

3            Do you recall that testimony?

4      A.    What was the second word you used?

5   Querrey and?

6      Q.    Querrey & Harrow.

7                MR. AINSWORTH:  Harrow,

8   H-a-r-r-o-w, I believe.  It's the second name

9   of that law firm.

10     A.    Yes.  I'm sorry.  I just know it as

11  the Querrey memo.  But yes, I'm familiar with

12  it.

13  BY MS. KILEY:

14     Q.    And what is your understanding of how

15  that memo came to be?

16     A.    My understanding of the memo, I

17  believe this was a memo that was written from

18  an investigation by the security company, I

19  believe, in the lawsuit, perhaps, that

20  Miss Riggio filed of the security company,

21  that this was an internal memo, perhaps,

22  documenting their investigation of the

23  incident.

24     Q.    Are you aware that the Querrey &

MELISSA RODRIGUEZ, PH.D.                        September 13, 2016

Page 215

1    Harrow law firm represented the security

2    company that was a named defendant in the

3    lawsuit filed by Mrs. Riggio?

4        A.   I think that's what I just said.

5             It's my understanding that it was a

6    memo that -- I believe so, yes.

7        Q.   And this memo details what that

8    defense attorney believes are inconsistencies

9    of Miss Riggio's statements; is that correct?

10       A.   I believe the memo certainly -- the

11   memo certainly does address inconsistencies

12   in Miss Riggio's statements.

13            Whether it was written by a -- by the

14   defense attorney, I would need to go back and

15   double-check that.  I have no reason to doubt

16   that.

17            But if you had asked me who the

18   author of the memo was, I don't know that I

19   could have said the defense attorney without

20   looking back at it.

21       Q.   I will represent to you that it was

22   authored by one of the defense attorneys in

23   the civil lawsuit filed by Miss Riggio.

24       A.   Okay.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 216

1      Q.   Would you agree with me, assuming

2   that to be true, that the Querrey & Harrow

3   memo is not an objective document?

4                  MR. AINSWORTH:  Object to the

5   form of the question.

6      A.   Well, if -- it's a document that I

7   suppose -- I mean, objective as in the sense

8   it's written by someone who had some stake in

9   the process.

10           If that's how you're defining "not

11   objective," then, I suppose I would agree

12   with that.

13   BY MS. KILEY:

14      Q.   Well, how -- how do you define

15   "objective"?

16      A.   Probably the way I just said.  I

17   don't know if that's how you define

18   "objective."

19           But that's probably the way I would

20   define it.

21      Q.   Turning to the section of your report

22   where you list all of the materials that you

23   reviewed.

24      A.   Okay.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 217

1      Q.    The last three items are the SERI

2   First Analytical Report, the SERI Second

3   Analytical Report, and the SERI Fourth

4   Analytical Report.

5            Is that correct?

6      A.    That's correct.

7      Q.    How are the SERI reports relevant to

8   your analysis of the factors that go into

9   whether there was a false confession?

10     A.    Well, the SERI reports reflect the

11  forensic evidence that was tested.  And so

12  it's relevant to understanding the facts of

13  the case.

14           So to the extent that understanding

15  the facts of the case provides context for my

16  analysis, that's why it's relevant.

17     Q.    Were you aware that there were no

18  penile swabs taken of Mr. Chatman?

19     A.    If it was in the materials, then

20  that's something I would have reviewed.

21     Q.    As you sit here today, do you recall

22  ever reading the fact that there were never

23  penile swabs taken of Mr. Chatman?

24     A.    I can't specifically recall where I

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

 1   would have read that, so no.

 2       Q.   As you sit here today, do you recall

 3   whether you ever read that Mr. Chatman's

 4   pubic hairs were combed?

 5       A.   I can't recall specifically.

 6            What I do know is that the DNA

 7   reports that were -- and the forensic reports

 8   were exculpatory to Mr. Chatman and there was

 9   nothing inculpatory on the -- on Miss Riggio

10   that suggested that Carl Chatman was

11   identified.

12       Q.   And you would agree that you don't

13   know what evidence was tested; is that

14   correct?

15       A.   I know some of the evidence --

16       Q.   Strike that.  Strike that.

17            You don't know the entire universe of

18   evidence that was tested; is that correct?

19       A.   I know it was discussed in the

20   reports.  So that's -- that's the universe of

21   which I'm aware.

22            I know that there was --

23   Mr. Chatman's pants were tested and there was

24   semen detected and female DNA detected, but

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

1    that was -- Miss Riggio was excluded from

2    that, for example.

3            So I'm aware of, certainly, some

4    evidence that was tested.

5       Q.   Were the inside of Mr. Chatman's

6    shorts or pants ever tested?

7       A.   My understanding is that his pants

8    were tested.  Whether it was the inside or

9    the outside, I'd have to go back to the

10   reports.  And semen was found, as was female

11   DNA, but that excluded Miss Riggio.

12      Q.   So you don't know the answer to my

13   question?

14      A.   Whether it was the inside or the

15   outside of the pants?

16      Q.   Correct.

17      A.   I would have to go back to look.  I

18   don't know.

19            I can make a logical assumption, but

20   I don't know.

21      Q.   Did you ever review the testimony of

22   Mrs. Ruggio's accountant, Glenn Mironovich?

23      A.   No.

24      Q.   Are you aware of any studies

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 220

1    regarding how many individuals gave a false

2    confession or a reportedly false confession

3    and then took the Fifth Amendment at their

4    criminal trial?

5        A.   No, because it would be very

6    difficult to conduct such a study.

7        Q.   You put forth four different

8    criterion for whether someone has given a

9    false confession; is that correct?

10       A.    In proven -- in studies of proven

11   false confession cases, those four -- the

12   four criteria referred to before is what's

13   adopted as necessary.

14            One of those criteria is necessary to

15   be considered a proven false confession.

16       Q.   And you're not aware of anyone going

17   back to that and looking at the criminal

18   transcripts in those cases to see if the

19   defendant took the Fifth Amendment or not?

20       A.   It's possible.

21            I mean, in those archives of false

22   confessions, in those case studies, part of

23   the process is to review the -- whatever

24   original source materials you could get your

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 221

1   hands on.

2          So it's possible that that was

3   reviewed.  Whether they analyzed that in any

4   systematic way, which I think is your

5   question, to my knowledge, no.  But I would

6   have to go back to those original studies to

7   see if they recorded that detail.

8      Q.   Do you know if there's any studies

9   regarding false confessions or purported

10  false confessions where the criminal

11  defendant chose not to testify?

12     A.   Again, I would want to go back to

13  these case studies and archival studies of

14  documented false confessions and see if

15  that's something that they reported on.

16         It's possible that they reported on

17  the percentage of cases in which that

18  occurred.

19         But I -- I would have to go back and

20  look.

21                MS. KILEY:  I have no more

22  questions at this time.

23                MS. BENSINGER:  I have no

24  questions.

U.S. Legal Support, Inc.
(312) 236-8352

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

1

2                    CROSS-EXAMINATION

3   BY MR. NOWINSKI:

4       Q.   Hi, Doctor.  My name is Tom Nowinski.

5   I represent Brian Holmes and the State's

6   Attorney's Office.

7            I just have a couple of questions.

8            *First, you are not holding yourself

9   out as an expert on the practices of a

10  prosecutor in the review of evidence in

11  contemplation of filing formal charges

12  against a suspect, are you?

13      A.   I'm going to need to hear that

14  again.

15                  MR. NOWINSKI:  Sure.

16                  Can you repeat the question.

17

18                  *(Question read.)

19

20      A.   No.

21  BY MR. NOWINSKI:

22      Q.   And you are not a lawyer, correct?

23      A.   I am not.

24      Q.   When you were talking about

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 223

1    contamination with the walk-through, you had

2    mentioned an objective record.

3            Do you remember that testimony?

4    A.    Yes.

5    Q.    Tell me, in your words, what is an

6    objective record?

7    A.    Well, what I was referring to earlier

8    was there was no written confession statement

9    taken or a recording of the confession.

10   Q.    So, if there were a written

11   recordation of what Carl Chatman had told

12   Detective Roberts prior to the walk-through,

13   that would have been an objective record?

14   A.    It would have been a record.  It

15   would have been a record of what he

16   purportedly told Detective Roberts and

17   ASA Holmes.

18   Q.    Did you review the notes that Brian

19   Holmes took upon speaking to Detective

20   Roberts about what Carl Chatman told the

21   detective?

22   A.    Unless it was contained in police

23   reports?  Can I ask, would these have been

24   handwritten notes?

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 224

 1      Q.   Well --

 2      A.   Would they --

 3      Q.   They're not in a police report.

 4   I'll -- I will -- I will represent to you

 5   that I'm not talking about any police

 6   reports.

 7      A.   So --

 8      Q.   Did you review any handwritten notes

 9   from Brian Holmes that memorialized what

10   Detective Roberts had told Brian Holmes what

11   Carl Chatman told Detective Roberts?

12      A.   Not to my knowledge.

13      Q.   Did you review the felony review

14   folders of the assistant state's attorneys in

15   your analysis of this case?

16      A.   All of the materials I reviewed are

17   listed in my report.

18           I do not believe that that is part of

19   what I reviewed.

20              MR. NOWINSKI:  That's all I

21   have.

22           Thank you.

23              MR. AINSWORTH:  Does anyone

24   else have any other questions?

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 225

1                    MS. STALF:  I do not.

2                    MS. KILEY:  No.

3                    MS. BENSINGER:  No.

4                    MR. NOWINSKI:  No.

5                    MR. MICHALIK:  No.

6                    MR. AINSWORTH:  Then show

7     signature reserved, please.

8            Thank you, all.

9                    THE VIDEOGRAPHER:  The time is

10    now 3:07.  This is the conclusion of the

11    deposition.

12            We are off the record.

13                    STENOGRAPHER:  Just for the

14    record, before you all hang up, will you be

15    ordering transcript?

16                    MS. STALF:  I will order.

17                    MR. MICHALIK:  No, thank you.

18                    MS. KILEY:  I will order.

19    E-Tran, please.

20                    MS. BENSINGER:  No transcript.

21    Thank you.

22                    MR. NOWINSKI:  No, thank you.

23                    MR. AINSWORTH:  I'll take a

24    copy, an E-Tran, with signature pages.

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 226

1                    MS. STALF:  An E-Tran with

2    exhibits and an index, please.

3                    MS. STALF:  Can we expedite

4    this, please.

5                    THE STENOGRAPHER:  Thank you.

6

7            (Deposition concluded at 3:09 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 227

1                    CERTIFICATION

2        I, Darlene M. Coppola, a Notary Public, do

3    hereby certify that MELISSA BETH RUSSANO RODRIGUEZ,

4    PH.D. came before me on the 13th day of September,

5    2016 in Providence, Rhode Island, and was by me duly

6    sworn to testify to the truth and nothing but the

7    truth as to her knowledge touching and concerning the

8    matters in controversy in this cause; that she was

9    thereupon examined upon her oath and said examination

10   reduced to writing by me; and that the statement is a

11   true record of the testimony given by the witness, to

12   the best of my knowledge and ability.

13        I further certify that I am not a relative or

14   employee of counsel/attorney for any of the parties,

15   nor a relative or employee of such parties, nor am I

16   financially interested in the outcome of the action.

17        WITNESS MY HAND THIS 18th day of September,

18   2016.

19

20

21   DARLENE M. COPPOLA        MY COMMISSION EXPIRES:

22   NOTARY PUBLIC             11/15/16

23   REGISTERED MERIT REPORTER

24   CERTIFIED REALTIME REPORTER

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

1  Today's Date:       September 19, 2016

2  To:                 Russell Ainsworth, esquire

3  Copied to:          Krista E. Stalf, Esquire

4  From:               Darlene M. Coppola, RMR, CRR

5  Deposition of:      Melissa Beth Russano

6                      Rodriguez, Ph.d.

7  Taken:              September 13, 2016

8  Action:             CHATMAN VS CITY OF CHICAGO, ET AL.

9  _____

10

11     Enclosed is a copy of MELISSA BETH RUSSANO

12  RODRIGUEZ, PH.D.'S deposition.  Pursuant to the Rules

13  of Civil Procedure, DR. RUSSANO has thirty days to

14  sign the deposition from today's date.

15     Please have DR. RUSSANO sign the enclosed

16  signature page.  If there are any errors, please have

17  her mark the page, line and error on the enclosed

18  correction sheet.  She should not mark the transcript

19  itself.  This addendum should be forwarded to all

20  interested parties.

21     Thank you for your cooperation in this matter.

22

23

24

MELISSA RODRIGUEZ, PH.D.                    September 13, 2016

Page 229

```
 1      IN THE UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF ILLINOIS

 3               EASTERN DIVISION

 4

 5   *******************************

 6   CARL CHATMAN,

 7               Plaintiff,

 8   vs.                    CA NO. 14 CV 2945

 9   CITY OF CHICAGO, et al.,

10

11               Defendants

     *******************************

12

13

14      I, MELISSA BETH RUSSANO RODRIGUEZ, PH.D., say

15   that I have read the foregoing deposition and hereby

16   declare under penalty of perjury the foregoing is

17   true and correct:  (as prepared)  (as corrected on

18   errata).

19         Executed this _____ day of _____,

20   2016, at _____, _____.

21

22

23         _____

24            MELISSA BETH RUSSANO RODRIGUEZ, PH.D.
```

MELISSA RODRIGUEZ, PH.D.                          September 13, 2016

```
 1                    CORRECTION PAGE

 2    DEPONENT:   MELISSA BETH RUSSANO RODRIGUEZ, PH.D.

 3    DATE TAKEN: SEPTEMBER 13, 2016

 4    CASE:       CHATMAN VS. CITY OF CHICAGO, ET AL.

 5    *************************************************

 6    PAGE / LINE / SHOULD READ

 7    _____/_____/_____

 8    _____/_____/_____

 9    _____/_____/_____

10    _____/_____/_____

11    _____/_____/_____

12    _____/_____/_____

13    _____/_____/_____

14    _____/_____/_____

15    _____/_____/_____

16    _____/_____/_____

17    _____/_____/_____

18    _____/_____/_____

19    _____/_____/_____

20    _____/_____/_____

21    _____/_____/_____

22    _____/_____/_____

23    _____/_____/_____

24    _____/_____/_____
```

U.S. Legal Support, Inc.
(312) 236-8352

MELISSA RODRIGUEZ, PH.D.

September 13, 2016
Index: $2,000..accepted

**$**

**$2,000** 205:21
**$21,325** 26:13
**$295** 25:17

**(**

**(b)** 31:2

**0**

**0** 59:13
**02809** 10:19
**02903** 7:16

**1**

**1** 41:13 48:10
**1.2** 58:15 59:12
**1.6** 124:12,17
**10** 129:11
**104** 100:1
**10:00** 128:21 171:12 176:13
**10:30** 128:22 171:12 172:14
**11** 66:5 68:12
**11:15** 87:22 88:1
**11:29** 88:2,5
**12** 65:14 68:6 69:4 129:12
**125** 81:11
**12:00** 128:7
**12:24** 132:17,19
**12:37** 132:20,23
**13** 7:6 66:5 69:5 109:22

**13.8** 58:16 59:13
**14** 7:13 68:12 191:19 209:6,9
**15** 128:17 171:6 194:16 208:23 209:2
**155** 7:14 148:1
**16** 97:5 100:1 176:3
**16.1** 124:11
**16.3** 124:8 130:4
**17** 103:16
**177** 182:2
**19** 115:8
**1979** 100:6,13 153:3,8 158:23 201:22 202:1,3,6,9, 12 203:4,6,22 204:8,12 205:13 206:1
**1:17** 169:24 170:2
**1:30** 128:8
**1st** 12:6

**2**

**2** 29:14 37:11 39:9, 16 54:14 64:2
**20** 118:6 123:1 128:17 170:22 171:7 173:17
**2002** 41:17 100:15 158:23 178:21 179:5,17,19 199:5 200:23 203:22
**2003** 20:6 21:15
**2004** 199:6 200:24
**2007** 124:18
**2010** 58:8 69:5
**2014** 65:10
**2015** 24:3,19 25:5, 14 26:12 27:10,11,

13 67:19 210:12,16
**2016** 7:6
**2016-2017** 12:8
**21** 129:17 135:22
**22** 81:13 147:24
**22nd** 24:2
**23** 135:23
**23rd** 176:6,13
**24** 59:13 65:10
**25** 67:19 150:7 200:23
**25th** 132:7 199:5
**26** 192:20
**26(a)2(b)** 31:5
**26(b)3(a)** 31:2
**27** 182:1
**28** 24:19 25:5 26:12
**2945** 7:13
**295** 25:20 26:11
**2:03** 170:3,6

**3**

**3** 29:14 37:11 39:10,16 54:14 56:16 59:10 64:2 124:11 202:18
**3-** 16:17
**30** 130:9
**31** 160:19 190:7
**32** 199:22,23 200:2
**33** 88:8 90:17 198:22 199:10
**37** 29:20 72:1
**3:07** 225:10
**3:09** 226:7

**4**

**4** 69:3
**4,000** 16:17
**40** 27:16
**43** 29:20 72:1
**45** 11:12,13 12:15 128:11,12
**47** 13:12
**4:30** 132:6 134:24

**5**

**5** 84:2
**5/24** 135:6
**5/25** 135:7
**53** 65:14
**55** 12:15
**56** 12:18 68:6
**57** 12:20
**590** 26:4,9

**6**

**6** 130:6
**68** 106:6 107:14,19

**7**

**7** 28:12 57:11,22 58:8 88:7 90:17
**70** 106:8
**70-plus** 130:5
**7:00** 204:18

**8**

**8** 94:4,19 200:24

**80** 117:23
**85** 27:14
**8:00** 128:15,18 171:5
**8th** 199:6

**9**

**9/9/77** 10:21
**9:00** 128:15,18 171:5
**9:30** 132:6
**9:40** 7:7

**A**

**A&m** 49:2
**a.m.** 7:7 88:1,2 132:6 204:18
**ability** 112:23 113:7 114:16
**absence** 61:21 164:11,14
**absent** 96:8,19 112:4,18
**absolute** 117:19
**absolutely** 15:10 23:19 73:7 113:6 153:20
**abuse** 40:9 63:20 136:6,10,17,21 138:17 139:21,23 140:2 142:13 144:9, 14,16 146:5 147:23 148:12 149:2,5,10, 20 172:21
**abused** 119:19 142:10
**abusing** 181:8
**academic** 43:19 44:13,15 48:3
**accepted** 69:15, 20 125:17

MELISSA RODRIGUEZ, PH.D.

September 13, 2016
Index: access..article

**access** 145:19

**accommodate** 10:12

**account** 140:19, 21 142:13 143:20, 22 209:14 213:19

**accountant** 219:22

**accounts** 140:23

**accumulated** 29:23

**accumulation** 72:19

**accurate** 29:7 60:1 178:16 193:2 209:21

**accurately** 176:14 190:15 192:4

**accused** 16:19 46:18,23 47:5

**acquaintance** 204:12 208:1,4

**acquittal** 82:19, 23 83:1,12

**acquitted** 16:24

**act** 122:12,15

**activity** 74:20

**actual** 36:16 44:9 79:13 93:15 162:7 169:10 191:24 194:22 195:6

**acute** 138:6

**add** 28:17 174:16 183:10

**added** 13:1 26:17 39:17,23 131:8 183:14

**adding** 186:18 195:20

**addition** 25:13 29:9 110:13 135:7 139:13 209:12

**additional** 26:16 55:12 56:5 183:2 185:22 186:18 187:7

**additions** 25:7 29:10

**address** 10:16 18:18 215:11

**addressed** 18:16,23 204:9

**admission** 59:5 168:11

**admissions** 58:24

**admit** 75:24

**admitted** 57:19

**adopt** 61:20 143:23

**adopted** 48:15, 18 51:1 180:11 220:13

**adverse** 62:2

**advertise** 27:21

**advice** 37:22 38:3,13

**advocate** 126:18

**affect** 169:10

**affiliation** 123:19

**aftermath** 197:8 198:4

**agree** 41:8 46:4,8, 9,11 53:16 54:17,21 55:2,7 62:1 73:4,8, 12,16,18,20,21 74:1,5,17 75:11,22 77:4,9 78:9 84:6 86:23 95:9 96:6 111:24 112:21 120:9 121:14,22 125:16 196:6 197:11,18 198:7 201:4 207:2 213:16, 24 216:1,11 218:12

**ahead** 43:20 177:21

**Ainsworth** 7:21, 22 11:10 13:18 21:23 22:3 24:5 25:8 30:17,18,24 31:17,21 32:8,16,20 33:2,8,13,19 34:1,4, 11,24 35:5,13 36:6, 13,17,22 37:18,19, 23 38:6,8,18 40:14 56:22 57:21,24 58:2,4,7 65:5,10 74:21 75:1 77:17 98:16 120:18 147:8 148:19 169:14,17, 21 177:19 185:10 191:11 193:14 196:11 198:16 199:9,11,15,23 200:8 207:17 209:23 211:16 214:7 216:4 224:23 225:6,23

**Ainsworth's** 24:17 39:8,19 41:5

**Albert** 136:22

**alibi** 176:5,19 177:7,15,24

**allegation** 44:23 100:6,14,20 101:6, 17 139:8 205:15

**allegations** 40:1,10 66:13 68:13 148:12 153:2 204:24

**alleged** 63:8 65:20 68:7 82:21 139:21 160:23 161:18 183:16 184:13 200:19

**allegedly** 100:7 152:23 162:2

**alleging** 21:2

**allowed** 33:11

**alternate** 43:11

**Alvarez** 209:13 213:18

**amended** 67:17, 18,23

**Amendment** 220:3,19

**American** 69:6

**amount** 125:5 127:15 133:19,22 138:12 205:12,18, 23

**amounts** 19:8

**anal** 185:7

**anally** 184:16 185:1 186:2 196:1

**analyses** 138:1 159:22

**analysis** 52:24 56:7 61:10,18 85:19 115:19 154:6 166:5 167:24 191:17,22 192:16 209:3 217:8, 16 224:15

**Analytical** 217:2,3,4

**analyze** 136:3

**analyzed** 159:14 221:3

**analyzing** 113:20 118:11,15 168:23

**anonymous** 139:9 140:7,12,13, 15,19 141:8,13 143:8,22 145:6,8 146:2,3,23 147:6,18

**answering** 109:24

**answers** 51:8 140:10

**anymore** 69:2

**anyone's** 208:20 210:22 211:1

**appearances** 7:20

**appeared** 61:8 101:7

**appearing** 7:22

**appears** 136:9

**appellate** 213:12

**applicable** 9:14

**application** 55:14

**applied** 52:11,16, 20,23 53:9

**apply** 25:20,23 56:10

**applying** 54:12

**approach** 117:12 187:2

**approximately** 12:5 15:18 21:15 81:13 84:2 101:19 127:23 128:7 130:5 132:1 172:14 204:18 205:21

**approximation** 16:16 26:15

**April** 65:10

**archival** 221:13

**archives** 116:24 220:21

**area** 32:3 41:16 71:6 103:4

**argue** 49:17 109:11 137:3 148:10 149:19 181:12

**argument** 149:6

**armed** 16:21

**arrest** 111:11

**arrested** 111:20, 21 202:12

**arrive** 42:17

**arrived** 101:18

**arriving** 127:21

**article** 174:5 209:20,24 210:5,13, 18 213:17

MELISSA RODRIGUEZ, PH.D.

September 13, 2016
Index: articles..bottom

**articles** 41:19
58:10

**ASA** 62:13 100:18
128:16 129:8 157:9
162:13 172:13
182:18 183:13
203:6 223:17

**asks** 30:19 38:20

**assailant** 188:21

**assault** 46:24
47:6 60:3 79:13
97:8 98:1 99:14,17,
19 100:6,22 102:7
103:10 105:17,21
111:11 120:1
159:11,24 160:15
184:13 187:7
194:20 195:2 197:8
198:5 200:19

**assaulted** 62:22
103:1,11 139:6

**assaults** 158:24

**assert** 30:20

**asserting** 18:1

**assessment**
187:16 194:13

**assessments**
61:16

**assign** 79:19

**assigned** 44:3

**assist** 40:15
44:13

**assistance**
30:13 44:8

**assistant** 42:24
175:12,24 224:14

**associate**
137:15

**associates**
94:10 125:20

**association**
110:20 138:2 144:9
159:15

**assume** 10:7
87:13 111:21 144:7,

15 151:6 156:24
158:13 162:23
189:7,14 190:24
204:23

**assumed** 192:15

**assumes** 193:13

**assuming** 61:13
76:18,23 139:4
167:7 168:3 190:2,
19,21 191:6,14
192:12 207:6 216:1

**assumption**
88:11 105:2,5,7
110:10 167:11
189:1,13 219:19

**assumptions**
31:12,22 55:8

**attack** 152:19,24

**attacker** 151:5
152:5

**attempt** 59:24

**attempted** 127:8

**attend** 14:9

**attention** 65:13
95:7 181:24

**attorney** 16:7
17:24 31:3,10,13
175:12,24 183:8
188:6 209:13
213:18 215:8,14,19

**attorney's** 33:22
38:3 222:6

**attorneys** 21:20
73:19 126:5 212:19
215:22 224:14

**attorneys's** 8:9
38:13

**audio** 179:20

**author** 215:18

**authored** 19:18
22:23 67:6 146:23
213:7 215:22

**authoritative**
72:16,17,22

**authorities**
72:12 84:17

**average** 115:5
117:22 124:7,9,10,
16,17 125:15 130:4,
7

**aversive** 123:21

**awarded** 11:20

**aware** 47:3 84:17
85:4,7 94:12 98:11
99:6,11,16,17
100:13,19 102:5,18
103:9 104:6 113:24
116:19 122:21
125:22 133:2 134:8
136:2 137:7 146:7,
22 147:1,5 148:9
159:4 166:9 168:22
202:11 214:24
217:17 218:21
219:3,24 220:16

---

**B**

**B-E-T-H** 9:6

**B-U-L-L** 76:5

**back** 18:21 19:12
20:4 23:5 26:3
28:11 29:5 39:20
47:16 48:9 49:9
55:17,19 59:3,21
68:19 75:5 76:7
80:1 88:5 91:7
98:22,24 99:10,24
102:10,19 106:19
108:7,20 109:3,23
111:17,23 113:2
118:24 119:10,21
120:3,8 122:7
124:24 125:12
129:14 132:23
137:6 141:11
148:15 149:21
154:21 164:9
167:12 168:12,24
170:6 173:13
174:17 185:16
191:19 194:16
196:14 202:24
203:7,18 208:14

215:14,20 219:9,17
220:17 221:6,12,19

**Background**
56:17 59:10

**ball** 158:4

**bank** 16:20,21

**Barbara** 8:18
104:17

**bargain** 74:3
93:20

**base** 103:5 171:24

**based** 36:3 55:8
76:24 83:13 84:9,10
105:11 110:10
112:2 124:21 128:6
129:12 131:24
132:5 148:11
152:15,16 156:15
161:21 167:3,20
172:7 177:12
189:21 197:1
207:15

**bases** 189:12

**basic** 30:1 55:23
169:4

**basis** 34:6 36:16
37:12 41:11 51:3
60:12 86:9 147:22
149:13 175:8 185:6
193:13 196:9 204:4

**batch** 40:2,18,24
41:4

**bearing** 198:13
213:20

**beat** 73:23

**begins** 11:13
115:9 160:20

**behalf** 7:4,16,22
8:1,4,7,9,11 16:4
20:14,19 21:8,14,22

**behaviors**
106:13

**belief** 152:2
187:13

**believed** 87:5,10
110:12 151:15
157:24 158:6,9,17
194:10

**believes** 127:22
130:11 215:8

**bench** 17:3

**Bensinger** 8:10,
11 98:18 221:23
225:3,20

**Beth** 8:14 9:5,11

**bias** 94:20,24

**big** 89:19 157:21

**biographical**
183:14

**Bird** 15:24 16:2,5,
11,18,23 17:9,13,
21,24

**Bird's** 18:8

**birth** 10:20

**bit** 117:23 170:14
201:21

**Blair** 130:10 174:4

**blaming** 89:16

**blow** 139:7 140:6,
9 141:20,21

**board** 25:21

**bodies** 81:20

**body** 13:23 29:23
69:12,18 70:1 81:8
151:21

**bond** 202:12

**Boock** 8:17 62:12
108:13,16 128:2,8,
18,19 171:4 193:6

**book** 58:9 72:19

**borne** 49:18

**Bostic** 113:12,18
114:2

**bottom** 191:20
192:21

**Brandstrader** 150:2

**break** 10:10 87:20 125:9 174:22 193:19

**breaking** 43:17 44:15,20

**breaks** 175:2

**Brette** 8:10

**Brian** 8:20 222:5 223:18 224:9,10

**briefly** 26:18 88:18 141:20

**briefs** 212:5,10,18 213:6

**bring** 42:12 56:5

**Bristol** 10:18

**brought** 16:23 55:11

**building** 101:24 176:12

**Bull** 76:5

**Bull's** 76:5

**Bureau** 12:2

**Burrough** 98:14 99:7,12

**business** 10:16

**C**

**calculate** 124:20 127:14

**calculated** 125:1 127:13

**calendar** 27:17

**call** 28:9 121:7,8

**called** 8:15 104:15 152:10

**calls** 38:20

**capability** 103:8 179:16

**capable** 107:14, 19 114:20

**capital** 180:9

**caption** 66:21

**career** 14:17

**carefully** 129:15

**Carl** 7:9 11:11 15:2 19:21 22:11 23:17 28:2 30:9 79:7 95:19 96:1 100:15 109:1 111:15 132:9 151:4 152:5 156:11,17 160:16 177:24 178:20 182:21 184:7 188:20 195:6 218:10 223:11,20 224:11

**Cartrette** 98:14 99:7,13

**case** 7:13 15:3,14, 24 16:2,11,19 17:2, 4,8,12,20 18:1,5,8, 15,24 19:3,21 20:2 21:1,2,5,6,8,14,18, 22 22:5,11,14 23:17 25:1,4 27:15 28:2 30:7,13,16 32:19 33:15 43:18 53:18, 24 54:3,10,11 55:11 56:2 59:24 62:24 63:23 66:22 69:22 73:1 76:16 78:10, 11,16,17,18,19 79:7,10,16 80:24 81:22 82:17,21 83:5,7 85:18 90:6 91:9,18 92:1 93:17, 21 94:5,8 95:14,20 101:17 106:5 111:3, 16 113:17 118:11, 15,19 119:3,5 121:12 131:17,21 132:9 137:24 138:1 140:15 143:11 145:5 148:7 150:1 151:12 152:11 153:2,3,9,19 154:6, 10 156:11,18 158:14 160:5,20 161:10,16 165:5

168:5,15 174:20 175:17 177:11 187:5,20 188:6,18 190:2,11 192:10 194:11,19 198:15 207:4 208:20 211:4 212:19 213:23 217:13,15 220:22 221:13 224:15

**cases** 15:1,18 20:7,12,17 57:5,12, 18 74:13 77:14,16 78:1,2,3 80:12 81:1, 6,12,19 89:23 90:4, 9,11,12 91:5,11,13 93:12 94:12 112:17 116:19,22 117:1,21 131:11 138:1,9 168:23 180:9 204:20 220:11,18 221:17

**Cassell** 70:13

**categorize** 213:5

**category** 186:4

**caught** 28:6

**caused** 90:7 91:10 119:3

**central** 184:23 185:2,20 186:3,10, 20,21

**Cernick** 104:17 105:15 188:23

**certainty** 41:9 79:20 82:2

**certificate** 151:7,18,19 153:12, 16,21 154:8,13 158:20,21 159:5 187:21,24 189:6,13, 17 193:12 210:21 211:23

**certified** 7:3

**chances** 73:23 198:9

**change** 28:15,16 55:13,16 56:2,7,9 62:6 84:14 86:2

135:8 146:8 158:12 172:12 187:23

**changed** 49:15 106:1 198:13

**chapter** 72:20

**chapters** 41:19

**characteristics** 96:9

**characterize** 155:19 186:2 206:14

**characterized** 149:11

**charge** 25:17 26:1

**charged** 120:10

**charges** 16:23 25:1 26:13,16,20 73:24 222:11

**Chatman** 7:9 11:11 15:3 19:21 22:11 23:17 28:2 30:9 54:19 60:2 62:9,12,15,21 63:3, 8,16,22 64:3,23 66:15 67:24 68:15 76:18 79:7,17 95:20 96:1 100:15 101:10 104:7 105:16,20 106:14 107:17 108:4,18 109:1,6,14 110:5,6,12 111:6, 13,16 113:20 114:2, 20 117:24 118:3,13, 22 119:8 122:21 126:20 127:20 128:9,16,23 131:22 132:1,9 134:5,17 135:5 136:13,17 139:2,4,23 140:21 141:5,9,14,19 142:3,5,16,21 143:14 146:6,11,18, 22 147:6,21 149:2 151:4,6 152:5 153:13,15,24 156:11,18 157:6,10 159:10,16,19 160:13,16 161:17

162:22 163:17 164:13,16,17 165:13 171:21 172:2,14,15,19 176:11 177:1 178:20 182:21 183:3,7,19 184:7 188:20 189:3,4,5 190:3,10,18,20 191:4,7,15 192:9, 13,23 193:3,5,23 194:2,5,22 195:6 209:4 217:18,23 218:8,10 223:11,20 224:11

**Chatman's** 62:19 63:2 65:22 66:3 68:9 103:17 104:13 106:5 107:7 111:10 113:19 114:1 134:2 135:10 143:20 145:21 146:17 148:9 149:19,24 153:19 160:7 161:1 162:15 164:21 173:9 176:5 177:7,15,24 187:5 191:22,23 213:13 218:3,23 219:5

**cheated** 44:23 45:2

**cheating** 43:18 44:10,16,19

**check** 15:7 16:14 38:24 146:20 202:24 203:8

**checking** 15:16

**Chicago** 7:10 8:1,19,20 22:15,20, 24 23:14 98:17 169:18 170:11 178:19 179:15 209:19

**Chinese** 140:20

**Chinese-looking** 62:14 63:4,9 128:24 139:6 142:23 145:23 171:20 172:1,22 173:12 193:7

MELISSA RODRIGUEZ, PH.D.

September 13, 2016
Index: chose..confession

**chose** 221:11

**chronic** 138:7

**circumstances** 100:8 101:5,7,14 203:23 204:6,8 206:15 207:15 208:8

**citations** 50:22

**cite** 57:3 58:12 59:19 89:23 91:4 101:14 115:18 119:23 158:21

**cited** 50:17 57:10 58:13 105:13 119:14,21

**citing** 119:15 210:19

**City** 7:10 8:4 170:11

**civil** 9:13 21:1 64:4 122:22 205:3, 6,10 215:23

**claim** 85:5 87:4 120:12 121:4,24

**claimed** 85:11 110:4 152:18

**claiming** 87:3 151:3

**claims** 63:3 84:19,21 85:22 86:4,5,10,23

**clarification** 15:9 36:5 121:6

**clarify** 50:9 59:7 136:8 150:16

**classmate** 91:20

**Claude** 15:24 16:4,11

**clear** 129:1,18 141:2 142:9 144:4 175:10 203:1

**clients** 126:6

**clinical** 14:20

**close** 13:7

**closely** 71:3

**co-conspirator** 89:17

**coerced** 63:10 80:16

**coercion** 62:18 63:1,5 65:21 66:2 68:8

**coercive** 130:12 173:21 174:8

**cognitive** 103:18 104:13,21 105:4,22 106:3 107:11 108:5, 10 110:23 112:20 115:1,10 117:8,15 126:12,17 133:8 142:6 197:15

**cognitively** 106:16 108:19 109:2,14 110:12,18, 19 112:17 113:9 117:16

**coherent** 110:17

**coincide** 190:12

**Cokeley** 97:11

**collaborated** 199:17

**collaboration** 48:24

**collaborator** 49:4

**colleagues** 88:10

**college** 47:13 48:2

**combed** 218:4

**commit** 56:15,20, 23 57:1 86:19 107:21

**committed** 79:1 82:13 131:12,18 161:22 162:7,22,23 164:19

**committing** 16:19 57:13,19 59:1

**common** 88:15 89:20 90:18 125:20 139:16 208:5

**commonly** 125:16

**communicate** 88:11 89:21 91:16

**communicates** 157:22

**communication** 32:9 33:5 37:24 38:10 89:22 142:7 171:17

**communications** 31:3,6,7 93:5

**community** 50:1,2 58:15 59:8, 12 69:21,22 70:10, 18 71:1 80:22 121:16

**companies** 204:22

**company** 214:18,20 215:2

**compared** 84:18 156:4

**Comparing** 85:10

**compensated** 47:23

**compensation** 31:8 122:22

**complaining** 140:7

**complaint** 63:22 64:3,6,13,23 65:6, 15 66:6,12 67:5,17, 19,24

**completed** 65:17

**complying** 65:18 66:9

**component** 62:18

**comprehending** 114:12

**comprehension** 113:8 114:9

**concern** 130:14 138:22 152:12,14 181:4

**concerns** 158:24 166:6,7

**conclude** 134:16

**concluded** 63:20 226:7

**conclusion** 139:2 153:17,23 162:10 164:21 225:10

**conclusions** 86:3

**conclusively** 159:11

**condition** 44:2, 18

**conditions** 135:14,21

**conduct** 30:6 220:6

**conducted** 80:19,20,21 171:12 197:6,9 198:2

**conducting** 41:16

**confederate** 42:20,21 44:4,14

**confess** 19:10 74:14 75:9,20 76:10,15,17 77:6,10 83:24 84:3 91:22 92:23 96:21 112:1 117:20,22 119:8,24 120:6 130:20 150:12

**confessed** 20:15,20 58:19 85:2

86:20 87:4,14 107:17 112:18 115:13 116:11 119:16 137:23 165:17

**confesses** 56:14

**confessing** 56:19 59:1 60:2 92:11,12 93:1 107:15,20 116:16 134:18 155:5,8

**confession** 17:6,9,20 18:2,8,10, 13 52:24 53:10,11, 13,18 54:7 56:1,12, 13 57:5,13 58:14 59:5,8,11 61:22 65:22 66:3 68:9 73:22 74:1 76:22 77:3,15 78:3,11,17, 19 79:9 80:16 81:1, 5,6,12,19 82:3,9,18, 20,22 83:6,8 84:16, 19 85:6,8,11,12,23 86:5,6,11,24 87:5, 12 90:2,8,11,14 91:6,10,13 92:1,5 93:14,16,22 94:15 95:10,13,17 96:8,12 97:4 116:4,21 117:1,10,15,18,21 118:9,14,23 119:2,5 120:12 121:3,9,18 122:1,20 123:5,8,14 124:11,16 129:22 130:1,24 131:3,4,6, 7,11,17 133:6 135:4,10 136:4 137:9 138:4,24 143:18 144:11,12, 18 147:22 148:11 153:19 154:1,4,11, 16,18 155:18 156:2, 11 157:8 161:1,20 163:4,8,17,19,22,24 164:3,18 165:1,17, 21,23,24 166:2,3, 11,19 167:5,7,22 169:1 180:24 181:18 182:20 183:1 189:20 190:1, 6,12 191:23 192:1,

MELISSA RODRIGUEZ, PH.D.

September 13, 2016

Index: confession-type..crime

9,14,18 194:5
196:20 198:9,11
200:7,17 201:10,18
209:4 213:23 217:9
220:2,9,11,15
223:8,9

**confession-type** 71:10,21

**confessions**
17:7,18 19:1,4
28:21,22 41:17,22
42:3 45:11,15,18,
19,23 46:2 49:16,22
50:5 51:7,13,17,20,
21,23 52:4,6,10,12,
13,15,17,20 53:6
54:10 61:13 71:7,
13,18 73:13 74:12
83:9,17,19 84:8,14,
20,21 85:24 86:7
87:10,15 96:18
112:7 118:18 123:9
124:3,5,8 130:3
137:16,19 138:15
154:5,19 155:10,11
156:4 179:23
180:17,18,20
181:13,21 188:7
201:13 220:22
221:9,10,14

**confessors**
81:14

**confident** 39:24
41:11

**confinement**
121:2

**confirms** 95:6

**conflict** 63:14,15

**conflicting**
60:22 61:4

**conflicts** 63:18

**confront** 44:24
150:10,20 151:1

**confronted**
44:22

**confused**
104:16

**confusion**
131:9,16

**conjunction**
111:15

**consensus**
77:13

**consequences**
29:2 91:2 92:10
112:10,11 155:5,8,
14 156:1,7,13
157:18

**considered**
22:23 23:11,12
31:11 34:9 59:20
61:23 70:2,18 77:15
78:2,10,19 82:19
83:7 95:24 143:12
158:19 159:10
174:7 185:2 188:1
220:15

**considers**
173:19

**consisted** 27:14

**consistency**
183:6

**consistent**
102:3 142:9,12,15,
17 143:13,16
159:20 183:10
196:24

**consistently**
63:8

**consists** 29:24

**constellation**
88:23

**constitute** 27:19

**constraints**
46:12,13

**consult** 20:13,18,
19,23 21:12

**consultant**
15:12,15

**consultation**
25:18

**consultations**
25:7

**consulted** 20:2
21:7 54:8

**consulting**
19:24 20:4 27:4,13,
21 53:23

**contact** 21:19
123:16

**contacted** 21:10
24:3,4

**contained** 12:11
40:16 66:22 73:1
190:11 223:22

**contaminated**
164:20,22

**contamination**
160:22 161:7,13
162:12,19 165:4,8,
15 190:14,23 223:1

**contemplation**
222:11

**contend** 157:23

**content** 72:12

**context** 43:19
44:16 52:18 94:2
95:1 112:13 122:20
187:10 217:15

**contextual**
165:11

**continually**
49:5

**Continue** 21:24

**continued** 92:13

**contribute**
131:6

**contributed**
192:2

**contributes**
118:9

**converse** 33:12

**convict** 87:12

**convicted** 86:18
87:6 91:19 121:23

**conviction** 73:4,
9 74:3 151:20 152:9

192:3 210:23 211:2
213:14

**convictions**
87:16

**convince** 74:6,
10

**convincing**
75:19

**cooperate** 93:6

**Coppola** 7:18

**copy** 10:23,24
11:9,13 39:4 63:21
64:12,23 67:18
115:23 225:24

**correct** 11:14,15
12:16,21,23 14:4,5
24:19,20 25:18,19
26:13,14 27:1,2
37:14 48:7 51:14,15
54:15 56:21 57:2,7,
8 59:16 61:16 62:6,
7 65:22,23 66:22
68:9,10 69:7,8 72:2,
12 80:17 83:14 85:2
88:10 92:5 94:10,11
97:8 103:19,20
105:8,17,18,21
107:24 108:1 109:7
114:21 115:16
118:9,10 123:5,6
126:21 127:4
130:24 136:11
141:6,7,10 142:14
148:2,7,8,12 159:1,
2 161:3,4 171:9,21,
23 173:3,12 174:23
175:13,15,18,19
177:3,18 181:19
187:22 188:7,15,16
192:10,11 194:2,3,
6,7,8,11 196:2
197:22 198:5,6
200:11 201:1,19,20
203:24 208:21,22
213:3 215:9 217:5,6
218:14,18 219:16
220:9 222:22

**correctly** 40:5
177:8 193:8 201:2
209:16

**corroborate**
162:15 163:9

**corroborated**
104:14 199:17

**counsel** 7:19
8:16 148:10 149:19
150:1

**counseling**
206:1,5

**counter** 75:17

**country** 202:13

**couple** 194:14
222:7

**court** 7:11,12,17
9:4,22 11:7 19:15
24:13 64:20,24 65:9
67:21 152:7 213:8,
12

**courts** 138:20

**cover** 66:18,21

**create** 42:1

**created** 41:20
42:2 48:11 51:4
52:1,8

**credence** 145:17

**credibility** 60:5,
15 100:5 101:2
152:12 187:17
194:10,12 196:8
208:20 209:15
213:20

**credible** 187:14

**credit** 47:13 48:2,
3

**crime** 16:18
20:15,20 56:14,20
75:10 78:21,22
79:1,2 82:10,13
107:15,17,20 112:2
121:23 131:12,19
160:24 161:14,17,
19,22,23 162:4
163:2,3,10 164:19
165:19 166:12,23
167:4,21 168:8,13,
24 169:8 189:4,6

MELISSA RODRIGUEZ, PH.D.

September 13, 2016
Index: crime-relevant..determine

193:4

**crime-relevant**
165:6

**crimes** 74:15
77:7,10 86:18

**criminal** 16:2
21:1 26:23 73:14,
18,24 74:8,20 76:1
86:14,15 88:13
111:10 120:10
125:17,23 149:24
201:6,17 213:8
220:4,17 221:10

**criteria** 78:6,13,
15 82:7 83:3
220:12,14

**criterion** 220:8

**critical** 70:1,6,11,
17 177:6

**criticism** 186:7

**critiques** 70:14

**critiquing** 70:22

**CROSS-
EXAMINATION**
170:8 195:14 222:2

**crystal** 158:4

**cumulative**
129:10

**cumulatively**
175:3

**curious** 181:22

**current** 11:16
13:2

**curriculum**
11:14,17 12:11,14

**custodial** 180:9

**custody** 98:8
118:7,16,21 119:9,
22 123:3,7 124:21
125:2,6,11 129:19
130:18 131:23
135:6,8 174:10

**cut** 60:17

**cutoff** 118:1

**CV** 7:13 10:24
11:21 13:5,17,21,23
72:3

**D**

**danger** 129:21,24
144:17

**Darlene** 7:17

**data** 22:24 23:12
31:9 49:17 50:6,14
52:11,21 53:3 84:10

**date** 10:20 12:5
25:1 41:3 210:13

**dated** 24:18

**dates** 132:12

**day** 99:16 104:23
105:16,20 134:6

**de** 130:12

**deal** 89:19 93:15
157:22

**deals** 27:3

**decide** 54:2 76:8

**decided** 119:8
162:14

**decision** 54:21
210:20

**decision-
making** 42:16
71:7 112:12

**decisions** 43:4
213:13

**declared** 192:24
193:23

**decrease** 28:21
155:10

**deem** 29:11

**defendant** 7:16
8:1,4,7 20:24 215:2
220:19 221:11

**defendants**
7:11 8:5,12,16

20:22 66:24 170:12

**defense** 73:19
126:5 215:8,14,19,
22

**define** 56:12
88:20 106:3,9
120:21 133:16,18
216:14,17,20

**defined** 106:7,10
207:24

**defining** 216:10

**definition** 36:4
94:22 95:16 121:11
151:13 189:10
190:11

**definitive** 84:5

**definitively** 91:9
160:14

**degree** 48:7
93:13

**delivered** 157:15

**demeanor** 107:7

**demonstrated**
89:24

**denial** 92:13

**Denis** 8:19

**deny** 74:19 147:6,
17

**Department**
11:23 22:16 23:1,14
178:19 179:15

**departments**
85:16 179:5,11
180:1,2,4,11

**depend** 184:3

**dependent**
105:1

**depending** 56:2
137:10 150:13

**depends** 180:5,
10

**deposed** 211:5,
6,8

**deposition** 7:8,
14 9:11,17 10:23
11:9 23:21 24:15
25:9,24 26:2 34:15
40:4,22 64:11,22
97:11,18 107:23
108:3,12 113:11,23
119:12 132:9
145:21 146:17
147:2,7,12 149:24
163:15 173:10
175:11,17,20
177:18 178:1,3,8,9
186:16 198:10
203:7,10,11 204:9
206:3 225:11 226:7

**depositions**
100:17 108:22
132:12 212:13

**deprivation**
110:24 130:23
131:3,5,9,15 133:4,
5,11,14,17,18
134:17,20 135:2,9
144:18

**deprived** 19:8

**deprives** 54:23
123:18

**deputy** 97:7,11,
24 98:4 99:18
152:18,21,22
158:22

**deputy's** 98:12

**derived** 23:13

**describe** 88:18
92:19 141:22 143:3
144:3 162:1

**describing**
141:22 142:1,3
144:6

**description**
29:7 140:5

**design** 181:23

**desirable** 73:14,
20

**desire** 96:24

**Deskovic** 91:19

**detail** 43:14 182:6
183:20 184:18
185:2,4,8 186:3,5,
18 187:7 196:4
197:3 221:7

**detailed** 166:2

**detailing** 160:23

**details** 108:21
163:6,8 164:17
165:11 182:8 183:2,
11,15,16,22 184:1,
4,8,23 185:20,22,24
186:10,14 187:11,
14 190:11 193:3
195:20 199:16
215:7

**detainee** 11:24

**detainees**
136:23

**detected** 218:24

**detective** 62:13
65:21 66:1,14 67:1,
4 68:7,14 97:18,22
98:3,11 99:6,12,17
100:18 104:16,17
107:24 108:2,6,8,
13,16,23 128:8,18,
21 129:6 139:10
140:7,19,20 142:24
143:21,23 145:9,17,
23 146:4 156:20
157:9 162:13
163:14 165:1
168:11 172:3,12,16
182:18,20 193:1
203:10 223:12,16,
19,21 224:10,11

**detectives**
54:20 62:12 98:6
100:24 104:6 128:2
157:23 166:13,17
171:4 193:6

**determination**
53:10 60:14 84:5
152:1,3,7

**determinations**
53:12 60:6 85:8

**determine** 18:6
20:8 54:4 61:5

MELISSA RODRIGUEZ, PH.D.

September 13, 2016
Index: determined..estimates

79:21 80:13,15 82:8
83:16 97:23 113:20
116:3 133:3 161:19
164:16

**determined** 82:10

**determining** 116:11

**develop** 95:2

**developed** 45:17

**developing** 48:16

**diagnostic** 45:22

**differ** 135:16

**difference** 184:22

**differences** 144:1,3 199:4 200:22

**differently** 28:10

**difficult** 27:8 74:6,10,16 114:19 129:3 142:8 168:6 212:15 220:6

**difficulty** 141:24 142:3,22 143:4

**digitally** 39:5,6

**direct** 9:1 30:4 37:20 88:16 89:12 90:19,23 94:17,18 103:13 181:20,24 197:9 198:22 201:12

**directed** 110:6

**directly** 21:19 169:3 206:6

**disagree** 32:14 33:6

**discard** 103:24

**discomfort** 135:23 136:4,5,11, 24 137:9,20 138:3, 14,21 139:3,12,18

**disconfirms** 95:8

**discount** 166:17, 20

**discourage** 181:7

**discredit** 162:12

**discuss** 30:16 43:22 102:6 118:6 130:22 137:2

**discussed** 17:16 18:11 30:22 32:10 33:4 134:22 144:8 203:12,17 218:19

**discussing** 133:8 137:14

**discussion** 149:9 153:5

**displayed** 108:4

**dispositional** 45:10 96:9 97:2

**distinct** 137:4

**distinction** 35:22 59:4 136:7, 10,12,16 137:1 149:8,15

**distinguished** 85:5

**distortion** 97:1

**District** 7:12

**DNA** 57:6 78:1 79:5,15,16 82:15 151:8 159:13 160:1, 2,8,9,11 189:8 218:6,24 219:11

**DNA-WISE** 159:18

**Doctor** 11:7 64:20 65:13 67:21 88:7 133:2 170:10 187:18 195:10 222:4

**document** 11:18 12:22 23:23 24:16

25:21 29:21 65:1,3, 8 67:2 68:2,4,16 72:7 97:12,19 108:14 109:18,21 113:13 127:19 148:3 150:5 157:5 173:1 175:14 199:1 202:15,17 214:2 216:3,6

**documentary** 35:16

**documentation** 37:7,8 67:8 173:5 203:3 208:16

**documented** 81:11 116:21,24 124:4,15 128:14 131:10 221:14

**documenting** 214:22

**documents** 34:5 36:2 37:3 40:8 55:6 61:24 63:5 99:23 100:11 104:5 172:6,8 203:19 206:6

**door** 146:15

**double** 115:14

**double-check** 26:4 39:21 76:8 120:8 141:12 150:4 215:15

**doubt** 131:13 215:15

**downplay** 89:1

**downplaying** 89:17 156:21

**draft** 29:15

**drafted** 145:6

**drafting** 29:22 30:15 147:17

**drafts** 37:17 38:6, 7,16,21 39:3

**dramatically** 135:16

**Drizin** 81:11 124:15,20 130:2

**drove** 119:24

**due** 117:11 165:14 181:13

**duly** 8:22

**duration** 144:13

────────

**E**

**E-TRAN** 225:19, 24 226:1

**earlier** 102:20 170:24 183:20 187:19 192:7 204:9 205:8 223:7

**early** 21:6 101:19 102:3 204:16

**easier** 109:20

**edits** 38:7

**education** 17:4

**effect** 62:2 158:10 175:3 189:19

**effective** 77:6

**effects** 133:20

**egregious** 160:21 161:6,8

**elicited** 192:1

**eliminate** 180:23

**eliminated** 180:17,21

**emanating** 206:6

**emerge** 183:23 196:4

**emerged** 185:5 197:4

**employed** 94:9

**employees** 94:13

**encompasses** 12:14

**encounter** 172:9 173:6

**encounters** 173:16

**encourages** 76:17

**end** 12:18 28:17

**endures** 144:14

**enforcement** 21:22 53:5 83:23 200:20

**engage** 44:12

**engaged** 106:14

**engaging** 181:7

**England** 76:4 126:15

**entered** 176:12

**entire** 218:17

**entirety** 72:9

**envelope** 145:16

**episode** 186:22

**equipped** 70:21

**equivalent** 88:16 89:12 90:19

**equivalents** 90:22

**eradicate** 180:22

**error** 28:9

**errors** 28:5

**escape** 123:21

**essentially** 44:10 61:11 69:15 91:22 92:19

**establish** 32:24 60:12 61:7

**established** 69:14 78:8

**estimate** 129:11

**estimates** 58:21 83:21

MELISSA RODRIGUEZ, PH.D.

September 13, 2016
Index: et al..false

**et al** 124:18

**ethical** 46:8,13,15

**evaluate** 107:3
114:8 164:9

**evaluated**
142:11

**evaluation**
105:11 114:14
143:24

**event** 38:5 39:2
142:1,4 167:1 168:3
169:7,11 182:7
184:24 185:21

**events** 62:3,5
186:21 187:15
193:2

**eventually**
204:20

**evidence** 55:10
60:22 78:22 79:5,15
82:16 91:17 95:4,
18,23 96:2 101:9
111:5 118:19
134:20 150:11,20
151:2,5,8,9,14,15
152:17,21 156:19
158:2,7,11,16
159:14,15 160:12,
18 174:19 177:1
188:14,19 189:1,8,
11,15,20,24 190:5,
13 217:11 218:13,
15,18 219:4 222:10

**evidenced**
74:11

**evolved** 199:3
200:21

**ex-wife** 146:17

**exact** 15:8 206:20

**exaggerate**
90:24 91:2

**exam** 91:21

**examination**
8:15 9:1 18:5 30:7

**examine** 45:4,12,
17 80:12 81:2 181:2

200:6 201:14

**examined** 8:22
81:5 161:11

**examples** 89:10
90:21 91:3,11
160:21 186:13

**excessive** 40:2

**exchange** 93:21

**exclude** 78:1

**excluded** 79:17
82:15 160:9,13
219:1,11

**exculpatory**
151:8 159:22 189:8
218:8

**excuses** 89:6,15

**exhaustive**
212:23

**exhibit** 10:23
11:3,8 12:15,19
24:7,9,14 64:11,16,
21 65:14 66:12,18
67:11,13,22 200:2

**exhibits** 226:2

**exist** 122:4

**existence** 97:6
158:22

**exonerated**
79:4

**exoneration**
78:1

**exonerations**
57:6

**exonoree** 78:9
80:12

**expect** 117:17
131:14 133:15
184:19 185:21

**expected**
183:18,22

**expedite** 226:3

**experience** 84:1

**experienced**
129:19 139:3,24

**experiencing**
133:20

**experiment**
46:22

**experimental**
43:17 44:15,21

**experimentally**
138:16,17

**expert** 13:16 15:2
16:8 19:18 20:9
31:8,10,13 129:19
160:2 178:12,13
197:12,13,19,20,22,
24 207:21 222:9

**expert's** 202:1

**expertise** 14:1
103:14 197:24

**explain** 42:4
51:22 105:3 191:16

**explaining**
190:23

**explains** 106:13

**explanation**
210:20

**explicit** 89:8

**explicitly** 93:10

**explore** 101:12

**expose** 169:6

**exposed** 163:5
165:6,10 166:23

**exposure** 167:3

**expressed**
31:12,15,19,23
152:11

**extent** 31:6 35:21
75:15 109:9 121:13
131:10 164:16
181:6,9 217:14

**external** 96:20
112:4,14

_____

**F**

**face** 143:15

**face-saving**
89:6,15

**fact** 74:11,14
84:12 88:9 90:1
99:11,18 101:8
102:1 103:11
104:20 105:23
107:21 113:24
120:5 122:1 134:10
143:24 146:6,8
153:5,12 162:1
163:16,23 164:8,15,
23 180:13 181:2
186:17 188:1 189:7
190:9,17,19 191:4,
7,24 193:22 201:5
205:9 217:22

**facto** 130:12

**factor** 50:21
61:14 95:10,12
118:18 125:8
130:23 131:8 133:5
135:2,10 143:17
201:12

**factors** 17:6,17
18:7,11,14,16,18,
19,23 19:2 45:4,10
51:6 52:9,14 54:5,9
55:23,24 61:12,22
79:6 80:14 81:6
84:15 90:14 96:11
97:3 112:4 118:4,8,
13 119:4 153:18,23
154:2,3,11,12,15,
16,17 158:19 159:4,
9 180:19 188:7
196:20 198:8
213:21 217:8

**facts** 30:16,22
31:9,18 32:1,4,11,
17,24 33:4,14 34:2,
8 35:16,17 36:1,8,
23 37:1,5,9 54:12
55:12,14 56:2 61:20
139:1 144:8 190:3,
13,21 191:1,14
192:13,15 193:13

217:12,15

**factual** 53:19
55:8 59:23 60:12
79:21 83:14

**factually** 78:9,13
80:13 151:24
192:24 193:23

**failed** 91:21

**failing** 177:6

**fair** 10:8 31:20
126:19 127:2

**fairly** 39:24
206:17

**fall** 186:4

**false** 17:7,9,17
18:2,7,10,13,24
19:3 28:20 41:22
45:14,18 46:1,2
51:13 52:4,6 53:13
54:7 56:1,12,13
57:5 59:7 61:13,22
71:10,20 77:3,15
78:2,11,17,19 79:10
81:1,5,6,11,14,19
82:4,9,18,19,22
83:8,17,19 84:7,13,
15,19,20,21 85:5,6,
9,11,12,23,24 86:4,
5,7,10,11,23,24
87:5,14 89:4 90:1,8,
10 91:6,10,12,17
92:1 94:14 95:10,
13,17 96:7,12,17
97:3 112:7 116:3,4,
21,24 117:10,14,18,
21 118:9,14,18,22
119:1,2,5 120:13
121:4,24 123:4,8,13
124:5,8,11,16
129:22 130:1,3,23
131:3,7,10 133:6
135:4 136:4 137:9,
15,19 138:3,15
143:18 144:11,12,
17 151:2,5,10,13,15
153:19 154:4,11,16,
17 155:9,18 156:2,
10,19 158:2,7,10,
11,15 180:18,20,23
181:13,18,21 188:7,
14,19 189:1,3,10,

MELISSA RODRIGUEZ, PH.D.

September 13, 2016
Index: falsely..guilty

15,19,24 190:1,5,6
191:24 192:9,14,19
194:5 196:20 198:9
201:10,13 213:23
217:9 220:1,2,9,11,
15,21 221:9,10,14

**falsely** 58:18 85:2
86:19 87:4 96:21
112:1,18 115:13
116:11,16 117:20,
22 119:16,24 120:6
130:19 134:17
137:23

**familiar** 72:11
103:5 113:17
114:24 115:3
149:16 204:14
214:11

**familiarity** 14:1

**family** 204:11
207:24

**favorable** 13:9

**fed** 164:12

**federal** 9:13 12:2
19:14 64:24 65:9
67:24

**fee** 26:6

**feed** 81:8

**feedback** 21:16

**feel** 10:3 23:23
111:19

**fell** 81:14

**felony** 224:13

**felt** 119:17

**female** 160:8
206:9,12 218:24
219:10

**Ferry** 10:18

**field** 41:12 69:17
71:4 72:16 77:14
84:18 150:18,19
151:1

**figure** 27:16

**filed** 63:22 64:3,
13,23 65:6 67:19,24

147:21 212:6,18
214:20 215:3,23

**filing** 65:9 149:12
202:2 222:11

**final** 37:16

**Finally** 100:2

**financial** 122:22
153:6,8 158:24

**find** 45:18 81:10
103:8 109:15,20
176:7 207:10

**finders** 164:9,15
181:2

**findings** 56:8,10

**fine** 169:20

**finished** 194:15

**firm** 22:10 39:8,19
41:5 214:9 215:1

**fit** 113:21

**five-** 26:3

**flags** 54:6

**flaw** 32:9 36:14

**fled** 202:13

**flights** 110:21

**Florida** 48:22

**focus** 95:5 135:23

**Focusing**
139:20

**folders** 224:14

**follow** 33:21
37:22 38:2,12
170:21

**food** 19:8

**footnote** 57:11,
22 58:8 69:4,5 88:8
90:17 100:1 148:1
182:2

**force** 40:2 66:14,
15 68:14,15

**forces** 96:20
112:14,15

**forcibly** 102:2

**forensic** 160:17
217:11 218:7

**form** 13:19 22:4
31:5 34:5 36:18
39:3 64:6 74:22
77:18 120:19
136:20 147:9
148:20 185:11
191:12 193:15
196:12 198:17
207:18 216:5

**formal** 222:11

**formally** 39:7

**formation** 36:24

**forming** 31:11,
14,19,22 33:15
188:2

**forms** 204:4

**formulate** 196:9

**formulating**
34:9 37:10 40:15
210:18

**formulation**
32:18 34:3

**found** 29:8 81:12
155:6 159:15,16
160:7 199:21 210:2,
4 219:10

**foundational**
32:5

**Fourth** 217:3

**fraction** 27:12,20

**frame** 172:23
173:15

**frankly** 84:12

**freak** 157:11

**free** 10:3 23:23
73:24 86:24

**freely** 76:16

**frequency** 83:17
84:7,19 85:10 86:6
102:6

**frequently**
168:18

**Friday** 24:2 106:2

**friend** 204:10
207:24

**full** 9:3,5 34:16
59:4 106:6 107:1
176:4 190:8 198:23
199:13 200:1,4

**fully** 51:9 59:1

**functional** 88:16
89:12 90:19,22

**functioning**
103:18 106:6
133:13

**fundamental**
123:18 194:20

**funding** 12:2

**G**

**gain** 65:22 68:8
91:6

**Garden** 176:10

**Garner** 7:3

**gave** 121:24
132:12 142:13
150:1 165:1 182:21
220:1

**general** 71:6
101:4 123:2,8 130:8
131:4 142:7 152:20
196:22

**generally** 53:12
69:14,19 70:17
72:11,18 75:23
78:18 81:4 82:8
94:1 122:13 142:19
171:2

**give** 31:21 36:4
89:10 90:21 95:17
118:14,22 122:19
127:17 134:9
153:24 169:18
184:10

**giving** 41:8,10
133:6

**glanced** 26:18

**glean** 55:6 127:6

**gleaned** 22:24
37:9 52:22 53:4
54:12

**Gleason** 175:12

**Glenn** 219:22

**goal** 45:16 73:6,
10,20

**good** 101:11
124:23 128:3
129:1 169:16,19

**grade** 48:8

**graduate** 20:4
21:7

**grant** 11:19,22,23
12:4,8,9 210:20

**granted** 154:8,14

**granting** 158:20
159:5

**Graves** 136:22

**great** 85:15

**Griffin** 8:21

**ground** 9:20
116:12

**group** 12:1

**groups** 43:3,5

**guardian** 126:9

**Gudjonsson**
58:8,11

**guess** 16:15
57:10 122:6 123:2
183:17 191:2 206:3

**guesses** 40:7

**guessing** 128:5

**guilt** 150:11,21
151:2 168:3

**guilty** 28:23 43:16
44:2,4,14,24 45:20,
24 73:5,13,22,23

MELISSA RODRIGUEZ, PH.D.

September 13, 2016
Index: H-A-R-R-O-W..increases

74:2,6,10,18 75:10
77:6,10 87:1 95:3,
15,16 123:24 124:2
163:2,5

## H

**H-A-R-R-O-W**
214:8

**H-O-V-E-Y** 176:1
211:17

**habits** 134:2

**hairs** 218:4

**half** 45:1,2 210:7

**halfway** 200:15

**hand** 115:6 125:3

**handed** 11:8
24:13 64:20 67:21

**hands** 221:1

**handwritten**
223:24 224:8

**hang** 199:20
225:14

**happen** 122:5
162:21

**happened**
54:18,24 55:3 60:24
184:2 204:16

**happening** 94:1

**happy** 10:4,11
103:14 115:23

**hard** 18:22 39:4
140:2,4 141:19

**harm** 139:21
165:18 167:2,19,23
168:5,16

**Harrison** 127:21
145:10

**Harrow** 214:1,6,7
215:1 216:2

**harsher** 19:11
90:20,23 92:12

**head** 10:1 94:17
103:6 108:9 117:5
139:8 140:3 159:8

**hear** 102:10
222:13

**heard** 97:24 99:19
152:22

**hearing** 17:19,23
148:6 149:6,18

**hears** 157:20

**heavily** 50:17

**helped** 17:4 53:5

**helpful** 35:3 54:3
85:21 121:11 179:3
201:13 212:9

**helps** 81:8

**hey** 93:2

**high** 50:21 74:12

**higher** 77:2 112:9
116:17 117:14,18,
23 135:3 144:17
155:9 156:2,10

**highly** 76:20 77:4
103:11 187:10

**hit** 117:19 140:2
141:5,9,14,19
144:22 145:3

**hold** 178:11,13
184:6 197:14,21,23
198:21

**holding** 222:8

**Holmes** 62:13
100:19 128:16
129:8 157:9 162:13
171:6 172:2,13
182:18 183:13
222:5 223:17,19
224:9,10

**Holmes'** 203:6

**Holy** 8:20

**hope** 77:12

**hospital** 202:8

**host** 133:12

**hour** 25:17 26:5,9

**hours** 26:7,21
27:14,16 34:16 48:5
124:8,11,13,17
125:7 127:23
128:12 129:12
130:4,6,9,12,15
132:2,4 134:6,23
173:20 174:7,14,16,
21 204:17

**Houston** 13:14
48:24

**Hovey** 176:1
211:15,16

**human** 74:17
75:2,13 183:4
198:1,3

**hundreds** 29:24
58:9

**hyperlinks**
202:19 203:13

**hyphen** 198:24

**hypothesis**
95:2,7,8

## I

**i.e.** 193:5

**idea** 69:9 101:11

**identification**
11:4 24:10 64:17
67:14 151:4,10
158:1,18 188:20,22
189:2,9

**identified** 31:12
50:14 79:4 80:22
82:2,14 101:22
151:12 152:4
188:13 218:11

**identify** 31:9,18
45:13,22 52:9
114:19 181:3

**identifying**
36:14

**identity** 145:12

**ignore** 103:22,24

**illegal** 181:8

**Illinois** 7:13
151:22

**illness** 59:15
96:11 112:19
115:12,15,20
116:18 118:5
126:12,16 142:6

**illnesses** 59:20
117:7

**illustration**
177:10

**imagine** 56:19
126:4 134:13 207:1,
3

**impact** 50:21

**impair** 112:22
113:6

**impaired** 106:16
108:19 109:2,14
110:12,18,20
112:17 113:9
117:16 133:12

**impairment**
104:14 105:4,22
106:4 107:11 108:5,
11 110:23 112:20
115:10 117:8,15
118:5 126:13,17
133:9,14 142:6

**impairments**
104:21 115:2

**impetus** 172:20

**implicate** 101:10

**implication**
92:16,18 153:7

**implicitly** 93:10

**implied** 89:22
91:24 93:10

**imply** 89:2,7
92:11,15

**important** 53:18
73:6,10 116:15
168:1,5

**impossibility**
78:24 82:12

**impossible**
83:20 85:13

**improper** 17:12
21:3

**incentifies**
118:13

**incentive** 75:24
76:12,17 120:11,14,
22 121:7,8,14,24
122:3,11,14

**incentives**
122:4

**incident** 100:15
141:4 144:6 183:16
214:23

**inclination**
74:19

**inclined** 76:15

**include** 57:12,18
58:23 88:24

**includes** 89:5
197:16

**including** 62:12
104:16 182:23

**inclusion** 78:6

**incoherence**
110:22

**incoherent**
104:18 107:8 110:5,
16 111:5

**inconsistencie
s** 140:18 143:19
201:11 215:8,11

**Incorporated**
7:5

**increase** 28:20
123:4 144:13 198:8
201:9 213:22

**increased** 18:12
54:6 144:10

**increases**
130:18 144:19,21

MELISSA RODRIGUEZ, PH.D.                                    September 13, 2016
                                    Index: incredibly..isolation

187:11 189:24 190:5

**incredibly** 27:11 74:16 101:6 187:6 203:23 204:6 206:14

**incriminating** 172:18,20 182:19

**inculpatory** 103:22 218:9

**index** 226:2

**indicating** 108:10 113:8 140:9 162:14

**indication** 100:2 142:8 176:17

**indications** 107:11

**indicative** 83:2

**individual** 8:1 43:11,21 44:6 46:17,18 72:22 96:24 117:9 127:3 133:23 145:6 165:16 202:11

**individually** 43:5,9

**individuals** 43:2 50:13 58:24 70:1,4 105:13 116:20 220:1

**induce** 150:11

**inflict** 137:12

**influence** 49:19 71:6

**influenced** 49:13

**influential** 41:21 48:11 49:11,14 50:23 52:2

**informal** 20:3

**information** 30:19 45:24 46:2 49:18 52:22 56:4,6 60:23 61:4 63:13

65:9 69:18 88:12 95:4,6,8 109:12 111:9 114:6 134:8 135:12 143:9,13 164:12 165:6,13 166:13,14,18 167:3, 20 168:2 169:6,9 172:7 183:19 187:2 203:3 209:19

**informative** 186:20

**informed** 98:3 202:16

**initial** 39:18 40:2, 18,24 41:4 137:6 182:19 184:12,20 186:11

**initially** 23:13 210:9

**initiate** 44:10

**initiation** 44:19

**innocence** 79:22 83:14 131:13 151:8,9,18,20 153:12,16,21 154:8, 14 158:21 159:6 172:16 187:21,24 189:7,13,14,17 191:24 193:12 210:21 211:23

**innocent** 28:21 43:16 44:4,18,20,24 46:3 56:14 75:10 77:11 78:9,14 80:13 83:24 84:3 86:18 95:14 123:24 124:2 131:14 151:7,10,24 158:10 189:4,5 190:3,10,18,20 191:1,5,8,16 192:24 193:24 194:2

**inside** 145:18 219:5,8,14

**insight** 134:9

**instances** 61:3 116:5 138:6 186:9

**instruct** 35:10 38:9

**instructed** 43:8, 10

**instructing** 33:16 36:11

**instructions** 33:22

**integrity** 152:9 210:23 211:2

**intelligence** 103:18 105:11 106:10 114:11

**intense** 123:21 144:16 145:3

**intensify** 125:8

**intensity** 144:13

**interacted** 104:15,20,23 105:16

**interaction** 140:20 142:22 143:21,22

**interactions** 105:20

**intercourse** 160:13

**interest** 75:14, 16,20 92:23

**internal** 214:21

**International** 48:23 49:2

**interoffice** 145:15,19

**interpretation** 105:1 177:13

**interpreted** 176:24

**interpreting** 177:8

**interrogated** 104:8 124:22 125:18,23 126:21 127:22 128:16 129:1 171:21 172:3, 4,13 193:5 195:23

**interrogating** 62:9,11 94:2 172:1

**interrogation** 11:24 17:5,13 19:7 21:3 22:1 42:9 45:6, 10,22 46:6,19 52:9 54:23 62:19 63:11 75:16,18 76:9,21 80:15 85:17 91:20 92:4 94:14 106:24 108:6,8 109:10 112:14 118:8,17 122:19 124:6,10,12, 17 125:2,10,15,21 127:3,10 128:1,4, 10,15,19,20 129:5, 20 130:7,11,14,18 134:3 136:15 146:11 150:8,10 170:23 171:4,6,13 173:2,11,20 174:2, 6,10,11,14,15,20 175:2,4 178:14,20 181:5 182:22 183:12 191:22 209:3

**interrogation- related** 69:23

**interrogations** 41:17 42:3 49:16,21 50:5 51:7 55:4 63:2 71:7,14,17 74:11 76:19 106:15 109:6 124:10 129:9 130:6, 8 157:24 179:6,17, 23 180:9,14,17 182:23

**interrogator** 130:11 174:4

**interrogators** 94:8 120:6 123:17

**interview** 98:7 99:4

**interviewed** 98:12 99:12 113:18 172:17

**interviewing** 99:7

**interviews** 30:6 54:19

**intoxicated** 111:4,6

**introduced** 50:17

**inverse** 61:19

**investigate** 81:23 176:18 177:7

**investigated** 100:4

**investigation** 12:3 40:9 73:15 99:8 100:14,24 214:18,22

**investigative** 94:20

**investigator** 94:20,24 142:14,18 173:19,24

**investigators** 84:1 95:11,21 100:13 103:21 126:3 168:24 193:4

**invoice** 24:18,21, 24 25:5,12,13,14,16 26:12

**involve** 116:20

**involved** 17:22 50:4 62:9,11,18 94:13 95:14

**involvement** 74:7,20 76:1 77:7 94:18

**involves** 82:18

**involving** 21:18

**Iowa** 49:7

**IQ** 103:23 104:7 105:24 106:5,7 107:14,19 111:24 112:3,7,22 117:22

**Island** 7:15 10:19 180:7

**isolation** 118:7, 16 119:24 123:4,7, 13,15 125:2 129:20

MELISSA RODRIGUEZ, PH.D.

September 13, 2016
Index: issue..lost

**issue** 84:4 107:4 200:6 207:9

**issued** 153:13,15, 22

**issues** 69:23 71:11,21 116:14 171:18 181:4

**issuing** 151:21

**items** 217:1

**J**

**Jack** 8:17

**James** 211:13

**Janine** 113:12,18

**janitor** 101:24 204:13

**January** 199:6 200:24

**JD** 149:8

**Jeff** 91:18

**job** 119:1 192:18

**John** 8:16 94:9

**joking** 157:10

**journal** 50:21

**journals** 50:19

**Juan** 94:5,7

**judge** 17:4

**judicial** 152:3

**July** 24:19 25:5,14 26:12 210:12,16

**jurisdiction** 180:5

**jurors** 87:13

**jury** 87:11

**justice** 10:18 11:24 26:23 73:18 86:14,15 88:13

**juveniles** 126:8

**K**

**Karczewski** 8:21

**Kassin** 48:20 124:18 125:9

**Kate** 48:24

**Kato** 8:18 49:4 62:16 63:6 68:8,14 143:3,21,23 175:17

**Kato's** 40:1 67:1, 4

**Kedzie** 127:21 145:10

**Kiley** 8:6 102:8,16 195:15,16 196:14 197:5 198:20 199:10,13 200:3,10 208:10 209:8 211:21 214:13 216:13 221:21 225:2,18

**kill** 140:8 141:23

**kit** 202:9

**knew** 101:21,23 161:21 163:12 166:22,24 168:7

**knowing** 27:9 54:23

**knowingly** 112:23 114:3

**knowledge** 12:13 13:24 15:17 29:23 47:8 49:21 68:5 69:17 71:23 72:19 117:4 169:2 221:5 224:12

**Kris** 49:4 175:17

**Krista** 7:24 102:8

**Kriston** 8:18

**L**

**lab** 49:5 76:5

**laboratories** 50:24

**laboratory** 28:19 41:21 42:2,4, 11,14,17 46:6,21 47:10,23 48:12,13, 21 49:12 50:7,15 51:12,20 52:3,18,23 137:11 138:11,18

**lack** 133:21

**lacked** 209:14 213:19

**lacks** 194:10

**language** 191:3 199:2

**large** 84:8 179:11 199:4 200:22

**lasted** 127:1,4 128:4 129:2 171:6 174:21

**lasting** 130:6,12 173:20 174:14

**lasts** 124:12 130:15

**law** 21:22 22:10 41:5 53:5 69:6 83:23 166:8 200:19 214:9 215:1

**lawsuit** 68:1 205:3,6,10 214:19 215:3,23

**lawsuits** 204:20

**lawyer** 126:6 212:9 222:22

**lawyers** 213:5

**layout** 146:10

**laypeople** 114:18

**layperson** 115:5

**lead** 52:14 74:2 87:6,15 92:4 96:7 97:3 106:15 110:8 121:17 123:8,13 139:18 155:9

**leading** 32:6 76:22 161:15

**leads** 90:14 123:17 131:3,9

**learned** 49:19

**led** 60:2 108:18 109:1 120:6 134:16, 17 141:24 153:18, 24

**legal** 7:3,4 9:5 36:16 93:19 149:8, 15 150:15

**length** 45:9 124:7,9,16 125:15 129:20 130:4

**lengthy** 19:7

**leniency** 88:17 89:2,7,9,13,22 92:11,15 93:13,21 157:22

**lenient** 93:4

**Leo** 81:11 124:15, 20

**Leo's** 130:2

**level** 79:20 82:2 112:9 117:8 133:8 144:19

**lied** 177:1

**lifetime** 115:13 206:10,13 207:14 208:7

**light** 78:22 100:5

**likelihood** 28:20,22 54:6 77:3 117:18 130:19 135:3 144:10,12 155:11 156:2,3 181:12,18 189:20, 24 190:6 201:9 206:16,22 208:6

**limine** 202:2

**limit** 35:18

**Lindsay** 48:22

**lines** 92:20 93:5,9 182:4

**lineup** 128:7

**lineups** 128:1

**linking** 159:17,18

**list** 12:20 13:1 39:15 49:10 64:1 66:24 97:20 113:14 175:6 212:23 216:22

**listed** 13:5,13,21, 23 29:13,19 30:3 37:10 39:9,13 64:8 67:1 72:1,15 97:13, 15 212:20 224:17

**Listen** 35:2

**literature** 69:13 81:8,21 103:3,5,14 115:1,4 180:15 181:15

**litigation** 19:19, 24 20:10,13,18 27:4

**local** 9:14

**Loevy** 22:10

**logic** 43:7

**logical** 219:19

**long** 119:9,22 126:23 127:3 128:3, 5 129:1 135:13 136:14,20 139:15, 17 198:18

**long-term** 112:11

**longer** 123:20 133:13

**looked** 91:18

**looseness** 110:20

**lost** 170:14

MELISSA RODRIGUEZ, PH.D.

September 13, 2016
Index: lot..murdering

**lot** 85:1 135:20

**loud** 152:24

**low** 103:23 104:7 111:24 112:3,22 207:13 208:9

**lower** 156:3

**lull** 89:3

**lunch** 169:15

**lying** 60:10,15 61:16 152:4

---

**M**

**M-E-L-I-S-S-A** 9:6

**made** 35:23 53:10 58:24 59:4 103:22 105:8 149:5 151:24 172:17 182:14

**Madon** 49:7

**mail** 145:15,19

**Main** 7:15

**maintaining** 172:15

**make** 13:2 28:6 34:18,20 35:8,9 38:6 43:3 53:12 60:5,14 61:16 83:21 85:7 86:3 93:24 112:1 136:10,12 137:1 146:1 181:1 200:11 212:16 219:19

**makes** 43:3 162:6 172:22

**making** 53:15 136:7,16 187:16 194:12

**Malloy** 48:22

**manager** 98:3

**mandated** 179:12

**manipulate** 29:1 43:15 92:9

138:16 155:4,7,13, 24 156:6,12

**manipulates** 157:17

**manner** 56:9

**manuscript** 71:12

**manuscripts** 71:9,20

**Maria** 8:17

**mark** 10:22 24:6 64:10 67:11 175:21 176:9 177:14,24

**marked** 11:3,8 24:9,14 64:16,21 67:13,22

**material** 212:2

**materials** 29:15 39:9,12,15,17,19,22 40:13,18 55:10 59:24 60:7,11 85:18 97:14,20 113:14 131:20 140:14 143:10 206:2 212:3, 12,14 213:6 216:22 217:19 220:24 224:16

**math** 26:21 27:18 129:15

**matter** 7:9 10:24 11:11 16:5 64:24 119:17 145:2 158:8 165:7 170:12

**maximization** 28:14,24 90:18,21 91:5,12 92:3,9 155:3,12,17,22 156:5,9 188:10

**maximization-type** 91:15

**maximize** 45:23

**Mcgreal** 8:17 97:18,22 98:11 99:6,12,17

**meaning** 45:23

**means** 42:22

**medical** 14:9,11 195:23 200:20

**meet** 30:9

**Melissa** 7:8 8:14 9:5,11

**member** 204:11 207:24 211:2

**memo** 40:3 98:19 141:8 143:8 147:7 202:23 203:16 214:11,15,16,17,21 215:6,7,10,11,18 216:3

**memo's** 143:22

**memorandum** 140:16 141:13 145:7 146:24 147:18

**memorialization** 164:24

**memorialized** 161:1 164:1,10 224:9

**memorializing** 163:3

**memories** 197:7,10

**memory** 19:5 62:3,5 71:8 164:20, 22 166:4 169:10 183:4 196:22,24 197:2,17 198:1,3

**mental** 59:15,19 81:14,17 96:10 106:7 112:19 115:11,14,20 116:18 118:4,5 126:12,16 142:6

**mention** 94:4 97:6

**mentioned** 96:14 105:14 202:23 223:2

**merit** 69:15

**methodologies** 81:24 116:13

**methodology** 29:6 70:20,22 71:5

**Michael** 8:20

**Michalik** 8:3 169:19 170:9,10 177:22 186:6 191:18 193:18,21 195:9 199:18 209:6 225:5,17

**middle** 28:19 194:17

**Midona** 8:18 104:16,18

**midway** 41:15 59:9

**mind** 107:5 122:8 130:16

**minds** 158:4

**minimization** 28:23 88:15,19,22 89:11,24 90:9,13 92:8 155:3,12,17,22 156:4,8 157:17 188:10

**minimizing** 46:1 157:12

**minimum** 28:14

**minor** 13:9 144:4

**minute** 132:15 162:23

**minutes** 28:3 127:17 128:11,13, 17 130:9 171:7

**Miranda** 111:14 112:23 113:8 114:4, 8,13,15 115:2

**Mirandized** 111:22

**Miriam** 114:12

**Mironovich** 219:22

**mirror** 146:14

**mischaracterizes** 148:21 185:12

**Mischka** 8:18 62:13 108:24 128:2, 19 171:5 193:6

**misconduct** 44:12,13,16

**Mission** 176:10

**Missions** 134:11

**mistaken** 151:23

**model** 42:8 45:8 52:8

**Monday** 105:24

**money** 122:10, 11,13,14

**months** 176:11

**moral** 46:14

**morning** 28:4 99:13 102:3 129:9 134:24 182:24 204:16

**mother** 113:19 114:1

**motion** 147:21 149:1,6,10,12 202:2

**motivated** 118:22 182:5

**motivation** 162:20

**move** 32:14 34:23 35:8

**multiple** 58:17 62:10 116:13 118:3 119:4 120:5 126:24 127:24 141:9,14 152:19 175:4 182:23 189:22,23 206:24

**murdering** 91:20

MELISSA RODRIGUEZ, PH.D.

September 13, 2016
Index: naivety..pain

**N**

**naivety** 112:2

**name's** 195:16

**named** 215:2

**names** 211:10,11

**narrative** 201:16

**nature** 17:1 74:18 75:2,13

**nearby** 98:5

**necessarily** 61:15 70:15 76:2 83:2 93:2 111:3 116:12 137:4 138:14 180:21,22

**Neibauer** 105:19

**newspaper** 209:19 210:17 213:16

**night** 26:18 28:3 134:7,11 176:6

**nonacquaintance** 208:3,7

**nonfamiliar** 207:23

**Northern** 7:12

**Notary** 8:22

**notation** 177:5

**note** 75:22 140:18 199:2 200:20

**noted** 13:17 54:13 118:15 135:1 154:16

**notes** 15:7,16 16:14 49:10 99:10 169:13 223:18,24 224:8

**noteworthy** 175:5

**noting** 154:10

**notion** 88:14

**notoriety** 97:1

**November** 67:19

**Nowinski** 8:8 222:3,4,15,21 224:20 225:4,22

**nuanced** 187:2

**numb** 140:4 141:20

**number** 15:8 45:23 48:4 57:4 77:1 83:13 96:14 117:20 174:15 186:13

**numbers** 209:7

**numerous** 41:18

**O**

**object** 13:18 21:23 22:3 36:17 74:21 98:17 120:18 147:8 148:19 185:10,11 191:11 193:14 196:11 198:16 207:17 216:4

**objection** 32:20 34:13,18,22 35:8,10 36:16 77:17 177:19

**objections** 34:21

**objective** 164:2, 6,8,11,14 165:9 166:4 181:3 216:3, 7,11,15,18 223:2,6, 13

**observed** 146:2

**obtain** 53:6 66:2 127:9

**obtained** 198:12 201:19

**obtaining** 47:12 48:6 73:12 201:10

**occasion** 100:23 103:2,12

**occasions** 15:19 19:17 22:14, 19

**occur** 52:10 83:17 85:20 86:6 124:3 132:4 160:16 180:20 194:21

**occurred** 60:13 61:9,11,14 63:20 78:21,23 79:3,13 82:11 97:8 98:10 100:7 101:8 102:2 127:13 128:15 143:17 144:8 146:15 156:24 172:9 173:2,6,7 190:4,24 195:3 201:18 203:22 204:5 221:18

**occurrence** 134:13

**occurring** 180:24

**occurs** 44:19 162:19 165:8 208:2, 3

**October** 12:6,8

**odds** 213:23

**offenders** 115:11,14

**offense** 46:17 57:14,20 59:2 74:8 76:1 89:1,18,20 91:1,3 120:10 156:22 157:13 162:7,24

**offer** 17:10,11 89:8 93:21,24

**offered** 93:15

**offering** 192:8 195:1,5 198:14

**offhand** 210:14

**office** 8:9 24:17 222:6

**officer** 40:1 54:22 62:14,15 63:4,6,9 92:21 93:1 94:2

**128:24 139:7 140:7 143:2 171:20 172:1, 22 173:12 193:7

**officer's** 140:19 143:5

**officer/ detective** 146:2

**officers** 8:2,20 22:20 93:23 95:1 115:6 124:19 139:14 151:15 158:5,14 195:24

**official** 69:15,16 173:4

**oft** 41:20 48:11 52:2

**one's** 62:2

**one-way** 146:13

**open** 146:15

**opine** 18:9 79:8

**opining** 192:17 194:1,4,9 196:7

**opinion** 17:8,10, 11 20:9 63:7,14,15 82:17 88:19 100:21 103:21 110:17 159:23 160:19 174:6 175:8 178:18 179:1 189:19 192:8, 23 193:11 195:1,5 198:10,12 201:8 206:9,12

**opinions** 13:16 16:8 20:14 21:13 22:15,19 31:11,14, 19,23 32:18 33:15 34:3,6,10 36:24 37:10 40:15 41:7,10 55:7,13 72:24 105:8 135:9,22 153:11 187:20 188:2,4 189:16 196:10,19 198:8,14 202:1 208:19 210:18 213:7,20

**opposed** 123:14 125:10 131:4 134:7 138:6 184:7

**OPS** 8:4 63:19 67:9 139:9 140:5,16 142:13,17 143:1 157:7 170:11

**OPS's** 40:9

**order** 133:4 162:10 225:16,18

**ordering** 225:15

**ordinary** 114:11

**oriented** 9:20

**original** 21:9 49:5 50:16 59:22 186:14 220:24 221:6

**originally** 145:14

**ourself** 75:14

**outcome** 16:22 73:14 85:17 93:17

**over- represented** 81:18

**overarching** 86:17

**overturned** 151:21

**P**

**P-H-A-R-R** 175:21

**p.m.** 132:19,20 170:2,3 176:13 226:7

**Pacific** 176:10

**pages** 12:15,18 29:14,20 37:11 39:9,16 54:14 64:2 66:5,11 68:11 72:1 135:22 225:24

**paid** 16:10,13

**pain** 137:12,19 138:3,6,7,10,12,21 139:11

MELISSA RODRIGUEZ, PH.D.

September 13, 2016
Index: paired..polygraph

**paired** 42:18

**pairs** 43:3

**Pan** 105:12
142:11,16

**pants** 160:8
218:23 219:6,7,15

**Papa** 211:13

**paper** 69:6,10,11
70:3

**paradigm** 42:2,
5,7 45:3,7,8,12,16
48:13,16,19,20
49:5,12,18 50:15,17
51:1,2,3,12 52:7
53:4 137:14

**paradigms**
41:21 48:12 52:3,23

**paragraph**
28:13 57:3 59:10
65:14,16,20 68:6,7
69:4 88:9 115:9
160:20 176:4 190:8
191:20 192:21
194:18 198:23
199:12,14 200:1,4,
16 209:12

**parent** 126:8

**parks** 126:1

**part** 50:22 54:2
70:9,18 71:1 75:18
90:16 109:10
112:11 119:15
139:16 149:5 176:7
189:18 192:15
220:22 224:18

**partial** 59:5

**partially** 105:9
147:23

**participant**
42:19 44:9

**participants**
43:16 45:1 47:5,22
138:17

**participate**
42:15 43:2 47:9

**participating**
47:11

**participation**
47:24

**particulars**
116:6 147:12

**partly** 149:12

**parts** 86:15

**party** 163:2

**party's** 31:3,10,
13

**passage** 62:1

**patients** 14:13,
17

**Paul** 8:3 70:13
170:10

**pay** 95:7

**peer-reviewed**
41:19

**Pena** 8:17 98:4

**pending** 10:13

**penetrated**
184:14,17 185:1
186:2 196:1

**penetration**
185:7

**penile** 217:18,23

**people** 43:4,5
45:20 54:24 56:18
58:18,20 62:11 70:8
71:2 73:5,13 74:14
75:11 76:14,15
77:6,10 81:17 83:24
84:3 85:1 86:18
87:1 96:21 104:14,
19 105:2 114:10
115:1 116:10,17
117:1,22 122:11
123:16,18,24 124:2
126:16 127:7
131:11 137:12,21
138:9 157:7 169:6

**percent** 58:15,16
59:12,13 81:13 84:2

**percentage**
27:3,5,19 74:12
76:6 79:19 83:19,24
84:7,13 130:5
206:20 221:17

**percentages**
57:4 58:12

**perception** 29:1
121:15 155:4,8,13,
24 156:6,13 157:18

**perceptions**
92:10

**perform** 27:7
48:4 70:7

**performed**
46:21 61:18

**performing**
47:11

**period** 124:4
134:22

**periods** 123:3
136:14,20 139:15,
17

**peripheral**
184:23 185:23
186:4

**perpetrator**
79:3,17,18 82:14
194:22 195:7

**person** 21:10
56:14 60:16,19,24
61:1 73:22,23 74:2,
10,18 75:19 78:24
79:1 82:12,15 95:3,
14,15,16 101:21
112:17 117:16
120:9 122:15
141:22 163:5 165:5
166:22 207:24

**person's** 62:5
169:10 208:7

**personal** 13:22

**personally**
80:19 161:11

**personnel**
200:20

**persons** 45:24
46:3 77:11

**perspective**
168:1 183:4

**persuasion**
71:6

**persuasive**
76:21 77:5

**pertaining** 22:1

**Pete** 130:10 174:4

**Ph.d.** 8:14 71:2

**Ph.d.s.** 70:19

**Pharr** 175:21
176:10 177:14,24

**Pharr's** 176:24
177:17 178:8

**phenomenon**
17:5 93:8 96:16
105:23 165:4

**phonetic** 136:22

**photographs**
161:14 169:8

**phrase** 28:10
29:10 31:17 48:9
51:11

**physical** 62:18
63:1,4 65:21 66:2
68:8,14 78:23 82:11
123:13 135:23
136:3,5,6,10,11,17,
21,24 137:9,19
138:3,21 139:11,18,
21,23 140:1 144:9,
14,16 147:23
148:12 149:2,5,10,
20

**physically** 62:21
63:10 110:7 119:19
138:17 139:5

**pick** 104:20

**picked** 104:24

**piece** 127:8
129:3,13 131:21
143:12

**pieces** 60:23
203:2

**piecing** 172:5

**place** 146:5
173:11 188:1

**places** 125:18,24
180:6

**plaintiff** 7:10,23
21:1

**plaintiff's** 65:15
66:12

**play** 112:15
134:21 191:17

**player** 73:17

**plea** 74:3 93:20

**plenty** 34:4 113:7
114:10 137:17

**plural** 58:5

**point** 14:16 72:2,9
98:21 99:7 111:22
116:15 144:20,22,
23 145:2,3 164:10
173:1

**points** 56:5

**police** 8:2,19,20
22:15,20 23:1,14
54:22 62:14 63:4
76:20 77:2 85:15
92:21 93:1,23 94:2
95:1,23 96:8 100:3
115:6 124:19 127:6
128:24 139:6,14
151:14 158:4,14,15
166:8 168:18,23
173:5 176:17,24
177:6,13 178:4,5,7,
12,14,15,17,19
179:5,15,24 180:2,
4,11 181:7 182:6
183:8 184:2 186:12
188:5 195:24
199:16 201:7 202:5
223:22 224:3,5

**policy** 126:11

**polygraph** 91:21

MELISSA RODRIGUEZ, PH.D.

September 13, 2016
Index: poor..pure

**poor** 193:19

**populations** 58:20

**portion** 105:14 126:24 145:20 163:14 179:11

**posed** 33:18

**position** 93:24 114:8

**positive** 158:1

**possibility** 180:23

**possibly** 40:3,20 56:19 122:4

**post-confession** 201:15

**post-conviction** 212:2,3,6,12,13 213:9

**posted** 202:12

**potential** 91:2 96:3 121:1 131:8 154:10

**potentially** 22:14,19 46:20 55:12 61:14 86:24 87:2 134:23 135:8 164:22 168:17

**practice** 179:5 180:4,6,8

**practices** 178:12,14,16,17 201:9 222:9

**pragmatic** 92:16,18

**pragmatically** 92:11,14

**precludes** 164:15

**predicated** 153:11 164:23 187:20 189:16 191:23 193:11

**preparation** 25:8,21 29:15 212:21,22

**prepared** 24:22 28:1

**preparing** 212:24

**presence** 73:21 112:21 126:2 135:1

**present** 18:15, 19,20 54:10 79:6 80:14 81:7 87:12 90:10,13 91:12 109:5,8 126:6,8,18 131:16 150:20 153:18,24 156:11, 13,17 158:15 206:21 213:22

**presentation** 91:16 156:19 188:14 189:10,15, 23

**presented** 151:11 158:11 188:6 190:4

**press** 13:8,10

**pressing** 86:17

**pressure** 96:20 112:18

**prestigious** 50:19

**presumption** 181:16,17

**pretend** 158:3

**pretends** 44:5

**pretty** 33:9 102:3 105:23 110:5

**previous** 100:6 101:16

**previously** 110:14 111:20,21, 23 193:5

**primarily** 45:7

**principles** 54:15 55:15 196:22

197:16

**prior** 22:13,18 37:16 38:16 76:8 83:7 100:23 111:10, 14 160:24 163:12 204:14 212:24 223:12

**prison** 79:2 121:2

**prisoners** 59:14

**private** 125:18

**privilege** 30:20

**privileged** 30:19,22 32:3,10, 11,21 33:5 37:23 38:10

**probability** 207:13

**problem** 35:5,15, 20 38:19 44:6,7 86:11,12,13,17,22 114:2

**problematic** 113:9

**problems** 43:8, 12,21,23,24

**Procedure** 9:13

**proceeding** 213:8

**proceedings** 211:23 212:7 213:10

**process** 18:4 42:8,9 52:8 75:19 95:4 109:10 112:12 190:23 216:9 220:23

**processes** 22:2

**procured** 147:22

**produced** 187:3

**producing** 18:7

**product** 190:13

**professional** 14:19 41:14

**professionally** 9:8

**professionals** 53:5 195:24

**professor** 21:11, 17 26:22

**prolong** 123:3

**prolonged** 19:7 118:7,16,21 123:7 124:5 130:17

**promise** 89:12

**promises** 88:16

**prompt** 100:24

**prone** 117:10

**pronouncing** 40:5

**proof** 116:12

**proper** 150:9,15, 17,18,24 151:1

**proposition** 123:2

**prosecution** 21:8,14 54:8

**prosecutor** 222:10

**prosecutors** 93:18,20 100:3

**Protect** 31:2

**protecting** 75:14

**protocol** 166:8

**proven** 78:19 81:1 82:3,9 130:3 220:10,15

**provide** 17:4 21:13,16 22:15,19 30:13 31:4 32:16 33:13 34:1,8 36:22 76:12 85:18 109:13 117:10 166:12 182:6 186:11 204:24 205:2 209:23

**provided** 17:2 31:10,13 32:1,5 33:1 34:4 35:24 36:1 37:2 63:21 79:16 111:9 146:16 164:17 165:13,20 166:2 175:7 183:2, 7,19 192:9 193:3 194:5 200:18 201:7

**Providence** 7:15

**providing** 19:24 32:11 89:6 93:14 116:21 129:21 130:1 184:1 192:13

**psychiatry** 14:7

**psychologic** 30:1

**psychological** 30:2 54:14 55:15 74:19 120:11,14,22 121:7 169:5

**psychologist** 14:14,17

**psychology** 14:3,20 50:19 69:6 71:3 197:16

**pubic** 218:4

**public** 8:22 125:24 126:1

**publication** 71:11

**publications** 12:20,24 13:1,4,13 22:22 29:19 49:10 71:10,24

**published** 41:18 50:18 71:22

**publishing** 48:17

**punish** 90:23

**punishment** 19:11 73:5,9 90:20 91:23 92:12

**pure** 207:15

MELISSA RODRIGUEZ, PH.D.

September 13, 2016
Index: purported..reflected

**purported** 221:9

**purportedly** 223:16

**purports** 213:17

**purposes** 19:18 20:1,10,13,19 27:4 46:7 47:12 48:6 59:18 77:16 78:12 82:20 143:24

**pursuant** 9:12

**put** 46:22 86:21 129:20 201:23 220:7

**Q**

**qualifications** 13:16 41:14

**quality** 135:15,19

**quantified** 82:5

**quantify** 133:10 141:18

**Querrey** 40:3 98:19 202:23 203:16 214:1,5,6, 11,24 216:2

**question** 10:2,6 13:19 15:9 20:16 22:4 23:4,7 31:17, 20,24 32:4,5,6 33:12 34:7 35:15, 19,21 36:7,12,18 37:20 38:9,14,19, 22,23 47:14,18 50:9,12 51:9 53:2, 15 55:17,21 58:22 68:17,21 74:22 75:7 77:18 78:14 79:12 80:3,6 98:22 102:22 106:21 109:23 110:2 113:4 114:16 120:19 124:23 125:13 130:16 137:6 140:11 147:9, 10 148:17,20,22 154:23 167:10,13, 18 178:22,24 181:14 183:17

185:11,14,16,18 191:2,12 193:15,16, 19 196:12,15,17,23 198:17 207:5,18,19 216:5 219:13 221:5 222:16,18

**questioned** 125:5 172:13

**questioning** 126:24 127:1 129:10

**questions** 10:13 33:17,23 161:15 194:20 195:18 201:24 202:3 221:22,24 222:7 224:24

**quickly** 127:14

**R**

**R-O-D-R-I-G-U-E-Z** 9:7

**R-U-S-S-A-N-O** 9:7

**Rachel** 8:6 195:16

**raise** 54:5

**randomly** 44:3

**range** 58:15 59:12 81:15

**ranges** 58:21

**rape** 100:13 102:2 153:2 197:7,10,12, 13,19,20,22,24 198:3 201:22 202:1, 3,6,9,12 203:4,6,22 204:8,13 206:1 207:21,23 208:3,4 209:14 213:19

**raped** 101:20 206:10,13 207:14 208:6

**rapes** 204:5,10 206:23,24

**raping** 91:19 193:1,24

**rapists** 73:9

**rare** 87:11

**rate** 115:14 116:17

**rates** 58:14 59:8, 11

**Ray** 76:5

**re-** 84:22 193:17

**re-create** 46:5, 14

**react** 46:19

**reaction** 114:7

**read** 23:4,7 28:18 30:24 47:15,18 55:11,16,18,21 59:7 65:15 66:7,11 68:18,21 72:1,8 75:4,7 79:24 80:3 89:7 92:19 93:4 97:10,17 98:21,23 99:2 102:10,14,19, 22 104:11 106:18, 21 107:23 108:12, 21,22 109:23 110:2 111:14,15 113:1,4, 11,22 132:8,11 140:23 145:20 147:11 148:5,14,17 149:17,22,23 154:21,23 163:14 167:12,15 176:14 185:18 190:15 191:6,21 192:4 193:8 196:14,17 201:2 202:15 209:16 210:22 211:1,7 218:1,3 222:18

**reading** 29:5 59:6 93:8 212:5 217:22

**real-life** 51:19,23 52:17,20,24 53:7, 11,18 91:4,11 92:1

**real-world** 46:5 90:3

**reality** 97:1

**reason** 10:11 96:23 102:11 119:16 121:2,5 123:11 137:17,22 215:15

**reasonable** 41:8 105:5 122:9 144:15 157:19 158:16

**reasons** 46:15 71:22 83:10

**recall** 39:17 41:3 108:23 155:2 171:1, 14 173:14,22 187:11 214:3 217:21,24 218:2,5

**recalled** 186:22

**receive** 12:4 19:10 64:9 95:5

**received** 11:10 13:8 24:16 40:17 41:4 153:8 204:22 205:9

**receiving** 133:19

**recent** 13:14 28:7

**recess** 88:1 132:19 170:2

**recognized** 138:20

**recollection** 142:19 203:17 205:17

**recommendati on** 125:19,22

**recommendati ons** 49:20 126:11

**recommending** 179:10

**record** 7:2,20 9:10 19:13 53:20 54:22 63:17 65:6 87:20,22 88:5 99:2 102:14 107:1,3 109:4 111:10,18 128:3 131:24 132:5,

17,23 134:19 148:21 156:15 163:11 164:2,6,8, 12,14 165:10 166:4 167:15 169:22,24 170:6 174:24 179:13 180:8 181:3 201:23 223:2,6,13, 14,15 225:12,14

**recordation** 223:11

**recorded** 107:1 173:5 179:20 181:10 221:7

**recording** 7:2 126:22 179:12 180:13 181:6 223:9

**records** 41:4 54:13 62:24 63:14 64:1 65:24 76:24 95:19,22 96:5 106:11 111:8 134:9, 16 142:21 145:5 148:7 202:8 206:1

**red** 54:5

**reduce** 181:12

**reduces** 73:22 181:17,21

**refer** 23:18,21 49:7 72:22 91:7 176:4 208:23

**reference** 69:5, 19 157:4 183:6 203:6,9 206:4

**referencing** 138:9

**referred** 110:14 143:2 173:17 208:12 220:12

**referring** 21:6 58:16 70:5 118:24 206:19 208:13 223:7

**refers** 62:15

**reflect** 217:10

**reflected** 11:20 25:4 145:15

MELISSA RODRIGUEZ, PH.D.

**refuse** 33:22

**regular** 134:2,12

**Reid** 88:9 94:9,13 125:20 130:10,13 174:4 179:9 180:13

**reinterrogation** 129:7

**reject** 63:19

**rejected** 71:11, 16

**relate** 31:7 198:8 203:4

**related** 40:8 71:4, 17 83:14 96:23 112:7 113:16 170:21 191:2 202:1

**relating** 187:14

**relationship** 112:8 136:3 137:8, 18

**relative** 28:23 155:11

**relevance** 201:8 207:3,7

**relevant** 18:23 19:2 46:18 56:6 69:21 70:10 71:1 111:3 122:18 169:3 183:12 217:7,12,16

**reliability** 83:11 138:23 166:5 167:24 191:16 200:6 201:15

**reliable** 143:9

**relied** 30:4 31:14, 18,22 33:14 34:2 36:23 37:5,9,12

**rely** 29:18,22 37:2 139:1 210:17

**relying** 13:15,23 32:12 139:10

**remain** 154:12

**remember** 25:11 37:1,4 41:2 45:1 66:4 99:15,20 108:9

111:12,19 119:15, 20 120:2,7 156:21 159:7 166:21 182:7 185:8 212:5 223:3

**remembered** 167:1 168:2 183:21 184:19

**remembering** 142:1,22 162:8 167:3,19 184:8,23

**remind** 113:16

**render** 13:16 16:8 20:9,14

**rendered** 73:1

**rendering** 105:8 208:19

**repeat** 20:16 23:2 47:14 68:17 75:3 79:23 106:17 112:24 148:13 185:15 193:17 222:16

**repeatedly** 208:18

**rephrase** 10:5 77:20 84:23 196:13 198:19

**report** 11:1,9 12:19 19:18 23:18, 22 25:7,17,22 28:1, 7 29:11,14,16,20,22 30:3,15 31:4 37:11, 13,17 38:17 39:10, 16 40:11,16 41:13 48:10 52:1 54:11 56:16 67:5,9 69:3, 19 72:5,6 73:2 84:2 85:16 88:8 94:4 96:15,17 97:5 101:15 103:16 104:11 105:14 109:16,20 115:8 118:6 123:1 127:11 129:17 136:9 137:2, 22 139:9 143:1 147:20 150:7 157:6 170:22 173:18 176:3,7,9,21,23 179:8 182:1,15,16,

17 186:15 190:8 191:20 192:16,21 194:16,23 198:23 202:19 208:24 212:21,22 213:1 216:21 217:2,3,4 224:3,17

**reported** 134:10 140:3 141:8,14 143:14 152:22 178:5,6 221:15,16

**reportedly** 220:2

**reporter** 7:17 9:4,22 11:7 24:13 64:20 67:21

**reporting** 141:3

**reports** 63:19 127:6 139:14 144:2 176:17 178:5,7 184:12 202:5 217:7, 10 218:7,20 219:10 223:23 224:6

**represent** 24:15 64:22 67:23 170:11 195:17 215:21 222:5 224:4

**represented** 215:1

**reputation** 121:16

**requested** 40:14

**require** 126:7

**required** 31:4

**requirement** 126:15

**requirements** 180:12

**reread** 108:7 174:17

**research** 28:20 41:16 42:22,23 46:6 48:5 49:15 50:1,2,3 51:6 53:8 55:14,24 56:8,10 70:2,7,11, 14,15 76:3 81:3,21 82:20 86:2,8 87:9

88:14 103:15 112:6 113:7 114:10 189:21

**researcher** 85:21

**researchers** 48:15 77:24 78:5 80:23 81:2,4

**reserved** 225:7

**respect** 117:12 167:24 177:14 179:6 182:14 195:19 202:3 213:9

**respectfully** 35:7

**response** 168:20

**responses** 9:24

**restatement** 187:10

**resubmit** 71:15

**Resubmitted** 13:6

**result** 74:12 93:13

**resulted** 15:11, 20 82:22 94:14

**retained** 15:1,6, 20 16:7 22:9,13,18 23:16 39:7 210:8,9, 11

**retardation** 81:15,18 96:10 106:7

**retelling** 185:23 186:19

**retellings** 187:3, 9

**retract** 120:12 121:3,17

**retracting** 121:9

**retrained** 173:19

**reveal** 138:2

**revealing** 33:4,5

**review** 13:9 21:21 22:14 25:21 29:14 54:13 56:4 60:21 63:14 65:24 72:20 76:24 95:19,22 96:4 103:17 111:8 119:10 140:14,15 145:4 148:6 175:9, 11,16,20,23 177:17 202:5,8 205:2,5,24 206:5 211:8,22 212:1,2,18 213:7,12 219:21 220:23 222:10 223:18 224:8,13

**reviewed** 28:1 34:5 60:6 61:24 63:5 97:14,21 98:20 99:23 100:12 104:5 106:12 118:20 152:11 178:9 203:3 206:3 212:20,22,24 216:23 217:20 221:3 224:16,19

**reviewing** 20:8 59:23 60:17 62:24 131:20 143:10

**reviews** 11:18 12:22 28:7 29:21 58:9 65:3 67:2 68:4, 16 72:7 97:12,19 108:14 109:18,21 113:13 127:19 148:3 150:5 157:5 175:14 199:1 202:17

**revise** 71:14

**Revised** 13:6

**revision** 29:4

**revisions** 13:9 25:6 28:5

**Rhode** 7:15 10:19 180:7

**rich** 165:11

**Richard** 8:21

**Ricks** 13:14

**Riggio** 8:7 40:4,6, 22 60:3 101:18

MELISSA RODRIGUEZ, PH.D.

September 13, 2016
Index: Riggio's..similar

111:11 120:1 152:4, 18 158:2 159:1,12, 16,18,19 160:8,12, 15 184:1,6,11 186:10 187:13 189:9 193:1,24 194:9,13 195:17,22 200:17 204:17,21 214:20 215:3,23 218:9 219:1,11

**Riggio's** 151:3 152:13 187:17 188:19 189:2 198:10 203:11 205:24 215:9,12

**rights** 21:2 111:14,15 112:23 114:4,13,15

**risk** 18:12 46:1 61:14,21 95:10,12 117:14 118:3,18 119:4 123:4 130:23 135:2 143:17 144:19 154:10,12, 16,17 156:10 180:18 188:6 201:12

**Rita** 8:17

**Rivera** 94:5,8

**Road** 10:18

**robbery** 16:20,21

**Robert** 175:24 211:15,16

**Roberts** 8:16 62:13 65:21 66:2,14 100:18 107:24 108:3 128:21 129:6 156:20 157:9 162:13 165:2 171:11 172:3,17 182:18,20 223:12, 16,20 224:10,11

**Roberts'** 108:6,8 163:15 168:11 193:1 203:10

**Rodriguez** 8:14 9:6,12

**Roe** 98:3,5,6

104:18 109:5,12 110:4,11

**Roe's** 107:6

**Roger** 10:17 26:24

**rolled** 106:2

**romantic** 208:1

**room** 43:6 55:1 97:7 125:7 128:9 136:15 146:4,11 213:5

**roughly** 20:5 27:14

**routinely** 137:22

**rude** 35:1

**Ruggio's** 100:4 209:14 213:19 219:22

**rule** 23:20 31:1,5 43:17 44:15,21 101:4 165:12

**ruled** 151:23

**rules** 9:13,14,20 31:2 34:20 35:12

**run** 12:7

**runs** 75:16

**Russano** 7:9 8:14 9:6,9,12,16 13:14

**Russell** 7:21 34:13 35:23 36:12 64:12 67:17

**Russell's** 193:20

---

**S**

**salient** 187:10

**samples** 58:15 59:8,12,14

**Saul** 48:20

**saved** 38:17 39:3

**scale** 86:21 106:7

**scales** 106:10

**scared** 119:18

**scene** 160:24 161:14,17,23 162:5 163:2,3,10 165:18 166:11,23 167:4,21 168:9,13 169:8

**schizophrenia** 116:20 117:2,6

**scholarly** 41:18

**school** 10:17 14:9 20:5 21:7 26:23

**schools** 125:21

**science** 69:22 70:20,23 71:3,5

**scientific** 13:24 41:9 69:21 70:2,10, 18 71:1 77:16 78:11 80:22 81:9

**scientist** 14:23

**scientists** 50:3

**section** 56:17 109:15 194:18 209:2 216:21

**sections** 72:9

**secured** 204:21

**security** 89:4 98:3 204:22 205:1 214:18,20 215:1

**seeking** 122:22

**self-interest** 75:9

**self-report** 115:12 116:8,9,16

**self-reported** 58:14 59:7,11 116:3

**self-reporting** 115:20

**semen** 160:7,11 218:24 219:10

**send** 39:8

**sense** 53:15 89:4 139:16 149:14 169:1 172:22 208:5 216:7

**sentence** 28:12, 17,19 56:18 58:13, 16 90:16 92:7 93:4 115:11 192:22 194:18 209:11

**separate** 26:6

**separately** 49:1 137:2

**September** 7:6

**Sergeants** 8:19

**SERI** 217:1,2,3,7, 10

**series** 43:7

**seriousness** 89:1,17 91:1 156:22 157:13

**served** 202:4

**serves** 201:8

**services** 16:10 19:24 25:18 27:22

**session** 127:4 174:1,2,14,20

**sessions** 126:24 174:16 175:4 206:5

**set** 61:5,15 69:1 190:2,21 191:1,14 192:13,15

**setting** 44:17 46:19 84:6

**settlement** 153:8 205:9,11

**settlements** 204:23

**setup** 146:10

**severe** 117:7 140:6,9 141:21

**severity** 46:16

**sex** 158:24

**sexual** 46:24 47:6 60:3 97:24 99:13, 17,19 100:6,21 102:6 103:10 105:17,21 111:11 120:1 159:24 160:12,15 195:2 197:8

**sexually** 103:1, 11 159:11

**shackled** 125:7 135:18 136:14,19 139:15,17

**shackling** 136:23

**shakes** 10:1

**sheriff** 8:11

**short** 124:4

**short-term** 112:10

**shorter** 109:20

**shorts** 219:6

**show** 173:2 225:6

**showed** 159:10

**showing** 161:14 169:5

**shown** 204:17

**sic** 56:20 115:12

**side** 140:3

**signature** 225:7, 24

**significance** 163:20,21,23 164:4, 5 182:12

**significant** 144:1 166:6

**significantly** 192:2 199:3 200:21

**signs** 108:10,17, 24

**silly** 104:3

**similar** 100:8 101:7,13,17 102:4

MELISSA RODRIGUEZ, PH.D.

September 13, 2016
Index: similarities..studies

203:23 204:6
206:14,23 207:15
208:8

**similarities**
153:1 158:23

**similarly** 90:12

**single** 85:17
174:1,13 187:6

**sister** 113:19
114:1

**sit** 129:15 217:21
218:2

**sitting** 135:18

**situation** 9:21
42:10 46:23 57:6
96:19 122:18
123:22 125:8
130:17 153:6
191:15

**situational**
112:15

**situations** 58:24
155:18

**six-hour** 174:13
175:2

**sizable** 76:6

**skills** 103:7

**skipping** 170:13

**sleep** 110:24
130:22 131:2,5,9,15
132:4 133:4,5,11,
13,16,18,19,21,22
134:2,6,14,16,20
135:2,6,9,15,18,19
144:18

**sleeping** 97:7,24
98:5,12 99:18
134:11 135:7,17
152:17 158:22

**slept** 131:22 132:1
134:21 135:13,14
162:2,3

**slight** 140:24
141:15

**slow** 104:16,17
105:3 107:9

**small** 27:11,20
206:17 207:1,3

**social** 14:23 50:3
69:22 70:20 71:3,4
123:19 169:5

**societal** 73:6,10
86:11,12,22

**society** 69:6 84:8

**solve** 43:9

**solved** 43:10

**solving** 43:11
44:6

**somebody's**
112:22

**something's**
82:9

**sooner** 185:5
197:4

**sort** 21:2 72:20
75:24 77:13 105:4
126:8 152:1,3,6
153:6 208:1

**sought** 133:3

**sounds** 169:16

**source** 23:13
143:9 169:9 209:18
220:24

**sources** 29:18
30:4 72:15 161:13
175:7 189:22
202:21

**South** 7:15

**speak** 35:14

**speaking** 34:20
122:13 223:19

**specialist** 7:4

**specific** 18:6
19:13 22:5 37:5
58:12 75:12 78:4,5
84:13 89:10,23 90:7
118:12 138:14
139:1,22 157:4

159:4 191:3 212:4

**specifically**
18:21 40:14 42:1
48:18 57:10 70:15
99:21 101:22
119:14,21,23 120:4
125:13 133:3
134:15 135:24
137:8 138:5 139:20
152:20 155:23
156:21 173:14
174:18 182:1
217:24 218:5

**specifics** 125:1

**speculate**
128:10 203:20

**speculation**
84:9 129:12 207:16

**spell** 9:4

**spent** 176:6

**stable** 105:23
144:24

**stake** 216:8

**Stalf** 7:24 9:2,10,
15 10:22 11:6 14:2
22:6 23:3,10 24:6,
12 30:21 31:24
32:13,15,23 33:6,
16,20 34:12 35:4,6,
22 36:10,15,19,21
37:21 38:1,11 39:1
47:15,21 55:18
56:24 57:23 58:1,3,
6 64:10,19 65:7,12
67:10,16,20 68:18,
24 75:4,21 77:21
79:24 80:9 87:19
88:6 98:23 99:5
102:12,17,24
106:18 107:13
110:9 113:1,10
120:23 132:14
133:1 147:14
148:14 149:3
154:21 155:15
167:12,17 168:21
169:12,16 187:19
188:3 225:1,16
226:1,3

**stand** 113:21

**standard** 179:4
180:3,6 184:6,9

**standpoint**
166:4

**start** 12:5 15:13
76:9 131:11,13
133:20

**started** 49:19
128:7

**starting** 12:6
28:18 128:21
142:10

**startling** 101:13

**startlingly** 100:7
208:8

**starts** 28:13 190:8
200:5

**state** 7:19 8:9 9:3
15:23 48:10 49:7,
11,14,20 56:18
69:16 88:9 90:17
92:7 120:4 151:22
209:12

**state's** 175:12,24
183:8 188:5 209:13
213:18 222:5
224:14

**stated** 34:19
93:10 173:15 174:5
195:21 208:18

**statement** 69:16
82:6 157:14 161:21
162:16 165:14
176:24 178:23
182:13 183:1
185:13 190:12
199:5 200:16,17,23
201:7,12 204:5
223:8

**statements**
103:22 107:6
110:11 119:13
172:18,21 183:7,20
186:11 198:13
200:18,21 215:9,12

**states** 41:15

59:11 100:2 126:7
199:3

**stating** 49:23

**station** 127:21
145:10

**statistical**
206:16,22 207:13
208:6

**statistics** 22:23
23:12 59:19 206:19
207:8,21 208:12,13

**status** 13:6

**STENOGRAPH
ER** 225:13 226:5

**stenographic**
7:20

**Stephanie** 49:7

**steps** 97:23 116:2
176:18

**Stone** 105:12

**stop** 169:15

**story** 152:13
169:8 182:9 187:4

**stranger** 101:21
102:2

**Street** 7:15

**strike** 140:13
143:7 186:7 218:16

**strong** 41:11
74:18 120:11,14

**struck** 139:7
145:23

**struggling** 44:5

**students** 42:13
44:3,11 47:9

**studied** 51:16,19,
23 52:13,14 57:6

**studies** 10:18
26:24 30:1,2 47:3,
10,12,23 50:7 57:4,
9,18 58:4,17,22,23
59:22 69:23 72:22
80:11,18,19 81:1,9

MELISSA RODRIGUEZ, PH.D.

September 13, 2016
Index: study..themes

82:1 85:4,7 102:5, 18 103:9 112:16 116:8,9 117:21 133:2 136:2 137:7, 12,24 138:1,5,8,13 168:22 169:2,5 181:15,20 189:23 197:6,10 198:3 219:24 220:10,22 221:6,8,13

**study** 29:7 31:8 42:15,20 43:2 48:5 49:16 50:4,16 51:6 53:17 57:12 58:2,6, 10,11 71:5 77:14 81:11 84:1 115:18, 23 116:2,7,13 124:7,14,20 125:9 130:3 137:8 138:11 156:3 173:24 174:3 180:15 181:23 208:17 220:6

**studying** 41:22 42:3 51:13 52:3,5, 12

**subject** 57:19

**subjected** 17:14 19:6 138:10

**subjects** 46:22

**submission** 39:18

**submit** 37:17 38:5

**submitted** 40:10 140:16

**submitting** 37:16

**subpoena** 9:13

**subsequent** 48:16 103:12 184:21 185:22 186:18 187:3,8

**subsequently** 44:22

**succinctly** 34:19 198:19

**sued** 204:21

**suffered** 136:18 149:2

**suffering** 115:21

**sufficient** 19:8

**sufficiently** 69:14

**suggest** 66:1 74:15 87:9 95:23 100:12 102:19 103:10 104:6,19 114:22 118:21 126:5 131:24 136:23 142:2,21 145:1 175:1 206:17

**suggested** 32:7 145:5 203:14 218:10

**suggestibility** 112:9

**suggesting** 89:18 109:13

**suggestion** 134:12

**suggestive** 76:21 77:5

**suggests** 76:6 106:12 108:4 114:10

**suit** 64:4 122:23

**super** 34:24

**supervisor** 98:12

**supervisor's** 98:13

**supplementary** 25:13

**support** 7:5 41:11 61:21 123:16, 19 181:16

**supported** 139:9 189:8

**supporting** 105:10 160:18

**supports** 88:14 180:13

**suppose** 38:22 121:19,21 163:9 216:7,11

**suppress** 17:20 147:21 149:1,10,12

**suppressed** 83:6,9 148:11

**suppression** 17:19,23 83:12 148:6 149:18

**surprise** 185:3

**surprised** 158:6

**surprising** 104:22 183:3 185:4 186:19,24 187:6 195:21 196:3,8 197:1

**surrounding** 204:8

**survey** 83:22 124:18

**Susan** 8:7 60:3 183:24 184:6,11 188:19 189:2 194:9 195:17

**suspect** 74:6 89:3 93:12 95:11 96:6,13 98:8 130:19 144:14 150:10,21 151:1 158:10 165:5 166:10 167:2,19 168:12 181:9 188:14 222:12

**suspect's** 29:1 92:10 121:15 155:4, 7,13,24 156:6,12 157:18 179:16

**suspects** 42:9, 10 75:23 76:8 88:12 93:6 95:20,24 96:3 115:21 125:17,23 168:24 179:7,23

**swabs** 217:18,23

**sworn** 8:22

**symptom** 110:19,22

**symptoms** 108:5,17,24

**synonymous** 110:18

**system** 73:18 86:14,15 88:13 93:19 123:16

**systematic** 121:8 221:4

**systemic** 121:14

———

**T**

**tactic** 88:19 89:11 90:1

**tactics** 88:15,22, 23,24 89:21 90:10, 13,18,22 91:5 150:8 181:8

**taking** 9:22 110:8 161:16 165:18

**talk** 34:14,17 57:4 94:19

**talked** 155:2 188:11 201:21 205:8 214:1

**talker** 104:17

**talking** 27:9 57:21 72:3 90:3 110:15 149:15 174:1,9,13,15 188:10 196:21 200:12 212:10 222:24 224:5

**target** 44:7

**tarnished** 121:17

**team** 43:10,12,24

**technical** 29:6 155:1

**technique** 91:15 150:10 157:2,17

**techniques** 28:14,24 45:6,13,22 76:22 77:1,5 91:12

**symptoms** 92:3,9 155:3,7,12, 17,23 156:5,9,17 188:4

**telling** 60:9 61:5, 17 184:20,21 211:5

**tells** 81:16 160:17

**ten** 15:17,18 26:20

**tend** 89:3 95:5

**tentative** 188:22

**term** 88:24 92:18

**terminology** 42:21

**terms** 176:5 184:7

**test** 19:5

**tested** 79:16 217:11 218:13,18, 23 219:4,6,8

**testified** 8:23 19:14 108:24 135:5 141:5 168:14 170:23 183:14 184:15,16 186:15 192:7 203:21

**testify** 16:4 108:16 221:11

**testimony** 15:12,21 17:2 18:17,22 26:7,10 31:9 107:23 108:3, 12 119:7,11 127:7 145:21 155:16,20 162:13 163:15 171:1,14 173:10,22 185:20 193:11 195:20 196:5 198:11 199:6 200:24 201:6,18 204:2 205:3,6 207:12 208:9 210:22,24 211:1,9 214:3 219:21 223:3

**Texas** 49:2

**text** 72:18

**texts** 72:16,23

**themes** 88:11

MELISSA RODRIGUEZ, PH.D.

September 13, 2016
Index: theory..variation

**theory** 58:10

**thing** 28:16 66:7 90:7 104:24 107:5 200:12

**things** 35:11,12 45:9 83:13 89:5 93:6 137:2 139:12 175:8 183:21 188:12 194:14

**thinking** 141:23

**Thomas** 8:8,17 97:18 150:2

**thought** 109:13 110:21 140:8 143:2 192:6 207:6

**thoughts** 21:18

**threats** 19:9 66:14 68:14 90:19, 23 139:21

**thumbs** 169:18

**Thursday** 106:2

**time** 7:7 12:13 23:2,21 27:24 34:18 35:14 39:13 40:23 43:21 44:8 48:1 62:2,6 66:20 69:12 79:2 87:21 88:4 101:10,19 104:7 106:2 107:12 111:6 124:4,21 125:6,10 126:20 127:9,15 129:10 131:22 132:6,16,22 134:3 136:14,20 137:5 139:16,17,19 141:6 146:4 154:20 157:24 158:5,17 164:10,13 166:19 169:23 170:5 172:10,23 173:15 179:9 182:8,19 183:11 184:12,15 186:23 187:15 195:22 199:4 200:17,22 210:11 221:22 225:9

**timeline** 127:12 128:6 170:22 171:22 172:6

**times** 15:5 141:9, 15 150:23 152:19 172:2

**titled** 209:3

**today** 7:6 13:17 41:8,10 179:24 213:21 217:21 218:2

**today's** 25:8

**told** 43:1,20 91:21 98:5,6 114:1 142:16,17 147:15, 19 171:3 177:14 187:18,19 188:3,24 203:14 223:11,16, 20 224:10,11

**Tom** 222:4

**tone** 157:14

**top** 65:8 94:16 103:6 108:9 117:5 129:17 159:7

**topic** 30:23 69:13 169:3

**topics** 41:20

**tortured** 137:21

**total** 26:13,16 27:6 125:10 126:20 127:9

**track** 84:11 85:16

**tracks** 85:14

**Tracy** 175:12

**train** 53:5

**trained** 13:24 44:8

**training** 14:3,6, 11,19 70:20 71:4 197:15

**transcript** 97:10, 17 113:12 146:16 148:5 149:17,22,23 175:11,17,21,23 177:18 178:8,10 211:22 225:15,20

**transcripts** 132:8,11 220:18

**transfer** 159:24 160:4

**translation** 170:15

**treat** 14:13

**treated** 14:17

**treatise** 69:16

**treatment** 88:13

**trial** 17:3 26:7,9 74:4 83:7 87:6 113:21 119:11 121:12 184:15 186:15 196:4 199:6 200:24 201:6,17 213:8 220:4

**Tribune** 209:19

**trouble** 114:11

**true** 18:10 28:22 41:22 45:14,19 51:13,16,19,20,23 52:3,5,10,12,13,14, 17,20,24 53:6,11,13 54:9 76:19,23 79:3, 10 82:13 83:20 84:14 85:9 90:14 92:5 93:11 107:18 120:12 121:3,17 122:2 123:9,14,23 124:1 131:6,17 137:15 139:5 153:24 154:5,18 155:11 156:4 158:9, 18 165:17 167:7,9, 11,21 183:24 188:21 192:19 216:2

**truth** 60:9 61:6,17 74:7

**tunnel** 94:20,22, 24 95:9 177:10

**turn** 11:12 21:12 35:14 81:20 122:6 192:2 202:18

**turning** 65:13 66:17 68:6 88:7 97:5 135:22 150:7 216:21

**turns** 78:20

**tweaked** 51:2

**twelve** 26:20

**two-minute** 87:20

**type** 30:12 70:7 81:3 116:8,9 157:1 184:4,18 187:2

**types** 45:5 77:14 115:19

**typical** 124:12 161:13

**typically** 27:17 42:13 79:5 89:2 116:7 134:5 166:9

**typos** 28:8

**U**

**U.S.** 7:11 11:23

**Uh-huh** 10:9 66:23 94:6 129:23 136:1

**ultimate** 80:16

**ultimately** 48:7

**umbrella** 12:1 88:24

**underlying** 56:8,10 57:14,20 59:2 70:22 84:15

**underneath** 199:15

**understand** 10:3,4,7 33:8 80:5 81:22 114:15 148:23 153:7 209:4 212:16

**understanding** 53:19 60:1 62:8,10, 17,20,23 67:3 79:11,14 93:19 98:2,9 101:16 105:18 114:3,20 115:2 139:22 140:1 145:13 148:24

149:4,9 151:17,19 152:8 159:13,21 160:3,6 171:22 172:5 179:22 184:11 204:7,19 207:20,22 214:14, 16 215:5 217:12,14 219:7

**undertaking** 53:17

**undisclosed** 205:18,23

**unethical** 47:1 138:19

**unfamiliarity** 64:5

**unhelpful** 86:1

**unique** 123:12 131:2 154:17 155:18

**unit** 152:9,10 210:23 211:3

**universe** 206:23 207:23 218:17,20

**university** 10:17 21:11 26:24 44:17 48:23 49:2

**unknowable** 84:10

**unknown** 199:16

**unreliable** 166:15

**unusual** 168:10

**up-to-date** 11:16

**updated** 25:12

**upheld** 213:13

**V**

**vague** 205:17

**variation** 141:16, 17

MELISSA RODRIGUEZ, PH.D.

September 13, 2016
Index: variations..zone

**variations** 140:24

**vary** 133:23 138:12

**verbal** 9:24 35:16 163:19,21,24 165:23 182:19

**verbally** 36:23 37:2

**verified** 84:20 85:6,11,24 86:7

**Versie** 146:18,22 147:5

**version** 11:17,20 61:20 193:2

**versions** 199:19

**versus** 7:10 43:3 83:19 84:13,20,21 85:11,23 164:19 168:3 174:10

**victim** 89:16 100:22 151:12

**victimized** 100:23

**victims** 102:7 103:10 197:7,19,20, 22,24 198:4

**victims'** 197:10

**video** 7:4 179:20 180:8

**video-recording** 179:10

**videoconference** 170:16

**videotape** 179:16

**view** 116:6

**viewpoints** 69:24

**violent** 152:23,24

**virtually** 85:13

**vision** 94:21,23, 24 95:9 177:10

**visual** 165:11

**vitae** 11:14,17 12:11,14

**voluntarily** 96:21

**voluntariness** 138:23

**voluntary** 96:17 97:3

**vulnerabilities** 96:7,13,24 130:21

**W**

**waive** 112:23 202:4

**waiving** 114:3

**walk** 161:18 163:2 168:13

**walk-through** 107:8 109:8,9 111:7 129:8 160:23 161:6 162:9,11,15 163:6, 12,18 164:13,23 165:9 167:20 168:4 182:24 187:12 223:1,12

**walking** 110:8 161:17 168:8

**Walsh** 8:19

**wanted** 170:20

**watching** 146:8, 9

**ways** 150:19

**wealth** 91:11 169:4

**websites** 202:20

**week** 27:17

**weigh** 112:10

**whereabouts** 177:2

**white** 69:6,10,11 70:2

**wholly** 33:7

**wife's** 183:15

**Williams** 10:17 26:24

**Willis** 7:3

**witness's** 102:9 169:7 185:12

**witnesses** 30:7 182:5 196:8

**women** 207:14

**word** 60:20 105:3 214:4

**worded** 174:18

**words** 92:8 172:24 200:5 223:5

**work** 13:22 25:1 27:3,6,13,14,16 43:22,24 46:12,13 101:18 118:2 204:17

**worked** 145:9

**working** 21:17 42:23,24 43:4,5

**workplace** 102:3

**worse** 44:12 91:23 161:12

**writing** 37:13 147:6 161:2 163:4 164:1 192:16

**written** 58:10 69:12 71:21 164:18, 24 165:14,20,24 166:2,3,10,19 183:1 214:17 215:13 216:8 223:8,10

**wrong** 95:11 205:19

**wrongdoing** 96:8

**wrongful** 87:15 192:3

**wrote** 109:19 174:5

**Y**

**year** 12:7 27:9,18 99:22 108:21 210:8

**years** 19:23 29:24 198:11

**yelling** 152:19

**York** 15:23

**Z**

**zone** 129:21,24 144:17