```
1:1
1:2     IN THE UNITED STATES DISTRICT COURT
1:3     FOR THE NORTHERN DISTRICT OF ILLINOIS
1:4            EASTERN DIVISION
1:5     - - - - - - - - - - - - - - - - - - -x
1:6     CARL CHATMAN,
1:7                      Plaintiff,
1:8           -against- Index No.
                         14 CV 2945
1:9
        CITY OF CHICAGO; CHICAGO POLICE DETECTIVE
1:10    JOHN ROBERTS; CHICAGO POLICE DETECTIVE
        THOMAS McGREAL; CHICAGO POLICE DETECTIVE
1:11    MARIA PENA; CHICAGO POLICE DETECTIVE JACK
        BOOCK; CHICAGO POLICE DETECTIVE RITA
1:12    MISCHKA; CHICAGO POLICE DETECTIVE BARBARA
        MIDONA; CHICAGO POLICE SERGEANT DENNIS
1:13    WALSH; CHICAGO POLICE OFFICER MICHAEL
        KARCZEWSKI; CHICAGO POLICE OFFICER
1:14    RICHARD GRIFFIN; CHICAGO POLICE
        LIEUTENANT JOSEPH JORIA; CHICAGO POLICE
1:15    SERGEANT BRYAN HOLY; COOK COUNTY
        SHERIFF'S DEPUTY MICHAEL COKELEY; COOK
1:16    COUNTY SHERIFF'S DEPUTY JOSEPH PRINCE;
        COOK COUNTY SHERIFF'S DEPUTY SERGEANT
1:17    MARIA MOKSTAD; COOK COUNTY SHERIFF'S
        DEPUTY LIEUTENANT BURROUGH CARTRETTE;
1:18    ASSISTANT STATE'S ATTORNEY BRIAN HOLMES
        and UNKNOWN COOK COUNTY SHERIFF'S
1:19    DEPUTIES; THE COUNTY OF COOK; THOMAS
        DART, in his official capacity as SHERIFF
1:20    OF COOK COUNTY, and ANITA ALVAREZ, in her
        official capacity as COOK COUNTY STATE's
1:21    ATTORNEY; and SUSAN RIGGIO,
1:22                     Defendants.
1:23    - - - - - - - - - - - - - - - - - - -x
1:24    VIDEOTAPED DEPOSITION OF MICHAEL WELNER,
        M.D.
1:25
```

EXHIBIT E

2:1

2:2                      1250 Broadway

                        New York, New York

2:3

                      December 13, 2016

2:4                      9:28 a.m.

2:5   VIDEOTAPED DEPOSITION of MICHAEL WELNER,

2:6   M.D., the Expert Witness in the

2:7   above-entitled action, held at the above

2:8   time and place, taken before Margaret

2:9   Scully-Ayers, a Shorthand Reporter and

2:10  Notary Public of the State of New York,

2:11  pursuant to the Federal Rules of Civil

2:12  Procedure and Subpoena.

2:13

2:14            *    *    *

2:15

2:16

2:17

2:18

2:19

2:20

2:21

2:22

2:23

2:24

2:25

```
3:1
3:2     APPEARANCES:
3:3
3:4
        LOEVY & LOEVY
3:5     Attorneys for Plaintiff
            312 North May Street
3:6         Suite 100
            Chicago, Illinois 60607
3:7
        BY:  RUSSELL R. AINSWORTH, ESQ.
3:8
3:9
3:10    DYKEMA GOSSETT PLLC
        Attorneys for Defendants
3:11    City of Chicago and Brian Holmes
            10 South Wacker Drive
3:12        Suite 2300
            Chicago, Illinois 60606
3:13
        BY:  KATHERINE MORRISON, ESQ.
3:14        (Via Videoconference)
3:15
3:16    BORKAN & SCAHILL, LTD
        Attorney for Individually named
3:17    defendant police officers
            20 South Clark Street
3:18        Suite 1700
            Chicago, Illinois 60603
3:19
        BY:  KRISTA E. STALF, ESQ.
3:20
3:21
3:22    (Appearances continued on next page.)
3:23
3:24
3:25
```

```
4:1
4:2     APPEARANCES CONTINUED
4:3
4:4
        HINSHAW & COLBERTSON LLP
4:5     Attorneys for Cook County Sheriff's
        Office defendants
4:6        222 North LaSalle Street
           Suite 300
4:7        Chicago, Illinois 60601-1081
4:8     BY:  JAMES VLAHAKIS, ESQ.
             (Via videoconference)
4:9
4:10
        BOLLINGER CONNOLLY KRAUSE LLC
4:11    Attorneys for Defendant
        Susan Riggio
4:12       500 West Madison Street
           Suite 2430
4:13       Chicago, Illinois 60661-2593
4:14    BY:  ANDREW CHESTNUT, ESQ.
             (Via videoconference)
4:15
4:16
4:17    ALSO PRESENT:   J.D. MARTINEZ,
                        Videographer
4:18
4:19              *      *      *
4:20
4:21
4:22
4:23
4:24
4:25
```

```
5:1
5:2                    I N D E X
5:3
       WITNESS            EXAMINATION BY       PAGE
5:4
5:5    M. Welner, MD   Mr. Ainsworth      8, 330
                       Mr. Chestnut       315
5:6
5:7
5:8
5:9
5:10               E X H I B I T S
5:11   PLAINTIFF'S     DESCRIPTION        PAGE
5:12   Exhibit 1       Report                70
5:13   Exhibit 2       Mrs. Riggio hospital
                       record                82
5:14
       Exhibit 3       Fourth Analytical
5:15                   Report                83
5:16   Exhibit 4       Sixth Analytical
                       Report                88
5:17
       Exhibit 5       CV                   148
5:18
       Exhibit 6       Billings            182
5:19
       Exhibit 7       Chatman
5:20                   Medical record      294
5:21
5:22   Reporter has retained all exhibits.
5:23
5:24
5:25
```

6:1

6:2          THE VIDEOGRAPHER:  We are now on

6:3     the record.  Please note that the

6:4     microphones are sensitive and may pick

6:5     up whispering or private

6:6     conversations.

6:7          Please turn off all cell phones

6:8     or just place them away from the

6:9     microphones as they can interfere with

6:10    the deposition audio.

6:11         Recording will continue until

6:12    all parties agree to go off the

6:13    record.

6:14         My name is J.D. Martinez

6:15    representing Veritext New York.

6:16         The date today is December 13,

6:17    2016, and the time is approximately

6:18    9:28 a.m.

6:19         This deposition is being held at

6:20    Veritext NYC located at 1250 Broadway,

6:21    New York, New York.

6:22         The caption of this case is Carl

6:23    Chatman versus City of Chicago, et al.

6:24         This case being held in the

6:25    United States District Court, Northern

7:1

7:2     District of Illinois, Eastern

7:3     Division.  Case No. 14 CV 2945.

7:4         The name of the Witness is Dr.

7:5     Michael Welner.

7:6         At this time the attorneys

7:7     present in the room and attending

7:8     remotely will identify themselves and

7:9     the parties they represent, after

7:10    which our court reporter, Margaret

7:11    Scully-Ayers, will swear in the

7:12    Witness and we can proceed.

7:13        MR. AINSWORTH:  Russell

7:14    Ainsworth on behalf of the Plaintiff.

7:15        MS. STALF:  Krista Stalf on

7:16    behalf of the individually named City

7:17    of Chicago police officers.

7:18        MR. CHESTNUT:  Andrew Chestnut

7:19    on behalf of defendant Susan Riggio,

7:20    remotely.

7:21        MR. VLAHAKIS:  James Vlahakis on

7:22    behalf of defendants Cartrette,

7:23    Mokstad, and Cokeley.

7:24        MS. MORRISON:  Katherine

7:25    Morrison on behalf of City of Chicago.

8:1

8:2          THE REPORTER:  Margaret

8:3      Scully-Ayers, Veritext.

8:4          [Whereupon, an oath was

8:5      administered.]

8:6  M I C H A E L   W E L N E R,  M.D., the

8:7  Witness herein, having first been duly sworn

8:8  by the Notary Public, was examined and

8:9  testified as follows:

8:10  BY THE REPORTER:

8:11      Q.    What is your name?

8:12      A.    Michael Welner, M.D.

8:13      Q.    Where do you reside?

8:14      A.    Office address is 224 West 30th

8:15  Street, Suite 807, New York, New York

8:16  10001.

8:17  EXAMINATION BY MR. AINSWORTH:

8:18          MR. AINSWORTH:  I note for the

8:19      record, it's now 9:30 a.m.

8:20      Q.    Sir, you have been deposed many

8:21  times, right?

8:22      A.    I've been deposed a number of

8:23  times.

8:24      Q.    I would like to make sure we

8:25  are on the same page as you know.

9:1

9:2        A.    Sure.

9:3        Q.    The first thing I ask you is to

9:4    wait until I'm done asking my questions

9:5    so we are not speaking at the same time

9:6    making life difficult for Margaret.

9:7    Okay?

9:8        A.    Certainly.

9:9        Q.    I'll try to do the same for

9:10   you; that is wait until you are done with

9:11   your answer before beginning my next

9:12   question.   Okay?

9:13       A.    Absolutely.

9:14       Q.    If you don't understand my

9:15   question, please indicate to me you do

9:16   not understand by asking me to rephrase,

9:17   reask, or in some way tell me that you

9:18   don't understand the question.

9:19       A.    Yes.

9:20       Q.    The flip side of that is if you

9:21   answer my question, I'll assume that you

9:22   understood my question as I posed it.

9:23   Fair?

9:24       A.    Understood.

9:25       Q.    If you need a break at any

10:1

10:2    time, just let us know.  All I ask is

10:3    that you answer any question that's

10:4    pending before we do so.

10:5        A.    Okay.  I just -- I have already

10:6    let you know before we've gone on camera,

10:7    I'm going to need to take a brief break a

10:8    little after ten o'clock to make a brief

10:9    phone call and so I won't necessarily

10:10   keep my eyes on the clock, perhaps

10:11   someone around here will and we may end

10:12   up breaking then.

10:13       Q.    All right.  Sir --

10:14           MS. MORRISON:  We are here for

10:15       O-P-S as well on behalf of the City,

10:16       just for the record.

10:17           MR. AINSWORTH:  Very good.

10:18       Q.    Sir, would you agree that the

10:19   study of false confessions can be helped

10:20   by studying those cases in which there

10:21   are demonstrably false confessions and

10:22   looking to see what mechanisms led to

10:23   those false confessions?

10:24       A.    Yes, sir.

10:25       Q.    Have you conducted such a study

11:1

11:2    yourself?

11:3         A.    I've attempted to in the same

11:4    vein.

11:5         Q.    So you have attempted to do

11:6    such a study, but you have not conducted

11:7    such a study; is that correct?

11:8         A.    I have conducted it, but I have

11:9    not completed it so I think -- my -- you

11:10   know, I have conducted it.

11:11        Q.    In order to conduct such a

11:12   study, that is to look at demonstrably

11:13   false confessions and look at the factors

11:14   that led to the false confessions being

11:15   obtained, how many false confessions

11:16   would you have to look at?

11:17        A.    The interplay of factors that

11:18   contribute to a false confession is

11:19   complex, involves an uncertain number of

11:20   factors, but the best we can understand

11:21   is that it is an element of suspect

11:22   vulnerability; element of the context in

11:23   which the questioning take place; an

11:24   element of how questioning officers play

11:25   off the vulnerability of the suspect.

12:1

12:2        Now, the combination of all

12:3  vulnerabilities with all of the ways in

12:4  which officers may engage suspects and

12:5  relevant contexts that may or may not

12:6  contribute to false confessions are large

12:7  enough that one would have to be guarded

12:8  about conclusions from smaller sample

12:9  size.

12:10       The larger number of cases to

12:11  be reflected in such a study the easier

12:12  it is to draw conclusions from

12:13  overrepresented circumstances.

12:14       So as it relates to the

12:15  research that I was able to conduct but

12:16  not complete, the frequency with which

12:17  certain qualities emerged from the false

12:18  confession studies were informative to

12:19  understanding how false confessions come

12:20  about.  They weren't ultimately

12:21  conclusory.

12:22       We can speak more about it, but

12:23  at some point there is enough

12:24  overrepresentation of a certain quality

12:25  within that confession that one can draw

13:1

13:2     conclusions that has a relevant

13:3     dissociation and may even be a cause with

13:4     sufficient numbers.

13:5         Q.    How many, sir?

13:6         A.    How many?

13:7         Q.    Did you understand my question?

13:8         A.    Yes.

13:9         Q.    I understood your answer to be

13:10     looking at more false confessions is

13:11     better than looking at less; is that a

13:12     fair summary of your answer?

13:13         A.    I think I gave it a lot more

13:14     substance than that.

13:15         Q.    I know.  Is it a fair summary?

13:16         A.    No, it's not.

13:17         Q.    Sir, how many demonstrably

13:18     false confessions would you need to study

13:19     in order to reach conclusions about the

13:20     factors that are likely to lead to false

13:21     confessions?

13:22         A.    The number of cases in which I

13:23     drew information from, information that I

13:24     was able to have confidence in was valid

13:25     at the time, was a sufficient number to

14:1

14:2    tell me that in some instances if a

14:3    person is confronted in questioning with

14:4    the idea that he or she has failed a

14:5    polygraph, that that can contribute to a

14:6    false confession because of the frequency

14:7    within that small sample of how that was

14:8    represented.

14:9            Now, now, the degree to which

14:10   that creates a risk is uncertain.  What

14:11   the sample size would need to be in order

14:12   to be able to quantify that elevated

14:13   risk, is unknown.

14:14           However, because of the

14:15   frequency even among a small sample of

14:16   cases in which a person was told you

14:17   failed a polygraph very shortly afterward

14:18   followed by a false confession, that

14:19   enabled me to draw that conclusion even

14:20   from a smaller sample size.

14:21           So my point earlier was there

14:22   are numerous factors that play in:

14:23   suspect vulnerability; question of

14:24   factors, context factors.  There are

14:25   numerous factors within that.

15:1
15:2          Some emerge with -- let's say
15:3    we looked at ten cases, and those ten
15:4    cases happened to be cases of multiple
15:5    claimants in which one confession rolled
15:6    into the other, right?
15:7          So one can then potentially
15:8    derive a conclusion that questioning
15:9    rolls one confession into another,
15:10   creates a risk of false confession.
15:11         Let's see the next 20 false
15:12   confessions that one has an opportunity
15:13   to review involved single suspects, all
15:14   right, or multiple suspects in which that
15:15   is not the case.
15:16         So at some point a sample size
15:17   is small enough that while one can find
15:18   an association, one has to note it and
15:19   recognize it and hopefully with further
15:20   like or similar cases, one can draw
15:21   conclusions about how much that increases
15:22   a risk.
15:23         But you can learn a lot even
15:24   from smaller sample sizes.  As they grow
15:25   larger, you can learn that much more.

16:1

16:2    Q.   What was the size of your

16:3    sample size that you used to determine

16:4    your conclusions regarding the

16:5    confrontation of the results of the

16:6    polygraph?

16:7    A.   I don't remember.  I haven't

16:8    looked at that in probably ten years.

16:9    Q.   Was that 22, does that sound

16:10   right?

16:11   A.   I think 22 is what we

16:12   originally charted.  I don't think we

16:13   looked at all 22.

16:14   Q.   Right.

16:15   A.   Because there was a number of

16:16   cases in which we didn't have enough data

16:17   and; therefore, couldn't derive any

16:18   meaningful conclusions.

16:19   Q.   So something less than half of

16:20   22?

16:21   A.   I don't know.  Again, you

16:22   probably, no, you definitely have given

16:23   more attention than I have.

16:24        I produced the documents based

16:25   on discovery requests.  I have not

17:1

17:2   reviewed them in ten years and don't have

17:3   any expectation to.

17:4        Q.    Why don't you have any

17:5   expectation to?

17:6        A.    The study is on hold.  Unless I

17:7   resume the study, which is our study

17:8   because, of course, this was disclosed to

17:9   you under seal, then we will not build on

17:10  what we have done.

17:11        What I'm testifying to here in

17:12  this deposition or even in a court

17:13  proceeding is what we came to learn, what

17:14  I have taught.

17:15        What I taught is what emerged

17:16  from that earlier study that were three

17:17  areas which I felt based on the study of

17:18  those cases were pertinent to potential

17:19  causes of false confessions:  threat of

17:20  death penalty; rolling one confession

17:21  into another; and assertions of

17:22  specifically a failed polygraph.

17:23        And from a standpoint of

17:24  suspect vulnerability, the likelihood

17:25  that mental retardation is more

18:1

18:2    represented, specifically mental

18:3    retardation as opposed to low

18:4    intelligence, mental retardation is

18:5    overrepresented among confirmed cases of

18:6    false confessions relative to its

18:7    representation among general forensic

18:8    populations.

18:9        Q.    Did you conduct any statistical

18:10   analysis of the cases that you were able

18:11   to determine of that 22 that were

18:12   demonstrative false confessions?

18:13       A.    No.

18:14       Q.    And you have no training, you

18:15   took a case in statistics in your first

18:16   year of medical school, right?

18:17       A.    I have taken a course in

18:18   statistics, but I had exposure to

18:19   statistics and statistical analysis in

18:20   research for well over ten years through

18:21   The Depravity Standard.

18:22            I certainly have an

18:23   appreciation for it and in some aspects,

18:24   the potential for it.  But statistics a

18:25   huge field.  Some aspects may be

19:1

19:2    pertinent to some study, some aspects may

19:3    not be pertinent.  I certainly don't deal

19:4    with it on everyday basis or an every

19:5    week basis, just periodically.

19:6         Q.    Is there a reason why you did

19:7    not subject the cases that you looked at

19:8    within the 22 to any type of statistical

19:9    analysis?

19:10        A.    What is the point of doing a

19:11   statistical analysis on an incomplete

19:12   study?  Nobody does that.

19:13        Q.    The fact that it's incomplete,

19:14   does that mean that you cannot draw

19:15   conclusions from that sample that you

19:16   were considering?

19:17        A.    Let me see if I can give you an

19:18   example of what I'm trying to say:  The

19:19   noted criminalist Henry Lee teaches this,

19:20   says, I was asked to respond when a law

19:21   enforcement officer, a state trooper, was

19:22   struck by the side of the road on a

19:23   Connecticut highway.

19:24            They put up roadblocks, stopped

19:25   all of the cars, and asked me to go as a

20:1

20:2   chief forensic scientist for the State of

20:3   Connecticut to try to help them

20:4   investigate who was responsible for

20:5   hitting the trooper.

20:6            I notice you are sort of

20:7   nodding your head as if you are bored.

20:8   If you like me to answer the question,

20:9   please give me your attention.  I

20:10  appreciate it.

20:11      Q.    The imprint of the badge.

20:12      A.    I know you read the deposition.

20:13  This is my deposition for this case so

20:14  I'm just responding to your question:

20:15            So Dr. Lee inspected each car

20:16  at the roadblock, saw no signs of human

20:17  tissue, no signs of scuffing, and then

20:18  happened to walk by a tractor trailer.

20:19            On the side of the cab noticed

20:20  a smudge.  He looked closer at the smudge

20:21  and then wiped it away.

20:22            When he wiped the smudge, what

20:23  he saw neatly imprinted Connecticut State

20:24  Police which identically was a mirror

20:25  image of the shoulder emblem on the state

21:1

21:2     trooper's uniform.

21:3              His teaching from that, which

21:4     is my answer to you, there are certain

21:5     things you don't know to research -- to

21:6     do a research study to understand that

21:7     truck was responsible.

21:8              When one sees in a small sample

21:9     of confirmed false confessions, repeated

21:10    whether three times, whether four, I

21:11    think if was three instances where

21:12    someone told they failed a polygraph and

21:13    they very shortly afterward confess, one

21:14    can't conclude the degree, the

21:15    quantitative increase in risk.

21:16            But in those cases I had

21:17    sufficient understanding to be able to

21:18    conclude that that had a causal

21:19    relationship to those false confessions.

21:20            I didn't need to do a complex

21:21    statistical analysis to be able to come

21:22    to a conclusion about something

21:23    repeatedly representing in an event as

21:24    rare as false confessions.

21:25        Q.    So your sufficient

22:1

22:2    understanding was based on you deeming

22:3    the polygraph confrontation factor to be

22:4    present in enough cases, possibly three

22:5    or four out of some sample of less than

22:6    22, that made you think in your gut it

22:7    was a factor that led to false

22:8    confessions; or what was it if it wasn't

22:9    your gut?

22:10       A.    It was a close association in

22:11   time because it had come up more than

22:12   once.  It led to me believe that despite

22:13   the disparity among cases, every case has

22:14   its own profile, its own quality.

22:15           If you see something come up as

22:16   repeatedly as three times in a small

22:17   sample size, then I had an appreciation

22:18   for its ability to impact a case among

22:19   defendants or suspects who may have

22:20   different qualities.

22:21           Again, while the conclusions I

22:22   have are guarded, I was impressed by it

22:23   and it's certainly a basis for my caution

22:24   when I encounter that in a case.

22:25       Q.    How are your conclusions

23:1

23:2    guarded there?

23:3       A.   There is only so much as you

23:4    interpret as you sort of imply, okay, so

23:5    it's come up a few times, is that just a

23:6    mere coincidence?  Does it depend on the

23:7    cases that one has access to?

23:8         I think that has everything to

23:9    do with why my conclusions would take

23:10   note of it.

23:11        I'm not sure beyond recognizing

23:12   that notable appearance, that frequency,

23:13   about what it means and how to

23:14   extrapolate it.  It just causes me to be

23:15   cautious and concerned when I see

23:16   something like that come up in a case.

23:17      Q.   So you know that statistical

23:18   analysis can answer those questions,

23:19   right?

23:20      A.   No.  Statistical analysis can't

23:21   answer anything if you can't account for

23:22   the universe of the confessions that I

23:23   would need to be looking at.

23:24        It's becomes a factoid, a

23:25   conclusion drawn from a limited sample

24:1

24:2    that may or may not be correct.

24:3            I can't guarantee that the full

24:4    gamut of proven false confessions would

24:5    not bear out statistics that would show

24:6    otherwise and so that's why statistical

24:7    analyses are run after one is confident

24:8    that they have a sample that is

24:9    sufficiently reflective of the entire

24:10   universe of demonstrated false

24:11   confessions.

24:12       Q.    Right.  So if your end is

24:13   larger and you have more data to work on,

24:14   statistical analysis can help you

24:15   determine whether factors are actually

24:16   causation or --

24:17       A.    If your end is sufficient and

24:18   your data is sufficient, absolutely.

24:19       Q.    And so in your attempted study,

24:20   you had an insufficient end in your

24:21   consideration; is that right?

24:22       A.    Yes.  Insufficient end and I

24:23   think there were certain cases in which

24:24   we had come information.  I wasn't

24:25   confident that we had a whole story.  Not

25:1

25:2    because I didn't believe anything.  It's

25:3    with any case such as the cases we

25:4    actually work on in real life.

25:5         The difference between the

25:6    research world, which is why the research

25:7    world is often so utterly irrelevant to

25:8    disputed confessions and real cases, you

25:9    know this without asking me having worked

25:10   on a case, you dissect these cases.  You

25:11   have to dissect these cases, and the

25:12   research community can't relate to that,

25:13   they can't relate to it.

25:14         What one learns about -- and

25:15   this is also something that affected my

25:16   estimation of cases is the experience of

25:17   actually working on the very cases that

25:18   were in that sample.

25:19         There are things that you learn

25:20   about are not in the box score.  You can

25:21   look at the box score and you can see

25:22   this guy went two for four with a single

25:23   and a double and you see someone else

25:24   went four for four with for scratch hits,

25:25   you tell me who has more impact on the

26:1

26:2    game. It's not in the box score.

26:3         And so it is with relationship

26:4    between, gee, I have more cases and I

26:5    have more data, but as you come to

26:6    appreciate from working the cases, and

26:7    it's not just disputed confession, any

26:8    aspect of forensic mental health, there

26:9    are things that emerge with all of the

26:10    data points converging which is why the

26:11    study was designed as it was that enable

26:12    one to have an appreciation that you're

26:13    not only seeing the obvious and shiny

26:14    object but you're seeing things beyond

26:15    the periphery that may be relevant and

26:16    within the work of case you can better

26:17    inform that and research is harder to do

26:18    unless the protocol is set up the same

26:19    way.

26:20         The research can be done and

26:21    now especially the research could be

26:22    done.

26:23         But the research wouldn't be

26:24    done unless someone honestly and not in

26:25    an agenda way rolled up their sleeves and

27:1

27:2    said, you know what, I really want to get

27:3    to a bottom of this, you know, and the

27:4    Innocence Project, DOJ, the Exoneration

27:5    Institute, you guys fork over the assets

27:6    to kind of cover this, then we will learn

27:7    something.  That data is actually there.

27:8            Until you get quantity and

27:9    quality of data, statistical analysis can

27:10   be misleading.  Conclusions can be

27:11   misleading.

27:12           We end up knowing what we know,

27:13   but we know has its best fidelity when it

27:14   emerges from actual cases because the

27:15   theory is theory.

27:16   Q.    Who is the research community

27:17   that cannot relate to that that you are

27:18   referring to?

27:19   A.    People who don't work on cases

27:20   or people who extrapolate broad

27:21   conclusions from cases for which there is

27:22   limited information.

27:23           For example, if I was to write

27:24   an article and if I was to cite from a

27:25   given case that I didn't have intimate

28:1

28:2    familiarity with but I happened to read

28:3    someone else's article and say, well,

28:4    gee, this was a false confession; that is

28:5    the research community.

28:6            If I was a person who wrote a

28:7    research article citing to a news article

28:8    as a source of information or, for

28:9    example, a blurb on the Innocence Project

28:10   as being an adequate database of

28:11   information to inform a causal

28:12   understanding of false confession, that

28:13   is a disconnect and it can be an honest

28:14   disconnect from somebody who doesn't have

28:15   any case experience or can be a dishonest

28:16   disconnect from someone who has case

28:17   experience but they're content in order

28:18   to give the patinae of publication to

28:19   rely on information that they know in

28:20   their heart has inadequate data available

28:21   to it.

28:22            I don't know the motives, what

28:23   the heart of man is.  But what I can tell

28:24   you when you work the actual cases, you

28:25   come to appreciate that there are many

29:1

29:2    data points that can inform these

29:3    questions and they are far more complex

29:4    than, for example, than reading the

29:5    "Chicago Tribune."

29:6        Q.    Who are the people?

29:7        A.    You're more acquainted with the

29:8    universe than I am.

29:9            There is a difference between

29:10   research in this area and a difference

29:11   between practice.

29:12           Some people work on cases, some

29:13   people do research, some people do both.

29:14       Q.    You said, "the research

29:15   community."  I trying to figure out who

29:16   that is.

29:17       A.    I'm just responding to your

29:18   question.

29:19       Q.    I know.  My question is:  Who

29:20   is the research community?

29:21       A.    The research community is

29:22   negligible.  There is really no research

29:23   being done in this area.  It's primarily

29:24   polemics.  All right?

29:25           Occasionally there is an

30:1

30:2    article like a law review by Garrett

30:3    [phonetic] or somebody who is law

30:4    professor who takes a look at confirmed

30:5    cases of false confessions trying to draw

30:6    out conclusions.

30:7          An article by for example;

30:8    like, Leo and Drizen:  Leo's worked

30:9    cases.  He has that orientation.  He

30:10    knows what goes into informing a case.

30:11    But he's content to cite to news articles

30:12    and other cases of limited information by

30:13    comparison and kind of mix them all

30:14    together with the idea that perhaps the

30:15    conclusions could be affected by them.

30:16          Drizen, who was the law

30:17    professor, he co-wrote it.  The area of

30:18    publishing -- I'm sorry, the idea of

30:19    researching based on demonstrated cases

30:20    of false confession, that is the right

30:21    way it's done, but it's published in a

30:22    way that does not account for the

30:23    inadequacy of data.

30:24          So, if there are other case

30:25    samples, larger samples, that follow that

31:1

31:2    pathway, they can be informative.

31:3            Gisli Gudjonsson published on

31:4    specific cases in which he brought a lot

31:5    of information to bear to help to inform

31:6    one about specific types of cases of

31:7    false confessions.

31:8            Dr. Kassin published on

31:9    specific cases of false confession but

31:10   also did so through a lens of cases in

31:11   which you either had an interest in as an

31:12   expert witness and included a partial

31:13   collection of data.

31:14           So, the overall idea of

31:15   utilizing demonstrable false confessions

31:16   to actually look for answers is the path

31:17   forward.

31:18       Q.    So you are saying that looking

31:19   at the demonstrably false confessions is

31:20   the way to conduct the research, but

31:21   researchers are not adequately getting

31:22   the data necessary to draw conclusions

31:23   from those studies; is that fair?

31:24       A.    Correct.

31:25       Q.    So if the conclusions that the

32:1

32:2    research community were drawing are

32:3    wrong, that could be demonstrated, right?

32:4         A.    Well, it is demonstrated.

32:5         Q.    How is it demonstrated?

32:6         A.    It's demonstrated through the

32:7    reports of expert witnesses that

32:8    participate in cases such as this.

32:9              I'm not speaking to Dr. Russano

32:10   in general terms, but you certainly have

32:11   experience in this area.  I have

32:12   experience in this area.

32:13             I think the reports that are

32:14   often provided are speckled with these

32:15   broad presumptions that derive primarily

32:16   from polemics actually demonstrated and

32:17   researched or; for example, conclusions

32:18   derived from studies that will teach

32:19   about whether a college student can crash

32:20   a computer.

32:21             But the idea it can inform a

32:22   rape investigation is ridiculous.

32:23             So if we were having litigation

32:24   about whether college students were

32:25   crashing computers and gave

33:1

33:2    self-incriminating statements, we might

33:3    be able to use that research especially

33:4    if they were questioned by professors as

33:5    opposed to law enforcement.

33:6            But the blending of one

33:7    substantive findings from source research

33:8    that's just not going to inform these

33:9    questions with findings that may

33:10   originate from actual cases can

33:11   demonstrate how you then run statistical

33:12   analysis on data that emerges from

33:13   completely inadequate sources, with data

33:14   that may emerge from fantastic sources.

33:15   It just screws up your data.

33:16            There's the need to be able to

33:17   preserve a sample so you don't have bad

33:18   data mucking up the analysis of good data

33:19   is also the responsibility of the

33:20   researcher.

33:21            And, so, it plays itself out in

33:22   the nature of the assertions and the

33:23   number of these cases.

33:24            I'm not speaking universally.

33:25   I'm just saying from experience and you

34:1

34:2     asked me how it presents itself; that's

34:3     where it presents itself.

34:4          Q.    That's wasn't my question, sir.

34:5     Let's just try to go back to my question,

34:6     and maybe -- you gave very long answer.

34:7     I didn't fully appreciate your answer

34:8     responding to my question because I

34:9     didn't understand a portion of it.

34:10          Let me just, not to belabor the

34:11     point, try to dig down and see if I do

34:12     understand what you are saying.

34:13          My question related to there

34:14     being an avenue to demonstrate that the

34:15     conclusions that the research community

34:16     is reaching is wrong; and you said, yes,

34:17     there is an answer.  It's already being

34:18     done through experts' reports.  I got

34:19     confused there.

34:20          What experts report are you

34:21     referring to?

34:22          A.    One way or the other we were --

34:23     first of all, there is no research

34:24     community on false confessions.  There is

34:25     so little research actually being done on

35:1

35:2  demonstrable cases of false confessions.

35:3          There is a lot of -- I don't

35:4  consider research on college students to

35:5  be research on false confession.  It's

35:6  research on college students which

35:7  conclusions are made by false confession

35:8  experts.  That is not a research

35:9  community of false confession.  That is

35:10  research community of college students.

35:11          Now that we pushed that away,

35:12  if you want to call it community,

35:13  Professor Garrett, Professor Leo,

35:14  Professor Drizen, perhaps a more adequate

35:15  reference to them would be concerned

35:16  individuals.  But a community is a little

35:17  overly ambitious.

35:18          We can toss a couple names in

35:19  there, Gudjonsson and Kassin, you come up

35:20  with five more, we can go to [inaudible].

35:21          THE REPORTER:  All right, one

35:22     more time the names --

35:23          THE WITNESS:  Gudjonsson,

35:24     Kassin.

35:25     A.    But it's not a community.  It's

36:1

36:2    a couple of people who write about cases

36:3    and a number of other people who write

36:4    polemics about how bad police officers

36:5    are, again, with these broad presumptions

36:6    of here is what cops do all of the time.

36:7    It's like saying this is the way my

36:8    deposition is going to go because all

36:9    attorneys depose people this way.

36:10           Well, you would recognize on

36:11   its face that that's idiotic.

36:12           And so there is nothing to be

36:13   gained from sort of a broad presumption;

36:14   however, there are people who have taken

36:15   good data from good sources of data and

36:16   if that actually does grow one day into a

36:17   community, we are going to learn some

36:18   things.  It will be very exciting because

36:19   the means are there now more than ever

36:20   before, more than ever before.

36:21           We will learn about what is

36:22   relevant, what is overstated, and what is

36:23   hot air and we will get there, you know,

36:24   I'm hopeful.

36:25           Be that as it may, the idea

37:1

37:2   what is demonstrably false, again, an

37:3   orientation which I'm not going to

37:4   generalize to all cases but you asked me

37:5   for an example.

37:6          MR. AINSWORTH:  I didn't.

37:7          THE WITNESS:  Okay.  We'll leave

37:8     it at that then.

37:9     Q.   Sir, would you agree with me

37:10  that if the current research is

37:11  extrapolating from poor data and reaching

37:12  conclusions that are wrong, that could be

37:13  demonstrated by conducting studies with

37:14  better data --

37:15     A.   Sure.

37:16     Q.   -- and reaching conclusions

37:17  that are supported by the science?

37:18     A.   Certainly.

37:19     Q.   Do you know of anybody who has

37:20  conducted any published research in any

37:21  peer-reviewed journal that demonstrates

37:22  the conclusions that are being reached by

37:23  the research community, your term, are

37:24  wrong?

37:25     A.   First of all, my term isn't the

38:1

38:2    research community.

38:3        Q.    That is what you said in this

38:4    deposition, sir.

38:5        A.    What I said is there is no

38:6    community.

38:7        Q.    You said, "The research

38:8    community can not relate to that."

38:9        A.    I talked about the difference

38:10   between research community and forensic

38:11   practice.  I didn't talk about the

38:12   conclusions of a research community.  I

38:13   was quite clear.  If not, I'll just

38:14   repeat it.

38:15            There is no research community

38:16   in false confessions.  There is a

38:17   research community in college student

38:18   studies that are extrapolated to false

38:19   confessions.  That is not a research

38:20   community of false confessions.

38:21            And I specifically named names.

38:22   I believe my testimony was, you take

38:23   Garrett who wrote about a case study, you

38:24   take Leo and Drizen who wrote a case

38:25   study in which they attempted to inform.

39:1

39:2        I'm going to leave the

39:3  criticism of their work aside, just in

39:4  terms of approach of actually studying

39:5  cases of false confession, Kassin,

39:6  Gudjonsson, you have got five people.  I

39:7  wouldn't call that a community.  It's a

39:8  certain number of individuals.

39:9        Be that as it may, there is --

39:10  the area within the behavioral sciences

39:11  is so boutique, so esoteric, and is

39:12  primarily populated by people who are

39:13  part of these proceedings, there is very

39:14  little interest generated in studying

39:15  this.

39:16        Consider this:  Two, 40 percent

39:17  of the people I just names are law

39:18  professors.  What does that tell you

39:19  about how robust this represents itself

39:20  in behavioral sciences, 40 percent; and

39:21  the other three, one is in England, all

39:22  right, one is a social scientist, which

39:23  is mush science.  The other is social

39:24  scientist which is also mush science

39:25  which can't relate to hard science.

40:1

40:2        And I'm not taking anything

40:3   away from social sciences, it has its

40:4   place.  It's not hard.  So the comfort

40:5   level with making broad generalizations

40:6   is different from the social science

40:7   world relative to the harder science

40:8   world.

40:9        What I'm saying, I believe I'm

40:10  answering your question, is there is very

40:11  little awareness of this area in the hard

40:12  science community.

40:13       On some level, again, it exists

40:14  in a parallel universe with articles

40:15  attached to it saying, hey, we are

40:16  science, pay attention to us; but they

40:17  did that with repressed memories too and

40:18  then one day everybody was laughing at

40:19  them.

40:20       There isn't research published

40:21  refuting this because, just to give you

40:22  an example, I have to work on a case

40:23  about coprophilia.  Fascinating, right?

40:24  People who are sexually aroused by feces.

40:25       So what did I do, I looked for

41:1

41:2    the research in the area.  Now, it

41:3    exists, right?  Strange as it seems.  I

41:4    couldn't find any research in the area

41:5    that had meaning and depth.

41:6          Why?  Well, consider what the

41:7    whole process of writing an article for

41:8    example to refute the conclusions of a

41:9    couple of people 40 percent whom are law

41:10    professors anyway.

41:11          You have to devote your

41:12    academic attention to something.  You

41:13    have to say it's my life pursuant to do

41:14    this.

41:15          And it's the same thing with

41:16    coprophilia, who wants to devote their

41:17    academic attention and personal and their

41:18    personal and professional passions to

41:19    writing about sexual gratification from

41:20    feces.

41:21          One would think one would have

41:22    some other interesting things to absorb

41:23    themselves passionwise.

41:24          So the idea that nobody writes

41:25    an article to necessarily refute it,

42:1

42:2     doesn't necessarily make it legitimate.

42:3            It means there is as much

42:4     relevance in the lives of day-to-day

42:5     behavioral scientists and practicing

42:6     behavioral scientist as Guam does to you.

42:7     It's just some island way off in the

42:8     Pacific.

42:9            So there is nothing being done

42:10    in a substantive way and I would add my

42:11    interest in this area originally wasn't

42:12    to refute anything.

42:13           It was borne of the idea that

42:14    it's something I'm seeing, something I'm

42:15    exposed to.  I can see we are not

42:16    learning anything so I don't see this

42:17    being done, hey, maybe we can learn

42:18    something.

42:19           I think one day we are going to

42:20    get there.  At some point someone is

42:21    going to say, hey, why don't resolve

42:22    these questions instead of just sort of

42:23    talking about it and throwing out

42:24    theories because the gig is up.

42:25    Everybody knows that the theories have no

43:1

43:2    bottom.  I think that will help us get

43:3    there.

43:4        Q.    So you know of no published

43:5    study that refutes the conclusions that

43:6    are currently being drawn by, whether you

43:7    call them the research community or the

43:8    people publishing in the field of false

43:9    confessions, whatever term you use?

43:10       A.    There are many conclusions

43:11   asserted and I think the safest answer is

43:12   no.

43:13       Q.    And you agree that there is no

43:14   published study that refutes what the

43:15   researchers on false confessions have

43:16   concluded, correct?

43:17            There is a double negative

43:18   there.

43:19       A.    I understand what you're

43:20   saying.

43:21            Again, look, Leo and Ofshe came

43:22   out with an article of case studies.

43:23            Professor Paul Cassell came

43:24   back and took a look at their cases and

43:25   wrote a critical article.  They responded

44:1

44:2    by writing a critical article.

44:3          I don't know about that any of

44:4    that research study, but they looked at

44:5    cases but everyone was dealing with a

44:6    limited dataset.  There were others who

44:7    perhaps have drawn different conclusions.

44:8          I don't want to give the

44:9    impression there is any more substance

44:10   than there is.

44:11         It's better to say there's been

44:12   no systematic study done to explore; for

44:13   example, the Leo and Drizen conclusions;

44:14   the Kassin conclusions that emerged from

44:15   his college student, and, again, what's

44:16   to refute?  They are college students so

44:17   on its face the data emerged from an

44:18   irrelevant place so it doesn't have to do

44:19   with cases so if we reduced that -- let's

44:20   say we were to refer to Amanda Knox which

44:21   Dr. Kassin's written about.  He knows

44:22   more about the Amanda Knox case than most

44:23   people.

44:24         If you're going to write about

44:25   that specific case, you are going to have

45:1

45:2   to have access to the data that he had

45:3   access to.

45:4           So I think that speaks to my

45:5   earlier answer about the requirement for

45:6   some intimate familiarity with all of the

45:7   relevant data.

45:8           Please understand that I'm

45:9   speaking about cases that inform the

45:10  literature that are singular in nature if

45:11  they emerge from Kassin or Gudjonsson and

45:12  in the multiple case of Leo and Drizen,

45:13  the problem being that, hey, some of

45:14  these cases there is a good amount of

45:15  data on, very informative; and some of

45:16  these cases emerge from news articles and

45:17  they draw their conclusions from

45:18  everything.

45:19          So criticisms, I'm not the

45:20  first person to voice criticisms in this

45:21  kind of forum for the limitations of the

45:22  data and what one could conclude from

45:23  them; but nobody is writing articles

45:24  saying this is my opinion on Leo and

45:25  Drizen's data, for the simple reason that

46:1

46:2     part of Leo and Drizen's data isn't even

46:3     data. Who uses news articles for as

46:4     scientific data?

46:5           If I were to submit to a

46:6     scientific journal, I'm going to, of

46:7     course, that was published in a law

46:8     review, I don't know that I can get

46:9     something like that published.

46:10           So your question has to

46:11     incorporate those elements. But, no,

46:12     nothing's being written.

46:13           Nothing is being written to

46:14     refute nothing, that in my answer.

46:15     Q. I'm not asking if there's been

46:16     research that's been published to refute

46:17     anyone.

46:18           I'm just saying, is there any

46:19     research study that's been published in a

46:20     peer-review journal that contradicts the

46:21     conclusions that have been drawn by the

46:22     scientists that you referenced?

46:23     A. There are so many conclusions

46:24     and assertions made that I don't want to

46:25     make a blanket statement, but I really

47:1

47:2   can't.  I'm not aware, for example, of

47:3   literature from police journals that may

47:4   take a different and in a very systematic

47:5   way take a different -- that may derive

47:6   different conclusions about police

47:7   approaches.

47:8            At least from the behavioral

47:9   science literature, I'm not aware of any.

47:10           MS. STALF:  Russell, could you

47:11      let us know a good time to take the

47:12      five-minute break that the doctor

47:13      requested?

47:14           MR. AINSWORTH:  Sure.

47:15      Q.    Let me rephrase it this way:

47:16   You know of no studies published in a

47:17   peer-review journal that contradicts the

47:18   conclusions that have been drawn by the

47:19   scientists that you referenced earlier?

47:20      A.    Again, there are so many

47:21   conclusions presented, you are also

47:22   asking -- I will give you an example.

47:23   For years people like Kassin were

47:24   publishing about how --

47:25           THE WITNESS:  I kicked her under

48:1

48:2        the table by mistake.

48:3        A.    -- they were publishing how

48:4    confessions that were unreliable have

48:5    very little detail, all right.  And the

48:6    coterie, you know, the people who are

48:7    attracting the most attention to this

48:8    area would speak to the idea that they

48:9    can analysis confessions and the

48:10   confessions had with very little data and

48:11   they would offer this in their reports

48:12   and stuff like that.

48:13           Then Garrett came along wrote a

48:14   study and talked about how many false

48:15   confessions had very detailed confessions

48:16   so that refutes.

48:17           So there are so many ideas that

48:18   over the years, Dr. Kassin, Dr. Lee, just

48:19   thrown against the wall that when someone

48:20   does meaningful, thoughtful case analysis

48:21   or case study with data, some of those

48:22   conclusions may ultimately be rethought

48:23   so I can't make a blanket statement and

48:24   say that nothing's been refuted.

48:25           There's just been so much

49:1

49:2     thrown against the wall with the idea

49:3     something will register because it sounds

49:4     so disturbing that, in time, perhaps some

49:5     of those ideas may prove to be correct.

49:6              I'm not making a blanket

49:7     statement saying things are all nonsense.

49:8     I'm making a blanket statement saying

49:9     that these things are unproven in their

49:10    broad assertions.

49:11            So the answer is a qualified no

49:12    because I just gave you an example from

49:13    Garrett about a long-held idea that was

49:14    promulgated as something scientific that

49:15    was dramatically rethought in the wake of

49:16    that article.

49:17    Q.    Can you tell me if there are

49:18    any published studies in the

49:19    peer-reviewed journal that refute any of

49:20    the conclusions on contentions made in

49:21    Dr. Russano's report disclosed in this

49:22    case?

49:23    A.    I probably would want to look

49:24    at the report.  Judging how little an

49:25    area of science this is, it's basically

50:1

50:2    air, I think the simple answer is no.

50:3        Q.    You know of no studies in a

50:4    peer-reviewed journal that refutes any of

50:5    contentions or conclusions that are made

50:6    in Dr. Russano's report?

50:7            MS. STALF:  Objection, asked and

50:8        answered.

50:9        A.    I would probably want to go

50:10   through every single one of the

50:11   assertions that she makes about the

50:12   science.  But for purposes of brevity, I

50:13   will say no.

50:14       Q.    That you don't know of any

50:15   study that contradicts Dr. Russano's

50:16   conclusions, correct?

50:17       A.    Conclusions about the science,

50:18   yes.  She made conclusions about the

50:19   case.  She made conclusions about the

50:20   discipline.

50:21           Maybe calling it a science, is

50:22   a little too charitable, the discipline.

50:23           I don't.

50:24           MR. AINSWORTH:  If you want to

50:25       break now?

51:1

51:2          THE VIDEOGRAPHER:  We are going

51:3     off the record, 10:15 a.m.

51:4          End of disc number 1.

51:5          [Discussion held off the

51:6     record.]

51:7          [Whereupon, at 10:15 a.m., a

51:8     recess was taken.]

51:9          [Whereupon, at 10:24 a.m.  the

51:10     testimony continued.]

51:11          THE VIDEOGRAPHER:  Returning to

51:12     the record, 10:24 a.m.

51:13          Beginning of disc number 2.

51:14     Q.   So, Doctor, it's fair to say

51:15 that in order for a researcher to draw

51:16 conclusions that would be valid in the

51:17 field of false confessions, you would

51:18 want them to look at good data with the

51:19 sufficient sample size that would lend

51:20 itself to statistical analysis that would

51:21 eventually yield robust and supportable

51:22 conclusions; is this an accurate summary

51:23 of what you --

51:24     A.   I agree to a point.  Just going

51:25 back to my point about Dr. Lee.  If you

52:1

52:2    have good date from sufficient sample

52:3    size and something is clearly, frequently

52:4    represented, you don't need to do

52:5    statistical analysis to understand that

52:6    it's significant.

52:7            Other kinds of area would

52:8    require statistical analysis in order to

52:9    be able to assess their -- the validity

52:10   of their relevance so it depends on what

52:11   you actually find.  Certain things jump

52:12   out as obvious.  Statistical analysis

52:13   enables you to understand the degree of

52:14   significance of what you are finding and

52:15   it enables you to see things that

52:16   otherwise would be submerged from the

52:17   naked eye.

52:18   Q.   Let's take for example your

52:19   polygraph confrontation scenario where

52:20   being confronted with the conclusion that

52:21   you failed the polygraph is a factor that

52:22   leads to false confession.

52:23            If you looked at 20 more cases

52:24   and you found that in none of those cases

52:25   people who had been confronted with a

53:1

53:2   failed polygraph result actually provided

53:3   a false confession, would that cause you

53:4   to reconsider your conclusions drawn from

53:5   the very small sample size that you

53:6   looked at or started to look at it?

53:7       A.    It would cause me to reconsider

53:8   the significance of it.  I think that

53:9   what is critical to the understanding of

53:10  false confessions, in research as well as

53:11  a forensic context, is what moves the

53:12  suspect from denial to embracing

53:13  responsibility.

53:14           And so there is a time

53:15  proximity and if you have 20 more cases,

53:16  you still have those three cases in which

53:17  it took place.

53:18           Now, it may be demonstrably

53:19  less cause and effect related but in

53:20  those three cases that I raised, I can't

53:21  access them, I'm just telling you three

53:22  or four, it may have been four, from

53:23  those cases from what we learned, there

53:24  is definitely a cause-effect like shortly

53:25  after the information came in of failing

54:1

54:2    of polygraph, within a very brief period

54:3    of time a person offered

54:4    self-incriminating statements and had

54:5    gone from denial to acceptance.

54:6           So one can't take that away but

54:7    with additional data, the consequence of

54:8    that if it didn't come up in 20 more

54:9    cases becomes much more diluted and less

54:10    impactful relative to other factors that

54:11    might emerge from those 20 cases.

54:12           If that's -- if you want, I can

54:13    give you an example of where that may

54:14    apply.

54:15       Q.    Sure.

54:16       A.    Let's take for example

54:17    controversies about whether SSRIs relates

54:18    to violence.

54:19           It's a hotly contested issue of

54:20    my psychopharmacological community.

54:21       Q.    If you just state for the

54:22    record what is an SSRI?

54:23       A.    Selective serotonin reuptake

54:24    inhibitors.

54:25           There is an active discussion,

55:1

55:2    some of which is in the forensic

55:3    community, some of which is in the

55:4    clinical community, about the

55:5    relationship between SSRIs and homicidal

55:6    violence as opposed to mere

55:7    agressiveness.

55:8            Those who dismiss it, say that

55:9    it's so rare and that the data informing

55:10   it is poor and that people who advocate

55:11   the cause-effect relationship are

55:12   basically confusing aggressiveness with

55:13   homicidal violence.  They are basically

55:14   blending the two items.

55:15           Those who assert there is a

55:16   relationship will point to cases and tout

55:17   a time proximal relationship, a person

55:18   took X dose or took increased dose of

55:19   said medication, became homicidally

55:20   violent in a very short period of time,

55:21   all other potential causal factors were

55:22   accounted for because the case was

55:23   closely scrutinized in a forensic arena

55:24   because of the legal consequences.  Those

55:25   cases happen.  They're real.

56:1

56:2         What they'll say is, okay,

56:3 those who say it's inconsequential, we

56:4 have given Zoloft a bazillion times and

56:5 this only happened a small fraction of

56:6 times; and they'll say, yeah, but it

56:7 happened, it happened and you can't come

56:8 up with another cause.

56:9         So that's the analysis of the

56:10 situation. What I'm able to say is its

56:11 frequent representation is significant to

56:12 me.

56:13         Other factors may emerge with

56:14 20 other cases in which someone is

56:15 informed they failed a polygraph where

56:16 there is no causal relationship between

56:17 the polygraph -- being informed of failed

56:18 polygraph and a false confession, but in

56:19 a case where it happened, it happened,

56:20 you know, so, I'm not taking a side in

56:21 this psychopharmacologic dispute. Those

56:22 kinds of things happened all over science

56:23 where there is an area that wants to be

56:24 relevant, you know, cause-effect of a

56:25 given side effect. It's all over product

57:1

57:2    liability.  It's something that so many

57:3    different sectors of law encounter.

57:4            You have enough data, what kind

57:5    of data do you have?  Can you account for

57:6    all kinds of causal relationships?

57:7            These are well understood

57:8    concepts.  So that is one that

57:9    immediately comes to mind that I perhaps

57:10   wrestle with at least within a clinical

57:11   realm on a more regular basis if not a

57:12   forensic one.

57:13           THE WITNESS:  Can I please break

57:14       for a moment?  I'm sorry.

57:15           THE VIDEOGRAPHER:  Going off the

57:16       record 10:31 a.m.

57:17           [Discussion held off the

57:18       record.]

57:19           [Whereupon, at 10:31 a.m., a

57:20       recess was taken.]

57:21           [Whereupon, at 10:48 a.m., the

57:22       testimony continued.]

57:23           THE VIDEOGRAPHER:  Returning to

57:24       the record, 10:48 a.m.

57:25       Q.    So is the converse true,

58:1

58:2   Doctor, if you didn't see a factor being

58:3   present in the demonstrably false

58:4   confessions that you looked and the study

58:5   you attempted that you can then conclude

58:6   that those factors from that limited

58:7   sample that you reviewed are not a factor

58:8   in the false confessions?

58:9       A.    I wouldn't do that because the

58:10  sample size was so small.  I thought you

58:11  were going to ask about the 20 additional

58:12  cases.

58:13           Yeah, if you get 20 additional

58:14  cases and something keeps popping up and

58:15  you never appreciated if was significant

58:16  before then so....

58:17      Q.    So you accept that false

58:18  confessions do occur?

58:19      A.    Yes, sir.

58:20      Q.    And that false confessions have

58:21  occurred in cases where we can

58:22  demonstrably prove somebody is innocent,

58:23  right?

58:24      A.    Correct.

58:25      Q.    Doctor, does it then follow

59:1

59:2    there can be demonstrably false

59:3    confessions --

59:4            MR. AINSWORTH:  Strike that.

59:5        Q.    Doctor, does it then follow

59:6    that there could be false confessions in

59:7    cases where you cannot demonstrably prove

59:8    that the person is innocent?

59:9        A.    That's correct.

59:10       Q.    So when you are looking to

59:11   determine whether somebody is

59:12   demonstrably innocent and it's a rape

59:13   case, is the fact that there is no DNA

59:14   recovered from the crime scene indicative

59:15   that the person is innocent, even if it's

59:16   no demonstrative but indicative?

59:17       A.    No.  It may or may not be.  If

59:18   it were present it would be strong proof

59:19   of guilt if there was no likelihood of

59:20   some consensual sexual contact with that

59:21   person; for example, this case.

59:22           I think it's unrealistic to

59:23   expect that Mr. Chatman and Ms. Riggio

59:24   would have been carrying on a consensual

59:25   sexual relationship because there was

60:1

60:2    just no connection between the two of

60:3    them, historically.

60:4         The absence of it, DNA material

60:5    is not available that all cases of sexual

60:6    assault and so while it is usually

60:7    available and it supports an idea that a

60:8    person is innocent, the absence of DNA

60:9    doesn't account for all possibilities.

60:10   Q.    How about in this case where at

60:11   trial they presented evidence there was

60:12   both anal penetration and vaginal

60:13   penetration but no DNA from anyone other

60:14   than Ms. Riggio was recovered from the

60:15   crime scene, does that at least tilt the

60:16   facts in favor of innocence for Mr.

60:17   Chatman?

60:18   A.    I think there is no further

60:19   tilting beyond what I said.  The fact

60:20   there is no DNA is supportive of his

60:21   innocence but it certainly doesn't

60:22   demonstrate the certainty of that

60:23   innocence.

60:24        Whether allegations of anal or

60:25   anal plus vaginal, it's -- for me it's an

61:1

61:2   issue of presence versus absence as

61:3   opposed to the nature of the assertion

61:4   especially because Ms. Riggio was, by her

61:5   account, struck on the head.

61:6         Certainly by all of the

61:7   accounts of the witnesses who were there,

61:8   she was not fully coherent.  Somebody who

61:9   had an altered mental status to whatever

61:10   degree, that would affect the

61:11   reconstruction of the event.

61:12         It's possible that her

61:13   reconstruction of the events has certain

61:14   details that were accurate that she

61:15   remembers and certain details more

61:16   reflective of her confusion.

61:17   Q.   So what would it take in Mr.

61:18   Chatman's case for you to determine that

61:19   he was in fact innocent of this crime?

61:20   A.   Well, another perpetrator being

61:21   identified and certainly referencing the

61:22   assertions that you made through Dr.

61:23   Russano through the litigation this is an

61:24   all together fabricated rape claim.

61:25         If it's a false claim, then he

62:1

62:2   or anybody else couldn't reasonably be a

62:3   suspect.

62:4          You have two vectors.  One

62:5   relates to the suspect and one relates to

62:6   the complaint itself.

62:7     Q.   What if there was a hair from

62:8   another man that was found on Susan

62:9   Riggio, in Susan Riggio's pubic hair --

62:10         MS. STALF:  Objection.

62:11     Q.   -- would that indicate to you

62:12   that Mr. Chatman was innocence?

62:13         MS. STALF:  Objection, complete

62:14     hypothetical.

62:15     A.   There's a few questions to ask.

62:16   First of all, whose hair is that and what

62:17   is that person's association to Ms.

62:18   Riggio and her movements.

62:19         I think that is where the

62:20   discussion would start and then it would

62:21   graduate into a forensic science analysis

62:22   of the legitimacy of hair analysis which

62:23   attracts a lot of dispute and I'm not

62:24   going to take a side on that one either.

62:25         It could be informative but it

63:1

63:2    would certainly have to go threw both of

63:3    those car washes and see how it emerges

63:4    on the other side.

63:5        Q.    Why would you want to know

63:6    whose hair it was if it was found in her

63:7    pubic hair?

63:8        A.    Because there is a whole range

63:9    of scenarios of how another person's

63:10   pubic hair can become part of one's own

63:11   pubic hair.  You can borrow a pair of

63:12   pants, right?

63:13           There are all kinds of

63:14   scenarios that one would have to account

63:15   for which is why I literally used the

63:16   metaphor of a car wash.  You put

63:17   something through, it gets scrubbed, it

63:18   get's blown, and it get's everything and

63:19   you see what emerges on the other side;

63:20   the scrutiny of the origin and the

63:21   evidence, the nature of it, the fidelity

63:22   of it.

63:23           Look, example, she is on the

63:24   desk, she's naked, we don't know whose

63:25   been near that desk over time.  It could

64:1

64:2     be somebody that dropped a hair.  She's

64:3     on a desk grinding her pubic area.  This

64:4     is one of many scenarios.  I'm not saying

64:5     to be sort of dismissive.

64:6             You have to account for all of

64:7     those possibilities and see what emerges

64:8     on the other side.  I don't really have

64:9     an opinion.  It's certainly you look at

64:10    and say, oh, let's chase this through,

64:11    follow this through and see what

64:12    possibilities that we can account for.

64:13        Q.    Let me change my hypothetical.

64:14            What if you found somebody

64:15    else's, a male's DNA on the victim's

64:16    vaginal swab, that was not Carl Chatman

64:17    or Ms. Riggio's husband --

64:18        A.    Sure.

64:19        Q.    -- would that lead, would that

64:20    be indicative of innocence in your mind?

64:21        A.    Yes, if there was no evidence

64:22    that she could have had any consensual

64:23    sexual contact with this person and his

64:24    DNA was inside of her and it suggested

64:25    sexual contact that couldn't have come

65:1

65:2     from anything else, sure.  Sure.

65:3         Q.     That would indicate innocence:

65:4     Only if we he had DNA from some other man

65:5     on the victim's vaginal swab?

65:6         A.     Yes.  But what I'm saying is

65:7     with no evidence of consensual sexual

65:8     contact, I can't account for Ms. Riggio's

65:9     private life.  I could but that wasn't

65:10    the focus of my examination.

65:11            And I have had cases in which

65:12    this's come up in which a person's

65:13    available DNA and was there a

65:14    relationship, was there not a

65:15    relationship.

65:16            I don't want to suggest she was

65:17    unfaithful for her husband, these are the

65:18    possibilities.

65:19            Now, if there is no way that

65:20    she could have been consensually involved

65:21    with the person whose DNA.

65:22            THE REPORTER:  You have to slow

65:23       down, Doc.

65:24            THE WITNESS:  I'm sorry.

65:25        A.     With the person whose DNA was

66:1

66:2    inside her, then sure, that would be

66:3    strongly supportive of Mr. Chatman's

66:4    innocence under the circumstance.

66:5        Q.    Assume for this hypothetical

66:6    that Ms. Riggio had not had sex of any

66:7    kind within 72 hours before the rape kit

66:8    was obtained.

66:9        A.    Yeah.

66:10       Q.    So she didn't have sex with her

66:11   husband or anybody else for 72 hours.

66:12       A.    Um.

66:13       Q.    Then there is a swab taken of

66:14   her, a vaginal swab is obtained.

66:15           If that had male DNA from

66:16   somebody whose not Carl Chatman, only

66:17   then would you be willing to say that Mr.

66:18   Chatman was innocent?

66:19       A.    I didn't --

66:20           MS. STALF:  Objection to the

66:21       form of the question; complete

66:22       hypothetical.

66:23       A.    -- I didn't say only then.  I

66:24   said that is a scenario in which I would

66:25   strongly consider Mr. Chatman to be

67:1

67:2     innocent.

67:3          Q.   Why would you strongly consider

67:4     Mr. Chatman to be innocent under that

67:5     scenario?

67:6          A.   Because there is no indication

67:7     from the available fact pattern of

67:8     multiple assailants.  So whoever attacked

67:9     her was one person.  There was only

67:10    evidence of one person.  If there

67:11    evidence of another person, then it is

67:12    not Carl Chatman.

67:13              Now, if there is a possibility

67:14    of multiple assailants, well, then it

67:15    becomes more ambiguous.

67:16         Q.   Right.

67:17         A.   But nobody is suggesting she

67:18    was attacked by more than one person.

67:19         Q.   Sir, does the fact that there

67:20    was no hair transfer not only from Carl

67:21    Chatman to Ms. Riggio, also no hair

67:22    transfer from Ms. Riggio to Mr. Chatman,

67:23    does that indicate to you that Mr.

67:24    Chatman is more likely to be innocent?

67:25         A.   Not in this case.  I'm not an

68:1

68:2     expert in hair transfer, and so I want to

68:3     point that out.

68:4            If you will allow me to

68:5     extrapolate from broad physical evidence,

68:6     the presence of whether it be hair or

68:7     some other physical evidence that is not

68:8     DNA.

68:9            I'm not sure that I can account

68:10     for the nature of contact that the two

68:11     had.  I think that is a bit unclear, how

68:12     long it happened for and so it certainly

68:13     wouldn't surprise me if some kind of

68:14     physical evidence was available.

68:15            I also respect that in a scene

68:16     where you have all kinds of stuff all

68:17     over the place, it's in an office,

68:18     there's papers; there's mess; there's

68:19     this; there's that.  What gets tested,

68:20     what gets identified for testing, what

68:21     gets collected as evidence may have

68:22     captured whatever could have come from an

68:23     assailant assuming that it took place.

68:24            One assumes the -- if it

68:25     happens in an environment where this is

69:1

69:2  basically nothing else such as an outdoor

69:3  environment, sort of a naturalistic

69:4  setting so that something that is

69:5  potential evidence may be more readily

69:6  recognized, this hair is not supposed to

69:7  be here.  We are by a river or isolated

69:8  area where nobody comes here.  It's a

69:9  little different.

69:10         You have a lot of people coming

69:11  into that office.  You have a lot of

69:12  mishmash from an apparent struggle on a

69:13  desk.  You have urine that can perhaps

69:14  impact transfer of some material.  So

69:15  it's a little bit harder to account for.

69:16         And then I'll leave it at that

69:17  cause I can't speak from any expertise to

69:18  the idea of percentages of transfer of

69:19  hair, not something I know about.

69:20     Q.    What is adversarial bias?

69:21     A.    What context are you bringing

69:22  it from?

69:23     Q.    Your report.

69:24     A.    But can you point to my report

69:25  and I will explain it?

70:1

70:2    Q.    I had read a portion of your

70:3    reports.

70:4            "One of greatest challenges to

70:5    the behavorial scientist's assessment of

70:6    disputed confession is to avoid

70:7    speculation and to avoid presumptions

70:8    that are guided by adversarial bias

70:9    rather than the framework of what has

70:10   been established."

70:11           MS. STALF:  For the record, what

70:12       page are you reading from?

70:13           MR. AINSWORTH:  11.

70:14   Q.    What did you mean by

70:15   adversarial bias?

70:16   A.    I need more.

70:17           MS. STALF:  Can the doctor see

70:18       the report, Russell?

70:19           MR. AINSWORTH:  Let's mark this

70:20       as 1.

70:21           [The document was hereby marked

70:22       as Plaintiff's Exhibit 1 for

70:23       identification, as of this date.]

70:24   Q.    I will direct you down.

70:25   Looking at the "until this work is done"

71:1

71:2  paragraph.

71:3         I read to you the last sentence

71:4  in that paragraph.

71:5     A.   Um -- yeah.  I'm referring to

71:6  those bullet points up above.  I actually

71:7  had a chance to look at this.

71:8         I'm talking about how research

71:9  hasn't established these points and

71:10 research can and should but research has

71:11 to approach this in the absence of

71:12 adversarial bias.

71:13        Example --

71:14    Q.   What is --

71:15    A.   I'm explaining.  I'm giving you

71:16 a clear example of adversarial bias.

71:17        The polemics that are written

71:18 by Dr. Kassin specifically and perhaps

71:19 others operate from a presumption that

71:20 false confessions are driven by police

71:21 misconduct.

71:22        That is adversarial bias

71:23 because it's already been established

71:24 that in certain instances false

71:25 confessions happened principally because

72:1

72:2      of the vulnerability of the suspect.

72:3              The orientation presumes police

72:4      misconduct, presumes that police, as if

72:5      they were, I mean, maybe we have robots

72:6      at McDonalds making hamburgers but we

72:7      don't have robots doing interrogations.

72:8              There is no uniform aspect how

72:9      police question suspects. Everybody is

72:10     different. Everybody is different, so --

72:11     research that is free of adversarial bias

72:12     doesn't come in saying, we know what

72:13     happened. Let's figure out what the

72:14     police misconduct was. No. No. No. It

72:15     says there are three potential

72:16     contributors. There may be interrogation

72:17     tactics; maybe suspect vulnerabilities;

72:18     it maybe the context in which it took

72:19     place. Don't know. Let's see. Let's

72:20     put them all together and see what had

72:21     that proximal cause-effect relationship,

72:22     or how they played off one another 'cause

72:23     maybe it's not the questioning per se,

72:24     maybe it's the questioning with this

72:25     particular vulnerability that makes the

73:1

73:2    difference.

73:3            To approach it differently to

73:4    come in with just let's see what aspect

73:5    of police overreach is responsible for

73:6    this adversarial bias, that is an example

73:7    but that's certainly pertinent to what

73:8    I'm laying out here.

73:9            Or, for example, adversarial

73:10   bias would say, we have studied

73:11   suggestibility and we've studied

73:12   compliance so that is all that matter.

73:13   Really?  Do we know that?  Is there some

73:14   vulnerability that we haven't discovered

73:15   yet?  Maybe.  How do we know?  How do we

73:16   know?  That is adversarial bias.

73:17           It's adversarial bias to say;

73:18   for instance, there is no way that a

73:19   person could possibly be vulnerable

73:20   because they are not super suggestible or

73:21   compliant or because they were

73:22   suggestible, that is the vulnerability.

73:23   How do you know that?  Maybe they're

73:24   suggestible but it's totally irrelevant

73:25   to why they confessed falsely.

74:1

74:2          Do you see what I'm saying?

74:3    Because that is where the research is.

74:4    Okay.  Fine.  The research is there, it's

74:5    informative.  The race between the

74:6    tortoise and the heir, the heir is

74:7    winning.  Maybe the tortoise that nobody

74:8    is a talking about is the vulnerability

74:9    responsible.  That is what I'm talking,

74:10   adversarial bias.  It's just, again, I

74:11   can go on and on.  Those are also two

74:12   examples I think illustrate it.

74:13          There are different qualities

74:14   of adversarial bias that reside in all

74:15   three of those domains that's other micro

74:16   aspects of this discussion of false

74:17   confession.

74:18     Q.    Is it fair to say that

74:19   adversarial bias is taking a position

74:20   based not on the science, but based n

74:21   some agenda or nonscientific motivator?

74:22     A.    Sure.  That is a fair

74:23   breakdown.  I think it encompasses it.

74:24     Q.    I'm just trying to understand,

74:25   not what the terms means in literature,

75:1

75:2    just how you are using it.

75:3      A.   You know, at face value, I get

75:4    you.  And at face value, you are right.

75:5    It plays itself out in a variety of ways.

75:6          I remember, this has nothing to

75:7    do with litigation per se, but you talk

75:8    about the importance of agenda.  Agenda

75:9    may not necessarily have to do with

75:10    litigation or who you want to get hired

75:11    by, hired by plaintiff's bar, defense

75:12    bar, whatever.

75:13          It may have to do with your own

75:14    peculiar interest in research.  All

75:15    right.  And that may be pertinent to this

75:16    case.

75:17          Again, I'm not saying this as a

75:18    -- to be at all disparaging of Dr.

75:19    Russano.  I want to put this on the

75:20    record.

75:21          Dr. Russano is obviously very

75:22    proud of herself.  She should be.  She's

75:23    a dedicated person.  She's got some nice

75:24    grants.  It's terrific.  She's a very

75:25    serious professional and that's great.

76:1

76:2        But she is very

76:3    self-congratulatory which may be

76:4    deserved.  I'm very proud of my own

76:5    accomplishments.

76:6        From that posture, a person is

76:7    very much oriented around their universe,

76:8    right?

76:9        I remember the experience of

76:10   reading an article in a very visible

76:11   behavioral science literature about

76:12   multiple personality disorder in murder

76:13   defendants and I was so impressed by it.

76:14   It was in my early career.  People are

76:15   like, wow, the researcher found all of

76:16   this multiple personality cases.  How did

76:17   that person do this?

76:18        By act of God, I happened to be

76:19   sitting in the same room doing some work

76:20   where this very researcher probably about

76:21   five years later was interviewing

76:22   somebody in an offshoot of the same

76:23   study.

76:24        I was doing my work.  It was

76:25   kind of a big room, and this person was

77:1

77:2    asking very leading questions of this

77:3    examinee and I sat there and listened.

77:4    Ah-ha, now I know how she finds so many

77:5    multiple personality disorders.  You ask

77:6    the right questions, you get the answer.

77:7         That could be adversarial bias

77:8    that relates that goes beyond just the

77:9    perimeters of litigations.

77:10        You may say that it's a

77:11   different form of bias, not necessarily

77:12   adversarial about I think it wasn't just

77:13   the multiple personality per se but it

77:14   was all of the social agenda that was

77:15   behind it that was carried in the wake of

77:16   those findings.

77:17        So there are many different

77:18   aspects of at least what I'm collecting

77:19   into that term adversarial bias.

77:20        I think you encompassed it

77:21   properly in your summary of my statement.

77:22   Q.    Did you exhibit adversarial

77:23   bias in the report that you prepared in

77:24   this case that we marked as Exhibit 1?

77:25   A.    I hope not.  It's a challenge.

78:1

78:2    I hope not.

78:3         Q.    You try not to?

78:4         A.    I try not to.  I think there

78:5    are forces looking to be retained by one

78:6    side.  There are challenges to

78:7    objectivity inherent to litigation.  You

78:8    have to do what you can to guard against

78:9    that, and I hope I didn't.

78:10        Q.    What did you do to guard

78:11   against adversarial bias?

78:12        A.    I thought about what I wrote,

78:13   how I wrote it, conclusions that I made,

78:14   whether they were fair.

78:15             What I commonly do and I am

78:16   sure I did it in this case although in a

78:17   30-page report, I can't tell you exactly

78:18   whether that was the process in every

78:19   step.  I -- very early in the process, I

78:20   can't say this happens for every case,

78:21   but certainly it happened in this case, I

78:22   adopt the perspective of the side that

78:23   has not retained me and sort of take it

78:24   at face value with you and some of your

78:25   questions, what if, what if this didn't

79:1

79:2    happen?  What if he was the wrong guy?

79:3    What if this?  There are several points

79:4    raised here.

79:5          And I get grounded in that just

79:6    taking it at face value and just giving

79:7    it credit for discussion's sake and I use

79:8    the expression before, I can't say that I

79:9    used it often, but because I used it

79:10    earlier in the deposition, it sort of

79:11    applies here:  You put things through a

79:12    car wash, see what happens.  When they

79:13    get scrubbed, have the opportunity to

79:14    have a little water thrown at them,

79:15    brush, soap, see how they emerge at the

79:16    other side.

79:17          At least with the information

79:18    that I have available, the conclusions

79:19    are there.  Of course, this is a case

79:20    that has a tremendous amount of data, at

79:21    least documentation around it.  There is

79:22    always something in a source that you

79:23    might night have read that can impact

79:24    one's opinion.

79:25          Running all of that information

80:1

80:2    through the car wash that I said, I came

80:3    up with the conclusions on the other

80:4    side.

80:5          I think one quality is to

80:6    internalize the points of the side that

80:7    hasn't retained me at face value.  What

80:8    if it's true?

80:9    Q.    So I want to in a way test your

80:10   adversarial bias or presence of bias by

80:11   talking more about what would lead you to

80:12   conclude that Mr. Chatman was in fact

80:13   innocent?

80:14         We have already, you said that

80:15   a hair, the pubic hair would not

80:16   necessarily lead you to conclude that Mr.

80:17   Chatman was innocent, right?

80:18   A.    Correct, not without more.

80:19   Q.    But if there was the presence

80:20   of another man's DNA on the vaginal swab

80:21   taken from Ms. Riggio where she did not

80:22   have sex within 72 hours that was not

80:23   Carl Chatman's that would lead you to

80:24   conclude Mr. Chatman was innocent?

80:25   A.    Fair to say.

81:1

81:2      Q.   Sir, are you aware in fact that

81:3 another man's DNA was found on Ms.

81:4 Riggio's vaginal swab that was not Carl

81:5 Chatman's?

81:6      A.   I'm not aware of that.

81:7      Q.   Are you aware that another

81:8 man's DNA that is not Carl Chatman's was

81:9 found on Ms. Riggio's underwear?

81:10      A.   I'm not aware of that.

81:11      Q.   Are you aware that another

81:12 man's DNA that is not Carl Chatman's was

81:13 found on vacuumings from the victim's

81:14 underwear obtained from the rape kit?

81:15      A.   I'm not aware of that.

81:16      Q.   Are you aware that the other

81:17 man's DNA found on Ms. Riggio's vaginal

81:18 swab was not her husband's?

81:19      A.   I'm not aware of that.

81:20      Q.   Are you aware that the other

81:21 man's DNA that was found on Ms. Riggio's

81:22 underwear was not her husband's?

81:23      A.   I'm not aware of that.

81:24      Q.   Are you aware that Ms. Riggio

81:25 at the time that the rape kit was

82:1

82:2    conducted reported that she had not had

82:3    sex with anyone for the 72 hours

82:4    proceeding the assault?

82:5        A.    It was probably in a record,

82:6    but I'm not aware of it.

82:7            MR. AINSWORTH:  So let's just

82:8        mark this as Exhibit No. 2.

82:9            [The document was hereby marked

82:10       as Plaintiff's Exhibit 2 for

82:11       identification, as of this date.]

82:12       Q.    I'm showing you what's been

82:13   marked as Exhibit No. 2.  This is a

82:14   document Bates number plaintiff 015424

82:15   through 015436 and this is Ms. Riggio's

82:16   records from Northwestern Memorial

82:17   Hospital at the time that the rape kit

82:18   was conducted the morning of May 24,

82:19   2002.

82:20           I ask you to turn to the second

82:21   to last page of this exhibit, page 15435

82:22   in the bottom right-hand corner.

82:23           [Witness complying.]

82:24       A.    Yes.

82:25       Q.    And in the bottom right-hand

83:1

83:2    corner of that document there is a box 8,

83:3    "Pertinent Medical History"?

83:4        A.    Yes.

83:5        Q.    B, there is a question sexual

83:6    activity within 72 hours of assault which

83:7    is a standard question that they ask to

83:8    determine whether somebody else's DNA

83:9    might be found there from a consensual

83:10   encounter, right?

83:11       A.    Correct.

83:12       Q.    And Ms. Riggio indicated, no,

83:13   that she had not had sexual activity?

83:14       A.    Yes.

83:15       Q.    Do you recall from her

83:16   deposition she testified she had not been

83:17   unfaithful to her husband?

83:18       A.    Yes.

83:19            MR. AINSWORTH:  Now, let's mark

83:20       Exhibit 3.

83:21            [The document was hereby marked

83:22       as Plaintiff's Exhibit 3 for

83:23       identification, as of this date.]

83:24            MR. AINSWORTH:  For the record

83:25       this will be Bates numbered plaintiff

84:1

84:2      030030 through 030037.

84:3      Q.    I'm showing you Exhibit 3.

84:4   It's the Fourth Analytical Report from

84:5   Serological Research Institute dated

84:6   December 9, 2015.

84:7          I take it you have not read

84:8   that document; is that correct?

84:9      A.    I don't know that I studied it.

84:10  I may have seen it.  I have to go back

84:11  and check.  It's not that familiar so if

84:12  I looked at it, I don't know that I

84:13  looked at it with the same level of

84:14  scrutiny like a medical record or

84:15  psychiatric record so....

84:16     Q.    You are not an expert in DNA?

84:17     A.    No, sir.

84:18     Q.    You have not read Dr. Carl

84:19  White's [phonetic] expert report or

84:20  deposition testimony about the DNA

84:21  evidence in this case, have you?

84:22     A.    No, I haven't.

84:23     Q.    Let's turn to the last page,

84:24  sorry, the seventh page of this

84:25  eight-page document where is says,

85:1

85:2    "Conclusions."  Do you see that, sir?

85:3         A.    Yes.

85:4         Q.    "One, the trace amount of DNA

85:5    recovered from the vaginal swabs resulted

85:6    in weak and incomplete YSTR results.

85:7              "This partial profile could not

85:8    have originated from Carl Chatman.

85:9              "Two, the trace amount of DNA

85:10   recovered from the rectal swabs resulted

85:11   in a single allele.  No further

85:12   interpretations could be made."

85:13        A.    Um.

85:14        Q.    "Three, the trace amounts of

85:15   DNA recovered from the panty swabbing

85:16   resulted in weak and incomplete YSTR

85:17   results."

85:18        A.    Um.

85:19        Q.    "This partial profile could not

85:20   have originated from Carl Chatman."

85:21        A.    Um.

85:22        Q.    "Four, the trace amounts of DNA

85:23   recovered from the panty M-Vac sample

85:24   results in a weak and incomplete mixture

85:25   from at least two unrelated male

86:1

86:2     individuals.

86:3              "Carl Chatman is not a

86:4     contributor to this mixture."

86:5         A.    Um.

86:6         Q.    Do you see that, sir?

86:7         A.    I do.

86:8         Q.    Now, sir, I will represent to

86:9     you that the only way YSTR results can be

86:10    had is if the Y is from the Y chromosome

86:11    that a man contributes to a sample and

86:12    that the only way to get a YSTR result is

86:13    male DNA is present in a profile making

86:14    it particularly useful in rape cases

86:15    where you have physically a mixture of

86:16    victim's female DNA and the perpetrator's

86:17    male DNA.

86:18        A.    Okay.

86:19        Q.     If these results are correct as

86:20    I am representing them to you that this

86:21    was male DNA recovered from both the

86:22    vaginal swab, swabbings from Ms. Riggio's

86:23    underwear, and from vacuumings from Ms.

86:24    Riggio's underwear and Mr. Chatman is

86:25    excluded from all three of these, you

87:1

87:2    would agree with me that he is, in fact,

87:3    innocent?

87:4            MS. STALF:  Objection to form;

87:5        foundation.

87:6        A.    I can't --

87:7            MR. CHESTNUT:  I join in the

87:8        objection.

87:9            MR. VLAHAKIS:  Objection.

87:10       A.    I can't account for the

87:11   provenance of that DNA.  I understand

87:12   what you are saying about the Y

87:13   chromosome, but I don't know if her

87:14   husband fits into this.  I don't know

87:15   about contamination.  I see something

87:16   about two unrelated males.  There was one

87:17   person involved in this event so I think

87:18   there are a range of possibilities

87:19   including the possibility of some other

87:20   undisclosed consensual sex.  It's

87:21   possible.

87:22           It just doesn't resolve that

87:23   question.  It resolves a question that

87:24   this isn't from Carl Chatman.

87:25       Q.    Sir, five minutes ago you told

88:1

88:2   me if we found another man's DNA on the

88:3   vaginal swab that was not --

88:4          MR. AINSWORTH:  Strike that.

88:5       Let me show you the Fifth Analytical

88:6       Report, actually the Six Analytical

88:7       Report.

88:8          [The document was hereby marked

88:9       as Plaintiff's Exhibit 4 for

88:10      identification, as of this date.]

88:11      Q.    Showing you what we have marked

88:12   as Exhibit No. 4, which is a document

88:13   Bates numbered plaintiff 030179 through

88:14   030184, entitled, "Sixth Analytical

88:15   Report" from the Serological Research

88:16   Institute.

88:17          If you turn to the last page of

88:18   Exhibit No. 4.

88:19          [Witness complying.]

88:20      Q.    Sorry.  The second to last

88:21   page, page 5 of 6.

88:22      A.    Uh-huh.

88:23      Q.    "Conclusions, one, the trace

88:24   amount of the DNA recovered from vaginal

88:25   swabs resulted in weak and incomplete

89:1

89:2    YSTR results.

89:3          "This partial profile could not

89:4    have originated from Carl Chatman or from

89:5    Frank Riggio."

89:6          And, sir, you understand Frank

89:7    Riggio to be Susan Riggio's husband?

89:8    A.    Right.

89:9    Q.    "Three, the trace amount of DNA

89:10    recovered from the panty swabbing

89:11    resulted in weak and incomplete YSTR

89:12    results.

89:13          "This partial profile could not

89:14    have originated from Carl Chatman or from

89:15    Frank Riggio."

89:16          Do you see that, sir?

89:17    A.    Yes.

89:18    Q.    So we have DNA, male DNA,

89:19    recovered from Ms. Riggio's vaginal swab

89:20    that's not Carl Chatman's and not her

89:21    husband's, right?

89:22    A.    Correct.

89:23    Q.    We have male DNA recovered from

89:24    Ms. Riggio's underwear that is not Carl

89:25    Chatman's and not Frank Riggio's, right?

90:1

90:2      A.    Correct.

90:3      Q.    About five minutes ago you told

90:4  me that if there was in fact male DNA

90:5  that was not Carl Chatman's found on Ms.

90:6  Riggio's vaginal swab, that you would

90:7  agree that Carl Chatman was innocent,

90:8  right?

90:9        MS. STALF:  Objection to the

90:10     form of the question; misstates the

90:11     Witness's testimony.

90:12        MR. CHESTNUT:  Objection.

90:13      A.    My testimony was -- you can

90:14  read it back to me.  I said what I said.

90:15      Q.    And that was if we found --

90:16      A.    I said what I said.

90:17      Q.    Yeah, and I want to make sure

90:18  that it's clear that you understand this.

90:19  Not that what you said is what you said.

90:20        If we found male DNA on Ms.

90:21  Riggio's vaginal swab that was not Carl

90:22  Chatman's, you would agree that Carl

90:23  Chatman was in fact innocent?

90:24        MS. STALF:  Objection to the

90:25     form of the question.

91:1

91:2    MR. CHESTNUT:  Objection to the

91:3    form of the question.

91:4    A.    Let me be clear, no one has

91:5    been identified as the origin of this

91:6    male DNA so there are three

91:7    possibilities:  One is that Carl Chatman

91:8    is innocent.  One is that she has an

91:9    undisclosed consensual relationship.  One

91:10   is that it originated from contaminate.

91:11   You have to rely on a DNA

91:12   specialist to engage the question of to

91:13   what degree this is contaminate or not.

91:14   I can't interpret it from that.  I can't

91:15   address that possibility.

91:16   There are two possibilities.

91:17   One is that there is an undisclosed

91:18   consensual relationship and the other is

91:19   there was another assailant and he is

91:20   innocent so it is certainly a

91:21   possibility.

91:22   Q.    So let's step back and answer

91:23   my question, right?  My question is,

91:24   Doctor, you would agree that just five

91:25   minutes ago you told me if we found male

92:1

92:2     DNA on Ms. Riggio's vaginal swab that

92:3     would mean that Mr. Chatman was innocent,

92:4     right?

92:5             MS. STALF:  Objection to the

92:6         form of question; asked and answered;

92:7         and you are misstating the Witness's

92:8         testimony once again.

92:9             MR. VLAHAKIS:  Join.

92:10            MS. MORRISON:  Join.

92:11            MR. CHESTNUT:  Join.

92:12        A.    I answered your question as I

92:13    answered it and I answered this past

92:14    question as I answered it and my opinion

92:15    is as it is.

92:16        Q.    I'm just trying to find out did

92:17    you misspeak before?

92:18        A.    No.  You are gaming my answers.

92:19    Let's be clear about this.  My position

92:20    is if it's obvious who the DNA originated

92:21    from, whether it originated from some

92:22    swab or a technique of a discipline that

92:23    is not my own.

92:24            You are leading me into

92:25    evidence collection which I have claimed

93:1

93:2    no expertise for, but I'm answering your

93:3    questions at face value and good faith

93:4    with the understanding you are actually

93:5    interested in an honest answer and you

93:6    were not gaming my answers that if it's

93:7    clear that it originates from another

93:8    individual, there is only one assailant,

93:9    and if it's clear there is no consensual

93:10   sex happened during that period of time,

93:11   then, of course, Carl Chatman would be

93:12   innocent.

93:13           I'm not hedging at all.  What I

93:14   am saying is, I don't know enough to

93:15   account for the possibility of

93:16   contamination.  I don't know enough to be

93:17   able to say whether her answer about the

93:18   consensual sex was a sincere one.  I

93:19   don't know.  I haven't explored that.

93:20   I'm accounting for the possibility that,

93:21   yes, Mr. Chatman is innocent.

93:22           It's one of three possibilities

93:23   based on what you presented me venturing

93:24   beyond the hypothetical of whether it was

93:25   a swab or some other technique.

94:1

94:2               You were throwing me the

94:3    pitches, and I'm hitting them right back

94:4    to you.  There is no mystery in what I'm

94:5    saying.

94:6       Q.   Let's go back to the beginning

94:7    of the deposition when I said you have to

94:8    wait for my question before you start

94:9    your answer.  Okay.  That's how we are

94:10    going to proceed.  I will ask the

94:11    question, you provide the answer.

94:12           So, I wanted to know, well, we

94:13    can agree because you're not a DNA expert

94:14    you'll leave the realm of contamination

94:15    of the evidence to somebody else's

94:16    bailiwick?

94:17       A.   Yes, sir.

94:18       Q.   So your only concern was

94:19    whether Ms. Riggio was having an affair

94:20    with somebody else and had sex with that

94:21    other person and that other person's DNA

94:22    was recovered from both her vaginal swab

94:23    and her underwear, but Carl Chatman's DNA

94:24    wasn't recovered from either source even

94:25    though according to Ms. Riggio he had sex

95:1

95:2    with her?

95:3          MS. STALF:  Objection to the

95:4       form of the question.

95:5       Q.    My question to you, sir, is

95:6    there any evidence that Ms. Riggio was

95:7    having a sexual affair with somebody who

95:8    is not Frank Riggio?

95:9       A.    It's not something I explored.

95:10   It's not part of my assessment.

95:11      Q.    I didn't ask you if you

95:12   explored it.

95:13      A.    I can't answer the question one

95:14   way or the other.

95:15      Q.    Let me ask you this:  Can you

95:16   tell me as you sit here today any

95:17   evidence that you have from Ms. Riggio

95:18   having an affair?

95:19          MS. STALF:  Objection to the

95:20       form of the question; foundation.

95:21      A.    I just --

95:22          MR. CHESTNUT:  Join.

95:23      A.    It's not an area that I

95:24   explored.

95:25      Q.    I didn't ask you if you had an

96:1

96:2  opinion.  I asked you, can you point to

96:3  any piece of evidence that indicates Ms.

96:4  Riggio was having sex with somebody who

96:5  wasn't her husband during the 72 hours

96:6  before the alleged rape?

96:7  MS. STALF:  Objection to the

96:8  form of the question; asked and

96:9  answered; foundation.

96:10  A.  My answer was that I was

96:11  exploring something else.  I was not

96:12  exploring the issue of Ms. Riggio's

96:13  fidelity and so I didn't review materials

96:14  that would inform that over and above

96:15  what you've presented me here but more

96:16  definitively her representations in the

96:17  emergency room, which, again, people may

96:18  or may not be forthcoming when they

96:19  communicate with people making a medical

96:20  record so that doesn't inform.

96:21  There is no evidence one way or

96:22  the other.  I supposed there is evidence

96:23  that she is not.

96:24  Especially someone who worked

96:25  in an emergency room in a medicine

97:1

97:2   capacity and had to take history,

97:3   sometimes you get the full story,

97:4   sometimes you don't.

97:5           There are certain sensitive

97:6   questions that one has to understand that

97:7   people are not going to be fully

97:8   forthcoming.  Just don't know.

97:9       Q.    Did you hear my question?

97:10      A.    I answered your question.

97:11          MR. AINSWORTH:  Would you please

97:12      restate the question.

97:13          Listen to the question.

97:14          [The requested portion of the

97:15      record was read.]

97:16          MS. STALF:  Same objection;

97:17      asked and answered multiple times;

97:18      there is lack of foundation.

97:19          Just because you want it in a

97:20      different way, doesn't mean you're

97:21      going to get the answer that you want.

97:22          If you want to answer it again,

97:23      you can.

97:24      A.    The evidence she wasn't having

97:25   a consensual relationship is in her

98:1

98:2    representation to the emergency room.

98:3            The evidence she was having a

98:4    consensual relationship is in these

98:5    findings which suggest she was having sex

98:6    with someone and that may have been a

98:7    consensual relationship, so maybe no and

98:8    maybe yes.

98:9        Q.    So the only evidence you can

98:10   point that suggests Ms. Riggio was having

98:11   a consensual relationship, sexual

98:12   relationship, is that DNA report that I

98:13   just handed you indicating that it was

98:14   not Carl Chatman's DNA on the vaginal

98:15   swab and the underwear?

98:16       A.    Yes, as I said before --

98:17           MS. STALF:  Objection.

98:18       A.    -- it's not something that I

98:19   was involved in this case to explore, but

98:20   those are two pieces of evidence that are

98:21   available to me and to engage that

98:22   specific question, one speaks to the idea

98:23   she was not and one speaks to the idea

98:24   she was, although neither definitively.

98:25       Q.    If the Chatman case was one of

99:1

99:2    the 22 cases that you were looking at in

99:3    your attempted study and you learned that

99:4    the DNA as it as is exactly what I

99:5    presented to you.

99:6            So for this hypothetical,

99:7    assume for the purposes of this question

99:8    that the DNA is that there is no DNA on

99:9    Ms. Riggio's vaginal swab and underwear

99:10   that is not from Carl Chatman and not

99:11   from that her husband, and you don't have

99:12   any adversarial bias, you would conclude

99:13   that this case was or was not a

99:14   demonstrably false confession?

99:15           MS. STALF:  Objection to the

99:16       form of the question; foundation;

99:17       hypothetical.

99:18       A.    The answer is I wouldn't know.

99:19   I wouldn't know we can even include it.

99:20   Can't tell.  Haven't established the

99:21   notion of contamination versus consent,

99:22   versus nonconsent.

99:23           If it was definitively

99:24   established, you know, if you have an

99:25   eighth report from these folks, the

100:1

100:2    eighth report, I don't know how many

100:3    reports, six, seven, eight, whatever.

100:4        Q.    Six.

100:5        A.    Okay.  Well, if you get another

100:6    iteration of the report and the person is

100:7    produced who could not have had a

100:8    consensual relationship with her, then I

100:9    would say that it's false confession and

100:10   Mr. Chatman is innocent, accounting for

100:11   the assumption for our purposes in this

100:12   discussion only because I'm not a DNA

100:13   specialist, that that could not have been

100:14   a contaminant.

100:15       Q.    So you are saying that either

100:16   Susan Riggio lied or Carl Chatman is

100:17   innocent?

100:18            MS. STALF:  Objection to form.

100:19            MR. CHESTNUT:  Join.

100:20       A.    Yes.  One of those two

100:21   possibilities or a contaminant and I'll

100:22   leave measuring errors and all of that

100:23   other stuff to the DNA experts.  I don't

100:24   know to what degree this has been

100:25   contested.

101:1

101:2                I'm not involved at all, as I

101:3    pointed out, I have not been provided

101:4    with those depositions and it's not my

101:5    scientific expertise.

101:6        Q.    So you are not aware there is

101:7    no --

101:8        A.    I'm not aware of it.  I haven't

101:9    seen it.

101:10       Q.    Looking back at your list of

101:11   documents that you reviewed in Exhibit 1?

101:12       A.    Uh-huh, yeah.

101:13       Q.    Item No. 26.  You say, SERI

101:14   report."

101:15       A.    Yeah.

101:16       Q.    There are three SERI reports

101:17   that were prepared and produced prior to

101:18   the criminal trial, three that produced

101:19   prior to the criminal trial and three

101:20   that came after Mr. Chatman's

101:21   exoneration.

101:22            Do you know which SERI reports

101:23   you reviewed?

101:24       A.    I don't know.  All I know what

101:25   I got out of the SERI report was that it

102:1

102:2     wasn't his DNA.  That it kind of what I

102:3     got out of what I reviewed was that he

102:4     was not implicated as the person who, you

102:5     know, had attacked her.

102:6          Q.    He was not implicated or he was

102:7     excluded as being the person?

102:8          A.    I have to go back over what I

102:9     looked at.  What I got out of the SERI

102:10    report that I received or at least that I

102:11    looked at, the DNA evidence didn't

102:12    support his being involved and that

102:13    contributed to an impression that he was

102:14    innocent for this crime or this

102:15    assertion.

102:16         Q.    You included facts in this case

102:17    related to whether or not Carl Chatman

102:18    was innocent or guilty, right?

102:19         A.    You have to direct me to

102:20    something.

102:21         Q.    In your report, you included

102:22    facts whether or not Carl Chatman was

102:23    innocent, right?

102:24         A.    You know, you can wag your head

102:25    all you want, but I still don't know what

103:1

103:2    you're talking about.

103:3          If you can direct me to where

103:4    in the report, I can follow you,

103:5    otherwise, I'm just not tracking what

103:6    you're talking about.

103:7      Q.   In your factual summary, right,

103:8    part of your inquiry was whether or not

103:9    Carl Chatman was innocent?

103:10      A.   When you say factual summary,

103:11    are you talking about what I wrote from

103:12    page 4 to page 8?

103:13      Q.   Yes.

103:14      A.   I don't know.  I just don't

103:15    know.

103:16      Q.   You don't know whether or not

103:17    you included facts that included whether

103:18    Carl Chatman was innocent or guilty; is

103:19    that your testimony?

103:20      A.   I may have, but, again, I'm

103:21    more -- I'm just thinking about the

103:22    question as you phrased it earlier.

103:23         THE WITNESS:  Maybe you can read

103:24      it back to me, his earlier question.

103:25      Q.   It's not pending, sir.

104:1

104:2        A.    My answer is, again, unless you

104:3    direct me to some specific point between

104:4    page 4 and page 8, what I included was a

104:5    narrative of the criminal complaint and

104:6    it's aftermath, that is what I included.

104:7        Q.    Was part of your purpose of

104:8    preparing this report to include the

104:9    facts that would bear upon whether or not

104:10   Carl Chatman was innocent or guilty?

104:11          MS. STALF:  Objection to the

104:12      form of the question.

104:13       A.    Not necessarily.  The purpose

104:14   of including that was really more just an

104:15   orientation for engaging the confession

104:16   issue.

104:17       Q.    You didn't include and you are

104:18   not here to opine as to whether Carl

104:19   Chatman is guilty?

104:20       A.    No.

104:21          I can see by the way on page 8

104:22   I was referencing a number of assertions

104:23   that are arguments about his innocence.

104:24          I included them because they

104:25   are part of this discussion about the

105:1

105:2    confession, but they are variably related

105:3    to questions of his innocence or

105:4    misconduct of the police so it kind of

105:5    depends what we are talking about.

105:6            And in terms of whole notion of

105:7    guilt, I just I have to go over this.  It

105:8    was really more oriented to the statement

105:9    as opposed to guilt or innocence.

105:10    Q.    You didn't purposely exclude

105:11   mention of DNA information from your

105:12   summary of the facts?

105:13    A.    No, I didn't purposely.  If

105:14   it's not in there, it certainly wasn't by

105:15   design.

105:16    Q.    Do you think Ms. Riggio was

105:17   having an extramarital affair?

105:18            MS. STALF:  Objection to form,

105:19        foundation.

105:20            MR. CHESTNUT:  Objection to

105:21        form.

105:22    A.    I just don't know.

105:23    Q.    Are you leaning one way or the

105:24   other; closer to her having an affair or

105:25   closer to her not having an affair?

106:1

106:2          MS. STALF:  Objection to the

106:3      form of the question.

106:4      Q.    I mean back in May 2002.

106:5      A.    It really hasn't entered my

106:6  mind until this deposition.  It's not

106:7  really something I was concerning myself

106:8  with.  I have not been of a posture of

106:9  analyzing DNA and what it means.

106:10          I think you asked me several

106:11  questions earlier about was I aware that

106:12  somebody else's DNA was found, I wasn't,

106:13  that was my testimony.  So it's not

106:14  something that -- my orientation was just

106:15  that nothing implicated Chatman from the

106:16  available testing and it didn't graduate

106:17  to what you're bringing up in this

106:18  deposition so it really hasn't entered my

106:19  mind.

106:20      Q.    So this deposition is my

106:21  opportunity to examine you based on the

106:22  opinions you hold and so I'm asking you

106:23  now, and forever hold your peace, do you

106:24  have an opinion at all about whether Ms.

106:25  Riggio was having an extramarital affair

107:1

107:2    in May 2002?

107:3           MS. STALF:  Objection to the

107:4       form of the question; asked and

107:5       answered.

107:6       A.    I have no idea.

107:7           MR. AINSWORTH:  May we go off

107:8       the record.

107:9           THE VIDEOGRAPHER:  Going off the

107:10      record 11:45.

107:11          End of disc number 2.

107:12          [Discussion held off the

107:13      record.]

107:14          [Whereupon, at 11:45 a.m., a

107:15      recess was taken.]

107:16          [Whereupon, at 11:55 a.m., the

107:17      testimony continued.]

107:18          THE VIDEOGRAPHER:  Returning to

107:19      the record 11:55 a.m.

107:20          Beginning of disc number 3.

107:21    Q.    What did you do to prepare for

107:22  your deposition?

107:23    A.    Read my report, sat and spoke

107:24  with the attorney, and that's pretty much

107:25  it.

108:1

108:2      Q.    When did you meet with Krista?

108:3      A.    Yesterday.

108:4      Q.    For how long?

108:5      A.    A couple of hours.

108:6      Q.    You were deposed on November

108:7   4th of this year in the Swift case,

108:8   right?

108:9      A.    Correct.

108:10     Q.    Did you review any articles

108:11  between the Swift deposition and now?

108:12          MS. STALF:  Objection to the

108:13      form of the question.

108:14     A.    I have read medical literature

108:15  between then and now.

108:16          MR. AINSWORTH:  That was a poor

108:17      question.

108:18     Q.    Since the Swift deposition on

108:19  November 4, 2016, did you review any

108:20  published literature regarding false

108:21  confessions?

108:22     A.    I may have.  I can't answer

108:23  that question definitively.  I haven't in

108:24  the past week or so, so I haven't in the

108:25  very, very recent past.

109:1

109:2          Beyond that I have.

109:3     Q.   After the Swift deposition, did

109:4 you go back to look up some of the terms

109:5 that you didn't know what they meant?

109:6     A.   Oh, no.  I mean those are just

109:7 -- I remember I haven't reviewed the

109:8 Swift deposition.  There is some issue

109:9 with redaction.

109:10          First of all, I'm at a stage of

109:11 the Swift deposition where I was supposed

109:12 to be reading to sign off on my answers

109:13 whether they are correct or not and I

109:14 haven't signed off on that yet so I can

109:15 respond to some of your questions but

109:16 there were a number of questions about

109:17 terms that were raised that were just

109:18 irrelevant to anything.

109:19          And so I didn't go back to look

109:20 them up because they were irrelevant

109:21 before, irrelevant during, irrelevant

109:22 after.

109:23     Q.   So you didn't look up the

109:24 meaning of those terms --

109:25     A.   No.

110:1

110:2      Q.    -- raised in the Swift

110:3  deposition that you don't know the

110:4  answers?

110:5      A.    No, no.

110:6      Q.    So it's fair to say that you

110:7  still don't know what they mean?

110:8      A.    Yeah, it is.  And it's fair to

110:9  say they are still as inconsequential as

110:10  they were during the Swift deposition.

110:11        If you asked me about

110:12  Kazakhstan and I can't answer the

110:13  question, I'm not going to look it up

110:14  after the deposition.  I just don't care.

110:15      Q.    I want to ask you about, I'm

110:16  not going to go through the Swift report

110:17  accept for this one piece of it because

110:18  it pertains to sex offenders.

110:19        You wrote in that report, "Mr.

110:20  Douglas was a crack addict who carried

110:21  cash and who sought sex when he was high.

110:22        "He would have had sex with

110:23  many prostitutes and would have killed

110:24  far greater numbers of victims were his

110:25  sexual activities to be an actual

111:1

111:2  indicator of his attempts to murder."

111:3     Do you recall that portion?

111:4   A.  Sure.

111:5   Q.  What did you mean saying that

111:6  Mr. Douglas would have killed far greater

111:7  numbers of victims were his sexual

111:8  activities be an actual indicator of his

111:9  attempts to murder?

111:10   A.  I meant exactly that but to

111:11  perhaps to provide some additional

111:12  context, the issue in question was Mr.

111:13  Douglas and whether he -- evidence of his

111:14  sexual involvement with the victim is the

111:15  de facto evidence that he killed her.

111:16     Evidence of his sexual activity

111:17  with a prostitute is that evidence that

111:18  he killed the prostitute and can one make

111:19  that assertion when sex with prostitutes

111:20  was regular activity of his life like for

111:21  some people going to the gym, with some

111:22  degree of frequency; or that, you know,

111:23  others may not be able to relate to?

111:24     So he did have these encounters

111:25  which were brutal and he had other

112:1

112:2    encounters which did not lead to people

112:3    being victimized in that manner.

112:4            And so what we know about him,

112:5    what was available about him, has to be

112:6    taken into account, in consideration of

112:7    his DNA being found in a prostitute who

112:8    would have been part of his consensual

112:9    pool of encounters.

112:10    Q.    What did you mean by, "would

112:11   have killed far greater numbers of

112:12   victims"?

112:13    A.    Because there are individuals

112:14   who target prostitutes for violent

112:15   predation, whether it be rape, homicide,

112:16   or both.

112:17            They are not necessarily living

112:18   a lifestyle in which I sell drugs, I get

112:19   money.  I have a strong sexual appetite.

112:20   I meet that appetite with prostitutes and

112:21   this is part of my regular activity just

112:22   for other people, I go to church once a

112:23   week.

112:24            For them they have the lives

112:25   that they have and their violent

113:1

113:2  predation focuses on prostitutes as a

113:3  vulnerable population that perhaps others

113:4  don't necessarily document so it's a lot

113:5  easier to tie a cause-effect to their

113:6  activity with prostitutes as homicidal in

113:7  nature because that is how they relate to

113:8  prostitutes.

113:9        In this case he relates to

113:10  prostitutes in a sexual way as typical

113:11  sexual partner.

113:12        In some of those encounters, an

113:13  unknown percentage, but it is not a

113:14  hand-in-glove overlap, have ended in

113:15  homicide and he was regularly availing

113:16  himself of prostitutes that are part of

113:17  his lifestyle of drug use, drug sales,

113:18  having cash on hand, having no

113:19  responsibilities and no expenses, and

113:20  those kinds of things which are different

113:21  from; for example, those individuals who

113:22  otherwise their relationship to

113:23  prostitutes is more exclusively limited

113:24  to their homicidal and brutal activities

113:25  and the enacting of their fantasies.

114:1

114:2        Q.    How do you know that John

114:3   Douglas didn't kill more people than you

114:4   know about?

114:5        A.    We don't know.  We don't know

114:6   that he killed many, many, many, many,

114:7   many people.  That is much more

114:8   unrealistic.

114:9            What I was referring to in that

114:10  statement was how active he was, how

114:11  known he was to engage in these

114:12  activities just as a matter of regular

114:13  lifestyle and that the number of victims

114:14  that could potentially be attributed to

114:15  him relative to that level of activity,

114:16  there's still a spread; that's what I was

114:17  referring to in that statement.

114:18       Q.    You don't hold yourself out to

114:19  be an expert in memory, do you?

114:20       A.    No and yes.  There are some

114:21  aspects of memory that are within my

114:22  expertise and some aspects of memory that

114:23  are not.  It just really depends on the

114:24  nature of the question.

114:25           It's just kind of like false

115:1

115:2    confession.  I don't hold myself out to

115:3    be an expert in police; however, I have

115:4    expertise in the areas in which we've

115:5    been discussing today.  If I don't have

115:6    expertise, I will tell you.

115:7          So it is with memory, certain

115:8    aspects of memory I have expertise;

115:9    ceratin aspects I don't.

115:10   Q.    What aspects of memory, the

115:11   science of memory, do you consider

115:12   yourself --

115:13   A.    It's a big universe.  I can't

115:14   answer that question.  You have to ask me

115:15   a specific question.  Say, is this

115:16   something part of your expertise?  I will

115:17   give you a yes or no as best I can.

115:18   Q.    Tell me of any aspect of

115:19   memory, the science of memory, that you

115:20   consider yourself to be an expert in.

115:21   A.    It's just too broad a question.

115:22   Q.    Have you conducted any studies

115:23   --

115:24   A.    Well, that has been nothing to

115:25   do with expertise.

116:1

116:2          Q.    I didn't ask you whether it has

116:3    anything to do with --

116:4          A.    Yeah, but I answered as I did.

116:5          Q.    No.  Sir, let me finish the

116:6    question, then you answer the question.

116:7    That is how it works.

116:8                Here's the question:  Have you

116:9    conducted any studies in the field of

116:10   memory?

116:11         A.    No.

116:12         Q.    Have you published any studies

116:13   in the field of memory?

116:14         A.    No.

116:15         Q.    Have you peer reviewed any

116:16   studies in the field of memory?

116:17         A.    I don't think so.

116:18         Q.    Have you taught any courses

116:19   regarding the science of memory?

116:20         A.    I have taught in the evaluation

116:21   of patients, how to assess memory.  I

116:22   have taught in the course of my teaching

116:23   about malingered memory impairment.  I've

116:24   taught about dementia.  I have -- how

116:25   memory is affected by traumatic events.

117:1

117:2     I have taught a number of different areas

117:3     of memory.  Those are four that

117:4     immediately come to mind.

117:5         Q.    How do you assess memory?

117:6         A.    You can assess memory through

117:7     mental status examination; through asking

117:8     the person to recount a story.

117:9             You can assess memory by asking

117:10    a person to account for their specific

117:11    whereabouts or their movements during a

117:12    period of time that one can't account

117:13    for.

117:14            For more granular assessment of

117:15    memory, there are a variety of tests that

117:16    one would refer to, to a

117:17    neuropsychologist to help to supplement

117:18    what you already get out of psychiatric

117:19    examination.

117:20        Q.    When you say "mental status,"

117:21    do you mean orientation times three or

117:22    what?

117:23        A.    No.  You refer to object

117:24    recall, I'm going to give you three

117:25    things to remember; see if someone

118:1

118:2     remembers after a few minutes, see if

118:3     they remember after a few minutes more or

118:4     over the course of an interview being

118:5     aware of the material that has come up

118:6     that you have disclosed within the

118:7     discussion to see how someone references

118:8     it later in the discussion; or -- or if

118:9     you are speaking about a particular

118:10     event, some clear familiarity with an

118:11     event at a detail level; for example,

118:12     something that comes up in forensics is

118:13     you may have the discussion with somebody

118:14     about the proceedings of their case and

118:15     they are in a position to tell you,

118:16     possibly, yes, and two weeks ago we had a

118:17     hearing in which this came up and what

118:18     the person is recounting to you is

118:19     reflected -- is paralleling what actually

118:20     transpired and you are aware of that and

118:21     you can verify; or -- or a person is very

118:22     confused and gives a response where

118:23     material that you know that they have

118:24     been exposed to and to a degree they can

118:25     internalize and be expect to remember,

119:1

119:2     that person is not remembering.

119:3              And then there are exercises

119:4     that one can undertake independent of

119:5     actual memory.

119:6              Gudjonsson tests where you give

119:7     a person a story, asked them to recount

119:8     the number of details and the number of

119:9     details that is person recounts is able

119:10    to inform a sense of that individual's

119:11    memory.

119:12             You ask them after a certain

119:13    amount of time or you can independently

119:14    -- Gudjonsson's test is based on an

119:15    exercise already conducted by

119:16    psychiatrists and neurologists for years

119:17    where you tell them a story and ask them

119:18    to repeat it and you see how many of the

119:19    details a person gets sometime later.

119:20             That's a form of memory testing

119:21    been around for quite a long time.  It

119:22    just with Gudjonsson there's a story.

119:23    It's the same story that you give

119:24    administration to administration.

119:25             The longer stories are part of

120:1

120:2    most mental status exams and mental

120:3    status exam limit's itself to can you

120:4    remember three objects; after a few

120:5    minutes, can you remember those same

120:6    objects down the line.

120:7            But the mental status exams are

120:8    really meant to be something of

120:9    rudimentary screening.

120:10           Over the course of your

120:11   examination of someone, there are many

120:12   other questions that you asked that

120:13   assess mental status qualities that go

120:14   well beyond that crude zero to 30 measure

120:15   that you give most of time as sort of

120:16   preliminary or to check the boxes for all

120:17   things.

120:18      Q.    When you were talking about

120:19   assessing memory in this context, you

120:20   were talking about looking for memory

120:21   impairment; is that right?

120:22      A.    Sometimes, sure.

120:23      Q.    And under what other contexts?

120:24      A.    Because in a forensic context,

120:25   you always have to consider whether a

121:1

121:2     person is a dishonest informant. So

121:3     sometimes you're looking for impairment,

121:4     sometimes you're looking for distortion

121:5     of memory which may be conscious or

121:6     unconscious.

121:7         Q.    What are the stages of memory?

121:8         A.    You mean registration,

121:9     recognition, recall, is what you are

121:10     talking about?

121:11         Q.    I'm asking you, sir.

121:12         A.    Yeah, but there are different

121:13     -- the idea of staging. It can be

121:14     immediate, recent, remote. There are

121:15     different kinds of self-classifications.

121:16         Immediate, recent, remote.

121:17         Q.    What does immediate mean?

121:18         A.    I remember what you just asked

121:19     me. What does immediate mean? I just

121:20     repeated it. It involves repetition,

121:21     neuropsychologically more of a repetition

121:22     function.

121:23         If I was to -- if I were to

121:24     recount to you the verbiage of one of the

121:25     questions that you asked in that whole

122:1

122:2    DNA exchange that we had, that would be

122:3    recent memory.  It goes beyond just the

122:4    idea of merely repeating something to

122:5    you.  I would have to record for recent

122:6    access.

122:7              If we had a much earlier

122:8    encounter at some point, some years ago

122:9    on another case, that would be a matter

122:10   of remote memory; for example, the Swift

122:11   case, I've consulted on a case with that

122:12   attorney was on the opposite side and I

122:13   had memory of those experiences that were

122:14   accurate so that's a remote memory

122:15   experience, not recent memory.

122:16             So you have a variety of

122:17   different neuropsychological functions

122:18   involved; neuroanatomical functions

122:19   involved in different aspects of the

122:20   memory but we pretty much break it down

122:21   by immediate, recent, and remote.

122:22        Q.    Who is we?

122:23        A.    Psychiatrists.

122:24        Q.    What are the factors that

122:25   affect encoding memories?

123:1

123:2      A.    The factors?

123:3      Q.    Yeah.

123:4      A.    I don't know that I really

123:5  understand the question.

123:6      Q.    Are you stalling for time?

123:7      A.    Should I?

123:8      MS. STALF:  Objection to form of

123:9      question.

123:10      That's harassing, Russell.

123:11      Knock it off.

123:12      Q.    What are the factors that

123:13  affect encoding memory?

123:14      A.    Well, there are neuroanatomical

123:15  factors, obviously.

123:16      Q.    What are they?

123:17      A.    The parts of the brain involved

123:18  in memory:  parts of the frontal lobe

123:19  involved in memory; parts of the temporal

123:20  lobe; parts of the parietal lobe.

123:21      There are anatomical factors.

123:22  There are, in all likelihood,

123:23  neurophysiological factors that are not

123:24  as well accounted for.

123:25      The temporal lobe is a very

124:1

124:2    important part of memory.  It's far more

124:3    identified.  There are other parts of the

124:4    brain that not so much.

124:5            But physiologically, we don't

124:6    necessarily know what neurotransmitters

124:7    have a specific involvement in memory

124:8    relative to others, but in all

124:9    likelihood, there is some involvement

124:10   there.

124:11       Q.    Tell me sir, what you do know,

124:12   what parts of the frontal brain, what

124:13   parts of the temporal lobe do affect

124:14   memory?

124:15       A.    Medial temporal lobe is

124:16   involved in memory.

124:17            MR. AINSWORTH:  I'm sorry.  I

124:18       threw you off track.

124:19       Q.    What parts of the brain are

124:20   involved in --

124:21            MR. AINSWORTH:  Strike that.

124:22       Q.    What parts of the brain that

124:23   you just mentioned are involved -- are

124:24   factors that affect encoding memory?

124:25       A.    I believe the parietal lobe is

125:1

125:2     more involved in encoding.  I don't

125:3     believe it's exclusive to the parietal

125:4     lobe.

125:5          Q.     Which other parts?

125:6          A.     The frontal and temporal.

125:7          Q.     So all these are involved?

125:8          A.     I believe all three are

125:9     involved.

125:10          Q.     You mention the

125:11     neurophysiological actions of the brain?

125:12          A.     Capabilities of brain.

125:13          Q.     What neurophysiological

125:14     capabilities of the brain come into play?

125:15          A.     That goes beyond my expertise.

125:16          Q.     Let me ask the question that I

125:17     was asking about --

125:18          A.     I don't think we know as much,

125:19     that was my point, but what we do know,

125:20     goes beyond my expertise.

125:21          Q.     What are the factors that

125:22     affect the encoding of memory?

125:23          A.     That's not an area of my

125:24     expertise.

125:25          Q.     What factors affect the storage

126:1

126:2    of memory?

126:3        A.    Aging, brain injury.

126:4        Q.    Trauma?

126:5        A.    Intoxication, psychiatric

126:6    illness.  Did I say -- when you said

126:7    trauma, I meant physical and also

126:8    emotional trauma affected coding.

126:9        Q.    We are talking about storage?

126:10       A.    Yes.

126:11       Q.    So you are saying emotional

126:12   trauma can affect storage?

126:13       A.    Yes.  Those are factors that

126:14   immediately come to mind.

126:15       Q.    Take much time as you need.

126:16       A.    It's what comes to mind.

126:17       Q.    I understand.  Take as much

126:18   time as you need.

126:19       A.    I rather not sloth, there's no

126:20   need.  It's what comes to mind.

126:21       Q.    I know but if you need more

126:22   time, if you think more time would help

126:23   you think of other factors, please take

126:24   as much time as you need.

126:25       A.    Could be medical conditions,

127:1

127:2     could be the passage of time.

127:3          Q.    Is that different from is

127:4     passage of time different from aging?

127:5          A.    Yes, because age relates to the

127:6     natural deterioration or decline of one's

127:7     cognition.

127:8               And then there is age-related

127:9     memory loss that is not necessarily

127:10    associated with dementia.

127:11              But a person may not

127:12    necessarily experience age-related memory

127:13    loss over the course of 20 years, the

127:14    passage of time or even far less that may

127:15    interfere with memories at least that

127:16    have already been encoded.

127:17         Q.    What are the factors that

127:18    affect retrieval of memory?

127:19         A.    Aging; brain injury; trauma;

127:20    repression; suppression, those come to

127:21    mind.

127:22         Q.    Have you conducted any research

127:23    on how trauma, for this purpose let's

127:24    take physical trauma, how physical trauma

127:25    affects the process of memory?

128:1

128:2        A.    I have not.

128:3        Q.    Are you familiar with how

128:4    physical trauma and let's take the

128:5    example of somebody's head being slammed

128:6    behind a desk several times, affect

128:7    memory?

128:8        A.    How, no.  That it does, sure.

128:9            The experience of

128:10   postconcussive effects on memory are

128:11   chronicled.  Postconcussive effects are

128:12   variable, maybe obvious in some and

128:13   latent or more hidden in others.

128:14           Memory impairment is a common,

128:15   not universal, it's a common finding in a

128:16   mildly or not so mildly concussive

128:17   experience.

128:18       Q.    So in a postconcussive

128:19   situation, some people may sustain memory

128:20   loss?

128:21       A.    Some may, yeah.

128:22       Q.    Some may not; is that fair to

128:23   say?

128:24       A.    Yeah.  The more serious the

128:25   concussion, the more likely the person is

129:1

129:2    to experience memory loss.

129:3           The Chicago Bears quarterback

129:4    who gets clobbered on a sack and leaves

129:5    the game for it and is a bit dazed, may

129:6    have some memory impairment.

129:7           That same Chicago Bears

129:8    quarterback gets clobbered and knocked

129:9    out on the field, is more likely to

129:10    experience some level of memory

129:11    impairment.

129:12    Q.    When you talk about memory

129:13    impairment, you are talking about

129:14    forgetting or not recalling events,

129:15    right?

129:16    A.    Sure.

129:17    Q.    You are not talking about

129:18    recalling things that didn't actually

129:19    occur, right?

129:20    A.    You mean distortion of memory?

129:21    Q.    What I'm talking about is

129:22    events, recalling events that didn't

129:23    actually occur?

129:24    A.    That's what I'm saying,

129:25    distortion of memory, that a person in an

130:1

130:2    effort to reconstruct what happened,

130:3    essentially presents an account that is

130:4    just not true, but is attempting to fill

130:5    in the blanks.

130:6          That occurs independent of the

130:7    actual concussion itself and more of a

130:8    process of asking the person to fill in

130:9    the blanks.

130:10         Some people will say I don't

130:11   and some people will not say I don't know

130:12   and will give their best effort to fill

130:13   in with something false.  Depends on the

130:14   person.

130:15      Q.   Do you know why that is?  Can

130:16   you tell us why that is?

130:17      A.   I think it depends on the

130:18   individual.

130:19      Q.   Why?

130:20      A.   It depends on the individual.

130:21      Q.   Why?

130:22      A.   I believe I answered the

130:23   question.

130:24      Q.   Why does it depend on the

130:25   individual?

131:1

131:2        A.     Because some individuals by

131:3   virtue of their personality maybe fill in

131:4   blanks with something that is incorrect

131:5   and some maybe responding to the

131:6   pressures of the situation.  It doesn't

131:7   relate to their personality so much as it

131:8   relates to the nature of what happens in

131:9   how they were questioned.

131:10            Some people are just more given

131:11  to just simply confabulating because that

131:12  is how they relate.  If there is

131:13  something that they may not be fully

131:14  mindful of, they fill in the blanks more

131:15  comfortably.

131:16       Q.     Is this your supposition or is

131:17  that something studied and they

131:18  determined that the cause why some people

131:19  have distortion of memory is because of

131:20  pressure of situation or their

131:21  personality or this third thing that some

131:22  people are more prone to confabulation?

131:23       A.     Let's go back to the Henry Lee

131:24  issue.  There are issues certainly to

131:25  experience and to some degree they are

132:1

132:2     demonstrated.  The first explanation that

132:3     I provided of individuals who have memory

132:4     distrust and by virtue of their own

132:5     personality qualities, how they relate to

132:6     another person takes us into the specific

132:7     false confession realm.  They fill in the

132:8     blanks with incorrect details driven more

132:9     by their personality within the dynamic

132:10    of what is going on.

132:11          The phenomenon of memory

132:12    distrust, I know I have been pretty

132:13    dismissive of false confession research,

132:14    useless, such as it is, there's actually

132:15    been documentation of actual cases in

132:16    which memory distrust was implicated in

132:17    false confessions and the vehicle for

132:18    that is a detailing by a suspect of a

132:19    scenario that is incorrect, incorrect,

132:20    but it is recounted as the memory of the

132:21    suspect but it is borne of memory

132:22    distrust and also borne of the

132:23    personality of the suspect, not of some

132:24    organic cause.

132:25          Now, for some individuals who

133:1

133:2    have conditions in which they

133:3    confabulate, it's been studied in

133:4    populations in which it is medically

133:5    implicated or psychologically implicated.

133:6            They were more given to

133:7    presenting distorted details and not

133:8    necessarily because they were consciously

133:9    doing so.  They may do so without regard,

133:10   it's the way they relate.  It doesn't

133:11   have anything to do with the personality

133:12   how that person relates to said specific

133:13   question.

133:14           Then there are instances that

133:15   may have been studied systematically or

133:16   demonstrated on cases that I worked on

133:17   and are well-documented where an

133:18   individual who does not remember is

133:19   questioned in such a way that the

133:20   circumstances would compel someone to add

133:21   additional details to what they don't

133:22   know and they are responsive to the

133:23   pressure of an examiner to give them

133:24   information that the examiner believes

133:25   they have but they do not have.

134:1

134:2          That is something not just in

134:3    an investigation setting in which people

134:4    are questioned in intense circumstances,

134:5    that is more a by-product of expectation

134:6    of an interviewer than it is the

134:7    personality of the person who offers that

134:8    distorted information.

134:9          Those are three distinctly

134:10   different entities.  I can't tell you

134:11   there's been this systematic research

134:12   study of these, I can't.

134:13         I can tell you that these are

134:14   phenomena that are well-identified.

134:15      Q.    Well-identified by yourself?

134:16      A.    Just in the way that I already

134:17   answered.

134:18      Q.    No, no.  I want to know?

134:19      A.    I already answered.

134:20      Q.    Can you point me to any study

134:21   that demonstrates any of three effects

134:22   you just discussed?

134:23         MS. STALF:  Objection, asked and

134:24      answered.

134:25      A.    I think by the time we get to

135:1

135:2    trial, if I have to do, then I will do

135:3    it.  No, I can't point to a study.

135:4            If it's important by the time

135:5    we get to trial, I will give you the

135:6    confabulation studies and I will give you

135:7    all of that literature behind it.

135:8            I think what I'm pointing out

135:9    is not revolutionary and documented in

135:10   the scientific literature, not the social

135:11   science literature, the real science

135:12   literature.  There is nothing

135:13   revolutionary that I'm talking about.  I

135:14   can't give you citations as we are

135:15   sitting here.

135:16       Q.   All three of those different

135:17   aspects that you just discussed, it's

135:18   your contention all three appear in the

135:19   literature that's been published in

135:20   peer-reviewed journals; is that what you

135:21   are saying?

135:22       A.   I didn't say that.

135:23       Q.   Well, that's what I'm trying to

135:24   find out.

135:25           For each of the three aspects,

136:1

136:2    is there a body of literature --

136:3         A.    Oh, there is a body of --

136:4              MR. AINSWORTH:  Excuse me, sir,

136:5         I'm trying to finish my question.  You

136:6         are making life very difficult for the

136:7         court reporter.

136:8              THE WITNESS:  I'll let her

136:9         complain for herself.

136:10             MR. AINSWORTH:  No.  I want a

136:11        clean transcript.  I don't your

136:12        answers lost because the court

136:13        reporter can't take them down.  I

136:14        care.

136:15             I also care about Margaret.  She

136:16        is a very nice person.

136:17             MS. STALF:  Knock it down a

136:18        notch.

136:19             THE WITNESS:  Thank you for your

136:20        righteousness.  I will wait and answer

136:21        your question.

136:22             Don't think for a minute that I

136:23        think you are angry with me.  It's

136:24        just posturing.

136:25             Just ask the question and I will

137:1

137:2     be more polite to wait till the end of

137:3     your question.

137:4     Q.    For each of the three aspects

137:5  that you just discussed, is there a body

137:6  of literature that's been published in

137:7  peer-reviewed journals that explain the

137:8  aspects as you described them?

137:9     A.    Yeah.  There is definitely a

137:10 body of literature about confabulation.

137:11          I don't know that Dr.

137:12 Gudjonsson published on memory distrust,

137:13 specifically as it relates to confession

137:14 setting.

137:15          I would have to go back and

137:16 access the question of memory distrust in

137:17 other settings.  I believe it is

137:18 well-documented.  I want to hedge that

137:19 with respect to the idea of the dynamic

137:20 of the pressure of the examiner, pressure

137:21 of questioner, to what degree that

137:22 yields.  There is certainly a phenomenon

137:23 well-known to child abuse matters.  To

137:24 what degree that's been published in

137:25 peer-reviewed literature, I believe it

138:1

138:2    has, but, again, I want to go back and

138:3    make sure and produce it as need be.

138:4         Q.    Doctor, the reason why I stress

138:5    the importance of listening to the

138:6    question, is because we are talking about

138:7    among postconcussive population.

138:8    Remember that I asked you about the

138:9    effects of postconcussive and you gave me

138:10   these three aspects.

138:11              I'm asking you, sir, for the

138:12   postconcussive population, are there

138:13   reported studies in peer-reviewed

138:14   journals that explain each of three

138:15   aspects is present people who have

138:16   sustained a concussion.

138:17        A.    I don't believe so.  That is

138:18   much more granular application of the

138:19   study of postconcussive phenomena.

138:20        Q.    You had criticized the use of

138:21   college students and simulations in the

138:22   research design that have been used by

138:23   people studying false confession; fair to

138:24   say?

138:25        A.    I have criticized the

139:1

139:2    extrapolation, yeah.  If you want to

139:3    understand about college students, that's

139:4    great, give it to the dean and go with

139:5    it.

139:6              But the extrapolation of that

139:7    to the context of the interrogation room

139:8    is what I have been critical of.

139:9              MR. AINSWORTH:  Actually, let's

139:10        go off the record.

139:11             THE VIDEOGRAPHER:  Going off the

139:12        record.

139:13             The time is 12:29 p.m.

139:14             [Discussion held off the

139:15        record.]

139:16             [Whereupon, at 12:29 p.m., a

139:17        recess was taken.]

139:18             [Whereupon, at 12:56 p.m., the

139:19        testimony continued.]

139:20             THE VIDEOGRAPHER:  Return to

139:21        record, 12:56 p.m.

139:22             Beginning of disc number 4.

139:23    Q.    So, Doctor, you see no value in

139:24    extrapolating from experiments conducted

139:25    using college students and simulations in

140:1

140:2     the field of false confessions?

140:3         A.    I think it might have value if

140:4     there is an incident involving some petty

140:5     event in an academic context in which an

140:6     academic investigation is initiated and

140:7     the nature of how that is undertaken

140:8     results in some admissions to professors

140:9     that might been involved.

140:10         The student in question may

140:11     say, I gave a false submission and may

140:12     reference it, you know, depending on the

140:13     conditions, I think an argument could be

140:14     made.

140:15         That's why I said before send

140:16     it to the dean.  It may have some

140:17     relevance on the collegiate context, but

140:18     it doesn't embed itself in the real

140:19     world.

140:20         Q.    So studies predicated upon

140:21     simulations involving college students in

140:22     certain paradigm where college students

140:23     are led to actually cheat and then are

140:24     interrogated about whether they cheated,

140:25     that data cannot be extrapolated from

141:1

141:2    outside of the collegiate setting; is

141:3    that fair to say?

141:4         A.    It can't be extrapolated

141:5    outside of the setting of very petty

141:6    matters for which the consequences are,

141:7    you know, benign or perhaps potentially

141:8    reversible involving questioning that

141:9    involves someone who there may be some

141:10   level of alliance and there isn't the

141:11   presumption of -- there is not the

141:12   ominous presumption that I am a private

141:13   citizen, I'm talking to a cop

141:14   investigating a case as opposed to I'm

141:15   talking to a teacher, somebody from the

141:16   administration that doesn't have a

141:17   designated role of I investigate crimes

141:18   but a person who may be, I take care of

141:19   students, I concern myself with lots of

141:20   things and we are just taking.

141:21             So, it's the -- no, one can't

141:22   extrapolate across the nature of

141:23   questioner, the nature of the offense.

141:24   No, not to major crimes.

141:25        Q.    You are aware that Dr. Russano

142:1

142:2     in her research has created a paradigm in

142:3     which research subjects are educed to

142:4     cheat when they were told not to and then

142:5     are interrogated about whether they

142:6     cheated or not?

142:7         A.    Yes.

142:8         Q.    You would say that is an

142:9     example of a study that had no

142:10    practicality in anything other than the

142:11    collegiate setting or the petty crimes

142:12    that you described?

142:13        A.    Yes.

142:14        Q.    Do you know who funded Dr.

142:15    Russano's report?

142:16        A.    Some government agencies.

142:17        Q.    Do you know which one?

142:18        A.    I'm not exactly sure.  I know

142:19    she made reference to it.  I have to --

142:20        Q.    Would it refresh your

142:21    recollection Department of Defense and

142:22    the Department of Justice via the

142:23    High-Value Detainee Interrogation Group

142:24    fund her work?

142:25        A.    Fund that work, the college

143:1

143:2    students work?  Fund that work or the

143:3    college student work or some other

143:4    high-value detainee work?

143:5        Q.    Funds the research that she

143:6    conducts from her lab including work

143:7    extrapolated from the data derived from

143:8    studies using research subjects who are

143:9    educed to tell a lie and are

143:10   interrogated?

143:11       A.    That doesn't really answer my

143:12   question.  It's my deposition.  I don't

143:13   want to assume an incorrect dynamic.

143:14           Look at, the Department of

143:15   Defense will spend a bazillion dollars on

143:16   fighter bombers that don't fly so just

143:17   because the Department of Defense funds

143:18   something doesn't mean it has any kind of

143:19   utility.

143:20           I don't think we would have

143:21   the, well, I mean, look, there was just a

143:22   controversy about the F-35.

143:23           People who make funding

143:24   decisions, it doesn't necessarily convey

143:25   legitimacy.

144:1

144:2                    God bless her, she can shake

144:3    money out of the Department of Defense,

144:4    she can shake money out of the Department

144:5    of Defense for college student studies,

144:6    that is great, but to what degree they

144:7    can generalize high-value detainees.  I

144:8    don't know what she is studying for

144:9    high-value detainees.  I certain hope

144:10   this is American citizens and not

144:11   extrapolating college students as they

144:12   relate to high-value detainees or we'll

144:13   still be up the creek with the

144:14   responsibilities that we have, but God

144:15   bless her for taking an interest in this

144:16   area really, respect, I think it's

144:17   fantastic.

144:18                    If she can get money out of

144:19   them, more power to her.

144:20        Q.    Have you been hired to conduct

144:21   research for either of the Department of

144:22   Defense or the Department of Justice?

144:23        A.    No, I haven't applied.

144:24        Q.    I didn't ask whether you

144:25   applied.

145:1

145:2          A.    You have to apply for a grant

145:3    to get it.

145:4          Q.    Have you ever been funded by

145:5    the Department of Defense or Department

145:6    of Justice?

145:7          A.    No, sir.

145:8          Q.    Have you provided any training

145:9    to federal law enforcement authorities

145:10   how to conduct interrogations?

145:11         A.    I haven't.

145:12         Q.    Have you provided training to

145:13   anyone about how to conduct

145:14   interrogations?

145:15         A.    I lectured at the North

145:16   Carolina Homicide Investigators

145:17   Association about interrogations with

145:18   specific expression of the concerns from

145:19   the aforementioned research of things I

145:20   wanted to make them aware of that they

145:21   needed to be cautions about.

145:22              It certainly wasn't a training

145:23   context.

145:24         Q.    When was that?

145:25         A.    It's on my CV.  I couldn't tell

146:1

146:2    you.  Maybe 2005, 2004.  Actually, it

146:3    probably would have been 2005, 2006.  You

146:4    have to reference the CV.

146:5         Q.    How long was that training?

146:6         A.    I was brought in as a keynote

146:7    speaker.

146:8         Q.    How long did you speak for?

146:9         A.    I don't know.

146:10        Q.    More or less than an hour?

146:11        A.    Hour, hour and a half, maybe

146:12   two hours.

146:13        Q.    Somewhere between around an

146:14   hour and two hours?

146:15        A.    Yeah, yeah.

146:16              You don't bring your keynote in

146:17   to speak in for 40 minutes.  The fact

146:18   that they brought me in, I'm sure I was

146:19   speaking for some extended period of time

146:20   for them to position such as they did.

146:21        Q.    Did you speak just that one

146:22   time or did you speak on other occasions

146:23   to that group?

146:24        A.    Just that time.

146:25        Q.    Any other time that you have

147:1

147:2   ever spoken or provided training on the

147:3   topic of interrogations in your career?

147:4       A.    For law enforcement?

147:5       Q.    For law enforcement.

147:6       A.    No.

147:7       Q.    Any other time that you

147:8   provided training to anybody on

147:9   interrogations at all?

147:10      A.    I lectured at the American

147:11  Academy of Forensic Sciences on disputed

147:12  confessions and specifically as it

147:13  related to some of identified risk

147:14  factors and the assessment of data that

147:15  emerges from interrogation.  That is also

147:16  on my CV.

147:17          I if I had to peg that, it

147:18  would have ben about 2002 or so.

147:19          And I have lectured to

147:20  prosecutors on this specific area, but

147:21  not just in encompassing the

147:22  interrogation issue also more broadly

147:23  myths and fact about disputing confession

147:24  research.

147:25          MR. AINSWORTH:  Let's mark this

148:1

148:2        as Exhibit 5.

148:3             [The document was hereby marked

148:4        as Plaintiff's Exhibit 5 for

148:5        identification, as of this date.]

148:6        Q.    What we have marked as Exhibit

148:7    5, is this your CV, sir?

148:8        A.    Yes.

148:9        Q.    This was produced to us in this

148:10   case.  Is this current as of the date of

148:11   your report?

148:12       A.    I have given a couple of

148:13   additional lectures since June;

148:14   otherwise, it substantively current.

148:15       Q.    Have you given any lectures

148:16   since June that have any applicability to

148:17   your work in this case?

148:18       A.    No.

148:19       Q.    Can you identify to me the

148:20   lectures that you provided to prosecutors

148:21   if they are listed on this CV?

148:22       A.    Yeah, sure.

148:23             April 2012, Illinois State's

148:24   Attorney Appellate Prosecutors, Violent

148:25   Crimes Conference; the Science, and,

149:1

149:2    quote, Science of Confession Expertise;

149:3    that's what I was referring to.

149:4        Q.    Any other times you provided

149:5    training to prosecutors?

149:6        A.    On this topic?

149:7        Q.    On the topic of false

149:8    confessions.

149:9        A.    Not that I can see here.

149:10       I have to say only because we

149:11   are creating a record and I'm just

149:12   noticing this now, I believe that I

149:13   lectured to the Arkansas District

149:14   Attorney's Association, whatever they

149:15   call themselves.  I don't believe I

149:16   lectured about confessions.  There were

149:17   several lectures that I gave there

149:18   repeatedly.  I believe I covered those

149:19   topics and not the confession one, but

149:20   I'm just sort of holding that out just in

149:21   case when I go back over to what I did in

149:22   Arkansas and add to this, it would be the

149:23   same lecture that I gave in Illinois.

149:24       Q.    I see it was actually in 2003

149:25   you have North Carolina Homicide

150:1

150:2    Investigation Association.

150:3        A.    Okay.

150:4        Q.    Would you say October 2003?

150:5        A.    Makes sense.  I only spoke to

150:6    them once.

150:7        Q.    Was that before or after you

150:8    stopped working on that study you

150:9    attempted?

150:10       A.    It was before.  It was while we

150:11   were doing it.  It was before we stopped.

150:12       Q.    I'm sorry.  You referenced one

150:13   other lecture.  I can't recall.

150:14       A.    There was one that I see that I

150:15   didn't reference, Nebraska Institute of

150:16   Forensic Sciences.

150:17       Q.    What date?

150:18       A.    June 2003.

150:19             And it substantively -- it was

150:20   substantively very similar to North

150:21   Carolina Homicide Investigators

150:22   Association.

150:23             The difference in the lecture

150:24   was the subtext beyond slides was one

150:25   more perspective for the North Carolina

151:1

151:2    crowd because Nebraska was more of a

151:3    mixed crowd including not only law

151:4    enforcement, but attorneys and forensic

151:5    science students.  It was just a

151:6    different audience.  It was pretty

151:7    similar slides, but it was very different

151:8    and less prescriptive in nature but

151:9    topically, substantively, it was a very

151:10   similar lecture.

151:11            There is something here that I

151:12   haven't referenced in which I was asked

151:13   to speak on a panel by the New York State

151:14   Justice Task Force, was put on by the

151:15   Chief Justice, a panel assembled by Chief

151:16   Justice of New York State in connection

151:17   with wrongful convictions specifically

151:18   demonstrably false confessions and

151:19   proposed conclusions that occurred in

151:20   January 2011 and that was a

151:21   solutions-oriented lecture that was all

151:22   about the confession issue.

151:23        Q.    That was in January 2011?

151:24        A.    Yes, sir.

151:25        Q.    "Wrongful Convictions and

152:1

152:2    Confessions, Myths, Facts and Solution."

152:3        A.    Yes, that was the title.

152:4        Q.    Who was the audience?

152:5        A.    It was a small audience of ten

152:6    to 15 defense attorneys; prosecutors;

152:7    judges; senior policy people in criminal

152:8    justice policy in New York State really

152:9    engaging the issue of wrongful

152:10   convictions and seeing how can we better

152:11   understand the issue from a confession

152:12   standpoint and from a standpoint is there

152:13   anything we can do to solve this, is

152:14   there anything we can do to make sure

152:15   this doesn't happen.

152:16            This was a panel assembled by

152:17   the Chief Judge of the State of New York.

152:18   I believe at the time was Judy Kaye.  I'm

152:19   not positive.

152:20       Q.    When you spoke to the North

152:21   Carolina crowd, what did you tell them?

152:22       A.    Well, I'm pretty certain from a

152:23   prescriptive standpoint I urged their

152:24   caution in interrogation with threatening

152:25   suspects with the death penalty and

153:1

153:2    advised them that this is something that

153:3    in my early review came up in such a way

153:4    to lead me to a conclusion that for some

153:5    people this may cause them to falsely

153:6    confess.  You have to be aware of that.

153:7         The same when you have a

153:8    multiple suspect case, you need to be

153:9    careful how you leverage one confession

153:10   into other because of the possibility it

153:11   can create a false confession in another

153:12   one; likewise, as I noted before my

153:13   concern about advising someone they had

153:14   failed a polygraph and whether that might

153:15   have an impact.

153:16        So I advised them to be

153:17   cautious in their interrogations going

153:18   forward that if they were to do something

153:19   like this it might create a risk that

153:20   they otherwise didn't really have to

153:21   involve in a case.

153:22   Q.    Is it your recollection that

153:23   you did not lecture the North Carolina

153:24   crowd about the negative association that

153:25   you had or --

154:1

154:2          MR. AINSWORTH:  Poorly phrased.

154:3     Q.    I'm correct that you looked at

154:4   other variables other than confronting

154:5   people with threats of the death penalty

154:6   and confronting people with failures of a

154:7   polygraph, right?

154:8     A.    There are certain things that I

154:9   made note of and one of which was for all

154:10  of the information that we had been

154:11  provided about false confessions we just

154:12  didn't see any psychotic people.  We

154:13  didn't see people with major mental

154:14  illness.  That is something that you see

154:15  suffused through the literature on this,

154:16  especially the polemics.

154:17          The evidence of significance of

154:18  mental retardation is definitely more

154:19  robust than it is for serious mental

154:20  illness.

154:21          Now, as I referenced before,

154:22  that's not to say they're aren't other

154:23  cases what would come forward in which

154:24  serious mental illness becomes an issue

154:25  that's also not to account for people who

155:1

155:2     voluntarily falsely confess when they are

155:3     psychotic but more from the context of

155:4     their own interrogation of suspects.

155:5              The idea just because a person

155:6     has a diagnosis he is at risk for false

155:7     confessions is not borne out.

155:8              In the data that we had where

155:9     it was borne out, it was not a by-product

155:10    of hallucinations or delusions but very

155:11    much borne out by the dynamic between the

155:12    officers and the suspect how the officers

155:13    manipulated the suspect and in a way sort

155:14    of took advantage of his psychiatric

155:15    illness and also intellectual

155:16    limitations.

155:17             I believe in that lecture, I

155:18    made clear it had been oversold by the

155:19    innocence industry.

155:20             The other areas of sort of, you

155:21    know, this isn't impressive or we haven't

155:22    found this, they don't come to mind.  I

155:23    don't want to that I have -- I didn't

155:24    bring those up, but really what I

155:25    remember most was the caution that I gave

156:1

156:2    because I thought it would be an

156:3    opportunity to give them something

156:4    prescriptive that could help them in

156:5    their work as opposed to give them a

156:6    sense of confidence that their

156:7    confessions are okay.

156:8            No psychiatrist needs to assure

156:9    a police officer that their confessions

156:10   are okay.  They like to believe their

156:11   confessions are okay.

156:12           My role was to tell them, hey,

156:13   you know, as Lee Corso likes to say for

156:14   all of your college football fans out

156:15   there, not so fast my friend.  There may

156:16   be certain instances in your

156:17   interrogation where you employ something

156:18   and may be placing your interrogation at

156:19   risk because you choose to do this and as

156:20   I sit here and lecture to you and educate

156:21   you from what I know which is obviously

156:22   different from your street-level

156:23   experience of this, speaking to my own

156:24   earlier testimony that I'm not a police

156:25   officer, don't have expertise in

157:1

157:2    policing.

157:3           But from another person's

157:4    vantage point, these are things that may

157:5    contribute to a false confession in a way

157:6    that your naked eye misses so I think

157:7    that along the way, I may have mentioned

157:8    a variety of other things but that was

157:9    really what I was after was to give them

157:10   something to take away for their own

157:11   practices and to affect how they would

157:12   conduct themselves in the future.

157:13     Q.    Is it fair to say of the 22

157:14   cases, you have approximately ten that

157:15   you determined to be demonstrably false

157:16   confessions?

157:17     A.    I think you asked me this

157:18   question at the beginning.  I told you I

157:19   haven't looked at the stuff in ten years,

157:20   had no immediate plans to look at it.

157:21           I complied with the discovery

157:22   request and that was it.  I really don't

157:23   remember beyond what was said.

157:24     Q.    You referenced an example where

157:25   a police officer was taking advantage of

158:1

158:2    an individual's mental limitations both

158:3    cognitively and mental illness.

158:4           Were you referencing a specific

158:5    case?

158:6      A.   Yes, a case in Michigan.  I

158:7    believe they guy's name is Eddie Lloyd,

158:8    Eddie Joe Lloyd, one of those three-named

158:9    people.  I certainly don't want to

158:10    disrespect his name.  I think his name

158:11    Eddie Joe Lloyd, it's close enough, where

158:12    somebody was both intellectually limited

158:13    and someone who was quite psychiatrically

158:14    ill.

158:15           The nature of the questioning

158:16    really did exploit his limitations.

158:17    Where one quality ended and the other

158:18    began, very difficult to determine.

158:19           In a vacuum, his limitations

158:20    for false confession would not have

158:21    happened.  In certain instances it does.

158:22           John Mark Karr gave a false

158:23    confession to killing JonBenet Ramsey

158:24    because of his psychiatric illness and

158:25    emotional makeup, so that is really what

159:1

159:2    I was speaking of.

159:3       Q.   I'm sorry, you said that absent

159:4    other factors Eddie Joe Lloyd in your

159:5    opinion would not have confessed?

159:6       A.   Absence what the police did

159:7    with him in interrogation.  The police

159:8    worked him over in a way where his

159:9    intellectual limitation and his

159:10    psychiatric illness converged with the

159:11    way they questioned him such that it

159:12    culminated in a false confession.  It was

159:13    really the synergy of those two issues.

159:14       Q.   How many of the other cases

159:15    that you studied that had demonstrably

159:16    false confessions had a suspect with a

159:17    serious mental illness?

159:18       A.   I don't know that any were

159:19    identified from that sample.

159:20       When I say "serious mental

159:21    illness," I'm not talking about

159:22    depression.  I'm talking psychotic like

159:23    your examinee here, Mr. Chatman, that is

159:24    a person at least in my professional

159:25    opinion based on records, not having

160:1

160:2    examined him, with that qualification,

160:3    I'm comfortable in -- I'm comfortable in

160:4    agreeing to an opinion that would assert

160:5    he has a serious mental illness.

160:6        Q.    Your opinion is of the

160:7    demonstrably false confessions, you only

160:8    had one case where there is a person with

160:9    a mental illness in that sample?

160:10       A.    With a psychotic mental illness

160:11    in that sample.  Again, you know, if

160:12    somebody was experiencing depression, I

160:13    don't know enough to say they did not,

160:14    they may have been in treatment for

160:15    something but the symptoms of that

160:16    condition are not really part of the

160:17    narrative.

160:18          There was no discussion of

160:19    hallucination, delusions, this sort of

160:20    thing or the other qualities that are

160:21    unique for someone who has bipolar mania,

160:22    which is my first exposure to a false

160:23    confession case which involved a

160:24    psychotic person.  So -- but they weren't

160:25    there.

161:1

161:2        Q.    So, in the one case that you

161:3    looked at that had a person with mental

161:4    illness, your belief was that mental

161:5    illness was a contributing factor to the

161:6    false confession?

161:7        A.    Yes, sir.

161:8        Q.    And you have no case in your

161:9    sample were there was demonstrably false

161:10   confession where you found that mental

161:11   illness was not a contributing factor to

161:12   the false confession?

161:13       A.    I'm not sure I understand the

161:14   question.

161:15       Q.    Let me ask again.  You did not

161:16   find any cases in the sample of

161:17   demonstrably false confession cases where

161:18   the suspect had a mental illness, but

161:19   that mental illness did not contribute to

161:20   his false confession?

161:21       A.    There is really only one case

161:22   in which a person manifested a major

161:23   psychiatric illness.

161:24       Q.    And that was --

161:25       A.    And I credited it for being

162:1

162:2    relevant.  I came to the conclusion

162:3    whatever the police did that with this

162:4    gentleman in Michigan, he would have not

162:5    confessed if he were not as limited by

162:6    psychiatric illness such as he was.

162:7            So I did make a leap there and

162:8    some instances it could have potentially

162:9    been not relevant.  I was really left

162:10   with the impression that it would have

162:11   happened if he was not psychiatrically

162:12   ill.

162:13       Q.    Would you agree that in order

162:14   to identify a demonstrably false

162:15   confession, first the person has to have

162:16   the confession overturned for it to be

162:17   able to come to your attention?

162:18       A.    Not necessarily.

162:19       Q.    All of the 22 cases that you

162:20   started with came from people who had

162:21   their confessions overturned?

162:22       A.    That's because I used the

162:23   Innocence Project website.

162:24            I think if I can embark on this

162:25   -- you can embark on this another way.

163:1

163:2    This is how we were limited back then, of

163:3    course, as I mentioned before, whatever

163:4    work we have done on that study is

163:5    proprietary and sealed by court order

163:6    which we would certainly address were

163:7    that court order not to be respected.

163:8         But, be that as it may, we live

163:9    in a very different time baby.  We're

163:10   living in a time where you have got ever

163:11   interrogation filmed now by certain

163:12   police departments and jurisdictions

163:13   where somebody really cared to address

163:14   this.

163:15         Mr. Loevy, his institute and

163:16   the Innocence Project, those folks and

163:17   the other pools have access maybe even

163:18   the Department of Defense as we brought

163:19   them up, Dr. Russano.  You really want to

163:20   figure it out, let them sit down with all

163:21   of these videotapes of suspects being

163:22   interrogated and some of those folks will

163:23   never get charged, that's my point.

163:24         If you have the videotapes of

163:25   people that are simply being

164:1

164:2    interrogated, some of them, the charges

164:3    may be dropped but you have all of those

164:4    videotapes available.  It's just there.

164:5    It's just a cherry waiting to be picked.

164:6           Sit down with those videotapes,

164:7    watch the interrogations without

164:8    selectivity, Leo style, he worked 180

164:9    interrogations.  He didn't come up with

164:10   one false confession.

164:11          Sit down with a hundred eighty

164:12   videotapes start to finish, if somebody

164:13   confesses falsely and the charges are

164:14   dropped, nothing has to be overturned,

164:15   but it will be there.

164:16          The police will have made an

164:17   assessment this person didn't do it, we

164:18   never brought the charges.  But the

164:19   interrogation is there, the record is

164:20   there.  Everything that went on in the

164:21   interrogation is there for everybody to

164:22   see.

164:23          That's how it could be informed

164:24   today, yesterday, the day before.  It's

164:25   all there.  It doesn't even take a rocket

165:1

165:2    scientist to come up with this study.

165:3    Take it and run with it, you know.

165:4              So back when I was exploring

165:5    this, it was a different time.

165:6        Q.    That's what we are talking

165:7    about.

165:8        A.    We're talking about 2004, 2005,

165:9    that is a good ten years later.

165:10             Is the study of false

165:11   confessions so moribund and useless that

165:12   we truly are back in 2005 in 2016, I

165:13   submit, yes.  I also submit it doesn't

165:14   have to be that way.

165:15       Q.    I'm not looking for an info

165:16   pitch.

165:17       A.    What info pitch?

165:18       Q.    I'm asking about your sample

165:19   size starting in 2002.

165:20       A.    Yes.

165:21       Q.    If you were lecturing about the

165:22   results in 2003 --

165:23       A.    I guess so.

165:24       Q.    Back in 2002 you used a sample

165:25   size of exonerations from the Innocence

166:1

166:2    Project?

166:3        A.    Yes, sir.

166:4        Q.    My question to you, sir, there

166:5    are some impediments to be exonerated

166:6    when you have a serious mental illness,

166:7    right?

166:8        A.    I'm not sure I understand the

166:9    question.

166:10       Q.    Well, consider it from the

166:11   perspective of an attorney on a project

166:12   dedicated to exonerating people who have

166:13   been wrongfully convicted as innocent men

166:14   or women.

166:15           If they receive an intake form

166:16   with someone with a thought disorder who

166:17   has trouble communicating, it makes it

166:18   hard to evaluate the case whether to be

166:19   taken.

166:20           The irony the people with the

166:21   most trouble communicating may be the

166:22   most vulnerable to being wrongfully

166:23   convicted, but the least able to

166:24   effectively advocate for themselves to

166:25   get somebody to take their case in the

167:1

167:2    first place.

167:3              So the one result may be that

167:4    you have the source of data you're

167:5    choosing the 22 cases from may under

167:6    represent the people who are mentally ill

167:7    because they simply can't get to the

167:8    level where somebody is able to look into

167:9    their claim and effectively present it?

167:10             MS. STALF:  Objection to form;

167:11        foundation.

167:12        A.    That's an excellent question.

167:13   I think in theory I would certainly

167:14   consider that possible.  I think in

167:15   actuality there are two things that would

167:16   speak against it.

167:17             First of all, I have enormous

167:18   respect for the Innocence Project as a

167:19   receptacle to these concerns.  I don't

167:20   experience them as a biased organization

167:21   that is prejudice against the

167:22   psychiatrically ill such that they would

167:23   discount them.

167:24             I have worked on cases opposite

167:25   the Innocence Project.  I worked on one

168:1

168:2    with an affiliate and I worked opposite

168:3    the.

168:4             With my respect for them, I've

168:5    seen them workup cases in a marvelous

168:6    way.  I have seen them workup cases

168:7    perhaps not as marvelous a way.

168:8             What I have been impressed by

168:9    is the experience that, there is one case

168:10   in particular that I'm thinking of that

168:11   they cast their lot with someone by

168:12   virtue of his personality, would have

168:13   undercut himself because of how he

168:14   related in the way that you were

168:15   describing someone that does an intake

168:16   form.  I could see a lot of defense

168:17   counsel just sort of looking at this

168:18   person and discounting not giving him a

168:19   second look and they took him on.

168:20            I think in actuality, I don't

168:21   know about the other organizations, I

168:22   haven't had proximity to the intimacy how

168:23   they work.

168:24            The second thing one has to

168:25   factor in here is the death penalty.

169:1

169:2    Man, if you were on death row, you have

169:3    more recourses in terms of turning your

169:4    case over upside down and sideways than

169:5    anybody with the exception of, like, if

169:6    you were Al-Qaeda.

169:7          If any defendant in America

169:8    that said, I'm in Al-Qaeda, that

169:9    immediately guarantees them the best

169:10    representation of anybody in America, and

169:11    for free.

169:12          When somebody is on death row

169:13    the wherewithal to explore the

169:14    possibility of miscarriage of justice in

169:15    contemporary America is so deep, smart,

169:16    heavily, heavily staffed, that a person

169:17    with a major psychiatric illness does not

169:18    get overlooked.

169:19          Now, that's not to say, I'm not

169:20    making a blanket statement that there is

169:21    not somebody out there who might have

169:22    great difficultly communicating who

169:23    doesn't reach out to the Innocence

169:24    Project and who is unable to generate

169:25    interest in an attorney because perhaps

170:1

170:2   his case is less luminous.

170:3           Yes, absolutely, I believe that

170:4   the reason there is a high representation

170:5   of murder among false confession cases is

170:6   because those are the cases that certain

170:7   appellate interests take, you know, get

170:8   involved in.

170:9           They are not getting involved

170:10  in robbery cases, so, yeah, you know,

170:11  there will be some body of robbery cases

170:12  that are false confessions that we

170:13  haven't accounted for.  I'm there.

170:14          I do agree that in cases that

170:15  attract less de facto scrutiny by people

170:16  who are open minded, they can get missed

170:17  but it's not a universal truism.

170:18          I think especially because,

170:19  look, people with major psychiatric

170:20  illnesses can end up with capital

170:21  charges, death penalty charges, murder

170:22  charges.

170:23          They can be vulnerable for all

170:24  of the reasons of their condition whether

170:25  they gave a confession or not.

171:1

171:2          It happen to be the street guy

171:3   who happened to be close to where it

171:4   happened and circumstantial evidence

171:5   implicated him.

171:6          I interpreted the very small

171:7   representation of people with active

171:8   psychotic symptoms as contrary to

171:9   published assertions that mental illness

171:10  is a risk factor.  Which is one of the

171:11  shouts from the rooftop pronouncements

171:12  that I'm used to reading in polemics.

171:13         Now, when I read that about

171:14  mental retardation, yeah, I'm there.  I

171:15  experience it as a risk factor for a

171:16  range of reasons, we can talk.  The two

171:17  are equated in the literature and that

171:18  just doesn't draw support from what I had

171:19  the opportunity to see.

171:20     Q.   And from what you had the

171:21  opportunity to see is one case in an

171:22  unknown sample that could be as least at

171:23  six cases?

171:24     A.   I have worked on disputed

171:25  confession cases for 14 years now.  I

172:1

172:2    have seen more false confessions, real

172:3    false confession that most folks have

172:4    seen in their career, not all folks, most

172:5    folks.

172:6              I'm sure there are a number of

172:7    people who have seen more false

172:8    confessions than me, but I have seen more

172:9    false confessions than most.  I'm not

172:10   telling you the false confessions that I

172:11   have seen, let me make this clear, these

172:12   are false confessions, in which I was

172:13   consulted to prosecutors or civil

172:14   attorneys who did not want me to come to

172:15   that conclusion and I told them this is a

172:16   false confession.

172:17             And I'm telling you that major

172:18   mental illness is underrepresented from

172:19   what I have seen with my own eyes where I

172:20   have the whole file available to me.

172:21   It's underrepresented.

172:22             Now, small sample size.  We are

172:23   not talking about one case.  We're

172:24   talking about a phenomenon where if it is

172:25   as consequential as the polemics suggest,

173:1

173:2    I should be seeing it more frequently

173:3    then I'm seeing it.

173:4              There are those cases that are

173:5    false, that I'm confident are false, and

173:6    then those cases just to preempt a

173:7    question you aught to have, which are

173:8    ambiguous.

173:9              I don't know.  I just don't

173:10   know.  Could be, couldn't be.  I'm not

173:11   sure at the end of the day.

173:12             It's underrepresented in those

173:13   cases so I'm merely doing a distinction

173:14   between the potency of that from that of

173:15   retardation which in my experience is

173:16   better established and better borne out

173:17   by data.

173:18      Q.   So tell me what the data is

173:19   about mental illness not being a

173:20   contributing factor --

173:21      A.   I just answered the question.

173:22      Q.   Tell me the cases.

173:23      A.   I answered the question.

173:24      Q.   You said you have 14 years of

173:25   experience, you have talked to all of

174:1

174:2    these people, you have done all of this

174:3    stuff.

174:4              Tell me who did you talk to,

174:5    what did you tell them?

174:6        A.    Let me put it this way:  You

174:7    have a number of reports of mine.  You

174:8    can go to all those reports.

174:9              You show me which of those

174:10   reports involved a litigant who had a

174:11   major psychiatric illness and compare

174:12   that to the incidence of major

174:13   psychiatric illness in forensic

174:14   population, see how those percentages

174:15   line up.  See if there is an

174:16   overrepresentation among the litigants.

174:17             Let's assume for the moment

174:18   every single case that I ever worked on

174:19   was a false confession, let's just

174:20   assume, let alone the ones that were

174:21   false, you have the Thibodeax case, you

174:22   have got the report.  He didn't have a

174:23   psychiatric illness, right.

174:24             You know just from a standpoint

174:25   of my previous testimony that the

175:1

175:2    Rossetti [phonetic] four, that my

175:3    conclusion that was a false confession.

175:4    Those guys who confused, they were not

175:5    psychotic.

175:6           What I'm speaking of, I'm

175:7    speaking substance, of course, the

175:8    numbers are small but that's because

175:9    false confessions are so rare.  They

175:10   happen, but I'm merely talking about the

175:11   overrepresentation of those with

175:12   psychotic illness in the police context.

175:13          I distinguish that from people

175:14   that may give voluntary false

175:15   confessions.  I eluded to Sanders

175:16   [phonetic] when I spoke earlier.  I've

175:17   talked about this in previous deposition

175:18   which you read.

175:19          For the record, my first

175:20   encounter with a false confession was

175:21   someone who voluntarily false confessed

175:22   without any influence of the police

175:23   because he was psychotic, manic.

175:24          He represented that he killed

175:25   his wife when in fact she had suicided

176:1

176:2    but because he initiated --

176:3         Q.    Why are you talking about this?

176:4         A.    Because you asked me for

176:5    evidence and data.  I'm giving you data

176:6    especially if you asked me five times the

176:7    same question.  I'll make my answer five

176:8    times as long if it encompasses what you

176:9    seem to not be getting.

176:10        Q.    No.

176:11        A.    Does that answer the question?

176:12        Q.    Sir, what methodology do you

176:13   use to reach your statement here today

176:14   that people with mental illness are

176:15   underrepresented in the incidence of

176:16   demonstrably false confession?

176:17        A.    My testimony was psychotic

176:18   mental illness, serious mental illness.

176:19   I specifically distinguished a

176:20   psychiatric diagnosis from serious mental

176:21   illness and I spoke about the

176:22   significance of demonstrably false

176:23   confessions, either those documented in

176:24   the literature for which there is

176:25   undisputed or a sufficient amount of the

177:1

177:2    data or cases that worked on myself, that

177:3    is my methodology.

177:4        Q.    Putting aside cases that you

177:5    worked on yourself, what is the other

177:6    body of cases that you were referring to?

177:7        A.    I referenced the literature.  I

177:8    referenced the -- I referenced the

177:9    dataset from the Innocence Project for

177:10   which I can comfortably conclude that

177:11   those were false confessions based on all

177:12   of information available to me.

177:13            THE REPORTER:  One second,

177:14       please.

177:15            [Whereupon, at 1:39 p.m., a

177:16       recess was taken.]

177:17            [Whereupon, at 1:39 p.m., the

177:18       testimony continued.]

177:19       A.    I would add to that there are

177:20   some, I don't know how many, I can't put

177:21   a number, like, the Michael Crowe case in

177:22   San Diego that may have not have been

177:23   part of the Innocence Project sample at

177:24   the time that I drew those cases down.

177:25            Nobody is disputing those are

178:1

178:2    false confessions.  There is significant

178:3    information available about the suspect

178:4    to be able to comfortably conclude that

178:5    that person did not have a psychotic

178:6    mental illness and the false confession

178:7    happened for other reasons.

178:8         I would say from those three

178:9    resources.

178:10    Q.    In the 22 cases, you can't tell

178:11   us how you chose those 22 from all of

178:12   cases that had false confessions that

178:13   yielded exonerations posted on the

178:14   Innocence Project's website?

178:15    A.    Sure I can.

178:16    Q.    How?

178:17    A.    The Innocence Project says when

178:18   third-parties implicate people falsely,

178:19   that is a false confession; it's not.

178:20         The Innocence Project has said

178:21   that when someone pleads guilty, that it

178:22   is a false confession; it's not.

178:23         They include in their sample

178:24   what they call false confessions in their

178:25   website things that are not false

179:1
179:2  confessions.
179:3     And so the paradigm that
179:4  oriented the selection was cases were
179:5  selected when the fact pattern included
179:6  there was a person who denied
179:7  involvement, went into interrogation, and
179:8  at the end of the interrogation, said I
179:9  did it or some variant thereof where
179:10  clearly they took ownership as opposed to
179:11  cases where they thought they were
179:12  exculpating themselves but in fact they
179:13  said they were a block or two away from a
179:14  scene and that was interrupted as an
179:15  admission.
179:16     That is not an admission by the
179:17  suspect so that is not a false confession
179:18  as opposed to another case that is
179:19  specifically in Leo's sample that he
179:20  calls a false confession.  I actually
179:21  worked on the case.  I know it wasn't.
179:22     Someone who says, I didn't
179:23  confess.  The police basically, the
179:24  interpreter mistranslated what I said,
179:25  how could it be a false confession if

180:1

180:2    they simply get the language wrong?

180:3              So when you cut out the fat,

180:4    what we were left with is what we

180:5    attempted to study earlier.

180:6              What we were left with at that

180:7    time was 22 cases.  It was culled based

180:8    on an inclusion of everything that would

180:9    fit that criteria.

180:10   Q.    Sir, did you include cases

180:11   where somebody confessed implicating

180:12   themselves as well as another person?

180:13   A.    Yes, because they implicated

180:14   themselves like the Rossetti four,

180:15   perfect example.

180:16   Q.    So in Carl Chatman, if there is

180:17   no contamination of the DNA and if Ms.

180:18   Riggio wasn't having an affair, he is an

180:19   example of a person with a serious mental

180:20   illness who give a false confession,

180:21   right?

180:22   A.    Sure.

180:23   Q.    So let's turn to Exhibit No. 1

180:24   if you would, which is your report in

180:25   this case.

181:1

181:2     A.     Um.

181:3     Q.     Were you provided with material

181:4   in addition to those listed on page 2 and

181:5   3 --

181:6     A.     Yes.

181:7     Q.     -- of the report?

181:8            What material do you have

181:9   related to this case in addition to those

181:10  listed on page 2 and 3?

181:11    A.     I have to go back and look, a

181:12  lot.  I did not have an opportunity to go

181:13  through everything I was provided.  I

181:14  worked as quickly as I could to reach

181:15  whatever conclusions that I could within

181:16  the assigned time frame.

181:17            I have a lot of materials that

181:18  to this day I have not yet reviewed that

181:19  the attorney sent me.

181:20    Q.     And the attorneys paid you

181:21  about a hundred thousand dollars for this

181:22  report, right?

181:23    A.     No, they paid me for the time I

181:24  spent working on the case.  The report

181:25  was merely a component of the time spent.

182:1

182:2       Q.    Right, the end product of --

182:3       A.    My work.

182:4       Q.    -- your work was the report?

182:5       A.    Yes, sir.

182:6       Q.    How much money did that cost?

182:7       A.    I don't know.  I haven't been

182:8  paid anything yet.  We certainly

182:9  submitted bills and they were certainly

182:10  high five figures.  If they went over

182:11  six, they went over six.

182:12           MR. AINSWORTH:  Let's mark this

182:13      as Exhibit No. 6.

182:14         [The document was hereby marked

182:15      as Plaintiff's Exhibit 6 for

182:16      identification, as of this date.]

182:17           MR. AINSWORTH:  For the record,

182:18      those playing at home, this is

182:19      Bates-stamped BS Welner 000019 through

182:20      56.

182:21       Q.    Looking at the first page of

182:22  Exhibit 6.

182:23       A.    Um.

182:24       Q.    Showing a total of $92,910 --

182:25       A.    Yes.

183:1

183:2          Q.     -- for the Carl Chatman case --

183:3          A.     Yes, high figures, high fives.

183:4          Q.     -- that you billed?

183:5          A.     Yes, sir.

183:6          Q.     And you are the sole owner of

183:7    The Forensic Panel?

183:8          A.     Yes, sir.

183:9          Q.     On the first page of this

183:10   Exhibit 6, the second case is blacked out

183:11   there.

183:12         A.     Yes.

183:13         Q.     Do you know why it's blacked

183:14   out?

183:15         A.     I'm trying to remember what the

183:16   case is.  I think I have not been

183:17   disclosed in that case.

183:18         Q.     Are you working on a report on

183:19   that case?

183:20         A.     I guess if it's blacked out, I

183:21   can't really talk about it, right?

183:22         Q.     Well, I'm just I'm trying to

183:23   find out if that is going to be public?

183:24         A.     I guess when it becomes public,

183:25   it gets unblacked out.  If it's blacked

184:1

184:2    out, it means I'm blacked out.

184:3        Q.    And so these four cases on the

184:4    first page have all been billed within

184:5    the past two years or so; is that right?

184:6        A.    Is it four years?

184:7        Q.    Two years I think.

184:8        A.    I don't think it's two years.

184:9        Q.    Well, your Patrick report was

184:10   produced on June 15th, 2015.

184:11       A.    Patrick, Saunders, and Chatman

184:12   maybe two years, but the blacked out

184:13   case, I don't think that billing has been

184:14   generated from two years.

184:15            It was responsive to the

184:16   question what have we generated in the

184:17   past three years, four years, whatever,

184:18   so that is what it amounts to.

184:19       Q.    Let me do just a little bit of

184:20   math.  Since 2015 for the three cases of

184:21   Carl Chatman, 92,910; plus the Patrick

184:22   case, 130,458.75; and the Saunders case

184:23   138,810.

184:24            We have $362,178 paid to you by

184:25   one client, the City of Chicago, for the

185:1

185:2     last two years; does that sound right?

185:3        A.   Or that would be because we

185:4     hadn't been paid on Chatman but

185:5     anticipating payment.  They were

185:6     different clients for each but the City

185:7     of Chicago is involved.

185:8        Q.   The City of Chicago is the one

185:9     paying the bill for each case?

185:10        A.   Yes, I guess.

185:11        Q.   So what portion of your income

185:12     for the last two years does the $362,000

185:13     figure equate to?

185:14        A.   I haven't really calculated it,

185:15     but if over the last two years practice

185:16     income is somewhere 2.25 million.  Doing

185:17     the math, that would be probably

185:18     somewhere a little bit under 20 percent

185:19     of income.

185:20        If it's 2.5, it's closer to 15

185:21     percent, so somewhere in this realm of 15

185:22     to 20 percent.

185:23        Q.   Do you hope to have business

185:24     with the City of Chicago in the future?

185:25        A.   I am blessed enough to have to

186:1

186:2    be very selective about cases and I

186:3    always hope to have legitimate cases.

186:4              I have a luxury to be able to

186:5    decline to participate in cases and have

186:6    declined to participate in cases from the

186:7    City of Chicago right at the outset so I

186:8    think that those who have recommended

186:9    cases to me, have had that experience.

186:10             If they recommended more than

186:11   one, I have taken some of their cases and

186:12   I haven't taken others.

186:13             If there are cases that I can

186:14   tell at the beginning are cases that we

186:15   should not be involved in for reasons of

186:16   merit or other reasons, no, I'm not

186:17   interested in having those cases.

186:18             If they are cases that

186:19   potentially have merit, we're willing to

186:20   participate.

186:21             If they are cases that

186:22   ultimately don't have merit, you know,

186:23   I'm pleased to be able to be affix my

186:24   name to reports of cases where I feel

186:25   comfortable in the findings.  Those are

187:1

187:2    the cases that I prefer and those are the

187:3    cases I would want to attract.

187:4        Q.    Are you listening to my

187:5    question, sir?

187:6        A.    I answered your question.

187:7        Q.    Do you hope to have further

187:8    business with the City of Chicago?

187:9            MS. STALF:  Objection, asked and

187:10       answered.  He answered the question.

187:11       A.    I hope to have future cases of

187:12   merit come to me from the City of

187:13   Chicago.

187:14       Q.    Have you ever provided a report

187:15   for a plaintiff in a wrongful conviction

187:16   lawsuit?

187:17       A.    I haven't been retained by a

187:18   plaintiff in a wrongful conviction

187:19   lawsuit.  If I'm not retained, I can't

187:20   provide a report.

187:21       Q.    Have you ever been retained by

187:22   a plaintiff in a wrongful conviction

187:23   lawsuit?

187:24       A.    I have not.

187:25       Q.    You have only worked for the

188:1

188:2    defense in a wrongful conviction

188:3    lawsuits?

188:4         A.    I believe so.

188:5         Q.    Sir, on pages 4 through 7 of

188:6    your report, you relate certain facts.

188:7    How do you determine which facts you

188:8    would include and which facts you

188:9    wouldn't include?

188:10        A.    I did not discriminate.  I

188:11   aimed to provide a concise narrative to

188:12   inform the confession-related questions

188:13   that I would be addressing in the

188:14   conclusion.

188:15        Q.    I don't see any mention about

188:16   the DNA from the vaginal swab in your

188:17   decision of the facts.

188:18        A.    Yeah.

188:19        Q.    Is there a reason for that?

188:20        A.    I mean I can only say when I

188:21   said Ms. Riggio did not exhibit abrasions

188:22   or cuts.

188:23             THE REPORTER:  Doctor, you have

188:24       to slow down.

188:25             THE WITNESS:  Sorry.

189:1

189:2     A.   Mrs. Riggio did not exhibit

189:3   abrasions or cuts, no genital lacerations

189:4   and a rape examination did not produce

189:5   sperm.

189:6        That my records to a rape

189:7   examination did not produce sperm, for me

189:8   I was content for myself that I was

189:9   referencing DNA.  I wasn't thinking about

189:10   DNA coming from incidental contact

189:11   because that would be irrelevant to a

189:12   rape discussion.

189:13        When it comes to a rape

189:14   discussion, the origin of DNA via sperm

189:15   is certainly the most powerful but

189:16   certainly DNA can emerge from other sorts

189:17   of contact.

189:18        Having expressed that, I

189:19   evidently made the estimation that I was

189:20   making myself clear that there wasn't

189:21   anything that was implicating Mr. Chatman

189:22   in the physical findings.

189:23     Q.   So you are saying that you knew

189:24   there was somebody else's DNA on the

189:25   vaginal swab, but by typing a rape

190:1

190:2    examination did not produce sperm -- you

190:3    are shaking your head no?

190:4         A.    I already testified to this.  I

190:5    didn't know there was somebody else's DNA

190:6    at all.

190:7              I was just operating from a

190:8    factual understanding there was nothing

190:9    physically that attached him to this and

190:10   that when I mentioned sperm, and perhaps

190:11   in a shorthanded way, I was encompassing

190:12   DNA within that reference.

190:13        Q.    So you wrote that entire report

190:14   without the understanding that there was

190:15   DNA on Ms. Riggio's vaginal swab that

190:16   exculpated Mr. Chatman --

190:17             MS. STALF:  Objection to form of

190:18        the question.

190:19        Q.    Right?

190:20        A.    I wrote this without the

190:21   understanding that there was DNA

190:22   attributed to another person, yes.  I did

190:23   not have that information when I wrote

190:24   this report.

190:25             Would I have included it, sure.

191:1

191:2    I would have definitely made reference to

191:3    it.  If I knew that, I would have made

191:4    reference to it.

191:5        Q.    If Carl Chatman indeed gave a

191:6    false confession, that would change your

191:7    entire report, right?

191:8        A.    Yes and no.  There are several

191:9    questions addressed.  I have given a lot

191:10   of testimony already about a lot of

191:11   things; for example the -- well, it would

191:12   change what it changes, it would change a

191:13   false confession so there has to be other

191:14   discussion.

191:15            I -- I absolutely wouldn't

191:16   change the entire report.  One has to

191:17   address point by point.

191:18            There are certain aspects of

191:19   what I communicated in the report that

191:20   actually embed themselves in the

191:21   consideration of false confession so I

191:22   didn't exclude false confession from

191:23   this.  It was among the considerations

191:24   that were mentioned over the course of my

191:25   conclusions.

192:1

192:2      Q.    All right, sir, would you

192:3    please identify for me then if Ms. Riggio

192:4    was not having an affair with another

192:5    sexual partner in the three days

192:6    proceeding the May 24th, 2002 alleged

192:7    sexual assault, and assuming there is no

192:8    contamination of the DNA, what portion of

192:9    your or portions of your report would

192:10   need to be changed?

192:11            MS. STALF:  Objection to form.

192:12            MR. CHESTNUT:  Objection to

192:13       form; complete hypothetical.

192:14            MS. STALF:  Join.  Also

192:15       foundation.

192:16     A.    Let's start with question 1.

192:17   First paragraph doesn't need to change.

192:18   The second paragraph doesn't need to

192:19   change.  The third paragraph doesn't need

192:20   to change.  The fourth paragraph doesn't

192:21   need to change -- oop, fourth paragraph,

192:22   doesn't need to change.  Fifth paragraph

192:23   doesn't need to change.  All of the

192:24   bullet points don't need to change.

192:25   Sixth paragraph, doesn't need to change.

193:1

193:2    Seventh paragraph doesn't need to change.

193:3    Eighth paragraph doesn't need to change.

193:4    Ninth paragraph doesn't need to change.

193:5    The tenth paragraph doesn't need to

193:6    change.

193:7            Next page, page 12, 11, 12, all

193:8    of the bullet points below, the whole

193:9    page 12 doesn't change.

193:10           Page 13 doesn't change.  The

193:11   entire page stays the same.

193:12           Page 14, the first paragraph

193:13   doesn't need to change.  The next

193:14   paragraph doesn't need to change.  The

193:15   pullout about Kassin doesn't need to

193:16   change.  The next paragraph doesn't need

193:17   to change.  The next paragraph doesn't

193:18   need to change.  The entire page 14

193:19   doesn't need to change.

193:20           The next page, the rest of

193:21   question 1 doesn't need to change.

193:22           Question 2, first paragraph

193:23   doesn't need to change.  The rest of the

193:24   page doesn't need to change.

193:25           Page 16, page 16 doesn't need

194:1

194:2    to change.  Sorry.  Page 16, I wouldn't

194:3    delete anything.

194:4            I would likely add something

194:5    referencing this discussion but I

194:6    wouldn't delete anything.  I wouldn't

194:7    change anything there.  I wouldn't alter

194:8    anything there.  The findings are what

194:9    they are.

194:10           The reference to DNA here

194:11   speaks to the question whether no rape

194:12   took place and that is really not part of

194:13   the consideration of if someone else's

194:14   DNA is there.  That doesn't really get

194:15   addressed through that finding for all of

194:16   these possibilities, that doesn't change;

194:17   however, I would have included some

194:18   discussion if I was operating from that

194:19   vantage point on page 16.

194:20      Q.    So you would have included on

194:21   page 16 some reference to the fact that

194:22   Mr. Chatman was actually innocent?

194:23      A.    No, I would have said -- here's

194:24   what I would have said, I would have

194:25   said, more recent, allowing for editing,

195:1

195:2    more recent scientific -- more recent

195:3    testing of DNA has suggested -- more

195:4    recent testing of DNA has yielded

195:5    biological material transmitted by sexual

195:6    contact which does not belong to Mr.

195:7    Riggio or Mr. Chatman; therefore, the

195:8    possibility that this is a false

195:9    confession is real.

195:10            It is -- this material may have

195:11   emerged from contamination or consensual

195:12   activity coinciding timewise with a

195:13   sexual assault by Mr. Chatman or Mr.

195:14   Chatman may have not been involved at

195:15   all, that is yet to be determined and I

195:16   can address this with access to further

195:17   information about the case.  That is

195:18   probably what I would put in there.

195:19       Q.    The look of consternation on my

195:20   face is my question, this whole exercise

195:21   is assuming that Ms. Riggio did not have

195:22   consensual sex in the three days before

195:23   May 24, 2002, with some paramour and

195:24   assuming there is no contamination of the

195:25   DNA, how would your report be --

196:1

196:2      A.    I don't put assumptions in my

196:3  report so I wouldn't change my report at

196:4  all to accommodate an assumption or a

196:5  hypothetical.  That is the disconnect

196:6  between deposition and the composition of

196:7  a report.  So, you know, that is what I

196:8  would do.

196:9        The look of consternation may

196:10  relate to there is very little about my

196:11  report that would otherwise change.  I

196:12  don't see how question 3 --

196:13      Q.    Well, no, sir.  The reason that

196:14  I am asking you to do is how your report

196:15  would change if Carl Chatman was in fact

196:16  innocent based on the hypothetical --

196:17      A.    That's what I'm doing.  I'm

196:18  walking you through page by page about

196:19  what would change.

196:20      Q.    Listen to my question, sir.  We

196:21  can only do this with question answer.

196:22  If you interrupt me, I have to restate

196:23  the whole thing.  You know how this goes.

196:24  You have done this before.

196:25        The whole purpose of this

197:1

197:2    exercise is to have you tell me how your

197:3    report would have to be changed if in

197:4    fact Carl Chatman was innocent because

197:5    Ms. Riggio did not have a sex with an

197:6    affair partner in the three days before

197:7    May 24, 2002, and there is no

197:8    contamination of the DNA evidence?

197:9         MS. STALF:  Objection to the

197:10      form; foundation; complete

197:11      hypothetical.

197:12         MR. CHESTNUT:  Join.

197:13    A.   And I answered it with respect

197:14    to up to and inclusive page 16.  I would

197:15    tell you page 17 wouldn't change.

197:16         I'm now looking at page 18.

197:17    Page 18 doesn't change.

197:18         Page 19 hasn't changed.

197:19         [Whereupon, the Witness is

197:20      perusing the document.]

197:21         Page 20 doesn't change.

197:22         [Whereupon, the Witness is

197:23      perusing the document.]

197:24    A.   Page 21 doesn't change.  I

197:25    actually have a question -- no, actually,

198:1

198:2     I think I don't have a question.

198:3              This DNA evidence that you

198:4     presented, when did that become

198:5     available, chronologically?

198:6         Q.    December, 2013.

198:7         A.    Thank you.

198:8              The rest of question 4 doesn't

198:9     change.

198:10             I want to qualify this.  It

198:11    doesn't change but I need to call your

198:12    attention to the fourth paragraph on page

198:13    22.  "The only explanation provided as an

198:14    alternative to the conclusion that Mr.

198:15    Chatman raped Ms. Riggio is that her

198:16    claim is fabricated."

198:17             This entire discussion is an

198:18    alternative explanation but it was never

198:19    provided to me at the time of the

198:20    composition of my report.

198:21             And, so, I would change that

198:22    sentence if in fact I was asked to

198:23    consider both alternatives.

198:24             It doesn't change the rest of

198:25    discussion because you can't charge

199:1

199:2   tunnel vision of investigators who don't

199:3   have access to any of this investigation

199:4   at the time that no other indicator that

199:5   somebody else was involved and the only

199:6   other argument being raised was this

199:7   being a fabricated complaint.

199:8            Be that as it may, I just want

199:9   to make sure for the record there is a

199:10  reason I'm not changing it and it's

199:11  because of the date of this material

199:12  becoming available and this being raised

199:13  through this deposition as opposed to Dr.

199:14  Russano's report and the opinions that

199:15  she presented and the theories behind

199:16  them.

199:17            Question 5 doesn't change.

199:18            [Whereupon, the Witness is

199:19      perusing the document.]

199:20            Question 6 doesn't change.

199:21      Question 7 -- actually, page 25

199:22      doesn't change.

199:23            [Whereupon, the Witness is

199:24      perusing the document.]

199:25            Page 26 doesn't change.  The

200:1

200:2       rest of question 7 doesn't change.

200:3           [Whereupon, the Witness is

200:4       perusing the document.]

200:5           The rest of page 27 doesn't

200:6       change.  Page 28 doesn't change.

200:7           [Whereupon, the Witness is

200:8       perusing the document.]

200:9           Question 9 doesn't change.

200:10          That's it.  So that's what we've

200:11      got.

200:12      Q.    So if Ms. Riggio had not had

200:13 sex with an affair partner in the three

200:14 days before May 24, 2002, if there is no

200:15 contamination of the DNA, you would not

200:16 omit anything from your entire 30-page

200:17 report but make the two small additions

200:18 that you referenced?

200:19         MS. STALF:  Objection, asked and

200:20       answered; form; foundation.

200:21         MR. CHESTNUT:  Same objection.

200:22      A.    I would make those additions.

200:23      Q.    And not change any information

200:24 in your report, correct?

200:25         MS. STALF:  Same objection.

201:1

201:2     A.   No, I wasn't asked to address

201:3  anything else.

201:4       MR. AINSWORTH:  Let's change the

201:5    tape.

201:6       THE VIDEOGRAPHER:  Going off the

201:7    record.  The time it 2:15 p.m.

201:8       [Discussion held off the

201:9    record.]

201:10      [Whereupon, at 2:15 p.m., a

201:11   recess was taken.]

201:12      [Whereupon, at 2:26 p.m., the

201:13   testimony continued.]

201:14      THE VIDEOGRAPHER:  Returning to

201:15   the record 2:26 p.m.

201:16      Beginning of disc number 5.

201:17    Q.   If Ms. Riggio did not have sex

201:18  with somebody what was not her husband in

201:19  the three days before May 24, 2002, no

201:20  contamination of the DNA, what factor or

201:21  factors led to Mr. Chatman's false

201:22  confession?

201:23      MS. STALF:  Objection, form;

201:24    foundation.

201:25      MR. CHESTNUT:  Join.

202:1

202:2          MR. VLAHAKIS: Objection, form;

202:3     hypothetical.

202:4     A.   I think that if this is a false

202:5    confession that what contributes to it

202:6    would be at least the -- let me restate

202:7    that.

202:8         The evidence available to me

202:9    what contributes to it would be his

202:10    vulnerability; psychotic thinking; and in

202:11    particular, his being preoccupied at

202:12    times that he is psychotic with violent

202:13    and sexual assaultive themes which in the

202:14    context of even a benign question could

202:15    elicit a false confession.

202:16        I say this because if he was

202:17    making confessions to a psychiatrist or

202:18    psychologists in the hospital setting who

202:19    weren't investigating a crime, I wouldn't

202:20    go so far to say he confessed to one of

202:21    Dr. Russano's college professors.

202:22        Maybe with the reality he was

202:23    offering self-incriminating statements to

202:24    mental health professionals is notable on

202:25    this particular point.

203:1

203:2          The other issue which maybe of

203:3   consequences is the question which Dr.

203:4   Russano raised of contamination which, I

203:5   again, both of these I referenced in my

203:6   report.

203:7          Is it possible walking through

203:8   a scene at a time that he has variable

203:9   level of intact reality, a place that he

203:10  may have been before, a place that he may

203:11  have visited for all of the benign

203:12  reasons discussed.  He may have gone in

203:13  that courtroom, wondered around,

203:14  everything.  There is still many

203:15  variables within those boundaries that he

203:16  could have internalized details that he

203:17  was exposed to because he was in a place

203:18  where his sense of reality was so

203:19  unpredictable.

203:20          Again, I am speaking in

203:21  theoretical terms, but I want to give it

203:22  a little more heft, to your credit, by

203:23  saying I'm not just pulling things out of

203:24  thin air.

203:25          Look, we know he has

204:1

204:2    schizophrenia.  We know he has a

204:3    condition that at times he is quite

204:4    psychotic.  We don't know, for example,

204:5    whether he became more psychotic after

204:6    arrest.  That happens to some people.  We

204:7    don't know how psychotic he would have

204:8    been at the time of his questioning.

204:9         We do know he has a psychotic

204:10   condition at least certainly the realm of

204:11   possibility is what you see in the

204:12   hospital is what you got at the time of

204:13   questioning, it could be.  Sometimes it

204:14   is and sometimes it isn't.

204:15         But we certainly know what he

204:16   is capable of when he is psychotic, and

204:17   what we know is that he is capable of

204:18   being quite sexually preoccupied, quite

204:19   preoccupied with themes about violence as

204:20   they relate to women and in a way that

204:21   someone who is not familiar with him does

204:22   not necessarily appreciate and so that is

204:23   a contributing issue, and, of course, the

204:24   confession is then written out and

204:25   prepared after he is in a setting where

205:1

205:2    he's at the scene what he might have

205:3    internalized with a more frayed ability

205:4    to differentiate between what is real and

205:5    what is not real.  Those are the two

205:6    areas that come to mind.

205:7          Now, I'm not in a position to

205:8    definitely dismiss this Kato [phonetic]

205:9    thing because, you know, I understand

205:10    that the assertion that he gave a false

205:11    confession because that brutal China man

205:12    and I say that, you know, specifically

205:13    because, you know, he didn't know

205:14    Detective Kato.  Detective Kato hasn't

205:15    been attached to this case.  He's just

205:16    sort of a figure with a legacy, you know,

205:17    available to attorneys who work in this

205:18    genre.

205:19          His involvement is just a

205:20    completely ambiguous issue that's left to

205:21    another discussion about the veracity of

205:22    the complaint filed against said officer

205:23    in the room while the questioning is

205:24    going on.  So that to me is ambiguous.

205:25          What is not ambiguous is that

206:1

206:2    he has a major psychiatric illness.  It

206:3    is not ambiguous in his medical record

206:4    that says that he can be sexually

206:5    preoccupied with violent themes when he

206:6    gets psychotic, particularly rape, rape,

206:7    not just killing or hitting people in the

206:8    abstract.

206:9            And then when he was exposed to

206:10   a scene and at a time where there was at

206:11   least one witness says sometimes he made

206:12   sense, sometimes he doesn't make sense.

206:13           Again, in terms of a person's

206:14   sense of reality engaged in his

206:15   environment, sometimes he may be intact

206:16   and at other times he might not have been

206:17   taken to his environment or reacting to

206:18   it in a way that is intact.

206:19           That is different than the leap

206:20   one would make with the unresolved Kato

206:21   questions which are one side feels one

206:22   way and another side feels another way.

206:23   Q.    Would you expect a person with

206:24   Carl Chatman's psychiatric makeup and his

206:25   psychiatric history to have difficultly

207:1

207:2    communicating with the police officers

207:3    during his interrogation in May of 2002?

207:4        A.    Not necessarily.  Not

207:5    necessarily.

207:6        Q.    So he wouldn't have trouble

207:7    communicating with his interrogators

207:8    meaning --

207:9            MR. AINSWORTH:  Let me strike

207:10        that.

207:11            THE WITNESS:  I'm not going to

207:12        cut you off.  My reaction is my

207:13        reaction.  I'm not going to interrupt

207:14        you.  Go ahead.

207:15            MR. AINSWORTH:  I want to

207:16        restart the question and get rid of a

207:17        pronoun.

207:18        Q.    Is it your opinion that Carl

207:19    Chatman would not have had difficulty

207:20    speaking or communicating with his

207:21    interrogators during his interrogation on

207:22    May 24, 2002?

207:23        A.    I haven't um -- I haven't

207:24    experienced in any of the records that I

207:25    reviewed that he has difficultly

208:1

208:2    communicating.

208:3            I think that the challenge with

208:4    Mr. Chatman such as I have been exposed

208:5    to and keeping all of this together is

208:6    that with Mr. Chatman he is perfectly

208:7    capable of confessing.  He also just says

208:8    certain things that just kind of don't

208:9    make sense, so one has to listen to him

208:10   holistically.

208:11           Look, there are people with

208:12   psychotic illness who commit crimes and

208:13   they give confessions and that is what

208:14   true confessions look like.

208:15           It's sort of a millage of

208:16   material that is accurate, makes sense

208:17   and also material that either doesn't

208:18   make sense or other material that is an

208:19   idiosyncratic association that they make

208:20   that makes sense to them but doesn't make

208:21   sense to the listener; the listener

208:22   doesn't really know what to do with it.

208:23           I'm saying this also not just

208:24   from the experience of forensics.  I

208:25   worked on a pretrial unit for three

209:1
209:2    years.  I had the experience of sitting
209:3    down with people after they've been
209:4    arrested.  I have had that discussion of,
209:5    like, what happened, you know, with
209:6    people who are acutely ill what it's like
209:7    to listen to them in a raw state.
209:8              I have been to emergency rooms
209:9    with a cop on the other side of the door
209:10   saying, why are you here?  What happened?
209:11   and hearing somebody in an acute state
209:12   say what they're saying.
209:13             That's not a -- I don't want to
209:14   say not uncommon.  People with major
209:15   psychiatric illnesses sometimes commit
209:16   violent crimes and sometimes they give
209:17   admissions, and they can communicate
209:18   perfectly fine but you certainly do
209:19   listen to it in a different way if you
209:20   could basically take what someone is
209:21   saying at face value, not have to worry
209:22   about, I heard him say that but what is
209:23   he actually trying to say?
209:24             I hope that answers your
209:25   question.

210:1

210:2          Q.     What is flight of ideas?

210:3          A.     Flight of ideas is an

210:4     accelerated way of expressing oneself

210:5     where you as the listener will hear

210:6     something as thoughts progressing from

210:7     point A to point B.

210:8               A person's who is accelerated

210:9     in his thinking will go from idea A to

210:10    idea C or idea D.

210:11              So it's a reflection of the

210:12    acceleration of the person's thinking

210:13    faster than the association that a lister

210:14    would naturally make.

210:15         Q.     What is looseness of

210:16    association?

210:17         A.     Flight of ideas is -- I'm

210:18    answering your question.  Wherein flight

210:19    of ideas is a person going from point A

210:20    to point D, point A to point C, you as

210:21    the listener are going from point A to

210:22    point D, it's still in the same alphabet.

210:23              Loose associations is where a

210:24    person goes from point A to pi r squared.

210:25    They are veering off onto something

211:1

211:2     that's idiosyncratically related.  They

211:3     understand the connection, it's not so

211:4     much a reflection of their acceleration

211:5     as it is a reflection of their disconnect

211:6     of just the frequency they are on.  How

211:7     things associate are much more

211:8     disconnected from the rational.

211:9          Q.    A disorganized way of thinking?

211:10         A.    Disorganized is another way.

211:11    Disorganized thinking is when someone's

211:12    communication simply doesn't make sense

211:13    and the listener just says, huh?  Is just

211:14    doesn't make sense.

211:15            And while there is a certain

211:16    disorganization too to loose

211:17    associations, it makes sense to them.

211:18            Truly disorganized thinking

211:19    doesn't make sense to them either.  It's

211:20    truly all over the place and are

211:21    sometimes described as incoherent and

211:22    sometimes they may be indistinguishable

211:23    from someone who has a medical condition

211:24    where they would be portrayed as

211:25    delirious.

212:1

212:2              I think it's more precise to

212:3    just actually cleave off loose

212:4    association from disorganization allowing

212:5    for the idea there is some overlap, but

212:6    they really are more distinct entities.

212:7       Q.    On May 26th, 2002, when Carl

212:8    Chatman went to the Cook County Jail and

212:9    was placed into the mental health wing of

212:10   the Cook County Jail, he was documented

212:11   to have both flight of ideas and

212:12   looseness of association, correct?

212:13      A.    Yes, but I prefer to go back

212:14   and look at the record but I know he was

212:15   referred into the hospital because their

212:16   feeling was he was psychotic.

212:17              Actual symptoms, I have to go

212:18   back and look.  I haven't looked at that

212:19   in a bit.

212:20      Q.    You are saying that if Carl

212:21   Chatman gave a false confession, he may

212:22   have learned crime scene facts by walking

212:23   through the Daley Center, right?

212:24      A.    May have, yeah, it's possible.

212:25      Q.    How would Carl Chatman know all

213:1

213:2   of the details provided in his nine-page

213:3   handwritten statement detailing how he

213:4   raped Susan Riggio, the color of her

213:5   skirt, the type of pantyhose that she was

213:6   wearing, the use of the scissors, how

213:7   would he know that?

213:8         MS. STALF:  Objection to the

213:9      form of the question; foundation;

213:10     compound.

213:11    A.    I guess if he was guilty, he

213:12  would know it, right?

213:13    Q.    But under this hypothetical,

213:14  Ms. Riggio has not had sex with somebody

213:15  not her husband in the three days

213:16  preceding May 24th, 2002, and there is no

213:17  contamination of the DNA --

213:18    A.    Right.

213:19    Q.    -- unless Carl Chatman was

213:20  innocent, how would be know?

213:21        MR. CHESTNUT:  Objection to

213:22     form; complete hypothetical.

213:23        MS. STALF:  Join.

213:24    A.    Look, if he has a false

213:25  confession and really there are facts

214:1

214:2    that there is just no way one could have

214:3    gotten unless they got them from a

214:4    questioning officer.  And then there are

214:5    facts versus just a guess, you fill in

214:6    incidentally, adding kind of probably end

214:7    up parsing it down detail by detail.

214:8            Some of those may have been

214:9    internalized from the police officer as a

214:10   source or people who, you know, or people

214:11   processing him.  I know there is a matter

214:12   of chain of custody, what he is even in a

214:13   position to be exposed to.

214:14           I think it's safe to conclude

214:15   he doesn't have exposure to anybody in

214:16   any meaningful way to communicate about

214:17   the crime unless it was with police

214:18   officers.

214:19   Q.   So it would have to come from

214:20   police officers?

214:21   A.   Yes --

214:22           MS. STALF:  Objection to form.

214:23   A.   Yes, unless, it was just a

214:24   detail where it's fairly easy to just

214:25   sort of guess one way or the other.

215:1

215:2    The notion of somebody having

215:3 pantyhose; for example, is that a stretch

215:4 to guess?  I don't know.

215:5    I'm not trying to dismiss that

215:6 at all.  I think there are certain things

215:7 that a person may guess at, certain

215:8 points that person, may in the nature of

215:9 the questioning, maybe otherwise led to.

215:10 Q. What color was Mrs. Riggio's

215:11 skirt?

215:12 A. I don't remember.

215:13 Q. Well, take a look at your

215:14 report.

215:15    [Witness complying.]

215:16 A. On page -- it's not in here.

215:17 Q. The victim's shirt was

215:18 burgundy.

215:19 A. Okay, that sounds familiar.

215:20 Q. Do you think that Carl Chatman

215:21 guessed that the color of victim's shirt

215:22 was burgundy?

215:23 A. That's not your typical color

215:24 pallet, but he didn't have the -- we

215:25 didn't record his statements, right, and

216:1

216:2    they got written up later.  He could have

216:3    said something like dark red or something

216:4    like that and it got written as burgundy

216:5    in the statement that police provided so

216:6    whether he used the word burgundy or

216:7    something else, you know, I don't know.

216:8            In terms of just knowing enough

216:9    about him to know whether burgundy is

216:10   part of his color pallet, I don't know.

216:11   Q.    Well, you know he's a 48-year

216:12   homeless person with schizophrenia.

216:13   A.    Yeah, I know there are homeless

216:14   people with schizophrenia that have been

216:15   professors of art.

216:16   Q.    And Carl Chatman was not a --

216:17   A.    I'm trying to say the mere fact

216:18   that he is homeless or the reality that

216:19   he's homeless and mentally ill, it

216:20   doesn't speak to what he may have been

216:21   exposed to or had an interest in at an

216:22   earlier time.

216:23   Q.    According to the police, what

216:24   color did Carl Chatman initially say the

216:25   color of the victim's skirt was, do you

217:1

217:2      know?

217:3          A.    I don't know.

217:4          Q.    You never looked at them?

217:5          A.    I did but I just don't

217:6      remember.

217:7          Q.    Would it have been relevant to

217:8      your inquiry if Carl Chatman's

217:9      description of the color of skirt changed

217:10     to match the crime scene photos?

217:11         A.    I think that if I was in a

217:12     position to have to entertain his

217:13     changing over the course of questioning

217:14     and it's a false confession scenario and

217:15     he has specific details which could not

217:16     have come from contamination because

217:17     nobody, I'm assuming nobody, was in a

217:18     position to show him the dress.  That is

217:19     was an artifact of the questioning,

217:20     something that originated with the

217:21     officers or just the way they were

217:22     questioning.

217:23            There are a range of ways in

217:24     which that can happen.  Certainly it's

217:25     realistic to consider that idea strongly.

218:1

218:2        Q.    When you say "that idea," you

218:3   mean the idea that details of the crime

218:4   were provided to Carl Chatman by the

218:5   police?

218:6        A.    No.  Details were exposed to

218:7   him.  Provided is another thing.

218:8             Somebody can be sitting down

218:9   with him, I'm looking at this beautiful

218:10  burgundy dress and there is a tear in it.

218:11  Can you please tell me how it got there?

218:12            Now, that may be someone who is

218:13  just flippant or somebody who is just

218:14  confrontational or someone who, you know,

218:15  using that as an example how something

218:16  like that can come out and the person is

218:17  speaking to an idea incidentally, and

218:18  then, of course, as you were also

218:19  presenting as a possibility the idea that

218:20  someone speaks to him in the form of

218:21  questioning in a way where some people

218:22  are less caviler but, you know, clearly

218:23  asking questions that incorporate details

218:24  that if he internalizes this, nobody

218:25  should be shocked downstream.

219:1

219:2    Q.   You read the depositions of

219:3   each of Mr. Chatman's interrogators,

219:4   right?

219:5    A.   I don't know that I read all of

219:6   them.  I certainly read some of them.

219:7    Q.   Well, you read Boock, right?

219:8    A.   Yes.

219:9    Q.   Roberts?

219:10    A.   Yes.

219:11    Q.   Holmes?  I hope you read

219:12   Holmes.

219:13    A.   I don't know that I have Holmes

219:14   in here.  I don't see I have Holmes, I

219:15   have Roberts, Boock.  I didn't read --

219:16   why am I blanking on her name?

219:17    Q.   Mischka?

219:18    A.   Yes, I read some.  I didn't

219:19   real all.

219:20    Q.   Mischka didn't remember

219:21   anything.

219:22       But I will tell you that in the

219:23   depositions of the interrogators that you

219:24   did read, I was the questioner on all of

219:25   them.  You have to read a lot of

220:1

220:2   questions --

220:3      A.   I know.

220:4      Q.   -- a lot of transcripts with

220:5   lots of lines of questions and they each

220:6   kind of get redundant in the police

220:7   officer depositions, right?

220:8      A.   Not at all.  Your questions are

220:9   very interesting.  You are obviously very

220:10   good at what you do, so....

220:11      Q.   Do you recall that each of the

220:12   police officers whose testimony you did

220:13   read testified they were trained and they

220:14   were not to leak nonpublic crime scene

220:15   facts to the suspects for fear of

220:16   contamination?

220:17      A.   Yes.

220:18      Q.   And that each one of those

220:19   detectives conformed to the practice and

220:20   training of not leaking crime scene facts

220:21   to the suspect?

220:22      A.   Correct.

220:23      Q.   Is it your belief that

220:24   notwithstanding their testimony, those

220:25   police officers providing this question

221:1

221:2    that Carl Chatman is indeed innocent

221:3    because Ms. Riggio didn't have sex with

221:4    somebody the three days before May 24 and

221:5    there is no contamination to the DNA that

221:6    those officers actually provided details

221:7    of the crime scene to Mr. Chatman?

221:8          MS. STALF:  Objection, form;

221:9      foundation; complete hypothetical.

221:10      A.    I don't know.  I just don't

221:11   know.  I think even in recapping, I have,

221:12   and you know this already, but just to

221:13   say this for the record, I have been very

221:14   consistent and open in my support of

221:15   videotaping not only interrogations but

221:16   also in psychiatric exams because we have

221:17   something in common with officers that,

221:18   of course, social psychologists and

221:19   researchers can't relate to, that is the

221:20   interview of an examinee especially when

221:21   you sit down, the very reason you are

221:22   videotaping our discussion today.  Why

221:23   are we being videotaped, you and I?

221:24   Because it's what was said, how it was

221:25   said.

222:1

222:2          The idea when you summarize you

222:3    may even summarize it accurately, but

222:4    you're always going to miss something.

222:5    Even if great notes are taken, there is

222:6    always something one doesn't catch.

222:7          To presuppose, for any officer

222:8    to presuppose, that they can account for

222:9    everything they said and everything they

222:10   did in an interview, unless there is

222:11   actual record, I couldn't do that in my

222:12   interviews so why would I expect it of

222:13   another person.

222:14          And so I don't know they can

222:15   necessarily account for everything they

222:16   did in an interview even with good

222:17   intentions.

222:18          I try, just as a reference

222:19   point, I try to be ethical, professional.

222:20   There are things I wouldn't do in an

222:21   interview, sitting with someone for

222:22   hours, hours, hours, and hours on end and

222:23   then I may sit back and reflect on the

222:24   interview and think that nothing

222:25   happened, but I will sit and watch a

223:1

223:2    videotape of an interview and sort of

223:3    cringe, did I really do that or did I say

223:4    that?

223:5            I think even in the realm of

223:6    possibilities even for people that aspire

223:7    to be professional as possible, if they

223:8    don't have a videotape record of what

223:9    they have done, they can't necessarily

223:10   account for what they've done.

223:11           They can express their

223:12   intensions but they can't necessarily

223:13   account for their actions.

223:14   Q.    Sir, turn to page 28 of Exhibit

223:15   1, if you would.

223:16           [Witness complying.]

223:17   Q.    Do you see the second paragraph

223:18   there, "ASA Holmes was not familiar with

223:19   the precise layout of the alleged crime

223:20   scene nor were other officers who

223:21   accompanied them into the building."

223:22           Do you see that, sir?

223:23   A.    I do.

223:24   Q.    So you didn't read Mr. Holmes'

223:25   deposition that he used to work in the

224:1

224:2     Daley Center for two years and everyday

224:3     for two years when he went to work, he

224:4     would go to the Daley Center, ride the

224:5     elevator up to go to his office.

224:6              You were not aware of that?

224:7              MS. STALF:  Objection to form of

224:8         the question; misstates facts in

224:9         evidence.

224:10     A.    I'm not aware of that.

224:11     Q.    Now that you know --

224:12     A.    What floor did he work on?

224:13     Q.    I don't recall the exact floor,

224:14    sir.

224:15             Now that you know Mr. Holmes

224:16    used to work at the Daley Center, would

224:17    that cause you to change at all the

224:18    sentence that I just read to you about

224:19    ASA Holmes was not familiar with the

224:20    precise layout of the alleged crime scene

224:21    --

224:22     A.    I -- I'm sorry.

224:23             MS. STALF:  Objection, form,

224:24        foundation; misstate facts in

224:25        evidence.

225:1

225:2      A.   I need to know where he worked.

225:3  Did he work in that courtroom?  Did he

225:4  work in that -- I am familiar with the

225:5  space that we have been in today, but I

225:6  don't know what goes on down the hall.

225:7  They may have a nightclub down there, no

225:8  idea.

225:9        So this is referencing

225:10  something that happened on the 21st

225:11  floor.  There is the sixth floor

225:12  bathroom, and -- but, principally, the

225:13  21st floor, the courtroom, the benches,

225:14  the judge's, her office.  These are very

225:15  specific locations.

225:16        Without some reference point

225:17  where he was working and what his

225:18  movements were, it's hard for me to say.

225:19  I just don't know.

225:20      Q.   Why did you --

225:21      A.   I certainly wouldn't change

225:22  that.

225:23      Q.   Why did you write that ASA

225:24  Holmes was not familiar with the precise

225:25  layout of alleged crime scene?

226:1

226:2     A.    I don't know.  I derived it

226:3   from somewhere.  I can't tell you

226:4   specifically where I got that but that's

226:5   where I derived it.

226:6     Q.    But not from Mr. Holmes'

226:7   deposition testimony?

226:8     A.    I don't think so.  I don't know

226:9   that I read it.

226:10    Q.    Why did you read Sergeant

226:11  Walsh's testimony instead of Mr. Holmes'

226:12  testimony?

226:13         MS. STALF:  Objection to the

226:14      form of the question.

226:15    A.    I'm not sure.  I think if I

226:16  remember, Lieutenant Walsh was one of the

226:17  officers who was with him in the -- when

226:18  they did the walk-through; is that

226:19  correct?

226:20    Q.    Yes.

226:21    A.    I think I just sort of wanted

226:22  to get a sense of what transpired with

226:23  that whole walk-through.  I wasn't

226:24  really -- I was intrigued with his mental

226:25  state at the walk-through, where did they

227:1

227:2    go, they couldn't get in at first, that

227:3    kind of thing; that's what attracted me.

227:4            I mentioned earlier I had a

227:5    large number of sources in my process and

227:6    I also asked for additional materials

227:7    which then sent based on initial

227:8    review, can you please send this, please

227:9    sent this; and following it down that

227:10   rabbit hole.

227:11           And at some point in that

227:12   process, I had an interest in what went

227:13   on with the walk-throughout and felt

227:14   Walsh would be informing that day.

227:15     Q.   So you were asked to review the

227:16   circumstances of a confession provided by

227:17   Mr. Chatman, right?

227:18     A.   Yeah.  I was also asked to

227:19   review Dr. Russano's report.  Dr. Russano

227:20   gave some attention to that.  I thought,

227:21   okay, let me try to understand this

227:22   better.  I understand what she is saying

227:23   about it, let me get a feel for what that

227:24   was all about.

227:25     Q.   But you didn't think it was

228:1

228:2    necessary to read the deposition of

228:3    person who took Mr. Chatman's written

228:4    confession?

228:5          MS. STALF:  Objection to form;

228:6      foundation.

228:7      A.   No.  I didn't say that at all.

228:8    I said I had a bunch of materials and I

228:9    got through them as fast as I could.  I

228:10   didn't express an opinion about ASA

228:11   Holmes because I wasn't exposed to that

228:12   so I don't have an opinion what I'm not

228:13   exposed to.

228:14        If I had a little more time, I,

228:15   in all likelihood, I would have gotten

228:16   around to read his deposition.

228:17        Certainly, it is always

228:18   important to learn from all the people

228:19   involved.

228:20        I consumed the materials as

228:21   quickly as I could and if there were

228:22   areas here that I did not feel I had a

228:23   sufficient amount of information to offer

228:24   an opinion on, we already covered Ms.

228:25   Riggio and whether she had an

229:1

229:2    extramarital affair or not, I didn't ever

229:3    address them in my report.

229:4            Look, I missed your brilliant

229:5    deposition question, imagine that.  I

229:6    just sort of followed it through and

229:7    there are other materials that are

229:8    available for me to continue to review

229:9    including that deposition including, I'm

229:10   sure, a number of other materials.

229:11       Q.    You didn't read the trial?

229:12            MS. STALF:  Objection to the

229:13       form of the question.

229:14       A.    I did read the trial.

229:15       Q.    You did?  Sorry.

229:16       A.    I did.

229:17       Q.    Let me direct your attention to

229:18   still on Exhibit 1, page 23.

229:19            You write, "Mr. Chatman

229:20   resisted investigators' early

229:21   confrontations and accusations of him."

229:22            Do you see that?

229:23       A.    Yes.

229:24       Q.    "Only once he was confronted

229:25   having been identified by the victim and

230:1

230:2   Ms. Riggio having detailed her encounter

230:3   and his alibi having being unsupported

230:4   that Mr. Chatman confessed."

230:5           Do you see that there, sir?

230:6       A.   Yes.

230:7       Q.   Now, it's your understanding

230:8   that Mr. Chatman according to the

230:9   Defendants confessed initially to whom?

230:10      A.   To, for all intents and

230:11  purposes, Roberts.

230:12      Q.   Why do you say for all intents

230:13  and --

230:14      A.   Because that is what he really

230:15  elaborated and he made self-incriminating

230:16  statements.  From what I reviewed, it

230:17  didn't sound they weren't taken that

230:18  seriously.

230:19      Q.   Sarcastic comments.

230:20      A.   Yeah, he curtly said, If that's

230:21  what she said, that is what I did."

230:22           It wasn't clear to me that was

230:23  sufficient for them to -- they

230:24  interpreted it as sarcastic, Roberts.

230:25      Q.   So the confession was first

231:1

231:2  provided to Roberts?

231:3  A.  Yes, sir.

231:4  Q.  And according to you, it was

231:5  only after Mr. Roberts confronts or

231:6  Detective Roberts confronts Mr. Chatman

231:7  with having been identified by the victim

231:8  and Ms. Riggio having detailed her

231:9  encounter and his alibi having been

231:10  unsupported that Mr. Chatman confessed?

231:11  A.  No, not what I wrote, not my

231:12  opinion.  The account of Roberts was he

231:13  really didn't do much of anything at all,

231:14  just like let me have a cigarette and

231:15  his -- but, look, it was coming on the

231:16  heels of earlier questioning in which

231:17  these circumstances had taken place that

231:18  he was confronted and this information

231:19  was presented to him and so there was a

231:20  certain gap of time.  He had an

231:21  opportunity to think.  It wasn't

231:22  particularly long but the confronting

231:23  happened in earlier questioning and my

231:24  takeaway from Roberts is that Roberts

231:25  elicited a self-incriminating statement

232:1

232:2    without going through the exercise that

232:3    the earlier questioners had done when

232:4    they confronted him with this material.

232:5            So they confronted him with

232:6    these materials, he was curt, perhaps

232:7    sarcastic, not particularly forthcoming.

232:8            And there is a little break.

232:9    Roberts go in.  The length of their

232:10   discussion or exchange, I have to go back

232:11   at look at it.

232:12           My impression was Roberts

232:13   fairly quickly was able to engage him in

232:14   a more elaborate self-incriminating

232:15   statement.

232:16      Q.    You referenced there was a

232:17   witness that indicated sometimes you

232:18   could understand Mr. Chatman and

232:19   sometimes you couldn't?

232:20      A.    Um, yes.

232:21           Let me be really precise in

232:22   wording because that was Charles Roe

232:23   [phonetic], sometimes he can understand

232:24   him, sometimes he couldn't.

232:25           That was Charles Roe who was

233:1

233:2    part of that group that accompanied him

233:3    to the Daley Center, page 28.

233:4         Q.    You thought that Carl Chatman

233:5    wouldn't have trouble communicating with

233:6    the detectives but perhaps the detectives

233:7    would have trouble understanding Mr.

233:8    Chatman; is that what you're saying?

233:9         A.    No.    I think understanding him,

233:10   they might be able to understand him, but

233:11   they might not necessarily -- understand

233:12   him fine, might not necessarily sort out

233:13   where he was lucid from when he wasn't

233:14   lucid.

233:15        You know, for example,

233:16   something that emerged in his deposition

233:17   was that he never peed in a cup, yet he

233:18   said, "I peed in a cup" in others so....

233:19        I don't think that the

233:20   investigators said, well, he is

233:21   delusional, so he says he peed in a cup.

233:22        No, they took it a face value

233:23   and went looking.   They went looking for

233:24   pee in a cup.

233:25        That's kind of their -- they

234:1

234:2     didn't have the ability to discern, you

234:3     know, what was rational and what was

234:4     either a loose association because pee in

234:5     a cup falls on the heels of her peeing on

234:6     the desk.  That is an idiosyncratic

234:7     association at least from a psychiatric

234:8     standpoint.  It doesn't come out of thin

234:9     air, the discussion about her urinating,

234:10    he urinated too.  They don't have that

234:11    discernment.

234:12            Even then you get a bunch of

234:13    psychiatrists who say, oh, he says, I

234:14    didn't pee in a cup, what was that?

234:15            Some may just say that is frank

234:16    incoherence.  Some may say loose

234:17    association, so that is an arguable point

234:18    even among mental health professionals.

234:19            So I would never anticipate

234:20    investigators to go there with that level

234:21    of filleting.  Well, okay, he is with it,

234:22    no, he is kind of fading out.  That is

234:23    suggested by Mr. Roe saying sometimes he

234:24    can understand him and sometimes he

234:25    can't.

235:1

235:2            To understand what he is

235:3    referring to, I would need to know more.

235:4            There isn't anything I have

235:5    been exposed to in Mr. Chatman's

235:6    assessments that suggested that he had

235:7    some vocalization problem.  It was more

235:8    those things that he was saying while

235:9    they can understand him, his style of

235:10   communication was such that was

235:11   irrational what he was saying, so,

235:12   therefore, they were concerned that it

235:13   was reflected of psychosis, whether it be

235:14   loose association or flight of ideas.

235:15           You can understand it but it

235:16   doesn't make sense.  You can understand

235:17   it.  He is not speaking Spanish to a

235:18   person that doesn't speak Spanish or he

235:19   is not speaking word salad which is

235:20   something I can tell you I have examined

235:21   in fact in a forensic case.

235:22           I have examined someone who

235:23   literally was communicating with what

235:24   someone call word salad.  Couldn't

235:25   understand him.  Speaking English but it

236:1

236:2    was literally incoherent.

236:3           I'm not seeing that from his

236:4    communication that it ventures into

236:5    incoherence.

236:6       Q.    So when somebody presents with

236:7    flight of ideas or looseness of

236:8    association, to a layperson receiving

236:9    that speech, they may have a reaction

236:10   similar to Charles Roe's where sometimes

236:11   it make sense, sometimes he doesn't,

236:12   sometimes you understand him and

236:13   sometimes you I can't understand him; is

236:14   that right?

236:15          MS. STALF:  Objection to form.

236:16      A.    Yes and no.  When I was reading

236:17   Roe, I find myself reference his

236:18   deposition the way Mr. Chatman presented

236:19   the deposition, there were times that he

236:20   said things that made sense and there

236:21   were other times he was making

236:22   idiosyncratic associations.

236:23      Q.    Who are you referring to now?

236:24      A.    Chatman.  That's a vivid

236:25   illustration of his communication style.

237:1

237:2        You can understand him but

237:3    sometimes he said, huh, what are you try

237:4    to say?  It's not clear to me what you

237:5    are trying to say.  Sometimes perfectly

237:6    clear what he was trying to say.

237:7        I didn't see flight of ideas in

237:8    there in such a way that was -- that a

237:9    person could not understand.

237:10        I saw some loose associations

237:11   in his deposition, sometimes

237:12   conspicuously.

237:13        And, so, as I read Roe, that is

237:14   what I was thinking of.  I said, okay,

237:15   well, this is what I see from the

237:16   deposition.  I get it.

237:17        But that was my interpretation

237:18   without more from Mr. Roe saying that

237:19   sometimes you can understand him and

237:20   sometimes you can't.

237:21        Which, as someone who worked in

237:22   an acute emergency room and forensic

237:23   hospital where people get referred

237:24   pretrial, I have seen.

237:25        Somebody comes into custody,

238:1

238:2    it's clear they have loose associations.

238:3    They get referred to a psychiatric

238:4    hospital, say, look, let's tighten up his

238:5    meds because he was experiencing some

238:6    symptoms of psychosis.

238:7        Q.    You mentioned the police went

238:8    looking for a cup.  Who went looking for

238:9    a cup?

238:10       A.    Who, I can't tell you

238:11   specifically.  What I recall from

238:12   reviewing the records, is there was an

238:13   effort to try to find what wastebasket he

238:14   would have discarded this cup into.  I

238:15   just can reference where it appears.

238:16       Q.    I think you are referring to my

238:17   question of detectives asking them did

238:18   anybody ask Carl in which wastebasket he

238:19   deposited the cup?

238:20       A.    I don't know.  I would like to

238:21   credit your questioning.  I can't.

238:22            I don't think that I'm

238:23   confusing it with the testimony of

238:24   somebody who says they went through the

238:25   building.  There was a time they thought

239:1

239:2    he was sleeping there.

239:3            I think someone specifically

239:4    said that they looked for the cup,

239:5    whether it was the wastebasket or I'm

239:6    drawing this from your question, I'm not

239:7    sure.

239:8            They didn't find one.  That was

239:9    my takeaway and the takeaway that Dr.

239:10   Russano cited, and I didn't find anything

239:11   to the contrary.

239:12   Q.    For purposes of your report,

239:13   please answer this however makes sense.

239:14   Please answer in a way that make sense to

239:15   you and tell me if I was going wrong.

239:16           Lay people communicating with

239:17   Carl Chatman on May 24, May 25, 2002,

239:18   during his interrogation would be able to

239:19   tell sometimes he was making sense and

239:20   sometimes he wasn't making sense and so

239:21   they may have to ask follow-up questions

239:22   to try to decipher what it was he was

239:23   trying to communicate with them.

239:24           Is that a fair representation

239:25   of the working hypothesis of how the

240:1

240:2     interactions went on between Mr. Chatman

240:3     and --

240:4          A.     Almost.

240:5               MS. STALF:  Objection to form,

240:6          foundation.

240:7          A.     Almost.  I think the one

240:8     allowance that I have to make when Mr.

240:9     Roe encountered him was the middle of the

240:10    night.  It's not clear to me how he would

240:11    have even been evolving because if he did

240:12    offer self-incriminating statements to

240:13    Roberts at say ten o'clock and he was

240:14    aware he was in a heap of trouble because

240:15    he was confessing to rape, he was being

240:16    held accountable, whether at some point

240:17    he unravelled to a greater degree at a

240:18    later point more which manifested at a

240:19    time when somebody may be a little more

240:20    worn out at two in the morning.

240:21               It was hard for me to be able

240:22    to graft the quality of the communication

240:23    at 2 a.m. or 3 a.m. and graft that to,

240:24    you know, 8:30 a.m., midday, 1:30 in the

240:25    afternoon when the detectives are

241:1

241:2     questioning, in the early evening, I

241:3     can't graft.

241:4          And that is not only reflective

241:5     of just clinical experience but also just

241:6     reflective of experience that I had

241:7     sometimes dramatic of what happens when a

241:8     person's communication changes and they

241:9     destabilize after they have been

241:10    implicated in a major crime.

241:11        Q.    So Charles Roe interacted with

241:12    Carl Chatman during the walk-through,

241:13    that was his frame of reference?

241:14        A.    Yes.

241:15        Q.    So would you then agree that

241:16    well, I don't want to put any words in

241:17    your mouth.  I would rather hear it from

241:18    you.

241:19          My summary, my takeaway from

241:20    what you said is that a layperson

241:21    interacting with Mr. Chatman during the

241:22    walk-through would sometimes be able to

241:23    understand him, sometimes not be able to

241:24    understand him, may have to ask follow-up

241:25    questions when they didn't understand him

242:1

242:2    to elicit what Mr. Chatman was trying to

242:3    communicate; is that --

242:4            MS. STALF:  Objection, form;

242:5        foundation.

242:6        A.    I think it's fair.

242:7        Q.    You read the testimony of

242:8    Sergeant Walsh and Detective Boock and

242:9    Detective Roberts that they had zero

242:10    problems communicating with Mr. Chatman

242:11    whatsoever, right?

242:12        A.    Yes.

242:13        Q.    So are you discounting their

242:14    testimony, are you saying they are wrong?

242:15        A.    No, because I don't know the

242:16    nature of their questions.

242:17            They may have been -- there are

242:18    a variety of possibilities.  I just

242:19    mentioned one with my earlier answer that

242:20    he deteriorated, that fatigue had some

242:21    impact on the -- how intact he was at a

242:22    later point.

242:23            But it's also possible even

242:24    stripping all of that away, and his

242:25    response, his responses with them may

243:1

243:2    have been more terse.  They may have been

243:3    satisfied because he wasn't expressing

243:4    himself especially in great content that

243:5    he was able to communicate with them in a

243:6    way that makes sense.

243:7         That was quite common to the

243:8    experience of interacting or interviewing

243:9    people that are psychotic.  Some of them

243:10   it's right out there.  They're

243:11   disorganized.  They have loose

243:12   association or flight of ideas and that

243:13   emerges very quickly in communication.

243:14        Some of them you have to talk

243:15   with them for a while or you have to get

243:16   them talking.

243:17        The more they speak the more as

243:18   you find you listen to them, what was

243:19   that about?  And then it happens again

243:20   and then you say, this is more just this

243:21   person saying something, I'm not sure

243:22   what to make of it but this person is

243:23   doing it from time to time and saying

243:24   things that this didn't add up, that

243:25   didn't add up, and the other didn't add

244:1

244:2    up, and now we've been sitting with them

244:3    for an hour maybe.  He doesn't add up.

244:4            I don't mean legitimacy but I

244:5    mean he doesn't add up.  There may be

244:6    something wrong with him.

244:7            So as it relates to

244:8    communication, it's not only very

244:9    different among people, but it may be

244:10   different over time in the same person

244:11   and it may actually speak to the nature

244:12   of interaction, and it can be camouflaged

244:13   if they're asking him questions and he's

244:14   brief answers and they just move onto the

244:15   next question and they go through their

244:16   progressions for however long they go

244:17   through it.

244:18       Q.   So you know that Roberts

244:19   interacted with Mr. Chatman at 10 p.m.?

244:20       A.   Yes.

244:21       Q.   He also interacted with Mr.

244:22   Chatman during the walk-through from 2 to

244:23   4 a.m.?

244:24       A.   Yes.

244:25       Q.   He also interacted with Mr.

245:1

245:2    Chatman from nine o'clock on to the end

245:3    of his written statement at the end at

245:4    10:50 a.m.?

245:5        A.    Yes.

245:6        Q.    And according to Detective

245:7    Roberts, Mr. Chatman was just asked

245:8    open-ended questions and allowed to give

245:9    a narrative as to what happened between

245:10   him and Ms. Riggio on May 24th, 2002?

245:11       A.    Yes.

245:12       Q.    Knowing those facts, does that

245:13   change your prior answers in any way?

245:14       A.    Not really.  What I also

245:15   testified to before my impression is they

245:16   basically took what he was saying at face

245:17   value.

245:18           The example, there may be

245:19   others, it just comes to mind, was the

245:20   whole pee in a cup thing.

245:21           He said he peed in a cup and

245:22   they took it at face value along with

245:23   everything else.  At some later point he

245:24   said, "I never peed in a cup."

245:25           That is an example of something

246:1

246:2    someone listening critically would say,

246:3    how does that fit into anything, what

246:4    reason does he have to pee in a cup at a

246:5    crime scene?  He is not giving a specimen

246:6    for drug testing, right?  It doesn't fit

246:7    in.  It's a non sequitur.

246:8              So one might say is that

246:9    indicative of a loose association if one

246:10   is looking at that critically?

246:11             I don't see that level of

246:12   critical thinking being applied in there.

246:13   Just basically kind of taking it and

246:14   taking it at face value and pouring it

246:15   into whatever statement was prepared.

246:16      Q.    When Carl Chatman was deposed,

246:17   he said he didn't have anything to do

246:18   with the sexual assault, right?

246:19      A.    That's correct.

246:20      Q.    So when is it that you are

246:21   saying he later said he never peed in the

246:22   cup?

246:23      A.    At the deposition.

246:24      Q.    When he was saying I didn't

246:25   have anything to do with the crime at

247:1

247:2   all?

247:3        A.    That's right.   That's right.

247:4        Q.    Let's ponder this a little bit.

247:5             What possible relevance does it

247:6   have if Carl Chatman is saying in 2015

247:7   that he never urinated in a cup along

247:8   with never raping anybody?

247:9        A.    Well, let me explain this:   He

247:10  is questioned in a sexual assault

247:11  investigation which is centered around a

247:12  sexual assault; giving a statement

247:13  relating to the events of the sexual

247:14  assault.

247:15            It would be impossible -- this

247:16  is responsive to your question.

247:17            It would be impossible for a

247:18  listener taking this in to experience

247:19  that as a loose association or flight of

247:20  ideas or some measure of psychotic

247:21  communication.   Psychotic communications

247:22  manifest as loose associations.

247:23            What I saw in the officers'

247:24  recapitulation of all of this was that

247:25  they included it without reflecting on

248:1

248:2　　this idea of peeing in the cup is a non

248:3　　sequitur.  It's something that is

248:4　　reserved for when one gives a specimen or

248:5　　goes to a walk-in center but what is it

248:6　　doing in the middle of this story?  It's

248:7　　disconnected.  What does that say about

248:8　　the speaker?

248:9　　　　　　And I didn't see them honing in

248:10　　on that and saying, that is very strange,

248:11　　that is very peculiar.  And it is

248:12　　peculiar.

248:13　　　　　　And I didn't see them

248:14　　considering that may be this was a loose

248:15　　association by a psychotic person.

248:16　　　　　　What I saw was, they were

248:17　　basically saying, yeah, I understood him.

248:18　　I kind of took what he had to say and I

248:19　　wrote it down or I made up a statement

248:20　　from it and that was in a very

248:21　　matter-of-fact way without considering

248:22　　there were certain elements of what he

248:23　　was saying that were they to really drill

248:24　　down on them, they would have to consider

248:25　　that they were non sequiturs and

249:1

249:2    therefore wonder whether they are

249:3    reflective of psychotic thinking.

249:4             Now, I hear what you are saying

249:5    about the idea, if no sexual assault ever

249:6    occurred.  I wasn't there, of course, I

249:7    wouldn't pee in a cup.

249:8             That's really not what I'm not

249:9    speaking to.  I'm not speaking to the

249:10   idea whether he was honest or dishonest.

249:11            What I'm saying is in a

249:12   statement that they are talking about a

249:13   sex assault in which a person is

249:14   discussing a sex assault.  The idea of

249:15   loose association or flight of ideas is

249:16   irrelevant because the statement itself

249:17   is of an irrelevant topic, irrespective

249:18   of guilt or innocence.  It's an

249:19   irrelevant topic.  We're talking about

249:20   the sex assault.

249:21            He's talking about a sex

249:22   assault and his movements during that,

249:23   but the pee in the cup segment is a non

249:24   sequitur.  It doesn't have any connection

249:25   to it.

250:1

250:2                 Let's assume it happen, then it

250:3     of itself, would be bizarre.  It would be

250:4     bizarre, and so it was not separated, it

250:5     was not set off at some odd quality of

250:6     the statement.  It was just connected

250:7     just as everything else.

250:8                 And so that's consistent to me

250:9     with the officers saying, I didn't have

250:10    any problem understanding him.  We had

250:11    this discussion.  This is what my

250:12    takeaway is and they put it in.

250:13                That's how I'm trying to answer

250:14    your question.

250:15    Q.    If the perpetrator really did

250:16    pee in a cup at the crime scene, that

250:17    would be hugely relevant, right?

250:18    A.    It might be.  It might also be

250:19    reflective of psychosis because it's

250:20    strange.  Of course it's relevant.

250:21    Q.    You may have his fingerprints

250:22    on the cup?

250:23    A.    Well, if there is pee in the

250:24    cup, there, right, would you ever get to

250:25    the fingerprints?

251:1

251:2      Q.    So it might have his pee, it

251:3  might have DNA?

251:4      A.    Yes.

251:5      Q.    So you would expect that the

251:6  police detectives would do what they

251:7  could to try to recover it?

251:8      A.    Perhaps.

251:9      Q.    What do you mean perhaps?

251:10     A.    I'm not an expert in police

251:11  procedure.  You're asking me to answer

251:12  questions about police procedure.

251:13        They were collecting

251:14  fingerprints.  They were collecting this,

251:15  they were collecting that, and they were

251:16  pursuing and exploring.

251:17        It's what they like to say

251:18  about us when we do our work.  What is

251:19  the most important question that you ask

251:20  the examinee, the one you forgot to ask;

251:21  and that is the nature of the question

251:22  that you are posing to me.

251:23        What is the most important

251:24  evidence they could have collected?  The

251:25  one that they forget to collect.

252:1

252:2        I can't speak to police

252:3   procedure.  That's not what I'm here for.

252:4        What I'm only addressing in the

252:5   questions is the relationship as a

252:6   statement as a progression of thought of

252:7   peeing in a cup is with the rest of the

252:8   statement, that is all that my expertise

252:9   interdigitates with and not the idea of,

252:10  gee, should they have gone looking for

252:11  hair?  And, yeah, they went for looking

252:12  for fingerprints on this part of the

252:13  desk.  Why didn't they check this part of

252:14  the desk?  That is for the crime scene

252:15  analyst to deal with.

252:16        Whether they looked in enough

252:17  garbage cans, that's something that I

252:18  don't have expertise to address.

252:19   Q.    You have gone on for days in

252:20  different depositions about your

252:21  expertise in doing forensic examinations

252:22  of this kind.

252:23   A.    What, collecting urine cups?

252:24   Q.    No, sir.  Reviewing the

252:25  records, looking at the evidence to

253:1

253:2    determine whether somebody's given a

253:3    false confession.

253:4           And based on your experience,

253:5    sir, would you expect that the detectives

253:6    would try to find the cup that the

253:7    perpetrator of a sexual assault had

253:8    touched and peed in?

253:9           MS. STALF:  Objection, form;

253:10     foundation; asked and answered.

253:11    A.   Well, since you reviewed the

253:12    testimony which you say that I have gone

253:13    on for days, I would appreciate it if you

253:14    could point to me one example where I say

253:15    I looked at all that kind of evidence to

253:16    see if somebody's given a false

253:17    confession or not because I don't recall

253:18    that I've been involved in cases where I

253:19    was asked to go figure out whether a

253:20    confession is false.  It's not my role.

253:21    It wasn't even my role in this case.

253:22           I don't know that incapsulates

253:23    my previous testimony, whether it's been

253:24    for days or two seconds.  So where did I

253:25    do that?

254:1

254:2      Q.   So you have no expertise in

254:3  determining whether -- you agree you have

254:4  no expertise in determining whether

254:5  someone is innocent or guilty?

254:6      A.   That's not a psychiatrist's

254:7  role.  It's not a psychologist's role.

254:8  It's not a research psychologist's role.

254:9  It's not a theoretician's or polemicist's

254:10  role and it's not the role of the five

254:11  folks that call themselves a community's

254:12  role.

254:13        It's nobody role.  It's a hard

254:14  evidence determination.  That is where it

254:15  comes from.

254:16      Q.   Is it a role of a judge?

254:17      A.   Yes, judge and jury.

254:18      Q.   It's the role of the judge to

254:19  determine someone's innocence?

254:20      A.   Correct.

254:21        MR. AINSWORTH:  Let's take a

254:22      break.

254:23        THE VIDEOGRAPHER:  Going off the

254:24      record 3:26 p.m.

254:25        This is the end of disc number

255:1

255:2      5.

255:3            [Discussion held off the

255:4      record.]

255:5            [Whereupon, at 3:26 p.m., a

255:6      recess was taken.]

255:7            [Whereupon, at 3:40 p.m., the

255:8      testimony continued.]

255:9            THE VIDEOGRAPHER:  Return to the

255:10      record 3:40 p.m.

255:11            The beginning of disc number 6.

255:12      Q.   On page 7 paragraph 4 on that

255:13    page says, "Mr. Chatman was tried,

255:14    convicted, and sentenced to 30 years in

255:15    prison.  The appeal of his conviction was

255:16    denied."

255:17           And then you write, "Mrs.

255:18    Riggio later filed a personal injury suit

255:19    against the building in connection with

255:20    the effects of the incident on her."

255:21           Why did you say Ms. Riggio

255:22    later filed a personal injury suit?

255:23    A.   Because she filed a personal

255:24    injury suit.

255:25    Q.   That was after the conviction?

256:1

256:2    A.    I'm not sure.  Actually, I may

256:3  be incorrect about the timing of it, but

256:4  she did file a personal injury suit.

256:5    Q.    Are you aware she filed a

256:6  personal injury suit ten days after the

256:7  alleged sexual assault?

256:8    A.    Quite possible.  I may have

256:9  been mistaken where I positioned it.

256:10    Q.    Does the fact that somebody has

256:11  filed a personal injury lawsuit have any

256:12  significance for you as a forensic

256:13  clinician?

256:14        MS. STALF:  Objection to the

256:15      form of the question.

256:16    A.    Significance about what?

256:17    Q.    That person's credibility?

256:18    A.    Sometimes.

256:19    Q.    In what way?

256:20    A.    Because they are a motivated

256:21  litigant.

256:22    Q.    Motivated by?

256:23    A.    A person who is an active

256:24  litigant has an active motivation.

256:25    Q.    Motivated by what?

257:1

257:2      A.   It's a personal injury suit,

257:3  motivation to prevail in a personal

257:4  injury suit to prove that the building

257:5  was in some way negligent or whatever the

257:6  specifics of the assertion where.

257:7      Q.   To obtain what?

257:8      A.   To obtain compensation.

257:9      Q.   Money?

257:10     A.   Yes.  And for a rape victim,

257:11  they damn well should.  It's a

257:12  catastrophic event in a person's life.

257:13        The building may or may not be

257:14  responsible but a person certainly, as

257:15  injuries go, it's a little bit more

257:16  dramatic than a slip and fall, shall we

257:17  say.

257:18     Q.   Is being wrongfully convicted

257:19  for a false confession also a traumatic

257:20  injury?

257:21     A.   Sure, absolutely, a person who

257:22  is wrongfully convicted has been wronged.

257:23        I don't know that is the nature

257:24  of this litigation.  I know there is a

257:25  compensation fund that's set up for

258:1

258:2    someone who's been wrongfully convicted.

258:3                There isn't a de facto

258:4    compensation fund for a rape victim, so

258:5    rape victims that seek some kind of

258:6    compensation have to initiate it because

258:7    there isn't anything necessarily built in

258:8    for that.

258:9                That's isn't taking anything

258:10   away from how a wrongful conviction can

258:11   be a very painful event in a person's

258:12   life and have tremendous consequences.

258:13      Q.    On page 12 of Exhibit 1, you

258:14   have the bullet points there.

258:15      A.    Um.

258:16      Q.    What methodology did you use to

258:17   reach the opinions expressed in those

258:18   bullet points?

258:19      A.    You know, listen, I really have

258:20   tried so hard not to be hard on Dr.

258:21   Russano, and you just keep teeing it up

258:22   and this stuff is just -- to give this

258:23   consequence is like hoisting a pinata.

258:24                This is, "A college student

258:25   adopting a role play does not face the

259:1

259:2    unconscious pressures coursing through

259:3    the mind of a suspect being interrogated

259:4    for rape."

259:5           I would say there is no article

259:6    that I have ever seen in which even the

259:7    most strident police critics who write

259:8    this, would say, even captain who was

259:9    sort of the originator of all this who

259:10   would, that a suspect being interrogated

259:11   for rape, the pressures, the unconscious

259:12   pressures native to that suspect equate

259:13   with a college student in role play.

259:14          I don't know how they could get

259:15   it through peer review.  I don't know how

259:16   they respect themselves after writing

259:17   something like that.

259:18          The methodology, we are back to

259:19   Henry Lee with the badge.

259:20          Do you as an attorney believe

259:21   that the pressures on a college student

259:22   in role play equate with a suspect being

259:23   interrogated for rape?  Does anyone who

259:24   works in law enforcement, even a defense

259:25   attorney let alone a prosecutor feel that

260:1

260:2    way?  It's not native to the experience

260:3    of any professional that works in this.

260:4              A student adopting the role

260:5    play of involvement in crashing a

260:6    computer does not experience the gravity

260:7    of one confronting the consequences of

260:8    the accountability for rape.

260:9              Is someone really going to

260:10   write an article to say the consequences

260:11   that a person confronts of accountability

260:12   for rape are identical or even comparable

260:13   to a those of a person crashing a

260:14   computer?  Is anyone going to put that in

260:15   a article?  Would that ever get published

260:16   or get taken seriously?

260:17             It reminds me of what I put in

260:18   my report where I reference to Dr. Ofshe

260:19   on page 13, that is a laughable piece of

260:20   research.

260:21             If a graduate student gave me

260:22   that piece of research, I'd give the

260:23   graduate student a D and recommend they

260:24   be dropped from graduate school,

260:25   basically thrown out of the program,

261:1

261:2    basically disqualified from even being

261:3    taken seriously.

261:4              This, by the way, is coming

261:5    from someone who's been more of a

261:6    proponent to broad statements about

261:7    police methodology than anybody.  Nobody

261:8    is a more strident critic of police

261:9    procedure than Dr. Ofshe.  That is what

261:10   he says about this.

261:11             Do you really want me to run

261:12   through the other ones?

261:13      Q.    Is it fair to say, Doctor, that

261:14   you are applying common sense as your

261:15   methodology for the statements that you

261:16   made in those bullet points?

261:17      A.    Yes and no.  I think that,

261:18   obviously, if it was only common sense

261:19   than Dr. Kassin and Dr. Russano would not

261:20   actually conflate the responses from one

261:21   exercises to another.

261:22             So my conclusion is that there

261:23   is either a self-serving disconnect or

261:24   just a disconnect from lack of experience

261:25   between the research community of social

262:1

262:2    sciences where one can believe the world

262:3    is flat until one steps foot on a globe

262:4    that is round and spherical and has to

262:5    experience the real world as law

262:6    enforcement officers do, suspects do, as

262:7    attorneys do where the real world is

262:8    different for the professionals and the

262:9    participates.

262:10            Now, someone on a jury may be

262:11   devoid of such experience and so the idea

262:12   of common sense may be it is somewhere

262:13   above common sense but beyond the idea of

262:14   methodology.  There is no methodology to

262:15   equate them.  It's -- it's -- you know,

262:16   it's just useless.

262:17       Q.    Did you apply anything other

262:18   than common sense you can identify for

262:19   the record?

262:20       A.    Yeah, professional experience.

262:21   Professional experience of I was a

262:22   corrections psychiatrist examining

262:23   suspects -- I'm sorry, people who had

262:24   been arrested.

262:25            I had opportunity to interview

263:1

263:2    them about their experiences in

263:3    interrogation and custody, about the

263:4    gravity of the experience.

263:5          I have talked to people who

263:6    confessed who were familiar with -- who

263:7    were reflecting upon their decision to

263:8    confess.  Those who had regret because

263:9    they came to realize that was the only

263:10    evidence against them and those who just

263:11    simply reflected on the experience

263:12    talking about their custody.

263:13          I had the opportunity to review

263:14    disputed confession cases in which

263:15    suspects have been very expressive about

263:16    the pressure involved in the custodial

263:17    setting in which they had been accused of

263:18    something, whether they confessed or not,

263:19    but the way, whether it be a disputed

263:20    confession or not, it may be in other

263:21    cases.

263:22          In a range of forensic cases

263:23    that are presented to me for pretrial

263:24    examination, there are interrogations

263:25    that I am presented with, some of them

264:1

264:2    are recorded, some of which are not

264:3    recorded.  Some of which the suspect

264:4    confesses, some of which the suspect does

264:5    not.

264:6            But in all of those for major

264:7    crimes, the intensity of the encounter,

264:8    if it's not obvious enough to somebody

264:9    watching the interview, then just speak

264:10   to the suspect, the examinee, the

264:11   defendant about their experience of

264:12   confession.

264:13           They are certainly not going to

264:14   acquaint it with an academic exercise,

264:15   especially in this day and age in

264:16   academia where people have to have their

264:17   safe spaces all of the time.

264:18           There is experience working in

264:19   cases.  There is experience as a

264:20   clinician.  There is experience in

264:21   dealing with the research community.

264:22           Oh, she's a social

264:23   psychologist, even he says he would drop

264:24   somebody from graduate school if they

264:25   presented the piece of research to him

265:1

265:2    and tried to equate one of the two.

265:3           One thing he exactly says,

265:4    somebody thought he can simulate

265:5    interrogation by setting up an experiment

265:6    crashing, someone crashed a computer and

265:7    was told they had hit the wrong key and

265:8    when that person was, a jump ahead, that

265:9    was offered as an example of eliciting a

265:10    false confession.

265:11           It is a terribly naive,

265:12    incompetent piece of research which I

265:13    have criticized all over this country and

265:14    to the author of the work.

265:15           Look, it's in my report but I

265:16    guess my report is not into evidence, or

265:17    maybe it is.

265:18           He says, "I think that is a

265:19    silly piece of research."

265:20    Q.    You read it three times, sir.

265:21    A.    This is a separate quote.  This

265:22    is a separate quote.  He calls it

265:23    laughable.  Laughable.  Laughable.  I'm

265:24    not being hyperbolic.  He called it

265:25    laughable.

266:1

266:2                    By the way, he wasn't

266:3       testifying for the prosecutor.  He was

266:4       testifying for a defense attorney in a

266:5       confession case and still called it

266:6       laughable.

266:7                    And he says, the kind of thing

266:8       that people like you, referring to the

266:9       prosecutor, keep bringing up because it's

266:10      so stupid.  That's why I made the

266:11      reference before to the pinata.

266:12                   You know, I think, look, Dr.

266:13      Russano is an educated, very serious

266:14      professional.  I'm focussing on the

266:15      report for the serious things.

266:16                   This aspect of the presentation

266:17      is what Dr. Ofshe said and put her in a

266:18      position to be laughable when we have to

266:19      take it serious.  It's not the singular

266:20      element of this case but to focus on it

266:21      to actually heighten it for what it

266:22      really is not.

266:23         Q.    You did not have your report

266:24      peer reviewed, right?

266:25         A.    I did not.

267:1

267:2        Q.    You could have?

267:3        A.    No.  I couldn't have.  I

267:4    started work on this case very shortly

267:5    before I gave the report.

267:6              In fact, when the attorney

267:7    first approached me, I turned the case

267:8    down.  I said I don't have enough time to

267:9    work on this.

267:10              She went back and got more time

267:11    and asked if I could complete it.  I

267:12    expected to start it at X time.  And I

267:13    started it when I started it and I only

267:14    had a certain amount of time and I had

267:15    far more records than I ever expected to

267:16    read.

267:17              While peer review, I'm

267:18    certainly proud of what an efficient

267:19    process we have, there was absolutely not

267:20    enough time to be able to pull off an

267:21    interview.

267:22        Q.    You did not interview Carl

267:23    Chatman?

267:24        A.    I did not.

267:25        Q.    Did you want to interview Carl

268:1

268:2     Chatman?

268:3         A.    Sure, absolutely.

268:4         Q.    Did you make any effort to

268:5     interview Carl Chatman?

268:6         A.    I didn't.  I made it clear to

268:7     my attorney that the findings were going

268:8     to be limited because of my inability to

268:9     interview him.

268:10          There is a lot one can learn

268:11     from an interview but not interviewing

268:12     takes a number of issues off the table.

268:13     We may talk about some of them in this

268:14     deposition.

268:15          There are certain areas where I

268:16     don't have an opinion.  I can't.  I never

268:17     interviewed them.

268:18          And so I set the limitations of

268:19     the report by the virtue of that.  It's

268:20     not enough that Dr. Russano choose not to

268:21     interview, I had certain circumstances in

268:22     which that low threshold that's set is

268:23     not something I would adopt and I would

268:24     attempt to interview.  In certain

268:25     instances I asked.  In this case I didn't

269:1

269:2    ask.

269:3            When I saw what I had in the

269:4    way of records, my reaction was I'm going

269:5    to get through this the best that I can

269:6    but I don't even know that I'm going to

269:7    be able to offer an opinion on in the end

269:8    because there is so much that I have to

269:9    review in way of records so what I

269:10   offered an opinion on was on the basis of

269:11   whatever it was I reviewed and whatever

269:12   is not in here is what I didn't have time

269:13   to review.

269:14       Q.    Did you indicate in your report

269:15   you didn't interview Carl Chatman?

269:16       A.    No.  I put my sources of

269:17   information and it's abundantly clear I

269:18   did not interview him because it's not in

269:19   the sources of information.

269:20       Q.    Ms. Riggio was never given a

269:21   measure that would test her for

269:22   malingering, right?

269:23       A.    She was never given a symptom

269:24   validity assessment which actually speaks

269:25   to both issues.

270:1

270:2            One actually speaks to -- I

270:3    should say validity indicator which would

270:4    speak more to her as a historian.

270:5            Malingering refers to an actual

270:6    illness and I think what we have been

270:7    talking about is really just the accuracy

270:8    of history which is two different items.

270:9            One is whether you are

270:10   exaggerating symptoms.  The other is if

270:11   something even happened or not; in other

270:12   words, how are you affected by them.

270:13           I didn't see any evidence

270:14   certainly from Dr. Russano.  She didn't

270:15   engage her, test her, or evaluate her

270:16   that way.

270:17           I have not been provided

270:18   anything from any of the other venues in

270:19   which she has been scrutinized that speak

270:20   to that kind of testing.

270:21      Q.    So is the answer to my

270:22   question, Mrs. Riggio, was not given a

270:23   measure by anybody to test her for

270:24   malingering?

270:25      A.    I don't know.  There are

271:1

271:2    several proceedings, some of which I had

271:3    proximity to and read some depositions.

271:4            There are some records that

271:5    I've reviewed.  I certainly haven't read

271:6    all of her records.

271:7            I don't know whether somewhere

271:8    along the line testing was included in

271:9    her portfolio so my answer is what it is.

271:10    Q.    You write, "There are

271:11   well-established methodologies for

271:12   ascertaining whether a litigant is

271:13   embellishing in these types of

271:14   pathologies, including trauma, right?

271:15    A.    Yes.

271:16    Q.    And when you're talking about

271:17   methodologies, you're including

271:18   psychological testing, right?

271:19    A.    Correct.

271:20    Q.    And at least as you sit here

271:21   today, you are not aware of any

271:22   psychological testing that was performed

271:23   on Ms. Riggio for malingering?

271:24    A.    Correct.

271:25    Q.    You talk about revictimization

272:1

272:2    on page 18.

272:3        A.    Yes.

272:4        Q.    "Revictimization has been

272:5    described in the psychiatric literature

272:6    with those with PTSD.

272:7        "Those who have been previously

272:8    victimized are even described to be at

272:9    greater risk of revictimization."

272:10       Do you see that, sir?

272:11     A.    Correct.

272:12     Q.    You cite a study, right?

272:13     A.    Yes.

272:14     Q.    That study talks about how

272:15    people, victims, women who have been

272:16    sexually assaulted who have PTSD who turn

272:17    to drugs or sex or alcohol to cope are

272:18    more vulnerable to be revictimized

272:19    perhaps because they are less well able

272:20    to defend themselves when they are

272:21    incapacitated by drugs or alcohol or in

272:22    risky situations sexually.

272:23     A.    Well, that is a leap of

272:24    conclusion but that is a conclusion that

272:25    an author may make based on the data.

273:1

273:2      Q.    The author that you cite made

273:3   that conclusion?

273:4      A.    That's right.

273:5      Q.    Do you disagree with the cited

273:6   material or the material that you cited

273:7   to?

273:8      A.    No.  But what I'm suggesting is

273:9   that may not account for everything in

273:10  their findings, there may be other

273:11  explanations as well that are not

273:12  accounted.

273:13       But the point is that

273:14  victimization does happen.  There are a

273:15  variety of reasons a person may be

273:16  revictimized; for example, you talked

273:17  about the inference of alcohol and drug

273:18  abuse.

273:19       A person who is victimized and

273:20  develops postraumatic stress disorder is

273:21  more likely to be withdrawn and avoidant

273:22  and that person may choose or approach

273:23  work in such a way that they may choose

273:24  to go to work at a time when there is no

273:25  one around.

274:1

274:2          So that person is more isolated

274:3    and in certain circumstance may expose

274:4    oneself to being attacked undetected.

274:5          You may say the circumstances

274:6    are replicated but this is a fortified

274:7    building which there is a police

274:8    presence.  It's a courthouse.

274:9          So the person may unwittingly

274:10   by being present in a building at a time

274:11   there isn't a particular amount of

274:12   traffic, be exposed to someone they feel

274:13   that there won't be anybody around.

274:14         I raise this in connection with

274:15   the idea of the drugs and alcohol.  The

274:16   drug and alcohol use in response to

274:17   trauma for some it is a coping strategy,

274:18   an adjustment strategy, is an adaptation.

274:19   Some adaptations are chemical, some

274:20   behavioral.

274:21         Again, I'm not saying this to

274:22   blame a victim, what I am saying is in

274:23   this paragraph, what I'm really trying to

274:24   address is that for reasons that are not

274:25   crystally accounted for, victimization

275:1

275:2    does happen and some people may be at

275:3    increased risk.

275:4             Drug and alcohol population is

275:5    one of those but revictimization is not

275:6    limited to those who use drugs and

275:7    alcohol.

275:8     Q.   Are you saying that Ms. Riggio

275:9    was more vulnerable to being raped by a

275:10    stranger at work in 2002 because she had

275:11    supposedly been raped by a stranger at

275:12    work in 1979; is that what you're saying?

275:13            MR. CHESTNUT:  Objection to

275:14      form.

275:15     A.   What I'm saying is Ms. Riggio

275:16    is more vulnerable to being raped at an

275:17    odd hour than she would be to being raped

275:18    during rush hour when there is all kinds

275:19    of people around the courthouse.

275:20     Q.   You're saying because she was

275:21    raped in the early morning hours when

275:22    nobody else was around, that makes her

275:23    more likely to go to work at an early

275:24    morning hour when no one else is around;

275:25    it that's what you're saying?

276:1

276:2      A.    No.  What I said was because

276:3  she was raped, then that may have had an

276:4  impact with -- that may have impacted how

276:5  she related to others.  Not she was doing

276:6  something to prevent the idea of being

276:7  raped.

276:8        They are more avoidant, more

276:9  withdrawn, so they relate to their

276:10  surroundings in a different way.

276:11        That may have had something to

276:12  do with how she chose and apportioned her

276:13  work time which unwittingly would have

276:14  exposed to her to isolated circumstances

276:15  such as what occurred that morning at

276:16  7:30.

276:17      Q.    So you acknowledge there is no

276:18  record to support whatsoever for the

276:19  proposition that Ms. Riggio was going

276:20  into work early as a result of trying to

276:21  withdraw or avoid people?

276:22      A.    There may be a record, but, I'm

276:23  not basing it on that record.

276:24        All that I'm saying in this

276:25  paragraph, revictimization happens.

277:1

277:2    There is no such thing as you get raped

277:3    once and you punch a ticket and you never

277:4    get raped again as if it's chicken pox.

277:5    Life doesn't work that way.  All right.

277:6            People can be raped and they

277:7    can be raped again under certain

277:8    circumstances.

277:9            What that article acknowledges

277:10   is that people can make life choices that

277:11   they don't realize are making them

277:12   vulnerable.  There is not necessarily

277:13   some conscious reason for it.

277:14            They speak in the article about

277:15   choices that people make by virtue of

277:16   having been traumatized where the choices

277:17   themselves actually contribute to them

277:18   being revictimized.

277:19            What I'm telling you is it

277:20   doesn't necessarily account for the

277:21   universe of those who are revictimized

277:22   but people do make choices as a result of

277:23   the earlier victimization that may have

277:24   some involvement in their later

277:25   victimization.  It doesn't necessarily

278:1

278:2    have to limit itself to -- to drug and

278:3    alcohol use.

278:4         Q.    You use the analogy to flood

278:5    insurance for revictimization.

278:6              Correct me if I'm wrong, but

278:7    many people who flood one time will flood

278:8    again because there is something wrong

278:9    with their house:  It's flooded with

278:10   water, and so when it rains again, it

278:11   might flood again?

278:12        A.    Can you refer me to the page?

278:13   Oh, here we go.  It's right up above.

278:14        Q.    And so, sir, are you saying

278:15   that like a house that floods frequently

278:16   that Ms. Riggio was more at risk than

278:17   anybody else of being raped again in 2002

278:18   by virtue of the fact she was supposedly

278:19   raped in 1979?

278:20        A.    No, that's not what I'm saying.

278:21   And even with the --

278:22              MR. CHESTNUT:  I need to make an

278:23        objection.

278:24              THE WITNESS:  Sorry.

278:25              MR. CHESTNUT:  Objection to

279:1

279:2          form; calls for speculation;

279:3          foundation.

279:4          A.     That's not what I'm saying.

279:5   Even with respect to the flood insurance,

279:6   I actually wasn't referring to flaws in

279:7   the house or the construction.

279:8               If you live in certain parts of

279:9   the country and you get whacked by a

279:10  hurricane and there is flood, it is what

279:11  it is.  You have had your damage, you

279:12  have filed your claim.  You maybe that

279:13  poor sole being in that part of Louisiana

279:14  by virtue of a decision by the Army Corp

279:15  of Engineers such as what I witnessed

279:16  with my own eyes, they divert and

279:17  reconstruct the levee and it floods an

279:18  entire community for reason -- for events

279:19  that you have no control of and don't

279:20  even have anything to do with a hurricane

279:21  and you end up getting slaughtered again.

279:22               They were completely

279:23  disconnected circumstances and you can

279:24  make your home as flood proof as possible

279:25  and you wouldn't have a choice in the

280:1

280:2    matter.

280:3           You can make it as hurricane

280:4    proof and possible and you have no choice

280:5    in that matter.

280:6           That's really what I'm talking

280:7    to.  I'm talking about the idea of

280:8    dealing with rape which is the inference

280:9    otherwise made as if it's chicken pox.

280:10          You could get raped once, you

280:11    don't get raped again.  And if you get

280:12    raped again, well, that must be a

280:13    suspicious complaint.  And that's just

280:14    not true.  It's just not true.

280:15    Q.   Ms. Riggio was never diagnosed

280:16    with a concussion, right, nowhere in the

280:17    medical records was she ever diagnosed

280:18    with a concussion?

280:19    A.   I really prefer to go back into

280:20    the medical records.  I know how she

280:21    presented a few days later with the

280:22    symptoms.

280:23          And I also would be interested

280:24    to have a greater exposure to her civil

280:25    litigation to see how that was dealt

281:1

281:2     with.

281:3             I didn't have exposure to those

281:4     records.  What I saw was what she

281:5     presented with medically a few days after

281:6     this event which were symptoms that are

281:7     commonly found in a postconcussive

281:8     setting.

281:9        Q.    But no doctor examining her

281:10    said she had a concussion?

281:11       A.    I don't think so.  Again, I

281:12    don't know who examined her in the

281:13    context of her civil litigation.

281:14            I don't believe she was

281:15    diagnosed with a concussion when she

281:16    presented for medical attention a few

281:17    days later.

281:18            Yes, that visit that I saw, she

281:19    was not diagnosed with a concussion.

281:20       Q.    And when Dr. Temple conducted

281:21    his rape kit examination, he found no

281:22    sign of redness or injury anywhere on her

281:23    body?

281:24       A.    Correct.

281:25       Q.    She claims to have been anally

282:1

282:2    raped with no lubrication first and then

282:3    raped vaginally, correct?

282:4          MS. STALF:  Objection to the

282:5       form of question, assumes facts not in

282:6       evidence.

282:7          MR. CHESTNUT:  Join.

282:8    A.     Correct.

282:9    Q.     And there was no injury to her

282:10   anus, right?

282:11   A.     Correct.

282:12   Q.     She was not one, all though you

282:13   may not have read Frank Riggio's

282:14   deposition, she was not one who regularly

282:15   engaged in anal intercourse.

282:16         MS. STALF:  Objection to the

282:17      form of the question; calls for

282:18      speculation; assumes facts not in

282:19      evidence.

282:20   A.     Well, one is regular.  And I

282:21   think we already discussed in this

282:22   deposition rather than the one-armed man,

282:23   we have the one-allele man.

282:24         So, no, have no idea what

282:25   activity she participated in and I don't

283:1

283:2    know that I can speak to the idea whether

283:3    a person who has engaged in anal sex at

283:4    all over the course of their lifetime

283:5    however frequent that would be to what

283:6    degree trauma would be excepted in anal

283:7    penetration.

283:8         Q.    When you say the one allele,

283:9    are you referring to the Fourth

283:10   Analytical Report?

283:11        A.    Yeah, I'm referring to Exhibit

283:12   3.  Do I still have it in front of me?

283:13        Q.    Exhibit 3.

283:14        A.    Number 2, the trace amount of

283:15   DNA recovered from the rectal swabs

283:16   resulted in a single allele.

283:17             So, yeah, the one-allele man;

283:18   that's what I was referring to.

283:19        Q.    So you haven't read Dr. White's

283:20   report or testimony where he excluded Mr.

283:21   Chatman to be a contributor to that

283:22   allele?

283:23        A.    We covered that already.  I

283:24   said the one-allele man.  That's my

283:25   point.  I'm saying -- this is -- I'm

284:1

284:2     crediting you, by your own point there is

284:3     this ambiguousness out there of whatever

284:4     her sexual history is that's introduced

284:5     by this.

284:6              Either he is innocent or there

284:7     is some kind of extramarital activity or

284:8     there is a contaminant; one of those

284:9     three possibilities, but whatever it is,

284:10    it's the one-allele man; that's my point.

284:11             It's this mysterious individual

284:12    we have no idea who it is.  We just know

284:13    who it isn't.

284:14             We know it's not Chatman and we

284:15    know it's not Mr. Riggio.  That we know,

284:16    that's my point.

284:17    Q.    So you think that Ms. Riggio is

284:18    having not only an extramarital affair

284:19    but an extramarital affair that involves

284:20    anal intercourse in the three days before

284:21    May 24, 2002?

284:22    A.    I don't --

284:23             MR. CHESTNUT:  Objection,

284:24        mischaracterization of testimony;

284:25        calls for speculation; no foundation;

285:1

285:2      argumentative.

285:3                Go ahead, you can answer.

285:4      A.    Yeah, I would defer to

285:5  testimony about whether findings on the

285:6  rectal swab whether they are more

285:7  reflective than what you see in a vaginal

285:8  swab.

285:9                I know from the pathologist's

285:10  perspective there are a lot of

285:11  pathologists that might raise that

285:12  question.

285:13                Be that as it may, there may be

285:14  an extramarital contaminant so and that

285:15  is my point.  It is quizzical.

285:16                The point is it's the one

285:17  allele that belongs to somebody.  We

285:18  don't know how it got there but it's

285:19  there and we don't know who it belongs

285:20  it; that is all I'm trying to say.

285:21      Q.    You write on page 17 that Ms.

285:22  Riggio's recollection of the period

285:23  spanning these blows would be vulnerable

285:24  to error."

285:25      A.    Correct.

286:1

286:2              Page again, sorry?

286:3     Q.     Page 17.

286:4     A.     Yes.

286:5              Trauma; postconcussive

286:6 symptoms; emotional trauma and physical

286:7 trauma.

286:8     Q.     What are you basing the fact

286:9 that her recollection would be vulnerable

286:10 to error?

286:11     A.     Emotional trauma and physical

286:12 head trauma.

286:13     Q.     Do you think Ms. Riggio was

286:14 inaccurate about her account of her

286:15 sexual assault?

286:16              MR. CHESTNUT:  Form,

286:17     mischaracterizes the testimony.

286:18     Q.     So are you saying that she was

286:19 more likely to be wrong about the events

286:20 in the sexual assault or more likely to

286:21 be accurate about the events of the

286:22 sexual assault?

286:23     A.     I don't have an opinion.  What

286:24 I'm saying here is that the experience of

286:25 emotional trauma, the experience of

287:1

287:2    physical head trauma, have an impact that

287:3    could potentially affect one's fidelity

287:4    as a historian.

287:5        Q.    Did it have an impact here?

287:6        A.    I don't know.

287:7        Q.    Do you have an opinion whether

287:8    it happened here?

287:9        A.    I guess that goes back to the

287:10    whole question of guilt versus innocence,

287:11    doesn't it?

287:12        Q.    No.  I'm asking do you have an

287:13    opinion as to her whether her account of

287:14    the events during the sexual assault were

287:15    less accurate because of the emotional

287:16    and physical trauma she says she

287:17    sustained?

287:18        A.    It's impossible to tell based

287:19    on the information that I have available.

287:20    There are some discrepancies in accounts

287:21    and the discrepancies in account may

287:22    relate to other factors such as the

287:23    passage of time or even the pressures of

287:24    litigation and what happens to complaints

287:25    under those circumstances that they may

288:1

288:2    elaborate.

288:3              A person maybe self-serving but

288:4    it doesn't mean that events did not

288:5    happen but a person's complaint may

288:6    change, may shift.

288:7              That doesn't take away the

288:8    immediate aftermath in which she was

288:9    incoherent and a person may be incoherent

288:10   from the original trauma.  A person may

288:11   be incoherent from postconcussive

288:12   symptoms.

288:13             So distinguishing whether her

288:14   presentation was the by-product of a

288:15   physical injury or emotional injury is

288:16   something I cannot do.

288:17             Those potential causes for what

288:18   was described by witnesses and that

288:19   incoherence, whatever its origin, could

288:20   affect the accuracy of her recollection

288:21   for that time.

288:22   Q.    Page 19, five paragraphs down.

288:23   You say, "It is possible in this climate

288:24   that Mrs. Riggio's account of the 2002

288:25   event in which she stated at an earlier

289:1

289:2    point that she was unsure whether she had

289:3    been penetrated and later offered that

289:4    she had been both anally and vaginally

289:5    violated was embellished."

289:6           Do you see that, sir?

289:7    A.    Yes, sir.

289:8    Q.    Do you have an opinion as to

289:9    whether Ms. Riggio was embellishing as to

289:10    the level and degree of penetration she

289:11    claimed to have sustained during the

289:12    assault?

289:13    A.    I don't know.  I don't have an

289:14    opinion.

289:15    Q.    Page 20, fourth full paragraph

289:16    there states, "Supporting Mr. Chatman's

289:17    claims that his confession was false, the

289:18    Plaintiff asserted that he was docile."

289:19           Do you see that?

289:20    A.    Yes.

289:21    Q.    Every single person who

289:22    interacted with Carl Chatman during the

289:23    night of his interrogation claims that he

289:24    was docile.

289:25    A.    Okay.

290:1

290:2      Q.    Is that right?

290:3      A.    I don't know that I can account

290:4  for every single person that he

290:5  interacted with.

290:6      Q.    Only the people you read,

290:7  right?

290:8      A.    Only the people that I read,

290:9  only the people that I remember.

290:10      His docility was not something

290:11  that I was really looking for.  I'm sure

290:12  I read some reference to it.  I don't

290:13  recall anybody referencing that he was

290:14  particularly agitated.

290:15      Docile is a little more than

290:16  not agitated.  Docile is, well, docile is

290:17  what it is.  Not agitated and calm is

290:18  also a little bit less than docile.

290:19  Docile is a much more submissive and

290:20  deferential adjective.

290:21      I'm trying to remember what

290:22  deposition or what testimony in which I

290:23  actually read the word submissive or

290:24  docile, whether that is something that is

290:25  out of your well-worded civil suit or

291:1

291:2    whether that actually was the verbiage

291:3    used by one of the people interacting

291:4    with him.

291:5        Q.    Nobody claims that Mr. Chatman

291:6    was anything other than docile, right?

291:7        A.    What do you mean, anything

291:8    other than docile?  There is a whole

291:9    universe of people who are not

291:10   submissive.

291:11            My recollection is that he was

291:12   described as calm, composed.  That's not

291:13   docile.  Docile is not calm and composed.

291:14   It's something more than that.

291:15            There is a reason that you

291:16   didn't say calm and composed in your

291:17   civil complaint.  You chose docile.  It's

291:18   your wording just as I chose the words

291:19   here.  Docile does not equate with calm

291:20   and composed.

291:21            My recollection of what I read

291:22   was that he was calm and composed,

291:23   behaviorally unremarkable, not agitated.

291:24            I don't recall reading anything

291:25   about docile.  It is possible that it was

292:1

292:2    worded somewhere but you have to direct

292:3    me to it.

292:4        Q.    So you're quibbling with

292:5    whether Mr. Chatman --

292:6            [Whereupon, at 4:19 p.m., an

292:7        alarm sounded at the remote location.]

292:8            MR. CHESTNUT:  We're going to

292:9        have to take a break.

292:10           MR. AINSWORTH:  We can't break.

292:11           MS. STALF:  Wait.  Chicago

292:12       people?

292:13           MR. AINSWORTH:  Chicago people?

292:14           We are off the record.

292:15           THE REPORTER:  Do you want to

292:16       give me a time?

292:17           THE VIDEOGRAPHER:  4:20 p.m.

292:18           [Discussion held off the

292:19       record.]

292:20           [Whereupon, at 4:20 p.m., a

292:21       recess was taken.]

292:22           [Whereupon, at 4:29 p.m., the

292:23       testimony continued.]

292:24           THE VIDEOGRAPHER:  Returning to

292:25       the record 4:29 p.m.

293:1

293:2      Q.    All right, sir, in your report

293:3   you reference an incident where Carl

293:4   Chatman was stating to hospital personnel

293:5   that he had been raping and killing

293:6   women, right?

293:7      A.    Yes, sir.

293:8            What page are we on?

293:9      Q.    We are not on any page, sir.

293:10           1986, you know what I'm talking

293:11  about.

293:12     A.    I said, yes.  I would just like

293:13  to get to that page.  I'm with you.

293:14     Q.    The doctors and medical

293:15  personnel who interacted with Carl

293:16  Chatman at the time related that he was

293:17  delusional at the time that he was making

293:18  those statements, right?

293:19     A.    I don't know that they were

293:20  specifically referring to those

293:21  statements.

293:22     Q.    He said he was Superman, right?

293:23     A.    Well, that would be a delusion.

293:24     Q.    Let's just look at the medical

293:25  report.

294:1

294:2      A.    I'm all in favor of doing that.

294:3            MR. AINSWORTH:  Let's mark this

294:4      as Exhibit 7.

294:5            [The document was hereby marked

294:6      as Plaintiff's Exhibit 7 for

294:7      identification, as of this date.]

294:8      Q.    I'm going to show you what been

294:9   marked as Exhibit 7, Bates plaintiff

294:10  0022621 through 42.

294:11           Sir, if you turn to the fourth

294:12  page --

294:13     A.    Uh-huh.

294:14     Q.    -- of this in the bottom

294:15  right-hand corner has a 4.

294:16     A.    Yeah, uh-huh.

294:17     Q.    It says, "Client signed himself

294:18  in voluntarily.  According to him he was

294:19  raping women and the police have not

294:20  caught him.

294:21           "He says he feels like killing

294:22  women because they won't have sex with

294:23  him.

294:24           "He says he was Superman.

294:25           "Appearance is unkempt.  He is

295:1

295:2    alert; oriented in three spheres;

295:3    cooperative; suspicious; guarded; hears

295:4    voices."

295:5       A.   Uh-huh.

295:6       Q.   "When he talked to the doctor

295:7    in the unit he was just playing with some

295:8    women, he grabbed their hands and told

295:9    them to bring him to the hospital.  He

295:10    denied raping them.

295:11        "Denied drinking prior to

295:12    admission.  Denied any other problems.

295:13    Denied insomnia, suicidal ideations."

295:14       A.   Okay.

295:15       Q.   Do you see that?

295:16       A.   I do.  I also see where it

295:17    says, "no delusion noted" on the same

295:18    page.

295:19       Q.   Sir, page 6 of the same medical

295:20    record.

295:21       A.   Um.

295:22       Q.   Do you see where it says

295:23    "Mental Status Examination"?

295:24       A.   Uh-huh.

295:25       Q.   On the date of his admission,

296:1

296:2     1/4/86, takes you about half the way down

296:3     the paragraph under Mental Status

296:4     Examination where it says, "Would have,"

296:5     something, something "by a lady and

296:6     became delusional about killing and

296:7     raping women."

296:8            Do you see that?

296:9     A.    Hang on a second.  Sorry.

296:10    Please direct me.

296:11    Q.    Can I point?

296:12    A.    Page 6, right?

296:13    Q.    Right below here [indicating]

296:14    where there is a plus, "and became

296:15    delusional about killing and raping

296:16    women."

296:17    A.    That may say delusional, but

296:18    yeah, let's just say it does.

296:19    Q.    This is the mental status exam?

296:20    A.    Yes.

296:21    Q.    One of the primary things that

296:22    you do when somebody comes in?

296:23    A.    Yeah, yeah.

296:24    Q.    Look at preliminary treatment

296:25    plan with full recommendations --

297:1

297:2      A.   Wait.  Wait.  Wait.  Wait.

297:3  Four lines down from that it says,

297:4  "homicidal thought, could be delusional

297:5  or real which," something, "a danger to

297:6  others."

297:7        So the doctor clearly says he

297:8  doesn't resolve whether the homicidal

297:9  thoughts are delusional or real.

297:10     Q.   If you look down it says,

297:11  "Haldol to minimize delusion."  And is

297:12  that homicidal?

297:13     A.   "Homicidal" something.

297:14     Q.   Yes?

297:15     A.   Yeah.

297:16     Q.   And then he is listed as being

297:17  intoxicated on page 13.

297:18     A.   Um.  So where are we?

297:19     Q.   "Elaboration of reasons for

297:20  necessitating hospitalization at this

297:21  time."

297:22     A.   Okay.

297:23     Q.   Then if you look at the last

297:24  page of the document.

297:25     A.   Yeah.

298:1

298:2      Q.    I'm not sure what kind of

298:3  speech.  It's under the "I certify the

298:4  above person being examined."

298:5      A.    "Slurred speech."

298:6      Q.    "Ataxic."

298:7      A.    Means he's unsteady in his

298:8  movements.

298:9      Q.    "Delusional, I raped a woman in

298:10  front of the policeman" --

298:11      A.    "Tonight."

298:12      Q.    "Tonight."

298:13      So he was intoxicated, unsteady

298:14  on his feet and saying he was Superman

298:15  and had raped a woman in front of a

298:16  police officer.

298:17      A.    Well, here it doesn't say

298:18  Superman, but it says that he raped a

298:19  woman in front of a police officer.

298:20      Q.    Right, but all in the same

298:21  admission still the January 4, 1986 date?

298:22      A.    Yes.

298:23      Q.    He was making these statements

298:24  and then he was discharged a few days

298:25  later?

299:1

299:2     A.    Okay.

299:3     Q.    Where he is deemed to be no

299:4  longer a threat to himself and others.

299:5     A.    Right.

299:6         Is there a question?

299:7     Q.    So, sir, are you substituting

299:8  your judgment for the medical

299:9  professionals who examined Mr. Chatman in

299:10  January 1986 as to whether he was

299:11  delusional about actually having

299:12  homicidal ideations?

299:13     A.    No.

299:14         MS. STALF:  Object, form.

299:15     A.    In fact I agree with them.  He

299:16  may have been delusional.  He may not

299:17  have been delusional.

299:18         They did make a determination.

299:19  If the guy says he's Superman, it's

299:20  obvious.

299:21         But one of the good things that

299:22  they did do, was that, it may not have

299:23  been clear about whether he was

299:24  intoxicated or whether this just

299:25  reflected intoxication or actual

300:1

300:2    psychiatric illness.

300:3            People who are assessed to be

300:4    intoxicated are shorter hospital stays

300:5    because they are appraised, generally

300:6    speaking, when they are unlubricated that

300:7    their risk mitigates considerably as

300:8    opposed to a person for whom their risk

300:9    is attributed to the illness itself.

300:10           The idea that Mr. Chatman was

300:11   an alcohol abuser is no secret.  The idea

300:12   that he's abusing alcohol in the day and

300:13   in the morning is no secret and not

300:14   disputed I should say.

300:15           So the idea that his alcohol

300:16   use coinciding with the sexual assault in

300:17   some way makes alcohol intoxication more

300:18   likely a possibility than actually his

300:19   behavioral lack of control because he has

300:20   a psychotic illness, it's not resolved.

300:21           There are plenty of alcoholic

300:22   rapists, there are plenty of

300:23   schizophrenic rapists.

300:24           What we do know is people with

300:25   dual diagnosis who have major psychiatric

301:1

301:2    illnesses and have substance abuse

301:3    problems are greater risk for violence to

301:4    others.

301:5            So, you know, I should have if

301:6    I really needed to give some attention to

301:7    the notion of risk and how realistic it

301:8    would be to assess him for violence

301:9    toward others and perhaps in my report I

301:10   should have accounted for the idea he was

301:11   a greater risk because he was a dual

301:12   diagnosis abuser.

301:13           I only accounted for the idea

301:14   that he had voices in thinking in the

301:15   past.

301:16           If he was irrational, well,

301:17   rape is often an irrational crime so it

301:18   certainly doesn't preclude that and I'm

301:19   not substituting anyone's judgement.

301:20           This certainly expands my

301:21   thinking to incorporate the role of

301:22   intoxication involved in this which

301:23   perhaps I didn't give attention to.

301:24      Q.   Was there any suggestion that

301:25   Mr. Chatman -- that the perpetrator of

302:1

302:2     the sexual assault was intoxicated?

302:3          A.    The victim in one of her

302:4     interviews said he smelled like alcohol.

302:5          Q.    That he was actually drinking

302:6     or had been drinking?

302:7          A.    He smelled like alcohol as a

302:8     person who had some -- a person who would

302:9     have had a certain amount of alcohol --

302:10    taken a certain amount of alcohol with

302:11    some relative recency might smell like

302:12    alcohol.

302:13         Q.    Sir, Mr. Chatman had never been

302:14    arrested for any type of sexual offense,

302:15    right, up to the age of 48, right?

302:16         A.    Yes, that's correct.

302:17         Q.    You would expect if somebody

302:18    was a serial rapist that at some point in

302:19    their life, this guy is living on the

302:20    street with a lot of contact with police,

302:21    would have been arrested from some type

302:22    of sexual crime, right?

302:23              MS. STALF:  Objection to the

302:24         form; foundation; assumes facts.

302:25         A.    Not necessarily, especially

303:1

303:2     when you bring the whole question of

303:3     psychotic illness into play.

303:4              Someone who reaches a point of

303:5     some level of deterioration, and, again,

303:6     referencing the last report, who was

303:7     additionally lubricated with a substance,

303:8     can commit an offense which there is no

303:9     previous history of.

303:10             Now, if we are speaking about

303:11    people who have no psychiatric illness,

303:12    who are just your classic sexual predator

303:13    of rape paraphilics, yeah, one would

303:14    expect a more colorful sexual history.

303:15             It doesn't necessarily mean

303:16    they've been arrested, could get away

303:17    with it, some people do; but one would

303:18    expect a colorful history that originates

303:19    from much earlier years than this stage.

303:20       Q.    On page 23 of your report you

303:21    write in the third paragraph, "There is

303:22    no evidence that Carl Chatman was

303:23    suggestible or otherwise easily led,"

303:24    right?

303:25       A.    Correct.

304:1

304:2      Q.    Are you discounting Charles

304:3  Roe's testimony that police officers were

304:4  leading Carl Chatman through the Daley

304:5  Center?

304:6          MS. STALF:  Objection to the

304:7     form.

304:8      A.    Leading him through the Daley

304:9  Center doesn't make him easily led in a

304:10  clinical standpoint or suggestible from

304:11  clinical standpoint.

304:12      Q.    Well, Charles Roe was

304:13  describing that Carl Chatman was being

304:14  led by police officers as to where to go

304:15  within the Daley Center and he would

304:16  agree with that and do what they suggest?

304:17          MS. STALF:  Objection to the

304:18     form.

304:19      Q.    You don't think there is any

304:20  evidence of suggestibility?

304:21      A.    Not in that, not in that.  All

304:22  of that reflects is that he is polite and

304:23  kind of proceeding along with police

304:24  officers.  That is what it reflects.

304:25          What one can clinically

305:1

305:2    interpret from that is not much.

305:3        Q.    What does easily led mean in

305:4    the clinical literature?

305:5        A.    In the disputing confession

305:6    literature, it's a person who is led to

305:7    make self-incriminating statements or

305:8    elaborating statements by police officers

305:9    in the nature of questions or clinicians

305:10   in the nature of their questions.

305:11           Again, we have some clinical

305:12   records, but not particularly detailed,

305:13   he was questioned in those.

305:14           But there is in the context of

305:15   this discussion about disputing

305:16   confessions and question 5, "Did he

305:17   possess vulnerabilities?"

305:18           I'm talking about

305:19   vulnerabilities that relate to risk of

305:20   false confession, that's what I'm talking

305:21   about, not somebody that says go up the

305:22   stairs here and go up the stairs here.

305:23   That's not easily led.

305:24           Easily led is, well, you did

305:25   have anal sex with her, didn't you?

306:1

306:2    Well, yeah, I did, when someone didn't

306:3    necessarily have.  And that is following

306:4    the lead of a questioner that is a little

306:5    bit different from just what Roe was

306:6    referring to.

306:7        Q.   How long is an average

306:8    interrogation?

306:9          MS. STALF:  Objection to the

306:10      form; foundation.

306:11        A.   There are different studies

306:12    that have explored it whether an hour and

306:13    a half by some estimates, a little bit

306:14    less, a little bit more, that's what

306:15    articles typically point to.

306:16        Q.   How long is a typical

306:17    interrogation involving a sexual assault

306:18    and a homicide investigation?

306:19        A.   I don't know.  And typical,

306:20    isn't that an interesting question.  What

306:21    is a typical homicide?  What is a typical

306:22    sex assault?

306:23          The crime is more serious, the

306:24    intensity and the questioning is greater.

306:25    The pressures are greater for a suspect

307:1

307:2   to deny.  Pressures are greater for

307:3   questioners if they feel they are on the

307:4   cusp of getting self-incriminating

307:5   statements to persist with the

307:6   questioning so you have these forces that

307:7   are perhaps, not perhaps, that are

307:8   distinctive to major crimes.

307:9       Q.   Carl Chatman received a

307:10  certificate of innocence, right?

307:11      A.   Yes, sir.

307:12      Q.   So you credit the certificate

307:13  of innocence as evidence of Mr. Chatman's

307:14  actual innocence, right?

307:15          MS. STALF:  Objection to form.

307:16      A.   No.  I don't believe I did in

307:17  this report.

307:18      Q.   But you should, right?

307:19      A.   No.  Why should I?  It's a

307:20  statement by the prosecutor's office not

307:21  to contest something, a statement by

307:22  court that relates very closely to one's

307:23  ability to gain benefits, and Loevy &

307:24  Loevy specifically expressed it that way.

307:25          This is something that is a

308:1

308:2    necessary step in order to be able to

308:3    receive benefits.

308:4          So procedurally it's something

308:5    that follows.  It's not -- it didn't have

308:6    any kind of relationship to the quality

308:7    of the evidence that we've been speaking

308:8    about.  It's a procedural event.

308:9    Q.   So something that is a

308:10    procedural event as looking at something

308:11    other than guilt or innocence --

308:12          MR. AINSWORTH:  Strike that.

308:13    Q.   But the court has to make a

308:14    finding by a preponderance of the

308:15    evidence Mr. Chatman is innocent, right?

308:16          MS. STALF:  Objection to the

308:17    form.

308:18          MR. CHESTNUT:  Objection to

308:19    form.

308:20    A.   The court doesn't have to do

308:21    it.  The court chooses to do what the

308:22    court chooses to do, a judge's

308:23    prerogative or prosecutors prerogative

308:24    contesting something or not contesting it

308:25    are nonscientific events.

309:1

309:2      They are more in accordance

309:3    with their role.  They have a different

309:4    role than I have.  This isn't a report

309:5    about procedure.  This is the report

309:6    about the kinds of things that form such

309:7    an opinion.

309:8      Q.   So you think that it is

309:9    irrelevant that Carl Chatman received a

309:10   certificate of innocence to your input?

309:11     A.   No.  It's irrelevant to my

309:12   assessment, and my assessment focussed on

309:13   the nine questions.  It's irrelevant to

309:14   those nine questions.  It's not

309:15   irrelevant to the event or we wouldn't be

309:16   here, right.

309:17      Procedurally, it's very

309:18   relevant to the case.  It would not have

309:19   come about were there not to have been

309:20   very serious reason to reconsider Mr.

309:21   Chatman's innocence.

309:22      There is no disputing that it's

309:23   an issue under consideration.  Whether

309:24   it's resolved by the certificate of

309:25   innocence, not from a scientific

310:1

310:2    standpoint, it's procedural issue.

310:3        Q.    And it's not relevant on a

310:4    scientific basis because a court's

310:5    determination is not the same as your

310:6    determination?

310:7        A.    There are courts that denied

310:8    his appeal and said he is guilty.  That

310:9    didn't necessarily make him guilty, did

310:10   it?

310:11           The courts make assessments

310:12   based on the information available to

310:13   them at the time.

310:14           And the information available

310:15   to them at the time as a trier of fact

310:16   decision which is different from the

310:17   scientific opinion, they're just two

310:18   different entities.

310:19       Q.    When you evaluate claims such

310:20   as this, you look at internal affairs'

310:21   record, right?

310:22       A.    If I can, sure.

310:23       Q.    Those are helpful?

310:24       A.    Sure, absolutely.

310:25       Q.    You don't know how soon after

311:1

311:2   the assault, Mr. Chatman, after -- when I

311:3   say assault, it's a poor word.

311:4          You don't know how soon after

311:5   Mr. Chatman's confession he reported he

311:6   had been physically assaulted during that

311:7   interrogation, right?

311:8     A.   I believe that his first

311:9   reference was several months later with

311:10  Dr. Pan; is that correct?

311:11         It certainly wasn't when he was

311:12  examined shortly after the fact and it

311:13  wasn't on the notes on admission from the

311:14  correction service.

311:15         It was -- my understanding it

311:16  was several months with Dr. Pan he

311:17  acknowledged he raped.

311:18     Q.   If Mr. Chatman actually told

311:19  other people much sooner about the being

311:20  beaten during the interrogation, would

311:21  that change your opinion?

311:22     A.   Oh, yeah.

311:23         MS. STALF:  Objection to the

311:24     form.

311:25     A.   Yeah, if there was a record

312:1

312:2    that he went in after arrest and was

312:3    telling doctors they had beaten me, I

312:4    would take it, I would definitely take it

312:5    more seriously.

312:6          Again, I believe I mentioned

312:7    this in my report, but it's pertinent to

312:8    this answer.  The responsibilities of a

312:9    forensic examiner in this, whether they

312:10    choose to admit it or not, in order to be

312:11    objective, there is an arc of a

312:12    confession.

312:13          A person going from denial to

312:14    confession, what is the time proximity of

312:15    going from denial to confession and what

312:16    is the proximity of a person going from

312:17    confession to retraction?

312:18          There is any number of things

312:19    that can happen over the course of

312:20    several months in which somebody can say,

312:21    shmuck, you confessed to rape and that's

312:22    all the evidence that you have against

312:23    you.  Do you realize what a ridiculous

312:24    idea that was?

312:25          And so whether pressure is

313:1

313:2    originated from within, whether they

313:3    original from a cellmate, whether they

313:4    original from an ex-wife, whether they

313:5    originate from anybody.

313:6             The longer period of time --

313:7    now, it is also helpful if one can get

313:8    the notes of a criminal defense attorney.

313:9             In certain instances I found

313:10   them very helpful.  If you want to make

313:11   them available for my review, I'd

313:12   certainly love reviewing them.

313:13            What did the criminal defense

313:14   attorney document about his initial

313:15   encounter with your plaintiff?  Because

313:16   that informs the arc.

313:17            I taught this in materials that

313:18   you have that, this is a way in which we

313:19   can get to the bottom of a number of

313:20   these disputed confessions so we don't

313:21   necessarily have to deal with ambiguity.

313:22            For example, Thibodeax.  I read

313:23   the criminal defense attorney's notes,

313:24   helpful.  I concluded that that was false

313:25   confession.  I was retained by

314:1

314:2    prosecutors.

314:3              So if one wants to engage this

314:4    objectively in also a serious forensic

314:5    examination and not a college student

314:6    exercise, then one deals with the arc.

314:7              Confession to -- I'm sorry.

314:8    Denial to confession, confession to

314:9    denial.

314:10             So there is a difference

314:11   between seven months and right after the

314:12   fact; that is why it's consequential to

314:13   me.  There is less of a likelihood some

314:14   intervening factor or person to rethink

314:15   his course of action.

314:16   Q.    If Mr. Chatman is actually

314:17   innocent of this crime, is he entitled to

314:18   compensation in your view?

314:19             MS. STALF:  Objection to the

314:20        form of the question; foundation.

314:21   A.    Well, he's already been given

314:22   compensation by the fund for exoneration.

314:23   Isn't that what the certificate of

314:24   innocence it for?

314:25   Q.    Yes.

315:1

315:2      A.    He was given the certificate of

315:3   innocence.  He's provided compensation.

315:4   Sure.  I think he is entitled to that

315:5   compensation.  Absolutely.

315:6      Q.    Doctor, you don't hold any

315:7   opinion as to whether it's more likely

315:8   under this set of facts that Ms. Riggio

315:9   had sex with somebody who was not her

315:10  husband in the three days before May 24,

315:11  2002, the DNA was contaminated, or that

315:12  Mr. Chatman was actually innocent and

315:13  gave a false confession?

315:14     A.    I have no opinion, no opinion.

315:15          MR. AINSWORTH:  I have no

315:16     further questions.

315:17          THE WITNESS:  Okay.

315:18          MS. STALF:  Chicago, any

315:19     questions?

315:20          MR. CHESTNUT:  Yes.

315:21  EXAMINATION BY MR. CHESTNUT:

315:22     Q.    Dr. Welner, my name is Andrew

315:23  Chestnut.  I represent Susan Riggio.

315:24          I will try to be brief.  We

315:25  have been here for a while so....

316:1

316:2      A.    Well, you're the ones with the

316:3   fire drills.

316:4      Q.    That's way out of our control.

316:5   Trust me.

316:6           In your report on page 16, I'll

316:7   direct you, it state that rape is not

316:8   disproved by an absence of physical

316:9   evidence.

316:10          Is that your opinion to a

316:11  reasonable degree of psychological

316:12  certainty?

316:13     A.    Yes, sir.  Reasonable degree of

316:14  psychiatric certainty which is more to

316:15  the point, medical certainty.

316:16     Q.    Thank you.  I will assume that

316:17  your opinions during my questions are to

316:18  that standard.

316:19          Would you also agree it's

316:20  possible in light of the DNA results that

316:21  you reviewed and have been asked about

316:22  and all of the other information that you

316:23  have about this case, that Carl Chatman

316:24  could have attacked and raped Sue Riggio

316:25  on May 24th, 2002, in the Daley Center

317:1

317:2     and not leave a collectible DNA sample;

317:3     is that possible?

317:4              MR. AINSWORTH:  Object to the

317:5         form.

317:6              MS. STALF:  Object to the form.

317:7     A.     That's correct.  For something

317:8     like that I would rather defer to someone

317:9     who has far more expertise than just the

317:10    collection and what does it mean when you

317:11    found an artifact.

317:12             I want to stop there.  That is

317:13    the boundary of likelihood or

317:14    possibilities.  I'll leave that for

317:15    others to address.

317:16    Q.     Sure.  My question was just

317:17    limited to whether that was possible.

317:18    A.     You know what --

317:19             MR. AINSWORTH:  Same objection.

317:20    A.     -- my answer has to be the

317:21    same.  I just don't know how it changes

317:22    and so it may not change at all.  I just

317:23    don't want to guess at it.

317:24    Q.     I think you touched on this in

317:25    your report, based on your review, would

318:1

318:2    you agree that the 1979 rape and the 2002

318:3    rape were different in many significant

318:4    respects?

318:5             MR. AINSWORTH:  Objection to the

318:6        form of the question.

318:7        A.    Yes, sir.

318:8        Q.    What are some of those

318:9    significant differences between the two

318:10   events?

318:11       A.    Well, the most significant to

318:12   me without micromanaging the details is

318:13   that the 2002 rape was a very dramatic

318:14   scene in an open area with Ms. Riggio

318:15   discovered incoherent in the middle of a

318:16   mess in a pool of urine, unclothed, with

318:17   her clothing disturbed, with a knife

318:18   present at the scene, and clear evidence

318:19   of a struggle where she would be easily

318:20   found.  She would be unmistakably found

318:21   by another person at some point whether

318:22   five minutes later, 20 minutes later, or

318:23   half hour later.  She wouldn't have been

318:24   sitting there for many hours before being

318:25   discovered.

319:1

319:2          The first event by its account

319:3    occurred in a restroom.  She went out and

319:4    brought it to the attention of others and

319:5    been affected by whatever physical

319:6    disrobing, but she engaged them and

319:7    recounted an event to them which was

319:8    dealt with at face value and which

319:9    ultimately she was -- she filed a civil

319:10   claim in which nobody was suggesting she

319:11   had fabricated this.  I shouldn't say

319:12   nobody was suggesting, which the findings

319:13   did not determine that she had

319:14   fabricated.

319:15          In light of Dr. Russano's

319:16   assertions or implications that she had

319:17   fabricated this and that being such a

319:18   linchpin of the plaintiff's argument, it

319:19   was remarkable that the 2002 event was so

319:20   messy when by her own experience she had

319:21   precedent for being able to file a rape

319:22   claim that was received at face value

319:23   without having to go through all of the

319:24   big production that would have been

319:25   entailed by what occurred in 2002.

320:1

320:2    So, do I as a forensic

320:3    psychiatrist, again, this sort of speaks

320:4    to Mr. Ainsworth's earlier question, do I

320:5    have to consider the possibility

320:6    something is fabricated when someone is a

320:7    litigant, sure.

320:8    But litigants are also affected

320:9    by their level of experience when they

320:10   stage things.

320:11   This is somebody that had the

320:12   experience what it's like to actually

320:13   participate in a successful rape claim.

320:14   So the notion of this being

320:15   staged with such a dramatic degree is

320:16   incompatible with that.  I'm not saying

320:17   this to vouch for what is true and what

320:18   is false of what is being raised here.

320:19   The previous history is

320:20   important in a way that could not have

320:21   informed if this was the only time she

320:22   was making a rape claim, then anything

320:23   could be possible.

320:24   Sure, somebody can be found

320:25   like that in theory, file a similar claim

321:1

321:2     a short time afterward and one would have

321:3     to consider, okay, well, is this real or

321:4     not real.

321:5               Does that make sense?

321:6        Q.    I believe so.

321:7               How would you characterize then

321:8     the assertion because Sue Riggio claimed

321:9     she was raped once in 1979, it was more

321:10    likely that she fabricated the 2002 rape

321:11    at the Daley Center in Chicago, you are

321:12    saying it wouldn't make that more likely

321:13    in your view?

321:14              MR. AINSWORTH:  Objection to the

321:15         form of the question.

321:16       A.    Yeah.  I'm not sure I fully

321:17    follow you.

321:18              What do I make of the assertion

321:19    because she made a civil claim in the

321:20    earlier, that it means a later claim,

321:21    that if she raises a later claim, that

321:22    claim is more likely to be fabricated?

321:23       Q.    That's my question.

321:24       A.    Yeah.  That doesn't mean

321:25    anything about anything.

322:1

322:2          There are plenty of people who

322:3    file multiple lawsuits.  Some of those

322:4    people are multiple litigants because

322:5    they do, in fact, exploit the system.

322:6          And some people who file

322:7    multiple litigations are people who were

322:8    unfortunate enough to have experienced

322:9    multiple events in their life that lead

322:10   to litigation and some of those people of

322:11   the group of folks that experience

322:12   multiple events have had enough of

322:13   positive experience in dealing with

322:14   litigation that their head goes there

322:15   when something happens.

322:16          There are people who

322:17   experienced multiple events in their life

322:18   that because their earlier experience

322:19   with personal injury litigation is so

322:20   traumatic for them, they don't file a

322:21   complaint, not because their claim isn't

322:22   legitimate but they don't want to put

322:23   themselves through that anymore when they

322:24   went through that once before.

322:25          So what it tells me is that she

323:1

323:2    had this experience before, it didn't

323:3    dissuade her from seeking accountability.

323:4    It was familiar enough to her that she

323:5    chose to deal with it this way.

323:6             It doesn't reflect at all on

323:7    the legitimacy and lack of it.

323:8             To me the most compelling

323:9    evidence about legitimacy, the most

323:10   compelling evidence of legitimacy based

323:11   on my experience as a forensic

323:12   psychiatrist, based on my experience in

323:13   sex assault cases, bases on my experience

323:14   with litigants is the juxtaposition of

323:15   the 1979 fairly unremarkable by history

323:16   event and the 2002 event, that is

323:17   remarkable.

323:18            Does it resolve the question

323:19   one way or the other, no, it doesn't.

323:20   But it's a pretty remarkable circumstance

323:21   of both and I can't really compare the

323:22   compelling quality of any other aspect of

323:23   evidence when one looks at how these

323:24   events relate to one another, nothing

323:25   really stands up to that.

324:1

324:2     Q.   So you would agree ultimately

324:3  that the fact of the 1979 rape makes it

324:4  less likely rather than more likely she

324:5  would fabricate the 2002 rape?

324:6        MR. AINSWORTH:  Object to form

324:7      of the question.

324:8        And to the extent that, Counsel,

324:9      you are asking questions that are

324:10     eliciting new opinions, I absolutely

324:11     object.

324:12       You had the opportunity as of

324:13     October 31st to elicit opinion.

324:14       And I'll move to bar any new

324:15     opinions you are trying to elicit from

324:16     the Witness.

324:17       Do you understand, Counsel?

324:18     MR. CHESTNUT:  I think that is

324:19     stated in the report.

324:20     MR. AINSWORTH:  So why are we

324:21     asking him it?

324:22     MR. CHESTNUT:  I'm asking him to

324:23     clarify the statement he was making in

324:24     his report.

324:25     A.   Can you restate the last

325:1

325:2     question?

325:3         Q.    Sure.

325:4             Would you agree that the 1979

325:5     rape makes it less likely versus more

325:6     likely that Sue Riggio would have

325:7     fabricated the 2002 rape at the Daley

325:8     Center?

325:9             MR. AINSWORTH:  I object on the

325:10        same grounds.  I don't see that

325:11        anywhere in his report.

325:12            Counsel, if you can point me to

325:13        it, tell me.

325:14            MR. CHESTNUT:  He's saying in

325:15        his report she could have known from

325:16        the 1979 experience there was no need

325:17        to create a theatrical production to

325:18        engender the belief in others that she

325:19        was raped.

325:20            MR. AINSWORTH:  I don't see

325:21        anything in there about more likely or

325:22        less likely either way.

325:23            MR. CHESTNUT:  That's what I'm

325:24        asking.

325:25            MR. AINSWORTH:  Right.  And I'm

326:1

326:2     saying you are trying to elicit a new

326:3     opinion and I object.

326:4          You are way, way, way past the

326:5     deadline for new opinions.

326:6          MR. CHESTNUT:  You're objection

326:7     is noted.

326:8          THE WITNESS:  Can I answer the

326:9     question?

326:10          MR. CHESTNUT:  Yes.

326:11     A.    Yes, it makes it less likely.

326:12     Q.    We have touched on a few of the

326:13  factors that you state in your report

326:14  kind of explained Sue Riggio having

326:15  remembered more details about the 2002

326:16  event as time progressed.

326:17          We talked about the

326:18  fragmentation of the memory due to

326:19  trauma, and we also talked about the

326:20  details.  I'm not asking any other detail

326:21  about those.

326:22          My question is, could another

326:23  factor could have been her embarrassment

326:24  to disclose some of those specific and

326:25  very personal details to the

327:1

327:2    investigators that were questioning her

327:3    in the immediate aftermath, could that

327:4    have been another factor?

327:5        A.    Yes, I think it is actually

327:6    noted in one of my footnotes.  The

327:7    footnote I have is number 5.  It speaks

327:8    about the idea of shame and its impact on

327:9    disclosure.

327:10       Q.    That's fair.

327:11             Are you familiar with Ann

327:12   Burgess?

327:13       A.    I know her.  I know her well.

327:14       Q.    Would you agree she is a

327:15   well-respected individual in the rape

327:16   research community?

327:17       A.    Sure.  She became famous from

327:18   it.  She coined rape trauma syndrome.

327:19   She is a pioneer in forensic nursing.

327:20   She is an extremely highly regarded

327:21   researcher involved not only in academia

327:22   but law enforcement.

327:23             She founded the crime

327:24   classification manual she worked in my

327:25   practice in The Forensic Panel.  I

328:1

328:2    published with her.  I have just a lot of

328:3    goods thing to say about her.

328:4            She is just an extremely

328:5    learned -- I mean no disrespect by

328:6    putting it this way, she is a learned old

328:7    lady.  She is a wise old lady.

328:8            I hope she never sees this.

328:9    But she is one of those people who is

328:10   much older, that one can learn from just

328:11   by virtue of her age and experience.

328:12   She's seen a lot of things.

328:13           MS. STALF:  We lost them.

328:14           THE VIDEOGRAPHER:  Going off the

328:15       record 5:09 p.m.

328:16           [Discussion held off the

328:17       record.]

328:18           [Whereupon, at 5:09 p.m., a

328:19       recess was taken.]

328:20           [Whereupon, at 5:12 p.m., the

328:21       testimony continued.]

328:22           THE VIDEOGRAPHER:  Returning to

328:23       the record 5:12 p.m.

328:24           Beginning of disc number 7.

328:25           THE WITNESS:  I just wanted to

329:1

329:2        add to my previous answer to say that

329:3        I have been involved in cases in which

329:4        I have been on the opposite side of

329:5        Dr. Burgess.  I have had that

329:6        experience of disagreeing with how she

329:7        sizes things up.

329:8              I've also had the experience of

329:9        her reviewing me and me peer reviewing

329:10       her in The Forensic Panel and having a

329:11       difference of opinion of perspective.

329:12             So I want to account for that.

329:13       There are times when we may not

329:14       necessarily aline but at the end of

329:15       day, she's a pretty significant figure

329:16       in forensic science especially in

329:17       forensic nursing, she all but started

329:18       the discipline.  So she has quite a

329:19       history behind her.

329:20       Q.    In this case, just to follow up

329:21  on that point, you haven't reviewed her

329:22  report or her deposition testimony?

329:23       A.    I don't know she was involved.

329:24       Q.    That's fair.

329:25       A.    I don't even know that I knew

330:1

330:2   she was involved before I wrote my

330:3   report.  I haven't read her report.  It's

330:4   out there.  At some point I'm going to

330:5   sit down and look at it but I had no

330:6   exposure to it.

330:7         MR. CHESTNUT:  I'm done.  Thank

330:8     you.

330:9         MS. STALF:  Anybody out there

330:10     questions?

330:11         MS. MORRISON:  I have none.

330:12   CONTINUING EXAMINATION BY MR. AINSWORTH:

330:13     Q.   Sir, you said it's less likely

330:14   that Ms. Riggio fabricated the 2002

330:15   sexual assault based on the fact that she

330:16   was allegedly sexually assaulted in 1979,

330:17   correct?

330:18     A.   No, I said based on the

330:19   circumstances in 1979 juxtaposed with

330:20   2002, it's evidence of less likelihood.

330:21         I did not say that it didn't

330:22   happen.  I didn't say that I have a

330:23   conclusion on it.  It's a matter of

330:24   weighing evidence just as we have gone

330:25   all the way through this matter.

331:1

331:2          It is remarkable or notable

331:3    evidence.  It is evidence of less

331:4    likelihood, but it doesn't resolve the

331:5    matter.

331:6      Q.    What possible expertise could

331:7    you be drawing upon to make the analysis

331:8    that it's less likely that Ms. Riggio is

331:9    lying?

331:10      A.    I answered the question

331:11   earlier.  I spoke about my experience in

331:12   sex assault cases.  I spoke of my

331:13   experience of fabricated claims.  I spoke

331:14   of my experience as a forensic examiner

331:15   of people who are personal injury

331:16   litigants.  Three examples right there.

331:17   And I have had a variety of case

331:18   experiences in those three inflexion

331:19   points of this issue.

331:20      Q.    Do you take into account the

331:21   fact that Kato was accused 25 previous

331:22   times of abusing suspects in

331:23   interrogation rooms?

331:24      A.    Yeah, absolutely.  I reviewed

331:25   that record.

332:1

332:2      Q.   And does that make you believe

332:3  that it's more likely that Carl Chatman

332:4  was similarly abused by Chris Kato or

332:5  less likely?

332:6      A.   I think the fact that Mr. Kato

332:7  has that history makes it more likely.  I

332:8  think the fact that the historical

332:9  accounts of those events which I also

332:10  asked to look at and how they do not bear

332:11  resemblance to what was being asserted

332:12  here made it less likely.

332:13        I think the idea that Mr.

332:14  Chatman was alone with Mr. Roberts or and

332:15  that -- I'm sorry, with Mr. Kato and that

332:16  some other person who came forward and

332:17  provided some memo who was an unknown

332:18  third-party who had access to this made

332:19  it less likely.

332:20        I think Mr. Chatman's

332:21  discussion of what was done to him

332:22  physically and how they did not match the

332:23  doubling over the account of what the

332:24  complaint asserted made it less likely.

332:25        So I did take note of Kato's

333:1

333:2     history.  I read it.  I think that

333:3     history in and of itself makes it more

333:4     likely.  It's a balancing issue.

333:5              There is this that argues for

333:6     it and this that argues against.

333:7              As you compared it to this idea

333:8     that 1979 to 2002, I have the same thing.

333:9     That is the one remarkable piece of

333:10    history.  It's not a remarkable piece of

333:11    history that provides a counterbalance,

333:12    that's not to say that one doesn't exist,

333:13    but that is the remarkable history that I

333:14    have to work with.

333:15         Q.    You've never seen any

333:16    criticisms of Dr. Burgess's work?

333:17         A.    I have.

333:18         Q.    You have.

333:19              Have you seen criticisms how

333:20    she conducts her research?

333:21         A.    No, I haven't.

333:22              When I say -- let me clarify.

333:23    Work, I have seen criticisms of her

333:24    opinions in a court setting, that is the

333:25    work I'm familiar with.

334:1

334:2        In terms of criticism of her

334:3    research, look, there are people that

334:4    took issue with rape trauma syndrome and

334:5    I understand that is not a unanimously

334:6    supported idea.

334:7        It, for example, it doesn't

334:8    comprise it's own entity in DSM and

334:9    something like that.  It doesn't speak to

334:10   the notion of consensus.

334:11       But in terms of criticism

334:12   itself, the criticism that I have

334:13   actually seen has just been criticism

334:14   where folks might have disagreed with her

334:15   findings in certain cases.

334:16   Q.   So you don't know about her

334:17   fabricating cites to literature to

334:18   support --

334:19   A.   No, no, no, that is something

334:20   -- that I'm not aware of.

334:21   Q.   That is not something that you

334:22   think Dr. Burgess would do based on your

334:23   work relationship with her?

334:24   A.   You know, and I think I gave a

334:25   lot of discussion to this in Swift, I

335:1

335:2    don't need to give a long answer.

335:3          I learned a long time ago, you

335:4    know, The Forensic Panel, is The Forensic

335:5    Panel but it's my practice and anything

335:6    that goes on with people on the panel, I

335:7    end up feeling like I'm going to be in a

335:8    deposition answering for it.

335:9          A while back there was a guy a

335:10   Park Dietz, a well-known forensic

335:11   psychiatrist.  There was some

335:12   psychiatrist in his practice, a child

335:13   psychiatrist that he was touting and, you

335:14   know, giving a lot of exposure to and the

335:15   guy became the head of psychiatry

335:16   division at the American Academy of

335:17   Forensic Sciences which is a pretty

335:18   prestigious thing and wouldn't you know,

335:19   he showed up on his Facebook page

335:20   snorting cocaine and doing all kinds of

335:21   bizarre things and this is a guy who is

335:22   making determinations about child custody

335:23   so you can imagine the abject humiliation

335:24   that it would have been to Dietz's

335:25   practice that this kind of thing went on.

336:1

336:2                    For example, Elizabeth Loftus

336:3        who is a name that folks know.  She was

336:4        subject to perhaps one of the most

336:5        devastating and humiliating

336:6        cross-examinations of an expert witness

336:7        in the Scooter Libby case, the former aid

336:8        to the vice president.

336:9                    And so I took a look at this

336:10       specifically, you know, what happened to

336:11       Loftus and what happened to this Keegan

336:12       [phonetic] guy and his practice.

336:13                    You know, he is a serious guy,

336:14       Dietz, he's had his own problems, and I

336:15       thought, I don't want that happening to

336:16       me.  I'm not going to be put in a

336:17       position -- I can account for work people

336:18       do in my practice, but I don't know who

336:19       snorted cocaine and I don't know who is

336:20       doing ridiculous things.

336:21                    I like to think that they --

336:22       no, we won't abide that in my practice,

336:23       fabricating research stuff.  We wouldn't,

336:24       no, that's not anything, that's not

336:25       something I take well to at all.  I'm not

337:1

337:2    aware of it.  No.  I don't take well to

337:3    hearing it.

337:4            I mean it is what it is.  If it

337:5    is what it is, obviously, it's not

337:6    something I'm happy about.

337:7            I can only account for what we

337:8    do and what we manage within our own

337:9    practice.  Unfortunately, I cannot, you

337:10   know, I don't have people in my custody;

337:11   that's not how it works.

337:12           MR. AINSWORTH:  I have no

337:13      further questions.

337:14          THE VIDEOGRAPHER:  Going off the

337:15      record, 5:21 p.m.

337:16           [TIME NOTED:  5:21 a.m.]

337:17   _____

            MICHAEL WELNER, M.D.

337:18

337:19

         _____

337:20   Subscribed and sworn to

         before me this _____

337:21   day of _____, 2017.

337:22   _____

            Notary Public

337:23

337:24

337:25

338:1

338:2                    CERTIFICATION

338:3

338:4        I, MARGARET SCULLY-AYERS, a Notary

338:5    Public for and within the State of New

338:6    York, do hereby certify:

338:7        That the witness whose testimony as

338:8    herein set forth, was duly sworn by me;

338:9    and that the within transcript is a true

338:10   record of the testimony given by said

338:11   witness.

338:12       I further certify that I am not

338:13   related to any of the parties to this

338:14   action by blood or marriage, and that I

338:15   am in no way interested in the outcome of

338:16   this matter.

338:17       IN WITNESS WHEREOF, I have hereunto

338:18   set my hand this 29th day of December,

338:19   2016.

338:20

338:21   _____

338:22       MARGARET SCULLY-AYERS

338:23              *      *      *

338:24

338:25

```
339:1
339:2                    ERRATA SHEET
            VERITEXT/NEW YORK REPORTING, LLC
339:3
         CASE NAME: Carl Chatman -v- City of
339:4      Chicago, et al.
         DATE OF DEPOSITION: December 13, 2016
339:5      WITNESS' NAME: Michael Welner, M.D.
339:6      PAGE/LINE(S)/   CHANGE         REASON
         ____/_____/_____/_____
339:7    ____/_____/_____/_____
         ____/_____/_____/_____
339:8    ____/_____/_____/_____
         ____/_____/_____/_____
339:9    ____/_____/_____/_____
         ____/_____/_____/_____
339:10   ____/_____/_____/_____
         ____/_____/_____/_____
339:11   ____/_____/_____/_____
         ____/_____/_____/_____
339:12   ____/_____/_____/_____
         ____/_____/_____/_____
339:13   ____/_____/_____/_____
         ____/_____/_____/_____
339:14   ____/_____/_____/_____
         ____/_____/_____/_____
339:15   ____/_____/_____/_____
         ____/_____/_____/_____
339:16   ____/_____/_____/_____
         ____/_____/_____/_____
339:17   ____/_____/_____/_____
         ____/_____/_____/_____
339:18   ____/_____/_____/_____
         ____/_____/_____/_____
339:19   ____/_____/_____/_____
339:20
            _____
339:21            MICHAEL WELNER, M.D.
339:22   SUBSCRIBED AND SWORN TO
         BEFORE ME THIS_____DAY
339:23   OF_____, 2017.
339:24   _____
            NOTARY PUBLIC
339:25   MY COMMISSION EXPIRES_____
```

**[& - 3:26]**  Page 1

| & |
|---|
| **&** 3:4,16 4:4 307:23 |

| 0 |
|---|
| **000019** 182:19 |
| **0022621** 294:10 |
| **015424** 82:14 |
| **015436** 82:15 |
| **030030** 84:2 |
| **030037** 84:2 |
| **030179** 88:13 |
| **030184** 88:14 |

| 1 |
|---|
| **1** 5:12 51:4 70:20 70:22 77:24 101:11 180:23 192:16 193:21 223:15 229:18 258:13 |
| **1/4/86** 296:2 |
| **10** 3:11 244:19 |
| **100** 3:6 |
| **10001** 8:16 |
| **10:15** 51:3,7 |
| **10:24** 51:9,12 |
| **10:31** 57:16,19 |
| **10:48** 57:21,24 |
| **10:50** 245:4 |
| **11** 70:13 193:7 |
| **11:45** 107:10,14 |
| **11:55** 107:16,19 |
| **12** 193:7,7,9 258:13 |
| **1250** 2:2 6:20 |
| **12:29** 139:13,16 |
| **12:56** 139:18,21 |
| **13** 2:3 6:16 193:10 260:19 297:17 339:4 |

| **130,458.75** 184:22 |
| **138,810** 184:23 |
| **14** 1:8 7:3 171:25 173:24 193:12,18 |
| **148** 5:17 |
| **15** 152:6 185:20,21 |
| **15435** 82:21 |
| **15th** 184:10 |
| **16** 193:25,25 194:2 194:19,21 197:14 316:6 |
| **17** 197:15 285:21 286:3 |
| **1700** 3:18 |
| **18** 197:16,17 272:2 |
| **180** 164:8 |
| **182** 5:18 |
| **19** 197:18 288:22 |
| **1979** 275:12 278:19 318:2 321:9 323:15 324:3 325:4,16 330:16,19 333:8 |
| **1986** 293:10 298:21 299:10 |
| **1:30** 240:24 |
| **1:39** 177:15,17 |

| 2 |
|---|
| **2** 5:13 51:13 82:8 82:10,13 107:11 181:4,10 193:22 240:23 244:22 283:14 |
| **2.25** 185:16 |
| **2.5** 185:20 |
| **20** 3:17 15:11 52:23 53:15 54:8 54:11 56:14 58:11 58:13 127:13 185:18,22 197:21 289:15 318:22 |

| **2002** 82:19 106:4 107:2 147:18 165:19,24 192:6 195:23 197:7 200:14 201:19 207:3,22 212:7 213:16 239:17 245:10 275:10 278:17 284:21 288:24 315:11 316:25 318:2,13 319:19,25 321:10 323:16 324:5 325:7 326:15 330:14,20 333:8 |
| **2003** 149:24 150:4 150:18 165:22 |
| **2004** 146:2 165:8 |
| **2005** 146:2,3 165:8 165:12 |
| **2006** 146:3 |
| **2011** 151:20,23 |
| **2012** 148:23 |
| **2013** 198:6 |
| **2015** 84:6 184:10 184:20 247:6 |
| **2016** 2:3 6:17 108:19 165:12 338:19 339:4 |
| **2017** 337:21 339:23 |
| **21** 197:24 |
| **21st** 225:10,13 |
| **22** 16:9,11,13,20 18:11 19:8 22:6 99:2 157:13 162:19 167:5 178:10,11 180:7 198:13 |
| **222** 4:6 |

| **224** 8:14 |
| **23** 229:18 303:20 |
| **2300** 3:12 |
| **24** 82:18 195:23 197:7 200:14 201:19 207:22 221:4 239:17 284:21 315:10 |
| **2430** 4:12 |
| **24th** 192:6 213:16 245:10 316:25 |
| **25** 199:21 239:17 331:21 |
| **26** 101:13 199:25 |
| **26th** 212:7 |
| **27** 200:5 |
| **28** 200:6 223:14 233:3 |
| **294** 5:20 |
| **2945** 1:8 7:3 |
| **29th** 338:18 |
| **2:15** 201:7,10 |
| **2:26** 201:12,15 |

| 3 |
|---|
| **3** 5:14 83:20,22 84:3 107:20 181:5 181:10 196:12 240:23 283:12,13 |
| **30** 78:17 120:14 200:16 255:14 |
| **300** 4:6 |
| **30th** 8:14 |
| **312** 3:5 |
| **315** 5:5 |
| **31st** 324:13 |
| **330** 5:5 |
| **35** 143:22 |
| **362,000** 185:12 |
| **362,178** 184:24 |
| **3:26** 254:24 255:5 |

**3:40** 255:7,10

**4**

**4** 5:16 88:9,12,18 103:12 104:4 108:19 139:22 188:5 198:8 244:23 255:12 294:15 298:21
**40** 39:16,20 41:9 146:17
**42** 294:10
**48** 216:11 302:15
**4:19** 292:6
**4:20** 292:17,20
**4:29** 292:22,25
**4th** 108:7

**5**

**5** 5:17 88:21 148:2 148:4,7 199:17 201:16 255:2 305:16 327:7
**500** 4:12
**56** 182:20
**5:09** 328:15,18
**5:12** 328:20,23
**5:21** 337:15,16

**6**

**6** 5:18 88:21 182:13,15,22 183:10 199:20 255:11 295:19 296:12
**60601-1081** 4:7
**60603** 3:18
**60606** 3:12
**60607** 3:6
**60661-2593** 4:13

**7**

**7** 5:19 188:5 199:21 200:2 255:12 294:4,6,9 328:24
**70** 5:12
**72** 66:7,11 80:22 82:3 83:6 96:5
**7:30** 276:16

**8**

**8** 5:5 83:2 103:12 104:4,21
**807** 8:15
**82** 5:13
**83** 5:15
**88** 5:16
**8:30** 240:24

**9**

**9** 84:6 200:9
**92,910** 182:24 184:21
**9:28** 2:4 6:18
**9:30** 8:19

**a**

**a.m.** 2:4 6:18 8:19 51:3,7,9,12 57:16 57:19,21,24 107:14,16,19 240:23,23,24 244:23 245:4 337:16
**abide** 336:22
**ability** 22:18 205:3 234:2 307:23
**abject** 335:23
**able** 12:15 13:24 14:12 18:10 21:17 21:21 33:3,16 52:9 56:10 93:17 111:23 119:9

162:17 166:23 167:8 178:4 186:4 186:23 232:13 233:10 239:18 240:21 241:22,23 243:5 267:20 269:7 272:19 308:2 319:21
**abrasions** 188:21 189:3
**absence** 60:4,8 61:2 71:11 159:6 316:8
**absent** 159:3
**absolutely** 9:13 24:18 170:3 191:15 257:21 267:19 268:3 310:24 315:5 324:10 331:24
**absorb** 41:22
**abstract** 206:8
**abundantly** 269:17
**abuse** 137:23 273:18 301:2
**abused** 332:4
**abuser** 300:11 301:12
**abusing** 300:12 331:22
**academia** 264:16 327:21
**academic** 41:12,17 140:5,6 264:14
**academy** 147:11 335:16
**accelerated** 210:4 210:8
**acceleration** 210:12 211:4

**accept** 58:17 110:17
**acceptance** 54:5
**access** 23:7 45:2,3 53:21 122:6 137:16 163:17 195:16 199:3 332:18
**accommodate** 196:4
**accompanied** 223:21 233:2
**accomplishments** 76:5
**account** 23:21 30:22 57:5 60:9 61:5 63:14 64:6 64:12 65:8 68:9 69:15 87:10 93:15 112:6 117:10,12 130:3 154:25 222:8,15 223:10 223:13 231:12 273:9 277:20 286:14 287:13,21 288:24 290:3 319:2 329:12 331:20 332:23 336:17 337:7
**accountability** 260:8,11 323:3
**accountable** 240:16
**accounted** 55:22 123:24 170:13 273:12 274:25 301:10,13
**accounting** 93:20 100:10
**accounts** 61:7 287:20 332:9

accuracy 270:7 288:20
accurate 51:22 61:14 122:14 208:16 286:21 287:15
accurately 222:3
accusations 229:21
accused 263:17 331:21
acknowledge 276:17
acknowledged 311:17
acknowledges 277:9
acquaint 264:14
acquainted 29:7
act 76:18
action 2:7 314:15 338:14
actions 125:11 223:13
active 54:25 114:10 171:7 256:23,24
activities 110:25 111:8 113:24 114:12
activity 83:6,13 111:16,20 112:21 113:6 114:15 195:12 282:25 284:7
actual 27:14 28:24 33:10 110:25 111:8 119:5 130:7 132:15 212:17 222:11 270:5 299:25 307:14

actuality 167:15 168:20
acute 209:11 237:22
acutely 209:6
adaptation 274:18
adaptations 274:19
add 42:10 133:20 149:22 177:19 194:4 243:24,25 243:25 244:3,5 329:2
addict 110:20
adding 214:6
addition 181:4,9
additional 54:7 58:11,13 111:11 133:21 148:13 227:6
additionally 303:7
additions 200:17 200:22
address 8:14 91:15 163:6,13 191:17 195:16 201:2 229:3 252:18 274:24 317:15
addressed 191:9 194:15
addressing 188:13 252:4
adequate 28:10 35:14
adequately 31:21
adjective 290:20
adjustment 274:18
administered 8:5

administration 119:24,24 141:16
admission 179:15 179:16 295:12,25 298:21 311:13
admissions 140:8 209:17
admit 312:10
adopt 78:22 268:23
adopting 258:25 260:4
advantage 155:14 157:25
adversarial 69:20 70:8,15 71:12,16 71:22 72:11 73:6 73:9,16,17 74:10 74:14,19 77:7,12 77:19,22 78:11 80:10 99:12
advised 153:2,16
advising 153:13
advocate 55:10 166:24
affair 94:19 95:7 95:18 105:17,24 105:25 106:25 180:18 192:4 197:6 200:13 229:2 284:18,19
affairs 310:20
affect 61:10 122:25 123:13 124:13,24 125:22 125:25 126:12 127:18 128:6 157:11 287:3 288:20
affiliate 168:2

affix 186:23
aforementioned 145:19
aftermath 104:6 288:8 327:3
afternoon 240:25
afterward 14:17 21:13 321:2
age 127:5,8,12 264:15 302:15 328:11
agencies 142:16
agenda 26:25 74:21 75:8,8 77:14
aggressiveness 55:12
aging 126:3 127:4 127:19
agitated 290:14,16 290:17 291:23
ago 87:25 90:3 91:25 118:16 122:8 335:3
agree 6:12 10:18 37:9 43:13 51:24 87:2 90:7,22 91:24 94:13 162:13 170:14 241:15 254:3 299:15 304:16 316:19 318:2 324:2 325:4 327:14
agreeing 160:4
agressiveness 55:7
ah 77:4
ahead 207:14 265:8 285:3
aid 336:7

aimed 188:11
ainsworth 3:7 5:5
  7:13,14 8:17,18
  10:17 37:6 47:14
  50:24 59:4 70:13
  70:19 82:7 83:19
  83:24 88:4 97:11
  107:7 108:16
  124:17,21 136:4
  136:10 139:9
  147:25 154:2
  182:12,17 201:4
  207:9,15 254:21
  292:10,13 294:3
  308:12 315:15
  317:4,19 318:5
  321:14 324:6,20
  325:9,20,25
  330:12 337:12
ainsworth's 320:4
air 36:23 50:2
  203:24 234:9
al 6:23 169:6,8
  339:4
alarm 292:7
alcohol 272:17,21
  273:17 274:15,16
  275:4,7 278:3
  300:11,12,15,17
  302:4,7,9,10,12
alcoholic 300:21
alert 295:2
alibi 230:3 231:9
aline 329:14
allegations 60:24
alleged 96:6 192:6
  223:19 224:20
  225:25 256:7
allegedly 330:16
allele 85:11 282:23
  283:8,16,17,22,24

284:10 285:17
alliance 141:10
allow 68:4
allowance 240:8
allowed 245:8
allowing 194:25
  212:4
alphabet 210:22
alter 194:7
altered 61:9
alternative 198:14
  198:18
alternatives
  198:23
alvarez 1:20
amanda 44:20,22
ambiguity 313:21
ambiguous 67:15
  173:8 205:20,24
  205:25 206:3
ambiguousness
  284:3
ambitious 35:17
america 169:7,10
  169:15
american 144:10
  147:10 335:16
amount 45:14
  79:20 85:4,9
  88:24 89:9 119:13
  176:25 228:23
  267:14 274:11
  283:14 302:9,10
amounts 85:14,22
  184:18
anal 60:12,24,25
  282:15 283:3,6
  284:20 305:25
anally 281:25
  289:4

analogy 278:4
analyses 24:7
analysis 18:10,19
  19:9,11 21:21
  23:18,20 24:14
  27:9 33:12,18
  48:9,20 51:20
  52:5,8,12 56:9
  62:21,22 331:7
analyst 252:15
analytical 5:14,16
  84:4 88:5,6,14
  283:10
analyzing 106:9
anatomical 123:21
andrew 4:14 7:18
  315:22
angry 136:23
anita 1:20
ann 327:11
answer 9:11,21
  10:3 13:9,12 20:8
  21:4 23:18,21
  34:6,7,17 43:11
  45:5 46:14 49:11
  50:2 77:6 91:22
  93:5,17 94:9,11
  95:13 96:10 97:21
  97:22 99:18 104:2
  108:22 110:12
  115:14 116:6
  136:20 143:11
  176:7,11 196:21
  239:13,14 242:19
  250:13 251:11
  270:21 271:9
  285:3 312:8
  317:20 326:8
  329:2 335:2
answered 50:8
  92:6,12,13,13,14

96:9 97:10,17
  107:5 116:4
  130:22 134:17,19
  134:24 173:21,23
  187:6,10,10
  197:13 200:20
  253:10 331:10
answering 40:10
  93:2 210:18 335:8
answers 31:16
  92:18 93:6 109:12
  110:4 136:12
  209:24 244:14
  245:13
anticipate 234:19
anticipating 185:5
anus 282:10
anybody 37:19
  62:2 66:11 147:8
  169:5,10 214:15
  238:18 247:8
  261:7 270:23
  274:13 278:17
  290:13 313:5
  330:9
anymore 322:23
anyone's 301:19
anyway 41:10
apparent 69:12
appeal 255:15
  310:8
appear 135:18
appearance 23:12
  294:25
appearances 3:2
  3:22 4:2
appears 238:15
appellate 148:24
  170:7
appetite 112:19,20

[applicability - association]          Page 5

applicability 148:16
application 138:18
applied 144:23,25 246:12
applies 79:11
apply 54:14 145:2 262:17
applying 261:14
apportioned 276:12
appraised 300:5
appreciate 20:10 26:6 28:25 34:7 204:22 253:13
appreciated 58:15
appreciation 18:23 22:17 26:12
approach 39:4 71:11 73:3 273:22
approached 267:7
approaches 47:7
approximately 6:17 157:14
april 148:23
arc 312:11 313:16 314:6
area 29:10,23 30:17 32:11,12 39:10 40:11 41:2 41:4 42:11 48:8 49:25 52:7 56:23 64:3 69:8 95:23 125:23 144:16 147:20 318:14
areas 17:17 115:4 117:2 155:20 205:6 228:22 268:15
arena 55:23

arguable 234:17
argues 333:5,6
argument 140:13 199:6 319:18
argumentative 285:2
arguments 104:23
arkansas 149:13 149:22
armed 282:22
army 279:14
aroused 40:24
arrest 204:6 312:2
arrested 209:4 262:24 302:14,21 303:16
art 216:15
article 27:24 28:3 28:7,7 30:2,7 41:7 41:25 43:22,25 44:2 49:16 76:10 259:5 260:10,15 277:9,14
articles 30:11 40:14 45:16,23 46:3 108:10 306:15
artifact 217:19 317:11
asa 223:18 224:19 225:23 228:10
ascertaining 271:12
aside 39:3 177:4
asked 19:20,25 34:2 37:4 50:7 92:6 96:2,8 97:17 106:10 107:4 110:11 119:7 120:12 121:18,25 134:23 138:8

151:12 157:17 176:4,6 187:9 198:22 200:19 201:2 227:6,15,18 245:7 253:10,19 267:11 268:25 316:21 332:10
asking 9:4,16 25:9 46:15 47:22 77:2 106:22 117:7,9 121:11 125:17 130:8 138:11 165:18 196:14 218:23 238:17 244:13 251:11 287:12 324:9,21 324:22 325:24 326:20
aspect 26:8 72:8 73:4 115:18 266:16 323:22
aspects 18:23,25 19:2 74:16 77:18 114:21,22 115:8,9 115:10 122:19 135:17,25 137:4,8 138:10,15 191:18
aspire 223:6
assailant 68:22 91:19 93:8
assailants 67:8,14
assault 60:6 82:4 83:6 192:7 195:13 246:18 247:10,12 247:14 249:5,13 249:14,20,22 253:7 256:7 286:15,20,22 287:14 289:12 300:16 302:2 306:17,22 311:2,3

323:13 330:15 331:12
assaulted 272:16 311:6 330:16
assaultive 202:13
assembled 151:15 152:16
assert 55:15 160:4
asserted 43:11 289:18 332:11,24
assertion 61:3 102:15 111:19 205:10 257:6 321:8,18
assertions 17:21 33:22 46:24 49:10 50:11 61:22 104:22 171:9 319:16
assess 52:9 116:21 117:5,6,9 120:13 301:8
assessed 300:3
assessing 120:19
assessment 70:5 95:10 117:14 147:14 164:17 269:24 309:12,12
assessments 235:6 310:11
assets 27:5
assigned 181:16
assistant 1:18
associate 211:7
associated 127:10
association 15:18 22:10 62:17 145:17 149:14 150:2,22 153:24 208:19 210:13,16 212:4,12 234:4,7

234:17 235:14 236:8 243:12 246:9 247:19 248:15 249:15

**associations** 210:23 211:17 236:22 237:10 238:2 247:22

**assume** 9:21 66:5 99:7 143:13 174:17,20 250:2 316:16

**assumes** 68:24 282:5,18 302:24

**assuming** 68:23 192:7 195:21,24 217:17

**assumption** 100:11 196:4

**assumptions** 196:2

**assure** 156:8

**ataxic** 298:6

**attached** 40:15 190:9 205:15

**attacked** 67:8,18 102:5 274:4 316:24

**attempt** 268:24

**attempted** 11:3,5 24:19 38:25 58:5 99:3 150:9 180:5

**attempting** 130:4

**attempts** 111:2,9

**attending** 7:7

**attention** 16:23 20:9 40:16 41:12 41:17 48:7 162:17 198:12 227:20 229:17 281:16 301:6,23 319:4

**attorney** 1:18,21 3:16 107:24 122:12 148:24 166:11 169:25 181:19 259:20,25 266:4 267:6 268:7 313:8,14

**attorney's** 149:14 313:23

**attorneys** 3:5,10 4:5,11 7:6 36:9 151:4 152:6 172:14 181:20 205:17 262:7

**attract** 170:15 187:3

**attracted** 227:3

**attracting** 48:7

**attracts** 62:23

**attributed** 114:14 190:22 300:9

**audience** 151:6 152:4,5

**audio** 6:10

**aught** 173:7

**author** 265:14 272:25 273:2

**authorities** 145:9

**available** 28:20 60:5,7 65:13 67:7 68:14 79:18 98:21 106:16 112:5 164:4 172:20 177:12 178:3 198:5 199:12 202:8 205:17 229:8 287:19 310:12,14 313:11

**availing** 113:15

**avenue** 34:14

**average** 306:7

**avoid** 70:6,7 276:21

**avoidant** 273:21 276:8

**aware** 47:2,9 81:2 81:6,7,10,11,15,16 81:19,20,23,24 82:6 101:6,8 106:11 118:5,20 141:25 145:20 153:6 224:6,10 240:14 256:5 271:21 334:20 337:2

**awareness** 40:11

**ayers** 2:9 7:11 8:3 338:4,22

## b

**b** 5:10 83:5 210:7

**baby** 163:9

**back** 34:5 43:24 51:25 84:10 90:14 91:22 94:3,6 101:10 102:8 103:24 106:4 109:4,19 131:23 137:15 138:2 149:21 163:2 165:4,12,24 181:11 212:13,18 222:23 232:10 259:18 267:10 280:19 287:9 335:9

**bad** 33:17 36:4

**badge** 20:11 259:19

**bailiwick** 94:16

**balancing** 333:4

**bar** 75:11,12 324:14

**barbara** 1:12

**based** 16:24 17:17 22:2 30:19 74:20 74:20 93:23 106:21 119:14 159:25 177:11 180:7 196:16 227:7 253:4 272:25 287:18 310:12 317:25 323:10,12 330:15 330:18 334:22

**bases** 323:13

**basically** 49:25 55:12,13 69:2 179:23 209:20 245:16 246:13 248:17 260:25 261:2

**basing** 276:23 286:8

**basis** 19:4,5 22:23 57:11 269:10 310:4

**bates** 82:14 83:25 88:13 182:19 294:9

**bathroom** 225:12

**bazillion** 56:4 143:15

**bear** 24:5 31:5 104:9 332:10

**bears** 129:3,7

**beaten** 311:20 312:3

**beautiful** 218:9

**becoming** 199:12

**began** 158:18

**beginning** 9:11
51:13 94:6 107:20
139:22 157:18
186:14 201:16
255:11 328:24
**behalf** 7:14,16,19
7:22,25 10:15
**behavioral** 39:10
39:20 42:5,6 47:8
76:11 274:20
300:19
**behaviorally**
291:23
**behavioral** 70:5
**belabor** 34:10
**belief** 161:4
220:23 325:18
**believe** 22:12 25:2
38:22 40:9 124:25
125:3,8 130:22
137:17,25 138:17
149:12,15,18
152:18 155:17
156:10 158:7
170:3 188:4
259:20 262:2
281:14 307:16
311:8 312:6 321:6
332:2
**believes** 133:24
**belong** 195:6
**belongs** 285:17,19
**ben** 147:18
**benches** 225:13
**benefits** 307:23
308:3
**benign** 141:7
202:14 203:11
**best** 11:20 27:13
115:17 130:12
169:9 269:5

**better** 13:11 26:16
37:14 44:11
152:10 173:16,16
227:22
**beyond** 23:11
26:14 60:19 77:8
93:24 109:2
120:14 122:3
125:15,20 150:24
157:23 262:13
**bias** 69:20 70:8,15
71:12,16,22 72:11
73:6,10,16,17
74:10,14,19 77:7
77:11,19,23 78:11
80:10,10 99:12
**biased** 167:20
**big** 76:25 115:13
319:24
**bill** 185:9
**billed** 183:4 184:4
**billing** 184:13
**billings** 5:18
**bills** 182:9
**biological** 195:5
**bipolar** 160:21
**bit** 68:11 69:15
129:5 184:19
185:18 212:19
247:4 257:15
290:18 306:5,13
306:14
**bizarre** 250:3,4
335:21
**blacked** 183:10,13
183:20,25 184:2
184:12
**blame** 274:22
**blanket** 46:25
48:23 49:6,8
169:20

**blanking** 219:16
**blanks** 130:5,9
131:4,14 132:8
**blending** 33:6
55:14
**bless** 144:2,15
**blessed** 185:25
**block** 179:13
**blood** 338:14
**blown** 63:18
**blows** 285:23
**blurb** 28:9
**body** 136:2,3
137:5,10 170:11
177:6 281:23
**bollinger** 4:10
**bombers** 143:16
**boock** 1:11 219:7
219:15 242:8
**bored** 20:7
**borkan** 3:16
**borne** 42:13
132:21,22 155:7,9
155:11 173:16
**borrow** 63:11
**bottom** 27:3 43:2
82:22,25 294:14
313:19
**boundaries** 203:15
**boundary** 317:13
**boutique** 39:11
**box** 25:20,21 26:2
83:2
**boxes** 120:16
**brain** 123:17
124:4,12,19,22
125:11,12,14
126:3 127:19
**break** 9:25 10:7
47:12 50:25 57:13
122:20 232:8

254:22 292:9,10
**breakdown** 74:23
**breaking** 10:12
**brevity** 50:12
**brian** 1:18 3:11
**brief** 10:7,8 54:2
244:14 315:24
**brilliant** 229:4
**bring** 146:16
155:24 295:9
303:2
**bringing** 69:21
106:17 266:9
**broad** 27:20 32:15
36:5,13 40:5
49:10 68:5 115:21
261:6
**broadly** 147:22
**broadway** 2:2
6:20
**brought** 31:4
146:6,18 163:18
164:18 319:4
**brush** 79:15
**brutal** 111:25
113:24 205:11
**bryan** 1:15
**bs** 182:19
**build** 17:9
**building** 223:21
238:25 255:19
257:4,13 274:7,10
**built** 258:7
**bullet** 71:6 192:24
193:8 258:14,18
261:16
**bunch** 228:8
234:12
**burgess** 327:12
329:5 334:22

burgess's 333:16
burgundy 215:18
    215:22 216:4,6,9
    218:10
burrough 1:17
business 185:23
    187:8

**c**

c 8:6 210:10,20
cab 20:19
calculated 185:14
call 10:9 35:12
    39:7 43:7 149:15
    178:24 198:11
    235:24 254:11
called 265:24
    266:5
calling 50:21
calls 179:20
    265:22 279:2
    282:17 284:25
calm 290:17
    291:12,13,16,19
    291:22
camera 10:6
camouflaged
    244:12
cans 252:17
capabilities
    125:12,14
capable 204:16,17
    208:7
capacity 1:19,20
    97:2
capital 170:20
captain 259:8
caption 6:22
captured 68:22
car 20:15 63:3,16
    79:12 80:2

care 110:14
    136:14,15 141:18
cared 163:13
career 76:14 147:3
    172:4
careful 153:9
carl 1:6 6:22 64:16
    66:16 67:12,20
    80:23 81:4,8,12
    84:18 85:8,20
    86:3 87:24 89:4
    89:14,20,24 90:5,7
    90:21,22 91:7
    93:11 94:23 98:14
    99:10 100:16
    102:17,22 103:9
    103:18 104:10,18
    180:16 183:2
    184:21 191:5
    196:15 197:4
    206:24 207:18
    212:7,20,25
    213:19 215:20
    216:16,24 217:8
    218:4 221:2 233:4
    238:18 239:17
    241:12 246:16
    247:6 267:22,25
    268:5 269:15
    289:22 293:3,15
    303:22 304:4,13
    307:9 309:9
    316:23 332:3
    339:3
carolina 145:16
    149:25 150:21,25
    152:21 153:23
carried 77:15
    110:20
carrying 59:24

cars 19:25
cartrette 1:17 7:22
case 6:22,24 7:3
    15:15 18:15 20:13
    22:13,18,24 23:16
    25:3,10 26:16
    27:25 28:15,16
    30:10,24 38:23,24
    40:22 43:22 44:22
    44:25 45:12 48:20
    48:21 49:22 50:19
    55:22 56:19 59:13
    59:21 60:10 61:18
    67:25 75:16 77:24
    78:16,20,21 79:19
    84:21 98:19,25
    99:13 102:16
    108:7 113:9
    118:14 122:9,11
    122:11 141:14
    148:10,17 149:21
    153:8,21 158:5,6
    160:8,23 161:2,8
    161:21 166:18,25
    168:9 169:4 170:2
    171:21 172:23
    174:18,21 177:21
    179:18,21 180:25
    181:9,24 183:2,10
    183:16,17,19
    184:13,22,22
    185:9 195:17
    205:15 235:21
    253:21 266:5,20
    267:4,7 268:25
    309:18 316:23
    329:20 331:17
    336:7 339:3
cases 10:20 12:10
    13:22 14:16 15:3
    15:4,4,20 16:16

17:18 18:5,10
    19:7 21:16 22:4
    22:13 23:7 24:23
    25:3,8,10,11,16,17
    26:4,6 27:14,19,21
    28:24 29:12 30:5
    30:9,12,19 31:4,6
    31:9,10 32:8
    33:10,23 35:2
    36:2 37:4 39:5
    43:24 44:5,19
    45:9,14,16 52:23
    52:24 53:15,16,20
    53:23 54:9,11
    55:16,25 56:14
    58:12,14,21 59:7
    60:5 65:11 76:16
    86:14 99:2 132:15
    133:16 154:23
    157:14 159:14
    161:16,17 162:19
    167:5,24 168:5,6
    170:5,6,10,11,14
    171:23,25 173:4,6
    173:13,22 177:2,4
    177:6,24 178:10
    178:12 179:4,11
    180:7,10 184:3,20
    186:2,3,5,6,9,11
    186:13,14,17,18
    186:21,24 187:2,3
    187:11 253:18
    263:14,21,22
    264:19 323:13
    329:3 331:12
    334:15
cash 110:21
    113:18
cassell 43:23
cast 168:11

[catastrophic - chatman's]

**catastrophic** 257:12
**catch** 222:6
**caught** 294:20
**causal** 21:18 28:11 55:21 56:16 57:6
**causation** 24:16
**cause** 13:3 53:3,7 53:19,24 55:11 56:8,24 69:17 72:21,22 113:5 131:18 132:24 153:5 224:17
**causes** 17:19 23:14 288:17
**caution** 22:23 152:24 155:25
**cautions** 145:21
**cautious** 23:15 153:17
**caviler** 218:22
**cell** 6:7
**cellmate** 313:3
**center** 212:23 224:2,4,16 233:3 248:5 304:5,9,15 316:25 321:11 325:8
**centered** 247:11
**ceratin** 115:9
**certain** 12:17,24 21:4 24:23 39:8 52:11 61:13,15 71:24 97:5 115:7 119:12 140:22 144:9 152:22 154:8 156:16 158:21 163:11 170:6 188:6 191:18 208:8 211:15 215:6,7

231:20 248:22 267:14 268:15,21 268:24 274:3 277:7 279:8 302:9 302:10 313:9 334:15
**certainly** 9:8 18:22 19:3 22:23 32:10 37:18 60:21 61:6,21 63:2 64:9 68:12 73:7 78:21 91:20 105:14 131:24 137:22 145:22 158:9 163:6 167:13 182:8,9 189:15,16 204:10,15 209:18 217:24 219:6 225:21 228:17 257:14 264:13 267:18 270:14 271:5 301:18,20 311:11 313:12
**certainty** 60:22 316:12,14,15
**certificate** 307:10 307:12 309:10,24 314:23 315:2
**certification** 338:2
**certify** 298:3 338:6,12
**chain** 214:12
**challenge** 77:25 208:3
**challenges** 70:4 78:6
**chance** 71:7
**change** 64:13 191:6,12,12,16 192:17,19,20,21 192:22,23,24,25

193:2,3,4,6,9,10 193:13,14,16,17 193:18,19,21,23 193:24 194:2,7,16 196:3,11,15,19 197:15,17,21,24 198:9,11,21,24 199:17,20,22,25 200:2,6,6,9,23 201:4 224:17 225:21 245:13 288:6 311:21 317:22 339:6
**changed** 192:10 197:3,18 217:9
**changes** 191:12 241:8 317:21
**changing** 199:10 217:13
**characterize** 321:7
**charge** 198:25
**charged** 163:23
**charges** 164:2,13 164:18 170:21,21 170:22
**charitable** 50:22
**charles** 232:22,25 236:10 241:11 304:2,12
**charted** 16:12
**chase** 64:10
**chatman** 1:6 5:19 6:23 59:23 60:17 62:12 64:16 66:16 66:18,25 67:4,12 67:21,22,24 80:12 80:17,24 85:8,20 86:3,24 87:24 89:4,14 90:7,23 91:7 92:3 93:11 93:21 98:25 99:10

100:10,16 102:17 102:22 103:9,18 104:10,19 106:15 159:23 180:16 183:2 184:11,21 185:4 189:21 190:16 191:5 194:22 195:7,13 195:14 196:15 197:4 198:15 207:19 208:4,6 212:8,21,25 213:19 215:20 216:16,24 218:4 221:2,7 227:17 229:19 230:4,8 231:6,10 232:18 233:4,8 236:18,24 239:17 240:2 241:12,21 242:2 242:10 244:19,22 245:2,7 246:16 247:6 255:13 267:23 268:2,5 269:15 283:21 284:14 289:22 291:5 292:5 293:4 293:16 299:9 300:10 301:25 302:13 303:22 304:4,13 307:9 308:15 309:9 311:2,18 314:16 315:12 316:23 332:3,14 339:3
**chatman's** 61:18 66:3 80:23 81:5,8 81:12 89:20,25 90:5,22 94:23 98:14 101:20 201:21 206:24

[chatman's - collected]                                                      Page 10

217:8 219:3 228:3
235:5 289:16
307:13 309:21
311:5 332:20
**cheat** 140:23
142:4
**cheated** 140:24
142:6
**check** 84:11
120:16 252:13
**chemical** 274:19
**cherry** 164:5
**chestnut** 4:14 5:5
7:18,18 87:7
90:12 91:2 92:11
95:22 100:19
105:20 192:12
197:12 200:21
201:25 213:21
275:13 278:22,25
282:7 284:23
286:16 292:8
308:18 315:20,21
315:23 324:18,22
325:14,23 326:6
326:10 330:7
**chicago** 1:9,9,10
1:10,11,11,12,12
1:13,13,14,14 3:6
3:11,12,18 4:7,13
6:23 7:17,25 29:5
129:3,7 184:25
185:7,8,24 186:7
187:8,13 292:11
292:13 315:18
321:11 339:4
**chicken** 277:4
280:9
**chief** 20:2 151:15
151:15 152:17

**child** 137:23
335:12,22
**china** 205:11
**choice** 279:25
280:4
**choices** 277:10,15
277:16,22
**choose** 156:19
268:20 273:22,23
312:10
**chooses** 308:21,22
**choosing** 167:5
**chose** 178:11
276:12 291:17,18
323:5
**chris** 332:4
**chromosome**
86:10 87:13
**chronicled** 128:11
**chronologically**
198:5
**church** 112:22
**cigarette** 231:14
**circumstance** 66:4
274:3 323:20
**circumstances**
12:13 133:20
134:4 227:16
231:17 268:21
274:5 276:14
277:8 279:23
287:25 330:19
**circumstantial**
171:4
**citations** 135:14
**cite** 27:24 30:11
272:12 273:2
**cited** 239:10 273:5
273:6
**cites** 334:17

**citing** 28:7
**citizen** 141:13
**citizens** 144:10
**city** 1:9 3:11 6:23
7:16,25 10:15
184:25 185:6,8,24
186:7 187:8,12
339:3
**civil** 2:11 172:13
280:24 281:13
290:25 291:17
319:9 321:19
**claim** 61:24,25
167:9 198:16
279:12 319:10,22
320:13,22,25
321:19,20,21,22
322:21
**claimants** 15:5
**claimed** 92:25
289:11 321:8
**claims** 281:25
289:17,23 291:5
310:19 331:13
**clarify** 324:23
333:22
**clark** 3:17
**classic** 303:12
**classification**
327:24
**classifications**
121:15
**clean** 136:11
**clear** 38:13 71:16
90:18 91:4 92:19
93:7,9 118:10
155:18 172:11
189:20 230:22
237:4,6 238:2
240:10 268:6
269:17 299:23

318:18
**clearly** 52:3
179:10 218:22
297:7
**cleave** 212:3
**client** 184:25
294:17
**clients** 185:6
**climate** 288:23
**clinical** 55:4 57:10
241:5 304:10,11
305:4,11
**clinically** 304:25
**clinician** 256:13
264:20
**clinicians** 305:9
**clobbered** 129:4,8
**clock** 10:10
**close** 22:10 158:11
171:3
**closely** 55:23
307:22
**closer** 20:20
105:24,25 185:20
**clothing** 318:17
**cocaine** 335:20
336:19
**coding** 126:8
**cognition** 127:7
**cognitively** 158:3
**coherent** 61:8
**coincidence** 23:6
**coinciding** 195:12
300:16
**coined** 327:18
**cokeley** 1:15 7:23
**colbertson** 4:4
**collect** 251:25
**collected** 68:21
251:24

**collectible** 317:2
**collecting** 77:18
  251:13,14,15
  252:23
**collection** 31:13
  92:25 317:10
**college** 32:19,24
  35:4,6,10 38:17
  44:15,16 138:21
  139:3,25 140:21
  140:22 142:25
  143:3 144:5,11
  156:14 202:21
  258:24 259:13,21
  314:5
**collegiate** 140:17
  141:2 142:11
**color** 213:4 215:10
  215:21,23 216:10
  216:24,25 217:9
**colorful** 303:14,18
**combination** 12:2
**come** 12:19 21:21
  22:11,15 23:5,16
  24:24 26:5 28:25
  35:19 54:8 56:7
  64:25 65:12 68:22
  72:12 73:4 117:4
  118:5 125:14
  126:14 127:20
  154:23 155:22
  162:17 164:9
  165:2 172:14
  187:12 205:6
  214:19 217:16
  218:16 234:8
  309:19
**comes** 57:9 69:8
  118:12 126:16,20
  189:13 237:25
  245:19 254:15

  296:22
**comfort** 40:4
**comfortable** 160:3
  160:3 186:25
**comfortably**
  131:15 177:10
  178:4
**coming** 69:10
  189:10 231:15
  261:4
**comments** 230:19
**commission**
  339:25
**commit** 208:12
  209:15 303:8
**common** 128:14
  128:15 221:17
  243:7 261:14,18
  262:12,13,18
**commonly** 78:15
  281:7
**communicate**
  96:19 209:17
  214:16 239:23
  242:3 243:5
**communicated**
  191:19
**communicating**
  166:17,21 169:22
  207:2,7,20 208:2
  233:5 235:23
  239:16 242:10
**communication**
  211:12 235:10
  236:4,25 240:22
  241:8 243:13
  244:8 247:21
**communications**
  247:21
**community** 25:12
  27:16 28:5 29:15

  29:20,21 32:2
  34:15,24 35:9,10
  35:12,16,25 36:17
  37:23 38:2,6,8,10
  38:12,15,17,20
  39:7 40:12 43:7
  54:20 55:3,4
  261:25 264:21
  279:18 327:16
**community's**
  254:11
**comparable**
  260:12
**compare** 174:11
  323:21
**compared** 333:7
**comparison** 30:13
**compel** 133:20
**compelling** 323:8
  323:10,22
**compensation**
  257:8,25 258:4,6
  314:18,22 315:3,5
**complain** 136:9
**complaint** 62:6
  104:5 199:7
  205:22 280:13
  288:5 291:17
  322:21 332:24
**complaints** 287:24
**complete** 12:16
  62:13 66:21
  192:13 197:10
  213:22 221:9
  267:11
**completed** 11:9
**completely** 33:13
  205:20 279:22
**complex** 11:19
  21:20 29:3

**compliance** 73:12
**compliant** 73:21
**complied** 157:21
**complying** 82:23
  88:19 215:15
  223:16
**component** 181:25
**composed** 291:12
  291:13,16,20,22
**composition** 196:6
  198:20
**compound** 213:10
**comprise** 334:8
**computer** 32:20
  260:6,14 265:6
**computers** 32:25
**concepts** 57:8
**concern** 94:18
  141:19 153:13
**concerned** 23:15
  35:15 235:12
**concerning** 106:7
**concerns** 145:18
  167:19
**concise** 188:11
**conclude** 21:14,18
  45:22 58:5 80:12
  80:16,24 99:12
  177:10 178:4
  214:14
**concluded** 43:16
  313:24
**conclusion** 14:19
  15:8 21:22 23:25
  52:20 153:4 162:2
  172:15 175:3
  188:14 198:14
  261:22 272:24,24
  273:3 330:23
**conclusions** 12:8
  12:12 13:2,19

15:21 16:4,18
19:15 22:21,25
23:9 27:10,21
30:6,15 31:22,25
32:17 34:15 35:7
37:12,16,22 38:12
41:8 43:5,10 44:7
44:13,14 45:17
46:21,23 47:6,18
47:21 48:22 49:20
50:5,16,17,18,19
51:16,22 53:4
78:13 79:18 80:3
85:2 88:23 151:19
181:15 191:25
**conclusory** 12:21
**concussion** 128:25
130:7 138:16
280:16,18 281:10
281:15,19
**concussive** 128:16
**condition** 160:16
170:24 204:3,10
211:23
**conditions** 126:25
133:2 140:13
**conduct** 11:11
12:15 18:9 31:20
144:20 145:10,13
157:12
**conducted** 10:25
11:6,8,10 37:20
82:2,18 115:22
116:9 119:15
127:22 139:24
281:20
**conducting** 37:13
**conducts** 143:6
333:20
**confabulate** 133:3

**confabulating**
131:11
**confabulation**
131:22 135:6
137:10
**conference** 148:25
**confess** 21:13
153:6 155:2
179:23 263:8
**confessed** 73:25
159:5 162:5
175:21 180:11
202:20 230:4,9
231:10 263:6,18
312:21
**confesses** 164:13
264:4
**confessing** 208:7
240:15
**confession** 11:18
12:18,25 14:6,18
15:5,9,10 17:20
26:7 28:4,12
30:20 31:9 35:5,7
35:9 39:5 52:22
53:3 56:18 70:6
74:17 99:14 100:9
104:15 105:2
115:2 132:7,13
137:13 138:23
147:23 149:2,19
151:22 152:11
153:9,11 157:5
158:20,23 159:12
160:23 161:6,10
161:12,17,20
162:15,16 164:10
170:5,25 171:25
172:3,16 174:19
175:3,20 176:16
178:6,19,22

179:17,20,25
180:20 188:12
191:6,13,21,22
195:9 201:22
202:5,15 204:24
205:11 212:21
213:25 217:14
227:16 228:4
230:25 253:3,17
253:20 257:19
263:14,20 264:12
265:10 266:5
289:17 305:5,20
311:5 312:12,14
312:15,17 313:25
314:7,8,8 315:13
**confessions** 10:19
10:21,23 11:13,14
11:15 12:6,19
13:10,18,21 15:12
17:19 18:6,12
21:9,19,24 22:8
23:22 24:4,11
25:8 30:5 31:7,15
31:19 34:24 35:2
38:16,19,20 43:9
43:15 48:4,9,10,15
48:15 51:17 53:10
58:4,8,18,20 59:3
59:6 71:20,25
108:21 132:17
140:2 147:12
149:8,16 151:18
152:2 154:11
155:7 156:7,9,11
157:16 159:16
160:7 162:21
165:11 170:12
172:2,8,9,10,12
175:9,15 176:23
177:11 178:2,12

178:24 179:2
202:17 208:13,14
305:16 313:20
**confidence** 13:24
156:6
**confident** 24:7,25
173:5
**confirmed** 18:5
21:9 30:4
**conflate** 261:20
**conformed** 220:19
**confrontation**
16:5 22:3 52:19
**confrontational**
218:14
**confrontations**
229:21
**confronted** 14:3
52:20,25 229:24
231:18 232:4,5
**confronting** 154:4
154:6 231:22
260:7
**confronts** 231:5,6
260:11
**confused** 34:19
118:22 175:4
**confusing** 55:12
238:23
**confusion** 61:16
**congratulatory**
76:3
**connected** 250:6
**connecticut** 19:23
20:3,23
**connection** 60:2
151:16 211:3
249:24 255:19
274:14
**connolly** 4:10

conscious  121:5
  277:13
consciously  133:8
consensual  59:20
  59:24 64:22 65:7
  83:9 87:20 91:9
  91:18 93:9,18
  97:25 98:4,7,11
  100:8 112:8
  195:11,22
consensually
  65:20
consensus  334:10
consent  99:21
consequence  54:7
  258:23
consequences
  55:24 141:6 203:3
  258:12 260:7,10
consequential
  172:25 314:12
consider  35:4
  39:16 41:6 66:25
  67:3 115:11,20
  120:25 166:10
  167:14 198:23
  217:25 248:24
  320:5 321:3
considerably
  300:7
consideration
  24:21 112:6
  191:21 194:13
  309:23
considerations
  191:23
considering  19:16
  248:14,21
consistent  221:14
  250:8

conspicuously
  237:12
consternation
  195:19 196:9
construction
  279:7
consulted  122:11
  172:13
consumed  228:20
contact  59:20
  64:23,25 65:8
  68:10 189:10,17
  195:6 302:20
contaminant
  100:14,21 284:8
  285:14
contaminate  91:10
  91:13
contaminated
  315:11
contamination
  87:15 93:16 94:14
  99:21 180:17
  192:8 195:11,24
  197:8 200:15
  201:20 203:4
  213:17 217:16
  220:16 221:5
contemporary
  169:15
content  28:17
  30:11 189:8 243:4
contention  135:18
contentions  49:20
  50:5
contest  307:21
contested  54:19
  100:25
contesting  308:24
  308:24

context  11:22
  14:24 53:11 69:21
  72:18 111:12
  120:19,24 139:7
  140:5,17 145:23
  155:3 175:12
  202:14 281:13
  305:14
contexts  12:5
  120:23
continue  6:11
  229:8
continued  3:22 4:2
  51:10 57:22
  107:17 139:19
  177:18 201:13
  255:8 292:23
  328:21
continuing  330:12
contradicts  46:20
  47:17 50:15
contrary  171:8
  239:11
contribute  11:18
  12:6 14:5 157:5
  161:19 277:17
contributed
  102:13
contributes  86:11
  202:5,9
contributing
  161:5,11 173:20
  204:23
contributor  86:4
  283:21
contributors
  72:16
control  279:19
  300:19 316:4
controversies
  54:17

controversy
  143:22
converged  159:10
converging  26:10
conversations  6:6
converse  57:25
convey  143:24
convicted  166:13
  166:23 255:14
  257:18,22 258:2
conviction  187:15
  187:18,22 188:2
  255:15,25 258:10
convictions  151:17
  151:25 152:10
cook  1:15,15,16,17
  1:18,19,20,20 4:5
  212:8,10
cooperative  295:3
cop  141:13 209:9
cope  272:17
coping  274:17
coprophilia  40:23
  41:16
cops  36:6
corner  82:22 83:2
  294:15
corp  279:14
correct  11:7 24:2
  31:24 43:16 49:5
  50:16 58:24 59:9
  80:18 83:11 84:8
  86:19 89:22 90:2
  108:9 109:13
  154:3 200:24
  212:12 220:22
  226:19 246:19
  254:20 271:19,24
  272:11 278:6
  281:24 282:3,8,11
  285:25 302:16

303:25 311:10 317:7 330:17
**correction** 311:14
**corrections** 262:22
**corso** 156:13
**cost** 182:6
**coterie** 48:6
**counsel** 168:17 324:8,17 325:12
**counterbalance** 333:11
**country** 265:13 279:9
**county** 1:15,16,16 1:17,18,19,20,20 4:5 212:8,10
**couple** 35:18 36:2 41:9 108:5 148:12
**course** 17:8 18:17 46:7 79:19 93:11 116:22 118:4 120:10 127:13 163:3 175:7 191:24 204:23 217:13 218:18 221:18 249:6 250:20 283:4 312:19 314:15
**courses** 116:18
**coursing** 259:2
**court** 1:2 6:25 7:10 17:12 136:7 136:12 163:5,7 307:22 308:13,20 308:21,22 333:24
**court's** 310:4
**courthouse** 274:8 275:19
**courtroom** 203:13 225:3,13

**courts** 310:7,11
**cover** 27:6
**covered** 149:18 228:24 283:23
**crack** 110:20
**crash** 32:19
**crashed** 265:6
**crashing** 32:25 260:5,13 265:6
**create** 153:11,19 325:17
**created** 142:2
**creates** 14:10 15:10
**creating** 149:11
**credibility** 256:17
**credit** 79:7 203:22 238:21 307:12
**credited** 161:25
**crediting** 284:2
**creek** 144:13
**crime** 59:14 60:15 61:19 102:14 202:19 212:22 214:17 217:10 218:3 220:14,20 221:7 223:19 224:20 225:25 241:10 246:5,25 250:16 252:14 301:17 302:22 306:23 314:17 327:23
**crimes** 141:17,24 142:11 148:25 208:12 209:16 264:7 307:8
**criminal** 101:18 101:19 104:5 152:7 313:8,13,23

**criminalist** 19:19
**cringe** 223:3
**criteria** 180:9
**critic** 261:8
**critical** 43:25 44:2 53:9 139:8 246:12
**critically** 246:2,10
**criticism** 39:3 334:2,11,12,13
**criticisms** 45:19 45:20 333:16,19 333:23
**criticized** 138:20 138:25 265:13
**critics** 259:7
**cross** 336:6
**crowd** 151:2,3 152:21 153:24
**crowe** 177:21
**crude** 120:14
**crystally** 274:25
**culled** 180:7
**culminated** 159:12
**cup** 233:17,18,21 233:24 234:5,14 238:8,9,14,19 239:4 245:20,21 245:24 246:4,22 247:7 248:2 249:7 249:23 250:16,22 250:24 252:7 253:6
**cups** 252:23
**current** 37:10 148:10,14
**currently** 43:6
**curt** 232:6
**curtly** 230:20
**cusp** 307:4
**custodial** 263:16

**custody** 214:12 237:25 263:3,12 335:22 337:10
**cut** 180:3 207:12
**cuts** 188:22 189:3
**cv** 1:8 5:17 7:3 145:25 146:4 147:16 148:7,21

**d**

**d** 5:2 210:10,20,22 260:23
**daley** 212:23 224:2,4,16 233:3 304:4,8,15 316:25 321:11 325:7
**damage** 279:11
**damn** 257:11
**danger** 297:5
**dark** 216:3
**dart** 1:19
**data** 16:16 24:13 24:18 26:5,10 27:7,9 28:20 29:2 30:23 31:13,22 33:12,13,15,18,18 36:15,15 37:11,14 44:17 45:2,7,15,22 45:25 46:2,3,4 48:10,21 51:18 54:7 55:9 57:4,5 79:20 140:25 143:7 147:14 155:8 167:4 173:17,18 176:5,5 177:2 272:25
**database** 28:10
**dataset** 44:6 177:9
**date** 6:16 52:2 70:23 82:11 83:23 88:10 148:5,10 150:17 182:16

199:11 294:7
295:25 298:21
339:4
**dated** 84:5
**day** 36:16 40:18
42:4,4,19 164:24
173:11 181:18
227:14 264:15
300:12 329:15
337:21 338:18
339:22
**days** 192:5 195:22
197:6 200:14
201:19 213:15
221:4 252:19
253:13,24 256:6
280:21 281:5,17
284:20 298:24
315:10
**dazed** 129:5
**de** 111:15 170:15
258:3
**deadline** 326:5
**deal** 19:3 252:15
313:21 323:5
**dealing** 44:5
264:21 280:8
322:13
**deals** 314:6
**dealt** 280:25 319:8
**dean** 139:4 140:16
**death** 17:20
152:25 154:5
168:25 169:2,12
170:21
**december** 2:3 6:16
84:6 198:6 338:18
339:4
**decipher** 239:22
**decision** 188:17
263:7 279:14

310:16
**decisions** 143:24
**decline** 127:6
186:5
**declined** 186:6
**dedicated** 75:23
166:12
**deemed** 299:3
**deeming** 22:2
**deep** 169:15
**defend** 272:20
**defendant** 3:17
4:11 7:19 169:7
264:11
**defendants** 1:22
3:10 4:5 7:22
22:19 76:13 230:9
**defense** 75:11
142:21 143:15,17
144:3,5,22 145:5
152:6 163:18
168:16 188:2
259:24 266:4
313:8,13,23
**defer** 285:4 317:8
**deferential** 290:20
**definitely** 16:22
53:24 137:9
154:18 191:2
205:8 312:4
**definitively** 96:16
98:24 99:23
108:23
**degree** 14:9 21:14
52:13 61:10 91:13
100:24 111:22
118:24 131:25
137:21,24 144:6
240:17 283:6
289:10 316:11,13
320:15

**delete** 194:3,6
**delirious** 211:25
**delusion** 293:23
295:17 297:11
**delusional** 233:21
293:17 296:6,15
296:17 297:4,9
298:9 299:11,16
299:17
**delusions** 155:10
160:19
**dementia** 116:24
127:10
**demonstrable**
31:15 35:2
**demonstrably**
10:21 11:12 13:17
31:19 37:2 53:18
58:3,22 59:2,7,12
99:14 151:18
157:15 159:15
160:7 161:9,17
162:14 176:16,22
**demonstrate**
33:11 34:14 60:22
**demonstrated**
24:10 30:19 32:3
32:4,5,6,16 37:13
132:2 133:16
**demonstrates**
37:21 134:21
**demonstrative**
18:12 59:16
**denial** 53:12 54:5
312:13,15 314:8,9
**denied** 179:6
255:16 295:10,11
295:12,13 310:7
**dennis** 1:12
**deny** 307:2

**department**
142:21,22 143:14
143:17 144:3,4,21
144:22 145:5,5
163:18
**departments**
163:12
**depend** 23:6
130:24
**depending** 140:12
**depends** 52:10
105:5 114:23
130:13,17,20
**depose** 36:9
**deposed** 8:20,22
108:6 246:16
**deposited** 238:19
**deposition** 1:24
2:5 6:10,19 17:12
20:12,13 36:8
38:4 79:10 83:16
84:20 94:7 106:6
106:18,20 107:22
108:11,18 109:3,8
109:11 110:3,10
110:14 143:12
175:17 196:6
199:13 223:25
226:7 228:2,16
229:5,9 233:16
236:18,19 237:11
237:16 246:23
268:14 282:14,22
290:22 329:22
335:8 339:4
**depositions** 101:4
219:2,23 220:7
252:20 271:3
**depravity** 18:21
**depression** 159:22
160:12

**depth** 41:5
**deputies** 1:19
**deputy** 1:15,16,16
  1:17
**derive** 15:8 16:17
  32:15 47:5
**derived** 32:18
  143:7 226:2,5
**described** 137:8
  142:12 211:21
  272:5,8 288:18
  291:12
**describing** 168:15
  304:13
**description** 5:11
  217:9
**deserved** 76:4
**design** 105:15
  138:22
**designated** 141:17
**designed** 26:11
**desk** 63:24,25 64:3
  69:13 128:6 234:6
  252:13,14
**despite** 22:12
**destabilize** 241:9
**detail** 48:5 118:11
  214:7,7,24 326:20
**detailed** 48:15
  230:2 231:8
  305:12
**detailing** 132:18
  213:3
**details** 61:14,15
  119:8,9,19 132:8
  133:7,21 203:16
  213:2 217:15
  218:3,6,23 221:6
  318:12 326:15,20
  326:25

**detainee** 142:23
  143:4
**detainees** 144:7,9
  144:12
**detective** 1:9,10,10
  1:11,11,12 205:14
  205:14 231:6
  242:8,9 245:6
**detectives** 220:19
  233:6,6 238:17
  240:25 251:6
  253:5
**deteriorated**
  242:20
**deterioration**
  127:6 303:5
**determination**
  254:14 299:18
  310:5,6
**determinations**
  335:22
**determine** 16:3
  18:11 24:15 59:11
  61:18 83:8 158:18
  188:7 253:2
  254:19 319:13
**determined**
  131:18 157:15
  195:15
**determining** 254:3
  254:4
**devastating** 336:5
**develops** 273:20
**devoid** 262:11
**devote** 41:11,16
**diagnosed** 280:15
  280:17 281:15,19
**diagnosis** 155:6
  176:20 300:25
  301:12

**diego** 177:22
**dietz** 335:10
  336:14
**dietz's** 335:24
**difference** 25:5
  29:9,10 38:9 73:2
  150:23 314:10
  329:11
**differences** 318:9
**different** 22:20
  40:6 44:7 47:4,5,6
  57:3 69:9 72:10
  72:10 74:13 77:11
  77:17 97:20
  113:20 117:2
  121:12,15 122:17
  122:19 127:3,4
  134:10 135:16
  151:6,7 156:22
  163:9 165:5 185:6
  206:19 209:19
  244:9,10 252:20
  262:8 270:8
  276:10 306:5,11
  309:3 310:16,18
  318:3
**differentiate** 205:4
**differently** 73:3
**difficult** 9:6 136:6
  158:18
**difficultly** 169:22
  206:25 207:25
**difficulty** 207:19
**dig** 34:11
**diluted** 54:9
**direct** 70:24
  102:19 103:3
  104:3 229:17
  292:2 296:10
  316:7

**disagree** 273:5
**disagreed** 334:14
**disagreeing** 329:6
**disc** 51:4,13
  107:11,20 139:22
  201:16 254:25
  255:11 328:24
**discarded** 238:14
**discern** 234:2
**discernment**
  234:11
**discharged** 298:24
**discipline** 50:20
  50:22 92:22
  329:18
**disclose** 326:24
**disclosed** 17:8
  49:21 118:6
  183:17
**disclosure** 327:9
**disconnect** 28:13
  28:14,16 196:5
  211:5 261:23,24
**disconnected**
  211:8 248:7
  279:23
**discount** 167:23
**discounting**
  168:18 242:13
  304:2
**discovered** 73:14
  318:15,25
**discovery** 16:25
  157:21
**discrepancies**
  287:20,21
**discriminate**
  188:10
**discussed** 134:22
  135:17 137:5
  203:12 282:21

discussing  115:5
  249:14
discussion  51:5
  54:25 57:17 62:20
  74:16 100:12
  104:25 107:12
  118:7,8,13 139:14
  160:18 189:12,14
  191:14 194:5,18
  198:17,25 201:8
  205:21 209:4
  221:22 232:10
  234:9 250:11
  255:3 292:18
  305:15 328:16
  332:21 334:25
discussion's  79:7
dishonest  28:15
  121:2 249:10
dismiss  55:8 205:8
  215:5
dismissive  64:5
  132:13
disorder  76:12
  166:16 273:20
disorders  77:5
disorganization
  211:16 212:4
disorganized
  211:9,10,11,18
  243:11
disparaging  75:18
disparity  22:13
disproved  316:8
dispute  56:21
  62:23
disputed  25:8 26:7
  70:6 147:11
  171:24 263:14,19
  300:14 313:20

disputing  147:23
  177:25 305:5,15
  309:22
disqualified  261:2
disrespect  158:10
  328:5
disrobing  319:6
dissect  25:10,11
dissociation  13:3
dissuade  323:3
distinct  212:6
distinction  173:13
distinctive  307:8
distinctly  134:9
distinguish  175:13
distinguished
  176:19
distinguishing
  288:13
distorted  133:7
  134:8
distortion  121:4
  129:20,25 131:19
district  1:2,3 6:25
  7:2 149:13
distrust  132:4,12
  132:16,22 137:12
  137:16
disturbed  318:17
disturbing  49:4
divert  279:16
division  1:4 7:3
  335:16
dna  59:13 60:4,8
  60:13,20 64:15,24
  65:4,13,21,25
  66:15 68:8 80:20
  81:3,8,12,17,21
  83:8 84:16,20
  85:4,9,15,22 86:13
  86:16,17,21 87:11

88:2,24 89:9,18,18
89:23 90:4,20
91:6,11 92:2,20
94:13,21,23 98:12
98:14 99:4,8,8
100:12,23 102:2
102:11 105:11
106:9,12 112:7
122:2 180:17
188:16 189:9,10
189:14,16,24
190:5,12,15,21
192:8 194:10,14
195:3,4,25 197:8
198:3 200:15
201:20 213:17
221:5 251:3
283:15 315:11
316:20 317:2
doc  65:23
docile  289:18,24
  290:15,16,16,18
  290:19,24 291:6,8
  291:13,13,17,19
  291:25
docility  290:10
doctor  47:12
  51:14 58:2,25
  59:5 70:17 91:24
  138:4 139:23
  188:23 261:13
  281:9 295:6 297:7
  315:6
doctors  293:14
  312:3
document  70:21
  82:9,14 83:2,21
  84:8,25 88:8,12
  113:4 148:3
  182:14 197:20,23
  199:19,24 200:4,8

294:5 297:24
  313:14
documentation
  79:21 132:15
documented
  133:17 135:9
  137:18 176:23
  212:10
documents  16:24
  101:11
doing  19:10 72:7
  76:19,24 133:9
  150:11 173:13
  185:16 196:17
  243:23 248:6
  252:21 276:5
  294:2 335:20
  336:20
doj  27:4
dollars  143:15
  181:21
domains  74:15
door  209:9
dose  55:18,18
double  25:23
  43:17
doubling  332:23
douglas  110:20
  111:6,13 114:3
downstream
  218:25
dr  7:4 20:15 31:8
  32:9 44:21 48:18
  48:18 49:21 50:6
  50:15 51:25 61:22
  71:18 75:18,21
  84:18 137:11
  141:25 142:14
  163:19 199:13
  202:21 203:3
  227:19,19 239:9

258:20 260:18 261:9,19,19 266:12,17 268:20 270:14 281:20 283:19 311:10,16 315:22 319:15 329:5 333:16 334:22

**dramatic** 241:7 257:16 318:13 320:15

**dramatically** 49:15

**draw** 12:12,25 14:19 15:20 19:14 30:5 31:22 45:17 51:15 171:18

**drawing** 32:2 239:6 331:7

**drawn** 23:25 43:6 44:7 46:21 47:18 53:4

**dress** 217:18 218:10

**drew** 13:23 177:24

**drill** 248:23

**drills** 316:3

**drinking** 295:11 302:5,6

**drive** 3:11

**driven** 71:20 132:8

**drizen** 30:8,16 35:14 38:24 44:13 45:12

**drizen's** 45:25 46:2

**drop** 264:23

**dropped** 64:2 164:3,14 260:24

**drug** 113:17,17 246:6 273:17 274:16 275:4 278:2

**drugs** 112:18 272:17,21 274:15 275:6

**dsm** 334:8

**dual** 300:25 301:11

**due** 326:18

**duly** 8:7 338:8

**dykema** 3:10

**dynamic** 132:9 137:19 143:13 155:11

**e**

**e** 3:19 5:2,10 8:6,6 8:6

**earlier** 14:21 17:16 45:5 47:19 79:10 103:22,24 106:11 122:7 156:24 175:16 180:5 216:22 227:4 231:16,23 232:3 242:19 277:23 288:25 303:19 320:4 321:20 322:18 331:11

**early** 76:14 78:19 153:3 229:20 241:2 275:21,23 276:20

**easier** 12:11 113:5

**easily** 303:23 304:9 305:3,23,24 318:19

**eastern** 1:4 7:2

**easy** 214:24

**eddie** 158:7,8,11 159:4

**editing** 194:25

**educate** 156:20

**educated** 266:13

**educed** 142:3 143:9

**effect** 53:19,24 55:11 56:24,25 72:21 113:5

**effectively** 166:24 167:9

**effects** 128:10,11 134:21 138:9 255:20

**efficient** 267:18

**effort** 130:2,12 238:13 268:4

**eight** 84:25 100:3

**eighth** 99:25 100:2 193:3

**eighty** 164:11

**either** 31:11 62:24 94:24 100:15 144:21 176:23 208:17 211:19 234:4 261:23 284:6 325:22

**elaborate** 232:14 288:2

**elaborated** 230:15

**elaborating** 305:8

**elaboration** 297:19

**element** 11:21,22 11:24 266:20

**elements** 46:11 248:22

**elevated** 14:12

**elevator** 224:5

**elicit** 202:15 242:2 324:13,15 326:2

**elicited** 231:25

**eliciting** 265:9 324:10

**elizabeth** 336:2

**else's** 28:3 64:15 83:8 94:15 106:12 189:24 190:5 194:13

**eluded** 175:15

**embark** 162:24,25

**embarrassment** 326:23

**embed** 140:18 191:20

**embellished** 289:5

**embellishing** 271:13 289:9

**emblem** 20:25

**embracing** 53:12

**emerge** 15:2 26:9 33:14 45:11,16 54:11 56:13 79:15 189:16

**emerged** 12:17 17:15 44:14,17 195:11 233:16

**emergency** 96:17 96:25 98:2 209:8 237:22

**emerges** 27:14 33:12 63:3,19 64:7 147:15 243:13

**emotional** 126:8 126:11 158:25 286:6,11,25 287:15 288:15

**employ** 156:17
**enable** 26:11
**enabled** 14:19
**enables** 52:13,15
**enacting** 113:25
**encoded** 127:16
**encoding** 122:25
  123:13 124:24
  125:2,22
**encompassed**
  77:20
**encompasses**
  74:23 176:8
**encompassing**
  147:21 190:11
**encounter** 22:24
  57:3 83:10 122:8
  175:20 230:2
  231:9 264:7
  313:15
**encountered** 240:9
**encounters** 111:24
  112:2,9 113:12
**ended** 113:14
  158:17 245:8
**enforcement**
  19:21 33:5 145:9
  147:4,5 151:4
  259:24 262:6
  327:22
**engage** 12:4 91:12
  98:21 114:11
  232:13 270:15
  314:3
**engaged** 206:14
  282:15 283:3
  319:6
**engaging** 104:15
  152:9
**engender** 325:18

**engineers** 279:15
**england** 39:21
**english** 235:25
**enormous** 167:17
**entailed** 319:25
**entered** 106:5,18
**entertain** 217:12
**entire** 24:9 190:13
  191:7,16 193:11
  193:18 198:17
  200:16 279:18
**entities** 134:10
  212:6 310:18
**entitled** 2:7 88:14
  314:17 315:4
**entity** 334:8
**environment**
  68:25 69:3 206:15
  206:17
**equate** 185:13
  259:12,22 262:15
  265:2 291:19
**equated** 171:17
**errata** 339:2
**error** 285:24
  286:10
**errors** 100:22
**esoteric** 39:11
**especially** 26:21
  33:3 61:4 96:24
  154:16 170:18
  176:6 221:20
  243:4 264:15
  302:25 329:16
**esq** 3:7,13,19 4:8
  4:14
**essentially** 130:3
**established** 70:10
  71:9,23 99:20,24
  173:16 271:11

**estimates** 306:13
**estimation** 25:16
  189:19
**et** 6:23 339:4
**ethical** 222:19
**evaluate** 166:18
  270:15 310:19
**evaluation** 116:20
**evening** 241:2
**event** 21:23 61:11
  87:17 118:10,11
  140:5 257:12
  258:11 281:6
  288:25 308:8,10
  309:15 319:2,7,19
  323:16,16 326:16
**events** 61:13
  116:25 129:14,22
  129:22 247:13
  279:18 286:19,21
  287:14 288:4
  308:25 318:10
  322:9,12,17
  323:24 332:9
**eventually** 51:21
**everybody** 40:18
  42:25 72:9,10
  164:21
**everyday** 19:4
  224:2
**evidence** 60:11
  63:21 64:21 65:7
  67:10,11 68:5,7,14
  68:21 69:5 84:21
  92:25 94:15 95:6
  95:17 96:3,21,22
  97:24 98:3,9,20
  102:11 111:13,15
  111:16,17 154:17
  171:4 176:5 197:8
  198:3 202:8 224:9

  224:25 251:24
  252:25 253:15
  254:14 263:10
  265:16 270:13
  282:6,19 303:22
  304:20 307:13
  308:7,15 312:22
  316:9 318:18
  323:9,10,23
  330:20,24 331:3,3
**evidently** 189:19
**evolving** 240:11
**ex** 313:4
**exact** 224:13
**exactly** 78:17 99:4
  111:10 142:18
  265:3
**exaggerating**
  270:10
**exam** 120:3
  296:19
**examination** 5:3
  8:17 65:10 117:7
  117:19 120:11
  189:4,7 190:2
  263:24 281:21
  295:23 296:4
  314:5 315:21
  330:12
**examinations**
  252:21 336:6
**examine** 106:21
**examined** 8:8
  160:2 235:20,22
  281:12 298:4
  299:9 311:12
**examinee** 77:3
  159:23 221:20
  251:20 264:10
**examiner** 133:23
  133:24 137:20

312:9 331:14
**examining** 262:22
  281:9
**example** 19:18
  27:23 28:9 29:4
  30:7 32:17 37:5
  40:22 41:8 44:13
  47:2,22 49:12
  52:18 54:13,16
  59:21 63:23 71:13
  71:16 73:6,9
  113:21 118:11
  122:10 128:5
  142:9 157:24
  180:15,19 191:11
  204:4 215:3
  218:15 233:15
  245:18,25 253:14
  265:9 273:16
  313:22 334:7
  336:2
**examples** 74:12
  331:16
**exams** 120:2,7
  221:16
**excellent** 167:12
**excepted** 283:6
**exception** 169:5
**exchange** 122:2
  232:10
**exciting** 36:18
**exclude** 105:10
  191:22
**excluded** 86:25
  102:7 283:20
**exclusive** 125:3
**exclusively** 113:23
**exculpated** 190:16
**exculpating**
  179:12

**excuse** 136:4
**exercise** 119:15
  195:20 197:2
  232:2 264:14
  314:6
**exercises** 119:3
  261:21
**exhibit** 5:12,13,14
  5:16,17,18,19
  70:22 77:22,24
  82:8,10,13,21
  83:20,22 84:3
  88:9,12,18 101:11
  148:2,4,6 180:23
  182:13,15,22
  183:10 188:21
  189:2 223:14
  229:18 258:13
  283:11,13 294:4,6
  294:9
**exhibits** 5:22
**exist** 333:12
**exists** 40:13 41:3
**exonerated** 166:5
**exonerating**
  166:12
**exoneration** 27:4
  101:21 314:22
**exonerations**
  165:25 178:13
**expands** 301:20
**expect** 59:23
  118:25 206:23
  222:12 251:5
  253:5 302:17
  303:14,18
**expectation** 17:3,5
  134:5
**expected** 267:12
  267:15

**expenses** 113:19
**experience** 25:16
  28:15,17 32:11,12
  33:25 76:9 122:15
  127:12 128:9,17
  129:2,10 131:25
  156:23 167:20
  168:9 171:15
  173:15,25 186:9
  208:24 209:2
  241:5,6 243:8
  247:18 253:4
  260:2,6 261:24
  262:5,11,20,21
  263:4,11 264:11
  264:18,19,20
  286:24,25 319:20
  320:9,12 322:11
  322:13,18 323:2
  323:11,12,13
  325:16 328:11
  329:6,8 331:11,13
  331:14
**experienced**
  207:24 322:8,17
**experiences**
  122:13 263:2
  331:18
**experiencing**
  160:12 238:5
**experiment** 265:5
**experiments**
  139:24
**expert** 2:6 31:12
  32:7 68:2 84:16
  84:19 94:13
  114:19 115:3,20
  251:10 336:6
**expertise** 69:17
  93:2 101:5 114:22
  115:4,6,8,16,25

125:15,20,24
  149:2 156:25
  252:8,18,21 254:2
  254:4 317:9 331:6
**experts** 34:18,20
  35:8 100:23
**expires** 339:25
**explain** 69:25
  137:7 138:14
  247:9
**explained** 326:14
**explaining** 71:15
**explanation** 132:2
  198:13,18
**explanations**
  273:11
**exploit** 158:16
  322:5
**explore** 44:12
  98:19 169:13
**explored** 93:19
  95:9,12,24 306:12
**exploring** 96:11
  96:12 165:4
  251:16
**expose** 274:3
**exposed** 42:15
  118:24 203:17
  206:9 208:4
  214:13 216:21
  218:6 228:11,13
  235:5 274:12
  276:14
**exposure** 18:18
  160:22 214:15
  280:24 281:3
  330:6 335:14
**express** 223:11
  228:10
**expressed** 189:18
  258:17 307:24

**expressing** 210:4
243:3
**expression** 79:8
145:18
**expressive** 263:15
**extended** 146:19
**extent** 324:8
**extramarital**
105:17 106:25
229:2 284:7,18,19
285:14
**extrapolate** 23:14
27:20 68:5 141:22
**extrapolated**
38:18 140:25
141:4 143:7
**extrapolating**
37:11 139:24
144:11
**extrapolation**
139:2,6
**extremely** 327:20
328:4
**eye** 52:17 157:6
**eyes** 10:10 172:19
279:16

**f**

**f** 143:22
**fabricate** 324:5
**fabricated** 61:24
198:16 199:7
319:11,14,17
320:6 321:10,22
325:7 330:14
331:13
**fabricating** 334:17
336:23
**face** 36:11 44:17
75:3,4 78:24 79:6
80:7 93:3 195:20
209:21 233:22

245:16,22 246:14
258:25 319:8,22
**facebook** 335:19
**fact** 19:13 59:13
60:19 61:19 67:7
67:19 80:12 81:2
87:2 90:4,23
146:17 147:23
175:25 179:5,12
194:21 196:15
197:4 198:22
216:17 235:21
248:21 256:10
267:6 278:18
286:8 299:15
310:15 311:12
314:12 322:5
324:3 330:15
331:21 332:6,8
**facto** 111:15
170:15 258:3
**factoid** 23:24
**factor** 22:3,7
52:21 58:2,7
161:5,11 168:25
171:10,15 173:20
201:20 314:14
326:23 327:4
**factors** 11:13,17
11:20 13:20 14:22
14:24,24,25 24:15
54:10 55:21 56:13
58:6 122:24 123:2
123:12,15,21,23
124:24 125:21,25
126:13,23 127:17
147:14 159:4
201:21 287:22
326:13
**facts** 60:16 102:16
102:22 103:17

104:9 105:12
152:2 188:6,7,8,17
212:22 213:25
214:5 220:15,20
224:8,24 245:12
282:5,18 302:24
315:8
**factual** 103:7,10
190:8
**fading** 234:22
**failed** 14:4,17
17:22 21:12 52:21
53:2 56:15,17
153:14
**failing** 53:25
**failures** 154:6
**fair** 9:23 13:12,15
31:23 51:14 74:18
74:22 78:14 80:25
110:6,8 128:22
138:23 141:3
157:13 239:24
242:6 261:13
327:10 329:24
**fairly** 214:24
232:13 323:15
**faith** 93:3
**fall** 257:16
**falls** 234:5
**false** 10:19,21,23
11:13,14,15,18
12:6,17,19 13:10
13:18,20 14:6,18
15:10,11 17:19
18:6,12 21:9,19,24
22:7 24:4,10 28:4
28:12 30:5,20
31:7,9,15,19 34:24
35:2,5,7,9 37:2
38:16,18,20 39:5
43:8,15 48:14

51:17 52:22 53:3
53:10 56:18 58:3
58:8,17,20 59:2,6
61:25 71:20,24
74:16 99:14 100:9
108:20 114:25
130:13 132:7,13
132:17 138:23
140:2,11 149:7
151:18 153:11
154:11 155:6
157:5,15 158:20
158:22 159:12,16
160:7,22 161:6,9
161:12,17,20
162:14 164:10
165:10 170:5,12
172:2,3,7,9,10,12
172:16 173:5,5
174:19,21 175:3,9
175:14,20,21
176:16,22 177:11
178:2,6,12,19,22
178:24,25 179:17
179:20,25 180:20
191:6,13,21,22
195:8 201:21
202:4,15 205:10
212:21 213:24
217:14 253:3,16
253:20 257:19
265:10 289:17
305:20 313:24
315:13 320:18
**falsely** 73:25 153:5
155:2 164:13
178:18
**familiar** 84:11
128:3 204:21
215:19 223:18
224:19 225:4,24

263:6 323:4 327:11 333:25

**familiarity** 28:2 45:6 118:10

**famous** 327:17

**fans** 156:14

**fantasies** 113:25

**fantastic** 33:14 144:17

**far** 29:3 110:24 111:6 112:11 124:2 127:14 202:20 267:15 317:9

**fascinating** 40:23

**fast** 156:15 228:9

**faster** 210:13

**fat** 180:3

**fatigue** 242:20

**favor** 60:16 294:2

**fear** 220:15

**feces** 40:24 41:20

**federal** 2:11 145:9

**feel** 186:24 227:23 228:22 259:25 274:12 307:3

**feeling** 212:16 335:7

**feels** 206:21,22 294:21

**feet** 298:14

**felt** 17:17 227:13

**female** 86:16

**fidelity** 27:13 63:21 96:13 287:3

**field** 18:25 43:8 51:17 116:9,13,16 129:9 140:2

**fifth** 88:5 192:22

**fighter** 143:16

**figure** 29:15 72:13 163:20 185:13 205:16 253:19 329:15

**figures** 182:10 183:3

**file** 172:20 256:4 319:21 320:25 322:3,6,20

**filed** 205:22 255:18,22,23 256:5,11 279:12 319:9

**fill** 130:4,8,12 131:3,14 132:7 214:5

**filleting** 234:21

**filmed** 163:11

**find** 15:17 41:4 52:11 92:16 135:24 161:16 183:23 236:17 238:13 239:8,10 243:18 253:6

**finding** 52:14 128:15 194:15 308:14

**findings** 33:7,9 77:16 98:5 186:25 189:22 194:8 268:7 273:10 285:5 319:12 334:15

**finds** 77:4

**fine** 74:4 209:18 233:12

**fingerprints** 250:21,25 251:14 252:12

**finish** 116:5 136:5 164:12

**fire** 316:3

**first** 8:7 9:3 18:15 34:23 37:25 45:20 62:16 109:10 132:2 160:22 162:15 167:2,17 175:19 182:21 183:9 184:4 192:17 193:12,22 227:2 230:25 267:7 282:2 311:8 319:2

**fit** 180:9 246:3,6

**fits** 87:14

**five** 35:20 39:6 47:12 76:21 87:25 90:3 91:24 176:6 176:7 182:10 254:10 288:22 318:22

**fives** 183:3

**flat** 262:3

**flaws** 279:6

**flight** 210:2,3,17 210:18 212:11 235:14 236:7 237:7 243:12 247:19 249:15

**flip** 9:20

**flippant** 218:13

**flood** 278:4,7,7,11 279:5,10,24

**flooded** 278:9

**floods** 278:15 279:17

**floor** 224:12,13 225:11,11,13

**fly** 143:16

**focus** 65:10 266:20

**focuses** 113:2

**focussed** 309:12

**focussing** 266:14

**folks** 99:25 163:16 163:22 172:3,4,5 254:11 322:11 334:14 336:3

**follow** 30:25 58:25 59:5 64:11 103:4 239:21 241:24 321:17 329:20

**followed** 14:18 229:6

**following** 227:9 306:3

**follows** 8:9 308:5

**foot** 262:3

**football** 156:14

**footnote** 327:7

**footnotes** 327:6

**force** 151:14

**forces** 78:5 307:6

**forensic** 18:7 20:2 26:8 38:10 53:11 55:2,23 57:12 62:21 120:24 147:11 150:16 151:4 174:13 183:7 235:21 237:22 252:21 256:12 263:22 312:9 314:4 320:2 323:11 327:19,25 329:10,16,17 331:14 335:4,4,10 335:17

**forensics** 118:12 208:24

**forever** 106:23

**forget** 251:25

**forgetting** 129:14

**[forgot - given]**

**forgot** 251:20
**fork** 27:5
**form** 66:21 77:11
87:4 90:10,25
91:3 92:6 95:4,20
96:8 99:16 100:18
104:12 105:18,21
106:3 107:4
108:13 119:20
123:8 166:15
167:10 168:16
190:17 192:11,13
197:10 200:20
201:23 202:2
213:9,22 214:22
218:20 221:8
224:7,23 226:14
228:5 229:13
236:15 240:5
242:4 253:9
256:15 275:14
279:2 282:5,17
286:16 299:14
302:24 304:7,18
306:10 307:15
308:17,19 309:6
311:24 314:20
317:5,6 318:6
321:15 324:6
**former** 336:7
**forth** 338:8
**forthcoming** 96:18
97:8 232:7
**fortified** 274:6
**forum** 45:21
**forward** 31:17
153:18 154:23
332:16
**found** 52:24 62:8
63:6 64:14 76:15
81:3,9,13,17,21

83:9 88:2 90:5,15
90:20 91:25
106:12 112:7
155:22 161:10
281:7,21 313:9
317:11 318:20,20
320:24
**foundation** 87:5
95:20 96:9 97:18
99:16 105:19
167:11 192:15
197:10 200:20
201:24 213:9
221:9 224:24
228:6 240:6 242:5
253:10 279:3
284:25 302:24
306:10 314:20
**founded** 327:23
**four** 21:10 22:5
25:22,24,24 53:22
53:22 85:22 117:3
175:2 180:14
184:3,6,17 297:3
**fourth** 5:14 84:4
192:20,21 198:12
283:9 289:15
294:11
**fraction** 56:5
**fragmentation**
326:18
**frame** 181:16
241:13
**framework** 70:9
**frank** 89:5,6,15,25
95:8 234:15
282:13
**frayed** 205:3
**free** 72:11 169:11
**frequency** 12:16
14:6,15 23:12

111:22 211:6
**frequent** 56:11
283:5
**frequently** 52:3
173:2 278:15
**friend** 156:15
**front** 283:12
298:10,15,19
**frontal** 123:18
124:12 125:6
**full** 24:3 97:3
289:15 296:25
**fully** 34:7 61:8
97:7 131:13
321:16
**function** 121:22
**functions** 122:17
122:18
**fund** 142:24,25
143:2 257:25
258:4 314:22
**funded** 142:14
145:4
**funding** 143:23
**funds** 143:5,17
**further** 15:19
60:18 85:11 187:7
195:16 315:16
337:13 338:12
**future** 157:12
185:24 187:11

**g**

**gain** 307:23
**gained** 36:13
**game** 26:2 129:5
**gaming** 92:18 93:6
**gamut** 24:4
**gap** 231:20
**garbage** 252:17
**garrett** 30:2 35:13
38:23 48:13 49:13

**gee** 26:4 28:4
252:10
**general** 18:7 32:10
**generalizations**
40:5
**generalize** 37:4
144:7
**generally** 300:5
**generate** 169:24
**generated** 39:14
184:14,16
**genital** 189:3
**genre** 205:18
**gentleman** 162:4
**getting** 31:21
170:9 176:9
279:21 307:4
**gig** 42:24
**gisli** 31:3
**give** 19:17 20:9
28:18 40:21 44:8
47:22 54:13
115:17 117:24
119:6,23 120:15
130:12 133:23
135:5,6,14 139:4
156:3,5 157:9
175:14 180:20
203:21 208:13
209:16 245:8
258:22 260:22
292:16 301:6,23
335:2
**given** 16:22 27:25
56:4,25 131:10
133:6 148:12,15
191:9 253:2,16
269:20,23 270:22
314:21 315:2
338:10

**gives** 118:22 248:4
**giving** 71:15 79:6
　168:18 176:5
　246:5 247:12
　335:14
**globe** 262:3
**glove** 113:14
**go** 6:12 19:25 34:5
　35:20 36:8 50:9
　63:2 74:11 84:10
　94:6 102:8 105:7
　107:7 109:4,19
　110:16 112:22
　120:13 131:23
　137:15 138:2
　139:4,10 149:21
　174:8 181:11,12
　202:20 207:14
　210:9 212:13,17
　224:4,5 227:2
　232:9,10 234:20
　244:15,16 253:19
　257:15 273:24
　275:23 278:13
　280:19 285:3
　304:14 305:21,22
　319:23
**god** 76:18 144:2
　144:14
**goes** 30:10 77:8
　122:3 125:15,20
　196:23 210:24
　225:6 248:5 287:9
　322:14 335:6
**going** 10:7 33:8
　36:8,17 37:3 39:2
　42:19,21 44:24,25
　46:6 51:2,24
　57:15 58:11 62:24
　94:10 97:7,21
　107:9 110:13,16

111:21 117:24
132:10 139:11
153:17 183:23
201:6 205:24
207:11,13 210:19
210:21 222:4
232:2 239:15
254:23 260:9,14
264:13 268:7
269:4,6 276:19
292:8 294:8
312:13,15,16
328:14 330:4
335:7 336:16
337:14
**good** 10:17 33:18
　36:15,15 45:14
　47:11 51:18 52:2
　93:3 165:9 220:10
　222:16 299:21
**goods** 328:3
**gossett** 3:10
**gotten** 214:3
　228:15
**government**
　142:16
**grabbed** 295:8
**graduate** 62:21
　106:16 260:21,23
　260:24 264:24
**graft** 240:22,23
　241:3
**grant** 145:2
**grants** 75:24
**granular** 117:14
　138:18
**gratification** 41:19
**gravity** 260:6
　263:4
**great** 75:25 139:4
　144:6 169:22

222:5 243:4
**greater** 110:24
　111:6 112:11
　240:17 272:9
　280:24 301:3,11
　306:24,25 307:2
**greatest** 70:4
**griffin** 1:14
**grinding** 64:3
**grounded** 79:5
**grounds** 325:10
**group** 142:23
　146:23 233:2
　322:11
**grow** 15:24 36:16
**guam** 42:6
**guarantee** 24:3
**guarantees** 169:9
**guard** 78:8,10
**guarded** 12:7
　22:22 23:2 295:3
**gudjonsson** 31:3
　35:19,23 39:6
　45:11 119:6,22
　137:12
**gudjonsson's**
　119:14
**guess** 165:23
　183:20,24 185:10
　213:11 214:5,25
　215:4,7 265:16
　287:9 317:23
**guessed** 215:21
**guided** 70:8
**guilt** 59:19 105:7,9
　249:18 287:10
　308:11
**guilty** 102:18
　103:18 104:10,19
　178:21 213:11
　254:5 310:8,9

**gut** 22:6,9
**guy** 25:22 79:2
　171:2 299:19
　302:19 335:9,15
　335:21 336:12,13
**guy's** 158:7
**guys** 27:5 175:4
**gym** 111:21

## h

**h** 5:10 8:6
**ha** 77:4
**hair** 62:7,9,16,22
　63:6,7,10,11 64:2
　67:20,21 68:2,6
　69:6,19 80:15,15
　252:11
**haldol** 297:11
**half** 16:19 146:11
　296:2 306:13
　318:23
**hall** 225:6
**hallucination**
　160:19
**hallucinations**
　155:10
**hamburgers** 72:6
**hand** 82:22,25
　113:14,18 294:15
　338:18
**handed** 98:13
**hands** 295:8
**handwritten**
　213:3
**hang** 296:9
**happen** 55:25 79:2
　152:15 171:2
　175:10 217:24
　250:2 273:14
　275:2 288:5
　312:19 330:22

**happened** 15:4
  20:18 28:2 56:5,7
  56:7,19,19,22
  68:12 71:25 72:13
  76:18 78:21 93:10
  130:2 158:21
  162:11 171:3,4
  178:7 209:5,10
  222:25 225:10
  231:23 245:9
  270:11 287:8
  336:10,11
**happening** 336:15
**happens** 68:25
  78:20 79:12 131:8
  204:6 241:7
  243:19 276:25
  287:24 322:15
**happy** 337:6
**harassing** 123:10
**hard** 39:25 40:4
  40:11 166:18
  225:18 240:21
  254:13 258:20,20
**harder** 26:17 40:7
  69:15
**head** 20:7 61:5
  102:24 128:5
  190:3 286:12
  287:2 322:14
  335:15
**health** 26:8 202:24
  212:9 234:18
**heap** 240:14
**hear** 97:9 210:5
  241:17 249:4
**heard** 209:22
**hearing** 118:17
  209:11 337:3
**hears** 295:3

**heart** 28:20,23
**heavily** 169:16,16
**hedge** 137:18
**hedging** 93:13
**heels** 231:16 234:5
**heft** 203:22
**heighten** 266:21
**heir** 74:6,6
**held** 2:7 6:19,24
  49:13 51:5 57:17
  107:12 139:14
  201:8 240:16
  255:3 292:18
  328:16
**help** 20:3 24:14
  31:5 43:2 117:17
  126:22 156:4
**helped** 10:19
**helpful** 310:23
  313:7,10,24
**henry** 19:19
  131:23 259:19
**hereunto** 338:17
**hey** 40:15 42:17
  42:21 45:13
  156:12
**hidden** 128:13
**high** 110:21
  142:23 143:4
  144:7,9,12 170:4
  182:10 183:3,3
**highly** 327:20
**highway** 19:23
**hinshaw** 4:4
**hired** 75:10,11
  144:20
**historian** 270:4
  287:4
**historical** 332:8
**historically** 60:3

**history** 83:3 97:2
  206:25 270:8
  284:4 303:9,14,18
  320:19 323:15
  329:19 332:7
  333:2,3,10,11,13
**hit** 265:7
**hits** 25:24
**hitting** 20:5 94:3
  206:7
**hoisting** 258:23
**hold** 17:6 106:22
  106:23 114:18
  115:2 315:6
**holding** 149:20
**hole** 227:10
**holistically** 208:10
**holmes** 1:18 3:11
  219:11,12,13,14
  223:18,24 224:15
  224:19 225:24
  226:6,11 228:11
**holy** 1:15
**home** 182:18
  279:24
**homeless** 216:12
  216:13,18,19
**homicidal** 55:5,13
  113:6,24 297:4,8
  297:12,13 299:12
**homicidally** 55:19
**homicide** 112:15
  113:15 145:16
  149:25 150:21
  306:18,21
**honest** 28:13 93:5
  249:10
**honestly** 26:24
**honing** 248:9
**hope** 77:25 78:2,9
  144:9 185:23

  186:3 187:7,11
  209:24 219:11
  328:8
**hopeful** 36:24
**hopefully** 15:19
**hospital** 5:13
  82:17 202:18
  204:12 212:15
  237:23 238:4
  293:4 295:9 300:4
**hospitalization**
  297:20
**hot** 36:23
**hotly** 54:19
**hour** 146:10,11,11
  146:14 244:3
  275:17,18,24
  306:12 318:23
**hours** 66:7,11
  80:22 82:3 83:6
  96:5 108:5 146:12
  146:14 222:22,22
  222:22,22 275:21
  318:24
**house** 278:9,15
  279:7
**huge** 18:25
**hugely** 250:17
**huh** 88:22 101:12
  211:13 237:3
  294:13,16 295:5
  295:24
**human** 20:16
**humiliating** 336:5
**humiliation**
  335:23
**hundred** 164:11
  181:21
**hurricane** 279:10
  279:20 280:3

**husband** 64:17
65:17 66:11 83:17
87:14 89:7 96:5
99:11 201:18
213:15 315:10
**husband's** 81:18
81:22 89:21
**hyperbolic** 265:24
**hypothesis** 239:25
**hypothetical**
62:14 64:13 66:5
66:22 93:24 99:6
99:17 192:13
196:5,19 197:11
202:3 213:13,22
221:9

**i**

**idea** 14:4 30:14,18
31:14 32:21 36:25
41:24 42:13 48:8
49:2,13 60:7
69:18 98:22,23
107:6 121:13
122:4 137:19
155:5 210:9,10,10
212:5 217:25
218:2,3,17,19
222:2 225:8 248:2
249:5,10,14 252:9
262:11,13 274:15
276:6 280:7
282:24 283:2
284:12 300:10,11
300:15 301:10,13
312:24 327:8
332:13 333:7
334:6
**ideas** 48:17 49:5
210:2,3,17,19
212:11 235:14
236:7 237:7

243:12 247:20
249:15
**ideations** 295:13
299:12
**identical** 260:12
**identically** 20:24
**identification**
70:23 82:11 83:23
88:10 148:5
182:16 294:7
**identified** 61:21
68:20 91:5 124:3
134:14,15 147:13
159:19 229:25
231:7
**identify** 7:8
148:19 162:14
192:3 262:18
**idiosyncratic**
208:19 234:6
236:22
**idiosyncratically**
211:2
**idiotic** 36:11
**illinois** 1:3 3:6,12
3:18 4:7,13 7:2
148:23 149:23
**illness** 126:6
154:14,20,24
155:15 158:3,24
159:10,17,21
160:5,9,10 161:4,5
161:11,18,19,23
162:6 166:6
169:17 171:9
172:18 173:19
174:11,13,23
175:12 176:14,18
176:18,21 178:6
180:20 206:2
208:12 270:6

300:2,9,20 303:3
303:11
**illnesses** 170:20
209:15 301:2
**illustrate** 74:12
**illustration** 236:25
**image** 20:25
**imagine** 229:5
335:23
**immediate** 121:14
121:16,17,19
122:21 157:20
288:8 327:3
**immediately** 57:9
117:4 126:14
169:9
**impact** 22:18
25:25 69:14 79:23
153:15 242:21
276:4 287:2,5
327:8
**impacted** 276:4
**impactful** 54:10
**impairment**
116:23 120:21
121:3 128:14
129:6,11,13
**impediments**
166:5
**implicate** 178:18
**implicated** 102:4,6
106:15 132:16
133:5,5 171:5
180:13 241:10
**implicating**
180:11 189:21
**implications**
319:16
**imply** 23:4
**importance** 75:8
138:5

**important** 124:2
135:4 228:18
251:19,23 320:20
**impossible** 247:15
247:17 287:18
**impressed** 22:22
76:13 168:8
**impression** 44:9
102:13 162:10
232:12 245:15
**impressive** 155:21
**imprint** 20:11
**imprinted** 20:23
**inability** 268:8
**inaccurate** 286:14
**inadequacy** 30:23
**inadequate** 28:20
33:13
**inaudible** 35:20
**incapacitated**
272:21
**incapsulates**
253:22
**incidence** 174:12
176:15
**incident** 140:4
255:20 293:3
**incidental** 189:10
**incidentally** 214:6
218:17
**include** 99:19
104:8,17 178:23
180:10 188:8,9
**included** 31:12
102:16,21 103:17
103:17 104:4,6,24
179:5 190:25
194:17,20 247:25
271:8
**including** 87:19
104:14 143:6

151:3 229:9,9
271:14,17
**inclusion**  180:8
**inclusive**  197:14
**incoherence**
234:16 236:5
288:19
**incoherent**  211:21
236:2 288:9,9,11
318:15
**income**  185:11,16
185:19
**incompatible**
320:16
**incompetent**
265:12
**incomplete**  19:11
19:13 85:6,16,24
88:25 89:11
**inconsequential**
56:3 110:9
**incorporate**  46:11
218:23 301:21
**incorrect**  131:4
132:8,19,19
143:13 256:3
**increase**  21:15
**increased**  55:18
275:3
**increases**  15:21
**incriminating**
33:2 54:4 202:23
230:15 231:25
232:14 240:12
305:7 307:4
**independent**  119:4
130:6
**independently**
119:13
**index**  1:8

**indicate**  9:15
62:11 65:3 67:23
269:14
**indicated**  83:12
232:17
**indicates**  96:3
**indicating**  98:13
296:13
**indication**  67:6
**indicative**  59:14
59:16 64:20 246:9
**indicator**  111:2,8
199:4 270:3
**indistinguishable**
211:22
**individual**  93:8
130:18,20,25
133:18 284:11
327:15
**individual's**
119:10 158:2
**individually**  3:16
7:16
**individuals**  35:16
39:8 86:2 112:13
113:21 131:2
132:3,25
**industry**  155:19
**inference**  273:17
280:8
**inflexion**  331:18
**influence**  175:22
**info**  165:15,17
**inform**  26:17
28:11 29:2 31:5
32:21 33:8 38:25
45:9 96:14,20
119:10 188:12
**informant**  121:2
**information**  13:23
13:23 24:24 27:22

28:8,11,19 30:12
31:5 53:25 79:17
79:25 105:11
133:24 134:8
154:10 177:12
178:3 190:23
195:17 200:23
228:23 231:18
269:17,19 287:19
310:12,14 316:22
**informative**  12:18
31:2 45:15 62:25
74:5
**informed**  56:15,17
164:23 320:21
**informing**  30:10
55:9 227:14
**informs**  313:16
**inherent**  78:7
**inhibitors**  54:24
**initial**  227:7
313:14
**initially**  216:24
230:9
**initiate**  258:6
**initiated**  140:6
176:2
**injuries**  257:15
**injury**  126:3
127:19 255:18,22
255:24 256:4,6,11
257:2,4,20 281:22
282:9 288:15,15
322:19 331:15
**innocence**  27:4
28:9 60:16,21,23
62:12 64:20 65:3
66:4 104:23 105:3
105:9 155:19
162:23 163:16
165:25 167:18,25

169:23 177:9,23
178:14,17,20
249:18 254:19
287:10 307:10,13
307:14 308:11
309:10,21,25
314:24 315:3
**innocent**  58:22
59:8,12,15 60:8
61:19 66:18 67:2
67:4,24 80:13,17
80:24 87:3 90:7
90:23 91:8,20
92:3 93:12,21
100:10,17 102:14
102:18,23 103:9
103:18 104:10
166:13 194:22
196:16 197:4
213:20 221:2
254:5 284:6
308:15 314:17
315:12
**input**  309:10
**inquiry**  103:8
217:8
**inside**  64:24 66:2
**insomnia**  295:13
**inspected**  20:15
**instance**  73:18
**instances**  14:2
21:11 71:24
133:14 156:16
158:21 162:8
268:25 313:9
**institute**  27:5 84:5
88:16 150:15
163:15
**insufficient**  24:20
24:22

**insurance** 278:5 279:5

**intact** 203:9 206:15,18 242:21

**intake** 166:15 168:15

**intellectual** 155:15 159:9

**intellectually** 158:12

**intelligence** 18:4

**intense** 134:4

**intensions** 223:12

**intensity** 264:7 306:24

**intentions** 222:17

**intents** 230:10,12

**interacted** 241:11 244:19,21,25 289:22 290:5 293:15

**interacting** 241:21 243:8 291:3

**interaction** 244:12

**interactions** 240:2

**intercourse** 282:15 284:20

**interdigitates** 252:9

**interest** 31:11 39:14 42:11 75:14 144:15 169:25 216:21 227:12

**interested** 93:5 186:17 280:23 338:15

**interesting** 41:22 220:9 306:20

**interests** 170:7

**interfere** 6:9 127:15

**internal** 310:20

**internalize** 80:6 118:25

**internalized** 203:16 205:3 214:9

**internalizes** 218:24

**interplay** 11:17

**interpret** 23:4 91:14 305:2

**interpretation** 237:17

**interpretations** 85:12

**interpreted** 171:6 230:24

**interpreter** 179:24

**interrogated** 140:24 142:5 143:10 163:22 164:2 259:3,10,23

**interrogation** 72:16 139:7 142:23 147:15,22 152:24 155:4 156:17,18 159:7 163:11 164:19,21 179:7,8 207:3,21 239:18 263:3 265:5 289:23 306:8,17 311:7,20 331:23

**interrogations** 72:7 145:10,14,17 147:3,9 153:17 164:7,9 221:15 263:24

**interrogators** 207:7,21 219:3,23

**interrupt** 196:22 207:13

**interrupted** 179:14

**intervening** 314:14

**interview** 118:4 221:20 222:10,16 222:21,24 223:2 262:25 264:9 267:21,22,25 268:5,9,11,21,24 269:15,18

**interviewed** 268:17

**interviewer** 134:6

**interviewing** 76:21 243:8 268:11

**interviews** 222:12 302:4

**intimacy** 168:22

**intimate** 27:25 45:6

**intoxicated** 297:17 298:13 299:24 300:4 302:2

**intoxication** 126:5 299:25 300:17 301:22

**intrigued** 226:24

**introduced** 284:4

**investigate** 20:4 141:17

**investigating** 141:14 202:19

**investigation** 32:22 134:3 140:6 150:2 199:3 247:11 306:18

**investigators** 145:16 150:21 199:2 229:20 233:20 234:20 327:2

**involve** 153:21

**involved** 15:13 65:20 87:17 98:19 101:2 102:12 122:18,19 123:17 123:19 124:16,20 124:23 125:2,7,9 140:9 160:23 170:8,9 174:10 185:7 186:15 195:14 199:5 228:19 253:18 263:16 301:22 327:21 329:3,23 330:2

**involvement** 111:14 124:7,9 179:7 205:19 260:5 277:24

**involves** 11:19 121:20 141:9 284:19

**involving** 140:4,21 141:8 306:17

**irony** 166:20

**irrational** 235:11 301:16,17

**irrelevant** 25:7 44:18 73:24 109:18,20,21,21 189:11 249:16,17 249:19 309:9,11 309:13,15

**irrespective** 249:17

**island** 42:7
**isolated** 69:7
274:2 276:14
**issue** 54:19 61:2
96:12 104:16
109:8 111:12
131:24 147:22
151:22 152:9,11
154:24 203:2
204:23 205:20
309:23 310:2
331:19 333:4
334:4
**issues** 131:24
159:13 268:12
269:25
**item** 101:13
**items** 55:14 270:8
**iteration** 100:6

**j**

**j.d.** 4:17 6:14
**jack** 1:11
**jail** 212:8,10
**james** 4:8 7:21
**january** 151:20,23
298:21 299:10
**joe** 158:8,11 159:4
**john** 1:10 114:2
158:22
**join** 87:7 92:9,10
92:11 95:22
100:19 192:14
197:12 201:25
213:23 282:7
**jonbenet** 158:23
**joria** 1:14
**joseph** 1:14,16
**journal** 37:21 46:6
46:20 47:17 49:19
50:4

**journals** 47:3
135:20 137:7
138:14
**judge** 152:17
254:16,17,18
**judge's** 225:14
308:22
**judgement** 301:19
**judges** 152:7
**judging** 49:24
**judgment** 299:8
**judy** 152:18
**jump** 52:11 265:8
**june** 148:13,16
150:18 184:10
**jurisdictions**
163:12
**jury** 254:17
262:10
**justice** 142:22
144:22 145:6
151:14,15,16
152:8 169:14
**juxtaposed** 330:19
**juxtaposition**
323:14

**k**

**karczewski** 1:13
**karr** 158:22
**kassin** 31:8 35:19
35:24 39:5 44:14
45:11 47:23 48:18
71:18 193:15
261:19
**kassin's** 44:21
**katherine** 3:13
7:24
**kato** 205:8,14,14
206:20 331:21
332:4,6,15

**kato's** 332:25
**kaye** 152:18
**kazakhstan**
110:12
**keegan** 336:11
**keep** 10:10 258:21
266:9
**keeping** 208:5
**keeps** 58:14
**key** 265:7
**keynote** 146:6,16
**kicked** 47:25
**kill** 114:3
**killed** 110:23
111:6,15,18
112:11 114:6
175:24
**killing** 158:23
206:7 293:5
294:21 296:6,15
**kind** 27:6 30:13
45:21 57:4 66:7
68:13 76:25 102:2
105:4 114:25
143:18 208:8
214:6 220:6 227:3
233:25 234:22
246:13 248:18
252:22 253:15
258:5 266:7
270:20 284:7
298:2 304:23
308:6 326:14
335:25
**kinds** 52:7 56:22
57:6 63:13 68:16
113:20 121:15
275:18 309:6
335:20
**kit** 66:7 81:14,25
82:17 281:21

**knew** 189:23
191:3 329:25
**knife** 318:17
**knock** 123:11
136:17
**knocked** 129:8
**know** 8:25 10:2,6
11:10 13:15 16:21
20:12 21:5 23:17
25:9 27:2,3,12,13
28:19,22 29:19
36:23 37:19 43:4
44:3 46:8 47:11
47:16 48:6 50:3
50:14 56:20,24
63:5,24 69:19
72:12,19 73:13,15
73:16,23 75:3
77:4 84:9,12
87:13,14 93:14,16
93:19 94:12 97:8
99:18,19,24 100:2
100:24 101:22,24
101:24 102:5,24
102:25 103:14,15
103:16 105:22
109:5 110:3,7
111:22 112:4
114:2,4,5,5 118:23
123:4 124:6,11
125:18,19 126:21
130:11,15 132:12
133:22 134:18
137:11 140:12
141:7 142:14,17
142:18 144:8
146:9 155:21
156:13,21 159:18
160:11,13 165:3
168:21 170:7,10
173:9,10 174:24

177:20 179:21
182:7 183:13
186:22 190:5
196:7,23 203:25
204:2,4,7,9,15,17
205:9,12,13,13,16
208:22 209:5
212:14,25 213:7
213:12,20 214:10
214:11 215:4
216:7,7,9,10,11,13
217:2,3 218:14,22
219:5,13 220:3
221:10,11,12
222:14 224:11,15
225:2,6,19 226:2,8
233:15 234:3
235:3 238:20
240:24 242:15
244:18 253:22
257:23,24 258:19
259:14,15 262:15
266:12 269:6
270:25 271:7
280:20 281:12
283:2 284:12,14
284:15,15 285:9
285:18,19 287:6
289:13 290:3
293:10,19 300:24
301:5 306:19
310:25 311:4
317:18,21 327:13
327:13 329:23,25
334:16,24 335:4
335:14,18 336:3
336:10,13,18,19
337:10
**knowing** 27:12
216:8 245:12

**known** 114:11
137:23 325:15
335:10
**knows** 30:10 42:25
44:21
**knox** 44:20,22
**krause** 4:10
**krista** 3:19 7:15
108:2

**l**

**l** 8:6,6
**lab** 143:6
**lacerations** 189:3
**lack** 97:18 261:24
300:19 323:7
**lady** 296:5 328:7,7
**language** 180:2
**large** 12:6 227:5
**larger** 12:10 15:25
24:13 30:25
**lasalle** 4:6
**latent** 128:13
**laughable** 260:19
265:23,23,23,25
266:6,18
**laughing** 40:18
**law** 19:20 30:2,3
30:16 33:5 39:17
41:9 46:7 57:3
145:9 147:4,5
151:3 259:24
262:5 327:22
**lawsuit** 187:16,19
187:23 256:11
**lawsuits** 188:3
322:3
**lay** 239:16
**laying** 73:8
**layout** 223:19
224:20 225:25

**layperson** 236:8
241:20
**lead** 13:20 64:19
80:11,16,23 112:2
153:4 306:4 322:9
**leading** 77:2 92:24
304:4,8
**leads** 52:22
**leak** 220:14
**leaking** 220:20
**leaning** 105:23
**leap** 162:7 206:19
272:23
**learn** 15:23,25
17:13 25:19 27:6
36:17,21 42:17
228:18 268:10
328:10
**learned** 53:23 99:3
212:22 328:5,6
335:3
**learning** 42:16
**learns** 25:14
**leave** 37:7 39:2
69:16 94:14
100:22 317:2,14
**leaves** 129:4
**lecture** 149:23
150:13,23 151:10
151:21 153:23
155:17 156:20
**lectured** 145:15
147:10,19 149:13
149:16
**lectures** 148:13,15
148:20 149:17
**lecturing** 165:21
**led** 10:22 11:14
22:7,12 140:23
201:21 215:9
303:23 304:9,14

305:3,6,23,24
**lee** 19:19 20:15
48:18 51:25
131:23 156:13
259:19
**left** 162:9 180:4,6
205:20
**legacy** 205:16
**legal** 55:24
**legitimacy** 62:22
143:25 244:4
323:7,9,10
**legitimate** 42:2
186:3 322:22
**lend** 51:19
**length** 232:9
**lens** 31:10
**leo** 30:8 35:13
38:24 43:21 44:13
45:12,24 46:2
164:8
**leo's** 30:8 179:19
**levee** 279:17
**level** 40:5,13 84:13
114:15 118:11
129:10 141:10
156:22 167:8
203:9 234:20
246:11 289:10
303:5 320:9
**leverage** 153:9
**liability** 57:2
**libby** 336:7
**lie** 143:9
**lied** 100:16
**lieutenant** 1:14,17
226:16
**life** 9:6 25:4 41:13
65:9 111:20 136:6
257:12 258:12
277:5,10 302:19

322:9,17
**lifestyle** 112:18
  113:17 114:13
**lifetime** 283:4
**light** 316:20
  319:15
**likelihood** 17:24
  59:19 123:22
  124:9 228:15
  314:13 317:13
  330:20 331:4
**likes** 156:13
**likewise** 153:12
**limit** 278:2
**limit's** 120:3
**limitation** 159:9
**limitations** 45:21
  155:16 158:2,16
  158:19 268:18
**limited** 23:25
  27:22 30:12 44:6
  58:6 113:23
  158:12 162:5
  163:2 268:8 275:6
  317:17
**linchpin** 319:18
**line** 120:6 174:15
  271:8 339:6
**lines** 220:5 297:3
**list** 101:10
**listed** 148:21
  181:4,10 297:16
**listen** 97:13
  196:20 208:9
  209:7,19 243:18
  258:19
**listened** 77:3
**listener** 208:21,21
  210:5,21 211:13
  247:18

**listening** 138:5
  187:4 246:2
**lister** 210:13
**literally** 63:15
  235:23 236:2
**literature** 45:10
  47:3,9 74:25
  76:11 108:14,20
  135:7,10,11,12,19
  136:2 137:6,10,25
  154:15 171:17
  176:24 177:7
  272:5 305:4,6
  334:17
**litigant** 174:10
  256:21,24 271:12
  320:7
**litigants** 174:16
  320:8 322:4
  323:14 331:16
**litigation** 32:23
  61:23 75:7,10
  78:7 257:24
  280:25 281:13
  287:24 322:10,14
  322:19
**litigations** 77:9
  322:7
**little** 10:8 34:25
  35:16 39:14 40:11
  48:5,10 49:24
  50:22 69:9,15
  79:14 184:19
  185:18 196:10
  203:22 228:14
  232:8 240:19
  247:4 257:15
  290:15,18 306:4
  306:13,14
**live** 163:8 279:8

**lives** 42:4 112:24
**living** 112:17
  163:10 302:19
**llc** 4:10 339:2
**lloyd** 158:7,8,11
  159:4
**llp** 4:4
**lobe** 123:18,20,20
  123:25 124:13,15
  124:25 125:4
**located** 6:20
**location** 292:7
**locations** 225:15
**loevy** 3:4,4 163:15
  307:23,24
**loftus** 336:2,11
**long** 34:6 49:13
  68:12 108:4
  119:21 146:5,8
  176:8 231:22
  244:16 306:7,16
  335:2,3
**longer** 119:25
  299:4 313:6
**look** 11:12,13,16
  25:21 30:4 31:16
  43:21,24 49:23
  51:18 53:6 63:23
  64:9 71:7 109:4
  109:19,23 110:13
  143:14,21 157:20
  167:8 168:19
  170:19 181:11
  195:19 196:9
  203:25 208:11,14
  212:14,18 213:24
  215:13 229:4
  231:15 232:11
  238:4 265:15
  266:12 293:24
  296:24 297:10,23

310:20 330:5
  332:10 334:3
  336:9
**looked** 15:3 16:8
  16:13 19:7 20:20
  40:25 44:4 52:23
  53:6 58:4 84:12
  84:13 102:9,11
  154:3 157:19
  161:3 212:18
  217:4 239:4
  252:16 253:15
**looking** 10:22
  13:10,11 23:23
  31:18 59:10 70:25
  78:5 99:2 101:10
  120:20 121:3,4
  165:15 168:17
  182:21 197:16
  218:9 233:23,23
  238:8,8 246:10
  252:10,11,25
  290:11 308:10
**looks** 323:23
**loose** 210:23
  211:16 212:3
  234:4,16 235:14
  237:10 238:2
  243:11 246:9
  247:19,22 248:14
  249:15
**looseness** 210:15
  212:12 236:7
**loss** 127:9,13
  128:20 129:2
**lost** 136:12 328:13
**lot** 13:13 15:23
  31:4 35:3 62:23
  69:10,11 113:4
  168:11,16 181:12
  181:17 191:9,10

219:25 220:4
268:10 285:10
302:20 328:2,12
334:25 335:14
**lots** 141:19 220:5
**louisiana** 279:13
**love** 313:12
**low** 18:3 268:22
**lubricated** 303:7
**lubrication** 282:2
**lucid** 233:13,14
**luminous** 170:2
**luxury** 186:4
**lying** 331:9

**m**

**m** 5:5 8:6 85:23
**m.d.** 1:24 2:6 8:6
8:12 337:17 339:5
339:21
**madison** 4:12
**major** 141:24
154:13 161:22
169:17 170:19
172:17 174:11,12
206:2 209:14
241:10 264:6
300:25 307:8
**makeup** 158:25
206:24
**making** 9:6 40:5
49:6,8 72:6 86:13
96:19 136:6
169:20 189:20
202:17 236:21
239:19,20 277:11
293:17 298:23
320:22 324:23
335:22
**male** 66:15 85:25
86:13,17,21 89:18
89:23 90:4,20

91:6,25
**male's** 64:15
**males** 87:16
**malingered**
116:23
**malingering**
269:22 270:5,24
271:23
**man** 28:23 62:8
65:4 86:11 169:2
205:11 282:22,23
283:17,24 284:10
**man's** 80:20 81:3
81:8,12,17,21 88:2
**manage** 337:8
**mania** 160:21
**manic** 175:23
**manifest** 247:22
**manifested** 161:22
240:18
**manipulated**
155:13
**manner** 112:3
**manual** 327:24
**margaret** 2:8 7:10
8:2 9:6 136:15
338:4,22
**maria** 1:11,17
**mark** 70:19 82:8
83:19 147:25
158:22 182:12
294:3
**marked** 70:21
77:24 82:9,13
83:21 88:8,11
148:3,6 182:14
294:5,9
**marriage** 338:14
**martinez** 4:17
6:14

**marvelous** 168:5,7
**match** 217:10
332:22
**material** 60:4
69:14 118:5,23
181:3,8 195:5,10
199:11 208:16,17
208:18 232:4
273:6,6
**materials** 96:13
181:17 227:6
228:8,20 229:7,10
232:6 313:17
**math** 184:20
185:17
**matter** 73:12
114:12 122:9
214:11 248:21
280:2,5 330:23,25
331:5 338:16
**matters** 137:23
141:6
**mcdonalds** 72:6
**mcgreal** 1:10
**md** 5:5
**mean** 19:14 70:14
72:5 92:3 97:20
106:4 109:6 110:7
111:5 112:10
117:21 121:8,17
121:19 129:20
143:18,21 188:20
218:3 244:4,5
251:9 288:4 291:7
303:15 305:3
317:10 321:24
328:5 337:4
**meaning** 41:5
109:24 207:8
**meaningful** 16:18
48:20 214:16

**means** 23:13 36:19
42:3 74:25 106:9
184:2 298:7
321:20
**meant** 109:5
111:10 120:8
126:7
**measure** 120:14
247:20 269:21
270:23
**measuring** 100:22
**mechanisms** 10:22
**medial** 124:15
**medical** 5:20
18:16 83:3 84:14
96:19 108:14
126:25 206:3
211:23 280:17,20
281:16 293:14,24
295:19 299:8
316:15
**medically** 133:4
281:5
**medication** 55:19
**medicine** 96:25
**meds** 238:5
**meet** 108:2 112:20
**memo** 332:17
**memorial** 82:16
**memories** 40:17
122:25 127:15
**memory** 114:19
114:21,22 115:7,8
115:10,11,19,19
116:10,13,16,19
116:21,23,25
117:3,5,6,9,15
119:5,11,20
120:19,20 121:5,7
122:3,10,13,14,15
122:20 123:13,18

**[memory - name]**

123:19 124:2,7,14
124:16,24 125:22
126:2 127:9,12,18
127:25 128:7,10
128:14,19 129:2,6
129:10,12,20,25
131:19 132:3,11
132:16,20,21
137:12,16 326:18
**men** 166:13
**mental** 17:25 18:2
18:4 26:8 61:9
117:7,20 120:2,2,7
120:13 154:13,18
154:19,24 158:2,3
159:17,20 160:5,9
160:10 161:3,4,10
161:18,19 166:6
171:9,14 172:18
173:19 176:14,18
176:18,20 178:6
180:19 202:24
212:9 226:24
234:18 295:23
296:3,19
**mentally** 167:6
216:19
**mention** 105:11
125:10 188:15
**mentioned** 124:23
157:7 163:3
190:10 191:24
227:4 238:7
242:19 312:6
**mere** 23:6 55:6
216:17
**merely** 122:4
173:13 175:10
181:25
**merit** 186:16,19
186:22 187:12

**mess** 68:18 318:16
**messy** 319:20
**metaphor** 63:16
**methodologies**
271:11,17
**methodology**
176:12 177:3
258:16 259:18
261:7,15 262:14
262:14
**michael** 1:13,15
1:24 2:5 7:5 8:12
177:21 337:17
339:5,21
**michigan** 158:6
162:4
**micro** 74:15
**micromanaging**
318:12
**microphones** 6:4,9
**midday** 240:24
**middle** 240:9
248:6 318:15
**midona** 1:12
**mildly** 128:16,16
**millage** 208:15
**million** 185:16
**mind** 57:9 64:20
106:6,19 117:4
126:14,16,20
127:21 155:22
205:6 245:19
259:3
**minded** 170:16
**mindful** 131:14
**mine** 174:7
**minimize** 297:11
**minute** 47:12
136:22
**minutes** 87:25
90:3 91:25 118:2

118:3 120:5
146:17 318:22,22
**mirror** 20:24
**miscarriage**
169:14
**mischaracterizat...**
284:24
**mischaracterizes**
286:17
**mischka** 1:12
219:17,20
**misconduct** 71:21
72:4,14 105:4
**mishmash** 69:12
**misleading** 27:10
27:11
**missed** 170:16
229:4
**misses** 157:6
**misspeak** 92:17
**misstate** 224:24
**misstates** 90:10
224:8
**misstating** 92:7
**mistake** 48:2
**mistaken** 256:9
**mistranslated**
179:24
**mitigates** 300:7
**mix** 30:13
**mixed** 151:3
**mixture** 85:24
86:4,15
**mokstad** 1:17 7:23
**moment** 57:14
174:17
**money** 112:19
144:3,4,18 182:6
257:9
**months** 311:9,16
312:20 314:11

**moribund** 165:11
**morning** 82:18
240:20 275:21,24
276:15 300:13
**morrison** 3:13
7:24,25 10:14
92:10 330:11
**motivated** 256:20
256:22,25
**motivation** 256:24
257:3
**motivator** 74:21
**motives** 28:22
**mouth** 241:17
**move** 244:14
324:14
**movements** 62:18
117:11 225:18
249:22 298:8
**moves** 53:11
**mucking** 33:18
**multiple** 15:4,14
45:12 67:8,14
76:12,16 77:5,13
97:17 153:8 322:3
322:4,7,9,12,17
**murder** 76:12
111:2,9 170:5,21
**mush** 39:23,24
**mysterious** 284:11
**mystery** 94:4
**myths** 147:23
152:2

**n**

**n** 5:2 8:6 74:20
**naive** 265:11
**naked** 52:17 63:24
157:6
**name** 6:14 7:4
8:11 158:7,10,10
186:24 219:16

315:22 336:3 339:3,5
**named** 3:16 7:16 38:21 158:8
**names** 35:18,22 38:21 39:17
**narrative** 104:5 160:17 188:11 245:9
**native** 259:12 260:2
**natural** 127:6
**naturalistic** 69:3
**naturally** 210:14
**nature** 33:22 45:10 61:3 63:21 68:10 113:7 114:24 131:8 140:7 141:22,23 151:8 158:15 215:8 242:16 244:11 251:21 257:23 305:9,10
**near** 63:25
**neatly** 20:23
**nebraska** 150:15 151:2
**necessarily** 10:9 41:25 42:2 75:9 77:11 80:16 104:13 112:17 113:4 124:6 127:9 127:12 133:8 143:24 162:18 204:22 207:4,5 222:15 223:9,12 233:11,12 258:7 277:12,20,25 302:25 303:15 306:3 310:9 313:21 329:14

**necessary** 31:22 228:2 308:2
**necessitating** 297:20
**need** 9:25 10:7 13:18 14:11 21:20 23:23 33:16 52:4 70:16 126:15,18 126:20,21,24 138:3 153:8 192:10,17,18,19 192:21,22,23,24 192:25 193:2,3,4,5 193:13,14,15,16 193:18,19,21,23 193:24,25 198:11 225:2 235:3 278:22 325:16 335:2
**needed** 145:21 301:6
**needs** 156:8
**negative** 43:17 153:24
**negligent** 257:5
**negligible** 29:22
**neither** 98:24
**neuroanatomical** 122:18 123:14
**neurologists** 119:16
**neurophysiologi...** 123:23 125:11,13
**neuropsychologi...** 122:17
**neuropsychologi...** 121:21
**neuropsychologist** 117:17
**neurotransmitters** 124:6

**never** 58:15 163:23 164:18 198:18 217:4 233:17 234:19 245:24 246:21 247:7,8 268:16 269:20,23 277:3 280:15 302:13 328:8 333:15
**new** 2:2,2,10 6:15 6:21,21 8:15,15 151:13,16 152:8 152:17 324:10,14 326:2,5 338:5 339:2
**news** 28:7 30:11 45:16 46:3
**nice** 75:23 136:16
**night** 79:23 240:10 289:23
**nightclub** 225:7
**nine** 213:2 245:2 309:13,14
**ninth** 193:4
**nodding** 20:7
**non** 246:7 248:2 248:25 249:23
**nonconsent** 99:22
**nonpublic** 220:14
**nonscientific** 74:21 308:25
**nonsense** 49:7
**north** 3:5 4:6 145:15 149:25 150:20,25 152:20 153:23
**northern** 1:3 6:25
**northwestern** 82:16
**notable** 23:12 202:24 331:2

**notary** 2:10 8:8 337:22 338:4 339:24
**notch** 136:18
**note** 6:3 8:18 15:18 23:10 154:9 332:25
**noted** 19:19 153:12 295:17 326:7 327:6 337:16
**notes** 222:5 311:13 313:8,23
**nothing's** 46:12 48:24
**notice** 20:6
**noticed** 20:19
**noticing** 149:12
**notion** 99:21 105:6 215:2 301:7 320:14 334:10
**notwithstanding** 220:24
**november** 108:6 108:19
**number** 8:22 11:19 12:10 13:22 13:25 16:15 33:23 36:3 39:8 51:4,13 82:14 104:22 107:11,20 109:16 114:13 117:2 119:8,8 139:22 172:6 174:7 177:21 201:16 227:5 229:10 254:25 255:11 268:12 283:14 312:18 313:19 327:7 328:24

**numbered** 83:25 88:13
**numbers** 13:4 110:24 111:7 112:11 175:8
**numerous** 14:22 14:25
**nursing** 327:19 329:17
**nyc** 6:20

**o**

**o** 10:15
**o'clock** 10:8 240:13 245:2
**oath** 8:4
**object** 26:14 117:23 299:14 317:4,6 324:6,11 325:9 326:3
**objection** 50:7 62:10,13 66:20 87:4,8,9 90:9,12 90:24 91:2 92:5 95:3,19 96:7 97:16 98:17 99:15 100:18 104:11 105:18,20 106:2 107:3 108:12 123:8 134:23 167:10 187:9 190:17 192:11,12 197:9 200:19,21 200:25 201:23 202:2 213:8,21 214:22 221:8 224:7,23 226:13 228:5 229:12 236:15 240:5 242:4 253:9 256:14 275:13 278:23,25 282:4

282:16 284:23 302:23 304:6,17 306:9 307:15 308:16,18 311:23 314:19 317:19 318:5 321:14 326:6
**objective** 312:11
**objectively** 314:4
**objectivity** 78:7
**objects** 120:4,6
**obtain** 257:7,8
**obtained** 11:15 66:8,14 81:14
**obvious** 26:13 52:12 92:20 128:12 264:8 299:20
**obviously** 75:21 123:15 156:21 220:9 261:18 337:5
**occasionally** 29:25
**occasions** 146:22
**occur** 58:18 129:19,23
**occurred** 58:21 151:19 249:6 276:15 319:3,25
**occurs** 130:6
**october** 150:4 324:13
**odd** 250:5 275:17
**offenders** 110:18
**offense** 141:23 302:14 303:8
**offer** 48:11 228:23 240:12 269:7
**offered** 54:3 265:9 269:10 289:3

**offering** 202:23
**offers** 134:7
**office** 4:5 8:14 68:17 69:11 224:5 225:14 307:20
**officer** 1:13,13 19:21 156:9,25 157:25 205:22 214:4,9 220:7 222:7 298:16,19
**officers** 3:17 7:17 11:24 12:4 36:4 155:12,12 207:2 214:18,20 217:21 220:12,25 221:6 221:17 223:20 226:17 247:23 250:9 262:6 304:3 304:14,24 305:8
**official** 1:19,20
**offshoot** 76:22
**ofshe** 43:21 260:18 261:9 266:17
**oh** 64:10 109:6 136:3 234:13 264:22 278:13 311:22
**okay** 9:7,12 10:5 23:4 37:7 56:2 74:4 86:18 94:9 100:5 150:3 156:7 156:10,11 215:19 227:21 234:21 237:14 289:25 295:14 297:22 299:2 315:17 321:3
**old** 328:6,7
**older** 328:10
**ominous** 141:12

**omit** 200:16
**once** 22:12 92:8 112:22 150:6 229:24 277:3 280:10 321:9 322:24
**one's** 63:10 79:24 127:6 287:3 307:22
**ones** 174:20 261:12 316:2
**oneself** 210:4 274:4
**oop** 192:21
**open** 170:16 221:14 245:8 318:14
**operate** 71:19
**operating** 190:7 194:18
**opine** 104:18
**opinion** 45:24 64:9 79:22 92:14 96:2 106:24 159:5,25 160:4,6 207:18 228:10,12,24 231:12 268:16 269:7,10 286:23 287:7,13 289:8,14 309:7 310:17 311:21 315:7,14 315:14 316:10 324:13 326:3 329:11
**opinions** 106:22 199:14 258:17 316:17 324:10,15 326:5 333:24
**opportunity** 15:12 79:13 106:21 156:3 171:19,21

181:12 231:21 262:25 263:13 324:12
**opposed** 18:3 33:5 55:6 61:3 105:9 141:14 156:5 179:10,18 199:13 300:8
**opposite** 122:12 167:24 168:2 329:4
**order** 11:11 13:19 14:11 28:17 51:15 52:8 162:13 163:5 163:7 308:2 312:10
**organic** 132:24
**organization** 167:20
**organizations** 168:21
**orientation** 30:9 37:3 72:3 104:15 106:14 117:21
**oriented** 76:7 105:8 151:21 179:4 295:2
**origin** 63:20 91:5 189:14 288:19
**original** 288:10 313:3,4
**originally** 16:12 42:11
**originate** 33:10 313:5
**originated** 85:8,20 89:4,14 91:10 92:20,21 217:20 313:2
**originates** 93:7 303:18

**originator** 259:9
**outcome** 338:15
**outdoor** 69:2
**outset** 186:7
**outside** 141:2,5
**overall** 31:14
**overlap** 113:14 212:5
**overlooked** 169:18
**overly** 35:17
**overreach** 73:5
**overrepresentation** 12:24 174:16 175:11
**overrepresented** 12:13 18:5
**oversold** 155:18
**overstated** 36:22
**overturned** 162:16 162:21 164:14
**owner** 183:6
**ownership** 179:10

**p**

**p** 10:15
**p.m.** 139:13,16,18 139:21 177:15,17 201:7,10,12,15 244:19 254:24 255:5,7,10 292:6 292:17,20,22,25 328:15,18,20,23 337:15
**pacific** 42:8
**page** 3:22 5:3,11 8:25 70:12 78:17 82:21,21 84:23,24 84:25 88:17,21,21 103:12,12 104:4,4 104:21 181:4,10 182:21 183:9 184:4 193:7,7,9,10

193:11,12,18,20 193:24,25,25 194:2,19,21 196:18,18 197:14 197:15,16,17,18 197:21,24 198:12 199:21,25 200:5,6 200:16 213:2 215:16 223:14 229:18 233:3 255:12,13 258:13 260:19 272:2 278:12 285:21 286:2,3 288:22 289:15 293:8,9,13 294:12 295:18,19 296:12 297:17,24 303:20 316:6 335:19 339:6
**pages** 188:5
**paid** 181:20,23 182:8 184:24 185:4
**painful** 258:11
**pair** 63:11
**pallet** 215:24 216:10
**pan** 311:10,16
**panel** 151:13,15 152:16 183:7 327:25 329:10 335:4,5,6
**pants** 63:12
**panty** 85:15,23 89:10
**pantyhose** 213:5 215:3
**papers** 68:18
**paradigm** 140:22 142:2 179:3

**paragraph** 71:2,4 192:17,18,19,20 192:21,22,25 193:2,3,4,5,12,14 193:16,17,22 198:12 223:17 255:12 274:23 276:25 289:15 296:3 303:21
**paragraphs** 288:22
**parallel** 40:14
**paralleling** 118:19
**paramour** 195:23
**paraphilics** 303:13
**parietal** 123:20 124:25 125:3
**park** 335:10
**parsing** 214:7
**part** 39:13 46:2 63:10 95:10 103:8 104:7,25 112:8,21 113:16 115:16 119:25 124:2 160:16 177:23 194:12 216:10 233:2 252:12,13 279:13
**partial** 31:12 85:7 85:19 89:3,13
**participate** 32:8 186:5,6,20 320:13
**participated** 282:25
**participates** 262:9
**particular** 72:25 118:9 168:10 202:11,25 274:11
**particularly** 86:14 206:6 231:22 232:7 290:14

305:12
**parties** 6:12 7:9
  178:18 338:13
**partner** 113:11
  192:5 197:6
  200:13
**parts** 123:17,18,19
  123:20 124:3,12
  124:13,19,22
  125:5 279:8
**party** 332:18
**passage** 127:2,4,14
  287:23
**passions** 41:18
**passionwise** 41:23
**path** 31:16
**pathologies**
  271:14
**pathologist's**
  285:9
**pathologists**
  285:11
**pathway** 31:2
**patients** 116:21
**patinae** 28:18
**patrick** 184:9,11
  184:21
**pattern** 67:7 179:5
**paul** 43:23
**pay** 40:16
**paying** 185:9
**payment** 185:5
**peace** 106:23
**peculiar** 75:14
  248:11,12
**pee** 233:24 234:4
  234:14 245:20
  246:4 249:7,23
  250:16,23 251:2
**peed** 233:17,18,21
  245:21,24 246:21

253:8
**peeing** 234:5
  248:2 252:7
**peer** 37:21 46:20
  47:17 49:19 50:4
  116:15 135:20
  137:7,25 138:13
  259:15 266:24
  267:17 329:9
**peg** 147:17
**pena** 1:11
**penalty** 17:20
  152:25 154:5
  168:25 170:21
**pending** 10:4
  103:25
**penetrated** 289:3
**penetration** 60:12
  60:13 283:7
  289:10
**people** 27:19,20
  29:6,12,13,13 36:2
  36:3,9,14 39:6,12
  39:17 40:24 41:9
  43:8 44:23 47:23
  48:6 52:25 55:10
  69:10 76:14 96:17
  96:19 97:7 111:21
  112:2,22 114:3,7
  128:19 130:10,11
  131:10,18,22
  134:3 138:15,23
  143:23 152:7
  153:5 154:5,6,12
  154:13,25 158:9
  162:20 163:25
  166:12,20 167:6
  170:15,19 171:7
  172:7 174:2
  175:13 176:14
  178:18 204:6

206:7 208:11
  209:3,6,14 214:10
  214:10 216:14
  218:21 223:6
  228:18 237:23
  239:16 243:9
  244:9 262:23
  263:5 264:16
  266:8 272:15
  275:2,19 276:21
  277:6,10,15,22
  278:7 290:6,8,9
  291:3,9 292:12,13
  300:3,24 303:11
  303:17 311:19
  322:2,4,6,7,10,16
  328:9 331:15
  334:3 335:6
  336:17 337:10
**percent** 39:16,20
  41:9 185:18,21,22
**percentage** 113:13
**percentages** 69:18
  174:14
**perfect** 180:15
**perfectly** 208:6
  209:18 237:5
**performed** 271:22
**perimeters** 77:9
**period** 54:2 55:20
  93:10 117:12
  146:19 285:22
  313:6
**periodically** 19:5
**periphery** 26:15
**perpetrator** 61:20
  250:15 253:7
  301:25
**perpetrator's**
  86:16

**persist** 307:5
**person** 14:3,16
  28:6 45:20 54:3
  55:17 59:8,15,21
  60:8 64:23 65:21
  65:25 67:9,10,11
  67:18 73:19 75:23
  76:6,17,25 87:17
  94:21 100:6 102:4
  102:7 117:8,10
  118:18,21 119:2,7
  119:9,19 121:2
  127:11 128:25
  129:25 130:8,14
  132:6 133:12
  134:7 136:16
  141:18 155:5
  159:24 160:8,24
  161:3,22 162:15
  164:17 168:18
  169:16 178:5
  179:6 180:12,19
  190:22 206:23
  210:19,24 215:7,8
  216:12 218:16
  222:13 228:3
  235:18 237:9
  243:21,22 244:10
  248:15 249:13
  256:23 257:14,21
  260:11,13 265:8
  273:15,19,22
  274:2,9 283:3
  288:3,9,10 289:21
  290:4 298:4 300:8
  302:8,8 305:6
  312:13,16 314:14
  318:21 332:16
**person's** 62:17
  63:9 65:12 94:21
  157:3 206:13

210:8,12 241:8
256:17 257:12
258:11 288:5
**personal** 41:17,18
255:18,22,23
256:4,6,11 257:2,3
322:19 326:25
331:15
**personality** 76:12
76:16 77:5,13
131:3,7,21 132:5,9
132:23 133:11
134:7 168:12
**personnel** 293:4
293:15
**perspective** 78:22
150:25 166:11
285:10 329:11
**pertains** 110:18
**pertinent** 17:18
19:2,3 73:7 75:15
83:3 312:7
**perusing** 197:20
197:23 199:19,24
200:4,8
**petty** 140:4 141:5
142:11
**phenomena**
134:14 138:19
**phenomenon**
132:11 137:22
172:24
**phone** 10:9
**phones** 6:7
**phonetic** 30:3
84:19 175:2,16
205:8 232:23
336:12
**photos** 217:10
**phrased** 103:22
154:2

**physical** 68:5,7,14
126:7 127:24,24
128:4 189:22
286:6,11 287:2,16
288:15 316:8
319:5
**physically** 86:15
190:9 311:6
332:22
**physiologically**
124:5
**pi** 210:24
**pick** 6:4
**picked** 164:5
**piece** 96:3 110:17
260:19,22 264:25
265:12,19 333:9
333:10
**pieces** 98:20
**pinata** 258:23
266:11
**pioneer** 327:19
**pitch** 165:16,17
**pitches** 94:3
**place** 2:8 6:8 11:23
40:4 44:18 53:17
68:17,23 72:19
167:2 194:12
203:9,10,17
211:20 231:17
**placed** 212:9
**placing** 156:18
**plaintiff** 1:7 3:5
7:14 82:14 83:25
88:13 187:15,18
187:22 289:18
294:9 313:15
**plaintiff's** 5:11
70:22 75:11 82:10
83:22 88:9 148:4
182:15 294:6

319:18
**plan** 296:25
**plans** 157:20
**play** 11:24 14:22
125:14 258:25
259:13,22 260:5
303:3
**played** 72:22
**playing** 182:18
295:7
**plays** 33:21 75:5
**pleads** 178:21
**please** 6:3,7 9:15
20:9 45:8 57:13
97:11 126:23
177:14 192:3
218:11 227:8,8
239:13,14 296:10
**pleased** 186:23
**plenty** 300:21,22
322:2
**pllc** 3:10
**plus** 60:25 184:21
296:14
**point** 12:23 14:21
15:16 19:10 34:11
42:20 51:24,25
55:16 68:3 69:24
96:2 98:10 104:3
122:8 125:19
134:20 135:3
157:4 163:23
191:17,17 194:19
202:25 210:7,7,19
210:20,20,20,21
210:22,24 222:19
225:16 227:11
234:17 240:16,18
242:22 245:23
253:14 273:13
283:25 284:2,10

284:16 285:15,16
289:2 296:11
302:18 303:4
306:15 316:15
318:21 325:12
329:21 330:4
**pointed** 101:3
**pointing** 135:8
**points** 26:10 29:2
71:6,9 79:3 80:6
192:24 193:8
215:8 258:14,18
261:16 331:19
**polemicist's** 254:9
**polemics** 29:24
32:16 36:4 71:17
154:16 171:12
172:25
**police** 1:9,10,10,11
1:11,12,12,13,13
1:14,14 3:17 7:17
20:24 36:4 47:3,6
71:20 72:3,4,9,14
73:5 105:4 115:3
156:9,24 157:25
159:6,7 162:3
163:12 164:16
175:12,22 179:23
207:2 214:9,17,20
216:5,23 218:5
220:6,12,25 238:7
251:6,10,12 252:2
259:7 261:7,8
274:7 294:19
298:16,19 302:20
304:3,14,23 305:8
**policeman** 298:10
**policing** 157:2
**policy** 152:7,8
**polite** 137:2
304:22

polygraph  14:5,17
   16:6 17:22 21:12
   22:3 52:19,21
   53:2 54:2 56:15
   56:17,18 153:14
   154:7
ponder  247:4
pool  112:9 318:16
pools  163:17
poor  37:11 55:10
   108:16 279:13
   311:3
poorly  154:2
popping  58:14
populated  39:12
population  113:3
   138:7,12 174:14
   275:4
populations  18:8
   133:4
portfolio  271:9
portion  34:9 70:2
   97:14 111:3
   185:11 192:8
portions  192:9
portrayed  211:24
posed  9:22
posing  251:22
position  74:19
   92:19 118:15
   146:20 205:7
   214:13 217:12,18
   266:18 336:17
positioned  256:9
positive  152:19
   322:13
possess  305:17
possibilities  60:9
   64:7,12 65:18
   87:18 91:7,16
   93:22 100:21

194:16 223:6
   242:18 284:9
   317:14
possibility  67:13
   87:19 91:15,21
   93:15,20 153:10
   169:14 195:8
   204:11 218:19
   300:18 320:5
possible  61:12
   87:21 167:14
   203:7 212:24
   223:7 242:23
   247:5 256:8
   279:24 280:4
   288:23 291:25
   316:20 317:3,17
   320:23 331:6
possibly  22:4
   73:19 118:16
postconcussive
   128:10,11,18
   138:7,9,12,19
   281:7 286:5
   288:11
posted  178:13
postraumatic
   273:20
posture  76:6 106:8
posturing  136:24
potency  173:14
potential  17:18
   18:24 55:21 69:5
   72:15 288:17
potentially  15:7
   114:14 141:7
   162:8 186:19
   287:3
pouring  246:14
power  144:19

powerful  189:15
pox  277:4 280:9
practicality
   142:10
practice  29:11
   38:11 185:15
   220:19 327:25
   335:5,12,25
   336:12,18,22
   337:9
practices  157:11
practicing  42:5
precedent  319:21
preceding  213:16
precise  212:2
   223:19 224:20
   225:24 232:21
preclude  301:18
predation  112:15
   113:2
predator  303:12
predicated  140:20
preempt  173:6
prefer  187:2
   212:13 280:19
prejudice  167:21
preliminary
   120:16 296:24
preoccupied
   202:11 204:18,19
   206:5
prepare  107:21
prepared  77:23
   101:17 204:25
   246:15
preparing  104:8
preponderance
   308:14
prerogative
   308:23,23

prescriptive  151:8
   152:23 156:4
presence  61:2 68:6
   80:10,19 274:8
present  4:17 7:7
   22:4 58:3 59:18
   86:13 138:15
   167:9 274:10
   318:18
presentation
   266:16 288:14
presented  47:21
   60:11 93:23 96:15
   99:5 198:4 199:15
   231:19 236:18
   263:23,25 264:25
   280:21 281:5,16
presenting  133:7
   218:19
presents  34:2,3
   130:3 236:6
preserve  33:17
president  336:8
pressure  131:20
   133:23 137:20,20
   263:16 312:25
pressures  131:6
   259:2,11,12,21
   287:23 306:25
   307:2
prestigious  335:18
presumes  72:3,4
presumption
   36:13 71:19
   141:11,12
presumptions
   32:15 36:5 70:7
presuppose  222:7
   222:8
pretrial  208:25
   237:24 263:23

**pretty** 107:24
122:20 132:12
151:6 152:22
323:20 329:15
335:17
**prevail** 257:3
**prevent** 276:6
**previous** 174:25
175:17 253:23
303:9 320:19
329:2 331:21
**previously** 272:7
**primarily** 29:23
32:15 39:12
**primary** 296:21
**prince** 1:16
**principally** 71:25
225:12
**prior** 101:17,19
245:13 295:11
**prison** 255:15
**private** 6:5 65:9
141:12
**probably** 16:8,22
49:23 50:9 76:20
82:5 146:3 185:17
195:18 214:6
**problem** 45:13
235:7 250:10
**problems** 242:10
295:12 301:3
336:14
**procedural** 308:8
308:10 310:2
**procedurally**
308:4 309:17
**procedure** 2:12
251:11,12 252:3
261:9 309:5
**proceed** 7:12
94:10

**proceeding** 17:13
82:4 192:6 304:23
**proceedings** 39:13
118:14 271:2
**process** 41:7 78:18
78:19 127:25
130:8 227:5,12
267:19
**processing** 214:11
**produce** 138:3
189:4,7 190:2
**produced** 16:24
100:7 101:17,18
148:9 184:10
**product** 56:25
134:5 155:9 182:2
288:14
**production** 319:24
325:17
**professional** 41:18
75:25 159:24
222:19 223:7
260:3 262:20,21
266:14
**professionals**
202:24 234:18
262:8 299:9
**professor** 30:4,17
35:13,13,14 43:23
**professors** 33:4
39:18 41:10 140:8
202:21 216:15
**profile** 22:14 85:7
85:19 86:13 89:3
89:13
**program** 260:25
**progressed** 326:16
**progressing** 210:6
**progression** 252:6
**progressions**
244:16

**project** 27:4 28:9
162:23 163:16
166:2,11 167:18
167:25 169:24
177:9,23 178:17
178:20
**project's** 178:14
**promulgated**
49:14
**prone** 131:22
**pronoun** 207:17
**pronouncements**
171:11
**proof** 59:18
279:24 280:4
**properly** 77:21
**proponent** 261:6
**proposed** 151:19
**proposition**
276:19
**proprietary** 163:5
**prosecutor** 259:25
266:3,9
**prosecutor's**
307:20
**prosecutors**
147:20 148:20,24
149:5 152:6
172:13 308:23
314:2
**prostitute** 111:17
111:18 112:7
**prostitutes** 110:23
111:19 112:14,20
113:2,6,8,10,16,23
**protocol** 26:18
**proud** 75:22 76:4
267:18
**prove** 49:5 58:22
59:7 257:4

**proven** 24:4
**provenance** 87:11
**provide** 94:11
111:11 187:20
188:11
**provided** 32:14
53:2 101:3 132:3
145:8,12 147:2,8
148:20 149:4
154:11 181:3,13
187:14 198:13,19
213:2 216:5 218:4
218:7 221:6
227:16 231:2
270:17 315:3
332:17
**provides** 333:11
**providing** 220:25
**proximal** 55:17
72:21
**proximity** 53:15
168:22 271:3
312:14,16
**psychiatric** 84:15
117:18 126:5
155:14 158:24
159:10 161:23
162:6 169:17
170:19 174:11,13
174:23 176:20
206:2,24,25
209:15 221:16
234:7 238:3 272:5
300:2,25 303:11
316:14
**psychiatrically**
158:13 162:11
167:22
**psychiatrist** 156:8
202:17 262:22
320:3 323:12

335:11,12,13

**psychiatrist's**
254:6

**psychiatrists**
119:16 122:23
234:13

**psychiatry** 335:15

**psychological**
271:18,22 316:11

**psychologically**
133:5

**psychologist**
264:23

**psychologist's**
254:7,8

**psychologists**
202:18 221:18

**psychopharmac...**
56:21

**psychopharmac...**
54:20

**psychosis** 235:13
238:6 250:19

**psychotic** 154:12
155:3 159:22
160:10,24 171:8
175:5,12,23
176:17 178:5
202:10,12 204:4,5
204:7,9,16 206:6
208:12 212:16
243:9 247:20,21
248:15 249:3
300:20 303:3

**ptsd** 272:6,16

**pubic** 62:9 63:7,10
63:11 64:3 80:15

**public** 2:10 8:8
183:23,24 337:22
338:5 339:24

**publication** 28:18

**published** 30:21
31:3,8 37:20
40:20 43:4,14
46:7,9,16,19 47:16
49:18 108:20
116:12 135:19
137:6,12,24 171:9
260:15 328:2

**publishing** 30:18
43:8 47:24 48:3

**pull** 267:20

**pulling** 203:23

**pullout** 193:15

**punch** 277:3

**purpose** 104:7,13
127:23 196:25

**purposely** 105:10
105:13

**purposes** 50:12
99:7 100:11
230:11 239:12

**pursuant** 2:11
41:13

**pursuing** 251:16

**pushed** 35:11

**put** 19:24 63:16
72:20 75:19 79:11
151:14 174:6
177:20 195:18
196:2 241:16
250:12 260:14,17
266:17 269:16
322:22 336:16

**putting** 177:4
328:6

**q**

**qaeda** 169:6,8

**qualification**
160:2

**qualified** 49:11

**qualify** 198:10

**qualities** 12:17
22:20 74:13
120:13 132:5
160:20

**quality** 12:24
22:14 27:9 80:5
158:17 240:22
250:5 308:6
323:22

**quantify** 14:12

**quantitative** 21:15

**quantity** 27:8

**quarterback**
129:3,8

**question** 9:12,15
9:18,21,22 10:3
13:7 14:23 20:8
20:14 29:18,19
34:4,5,8,13 40:10
46:10 66:21 72:9
83:5,7 87:23,23
90:10,25 91:3,12
91:23,23 92:6,12
92:14 94:8,11
95:4,5,13,20 96:8
97:9,10,12,13
98:22 99:7,16
103:22,24 104:12
106:3 107:4
108:13,17,23
110:13 111:12
114:24 115:14,15
115:21 116:6,6,8
123:5,9 125:16
130:23 133:13
136:5,21,25 137:3
137:16 138:6
140:10 143:12
157:18 161:14

166:4,9 167:12
173:7,21,23 176:7
176:11 184:16
187:5,6,10 190:18
192:16 193:21,22
194:11 195:20
196:12,20,21
197:25 198:2,8
199:17,20,21
200:2,9 202:14
203:3 207:16
209:25 210:18
213:9 220:25
224:8 226:14
229:5,13 238:17
239:6 244:15
247:16 250:14
251:19,21 256:15
270:22 282:5,17
285:12 287:10
299:6 303:2
305:16 306:20
314:20 317:16
318:6 320:4
321:15,23 323:18
324:7 325:2 326:9
326:22 331:10

**questioned** 33:4
131:9 133:19
134:4 159:11
247:10 305:13

**questioner** 137:21
141:23 219:24
306:4

**questioners** 232:3
307:3

**questioning** 11:23
11:24 14:3 15:8
72:23,24 141:8
158:15 204:8,13
205:23 214:4

215:9 217:13,19
217:22 218:21
231:16,23 238:21
241:2 306:24
307:6 327:2
**questions** 9:4
23:18 29:3 33:9
42:22 62:15 77:2
77:6 78:25 93:3
97:6 105:3 106:11
109:15,16 120:12
121:25 188:12
191:9 206:21
218:23 220:2,5,8
239:21 241:25
242:16 244:13
245:8 251:12
252:5 305:9,10
309:13,14 315:16
315:19 316:17
324:9 330:10
337:13
**quibbling** 292:4
**quickly** 181:14
228:21 232:13
243:13
**quite** 38:13 119:21
158:13 204:3,18
204:18 243:7
256:8 329:18
**quizzical** 285:15
**quote** 149:2
265:21,22

**r**

**r** 3:7 8:6 210:24
**rabbit** 227:10
**race** 74:5
**rains** 278:10
**raise** 274:14
285:11

**raised** 53:20 79:4
109:17 110:2
199:6,12 203:4
320:18
**raises** 321:21
**ramsey** 158:23
**range** 63:8 87:18
171:16 217:23
263:22
**rape** 32:22 59:12
61:24 66:7 81:14
81:25 82:17 86:14
96:6 112:15 189:4
189:6,12,13,25
194:11 206:6,6
240:15 257:10
258:4,5 259:4,11
259:23 260:8,12
280:8 281:21
301:17 303:13
312:21 316:7
318:2,3,13 319:21
320:13,22 321:10
324:3,5 325:5,7
327:15,18 334:4
**raped** 198:15
213:4 275:9,11,16
275:17,21 276:3,7
277:2,4,6,7 278:17
278:19 280:10,11
280:12 282:2,3
298:9,15,18
311:17 316:24
321:9 325:19
**raping** 247:8
293:5 294:19
295:10 296:7,15
**rapist** 302:18
**rapists** 300:22,23
**rare** 21:24 55:9
175:9

**rational** 211:8
234:3
**raw** 209:7
**reach** 13:19
169:23 176:13
181:14 258:17
**reached** 37:22
**reaches** 303:4
**reaching** 34:16
37:11,16
**reacting** 206:17
**reaction** 207:12,13
236:9 269:4
**read** 20:12 28:2
70:2 71:3 79:23
84:7,18 90:14
97:15 103:23
107:23 108:14
171:13 175:18
219:2,5,6,7,11,15
219:18,24,25
220:13 223:24
224:18 226:9,10
228:2,16 229:11
229:14 237:13
242:7 265:20
267:16 271:3,5
282:13 283:19
290:6,8,12,23
291:21 313:22
330:3 333:2
**readily** 69:5
**reading** 29:4
70:12 76:10
109:12 171:12
236:16 291:24
**real** 25:4,8 55:25
135:11 140:18
172:2 195:9 205:4
205:5 219:19
262:5,7 297:5,9

321:3,4
**realistic** 217:25
301:7
**reality** 202:22
203:9,18 206:14
216:18
**realize** 263:9
277:11 312:23
**really** 27:2 29:22
46:25 64:8 73:13
104:14 105:8
106:5,7,18 114:23
120:8 123:4
143:11 144:16
152:8 153:20
155:24 157:9,22
158:16,25 159:13
160:16 161:21
162:9 163:13,19
183:21 185:14
194:12,14 208:22
212:6 213:25
223:3 226:24
230:14 231:13
232:21 245:14
248:23 249:8
250:15 258:19
260:9 261:11
266:22 270:7
274:23 280:6,19
290:11 301:6
323:21,25
**realm** 57:11 94:14
132:7 185:21
204:10 223:5
**reask** 9:17
**reason** 19:6 45:25
138:4 170:4
188:19 196:13
199:10 221:21
246:4 277:13

279:18 291:15 309:20 339:6

**reasonable** 316:11 316:13

**reasonably** 62:2

**reasons** 170:24 171:16 178:7 186:15,16 203:12 273:15 274:24 297:19

**recall** 83:15 111:3 117:24 121:9 150:13 220:11 224:13 238:11 253:17 290:13 291:24

**recalling** 129:14 129:18,22

**recapitulation** 247:24

**recapping** 221:11

**receive** 166:15 308:3

**received** 102:10 307:9 309:9 319:22

**receiving** 236:8

**recency** 302:11

**receptacle** 167:19

**recess** 51:8 57:20 107:15 139:17 177:16 201:11 255:6 292:21 328:19

**recognition** 121:9

**recognize** 15:19 36:10

**recognized** 69:6

**recognizing** 23:11

**recollection** 142:21 153:22

285:22 286:9 288:20 291:11,21

**recommend** 260:23

**recommendations** 296:25

**recommended** 186:8,10

**reconsider** 53:4,7 309:20

**reconstruct** 130:2 279:17

**reconstruction** 61:11,13

**record** 5:13,20 6:3 6:13 8:19 10:16 51:3,6,12 54:22 57:16,18,24 70:11 75:20 82:5 83:24 84:14,15 96:20 97:15 107:8,10,13 107:19 122:5 139:10,12,15,21 149:11 164:19 175:19 182:17 199:9 201:7,9,15 206:3 212:14 215:25 221:13 222:11 223:8 254:24 255:4,10 262:19 276:18,22 276:23 292:14,19 292:25 295:20 310:21 311:25 328:15,17,23 331:25 337:15 338:10

**recorded** 264:2,3

**recording** 6:11

**records** 82:16 159:25 189:6

207:24 238:12 252:25 267:15 269:4,9 271:4,6 280:17,20 281:4 305:12

**recount** 117:8 119:7 121:24

**recounted** 132:20 319:7

**recounting** 118:18

**recounts** 119:9

**recourses** 169:3

**recover** 251:7

**recovered** 59:14 60:14 85:5,10,15 85:23 86:21 88:24 89:10,19,23 94:22 94:24 283:15

**rectal** 85:10 283:15 285:6

**red** 216:3

**redaction** 109:9

**redness** 281:22

**reduced** 44:19

**redundant** 220:6

**refer** 44:20 117:16 117:23 278:12

**reference** 35:15 140:12 142:19 146:4 150:15 190:12 191:2,4 194:10,21 222:18 225:16 236:17 238:15 241:13 260:18 266:11 290:12 293:3 311:9

**referenced** 46:22 47:19 150:12 151:12 154:21 157:24 177:7,8,8

200:18 203:5 232:16

**references** 118:7

**referencing** 61:21 104:22 158:4 189:9 194:5 225:9 290:13 303:6

**referred** 212:15 237:23 238:3

**referring** 27:18 34:21 71:5 114:9 114:17 149:3 177:6 235:3 236:23 238:16 266:8 279:6 283:9 283:11,18 293:20 306:6

**refers** 270:5

**reflect** 222:23 323:6

**reflected** 12:11 118:19 235:13 263:11 299:25

**reflecting** 247:25 263:7

**reflection** 210:11 211:4,5

**reflective** 24:9 61:16 241:4,6 249:3 250:19 285:7

**reflects** 304:22,24

**refresh** 142:20

**refute** 41:8,25 42:12 44:16 46:14 46:16 49:19

**refuted** 48:24

**refutes** 43:5,14 48:16 50:4

**refuting** 40:21

**regard** 133:9
**regarded** 327:20
**regarding** 16:4
  108:20 116:19
**register** 49:3
**registration** 121:8
**regret** 263:8
**regular** 57:11
  111:20 112:21
  114:12 282:20
**regularly** 113:15
  282:14
**relate** 25:12,13
  27:17 38:8 39:25
  111:23 113:7
  131:7,12 132:5
  133:10 144:12
  188:6 196:10
  204:20 221:19
  305:19 323:24
**related** 34:13
  53:19 102:17
  105:2 127:8,12
  147:13 168:14
  181:9 188:12
  211:2 276:5
  293:16 338:13
**relates** 12:14
  54:17 62:5,5 77:8
  113:9 127:5 131:8
  133:12 137:13
  244:7 307:22
**relating** 247:13
**relationship** 21:19
  26:3 55:5,11,16,17
  56:16 59:25 65:14
  65:15 72:21 91:9
  91:18 97:25 98:4
  98:7,11,12 100:8
  113:22 252:5

  308:6 334:23
**relationships** 57:6
**relative** 18:6 40:7
  54:10 114:15
  124:8 302:11
**relevance** 42:4
  52:10 140:17
  247:5
**relevant** 12:5 13:2
  26:15 36:22 45:7
  56:24 162:2,9
  217:7 250:17,20
  309:18 310:3
**rely** 28:19 91:11
**remarkable**
  319:19 323:17,20
  331:2 333:9,10,13
**remember** 16:7
  75:6 76:9 109:7
  117:25 118:3,25
  120:4,5 121:18
  133:18 138:8
  155:25 157:23
  183:15 215:12
  217:6 219:20
  226:16 290:9,21
**remembered**
  326:15
**remembering**
  119:2
**remembers** 61:15
  118:2
**reminds** 260:17
**remote** 121:14,16
  122:10,14,21
  292:7
**remotely** 7:8,20
**repeat** 38:14
  119:18
**repeated** 21:9
  121:20

**repeatedly** 21:23
  22:16 149:18
**repeating** 122:4
**repetition** 121:20
  121:21
**rephrase** 9:16
  47:15
**replicated** 274:6
**report** 5:12,15,16
  34:20 49:21,24
  50:6 69:23,24
  70:18 77:23 78:17
  84:4,19 88:6,7,15
  98:12 99:25 100:2
  100:6 101:14,25
  102:10,21 103:4
  104:8 107:23
  110:16,19 142:15
  148:11 174:22
  180:24 181:7,22
  181:24 182:4
  183:18 184:9
  187:14,20 188:6
  190:13,24 191:7
  191:16,19 192:9
  195:25 196:3,3,7
  196:11,14 197:3
  198:20 199:14
  200:17,24 203:6
  215:14 227:19
  229:3 239:12
  260:18 265:15,16
  266:15,23 267:5
  268:19 269:14
  283:10,20 293:2
  293:25 301:9
  303:6,20 307:17
  309:4,5 312:7
  316:6 317:25
  324:19,24 325:11
  325:15 326:13

  329:22 330:3,3
**reported** 82:2
  138:13 311:5
**reporter** 2:9 5:22
  7:10 8:2,10 35:21
  65:22 136:7,13
  177:13 188:23
  292:15
**reporting** 339:2
**reports** 32:7,13
  34:18 48:11 70:3
  100:3 101:16,22
  174:7,8,10 186:24
**represent** 7:9 86:8
  167:6 315:23
**representation**
  18:7 56:11 98:2
  169:10 170:4
  171:7 239:24
**representations**
  96:16
**represented** 14:8
  18:2 52:4 175:24
**representing** 6:15
  21:23 86:20
**represents** 39:19
**repressed** 40:17
**repression** 127:20
**request** 157:22
**requested** 47:13
  97:14
**requests** 16:25
**require** 52:8
**requirement** 45:5
**research** 12:15
  18:20 21:5,6 25:6
  25:6,12 26:17,20
  26:21,23 27:16
  28:5,7 29:10,13,14
  29:20,21,22 31:20
  32:2 33:3,7 34:15

34:23,25 35:4,5,6
35:8,10 37:10,20
37:23 38:2,7,10,12
38:15,17,19 40:20
41:2,4 43:7 44:4
46:16,19 53:10
71:8,10,10 72:11
74:3,4 75:14 84:5
88:15 127:22
132:13 134:11
138:22 142:2,3
143:5,8 144:21
145:19 147:24
254:8 260:20,22
261:25 264:21,25
265:12,19 327:16
333:20 334:3
336:23
**researched**  32:17
**researcher**  33:20
51:15 76:15,20
327:21
**researchers**  31:21
43:15 221:19
**researching**  30:19
**resemblance**
332:11
**reserved**  248:4
**reside**  8:13 74:14
**resisted**  229:20
**resolve**  42:21
87:22 297:8
323:18 331:4
**resolved**  300:20
309:24
**resolves**  87:23
**resources**  178:9
**respect**  68:15
137:19 144:16
167:18 168:4
197:13 259:16

279:5
**respected**  163:7
327:15
**respects**  318:4
**respond**  19:20
109:15
**responded**  43:25
**responding**  20:14
29:17 34:8 131:5
**response**  118:22
242:25 274:16
**responses**  242:25
261:20
**responsibilities**
113:19 144:14
312:8
**responsibility**
33:19 53:13
**responsible**  20:4
21:7 73:5 74:9
257:14
**responsive**  133:22
184:15 247:16
**rest**  193:20,23
198:8,24 200:2,5
252:7
**restart**  207:16
**restate**  97:12
196:22 202:6
324:25
**restroom**  319:3
**result**  53:2 86:12
167:3 276:20
277:22
**resulted**  85:5,10
85:16 88:25 89:11
283:16
**results**  16:5 85:6
85:17,24 86:9,19
89:2,12 140:8
165:22 316:20

**resume**  17:7
**retained**  5:22 78:5
78:23 80:7 187:17
187:19,21 313:25
**retardation**  17:25
18:3,4 154:18
171:14 173:15
**rethink**  314:14
**rethought**  48:22
49:15
**retraction**  312:17
**retrieval**  127:18
**return**  139:20
255:9
**returning**  51:11
57:23 107:18
201:14 292:24
328:22
**reuptake**  54:23
**reversible**  141:8
**revictimization**
271:25 272:4,9
275:5 276:25
278:5
**revictimized**
272:18 273:16
277:18,21
**review**  15:13 30:2
46:8,20 47:17
96:13 108:10,19
153:3 227:8,15,19
229:8 259:15
263:13 267:17
269:9,13 313:11
317:25
**reviewed**  17:2
37:21 49:19 50:4
58:7 101:11,23
102:3 109:7
116:15 135:20
137:7,25 138:13

181:18 207:25
230:16 253:11
266:24 269:11
271:5 316:21
329:21 331:24
**reviewing**  238:12
252:24 313:12
329:9,9
**revolutionary**
135:9,13
**richard**  1:14
**rid**  207:16
**ride**  224:4
**ridiculous**  32:22
312:23 336:20
**riggio**  1:21 4:11
5:13 7:19 59:23
60:14 61:4 62:9
62:18 66:6 67:21
67:22 80:21 81:24
83:12 89:5,7,15
94:19,25 95:6,8,17
96:4 98:10 100:16
105:16 106:25
180:18 188:21
189:2 192:3 195:7
195:21 197:5
198:15 200:12
201:17 213:4,14
221:3 228:25
230:2 231:8
245:10 255:18,21
269:20 270:22
271:23 275:8,15
276:19 278:16
280:15 284:15,17
286:13 289:9
315:8,23 316:24
318:14 321:8
325:6 326:14
330:14 331:8

**[riggio's - saying]**

**riggio's** 62:9 64:17
65:8 81:4,9,17,21
82:15 86:22,24
89:7,19,24,25 90:6
90:21 92:2 96:12
99:9 190:15
215:10 282:13
285:22 288:24
**right** 8:21 10:13
15:6,14 16:10,14
18:16 23:19 24:12
24:21 29:24 30:20
32:3 35:21 39:22
40:23 41:3 48:5
58:23 63:12 67:16
75:4,15 76:8 77:6
80:17 82:22,25
83:10 89:8,21,25
90:8 91:23 92:4
94:3 102:18,23
103:7 108:8
120:21 129:15,19
154:7 166:7
174:23 180:21
181:22 182:2
183:21 184:5
185:2 186:7
190:19 191:7
192:2 212:23
213:12,18 215:25
219:4,7 220:7
227:17 236:14
242:11 243:10
246:6,18 247:3,3
250:17,24 266:24
269:22 271:14,18
272:12 273:4
277:5 278:13
280:16 282:10
290:2,7 291:6
293:2,6,18,22

294:15 296:12,13
298:20 299:5
302:15,15,22
303:24 307:10,14
307:18 308:15
309:16 310:21
311:7 314:11
325:25 331:16
**righteousness**
136:20
**risk** 14:10,13
15:10,22 21:15
147:13 153:19
155:6 156:19
171:10,15 272:9
275:3 278:16
300:7,8 301:3,7,11
305:19
**risky** 272:22
**rita** 1:11
**river** 69:7
**road** 19:22
**roadblock** 20:16
**roadblocks** 19:24
**robbery** 170:10,11
**roberts** 1:10 219:9
219:15 230:11,24
231:2,5,6,12,24,24
232:9,12 240:13
242:9 244:18
245:7 332:14
**robots** 72:5,7
**robust** 39:19
51:21 154:19
**rocket** 164:25
**roe** 232:22,25
234:23 236:17
237:13,18 240:9
241:11 304:12
306:5

**roe's** 236:10 304:3
**role** 141:17 156:12
253:20,21 254:7,7
254:8,10,10,12,13
254:16,18 258:25
259:13,22 260:4
301:21 309:3,4
**rolled** 15:5 26:25
**rolling** 17:20
**rolls** 15:9
**rooftop** 171:11
**room** 7:7 76:19,25
96:17,25 98:2
139:7 205:23
237:22
**rooms** 209:8
331:23
**rossetti** 175:2
180:14
**round** 262:4
**row** 169:2,12
**rudimentary**
120:9
**rules** 2:11
**run** 24:7 33:11
165:3 261:11
**running** 79:25
**rush** 275:18
**russano** 32:9
61:23 75:19,21
141:25 163:19
203:4 227:19
239:10 258:21
261:19 266:13
268:20 270:14
**russano's** 49:21
50:6,15 142:15
199:14 202:21
227:19 319:15
**russell** 3:7 7:13
47:10 70:18

123:10

**s**

**s** 5:10 10:15 339:6
**sack** 129:4
**safe** 214:14 264:17
**safest** 43:11
**sake** 79:7
**salad** 235:19,24
**sales** 113:17
**sample** 12:8 14:7
14:11,15,20 15:16
15:24 16:3 19:15
21:8 22:5,17
23:25 24:8 25:18
33:17 51:19 52:2
53:5 58:7,10
85:23 86:11
159:19 160:9,11
161:9,16 165:18
165:24 171:22
172:22 177:23
178:23 179:19
317:2
**samples** 30:25,25
**san** 177:22
**sanders** 175:15
**sarcastic** 230:19
230:24 232:7
**sat** 77:3 107:23
**satisfied** 243:3
**saunders** 184:11
184:22
**saw** 20:16,23
237:10 247:23
248:16 269:3
281:4,18
**saying** 31:18 33:25
34:12 36:7 40:9
40:15 43:20 45:24
46:18 49:7,8 64:4
65:6 72:12 74:2

75:17 87:12 93:14
94:5 100:15 111:5
126:11 129:24
135:21 189:23
203:23 208:23
209:10,12,21
212:20 227:22
233:8 234:23
235:8,11 237:18
242:14 243:21,23
245:16 246:21,24
247:6 248:10,17
248:23 249:4,11
250:9 274:21,22
275:8,12,15,20,25
276:24 278:14,20
279:4 283:25
286:18,24 298:14
320:16 321:12
325:14 326:2
**says** 19:20 72:15
84:25 178:17
179:22 206:4,11
208:7 211:13
233:21 234:13
238:24 255:13
261:10 264:23
265:3,18 266:7
287:16 294:17,21
294:24 295:17,22
296:4 297:3,7,10
298:18 299:19
305:21
**scahill** 3:16
**scenario** 52:19
66:24 67:5 132:19
217:14
**scenarios** 63:9,14
64:4
**scene** 59:14 60:15
68:15 179:14

203:8 205:2
206:10 212:22
217:10 220:14,20
221:7 223:20
224:20 225:25
246:5 250:16
252:14 318:14,18
**schizophrenia**
204:2 216:12,14
**schizophrenic**
300:23
**school** 18:16
260:24 264:24
**science** 37:17
39:23,24,25 40:6,7
40:12,16 47:9
49:25 50:12,17,21
56:22 62:21 74:20
76:11 115:11,19
116:19 135:11,11
148:25 149:2
151:5 329:16
**sciences** 39:10,20
40:3 147:11
150:16 262:2
335:17
**scientific** 46:4,6
49:14 101:5
135:10 195:2
309:25 310:4,17
**scientist** 20:2
39:22,24 42:6
165:2
**scientist's** 70:5
**scientists** 42:5
46:22 47:19
**scissors** 213:6
**scooter** 336:7
**score** 25:20,21
26:2

**scratch** 25:24
**screening** 120:9
**screws** 33:15
**scrubbed** 63:17
79:13
**scrutinized** 55:23
270:19
**scrutiny** 63:20
84:14 170:15
**scuffing** 20:17
**scully** 2:9 7:11 8:3
338:4,22
**se** 72:23 75:7
77:13
**seal** 17:9
**sealed** 163:5
**second** 82:20
88:20 168:19,24
177:13 183:10
192:18 223:17
296:9
**seconds** 253:24
**secret** 300:11,13
**sectors** 57:3
**see** 10:22 15:11
19:17 22:15 23:15
25:21,23 34:11
42:15,16 52:15
58:2 63:3,19 64:7
64:11 70:17 72:19
72:20 73:4 74:2
79:12,15 85:2
86:6 87:15 89:16
104:21 117:25
118:2,7 119:18
139:23 149:9,24
150:14 154:12,13
154:14 164:22
168:16 171:19,21
174:14,15 188:15
196:12 204:11

219:14 223:17,22
229:22 230:5
237:7,15 246:11
248:9,13 253:16
270:13 272:10
280:25 285:7
289:6,19 295:15
295:16,22 296:8
325:10,20
**seeing** 26:13,14
42:14 152:10
173:2,3 236:3
**seek** 258:5
**seeking** 323:3
**seen** 84:10 101:9
168:5,6 172:2,4,7
172:8,11,19
237:24 259:6
328:12 333:15,19
333:23 334:13
**sees** 21:8 328:8
**segment** 249:23
**selected** 179:5
**selection** 179:4
**selective** 54:23
186:2
**selectivity** 164:8
**self** 33:2 54:4 76:3
121:15 202:23
230:15 231:25
232:14 240:12
261:23 288:3
305:7 307:4
**sell** 112:18
**send** 140:15 227:8
**senior** 152:7
**sense** 119:10 150:5
156:6 203:18
206:12,12,14
208:9,16,18,20,21
211:12,14,17,19

226:22 235:16
236:11,20 239:13
239:14,19,20
243:6 261:14,18
262:12,13,18
321:5
**sensitive**  6:4 97:5
**sent**  181:19 227:7
227:9
**sentence**  71:3
198:22 224:18
**sentenced**  255:14
**separate**  265:21
265:22
**separated**  250:4
**sequitur**  246:7
248:3 249:24
**sequiturs**  248:25
**sergeant**  1:12,15
1:16 226:10 242:8
**seri**  101:13,16,22
101:25 102:9
**serial**  302:18
**serious**  75:25
128:24 154:19,24
159:17,20 160:5
166:6 176:18,20
180:19 266:13,15
266:19 306:23
309:20 314:4
336:13
**seriously**  230:18
260:16 261:3
312:5
**serological**  84:5
88:15
**serotonin**  54:23
**service**  311:14
**serving**  261:23
288:3

**set**  26:18 250:5
257:25 268:18,22
315:8 338:8,18
**setting**  69:4 134:3
137:14 141:2,5
142:11 202:18
204:25 263:17
265:5 281:8
333:24
**settings**  137:17
**seven**  100:3
314:11
**seventh**  84:24
193:2
**sex**  66:6,10 80:22
82:3 87:20 93:10
93:18 94:20,25
96:4 98:5 110:18
110:21,22 111:19
195:22 197:5
200:13 201:17
213:14 221:3
249:13,14,20,21
272:17 283:3
294:22 305:25
306:22 315:9
323:13 331:12
**sexual**  41:19 59:20
59:25 60:5 64:23
64:25 65:7 83:5
83:13 95:7 98:11
110:25 111:7,14
111:16 112:19
113:10,11 192:5,7
195:5,13 202:13
246:18 247:10,12
247:13 249:5
253:7 256:7 284:4
286:15,20,22
287:14 300:16
302:2,14,22

303:12,14 306:17
330:15
**sexually**  40:24
204:18 206:4
272:16,22 330:16
**shake**  144:2,4
**shaking**  190:3
**shame**  327:8
**sheet**  339:2
**sheriff**  1:19
**sheriff's**  1:15,16
1:16,17,18 4:5
**shift**  288:6
**shiny**  26:13
**shirt**  215:17,21
**shmuck**  312:21
**shocked**  218:25
**short**  55:20 321:2
**shorter**  300:4
**shorthand**  2:9
**shorthanded**
190:11
**shortly**  14:17
21:13 53:24 267:4
311:12
**shoulder**  20:25
**shouts**  171:11
**show**  24:5 88:5
174:9 217:18
294:8
**showed**  335:19
**showing**  82:12
84:3 88:11 182:24
**side**  9:20 19:22
20:19 56:20,25
62:24 63:4,19
64:8 78:6,22
79:16 80:4,6
122:12 206:21,22
209:9 329:4

**sideways**  169:4
**sign**  109:12 281:22
**signature**  338:20
**signed**  109:14
294:17
**significance**  52:14
53:8 154:17
176:22 256:12,16
**significant**  52:6
56:11 58:15 178:2
318:3,9,11 329:15
**signs**  20:16,17
**silly**  265:19
**similar**  15:20
150:20 151:7,10
236:10 320:25
**similarly**  332:4
**simple**  45:25 50:2
**simply**  131:11
163:25 167:7
180:2 211:12
263:11
**simulate**  265:4
**simulations**
138:21 139:25
140:21
**sincere**  93:18
**single**  15:13 25:22
50:10 85:11
174:18 283:16
289:21 290:4
**singular**  45:10
266:19
**sir**  8:20 10:13,18
10:24 13:5,17
34:4 37:9 38:4
58:19 67:19 81:2
84:17 85:2 86:6,8
87:25 89:6,16
94:17 95:5 103:25
116:5 121:11

124:11 136:4
138:11 145:7
148:7 151:24
161:7 166:3,4
176:12 180:10
182:5 183:5,8
187:5 188:5 192:2
196:13,20 223:14
223:22 224:14
230:5 231:3
252:24 253:5
265:20 272:10
278:14 289:6,7
293:2,7,9 294:11
295:19 299:7
302:13 307:11
316:13 318:7
330:13
**sit** 95:16 156:20
163:20 164:6,11
221:21 222:23,25
271:20 330:5
**sitting** 76:19
135:15 209:2
218:8 222:21
244:2 318:24
**situation** 56:10
128:19 131:6,20
**situations** 272:22
**six** 88:6 100:3,4
171:23 182:11,11
**sixth** 5:16 88:14
192:25 225:11
**size** 12:9 14:11,20
15:16 16:2,3
22:17 51:19 52:3
53:5 58:10 165:19
165:25 172:22
**sizes** 15:24 329:7
**skirt** 213:5 215:11
216:25 217:9

**slammed** 128:5
**slaughtered**
279:21
**sleeping** 239:2
**sleeves** 26:25
**slides** 150:24
151:7
**slip** 257:16
**sloth** 126:19
**slow** 65:22 188:24
**slurred** 298:5
**small** 14:7,15
15:17 21:8 22:16
53:5 56:5 58:10
152:5 171:6
172:22 175:8
200:17
**smaller** 12:8 14:20
15:24
**smart** 169:15
**smell** 302:11
**smelled** 302:4,7
**smudge** 20:20,20
20:22
**snorted** 336:19
**snorting** 335:20
**soap** 79:15
**social** 39:22,23
40:3,6 77:14
135:10 221:18
261:25 264:22
**sole** 183:6 279:13
**solution** 152:2
**solutions** 151:21
**solve** 152:13
**somebody** 28:14
30:3 58:22 59:11
61:8 64:2,14
66:16 76:22 83:8
94:15,20 95:7
96:4 106:12

118:13 141:15
158:12 160:12
163:13 164:12
166:25 167:8
169:12,21 180:11
189:24 190:5
199:5 201:18
209:11 213:14
215:2 218:8,13
221:4 236:6
237:25 238:24
240:19 256:10
264:8,24 265:4
285:17 296:22
302:17 305:21
312:20 315:9
320:11,24
**somebody's** 128:5
253:2,16
**someone's** 211:11
254:19
**soon** 310:25 311:4
**sooner** 311:19
**sorry** 30:18 57:14
65:24 84:24 88:20
124:17 150:12
159:3 188:25
194:2 224:22
229:15 262:23
278:24 286:2
296:9 314:7
332:15
**sort** 20:6 23:4
36:13 42:22 64:5
69:3 78:23 79:10
120:15 149:20
155:13,20 160:19
168:17 205:16
208:15 214:25
223:2 226:21
229:6 233:12

259:9 320:3
**sorts** 189:16
**sought** 110:21
**sound** 16:9 185:2
230:17
**sounded** 292:7
**sounds** 49:3
215:19
**source** 28:8 33:7
79:22 94:24 167:4
214:10
**sources** 33:13,14
36:15 227:5
269:16,19
**south** 3:11,17
**space** 225:5
**spaces** 264:17
**spanish** 235:17,18
**spanning** 285:23
**speak** 12:22 48:8
69:17 146:8,17,21
146:22 151:13
167:16 216:20
235:18 243:17
244:11 252:2
264:9 270:4,19
277:14 283:2
334:9
**speaker** 146:7
248:8
**speaking** 9:5 32:9
33:24 45:9 118:9
146:19 156:23
159:2 175:6,7
203:20 207:20
218:17 235:17,19
235:25 249:9,9
300:6 303:10
308:7
**speaks** 45:4 98:22
98:23 194:11

218:20 269:24
270:2 320:3 327:7
**specialist** 91:12
100:13
**specific** 31:4,6,9
44:25 98:22 104:3
115:15 117:10
124:7 132:6
133:12 145:18
147:20 158:4
217:15 225:15
326:24
**specifically** 17:22
18:2 38:21 71:18
137:13 147:12
151:17 176:19
179:19 205:12
226:4 238:11
239:3 293:20
307:24 336:10
**specifics** 257:6
**specimen** 246:5
248:4
**speckled** 32:14
**speculation** 70:7
279:2 282:18
284:25
**speech** 236:9
298:3,5
**spend** 143:15
**spent** 181:24,25
**sperm** 189:5,7,14
190:2,10
**spheres** 295:2
**spherical** 262:4
**spoke** 107:23
150:5 152:20
175:16 176:21
331:11,12,13
**spoken** 147:2

**spread** 114:16
**squared** 210:24
**ssri** 54:22
**ssris** 54:17 55:5
**staffed** 169:16
**stage** 109:10
303:19 320:10
**staged** 320:15
**stages** 121:7
**staging** 121:13
**stairs** 305:22,22
**stalf** 3:19 7:15,15
47:10 50:7 62:10
62:13 66:20 70:11
70:17 87:4 90:9
90:24 92:5 95:3
95:19 96:7 97:16
98:17 99:15
100:18 104:11
105:18 106:2
107:3 108:12
123:8 134:23
136:17 167:10
187:9 190:17
192:11,14 197:9
200:19,25 201:23
213:8,23 214:22
221:8 224:7,23
226:13 228:5
229:12 236:15
240:5 242:4 253:9
256:14 282:4,16
292:11 299:14
302:23 304:6,17
306:9 307:15
308:16 311:23
314:19 315:18
317:6 328:13
330:9
**stalling** 123:6

**stamped** 182:19
**standard** 18:21
83:7 316:18
**standpoint** 17:23
152:12,12,23
174:24 234:8
304:10,11 310:2
**stands** 323:25
**start** 62:20 94:8
164:12 192:16
267:12
**started** 53:6
162:20 267:4,13
267:13 329:17
**starting** 165:19
**state** 2:10 19:21
20:2,23,25 54:21
151:13,16 152:8
152:17 209:7,11
226:25 316:7
326:13 338:5
**state's** 1:18,20
148:23
**stated** 288:25
324:19
**statement** 46:25
48:23 49:7,8
77:21 105:8
114:10,17 169:20
176:13 213:3
216:5 231:25
232:15 245:3
246:15 247:12
248:19 249:12,16
250:6 252:6,8
307:20,21 324:23
**statements** 33:2
54:4 202:23
215:25 230:16
240:12 261:6,15
293:18,21 298:23

305:7,8 307:5
**states** 1:2 6:25
289:16
**stating** 293:4
**statistical** 18:9,19
19:8,11 21:21
23:17,20 24:6,14
27:9 33:11 51:20
52:5,8,12
**statistics** 18:15,18
18:19,24 24:5
**status** 61:9 117:7
117:20 120:2,3,7
120:13 295:23
296:3,19
**stays** 193:11 300:4
**step** 78:19 91:22
308:2
**steps** 262:3
**stop** 317:12
**stopped** 19:24
150:8,11
**storage** 125:25
126:9,12
**stories** 119:25
**story** 24:25 97:3
117:8 119:7,17,22
119:23 248:6
**strange** 41:3
248:10 250:20
**stranger** 275:10
275:11
**strategy** 274:17,18
**street** 3:5,17 4:6
4:12 8:15 156:22
171:2 302:20
**stress** 138:4
273:20
**stretch** 215:3
**strident** 259:7
261:8

**strike** 59:4 88:4
124:21 207:9
308:12
**stripping** 242:24
**strong** 59:18
112:19
**strongly** 66:3,25
67:3 217:25
**struck** 19:22 61:5
**struggle** 69:12
318:19
**student** 32:19
38:17 44:15
140:10 143:3
144:5 258:24
259:13,21 260:4
260:21,23 314:5
**students** 32:24
35:4,6,10 44:16
138:21 139:3,25
140:21,22 141:19
143:2 144:11
151:5
**studied** 73:10,11
84:9 131:17 133:3
133:15 159:15
**studies** 12:18
31:23 32:18 37:13
38:18 43:22 47:16
49:18 50:3 115:22
116:9,12,16 135:6
138:13 140:20
143:8 144:5
306:11
**study** 10:19,25
11:6,7,12 12:11
13:18 17:6,7,7,16
17:17 19:2,12
21:6 24:19 26:11
38:23,25 43:5,14
44:4,12 46:19

48:14,21 50:15
58:4 76:23 99:3
134:12,20 135:3
138:19 142:9
150:8 163:4 165:2
165:10 180:5
272:12,14
**studying** 10:20
39:4,14 138:23
144:8
**stuff** 48:12 68:16
100:23 157:19
174:3 258:22
336:23
**stupid** 266:10
**style** 164:8 235:9
236:25
**subject** 19:7 336:4
**subjects** 142:3
143:8
**submerged** 52:16
**submission** 140:11
**submissive** 290:19
290:23 291:10
**submit** 46:5
165:13,13
**submitted** 182:9
**subpoena** 2:12
**subscribed** 337:20
339:22
**substance** 13:14
44:9 175:7 301:2
303:7
**substantive** 33:7
42:10
**substantively**
148:14 150:19,20
151:9
**substituting** 299:7
301:19

**subtext** 150:24
**successful** 320:13
**sue** 316:24 321:8
325:6 326:14
**sufficient** 13:4,25
21:17,25 24:17,18
51:19 52:2 176:25
228:23 230:23
**sufficiently** 24:9
**suffused** 154:15
**suggest** 65:16 98:5
172:25 304:16
**suggested** 64:24
195:3 234:23
235:6
**suggestibility**
73:11 304:20
**suggestible** 73:20
73:22,24 303:23
304:10
**suggesting** 67:17
273:8 319:10,12
**suggestion** 301:24
**suggests** 98:10
**suicidal** 295:13
**suicided** 175:25
**suit** 255:18,22,24
256:4,6 257:2,4
290:25
**suite** 3:6,12,18 4:6
4:12 8:15
**summarize** 222:2
222:3
**summary** 13:12
13:15 51:22 77:21
103:7,10 105:12
241:19
**super** 73:20
**superman** 293:22
294:24 298:14,18
299:19

**supplement**
117:17
**support** 102:12
171:18 221:14
276:18 334:18
**supportable** 51:21
**supported** 37:17
334:6
**supporting** 289:16
**supportive** 60:20
66:3
**supports** 60:7
**supposed** 69:6
96:22 109:11
**supposedly** 275:11
278:18
**supposition**
131:16
**suppression**
127:20
**sure** 8:24 9:2
23:11 37:15 47:14
54:15 64:18 65:2
65:2 66:2 68:9
74:22 78:16 90:17
111:4 120:22
128:8 129:16
138:3 142:18
146:18 148:22
152:14 161:13
166:8 172:6
173:11 178:15
180:22 190:25
199:9 226:15
229:10 239:7
243:21 256:2
257:21 268:3
290:11 298:2
310:22,24 315:4
317:16 320:7,24
321:16 325:3

327:17
**surprise** 68:13
**surroundings** 276:10
**susan** 1:21 4:11 7:19 62:8,9 89:7 100:16 213:4 315:23
**suspect** 11:21,25 14:23 17:24 53:12 62:3,5 72:2,17 132:18,21,23 153:8 155:12,13 159:16 161:18 178:3 179:17 220:21 259:3,10 259:12,22 264:3,4 264:10 306:25
**suspects** 12:4 15:13,14 22:19 72:9 152:25 155:4 163:21 220:15 262:6,23 263:15 331:22
**suspicious** 280:13 295:3
**sustain** 128:19
**sustained** 138:16 287:17 289:11
**swab** 64:16 65:5 66:13,14 80:20 81:4,18 86:22 88:3 89:19 90:6 90:21 92:2,22 93:25 94:22 98:15 99:9 188:16 189:25 190:15 285:6,8
**swabbing** 85:15 89:10

**swabbings** 86:22
**swabs** 85:5,10 88:25 283:15
**swear** 7:11
**swift** 108:7,11,18 109:3,8,11 110:2 110:10,16 122:10 334:25
**sworn** 8:7 337:20 338:8 339:22
**symptom** 269:23
**symptoms** 160:15 171:8 212:17 238:6 270:10 280:22 281:6 286:6 288:12
**syndrome** 327:18 334:4
**synergy** 159:13
**system** 322:5
**systematic** 44:12 47:4 134:11
**systematically** 133:15

**t**

**t** 5:10
**table** 48:2 268:12
**tactics** 72:17
**take** 10:7 11:23 23:9 38:22,24 47:4,5,11 52:18 54:6,16 61:17 62:24 78:23 84:7 97:2 126:15,17,23 127:24 128:4 136:13 141:18 157:10 164:25 165:3 166:25 170:7 209:20 215:13 254:21 266:19 288:7

292:9 312:4,4
331:20 332:25
336:25 337:2
**takeaway** 231:24 239:9,9 241:19 250:12
**taken** 2:8 18:17 36:14 51:8 57:20 66:13 80:21 107:15 112:6 139:17 166:19 177:16 186:11,12 201:11 206:17 222:5 230:17 231:17 255:6 260:16 261:3 292:21 302:10 328:19
**takes** 30:4 132:6 268:12 296:2
**talk** 38:11 75:7 129:12 171:16 174:4 183:21 243:14 268:13 271:25
**talked** 38:9 48:14 173:25 175:17 263:5 273:16 295:6 326:17,19
**talking** 42:23 71:8 74:8,9 80:11 103:2,6,11 105:5 120:18,20 121:10 126:9 129:13,17 129:21 135:13 138:6 141:13,15 159:21,22 165:6,8 172:23,24 175:10 176:3 243:16 249:12,19,21 263:12 270:7

271:16 280:6,7
293:10 305:18,20
**talks** 272:14
**tape** 201:5
**target** 112:14
**task** 151:14
**taught** 17:14,15 116:18,20,22,24 117:2 313:17
**teach** 32:18
**teacher** 141:15
**teaches** 19:19
**teaching** 21:3 116:22
**tear** 218:10
**technique** 92:22 93:25
**teeing** 258:21
**tell** 9:17 14:2 25:25 28:23 39:18 49:17 78:17 95:16 99:20 115:6,18 118:15 119:17 124:11 130:16 134:10,13 143:9 145:25 152:21 156:12 173:18,22 174:4,5 178:10 186:14 197:2,15 218:11 219:22 226:3 235:20 238:10 239:15,19 287:18 325:13
**telling** 53:21 172:10,17 277:19 312:3
**tells** 322:25
**temple** 281:20
**temporal** 123:19 123:25 124:13,15 125:6

**ten** 10:8 15:3,3
16:8 17:2 18:20
152:5 157:14,19
165:9 240:13
256:6
**tenth** 193:5
**term** 37:23,25
43:9 77:19
**terms** 32:10 39:4
74:25 105:6 109:4
109:17,24 169:3
203:21 206:13
216:8 334:2,11
**terribly** 265:11
**terrific** 75:24
**terse** 243:2
**test** 80:9 119:14
269:21 270:15,23
**tested** 68:19
**testified** 8:9 83:16
190:4 220:13
245:15
**testifying** 17:11
266:3,4
**testimony** 38:22
51:10 57:22 84:20
90:11,13 92:8
103:19 106:13
107:17 139:19
156:24 174:25
176:17 177:18
191:10 201:13
220:12,24 226:7
226:11,12 238:23
242:7,14 253:12
253:23 255:8
283:20 284:24
285:5 286:17
290:22 292:23
304:3 328:21
329:22 338:7,10

**testing** 68:20
106:16 119:20
195:3,4 246:6
270:20 271:8,18
271:22
**tests** 117:15 119:6
**thank** 136:19
198:7 316:16
330:7
**theatrical** 325:17
**themes** 202:13
204:19 206:5
**theoretical** 203:21
**theoretician's**
254:9
**theories** 42:24,25
199:15
**theory** 27:15,15
167:13 320:25
**thereof** 179:9
**thibodeax** 174:21
313:22
**thin** 203:24 234:8
**thing** 9:3 41:15
131:21 160:20
168:24 196:23
205:9 218:7 227:3
245:20 265:3
266:7 277:2 328:3
333:8 335:18,25
**things** 21:5 25:19
26:9,14 36:18
41:22 49:7,9
52:11,15 56:22
79:11 113:20
117:25 120:17
129:18 141:20
145:19 154:8
157:4,8 167:15
178:25 191:11
203:23 208:8

211:7 215:6
222:20 235:8
236:20 243:24
266:15 296:21
299:21 309:6
312:18 320:10
328:12 329:7
335:21 336:20
**think** 11:9 13:13
16:11,12 21:11
22:6 23:8 24:23
32:13 41:21 42:19
43:2,11 45:4 50:2
53:8 59:22 60:18
62:19 68:11 74:12
74:23 77:12,20
78:4 80:5 87:17
105:16 106:10
116:17 125:18
126:22,23 130:17
134:25 135:8
136:22,23 140:3
140:13 143:20
144:16 157:6,17
158:10 162:24
167:13,14 168:20
170:18 183:16
184:7,8,13 186:8
198:2 202:4 208:3
212:2 214:14
215:6,20 217:11
221:11 222:24
223:5 226:8,15,21
227:25 231:21
233:9,19 238:16
238:22 239:3
240:7 242:6
261:17 265:18
266:12 270:6
281:11 282:21
284:17 286:13

304:19 309:8
315:4 317:24
324:18 327:5
332:6,8,13,20
333:2 334:22,24
336:21
**thinking** 103:21
168:10 189:9
202:10 210:9,12
211:9,11,18
237:14 246:12
249:3 301:14,21
**third** 131:21
178:18 192:19
303:21 332:18
**this's** 65:12
**thomas** 1:10,19
**thought** 58:10
78:12 156:2
166:16 179:11
227:20 233:4
238:25 252:6
265:4 297:4
336:15
**thoughtful** 48:20
**thoughts** 210:6
297:9
**thousand** 181:21
**threat** 17:19 299:4
**threatening**
152:24
**threats** 154:5
**three** 17:16 21:10
21:11 22:4,16
39:21 53:16,20,21
72:15 74:15 85:14
86:25 89:9 91:6
93:22 101:16,18
101:19 117:21,24
120:4 125:8 134:9
134:21 135:16,18

**[three - trying]**

135:25 137:4
138:10,14 158:8
178:8 184:17,20
192:5 195:22
197:6 200:13
201:19 208:25
213:15 221:4
265:20 284:9,20
295:2 315:10
331:16,18
**threshold** 268:22
**threw** 63:2 124:18
**throwing** 42:23
94:2
**thrown** 48:19 49:2
79:14 260:25
**ticket** 277:3
**tie** 113:5
**tighten** 238:4
**till** 137:2
**tilt** 60:15
**tilting** 60:19
**time** 2:8 6:17 7:6
9:5 10:2 13:25
22:11 35:22 36:6
47:11 49:4 53:14
54:3 55:17,20
63:25 81:25 82:17
93:10 117:12
119:13,21 120:15
123:6 126:15,18
126:22,22,24
127:2,4,14 134:25
135:4 139:13
146:19,22,24,25
147:7 152:18
163:9,10 165:5
177:24 180:7
181:16,23,25
198:19 199:4
201:7 203:8 204:8

204:12 206:10
216:22 228:14
231:20 238:25
240:19 243:23,23
244:10 264:17
267:8,10,12,14,20
269:12 273:24
274:10 276:13
278:7 287:23
288:21 292:16
293:16,17 297:21
310:13,15 312:14
313:6 320:21
321:2 326:16
335:3 337:16
**times** 8:21,23
21:10 22:16 23:5
56:4,6 97:17
117:21 128:6
149:4 176:6,8
202:12 204:3
206:16 236:19,21
265:20 329:13
331:22
**timewise** 195:12
**timing** 256:3
**tissue** 20:17
**title** 152:3
**today** 6:16 95:16
115:5 164:24
176:13 221:22
225:5 271:21
**told** 14:16 21:12
87:25 90:3 91:25
142:4 157:18
172:15 265:7
295:8 311:18
**tonight** 298:11,12
**topic** 147:3 149:6
149:7 249:17,19

**topically** 151:9
**topics** 149:19
**tortoise** 74:6,7
**toss** 35:18
**total** 182:24
**totally** 73:24
**touched** 253:8
317:24 326:12
**tout** 55:16
**touting** 335:13
**trace** 85:4,9,14,22
88:23 89:9 283:14
**track** 124:18
**tracking** 103:5
**tractor** 20:18
**traffic** 274:12
**trailer** 20:18
**trained** 220:13
**training** 18:14
145:8,12,22 146:5
147:2,8 149:5
220:20
**transcript** 136:11
338:9
**transcripts** 220:4
**transfer** 67:20,22
68:2 69:14,18
**transmitted** 195:5
**transpired** 118:20
226:22
**trauma** 126:4,7,8
126:12 127:19,23
127:24,24 128:4
271:14 274:17
283:6 286:5,6,7,11
286:12,25 287:2
287:16 288:10
326:19 327:18
334:4
**traumatic** 116:25
257:19 322:20

**traumatized**
277:16
**treatment** 160:14
296:24
**tremendous** 79:20
258:12
**trial** 60:11 101:18
101:19 135:2,5
229:11,14
**tribune** 29:5
**tried** 255:13
258:20 265:2
**trier** 310:15
**trooper** 19:21 20:5
**trooper's** 21:2
**trouble** 166:17,21
207:6 233:5,7
240:14
**truck** 21:7
**true** 57:25 80:8
130:4 208:14
280:14,14 320:17
338:9
**truism** 170:17
**truly** 165:12
211:18,20
**trust** 316:5
**try** 9:9 20:3 34:5
34:11 78:3,4
222:18,19 227:21
237:3 238:13
239:22 251:7
253:6 315:24
**trying** 19:18 29:15
30:5 74:24 92:16
135:23 136:5
183:15,22 209:23
215:5 216:17
237:5,6 239:23
242:2 250:13
274:23 276:20

285:20 290:21
324:15 326:2
**tunnel** 199:2
**turn** 6:7 82:20
84:23 88:17
180:23 223:14
272:16 294:11
**turned** 267:7
**turning** 169:3
**two** 25:22 39:16
55:14 60:2 62:4
68:10 74:11 85:9
85:25 87:16 91:16
98:20 100:20
118:16 146:12,14
159:13 167:15
171:16 179:13
184:5,7,8,12,14
185:2,12,15
200:17 205:5
224:2,3 240:20
253:24 265:2
270:8 310:17
318:9
**type** 19:8 213:5
302:14,21
**types** 31:6 271:13
**typical** 113:10
215:23 306:16,19
306:21,21
**typically** 306:15
**typing** 189:25

**u**

**uh** 88:22 101:12
294:13,16 295:5
295:24
**ultimately** 12:20
48:22 186:22
319:9 324:2
**um** 66:12 71:5
85:13,18,21 86:5

181:2 182:23
207:23 232:20
258:15 295:21
297:18
**unable** 169:24
**unanimously**
334:5
**unblacked** 183:25
**uncertain** 11:19
14:10
**unclear** 68:11
**unclothed** 318:16
**uncommon** 209:14
**unconscious** 121:6
259:2,11
**undercut** 168:13
**underrepresented**
172:18,21 173:12
176:15
**understand** 9:14
9:16,18 11:20
13:7 21:6 34:9,12
43:19 45:8 52:5
52:13 74:24 87:11
89:6 90:18 97:6
123:5 126:17
139:3 152:11
161:13 166:8
205:9 211:3
227:21,22 232:18
232:23 233:10,11
234:24 235:2,9,15
235:16,25 236:12
236:13 237:2,9,19
241:23,24,25
324:17 334:5
**understanding**
12:19 21:17 22:2
28:12 53:9 93:4
190:8,14,21 230:7
233:7,9 250:10

311:15
**understood** 9:22
9:24 13:9 57:7
248:17
**undertake** 119:4
**undertaken** 140:7
**underwear** 81:9
81:14,22 86:23,24
89:24 94:23 98:15
99:9
**undetected** 274:4
**undisclosed** 87:20
91:9,17
**undisputed** 176:25
**unfaithful** 65:17
83:17
**unfortunate** 322:8
**unfortunately**
337:9
**uniform** 21:2 72:8
**unique** 160:21
**unit** 208:25 295:7
**united** 1:2 6:25
**universal** 128:15
170:17
**universally** 33:24
**universe** 23:22
24:10 29:8 40:14
76:7 115:13
277:21 291:9
**unkempt** 294:25
**unknown** 1:18
14:13 113:13
171:22 332:17
**unlubricated**
300:6
**unmistakably**
318:20
**unpredictable**
203:19

**unproven** 49:9
**unravelled** 240:17
**unrealistic** 59:22
114:8
**unrelated** 85:25
87:16
**unreliable** 48:4
**unremarkable**
291:23 323:15
**unresolved** 206:20
**unsteady** 298:7,13
**unsupported**
230:3 231:10
**unsure** 289:2
**unwittingly** 274:9
276:13
**upside** 169:4
**urged** 152:23
**urinated** 234:10
247:7
**urinating** 234:9
**urine** 69:13
252:23 318:16
**use** 33:3 43:9 79:7
113:17 138:20
176:13 213:6
258:16 274:16
275:6 278:3,4
300:16
**useful** 86:14
**useless** 132:14
165:11 262:16
**uses** 46:3
**usually** 60:6
**utility** 143:19
**utilizing** 31:15
**utterly** 25:7

**v**

**v** 339:3
**vac** 85:23

**[vacuum - want]**  Page 56

**vacuum** 158:19
**vacuumings** 81:13
 86:23
**vaginal** 60:12,25
 64:16 65:5 66:14
 80:20 81:4,17
 85:5 86:22 88:3
 88:24 89:19 90:6
 90:21 92:2 94:22
 98:14 99:9 188:16
 189:25 190:15
 285:7
**vaginally** 282:3
 289:4
**valid** 13:24 51:16
**validity** 52:9
 269:24 270:3
**value** 75:3,4 78:24
 79:6 80:7 93:3
 139:23 140:3
 142:23 143:4
 144:7,9,12 209:21
 233:22 245:17,22
 246:14 319:8,22
**vantage** 157:4
 194:19
**variable** 128:12
 203:8
**variables** 154:4
 203:15
**variably** 105:2
**variant** 179:9
**variety** 75:5
 117:15 122:16
 157:8 242:18
 273:15 331:17
**vectors** 62:4
**veering** 210:25
**vehicle** 132:17
**vein** 11:4

**ventures** 236:4
**venturing** 93:23
**venues** 270:18
**veracity** 205:21
**verbiage** 121:24
 291:2
**verify** 118:21
**veritext** 6:15,20
 8:3 339:2
**versus** 6:23 61:2
 99:21,22 214:5
 287:10 325:5
**vice** 336:8
**victim** 111:14
 229:25 231:7
 257:10 258:4
 274:22 302:3
**victim's** 64:15
 65:5 81:13 86:16
 215:17,21 216:25
**victimization**
 273:14 274:25
 277:23,25
**victimized** 112:3
 272:8 273:19
**victims** 110:24
 111:7 112:12
 114:13 258:5
 272:15
**videoconference**
 3:14 4:8,14
**videographer** 4:17
 6:2 51:2,11 57:15
 57:23 107:9,18
 139:11,20 201:6
 201:14 254:23
 255:9 292:17,24
 328:14,22 337:14
**videotape** 223:2,8
**videotaped** 1:24
 2:5 221:23

**videotapes** 163:21
 163:24 164:4,6,12
**videotaping**
 221:15,22
**view** 314:18
 321:13
**violated** 289:5
**violence** 54:18
 55:6,13 204:19
 301:3,8
**violent** 55:20
 112:14,25 148:24
 202:12 206:5
 209:16
**virtue** 131:3 132:4
 168:12 268:19
 277:15 278:18
 279:14 328:11
**visible** 76:10
**vision** 199:2
**visit** 281:18
**visited** 203:11
**vivid** 236:24
**vlahakis** 4:8 7:21
 7:21 87:9 92:9
 202:2
**vocalization** 235:7
**voice** 45:20
**voices** 295:4
 301:14
**voluntarily** 155:2
 175:21 294:18
**voluntary** 175:14
**vouch** 320:17
**vulnerabilities**
 12:3 72:17 305:17
 305:19
**vulnerability**
 11:22,25 14:23
 17:24 72:2,25
 73:14,22 74:8

 202:10
**vulnerable** 73:19
 113:3 166:22
 170:23 272:18
 275:9,16 277:12
 285:23 286:9

---

**w**

---

**w** 8:6
**wacker** 3:11
**wag** 102:24
**wait** 9:4,10 94:8
 136:20 137:2
 292:11 297:2,2,2,2
**waiting** 164:5
**wake** 49:15 77:15
**walk** 20:18 226:18
 226:23,25 227:13
 241:12,22 244:22
 248:5
**walking** 196:18
 203:7 212:22
**wall** 48:19 49:2
**walsh** 1:13 226:16
 227:14 242:8
**walsh's** 226:11
**want** 27:2 35:12
 44:8 46:24 49:23
 50:9,24 51:18
 54:12 63:5 65:16
 68:2 75:10,19
 80:9 90:17 97:19
 97:21,22 102:25
 110:15 134:18
 136:10 137:18
 138:2 139:2
 143:13 155:23
 158:9 163:19
 172:14 187:3
 198:10 199:8
 203:21 207:15
 209:13 241:16

**[want - worked]**

261:11 267:25 292:15 313:10 317:12,23 322:22 329:12 336:15

**wanted** 94:12 145:20 226:21 328:25

**wants** 41:16 56:23 314:3

**wash** 63:16 79:12 80:2

**washes** 63:3

**wastebasket** 238:13,18 239:5

**watch** 164:7 222:25

**watching** 264:9

**water** 79:14 278:10

**way** 9:17 26:19,25 30:21,22 31:20 34:22 36:7,9 42:7 42:10 47:5,15 65:19 73:18 80:9 86:9,12 95:14 96:21 97:20 104:21 105:23 113:10 133:10,19 134:16 153:3 155:13 157:5,7 159:8,11 162:25 165:14 168:6,7,14 174:6 190:11 204:20 206:18,22 206:22 209:19 210:4 211:9,10 214:2,16,25 217:21 218:21 236:18 237:8 239:14 243:6 245:13 248:21

256:19 257:5 260:2 261:4 263:19 266:2 269:4,9 270:16 273:23 276:10 277:5 296:2 300:17 307:24 313:18 316:4 320:20 323:5,19 325:22 326:4,4,4 328:6 330:25 338:15

**ways** 12:3 75:5 217:23

**we've** 10:6 73:11 115:4 200:10 244:2 308:7

**weak** 85:6,16,24 88:25 89:11

**wearing** 213:6

**website** 162:23 178:14,25

**week** 19:5 108:24 112:23

**weeks** 118:16

**weighing** 330:24

**welner** 1:24 2:5 5:5 7:5 8:12 182:19 315:22 337:17 339:5,21

**went** 25:22,24 164:20 179:7 182:10,11 212:8 224:3 227:12 233:23,23 238:7,8 238:24 240:2 252:11 267:10 312:2 319:3 322:24 335:25

**west** 4:12 8:14

**whacked** 279:9

**whatsoever** 242:11 276:18

**whereabouts** 117:11

**whereof** 338:17

**wherewithal** 169:13

**whispering** 6:5

**white's** 84:19 283:19

**wife** 175:25 313:4

**willing** 66:17 186:19

**wing** 212:9

**winning** 74:7

**wiped** 20:21,22

**wise** 328:7

**withdraw** 276:21

**withdrawn** 273:21 276:9

**witness** 2:6 5:3 7:4 7:12 8:7 31:12 35:23 37:7 47:25 57:13 65:24 82:23 88:19 103:23 136:8,19 188:25 197:19,22 199:18 199:23 200:3,7 206:11 207:11 215:15 223:16 232:17 278:24 315:17 324:16 326:8 328:25 336:6 338:7,11,17 339:5

**witness's** 90:11 92:7

**witnessed** 279:15

**witnesses** 32:7 61:7 288:18

**woman** 298:9,15 298:19

**women** 166:14 204:20 272:15 293:6 294:19,22 295:8 296:7,16

**wonder** 249:2

**wondered** 203:13

**word** 216:6 235:19 235:24 290:23 311:3

**worded** 290:25 292:2

**wording** 232:22 291:18

**words** 241:16 270:12 291:18

**work** 24:13 25:4 26:16 27:19 28:24 29:12 39:3 40:22 70:25 76:19,24 142:24,25 143:2,2 143:3,4,6 148:17 156:5 163:4 168:23 182:3,4 205:17 223:25 224:3,12,16 225:3 225:4 251:18 265:14 267:4,9 273:23,24 275:10 275:12,23 276:13 276:20 277:5 333:14,16,23,25 334:23 336:17

**worked** 25:9 30:8 96:24 133:16 159:8 164:8 167:24,25 168:2 171:24 174:18 177:2,5 179:21 181:14 187:25

[worked - zoloft]                                                    Page 58

208:25 225:2
237:21 327:24
**working**   25:17
26:6 150:8 181:24
183:18 225:17
239:25 264:18
**works**   116:7
259:24 260:3
337:11
**workup**   168:5,6
**world**   25:6,7 40:7
40:8 140:19 262:2
262:5,7
**worn**   240:20
**worry**   209:21
**wow**   76:15
**wrestle**   57:10
**write**   27:23 36:2,3
44:24 225:23
229:19 255:17
259:7 260:10
271:10 285:21
303:21
**writes**   41:24
**writing**   41:7,19
44:2 45:23 259:16
**written**   44:21
46:12,13 71:17
204:24 216:2,4
228:3 245:3
**wrong**   32:3 34:16
37:12,24 79:2
180:2 239:15
242:14 244:6
265:7 278:6,8
286:19
**wronged**   257:22
**wrongful**   151:17
151:25 152:9
187:15,18,22
188:2 258:10

**wrongfully**   166:13
166:22 257:18,22
258:2
**wrote**   28:6 30:17
38:23,24 43:25
48:13 78:12,13
103:11 110:19
190:13,20,23
231:11 248:19
330:2

| x |
|---|

**x**   1:5,23 5:2,10
55:18 267:12

| y |
|---|

**y**   86:10,10 87:12
**yeah**   56:6 58:13
66:9 71:5 90:17
101:12,15 110:8
116:4 121:12
123:3 128:21,24
137:9 139:2
146:15,15 148:22
170:10 171:14
188:18 212:24
216:13 227:18
230:20 248:17
252:11 262:20
283:11,17 285:4
294:16 296:18,23
296:23 297:15,25
303:13 306:2
311:22,25 321:16
321:24 331:24
**year**   18:16 108:7
216:11
**years**   16:8 17:2
18:20 47:23 48:18
76:21 119:16
122:8 127:13
157:19 165:9

171:25 173:24
184:5,6,7,8,12,14
184:17,17 185:2
185:12,15 209:2
224:2,3 255:14
303:19
**yesterday**   108:3
164:24
**yield**   51:21
**yielded**   178:13
195:4
**yields**   137:22
**york**   2:2,2,10 6:15
6:21,21 8:15,15
151:13,16 152:8
152:17 338:6
339:2
**ystr**   85:6,16 86:9
86:12 89:2,11

| z |
|---|

**zero**   120:14 242:9
**zoloft**   56:4

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2014. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.