# EXHIBIT C

Page 1

1

2 IN THE UNITED STATES DISTRICT COURT
3 FOR THE NORTHERN DISTRICT OF ILLINOIS
4          EASTERN DIVISION
5 - - - - - - - - - - - - - - - - - -x
6 CARL CHATMAN,
7                    Plaintiff,
8        -against- Index No.
                      14 CV 2945
9

   CITY OF CHICAGO; CHICAGO POLICE DETECTIVE
10 JOHN ROBERTS; CHICAGO POLICE DETECTIVE
   THOMAS McGREAL; CHICAGO POLICE DETECTIVE
11 MARIA PENA; CHICAGO POLICE DETECTIVE JACK
   BOOCK; CHICAGO POLICE DETECTIVE RITA
12 MISCHKA; CHICAGO POLICE DETECTIVE BARBARA
   MIDONA; CHICAGO POLICE SERGEANT DENNIS
13 WALSH; CHICAGO POLICE OFFICER MICHAEL
   KARCZEWSKI; CHICAGO POLICE OFFICER
14 RICHARD GRIFFIN; CHICAGO POLICE
   LIEUTENANT JOSEPH JORIA; CHICAGO POLICE
15 SERGEANT BRYAN HOLY; COOK COUNTY
   SHERIFF'S DEPUTY MICHAEL COKELEY; COOK
16 COUNTY SHERIFF'S DEPUTY JOSEPH PRINCE;
   COOK COUNTY SHERIFF'S DEPUTY SERGEANT
17 MARIA MOKSTAD; COOK COUNTY SHERIFF'S
   DEPUTY LIEUTENANT BURROUGH CARTRETTE;
18 ASSISTANT STATE'S ATTORNEY BRIAN HOLMES
   and UNKNOWN COOK COUNTY SHERIFF'S
19 DEPUTIES; THE COUNTY OF COOK; THOMAS
   DART, in his official capacity as SHERIFF
20 OF COOK COUNTY, and ANITA ALVAREZ, in her
   official capacity as COOK COUNTY STATE's
21 ATTORNEY; and SUSAN RIGGIO,
22                    Defendants.
23 - - - - - - - - - - - - - - - - - -x
24 VIDEOTAPED DEPOSITION OF MICHAEL WELNER,
   M.D.

25

Page 2

```
 1
 2          1250 Broadway
            New York, New York
 3
            December 13, 2016
 4          9:28 a.m.
 5  VIDEOTAPED DEPOSITION of MICHAEL WELNER,
 6  M.D., the Expert Witness in the
 7  above-entitled action, held at the above
 8  time and place, taken before Margaret
 9  Scully-Ayers, a Shorthand Reporter and
10  Notary Public of the State of New York,
11  pursuant to the Federal Rules of Civil
12  Procedure and Subpoena.
13
14          *   *   *
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2  APPEARANCES:
 3
 4
    LOEVY & LOEVY
 5  Attorneys for Plaintiff
       312 North May Street
 6     Suite 100
       Chicago, Illinois 60607
 7
    BY: RUSSELL R. AINSWORTH, ESQ.
 8
 9
10  DYKEMA GOSSETT PLLC
    Attorneys for Defendants
11  City of Chicago and Brian Holmes
       10 South Wacker Drive
12     Suite 2300
       Chicago, Illinois 60606
13
    BY: KATHERINE MORRISON, ESQ.
14     (Via Videoconference)
15
16  BORKAN & SCAHILL, LTD
    Attorney for Individually named
17  defendant police officers
       20 South Clark Street
18     Suite 1700
       Chicago, Illinois 60603
19
    BY: KRISTA E. STALF, ESQ.
20
21
22  (Appearances continued on next page.)
23
24
25
```

Page 4

```
 1
 2  APPEARANCES CONTINUED
 3
 4
    HINSHAW & COLBERTSON LLP
 5  Attorneys for Cook County Sheriff's
    Office defendants
 6     222 North LaSalle Street
       Suite 300
 7     Chicago, Illinois 60601-1081
 8  BY: JAMES VLAHAKIS, ESQ.
       (Via videoconference)
 9
10
    BOLLINGER CONNOLLY KRAUSE LLC
11  Attorneys for Defendant
    Susan Riggio
12     500 West Madison Street
       Suite 2430
13     Chicago, Illinois 60661-2593
14  BY: ANDREW CHESTNUT, ESQ.
       (Via videoconference)
15
16
17  ALSO PRESENT: J.D. MARTINEZ,
                  Videographer
18
19          *   *   *
20
21
22
23
24
25
```

Page 5

```
 1
 2          I N D E X
 3
    WITNESS        EXAMINATION BY     PAGE
 4
 5  M. Welner, MD  Mr. Ainsworth    8, 330
                   Mr. Chestnut       315
 6
 7
 8
 9
10          E X H I B I T S
11  PLAINTIFF'S  DESCRIPTION       PAGE
12  Exhibit 1    Report              70
13  Exhibit 2    Mrs. Riggio hospital
                 record             82
14
    Exhibit 3    Fourth Analytical
15               Report             83
16  Exhibit 4    Sixth Analytical
                 Report             88
17
    Exhibit 5    CV                148
18
    Exhibit 6    Billings          182
19
    Exhibit 7    Chatman
20               Medical record    294
21
22  Reporter has retained all exhibits.
23
24
25
```

2 (Pages 2 - 5)

Page 6

1
2    THE VIDEOGRAPHER: We are now on
3  the record. Please note that the
4  microphones are sensitive and may pick
5  up whispering or private
6  conversations.
7        Please turn off all cell phones
8  or just place them away from the
9  microphones as they can interfere with
10  the deposition audio.
11        Recording will continue until
12  all parties agree to go off the
13  record.
14        My name is J.D. Martinez
15  representing Veritext New York.
16        The date today is December 13,
17  2016, and the time is approximately
18  9:28 a.m.
19        This deposition is being held at
20  Veritext NYC located at 1250 Broadway,
21  New York, New York.
22        The caption of this case is Carl
23  Chatman versus City of Chicago, et al.
24        This case being held in the
25  United States District Court, Northern

Page 7

1
2  District of Illinois, Eastern
3  Division. Case No. 14 CV 2945.
4        The name of the Witness is Dr.
5  Michael Welner.
6        At this time the attorneys
7  present in the room and attending
8  remotely will identify themselves and
9  the parties they represent, after
10  which our court reporter, Margaret
11  Scully-Ayers, will swear in the
12  Witness and we can proceed.
13    MR. AINSWORTH: Russell
14  Ainsworth on behalf of the Plaintiff.
15    MS. STALF: Krista Stalf on
16  behalf of the individually named City
17  of Chicago police officers.
18    MR. CHESTNUT: Andrew Chestnut
19  on behalf of defendant Susan Riggio,
20  remotely.
21    MR. VLAHAKIS: James Vlahakis on
22  behalf of defendants Cartrette,
23  Mokstad, and Cokeley.
24    MS. MORRISON: Katherine
25  Morrison on behalf of City of Chicago.

Page 8

1
2    THE REPORTER: Margaret
3  Scully-Ayers, Veritext.
4        [Whereupon, an oath was
5  administered.]
6  M I C H A E L   W E L N E R, M.D., the
7  Witness herein, having first been duly sworn
8  by the Notary Public, was examined and
9  testified as follows:
10 BY THE REPORTER:
11    Q.   What is your name?
12    A.   Michael Welner, M.D.
13    Q.   Where do you reside?
14    A.   Office address is 224 West 30th
15  Street, Suite 807, New York, New York
16  10001.
17 EXAMINATION BY MR. AINSWORTH:
18    MR. AINSWORTH: I note for the
19  record, it's now 9:30 a.m.
20    Q.   Sir, you have been deposed many
21  times, right?
22    A.   I've been deposed a number of
23  times.
24    Q.   I would like to make sure we
25  are on the same page as you know.

Page 9

1
2    A.   Sure.
3    Q.   The first thing I ask you is to
4  wait until I'm done asking my questions
5  so we are not speaking at the same time
6  making life difficult for Margaret.
7  Okay?
8    A.   Certainly.
9    Q.   I'll try to do the same for
10  you; that is wait until you are done with
11  your answer before beginning my next
12  question. Okay?
13    A.   Absolutely.
14    Q.   If you don't understand my
15  question, please indicate to me you do
16  not understand by asking me to rephrase,
17  reask, or in some way tell me that you
18  don't understand the question.
19    A.   Yes.
20    Q.   The flip side of that is if you
21  answer my question, I'll assume that you
22  understood my question as I posed it.
23  Fair?
24    A.   Understood.
25    Q.   If you need a break at any

3 (Pages 6 - 9)

Page 10

1
2 time, just let us know.  All I ask is
3 that you answer any question that's
4 pending before we do so.
5     A.   Okay.  I just -- I have already
6 let you know before we've gone on camera,
7 I'm going to need to take a brief break a
8 little after ten o'clock to make a brief
9 phone call and so I won't necessarily
10 keep my eyes on the clock, perhaps
11 someone around here will and we may end
12 up breaking then.
13     Q.   All right.  Sir --
14        MS. MORRISON:  We are here for
15 O-P-S as well on behalf of the City,
16 just for the record.
17        MR. AINSWORTH:  Very good.
18     Q.   Sir, would you agree that the
19 study of false confessions can be helped
20 by studying those cases in which there
21 are demonstrably false confessions and
22 looking to see what mechanisms led to
23 those false confessions?
24     A.   Yes, sir.
25     Q.   Have you conducted such a study

Page 11

1
2 yourself?
3     A.   I've attempted to in the same
4 vein.
5     Q.   So you have attempted to do
6 such a study, but you have not conducted
7 such a study; is that correct?
8     A.   I have conducted it, but I have
9 not completed it so I think -- my -- you
10 know, I have conducted it.
11     Q.   In order to conduct such a
12 study, that is to look at demonstrably
13 false confessions and look at the factors
14 that led to the false confessions being
15 obtained, how many false confessions
16 would you have to look at?
17     A.   The interplay of factors that
18 contribute to a false confession is
19 complex, involves an uncertain number of
20 factors, but the best we can understand
21 is that it is an element of suspect
22 vulnerability; element of the context in
23 which the questioning take place; an
24 element of how questioning officers play
25 off the vulnerability of the suspect.

Page 12

1
2        Now, the combination of all
3 vulnerabilities with all of the ways in
4 which officers may engage suspects and
5 relevant contexts that may or may not
6 contribute to false confessions are large
7 enough that one would have to be guarded
8 about conclusions from smaller sample
9 size.
10        The larger number of cases to
11 be reflected in such a study the easier
12 it is to draw conclusions from
13 overrepresented circumstances.
14        So as it relates to the
15 research that I was able to conduct but
16 not complete, the frequency with which
17 certain qualities emerged from the false
18 confession studies were informative to
19 understanding how false confessions come
20 about.  They weren't ultimately
21 conclusory.
22        We can speak more about it, but
23 at some point there is enough
24 overrepresentation of a certain quality
25 within that confession that one can draw

Page 13

1
2 conclusions that has a relevant
3 dissociation and may even be a cause with
4 sufficient numbers.
5     Q.   How many, sir?
6     A.   How many?
7     Q.   Did you understand my question?
8     A.   Yes.
9     Q.   I understood your answer to be
10 looking at more false confessions is
11 better than looking at less; is that a
12 fair summary of your answer?
13     A.   I think I gave it a lot more
14 substance than that.
15     Q.   I know.  Is it a fair summary?
16     A.   No, it's not.
17     Q.   Sir, how many demonstrably
18 false confessions would you need to study
19 in order to reach conclusions about the
20 factors that are likely to lead to false
21 confessions?
22     A.   The number of cases in which I
23 drew information from, information that I
24 was able to have confidence in was valid
25 at the time, was a sufficient number to

4 (Pages 10 - 13)

Page 14

1
2 tell me that in some instances if a
3 person is confronted in questioning with
4 the idea that he or she has failed a
5 polygraph, that that can contribute to a
6 false confession because of the frequency
7 within that small sample of how that was
8 represented.
9        Now, now, the degree to which
10 that creates a risk is uncertain.  What
11 the sample size would need to be in order
12 to be able to quantify that elevated
13 risk, is unknown.
14        However, because of the
15 frequency even among a small sample of
16 cases in which a person was told you
17 failed a polygraph very shortly afterward
18 followed by a false confession, that
19 enabled me to draw that conclusion even
20 from a smaller sample size.
21        So my point earlier was there
22 are numerous factors that play in:
23 suspect vulnerability; question of
24 factors, context factors.  There are
25 numerous factors within that.

Page 15

1
2        Some emerge with -- let's say
3 we looked at ten cases, and those ten
4 cases happened to be cases of multiple
5 claimants in which one confession rolled
6 into the other, right?
7        So one can then potentially
8 derive a conclusion that questioning
9 rolls one confession into another,
10 creates a risk of false confession.
11        Let's see the next 20 false
12 confessions that one has an opportunity
13 to review involved single suspects, all
14 right, or multiple suspects in which that
15 is not the case.
16        So at some point a sample size
17 is small enough that while one can find
18 an association, one has to note it and
19 recognize it and hopefully with further
20 like or similar cases, one can draw
21 conclusions about how much that increases
22 a risk.
23        But you can learn a lot even
24 from smaller sample sizes.  As they grow
25 larger, you can learn that much more.

Page 16

1
2    Q.   What was the size of your
3 sample size that you used to determine
4 your conclusions regarding the
5 confrontation of the results of the
6 polygraph?
7    A.   I don't remember.  I haven't
8 looked at that in probably ten years.
9    Q.   Was that 22, does that sound
10 right?
11    A.   I think 22 is what we
12 originally charted.  I don't think we
13 looked at all 22.
14    Q.   Right.
15    A.   Because there was a number of
16 cases in which we didn't have enough data
17 and; therefore, couldn't derive any
18 meaningful conclusions.
19    Q.   So something less than half of
20 22?
21    A.   I don't know.  Again, you
22 probably, no, you definitely have given
23 more attention than I have.
24        I produced the documents based
25 on discovery requests.  I have not

Page 17

1
2 reviewed them in ten years and don't have
3 any expectation to.
4    Q.   Why don't you have any
5 expectation to?
6    A.   The study is on hold.  Unless I
7 resume the study, which is our study
8 because, of course, this was disclosed to
9 you under seal, then we will not build on
10 what we have done.
11        What I'm testifying to here in
12 this deposition or even in a court
13 proceeding is what we came to learn, what
14 I have taught.
15        What I taught is what emerged
16 from that earlier study that were three
17 areas which I felt based on the study of
18 those cases were pertinent to potential
19 causes of false confessions:  threat of
20 death penalty; rolling one confession
21 into another; and assertions of
22 specifically a failed polygraph.
23        And from a standpoint of
24 suspect vulnerability, the likelihood
25 that mental retardation is more

5 (Pages 14 - 17)

Page 18

1
2 represented, specifically mental
3 retardation as opposed to low
4 intelligence, mental retardation is
5 overrepresented among confirmed cases of
6 false confessions relative to its
7 representation among general forensic
8 populations.
9    Q.   Did you conduct any statistical
10 analysis of the cases that you were able
11 to determine of that 22 that were
12 demonstrative false confessions?
13    A.   No.
14    Q.   And you have no training, you
15 took a case in statistics in your first
16 year of medical school, right?
17    A.   I have taken a course in
18 statistics, but I had exposure to
19 statistics and statistical analysis in
20 research for well over ten years through
21 The Depravity Standard.
22       I certainly have an
23 appreciation for it and in some aspects,
24 the potential for it. But statistics a
25 huge field. Some aspects may be

Page 19

1
2 pertinent to some study, some aspects may
3 not be pertinent. I certainly don't deal
4 with it on everyday basis or an every
5 week basis, just periodically.
6    Q.   Is there a reason why you did
7 not subject the cases that you looked at
8 within the 22 to any type of statistical
9 analysis?
10    A.   What is the point of doing a
11 statistical analysis on an incomplete
12 study? Nobody does that.
13    Q.   The fact that it's incomplete,
14 does that mean that you cannot draw
15 conclusions from that sample that you
16 were considering?
17    A.   Let me see if I can give you an
18 example of what I'm trying to say: The
19 noted criminalist Henry Lee teaches this,
20 says, I was asked to respond when a law
21 enforcement officer, a state trooper, was
22 struck by the side of the road on a
23 Connecticut highway.
24       They put up roadblocks, stopped
25 all of the cars, and asked me to go as a

Page 20

1
2 chief forensic scientist for the State of
3 Connecticut to try to help them
4 investigate who was responsible for
5 hitting the trooper.
6       I notice you are sort of
7 nodding your head as if you are bored.
8 If you like me to answer the question,
9 please give me your attention. I
10 appreciate it.
11    Q.   The imprint of the badge.
12    A.   I know you read the deposition.
13 This is my deposition for this case so
14 I'm just responding to your question:
15       So Dr. Lee inspected each car
16 at the roadblock, saw no signs of human
17 tissue, no signs of scuffing, and then
18 happened to walk by a tractor trailer.
19       On the side of the cab noticed
20 a smudge. He looked closer at the smudge
21 and then wiped it away.
22       When he wiped the smudge, what
23 he saw neatly imprinted Connecticut State
24 Police which identically was a mirror
25 image of the shoulder emblem on the state

Page 21

1
2 trooper's uniform.
3       His teaching from that, which
4 is my answer to you, there are certain
5 things you don't know to research -- to
6 do a research study to understand that
7 truck was responsible.
8       When one sees in a small sample
9 of confirmed false confessions, repeated
10 whether three times, whether four, I
11 think if was three instances where
12 someone told they failed a polygraph and
13 they very shortly afterward confess, one
14 can't conclude the degree, the
15 quantitative increase in risk.
16       But in those cases I had
17 sufficient understanding to be able to
18 conclude that that had a causal
19 relationship to those false confessions.
20       I didn't need to do a complex
21 statistical analysis to be able to come
22 to a conclusion about something
23 repeatedly representing in an event as
24 rare as false confessions.
25    Q.   So your sufficient

6 (Pages 18 - 21)

1
2 understanding was based on you deeming
3 the polygraph confrontation factor to be
4 present in enough cases, possibly three
5 or four out of some sample of less than
6 22, that made you think in your gut it
7 was a factor that led to false
8 confessions; or what was it if it wasn't
9 your gut?
10    A.  It was a close association in
11 time because it had come up more than
12 once. It led to me believe that despite
13 the disparity among cases, every case has
14 its own profile, its own quality.
15    If you see something come up as
16 repeatedly as three times in a small
17 sample size, then I had an appreciation
18 for its ability to impact a case among
19 defendants or suspects who may have
20 different qualities.
21    Again, while the conclusions I
22 have are guarded, I was impressed by it
23 and it's certainly a basis for my caution
24 when I encounter that in a case.
25    Q.  How are your conclusions

1
2 guarded there?
3    A.  There is only so much as you
4 interpret as you sort of imply, okay, so
5 it's come up a few times, is that just a
6 mere coincidence? Does it depend on the
7 cases that one has access to?
8    I think that has everything to
9 do with why my conclusions would take
10 note of it.
11    I'm not sure beyond recognizing
12 that notable appearance, that frequency,
13 about what it means and how to
14 extrapolate it. It just causes me to be
15 cautious and concerned when I see
16 something like that come up in a case.
17    Q.  So you know that statistical
18 analysis can answer those questions,
19 right?
20    A.  No. Statistical analysis can't
21 answer anything if you can't account for
22 the universe of the confessions that I
23 would need to be looking at.
24    It's becomes a factoid, a
25 conclusion drawn from a limited sample

1
2 that may or may not be correct.
3    I can't guarantee that the full
4 gamut of proven false confessions would
5 not bear out statistics that would show
6 otherwise and so that's why statistical
7 analyses are run after one is confident
8 that they have a sample that is
9 sufficiently reflective of the entire
10 universe of demonstrated false
11 confessions.
12    Q.  Right. So if your end is
13 larger and you have more data to work on,
14 statistical analysis can help you
15 determine whether factors are actually
16 causation or --
17    A.  If your end is sufficient and
18 your data is sufficient, absolutely.
19    Q.  And so in your attempted study,
20 you had an insufficient end in your
21 consideration; is that right?
22    A.  Yes. Insufficient end and I
23 think there were certain cases in which
24 we had come information. I wasn't
25 confident that we had a whole story. Not

1
2 because I didn't believe anything. It's
3 with any case such as the cases we
4 actually work on in real life.
5    The difference between the
6 research world, which is why the research
7 world is often so utterly irrelevant to
8 disputed confessions and real cases, you
9 know this without asking me having worked
10 on a case, you dissect these cases. You
11 have to dissect these cases, and the
12 research community can't relate to that,
13 they can't relate to it.
14    What one learns about -- and
15 this is also something that affected my
16 estimation of cases is the experience of
17 actually working on the very cases that
18 were in that sample.
19    There are things that you learn
20 about are not in the box score. You can
21 look at the box score and you can see
22 this guy went two for four with a single
23 and a double and you see someone else
24 went four for four with for scratch hits,
25 you tell me who has more impact on the

7 (Pages 22 - 25)

Page 26

1
2  game. It's not in the box score.
3        And so it is with relationship
4  between, gee, I have more cases and I
5  have more data, but as you come to
6  appreciate from working the cases, and
7  it's not just disputed confession, any
8  aspect of forensic mental health, there
9  are things that emerge with all of the
10  data points converging which is why the
11  study was designed as it was that enable
12  one to have an appreciation that you're
13  not only seeing the obvious and shiny
14  object but you're seeing things beyond
15  the periphery that may be relevant and
16  within the work of case you can better
17  inform that and research is harder to do
18  unless the protocol is set up the same
19  way.
20        The research can be done and
21  now especially the research could be
22  done.
23        But the research wouldn't be
24  done unless someone honestly and not in
25  an agenda way rolled up their sleeves and

Page 27

1
2  said, you know what, I really want to get
3  to a bottom of this, you know, and the
4  Innocence Project, DOJ, the Exoneration
5  Institute, you guys fork over the assets
6  to kind of cover this, then we will learn
7  something. That data is actually there.
8        Until you get quantity and
9  quality of data, statistical analysis can
10  be misleading. Conclusions can be
11  misleading.
12        We end up knowing what we know,
13  but we know has its best fidelity when it
14  emerges from actual cases because the
15  theory is theory.
16  Q.  Who is the research community
17  that cannot relate to that that you are
18  referring to?
19  A.  People who don't work on cases
20  or people who extrapolate broad
21  conclusions from cases for which there is
22  limited information.
23        For example, if I was to write
24  an article and if I was to cite from a
25  given case that I didn't have intimate

Page 28

1
2  familiarity with but I happened to read
3  someone else's article and say, well,
4  gee, this was a false confession; that is
5  the research community.
6        If I was a person who wrote a
7  research article citing to a news article
8  as a source of information or, for
9  example, a blurb on the Innocence Project
10  as being an adequate database of
11  information to inform a causal
12  understanding of false confession, that
13  is a disconnect and it can be an honest
14  disconnect from somebody who doesn't have
15  any case experience or can be a dishonest
16  disconnect from someone who has case
17  experience but they're content in order
18  to give the patinae of publication to
19  rely on information that they know in
20  their heart has inadequate data available
21  to it.
22        I don't know the motives, what
23  the heart of man is. But what I can tell
24  you when you work the actual cases, you
25  come to appreciate that there are many

Page 29

1
2  data points that can inform these
3  questions and they are far more complex
4  than, for example, than reading the
5  "Chicago Tribune."
6  Q.  Who are the people?
7  A.  You're more acquainted with the
8  universe than I am.
9        There is a difference between
10  research in this area and a difference
11  between practice.
12        Some people work on cases, some
13  people do research, some people do both.
14  Q.  You said, "the research
15  community." I trying to figure out who
16  that is.
17  A.  I'm just responding to your
18  question.
19  Q.  I know. My question is: Who
20  is the research community?
21  A.  The research community is
22  negligible. There is really no research
23  being done in this area. It's primarily
24  polemics. All right?
25        Occasionally there is an

8 (Pages 26 - 29)

Page 30

1
2 article like a law review by Garrett
3 [phonetic] or somebody who is law
4 professor who takes a look at confirmed
5 cases of false confessions trying to draw
6 out conclusions.
7      An article by for example;
8 like, Leo and Drizen:  Leo's worked
9 cases.  He has that orientation.  He
10 knows what goes into informing a case.
11 But he's content to cite to news articles
12 and other cases of limited information by
13 comparison and kind of mix them all
14 together with the idea that perhaps the
15 conclusions could be affected by them.
16      Drizen, who was the law
17 professor, he co-wrote it.  The area of
18 publishing -- I'm sorry, the idea of
19 researching based on demonstrated cases
20 of false confession, that is the right
21 way it's done, but it's published in a
22 way that does not account for the
23 inadequacy of data.
24      So, if there are other case
25 samples, larger samples, that follow that

Page 31

1
2 pathway, they can be informative.
3      Gisli Gudjonsson published on
4 specific cases in which he brought a lot
5 of information to bear to help to inform
6 one about specific types of cases of
7 false confessions.
8      Dr. Kassin published on
9 specific cases of false confession but
10 also did so through a lens of cases in
11 which you either had an interest in as an
12 expert witness and included a partial
13 collection of data.
14      So, the overall idea of
15 utilizing demonstrable false confessions
16 to actually look for answers is the path
17 forward.
18   Q.   So you are saying that looking
19 at the demonstrably false confessions is
20 the way to conduct the research, but
21 researchers are not adequately getting
22 the data necessary to draw conclusions
23 from those studies; is that fair?
24   A.   Correct.
25   Q.   So if the conclusions that the

Page 32

1
2 research community were drawing are
3 wrong, that could be demonstrated, right?
4   A.   Well, it is demonstrated.
5   Q.   How is it demonstrated?
6   A.   It's demonstrated through the
7 reports of expert witnesses that
8 participate in cases such as this.
9      I'm not speaking to Dr. Russano
10 in general terms, but you certainly have
11 experience in this area.  I have
12 experience in this area.
13      I think the reports that are
14 often provided are speckled with these
15 broad presumptions that derive primarily
16 from polemics actually demonstrated and
17 researched or; for example, conclusions
18 derived from studies that will teach
19 about whether a college student can crash
20 a computer.
21      But the idea it can inform a
22 rape investigation is ridiculous.
23      So if we were having litigation
24 about whether college students were
25 crashing computers and gave

Page 33

1
2 self-incriminating statements, we might
3 be able to use that research especially
4 if they were questioned by professors as
5 opposed to law enforcement.
6      But the blending of one
7 substantive findings from source research
8 that's just not going to inform these
9 questions with findings that may
10 originate from actual cases can
11 demonstrate how you then run statistical
12 analysis on data that emerges from
13 completely inadequate sources, with data
14 that may emerge from fantastic sources.
15 It just screws up your data.
16      There's the need to be able to
17 preserve a sample so you don't have bad
18 data mucking up the analysis of good data
19 is also the responsibility of the
20 researcher.
21      And, so, it plays itself out in
22 the nature of the assertions and the
23 number of these cases.
24      I'm not speaking universally.
25 I'm just saying from experience and you

9 (Pages 30 - 33)

Page 34

1
2 asked me how it presents itself; that's
3 where it presents itself.
4    Q.   That's wasn't my question, sir.
5 Let's just try to go back to my question,
6 and maybe -- you gave very long answer.
7 I didn't fully appreciate your answer
8 responding to my question because I
9 didn't understand a portion of it.
10       Let me just, not to belabor the
11 point, try to dig down and see if I do
12 understand what you are saying.
13       My question related to there
14 being an avenue to demonstrate that the
15 conclusions that the research community
16 is reaching is wrong; and you said, yes,
17 there is an answer. It's already being
18 done through experts' reports. I got
19 confused there.
20       What experts report are you
21 referring to?
22    A.   One way or the other we were --
23 first of all, there is no research
24 community on false confessions. There is
25 so little research actually being done on

Page 35

1
2 demonstrable cases of false confessions.
3       There is a lot of -- I don't
4 consider research on college students to
5 be research on false confession. It's
6 research on college students which
7 conclusions are made by false confession
8 experts. That is not a research
9 community of false confession. That is
10 research community of college students.
11       Now that we pushed that away,
12 if you want to call it community,
13 Professor Garrett, Professor Leo,
14 Professor Drizen, perhaps a more adequate
15 reference to them would be concerned
16 individuals. But a community is a little
17 overly ambitious.
18       We can toss a couple names in
19 there, Gudjonsson and Kassin, you come up
20 with five more, we can go to [inaudible].
21       THE REPORTER: All right, one
22 more time the names --
23       THE WITNESS: Gudjonsson,
24 Kassin.
25    A.   But it's not a community. It's

Page 36

1
2 a couple of people who write about cases
3 and a number of other people who write
4 polemics about how bad police officers
5 are, again, with these broad presumptions
6 of here is what cops do all of the time.
7 It's like saying this is the way my
8 deposition is going to go because all
9 attorneys depose people this way.
10       Well, you would recognize on
11 its face that that's idiotic.
12       And so there is nothing to be
13 gained from sort of a broad presumption;
14 however, there are people who have taken
15 good data from good sources of data and
16 if that actually does grow one day into a
17 community, we are going to learn some
18 things. It will be very exciting because
19 the means are there now more than ever
20 before, more than ever before.
21       We will learn about what is
22 relevant, what is overstated, and what is
23 hot air and we will get there, you know,
24 I'm hopeful.
25       Be that as it may, the idea

Page 37

1
2 what is demonstrably false, again, an
3 orientation which I'm not going to
4 generalize to all cases but you asked me
5 for an example.
6       MR. AINSWORTH: I didn't.
7       THE WITNESS: Okay. We'll leave
8 it at that then.
9    Q.   Sir, would you agree with me
10 that if the current research is
11 extrapolating from poor data and reaching
12 conclusions that are wrong, that could be
13 demonstrated by conducting studies with
14 better data --
15    A.   Sure.
16    Q.   -- and reaching conclusions
17 that are supported by the science?
18    A.   Certainly.
19    Q.   Do you know of anybody who has
20 conducted any published research in any
21 peer-reviewed journal that demonstrates
22 the conclusions that are being reached by
23 the research community, your term, are
24 wrong?
25    A.   First of all, my term isn't the

10 (Pages 34 - 37)

Page 38

1
2 research community.
3    Q.    That is what you said in this
4 deposition, sir.
5    A.    What I said is there is no
6 community.
7    Q.    You said, "The research
8 community can not relate to that."
9    A.    I talked about the difference
10 between research community and forensic
11 practice. I didn't talk about the
12 conclusions of a research community. I
13 was quite clear. If not, I'll just
14 repeat it.
15        There is no research community
16 in false confessions. There is a
17 research community in college student
18 studies that are extrapolated to false
19 confessions. That is not a research
20 community of false confessions.
21        And I specifically named names.
22 I believe my testimony was, you take
23 Garrett who wrote about a case study, you
24 take Leo and Drizen who wrote a case
25 study in which they attempted to inform.

Page 39

1
2        I'm going to leave the
3 criticism of their work aside, just in
4 terms of approach of actually studying
5 cases of false confession, Kassin,
6 Gudjonsson, you have got five people. I
7 wouldn't call that a community. It's a
8 certain number of individuals.
9        Be that as it may, there is --
10 the area within the behavioral sciences
11 is so boutique, so esoteric, and is
12 primarily populated by people who are
13 part of these proceedings, there is very
14 little interest generated in studying
15 this.
16        Consider this: Two, 40 percent
17 of the people I just names are law
18 professors. What does that tell you
19 about how robust this represents itself
20 in behavioral sciences, 40 percent; and
21 the other three, one is in England, all
22 right, one is a social scientist, which
23 is mush science. The other is social
24 scientist which is also mush science
25 which can't relate to hard science.

Page 40

1
2        And I'm not taking anything
3 away from social sciences, it has its
4 place. It's not hard. So the comfort
5 level with making broad generalizations
6 is different from the social science
7 world relative to the harder science
8 world.
9        What I'm saying, I believe I'm
10 answering your question, is there is very
11 little awareness of this area in the hard
12 science community.
13        On some level, again, it exists
14 in a parallel universe with articles
15 attached to it saying, hey, we are
16 science, pay attention to us; but they
17 did that with repressed memories too and
18 then one day everybody was laughing at
19 them.
20        There isn't research published
21 refuting this because, just to give you
22 an example, I have to work on a case
23 about coprophilia. Fascinating, right?
24 People who are sexually aroused by feces.
25        So what did I do, I looked for

Page 41

1
2 the research in the area. Now, it
3 exists, right? Strange as it seems. I
4 couldn't find any research in the area
5 that had meaning and depth.
6        Why? Well, consider what the
7 whole process of writing an article for
8 example to refute the conclusions of a
9 couple of people 40 percent whom are law
10 professors anyway.
11        You have to devote your
12 academic attention to something. You
13 have to say it's my life pursuant to do
14 this.
15        And it's the same thing with
16 coprophilia, who wants to devote their
17 academic attention and personal and their
18 personal and professional passions to
19 writing about sexual gratification from
20 feces.
21        One would think one would have
22 some other interesting things to absorb
23 themselves passionwise.
24        So the idea that nobody writes
25 an article to necessarily refute it,

11 (Pages 38 - 41)

Page 42

1
2  doesn't necessarily make it legitimate.
3       It means there is as much
4  relevance in the lives of day-to-day
5  behavioral scientists and practicing
6  behavioral scientist as Guam does to you.
7  It's just some island way off in the
8  Pacific.
9       So there is nothing being done
10 in a substantive way and I would add my
11 interest in this area originally wasn't
12 to refute anything.
13       It was borne of the idea that
14 it's something I'm seeing, something I'm
15 exposed to. I can see we are not
16 learning anything so I don't see this
17 being done, hey, maybe we can learn
18 something.
19       I think one day we are going to
20 get there. At some point someone is
21 going to say, hey, why don't resolve
22 these questions instead of just sort of
23 talking about it and throwing out
24 theories because the gig is up.
25 Everybody knows that the theories have no

Page 43

1
2  bottom. I think that will help us get
3  there.
4       Q.   So you know of no published
5  study that refutes the conclusions that
6  are currently being drawn by, whether you
7  call them the research community or the
8  people publishing in the field of false
9  confessions, whatever term you use?
10      A.   There are many conclusions
11 asserted and I think the safest answer is
12 no.
13      Q.   And you agree that there is no
14 published study that refutes what the
15 researchers on false confessions have
16 concluded, correct?
17       There is a double negative
18 there.
19      A.   I understand what you're
20 saying.
21       Again, look, Leo and Ofshe came
22 out with an article of case studies.
23       Professor Paul Cassell came
24 back and took a look at their cases and
25 wrote a critical article. They responded

Page 44

1
2  by writing a critical article.
3       I don't know about that any of
4  that research study, but they looked at
5  cases but everyone was dealing with a
6  limited dataset. There were others who
7  perhaps have drawn different conclusions.
8       I don't want to give the
9  impression there is any more substance
10 than there is.
11       It's better to say there's been
12 no systematic study done to explore; for
13 example, the Leo and Drizen conclusions;
14 the Kassin conclusions that emerged from
15 his college student, and, again, what's
16 to refute? They are college students so
17 on its face the data emerged from an
18 irrelevant place so it doesn't have to do
19 with cases so if we reduced that -- let's
20 say we were to refer to Amanda Knox which
21 Dr. Kassin's written about. He knows
22 more about the Amanda Knox case than most
23 people.
24       If you're going to write about
25 that specific case, you are going to have

Page 45

1
2  to have access to the data that he had
3  access to.
4       So I think that speaks to my
5  earlier answer about the requirement for
6  some intimate familiarity with all of the
7  relevant data.
8       Please understand that I'm
9  speaking about cases that inform the
10 literature that are singular in nature if
11 they emerge from Kassin or Gudjonsson and
12 in the multiple case of Leo and Drizen,
13 the problem being that, hey, some of
14 these cases there is a good amount of
15 data on, very informative; and some of
16 these cases emerge from news articles and
17 they draw their conclusions from
18 everything.
19       So criticisms, I'm not the
20 first person to voice criticisms in this
21 kind of forum for the limitations of the
22 data and what one could conclude from
23 them; but nobody is writing articles
24 saying this is my opinion on Leo and
25 Drizen's data, for the simple reason that

12 (Pages 42 - 45)

1
2  part of Leo and Drizen's data isn't even
3  data. Who uses news articles for as
4  scientific data?
5          If I were to submit to a
6  scientific journal, I'm going to, of
7  course, that was published in a law
8  review, I don't know that I can get
9  something like that published.
10         So your question has to
11 incorporate those elements. But, no,
12 nothing's being written.
13         Nothing is being written to
14 refute nothing, that in my answer.
15    Q.  I'm not asking if there's been
16 research that's been published to refute
17 anyone.
18         I'm just saying, is there any
19 research study that's been published in a
20 peer-review journal that contradicts the
21 conclusions that have been drawn by the
22 scientists that you referenced?
23    A.  There are so many conclusions
24 and assertions made that I don't want to
25 make a blanket statement, but I really

1
2  can't. I'm not aware, for example, of
3  literature from police journals that may
4  take a different and in a very systematic
5  way take a different -- that may derive
6  different conclusions about police
7  approaches.
8          At least from the behavioral
9  science literature, I'm not aware of any.
10    MS. STALF: Russell, could you
11 let us know a good time to take the
12 five-minute break that the doctor
13 requested?
14    MR. AINSWORTH: Sure.
15    Q.  Let me rephrase it this way:
16 You know of no studies published in a
17 peer-review journal that contradicts the
18 conclusions that have been drawn by the
19 scientists that you referenced earlier?
20    A.  Again, there are so many
21 conclusions presented, you are also
22 asking -- I will give you an example.
23 For years people like Kassin were
24 publishing about how --
25    THE WITNESS: I kicked her under

1
2  the table by mistake.
3    A.  -- they were publishing how
4  confessions that were unreliable have
5  very little detail, all right. And the
6  coterie, you know, the people who are
7  attracting the most attention to this
8  area would speak to the idea that they
9  can analysis confessions and the
10 confessions had with very little data and
11 they would offer this in their reports
12 and stuff like that.
13         Then Garrett came along wrote a
14 study and talked about how many false
15 confessions had very detailed confessions
16 so that refutes.
17         So there are so many ideas that
18 over the years, Dr. Kassin, Dr. Lee, just
19 thrown against the wall that when someone
20 does meaningful, thoughtful case analysis
21 or case study with data, some of those
22 conclusions may ultimately be rethought
23 so I can't make a blanket statement and
24 say that nothing's been refuted.
25         There's just been so much

1
2  thrown against the wall with the idea
3  something will register because it sounds
4  so disturbing that, in time, perhaps some
5  of those ideas may prove to be correct.
6          I'm not making a blanket
7  statement saying things are all nonsense.
8  I'm making a blanket statement saying
9  that these things are unproven in their
10 broad assertions.
11         So the answer is a qualified no
12 because I just gave you an example from
13 Garrett about a long-held idea that was
14 promulgated as something scientific that
15 was dramatically rethought in the wake of
16 that article.
17    Q.  Can you tell me if there are
18 any published studies in the
19 peer-reviewed journal that refute any of
20 the conclusions on contentions made in
21 Dr. Russano's report disclosed in this
22 case?
23    A.  I probably would want to look
24 at the report. Judging how little an
25 area of science this is, it's basically

13 (Pages 46 - 49)

Page 50

1
2 air, I think the simple answer is no.
3    Q.   You know of no studies in a
4 peer-reviewed journal that refutes any of
5 contentions or conclusions that are made
6 in Dr. Russano's report?
7       MS. STALF: Objection, asked and
8    answered.
9    A.   I would probably want to go
10 through every single one of the
11 assertions that she makes about the
12 science. But for purposes of brevity, I
13 will say no.
14    Q.   That you don't know of any
15 study that contradicts Dr. Russano's
16 conclusions, correct?
17    A.   Conclusions about the science,
18 yes. She made conclusions about the
19 case. She made conclusions about the
20 discipline.
21       Maybe calling it a science, is
22 a little too charitable, the discipline.
23       I don't.
24       MR. AINSWORTH: If you want to
25 break now?

Page 51

1
2       THE VIDEOGRAPHER: We are going
3 off the record, 10:15 a.m.
4       End of disc number 1.
5       [Discussion held off the
6 record.]
7       [Whereupon, at 10:15 a.m., a
8 recess was taken.]
9       [Whereupon, at 10:24 a.m. the
10 testimony continued.]
11       THE VIDEOGRAPHER: Returning to
12 the record, 10:24 a.m.
13       Beginning of disc number 2.
14    Q.   So, Doctor, it's fair to say
15 that in order for a researcher to draw
16 conclusions that would be valid in the
17 field of false confessions, you would
18 want them to look at good data with the
19 sufficient sample size that would lend
20 itself to statistical analysis that would
21 eventually yield robust and supportable
22 conclusions; is this an accurate summary
23 of what you --
24    A.   I agree to a point. Just going
25 back to my point about Dr. Lee. If you

Page 52

1
2 have good date from sufficient sample
3 size and something is clearly, frequently
4 represented, you don't need to do
5 statistical analysis to understand that
6 it's significant.
7       Other kinds of area would
8 require statistical analysis in order to
9 be able to assess their -- the validity
10 of their relevance so it depends on what
11 you actually find. Certain things jump
12 out as obvious. Statistical analysis
13 enables you to understand the degree of
14 significance of what you are finding and
15 it enables you to see things that
16 otherwise would be submerged from the
17 naked eye.
18    Q.   Let's take for example your
19 polygraph confrontation scenario where
20 being confronted with the conclusion that
21 you failed the polygraph is a factor that
22 leads to false confession.
23       If you looked at 20 more cases
24 and you found that in none of those cases
25 people who had been confronted with a

Page 53

1
2 failed polygraph result actually provided
3 a false confession, would that cause you
4 to reconsider your conclusions drawn from
5 the very small sample size that you
6 looked at or started to look at it?
7    A.   It would cause me to reconsider
8 the significance of it. I think that
9 what is critical to the understanding of
10 false confessions, in research as well as
11 a forensic context, is what moves the
12 suspect from denial to embracing
13 responsibility.
14       And so there is a time
15 proximity and if you have 20 more cases,
16 you still have those three cases in which
17 it took place.
18       Now, it may be demonstrably
19 less cause and effect related but in
20 those three cases that I raised, I can't
21 access them, I'm just telling you three
22 or four, it may have been four, from
23 those cases from what we learned, there
24 is definitely a cause-effect like shortly
25 after the information came in of failing

14 (Pages 50 - 53)

Page 54

1
2 of polygraph, within a very brief period
3 of time a person offered
4 self-incriminating statements and had
5 gone from denial to acceptance.
6     So one can't take that away but
7 with additional data, the consequence of
8 that if it didn't come up in 20 more
9 cases becomes much more diluted and less
10 impactful relative to other factors that
11 might emerge from those 20 cases.
12     If that's -- if you want, I can
13 give you an example of where that may
14 apply.
15   Q.   Sure.
16   A.   Let's take for example
17 controversies about whether SSRIs relates
18 to violence.
19     It's a hotly contested issue of
20 my psychopharmacological community.
21   Q.   If you just state for the
22 record what is an SSRI?
23   A.   Selective serotonin reuptake
24 inhibitors.
25     There is an active discussion,

Page 55

1
2 some of which is in the forensic
3 community, some of which is in the
4 clinical community, about the
5 relationship between SSRIs and homicidal
6 violence as opposed to mere
7 agressiveness.
8     Those who dismiss it, say that
9 it's so rare and that the data informing
10 it is poor and that people who advocate
11 the cause-effect relationship are
12 basically confusing aggressiveness with
13 homicidal violence. They are basically
14 blending the two items.
15     Those who assert there is a
16 relationship will point to cases and tout
17 a time proximal relationship, a person
18 took X dose or took increased dose of
19 said medication, became homicidally
20 violent in a very short period of time,
21 all other potential causal factors were
22 accounted for because the case was
23 closely scrutinized in a forensic arena
24 because of the legal consequences. Those
25 cases happen. They're real.

Page 56

1
2     What they'll say is, okay,
3 those who say it's inconsequential, we
4 have given Zoloft a bazillion times and
5 this only happened a small fraction of
6 times; and they'll say, yeah, but it
7 happened, it happened and you can't come
8 up with another cause.
9     So that's the analysis of the
10 situation. What I'm able to say is its
11 frequent representation is significant to
12 me.
13     Other factors may emerge with
14 20 other cases in which someone is
15 informed they failed a polygraph where
16 there is no causal relationship between
17 the polygraph -- being informed of failed
18 polygraph and a false confession, but in
19 a case where it happened, it happened,
20 you know, so, I'm not taking a side in
21 this psychopharmacologic dispute. Those
22 kinds of things happened all over science
23 where there is an area that wants to be
24 relevant, you know, cause-effect of a
25 given side effect. It's all over product

Page 57

1
2 liability. It's something that so many
3 different sectors of law encounter.
4     You have enough data, what kind
5 of data do you have? Can you account for
6 all kinds of causal relationships?
7     These are well understood
8 concepts. So that is one that
9 immediately comes to mind that I perhaps
10 wrestle with at least within a clinical
11 realm on a more regular basis if not a
12 forensic one.
13     THE WITNESS: Can I please break
14 for a moment? I'm sorry.
15     THE VIDEOGRAPHER: Going off the
16 record 10:31 a.m.
17     [Discussion held off the
18 record.]
19     [Whereupon, at 10:31 a.m., a
20 recess was taken.]
21     [Whereupon, at 10:48 a.m., the
22 testimony continued.]
23     THE VIDEOGRAPHER: Returning to
24 the record, 10:48 a.m.
25   Q.   So is the converse true,

15 (Pages 54 - 57)

Page 58

1
2 Doctor, if you didn't see a factor being
3 present in the demonstrably false
4 confessions that you looked and the study
5 you attempted that you can then conclude
6 that those factors from that limited
7 sample that you reviewed are not a factor
8 in the false confessions?
9  A.  I wouldn't do that because the
10 sample size was so small.  I thought you
11 were going to ask about the 20 additional
12 cases.
13      Yeah, if you get 20 additional
14 cases and something keeps popping up and
15 you never appreciated if was significant
16 before then so....
17  Q.  So you accept that false
18 confessions do occur?
19  A.  Yes, sir.
20  Q.  And that false confessions have
21 occurred in cases where we can
22 demonstrably prove somebody is innocent,
23 right?
24  A.  Correct.
25  Q.  Doctor, does it then follow

Page 59

1
2 there can be demonstrably false
3 confessions --
4      MR. AINSWORTH:  Strike that.
5  Q.  Doctor, does it then follow
6 that there could be false confessions in
7 cases where you cannot demonstrably prove
8 that the person is innocent?
9  A.  That's correct.
10  Q.  So when you are looking to
11 determine whether somebody is
12 demonstrably innocent and it's a rape
13 case, is the fact that there is no DNA
14 recovered from the crime scene indicative
15 that the person is innocent, even if it's
16 no demonstrative but indicative?
17  A.  No.  It may or may not be.  If
18 it were present it would be strong proof
19 of guilt if there was no likelihood of
20 some consensual sexual contact with that
21 person; for example, this case.
22      I think it's unrealistic to
23 expect that Mr. Chatman and Ms. Riggio
24 would have been carrying on a consensual
25 sexual relationship because there was

Page 60

1
2 just no connection between the two of
3 them, historically.
4      The absence of it, DNA material
5 is not available that all cases of sexual
6 assault and so while it is usually
7 available and it supports an idea that a
8 person is innocent, the absence of DNA
9 doesn't account for all possibilities.
10  Q.  How about in this case where at
11 trial they presented evidence there was
12 both anal penetration and vaginal
13 penetration but no DNA from anyone other
14 than Ms. Riggio was recovered from the
15 crime scene, does that at least tilt the
16 facts in favor of innocence for Mr.
17 Chatman?
18  A.  I think there is no further
19 tilting beyond what I said.  The fact
20 there is no DNA is supportive of his
21 innocence but it certainly doesn't
22 demonstrate the certainty of that
23 innocence.
24      Whether allegations of anal or
25 anal plus vaginal, it's -- for me it's an

Page 61

1
2 issue of presence versus absence as
3 opposed to the nature of the assertion
4 especially because Ms. Riggio was, by her
5 account, struck on the head.
6      Certainly by all of the
7 accounts of the witnesses who were there,
8 she was not fully coherent.  Somebody who
9 had an altered mental status to whatever
10 degree, that would affect the
11 reconstruction of the event.
12      It's possible that her
13 reconstruction of the events has certain
14 details that were accurate that she
15 remembers and certain details more
16 reflective of her confusion.
17  Q.  So what would it take in Mr.
18 Chatman's case for you to determine that
19 he was in fact innocent of this crime?
20  A.  Well, another perpetrator being
21 identified and certainly referencing the
22 assertions that you made through Dr.
23 Russano from the litigation this is an
24 all together fabricated rape claim.
25      If it's a false claim, then he

16 (Pages 58 - 61)

Page 62

```
 1
 2  or anybody else couldn't reasonably be a
 3  suspect.
 4       You have two vectors. One
 5  relates to the suspect and one relates to
 6  the complaint itself.
 7   Q.   What if there was a hair from
 8  another man that was found on Susan
 9  Riggio, in Susan Riggio's pubic hair --
10       MS. STALF: Objection.
11   Q.   -- would that indicate to you
12  that Mr. Chatman was innocence?
13       MS. STALF: Objection, complete
14   hypothetical.
15   A.   There's a few questions to ask.
16  First of all, whose hair is that and what
17  is that person's association to Ms.
18  Riggio and her movements.
19       I think that is where the
20  discussion would start and then it would
21  graduate into a forensic science analysis
22  of the legitimacy of hair analysis which
23  attracts a lot of dispute and I'm not
24  going to take a side on that one either.
25       It could be informative but it
```

Page 63

```
 1
 2  would certainly have to go threw both of
 3  those car washes and see how it emerges
 4  on the other side.
 5   Q.   Why would you want to know
 6  whose hair it was if it was found in her
 7  pubic hair?
 8   A.   Because there is a whole range
 9  of scenarios of how another person's
10  pubic hair can become part of one's own
11  pubic hair. You can borrow a pair of
12  pants, right?
13       There are all kinds of
14  scenarios that one would have to account
15  for which is why I literally used the
16  metaphor of a car wash. You put
17  something through, it gets scrubbed, it
18  get's blown, and it get's everything and
19  you see what emerges on the other side;
20  the scrutiny of the origin and the
21  evidence, the nature of it, the fidelity
22  of it.
23       Look, example, she is on the
24  desk, she's naked, we don't know whose
25  been near that desk over time. It could
```

Page 64

```
 1
 2  be somebody that dropped a hair. She's
 3  on a desk grinding her pubic area. This
 4  is one of many scenarios. I'm not saying
 5  to be sort of dismissive.
 6       You have to account for all of
 7  those possibilities and see what emerges
 8  on the other side. I don't really have
 9  an opinion. It's certainly you look at
10  and say, oh, let's chase this through,
11  follow this through and see what
12  possibilities that we can account for.
13   Q.   Let me change my hypothetical.
14       What if you found somebody
15  else's, a male's DNA on the victim's
16  vaginal swab, that was not Carl Chatman
17  or Ms. Riggio's husband --
18   A.   Sure.
19   Q.   -- would that lead, would that
20  be indicative of innocence in your mind?
21   A.   Yes, if there was no evidence
22  that she could have had any consensual
23  sexual contact with this person and his
24  DNA was inside of her and it suggested
25  sexual contact that couldn't have come
```

Page 65

```
 1
 2  from anything else, sure. Sure.
 3   Q.   That would indicate innocence:
 4  Only if we he had DNA from some other man
 5  on the victim's vaginal swab?
 6   A.   Yes. But what I'm saying is
 7  with no evidence of consensual sexual
 8  contact, I can't account for Ms. Riggio's
 9  private life. I could but that wasn't
10  the focus of my examination.
11       And I have had cases in which
12  this's come up in which a person's
13  available DNA and was there a
14  relationship, was there not a
15  relationship.
16       I don't want to suggest she was
17  unfaithful for her husband, these are the
18  possibilities.
19       Now, if there is no way that
20  she could have been consensually involved
21  with the person whose DNA.
22       THE REPORTER: You have to slow
23  down, Doc.
24       THE WITNESS: I'm sorry.
25   A.   With the person whose DNA was
```

17 (Pages 62 - 65)

Page 66

1
2 inside her, then sure, that would be
3 strongly supportive of Mr. Chatman's
4 innocence under the circumstance.
5    Q.    Assume for this hypothetical
6 that Ms. Riggio had not had sex of any
7 kind within 72 hours before the rape kit
8 was obtained.
9    A.    Yeah.
10    Q.    So she didn't have sex with her
11 husband or anybody else for 72 hours.
12    A.    Um.
13    Q.    Then there is a swab taken of
14 her, a vaginal swab is obtained.
15         If that had male DNA from
16 somebody whose not Carl Chatman, only
17 then would you be willing to say that Mr.
18 Chatman was innocent?
19    A.    I didn't --
20         MS. STALF: Objection to the
21 form of the question; complete
22 hypothetical.
23    A.    -- I didn't say only then. I
24 said that is a scenario in which I would
25 strongly consider Mr. Chatman to be

Page 67

1
2 innocent.
3    Q.    Why would you strongly consider
4 Mr. Chatman to be innocent under that
5 scenario?
6    A.    Because there is no indication
7 from the available fact pattern of
8 multiple assailants. So whoever attacked
9 her was one person. There was only
10 evidence of one person. If there
11 evidence of another person, then it is
12 not Carl Chatman.
13         Now, if there is a possibility
14 of multiple assailants, well, then it
15 becomes more ambiguous.
16    Q.    Right.
17    A.    But nobody is suggesting she
18 was attacked by more than one person.
19    Q.    Sir, does the fact that there
20 was no hair transfer not only from Carl
21 Chatman to Ms. Riggio, also no hair
22 transfer from Ms. Riggio to Mr. Chatman,
23 does that indicate to you that Mr.
24 Chatman is more likely to be innocent?
25    A.    Not in this case. I'm not an

Page 68

1
2 expert in hair transfer, and so I want to
3 point that out.
4         If you will allow me to
5 extrapolate from broad physical evidence,
6 the presence of whether it be hair or
7 some other physical evidence that is not
8 DNA.
9         I'm not sure that I can account
10 for the nature of contact that the two
11 had. I think that is a bit unclear, how
12 long it happened for and so it certainly
13 wouldn't surprise me if some kind of
14 physical evidence was available.
15         I also respect that in a scene
16 where you have all kinds of stuff all
17 over the place, it's in an office,
18 there's papers; there's mess; there's
19 this; there's that. What gets tested,
20 what gets identified for testing, what
21 gets collected as evidence may have
22 captured whatever could have come from an
23 assailant assuming that it took place.
24         One assumes the -- if it
25 happens in an environment where this is

Page 69

1
2 basically nothing else such as an outdoor
3 environment, sort of a naturalistic
4 setting so that something that is
5 potential evidence may be more readily
6 recognized, this hair is not supposed to
7 be here. We are by a river or isolated
8 area where nobody comes here. It's a
9 little different.
10         You have a lot of people coming
11 into that office. You have a lot of
12 mishmash from an apparent struggle on a
13 desk. You have urine that can perhaps
14 impact transfer of some material. So
15 it's a little bit harder to account for.
16         And then I'll leave it at that
17 cause I can't speak from any expertise to
18 the idea of percentages of transfer of
19 hair, not something I know about.
20    Q.    What is adversarial bias?
21    A.    What context are you bringing
22 it from?
23    Q.    Your report.
24    A.    But can you point to my report
25 and I will explain it?

18 (Pages 66 - 69)

1
2      Q.   I had read a portion of your
3  reports.
4         "One of greatest challenges to
5  the behavioral scientist's assessment of
6  disputed confession is to avoid
7  speculation and to avoid presumptions
8  that are guided by adversarial bias
9  rather than the framework of what has
10  been established."
11         MS. STALF:  For the record, what
12  page are you reading from?
13         MR. AINSWORTH:  11.
14      Q.   What did you mean by
15  adversarial bias?
16      A.   I need more.
17         MS. STALF:  Can the doctor see
18  the report, Russell?
19         MR. AINSWORTH:  Let's mark this
20  as 1.
21         [The document was hereby marked
22  as Plaintiff's Exhibit 1 for
23  identification, as of this date.]
24      Q.   I will direct you down.
25  Looking at the "until this work is done"

1
2  paragraph.
3         I read to you the last sentence
4  in that paragraph.
5      A.   Um -- yeah. I'm referring to
6  those bullet points up above.  I actually
7  had a chance to look at this.
8         I'm talking about how research
9  hasn't established these points and
10  research can and should but research has
11  to approach this in the absence of
12  adversarial bias.
13         Example --
14      Q.   What is --
15      A.   I'm explaining.  I'm giving you
16  a clear example of adversarial bias.
17         The polemics that are written
18  by Dr. Kassin specifically and perhaps
19  others operate from a presumption that
20  false confessions are driven by police
21  misconduct.
22         That is adversarial bias
23  because it's already been established
24  that in certain instances false
25  confessions happened principally because

1
2  of the vulnerability of the suspect.
3         The orientation presumes police
4  misconduct, presumes that police, as if
5  they were, I mean, maybe we have robots
6  at McDonalds making hamburgers but we
7  don't have robots doing interrogations.
8         There is no uniform aspect how
9  police question suspects.  Everybody is
10  different.  Everybody is different, so --
11  research that is free of adversarial bias
12  doesn't come in saying, we know what
13  happened.  Let's figure out what the
14  police misconduct was.  No.  No.  No.  It
15  says there are three potential
16  contributors.  There may be interrogation
17  tactics; maybe suspect vulnerabilities;
18  it maybe the context in which it took
19  place.  Don't know.  Let's see.  Let's
20  put them all together and see what had
21  that proximal cause-effect relationship,
22  or how they played off one another 'cause
23  maybe it's not the questioning per se,
24  maybe it's the questioning with this
25  particular vulnerability that makes the

1
2  difference.
3         To approach it differently to
4  come in with just let's see what aspect
5  of police overreach is responsible for
6  this adversarial bias, that is an example
7  but that's certainly pertinent to what
8  I'm laying out here.
9         Or, for example, adversarial
10  bias would say, we have studied
11  suggestibility and we've studied
12  compliance so that is all that matter.
13  Really?  Do we know that?  Is there some
14  vulnerability that we haven't discovered
15  yet?  Maybe.  How do we know?  How do we
16  know?  That is adversarial bias.
17         It's adversarial bias to say;
18  for instance, there is no way that a
19  person could possibly be vulnerable
20  because they are not super suggestible or
21  compliant or because they were
22  suggestible, that is the vulnerability.
23  How do you know that?  Maybe they're
24  suggestible but it's totally irrelevant
25  to why they confessed falsely.

19 (Pages 70 - 73)

Page 74

1
2      Do you see what I'm saying?
3  Because that is where the research is.
4  Okay. Fine. The research is there, it's
5  informative. The race between the
6  tortoise and the heir, the heir is
7  winning. Maybe the tortoise that nobody
8  is a talking about is the vulnerability
9  responsible. That is what I'm talking,
10  adversarial bias. It's just, again, I
11  can go on and on. Those are also two
12  examples I think illustrate it.
13      There are different qualities
14  of adversarial bias that reside in all
15  three of those domains that's other micro
16  aspects of this discussion of false
17  confession.
18      Q.   Is it fair to say that
19  adversarial bias is taking a position
20  based not on the science, but based n
21  some agenda or nonscientific motivator?
22      A.   Sure. That is a fair
23  breakdown. I think it encompasses it.
24      Q.   I'm just trying to understand,
25  not what the terms means in literature,

Page 75

1
2  just how you are using it.
3      A.   You know, at face value, I get
4  you. And at face value, you are right.
5  It plays itself out in a variety of ways.
6      I remember, this has nothing to
7  do with litigation per se, but you talk
8  about the importance of agenda. Agenda
9  may not necessarily have to do with
10  litigation or who you want to get hired
11  by, hired by plaintiff's bar, defense
12  bar, whatever.
13      It may have to do with your own
14  peculiar interest in research. All
15  right. And that may be pertinent to this
16  case.
17      Again, I'm not saying this as a
18  -- to be at all disparaging of Dr.
19  Russano. I want to put this on the
20  record.
21      Dr. Russano is obviously very
22  proud of herself. She should be. She's
23  a dedicated person. She's got some nice
24  grants. It's terrific. She's a very
25  serious professional and that's great.

Page 76

1
2      But she is very
3  self-congratulatory which may be
4  deserved. I'm very proud of my own
5  accomplishments.
6      From that posture, a person is
7  very much oriented around their universe,
8  right?
9      I remember the experience of
10  reading an article in a very visible
11  behavioral science literature about
12  multiple personality disorder in murder
13  defendants and I was so impressed by it.
14  It was in my early career. People are
15  like, wow, the researcher found all of
16  this multiple personality cases. How did
17  that person do this?
18      By act of God, I happened to be
19  sitting in the same room doing some work
20  where this very researcher probably about
21  five years later was interviewing
22  somebody in an offshoot of the same
23  study.
24      I was doing my work. It was
25  kind of a big room, and this person was

Page 77

1
2  asking very leading questions of this
3  examinee and I sat there and listened.
4  Ah-ha, now I know how she finds so many
5  multiple personality disorders. You ask
6  the right questions, you get the answer.
7      That could be adversarial bias
8  that relates that goes beyond just the
9  perimeters of litigations.
10      You may say that it's a
11  different form of bias, not necessarily
12  adversarial about I think it wasn't just
13  the multiple personality per se but it
14  was all of the social agenda that was
15  behind it that was carried in the wake of
16  those findings.
17      So there are many different
18  aspects of at least what I'm collecting
19  into that term adversarial bias.
20      I think you encompassed it
21  properly in your summary of my statement.
22      Q.   Did you exhibit adversarial
23  bias in the report that you prepared in
24  this case that we marked as Exhibit 1?
25      A.   I hope not. It's a challenge.

20 (Pages 74 - 77)

Page 78

1
2  I hope not.
3      Q.   You try not to?
4      A.   I try not to. I think there
5  are forces looking to be retained by one
6  side. There are challenges to
7  objectivity inherent to litigation. You
8  have to do what you can to guard against
9  that, and I hope I didn't.
10     Q.   What did you do to guard
11 against adversarial bias?
12     A.   I thought about what I wrote,
13 how I wrote it, conclusions that I made,
14 whether they were fair.
15         What I commonly do and I am
16 sure I did it in this case although in a
17 30-page report, I can't tell you exactly
18 whether that was the process in every
19 step. I -- very early in the process, I
20 can't say this happens for every case,
21 but certainly it happened in this case, I
22 adopt the perspective of the side that
23 has not retained me and sort of take it
24 at face value with you and some of your
25 questions, what if, what if this didn't

Page 79

1
2  happen? What if he was the wrong guy?
3  What if this? There are several points
4  raised here.
5          And I get grounded in that just
6  taking it at face value and just giving
7  it credit for discussion's sake and I use
8  the expression before, I can't say that I
9  used it often, but because I used it
10 earlier in the deposition, it sort of
11 applies here: You put things through a
12 car wash, see what happens. When they
13 get scrubbed, have the opportunity to
14 have a little water thrown at them,
15 brush, soap, see how they emerge at the
16 other side.
17         At least with the information
18 that I have available, the conclusions
19 are there. Of course, this is a case
20 that has a tremendous amount of data, at
21 least documentation around it. There is
22 always something in a source that you
23 might might have read that can impact
24 one's opinion.
25         Running all of that information

Page 80

1
2  through the car wash that I said, I came
3  up with the conclusions on the other
4  side.
5          I think one quality is to
6  internalize the points of the side that
7  hasn't retained me at face value. What
8  if it's true?
9      Q.   So I want to in a way test your
10 adversarial bias or presence of bias by
11 talking more about what would lead you to
12 conclude that Mr. Chatman was in fact
13 innocent?
14         We have already, you said that
15 a hair, the pubic hair would not
16 necessarily lead you to conclude that Mr.
17 Chatman was innocent, right?
18     A.   Correct, not without more.
19     Q.   But if there was the presence
20 of another man's DNA on the vaginal swab
21 taken from Ms. Riggio where she did not
22 have sex within 72 hours that was not
23 Carl Chatman's that would lead you to
24 conclude Mr. Chatman was innocent?
25     A.   Fair to say.

Page 81

1
2      Q.   Sir, are you aware in fact that
3  another man's DNA was found on Ms.
4  Riggio's vaginal swab that was not Carl
5  Chatman's?
6      A.   I'm not aware of that.
7      Q.   Are you aware that another
8  man's DNA that is not Carl Chatman's was
9  found on Ms. Riggio's underwear?
10     A.   I'm not aware of that.
11     Q.   Are you aware that another
12 man's DNA that is not Carl Chatman's was
13 found on vacuumings from the victim's
14 underwear obtained from the rape kit?
15     A.   I'm not aware of that.
16     Q.   Are you aware that the other
17 man's DNA found on Ms. Riggio's vaginal
18 swab was not her husband's?
19     A.   I'm not aware of that.
20     Q.   Are you aware that the other
21 man's DNA that was found on Ms. Riggio's
22 underwear was not her husband's?
23     A.   I'm not aware of that.
24     Q.   Are you aware that Ms. Riggio
25 at the time that the rape kit was

21 (Pages 78 - 81)

Page 82

1
2 conducted reported that she had not had
3 sex with anyone for the 72 hours
4 proceeding the assault?
5      A.   It was probably in a record,
6 but I'm not aware of it.
7           MR. AINSWORTH:  So let's just
8 mark this as Exhibit No. 2.
9           [The document was hereby marked
10 as Plaintiff's Exhibit 2 for
11 identification, as of this date.]
12      Q.   I'm showing you what's been
13 marked as Exhibit No. 2.  This is a
14 document Bates number plaintiff 015424
15 through 015436 and this is Ms. Riggio's
16 records from Northwestern Memorial
17 Hospital at the time that the rape kit
18 was conducted the morning of May 24,
19 2002.
20           I ask you to turn to the second
21 to last page of this exhibit, page 15435
22 in the bottom right-hand corner.
23           [Witness complying.]
24      A.   Yes.
25      Q.   And in the bottom right-hand

Page 83

1
2 corner of that document there is a box 8,
3 "Pertinent Medical History"?
4      A.   Yes.
5      Q.   B, there is a question sexual
6 activity within 72 hours of assault which
7 is a standard question that they ask to
8 determine whether somebody else's DNA
9 might be found there from a consensual
10 encounter, right?
11      A.   Correct.
12      Q.   And Ms. Riggio indicated, no,
13 that she had not had sexual activity?
14      A.   Yes.
15      Q.   Do you recall from her
16 deposition she testified she had not been
17 unfaithful to her husband?
18      A.   Yes.
19           MR. AINSWORTH:  Now, let's mark
20 Exhibit 3.
21           [The document was hereby marked
22 as Plaintiff's Exhibit 3 for
23 identification, as of this date.]
24           MR. AINSWORTH:  For the record
25 this will be Bates numbered plaintiff

Page 84

1
2 030030 through 030037.
3      Q.   I'm showing you Exhibit 3.
4 It's the Fourth Analytical Report from
5 Serological Research Institute dated
6 December 9, 2015.
7           I take it you have not read
8 that document; is that correct?
9      A.   I don't know that I studied it.
10 I may have seen it.  I have to go back
11 and check.  It's not that familiar so if
12 I looked at it, I don't know that I
13 looked at it with the same level of
14 scrutiny like a medical record or
15 psychiatric record so....
16      Q.   You are not an expert in DNA?
17      A.   No, sir.
18      Q.   You have not read Dr. Carl
19 White's [phonetic] expert report or
20 deposition testimony about the DNA
21 evidence in this case, have you?
22      A.   No, I haven't.
23      Q.   Let's turn to the last page,
24 sorry, the seventh page of this
25 eight-page document where it says,

Page 85

1
2 "Conclusions."  Do you see that, sir?
3      A.   Yes.
4      Q.   "One, the trace amount of DNA
5 recovered from the vaginal swabs resulted
6 in weak and incomplete YSTR results.
7           "This partial profile could not
8 have originated from Carl Chatman.
9           "Two, the trace amount of DNA
10 recovered from the rectal swabs resulted
11 in a single allele.  No further
12 interpretations could be made."
13      A.   Um.
14      Q.   "Three, the trace amounts of
15 DNA recovered from the panty swabbing
16 resulted in weak and incomplete YSTR
17 results."
18      A.   Um.
19      Q.   "This partial profile could not
20 have originated from Carl Chatman."
21      A.   Um.
22      Q.   "Four, the trace amounts of DNA
23 recovered from the panty M-Vac sample
24 results in a weak and incomplete mixture
25 from at least two unrelated male

22 (Pages 82 - 85)

Page 86

1
2  individuals.
3       "Carl Chatman is not a
4  contributor to this mixture."
5    A.  Um.
6    Q.  Do you see that, sir?
7    A.  I do.
8    Q.  Now, sir, I will represent to
9  you that the only way YSTR results can be
10 had is if the Y is from the Y chromosome
11 that a man contributes to a sample and
12 that the only way to get a YSTR result is
13 male DNA is present in a profile making
14 it particularly useful in rape cases
15 where you have physically a mixture of
16 victim's female DNA and the perpetrator's
17 male DNA.
18   A.  Okay.
19   Q.  If these results are correct as
20 I am representing them to you that this
21 was male DNA recovered from both the
22 vaginal swab, swabbings from Ms. Riggio's
23 underwear, and from vacuumings from Ms.
24 Riggio's underwear and Mr. Chatman is
25 excluded from all three of these, you

Page 87

1
2  would agree with me that he is, in fact,
3  innocent?
4       MS. STALF:  Objection to form;
5  foundation.
6    A.  I can't --
7       MR. CHESTNUT:  I join in the
8  objection.
9       MR. VLAHAKIS:  Objection.
10   A.  I can't account for the
11 provenance of that DNA.  I understand
12 what you are saying about the Y
13 chromosome, but I don't know if her
14 husband fits into this.  I don't know
15 about contamination.  I see something
16 about two unrelated males.  There was one
17 person involved in this event so I think
18 there are a range of possibilities
19 including the possibility of some other
20 undisclosed consensual sex.  It's
21 possible.
22      It just doesn't resolve that
23 question.  It resolves a question that
24 this isn't from Carl Chatman.
25   Q.  Sir, five minutes ago you told

Page 88

1
2  me if we found another man's DNA on the
3  vaginal swab that was not --
4       MR. AINSWORTH:  Strike that.
5    Let me show you the Fifth Analytical
6    Report, actually the Six Analytical
7    Report.
8       [The document was hereby marked
9    as Plaintiff's Exhibit 4 for
10   identification, as of this date.]
11   Q.  Showing you what we have marked
12 as Exhibit No. 4, which is a document
13 Bates numbered plaintiff 030179 through
14 030184, entitled, "Sixth Analytical
15 Report" from the Serological Research
16 Institute.
17      If you turn to the last page of
18 Exhibit No. 4.
19      [Witness complying.]
20   Q.  Sorry.  The second to last
21 page, page 5 of 6.
22   A.  Uh-huh.
23   Q.  "Conclusions, one, the trace
24 amount of the DNA recovered from vaginal
25 swabs resulted in weak and incomplete

Page 89

1
2  YSTR results.
3       "This partial profile could not
4  have originated from Carl Chatman or from
5  Frank Riggio."
6       And, sir, you understand Frank
7  Riggio to be Susan Riggio's husband?
8    A.  Right.
9    Q.  "Three, the trace amount of DNA
10 recovered from the panty swabbing
11 resulted in weak and incomplete YSTR
12 results.
13      "This partial profile could not
14 have originated from Carl Chatman or from
15 Frank Riggio."
16      Do you see that, sir?
17   A.  Yes.
18   Q.  So we have DNA, male DNA,
19 recovered from Ms. Riggio's vaginal swab
20 that's not Carl Chatman's and not her
21 husband's, right?
22   A.  Correct.
23   Q.  We have male DNA recovered from
24 Ms. Riggio's underwear that is not Carl
25 Chatman's and not Frank Riggio's, right?

23 (Pages 86 - 89)

Page 90

1
2    A.   Correct.
3    Q.   About five minutes ago you told
4 me that if there was in fact male DNA
5 that was not Carl Chatman's found on Ms.
6 Riggio's vaginal swab, that you would
7 agree that Carl Chatman was innocent,
8 right?
9         MS. STALF:  Objection to the
10   form of the question; misstates the
11   Witness's testimony.
12        MR. CHESTNUT:  Objection.
13   A.   My testimony was -- you can
14 read it back to me.  I said what I said.
15   Q.   And that was if we found --
16   A.   I said what I said.
17   Q.   Yeah, and I want to make sure
18 that it's clear that you understand this.
19 Not that what you said is what you said.
20        If we found male DNA on Ms.
21 Riggio's vaginal swab that was not Carl
22 Chatman's, you would agree that Carl
23 Chatman was in fact innocent?
24        MS. STALF:  Objection to the
25   form of the question.

Page 91

1
2         MR. CHESTNUT:  Objection to the
3    form of the question.
4    A.   Let me be clear, no one has
5 been identified as the origin of this
6 male DNA so there are three
7 possibilities:  One is that Carl Chatman
8 is innocent.  One is that she has an
9 undisclosed consensual relationship.  One
10 is that it originated from contaminate.
11        You have to rely on a DNA
12 specialist to engage the question of to
13 what degree this is contaminate or not.
14 I can't interpret it from that.  I can't
15 address that possibility.
16        There are two possibilities.
17 One is that there is an undisclosed
18 consensual relationship and the other is
19 there was another assailant and he is
20 innocent so it is certainly a
21 possibility.
22   Q.   So let's step back and answer
23 my question, right?  My question is,
24 Doctor, you would agree that just five
25 minutes ago you told me if we found male

Page 92

1
2 DNA on Ms. Riggio's vaginal swab that
3 would mean that Mr. Chatman was innocent,
4 right?
5         MS. STALF:  Objection to the
6    form of question; asked and answered;
7    and you are misstating the Witness's
8    testimony once again.
9         MR. VLAHAKIS:  Join.
10        MS. MORRISON:  Join.
11        MR. CHESTNUT:  Join.
12   A.   I answered your question as I
13 answered it and I answered this past
14 question as I answered it and my opinion
15 is as it is.
16   Q.   I'm just trying to find out did
17 you misspeak before?
18   A.   No.  You are gaming my answers.
19 Let's be clear about this.  My position
20 is if it's obvious who the DNA originated
21 from, whether it originated from some
22 swab or a technique of a discipline that
23 is not my own.
24        You are leading me into
25 evidence collection which I have claimed

Page 93

1
2 no expertise for, but I'm answering your
3 questions at face value and good faith
4 with the understanding you are actually
5 interested in an honest answer and you
6 were not gaming my answers that if it's
7 clear that it originates from another
8 individual, there is only one assailant,
9 and if it's clear there is no consensual
10 sex happened during that period of time,
11 then, of course, Carl Chatman would be
12 innocent.
13        I'm not hedging at all.  What I
14 am saying is, I don't know enough to
15 account for the possibility of
16 contamination.  I don't know enough to be
17 able to say whether her answer about the
18 consensual sex was a sincere one.  I
19 don't know.  I haven't explored that.
20 I'm accounting for the possibility that,
21 yes, Mr. Chatman is innocent.
22        It's one of three possibilities
23 based on what you presented me venturing
24 beyond the hypothetical of whether it was
25 a swab or some other technique.

24 (Pages 90 - 93)

Page 94

1
2      You were throwing me the
3 pitches, and I'm hitting them right back
4 to you. There is no mystery in what I'm
5 saying.
6    Q.   Let's go back to the beginning
7 of the deposition when I said you have to
8 wait for my question before you start
9 your answer. Okay. That's how we are
10 going to proceed. I will ask the
11 question, you provide the answer.
12      So, I wanted to know, well, we
13 can agree because you're not a DNA expert
14 you'll leave the realm of contamination
15 of the evidence to somebody else's
16 bailiwick?
17    A.   Yes, sir.
18    Q.   So your only concern was
19 whether Ms. Riggio was having an affair
20 with somebody else and had sex with that
21 other person and that other person's DNA
22 was recovered from both her vaginal swab
23 and her underwear, but Carl Chatman's DNA
24 wasn't recovered from either source even
25 though according to Ms. Riggio he had sex

Page 95

1
2 with her?
3      MS. STALF: Objection to the
4    form of the question.
5    Q.   My question to you, sir, is
6 there any evidence that Ms. Riggio was
7 having a sexual affair with somebody who
8 is not Frank Riggio?
9    A.   It's not something I explored.
10 It's not part of my assessment.
11    Q.   I didn't ask you if you
12 explored it.
13    A.   I can't answer the question one
14 way or the other.
15    Q.   Let me ask you this: Can you
16 tell me as you sit here today any
17 evidence that you have from Ms. Riggio
18 having an affair?
19      MS. STALF: Objection to the
20    form of the question; foundation.
21    A.   I just --
22      MR. CHESTNUT: Join.
23    A.   It's not an area that I
24 explored.
25    Q.   I didn't ask you if you had an

Page 96

1
2 opinion. I asked you, can you point to
3 any piece of evidence that indicates Ms.
4 Riggio was having sex with somebody who
5 wasn't her husband during the 72 hours
6 before the alleged rape?
7      MS. STALF: Objection to the
8    form of the question; asked and
9    answered; foundation.
10    A.   My answer was that I was
11 exploring something else. I was not
12 exploring the issue of Ms. Riggio's
13 fidelity and so I didn't review materials
14 that would inform that over and above
15 what you've presented me here but more
16 definitively her representations in the
17 emergency room, which, again, people may
18 or may not be forthcoming when they
19 communicate with people making a medical
20 record so that doesn't inform.
21      There is no evidence one way or
22 the other. I supposed there is evidence
23 that she is not.
24      Especially someone who worked
25 in an emergency room in a medicine

Page 97

1
2 capacity and had to take history,
3 sometimes you get the full story,
4 sometimes you don't.
5      There are certain sensitive
6 questions that one has to understand that
7 people are not going to be fully
8 forthcoming. Just don't know.
9    Q.   Did you hear my question?
10    A.   I answered your question.
11      MR. AINSWORTH: Would you please
12    restate the question.
13      Listen to the question.
14      [The requested portion of the
15    record was read.]
16      MS. STALF: Same objection;
17    asked and answered multiple times;
18    there is lack of foundation.
19      Just because you want it in a
20    different way, doesn't mean you're
21    going to get the answer that you want.
22      If you want to answer it again,
23    you can.
24    A.   The evidence she wasn't having
25 a consensual relationship is in her

25 (Pages 94 - 97)

Page 98

1
2 representation to the emergency room.
3 The evidence she was having a
4 consensual relationship is in these
5 findings which suggest she was having sex
6 with someone and that may have been a
7 consensual relationship, so maybe no and
8 maybe yes.
9 Q. So the only evidence you can
10 point that suggests Ms. Riggio was having
11 a consensual relationship, sexual
12 relationship, is that DNA report that I
13 just handed you indicating that it was
14 not Carl Chatman's DNA on the vaginal
15 swab and the underwear?
16 A. Yes, as I said before --
17 MS. STALF: Objection.
18 A. -- it's not something that I
19 was involved in this case to explore, but
20 those are two pieces of evidence that are
21 available to me and to engage that
22 specific question, one speaks to the idea
23 she was not and one speaks to the idea
24 she was, although neither definitively.
25 Q. If the Chatman case was one of

Page 99

1
2 the 22 cases that you were looking at in
3 your attempted study and you learned that
4 the DNA as it as is exactly what I
5 presented to you.
6 So for this hypothetical,
7 assume for the purposes of this question
8 that the DNA is that there is no DNA on
9 Ms. Riggio's vaginal swab and underwear
10 that is not from Carl Chatman and not
11 from that her husband, any you don't have
12 any adversarial bias, you would conclude
13 that this case was or was not a
14 demonstrably false confession?
15 MS. STALF: Objection to the
16 form of the question; foundation;
17 hypothetical.
18 A. The answer is I wouldn't know.
19 I wouldn't know we can even include it.
20 Can't tell. Haven't established the
21 notion of contamination versus consent,
22 versus nonconsent.
23 If it was definitively
24 established, you know, if you have an
25 eighth report from these folks, the

Page 100

1
2 eighth report, I don't know how many
3 reports, six, seven, eight, whatever.
4 Q. Six.
5 A. Okay. Well, if you get another
6 iteration of the report and the person is
7 produced who could not have had a
8 consensual relationship with her, then I
9 would say that it's false confession and
10 Mr. Chatman is innocent, accounting for
11 the assumption for our purposes in this
12 discussion only because I'm not a DNA
13 specialist, that that could not have been
14 a contaminant.
15 Q. So you are saying that either
16 Susan Riggio lied or Carl Chatman is
17 innocent?
18 MS. STALF: Objection to form.
19 MR. CHESTNUT: Join.
20 A. Yes. One of those two
21 possibilities or a contaminant and I'll
22 leave measuring errors and all of that
23 other stuff to the DNA experts. I don't
24 know to what degree this has been
25 contested.

Page 101

1
2 I'm not involved at all, as I
3 pointed out, I have not been provided
4 with those depositions and it's not my
5 scientific expertise.
6 Q. So you are not aware there is
7 no --
8 A. I'm not aware of it. I haven't
9 seen it.
10 Q. Looking back at your list of
11 documents that you reviewed in Exhibit 1?
12 A. Uh-huh, yeah.
13 Q. Item No. 26. You say, SERI
14 report."
15 A. Yeah.
16 Q. There are three SERI reports
17 that were prepared and produced prior to
18 the criminal trial, three that produced
19 prior to the criminal trial and three
20 that came after Mr. Chatman's
21 exoneration.
22 Do you know which SERI reports
23 you reviewed?
24 A. I don't know. All I know what
25 I got out of the SERI report was that it

26 (Pages 98 - 101)

Page 102

1   wasn't his DNA. That it kind of what I
2   got out of what I reviewed was that he
3   was not implicated as the person who, you
4   know, had attacked her.
5   Q.   He was not implicated or he was
6   excluded as being the person?
7   A.   I have to go back over what I
8   looked at. What I got out of the SERI
9   report that I received or at least that I
10  looked at, the DNA evidence didn't
11  support his being involved and that
12  contributed to an impression that he was
13  innocent for this crime or this
14  assertion.
15  Q.   You included facts in this case
16  related to whether or not Carl Chatman
17  was innocent or guilty, right?
18  A.   You have to direct me to
19  something.
20  Q.   In your report, you included
21  facts whether or not Carl Chatman was
22  innocent, right?
23  A.   You know, you can wag your head
24  all you want, but I still don't know what

Page 103

1   you're talking about.
2       If you can direct me to where
3   in the report, I can follow you,
4   otherwise, I'm just not tracking what
5   you're talking about.
6   Q.   In your factual summary, right,
7   part of your inquiry was whether or not
8   Carl Chatman was innocent?
9   A.   When you say factual summary,
10  are you talking about what I wrote from
11  page 4 to page 8?
12  Q.   Yes.
13  A.   I don't know. I just don't
14  know.
15  Q.   You don't know whether or not
16  you included facts that included whether
17  Carl Chatman was innocent or guilty; is
18  that your testimony?
19  A.   I may have, but, again, I'm
20  more -- I'm just thinking about the
21  question as you phrased it earlier.
22      THE WITNESS: Maybe you can read
23  it back to me, his earlier question.
24  Q.   It's not pending, sir.

Page 104

1
2   A.   My answer is, again, unless you
3   direct me to some specific point between
4   page 4 and page 8, what I included was a
5   narrative of the criminal complaint and
6   it's aftermath, that is what I included.
7   Q.   Was part of your purpose of
8   preparing this report to include the
9   facts that would bear upon whether or not
10  Carl Chatman was innocent or guilty?
11      MS. STALF: Objection to the
12      form of the question.
13  A.   Not necessarily. The purpose
14  of including that was really more just an
15  orientation for engaging the confession
16  issue.
17  Q.   You didn't include and you are
18  not here to opine as to whether Carl
19  Chatman is guilty?
20  A.   No.
21      I can see by the way on page 8
22  I was referencing a number of assertions
23  that are arguments about his innocence.
24      I included them because they
25  are part of this discussion about the

Page 105

1
2   confession, but they are variably related
3   to questions of his innocence or
4   misconduct of the police so it kind of
5   depends what we are talking about.
6       And in terms of whole notion of
7   guilt, I just have to go over this. It
8   was really more oriented to the statement
9   as opposed to guilt or innocence.
10  Q.   You didn't purposely exclude
11  mention of DNA information from your
12  summary of the facts?
13  A.   No, I didn't purposely. If
14  it's not in there, it certainly wasn't by
15  design.
16  Q.   Do you think Ms. Riggio was
17  having an extramarital affair?
18      MS. STALF: Objection to form,
19      foundation.
20      MR. CHESTNUT: Objection to
21      form.
22  A.   I just don't know.
23  Q.   Are you leaning one way or the
24  other; closer to her having an affair or
25  closer to her not having an affair?

27 (Pages 102 - 105)

Page 106

1
2      MS. STALF: Objection to the
3  form of the question.
4    Q.   I mean back in May 2002.
5    A.   It really hasn't entered my
6  mind until this deposition. It's not
7  really something I was concerning myself
8  with. I have not been of a posture of
9  analyzing DNA and what it means.
10      I think you asked me several
11 questions earlier about was I aware that
12 somebody else's DNA was found, I wasn't,
13 that was my testimony. So it's not
14 something that -- my orientation was just
15 that nothing implicated Chatman from the
16 available testing and it didn't graduate
17 to what you're bringing up in this
18 deposition so it really hasn't entered my
19 mind.
20    Q.   So this deposition is my
21 opportunity to examine you based on the
22 opinions you hold and so I'm asking you
23 now, and forever hold your peace, do you
24 have an opinion at all about whether Ms.
25 Riggio was having an extramarital affair

Page 107

1
2  in May 2002?
3      MS. STALF: Objection to the
4  form of the question; asked and
5  answered.
6    A.   I have no idea.
7      MR. AINSWORTH: May we go off
8  the record.
9      THE VIDEOGRAPHER: Going off the
10 record 11:45.
11      End of disc number 2.
12      [Discussion held off the
13 record.]
14      [Whereupon, at 11:45 a.m., a
15 recess was taken.]
16      [Whereupon, at 11:55 a.m., the
17 testimony continued.]
18      THE VIDEOGRAPHER: Returning to
19 the record 11:55 a.m.
20      Beginning of disc number 3.
21    Q.   What did you do to prepare for
22 your deposition?
23    A.   Read my report, sat and spoke
24 with the attorney, and that's pretty much
25 it.

Page 108

1
2    Q.   When did you meet with Krista?
3    A.   Yesterday.
4    Q.   For how long?
5    A.   A couple of hours.
6    Q.   You were deposed on November
7  4th of this year in the Swift case,
8  right?
9    A.   Correct.
10    Q.   Did you review any articles
11 between the Swift deposition and now?
12      MS. STALF: Objection to the
13  form of the question.
14    A.   I have read medical literature
15 between then and now.
16      MR. AINSWORTH: That was a poor
17  question.
18    Q.   Since the Swift deposition on
19 November 4, 2016, did you review any
20 published literature regarding false
21 confessions?
22    A.   I may have. I can't answer
23 that question definitively. I haven't in
24 the past week or so, so I haven't in the
25 very, very recent past.

Page 109

1
2      Beyond that I have.
3    Q.   After the Swift deposition, did
4  you go back to look up some of the terms
5  that you didn't know what they meant?
6    A.   Oh, no. I mean those are just
7  -- I remember I haven't reviewed the
8  Swift deposition. There is some issue
9  with redaction.
10      First of all, I'm at a stage of
11 the Swift deposition where I was supposed
12 to be reading to sign off on my answers
13 whether they are correct or not and I
14 haven't signed off on that yet so I can
15 respond to some of your questions but
16 there were a number of questions about
17 terms that were raised that were just
18 irrelevant to anything.
19      And so I didn't go back to look
20 them up because they were irrelevant
21 before, irrelevant during, irrelevant
22 after.
23    Q.   So you didn't look up the
24 meaning of those terms --
25    A.   No.

28 (Pages 106 - 109)

Page 110

1
2    Q.    -- raised in the Swift
3 deposition that you don't know the
4 answers?
5    A.    No, no.
6    Q.    So it's fair to say that you
7 still don't know what they mean?
8    A.    Yeah, it is.  And it's fair to
9 say they are still as inconsequential as
10 they were during the Swift deposition.
11        If you asked me about
12 Kazakhstan and I can't answer the
13 question, I'm not going to look it up
14 after the deposition.  I just don't care.
15    Q.    I want to ask you about, I'm
16 not going to go through the Swift report
17 accept for this one piece of it because
18 it pertains to sex offenders.
19        You wrote in that report, "Mr.
20 Douglas was a crack addict who carried
21 cash and who sought sex when he was high.
22        "He would have had sex with
23 many prostitutes and would have killed
24 far greater numbers of victims were his
25 sexual activities to be an actual

Page 111

1
2 indicator of his attempts to murder."
3        Do you recall that portion?
4    A.    Sure.
5    Q.    What did you mean saying that
6 Mr. Douglas would have killed far greater
7 numbers of victims were his sexual
8 activities be an actual indicator of his
9 attempts to murder?
10    A.    I meant exactly that but to
11 perhaps to provide some additional
12 context, the issue in question was Mr.
13 Douglas and whether he -- evidence of his
14 sexual involvement with the victim is the
15 de facto evidence that he killed her.
16        Evidence of his sexual activity
17 with a prostitute is that evidence that
18 he killed the prostitute and can one make
19 that assertion when sex with prostitutes
20 was regular activity of his life like for
21 some people going to the gym, with some
22 degree of frequency; or that, you know,
23 others may not be able to relate to?
24        So he did have these encounters
25 which were brutal and he had other

Page 112

1
2 encounters which did not lead to people
3 being victimized in that manner.
4        And so what we know about him,
5 what was available about him, has to be
6 taken into account, in consideration of
7 his DNA being found in a prostitute who
8 would have been part of his consensual
9 pool of encounters.
10    Q.    What did you mean by, "would
11 have killed far greater numbers of
12 victims"?
13    A.    Because there are individuals
14 who target prostitutes for violent
15 predation, whether it be rape, homicide,
16 or both.
17        They are not necessarily living
18 a lifestyle in which I sell drugs, I get
19 money.  I have a strong sexual appetite.
20 I meet that appetite with prostitutes and
21 this is part of my regular activity just
22 for other people, I go to church once a
23 week.
24        For them they have the lives
25 that they have and their violent

Page 113

1
2 predation focuses on prostitutes as a
3 vulnerable population that perhaps others
4 don't necessarily document so it's a lot
5 easier to tie a cause-effect to their
6 activity with prostitutes as homicidal in
7 nature because that is how they relate to
8 prostitutes.
9        In this case he relates to
10 prostitutes in a sexual way as typical
11 sexual partner.
12        In some of those encounters, an
13 unknown percentage, but it is not a
14 hand-in-glove overlap, have ended in
15 homicide and he was regularly availing
16 himself of prostitutes that are part of
17 his lifestyle of drug use, drug sales,
18 having cash on hand, having no
19 responsibilities and no expenses, and
20 those kinds of things which are different
21 from; for example, those individuals who
22 otherwise their relationship to
23 prostitutes is more exclusively limited
24 to their homicidal and brutal activities
25 and the enacting of their fantasies.

29 (Pages 110 - 113)

Page 114

```
1
2      Q.   How do you know that John
3   Douglas didn't kill more people than you
4   know about?
5      A.   We don't know.  We don't know
6   that he killed many, many, many, many,
7   many people.  That is much more
8   unrealistic.
9         What I was referring to in that
10  statement was how active he was, how
11  known he was to engage in these
12  activities just as a matter of regular
13  lifestyle and that the number of victims
14  that could potentially be attributed to
15  him relative to that level of activity,
16  there's still a spread; that's what I was
17  referring to in that statement.
18     Q.   You don't hold yourself out to
19  be an expert in memory, do you?
20     A.   No and yes.  There are some
21  aspects of memory that are within my
22  expertise and some aspects of memory that
23  are not.  It just really depends on the
24  nature of the question.
25        It's just kind of like false
```

Page 115

```
1
2   confession.  I don't hold myself out to
3   be an expert in police; however, I have
4   expertise in the areas in which we've
5   been discussing today.  If I don't have
6   expertise, I will tell you.
7         So it is with memory, certain
8   aspects of memory I have expertise;
9   ceratin aspects I don't.
10     Q.   What aspects of memory, the
11  science of memory, do you consider
12  yourself --
13     A.   It's a big universe.  I can't
14  answer that question.  You have to ask me
15  a specific question.  Say, is this
16  something part of your expertise?  I will
17  give you a yes or no as best I can.
18     Q.   Tell me of any aspect of
19  memory, the science of memory, that you
20  consider yourself to be an expert in.
21     A.   It's just too broad a question.
22     Q.   Have you conducted any studies
23  --
24     A.   Well, that has been nothing to
25  do with expertise.
```

Page 116

```
1
2      Q.   I didn't ask you whether it has
3   anything to do with --
4      A.   Yeah, but I answered as I did.
5      Q.   No.  Sir, let me finish the
6   question, then you answer the question.
7   That is how it works.
8         Here's the question:  Have you
9   conducted any studies in the field of
10  memory?
11     A.   No.
12     Q.   Have you published any studies
13  in the field of memory?
14     A.   No.
15     Q.   Have you peer reviewed any
16  studies in the field of memory?
17     A.   I don't think so.
18     Q.   Have you taught any courses
19  regarding the science of memory?
20     A.   I have taught in the evaluation
21  of patients, how to assess memory.  I
22  have taught in the course of my teaching
23  about malingered memory impairment.  I've
24  taught about dementia.  I have -- how
25  memory is affected by traumatic events.
```

Page 117

```
1
2   I have taught a number of different areas
3   of memory.  Those are four that
4   immediately come to mind.
5      Q.   How do you assess memory?
6      A.   You can assess memory through
7   mental status examination; through asking
8   the person to recount a story.
9         You can assess memory by asking
10  a person to account for their specific
11  whereabouts or their movements during a
12  period of time that one can't account
13  for.
14        For more granular assessment of
15  memory, there are a variety of tests that
16  one would refer to, to a
17  neuropsychologist to help to supplement
18  what you already get out of psychiatric
19  examination.
20     Q.   When you say "mental status,"
21  do you mean orientation times three or
22  what?
23     A.   No.  You refer to object
24  recall, I'm going to give you three
25  things to remember; see if someone
```

Page 118

1
2  remembers after a few minutes, see if
3  they remember after a few minutes more or
4  over the course of an interview being
5  aware of the material that has come up
6  that you have disclosed within the
7  discussion to see how someone references
8  it later in the discussion; or -- or if
9  you are speaking about a particular
10  event, some clear familiarity with an
11  event at a detail level; for example,
12  something that comes up in forensics is
13  you may have the discussion with somebody
14  about the proceedings of their case and
15  they are in a position to tell you,
16  possibly, yes, and two weeks ago we had a
17  hearing in which this came up and what
18  the person is recounting to you is
19  reflected -- is paralleling what actually
20  transpired and you are aware of that and
21  you can verify; or -- or a person is very
22  confused and gives a response where
23  material that you know that they have
24  been exposed to and to a degree they can
25  internalize and be expect to remember,

Page 119

1
2  that person is not remembering.
3          And then there are exercises
4  that one can undertake independent of
5  actual memory.
6          Gudjonsson tests where you give
7  a person a story, asked them to recount
8  the number of details and the number of
9  details that is person recounts is able
10  to inform a sense of that individual's
11  memory.
12          You ask them after a certain
13  amount of time or you can independently
14  -- Gudjonsson's test is based on an
15  exercise already conducted by
16  psychiatrists and neurologists for years
17  where you tell them a story and ask them
18  to repeat it and you see how many of the
19  details a person gets sometime later.
20          That's a form of memory testing
21  been around for quite a long time. It
22  just with Gudjonsson there's a story.
23  It's the same story that you give
24  administration to administration.
25          The longer stories are part of

Page 120

1
2  most mental status exams and mental
3  status exam limit's itself to can you
4  remember three objects; after a few
5  minutes, can you remember those same
6  objects down the line.
7          But the mental status exams are
8  really meant to be something of
9  rudimentary screening.
10          Over the course of your
11  examination of someone, there are many
12  other questions that you asked that
13  assess mental status qualities that go
14  well beyond that crude zero to 30 measure
15  that you give most of time as sort of
16  preliminary or to check the boxes for all
17  things.
18      Q.  When you were talking about
19  assessing memory in this context, you
20  were talking about looking for memory
21  impairment; is that right?
22      A.  Sometimes, sure.
23      Q.  And under what other contexts?
24      A.  Because in a forensic context,
25  you always have to consider whether a

Page 121

1
2  person is a dishonest informant. So
3  sometimes you're looking for impairment,
4  sometimes you're looking for distortion
5  of memory which may be conscious or
6  unconscious.
7      Q.  What are the stages of memory?
8      A.  You mean registration,
9  recognition, recall, is what you are
10  talking about?
11      Q.  I'm asking you, sir.
12      A.  Yeah, but there are different
13  -- the idea of staging. It can be
14  immediate, recent, remote. There are
15  different kinds of self-classifications.
16          Immediate, recent, remote.
17      Q.  What does immediate mean?
18      A.  I remember what you just asked
19  me. What does immediate mean? I just
20  repeated it. It involves repetition,
21  neuropsychologically more of a repetition
22  function.
23          If I was to -- if I were to
24  recount to you the verbiage of one of the
25  questions that you asked in that whole

31 (Pages 118 - 121)

Page 122

1
2 DNA exchange that we had, that would be
3 recent memory. It goes beyond just the
4 idea of merely repeating something to
5 you. I would have to record for recent
6 access.
7        If we had a much earlier
8 encounter at some point, some years ago
9 on another case, that would be a matter
10 of remote memory; for example, the Swift
11 case, I've consulted on a case with that
12 attorney was on the opposite side and I
13 had memory of those experiences that were
14 accurate so that's a remote memory
15 experience, not recent memory.
16        So you have a variety of
17 different neuropsychological functions
18 involved; neuroanatomical functions
19 involved in different aspects of the
20 memory but we pretty much break it down
21 by immediate, recent, and remote.
22    Q.    Who is we?
23    A.    Psychiatrists.
24    Q.    What are the factors that
25 affect encoding memories?

Page 123

1
2    A.    The factors?
3    Q.    Yeah.
4    A.    I don't know that I really
5 understand the question.
6    Q.    Are you stalling for time?
7    A.    Should I?
8        MS. STALF:  Objection to form of
9 question.
10       That's harassing, Russell.
11 Knock it off.
12    Q.    What are the factors that
13 affect encoding memory?
14    A.    Well, there are neuroanatomical
15 factors, obviously.
16    Q.    What are they?
17    A.    The parts of the brain involved
18 in memory: parts of the frontal lobe
19 involved in memory; parts of the temporal
20 lobe; parts of the parietal lobe.
21       There are anatomical factors.
22 There are, in all likelihood,
23 neurophysiological factors that are not
24 as well accounted for.
25       The temporal lobe is a very

Page 124

1
2 important part of memory. It's far more
3 identified. There are other parts of the
4 brain that not so much.
5        But physiologically, we don't
6 necessarily know what neurotransmitters
7 have a specific involvement in memory
8 relative to others, but in all
9 likelihood, there is some involvement
10 there.
11    Q.    Tell me sir, what you do know,
12 what parts of the frontal brain, what
13 parts of the temporal lobe do affect
14 memory?
15    A.    Medial temporal lobe is
16 involved in memory.
17       MR. AINSWORTH:  I'm sorry. I
18 threw you off track.
19    Q.    What parts of the brain are
20 involved in --
21       MR. AINSWORTH:  Strike that.
22    Q.    What parts of the brain that
23 you just mentioned are involved -- are
24 factors that affect encoding memory?
25    A.    I believe the parietal is

Page 125

1
2 more involved in encoding. I don't
3 believe it's exclusive to the parietal
4 lobe.
5    Q.    Which other parts?
6    A.    The frontal and temporal.
7    Q.    So all these are involved?
8    A.    I believe all three are
9 involved.
10    Q.    You mention the
11 neurophysiological actions of the brain?
12    A.    Capabilities of brain.
13    Q.    What neurophysiological
14 capabilities of the brain come into play?
15    A.    That goes beyond my expertise.
16    Q.    Let me ask the question that I
17 was asking about --
18    A.    I don't think we know as much,
19 that was my point, but what we do know,
20 goes beyond my expertise.
21    Q.    What are the factors that
22 affect the encoding of memory?
23    A.    That's not an area of my
24 expertise.
25    Q.    What factors affect the storage

32 (Pages 122 - 125)

Page 126

1
2  of memory?
3      A.   Aging, brain injury.
4      Q.   Trauma?
5      A.   Intoxication, psychiatric
6  illness.  Did I say -- when you said
7  trauma, I meant physical and also
8  emotional trauma affected coding.
9      Q.   We are talking about storage?
10     A.   Yes.
11     Q.   So you are saying emotional
12 trauma can affect storage?
13     A.   Yes.  Those are factors that
14 immediately come to mind.
15     Q.   Take much time as you need.
16     A.   It's what comes to mind.
17     Q.   I understand.  Take as much
18 time as you need.
19     A.   I rather not sloth, there's no
20 need.  It's what comes to mind.
21     Q.   I know but if you need more
22 time, if you think more time would help
23 you think of other factors, please take
24 as much time as you need.
25     A.   Could be medical conditions,

Page 127

1
2  could be the passage of time.
3      Q.   Is that different from is
4  passage of time different from aging?
5      A.   Yes, because age relates to the
6  natural deterioration or decline of one's
7  cognition.
8           And then there is age-related
9  memory loss that is not necessarily
10 associated with dementia.
11          But a person may not
12 necessarily experience age-related memory
13 loss over the course of 20 years, the
14 passage of time or even far less that may
15 interfere with memories at least that
16 have already been encoded.
17     Q.   What are the factors that
18 affect retrieval of memory?
19     A.   Aging; brain injury; trauma;
20 repression; suppression, those come to
21 mind.
22     Q.   Have you conducted any research
23 on how trauma, for this purpose let's
24 take physical trauma, how physical trauma
25 affects the process of memory?

Page 128

1
2      A.   I have not.
3      Q.   Are you familiar with how
4  physical trauma and let's take the
5  example of somebody's head being slammed
6  behind a desk several times, affect
7  memory?
8      A.   How, no.  That it does, sure.
9           The experience of
10 postconcussive effects on memory are
11 chronicled.  Postconcussive effects are
12 variable, maybe obvious in some and
13 latent or more hidden in others.
14          Memory impairment is a common,
15 not universal, it's a common finding in a
16 mildly or not so mildly concussive
17 experience.
18     Q.   So in a postconcussive
19 situation, some people may sustain memory
20 loss?
21     A.   Some may, yeah.
22     Q.   Some may not; is that fair to
23 say?
24     A.   Yeah.  The more serious the
25 concussion, the more likely the person is

Page 129

1
2  to experience memory loss.
3           The Chicago Bears quarterback
4  who gets clobbered on a sack and leaves
5  the game for it and is a bit dazed, may
6  have some memory impairment.
7           That same Chicago Bears
8  quarterback gets clobbered and knocked
9  out on the field, is more likely to
10 experience some level of memory
11 impairment.
12     Q.   When you talk about memory
13 impairment, you are talking about
14 forgetting or not recalling events,
15 right?
16     A.   Sure.
17     Q.   You are not talking about
18 recalling things that didn't actually
19 occur, right?
20     A.   You mean distortion of memory?
21     Q.   What I'm talking about is
22 events, recalling events that didn't
23 actually occur?
24     A.   That's what I'm saying,
25 distortion of memory, that a person in an

33 (Pages 126 - 129)

Page 130

1
2 effort to reconstruct what happened,
3 essentially presents an account that is
4 just not true, but is attempting to fill
5 in the blanks.
6          That occurs independent of the
7 actual concussion itself and more of a
8 process of asking the person to fill in
9 the blanks.
10          Some people will say I don't
11 and some people will not say I don't know
12 and will give their best effort to fill
13 in with something false. Depends on the
14 person.
15     Q.  Do you know why that is? Can
16 you tell us why that is?
17     A.   I think it depends on the
18 individual.
19     Q.   Why?
20     A.   It depends on the individual.
21     Q.   Why?
22     A.   I believe I answered the
23 question.
24     Q.   Why does it depend on the
25 individual?

Page 131

1
2     A.  Because some individuals by
3 virtue of their personality maybe fill in
4 blanks with something that is incorrect
5 and some maybe responding to the
6 pressures of the situation. It doesn't
7 relate to their personality so much as it
8 relates to the nature of what happens in
9 how they were questioned.
10          Some people are just more given
11 to just simply confabulating because that
12 is how they relate. If there is
13 something that they may not be fully
14 mindful of, they fill in the blanks more
15 comfortably.
16     Q.  Is this your supposition or is
17 that something studied and they
18 determined that the cause why some people
19 have distortion of memory is because of
20 pressure of situation or their
21 personality or this third thing that some
22 people are more prone to confabulation?
23     A.   Let's go back to the Henry Lee
24 issue. There are issues certainly to
25 experience and to some degree they are

Page 132

1
2 demonstrated. The first explanation that
3 I provided of individuals who have memory
4 distrust and by virtue of their own
5 personality qualities, how they relate to
6 another person takes us into the specific
7 false confession realm. They fill in the
8 blanks with incorrect details driven more
9 by their personality within the dynamic
10 of what is going on.
11          The phenomenon of memory
12 distrust, I know I have been pretty
13 dismissive of false confession research,
14 useless, such as it is, there's actually
15 been documentation of actual cases in
16 which memory distrust was implicated in
17 false confessions and the vehicle for
18 that is a detailing by a suspect of a
19 scenario that is incorrect, incorrect,
20 but it is recounted as the memory of the
21 suspect but it is borne of memory
22 distrust and also borne of the
23 personality of the suspect, not of some
24 organic cause.
25          Now, for some individuals who

Page 133

1
2 have conditions in which they
3 confabulate, it's been studied in
4 populations in which it is medically
5 implicated or psychologically implicated.
6          They were more given to
7 presenting distorted details and not
8 necessarily because they were consciously
9 doing so. They may do so without regard,
10 it's the way they relate. It doesn't
11 have anything to do with the personality
12 how that person relates to said specific
13 question.
14          Then there are instances that
15 may have been studied systematically or
16 demonstrated on cases that I worked on
17 and are well-documented where an
18 individual who does not remember is
19 questioned in such a way that the
20 circumstances would compel someone to add
21 additional details to what they don't
22 know and they are responsive to the
23 pressure of an examiner to give them
24 information that the examiner believes
25 they have but they do not have.

34 (Pages 130 - 133)

Page 134

1
2      That is something not just in
3  an investigation setting in which people
4  are questioned in intense circumstances,
5  that is more a by-product of expectation
6  of an interviewer than it is the
7  personality of the person who offers that
8  distorted information.
9      Those are three distinctly
10 different entities. I can't tell you
11 there's been this systematic research
12 study of these, I can't.
13     I can tell you that these are
14 phenomena that are well-identified.
15 Q.   Well-identified by yourself?
16 A.   Just in the way that I already
17 answered.
18 Q.   No, no. I want to know?
19 A.   I already answered.
20 Q.   Can you point me to any study
21 that demonstrates any of three effects
22 you just discussed?
23     MS. STALF: Objection, asked and
24 answered.
25 A.   I think by the time we get to

Page 135

1
2  trial, if I have to do, then I will do
3  it. No, I can't point to a study.
4      If it's important by the time
5  we get to trial, I will give you the
6  confabulation studies and I will give you
7  all of that literature behind it.
8      I think what I'm pointing out
9  is not revolutionary and documented in
10 the scientific literature, not the social
11 science literature, the real science
12 literature. There is nothing
13 revolutionary that I'm talking about. I
14 can't give you citations as we are
15 sitting here.
16 Q.   All three of those different
17 aspects that you just discussed, it's
18 your contention all three appear in the
19 literature that's been published in
20 peer-reviewed journals; is that what you
21 are saying?
22 A.   I didn't say that.
23 Q.   Well, that's what I'm trying to
24 find out.
25     For each of the three aspects,

Page 136

1
2  is there a body of literature --
3  A.   Oh, there is a body of --
4      MR. AINSWORTH: Excuse me, sir,
5  I'm trying to finish my question. You
6  are making life very difficult for the
7  court reporter.
8      THE WITNESS: I'll let her
9  complain for herself.
10     MR. AINSWORTH: No. I want a
11 clean transcript. I don't your
12 answers lost because the court
13 reporter can't take them down. I
14 care.
15     I also care about Margaret. She
16 is a very nice person.
17     MS. STALF: Knock it down a
18 notch.
19     THE WITNESS: Thank you for your
20 righteousness. I will wait and answer
21 your question.
22     Don't think for a minute that I
23 think you are angry with me. It's
24 just posturing.
25     Just ask the question and I will

Page 137

1
2      be more polite to wait till the end of
3      your question.
4  Q.   For each of the three aspects
5  that you just discussed, is there a body
6  of literature that's been published in
7  peer-reviewed journals that explain the
8  aspects as you described them?
9  A.   Yeah. There is definitely a
10 body of literature about confabulation.
11     I don't know that Dr.
12 Gudjonsson published on memory distrust,
13 specifically as it relates to confession
14 setting.
15     I would have to go back and
16 access the question of memory distrust in
17 other settings. I believe it is
18 well-documented. I want to hedge that
19 with respect to the idea of the dynamic
20 of the pressure of the examiner, pressure
21 of questioner, to what degree that
22 yields. There is certainly a phenomenon
23 well-known to child abuse matters. To
24 what degree that's been published in
25 peer-reviewed literature, I believe it

35 (Pages 134 - 137)

Page 138

1
2 has, but, again, I want to go back and
3 make sure and produce it as need be.
4    Q.   Doctor, the reason why I stress
5 the importance of listening to the
6 question, is because we are talking about
7 among postconcussive population.
8 Remember that I asked you about the
9 effects of postconcussive and you gave me
10 these three aspects.
11       I'm asking you, sir, for the
12 postconcussive population, are there
13 reported studies in peer-reviewed
14 journals that explain each of three
15 aspects is present people who have
16 sustained a concussion.
17    A.   I don't believe so.  That is
18 much more granular application of the
19 study of postconcussive phenomena.
20    Q.   You had criticized the use of
21 college students and simulations in the
22 research design that have been used by
23 people studying false confession; fair to
24 say?
25    A.   I have criticized the

Page 139

1
2 extrapolation, yeah.  If you want to
3 understand about college students, that's
4 great, give it to the dean and go with
5 it.
6       But the extrapolation of that
7 to the context of the interrogation room
8 is what I have been critical of.
9       MR. AINSWORTH:  Actually, let's
10 go off the record.
11       THE VIDEOGRAPHER:  Going off the
12 record.
13       The time is 12:29 p.m.
14       [Discussion held off the
15 record.]
16       [Whereupon, at 12:29 p.m., a
17 recess was taken.]
18       [Whereupon, at 12:56 p.m., the
19 testimony continued.]
20       THE VIDEOGRAPHER:  Return to
21 record, 12:56 p.m.
22       Beginning of disc number 4.
23    Q.   So, Doctor, you see no value in
24 extrapolating from experiments conducted
25 using college students and simulations in

Page 140

1
2 the field of false confessions?
3    A.   I think it might have value if
4 there is an incident involving some petty
5 event in an academic context in which an
6 academic investigation is initiated and
7 the nature of how that is undertaken
8 results in some admissions to professors
9 that might have been involved.
10       The student in question may
11 say, I gave a false submission and may
12 reference it, you know, depending on the
13 conditions, I think an argument could be
14 made.
15       That's why I said before send
16 it to the dean.  It may have some
17 relevance on the collegiate context, but
18 it doesn't embed itself in the real
19 world.
20    Q.   So studies predicated upon
21 simulations involving college students in
22 certain paradigm where college students
23 are led to actually cheat and then are
24 interrogated about whether they cheated,
25 that data cannot be extrapolated from

Page 141

1
2 outside of the collegiate setting; is
3 that fair to say?
4    A.   It can't be extrapolated
5 outside of the setting of very petty
6 matters for which the consequences are,
7 you know, benign or perhaps potentially
8 reversible involving questioning that
9 involves someone who there may be some
10 level of alliance and there isn't the
11 presumption of -- there is not the
12 ominous presumption that I am a private
13 citizen, I'm talking to a cop
14 investigating a case as opposed to I'm
15 talking to a teacher, somebody from the
16 administration that doesn't have a
17 designated role of I investigate crimes
18 but a person who may be, I take care of
19 students, I concern myself with lots of
20 things and we are just taking.
21       So, it's the -- no, one can't
22 extrapolate across the nature of
23 questioner, the nature of the offense.
24 No, not to major crimes.
25    Q.   You are aware that Dr. Russano

36 (Pages 138 - 141)

Page 142

1
2  in her research has created a paradigm in
3  which research subjects are educed to
4  cheat when they were told not to and then
5  are interrogated about whether they
6  cheated or not?
7     A.   Yes.
8     Q.   You would say that is an
9  example of a study that had no
10 practicality in anything other than the
11 collegiate setting or the petty crimes
12 that you described?
13    A.   Yes.
14    Q.   Do you know who funded Dr.
15 Russano's report?
16    A.   Some government agencies.
17    Q.   Do you know which one?
18    A.   I'm not exactly sure. I know
19 she made reference to it. I have to --
20    Q.   Would it refresh your
21 recollection Department of Defense and
22 the Department of Justice via the
23 High-Value Detainee Interrogation Group
24 fund her work?
25    A.   Fund that work, the college

Page 143

1
2  students work? Fund that work or the
3  college student work or some other
4  high-value detainee work?
5     Q.   Funds the research that she
6  conducts from her lab including work
7  extrapolated from the data derived from
8  studies using research subjects who are
9  educed to tell a lie and are
10 interrogated?
11    A.   That doesn't really answer my
12 question. It's my deposition. I don't
13 want to assume an incorrect dynamic.
14    Look at, the Department of
15 Defense will spend a bazillion dollars on
16 fighter bombers that don't fly so just
17 because the Department of Defense funds
18 something doesn't mean it has any kind of
19 utility.
20    I don't think we would have
21 the, well, I mean, look, there was just a
22 controversy about the F-35.
23    People who make funding
24 decisions, it doesn't necessarily convey
25 legitimacy.

Page 144

1
2     God bless her, she can shake
3  money out of the Department of Defense,
4  she can shake money out of the Department
5  of Defense for college student studies,
6  that is great, but to what degree they
7  can generalize high-value detainees. I
8  don't know what she is studying for
9  high-value detainees. I certain hope
10 this is American citizens and not
11 extrapolating college students as they
12 relate to high-value detainees or we'll
13 still be up the creek with the
14 responsibilities that we have, but God
15 bless her for taking an interest in this
16 area really, respect, I think it's
17 fantastic.
18    If she can get money out of
19 them, more power to her.
20    Q.   Have you been hired to conduct
21 research for either of the Department of
22 Defense or the Department of Justice?
23    A.   No, I haven't applied.
24    Q.   I didn't ask whether you
25 applied.

Page 145

1
2     A.   You have to apply for a grant
3  to get it.
4     Q.   Have you ever been funded by
5  the Department of Defense or Department
6  of Justice?
7     A.   No, sir.
8     Q.   Have you provided any training
9  to federal law enforcement authorities
10 how to conduct interrogations?
11    A.   I haven't.
12    Q.   Have you provided training to
13 anyone about how to conduct
14 interrogations?
15    A.   I lectured at the North
16 Carolina Homicide Investigators
17 Association about interrogations with
18 specific expression of the concerns from
19 the aforementioned research of things I
20 wanted to make them aware of that they
21 needed to be cautions about.
22    It certainly wasn't a training
23 context.
24    Q.   When was that?
25    A.   It's on my CV. I couldn't tell

37 (Pages 142 - 145)

Page 146

1
2  you. Maybe 2005, 2004. Actually, it
3  probably would have been 2005, 2006. You
4  have to reference the CV.
5      Q.  How long was that training?
6      A.  I was brought in as a keynote
7  speaker.
8      Q.  How long did you speak for?
9      A.  I don't know.
10     Q.  More or less than an hour?
11     A.  Hour, hour and a half, maybe
12 two hours.
13     Q.  Somewhere between around an
14 hour and two hours?
15     A.  Yeah, yeah.
16         You don't bring your keynote in
17 to speak in for 40 minutes. The fact
18 that they brought me in, I'm sure I was
19 speaking for some extended period of time
20 for them to position such as they did.
21     Q.  Did you speak just that one
22 time or did you speak on other occasions
23 to that group?
24     A.  Just that time.
25     Q.  Any other time that you have

Page 147

1
2  ever spoken or provided training on the
3  topic of interrogations in your career?
4      A.  For law enforcement?
5      Q.  For law enforcement.
6      A.  No.
7      Q.  Any other time that you
8  provided training to anybody on
9  interrogations at all?
10     A.  I lectured at the American
11 Academy of Forensic Sciences on disputed
12 confessions and specifically as it
13 related to some of identified risk
14 factors and the assessment of data that
15 emerges from interrogation. That is also
16 on my CV.
17         I if I had to peg that, it
18 would have ben about 2002 or so.
19         And I have lectured to
20 prosecutors on this specific area, but
21 not just in encompassing the
22 interrogation issue also more broadly
23 myths and fact about disputing confession
24 research.
25     MR. AINSWORTH: Let's mark this

Page 148

1
2  as Exhibit 5.
3      [The document was hereby marked
4  as Plaintiff's Exhibit 5 for
5  identification, as of this date.]
6      Q.  What we have marked as Exhibit
7  5, is this your CV, sir?
8      A.  Yes.
9      Q.  This was produced to us in this
10 case. Is this current as of the date of
11 your report?
12     A.  I have given a couple of
13 additional lectures since June;
14 otherwise, it substantively current.
15     Q.  Have you given any lectures
16 since June that have any applicability to
17 your work in this case?
18     A.  No.
19     Q.  Can you identify to me the
20 lectures that you provided to prosecutors
21 if they are listed on this CV?
22     A.  Yeah, sure.
23         April 2012, Illinois State's
24 Attorney Appellate Prosecutors, Violent
25 Crimes Conference; the Science, and,

Page 149

1
2  quote, Science of Confession Expertise;
3  that's what I was referring to.
4      Q.  Any other times you provided
5  training to prosecutors?
6      A.  On this topic?
7      Q.  On the topic of false
8  confessions.
9      A.  Not that I can see here.
10         I have to say only because we
11 are creating a record and I'm just
12 noticing this now, I believe that I
13 lectured to the Arkansas District
14 Attorney's Association, whatever they
15 call themselves. I don't believe I
16 lectured about confessions. There were
17 several lectures that I gave there
18 repeatedly. I believe I covered those
19 topics and not the confession one, but
20 I'm just sort of holding that out just in
21 case when I go back over to what I did in
22 Arkansas and add to this, it would be the
23 same lecture that I gave in Illinois.
24     Q.  I see it was actually in 2003
25 you have North Carolina Homicide

38 (Pages 146 - 149)

Page 150

1
2  Investigation Association.
3      A.   Okay.
4      Q.   Would you say October 2003?
5      A.   Makes sense. I only spoke to
6  them once.
7      Q.   Was that before or after you
8  stopped working on that study you
9  attempted?
10     A.   It was before. It was while we
11 were doing it. It was before we stopped.
12     Q.   I'm sorry. You referenced one
13 other lecture. I can't recall.
14     A.    There was one that I see that I
15 didn't reference, Nebraska Institute of
16 Forensic Sciences.
17     Q.   What date?
18     A.   June 2003.
19          And it substantively -- it was
20 substantively very similar to North
21 Carolina Homicide Investigators
22 Association.
23          The difference in the lecture
24 was the subtext beyond slides was one
25 more perspective for the North Carolina

Page 151

1
2  crowd because Nebraska was more of a
3  mixed crowd including not only law
4  enforcement, but attorneys and forensic
5  science students. It was just a
6  different audience. It was pretty
7  similar slides, but it was very different
8  and less prescriptive in nature but
9  topically, substantively, it was a very
10 similar lecture.
11          There is something here that I
12 haven't referenced in which I was asked
13 to speak on a panel by the New York State
14 Justice Task Force, was put on by the
15 Chief Justice, a panel assembled by Chief
16 Justice of New York State in connection
17 with wrongful convictions specifically
18 demonstrably false confessions and
19 proposed conclusions that occurred in
20 January 2011 and that was a
21 solutions-oriented lecture that was all
22 about the confession issue.
23     Q.   That was in January 2011?
24     A.   Yes, sir.
25     Q.   "Wrongful Convictions and

Page 152

1
2  Confessions, Myths, Facts and Solution."
3      A.   Yes, that was the title.
4      Q.   Who was the audience?
5      A.   It was a small audience of ten
6  to 15 defense attorneys; prosecutors;
7  judges; senior policy people in criminal
8  justice policy in New York State really
9  engaging the issue of wrongful
10 convictions and seeing how can we better
11 understand the issue from a confession
12 standpoint and from a standpoint is there
13 anything we can do to solve this, is
14 there anything we can do to make sure
15 this doesn't happen.
16          This was a panel assembled by
17 the Chief Judge of the State of New York.
18 I believe at the time was Judy Kaye. I'm
19 not positive.
20     Q.   When you spoke to the North
21 Carolina crowd, what did you tell them?
22     A.    Well, I'm pretty certain from a
23 prescriptive standpoint I urged their
24 caution in interrogation with threatening
25 suspects with the death penalty and

Page 153

1
2  advised them that this is something that
3  in my early review came up in such a way
4  to lead me to a conclusion that for some
5  people this may cause them to falsely
6  confess. You have to be aware of that.
7          The same when you have a
8  multiple suspect case, you need to be
9  careful how you leverage one confession
10 into other because of the possibility it
11 can create a false confession in another
12 one; likewise, as I noted before my
13 concern about advising someone they had
14 failed a polygraph and whether that might
15 have an impact.
16          So I advised them to be
17 cautious in their interrogations going
18 forward that if they were to do something
19 like this it might create a risk that
20 they otherwise didn't really have to
21 involve in a case.
22     Q.   Is it your recollection that
23 you did not lecture the North Carolina
24 crowd about the negative association that
25 you had or --

39 (Pages 150 - 153)

Page 154

1
2           MR. AINSWORTH:  Poorly phrased.
3     Q.   I'm correct that you looked at
4  other variables other than confronting
5  people with threats of the death penalty
6  and confronting people with failures of a
7  polygraph, right?
8     A.   There are certain things that I
9  made note of and one of which was for all
10  of the information that we had been
11  provided about false confessions we just
12  didn't see any psychotic people.  We
13  didn't see people with major mental
14  illness.  That is something that you see
15  suffused through the literature on this,
16  especially the polemics.
17          The evidence of significance of
18  mental retardation is definitely more
19  robust than it is for serious mental
20  illness.
21          Now, as I referenced before,
22  that's not to say they're aren't other
23  cases what would come forward in which
24  serious mental illness becomes an issue
25  that's also not to account for people who

Page 155

1
2  voluntarily falsely confess when they are
3  psychotic but more from the context of
4  their own interrogation of suspects.
5          The idea just because a person
6  has a diagnosis he is at risk for false
7  confessions is not borne out.
8          In the data that we had where
9  it was borne out, it was not a by-product
10  of hallucinations or delusions but very
11  much borne out by the dynamic between the
12  officers and the suspect how the officers
13  manipulated the suspect and in a way sort
14  of took advantage of his psychiatric
15  illness and also intellectual
16  limitations.
17          I believe in that lecture, I
18  made clear it had been oversold by the
19  innocence industry.
20          The other areas of sort of, you
21  know, this isn't impressive or we haven't
22  found this, they don't come to mind.  I
23  don't want to that I have -- I didn't
24  bring those up, but really what I
25  remember most was the caution that I gave

Page 156

1
2  because I thought it would be an
3  opportunity to give them something
4  prescriptive that could help them in
5  their work as opposed to give them a
6  sense of confidence that their
7  confessions are okay.
8          No psychiatrist needs to assure
9  a police officer that their confessions
10  are okay.  They like to believe their
11  confessions are okay.
12          My role was to tell them, hey,
13  you know, as Lee Corso likes to say for
14  all of your college football fans out
15  there, not so fast my friend.  There may
16  be certain instances in your
17  interrogation where you employ something
18  and may be placing your interrogation at
19  risk because you choose to do this and as
20  I sit here and lecture to you and educate
21  you from what I know which is obviously
22  different from your street-level
23  experience of this, speaking to my own
24  earlier testimony that I'm not a police
25  officer, don't have expertise in

Page 157

1
2  policing.
3          But from another person's
4  vantage point, these are things that may
5  contribute to a false confession in a way
6  that your naked eye misses so I think
7  that along the way, I may have mentioned
8  a variety of other things but that was
9  really what I was after was to give them
10  something to take away for their own
11  practices and to affect how they would
12  conduct themselves in the future.
13     Q.   Is it fair to say of the 22
14  cases, you have approximately ten that
15  you determined to be demonstrably false
16  confessions?
17     A.   I think you asked me this
18  question at the beginning.  I told you I
19  haven't looked at the stuff in ten years,
20  had no immediate plans to look at it.
21          I complied with the discovery
22  request and that was it.  I really don't
23  remember beyond what was said.
24     Q.   You referenced an example where
25  a police officer was taking advantage of

40 (Pages 154 - 157)

Page 158

1
2  an individual's mental limitations both
3  cognitively and mental illness.
4        Were you referencing a specific
5  case?
6    A.   Yes, a case in Michigan. I
7  believe they guy's name is Eddie Lloyd,
8  Eddie Joe Lloyd, one of those three-named
9  people. I certainly don't want to
10 disrespect his name. I think his name
11 Eddie Joe Lloyd, it's close enough, where
12 somebody was both intellectually limited
13 and someone who was quite psychiatrically
14 ill.
15       The nature of the questioning
16 really did exploit his limitations.
17 Where one quality ended and the other
18 began, very difficult to determine.
19       In a vacuum, his limitations
20 for false confession would not have
21 happened. In certain instances it does.
22       John Mark Karr gave a false
23 confession to killing JonBenet Ramsey
24 because of his psychiatric illness and
25 emotional makeup, so that is really what

Page 159

1
2  I was speaking of.
3    Q.   I'm sorry, you said that absent
4  other factors Eddie Joe Lloyd in your
5  opinion would not have confessed?
6    A.   Absence what the police did
7  with him in interrogation. The police
8  worked him over in a way where his
9  intellectual limitation and his
10 psychiatric illness converged with the
11 way they questioned him such that it
12 culminated in a false confession. It was
13 really the synergy of those two issues.
14   Q.   How many of the other cases
15 that you studied that had demonstrably
16 false confessions had a suspect with a
17 serious mental illness?
18   A.   I don't know that any were
19 identified from that sample.
20       When I say "serious mental
21 illness," I'm not talking about
22 depression. I'm talking psychotic like
23 your examinee here, Mr. Chatman, that is
24 a person at least in my professional
25 opinion based on records, not having

Page 160

1
2  examined him, with that qualification,
3  I'm comfortable in -- I'm comfortable in
4  agreeing to an opinion that would assert
5  he has a serious mental illness.
6    Q.   Your opinion is of the
7  demonstrably false confessions, you only
8  had one case where there is a person with
9  a mental illness in that sample?
10   A.   With a psychotic mental illness
11 in that sample. Again, you know, if
12 somebody was experiencing depression, I
13 don't know enough to say they did not,
14 they may have been in treatment for
15 something but the symptoms of that
16 condition are not really part of the
17 narrative.
18       There was no discussion of
19 hallucination, delusions, this sort of
20 thing or the other qualities that are
21 unique for someone who has bipolar mania,
22 which is my first exposure to a false
23 confession case which involved a
24 psychotic person. So -- but they weren't
25 there.

Page 161

1
2    Q.   So, in the one case that you
3  looked at that had a person with mental
4  illness, your belief was that mental
5  illness was a contributing factor to the
6  false confession?
7    A.   Yes, sir.
8    Q.   And you have no case in your
9  sample were there was demonstrably false
10 confession where you found that mental
11 illness was not a contributing factor to
12 the false confession?
13   A.   I'm not sure I understand the
14 question.
15   Q.   Let me ask again. You did not
16 find any cases in the sample of
17 demonstrably false confession cases where
18 the suspect had a mental illness, but
19 that mental illness did not contribute to
20 his false confession?
21   A.   There is really only one case
22 in which a person manifested a major
23 psychiatric illness.
24   Q.   And that was --
25   A.   And I credited it for being

41 (Pages 158 - 161)

Page 162

1
2 relevant. I came to the conclusion
3 whatever the police did that with this
4 gentleman in Michigan, he would have not
5 confessed if he were not as limited by
6 psychiatric illness such as he was.
7      So I did make a leap there and
8 some instances it could have potentially
9 been not relevant. I was really left
10 with the impression that it would have
11 happened if he was not psychiatrically
12 ill.
13     Q.   Would you agree that in order
14 to identify a demonstrably false
15 confession, first the person has to have
16 the confession overturned for it to be
17 able to come to your attention?
18     A.   Not necessarily.
19     Q.   All of the 22 cases that you
20 started with came from people who had
21 their confessions overturned?
22     A.   That's because I used the
23 Innocence Project website.
24      I think if I can embark on this
25 -- you can embark on this another way.

Page 163

1
2 This is how we were limited back then, of
3 course, as I mentioned before, whatever
4 work we have done on that study is
5 proprietary and sealed by court order
6 which we would certainly address were
7 that court order not to be respected.
8      But, be that as it may, we live
9 in a very different time baby. We're
10 living in a time where you have got ever
11 interrogation filmed now by certain
12 police departments and jurisdictions
13 where somebody really cared to address
14 this.
15      Mr. Loevy, his institute and
16 the Innocence Project, those folks and
17 the other pools have access maybe even
18 the Department of Defense as we brought
19 them up, Dr. Russano. You really want to
20 figure it out, let them sit down with all
21 of these videotapes of suspects being
22 interrogated and some of those folks will
23 never get charged, that's my point.
24      If you have the videotapes of
25 people that are simply being

Page 164

1
2 interrogated, some of them, the charges
3 may be dropped but you have all of those
4 videotapes available. It's just there.
5 It's just a cherry waiting to be picked.
6      Sit down with those videotapes,
7 watch the interrogations without
8 selectivity, Leo style, he worked 180
9 interrogations. He didn't come up with
10 one false confession.
11      Sit down with a hundred eighty
12 videotapes start to finish, if somebody
13 confesses falsely and the charges are
14 dropped, nothing has to be overturned,
15 but it will be there.
16      The police will have made an
17 assessment this person didn't do it, we
18 never brought the charges. But the
19 interrogation is there, the record is
20 there. Everything that went on in the
21 interrogation is there for everybody to
22 see.
23      That's how it could be informed
24 today, yesterday, the day before. It's
25 all there. It doesn't even take a rocket

Page 165

1
2 scientist to come up with this study.
3 Take it and run with it, you know.
4      So back when I was exploring
5 this, it was a different time.
6     Q.   That's what we are talking
7 about.
8     A.   We're talking about 2004, 2005,
9 that is a good ten years later.
10      Is the study of false
11 confessions so moribund and useless that
12 we truly are back in 2005 in 2016, I
13 submit, yes. I also submit it doesn't
14 have to be that way.
15     Q.   I'm not looking for an info
16 pitch.
17     A.   What info pitch?
18     Q.   I'm asking about your sample
19 size starting in 2002.
20     A.   Yes.
21     Q.   If you were lecturing about the
22 results in 2003 --
23     A.   I guess so.
24     Q.   Back in 2002 you used a sample
25 size of exonerations from the Innocence

42 (Pages 162 - 165)

Page 166

1
2  Project?
3      A.   Yes, sir.
4      Q.   My question to you, sir, there
5  are some impediments to be exonerated
6  when you have a serious mental illness,
7  right?
8      A.   I'm not sure I understand the
9  question.
10     Q.   Well, consider it from the
11 perspective of an attorney on a project
12 dedicated to exonerating people who have
13 been wrongfully convicted as innocent men
14 or women.
15         If they receive an intake form
16 with someone with a thought disorder who
17 has trouble communicating, it makes it
18 hard to evaluate the case whether to be
19 taken.
20         The irony the people with the
21 most trouble communicating may be the
22 most vulnerable to being wrongfully
23 convicted, but the least able to
24 effectively advocate for themselves to
25 get somebody to take their case in the

Page 167

1
2  first place.
3          So the one result may be that
4  you have the source of data you're
5  choosing the 22 cases from may under
6  represent the people who are mentally ill
7  because they simply can't get to the
8  level where somebody is able to look into
9  their claim and effectively present it?
10     MS. STALF:  Objection to form;
11 foundation.
12     A.   That's an excellent question.
13 I think in theory I would certainly
14 consider that possible. I think in
15 actuality there are two things that would
16 speak against it.
17         First of all, I have enormous
18 respect for the Innocence Project as a
19 receptacle to these concerns. I don't
20 experience them as a biased organization
21 that is prejudice against the
22 psychiatrically ill such that they would
23 discount them.
24         I have worked on cases opposite
25 the Innocence Project. I worked on one

Page 168

1
2  with an affiliate and I worked opposite
3  the.
4          With my respect for them, I've
5  seen them workup cases in a marvelous
6  way. I have seen them workup cases
7  perhaps not as marvelous a way.
8          What I have been impressed by
9  is the experience that, there is one case
10 in particular that I'm thinking of that
11 they cast their lot with someone by
12 virtue of his personality, would have
13 undercut himself because of how he
14 related in the way that you were
15 describing someone that does an intake
16 form. I could see a lot of defense
17 counsel just sort of looking at this
18 person and discounting not giving him a
19 second look and they took him on.
20         I think in actuality, I don't
21 know about the other organizations, I
22 haven't had proximity to the intimacy how
23 they work.
24         The second thing one has to
25 factor in here is the death penalty.

Page 169

1
2  Man, if you were on death row, you have
3  more recourses in terms of turning your
4  case over upside down and sideways than
5  anybody with the exception of, like, if
6  you were Al-Qaeda.
7          If any defendant in America
8  that said, I'm in Al-Qaeda, that
9  immediately guarantees them the best
10 representation of anybody in America, and
11 for free.
12         When somebody is on death row
13 the wherewithal to explore the
14 possibility of miscarriage of justice in
15 contemporary America is so deep, smart,
16 heavily, heavily staffed, that a person
17 with a major psychiatric illness does not
18 get overlooked.
19         Now, that's not to say, I'm not
20 making a blanket statement that there is
21 not somebody out there who might have
22 great difficulty communicating who
23 doesn't reach out to the Innocence
24 Project and who is unable to generate
25 interest in an attorney because perhaps

43 (Pages 166 - 169)

Page 170

1
2 his case is less luminous.
3         Yes, absolutely, I believe that
4 the reason there is a high representation
5 of murder among false confession cases is
6 because those are the cases that certain
7 appellate interests take, you know, get
8 involved in.
9         They are not getting involved
10 in robbery cases, so, yeah, you know,
11 there will be some body of robbery cases
12 that are false confessions that we
13 haven't accounted for. I'm there.
14         I do agree that in cases that
15 attract less de facto scrutiny by people
16 who are open minded, they can get missed
17 but it's not a universal truism.
18         I think especially because,
19 look, people with major psychiatric
20 illnesses can end up with capital
21 charges, death penalty charges, murder
22 charges.
23         They can be vulnerable for all
24 of the reasons of their condition whether
25 they gave a confession or not.

Page 171

1
2         It happen to be the street guy
3 who happened to be close to where it
4 happened and circumstantial evidence
5 implicated him.
6         I interpreted the very small
7 representation of people with active
8 psychotic symptoms as contrary to
9 published assertions that mental illness
10 is a risk factor. Which is one of the
11 shouts from the rooftop pronouncements
12 that I'm used to reading in polemics.
13         Now, when I read that about
14 mental retardation, yeah, I'm there. I
15 experience it as a risk factor for a
16 range of reasons, we can talk. The two
17 are equated in the literature and that
18 just doesn't draw support from what I had
19 the opportunity to see.
20    Q.   And from what you had the
21 opportunity to see is one case in an
22 unknown sample that could be as least at
23 six cases?
24    A.   I have worked on disputed
25 confession cases for 14 years now. I

Page 172

1
2 have seen more false confessions, real
3 false confession that most folks have
4 seen in their career, not all folks, most
5 folks.
6         I'm sure there are a number of
7 people who have seen more false
8 confessions than me, but I have seen more
9 false confessions than most. I'm not
10 telling you the false confessions that I
11 have seen, let me make this clear, these
12 are false confessions, in which I was
13 consulted to prosecutors or civil
14 attorneys who did not want me to come to
15 that conclusion and I told them this is a
16 false confession.
17         And I'm telling you that major
18 mental illness is underrepresented from
19 what I have seen with my own eyes where I
20 have the whole file available to me.
21 It's underrepresented.
22         Now, small sample size. We are
23 not talking about one case. We're
24 talking about a phenomenon where if it is
25 as consequential as the polemics suggest,

Page 173

1
2 I should be seeing it more frequently
3 then I'm seeing it.
4         There are those cases that are
5 false, that I'm confident are false, and
6 then those cases just to preempt a
7 question you aught to have, which are
8 ambiguous.
9         I don't know. I just don't
10 know. Could be, couldn't be. I'm not
11 sure at the end of the day.
12         It's underrepresented in those
13 cases so I'm merely doing a distinction
14 between the potency of that from that of
15 retardation which in my experience is
16 better established and better borne out
17 by data.
18    Q.   So tell me what the data is
19 about mental illness not being a
20 contributing factor --
21    A.   I just answered the question.
22    Q.   Tell me the cases.
23    A.   I answered the question.
24    Q.   You said you have 14 years of
25 experience, you have talked to all of

44 (Pages 170 - 173)

Page 174

1
2 these people, you have done all of this
3 stuff.
4     Tell me who did you talk to,
5 what did you tell them?
6     A.   Let me put it this way:  You
7 have a number of reports of mine.  You
8 can go to all those reports.
9     You show me which of those
10 reports involved a litigant who had a
11 major psychiatric illness and compare
12 that to the incidence of major
13 psychiatric illness in forensic
14 population, see how those percentages
15 line up.  See if there is an
16 overrepresentation among the litigants.
17     Let's assume for the moment
18 every single case that I ever worked on
19 was a false confession, let's just
20 assume, let alone the ones that were
21 false, you have the Thibodeax case, you
22 have got the report.  He didn't have a
23 psychiatric illness, right.
24     You know just from a standpoint
25 of my previous testimony that the

Page 175

1
2 Rossetti [phonetic] four, that my
3 conclusion that was a false confession.
4 Those guys who confused, they were not
5 psychotic.
6     What I'm speaking of, I'm
7 speaking substance, of course, the
8 numbers are small but that's because
9 false confessions are so rare.  They
10 happen, but I'm merely talking about the
11 overrepresentation of those with
12 psychotic illness in the police context.
13     I distinguish that from people
14 that may give voluntary false
15 confessions.  I eluded to Sanders
16 [phonetic] when I spoke earlier.  I've
17 talked about this in previous deposition
18 which you read.
19     For the record, my first
20 encounter with a false confession was
21 someone who voluntarily false confessed
22 without any influence of the police
23 because he was psychotic, manic.
24     He represented that he killed
25 his wife when in fact she had suicided

Page 176

1
2 but because he initiated --
3     Q.   Why are you talking about this?
4     A.   Because you asked me for
5 evidence and data.  I'm giving you data
6 especially if you asked me five times the
7 same question.  I'll make my answer five
8 times as long if it encompasses what you
9 seem to not be getting.
10     Q.   No.
11     A.   Does that answer the question?
12     Q.   Sir, what methodology do you
13 use to reach your statement here today
14 that people with mental illness are
15 underrepresented in the incidence of
16 demonstrably false confession?
17     A.   My testimony was psychotic
18 mental illness, serious mental illness.
19 I specifically distinguished a
20 psychiatric diagnosis from serious mental
21 illness and I spoke about the
22 significance of demonstrably false
23 confessions, either those documented in
24 the literature for which there is
25 undisputed or a sufficient amount of the

Page 177

1
2 data or cases that worked on myself, that
3 is my methodology.
4     Q.   Putting aside cases that you
5 worked on yourself, what is the other
6 body of cases that you were referring to?
7     A.   I referenced the literature.  I
8 referenced the -- I referenced the
9 dataset from the Innocence Project for
10 which I can comfortably conclude that
11 those were false confessions based on all
12 of information available to me.
13     THE REPORTER:  One second,
14 please.
15     [Whereupon, at 1:39 p.m., a
16 recess was taken.]
17     [Whereupon, at 1:39 p.m., the
18 testimony continued.]
19     A.   I would add to that there are
20 some, I don't know how many, I can't put
21 a number, like, the Michael Crowe case in
22 San Diego that may have not have been
23 part of the Innocence Project sample at
24 the time that I drew those cases down.
25     Nobody is disputing those are

45 (Pages 174 - 177)

Page 178

1
2 false confessions. There is significant
3 information available about the suspect
4 to be able to comfortably conclude that
5 that person did not have a psychotic
6 mental illness and the false confession
7 happened for other reasons.
8        I would say from those three
9 resources.
10   Q.   In the 22 cases, you can't tell
11 us how you chose those 22 from all of
12 cases that had false confessions that
13 yielded exonerations posted on the
14 Innocence Project's website?
15   A.   Sure I can.
16   Q.   How?
17   A.   The Innocence Project says when
18 third-parties implicate people falsely,
19 that is a false confession; it's not.
20        The Innocence Project has said
21 that when someone pleads guilty, that it
22 is a false confession; it's not.
23        They include in their sample
24 what they call false confessions in their
25 website things that are not false

Page 179

1
2 confessions.
3        And so the paradigm that
4 oriented the selection was cases were
5 selected when the fact pattern included
6 there was a person who denied
7 involvement, went into interrogation, and
8 at the end of the interrogation, said I
9 did it or some variant thereof where
10 clearly they took ownership as opposed to
11 cases where they thought they were
12 exculpating themselves but in fact they
13 said they were a block or two away from a
14 scene and that was interrupted as an
15 admission.
16        That is not an admission by the
17 suspect so that is not a false confession
18 as opposed to another case that is
19 specifically in Leo's sample that he
20 calls a false confession. I actually
21 worked on the case. I know it wasn't.
22        Someone who says, I didn't
23 confess. The police basically, the
24 interpreter mistranslated what I said,
25 how could it be a false confession if

Page 180

1
2 they simply get the language wrong?
3        So when you cut out the fat,
4 what we were left with is what we
5 attempted to study earlier.
6        What we were left with at that
7 time was 22 cases. It was culled based
8 on an inclusion of everything that would
9 fit that criteria.
10   Q.   Sir, did you include cases
11 where somebody confessed implicating
12 themselves as well as another person?
13   A.   Yes, because they implicated
14 themselves like the Rossetti four,
15 perfect example.
16   Q.   So in Carl Chatman, if there is
17 no contamination of the DNA and if Ms.
18 Riggio wasn't having an affair, he is an
19 example of a person with a serious mental
20 illness who give a false confession,
21 right?
22   A.   Sure.
23   Q.   So let's turn to Exhibit No. 1
24 if you would, which is your report in
25 this case.

Page 181

1
2   A.   Um.
3   Q.   Were you provided with material
4 in addition to those listed on page 2 and
5 3 --
6   A.   Yes.
7   Q.   -- of the report?
8        What material do you have
9 related to this case in addition to those
10 listed on page 2 and 3?
11   A.   I have to go back and look, a
12 lot. I did not have an opportunity to go
13 through everything I was provided. I
14 worked as quickly as I could to reach
15 whatever conclusions that I could within
16 the assigned time frame.
17        I have a lot of materials that
18 to this day I have not yet reviewed that
19 the attorney sent me.
20   Q.   And the attorneys paid you
21 about a hundred thousand dollars for this
22 report, right?
23   A.   No, they paid me for the time I
24 spent working on the case. The report
25 was merely a component of the time spent.

46 (Pages 178 - 181)

Page 182

1
2   Q.   Right, the end product of --
3   A.   My work.
4   Q.   -- your work was the report?
5   A.   Yes, sir.
6   Q.   How much money did that cost?
7   A.   I don't know. I haven't been
8   paid anything yet. We certainly
9   submitted bills and they were certainly
10  high five figures. If they went over
11  six, they went over six.
12       MR. AINSWORTH: Let's mark this
13  as Exhibit No. 6.
14       [The document was hereby marked
15  as Plaintiff's Exhibit 6 for
16  identification, as of this date,]
17       MR. AINSWORTH: For the record,
18  those playing at home, this is
19  Bates-stamped BS Welner 000019 through
20  56.
21  Q.   Looking at the first page of
22  Exhibit 6.
23  A.   Um.
24  Q.   Showing a total of $92,910 --
25  A.   Yes.

Page 183

1
2   Q.   -- for the Carl Chatman case --
3   A.   Yes, high figures, high fives.
4   Q.   -- that you billed?
5   A.   Yes, sir.
6   Q.   And you are the sole owner of
7   The Forensic Panel?
8   A.   Yes, sir.
9   Q.   On the first page of this
10  Exhibit 6, the second case is blacked out
11  there.
12  A.   Yes.
13  Q.   Do you know why it's blacked
14  out?
15  A.   I'm trying to remember what the
16  case is. I think I have not been
17  disclosed in that case.
18  Q.   Are you working on a report on
19  that case?
20  A.   I guess if it's blacked out, I
21  can't really talk about it, right?
22  Q.   Well, I'm just I'm trying to
23  find out if that is going to be public?
24  A.   I guess when it becomes public,
25  it gets unblacked out. If it's blacked

Page 184

1
2   out, it means I'm blacked out.
3   Q.   And so these four cases on the
4   first page have all been billed within
5   the past two years or so; is that right?
6   A.   Is it four years?
7   Q.   Two years I think.
8   A.   I don't think it's two years.
9   Q.   Well, your Patrick report was
10  produced on June 15th, 2015.
11  A.   Patrick, Saunders, and Chatman
12  maybe two years, but the blacked out
13  case, I don't think that billing has been
14  generated from two years.
15       It was responsive to the
16  question what have we generated in the
17  past three years, four years, whatever,
18  so that is what it amounts to.
19  Q.   Let me do just a little bit of
20  math. Since 2015 for the three cases of
21  Carl Chatman, 92,910; plus the Patrick
22  case, 130,458.75; and the Saunders case
23  138,810.
24       We have $362,178 paid to you by
25  one client, the City of Chicago, for the

Page 185

1
2   last two years; does that sound right?
3   A.   Or that would be because we
4   hadn't been paid on Chatman but
5   anticipating payment. They were
6   different clients for each but the City
7   of Chicago is involved.
8   Q.   The City of Chicago is the one
9   paying the bill for each case?
10  A.   Yes, I guess.
11  Q.   So what portion of your income
12  for the last two years does the $362,000
13  figure equate to?
14  A.   I haven't really calculated it,
15  but if over the last two years practice
16  income is somewhere 2.25 million. Doing
17  the math, that would be probably
18  somewhere a little bit under 20 percent
19  of income.
20       If it's 2.5, it's closer to 15
21  percent, so somewhere in this realm of 15
22  to 20 percent.
23  Q.   Do you hope to have business
24  with the City of Chicago in the future?
25  A.   I am blessed enough to have to

47 (Pages 182 - 185)

Page 186

1
2 be very selective about cases and I
3 always hope to have legitimate cases.
4       I have a luxury to be able to
5 decline to participate in cases and have
6 declined to participate in cases from the
7 City of Chicago right at the outset so I
8 think that those who have recommended
9 cases to me, have had that experience.
10       If they recommended more than
11 one, I have taken some of their cases and
12 I haven't taken others.
13       If there are cases that I can
14 tell at the beginning are cases that we
15 should not be involved in for reasons of
16 merit or other reasons, no, I'm not
17 interested in having those cases.
18       If they are cases that
19 potentially have merit, we're willing to
20 participate.
21       If they are cases that
22 ultimately don't have merit, you know,
23 I'm pleased to be able to be affix my
24 name to reports of cases where I feel
25 comfortable in the findings. Those are

Page 187

1
2 the cases that I prefer and those are the
3 cases I would want to attract.
4       Q.   Are you listening to my
5 question, sir?
6       A.   I answered your question.
7       Q.   Do you hope to have further
8 business with the City of Chicago?
9       MS. STALF: Objection, asked and
10       answered. He answered the question.
11       A.   I hope to have future cases of
12 merit come to me from the City of
13 Chicago.
14       Q.   Have you ever provided a report
15 for a plaintiff in a wrongful conviction
16 lawsuit?
17       A.   I haven't been retained by a
18 plaintiff in a wrongful conviction
19 lawsuit. If I'm not retained, I can't
20 provide a report.
21       Q.   Have you ever been retained by
22 a plaintiff in a wrongful conviction
23 lawsuit?
24       A.   I have not.
25       Q.   You have only worked for the

Page 188

1
2 defense in a wrongful conviction
3 lawsuits?
4       A.   I believe so.
5       Q.   Sir, on pages 4 through 7 of
6 your report, you relate certain facts.
7 How do you determine which facts you
8 would include and which facts you
9 wouldn't include?
10       A.   I did not discriminate. I
11 aimed to provide a concise narrative to
12 inform the confession-related questions
13 that I would be addressing in the
14 conclusion.
15       Q.   I don't see any mention about
16 the DNA from the vaginal swab in your
17 decision of the facts.
18       A.   Yeah.
19       Q.   Is there a reason for that?
20       A.   I mean I can only say when I
21 said Ms. Riggio did not exhibit abrasions
22 or cuts.
23       THE REPORTER:  Doctor, you have
24       to slow down.
25       THE WITNESS: Sorry.

Page 189

1
2       A.   Mrs. Riggio did not exhibit
3 abrasions or cuts, no genital lacerations
4 and a rape examination did not produce
5 sperm.
6       That my records to a rape
7 examination did not produce sperm, for me
8 I was content for myself that I was
9 referencing DNA.  I wasn't thinking about
10 DNA coming from incidental contact
11 because that would be irrelevant to a
12 rape discussion.
13       When it comes to a rape
14 discussion, the origin of DNA via sperm
15 is certainly the most powerful but
16 certainly DNA can emerge from other sorts
17 of contact.
18       Having expressed that, I
19 evidently made the estimation that I was
20 making myself clear that there wasn't
21 anything that was implicating Mr. Chatman
22 in the physical findings.
23       Q.   So you are saying that you knew
24 there was somebody else's DNA on the
25 vaginal swab, but by typing a rape

48 (Pages 186 - 189)

Page 190

1
2 examination did not produce sperm -- you
3 are shaking your head no?
4     A.   I already testified to this.  I
5 didn't know there was somebody else's DNA
6 at all.
7         I was just operating from a
8 factual understanding there was nothing
9 physically that attached him to this and
10 that when I mentioned sperm, and perhaps
11 in a shorthanded way, I was encompassing
12 DNA within that reference.
13     Q.   So you wrote that entire report
14 without the understanding that there was
15 DNA on Ms. Riggio's vaginal swab that
16 exculpated Mr. Chatman --
17         MS. STALF: Objection to form of
18     the question.
19     Q.   Right?
20     A.   I wrote this without the
21 understanding that there was DNA
22 attributed to another person, yes.  I did
23 not have that information when I wrote
24 this report.
25         Would I have included it, sure.

Page 191

1
2 I would have definitely made reference to
3 it.  If I knew that, I would have made
4 reference to it.
5     Q.   If Carl Chatman indeed gave a
6 false confession, that would change your
7 entire report, right?
8     A.   Yes and no.  There are several
9 questions addressed.  I have given a lot
10 of testimony already about a lot of
11 things; for example the -- well, it would
12 change what it changes, it would change a
13 false confession so there has to be other
14 discussion.
15         I -- I absolutely wouldn't
16 change the entire report.  One has to
17 address point by point.
18         There are certain aspects of
19 what I communicated in the report that
20 actually embed themselves in the
21 consideration of false confession so I
22 didn't exclude false confession from
23 this.  It was among the considerations
24 that were mentioned over the course of my
25 conclusions.

Page 192

1
2     Q.   All right, sir, would you
3 please identify for me than if Ms. Riggio
4 was not having an affair with another
5 sexual partner in the three days
6 proceeding the May 24th, 2002 alleged
7 sexual assault, and assuming there is no
8 contamination of the DNA, what portion of
9 your or portions of your report would
10 need to be changed?
11         MS. STALF: Objection to form.
12         MR. CHESTNUT: Objection to
13     form; complete hypothetical.
14         MS. STALF:  Join.  Also
15     foundation.
16     A.   Let's start with question 1.
17 First paragraph doesn't need to change.
18 The second paragraph doesn't need to
19 change.  The third paragraph doesn't need
20 to change.  The fourth paragraph doesn't
21 need to change -- oop, fourth paragraph,
22 doesn't need to change.  Fifth paragraph
23 doesn't need to change.  All of the
24 bullet points don't need to change.
25 Sixth paragraph, doesn't need to change.

Page 193

1
2 Seventh paragraph doesn't need to change.
3 Eighth paragraph doesn't need to change.
4 Ninth paragraph doesn't need to change.
5 The tenth paragraph doesn't need to
6 change.
7         Next page, page 12, 11, 12, all
8 of the bullet points below, the whole
9 page 12 doesn't change.
10         Page 13 doesn't change.  The
11 entire page stays the same.
12         Page 14, the first paragraph
13 doesn't need to change.  The next
14 paragraph doesn't need to change.  The
15 pullout about Kassin doesn't need to
16 change.  The next paragraph doesn't need
17 to change.  The next paragraph doesn't
18 need to change.  The entire page 14
19 doesn't need to change.
20         The next page, the rest of
21 question 1 doesn't need to change.
22         Question 2, first paragraph
23 doesn't need to change.  The rest of the
24 page doesn't need to change.
25         Page 16, page 16 doesn't need

49 (Pages 190 - 193)

Page 194

1
2 to change. Sorry. Page 16, I wouldn't
3 delete anything.
4        I would likely add something
5 referencing this discussion but I
6 wouldn't delete anything. I wouldn't
7 change anything there. I wouldn't alter
8 anything there. The findings are what
9 they are.
10       The reference to DNA here
11 speaks to the question whether no rape
12 took place and that is really not part of
13 the consideration of if someone else's
14 DNA is there. That doesn't really get
15 addressed through that finding for all of
16 these possibilities, that doesn't change;
17 however, I would have included some
18 discussion if I was operating from that
19 vantage point on page 16.
20       Q.   So you would have included on
21 page 16 some reference to the fact that
22 Mr. Chatman was actually innocent?
23       A.   No, I would have said -- here's
24 what I would have said, I would have
25 said, more recent, allowing for editing,

Page 195

1
2 more recent scientific -- more recent
3 testing of DNA has suggested -- more
4 recent testing of DNA has yielded
5 biological material transmitted by sexual
6 contact which does not belong to Mr.
7 Riggio or Mr. Chatman; therefore, the
8 possibility that this is a false
9 confession is real.
10       It is -- this material may have
11 emerged from contamination or consensual
12 activity coinciding timewise with a
13 sexual assault by Mr. Chatman or Mr.
14 Chatman may have not been involved at
15 all, that is yet to be determined and I
16 can address this with access to further
17 information about the case. That is
18 probably what I would put in there.
19       Q.   The look of consternation on my
20 face is my question, this whole exercise
21 is assuming that Ms. Riggio did not have
22 consensual sex in the three days before
23 May 24, 2002, with some paramour and
24 assuming there is no contamination of the
25 DNA, how would your report be --

Page 196

1
2       A.   I don't put assumptions in my
3 report so I wouldn't change my report at
4 all to accommodate an assumption or a
5 hypothetical. That is the disconnect
6 between deposition and the composition of
7 a report. So, you know, that is what I
8 would do.
9        The look of consternation may
10 relate to there is very little about my
11 report that would otherwise change. I
12 don't see how question 3 --
13       Q.   Well, no, sir. The reason that
14 I am asking you to do is how your report
15 would change if Carl Chatman was in fact
16 innocent based on the hypothetical --
17       A.   That's what I'm doing. I'm
18 walking you through page by page about
19 what would change.
20       Q.   Listen to my question, sir. We
21 can only do this with question answer.
22 If you interrupt me, I have to restate
23 the whole thing. You know how this goes.
24 You have done this before.
25       The whole purpose of this

Page 197

1
2 exercise is to have you tell me how your
3 report would have to be changed if in
4 fact Carl Chatman was innocent because
5 Ms. Riggio did not have a sex with an
6 affair partner in the three days before
7 May 24, 2002, and there is no
8 contamination of the DNA evidence?
9       MS. STALF:  Objection to the
10 form; foundation; complete
11 hypothetical.
12       MR. CHESTNUT:  Join.
13       A.   And I answered it with respect
14 to up to and inclusive page 16. I would
15 tell you page 17 wouldn't change.
16       I'm now looking at page 18.
17 Page 18 doesn't change.
18       Page 19 hasn't changed.
19       [Whereupon, the Witness is
20 perusing the document.]
21       Page 20 doesn't change.
22       [Whereupon, the Witness is
23 perusing the document.]
24       A.   Page 21 doesn't change. I
25 actually have a question -- no, actually,

50 (Pages 194 - 197)

Page 198

1
2  I think I don't have a question.
3      This DNA evidence that you
4  presented, when did that become
5  available, chronologically?
6  Q.   December, 2013.
7  A.   Thank you.
8      The rest of question 4 doesn't
9  change.
10      I want to qualify this. It
11  doesn't change but I need to call your
12  attention to the fourth paragraph on page
13  22. "The only explanation provided as an
14  alternative to the conclusion that Mr.
15  Chatman raped Ms. Riggio is that her
16  claim is fabricated."
17      This entire discussion is an
18  alternative explanation but it was never
19  provided to me at the time of the
20  composition of my report.
21      And, so, I would change that
22  sentence if in fact I was asked to
23  consider both alternatives.
24      It doesn't change the rest of
25  discussion because you can't charge

Page 199

1
2  tunnel vision of investigators who don't
3  have access to any of this investigation
4  at the time that no other indicator that
5  somebody else was involved and the only
6  other argument being raised was this
7  being a fabricated complaint.
8      Be that as it may, I just want
9  to make sure for the record there is a
10  reason I'm not changing it and it's
11  because of the date of this material
12  becoming available and this being raised
13  through this deposition as opposed to Dr.
14  Russano's report and the opinions that
15  she presented and the theories behind
16  them.
17      Question 5 doesn't change.
18      [Whereupon, the Witness is
19  perusing the document.]
20      Question 6 doesn't change.
21      Question 7 -- actually, page 25
22  doesn't change.
23      [Whereupon, the Witness is
24  perusing the document.]
25      Page 26 doesn't change. The

Page 200

1
2  rest of question 7 doesn't change.
3      [Whereupon, the Witness is
4  perusing the document.]
5      The rest of page 27 doesn't
6  change. Page 28 doesn't change.
7      [Whereupon, the Witness is
8  perusing the document.]
9      Question 9 doesn't change.
10      That's it. So that's what we've
11  got.
12  Q.   So if Ms. Riggio had not had
13  sex with an affair partner in the three
14  days before May 24, 2002, if there is no
15  contamination of the DNA, you would not
16  omit anything from your entire 30-page
17  report but make the two small additions
18  that you referenced?
19      MS. STALF:  Objection, asked and
20  answered; form; foundation.
21      MR. CHESTNUT: Same objection.
22  A.   I would make those additions.
23  Q.   And not change any information
24  in your report, correct?
25      MS. STALF: Same objection.

Page 201

1
2  A.   No, I wasn't asked to address
3  anything else.
4      MR. AINSWORTH: Let's change the
5  tape.
6      THE VIDEOGRAPHER: Going off the
7  record. The time it 2:15 p.m.
8      [Discussion held off the
9  record.]
10      [Whereupon, at 2:15 p.m., a
11  recess was taken.]
12      [Whereupon, at 2:26 p.m., the
13  testimony continued.]
14      THE VIDEOGRAPHER: Returning to
15  the record 2:26 p.m.
16      Beginning of disc number 5.
17  Q.   If Ms. Riggio did not have sex
18  with somebody what was not her husband in
19  the three days before May 24, 2002, no
20  contamination of the DNA, what factor or
21  factors led to Mr. Chatman's false
22  confession?
23      MS. STALF: Objection, form;
24  foundation.
25      MR. CHESTNUT: Join.

51 (Pages 198 - 201)

1
2          MR. VLAHAKIS: Objection, form;
3    hypothetical.
4          A.    I think that if this is a false
5    confession that what contributes to it
6    would be at least the -- let me restate
7    that.
8          The evidence available to me
9    what contributes to it would be his
10   vulnerability; psychotic thinking; and in
11   particular, his being preoccupied at
12   times that is psychotic with violent
13   and sexual assaultive themes which in the
14   context of even a benign question could
15   elicit a false confession.
16         I say this because if he was
17   making confessions to a psychiatrist or
18   psychologists in the hospital setting who
19   weren't investigating a crime, I wouldn't
20   go so far to say he confessed to one of
21   Dr. Russano's college professors.
22         Maybe with the reality he was
23   offering self-incriminating statements to
24   mental health professionals is notable on
25   this particular point.

1
2          The other issue which maybe of
3    consequences is the question which Dr.
4    Russano raised of contamination which, I
5    again, both of these I referenced in my
6    report.
7          Is it possible walking through
8    a scene at a time that he has variable
9    level of intact reality, a place that he
10   may have been before, a place that he may
11   have visited for all of the benign
12   reasons discussed. He may have gone in
13   that courtroom, wondered around,
14   everything. There is still many
15   variables within those boundaries that he
16   could have internalized details that he
17   was exposed to because he was in a place
18   where his sense of reality was so
19   unpredictable.
20         Again, I am speaking in
21   theoretical terms, but I want to give it
22   a little more heft, to your credit, by
23   saying I'm not just pulling things out of
24   thin air.
25         Look, we know he has

1
2    schizophrenia. We know he has a
3    condition that at times he is quite
4    psychotic. We don't know, for example,
5    whether he became more psychotic after
6    arrest. That happens to some people. We
7    don't know how psychotic he would have
8    been at the time of his questioning.
9          We do know he has a psychotic
10   condition at least certainly the realm of
11   possibility is what you see in the
12   hospital is what you got at the time of
13   questioning, it could be. Sometimes it
14   is and sometimes it isn't.
15         But we certainly know what he
16   is capable of when he is psychotic, and
17   what we know is that he is capable of
18   being quite sexually preoccupied, quite
19   preoccupied with themes about violence as
20   they relate to women and in a way that
21   someone who is not familiar with him does
22   not necessarily appreciate and so that is
23   a contributing issue, and, of course, the
24   confession is then written out and
25   prepared after he is in a setting where

1
2    he's at the scene what he might have
3    internalized with a more frayed ability
4    to differentiate between what is real and
5    what is not real. Those are the two
6    areas that come to mind.
7          Now, I'm not in a position to
8    definitely dismiss this Kato [phonetic]
9    thing because, you know, I understand
10   that the assertion that he gave a false
11   confession because that brutal China man
12   and I say that, you know, specifically
13   because, you know, he didn't know
14   Detective Kato. Detective Kato hasn't
15   been attached to this case. He's just
16   sort of a figure with a legacy, you know,
17   available to attorneys who work in this
18   genre.
19         His involvement is just a
20   completely ambiguous issue that's left to
21   another discussion about the veracity of
22   the complaint filed against said officer
23   in the room while the questioning is
24   going on. So that to me is ambiguous.
25         What is not ambiguous is that

52 (Pages 202 - 205)

Page 206

1
2 he has a major psychiatric illness.  It
3 is not ambiguous in his medical record
4 that says that he can be sexually
5 preoccupied with violent themes when he
6 gets psychotic, particularly rape, rape,
7 not just killing or hitting people in the
8 abstract.
9         And then when he was exposed to
10 a scene and at a time where there was at
11 least one witness says sometimes he made
12 sense, sometimes he doesn't make sense.
13         Again, in terms of a person's
14 sense of reality engaged in his
15 environment, sometimes he may be intact
16 and at other times he might not have been
17 taken to his environment or reacting to
18 it in a way that is intact.
19         That is different than the leap
20 one would make with the unresolved Kato
21 questions which are one side feels one
22 way and another side feels another way.
23    Q.   Would you expect a person with
24 Carl Chatman's psychiatric makeup and his
25 psychiatric history to have difficultly

Page 207

1
2 communicating with the police officers
3 during his interrogation in May of 2002?
4    A.   Not necessarily.  Not
5 necessarily.
6    Q.   So he wouldn't have trouble
7 communicating with his interrogators
8 meaning --
9         MR. AINSWORTH:  Let me strike
10 that.
11         THE WITNESS:  I'm not going to
12 cut you off.  My reaction is my
13 reaction.  I'm not going to interrupt
14 you.  Go ahead.
15         MR. AINSWORTH:  I want to
16 restart the question and get rid of a
17 pronoun.
18    Q.   Is it your opinion that Carl
19 Chatman would not have had difficulty
20 speaking or communicating with his
21 interrogators during his interrogation on
22 May 24, 2002?
23    A.   I haven't um -- I haven't
24 experienced in any of the records that I
25 reviewed that he has difficultly

Page 208

1
2 communicating.
3         I think that the challenge with
4 Mr. Chatman such as I have been exposed
5 to and keeping all of this together is
6 that with Mr. Chatman he is perfectly
7 capable of confessing.  He also just says
8 certain things that just kind of don't
9 make sense, so one has to listen to him
10 holistically.
11         Look, there are people with
12 psychotic illness who commit crimes and
13 they give confessions and that is what
14 true confessions look like.
15         It's sort of a millage of
16 material that is accurate, makes sense
17 and also material that either doesn't
18 make sense or other material that is an
19 idiosyncratic association that they make
20 that makes sense to them but doesn't make
21 sense to the listener; the listener
22 doesn't really know what to do with it.
23         I'm saying this also not just
24 from the experience of forensics.  I
25 worked on a pretrial unit for three

Page 209

1
2 years.  I had the experience of sitting
3 down with people after they've been
4 arrested.  I have had that discussion of,
5 like, what happened, you know, with
6 people who are acutely ill what it's like
7 to listen to them in a raw state.
8         I have been to emergency rooms
9 with a cop on the other side of the door
10 saying, why are you here?  What happened?
11 and hearing somebody in an acute state
12 say what they're saying.
13         That's not a -- I don't want to
14 say not uncommon.  People with major
15 psychiatric illnesses sometimes commit
16 violent crimes and sometimes they give
17 admissions, and they can communicate
18 perfectly fine but you certainly do
19 listen to it in a different way if you
20 could basically take what someone is
21 saying at face value, not have to worry
22 about, I heard him say that but what is
23 he actually trying to say?
24         I hope that answers your
25 question.

53 (Pages 206 - 209)

Page 210

1
2    Q.   What is flight of ideas?
3    A.   Flight of ideas is an
4  accelerated way of expressing oneself
5  where you as the listener will hear
6  something as thoughts progressing from
7  point A to point B.
8         A person's who is accelerated
9  in his thinking will go from idea A to
10 idea C or idea D.
11        So it's a reflection of the
12 acceleration of the person's thinking
13 faster than the association that a lister
14 would naturally make.
15   Q.   What is looseness of
16 association?
17   A.   Flight of ideas is -- I'm
18 answering your question. Wherein flight
19 of ideas is a person going from point A
20 to point D, point A to point C, you as
21 the listener are going from point A to
22 point D, it's still in the same alphabet.
23        Loose associations is where a
24 person goes from point A to pi r squared.
25 They are veering off onto something

Page 211

1
2  that's idiosyncratically related. They
3  understand the connection, it's not so
4  much a reflection of their acceleration
5  as it is a reflection of their disconnect
6  of just the frequency they are on. How
7  things associate are much more
8  disconnected from the rational.
9    Q.   A disorganized way of thinking?
10   A.   Disorganized is another way.
11 Disorganized thinking is when someone's
12 communication simply doesn't make sense
13 and the listener just says, huh? Is just
14 doesn't make sense.
15        And while there is a certain
16 disorganization too to loose
17 associations, it makes sense to them.
18        Truly disorganized thinking
19 doesn't make sense to them either. It's
20 truly all over the place and are
21 sometimes described as incoherent and
22 sometimes they may be indistinguishable
23 from someone who has a medical condition
24 where they would be portrayed as
25 delirious.

Page 212

1
2         I think it's more precise to
3  just actually cleave off loose
4  association from disorganization allowing
5  for the idea there is some overlap, but
6  they really are more distinct entities.
7    Q.   On May 26th, 2002, when Carl
8  Chatman went to the Cook County Jail and
9  was placed into the mental health wing of
10 the Cook County Jail, he was documented
11 to have both flight of ideas and
12 looseness of association, correct?
13   A.   Yes, but I prefer to go back
14 and look at the record but I know he was
15 referred into the hospital because their
16 feeling was he was psychotic.
17        Actual symptoms, I have to go
18 back and look. I haven't looked at that
19 in a bit.
20   Q.   You are saying that if Carl
21 Chatman gave a false confession, he may
22 have learned crime scene facts by walking
23 through the Daley Center, right?
24   A.   May have, yeah, it's possible.
25   Q.   How would Carl Chatman know all

Page 213

1
2  of the details provided in his nine-page
3  handwritten statement detailing how he
4  raped Susan Riggio, the color of her
5  skirt, the type of pantyhose that she was
6  wearing, the use of the scissors, how
7  would he know that?
8         MS. STALF:  Objection to the
9  form of the question; foundation;
10 compound.
11   A.   I guess if he was guilty, he
12 would know it, right?
13   Q.   But under this hypothetical,
14 Ms. Riggio has not had sex with somebody
15 not her husband in the three days
16 preceding May 24th, 2002, and there is no
17 contamination of the DNA --
18   A.   Right.
19   Q.   -- unless Carl Chatman was
20 innocent, how would he know?
21        MR. CHESTNUT:  Objection to
22 form; complete hypothetical.
23        MS. STALF:  Join.
24   A.   Look, if he has a false
25 confession and really there are facts

54 (Pages 210 - 213)

Page 214

2 that there is just no way one could have
3 gotten unless they got them from a
4 questioning officer. And then there are
5 facts versus just a guess, you fill in
6 incidentally, adding kind of probably end
7 up parsing it down detail by detail.
8      Some of those may have been
9 internalized from the police officer as a
10 source or people who, you know, or people
11 processing him. I know there is a matter
12 of chain of custody, what he is even in a
13 position to be exposed to.
14      I think it's safe to conclude
15 he doesn't have exposure to anybody in
16 any meaningful way to communicate about
17 the crime unless it was with police
18 officers.
19   Q.   So it would have to come from
20 police officers?
21   A.   Yes --
22      MS. STALF: Objection to form.
23   A.   Yes, unless, it was just a
24 detail where it's fairly easy to just
25 sort of guess one way or the other.

Page 215

2      The notion of somebody having
3 pantyhose; for example, is that a stretch
4 to guess? I don't know.
5      I'm not trying to dismiss that
6 at all. I think there are certain things
7 that a person may guess at, certain
8 points that person, may in the nature of
9 the questioning, maybe otherwise led to.
10   Q.   What color was Mrs. Riggio's
11 skirt?
12   A.   I don't remember.
13   Q.   Well, take a look at your
14 report.
15      [Witness complying.]
16   A.   On page -- it's not in here.
17   Q.   The victim's shirt was
18 burgundy.
19   A.   Okay, that sounds familiar.
20   Q.   Do you think that Carl Chatman
21 guessed that the color of victim's shirt
22 was burgundy?
23   A.   That's not your typical color
24 pallet, but he didn't have the -- we
25 didn't record his statements, right, and

Page 216

2 they got written up later. He could have
3 said something like dark red or something
4 like that and it got written as burgundy
5 in the statement that police provided so
6 whether he used the word burgundy or
7 something else, you know, I don't know.
8      In terms of just knowing enough
9 about him to know whether burgundy is
10 part of his color pallet, I don't know.
11   Q.   Well, you know he's a 48-year
12 homeless person with schizophrenia.
13   A.   Yeah, I know there are homeless
14 people with schizophrenia that have been
15 professors of art.
16   Q.   And Carl Chatman was not a --
17   A.   I'm trying to say the mere fact
18 that he is homeless or the reality that
19 he's homeless and mentally ill, it
20 doesn't speak to what he may have been
21 exposed to or had an interest in at an
22 earlier time.
23   Q.   According to the police, what
24 color did Carl Chatman initially say the
25 color of the victim's skirt was, do you

Page 217

2 know?
3   A.   I don't know.
4   Q.   You never looked at them?
5   A.   I did but I just don't
6 remember.
7   Q.   Would it have been relevant to
8 your inquiry if Carl Chatman's
9 description of the color of skirt changed
10 to match the crime scene photos?
11   A.   I think that if I was in a
12 position to have to entertain his
13 changing over the course of questioning
14 and it's a false confession scenario and
15 he has specific details which could not
16 have come from contamination because
17 nobody, I'm assuming nobody, was in a
18 position to show him the dress. That is
19 was an artifact of the questioning,
20 something that originated with the
21 officers or just the way they were
22 questioning.
23      There are a range of ways in
24 which that can happen. Certainly it's
25 realistic to consider that idea strongly.

55 (Pages 214 - 217)

Page 218

1
2      Q.    When you say "that idea," you
3  mean the idea that details of the crime
4  were provided to Carl Chatman by the
5  police?
6      A.    No.  Details were exposed to
7  him.  Provided is another thing.
8           Somebody can be sitting down
9  with him, I'm looking at this beautiful
10 burgundy dress and there is a tear in it.
11 Can you please tell me how it got there?
12          Now, that may be someone who is
13 just flippant or somebody who is just
14 confrontational or someone who, you know,
15 using that as an example how something
16 like that can come out and the person is
17 speaking to an idea incidentally, and
18 then, of course, as you were also
19 presenting as a possibility the idea that
20 someone speaks to him in the form of
21 questioning in a way where some people
22 are less caviler but, you know, clearly
23 asking questions that incorporate details
24 that if he internalizes this, nobody
25 should be shocked downstream.

Page 219

1
2      Q.    You read the depositions of
3  each of Mr. Chatman's interrogators,
4  right?
5      A.    I don't know that I read all of
6  them.  I certainly read some of them.
7      Q.    Well, you read Boock, right?
8      A.    Yes.
9      Q.    Roberts?
10     A.    Yes.
11     Q.    Holmes?  I hope you read
12 Holmes.
13     A.    I don't know that I have Holmes
14 in here.  I don't see I have Holmes, I
15 have Roberts, Boock.  I didn't read --
16 why am I blanking on her name?
17     Q.    Mischka?
18     A.    Yes, I read some.  I didn't
19 real all.
20     Q.    Mischka didn't remember
21 anything.
22          But I will tell you that in the
23 depositions of the interrogators that you
24 did read, I was the questioner on all of
25 them.  You have to read a lot of

Page 220

1
2  questions --
3      A.    I know.
4      Q.    -- a lot of transcripts with
5  lots of lines of questions and they each
6  kind of get redundant in the police
7  officer depositions, right?
8      A.    Not at all.  Your questions are
9  very interesting.  You are obviously very
10 good at what you do, so....
11     Q.    Do you recall that each of the
12 police officers whose testimony you did
13 read testified they were trained and they
14 were not to leak nonpublic crime scene
15 facts to the suspects for fear of
16 contamination?
17     A.    Yes.
18     Q.    And that each one of those
19 detectives conformed to the practice and
20 training of not leaking crime scene facts
21 to the suspect?
22     A.    Correct.
23     Q.    Is it your belief that
24 notwithstanding their testimony, those
25 police officers providing this question

Page 221

1
2  that Carl Chatman is indeed innocent
3  because Ms. Riggio didn't have sex with
4  somebody the three days before May 24 and
5  there is no contamination to the DNA that
6  those officers actually provided details
7  of the crime scene to Mr. Chatman?
8           MS. STALF:  Objection, form;
9      foundation; complete hypothetical.
10     A.    I don't know.  I just don't
11 know.  I think even in recapping, I have,
12 and you know this already, but just to
13 say this for the record, I have been very
14 consistent and open in my support of
15 videotaping not only interrogations but
16 also in psychiatric exams because we have
17 something in common with officers that,
18 of course, social psychologists and
19 researchers can't relate to, that is the
20 interview of an examinee especially when
21 you sit down, the very reason you are
22 videotaping our discussion today.  Why
23 are we being videotaped, you and I?
24 Because it's what was said, how it was
25 said.

56 (Pages 218 - 221)

Page 222

1
2  The idea when you summarize you
3 may even summarize it accurately, but
4 you're always going to miss something.
5 Even if great notes are taken, there is
6 always something one doesn't catch.
7  To presuppose, for any officer
8 to presuppose, that they can account for
9 everything they said and everything they
10 did in an interview, unless there is
11 actual record, I couldn't do that in my
12 interviews so why would I expect it of
13 another person.
14  And so I don't know they can
15 necessarily account for everything they
16 did in an interview even with good
17 intentions.
18  I try, just as a reference
19 point, I try to be ethical, professional.
20 There are things I wouldn't do in an
21 interview, sitting with someone for
22 hours, hours, hours, and hours on end and
23 then I may sit back and reflect on the
24 interview and think that nothing
25 happened, but I will sit and watch a

Page 223

1
2 videotape of an interview and sort of
3 cringe, did I really do that or did I say
4 that?
5  I think even in the realm of
6 possibilities even for people that aspire
7 to be professional as possible, if they
8 don't have a videotape record of what
9 they have done, they can't necessarily
10 account for what they've done.
11  They can express their
12 intensions but they can't necessarily
13 account for their actions.
14  Q.  Sir, turn to page 28 of Exhibit
15 1, if you would.
16  [Witness complying.]
17  Q.  Do you see the second paragraph
18 there, "ASA Holmes was not familiar with
19 the precise layout of the alleged crime
20 scene nor were other officers who
21 accompanied them into the building."
22  Do you see that, sir?
23  A.  I do.
24  Q.  So you didn't read Mr. Holmes'
25 deposition that he used to work in the

Page 224

1
2 Daley Center for two years and everyday
3 for two years when he went to work, he
4 would go to the Daley Center, ride the
5 elevator up to go to his office.
6  You were not aware of that?
7  MS. STALF:  Objection to form of
8 the question; misstates facts in
9 evidence.
10  A.  I'm not aware of that.
11  Q.  Now that you know --
12  A.  What floor did he work on?
13  Q.  I don't recall the exact floor,
14 sir.
15  Now that you know Mr. Holmes
16 used to work at the Daley Center, would
17 that cause you to change at all the
18 sentence that I just read to you about
19 ASA Holmes was not familiar with the
20 precise layout of the alleged crime scene
21 --
22  A.  I -- I'm sorry.
23  MS. STALF:  Objection, form,
24 foundation; misstate facts in
25 evidence.

Page 225

1
2  A.  I need to know where he worked.
3 Did he work in that courtroom?  Did he
4 work in that -- I am familiar with the
5 space that we have been in today, but I
6 don't know what goes on down the hall.
7 They may have a nightclub down there, no
8 idea.
9  So this is referencing
10 something that happened on the 21st
11 floor.  There is the sixth floor
12 bathroom, and -- but, principally, the
13 21st floor, the courtroom, the benches,
14 the judge's, her office.  These are very
15 specific locations.
16  Without some reference point
17 where he was working and what his
18 movements were, it's hard for me to say.
19 I just don't know.
20  Q.  Why did you --
21  A.  I certainly wouldn't change
22 that.
23  Q.  Why did you write that ASA
24 Holmes was not familiar with the precise
25 layout of alleged crime scene?

57 (Pages 222 - 225)

Page 226

```
1
2     A.  I don't know.  I derived it
3  from somewhere.  I can't tell you
4  specifically where I got that but that's
5  where I derived it.
6     Q.  But not from Mr. Holmes'
7  deposition testimony?
8     A.  I don't think so.  I don't know
9  that I read it.
10    Q.  Why did you read Sergeant
11 Walsh's testimony instead of Mr. Holmes'
12 testimony?
13    MS. STALF:  Objection to the
14    form of the question.
15    A.  I'm not sure.  I think if I
16 remember, Lieutenant Walsh was one of the
17 officers who was with him in the -- when
18 they did the walk-through; is that
19 correct?
20    Q.  Yes.
21    A.  I think I just sort of wanted
22 to get a sense of what transpired with
23 that whole walk-through.  I wasn't
24 really -- I was intrigued with his mental
25 state at the walk-through, where did they
```

Page 227

```
1
2  go, they couldn't get in at first, that
3  kind of thing; that's what attracted me.
4        I mentioned earlier I had a
5  large number of sources in my process and
6  I also asked for additional materials
7  which were then sent based on initial
8  review, can you please send this, please
9  sent this; and following it down that
10 rabbit hole.
11       And at some point in that
12 process, I had an interest in what went
13 on with the walk-throughout and felt
14 Walsh would be informing that day.
15    Q.  So you were asked to review the
16 circumstances of a confession provided by
17 Mr. Chatman, right?
18    A.  Yeah.  I was also asked to
19 review Dr. Russano's report.  Dr. Russano
20 gave some attention to that.  I thought,
21 okay, let me try to understand this
22 better.  I understand what she is saying
23 about it, let me get a feel for what that
24 was all about.
25    Q.  But you didn't think it was
```

Page 228

```
1
2  necessary to read the deposition of
3  person who took Mr. Chatman's written
4  confession?
5     MS. STALF:  Objection to form;
6     foundation.
7     A.  No.  I didn't say that at all.
8  I said I had a bunch of materials and I
9  got through them as fast as I could.  I
10 didn't express an opinion about ASA
11 Holmes because I wasn't exposed to that
12 so I don't have an opinion what I'm not
13 exposed to.
14       If I had a little more time, I,
15 in all likelihood, would have gotten
16 around to read his deposition.
17       Certainly, it is always
18 important to learn from all the people
19 involved.
20       I consumed the materials as
21 quickly as I could and if there were
22 areas here that I did not feel I had a
23 sufficient amount of information to offer
24 an opinion on, we already covered Ms.
25 Riggio and whether she had an
```

Page 229

```
1
2  extramarital affair or not, I didn't ever
3  address them in my report.
4        Look, I missed your brilliant
5  deposition question, imagine that.  I
6  just sort of followed it through and
7  there are other materials that are
8  available for me to continue to review
9  including that deposition including, I'm
10 sure, a number of other materials.
11    Q.  You didn't read the trial?
12    MS. STALF:  Objection to the
13    form of the question.
14    A.  I did read the trial.
15    Q.  You did?  Sorry.
16    A.  I did.
17    Q.  Let me direct your attention to
18 still on Exhibit 1, page 23.
19       You write, "Mr. Chatman
20 resisted investigators' early
21 confrontations and accusations of him."
22       Do you see that?
23    A.  Yes.
24    Q.  "Only once he was confronted
25 having been identified by the victim and
```

Page 230

1
2 Ms. Riggio having detailed her encounter
3 and his alibi having being unsupported
4 that Mr. Chatman confessed."
5     Do you see that there, sir?
6 A.   Yes.
7 Q.   Now, it's your understanding
8 that Mr. Chatman according to the
9 Defendants confessed initially to whom?
10 A.   To, for all intents and
11 purposes, Roberts.
12 Q.   Why do you say for all intents
13 and --
14 A.   Because that is what he really
15 elaborated and he made self-incriminating
16 statements. From what I reviewed, it
17 didn't sound they weren't taken that
18 seriously.
19 Q.   Sarcastic comments.
20 A.   Yeah, he curtly said, If that's
21 what she said, that is what I did."
22     It wasn't clear to me that was
23 sufficient for them to -- they
24 interpreted it as sarcastic, Roberts.
25 Q.   So the confession was first

Page 231

1
2 provided to Roberts?
3 A.   Yes, sir.
4 Q.   And according to you, it was
5 only after Mr. Roberts confronts or
6 Detective Roberts confronts Mr. Chatman
7 with having been identified by the victim
8 and Ms. Riggio having detailed her
9 encounter and his alibi having been
10 unsupported that Mr. Chatman confessed?
11 A.   No, not what I wrote, not my
12 opinion. The account of Roberts was he
13 really didn't do much of anything at all,
14 I just like let me have a cigarette and
15 his -- but, look, it was coming on the
16 heels of earlier questioning in which
17 these circumstances had taken place that
18 he was confronted and this information
19 was presented to him and so there was a
20 certain gap of time. He had an
21 opportunity to think. It wasn't
22 particularly long but the confronting
23 happened in earlier questioning and my
24 takeaway from Roberts is that Roberts
25 elicited a self-incriminating statement

Page 232

1
2 without going through the exercise that
3 the earlier questioners had done when
4 they confronted him with this material.
5     So they confronted him with
6 these materials, he was curt, perhaps
7 sarcastic, not particularly forthcoming.
8     And there is a little break.
9 Roberts go in. The length of their
10 discussion or exchange, I have to go back
11 at look at it.
12     My impression was Roberts
13 fairly quickly was able to engage him in
14 a more elaborate self-incriminating
15 statement.
16 Q.   You referenced there was a
17 witness that indicated sometimes you
18 could understand Mr. Chatman and
19 sometimes you couldn't?
20 A.   Um, yes.
21     Let me be really precise in
22 wording because that was Charles Roe
23 [phonetic], sometimes he can understand
24 him, sometimes he couldn't.
25     That was Charles Roe who was

Page 233

1
2 part of that group that accompanied him
3 to the Daley Center, page 28.
4 Q.   You thought that Carl Chatman
5 wouldn't have trouble communicating with
6 the detectives but perhaps the detectives
7 would have trouble understanding Mr.
8 Chatman; is that what you're saying?
9 A.   No. I think understanding him,
10 they might be able to understand him, but
11 they might not necessarily -- understand
12 him fine, might not necessarily sort out
13 where he was lucid from when he wasn't
14 lucid.
15     You know, for example,
16 something that emerged in his deposition
17 was that he never peed in a cup, yet he
18 said, "I peed in a cup" in others so....
19     I don't think that the
20 investigators said, well, he is
21 delusional, so he says he peed in a cup.
22     No, they took it a face value
23 and went looking. They went looking for
24 pee in a cup.
25     That's kind of their -- they

Page 234

1
2  didn't have the ability to discern, you
3  know, what was rational and what was
4  either a loose association because pee in
5  a cup falls on the heels of her peeing on
6  the desk.  That is an idiosyncratic
7  association at least from a psychiatric
8  standpoint.  It doesn't come out of thin
9  air, the discussion about her urinating,
10  he urinated too.  They don't have that
11  discernment.
12         Even then you get a bunch of
13  psychiatrists who say, oh, he says, I
14  didn't pee in a cup, what was that?
15         Some may just say that is frank
16  incoherence.  Some may say loose
17  association, so that is an arguable point
18  even among mental health professionals.
19         So I would never anticipate
20  investigators to go there with that level
21  of filleting.  Well, okay, he is with it,
22  no, he is kind of fading out.  That is
23  suggested by Mr. Roe saying sometimes he
24  can understand him and sometimes he
25  can't.

Page 235

1
2         To understand what he is
3  referring to, I would need to know more.
4         There isn't anything I have
5  been exposed to in Mr. Chatman's
6  assessments that suggested that he had
7  some vocalization problem.  It was more
8  those things that he was saying while
9  they can understand him, his style of
10  communication was such that was
11  irrational what he was saying, so,
12  therefore, they were concerned that it
13  was reflected of psychosis, whether it be
14  loose association or flight of ideas.
15         You can understand it but it
16  doesn't make sense.  You can understand
17  it.  He is not speaking Spanish to a
18  person that doesn't speak Spanish or he
19  is not speaking word salad which is
20  something I can tell you I have examined
21  in fact in a forensic case.
22         I have examined someone who
23  literally was communicating with what
24  someone call word salad.  Couldn't
25  understand him.  Speaking English but it

Page 236

1
2  was literally incoherent.
3         I'm not seeing that from his
4  communication that it ventures into
5  incoherence.
6     Q.   So when somebody presents with
7  flight of ideas or looseness of
8  association, to a layperson receiving
9  that speech, they may have a reaction
10  similar to Charles Roe's where sometimes
11  it make sense, sometimes he doesn't,
12  sometimes you understand him and
13  sometimes you I can't understand him; is
14  that right?
15         MS. STALF:  Objection to form.
16     A.   Yes and no.  When I was reading
17  Roe, I find myself reference his
18  deposition the way Mr. Chatman presented
19  the deposition, there were times that he
20  said things that made sense and there
21  were other times he was making
22  idiosyncratic associations.
23     Q.   Who are you referring to now?
24     A.   Chatman.  That's a vivid
25  illustration of his communication style.

Page 237

1
2         You can understand him but
3  sometimes he said, huh, what are you try
4  to say?  It's not clear to me what you
5  are trying to say.  Sometimes perfectly
6  clear what he was trying to say.
7         I didn't see flight of ideas in
8  there in such a way that was -- that a
9  person could not understand.
10         I saw some loose associations
11  in his deposition, sometimes
12  conspicuously.
13         And, so, as I read Roe, that is
14  what I was thinking of.  I said, okay,
15  well, this is what I see from the
16  deposition.  I get it.
17         But that was my interpretation
18  without more from Mr. Roe saying that
19  sometimes you can understand him and
20  sometimes you can't.
21         Which, as someone who worked in
22  an acute emergency room and forensic
23  hospital where people get referred
24  pretrial, I have seen.
25         Somebody comes into custody,

60 (Pages 234 - 237)

Page 238

1
2 it's clear they have loose associations.
3 They get referred to a psychiatric
4 hospital, say, look, let's tighten up his
5 meds because he was experiencing some
6 symptoms of psychosis.
7    Q.   You mentioned the police went
8 looking for a cup.  Who went looking for
9 a cup?
10    A.   Who, I can't tell you
11 specifically.  What I recall from
12 reviewing the records, is there was an
13 effort to try to find what wastebasket he
14 would have discarded this cup into.  I
15 just can reference where it appears.
16    Q.   I think you are referring to my
17 question of detectives asking them did
18 anybody ask Carl in which wastebasket he
19 deposited the cup?
20    A.   I don't know.  I would like to
21 credit your questioning, is can't.
22       I don't think that I'm
23 confusing it with the testimony of
24 somebody who says they went through the
25 building.  There was a time they thought

Page 239

1
2 he was sleeping there.
3       I think someone specifically
4 said that they looked for the cup,
5 whether it was the wastebasket or I'm
6 drawing this from your question, I'm not
7 sure.
8       They didn't find one.  That was
9 my takeaway and the takeaway that Dr.
10 Russano cited, and I didn't find anything
11 to the contrary.
12    Q.   For purposes of your report,
13 please answer this however makes sense.
14 Please answer in a way that make sense to
15 you and tell me if I was going wrong.
16       Lay people communicating with
17 Carl Chatman on May 24, May 25, 2002,
18 during his interrogation would be able to
19 tell sometimes he was making sense and
20 sometimes he wasn't making sense and so
21 they may have to ask follow-up questions
22 to try to decipher what it was he was
23 trying to communicate with them.
24       Is that a fair representation
25 of the working hypothesis of how the

Page 240

1
2 interactions went on between Mr. Chatman
3 and --
4    A.   Almost.
5       MS. STALF:  Objection to form,
6 foundation.
7    A.   Almost.  I think the one
8 allowance that I have to make when Mr.
9 Roe encountered him was the middle of the
10 night.  It's not clear to me how he would
11 have even been evolving because if he did
12 offer self-incriminating statements to
13 Roberts at say ten o'clock and he was
14 aware he was in a heap of trouble because
15 he was confessing to rape, he was being
16 held accountable, whether at some point
17 he unravelled to a greater degree at a
18 later point more which manifested at a
19 time when somebody may be a little more
20 worn out at two in the morning.
21       It was hard for me to be able
22 to graft the quality of the communication
23 at 2 a.m. or 3 a.m. and graft that to,
24 you know, 8:30 a.m., midday, 1:30 in the
25 afternoon when the detectives are

Page 241

1
2 questioning, in the early evening, I
3 can't graft.
4       And that is not only reflective
5 of just clinical experience but also just
6 reflective of experience that I had
7 sometimes dramatic of what happens when a
8 person's communication changes and they
9 destabilize after they have been
10 implicated in a major crime.
11    Q.   So Charles Roe interacted with
12 Carl Chatman during the walk-through,
13 that was his frame of reference?
14    A.   Yes.
15    Q.   So would you then agree that
16 well, I don't want to put any words in
17 your mouth.  I would rather hear it from
18 you.
19       My summary, my takeaway from
20 what you said is that a layperson
21 interacting with Mr. Chatman during the
22 walk-through would sometimes be able to
23 understand him, sometimes not be able to
24 understand him, may have to ask follow-up
25 questions when they didn't understand him

61 (Pages 238 - 241)

Page 242

1
2 to elicit what Mr. Chatman was trying to
3 communicate; is that --
4        MS. STALF: Objection, form;
5 foundation.
6    A.   I think it's fair.
7    Q.   You read the testimony of
8 Sergeant Walsh and Detective Boock and
9 Detective Roberts that they had zero
10 problems communicating with Mr. Chatman
11 whatsoever, right?
12   A.   Yes.
13   Q.   So are you discounting their
14 testimony, are you saying they are wrong?
15   A.   No, because I don't know the
16 nature of their questions.
17        They may have been -- there are
18 a variety of possibilities.  I just
19 mentioned one with my earlier answer that
20 he deteriorated, that fatigue had some
21 impact on the -- how intact he was at a
22 later point.
23        But it's also possible even
24 stripping all of that away, and his
25 response, his responses with them may

Page 243

1
2 have been more terse.  They may have been
3 satisfied because he wasn't expressing
4 himself especially in great content that
5 he was able to communicate with them in a
6 way that makes sense.
7        That was quite common to the
8 experience of interacting or interviewing
9 people that are psychotic.  Some of them
10 it's right out there.  They're
11 disorganized.  They have loose
12 association or flight of ideas and that
13 emerges very quickly in communication.
14        Some of them you have to talk
15 with them for a while or you have to get
16 them talking.
17        The more they speak the more as
18 you find you listen to them, what was
19 that about?  And then it happens again
20 and then you say, this is more just this
21 person saying something, I'm not sure
22 what to make of it but this person is
23 doing it from time to time and saying
24 things that this didn't add up, that
25 didn't add up, and the other didn't add

Page 244

1
2 up, and now we've been sitting with them
3 for an hour maybe.  He doesn't add up.
4        I don't mean legitimacy but I
5 mean he doesn't add up.  There may be
6 something wrong with him.
7        So as it relates to
8 communication, it's not only very
9 different among people, but it may be
10 different over time in the same person
11 and it may actually speak to the nature
12 of interaction, and it can be camouflaged
13 if they're asking him questions and he's
14 brief answers and they just move onto the
15 next question and they go through their
16 progressions for however long they go
17 through it.
18   Q.   So you know that Roberts
19 interacted with Mr. Chatman at 10 p.m.?
20   A.   Yes.
21   Q.   He also interacted with Mr.
22 Chatman during the walk-through from 2 to
23 4 a.m.?
24   A.   Yes.
25   Q.   He also interacted with Mr.

Page 245

1
2 Chatman from nine o'clock on to the end
3 of his written statement at the end at
4 10:50 a.m.?
5    A.   Yes.
6    Q.   And according to Detective
7 Roberts, Mr. Chatman was just asked
8 open-ended questions and allowed to give
9 a narrative as to what happened between
10 him and Ms. Riggio on May 24th, 2002?
11   A.   Yes.
12   Q.   Knowing those facts, does that
13 change your prior answers in any way?
14   A.   Not really.  What I also
15 testified to before my impression is they
16 basically took what he was saying at face
17 value.
18        The example, there may be
19 others, it just comes to mind, was the
20 whole pee in a cup thing.
21        He said he peed in a cup and
22 they took it at face value along with
23 everything else.  At some later point he
24 said, "I never peed in a cup."
25        That is an example of something

62 (Pages 242 - 245)

Page 246

1
2  someone listening critically would say,
3  how does that fit into anything, what
4  reason does he have to pee in a cup at a
5  crime scene?  He is not giving a specimen
6  for drug testing, right?  It doesn't fit
7  in.  It's a non sequitur.
8       So one might say is that
9  indicative of a loose association if one
10 is looking at that critically?
11      I don't see that level of
12 critical thinking being applied in there.
13 Just basically kind of taking it and
14 taking it at face value and pouring it
15 into whatever statement was prepared.
16   Q.   When Carl Chatman was deposed,
17 he said he didn't have anything to do
18 with the sexual assault, right?
19   A.   That's correct.
20   Q.   So when is it that you are
21 saying he later said he never peed in the
22 cup?
23   A.   At the deposition.
24   Q.   When he was saying I didn't
25 have anything to do with the crime at

Page 247

1
2  all?
3    A.   That's right.  That's right.
4    Q.   Let's ponder this a little bit.
5       What possible relevance does it
6  have if Carl Chatman is saying in 2015
7  that he never urinated in a cup along
8  with never raping anybody?
9    A.   Well, let me explain this: He
10 is questioned in a sexual assault
11 investigation which is centered around a
12 sexual assault; giving a statement
13 relating to the events of the sexual
14 assault.
15      It would be impossible -- this
16 is responsive to your question.
17      It would be impossible for a
18 listener taking this in to experience
19 that as a loose association or flight of
20 ideas or some measure of psychotic
21 communication.  Psychotic communications
22 manifest as loose associations.
23      What I saw in the officers'
24 recapitulation of all of this was that
25 they included it without reflecting on

Page 248

1
2  this idea of peeing in the cup is a non
3  sequitur.  It's something that is
4  reserved for when one gives a specimen or
5  goes to a walk-in center but what is it
6  doing in the middle of this story?  It's
7  disconnected.  What does that say about
8  the speaker?
9       And I didn't see them honing in
10 on that and saying, that is very strange,
11 that is very peculiar.  And it is
12 peculiar.
13      And I didn't see them
14 considering that may be this was a loose
15 association by a psychotic person.
16      What I saw was, they were
17 basically saying, yeah, I understood him.
18 I kind of took what he had to say and I
19 wrote it down or I made up a statement
20 from it and that was in a very
21 matter-of-fact way without considering
22 there were certain elements of what he
23 was saying that were they to really drill
24 down on them, they would have to consider
25 that they were non sequiturs and

Page 249

1
2  therefore wonder whether they are
3  reflective of psychotic thinking.
4       Now, I hear what you are saying
5  about the idea, if no sexual assault ever
6  occurred.  I wasn't there, of course, I
7  wouldn't pee in a cup.
8       That's really not what I'm not
9  speaking to.  I'm not speaking to the
10 idea whether he was honest or dishonest.
11      What I'm saying is in a
12 statement that they are talking about a
13 sex assault in which a person is
14 discussing a sex assault.  The idea of
15 loose association or flight of ideas is
16 irrelevant because the statement itself
17 is of an irrelevant topic, irrespective
18 of guilt or innocence.  It's an
19 irrelevant topic.  We're talking about
20 the sex assault.
21      He's talking about a sex
22 assault and his movements during that,
23 but the pee in the cup segment is a non
24 sequitur.  It doesn't have any connection
25 to it.

63 (Pages 246 - 249)

Page 250

```
1
2          Let's assume it happen, then it
3  of itself, would be bizarre.  It would be
4  bizarre, and so it was not separated, it
5  was not set off at some odd quality of
6  the statement.  It was just connected
7  just as everything else.
8          And so that's consistent to me
9  with the officers saying, I didn't have
10 any problem understanding him.  We had
11 this discussion.  This is what my
12 takeaway is and they put it in.
13         That's how I'm trying to answer
14 your question.
15    Q.   If the perpetrator really did
16 pee in a cup at the crime scene, that
17 would be hugely relevant, right?
18    A.   It might be.  It might also be
19 reflective of psychosis because it's
20 strange.  Of course it's relevant.
21    Q.   You may have his fingerprints
22 on the cup?
23    A.   Well, if there is pee in the
24 cup, there, right, would you ever get to
25 the fingerprints?
```

Page 251

```
1
2    Q.   So it might have his pee, it
3  might have DNA?
4    A.   Yes.
5    Q.   So you would expect that the
6  police detectives would do what they
7  could to try to recover it?
8    A.   Perhaps.
9    Q.   What do you mean perhaps?
10   A.   I'm not an expert in police
11 procedure.  You're asking me to answer
12 questions about police procedure.
13        They were collecting
14 fingerprints.  They were collecting this,
15 they were collecting that, and they were
16 pursuing and exploring.
17        It's what they like to say
18 about us when we do our work.  What is
19 the most important question that you ask
20 the examinee, the one you forgot to ask;
21 and that is the nature of the question
22 that you are posing to me.
23        What is the most important
24 evidence they could have collected?  The
25 one that they forget to collect.
```

Page 252

```
1
2    I can't speak to police
3  procedure.  That's not what I'm here for.
4          What I'm only addressing in the
5  questions is the relationship as a
6  statement as a progression of thought of
7  peeing in a cup is with the rest of the
8  statement, that is all that my expertise
9  interdigitates with and not the idea of,
10 gee, should they have gone looking for
11 hair?  And, yeah, they went for looking
12 for fingerprints on this part of the
13 desk.  Why didn't they check this part of
14 the desk?  That is for the crime scene
15 analyst to deal with.
16         Whether they looked in enough
17 garbage cans, that's something that I
18 don't have expertise to address.
19    Q.   You have gone on for days in
20 different depositions about your
21 expertise in doing forensic examinations
22 of this kind.
23    A.   What, collecting urine cups?
24    Q.   No, sir.  Reviewing the
25 records, looking at the evidence to
```

Page 253

```
1
2  determine whether somebody's given a
3  false confession.
4          And based on your experience,
5  sir, would you expect that the detectives
6  would try to find the cup that the
7  perpetrator of a sexual assault had
8  touched and peed in?
9     MS. STALF:  Objection, form;
10    foundation; asked and answered.
11   A.   Well, since you reviewed the
12 testimony which you say that I have gone
13 on for days, I would appreciate it if you
14 could point to me one example where I say
15 I looked at all that kind of evidence to
16 see if somebody's given a false
17 confession or not because I don't recall
18 that I've been involved in cases where I
19 was asked to go figure out whether a
20 confession is false.  It's not my role.
21 It wasn't even my role in this case.
22         I don't know that incapsulates
23 my previous testimony, whether it's been
24 for days or two seconds.  So where did I
25 do that?
```

64 (Pages 250 - 253)

Page 254

1
2    Q.   So you have no expertise in
3  determining whether -- you agree you have
4  no expertise in determining whether
5  someone is innocent or guilty?
6    A.   That's not a psychiatrist's
7  role. It's not a psychologist's role.
8  It's not a research psychologist's role.
9  It's not a theoretician's or polemicist's
10  role and it's not the role of the five
11  folks that call themselves a community's
12  role.
13       It's nobody role. It's a hard
14  evidence determination. That is where it
15  comes from.
16    Q.   Is it a role of a judge?
17    A.   Yes, judge and jury.
18    Q.   It's the role of the judge to
19  determine someone's innocence?
20    A.   Correct.
21       MR. AINSWORTH: Let's take a
22  break.
23       THE VIDEOGRAPHER: Going off the
24  record 3:26 p.m.
25       This is the end of disc number

Page 255

1
2  5.
3       [Discussion held off the
4  record.]
5       [Whereupon, at 3:26 p.m., a
6  recess was taken.]
7       [Whereupon, at 3:40 p.m., the
8  testimony continued.]
9       THE VIDEOGRAPHER: Return to the
10  record 3:40 p.m.
11       The beginning of disc number 6.
12    Q.   On page 7 paragraph 4 on that
13  page says, "Mr. Chatman was tried,
14  convicted, and sentenced to 30 years in
15  prison. The appeal of his conviction was
16  denied."
17       And then you write, "Mrs.
18  Riggio later filed a personal injury suit
19  against the building in connection with
20  the effects of the incident on her."
21       Why did you say Ms. Riggio
22  later filed a personal injury suit?
23    A.   Because she filed a personal
24  injury suit.
25    Q.   That was after the conviction?

Page 256

1
2    A.   I'm not sure. Actually, I may
3  be incorrect about the timing of it, but
4  she did file a personal injury suit.
5    Q.   Are you aware she filed a
6  personal injury suit ten days after the
7  alleged sexual assault?
8    A.   Quite possible. I may have
9  been mistaken where I positioned it.
10    Q.   Does the fact that somebody has
11  filed a personal injury lawsuit have any
12  significance for you as a forensic
13  clinician?
14       MS. STALF: Objection to the
15  form of the question.
16    A.   Significance about what?
17    Q.   That person's credibility?
18    A.   Sometimes.
19    Q.   In what way?
20    A.   Because they are a motivated
21  litigant.
22    Q.   Motivated by?
23    A.   A person who is an active
24  litigant has an active motivation.
25    Q.   Motivated by what?

Page 257

1
2    A.   It's a personal injury suit,
3  motivation to prevail in a personal
4  injury suit to prove that the building
5  was in some way negligent or whatever the
6  specifics of the assertion where.
7    Q.   To obtain what?
8    A.   To obtain compensation.
9    Q.   Money?
10    A.   Yes. And for a rape victim,
11  they damn well should. It's a
12  catastrophic event in a person's life.
13       The building may or may not be
14  responsible but a person certainly, as
15  injuries go, it's a little bit more
16  dramatic than a slip and fall, shall we
17  say.
18    Q.   Is being wrongfully convicted
19  for a false confession also a traumatic
20  injury?
21    A.   Sure, absolutely, a person who
22  is wrongfully convicted has been wronged.
23       I don't know that is the nature
24  of this litigation. I know there is a
25  compensation fund that's set up for

65 (Pages 254 - 257)

Page 258

1
2  someone who's been wrongfully convicted.
3      There isn't a de facto
4  compensation fund for a rape victim, so
5  rape victims that seek some kind of
6  compensation have to initiate it because
7  there isn't anything necessarily built in
8  for that.
9      That's isn't taking anything
10  away from how a wrongful conviction can
11  be a very painful event in a person's
12  life and have tremendous consequences.
13  Q.   On page 12 of Exhibit 1, you
14  have the bullet points there.
15  A.   Um.
16  Q.   What methodology did you use to
17  reach the opinions expressed in those
18  bullet points?
19  A.   You know, listen, I really have
20  tried so hard not to be hard on Dr.
21  Russano, and you just keep teeing it up
22  and this stuff is just -- to give this
23  consequence is like hoisting a pinata.
24      This is, "A college student
25  adopting a role play does not face the

Page 259

1
2  unconscious pressures coursing through
3  the mind of a suspect being interrogated
4  for rape."
5      I would say there is no article
6  that I have ever seen in which even the
7  most strident police critics who write
8  this, would say, even captain who was
9  sort of the originator of all this who
10  would, that a suspect being interrogated
11  for rape, the pressures, the unconscious
12  pressures native to that suspect equate
13  with a college student in role play.
14      I don't know how they could get
15  it through peer review.  I don't know how
16  they respect themselves after writing
17  something like that.
18      The methodology, we are back to
19  Henry Lee with the badge.
20      Do you as an attorney believe
21  that the pressures on a college student
22  in role play equate with a suspect being
23  interrogated for rape?  Does anyone who
24  works in law enforcement, even a defense
25  attorney let alone a prosecutor feel that

Page 260

1
2  way?  It's not native to the experience
3  of any professional that works in this.
4      A student adopting the role
5  play of involvement in crashing a
6  computer does not experience the gravity
7  of one confronting the consequences of
8  the accountability for rape.
9      Is someone really going to
10  write an article to say the consequences
11  that a person confronts of accountability
12  for rape are identical or even comparable
13  to a those of a person crashing a
14  computer?  Is anyone going to put that in
15  a article?  Would that ever get published
16  or get taken seriously?
17      It reminds me of what I put in
18  my report where I reference to Dr. Ofshe
19  on page 13, that is a laughable piece of
20  research.
21      If a graduate student gave me
22  that piece of research, I'd give the
23  graduate student a D and recommend they
24  be dropped from graduate school,
25  basically thrown out of the program,

Page 261

1
2  basically disqualified from even being
3  taken seriously.
4      This, by the way, is coming
5  from someone who's been more of a
6  proponent to broad statements about
7  police methodology than anybody.  Nobody
8  is a more strident critic of police
9  procedure than Dr. Ofshe.  That is what
10  he says about this.
11      Do you really want me to run
12  through the other ones?
13  Q.   Is it fair to say, Doctor, that
14  you are applying common sense as your
15  methodology for the statements that you
16  made in those bullet points?
17  A.   Yes and no.  I think that,
18  obviously, if it was only common sense
19  than Dr. Kassin and Dr. Russano would not
20  actually conflate the responses from one
21  exercises to another.
22      So my conclusion is that there
23  is either a self-serving disconnect or
24  just a disconnect from lack of experience
25  between the research community of social

66 (Pages 258 - 261)

Page 262

```
 1
 2  sciences where one can believe the world
 3  is flat until one steps foot on a globe
 4  that is round and spherical and has to
 5  experience the real world as law
 6  enforcement officers do, suspects do, as
 7  attorneys do where the real world is
 8  different for the professionals and the
 9  participates.
10        Now, someone on a jury may be
11  devoid of such experience and so the idea
12  of common sense may be it is somewhere
13  above common sense but beyond the idea of
14  methodology.  There is no methodology to
15  equate them.  It's -- it's -- you know,
16  it's just useless.
17    Q.   Did you apply anything other
18  than common sense you can identify for
19  the record?
20    A.   Yeah, professional experience.
21  Professional experience of I was a
22  corrections psychiatrist examining
23  suspects -- I'm sorry, people who had
24  been arrested.
25        I had opportunity to interview
```

Page 263

```
 1
 2  them about their experiences in
 3  interrogation and custody, about the
 4  gravity of the experience.
 5        I have talked to people who
 6  confessed who were familiar with -- who
 7  were reflecting upon their decision to
 8  confess.  Those who had regret because
 9  they came to realize that was the only
10  evidence against them and those who just
11  simply reflected on the experience
12  talking about their custody.
13        I had the opportunity to review
14  disputed confession cases in which
15  suspects have been very expressive about
16  the pressure involved in the custodial
17  setting in which they had been accused of
18  something, whether they confessed or not,
19  but the way, whether it be a disputed
20  confession or not, it may be in other
21  cases.
22        In a range of forensic cases
23  that are presented to me for pretrial
24  examination, there are interrogations
25  that I am presented with, some of them
```

Page 264

```
 1
 2  are recorded, some of which are not
 3  recorded.  Some of which the suspect
 4  confesses, some of which the suspect does
 5  not.
 6        But in all of those for major
 7  crimes, the intensity of the encounter,
 8  if it's not obvious enough to somebody
 9  watching the interview, then just speak
10  to the suspect, the examinee, the
11  defendant about their experience of
12  confession.
13        They are certainly not going to
14  acquaint it with an academic exercise,
15  especially in this day and age in
16  academia where people have to have their
17  safe spaces all of the time.
18        There is experience working in
19  cases.  There is experience as a
20  clinician.  There is experience in
21  dealing with the research community.
22        Oh, she's a social
23  psychologist, even he says he would drop
24  somebody from graduate school if they
25  presented the piece of research to him
```

Page 265

```
 1
 2  and tried to equate one of the two.
 3        One thing he exactly says,
 4  somebody thought he can simulate
 5  interrogation by setting up an experiment
 6  crashing, someone crashed a computer and
 7  was told they had hit the wrong key and
 8  when that person was, a jump ahead, that
 9  was offered as an example of eliciting a
10  false confession.
11        It is a terribly naive,
12  incompetent piece of research which I
13  have criticized all over this country and
14  to the author of the work.
15        Look, it's in my report but I
16  guess my report is not into evidence, or
17  maybe it is.
18        He says, "I think that is a
19  silly piece of research."
20    Q.   You read it three times, sir.
21    A.   This is a separate quote.  This
22  is a separate quote.  He calls it
23  laughable.  Laughable.  Laughable.  I'm
24  not being hyperbolic.  He called it
25  laughable.
```

67 (Pages 262 - 265)

Page 266

1
2          By the way, he wasn't
3  testifying for the prosecutor.  He was
4  testifying for a defense attorney in a
5  confession case and still called it
6  laughable.
7          And he says, the kind of thing
8  that people like you, referring to the
9  prosecutor, keep bringing up because it's
10  so stupid.  That's why I made the
11  reference before to the pinata.
12          You know, I think, look, Dr.
13  Russano is an educated, very serious
14  professional.  I'm focussing on the
15  report for the serious things.
16          This aspect of the presentation
17  is what Dr. Ofshe said and put her in a
18  position to be laughable when we have to
19  take it serious.  It's not the singular
20  element of this case but to focus on it
21  to actually heighten it for what it
22  really is not.
23      Q.   You did not have your report
24  peer reviewed, right?
25      A.   I did not.

Page 267

1
2      Q.   You could have?
3      A.   No.  I couldn't have.  I
4  started work on this case very shortly
5  before I gave the report.
6          In fact, when the attorney
7  first approached me, I turned the case
8  down.  I said I don't have enough time to
9  work on this.
10          She went back and got more time
11  and asked if I could complete it.  I
12  expected to start it at X time.  And I
13  started it when I started it and I only
14  had a certain amount of time and I had
15  far more records than I ever expected to
16  read.
17          While peer review, I'm
18  certainly proud of what an efficient
19  process we have, there was absolutely not
20  enough time to be able to pull off an
21  interview.
22      Q.   You did not interview Carl
23  Chatman?
24      A.   I did not.
25      Q.   Did you want to interview Carl

Page 268

1
2  Chatman?
3      A.   Sure, absolutely.
4      Q.   Did you make any effort to
5  interview Carl Chatman?
6      A.   I didn't.  I made it clear to
7  my attorney that the findings were going
8  to be limited because of my inability to
9  interview him.
10          There is a lot one can learn
11  from an interview but not interviewing
12  takes a number of issues off the table.
13  We may talk about some of them in this
14  deposition.
15          There are certain areas where I
16  don't have an opinion.  I can't.  I never
17  interviewed them.
18          And so I set the limitations of
19  the report by the virtue of that.  It's
20  not enough that Dr. Russano choose not to
21  interview, I had certain circumstances in
22  which that low threshold that's set is
23  not something I would adopt and I would
24  attempt to interview.  In certain
25  instances I asked.  In this case I didn't

Page 269

1
2  ask.
3          When I saw what I had in the
4  way of records, my reaction was I'm going
5  to get through this the best that I can
6  but I don't even know that I'm going to
7  be able to offer an opinion on in the end
8  because there is so much that I have to
9  review in way of records so what I
10  offered an opinion on was on the basis of
11  whatever it was I reviewed and whatever
12  is not in here is what I didn't have time
13  to review.
14      Q.   Did you indicate in your report
15  you didn't interview Carl Chatman?
16      A.   No.  I put my sources of
17  information and it's abundantly clear I
18  did not interview him because it's not in
19  the sources of information.
20      Q.   Ms. Riggio was never given a
21  measure that would test her for
22  malingering, right?
23      A.   She was never given a symptom
24  validity assessment which actually speaks
25  to both issues.

68 (Pages 266 - 269)

Page 270

1
2      One actually speaks to -- I
3 should say validity indicator which would
4 speak more to her as a historian.
5      Malingering refers to an actual
6 illness and I think what we have been
7 talking about is really just the accuracy
8 of history which is two different items.
9      One is whether you are
10 exaggerating symptoms. The other is if
11 something even happened or not; in other
12 words, how are you affected by them.
13      I didn't see any evidence
14 certainly from Dr. Russano. She didn't
15 engage her, test her, or evaluate her
16 that way.
17      I have not been provided
18 anything from any of the other venues in
19 which she has been scrutinized that speak
20 to that kind of testing.
21      Q.   So is the answer to my
22 question, Mrs. Riggio, was not given a
23 measure by anybody to test her for
24 malingering?
25      A.   I don't know. There are

Page 271

1
2 several proceedings, some of which I had
3 proximity to and read some depositions.
4      There are some records that
5 I've reviewed. I certainly haven't read
6 all of her records.
7      I don't know whether somewhere
8 along the line testing was included in
9 her portfolio so my answer is what it is.
10      Q.   You write, "There are
11 well-established methodologies for
12 ascertaining whether a litigant is
13 embellishing in these types of
14 pathologies, including trauma, right?
15      A.   Yes.
16      Q.   And when you're talking about
17 methodologies, you're including
18 psychological testing, right?
19      A.   Correct.
20      Q.   And at least as you sit here
21 today, you are not aware of any
22 psychological testing that was performed
23 on Ms. Riggio for malingering?
24      A.   Correct.
25      Q.   You talk about revictimization

Page 272

1
2 on page 18.
3      A.   Yes.
4      Q.   "Revictimization has been
5 described in the psychiatric literature
6 with those with PTSD.
7      "Those who have been previously
8 victimized are even described to be at
9 greater risk of revictimization."
10      Do you see that, sir?
11      A.   Correct.
12      Q.   You cite a study, right?
13      A.   Yes.
14      Q.   That study talks about how
15 people, victims, women who have been
16 sexually assaulted who have PTSD who turn
17 to drugs or sex or alcohol to cope are
18 more vulnerable to be revictimized
19 perhaps because they are less well able
20 to defend themselves when they are
21 incapacitated by drugs or alcohol or in
22 risky situations sexually.
23      A.   Well, that is a leap of
24 conclusion but that is a conclusion that
25 an author may make based on the data.

Page 273

1
2      Q.   The author that you cite made
3 that conclusion?
4      A.   That's right.
5      Q.   Do you disagree with the cited
6 material or the material that you cited
7 to?
8      A.   No. But what I'm suggesting is
9 that may not account for everything in
10 their findings, there may be other
11 explanations as well that are not
12 accounted.
13      But the point is that
14 victimization does happen. There are a
15 variety of reasons a person may be
16 revictimized; for example, you talked
17 about the inference of alcohol and drug
18 abuse.
19      A person who is victimized and
20 develops postraumatic stress disorder is
21 more likely to be withdrawn and avoidant
22 and that person may choose or approach
23 work in such a way that they may choose
24 to go to work at a time when there is no
25 one around.

69 (Pages 270 - 273)

Page 274

1
2      So that person is more isolated
3  and in certain circumstance may expose
4  oneself to being attacked undetected.
5      You may say the circumstances
6  are replicated but this is a fortified
7  building which there is a police
8  presence. It's a courthouse.
9      So the person may unwittingly
10 by being present in a building at a time
11 there isn't a particular amount of
12 traffic, be exposed to someone they feel
13 that there won't be anybody around.
14     I raise this in connection with
15 the idea of the drugs and alcohol. The
16 drug and alcohol use in response to
17 trauma for some it is a coping strategy,
18 an adjustment strategy, is an adaptation.
19 Some adaptations are chemical, some
20 behavioral.
21     Again, I'm not saying this to
22 blame a victim, what I am saying is in
23 this paragraph, what I'm really trying to
24 address is that for reasons that are not
25 crystally accounted for, victimization

Page 275

1
2  does happen and some people may be at
3  increased risk.
4      Drug and alcohol population is
5  one of those but revictimization is not
6  limited to those who use drugs and
7  alcohol.
8      Q.   Are you saying that Ms. Riggio
9  was more vulnerable to being raped by a
10 stranger at work in 2002 because she had
11 supposedly been raped by a stranger at
12 work in 1979; is that what you're saying?
13     MR. CHESTNUT: Objection to
14 form.
15     A.   What I'm saying is Ms. Riggio
16 is more vulnerable to being raped at an
17 odd hour than she would be to being raped
18 during rush hour when there is all kinds
19 of people around the courthouse.
20     Q.   You're saying because she was
21 raped in the early morning hours when
22 nobody else was around, that makes her
23 more likely to go to work at an early
24 morning hour when no one else is around;
25 it that's what you're saying?

Page 276

1
2      A.   No.  What I said was because
3  she was raped, then that may have had an
4  impact with -- that may have impacted how
5  she related to others.  Not she was doing
6  something to prevent the idea of being
7  raped.
8      They are more avoidant, more
9  withdrawn, so they relate to their
10 surroundings in a different way.
11     That may have had something to
12 do with how she chose and apportioned her
13 work time which unwittingly would have
14 exposed to her to isolated circumstances
15 such as what occurred that morning at
16 7:30.
17     Q.   So you acknowledge there is no
18 record to support whatsoever for the
19 proposition that Ms. Riggio was going
20 into work early as a result of trying to
21 withdraw or avoid people?
22     A.   There may be a record, but, I'm
23 not basing it on that record.
24     All that I'm saying in this
25 paragraph, revictimization happens.

Page 277

1
2  There is no such thing as you get raped
3  once and you punch a ticket and you never
4  get raped again as if it's chicken pox.
5  Life doesn't work that way.  All right.
6      People can be raped and they
7  can be raped again under certain
8  circumstances.
9      What that article acknowledges
10 is that people can make life choices that
11 they don't realize are making them
12 vulnerable.  There is not necessarily
13 some conscious reason for it.
14     They speak in the article about
15 choices that people make by virtue of
16 having been traumatized where the choices
17 themselves actually contribute to them
18 being revictimized.
19     What I'm telling you is it
20 doesn't necessarily account for the
21 universe of those who are revictimized
22 but people do make choices as a result of
23 the earlier victimization that may have
24 some involvement in their later
25 victimization.  It doesn't necessarily

70 (Pages 274 - 277)

Page 278

1
2  have to limit itself to -- to drug and
3  alcohol use.
4      Q.   You use the analogy to flood
5  insurance for revictimization.
6      Correct me if I'm wrong, but
7  many people who flood one time will flood
8  again because there is something wrong
9  with their house: It's flooded with
10 water, and so when it rains again, it
11 might flood again?
12     A.   Can you refer me to the page?
13 Oh, here we go.  It's right up above.
14     Q.   And so, sir, are you saying
15 that like a house that floods frequently
16 that Ms. Riggio was more at risk than
17 anybody else of being raped again in 2002
18 by virtue of the fact she was supposedly
19 raped in 1979?
20     A.   No, that's not what I'm saying.
21 And even with the --
22     MR. CHESTNUT:  I need to make an
23 objection.
24     THE WITNESS:  Sorry.
25     MR. CHESTNUT:  Objection to

Page 279

1
2      form; calls for speculation;
3      foundation.
4      A.   That's not what I'm saying.
5  Even with respect to the flood insurance,
6  I actually wasn't referring to flaws in
7  the house or the construction.
8      If you live in certain parts of
9  the country and you get whacked by a
10 hurricane and there is flood, it is what
11 it is.  You have had your damage, you
12 have filed your claim.  You maybe that
13 poor sole being in that part of Louisiana
14 by virtue of a decision by the Army Corp
15 of Engineers such as what I witnessed
16 with my own eyes, they divert and
17 reconstruct the levee and it floods an
18 entire community for reason -- for events
19 that you have no control of and don't
20 even have anything to do with a hurricane
21 and you end up getting slaughtered again.
22     They were completely
23 disconnected circumstances and you can
24 make your home as flood proof as possible
25 and you wouldn't have a choice in the

Page 280

1
2  matter.
3      You can make it as hurricane
4  proof and possible and you have no choice
5  in that matter.
6      That's really what I'm talking
7  to.  I'm talking about the idea of
8  dealing with rape which is the inference
9  otherwise made as if it's chicken pox.
10     You could get raped once, you
11 don't get raped again.  And if you get
12 raped again, well, that must be a
13 suspicious complaint.  And that's just
14 not true.  It's just not true.
15     Q.   Ms. Riggio was never diagnosed
16 with a concussion, right, nowhere in the
17 medical records was she ever diagnosed
18 with a concussion?
19     A.   I really prefer to go back into
20 the medical records.  I know how she
21 presented a few days later with the
22 symptoms.
23     And I also would be interested
24 to have a greater exposure to her civil
25 litigation to see how that was dealt

Page 281

1
2  with.
3      I didn't have exposure to those
4  records.  What I saw was what she
5  presented with medically a few days after
6  this event which were symptoms that are
7  commonly found in a postconcussive
8  setting.
9      Q.   But no doctor examining her
10 said she had a concussion?
11     A.   I don't think so.  Again, I
12 don't know who examined her in the
13 context of her civil litigation.
14     I don't believe she was
15 diagnosed with a concussion when she
16 presented for medical attention a few
17 days later.
18     Yes, that visit that I saw, she
19 was not diagnosed with a concussion.
20     Q.   And when Dr. Temple conducted
21 his rape kit examination, he found no
22 sign of redness or injury anywhere on her
23 body?
24     A.   Correct.
25     Q.   She claims to have been anally

71 (Pages 278 - 281)

Page 282

1
2 raped with no lubrication first and then
3 raped vaginally, correct?
4     MS. STALF: Objection to the
5 form of question, assumes facts not in
6 evidence.
7     MR. CHESTNUT: Join.
8 A.   Correct.
9 Q.   And there was no injury to her
10 anus, right?
11 A.   Correct.
12 Q.   She was not one, all though you
13 may not have read Frank Riggio's
14 deposition, she was not one who regularly
15 engaged in anal intercourse.
16     MS. STALF: Objection to the
17 form of the question; calls for
18 speculation; assumes facts not in
19 evidence.
20 A.   Well, one is regular. And I
21 think we already discussed in this
22 deposition rather than the one-armed man,
23 we have the one-allele man.
24     So, no, have no idea what
25 activity she participated in and I don't

Page 283

1
2 know that I can speak to the idea whether
3 a person who has engaged in anal sex at
4 all over the course of their lifetime
5 however frequent that would be to what
6 degree trauma would be excepted in anal
7 penetration.
8 Q.   When you say the one allele,
9 are you referring to the Fourth
10 Analytical Report?
11 A.   Yeah, I'm referring to Exhibit
12 3. Do I still have it in front of me?
13 Q.   Exhibit 3.
14 A.   Number 2, the trace amount of
15 DNA recovered from the rectal swabs
16 resulted in a single allele.
17     So, yeah, the one-allele man;
18 that's what I was referring to.
19 Q.   So you haven't read Dr. White's
20 report or testimony where he excluded Mr.
21 Chatman to be a contributor to that
22 allele?
23 A.   We covered that already. I
24 said the one-allele man. That's my
25 point. I'm saying -- this is -- I'm

Page 284

1
2 crediting you, by your own point there is
3 this ambiguousness out there of whatever
4 her sexual history is that's introduced
5 by this.
6     Either he is innocent or there
7 is some kind of extramarital activity or
8 there is a contaminant; one of those
9 three possibilities, but whatever it is,
10 it's the one-allele man; that's my point.
11     It's this mysterious individual
12 we have no idea who it is. We just know
13 who it isn't.
14     We know it's not Chatman and we
15 know it's not Mr. Riggio. That we know,
16 that's my point.
17 Q.   So you think that Ms. Riggio is
18 having not only an extramarital affair
19 but an extramarital affair that involves
20 anal intercourse in the three days before
21 May 24, 2002?
22 A.   I don't --
23     MR. CHESTNUT: Objection,
24 mischaracterization of testimony;
25 calls for speculation; no foundation;

Page 285

1
2 argumentative.
3     Go ahead, you can answer.
4 A.   Yeah, I would defer to
5 testimony about whether findings on the
6 rectal swab whether they are more
7 reflective than what you see in a vaginal
8 swab.
9     I know from the pathologist's
10 perspective there are a lot of
11 pathologists that might raise that
12 question.
13     Be that as it may, there may be
14 an extramarital contaminant so and that
15 is my point. It is quizzical.
16     The point is it's the one
17 allele that belongs to somebody. We
18 don't know how it got there but it's
19 there and we don't know who it belongs
20 it; that is all I'm trying to say.
21 Q.   You write on page 17 that Ms.
22 Riggio's recollection of the period
23 spanning these blows would be vulnerable
24 to error."
25 A.   Correct.

72 (Pages 282 - 285)

Page 286

1
2          Page again, sorry?
3     Q.    Page 17.
4     A.    Yes.
5          Trauma; postconcussive
6  symptoms; emotional trauma and physical
7  trauma.
8     Q.   What are you basing the fact
9  that her recollection would be vulnerable
10 to error?
11    A.   Emotional trauma and physical
12 head trauma.
13    Q.   Do you think Ms. Riggio was
14 inaccurate about her account of her
15 sexual assault?
16        MR. CHESTNUT:  Form,
17    mischaracterizes the testimony.
18    Q.   So are you saying that she was
19 more likely to be wrong about the events
20 in the sexual assault or more likely to
21 be accurate about the events of the
22 sexual assault?
23    A.   I don't have an opinion.  What
24 I'm saying here is that the experience of
25 emotional trauma, the experience of

Page 287

1
2  physical head trauma, have an impact that
3  could potentially affect one's fidelity
4  as a historian.
5     Q.   Did it have an impact here?
6     A.   I don't know.
7     Q.   Do you have an opinion whether
8  it happened here?
9     A.   I guess that goes back to the
10 whole question of guilt versus innocence,
11 doesn't it?
12    Q.   No.  I'm asking do you have an
13 opinion as to her whether her account of
14 the events during the sexual assault were
15 less accurate because of the emotional
16 and physical trauma she says she
17 sustained?
18    A.   It's impossible to tell based
19 on the information that I have available.
20 There are some discrepancies in accounts
21 and the discrepancies in account may
22 relate to other factors such as the
23 passage of time or even the pressures of
24 litigation and what happens to complaints
25 under those circumstances that they may

Page 288

1
2  elaborate.
3        A person maybe self-serving but
4  it doesn't mean that events did not
5  happen but a person's complaint may
6  change, may shift.
7        That doesn't take away the
8  immediate aftermath in which she was
9  incoherent and a person may be incoherent
10 from the original trauma.  A person may
11 be incoherent from postconcussive
12 symptoms.
13        So distinguishing whether her
14 presentation was the by-product of a
15 physical injury or emotional injury is
16 something I cannot do.
17        Those potential causes for what
18 was described by witnesses and that
19 incoherence, whatever its origin, could
20 affect the accuracy of her recollection
21 for that time.
22    Q.   Page 19, five paragraphs down.
23 You say, "It is possible in this climate
24 that Mrs. Riggio's account of the 2002
25 event in which she stated at an earlier

Page 289

1
2  point that she was unsure whether she had
3  been penetrated and later offered that
4  she had been both anally and vaginally
5  violated was embellished."
6        Do you see that, sir?
7     A.   Yes, sir.
8     Q.   Do you have an opinion as to
9  whether Ms. Riggio was embellishing as to
10 the level and degree of penetration she
11 claimed to have sustained during the
12 assault?
13    A.   I don't know.  I don't have an
14 opinion.
15    Q.   Page 20, fourth full paragraph
16 there states, "Supporting Mr. Chatman's
17 claims that his confession was false, the
18 Plaintiff asserted that he was docile."
19        Do you see that?
20    A.   Yes.
21    Q.   Every single person who
22 interacted with Carl Chatman during the
23 night of his interrogation claims that he
24 was docile.
25    A.   Okay.

73 (Pages 286 - 289)

Page 290

```
1
2    Q.   Is that right?
3    A.   I don't know that I can account
4 for every single person that he
5 interacted with.
6    Q.   Only the people you read,
7 right?
8    A.   Only the people that I read,
9 only the people that I remember.
10       His docility was not something
11 that I was really looking for. I'm sure
12 I read some reference to it. I don't
13 recall anybody referencing that he was
14 particularly agitated.
15       Docile is a little more than
16 not agitated. Docile is, well, docile is
17 what it is. Not agitated and calm is
18 also a little bit less than docile.
19 Docile is a much more submissive and
20 deferential adjective.
21       I'm trying to remember what
22 deposition or what testimony in which I
23 actually read the word submissive or
24 docile, whether that is something that is
25 out of your well-worded civil suit or
```

Page 291

```
1
2 whether that actually was the verbiage
3 used by one of the people interacting
4 with him.
5    Q.   Nobody claims that Mr. Chatman
6 was anything other than docile, right?
7    A.   What do you mean, anything
8 other than docile? There is a whole
9 universe of people who are not
10 submissive.
11       My recollection is that he was
12 described as calm, composed. That's not
13 docile. Docile is not calm and composed.
14 It's something more than that.
15       There is a reason that you
16 didn't say calm and composed in your
17 civil complaint. You chose docile. It's
18 your wording just as I chose the words
19 here. Docile does not equate with calm
20 and composed.
21       My recollection of what I read
22 was that he was calm and composed,
23 behaviorally unremarkable, not agitated.
24       I don't recall reading anything
25 about docile. It is possible that it was
```

Page 292

```
1
2 worded somewhere but you have to direct
3 me to it.
4    Q.   So you're quibbling with
5 whether Mr. Chatman --
6       [Whereupon, at 4:19 p.m., an
7 alarm sounded at the remote location.]
8       MR. CHESTNUT: We're going to
9 have to take a break.
10       MR. AINSWORTH: We can't break.
11       MS. STALF: Wait. Chicago
12 people?
13       MR. AINSWORTH: Chicago people?
14 We are off the record.
15       THE REPORTER: Do you want to
16 give me a time?
17       THE VIDEOGRAPHER: 4:20 p.m.
18 [Discussion held off the
19 record.]
20       [Whereupon, at 4:20 p.m., a
21 recess was taken.]
22       [Whereupon, at 4:29 p.m., the
23 testimony continued.]
24       THE VIDEOGRAPHER: Returning to
25 the record 4:29 p.m.
```

Page 293

```
1
2    Q.   All right, sir, in your report
3 you reference an incident where Carl
4 Chatman was stating to hospital personnel
5 that he had been raping and killing
6 women, right?
7    A.   Yes, sir.
8       What page are we on?
9    Q.   We are not on any page, sir.
10       1986, you know what I'm talking
11 about.
12    A.   I said, yes. I would just like
13 to get to that page. I'm with you.
14    Q.   The doctors and medical
15 personnel who interacted with Carl
16 Chatman at the time related that he was
17 delusional at the time that he was making
18 those statements, right?
19    A.   I don't know that they were
20 specifically referring to those
21 statements.
22    Q.   He said he was Superman, right?
23    A.   Well, that would be a delusion.
24    Q.   Let's just look at the medical
25 report.
```

74 (Pages 290 - 293)

Page 294

1
2     A.   I'm all in favor of doing that.
3         MR. AINSWORTH:  Let's mark this
4  as Exhibit 7.
5         [The document was hereby marked
6  as Plaintiff's Exhibit 7 for
7  identification, as of this date.]
8     Q.   I'm going to show you what been
9  marked as Exhibit 7, Bates plaintiff
10  0022621 through 42.
11        Sir, if you turn to the fourth
12  page --
13    A.   Uh-huh.
14    Q.   -- of this in the bottom
15  right-hand corner has a 4.
16    A.   Yeah, uh-huh.
17    Q.   It says, "Client signed himself
18  in voluntarily.  According to him he was
19  raping women and the police have not
20  caught him.
21        "He says he feels like killing
22  women because they won't have sex with
23  him.
24        "He says he was Superman.
25        "Appearance is unkempt.  He is

Page 295

1
2  alert; oriented in three spheres;
3  cooperative; suspicious; guarded; hears
4  voices."
5     A.   Uh-huh.
6     Q.   "When he talked to the doctor
7  in the unit he was just playing with some
8  women, he grabbed their hands and told
9  them to bring him to the hospital.  He
10  denied raping them.
11        "Denied drinking prior to
12  admission.  Denied any other problems.
13  Denied insomnia, suicidal ideations."
14    A.   Okay.
15    Q.   Do you see that?
16    A.   I do.  I also see where it
17  says, "no delusion noted" on the same
18  page.
19    Q.   Sir, page 6 of the same medical
20  record.
21    A.   Um.
22    Q.   Do you see where it says
23  "Mental Status Examination"?
24    A.   Uh-huh.
25    Q.   On the date of his admission,

Page 296

1
2  1/4/86, takes you about half the way down
3  the paragraph under Mental Status
4  Examination where it says, "Would have,"
5  something, something "by a lady and
6  became delusional about killing and
7  raping women."
8         Do you see that?
9     A.   Hang on a second.  Sorry.
10  Please direct me.
11    Q.   Can I point?
12    A.   Page 6, right?
13    Q.   Right below here [indicating]
14  where there is a plus, "and became
15  delusional about killing and raping
16  women."
17    A.   That may say delusional, but
18  yeah, let's just say it does.
19    Q.   This is the mental status exam?
20    A.   Yes.
21    Q.   One of the primary things that
22  you do when somebody comes in?
23    A.   Yeah, yeah.
24    Q.   Look at preliminary treatment
25  plan with full recommendations --

Page 297

1
2     A.   Wait.  Wait.  Wait.  Wait.
3  Four lines down from that it says,
4  "homicidal thought, could be delusional
5  or real which," something, "a danger to
6  others."
7         So the doctor clearly says he
8  doesn't resolve whether the homicidal
9  thoughts are delusional or real.
10    Q.   If you look down it says,
11  "Haldol to minimize delusion."  And is
12  that homicidal?
13    A.   "Homicidal" something.
14    Q.   Yes?
15    A.   Yeah.
16    Q.   And then he is listed as being
17  intoxicated on page 13.
18    A.   Um.  So where are we?
19    Q.   "Elaboration of reasons for
20  necessitating hospitalization at this
21  time."
22    A.   Okay.
23    Q.   Then if you look at the last
24  page of the document.
25    A.   Yeah.

75 (Pages 294 - 297)

Page 298

1
2    Q.   I'm not sure what kind of
3  speech.  It's under the "I certify the
4  above person being examined."
5    A.   "Slurred speech."
6    Q.   "Ataxic."
7    A.   Means he's unsteady in his
8  movements.
9    Q.   "Delusional, I raped a woman in
10 front of the policeman" --
11   A.   "Tonight."
12   Q.   "Tonight."
13      So he was intoxicated, unsteady
14 on his feet and saying he was Superman
15 and had raped a woman in front of a
16 police officer.
17   A.   Well, here it doesn't say
18 Superman, but it says that he raped a
19 woman in front of a police officer.
20   Q.   Right, but all in the same
21 admission still the January 4, 1986 date?
22   A.   Yes.
23   Q.   He was making these statements
24 and then he was discharged a few days
25 later?

Page 299

1
2    A.   Okay.
3    Q.   Where he is deemed to be no
4  longer a threat to himself and others.
5    A.   Right.
6       Is there a question?
7    Q.   So, sir, are you substituting
8  your judgment for the medical
9  professionals who examined Mr. Chatman in
10 January 1986 as to whether he was
11 delusional about actually having
12 homicidal ideations?
13   A.   No.
14      MS. STALF:  Object, form.
15   A.   In fact I agree with them.  He
16 may have been delusional.  He may not
17 have been delusional.
18      They did make a determination.
19 If the guy says he's Superman, it's
20 obvious.
21      But one of the good things that
22 they did do, was that, it may not have
23 been clear about whether he was
24 intoxicated or whether this just
25 reflected intoxication or actual

Page 300

1
2  psychiatric illness.
3       People who are assessed to be
4  intoxicated are shorter hospital stays
5  because they are appraised, generally
6  speaking, when they are unlubricated that
7  their risk mitigates considerably as
8  opposed to a person for whom their risk
9  is attributed to the illness itself.
10      The idea that Mr. Chatman was
11 an alcohol abuser is no secret.  The idea
12 that he's abusing alcohol in the day and
13 in the morning is no secret and not
14 disputed I should say.
15      So the idea that his alcohol
16 use coinciding with the sexual assault in
17 some way makes alcohol intoxication more
18 likely a possibility than actually has
19 behavioral lack of control because he has
20 a psychotic illness, it's not resolved.
21      There are plenty of alcoholic
22 rapists, there are plenty of
23 schizophrenic rapists.
24      What we do know is people with
25 dual diagnosis who have major psychiatric

Page 301

1
2  illnesses and have substance abuse
3  problems are greater risk for violence to
4  others.
5       So, you know, I should have if
6  I really needed to give some attention to
7  the notion of risk and how realistic it
8  would be to assess him for violence
9  toward others and perhaps in my report I
10 should have accounted for the idea he was
11 a greater risk because he was a dual
12 diagnosis abuser.
13      I only accounted for the idea
14 that he had voices in thinking in the
15 past.
16      If he was irrational, well,
17 rape is often an irrational crime so it
18 certainly doesn't preclude that and I'm
19 not substituting anyone's judgement.
20      This certainly expands my
21 thinking to incorporate the role of
22 intoxication involved in this which
23 perhaps I didn't give attention to.
24   Q.   Was there any suggestion that
25 Mr. Chatman -- that the perpetrator of

76 (Pages 298 - 301)

Page 302

1
2 the sexual assault was intoxicated?
3     A.    The victim in one of her
4 interviews said he smelled like alcohol.
5     Q.    That he was actually drinking
6 or had been drinking?
7     A.    He smelled like alcohol as a
8 person who had some -- a person who would
9 have had a certain amount of alcohol --
10 taken a certain amount of alcohol with
11 some relative recency might smell like
12 alcohol.
13     Q.    Sir, Mr. Chatman had never been
14 arrested for any type of sexual offense,
15 right, up to the age of 48, right?
16     A.    Yes, that's correct.
17     Q.    You would expect if somebody
18 was a serial rapist that at some point in
19 their life, this guy is living on the
20 street with a lot of contact with police,
21 would have been arrested from some type
22 of sexual crime, right?
23         MS. STALF:  Objection to the
24     form; foundation; assumes facts.
25     A.    Not necessarily, especially

Page 303

1
2 when you bring the whole question of
3 psychotic illness into play.
4         Someone who reaches a point of
5 some level of deterioration, and, again,
6 referencing the last report, who was
7 additionally lubricated with a substance,
8 can commit an offense which there is no
9 previous history of.
10         Now, if we are speaking about
11 people who have no psychiatric illness,
12 who are just your classic sexual predator
13 of rape paraphilics, yeah, one would
14 expect a more colorful sexual history.
15         It doesn't necessarily mean
16 they've been arrested, could get away
17 with it, some people do; but one would
18 expect a colorful history that originates
19 from much earlier years than this stage.
20     Q.    On page 23 of your report you
21 write in the third paragraph, "There is
22 no evidence that Carl Chatman was
23 suggestible or otherwise easily led,"
24 right?
25     A.    Correct.

Page 304

1
2     Q.    Are you discounting Charles
3 Roe's testimony that police officers were
4 leading Carl Chatman through the Daley
5 Center?
6         MS. STALF:  Objection to the
7     form.
8     A.    Leading him through the Daley
9 Center doesn't make him easily led in a
10 clinical standpoint or suggestible from
11 clinical standpoint.
12     Q.    Well, Charles Roe was
13 describing that Carl Chatman was being
14 led by police officers as to where to go
15 within the Daley Center and he would
16 agree with that and do what they suggest?
17         MS. STALF:  Objection to the
18     form.
19     Q.    You don't think there is any
20 evidence of suggestibility?
21     A.    Not in that.  All
22 of that reflects is that he is polite and
23 kind of proceeding along with police
24 officers.  That is what it reflects.
25         What one can clinically

Page 305

1
2 interpret from that is not much.
3     Q.    What does easily led mean in
4 the clinical literature?
5     A.    In the disputing confession
6 literature, it's a person who is led to
7 make self-incriminating statements or
8 elaborating statements by police officers
9 in the nature of questions or clinicians
10 in the nature of their questions.
11         Again, we have some clinical
12 records, but not particularly detailed,
13 he was questioned in those.
14         But there is in the context of
15 this discussion about disputing
16 confessions and question 5, "Did he
17 possess vulnerabilities?"
18         I'm talking about
19 vulnerabilities that relate to risk of
20 false confession, that's what I'm talking
21 about, not somebody that says go up the
22 stairs here and go up the stairs here.
23 That's not easily led.
24         Easily led is, well, you did
25 have anal sex with her, didn't you?

77 (Pages 302 - 305)

Page 306

1
2 Well, yeah, I did, when someone didn't
3 necessarily have. And that is following
4 the lead of a questioner that is a little
5 bit different from just what Roe was
6 referring to.
7    Q.   How long is an average
8 interrogation?
9        MS. STALF: Objection to the
10 form; foundation.
11    A.   There are different studies
12 that have explored it whether an hour and
13 a half by some estimates, a little bit
14 less, a little bit more, that's what
15 articles typically point to.
16    Q.   How long is a typical
17 interrogation involving a sexual assault
18 and a homicide investigation?
19    A.   I don't know. And typical,
20 isn't that an interesting question. What
21 is a typical homicide? What is a typical
22 sex assault?
23        The crime is more serious, the
24 intensity and the questioning is greater.
25 The pressures are greater for a suspect

Page 307

1
2 to deny. Pressures are greater for
3 questioners if they feel they are on the
4 cusp of getting self-incriminating
5 statements to persist with the
6 questioning so you have these forces that
7 are perhaps, not perhaps, that are
8 distinctive to major crimes.
9    Q.   Carl Chatman received a
10 certificate of innocence, right?
11    A.   Yes, sir.
12    Q.   So you credit the certificate
13 of innocence as evidence of Mr. Chatman's
14 actual innocence, right?
15        MS. STALF: Objection to form.
16    A.   No. I don't believe I did in
17 this report.
18    Q.   But you should, right?
19    A.   No. Why should I? It's a
20 statement by the prosecutor's office not
21 to contest something, a statement by
22 court that relates very closely to one's
23 ability to gain benefits, and Loevy &
24 Loevy specifically expressed it that way.
25        This is something that is a

Page 308

1
2 necessary step in order to be able to
3 receive benefits.
4        So procedurally it's something
5 that follows. It's not -- it didn't have
6 any kind of relationship to the quality
7 of the evidence that we've been speaking
8 about. It's a procedural event.
9    Q.   So something that is a
10 procedural event as looking at something
11 other than guilt or innocence --
12        MR. AINSWORTH: Strike that.
13    Q.   But the court has to make a
14 finding by a preponderance of the
15 evidence Mr. Chatman is innocent, right?
16        MS. STALF: Objection to the
17 form.
18        MR. CHESTNUT: Objection to
19 form.
20    A.   The court doesn't have to do
21 it. The court chooses to do what the
22 court chooses to do, a judge's
23 prerogative or prosecutors prerogative
24 contesting something or not contesting it
25 are nonscientific events.

Page 309

1
2        They are more in accordance
3 with their role. They have a different
4 role than I have. This isn't a report
5 about procedure. This is the report
6 about the kinds of things that form such
7 an opinion.
8    Q.   So you think that it is
9 irrelevant that Carl Chatman received a
10 certificate of innocence to your input?
11    A.   No. It's irrelevant to my
12 assessment, and my assessment focussed on
13 the nine questions. It's irrelevant to
14 those nine questions. It's not
15 irrelevant to the event or we wouldn't be
16 here, right.
17        Procedurally, it's very
18 relevant to the case. It would not have
19 come about were there not to have been
20 very serious reason to reconsider Mr.
21 Chatman's innocence.
22        There is no disputing that it's
23 an issue under consideration. Whether
24 it's resolved by the certificate of
25 innocence, not from a scientific

78 (Pages 306 - 309)

Page 310

1
2  standpoint, it's procedural issue.
3     Q.   And it's not relevant on a
4  scientific basis because a court's
5  determination is not the same as your
6  determination?
7     A.   There are courts that denied
8  his appeal and said he is guilty.  That
9  didn't necessarily make him guilty, did
10 it?
11       The courts make assessments
12 based on the information available to
13 them at the time.
14       And the information available
15 to them at the time as a trier of fact
16 decision which is different from the
17 scientific opinion, they're just two
18 different entities.
19    Q.   When you evaluate claims such
20 as this, you look at internal affairs'
21 record, right?
22    A.   If I can, sure.
23    Q.   Those are helpful?
24    A.   Sure, absolutely.
25    Q.   You don't know how soon after

Page 311

1
2  the assault, Mr. Chatman, after -- when I
3  say assault, it's a poor word.
4        You don't know how soon after
5  Mr. Chatman's confession he reported he
6  had been physically assaulted during that
7  interrogation, right?
8     A.   I believe that his first
9  reference was several months later with
10 Dr. Pan; is that correct?
11       It certainly wasn't when he was
12 examined shortly after the fact and it
13 wasn't on the notes on admission from the
14 correction service.
15       It was -- my understanding it
16 was several months with Dr. Pan he
17 acknowledged he raped.
18    Q.   If Mr. Chatman actually told
19 other people much sooner about the being
20 beaten during the interrogation, would
21 that change your opinion?
22    A.   Oh, yeah.
23       MS. STALF:  Objection to the
24 form.
25    A.   Yeah, if there was a record

Page 312

1
2  that he went in after arrest and was
3  telling doctors they had beaten me, I
4  would take it, I would definitely take it
5  more seriously.
6        Again, I believe I mentioned
7  this in my report, but it's pertinent to
8  this answer.  The responsibilities of a
9  forensic examiner in this, whether they
10 choose to admit it or not, in order to be
11 objective, there is an arc of a
12 confession.
13       A person going from denial to
14 confession, what is the time proximity of
15 going from denial to confession and what
16 is the proximity of a person going from
17 confession to retraction?
18       There is any number of things
19 that can happen over the course of
20 several months in which somebody can say,
21 shmuck, you confessed to rape and that's
22 all the evidence that you have against
23 you.  Do you realize what a ridiculous
24 idea that was?
25       And so whether pressure is

Page 313

1
2  originated from within, whether they
3  original from a cellmate, whether they
4  original from an ex-wife, whether they
5  originate from anybody.
6        The longer period of time --
7  now, it is also helpful if one can get
8  the notes of a criminal defense attorney.
9        In certain instances I found
10 them very helpful.  If you want to make
11 them available for my review, I'd
12 certainly love reviewing them.
13       What did the criminal defense
14 attorney document about his initial
15 encounter with your plaintiff?  Because
16 that informs the arc.
17       I taught this in materials that
18 you have that, this is a way in which we
19 can get to the bottom of a number of
20 these disputed confessions so we don't
21 necessarily have to deal with ambiguity.
22       For example, Thibodeax.  I read
23 the criminal defense attorney's notes,
24 helpful.  I concluded that that was false
25 confession.  I was retained by

79 (Pages 310 - 313)

Page 314

1
2 prosecutors.
3       So if one wants to engage this
4 objectively in also a serious forensic
5 examination and not a college student
6 exercise, then one deals with the arc.
7       Confession to -- I'm sorry.
8 Denial to confession, confession to
9 denial.
10      So there is a difference
11 between seven months and right after the
12 fact; that is why it's consequential to
13 me. There is less of a likelihood some
14 intervening factor or person to rethink
15 his course of action.
16      Q.    If Mr. Chatman is actually
17 innocent of this crime, is he entitled to
18 compensation in your view?
19      MS. STALF: Objection to the
20 form of the question; foundation.
21      A.    Well, he's already been given
22 compensation by the fund for exoneration.
23 Isn't that what the certificate of
24 innocence it for?
25      Q.    Yes.

Page 315

1
2       A.    He was given the certificate of
3 innocence. He's provided compensation.
4 Sure. I think he is entitled to that
5 compensation. Absolutely.
6       Q.    Doctor, you don't hold any
7 opinion as to whether it's more likely
8 under this set of facts that Ms. Riggio
9 had sex with somebody who was not her
10 husband in the three days before May 24,
11 2002, the DNA was contaminated, or that
12 Mr. Chatman was actually innocent and
13 gave a false confession?
14      A.    I have no opinion, no opinion.
15      MR. AINSWORTH: I have no
16 further questions.
17      THE WITNESS: Okay.
18      MS. STALF: Chicago, any
19 questions?
20      MR. CHESTNUT: Yes.
21 EXAMINATION BY MR. CHESTNUT:
22      Q.    Dr. Welner, my name is Andrew
23 Chestnut. I represent Susan Riggio.
24      I will try to be brief. We
25 have been here for a while so....

Page 316

1
2       A.    Well, you're the ones with the
3 fire drills.
4       Q.    That's way out of our control.
5 Trust me.
6       In your report on page 16, I'll
7 direct you, it state that rape is not
8 disproved by an absence of physical
9 evidence.
10      Is that your opinion to a
11 reasonable degree of psychological
12 certainty?
13      A.    Yes, sir. Reasonable degree of
14 psychiatric certainty which is more to
15 the point, medical certainty.
16      Q.    Thank you. I will assume that
17 your opinions during my questions are to
18 that standard.
19      Would you also agree it's
20 possible in light of the DNA results that
21 you reviewed and have been asked about
22 and all of the other information that you
23 have about this case, that Carl Chatman
24 could have attacked and raped Sue Riggio
25 on May 24th, 2002, in the Daley Center

Page 317

1
2 and not leave a collectible DNA sample;
3 is that possible?
4       MR. AINSWORTH: Object to the
5 form.
6       MS. STALF: Object to the form.
7       A.    That's correct. For something
8 like that I would rather defer to someone
9 who has far more expertise than just the
10 collection and what does it mean when you
11 found an artifact.
12      I want to stop there. That is
13 the boundary of likelihood or
14 possibilities. I'll leave that for
15 others to address.
16      Q.    Sure. My question was just
17 limited to whether that was possible.
18      A.    You know what --
19      MR. AINSWORTH: Same objection.
20      A.    -- my answer has to be the
21 same. I just don't know how it changes
22 and so it may not change at all. I just
23 don't want to guess at it.
24      Q.    I think you touched on this in
25 your report, based on your review, would

80 (Pages 314 - 317)

Page 318

```
 1
 2   you agree that the 1979 rape and the 2002
 3   rape were different in many significant
 4   respects?
 5        MR. AINSWORTH:  Objection to the
 6   form of the question.
 7   A.   Yes, sir.
 8   Q.   What are some of those
 9   significant differences between the two
10   events?
11   A.   Well, the most significant to
12   me without micromanaging the details is
13   that the 2002 rape was a very dramatic
14   scene in an open area with Ms. Riggio
15   discovered incoherent in the middle of a
16   mess in a pool of urine, unclothed, with
17   her clothing disturbed, with a knife
18   present at the scene, and clear evidence
19   of a struggle where she would be easily
20   found.  She would be unmistakably found
21   by another person at some point whether
22   five minutes later, 20 minutes later, or
23   half hour later.  She wouldn't have been
24   sitting there for many hours before being
25   discovered.
```

Page 319

```
 1
 2        The first event by its account
 3   occurred in a restroom.  She went out and
 4   brought it to the attention of others and
 5   been affected by whatever physical
 6   disrobing, but she engaged them and
 7   recounted an event to them which was
 8   dealt with at face value and which
 9   ultimately she was -- she filed a civil
10   claim in which nobody was suggesting she
11   had fabricated this.  I shouldn't say
12   nobody was suggesting, which the findings
13   did not determine that she had
14   fabricated.
15        In light of Dr. Russano's
16   assertions or implications that she had
17   fabricated this and that being such a
18   linchpin of the plaintiff's argument, it
19   was remarkable that the 2002 event was so
20   messy when by her own experience she had
21   precedent for being able to file a rape
22   claim that was received at face value
23   without having to go through all of the
24   big production that would have been
25   entailed by what occurred in 2002.
```

Page 320

```
 1
 2        So, do I as a forensic
 3   psychiatrist, again, this sort of speaks
 4   to Mr. Ainsworth's earlier question, do I
 5   have to consider the possibility
 6   something is fabricated when someone is a
 7   litigant, sure.
 8        But litigants are also affected
 9   by their level of experience when they
10   stage things.
11        This is somebody that had the
12   experience what it's like to actually
13   participate in a successful rape claim.
14        So the notion of this being
15   staged with such a dramatic degree is
16   incompatible with that.  I'm not saying
17   this to vouch for what is true and what
18   is false of what is being raised here.
19        The previous history is
20   important in a way that could not have
21   informed if this was the only time she
22   was making a rape claim, then anything
23   could be possible.
24        Sure, somebody can be found
25   like that in theory, file a similar claim
```

Page 321

```
 1
 2   a short time afterward and one would have
 3   to consider, okay, well, is this real or
 4   not real.
 5        Does that make sense?
 6   Q.   I believe so.
 7        How would you characterize then
 8   the assertion because Sue Riggio claimed
 9   she was raped once in 1979, it was more
10   likely that she fabricated the 2002 rape
11   at the Daley Center in Chicago, you are
12   saying it wouldn't make that more likely
13   in your view?
14        MR. AINSWORTH:  Objection to the
15   form of the question.
16   A.   Yeah.  I'm not sure I fully
17   follow you.
18        What do I make of the assertion
19   because she made a civil claim in the
20   earlier, that it means a later claim,
21   that if she raises a later claim, that
22   claim is more likely to be fabricated?
23   Q.   That's my question.
24   A.   Yeah.  That doesn't mean
25   anything about anything.
```

81 (Pages 318 - 321)

Page 322

```
 1
 2          There are plenty of people who
 3   file multiple lawsuits. Some of those
 4   people are multiple litigants because
 5   they do, in fact, exploit the system.
 6          And some people who file
 7   multiple litigations are people who were
 8   unfortunate enough to have experienced
 9   multiple events in their life that lead
10   to litigation and some of those people of
11   the group of folks that experience
12   multiple events have had enough of
13   positive experience in dealing with
14   litigation that their head goes there
15   when something happens.
16          There are people who
17   experienced multiple events in their life
18   that because their earlier experience
19   with personal injury litigation is so
20   traumatic for them, they don't file a
21   complaint, not because their claim isn't
22   legitimate but they don't want to put
23   themselves through that anymore when they
24   went through that once before.
25          So what it tells me is that she
```

Page 323

```
 1
 2   had this experience before, it didn't
 3   dissuade her from seeking accountability.
 4   It was familiar enough to her that she
 5   chose to deal with it this way.
 6          It doesn't reflect at all on
 7   the legitimacy and lack of it.
 8          To me the most compelling
 9   evidence about legitimacy, the most
10   compelling evidence of legitimacy based
11   on my experience as a forensic
12   psychiatrist, based on my experience in
13   sex assault cases, bases on my experience
14   with litigants is the juxtaposition of
15   the 1979 fairly unremarkable by history
16   event and the 2002 event, that is
17   remarkable.
18          Does it resolve the question
19   one way or the other, no, it doesn't.
20   But it's a pretty remarkable circumstance
21   of both and I can't really compare the
22   compelling quality of any other aspect of
23   evidence when one looks at how these
24   events relate to one another, nothing
25   really stands up to that.
```

Page 324

```
 1
 2     Q.   So you would agree ultimately
 3   that the fact of the 1979 rape makes it
 4   less likely rather than more likely she
 5   would fabricate the 2002 rape?
 6          MR. AINSWORTH:  Object to form
 7   of the question.
 8          And to the extent that, Counsel,
 9   you are asking questions that are
10   eliciting new opinions, I absolutely
11   object.
12          You had the opportunity as of
13   October 31st to elicit opinion.
14          And I'll move to bar any new
15   opinions you are trying to elicit from
16   the Witness.
17          Do you understand, Counsel?
18          MR. CHESTNUT:  I think that is
19   stated in the report.
20          MR. AINSWORTH:  So why are we
21   asking him it?
22          MR. CHESTNUT:  I'm asking him to
23   clarify the statement he was making in
24   his report.
25     A.   Can you restate the last
```

Page 325

```
 1
 2   question?
 3     Q.   Sure.
 4          Would you agree that the 1979
 5   rape makes it less likely versus more
 6   likely that Sue Riggio would have
 7   fabricated the 2002 rape at the Daley
 8   Center?
 9          MR. AINSWORTH:  I object on the
10   same grounds.  I don't see that
11   anywhere in his report.
12          Counsel, if you can point me to
13   it, tell me.
14          MR. CHESTNUT:  He's saying in
15   his report she could have known from
16   the 1979 experience there was no need
17   to create a theatrical production to
18   engender the belief in others that she
19   was raped.
20          MR. AINSWORTH:  I don't see
21   anything in there about more likely or
22   less likely either way.
23          MR. CHESTNUT:  That's what I'm
24   asking.
25          MR. AINSWORTH:  Right.  And I'm
```

82 (Pages 322 - 325)

Page 326

1
2  saying you are trying to elicit a new
3  opinion and I object.
4      You are way, way, way past the
5  deadline for new opinions.
6      MR. CHESTNUT: You're objection
7  is noted.
8      THE WITNESS: Can I answer the
9  question?
10     MR. CHESTNUT: Yes.
11 A.  Yes, it makes it less likely.
12 Q.  We have touched on a few of the
13 factors that you state in your report
14 kind of explained Sue Riggio having
15 remembered more details about the 2002
16 event as time progressed.
17     We talked about the
18 fragmentation of the memory due to
19 trauma, and we also talked about the
20 details. I'm not asking any other detail
21 about those.
22     My question is, could another
23 factor could have been her embarrassment
24 to disclose some of those specific and
25 very personal details to the

Page 327

1
2  investigators that were questioning her
3  in the immediate aftermath, could that
4  have been another factor?
5  A.  Yes, I think it is actually
6  noted in one of my footnotes. The
7  footnote I have is number 5. It speaks
8  about the idea of shame and its impact on
9  disclosure.
10 Q.  That's fair.
11     Are you familiar with Ann
12 Burgess?
13 A.  I know her. I know her well.
14 Q.  Would you agree she is a
15 well-respected individual in the rape
16 research community?
17 A.  Sure. She became famous from
18 it. She coined rape trauma syndrome.
19 She is a pioneer in forensic nursing.
20 She is an extremely highly regarded
21 researcher involved not only in academia
22 but law enforcement.
23     She founded the crime
24 classification manual she worked in my
25 practice in The Forensic Panel. I

Page 328

1
2  published with her. I have just a lot of
3  goods thing to say about her.
4      She is just an extremely
5  learned -- I mean no disrespect by
6  putting it this way, she is a learned old
7  lady. She is a wise old lady.
8      I hope she never sees this.
9  But she is one of those people who is
10 much older, that one can learn from just
11 by virtue of her age and experience.
12 She's seen a lot of things.
13     MS. STALF: We lost them.
14     THE VIDEOGRAPHER: Going off the
15 record 5:09 p.m.
16     [Discussion held off the
17 record.]
18     [Whereupon, at 5:09 p.m., a
19 recess was taken.]
20     [Whereupon, at 5:12 p.m., the
21 testimony continued.]
22     THE VIDEOGRAPHER: Returning to
23 the record 5:12 p.m.
24     Beginning of disc number 7.
25     THE WITNESS: I just wanted to

Page 329

1
2  add to my previous answer to say that
3  I have been involved in cases in which
4  I have been on the opposite side of
5  Dr. Burgess. I have had that
6  experience of disagreeing with how she
7  sizes things up.
8      I've also had the experience of
9  her reviewing me and me peer reviewing
10 her in The Forensic Panel and having a
11 difference of opinion of perspective.
12     So I want to account for that.
13 There are times when we may not
14 necessarily aline but at the end of
15 day, she's a pretty significant figure
16 in forensic science especially in
17 forensic nursing, she all but started
18 the discipline. So she has quite a
19 history behind her.
20 Q.  In this case, just to follow up
21 on that point, you haven't reviewed her
22 report or her deposition testimony?
23 A.  I don't know she was involved.
24 Q.  That's fair.
25 A.  I don't even know that I knew

83 (Pages 326 - 329)

Page 330

1
2 she was involved before I wrote my
3 report. I haven't read her report. It's
4 out there. At some point I'm going to
5 sit down and look at it but I had no
6 exposure to it.
7       MR. CHESTNUT: I'm done. Thank
8   you.
9       MS. STALF: Anybody out there
10   questions?
11       MS. MORRISON: I have none.
12 CONTINUING EXAMINATION BY MR. AINSWORTH:
13   Q. Sir, you said it's less likely
14 that Ms. Riggio fabricated the 2002
15 sexual assault based on the fact that she
16 was allegedly sexually assaulted in 1979,
17 correct?
18   A. No, I said based on the
19 circumstances in 1979 juxtaposed with
20 2002, it's evidence of less likelihood.
21 I did not say that it didn't
22 happen. I didn't say that I have a
23 conclusion on it. It's a matter of
24 weighing evidence just as we have gone
25 all the way through this matter.

Page 331

1
2       It is remarkable or notable
3 evidence. It is evidence of less
4 likelihood, but it doesn't resolve the
5 matter.
6   Q. What possible expertise could
7 you be drawing upon to make the analysis
8 that it's less likely that Ms. Riggio is
9 lying?
10   A. I answered the question
11 earlier. I spoke about my experience in
12 sex assault cases. I spoke of my
13 experience of fabricated claims. I spoke
14 of my experience as a forensic examiner
15 of people who are personal injury
16 litigants. Three examples right there.
17 And I have had a variety of case
18 experiences in those three inflexion
19 points of this issue.
20   Q. Do you take into account the
21 fact that Kato was accused 25 previous
22 times of abusing suspects in
23 interrogation rooms?
24   A. Yeah, absolutely. I reviewed
25 that record.

Page 332

1
2   Q. And does that make you believe
3 that it's more likely that Carl Chatman
4 was similarly abused by Chris Kato or
5 less likely?
6   A. I think the fact that Mr. Kato
7 has that history makes it more likely. I
8 think the fact that the historical
9 accounts of those events which I also
10 asked to look at and how they do not bear
11 resemblance to what was being asserted
12 here made it less likely.
13       I think the idea that Mr.
14 Chatman was alone with Mr. Roberts or and
15 that -- I'm sorry, with Mr. Kato and that
16 some other person who came forward and
17 provided some memo who was an unknown
18 third-party who had access to this made
19 it less likely.
20       I think Mr. Chatman's
21 discussion of what was done to him
22 physically and how they did not match the
23 doubling over the account of what the
24 complaint asserted made it less likely.
25       So I did take note of Kato's

Page 333

1
2 history. I read it. I think that
3 history in and of itself makes it more
4 likely. It's a balancing issue.
5       There is this that argues for
6 it and this that argues against.
7       As you compared it to this idea
8 that 1979 to 2002, I have the same thing.
9 That is the one remarkable piece of
10 history. It's not a remarkable piece of
11 history that provides a counterbalance,
12 that's not to say that one doesn't exist,
13 but that is the remarkable history that I
14 have to work with.
15   Q. You've never seen any
16 criticisms of Dr. Burgess's work?
17   A. I have.
18   Q. You have.
19       Have you seen criticisms how
20 she conducts her research?
21   A. No, I haven't.
22       When I say -- let me clarify.
23 Work, I have seen criticisms of her
24 opinions in a court setting, that is the
25 work I'm familiar with.

84 (Pages 330 - 333)

Page 334

1
2        In terms of criticism of her
3  research, look, there are people that
4  took issue with rape trauma syndrome and
5  I understand that is not a unanimously
6  supported idea.
7        It, for example, it doesn't
8  comprise it's own entity in DSM and
9  something like that.  It doesn't speak to
10  the notion of consensus.
11        But in terms of criticism
12  itself, the criticism that I have
13  actually seen has just been criticism
14  where folks might have disagreed with her
15  findings in certain cases.
16  Q.    So you don't know about her
17  fabricating cites to literature to
18  support --
19  A.    No, no, no, that is something
20  -- that I'm not aware of.
21  Q.    That is not something that you
22  think Dr. Burgess would do based on your
23  work relationship with her?
24  A.    You know, and I think I gave a
25  lot of discussion to this in Swift, I

Page 335

1
2  don't need to give a long answer.
3        I learned a long time ago, you
4  know, The Forensic Panel, is The Forensic
5  Panel but it's my practice and anything
6  that goes on with people on the panel, I
7  end up feeling like I'm going to be in a
8  deposition answering for it.
9        A while back there was a guy a
10  Park Dietz, a well-known forensic
11  psychiatrist.  There was some
12  psychiatrist in his practice, a child
13  psychiatrist that he was touting and, you
14  know, giving a lot of exposure to and the
15  guy became the head of psychiatry
16  division at the American Academy of
17  Forensic Sciences which is a pretty
18  prestigious thing and wouldn't you know,
19  he showed up on his Facebook page
20  snorting cocaine and doing all kinds of
21  bizarre things and this is a guy who is
22  making determinations about child custody
23  so you can imagine the abject humiliation
24  that it would have been to Dietz's
25  practice that this kind of thing went on.

Page 336

1
2        For example, Elizabeth Loftus
3  who is a name that folks know.  She was
4  subject to perhaps one of the most
5  devastating and humiliating
6  cross-examinations of an expert witness
7  in the Scooter Libby case, the former aid
8  to the vice president.
9        And so I took a look at this
10  specifically, you know, what happened to
11  Loftus and what happened to this Keegan
12  [phonetic] guy and his practice.
13        You know, he is a serious guy,
14  Dietz, he's had his own problems, and I
15  thought, I don't want that happening to
16  me.  I'm not going to be put in a
17  position -- I can account for work people
18  do in my practice, but I don't know who
19  snorted cocaine and I don't know who is
20  doing ridiculous things.
21        I like to think that they --
22  no, we won't abide that in my practice,
23  fabricating research stuff.  We wouldn't,
24  no, that's not anything, that's not
25  something I take well to at all.  I'm not

Page 337

1
2  aware of it.  No.  I don't take well to
3  hearing it.
4        I mean it is what it is.  If it
5  is what it is, obviously, it's not
6  something I'm happy about.
7        I can only account for what we
8  do and what we manage within our own
9  practice.  Unfortunately, I cannot, you
10  know, I don't have people in my custody;
11  that's not how it works.
12        MR. AINSWORTH:  I have no
13  further questions.
14        THE VIDEOGRAPHER:  Going off the
15  record, 5:21 p.m.
16        [TIME NOTED:  5:21 a.m.]
17  _____

     MICHAEL WELNER, M.D.

18
19
     _____
20  Subscribed and sworn to
     before me this _____
21  day of _____, 2017.
22  _____
     Notary Public
23
24
25

85 (Pages 334 - 337)



Page 338

1
2     CERTIFICATION
3
4     I, MARGARET SCULLY-AYERS, a Notary
5  Public for and within the State of New
6  York, do hereby certify:
7     That the witness whose testimony as
8  herein set forth, was duly sworn by me;
9  and that the within transcript is a true
10 record of the testimony given by said
11 witness.
12    I further certify that I am not
13 related to any of the parties to this
14 action by blood or marriage, and that I
15 am in no way interested in the outcome of
16 this matter.
17    IN WITNESS WHEREOF, I have hereunto
18 set my hand this 29th day of December,
19 2016
20
21
22    MARGARET SCULLY-AYERS
23        *    *    *
24
25

Page 339

1
2     ERRATA SHEET
      VERITEXT/NEW YORK REPORTING, LLC
3
   CASE NAME: Carl Chatman -v- City of
4  Chicago, et al.
   DATE OF DEPOSITION: December 13, 2016
5  WITNESS' NAME: Michael Welner, M.D.
6  PAGE/LINE(S)/  CHANGE      REASON
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21    MICHAEL WELNER, M.D.
22 SUBSCRIBED AND SWORN TO
   BEFORE ME THIS____DAY
23 OF_____, 2017.
24
   NOTARY PUBLIC
25 MY COMMISSION EXPIRES_____

86 (Pages 338 - 339)

[& - 3:26]                                                                    Page 1

| **&** |
| --- |
| **&** 3:4,16 4:4 307:23 |

| **0** |
| --- |
| **000019** 182:19 |
| **0022621** 294:10 |
| **015424** 82:14 |
| **015436** 82:15 |
| **030030** 84:2 |
| **030037** 84:2 |
| **030179** 88:13 |
| **030184** 88:14 |

| **1** |
| --- |
| **1** 5:12 51:4 70:20 70:22 77:24 101:11 180:23 192:16 193:21 223:15 229:18 258:13 |
| **1/4/86** 296:2 |
| **10** 3:11 244:19 |
| **100** 3:6 |
| **10001** 8:16 |
| **10:15** 51:3,7 |
| **10:24** 51:9,12 |
| **10:31** 57:16,19 |
| **10:48** 57:21,24 |
| **10:50** 245:4 |
| **11** 70:13 193:7 |
| **11:45** 107:10,14 |
| **11:55** 107:16,19 |
| **12** 193:7,7,9 258:13 |
| **1250** 2:2 6:20 |
| **12:29** 139:13,16 |
| **12:56** 139:18,21 |
| **13** 2:3 6:16 193:10 260:19 297:17 339:4 |

**130,458.75** 184:22
**138,810** 184:23
**14** 1:8 7:3 171:25 173:24 193:12,18
**148** 5:17
**15** 152:6 185:20,21
**15435** 82:21
**15th** 184:10
**16** 193:25,25 194:2 194:19,21 197:14 316:6
**17** 197:15 285:21 286:3
**1700** 3:18
**18** 197:16,17 272:2
**180** 164:8
**182** 5:18
**19** 197:18 288:22
**1979** 275:12 278:19 318:2 321:9 323:15 324:3 325:4,16 330:16,19 333:8
**1986** 293:10 298:21 299:10
**1:30** 240:24
**1:39** 177:15,17

| **2** |
| --- |
| **2** 5:13 51:13 82:8 82:10,13 107:11 181:4,10 193:22 240:23 244:22 283:14 |
| **2.25** 185:16 |
| **2.5** 185:20 |
| **20** 3:17 15:11 52:23 53:15 54:8 54:11 56:14 58:11 58:13 127:13 185:18,22 197:21 289:15 318:22 |

**2002** 82:19 106:4 107:2 147:18 165:19,24 192:6 195:23 197:7 200:14 201:19 207:3,22 212:7 213:16 239:17 245:10 275:10 278:17 284:21 288:24 315:11 316:25 318:2,13 319:19,25 321:10 323:16 324:5 325:7 326:15 330:14,20 333:8
**2003** 149:24 150:4 150:18 165:22
**2004** 146:2 165:8
**2005** 146:2,3 165:8 165:12
**2006** 146:3
**2011** 151:20,23
**2012** 148:23
**2013** 198:6
**2015** 84:6 184:10 184:20 247:6
**2016** 2:3 6:17 108:19 165:12 338:19 339:4
**2017** 337:21 339:23
**21** 197:24
**21st** 225:10,13
**22** 16:9,11,13,20 18:11 19:8 22:6 99:2 157:13 162:19 167:5 178:10,11 180:7 198:13
**222** 4:6

**224** 8:14
**23** 229:18 303:20
**2300** 3:12
**24** 82:18 195:23 197:7 200:14 201:19 207:22 221:4 239:17 284:21 315:10
**2430** 4:12
**24th** 192:6 213:16 245:10 316:25
**25** 199:21 239:17 331:21
**26** 101:13 199:25
**26th** 212:7
**27** 200:5
**28** 200:6 223:14 233:3
**294** 5:20
**2945** 1:8 7:3
**29th** 338:18
**2:15** 201:7,10
**2:26** 201:12,15

| **3** |
| --- |
| **3** 5:14 83:20,22 84:3 107:20 181:5 181:10 196:12 240:23 283:12,13 |
| **30** 78:17 120:14 200:16 255:14 |
| **300** 4:6 |
| **30th** 8:14 |
| **312** 3:5 |
| **315** 5:5 |
| **31st** 324:13 |
| **330** 5:5 |
| **35** 143:22 |
| **362,000** 185:12 |
| **362,178** 184:24 |
| **3:26** 254:24 255:5 |

[3:40 - accounts]

**3:40**  255:7,10

**4**

**4**  5:16 88:9,12,18
103:12 104:4
108:19 139:22
188:5 198:8
244:23 255:12
294:15 298:21
**40**  39:16,20 41:9
146:17
**42**  294:10
**48**  216:11 302:15
**4:19**  292:6
**4:20**  292:17,20
**4:29**  292:22,25
**4th**  108:7

**5**

**5**  5:17 88:21 148:2
148:4,7 199:17
201:16 255:2
305:16 327:7
**500**  4:12
**56**  182:20
**5:09**  328:15,18
**5:12**  328:20,23
**5:21**  337:15,16

**6**

**6**  5:18 88:21
182:13,15,22
183:10 199:20
255:11 295:19
296:12
**60601-1081**  4:7
**60603**  3:18
**60606**  3:12
**60607**  3:6
**60661-2593**  4:13

**7**

**7**  5:19 188:5
199:21 200:2
255:12 294:4,6,9
328:24
**70**  5:12
**72**  66:7,11 80:22
82:3 83:6 96:5
**7:30**  276:16

**8**

**8**  5:5 83:2 103:12
104:4,21
**807**  8:15
**82**  5:13
**83**  5:15
**88**  5:16
**8:30**  240:24

**9**

**9**  84:6 200:9
**92,910**  182:24
184:21
**9:28**  2:4 6:18
**9:30**  8:19

**a**

**a.m.**  2:4 6:18 8:19
51:3,7,9,12 57:16
57:19,21,24
107:14,16,19
240:23,23,24
244:23 245:4
337:16
**abide**  336:22
**ability**  22:18 205:3
234:2 307:23
**abject**  335:23
**able**  12:15 13:24
14:12 18:10 21:17
21:21 33:3,16
52:9 56:10 93:17
111:23 119:9

162:17 166:23
167:8 178:4 186:4
186:23 232:13
233:10 239:18
240:21 241:22,23
243:5 267:20
269:7 272:19
308:2 319:21
**abrasions**  188:21
189:3
**absence**  60:4,8
61:2 71:11 159:6
316:8
**absent**  159:3
**absolutely**  9:13
24:18 170:3
191:15 257:21
267:19 268:3
310:24 315:5
324:10 331:24
**absorb**  41:22
**abstract**  206:8
**abundantly**
269:17
**abuse**  137:23
273:18 301:2
**abused**  332:4
**abuser**  300:11
301:12
**abusing**  300:12
331:22
**academia**  264:16
327:21
**academic**  41:12,17
140:5,6 264:14
**academy**  147:11
335:16
**accelerated**  210:4
210:8
**acceleration**
210:12 211:4

**accept**  58:17
110:17
**acceptance**  54:5
**access**  23:7 45:2,3
53:21 122:6
137:16 163:17
195:16 199:3
332:18
**accommodate**
196:4
**accompanied**
223:21 233:2
**accomplishments**
76:5
**account**  23:21
30:22 57:5 60:9
61:5 63:14 64:6
64:12 65:8 68:9
69:15 87:10 93:15
112:6 117:10,12
130:3 154:25
222:8,15 223:10
223:13 231:12
273:9 277:20
286:14 287:13,21
288:24 290:3
319:2 329:12
331:20 332:23
336:17 337:7
**accountability**
260:8,11 323:3
**accountable**
240:16
**accounted**  55:22
123:24 170:13
273:12 274:25
301:10,13
**accounting**  93:20
100:10
**accounts**  61:7
287:20 332:9

accuracy 270:7
288:20
accurate 51:22
61:14 122:14
208:16 286:21
287:15
accurately 222:3
accusations
229:21
accused 263:17
331:21
acknowledge
276:17
acknowledged
311:17
acknowledges
277:9
acquaint 264:14
acquainted 29:7
act 76:18
action 2:7 314:15
338:14
actions 125:11
223:13
active 54:25
114:10 171:7
256:23,24
activities 110:25
111:8 113:24
114:12
activity 83:6,13
111:16,20 112:21
113:6 114:15
195:12 282:25
284:7
actual 27:14 28:24
33:10 110:25
111:8 119:5 130:7
132:15 212:17
222:11 270:5
299:25 307:14

actuality 167:15
168:20
acute 209:11
237:22
acutely 209:6
adaptation 274:18
adaptations
274:19
add 42:10 133:20
149:22 177:19
194:4 243:24,25
243:25 244:3,5
329:2
addict 110:20
adding 214:6
addition 181:4,9
additional 54:7
58:11,13 111:11
133:21 148:13
227:6
additionally 303:7
additions 200:17
200:22
address 8:14
91:15 163:6,13
191:17 195:16
201:2 229:3
252:18 274:24
317:15
addressed 191:9
194:15
addressing 188:13
252:4
adequate 28:10
35:14
adequately 31:21
adjective 290:20
adjustment
274:18
administered 8:5

administration
119:24,24 141:16
admission 179:15
179:16 295:12,25
298:21 311:13
admissions 140:8
209:17
admit 312:10
adopt 78:22
268:23
adopting 258:25
260:4
advantage 155:14
157:25
adversarial 69:20
70:8,15 71:12,16
71:22 72:11 73:6
73:9,16,17 74:10
74:14,19 77:7,12
77:19,22 78:11
80:10 99:12
advised 153:2,16
advising 153:13
advocate 55:10
166:24
affair 94:19 95:7
95:18 105:17,24
105:25 106:25
180:18 192:4
197:6 200:13
229:2 284:18,19
affairs 310:20
affect 61:10
122:25 123:13
124:13,24 125:22
125:25 126:12
127:18 128:6
157:11 287:3
288:20
affiliate 168:2

affix 186:23
aforementioned
145:19
aftermath 104:6
288:8 327:3
afternoon 240:25
afterward 14:17
21:13 321:2
age 127:5,8,12
264:15 302:15
328:11
agencies 142:16
agenda 26:25
74:21 75:8,8
77:14
aggressiveness
55:12
aging 126:3 127:4
127:19
agitated 290:14,16
290:17 291:23
ago 87:25 90:3
91:25 118:16
122:8 335:3
agree 6:12 10:18
37:9 43:13 51:24
87:2 90:7,22
91:24 94:13
162:13 170:14
241:15 254:3
299:15 304:16
316:19 318:2
324:2 325:4
327:14
agreeing 160:4
agressiveness 55:7
ah 77:4
ahead 207:14
265:8 285:3
aid 336:7

[aimed - appetite]

aimed 188:11
ainsworth 3:7 5:5
  7:13,14 8:17,18
  10:17 37:6 47:14
  50:24 59:4 70:13
  70:19 82:7 83:19
  83:24 88:4 97:11
  107:7 108:16
  124:17,21 136:4
  136:10 139:9
  147:25 154:2
  182:12,17 201:4
  207:9,15 254:21
  292:10,13 294:3
  308:12 315:15
  317:4,19 318:5
  321:14 324:6,20
  325:9,20,25
  330:12 337:12
ainsworth's 320:4
air 36:23 50:2
  203:24 234:9
al 6:23 169:6,8
  339:4
alarm 292:7
alcohol 272:17,21
  273:17 274:15,16
  275:4,7 278:3
  300:11,12,15,17
  302:4,7,9,10,12
alcoholic 300:21
alert 295:2
alibi 230:3 231:9
aline 329:14
allegations 60:24
alleged 96:6 192:6
  223:19 224:20
  225:25 256:7
allegedly 330:16
allele 85:11 282:23
  283:8,16,17,22,24

284:10 285:17
alliance 141:10
allow 68:4
allowance 240:8
allowed 245:8
allowing 194:25
  212:4
alphabet 210:22
alter 194:7
altered 61:9
alternative 198:14
  198:18
alternatives
  198:23
alvarez 1:20
amanda 44:20,22
ambiguity 313:21
ambiguous 67:15
  173:8 205:20,24
  205:25 206:3
ambiguousness
  284:3
ambitious 35:17
america 169:7,10
  169:15
american 144:10
  147:10 335:16
amount 45:14
  79:20 85:4,9
  88:24 89:9 119:13
  176:25 228:23
  267:14 274:11
  283:14 302:9,10
amounts 85:14,22
  184:18
anal 60:12,24,25
  282:15 283:3,6
  284:20 305:25
anally 281:25
  289:4

analogy 278:4
analyses 24:7
analysis 18:10,19
  19:9,11 21:21
  23:18,20 24:14
  27:9 33:12,18
  48:9,20 51:20
  52:5,8,12 56:9
  62:21,22 331:7
analyst 252:15
analytical 5:14,16
  84:4 88:5,6,14
  283:10
analyzing 106:9
anatomical 123:21
andrew 4:14 7:18
  315:22
angry 136:23
anita 1:20
ann 327:11
answer 9:11,21
  10:3 13:9,12 20:8
  21:4 23:18,21
  34:6,7,17 43:11
  45:5 46:14 49:11
  50:2 77:6 91:22
  93:5,17 94:9,11
  95:13 96:10 97:21
  97:22 99:18 104:2
  108:22 110:12
  115:14 116:6
  136:20 143:11
  176:7,11 196:21
  239:13,14 242:19
  250:13 251:11
  270:21 271:9
  285:3 312:8
  317:20 326:8
  329:2 335:2
answered 50:8
  92:6,12,13,13,14

96:9 97:10,17
  107:5 116:4
  130:22 134:17,19
  134:24 173:21,23
  187:6,10,10
  197:13 200:20
  253:10 331:10
answering 40:10
  93:2 210:18 335:8
answers 31:16
  92:18 93:6 109:12
  110:4 136:12
  209:24 244:14
  245:13
anticipate 234:19
anticipating 185:5
anus 282:10
anybody 37:19
  62:2 66:11 147:8
  169:5,10 214:15
  238:18 247:8
  261:7 270:23
  274:13 278:17
  290:13 313:5
  330:9
anymore 322:23
anyone's 301:19
anyway 41:10
apparent 69:12
appeal 255:15
  310:8
appear 135:18
appearance 23:12
  294:25
appearances 3:2
  3:22 4:2
appears 238:15
appellate 148:24
  170:7
appetite 112:19,20

[applicability - association]                    Page 5

applicability
  148:16
application  138:18
applied  144:23,25
  246:12
applies  79:11
apply  54:14 145:2
  262:17
applying  261:14
apportioned
  276:12
appraised  300:5
appreciate  20:10
  26:6 28:25 34:7
  204:22 253:13
appreciated  58:15
appreciation
  18:23 22:17 26:12
approach  39:4
  71:11 73:3 273:22
approached  267:7
approaches  47:7
approximately
  6:17 157:14
april  148:23
arc  312:11 313:16
  314:6
area  29:10,23
  30:17 32:11,12
  39:10 40:11 41:2
  41:4 42:11 48:8
  49:25 52:7 56:23
  64:3 69:8 95:23
  125:23 144:16
  147:20 318:14
areas  17:17 115:4
  117:2 155:20
  205:6 228:22
  268:15
arena  55:23

arguable  234:17
argues  333:5,6
argument  140:13
  199:6 319:18
argumentative
  285:2
arguments  104:23
arkansas  149:13
  149:22
armed  282:22
army  279:14
aroused  40:24
arrest  204:6 312:2
arrested  209:4
  262:24 302:14,21
  303:16
art  216:15
article  27:24 28:3
  28:7,7 30:2,7 41:7
  41:25 43:22,25
  44:2 49:16 76:10
  259:5 260:10,15
  277:9,14
articles  30:11
  40:14 45:16,23
  46:3 108:10
  306:15
artifact  217:19
  317:11
asa  223:18 224:19
  225:23 228:10
ascertaining
  271:12
aside  39:3 177:4
asked  19:20,25
  34:2 37:4 50:7
  92:6 96:2,8 97:17
  106:10 107:4
  110:11 119:7
  120:12 121:18,25
  134:23 138:8

151:12 157:17
  176:4,6 187:9
  198:22 200:19
  201:2 227:6,15,18
  245:7 253:10,19
  267:11 268:25
  316:21 332:10
asking  9:4,16 25:9
  46:15 47:22 77:2
  106:22 117:7,9
  121:11 125:17
  130:8 138:11
  165:18 196:14
  218:23 238:17
  244:13 251:11
  287:12 324:9,21
  324:22 325:24
  326:20
aspect  26:8 72:8
  73:4 115:18
  266:16 323:22
aspects  18:23,25
  19:2 74:16 77:18
  114:21,22 115:8,9
  115:10 122:19
  135:17,25 137:4,8
  138:10,15 191:18
aspire  223:6
assailant  68:23
  91:19 93:8
assailants  67:8,14
assault  60:6 82:4
  83:6 192:7 195:13
  246:18 247:10,12
  247:14 249:5,13
  249:14,20,22
  253:7 256:7
  286:15,20,22
  287:14 289:12
  300:16 302:2
  306:17,22 311:2,3

323:13 330:15
  331:12
assaulted  272:16
  311:6 330:16
assaultive  202:13
assembled  151:15
  152:16
assert  55:15 160:4
asserted  43:11
  289:18 332:11,24
assertion  61:3
  102:15 111:19
  205:10 257:6
  321:8,18
assertions  17:21
  33:22 46:24 49:10
  50:11 61:22
  104:22 171:9
  319:16
assess  52:9 116:21
  117:5,6,9 120:13
  301:8
assessed  300:3
assessing  120:19
assessment  70:5
  95:10 117:14
  147:14 164:17
  269:24 309:12,12
assessments  235:6
  310:11
assets  27:5
assigned  181:16
assistant  1:18
associate  211:7
associated  127:10
association  15:18
  22:10 62:17
  145:17 149:14
  150:2,22 153:24
  208:19 210:13,16
  212:4,12 234:4,7

234:17 235:14
236:8 243:12
246:9 247:19
248:15 249:15
**associations**
210:23 211:17
236:22 237:10
238:2 247:22
**assume** 9:21 66:5
99:7 143:13
174:17,20 250:2
316:16
**assumes** 68:24
282:5,18 302:24
**assuming** 68:23
192:7 195:21,24
217:17
**assumption**
100:11 196:4
**assumptions** 196:2
**assure** 156:8
**ataxic** 298:6
**attached** 40:15
190:9 205:15
**attacked** 67:8,18
102:5 274:4
316:24
**attempt** 268:24
**attempted** 11:3,5
24:19 38:25 58:5
99:3 150:9 180:5
**attempting** 130:4
**attempts** 111:2,9
**attending** 7:7
**attention** 16:23
20:9 40:16 41:12
41:17 48:7 162:17
198:12 227:20
229:17 281:16
301:6,23 319:4

**attorney** 1:18,21
3:16 107:24
122:12 148:24
166:11 169:25
181:19 259:20,25
266:4 267:6 268:7
313:8,14
**attorney's** 149:14
313:23
**attorneys** 3:5,10
4:5,11 7:6 36:9
151:4 152:6
172:14 181:20
205:17 262:7
**attract** 170:15
187:3
**attracted** 227:3
**attracting** 48:7
**attracts** 62:23
**attributed** 114:14
190:22 300:9
**audience** 151:6
152:4,5
**audio** 6:10
**aught** 173:7
**author** 265:14
272:25 273:2
**authorities** 145:9
**available** 28:20
60:5,7 65:13 67:7
68:14 79:18 98:21
106:16 112:5
164:4 172:20
177:12 178:3
198:5 199:12
202:8 205:17
229:8 287:19
310:12,14 313:11
**availing** 113:15
**avenue** 34:14

**average** 306:7
**avoid** 70:6,7
276:21
**avoidant** 273:21
276:8
**aware** 47:2,9 81:2
81:6,7,10,11,15,16
81:19,20,23,24
82:6 101:6,8
106:11 118:5,20
141:25 145:20
153:6 224:6,10
240:14 256:5
271:21 334:20
337:2
**awareness** 40:11
**ayers** 2:9 7:11 8:3
338:4,22

**b**

**b** 5:10 83:5 210:7
**baby** 163:9
**back** 34:5 43:24
51:25 84:10 90:14
91:22 94:3,6
101:10 102:8
103:24 106:4
109:4,19 131:23
137:15 138:2
149:21 163:2
165:4,12,24
181:11 212:13,18
222:23 232:10
259:18 267:10
280:19 287:9
335:9
**bad** 33:17 36:4
**badge** 20:11
259:19
**bailiwick** 94:16
**balancing** 333:4

**bar** 75:11,12
324:14
**barbara** 1:12
**based** 16:24 17:17
22:2 30:19 74:20
74:20 93:23
106:21 119:14
159:25 177:11
180:7 196:16
227:7 253:4
272:25 287:18
310:12 317:25
323:10,12 330:15
330:18 334:22
**bases** 323:13
**basically** 49:25
55:12,13 69:2
179:23 209:20
245:16 246:13
248:17 260:25
261:2
**basing** 276:23
286:8
**basis** 19:4,5 22:23
57:11 269:10
310:4
**bates** 82:14 83:25
88:13 182:19
294:9
**bathroom** 225:12
**bazillion** 56:4
143:15
**bear** 24:5 31:5
104:9 332:10
**bears** 129:3,7
**beaten** 311:20
312:3
**beautiful** 218:9
**becoming** 199:12
**began** 158:18

beginning 9:11
51:13 94:6 107:20
139:22 157:18
186:14 201:16
255:11 328:24
behalf 7:14,16,19
7:22,25 10:15
behavioral 39:10
39:20 42:5,6 47:8
76:11 274:20
300:19
behaviorally
291:23
behaviorial 70:5
belabor 34:10
belief 161:4
220:23 325:18
believe 22:12 25:2
38:22 40:9 124:25
125:3,8 130:22
137:17,25 138:17
149:12,15,18
152:18 155:17
156:10 158:7
170:3 188:4
259:20 262:2
281:14 307:16
311:8 312:6 321:6
332:2
believes 133:24
belong 195:6
belongs 285:17,19
ben 147:18
benches 225:13
benefits 307:23
308:3
benign 141:7
202:14 203:11
best 11:20 27:13
115:17 130:12
169:9 269:5

better 13:11 26:16
37:14 44:11
152:10 173:16,16
227:22
beyond 23:11
26:14 60:19 77:8
93:24 109:2
120:14 122:3
125:15,20 150:24
157:23 262:13
bias 69:20 70:8,15
71:12,16,22 72:11
73:6,10,16,17
74:10,14,19 77:7
77:11,19,23 78:11
80:10,10 99:12
biased 167:20
big 76:25 115:13
319:24
bill 185:9
billed 183:4 184:4
billing 184:13
billings 5:18
bills 182:9
biological 195:5
bipolar 160:21
bit 68:11 69:15
129:5 184:19
185:18 212:19
247:4 257:15
290:18 306:5,13
306:14
bizarre 250:3,4
335:21
blacked 183:10,13
183:20,25 184:2
184:12
blame 274:22
blanket 46:25
48:23 49:6,8
169:20

blanking 219:16
blanks 130:5,9
131:4,14 132:8
blending 33:6
55:14
bless 144:2,15
blessed 185:25
block 179:13
blood 338:14
blown 63:18
blows 285:23
blurb 28:9
body 136:2,3
137:5,10 170:11
177:6 281:23
bollinger 4:10
bombers 143:16
boock 1:11 219:7
219:15 242:8
bored 20:7
borkan 3:16
borne 42:13
132:21,22 155:7,9
155:11 173:16
borrow 63:11
bottom 27:3 43:2
82:22,25 294:14
313:19
boundaries 203:15
boundary 317:13
boutique 39:11
box 25:20,21 26:2
83:2
boxes 120:16
brain 123:17
124:4,12,19,22
125:11,12,14
126:3 127:19
break 9:25 10:7
47:12 50:25 57:13
122:20 232:8

254:22 292:9,10
breakdown 74:23
breaking 10:12
brevity 50:12
brian 1:18 3:11
brief 10:7,8 54:2
244:14 315:24
brilliant 229:4
bring 146:16
155:24 295:9
303:2
bringing 69:21
106:17 266:9
broad 27:20 32:15
36:5,13 40:5
49:10 68:5 115:21
261:6
broadly 147:22
broadway 2:2
6:20
brought 31:4
146:6,18 163:18
164:18 319:4
brush 79:15
brutal 111:25
113:24 205:11
bryan 1:15
bs 182:19
build 17:9
building 223:21
238:25 255:19
257:4,13 274:7,10
built 258:7
bullet 71:6 192:24
193:8 258:14,18
261:16
bunch 228:8
234:12
burgess 327:12
329:5 334:22

[burgess's - cast]                                                                    Page 8

| | | | |
|---|---|---|---|
| burgess's 333:16 | care 110:14 | cars 19:25 | 17:18 18:5,10 |
| burgundy 215:18 | 136:14,15 141:18 | cartrette 1:17 7:22 | 19:7 21:16 22:4 |
| 215:22 216:4,6,9 | cared 163:13 | case 6:22,24 7:3 | 22:13 23:7 24:23 |
| 218:10 | career 76:14 147:3 | 15:15 18:15 20:13 | 25:3,8,10,11,16,17 |
| burrough 1:17 | 172:4 | 22:13,18,24 23:16 | 26:4,6 27:14,19,21 |
| business 185:23 | careful 153:9 | 25:3,10 26:16 | 28:24 29:12 30:5 |
| 187:8 | carl 1:6 6:22 64:16 | 27:25 28:15,16 | 30:9,12,19 31:4,6 |
| | 66:16 67:12,20 | 30:10,24 38:23,24 | 31:9,10 32:8 |
| **c** | 80:23 81:4,8,12 | 40:22 43:22 44:22 | 33:10,23 35:2 |
| c 8:6 210:10,20 | 84:18 85:8,20 | 44:25 45:12 48:20 | 36:2 37:4 39:5 |
| cab 20:19 | 86:3 87:24 89:4 | 48:21 49:22 50:19 | 43:24 44:5,19 |
| calculated 185:14 | 89:14,20,24 90:5,7 | 55:22 56:19 59:13 | 45:9,14,16 52:23 |
| call 10:9 35:12 | 90:21,22 91:7 | 59:21 60:10 61:18 | 52:24 53:15,16,20 |
| 39:7 43:7 149:15 | 93:11 94:23 98:14 | 67:25 75:16 77:24 | 53:23 54:9,11 |
| 178:24 198:11 | 99:10 100:16 | 78:16,20,21 79:19 | 55:16,25 56:14 |
| 235:24 254:11 | 102:17,22 103:9 | 84:21 98:19,25 | 58:12,14,21 59:7 |
| called 265:24 | 103:18 104:10,18 | 99:13 102:16 | 60:5 65:11 76:16 |
| 266:5 | 180:16 183:2 | 108:7 113:9 | 86:14 99:2 132:15 |
| calling 50:21 | 184:21 191:5 | 118:14 122:9,11 | 133:16 154:23 |
| calls 179:20 | 196:15 197:4 | 122:11 141:14 | 157:14 159:14 |
| 265:22 279:2 | 206:24 207:18 | 148:10,17 149:21 | 161:16,17 162:19 |
| 282:17 284:25 | 212:7,20,25 | 153:8,21 158:5,6 | 167:5,24 168:5,6 |
| calm 290:17 | 213:19 215:20 | 160:8,23 161:2,8 | 170:5,6,10,11,14 |
| 291:12,13,16,19 | 216:16,24 217:8 | 161:21 166:18,25 | 171:23,25 173:4,6 |
| 291:22 | 218:4 221:2 233:4 | 168:9 169:4 170:2 | 173:13,22 177:2,4 |
| camera 10:6 | 238:18 239:17 | 171:21 172:23 | 177:6,24 178:10 |
| camouflaged | 241:12 246:16 | 174:18,21 177:21 | 178:12 179:4,11 |
| 244:12 | 247:6 267:22,25 | 179:18,21 180:25 | 180:7,10 184:3,20 |
| cans 252:17 | 268:5 269:15 | 181:9,24 183:2,10 | 186:2,3,5,6,9,11 |
| capabilities | 289:22 293:3,15 | 183:16,17,19 | 186:13,14,17,18 |
| 125:12,14 | 303:22 304:4,13 | 184:13,22,22 | 186:21,24 187:2,3 |
| capable 204:16,17 | 307:9 309:9 | 185:9 195:17 | 187:11 253:18 |
| 208:7 | 316:23 332:3 | 205:15 235:21 | 263:14,21,22 |
| capacity 1:19,20 | 339:3 | 253:21 266:5,20 | 264:19 323:13 |
| 97:1 | carolina 145:16 | 267:4,7 268:25 | 329:3 331:12 |
| capital 170:20 | 149:25 150:21,25 | 309:18 316:23 | 334:15 |
| captain 259:8 | 152:21 153:23 | 329:20 331:17 | cash 110:21 |
| caption 6:22 | carried 77:15 | 336:7 339:3 | 113:18 |
| captured 68:22 | 110:20 | cases 10:20 12:10 | cassell 43:23 |
| car 20:15 63:3,16 | carrying 59:24 | 13:22 14:16 15:3 | cast 168:11 |
| 79:12 80:2 | | 15:4,4,20 16:16 | |

catastrophic
257:12
catch 222:6
caught 294:20
causal 21:18 28:11
55:21 56:16 57:6
causation 24:16
cause 13:3 53:3,7
53:19,24 55:11
56:8,24 69:17
72:21,22 113:5
131:18 132:24
153:5 224:17
causes 17:19 23:14
288:17
caution 22:23
152:24 155:25
cautions 145:21
cautious 23:15
153:17
caviler 218:22
cell 6:7
cellmate 313:3
center 212:23
224:2,4,16 233:3
248:5 304:5,9,15
316:25 321:11
325:8
centered 247:11
ceratin 115:9
certain 12:17,24
21:4 24:23 39:8
52:11 61:13,15
71:24 97:5 115:7
119:12 140:22
144:9 152:22
154:8 156:16
158:21 163:11
170:6 188:6
191:18 208:8
211:15 215:6,7

231:20 248:22
267:14 268:15,21
268:24 274:3
277:7 279:8 302:9
302:10 313:9
334:15
certainly 9:8
18:22 19:3 22:23
32:10 37:18 60:21
61:6,21 63:2 64:9
68:12 73:7 78:21
91:20 105:14
131:24 137:22
145:22 158:9
163:6 167:13
182:8,9 189:15,16
204:10,15 209:18
217:24 219:6
225:21 228:17
257:14 264:13
267:18 270:14
271:5 301:18,20
311:11 313:12
certainty 60:22
316:12,14,15
certificate 307:10
307:12 309:10,24
314:23 315:2
certification 338:2
certify 298:3
338:6,12
chain 214:12
challenge 77:25
208:3
challenges 70:4
78:6
chance 71:7
change 64:13
191:6,12,12,16
192:17,19,20,21
192:22,23,24,25

193:2,3,4,6,9,10
193:13,14,16,17
193:18,19,21,23
193:24 194:2,7,16
196:3,11,15,19
197:15,17,21,24
198:9,11,21,24
199:17,20,22,25
200:2,6,6,9,23
201:4 224:17
225:21 245:13
288:6 311:21
317:22 339:6
changed 192:10
197:3,18 217:9
changes 191:12
241:8 317:21
changing 199:10
217:13
characterize 321:7
charge 198:25
charged 163:23
charges 164:2,13
164:18 170:21,21
170:22
charitable 50:22
charles 232:22,25
236:10 241:11
304:2,12
charted 16:12
chase 64:10
chatman 1:6 5:19
6:23 59:23 60:17
62:12 64:16 66:16
66:18,25 67:4,12
67:21,22,24 80:12
80:17,24 85:8,20
86:3,24 87:24
89:4,14 90:7,23
91:7 92:3 93:11
93:21 98:25 99:10

100:10,16 102:17
102:22 103:9,18
104:10,19 106:15
159:23 180:16
183:2 184:11,21
185:4 189:21
190:16 191:5
194:22 195:7,13
195:14 196:15
197:4 198:15
207:19 208:4,6
212:8,21,25
213:19 215:20
216:16,24 218:4
221:2,7 227:17
229:19 230:4,8
231:6,10 232:18
233:4,8 236:18,24
239:17 240:2
241:12,21 242:2
242:10 244:19,22
245:2,7 246:16
247:6 255:13
267:23 268:2,5
269:15 283:21
284:14 289:22
291:5 292:5 293:4
293:16 299:9
300:10 301:25
302:13 303:22
304:4,13 307:9
308:15 309:9
311:2,18 314:16
315:12 316:23
332:3,14 339:3
chatman's 61:18
66:3 80:23 81:5,8
81:12 89:20,25
90:5,22 94:23
98:14 101:20
201:21 206:24

**[chatman's - collected]**                                     Page 10

217:8 219:3 228:3
235:5 289:16
307:13 309:21
311:5 332:20
cheat 140:23
142:4
cheated 140:24
142:6
check 84:11
120:16 252:13
chemical 274:19
cherry 164:5
chestnut 4:14 5:5
7:18,18 87:7
90:12 91:2 92:11
95:22 100:19
105:20 192:12
197:12 200:21
201:25 213:21
275:13 278:22,25
282:7 284:23
286:16 292:8
308:18 315:20,21
315:23 324:18,22
325:14,23 326:6
326:10 330:7
chicago 1:9,9,10
1:10,11,11,12,12
1:13,13,14,14 3:6
3:11,12,18 4:7,13
6:23 7:17,25 29:5
129:3,7 184:25
185:7,8,24 186:7
187:8,13 292:11
292:13 315:18
321:11 339:4
chicken 277:4
280:9
chief 20:2 151:15
151:15 152:17

child 137:23
335:12,22
china 205:11
choice 279:25
280:4
choices 277:10,15
277:16,22
choose 156:19
268:20 273:22,23
312:10
chooses 308:21,22
choosing 167:5
chose 178:11
276:12 291:17,18
323:5
chris 332:4
chromosome
86:10 87:13
chronicled 128:11
chronologically
198:5
church 112:22
cigarette 231:14
circumstance 66:4
274:3 323:20
circumstances
12:13 133:20
134:4 227:16
231:17 268:21
274:5 276:14
277:8 279:23
287:25 330:19
circumstantial
171:4
citations 135:14
cite 27:24 30:11
272:12 273:2
cited 239:10 273:5
273:6
cites 334:17

citing 28:7
citizen 141:13
citizens 144:10
city 1:9 3:11 6:23
7:16,25 10:15
184:25 185:6,8,24
186:7 187:8,12
339:3
civil 2:11 172:13
280:24 281:13
290:25 291:17
319:9 321:19
claim 61:24,25
167:9 198:16
279:12 319:10,22
320:13,22,25
321:19,20,21,22
322:21
claimants 15:5
claimed 92:25
289:11 321:8
claims 281:25
289:17,23 291:5
310:19 331:13
clarify 324:23
333:22
clark 3:17
classic 303:12
classification
327:24
classifications
121:15
clean 136:11
clear 38:13 71:16
90:18 91:4 92:19
93:7,9 118:10
155:18 172:11
189:20 230:22
237:4,6 238:2
240:10 268:6
269:17 299:23

318:18
clearly 52:3
179:10 218:22
297:7
cleave 212:3
client 184:25
294:17
clients 185:6
climate 288:23
clinical 55:4 57:10
241:5 304:10,11
305:4,11
clinically 304:25
clinician 256:13
264:20
clinicians 305:9
clobbered 129:4,8
clock 10:10
close 22:10 158:11
171:3
closely 55:23
307:22
closer 20:20
105:24,25 185:20
clothing 318:17
cocaine 335:20
336:19
coding 126:8
cognition 127:7
cognitively 158:3
coherent 61:8
coincidence 23:6
coinciding 195:12
300:16
coined 327:18
cokeley 1:15 7:23
colbertson 4:4
collect 251:25
collected 68:21
251:24

collectible 317:2
collecting 77:18
251:13,14,15
252:23
collection 31:13
92:25 317:10
college 32:19,24
35:4,6,10 38:17
44:15,16 138:21
139:3,25 140:21
140:22 142:25
143:3 144:5,11
156:14 202:21
258:24 259:13,21
314:5
collegiate 140:17
141:2 142:11
color 213:4 215:10
215:21,23 216:10
216:24,25 217:9
colorful 303:14,18
combination 12:2
come 12:19 21:21
22:11,15 23:5,16
24:24 26:5 28:25
35:19 54:8 56:7
64:25 65:12 68:22
72:12 73:4 117:4
118:5 125:14
126:14 127:20
154:23 155:22
162:17 164:9
165:2 172:14
187:12 205:6
214:19 217:16
218:16 234:8
309:19
comes 57:9 69:8
118:12 126:16,20
189:13 237:25
245:19 254:15

296:22
comfort 40:4
comfortable 160:3
160:3 186:25
comfortably
131:15 177:10
178:4
coming 69:10
189:10 231:15
261:4
comments 230:19
commission
339:25
commit 208:12
209:15 303:8
common 128:14
128:15 221:17
243:7 261:14,18
262:12,13,18
commonly 78:15
281:7
communicate
96:19 209:17
214:16 239:23
242:3 243:5
communicated
191:19
communicating
166:17,21 169:22
207:2,7,20 208:2
233:5 235:23
239:16 242:10
communication
211:12 235:10
236:4,25 240:22
241:8 243:13
244:8 247:21
communications
247:21
community 25:12
27:16 28:5 29:15

29:20,21 32:2
34:15,24 35:9,10
35:12,16,25 36:17
37:23 38:2,6,8,10
38:12,15,17,20
39:7 40:12 43:7
54:20 55:3,4
261:25 264:21
279:18 327:16
community's
254:11
comparable
260:12
compare 174:11
323:21
compared 333:7
comparison 30:13
compel 133:20
compelling 323:8
323:10,22
compensation
257:8,25 258:4,6
314:18,22 315:3,5
complain 136:9
complaint 62:6
104:5 199:7
205:22 280:13
288:5 291:17
322:21 332:24
complaints 287:24
complete 12:16
62:13 66:21
192:13 197:10
213:22 221:9
267:11
completed 11:9
completely 33:13
205:20 279:22
complex 11:19
21:20 29:3

compliance 73:12
compliant 73:21
complied 157:21
complying 82:23
88:19 215:15
223:16
component 181:25
composed 291:12
291:13,16,20,22
composition 196:6
198:20
compound 213:10
comprise 334:8
computer 32:20
260:6,14 265:6
computers 32:25
concepts 57:8
concern 94:18
141:19 153:13
concerned 23:15
35:15 235:12
concerning 106:7
concerns 145:18
167:19
concise 188:11
conclude 21:14,18
45:22 58:5 80:12
80:16,24 99:12
177:10 178:4
214:14
concluded 43:16
313:24
conclusion 14:19
15:8 21:22 23:25
52:20 153:4 162:2
172:15 175:3
188:14 198:14
261:22 272:24,24
273:3 330:23
conclusions 12:8
12:12 13:2,19

**[conclusions - connolly]**

15:21 16:4,18 19:15 22:21,25 23:9 27:10,21 30:6,15 31:22,25 32:17 34:15 35:7 37:12,16,22 38:12 41:8 43:5,10 44:7 44:13,14 45:17 46:21,23 47:6,18 47:21 48:22 49:20 50:5,16,17,18,19 51:16,22 53:4 78:13 79:18 80:3 85:2 88:23 151:19 181:15 191:25

**conclusory** 12:21

**concussion** 128:25 130:7 138:16 280:16,18 281:10 281:15,19

**concussive** 128:16

**condition** 160:16 170:24 204:3,10 211:23

**conditions** 126:25 133:2 140:13

**conduct** 11:11 12:15 18:9 31:20 144:20 145:10,13 157:12

**conducted** 10:25 11:6,8,10 37:20 82:2,18 115:22 116:9 119:15 127:22 139:24 281:20

**conducting** 37:13

**conducts** 143:6 333:20

**confabulate** 133:3

**confabulating** 131:11

**confabulation** 131:22 135:6 137:10

**conference** 148:25

**confess** 21:13 153:6 155:2 179:23 263:8

**confessed** 73:25 159:5 162:5 175:21 180:11 202:20 230:4,9 231:10 263:6,18 312:21

**confesses** 164:13 264:4

**confessing** 208:7 240:15

**confession** 11:18 12:18,25 14:6,18 15:5,9,10 17:20 26:7 28:4,12 30:20 31:9 35:5,7 35:9 39:5 52:22 53:3 56:18 70:6 74:17 99:14 100:9 104:15 105:2 115:2 132:7,13 137:13 138:23 147:23 149:2,19 151:22 152:11 153:9,11 157:5 158:20,23 159:12 160:23 161:6,10 161:12,17,20 162:15,16 164:10 170:5,25 171:25 172:3,16 174:19 175:3,20 176:16 178:6,19,22

179:17,20,25 180:20 188:12 191:6,13,21,22 195:9 201:22 202:5,15 204:24 205:11 212:21 213:25 217:14 227:16 228:4 230:25 253:3,17 253:20 257:19 263:14,20 264:12 265:10 266:5 289:17 305:5,20 311:5 312:12,14 312:15,17 313:25 314:7,8,8 315:13

**confessions** 10:19 10:21,23 11:13,14 11:15 12:6,19 13:10,18,21 15:12 17:19 18:6,12 21:9,19,24 22:8 23:22 24:4,11 25:8 30:5 31:7,15 31:19 34:24 35:2 38:16,19,20 43:9 43:15 48:4,9,10,15 48:15 51:17 53:10 58:4,8,18,20 59:3 59:6 71:20,25 108:21 132:17 140:2 147:12 149:8,16 151:18 152:2 154:11 155:7 156:7,9,11 157:16 159:16 160:7 162:21 165:11 170:12 172:2,8,9,10,12 175:9,15 176:23 177:11 178:2,12

178:24 179:2 202:17 208:13,14 305:16 313:20

**confidence** 13:24 156:6

**confident** 24:7,25 173:5

**confirmed** 18:5 21:9 30:4

**conflate** 261:20

**conformed** 220:19

**confrontation** 16:5 22:3 52:19

**confrontational** 218:14

**confrontations** 229:21

**confronted** 14:3 52:20,25 229:24 231:18 232:4,5

**confronting** 154:4 154:6 231:22 260:7

**confronts** 231:5,6 260:11

**confused** 34:19 118:22 175:4

**confusing** 55:12 238:23

**confusion** 61:16

**congratulatory** 76:3

**connected** 250:6

**connecticut** 19:23 20:3,23

**connection** 60:2 151:16 211:3 249:24 255:19 274:14

**connolly** 4:10

[conscious - correct]                                                    Page 13

conscious 121:5
277:13
consciously 133:8
consensual 59:20
59:24 64:22 65:7
83:9 87:20 91:9
91:18 93:9,18
97:25 98:4,7,11
100:8 112:8
195:11,22
consensually
65:20
consensus 334:10
consent 99:21
consequence 54:7
258:23
consequences
55:24 141:6 203:3
258:12 260:7,10
consequential
172:25 314:12
consider 35:4
39:16 41:6 66:25
67:3 115:11,20
120:25 166:10
167:14 198:23
217:25 248:24
320:5 321:3
considerably
300:7
consideration
24:21 112:6
191:21 194:13
309:23
considerations
191:23
considering 19:16
248:14,21
consistent 221:14
250:8

conspicuously
237:12
consternation
195:19 196:9
construction
279:7
consulted 122:11
172:13
consumed 228:20
contact 59:20
64:23,25 65:8
68:10 189:10,17
195:6 302:20
contaminant
100:14,21 284:8
285:14
contaminate 91:10
91:13
contaminated
315:11
contamination
87:15 93:16 94:14
99:21 180:17
192:8 195:11,24
197:8 200:15
201:20 203:4
213:17 217:16
220:16 221:5
contemporary
169:15
content 28:17
30:11 189:8 243:4
contention 135:18
contentions 49:20
50:5
contest 307:21
contested 54:19
100:25
contesting 308:24
308:24

context 11:22
14:24 53:11 69:21
72:18 111:12
120:19,24 139:7
140:5,17 145:23
155:3 175:12
202:14 281:13
305:14
contexts 12:5
120:23
continue 6:11
229:8
continued 3:22 4:2
51:10 57:22
107:17 139:19
177:18 201:13
255:8 292:23
328:21
continuing 330:12
contradicts 46:20
47:17 50:15
contrary 171:8
239:11
contribute 11:18
12:6 14:5 157:5
161:19 277:17
contributed
102:13
contributes 86:11
202:5,9
contributing
161:5,11 173:20
204:23
contributor 86:4
283:21
contributors
72:16
control 279:19
300:19 316:4
controversies
54:17

controversy
143:22
converged 159:10
converging 26:10
conversations 6:6
converse 57:25
convey 143:24
convicted 166:13
166:23 255:14
257:18,22 258:2
conviction 187:15
187:18,22 188:2
255:15,25 258:10
convictions 151:17
151:25 152:10
cook 1:15,15,16,17
1:18,19,20,20 4:5
212:8,10
cooperative 295:3
cop 141:13 209:9
cope 272:17
coping 274:17
coprophilia 40:23
41:16
cops 36:6
corner 82:22 83:2
294:15
corp 279:14
correct 11:7 24:2
31:24 43:16 49:5
50:16 58:24 59:9
80:18 83:11 84:8
86:19 89:22 90:2
108:9 109:13
154:3 200:24
212:12 220:22
226:19 246:19
254:20 271:19,24
272:11 278:6
281:24 282:3,8,11
285:25 302:16

[correct - date]                                                            Page 14

303:25 311:10
317:7 330:17
**correction** 311:14
**corrections** 262:22
**corso** 156:13
**cost** 182:6
**coterie** 48:6
**counsel** 168:17
324:8,17 325:12
**counterbalance**
333:11
**country** 265:13
279:9
**county** 1:15,16,16
1:17,18,19,20,20
4:5 212:8,10
**couple** 35:18 36:2
41:9 108:5 148:12
**course** 17:8 18:17
46:7 79:19 93:11
116:22 118:4
120:10 127:13
163:3 175:7
191:24 204:23
217:13 218:18
221:18 249:6
250:20 283:4
312:19 314:15
**courses** 116:18
**coursing** 259:2
**court** 1:2 6:25
7:10 17:12 136:7
136:12 163:5,7
307:22 308:13,20
308:21,22 333:24
**court's** 310:4
**courthouse** 274:8
275:19
**courtroom** 203:13
225:3,13

**courts** 310:7,11
**cover** 27:6
**covered** 149:18
228:24 283:23
**crack** 110:20
**crash** 32:19
**crashed** 265:6
**crashing** 32:25
260:5,13 265:6
**create** 153:11,19
325:17
**created** 142:2
**creates** 14:10
15:10
**creating** 149:11
**credibility** 256:17
**credit** 79:7 203:22
238:21 307:12
**credited** 161:25
**crediting** 284:2
**creek** 144:13
**crime** 59:14 60:15
61:19 102:14
202:19 212:22
214:17 217:10
218:3 220:14,20
221:7 223:19
224:20 225:25
241:10 246:5,25
250:16 252:14
301:17 302:22
306:23 314:17
327:23
**crimes** 141:17,24
142:11 148:25
208:12 209:16
264:7 307:8
**criminal** 101:18
101:19 104:5
152:7 313:8,13,23

**criminalist** 19:19
**cringe** 223:3
**criteria** 180:9
**critic** 261:8
**critical** 43:25 44:2
53:9 139:8 246:12
**critically** 246:2,10
**criticism** 39:3
334:2,11,12,13
**criticisms** 45:19
45:20 333:16,19
333:23
**criticized** 138:20
138:25 265:13
**critics** 259:7
**cross** 336:6
**crowd** 151:2,3
152:21 153:24
**crowe** 177:21
**crude** 120:14
**crystally** 274:25
**culled** 180:7
**culminated** 159:12
**cup** 233:17,18,21
233:24 234:5,14
238:8,9,14,19
239:4 245:20,21
245:24 246:4,22
247:7 248:2 249:7
249:23 250:16,22
250:24 252:7
253:6
**cups** 252:23
**current** 37:10
148:10,14
**currently** 43:6
**curt** 232:6
**curtly** 230:20
**cusp** 307:4
**custodial** 263:16

**custody** 214:12
237:25 263:3,12
335:22 337:10
**cut** 180:3 207:12
**cuts** 188:22 189:3
**cv** 1:8 5:17 7:3
145:25 146:4
147:16 148:7,21

**d**

**d** 5:2 210:10,20,22
260:23
**daley** 212:23
224:2,4,16 233:3
304:4,8,15 316:25
321:11 325:7
**damage** 279:11
**damn** 257:11
**danger** 297:5
**dark** 216:3
**dart** 1:19
**data** 16:16 24:13
24:18 26:5,10
27:7,9 28:20 29:2
30:23 31:13,22
33:12,13,15,18,18
36:15,15 37:11,14
44:17 45:2,7,15,22
45:25 46:2,3,4
48:10,21 51:18
54:7 55:9 57:4,5
79:20 140:25
143:7 147:14
155:8 167:4
173:17,18 176:5,5
177:2 272:25
**database** 28:10
**dataset** 44:6 177:9
**date** 6:16 52:2
70:23 82:11 83:23
88:10 148:5,10
150:17 182:16

199:11 294:7
295:25 298:21
339:4
**dated** 84:5
**day** 36:16 40:18
42:4,4,19 164:24
173:11 181:18
227:14 264:15
300:12 329:15
337:21 338:18
339:22
**days** 192:5 195:22
197:6 200:14
201:6 213:15
221:4 252:19
253:13,24 256:6
280:21 281:5,17
284:20 298:24
315:10
**dazed** 129:5
**de** 111:15 170:15
258:3
**deadline** 326:5
**deal** 19:3 252:15
313:21 323:5
**dealing** 44:5
264:21 280:8
322:13
**deals** 314:6
**dealt** 280:25 319:8
**dean** 139:4 140:16
**death** 17:20
152:25 154:5
168:25 169:2,12
170:21
**december** 2:3 6:16
84:6 198:6 338:18
339:4
**decipher** 239:22
**decision** 188:17
263:7 279:14

310:16
**decisions** 143:24
**decline** 127:6
186:5
**declined** 186:6
**dedicated** 75:23
166:12
**deemed** 299:3
**deeming** 22:2
**deep** 169:15
**defend** 272:20
**defendant** 3:17
4:11 7:19 169:7
264:11
**defendants** 1:22
3:10 4:5 7:22
22:19 76:13 230:9
**defense** 75:11
142:21 143:15,17
144:3,5,22 145:5
152:6 163:18
168:16 188:2
259:24 266:4
313:8,13,23
**defer** 285:4 317:8
**deferential** 290:20
**definitely** 16:22
53:24 137:9
154:18 191:2
205:8 312:4
**definitively** 96:16
98:24 99:23
108:23
**degree** 14:9 21:14
52:13 61:10 91:13
100:24 111:22
118:24 131:25
137:21,24 144:6
240:17 283:6
289:10 316:11,13
320:15

**delete** 194:3,6
**delirious** 211:25
**delusion** 293:23
295:17 297:11
**delusional** 233:21
293:17 296:6,15
296:17 297:4,9
298:9 299:11,16
299:17
**delusions** 155:10
160:19
**dementia** 116:24
127:10
**demonstrable**
31:15 35:2
**demonstrably**
10:21 11:12 13:17
31:19 37:2 53:18
58:3,22 59:2,7,12
99:14 151:18
157:15 159:15
160:7 161:9,17
162:14 176:16,22
**demonstrate**
33:11 34:14 60:22
**demonstrated**
24:10 30:19 32:3
32:4,5,6,16 37:13
132:2 133:16
**demonstrates**
37:21 134:21
**demonstrative**
18:12 59:16
**denial** 53:12 54:5
312:13,15 314:8,9
**denied** 179:6
255:16 295:10,11
295:12,13 310:7
**dennis** 1:12
**deny** 307:2

**department** 
142:21,22 143:14
143:17 144:3,4,21
144:22 145:5,5
163:18
**departments**
163:12
**depend** 23:6
130:24
**depending** 140:12
**depends** 52:10
105:5 114:23
130:13,17,20
**depose** 36:9
**deposed** 8:20,22
108:6 246:16
**deposited** 238:19
**deposition** 1:24
2:5 6:10,19 17:12
20:12,13 36:8
38:4 79:10 83:16
84:20 94:7 106:6
106:18,20 107:22
108:11,18 109:3,8
109:11 110:3,10
110:14 143:12
175:17 196:6
199:13 223:25
226:7 228:2,16
229:5,9 233:16
236:18,19 237:11
237:16 246:23
268:14 282:14,22
290:22 329:22
335:8 339:4
**depositions** 101:4
219:2,23 220:7
252:20 271:3
**depravity** 18:21
**depression** 159:22
160:12

**depth** 41:5
**deputies** 1:19
**deputy** 1:15,16,16
1:17
**derive** 15:8 16:17
32:15 47:5
**derived** 32:18
143:7 226:2,5
**described** 137:8
142:12 211:21
272:5,8 288:18
291:12
**describing** 168:15
304:13
**description** 5:11
217:9
**deserved** 76:4
**design** 105:15
138:22
**designated** 141:17
**designed** 26:11
**desk** 63:24,25 64:3
69:13 128:6 234:6
252:13,14
**despite** 22:12
**destabilize** 241:9
**detail** 48:5 118:11
214:7,7,24 326:20
**detailed** 48:15
230:2 231:8
305:12
**detailing** 132:18
213:3
**details** 61:14,15
119:8,9,19 132:8
133:7,21 203:16
213:2 217:15
218:3,6,23 221:6
318:12 326:15,20
326:25

**detainee** 142:23
143:4
**detainees** 144:7,9
144:12
**detective** 1:9,10,10
1:11,11,12 205:14
205:14 231:6
242:8,9 245:6
**detectives** 220:19
233:6,6 238:17
240:25 251:6
253:5
**deteriorated**
242:20
**deterioration**
127:6 303:5
**determination**
254:14 299:18
310:5,6
**determinations**
335:22
**determine** 16:3
18:11 24:15 59:11
61:18 83:8 158:18
188:7 253:2
254:19 319:13
**determined**
131:18 157:15
195:15
**determining** 254:3
254:4
**devastating** 336:5
**develops** 273:20
**devoid** 262:11
**devote** 41:11,16
**diagnosed** 280:15
280:17 281:15,19
**diagnosis** 155:6
176:20 300:25
301:12

**diego** 177:22
**dietz** 335:10
336:14
**dietz's** 335:24
**difference** 25:5
29:9,10 38:9 73:2
150:23 314:10
329:11
**differences** 318:9
**different** 22:20
40:6 44:7 47:4,5,6
57:3 69:9 72:10
72:10 74:13 77:11
77:17 97:20
113:20 117:2
121:12,15 122:17
122:19 127:3,4
134:10 135:16
151:6,7 156:22
163:9 165:5 185:6
206:19 209:19
244:9,10 252:20
262:8 270:8
276:10 306:5,11
309:3 310:16,18
318:3
**differentiate** 205:4
**differently** 73:3
**difficult** 9:6 136:6
158:18
**difficultly** 169:22
206:25 207:25
**difficulty** 207:19
**dig** 34:11
**diluted** 54:9
**direct** 70:24
102:19 103:3
104:3 229:17
292:2 296:10
316:7

**disagree** 273:5
**disagreed** 334:14
**disagreeing** 329:6
**disc** 51:4,13
107:11,20 139:22
201:16 254:25
255:11 328:24
**discarded** 238:14
**discern** 234:2
**discernment**
234:11
**discharged** 298:24
**discipline** 50:20
50:22 92:22
329:18
**disclose** 326:24
**disclosed** 17:8
49:21 118:6
183:17
**disclosure** 327:9
**disconnect** 28:13
28:14,16 196:5
211:5 261:23,24
**disconnected**
211:8 248:7
279:23
**discount** 167:23
**discounting**
168:18 242:13
304:2
**discovered** 73:14
318:15,25
**discovery** 16:25
157:21
**discrepancies**
287:20,21
**discriminate**
188:10
**discussed** 134:22
135:17 137:5
203:12 282:21

discussing 115:5
249:14
discussion 51:5
54:25 57:17 62:20
74:16 100:12
104:25 107:12
118:7,8,13 139:14
160:18 189:12,14
191:14 194:5,18
198:17,25 201:8
205:21 209:4
221:22 232:10
234:9 250:11
255:3 292:18
305:15 328:16
332:21 334:25
discussion's 79:7
dishonest 28:15
121:2 249:10
dismiss 55:8 205:8
215:5
dismissive 64:5
132:13
disorder 76:12
166:16 273:20
disorders 77:5
disorganization
211:16 212:4
disorganized
211:9,10,11,18
243:11
disparaging 75:18
disparity 22:13
disproved 316:8
dispute 56:21
62:23
disputed 25:8 26:7
70:6 147:11
171:24 263:14,19
300:14 313:20

disputing 147:23
177:25 305:5,15
309:22
disqualified 261:2
disrespect 158:10
328:5
disrobing 319:6
dissect 25:10,11
dissociation 13:3
dissuade 323:3
distinct 212:6
distinction 173:13
distinctive 307:8
distinctly 134:9
distinguish 175:13
distinguished
176:19
distinguishing
288:13
distorted 133:7
134:8
distortion 121:4
129:20,25 131:19
district 1:2,3 6:25
7:2 149:13
distrust 132:4,12
132:16,22 137:12
137:16
disturbed 318:17
disturbing 49:4
divert 279:16
division 1:4 7:3
335:16
dna 59:13 60:4,8
60:13,20 64:15,24
65:4,13,21,25
66:15 68:8 80:20
81:3,8,12,17,21
83:8 84:16,20
85:4,9,15,22 86:13
86:16,17,21 87:11

88:2,24 89:9,18,18
89:23 90:4,20
91:6,11 92:2,20
94:13,21,23 98:12
98:14 99:4,8,8
100:12,23 102:2
102:11 105:11
106:9,12 112:7
122:2 180:17
188:16 189:9,10
189:14,16,24
190:5,12,15,21
192:8 194:10,14
195:3,4,25 197:8
198:3 200:15
201:20 213:17
221:5 251:3
283:15 315:11
316:20 317:2
doc 65:23
docile 289:18,24
290:15,16,16,18
290:19,24 291:6,8
291:13,13,17,19
291:25
docility 290:10
doctor 47:12
51:14 58:2,25
59:5 70:17 91:24
138:4 139:23
188:23 261:13
281:9 295:6 297:7
315:6
doctors 293:14
312:3
document 70:21
82:9,14 83:2,21
84:8,25 88:8,12
113:4 148:3
182:14 197:20,23
199:19,24 200:4,8

294:5 297:24
313:14
documentation
79:21 132:15
documented
133:17 135:9
137:18 176:23
212:10
documents 16:24
101:11
doing 19:10 72:7
76:19,24 133:9
150:11 173:13
185:16 196:17
243:23 248:6
252:21 276:5
294:2 335:20
336:20
doj 27:4
dollars 143:15
181:21
domains 74:15
door 209:9
dose 55:18,18
double 25:23
43:17
doubling 332:23
douglas 110:20
111:6,13 114:3
downstream
218:25
dr 7:4 20:15 31:8
32:9 44:21 48:18
48:18 49:21 50:6
50:15 51:25 61:22
71:18 75:18,21
84:18 137:11
141:25 142:14
163:19 199:13
202:21 203:3
227:19,19 239:9

258:20 260:18
261:9,19,19
266:12,17 268:20
270:14 281:20
283:19 311:10,16
315:22 319:15
329:5 333:16
334:22
**dramatic** 241:7
257:16 318:13
320:15
**dramatically**
49:15
**draw** 12:12,25
14:19 15:20 19:14
30:5 31:22 45:17
51:15 171:18
**drawing** 32:2
239:6 331:7
**drawn** 23:25 43:6
44:7 46:21 47:18
53:4
**dress** 217:18
218:10
**drew** 13:23 177:24
**drill** 248:23
**drills** 316:3
**drinking** 295:11
302:5,6
**drive** 3:11
**driven** 71:20
132:8
**drizen** 30:8,16
35:14 38:24 44:13
45:12
**drizen's** 45:25
46:2
**drop** 264:23
**dropped** 64:2
164:3,14 260:24

**drug** 113:17,17
246:6 273:17
274:16 275:4
278:2
**drugs** 112:18
272:17,21 274:15
275:6
**dsm** 334:8
**dual** 300:25
301:11
**due** 326:18
**duly** 8:7 338:8
**dykema** 3:10
**dynamic** 132:9
137:19 143:13
155:11

**e**

**e** 3:19 5:2,10 8:6,6
8:6
**earlier** 14:21
17:16 45:5 47:19
79:10 103:22,24
106:11 122:7
156:24 175:16
180:5 216:22
227:4 231:16,23
232:3 242:19
277:23 288:25
303:19 320:4
321:20 322:18
331:11
**early** 76:14 78:19
153:3 229:20
241:2 275:21,23
276:20
**easier** 12:11 113:5
**easily** 303:23
304:9 305:3,23,24
318:19
**eastern** 1:4 7:2

**easy** 214:24
**eddie** 158:7,8,11
159:4
**editing** 194:25
**educate** 156:20
**educated** 266:13
**educed** 142:3
143:9
**effect** 53:19,24
55:11 56:24,25
72:21 113:5
**effectively** 166:24
167:9
**effects** 128:10,11
134:21 138:9
255:20
**efficient** 267:18
**effort** 130:2,12
238:13 268:4
**eight** 84:25 100:3
**eighth** 99:25 100:2
193:3
**eighty** 164:11
**either** 31:11 62:24
94:24 100:15
144:21 176:23
208:17 211:19
234:4 261:23
284:6 325:22
**elaborate** 232:14
288:2
**elaborated** 230:15
**elaborating** 305:8
**elaboration**
297:19
**element** 11:21,22
11:24 266:20
**elements** 46:11
248:22
**elevated** 14:12

**elevator** 224:5
**elicit** 202:15 242:2
324:13,15 326:2
**elicited** 231:25
**eliciting** 265:9
324:10
**elizabeth** 336:2
**else's** 28:3 64:15
83:8 94:15 106:12
189:24 190:5
194:13
**eluded** 175:15
**embark** 162:24,25
**embarrassment**
326:23
**embed** 140:18
191:20
**embellished** 289:5
**embellishing**
271:13 289:9
**emblem** 20:25
**embracing** 53:12
**emerge** 15:2 26:9
33:14 45:11,16
54:11 56:13 79:15
189:16
**emerged** 12:17
17:15 44:14,17
195:11 233:16
**emergency** 96:17
96:25 98:2 209:8
237:22
**emerges** 27:14
33:12 63:3,19
64:7 147:15
243:13
**emotional** 126:8
126:11 158:25
286:6,11,25
287:15 288:15

employ 156:17
enable 26:11
enabled 14:19
enables 52:13,15
enacting 113:25
encoded 127:16
encoding 122:25
  123:13 124:24
  125:2,22
encompassed
  77:20
encompasses
  74:23 176:8
encompassing
  147:21 190:11
encounter 22:24
  57:3 83:10 122:8
  175:20 230:2
  231:9 264:7
  313:15
encountered 240:9
encounters 111:24
  112:2,9 113:12
ended 113:14
  158:17 245:8
enforcement
  19:21 33:5 145:9
  147:4,5 151:4
  259:24 262:6
  327:22
engage 12:4 91:12
  98:21 114:11
  232:13 270:15
  314:3
engaged 206:14
  282:15 283:3
  319:6
engaging 104:15
  152:9
engender 325:18

engineers 279:15
england 39:21
english 235:25
enormous 167:17
entailed 319:25
entered 106:5,18
entertain 217:12
entire 24:9 190:13
  191:7,16 193:11
  193:18 198:17
  200:16 279:18
entities 134:10
  212:6 310:18
entitled 2:7 88:14
  314:17 315:4
entity 334:8
environment
  68:25 69:3 206:15
  206:17
equate 185:13
  259:12,22 262:15
  265:2 291:19
equated 171:17
errata 339:2
error 285:24
  286:10
errors 100:22
esoteric 39:11
especially 26:21
  33:3 61:4 96:24
  154:16 170:18
  176:6 221:20
  243:4 264:15
  302:25 329:16
esq 3:7,13,19 4:8
  4:14
essentially 130:3
established 70:10
  71:9,23 99:20,24
  173:16 271:11

estimates 306:13
estimation 25:16
  189:19
et 6:23 339:4
ethical 222:19
evaluate 166:18
  270:15 310:19
evaluation 116:20
evening 241:2
event 21:23 61:11
  87:17 118:10,11
  140:5 257:12
  258:11 281:6
  288:25 308:8,10
  309:15 319:2,7,19
  323:16,16 326:16
events 61:13
  116:25 129:14,22
  129:22 247:13
  279:18 286:19,21
  287:14 288:4
  308:25 318:10
  322:9,12,17
  323:24 332:9
eventually 51:21
everybody 40:18
  42:25 72:9,10
  164:21
everyday 19:4
  224:2
evidence 60:11
  63:21 64:21 65:7
  67:10,11 68:5,7,14
  68:21 69:5 84:21
  92:25 94:15 95:6
  95:17 96:3,21,22
  97:24 98:3,9,20
  102:11 111:13,15
  111:16,17 154:17
  171:4 176:5 197:8
  198:3 202:8 224:9

224:25 251:24
  252:25 253:15
  254:14 263:10
  265:16 270:13
  282:6,19 303:22
  304:20 307:13
  308:7,15 312:22
  316:9 318:18
  323:9,10,23
  330:20,24 331:3,3
evidently 189:19
evolving 240:11
ex 313:4
exact 224:13
exactly 78:17 99:4
  111:10 142:18
  265:3
exaggerating
  270:10
exam 120:3
  296:19
examination 5:3
  8:17 65:10 117:7
  117:19 120:11
  189:4,7 190:2
  263:24 281:21
  295:23 296:4
  314:5 315:21
  330:12
examinations
  252:21 336:6
examine 106:21
examined 8:8
  160:2 235:20,22
  281:12 298:4
  299:9 311:12
examinee 77:3
  159:23 221:20
  251:20 264:10
examiner 133:23
  133:24 137:20

312:9 331:14
**examining** 262:22
  281:9
**example** 19:18
  27:23 28:9 29:4
  30:7 32:17 37:5
  40:22 41:8 44:13
  47:2,22 49:12
  52:18 54:13,16
  59:21 63:23 71:13
  71:16 73:6,9
  113:21 118:11
  122:10 128:5
  142:9 157:24
  180:15,19 191:11
  204:4 215:3
  218:15 233:15
  245:18,25 253:14
  265:9 273:16
  313:22 334:7
  336:2
**examples** 74:12
  331:16
**exams** 120:2,7
  221:16
**excellent** 167:12
**excepted** 283:6
**exception** 169:5
**exchange** 122:2
  232:10
**exciting** 36:18
**exclude** 105:10
  191:22
**excluded** 86:25
  102:7 283:20
**exclusive** 125:3
**exclusively** 113:23
**exculpated** 190:16
**exculpating**
  179:12

**excuse** 136:4
**exercise** 119:15
  195:20 197:2
  232:2 264:14
  314:6
**exercises** 119:3
  261:21
**exhibit** 5:12,13,14
  5:16,17,18,19
  70:22 77:22,24
  82:8,10,13,21
  83:20,22 84:3
  88:9,12,18 101:11
  148:2,4,6 180:23
  182:13,15,22
  183:10 188:21
  189:2 223:14
  229:18 258:13
  283:11,13 294:4,6
  294:9
**exhibits** 5:22
**exist** 333:12
**exists** 40:13 41:3
**exonerated** 166:5
**exonerating**
  166:12
**exoneration** 27:4
  101:21 314:22
**exonerations**
  165:25 178:13
**expands** 301:20
**expect** 59:23
  118:25 206:23
  222:12 251:5
  253:5 302:17
  303:14,18
**expectation** 17:3,5
  134:5
**expected** 267:12
  267:15

**expenses** 113:19
**experience** 25:16
  28:15,17 32:11,12
  33:25 76:9 122:15
  127:12 128:9,17
  129:2,10 131:25
  156:23 167:20
  168:9 171:15
  173:15,25 186:9
  208:24 209:2
  241:5,6 243:8
  247:18 253:4
  260:2,6 261:24
  262:5,11,20,21
  263:4,11 264:11
  264:18,19,20
  286:24,25 319:20
  320:9,12 322:11
  322:13,18 323:2
  323:11,12,13
  325:16 328:11
  329:6,8 331:11,13
  331:14
**experienced**
  207:24 322:8,17
**experiences**
  122:13 263:2
  331:18
**experiencing**
  160:12 238:5
**experiment** 265:5
**experiments**
  139:24
**expert** 2:6 31:12
  32:7 68:2 84:16
  84:19 94:13
  114:19 115:3,20
  251:10 336:6
**expertise** 69:17
  93:2 101:5 114:22
  115:4,6,8,16,25

125:15,20,24
  149:2 156:25
  252:8,18,21 254:2
  254:4 317:9 331:6
**experts** 34:18,20
  35:8 100:23
**expires** 339:25
**explain** 69:25
  137:7 138:14
  247:9
**explained** 326:14
**explaining** 71:15
**explanation** 132:2
  198:13,18
**explanations**
  273:11
**exploit** 158:16
  322:5
**explore** 44:12
  98:19 169:13
**explored** 93:19
  95:9,12,24 306:12
**exploring** 96:11
  96:12 165:4
  251:16
**expose** 274:3
**exposed** 42:15
  118:24 203:17
  206:9 208:4
  214:13 216:21
  218:6 228:11,13
  235:5 274:12
  276:14
**exposure** 18:18
  160:22 214:15
  280:24 281:3
  330:6 335:14
**express** 223:11
  228:10
**expressed** 189:18
  258:17 307:24

**expressing** 210:4
243:3
**expression** 79:8
145:18
**expressive** 263:15
**extended** 146:19
**extent** 324:8
**extramarital**
105:17 106:25
229:2 284:7,18,19
285:14
**extrapolate** 23:14
27:20 68:5 141:22
**extrapolated**
38:18 140:25
141:4 143:7
**extrapolating**
37:11 139:24
144:11
**extrapolation**
139:2,6
**extremely** 327:20
328:4
**eye** 52:17 157:6
**eyes** 10:10 172:19
279:16

**f**

**f** 143:22
**fabricate** 324:5
**fabricated** 61:24
198:16 199:7
319:11,14,17
320:6 321:10,22
325:7 330:14
331:13
**fabricating** 334:17
336:23
**face** 36:11 44:17
75:3,4 78:24 79:6
80:7 93:3 195:20
209:21 233:22

245:16,22 246:14
258:25 319:8,22
**facebook** 335:19
**fact** 19:13 59:13
60:19 61:19 67:7
67:19 80:12 81:2
87:2 90:4,23
146:17 147:23
175:25 179:5,12
194:21 196:15
197:4 198:22
216:17 235:21
248:21 256:10
267:6 278:18
286:8 299:15
310:15 311:12
314:12 322:5
324:3 330:15
331:21 332:6,8
**facto** 111:15
170:15 258:3
**factoid** 23:24
**factor** 22:3,7
52:21 58:2,7
161:5,11 168:25
171:10,15 173:20
201:20 314:14
326:23 327:4
**factors** 11:13,17
11:20 13:20 14:22
14:24,24,25 24:15
54:10 55:21 56:13
58:6 122:24 123:2
123:12,15,21,23
124:24 125:21,25
126:13,23 127:17
147:14 159:4
201:21 287:22
326:13
**facts** 60:16 102:16
102:22 103:17

104:9 105:12
152:2 188:6,7,8,17
212:22 213:25
214:5 220:15,20
224:8,24 245:12
282:5,18 302:24
315:8
**factual** 103:7,10
190:8
**fading** 234:22
**failed** 14:4,17
17:22 21:12 52:21
53:2 56:15,17
153:14
**failing** 53:25
**failures** 154:6
**fair** 9:23 13:12,15
31:23 51:14 74:18
74:22 78:14 80:25
110:6,8 128:22
138:23 141:3
157:13 239:24
242:6 261:13
327:10 329:24
**fairly** 214:24
232:13 323:15
**faith** 93:3
**fall** 257:16
**falls** 234:5
**false** 10:19,21,23
11:13,14,15,18
12:6,17,19 13:10
13:18,20 14:6,18
15:10,11 17:19
18:6,12 21:9,19,24
22:7 24:4,10 28:4
28:12 30:5,20
31:7,9,15,19 34:24
35:2,5,7,9 37:2
38:16,18,20 39:5
43:8,15 48:14

51:17 52:22 53:3
53:10 56:18 58:3
58:8,17,20 59:2,6
61:25 71:20,24
74:16 99:14 100:9
108:20 114:25
130:13 132:7,13
132:17 138:23
140:2,11 149:7
151:18 153:11
154:11 155:6
157:5,15 158:20
158:22 159:12,16
160:7,22 161:6,9
161:12,17,20
162:14 164:10
165:10 170:5,12
172:2,3,7,9,10,12
172:16 173:5,5
174:19,21 175:3,9
175:14,20,21
176:16,22 177:11
178:2,6,12,19,22
178:24,25 179:17
179:20,25 180:20
191:6,13,21,22
195:8 201:21
202:4,15 205:10
212:21 213:24
217:14 253:3,16
253:20 257:19
265:10 289:17
305:20 313:24
315:13 320:18
**falsely** 73:25 153:5
155:2 164:13
178:18
**familiar** 84:11
128:3 204:21
215:19 223:18
224:19 225:4,24

263:6 323:4
327:11 333:25
**familiarity** 28:2
45:6 118:10
**famous** 327:17
**fans** 156:14
**fantasies** 113:25
**fantastic** 33:14
144:17
**far** 29:3 110:24
111:6 112:11
124:2 127:14
202:20 267:15
317:9
**fascinating** 40:23
**fast** 156:15 228:9
**faster** 210:13
**fat** 180:3
**fatigue** 242:20
**favor** 60:16 294:2
**fear** 220:15
**feces** 40:24 41:20
**federal** 2:11 145:9
**feel** 186:24 227:23
228:22 259:25
274:12 307:3
**feeling** 212:16
335:7
**feels** 206:21,22
294:21
**feet** 298:14
**felt** 17:17 227:13
**female** 86:16
**fidelity** 27:13
63:21 96:13 287:3
**field** 18:25 43:8
51:17 116:9,13,16
129:9 140:2
**fifth** 88:5 192:22
**fighter** 143:16

**figure** 29:15 72:13
163:20 185:13
205:16 253:19
329:15
**figures** 182:10
183:3
**file** 172:20 256:4
319:21 320:25
322:3,6,20
**filed** 205:22
255:18,22,23
256:5,11 279:12
319:9
**fill** 130:4,8,12
131:3,14 132:7
214:5
**filleting** 234:21
**filmed** 163:11
**find** 15:17 41:4
52:11 92:16
135:24 161:16
183:23 236:17
238:13 239:8,10
243:18 253:6
**finding** 52:14
128:15 194:15
308:14
**findings** 33:7,9
77:16 98:5 186:25
189:22 194:8
268:7 273:10
285:5 319:12
334:15
**finds** 77:4
**fine** 74:4 209:18
233:12
**fingerprints**
250:21,25 251:14
252:12
**finish** 116:5 136:5
164:12

**fire** 316:3
**first** 8:7 9:3 18:15
34:23 37:25 45:20
62:16 109:10
132:2 160:22
162:15 167:2,17
175:19 182:21
183:9 184:4
192:17 193:12,22
227:2 230:25
267:7 282:2 311:8
319:2
**fit** 180:9 246:3,6
**fits** 87:14
**five** 35:20 39:6
47:12 76:21 87:25
90:3 91:24 176:6
176:7 182:10
254:10 288:22
318:22
**fives** 183:3
**flat** 262:3
**flaws** 279:6
**flight** 210:2,3,17
210:18 212:11
235:14 236:7
237:7 243:12
247:19 249:15
**flip** 9:20
**flippant** 218:13
**flood** 278:4,7,7,11
279:5,10,24
**flooded** 278:9
**floods** 278:15
279:17
**floor** 224:12,13
225:11,11,13
**fly** 143:16
**focus** 65:10 266:20
**focuses** 113:2

**focussed** 309:12
**focussing** 266:14
**folks** 99:25 163:16
163:22 172:3,4,5
254:11 322:11
334:14 336:3
**follow** 30:25 58:25
59:5 64:11 103:4
239:21 241:24
321:17 329:20
**followed** 14:18
229:6
**following** 227:9
306:3
**follows** 8:9 308:5
**foot** 262:3
**football** 156:14
**footnote** 327:7
**footnotes** 327:6
**force** 151:14
**forces** 78:5 307:6
**forensic** 18:7 20:2
26:8 38:10 53:11
55:2,23 57:12
62:21 120:24
147:11 150:16
151:4 174:13
183:7 235:21
237:22 252:21
256:12 263:22
312:9 314:4 320:2
323:11 327:19,25
329:10,16,17
331:14 335:4,4,10
335:17
**forensics** 118:12
208:24
**forever** 106:23
**forget** 251:25
**forgetting** 129:14

forgot 251:20
fork 27:5
form 66:21 77:11
  87:4 90:10,25
  91:3 92:6 95:4,20
  96:8 99:16 100:18
  104:12 105:18,21
  106:3 107:4
  108:13 119:20
  123:8 166:15
  167:10 168:16
  190:17 192:11,13
  197:10 200:20
  201:23 202:2
  213:9,22 214:22
  218:20 221:8
  224:7,23 226:14
  228:5 229:13
  236:15 240:5
  242:4 253:9
  256:15 275:14
  279:2 282:5,17
  286:16 299:14
  302:24 304:7,18
  306:10 307:15
  308:17,19 309:6
  311:24 314:20
  317:5,6 318:6
  321:15 324:6
former 336:7
forth 338:8
forthcoming 96:18
  97:8 232:7
fortified 274:6
forum 45:21
forward 31:17
  153:18 154:23
  332:16
found 52:24 62:8
  63:6 64:14 76:15
  81:3,9,13,17,21

83:9 88:2 90:5,15
  90:20 91:25
  106:12 112:7
  155:22 161:10
  281:7,21 313:9
  317:11 318:20,20
  320:24
foundation 87:5
  95:20 96:9 97:18
  99:16 105:19
  167:11 192:15
  197:10 200:20
  201:24 213:9
  221:9 224:24
  228:6 240:6 242:5
  253:10 279:3
  284:25 302:24
  306:10 314:20
founded 327:23
four 21:10 22:5
  25:22,24,24 53:22
  53:22 85:22 117:3
  175:2 180:14
  184:3,6,17 297:3
fourth 5:14 84:4
  192:20,21 198:12
  283:9 289:15
  294:11
fraction 56:5
fragmentation
  326:18
frame 181:16
  241:13
framework 70:9
frank 89:5,6,15,25
  95:8 234:15
  282:13
frayed 205:3
free 72:11 169:11
frequency 12:16
  14:6,15 23:12

111:22 211:6
frequent 56:11
  283:5
frequently 52:3
  173:2 278:15
friend 156:15
front 283:12
  298:10,15,19
frontal 123:18
  124:12 125:6
full 24:3 97:3
  289:15 296:25
fully 34:7 61:8
  97:7 131:13
  321:16
function 121:22
functions 122:17
  122:18
fund 142:24,25
  143:2 257:25
  258:4 314:22
funded 142:14
  145:4
funding 143:23
funds 143:5,17
further 15:19
  60:18 85:11 187:7
  195:16 315:16
  337:13 338:12
future 157:12
  185:24 187:11

**g**

gain 307:23
gained 36:13
game 26:2 129:5
gaming 92:18 93:6
gamut 24:4
gap 231:20
garbage 252:17
garrett 30:2 35:13
  38:23 48:13 49:13

gee 26:4 28:4
  252:10
general 18:7 32:10
generalizations
  40:5
generalize 37:4
  144:7
generally 300:5
generate 169:24
generated 39:14
  184:14,16
genital 189:3
genre 205:18
gentleman 162:4
getting 31:21
  170:9 176:9
  279:21 307:4
gig 42:24
gisli 31:3
give 19:17 20:9
  28:18 40:21 44:8
  47:22 54:13
  115:17 117:24
  119:6,23 120:15
  130:12 133:23
  135:5,6,14 139:4
  156:3,5 157:9
  175:14 180:20
  203:21 208:13
  209:16 245:8
  258:22 260:22
  292:16 301:6,23
  335:2
given 16:22 27:25
  56:4,25 131:10
  133:6 148:12,15
  191:9 253:2,16
  269:20,23 270:22
  314:21 315:2
  338:10

[gives - happen]

gives 118:22 248:4
giving 71:15 79:6
  168:18 176:5
  246:5 247:12
  335:14
globe 262:3
glove 113:14
go 6:12 19:25 34:5
  35:20 36:8 50:9
  63:2 74:11 84:10
  94:6 102:8 105:7
  107:7 109:4,19
  110:16 112:22
  120:13 131:23
  137:15 138:2
  139:4,10 149:21
  174:8 181:11,12
  202:20 207:14
  210:9 212:13,17
  224:4,5 227:2
  232:9,10 234:20
  244:15,16 253:19
  257:15 273:24
  275:23 278:13
  280:19 285:3
  304:14 305:21,22
  319:23
god 76:18 144:2
  144:14
goes 30:10 77:8
  122:3 125:15,20
  196:23 210:24
  225:6 248:5 287:9
  322:14 335:6
going 10:7 33:8
  36:8,17 37:3 39:2
  42:19,21 44:24,25
  46:6 51:2,24
  57:15 58:11 62:24
  94:10 97:7,21
  107:9 110:13,16

111:21 117:24
132:10 139:11
153:17 183:23
201:6 205:24
207:11,13 210:19
210:21 222:4
232:2 239:15
254:23 260:9,14
264:13 268:7
269:4,6 276:19
292:8 294:8
312:13,15,16
328:14 330:4
335:7 336:16
337:14
good 10:17 33:18
  36:15,15 45:14
  47:11 51:18 52:2
  93:3 165:9 220:10
  222:16 299:21
goods 328:3
gossett 3:10
gotten 214:3
  228:15
government
  142:16
grabbed 295:8
graduate 62:21
  106:16 260:21,23
  260:24 264:24
graft 240:22,23
  241:3
grant 145:2
grants 75:24
granular 117:14
  138:18
gratification 41:19
gravity 260:6
  263:4
great 75:25 139:4
  144:6 169:22

222:5 243:4
greater 110:24
  111:6 112:11
  240:17 272:9
  280:24 301:3,11
  306:24,25 307:2
greatest 70:4
griffin 1:14
grinding 64:3
grounded 79:5
grounds 325:10
group 142:23
  146:23 233:2
  322:11
grow 15:24 36:16
guam 42:6
guarantee 24:3
guarantees 169:9
guard 78:8,10
guarded 12:7
  22:22 23:2 295:3
gudjonsson 31:3
  35:19,23 39:6
  45:11 119:6,22
  137:12
gudjonsson's
  119:14
guess 165:23
  183:20,24 185:10
  213:11 214:5,25
  215:4,7 265:16
  287:9 317:23
guessed 215:21
guided 70:8
guilt 59:19 105:7,9
  249:18 287:10
  308:11
guilty 102:18
  103:18 104:10,19
  178:21 213:11
  254:5 310:8,9

gut 22:6,9
guy 25:22 79:2
  171:2 299:19
  302:19 335:9,15
  335:21 336:12,13
guy's 158:7
guys 27:5 175:4
gym 111:21

**h**

h 5:10 8:6
ha 77:4
hair 62:7,9,16,22
  63:6,7,10,11 64:2
  67:20,21 68:2,6
  69:6,19 80:15,15
  252:11
haldol 297:11
half 16:19 146:11
  296:2 306:13
  318:23
hall 225:6
hallucination
  160:19
hallucinations
  155:10
hamburgers 72:6
hand 82:22,25
  113:14,18 294:15
  338:18
handed 98:13
hands 295:8
handwritten
  213:3
hang 296:9
happen 55:25 79:2
  152:15 171:2
  175:10 217:24
  250:2 273:14
  275:2 288:5
  312:19 330:22

[happened - hurricane]                                                    Page 25

happened   15:4
  20:18 28:2 56:5,7
  56:7,19,19,22
  68:12 71:25 72:13
  76:18 78:21 93:10
  130:2 158:21
  162:11 171:3,4
  178:7 209:5,10
  222:25 225:10
  231:23 245:9
  270:11 287:8
  336:10,11
happening   336:15
happens   68:25
  78:20 79:12 131:8
  204:6 241:7
  243:19 276:25
  287:24 322:15
happy   337:6
harassing   123:10
hard   39:25 40:4
  40:11 166:18
  225:18 240:21
  254:13 258:20,20
harder   26:17 40:7
  69:15
head   20:7 61:5
  102:24 128:5
  190:3 286:12
  287:2 322:14
  335:15
health   26:8 202:24
  212:9 234:18
heap   240:14
hear   97:9 210:5
  241:17 249:4
heard   209:22
hearing   118:17
  209:11 337:3
hears   295:3

heart   28:20,23
heavily   169:16,16
hedge   137:18
hedging   93:13
heels   231:16 234:5
heft   203:22
heighten   266:21
heir   74:6,6
held   2:7 6:19,24
  49:13 51:5 57:17
  107:12 139:14
  201:8 240:16
  255:3 292:18
  328:16
help   20:3 24:14
  31:5 43:2 117:17
  126:22 156:4
helped   10:19
helpful   310:23
  313:7,10,24
henry   19:19
  131:23 259:19
hereunto   338:17
hey   40:15 42:17
  42:21 45:13
  156:12
hidden   128:13
high   110:21
  142:23 143:4
  144:7,9,12 170:4
  182:10 183:3,3
highly   327:20
highway   19:23
hinshaw   4:4
hired   75:10,11
  144:20
historian   270:4
  287:4
historical   332:8
historically   60:3

history   83:3 97:2
  206:25 270:8
  284:4 303:9,14,18
  320:19 323:15
  329:19 332:7
  333:2,3,10,11,13
hit   265:7
hits   25:24
hitting   20:5 94:3
  206:7
hoisting   258:23
hold   17:6 106:22
  106:23 114:18
  115:2 315:6
holding   149:20
hole   227:10
holistically   208:10
holmes   1:18 3:11
  219:11,12,13,14
  223:18,24 224:15
  224:19 225:24
  226:6,11 228:11
holy   1:15
home   182:18
  279:24
homeless   216:12
  216:13,18,19
homicidal   55:5,13
  113:6,24 297:4,8
  297:12,13 299:12
homicidally   55:19
homicide   112:15
  113:15 145:16
  149:25 150:21
  306:18,21
honest   28:13 93:5
  249:10
honestly   26:24
honing   248:9
hope   77:25 78:2,9
  144:9 185:23

186:3 187:7,11
  209:24 219:11
  328:8
hopeful   36:24
hopefully   15:19
hospital   5:13
  82:17 202:18
  204:12 212:15
  237:23 238:4
  293:4 295:9 300:4
hospitalization
  297:20
hot   36:23
hotly   54:19
hour   146:10,11,11
  146:14 244:3
  275:17,18,24
  306:12 318:23
hours   66:7,11
  80:22 82:3 83:6
  96:5 108:5 146:12
  146:14 222:22,22
  222:22,22 275:21
  318:24
house   278:9,15
  279:7
huge   18:25
hugely   250:17
huh   88:22 101:12
  211:13 237:3
  294:13,16 295:5
  295:24
human   20:16
humiliating   336:5
humiliation
  335:23
hundred   164:11
  181:21
hurricane   279:10
  279:20 280:3

**husband** 64:17
  65:17 66:11 83:17
  87:14 89:7 96:5
  99:11 201:18
  213:15 315:10
**husband's** 81:18
  81:22 89:21
**hyperbolic** 265:24
**hypothesis** 239:25
**hypothetical**
  62:14 64:13 66:5
  66:22 93:24 99:6
  99:17 192:13
  196:5,16 197:11
  202:3 213:13,22
  221:9

**i**

**idea** 14:4 30:14,18
  31:14 32:21 36:25
  41:24 42:13 48:8
  49:2,13 60:7
  69:18 98:22,23
  107:6 121:13
  122:4 137:19
  155:5 210:9,10,10
  212:5 217:25
  218:2,3,17,19
  222:2 225:8 248:2
  249:5,10,14 252:9
  262:11,13 274:15
  276:6 280:7
  282:24 283:2
  284:12 300:10,11
  300:15 301:10,13
  312:24 327:8
  332:13 333:7
  334:6
**ideas** 48:17 49:5
  210:2,3,17,19
  212:11 235:14
  236:7 237:7

243:12 247:20
  249:15
**ideations** 295:13
  299:12
**identical** 260:12
**identically** 20:24
**identification**
  70:23 82:11 83:23
  88:10 148:5
  182:16 294:7
**identified** 61:21
  68:20 91:5 124:3
  134:14,15 147:13
  159:19 229:25
  231:7
**identify** 7:8
  148:19 162:14
  192:3 262:18
**idiosyncratic**
  208:19 234:6
  236:22
**idiosyncratically**
  211:2
**idiotic** 36:11
**illinois** 1:3 3:6,12
  3:18 4:7,13 7:2
  148:23 149:23
**illness** 126:6
  154:14,20,24
  155:15 158:3,24
  159:10,17,21
  160:5,9,10 161:4,5
  161:11,18,19,23
  162:6 166:6
  169:17 171:9
  172:18 173:19
  174:11,13,23
  175:12 176:14,18
  176:18,21 178:6
  180:20 206:2
  208:12 270:6

300:2,9,20 303:3
  303:11
**illnesses** 170:20
  209:15 301:2
**illustrate** 74:12
**illustration** 236:25
**image** 20:25
**imagine** 229:5
  335:23
**immediate** 121:14
  121:16,17,19
  122:21 157:20
  288:8 327:3
**immediately** 57:9
  117:4 126:14
  169:9
**impact** 22:18
  25:25 69:14 79:23
  153:15 242:21
  276:4 287:2,5
  327:8
**impacted** 276:4
**impactful** 54:10
**impairment**
  116:23 120:21
  121:3 128:14
  129:6,11,13
**impediments**
  166:5
**implicate** 178:18
**implicated** 102:4,6
  106:15 132:16
  133:5,5 171:5
  180:13 241:10
**implicating**
  180:11 189:21
**implications**
  319:16
**imply** 23:4
**importance** 75:8
  138:5

**important** 124:2
  135:4 228:18
  251:19,23 320:20
**impossible** 247:15
  247:17 287:18
**impressed** 22:22
  76:13 168:8
**impression** 44:9
  102:13 162:10
  232:12 245:15
**impressive** 155:21
**imprint** 20:11
**imprinted** 20:23
**inability** 268:8
**inaccurate** 286:14
**inadequacy** 30:23
**inadequate** 28:20
  33:13
**inaudible** 35:20
**incapacitated**
  272:21
**incapsulates**
  253:22
**incidence** 174:12
  176:15
**incident** 140:4
  255:20 293:3
**incidental** 189:10
**incidentally** 214:6
  218:17
**include** 99:19
  104:8,17 178:23
  180:10 188:8,9
**included** 31:12
  102:16,21 103:17
  103:17 104:4,6,24
  179:5 190:25
  194:17,20 247:25
  271:8
**including** 87:19
  104:14 143:6

151:3 229:9,9
271:14,17
**inclusion** 180:8
**inclusive** 197:14
**incoherence**
234:16 236:5
288:19
**incoherent** 211:21
236:2 288:9,9,11
318:15
**income** 185:11,16
185:19
**incompatible**
320:16
**incompetent**
265:12
**incomplete** 19:11
19:13 85:6,16,24
88:25 89:11
**inconsequential**
56:3 110:9
**incorporate** 46:11
218:23 301:21
**incorrect** 131:4
132:8,19,19
143:13 256:3
**increase** 21:15
**increased** 55:18
275:3
**increases** 15:21
**incriminating**
33:2 54:4 202:23
230:15 231:25
232:14 240:12
305:7 307:4
**independent** 119:4
130:6
**independently**
119:13
**index** 1:8

**indicate** 9:15
62:11 65:3 67:23
269:14
**indicated** 83:12
232:17
**indicates** 96:3
**indicating** 98:13
296:13
**indication** 67:6
**indicative** 59:14
59:16 64:20 246:9
**indicator** 111:2,8
199:4 270:3
**indistinguishable**
211:22
**individual** 93:8
130:18,20,25
133:18 284:11
327:15
**individual's**
119:10 158:2
**individually** 3:16
7:16
**individuals** 35:16
39:8 86:2 112:13
113:21 131:2
132:3,25
**industry** 155:19
**inference** 273:17
280:8
**inflexion** 331:18
**influence** 175:22
**info** 165:15,17
**inform** 26:17
28:11 29:2 31:5
32:21 33:8 38:25
45:9 96:14,20
119:10 188:12
**informant** 121:2
**information** 13:23
13:23 24:24 27:22

28:8,11,19 30:12
31:5 53:25 79:17
79:25 105:11
133:24 134:8
154:10 177:12
178:3 190:23
195:17 200:23
228:23 231:18
269:17,19 287:19
310:12,14 316:22
**informative** 12:18
31:2 45:15 62:25
74:5
**informed** 56:15,17
164:23 320:21
**informing** 30:10
55:9 227:14
**informs** 313:16
**inherent** 78:7
**inhibitors** 54:24
**initial** 227:7
313:14
**initially** 216:24
230:9
**initiate** 258:6
**initiated** 140:6
176:2
**injuries** 257:15
**injury** 126:3
127:19 255:18,22
255:24 256:4,6,11
257:2,4,20 281:22
282:9 288:15,15
322:19 331:15
**innocence** 27:4
28:9 60:16,21,23
62:12 64:20 65:3
66:4 104:23 105:3
105:9 155:19
162:23 163:16
165:25 167:18,25

169:23 177:9,23
178:14,17,20
249:18 254:19
287:10 307:10,13
307:14 308:11
309:10,21,25
314:24 315:3
**innocent** 58:22
59:8,12,15 60:8
61:19 66:18 67:2
67:4,24 80:13,17
80:24 87:3 90:7
90:23 91:8,20
92:3 93:12,21
100:10,17 102:14
102:18,23 103:9
103:18 104:10
166:13 194:22
196:16 197:4
213:20 221:2
254:5 284:6
308:15 314:17
315:12
**input** 309:10
**inquiry** 103:8
217:8
**inside** 64:24 66:2
**insomnia** 295:13
**inspected** 20:15
**instance** 73:18
**instances** 14:2
21:11 71:24
133:14 156:16
158:21 162:8
268:25 313:9
**institute** 27:5 84:5
88:16 150:15
163:15
**insufficient** 24:20
24:22

insurance 278:5 279:5
intact 203:9 206:15,18 242:21
intake 166:15 168:15
intellectual 155:15 159:9
intellectually 158:12
intelligence 18:4
intense 134:4
intensions 223:12
intensity 264:7 306:24
intentions 222:17
intents 230:10,12
interacted 241:11 244:19,21,25 289:22 290:5 293:15
interacting 241:21 243:8 291:3
interaction 244:12
interactions 240:2
intercourse 282:15 284:20
interdigitates 252:9
interest 31:11 39:14 42:11 75:14 144:15 169:25 216:21 227:12
interested 93:5 186:17 280:23 338:15
interesting 41:22 220:9 306:20
interests 170:7
interfere 6:9 127:15

internal 310:20
internalize 80:6 118:25
internalized 203:16 205:3 214:9
internalizes 218:24
interplay 11:17
interpret 23:4 91:14 305:2
interpretation 237:17
interpretations 85:12
interpreted 171:6 230:24
interpreter 179:24
interrogated 140:24 142:5 143:10 163:22 164:2 259:3,10,23
interrogation 72:16 139:7 142:23 147:15,22 152:24 155:4 156:17,18 159:7 163:11 164:19,21 179:7,8 207:3,21 239:18 263:3 265:5 289:23 306:8,17 311:7,20 331:23
interrogations 72:7 145:10,14,17 147:3,9 153:17 164:7,9 221:15 263:24
interrogators 207:7,21 219:3,23

interrupt 196:22 207:13
interrupted 179:14
intervening 314:14
interview 118:4 221:20 222:10,16 222:21,24 223:2 262:25 264:9 267:21,22,25 268:5,9,11,21,24 269:15,18
interviewed 268:17
interviewer 134:6
interviewing 76:21 243:8 268:11
interviews 222:12 302:4
intimacy 168:22
intimate 27:25 45:6
intoxicated 297:17 298:13 299:24 300:4 302:2
intoxication 126:5 299:25 300:17 301:22
intrigued 226:24
introduced 284:4
investigate 20:4 141:17
investigating 141:14 202:19
investigation 32:22 134:3 140:6 150:2 199:3 247:11 306:18

investigators 145:16 150:21 199:2 229:20 233:20 234:20 327:2
involve 153:21
involved 15:13 65:20 87:17 98:19 101:2 102:12 122:18,19 123:17 123:19 124:16,20 124:23 125:2,7,9 140:9 160:23 170:8,9 174:10 185:7 186:15 195:14 199:5 228:19 253:18 263:16 301:22 327:21 329:3,23 330:2
involvement 111:14 124:7,9 179:7 205:19 260:5 277:24
involves 11:19 121:20 141:9 284:19
involving 140:4,21 141:8 306:17
irony 166:20
irrational 235:11 301:16,17
irrelevant 25:7 44:18 73:24 109:18,20,21,21 189:11 249:16,17 249:19 309:9,11 309:13,15
irrespective 249:17

**island** 42:7
**isolated** 69:7
  274:7 276:14
**issue** 54:19 61:2
  96:12 104:16
  109:8 111:12
  131:24 147:22
  151:22 152:9,11
  154:24 203:2
  204:23 205:20
  309:23 310:2
  331:19 333:4
  334:4
**issues** 131:24
  159:13 268:12
  269:25
**item** 101:13
**items** 55:14 270:8
**iteration** 100:6

**j**

**j.d.** 4:17 6:14
**jack** 1:11
**jail** 212:8,10
**james** 4:8 7:21
**january** 151:20,23
  298:21 299:10
**joe** 158:8,11 159:4
**john** 1:10 114:2
  158:22
**join** 87:7 92:9,10
  92:11 95:22
  100:19 192:14
  197:12 201:25
  213:23 282:7
**jonbenet** 158:23
**joria** 1:14
**joseph** 1:14,16
**journal** 37:21 46:6
  46:20 47:17 49:19
  50:4

**journals** 47:3
  135:20 137:7
  138:14
**judge** 152:17
  254:16,17,18
**judge's** 225:14
  308:22
**judgement** 301:19
**judges** 152:7
**judging** 49:24
**judgment** 299:8
**judy** 152:18
**jump** 52:11 265:8
**june** 148:13,16
  150:18 184:10
**jurisdictions**
  163:12
**jury** 254:17
  262:10
**justice** 142:22
  144:22 145:6
  151:14,15,16
  152:8 169:14
**juxtaposed** 330:19
**juxtaposition**
  323:14

**k**

**karczewski** 1:13
**karr** 158:22
**kassin** 31:8 35:19
  35:24 39:5 44:14
  45:11 47:23 48:18
  71:18 193:15
  261:19
**kassin's** 44:21
**katherine** 3:13
  7:24
**kato** 205:8,14,14
  206:20 331:21
  332:4,6,15

**kato's** 332:25
**kaye** 152:18
**kazakhstan**
  110:12
**keegan** 336:11
**keep** 10:10 258:21
  266:9
**keeping** 208:5
**keeps** 58:14
**key** 265:7
**keynote** 146:6,16
**kicked** 47:25
**kill** 114:3
**killed** 110:23
  111:6,15,18
  112:11 114:6
  175:24
**killing** 158:23
  206:7 293:5
  294:21 296:6,15
**kind** 27:6 30:13
  45:21 57:4 66:7
  68:13 76:25 102:2
  105:4 114:25
  143:18 208:8
  214:6 220:6 227:3
  233:25 234:22
  246:13 248:18
  252:22 253:15
  258:5 266:7
  270:20 284:7
  298:2 304:23
  308:6 326:14
  335:25
**kinds** 52:7 56:22
  57:6 63:13 68:16
  113:20 121:15
  275:18 309:6
  335:20
**kit** 66:7 81:14,25
  82:17 281:21

**knew** 189:23
  191:3 329:25
**knife** 318:17
**knock** 123:11
  136:17
**knocked** 129:8
**know** 8:25 10:2,6
  11:10 13:15 16:21
  20:12 21:5 23:17
  25:9 27:2,3,12,13
  28:19,22 29:19
  36:23 37:19 43:4
  44:3 46:8 47:11
  47:16 48:6 50:3
  50:14 56:20,24
  63:5,24 69:19
  72:12,19 73:13,15
  73:16,23 75:3
  77:4 84:9,12
  87:13,14 93:14,16
  93:19 94:12 97:8
  99:18,19,24 100:2
  100:24 101:22,24
  101:24 102:5,24
  102:25 103:14,15
  103:16 105:22
  109:5 110:3,7
  111:22 112:4
  114:2,4,5,5 118:23
  123:4 124:6,11
  125:18,19 126:21
  130:11,15 132:12
  133:22 134:18
  137:11 140:12
  141:7 142:14,17
  142:18 144:8
  146:9 155:21
  156:13,21 159:18
  160:11,13 165:3
  168:21 170:7,10
  173:9,10 174:24

177:20 179:21
182:7 183:13
186:22 190:5
196:7,23 203:25
204:2,4,7,9,15,17
205:9,12,13,13,16
208:22 209:5
212:14,25 213:7
213:12,20 214:10
214:11 215:4
216:7,7,9,10,11,13
217:2,3 218:14,22
219:5,13 220:3
221:10,11,12
222:14 224:11,15
225:2,6,19 226:2,8
233:15 234:3
235:3 238:20
240:24 242:15
244:18 253:22
257:23,24 258:19
259:14,15 262:15
266:12 269:6
270:25 271:7
280:20 281:12
283:2 284:12,14
284:15,15 285:9
285:18,19 287:6
289:13 290:3
293:10,19 300:24
301:5 306:19
310:25 311:4
317:18,21 327:13
327:13 329:23,25
334:16,24 335:4
335:14,18 336:3
336:10,13,18,19
337:10
**knowing**  27:12
216:8 245:12

**known**  114:11
137:23 325:15
335:10
**knows**  30:10 42:25
44:21
**knox**  44:20,22
**krause**  4:10
**krista**  3:19 7:15
108:2

**l**

**l**  8:6,6
**lab**  143:6
**lacerations**  189:3
**lack**  97:18 261:24
300:19 323:7
**lady**  296:5 328:7,7
**language**  180:2
**large**  12:6 227:5
**larger**  12:10 15:25
24:13 30:25
**lasalle**  4:6
**latent**  128:13
**laughable**  260:19
265:23,23,23,25
266:6,18
**laughing**  40:18
**law**  19:20 30:2,3
30:16 33:5 39:17
41:9 46:7 57:3
145:9 147:4,5
151:3 259:24
262:5 327:22
**lawsuit**  187:16,19
187:23 256:11
**lawsuits**  188:3
322:3
**lay**  239:16
**laying**  73:8
**layout**  223:19
224:20 225:25

**layperson**  236:8
241:20
**lead**  13:20 64:19
80:11,16,23 112:2
153:4 306:4 322:9
**leading**  77:2 92:24
304:4,8
**leads**  52:22
**leak**  220:14
**leaking**  220:20
**leaning**  105:23
**leap**  162:7 206:19
272:23
**learn**  15:23,25
17:13 25:19 27:6
36:17,21 42:17
228:18 268:10
328:10
**learned**  53:23 99:3
212:22 328:5,6
335:3
**learning**  42:16
**learns**  25:14
**leave**  37:7 39:2
69:16 94:14
100:22 317:2,14
**leaves**  129:4
**lecture**  149:23
150:13,23 151:10
151:21 153:23
155:17 156:20
**lectured**  145:15
147:10,19 149:13
149:16
**lectures**  148:13,15
148:20 149:17
**lecturing**  165:21
**led**  10:22 11:14
22:7,12 140:23
201:21 215:9
303:23 304:9,14

305:3,6,23,24
**lee**  19:19 20:15
48:18 51:25
131:23 156:13
259:19
**left**  162:9 180:4,6
205:20
**legacy**  205:16
**legal**  55:24
**legitimacy**  62:22
143:25 244:4
323:7,9,10
**legitimate**  42:2
186:3 322:22
**lend**  51:19
**length**  232:9
**lens**  31:10
**leo**  30:8 35:13
38:24 43:21 44:13
45:12,24 46:2
164:8
**leo's**  30:8 179:19
**levee**  279:17
**level**  40:5,13 84:13
114:15 118:11
129:10 141:10
156:22 167:8
203:9 234:20
246:11 289:10
303:5 320:9
**leverage**  153:9
**liability**  57:2
**libby**  336:7
**lie**  143:9
**lied**  100:16
**lieutenant**  1:14,17
226:16
**life**  9:6 25:4 41:13
65:9 111:20 136:6
257:12 258:12
277:5,10 302:19

322:9,17
**lifestyle** 112:18
113:17 114:13
**lifetime** 283:4
**light** 316:20
319:15
**likelihood** 17:24
59:19 123:22
124:9 228:15
314:13 317:13
330:20 331:4
**likes** 156:13
**likewise** 153:12
**limit** 278:2
**limit's** 120:3
**limitation** 159:9
**limitations** 45:21
155:16 158:2,16
158:19 268:18
**limited** 23:25
27:22 30:12 44:6
58:6 113:23
158:12 162:5
163:2 268:8 275:6
317:17
**linchpin** 319:18
**line** 120:6 174:15
271:8 339:6
**lines** 220:5 297:3
**list** 101:10
**listed** 148:21
181:4,10 297:16
**listen** 97:13
196:20 208:9
209:7,19 243:18
258:19
**listened** 77:3
**listener** 208:21,21
210:5,21 211:13
247:18

**listening** 138:5
187:4 246:2
**lister** 210:13
**literally** 63:15
235:23 236:2
**literature** 45:10
47:3,9 74:25
76:11 108:14,20
135:7,10,11,12,19
136:2 137:6,10,25
154:15 171:17
176:24 177:7
272:5 305:4,6
334:17
**litigant** 174:10
256:21,24 271:12
320:7
**litigants** 174:16
320:8 322:4
323:14 331:16
**litigation** 32:23
61:23 75:7,10
78:7 257:24
280:25 281:13
287:24 322:10,14
322:19
**litigations** 77:9
322:7
**little** 10:8 34:25
35:16 39:14 40:11
48:5,10 49:24
50:22 69:9,15
79:14 184:19
185:18 196:10
203:22 228:14
232:8 240:19
247:4 257:15
290:15,18 306:4
306:13,14
**live** 163:8 279:8

**lives** 42:4 112:24
**living** 112:17
163:10 302:19
**llc** 4:10 339:2
**lloyd** 158:7,8,11
159:4
**llp** 4:4
**lobe** 123:18,20,20
123:25 124:13,15
124:25 125:4
**located** 6:20
**location** 292:7
**locations** 225:15
**loevy** 3:4,4 163:15
307:23,24
**loftus** 336:2,11
**long** 34:6 49:13
68:12 108:4
119:21 146:5,8
176:8 231:22
244:16 306:7,16
335:2,3
**longer** 119:25
299:4 313:6
**look** 11:12,13,16
25:21 30:4 31:16
43:21,24 49:23
51:18 53:6 63:23
64:9 71:7 109:4
109:19,23 110:13
143:14,21 157:20
167:8 168:19
170:19 181:11
195:19 196:9
203:25 208:11,14
212:14,18 213:24
215:13 229:4
231:15 232:11
238:4 265:15
266:12 293:24
296:24 297:10,23

310:20 330:5
332:10 334:3
336:9
**looked** 15:3 16:8
16:13 19:7 20:20
40:25 44:4 52:23
53:6 58:4 84:12
84:13 102:9,11
154:3 157:19
161:3 212:18
217:4 239:4
252:16 253:15
**looking** 10:22
13:10,11 23:23
31:18 59:10 70:25
78:5 99:2 101:10
120:20 121:3,4
165:15 168:17
182:21 197:16
218:9 233:23,23
238:8,8 246:10
252:10,11,25
290:11 308:10
**looks** 323:23
**loose** 210:23
211:16 212:3
234:4,16 235:14
237:10 238:2
243:11 246:9
247:19,22 248:14
249:15
**looseness** 210:15
212:12 236:7
**loss** 127:9,13
128:20 129:2
**lost** 136:12 328:13
**lot** 13:13 15:23
31:4 35:3 62:23
69:10,11 113:4
168:11,16 181:12
181:17 191:9,10

[lot - memory]

219:25 220:4
268:10 285:10
302:20 328:2,12
334:25 335:14
**lots** 141:19 220:5
**louisiana** 279:13
**love** 313:12
**low** 18:3 268:22
**lubricated** 303:7
**lubrication** 282:2
**lucid** 233:13,14
**luminous** 170:2
**luxury** 186:4
**lying** 331:9

**m**

**m** 5:5 8:6 85:23
**m.d.** 1:24 2:6 8:6
8:12 337:17 339:5
339:21
**madison** 4:12
**major** 141:24
154:13 161:22
169:17 170:19
172:17 174:11,12
206:2 209:14
241:10 264:6
300:25 307:8
**makeup** 158:25
206:24
**making** 9:6 40:5
49:6,8 72:6 86:13
96:19 136:6
169:20 189:20
202:17 236:21
239:19,20 277:11
293:17 298:23
320:22 324:23
335:22
**male** 66:15 85:25
86:13,17,21 89:18
89:23 90:4,20

91:6,25
**male's** 64:15
**males** 87:16
**malingered**
116:23
**malingering**
269:22 270:5,24
271:23
**man** 28:23 62:8
65:4 86:11 169:2
205:11 282:22,23
283:17,24 284:10
**man's** 80:20 81:3
81:8,12,17,21 88:2
**manage** 337:8
**mania** 160:21
**manic** 175:23
**manifest** 247:22
**manifested** 161:22
240:18
**manipulated**
155:13
**manner** 112:3
**manual** 327:24
**margaret** 2:8 7:10
8:2 9:6 136:15
338:4,22
**maria** 1:11,17
**mark** 70:19 82:8
83:19 147:25
158:22 182:12
294:3
**marked** 70:21
77:24 82:9,13
83:21 88:8,11
148:3,6 182:14
294:5,9
**marriage** 338:14
**martinez** 4:17
6:14

**marvelous** 168:5,7
**match** 217:10
332:22
**material** 60:4
69:14 118:5,23
181:3,8 195:5,10
199:11 208:16,17
208:18 232:4
273:6,6
**materials** 96:13
181:17 227:6
228:8,20 229:7,10
232:6 313:17
**math** 184:20
185:17
**matter** 73:12
114:12 122:9
214:11 248:21
280:2,5 330:23,25
331:5 338:16
**matters** 137:23
141:6
**mcdonalds** 72:6
**mcgreal** 1:10
**md** 5:5
**mean** 19:14 70:14
72:5 92:3 97:20
106:4 109:6 110:7
111:5 112:10
117:21 121:8,17
121:19 129:20
143:18,21 188:20
218:3 244:4,5
251:9 288:4 291:7
303:15 305:3
317:10 321:24
328:5 337:4
**meaning** 41:5
109:24 207:8
**meaningful** 16:18
48:20 214:16

**means** 23:13 36:19
42:3 74:25 106:9
184:2 298:7
321:20
**meant** 109:5
111:10 120:8
126:7
**measure** 120:14
247:20 269:21
270:23
**measuring** 100:22
**mechanisms** 10:22
**medial** 124:15
**medical** 5:20
18:16 83:3 84:14
96:19 108:14
126:25 206:3
211:23 280:17,20
281:16 293:14,24
295:19 299:8
316:15
**medically** 133:4
281:5
**medication** 55:19
**medicine** 96:25
**meds** 238:5
**meet** 108:2 112:20
**memo** 332:17
**memorial** 82:16
**memories** 40:17
122:25 127:15
**memory** 114:19
114:21,22 115:7,8
115:10,11,19,19
116:10,13,16,19
116:21,23,25
117:3,5,6,9,15
119:5,11,20
120:19,20 121:5,7
122:3,10,13,14,15
122:20 123:13,18

123:19 124:2,7,14
124:16,24 125:22
126:2 127:9,12,18
127:25 128:7,10
128:14,19 129:2,6
129:10,12,20,25
131:19 132:3,11
132:16,20,21
137:12,16 326:18
**men** 166:13
**mental** 17:25 18:2
18:4 26:8 61:9
117:7,20 120:2,2,7
120:13 154:13,18
154:19,24 158:2,3
159:17,20 160:5,9
160:10 161:3,4,10
161:18,19 166:6
171:9,14 172:18
173:19 176:14,18
176:18,20 178:6
180:19 202:24
212:9 226:24
234:18 295:23
296:3,19
**mentally** 167:6
216:19
**mention** 105:11
125:10 188:15
**mentioned** 124:23
157:7 163:3
190:10 191:24
227:4 238:7
242:19 312:6
**mere** 23:6 55:6
216:17
**merely** 122:4
173:13 175:10
181:25
**merit** 186:16,19
186:22 187:12

**mess** 68:18 318:16
**messy** 319:20
**metaphor** 63:16
**methodologies**
271:11,17
**methodology**
176:12 177:3
258:16 259:18
261:7,15 262:14
262:14
**michael** 1:13,15
1:24 2:5 7:5 8:12
177:21 337:17
339:5,21
**michigan** 158:6
162:4
**micro** 74:15
**micromanaging**
318:12
**microphones** 6:4,9
**midday** 240:24
**middle** 240:9
248:6 318:15
**midona** 1:12
**mildly** 128:16,16
**millage** 208:15
**million** 185:16
**mind** 57:9 64:20
106:6,19 117:4
126:14,16,20
127:21 155:22
205:6 245:19
259:3
**minded** 170:16
**mindful** 131:14
**mine** 174:7
**minimize** 297:11
**minute** 47:12
136:22
**minutes** 87:25
90:3 91:25 118:2

118:3 120:5
146:17 318:22,22
**mirror** 20:24
**miscarriage**
169:14
**mischaracterizat...**
284:24
**mischaracterizes**
286:17
**mischka** 1:12
219:17,20
**misconduct** 71:21
72:4,14 105:4
**mishmash** 69:12
**misleading** 27:10
27:11
**missed** 170:16
229:4
**misses** 157:6
**misspeak** 92:17
**misstate** 224:24
**misstates** 90:10
224:8
**misstating** 92:7
**mistake** 48:2
**mistaken** 256:9
**mistranslated**
179:24
**mitigates** 300:7
**mix** 30:13
**mixed** 151:3
**mixture** 85:24
86:4,15
**mokstad** 1:17 7:23
**moment** 57:14
174:17
**money** 112:19
144:3,4,18 182:6
257:9
**months** 311:9,16
312:20 314:11

**moribund** 165:11
**morning** 82:18
240:20 275:21,24
276:15 300:13
**morrison** 3:13
7:24,25 10:14
92:10 330:11
**motivated** 256:20
256:22,25
**motivation** 256:24
257:3
**motivator** 74:21
**motives** 28:22
**mouth** 241:17
**move** 244:14
324:14
**movements** 62:18
117:11 225:18
249:22 298:8
**moves** 53:11
**mucking** 33:18
**multiple** 15:4,14
45:12 67:8,14
76:12,16 77:5,13
97:17 153:8 322:3
322:4,7,9,12,17
**murder** 76:12
111:2,9 170:5,21
**mush** 39:23,24
**mysterious** 284:11
**mystery** 94:4
**myths** 147:23
152:2

| **n** |
|---|

**n** 5:2 8:6 74:20
**naive** 265:11
**naked** 52:17 63:24
157:6
**name** 6:14 7:4
8:11 158:7,10,10
186:24 219:16

315:22 336:3 339:3,5
**named** 3:16 7:16 38:21 158:8
**names** 35:18,22 38:21 39:17
**narrative** 104:5 160:17 188:11 245:9
**native** 259:12 260:2
**natural** 127:6
**naturalistic** 69:3
**naturally** 210:14
**nature** 33:22 45:10 61:3 63:21 68:10 113:7 114:24 131:8 140:7 141:22,23 151:8 158:15 215:8 242:16 244:11 251:21 257:23 305:9,10
**near** 63:25
**neatly** 20:23
**nebraska** 150:15 151:2
**necessarily** 10:9 41:25 42:2 75:9 77:11 80:16 104:13 112:17 113:4 124:6 127:9 127:12 133:8 143:24 162:18 204:22 207:4,5 222:15 223:9,12 233:11,12 258:7 277:12,20,25 302:25 303:15 306:3 310:9 313:21 329:14

**necessary** 31:22 228:2 308:2
**necessitating** 297:20
**need** 9:25 10:7 13:18 14:11 21:20 23:23 33:16 52:4 70:16 126:15,18 126:20,21,24 138:3 153:8 192:10,17,18,19 192:21,22,23,24 192:25 193:2,3,4,5 193:13,14,15,16 193:18,19,21,23 193:24,25 198:11 225:2 235:3 278:22 325:16 335:2
**needed** 145:21 301:6
**needs** 156:8
**negative** 43:17 153:24
**negligent** 257:5
**negligible** 29:22
**neither** 98:24
**neuroanatomical** 122:18 123:14
**neurologists** 119:16
**neurophysiologi...** 123:23 125:11,13
**neuropsychologi...** 122:17
**neuropsychologi...** 121:21
**neuropsychologist** 117:17
**neurotransmitters** 124:6

**never** 58:15 163:23 164:18 198:18 217:4 233:17 234:19 245:24 246:21 247:7,8 268:16 269:20,23 277:3 280:15 302:13 328:8 333:15
**new** 2:2,2,10 6:15 6:21,21 8:15,15 151:13,16 152:8 152:17 324:10,14 326:2,5 338:5 339:2
**news** 28:7 30:11 45:16 46:3
**nice** 75:23 136:16
**night** 79:23 240:10 289:23
**nightclub** 225:7
**nine** 213:2 245:2 309:13,14
**ninth** 193:4
**nodding** 20:7
**non** 246:7 248:2 248:25 249:23
**nonconsent** 99:22
**nonpublic** 220:14
**nonscientific** 74:21 308:25
**nonsense** 49:7
**north** 3:5 4:6 145:15 149:25 150:20,25 152:20 153:23
**northern** 1:3 6:25
**northwestern** 82:16
**notable** 23:12 202:24 331:2

**notary** 2:10 8:8 337:22 338:4 339:24
**notch** 136:18
**note** 6:3 8:18 15:18 23:10 154:9 332:25
**noted** 19:19 153:12 295:17 326:7 327:6 337:16
**notes** 222:5 311:13 313:8,23
**nothing's** 46:12 48:24
**notice** 20:6
**noticed** 20:19
**noticing** 149:12
**notion** 99:21 105:6 215:2 301:7 320:14 334:10
**notwithstanding** 220:24
**november** 108:6 108:19
**number** 8:22 11:19 12:10 13:22 13:25 16:15 33:23 36:3 39:8 51:4,13 82:14 104:22 107:11,20 109:16 114:13 117:2 119:8,8 139:22 172:6 174:7 177:21 201:16 227:5 229:10 254:25 255:11 268:12 283:14 312:18 313:19 327:7 328:24

[numbered - opportunity]

numbered 83:25
88:13
numbers 13:4
110:24 111:7
112:11 175:8
numerous 14:22
14:25
nursing 327:19
329:17
nyc 6:20

**o**

o 10:15
o'clock 10:8
240:13 245:2
oath 8:4
object 26:14
117:23 299:14
317:4,6 324:6,11
325:9 326:3
objection 50:7
62:10,13 66:20
87:4,8,9 90:9,12
90:24 91:2 92:5
95:3,19 96:7
97:16 98:17 99:15
100:18 104:11
105:18,20 106:2
107:3 108:12
123:8 134:23
167:10 187:9
190:17 192:11,12
197:9 200:19,21
200:25 201:23
202:2 213:8,21
214:22 221:8
224:7,23 226:13
228:5 229:12
236:15 240:5
242:4 253:9
256:14 275:13
278:23,25 282:4

282:16 284:23
302:23 304:6,17
306:9 307:15
308:16,18 311:23
314:19 317:19
318:5 321:14
326:6
objective 312:11
objectively 314:4
objectivity 78:7
objects 120:4,6
obtain 257:7,8
obtained 11:15
66:8,14 81:14
obvious 26:13
52:10 92:20
128:12 264:8
299:20
obviously 75:21
123:15 156:21
220:9 261:18
337:5
occasionally 29:25
occasions 146:22
occur 58:18
129:19,23
occurred 58:21
151:19 249:6
276:15 319:3,25
occurs 130:6
october 150:4
324:13
odd 250:5 275:17
offenders 110:18
offense 141:23
302:14 303:8
offer 48:11 228:23
240:12 269:7
offered 54:3 265:9
269:10 289:3

offering 202:23
offers 134:7
office 4:5 8:14
68:17 69:11 224:5
225:14 307:20
officer 1:13,13
19:21 156:9,25
157:25 205:22
214:4,9 220:7
222:7 298:16,19
officers 3:17 7:17
11:24 12:4 36:4
155:12,12 207:2
214:18,20 217:21
220:12,25 221:6
221:17 223:20
226:17 247:23
250:9 262:6 304:3
304:14,24 305:8
official 1:19,20
offshoot 76:22
ofshe 43:21 260:18
261:9 266:17
oh 64:10 109:6
136:3 234:13
264:22 278:13
311:22
okay 9:7,12 10:5
23:4 37:7 56:2
74:4 86:18 94:9
100:5 150:3 156:7
156:10,11 215:19
227:21 234:21
237:14 289:25
295:14 297:22
299:2 315:17
321:3
old 328:6,7
older 328:10
ominous 141:12

omit 200:16
once 22:12 92:8
112:22 150:6
229:24 277:3
280:10 321:9
322:24
one's 63:10 79:24
127:6 287:3
307:22
ones 174:20
261:12 316:2
oneself 210:4
274:4
oop 192:21
open 170:16
221:14 245:8
318:14
operate 71:19
operating 190:7
194:18
opine 104:18
opinion 45:24 64:9
79:24 92:14 96:2
106:24 159:5,25
160:4,6 207:18
228:10,12,24
231:12 268:16
269:7,10 286:23
287:7,13 289:8,14
309:7 310:17
311:21 315:7,14
315:14 316:10
324:13 326:3
329:11
opinions 106:22
199:14 258:17
316:17 324:10,15
326:5 333:24
opportunity 15:12
79:13 106:21
156:3 171:19,21

[opportunity - particularly]                                     Page 36

181:12 231:21 262:25 263:13 324:12

**opposed** 18:3 33:5 55:6 61:3 105:9 141:14 156:5 179:10,18 199:13 300:8

**opposite** 122:12 167:24 168:2 329:4

**order** 11:11 13:19 14:11 28:17 51:15 52:8 162:13 163:5 163:7 308:2 312:10

**organic** 132:24

**organization** 167:20

**organizations** 168:21

**orientation** 30:9 37:3 72:3 104:15 106:14 117:21

**oriented** 76:7 105:8 151:21 179:4 295:2

**origin** 63:20 91:5 189:14 288:19

**original** 288:10 313:3,4

**originally** 16:12 42:11

**originate** 33:10 313:5

**originated** 85:8,20 89:4,14 91:10 92:20,21 217:20 313:2

**originates** 93:7 303:18

**originator** 259:9

**outcome** 338:15

**outdoor** 69:2

**outset** 186:7

**outside** 141:2,5

**overall** 31:14

**overlap** 113:14 212:5

**overlooked** 169:18

**overly** 35:17

**overreach** 73:5

**overrepresentation** 12:24 174:16 175:11

**overrepresented** 12:13 18:5

**oversold** 155:18

**overstated** 36:22

**overturned** 162:16 162:21 164:14

**owner** 183:6

**ownership** 179:10

**P**

**p** 10:15

**p.m.** 139:13,16,18 139:21 177:15,17 201:7,10,12,15 244:19 254:24 255:5,7,10 292:6 292:17,20,22,25 328:15,18,20,23 337:15

**pacific** 42:8

**page** 3:22 5:3,11 8:25 70:12 78:17 82:21,21 84:23,24 84:25 88:17,21,21 103:12,12 104:4,4 104:21 181:4,10 182:21 183:9 184:4 193:7,7,9,10

193:11,12,18,20 193:24,25,25 194:2,19,21 196:18,18 197:14 197:15,16,17,18 197:21,24 198:12 199:21,25 200:5,6 200:16 213:2 215:16 223:14 229:18 233:3 255:12,13 258:13 260:19 272:2 278:12 285:21 286:2,3 288:22 289:15 293:8,9,13 294:12 295:18,19 296:12 297:17,24 303:20 316:6 335:19 339:6

**pages** 188:5

**paid** 181:20,23 182:8 184:24 185:4

**painful** 258:11

**pair** 63:11

**pallet** 215:24 216:10

**pan** 311:10,16

**panel** 151:13,15 152:16 183:7 327:25 329:10 335:4,5,6

**pants** 63:12

**panty** 85:15,23 89:10

**pantyhose** 213:5 215:3

**papers** 68:18

**paradigm** 140:22 142:2 179:3

**paragraph** 71:2,4 192:17,18,19,20 192:21,22,25 193:2,3,4,5,12,14 193:16,17,22 198:12 223:17 255:12 274:23 276:25 289:15 296:3 303:21

**paragraphs** 288:22

**parallel** 40:14

**paralleling** 118:19

**paramour** 175:23

**paraphilics** 303:13

**parietal** 123:20 124:25 125:3

**park** 335:10

**parsing** 214:7

**part** 39:13 46:2 63:10 95:10 103:8 104:7,25 112:8,21 113:16 115:16 119:25 124:2 160:16 177:23 194:12 216:10 233:2 252:12,13 279:13

**partial** 31:12 85:7 85:19 89:3,13

**participate** 32:8 186:5,6,20 320:13

**participated** 282:25

**participates** 262:9

**particular** 72:25 118:9 168:10 202:11,25 274:11

**particularly** 86:14 206:6 231:22 232:7 290:14

305:12
**parties**  6:12 7:9
  178:18 338:13
**partner**  113:11
  192:5 197:6
  200:13
**parts**  123:17,18,19
  123:20 124:3,12
  124:13,19,22
  125:5 279:8
**party**  332:18
**passage**  127:2,4,14
  287:23
**passions**  41:18
**passionwise**  41:23
**path**  31:16
**pathologies**
  271:14
**pathologist's**
  285:9
**pathologists**
  285:11
**pathway**  31:2
**patients**  116:21
**patinae**  28:18
**patrick**  184:9,11
  184:21
**pattern**  67:7 179:5
**paul**  43:23
**pay**  40:16
**paying**  185:9
**payment**  185:5
**peace**  106:23
**peculiar**  75:14
  248:11,12
**pee**  233:24 234:4
  234:14 245:20
  246:4 249:7,23
  250:16,23 251:2
**peed**  233:17,18,21
  245:21,24 246:21

253:8
**peeing**  234:5
  248:2 252:7
**peer**  37:21 46:20
  47:17 49:19 50:4
  116:15 135:20
  137:7,25 138:13
  259:15 266:24
  267:17 329:9
**peg**  147:17
**pena**  1:11
**penalty**  17:20
  152:25 154:5
  168:25 170:21
**pending**  10:4
  103:25
**penetrated**  289:3
**penetration**  60:12
  60:13 283:7
  289:10
**people**  27:19,20
  29:6,12,13,13 36:2
  36:3,9,14 39:6,12
  39:17 40:24 41:9
  43:8 44:23 47:23
  48:6 52:25 55:10
  69:10 76:14 96:17
  96:19 97:7 111:21
  112:2,22 114:3,7
  128:19 130:10,11
  131:10,18,22
  134:3 138:15,23
  143:23 152:7
  153:5 154:5,6,12
  154:13,25 158:9
  162:20 163:25
  166:12,20 167:6
  170:15,19 171:7
  172:7 174:2
  175:13 176:14
  178:18 204:6

206:7 208:11
  209:3,6,14 214:10
  214:10 216:14
  218:21 223:6
  228:18 237:23
  239:16 243:9
  244:9 262:23
  263:5 264:16
  266:8 272:15
  275:2,19 276:21
  277:6,10,15,22
  278:7 290:6,8,9
  291:3,9 292:12,13
  300:3,24 303:11
  303:17 311:19
  322:2,4,6,7,10,16
  328:9 331:15
  334:3 335:6
  336:17 337:10
**percent**  39:16,20
  41:9 185:18,21,22
**percentage**  113:13
**percentages**  69:18
  174:14
**perfect**  180:15
**perfectly**  208:6
  209:18 237:5
**performed**  271:22
**perimeters**  77:9
**period**  54:2 55:20
  93:10 117:12
  146:19 285:22
  313:6
**periodically**  19:5
**periphery**  26:15
**perpetrator**  61:20
  250:15 253:7
  301:25
**perpetrator's**
  86:16

**persist**  307:5
**person**  14:3,16
  28:6 45:20 54:3
  55:17 59:8,15,21
  60:8 64:23 65:21
  65:25 67:9,10,11
  67:18 73:19 75:23
  76:6,17,25 87:17
  94:21 100:6 102:4
  102:7 117:8,10
  118:18,21 119:2,7
  119:9,19 121:2
  127:11 128:25
  129:25 130:8,14
  132:6 133:12
  134:7 136:16
  141:18 155:5
  159:24 160:8,24
  161:3,22 162:15
  164:17 168:18
  169:16 178:5
  179:6 180:12,19
  190:22 206:23
  210:19,24 215:7,8
  216:12 218:16
  222:13 228:3
  235:18 237:9
  243:21,22 244:10
  248:15 249:13
  256:23 257:14,21
  260:11,13 265:8
  273:15,19,22
  274:2,9 283:3
  288:3,9,10 289:21
  290:4 298:4 300:8
  302:8,8 305:6
  312:13,16 314:14
  318:21 332:16
**person's**  62:17
  63:9 65:12 94:21
  157:3 206:13

210:8,12 241:8
256:17 257:12
258:11 288:5
**personal** 41:17,18
255:18,22,23
256:4,6,11 257:2,3
322:19 326:25
331:15
**personality** 76:12
76:16 77:5,13
131:3,7,21 132:5,9
132:23 133:11
134:7 168:12
**personnel** 293:4
293:15
**perspective** 78:22
150:25 166:11
285:10 329:11
**pertains** 110:18
**pertinent** 17:18
19:2,3 73:7 75:15
83:3 312:7
**perusing** 197:20
197:23 199:19,24
200:4,8
**petty** 140:4 141:5
142:11
**phenomena**
134:14 138:19
**phenomenon**
132:11 137:22
172:24
**phone** 10:9
**phones** 6:7
**phonetic** 30:3
84:19 175:2,16
205:8 232:23
336:12
**photos** 217:10
**phrased** 103:22
154:2

**physical** 68:5,7,14
126:7 127:24,24
128:4 189:22
286:6,11 287:2,16
288:15 316:8
319:5
**physically** 86:15
190:9 311:6
332:22
**physiologically**
124:5
**pi** 210:24
**pick** 6:4
**picked** 164:5
**piece** 96:3 110:17
260:19,22 264:25
265:12,19 333:9
333:10
**pieces** 98:20
**pinata** 258:23
266:11
**pioneer** 327:19
**pitch** 165:16,17
**pitches** 94:3
**place** 2:8 6:8 11:23
40:4 44:18 53:17
68:17,23 72:19
167:2 194:12
203:9,10,17
211:20 231:17
**placed** 212:9
**placing** 156:18
**plaintiff** 1:7 3:5
7:14 82:14 83:25
88:13 187:15,18
187:22 289:18
294:9 313:15
**plaintiff's** 5:11
70:22 75:11 82:10
83:22 88:9 148:4
182:15 294:6

319:18
**plan** 296:25
**plans** 157:20
**play** 11:24 14:22
125:14 258:25
259:13,22 260:5
303:3
**played** 72:22
**playing** 182:18
295:7
**plays** 33:21 75:5
**pleads** 178:21
**please** 6:3,7 9:15
20:9 45:8 57:13
97:11 126:23
177:14 192:3
218:11 227:8,8
239:13,14 296:10
**pleased** 186:23
**plenty** 300:21,22
322:2
**pllc** 3:10
**plus** 60:25 184:21
296:14
**point** 12:23 14:21
15:16 19:10 34:11
42:20 51:24,25
55:16 68:3 69:24
96:2 98:10 104:3
122:8 125:19
134:20 135:3
157:4 163:23
191:17,17 194:19
202:25 210:7,7,19
210:20,20,20,21
210:22,24 222:19
225:16 227:11
234:17 240:16,18
242:22 245:23
253:14 273:13
283:25 284:2,10

284:16 285:15,16
289:2 296:11
302:18 303:4
306:15 316:15
318:21 325:12
329:21 330:4
**pointed** 101:3
**pointing** 135:8
**points** 26:10 29:2
71:6,9 79:3 80:6
192:24 193:8
215:8 258:14,18
261:16 331:19
**polemicist's** 254:9
**polemics** 29:24
32:16 36:4 71:17
154:16 171:12
172:25
**police** 1:9,10,10,11
1:11,12,12,13,13
1:14,14 3:17 7:17
20:24 36:4 47:3,6
71:20 72:3,4,9,14
73:5 105:4 115:3
156:9,24 157:25
159:6,7 162:3
163:12 164:16
175:12,22 179:23
207:2 214:9,17,20
216:5,23 218:5
220:6,12,25 238:7
251:6,10,12 252:2
259:7 261:7,8
274:7 294:19
298:16,19 302:20
304:3,14,23 305:8
**policeman** 298:10
**policing** 157:2
**policy** 152:7,8
**polite** 137:2
304:22

polygraph  14:5,17
  16:6 17:22 21:12
  22:3 52:19,21
  53:2 54:2 56:15
  56:17,18 153:14
  154:7
ponder  247:4
pool  112:9 318:16
pools  163:17
poor  37:11 55:10
  108:16 279:13
  311:3
poorly  154:2
popping  58:14
populated  39:12
population  113:3
  138:7,12 174:14
  275:4
populations  18:8
  133:4
portfolio  271:9
portion  34:9 70:2
  97:14 111:3
  185:11 192:8
portions  192:9
portrayed  211:24
posed  9:22
posing  251:22
position  74:19
  92:19 118:15
  146:20 205:7
  214:13 217:12,18
  266:18 336:17
positioned  256:9
positive  152:19
  322:13
possess  305:17
possibilities  60:9
  64:7,12 65:18
  87:18 91:7,16
  93:22 100:21

194:16 223:6
  242:18 284:9
  317:14
possibility  67:13
  87:19 91:15,21
  93:15,20 153:10
  169:14 195:8
  204:11 218:19
  300:18 320:5
possible  61:12
  87:21 167:14
  203:7 212:24
  223:7 242:23
  247:5 256:8
  279:24 280:4
  288:23 291:25
  316:20 317:3,17
  320:23 331:6
possibly  22:4
  73:19 118:16
postconcussive
  128:10,11,18
  138:7,9,12,19
  281:7 286:5
  288:11
posted  178:13
postraumatic
  273:20
posture  76:6 106:8
posturing  136:24
potency  173:14
potential  17:18
  18:24 55:21 69:5
  72:15 288:17
potentially  15:7
  114:14 141:7
  162:8 186:19
  287:3
pouring  246:14
power  144:19

powerful  189:15
pox  277:4 280:9
practicality
  142:10
practice  29:11
  38:11 185:15
  220:19 327:25
  335:5,12,25
  336:12,18,22
  337:9
practices  157:11
practicing  42:5
precedent  319:21
preceding  213:16
precise  212:2
  223:19 224:20
  225:24 232:21
preclude  301:18
predation  112:15
  113:2
predator  303:12
predicated  140:20
preempt  173:6
prefer  187:2
  212:13 280:19
prejudice  167:21
preliminary
  120:16 296:24
preoccupied
  202:11 204:18,19
  206:5
prepare  107:21
prepared  77:23
  101:17 204:25
  246:15
preparing  104:8
preponderance
  308:14
prerogative
  308:23,23

prescriptive  151:8
  152:23 156:4
presence  61:2 68:6
  80:10,19 274:8
present  4:17 7:7
  22:4 58:3 59:18
  86:13 138:15
  167:9 274:10
  318:18
presentation
  266:16 288:14
presented  47:21
  60:11 93:23 96:15
  99:5 198:4 199:15
  231:19 236:18
  263:23,25 264:25
  280:21 281:5,16
presenting  133:7
  218:19
presents  34:2,3
  130:3 236:6
preserve  33:17
president  336:8
pressure  131:20
  133:23 137:20,20
  263:16 312:25
pressures  131:6
  259:2,11,12,21
  287:23 306:25
  307:2
prestigious  335:18
presumes  72:3,4
presumption
  36:13 71:19
  141:11,12
presumptions
  32:15 36:5 70:7
presuppose  222:7
  222:8
pretrial  208:25
  237:24 263:23

[pretty - psychiatrist]

pretty 107:24 122:20 132:12 151:6 152:22 323:20 329:15 335:17
prevail 257:3
prevent 276:6
previous 174:25 175:17 253:23 303:9 320:19 329:2 331:21
previously 272:7
primarily 29:23 32:15 39:12
primary 296:21
prince 1:16
principally 71:25 225:12
prior 101:17,19 245:13 295:11
prison 255:15
private 6:5 65:9 141:12
probably 16:8,22 49:23 50:9 76:20 82:5 146:3 185:17 195:18 214:6
problem 45:13 235:7 250:10
problems 242:10 295:12 301:3 336:14
procedural 308:8 308:10 310:2
procedurally 308:4 309:17
procedure 2:12 251:11,12 252:3 261:9 309:5
proceed 7:12 94:10

proceeding 17:13 82:4 192:6 304:23
proceedings 39:13 118:14 271:2
process 41:7 78:18 78:19 127:25 130:8 227:5,12 267:19
processing 214:11
produce 138:3 189:4,7 190:2
produced 16:24 100:7 101:17,18 148:9 184:10
product 56:25 134:5 155:9 182:2 288:14
production 319:24 325:12
professional 41:18 75:25 159:24 222:19 223:7 260:3 262:20,21 266:14
professionals 202:24 234:18 262:8 299:9
professor 30:4,17 35:13,13,14 43:23
professors 33:4 39:18 41:10 140:8 202:21 216:15
profile 22:14 85:7 85:19 86:13 89:3 89:13
program 260:25
progressed 326:16
progressing 210:6
progression 252:6
progressions 244:16

project 27:4 28:9 162:23 163:16 166:2,11 167:18 167:25 169:24 177:9,23 178:17 178:20
project's 178:14
promulgated 49:14
prone 131:22
pronoun 207:17
pronouncements 171:11
proof 59:18 279:24 280:4
properly 77:21
proponent 261:6
proposed 151:19
proposition 276:19
proprietary 163:5
prosecutor 259:25 266:3,9
prosecutor's 307:20
prosecutors 147:20 148:20,24 149:5 152:6 172:13 308:23 314:2
prostitute 111:17 111:18 112:7
prostitutes 110:23 111:19 112:14,20 113:2,6,8,10,16,23
protocol 26:18
proud 75:22 76:4 267:18
prove 49:5 58:22 59:7 257:4

proven 24:4
provenance 87:11
provide 94:11 111:11 187:20 188:11
provided 32:14 53:2 101:3 132:3 145:8,12 147:2,8 148:20 149:4 154:11 181:3,13 187:14 198:13,19 213:2 216:5 218:4 218:7 221:6 227:16 231:2 270:17 315:3 332:17
provides 333:11
providing 220:25
proximal 55:17 72:21
proximity 53:15 168:22 271:3 312:14,16
psychiatric 84:15 117:18 126:5 155:14 158:24 159:10 161:23 162:6 169:17 170:19 174:11,13 174:23 176:20 206:2,24,25 209:15 221:16 234:7 238:3 272:5 300:2,25 303:11 316:14
psychiatrically 158:13 162:11 167:22
psychiatrist 156:8 202:17 262:22 320:3 323:12

335:11,12,13
**psychiatrist's**
254:6
**psychiatrists**
119:16 122:23
234:13
**psychiatry** 335:15
**psychological**
271:18,22 316:11
**psychologically**
133:5
**psychologist**
264:23
**psychologist's**
254:7,8
**psychologists**
202:18 221:18
**psychopharmac...**
56:21
**psychopharmac...**
54:20
**psychosis** 235:13
238:6 250:19
**psychotic** 154:12
155:3 159:22
160:10,24 171:8
175:5,12,23
176:17 178:5
202:10,12 204:4,5
204:7,9,16 206:6
208:12 212:16
243:9 247:20,21
248:15 249:3
300:20 303:3
**ptsd** 272:6,16
**pubic** 62:9 63:7,10
63:11 64:3 80:15
**public** 2:10 8:8
183:23,24 337:22
338:5 339:24

**publication** 28:18
**published** 30:21
31:3,8 37:20
40:20 43:4,14
46:7,9,16,19 47:16
49:18 108:20
116:12 135:19
137:6,12,24 171:9
260:15 328:2
**publishing** 30:18
43:8 47:24 48:3
**pull** 267:20
**pulling** 203:23
**pullout** 193:15
**punch** 277:3
**purpose** 104:7,13
127:23 196:25
**purposely** 105:10
105:13
**purposes** 50:12
99:7 100:11
230:11 239:12
**pursuant** 2:11
41:13
**pursuing** 251:16
**pushed** 35:11
**put** 19:24 63:16
72:20 75:19 79:11
151:14 174:6
177:20 195:18
196:2 241:16
250:12 260:14,17
266:17 269:16
322:22 336:16
**putting** 177:4
328:6

**q**

**qaeda** 169:6,8
**qualification**
160:2

**qualified** 49:11
**qualify** 198:10
**qualities** 12:17
22:20 74:13
120:13 132:5
160:20
**quality** 12:24
22:14 27:9 80:5
158:17 240:22
250:5 308:6
323:22
**quantify** 14:12
**quantitative** 21:15
**quantity** 27:8
**quarterback**
129:3,8
**question** 9:12,15
9:18,21,22 10:3
13:7 14:23 20:8
20:14 29:18,19
34:4,5,8,13 40:10
46:10 66:21 72:9
83:5,7 87:23,23
90:10,25 91:3,12
91:23,23 92:6,12
92:14 94:8,11
95:4,5,13,20 96:8
97:9,10,12,13
98:22 99:7,16
103:22,24 104:12
106:3 107:4
108:13,17,23
110:13 111:12
114:24 115:14,15
115:21 116:6,6,8
123:5,9 125:16
130:23 133:13
136:5,21,25 137:3
137:16 138:6
140:10 143:12
157:18 161:14

166:4,9 167:12
173:7,21,23 176:7
176:11 184:16
187:5,6,10 190:18
192:16 193:21,22
194:11 195:20
196:12,20,21
197:25 198:2,8
199:17,20,21
200:2,9 202:14
203:3 207:16
209:25 210:18
213:9 220:25
224:8 226:14
229:5,13 238:17
239:6 244:15
247:16 250:14
251:19,21 256:15
270:22 282:5,17
285:12 287:10
299:6 303:2
305:16 306:20
314:20 317:16
318:6 320:4
321:15,23 323:18
324:7 325:2 326:9
326:22 331:10
**questioned** 33:4
131:9 133:19
134:4 159:11
247:10 305:13
**questioner** 137:21
141:23 219:24
306:4
**questioners** 232:3
307:3
**questioning** 11:23
11:24 14:3 15:8
72:23,24 141:8
158:15 204:8,13
205:23 214:4

215:9 217:13,19
217:22 218:21
231:16,23 238:21
241:2 306:24
307:6 327:2
**questions** 9:4
23:18 29:3 33:9
42:22 62:15 77:2
77:6 78:25 93:3
97:6 105:3 106:11
109:15,16 120:12
121:25 188:12
191:9 206:21
218:23 220:2,5,8
239:21 241:25
242:16 244:13
245:8 251:12
252:5 305:9,10
309:13,14 315:16
315:19 316:17
324:9 330:10
337:13
**quibbling** 292:4
**quickly** 181:14
228:21 232:13
243:13
**quite** 38:13 119:21
158:13 204:3,18
204:18 243:7
256:8 329:18
**quizzical** 285:15
**quote** 149:2
265:21,22

**r**

**r** 3:7 8:6 210:24
**rabbit** 227:10
**race** 74:5
**rains** 278:10
**raise** 274:14
285:11

**raised** 53:20 79:4
109:17 110:2
199:6,12 203:4
320:18
**raises** 321:21
**ramsey** 158:23
**range** 63:8 87:18
171:16 217:23
263:22
**rape** 32:22 59:12
61:24 66:7 81:14
81:25 82:17 86:14
96:6 112:15 189:4
189:6,12,13,25
194:11 206:6,6
240:15 257:10
258:4,5 259:4,11
259:23 260:8,12
280:8 281:21
301:17 303:13
312:21 316:7
318:2,3,13 319:21
320:13,22 321:10
324:3,5 325:5,7
327:15,18 334:4
**raped** 198:15
213:4 275:9,11,16
275:17,21 276:3,7
277:2,4,6,7 278:17
278:19 280:10,11
280:12 282:2,3
298:9,15,18
311:17 316:24
321:9 325:19
**raping** 247:8
293:5 294:19
295:10 296:7,15
**rapist** 302:18
**rapists** 300:22,23
**rare** 21:24 55:9
175:9

**rational** 211:8
234:3
**raw** 209:7
**reach** 13:19
169:23 176:13
181:14 258:17
**reached** 37:22
**reaches** 303:4
**reaching** 34:16
37:11,16
**reacting** 206:17
**reaction** 207:12,13
236:9 269:4
**read** 20:12 28:2
70:2 71:3 79:23
84:7,18 90:14
97:15 103:23
107:23 108:14
171:13 175:18
219:2,5,6,7,11,15
219:18,24,25
220:13 223:24
224:18 226:9,10
228:2,16 229:11
229:14 237:13
242:7 265:20
267:16 271:3,5
282:13 283:19
290:6,8,12,23
291:21 313:22
330:3 333:2
**readily** 69:5
**reading** 29:4
70:12 76:10
109:12 171:12
236:16 291:24
**real** 25:4,8 55:25
135:11 140:18
172:2 195:9 205:4
205:5 219:19
262:5,7 297:5,9

321:3,4
**realistic** 217:25
301:7
**reality** 202:22
203:9,18 206:14
216:18
**realize** 263:9
277:11 312:23
**really** 27:2 29:22
46:25 64:8 73:13
104:14 105:8
106:5,7,18 114:23
120:8 123:4
143:11 144:16
152:8 153:20
155:24 157:9,22
158:16,25 159:13
160:16 161:21
162:9 163:13,19
183:21 185:14
194:12,14 208:22
212:6 213:25
223:3 226:24
230:14 231:13
232:21 245:14
248:23 249:8
250:15 258:19
260:9 261:11
266:22 270:7
274:23 280:6,19
290:11 301:6
323:21,25
**realm** 57:11 94:14
132:7 185:21
204:10 223:5
**reask** 9:17
**reason** 19:6 45:25
138:4 170:4
188:19 196:13
199:10 221:21
246:4 277:13

279:18 291:15 309:20 339:6
**reasonable** 316:11 316:13
**reasonably** 62:2
**reasons** 170:24 171:16 178:7 186:15,16 203:12 273:15 274:24 297:19
**recall** 83:15 111:3 117:24 121:9 150:13 220:11 224:13 238:11 253:17 290:13 291:24
**recalling** 129:14 129:18,22
**recapitulation** 247:24
**recapping** 221:11
**receive** 166:15 308:3
**received** 102:10 307:9 309:9 319:22
**receiving** 236:8
**recency** 302:11
**receptacle** 167:19
**recess** 51:8 57:20 107:15 139:17 177:16 201:11 255:6 292:21 328:19
**recognition** 121:9
**recognize** 15:19 36:10
**recognized** 69:6
**recognizing** 23:11
**recollection** 142:21 153:22

285:22 286:9 288:20 291:11,21
**recommend** 260:23
**recommendations** 296:25
**recommended** 186:8,10
**reconsider** 53:4,7 309:20
**reconstruct** 130:2 279:17
**reconstruction** 61:11,13
**record** 5:13,20 6:3 6:13 8:19 10:16 51:3,6,12 54:22 57:16,18,24 70:11 75:20 82:5 83:24 84:14,15 96:20 97:15 107:8,10,13 107:19 122:5 139:10,12,15,21 149:11 164:19 175:19 182:17 199:9 201:7,9,15 206:3 212:14 215:25 221:13 222:11 223:8 254:24 255:4,10 262:19 276:18,22 276:23 292:14,19 292:25 295:20 310:21 311:25 328:15,17,23 331:25 337:15 338:10
**recorded** 264:2,3
**recording** 6:11
**records** 82:16 159:25 189:6

207:24 238:12 252:25 267:15 269:4,9 271:4,6 280:17,20 281:4 305:12
**recount** 117:8 119:7 121:24
**recounted** 132:20 319:7
**recounting** 118:18
**recounts** 119:9
**recourses** 169:3
**recover** 251:7
**recovered** 59:14 60:14 85:5,10,15 85:23 86:21 88:24 89:10,19,23 94:22 94:24 283:15
**rectal** 85:10 283:15 285:6
**red** 216:3
**redaction** 109:9
**redness** 281:22
**reduced** 44:19
**redundant** 220:6
**refer** 44:20 117:16 117:23 278:12
**reference** 35:15 140:12 142:19 146:4 150:15 190:12 191:2,4 194:10,21 222:18 225:16 236:17 238:15 241:13 260:18 266:11 290:12 293:3 311:9
**referenced** 46:22 47:19 150:12 151:12 154:21 157:24 177:7,8,8

200:18 203:5 232:16
**references** 118:7
**referencing** 61:21 104:22 158:4 189:9 194:5 225:9 290:13 303:6
**referred** 212:15 237:23 238:3
**referring** 27:18 34:21 71:5 114:9 114:17 149:3 177:6 235:3 236:23 238:16 266:8 279:6 283:9 283:11,18 293:20 306:6
**refers** 270:5
**reflect** 222:23 323:6
**reflected** 12:11 118:19 235:13 263:11 299:25
**reflecting** 247:25 263:7
**reflection** 210:11 211:4,5
**reflective** 24:9 61:16 241:4,6 249:3 250:19 285:7
**reflects** 304:22,24
**refresh** 142:20
**refute** 41:8,25 42:12 44:16 46:14 46:16 49:19
**refuted** 48:24
**refutes** 43:5,14 48:16 50:4
**refuting** 40:21

[regard - research]

regard 133:9
regarded 327:20
regarding 16:4
  108:20 116:19
register 49:3
registration 121:8
regret 263:8
regular 57:11
  111:20 112:21
  114:12 282:20
regularly 113:15
  282:14
relate 25:12,13
  27:17 38:8 39:25
  111:23 113:7
  131:7,12 132:5
  133:10 144:12
  188:6 196:10
  204:20 221:19
  276:9 287:22
  305:19 323:24
related 34:13
  53:19 102:17
  105:2 127:8,12
  147:13 168:14
  181:9 188:12
  211:2 276:5
  293:16 338:13
relates 12:14
  54:17 62:5,5 77:8
  113:9 127:5 131:8
  133:12 137:13
  244:7 307:22
relating 247:13
relationship 21:19
  26:3 55:5,11,16,17
  56:16 59:25 65:14
  65:15 72:21 91:9
  91:18 97:25 98:4
  98:7,11,12 100:8
  113:22 252:5

  308:6 334:23
relationships 57:6
relative 18:6 40:7
  54:10 114:15
  124:8 302:11
relevance 42:4
  52:10 140:17
  247:5
relevant 12:5 13:2
  26:15 36:22 45:7
  56:24 162:2,9
  217:7 250:17,20
  309:18 310:3
rely 28:19 91:11
remarkable
  319:19 323:17,20
  331:2 333:9,10,13
remember 16:7
  75:6 76:9 109:7
  117:25 118:3,25
  120:4,5 121:18
  133:18 138:8
  155:25 157:23
  183:15 215:12
  217:6 219:20
  226:16 290:9,21
remembered
  326:15
remembering
  119:2
remembers 61:15
  118:2
reminds 260:17
remote 121:14,16
  122:10,14,21
  292:7
remotely 7:8,20
repeat 38:14
  119:18
repeated 21:9
  121:20

repeatedly 21:23
  22:16 149:18
repeating 122:4
repetition 121:20
  121:21
rephrase 9:16
  47:15
replicated 274:6
report 5:12,15,16
  34:20 49:21,24
  50:6 69:23,24
  70:18 77:23 78:17
  84:4,19 88:6,7,15
  98:12 99:25 100:2
  100:6 101:14,25
  102:10,21 103:4
  104:8 107:23
  110:16,19 142:15
  148:11 174:22
  180:24 181:7,22
  181:24 182:4
  183:18 184:9
  187:14,20 188:6
  190:13,24 191:7
  191:16,19 192:9
  195:25 196:3,3,7
  196:11,14 197:3
  198:20 199:14
  200:17,24 203:6
  215:14 227:19
  229:3 239:12
  260:18 265:15,16
  266:15,23 267:5
  268:19 269:14
  283:10,20 293:2
  293:25 301:9
  303:6,20 307:17
  309:4,5 312:7
  316:6 317:25
  324:19,24 325:11
  325:15 326:13

  329:22 330:3,3
reported 82:2
  138:13 311:5
reporter 2:9 5:22
  7:10 8:2,10 35:21
  65:22 136:7,13
  177:13 188:23
  292:15
reporting 339:2
reports 32:7,13
  34:18 48:11 70:3
  100:3 101:16,22
  174:7,8,10 186:24
represent 7:9 86:8
  167:6 315:23
representation
  18:7 56:11 98:2
  169:10 170:4
  171:7 239:24
representations
  96:16
represented 14:8
  18:2 52:4 175:24
representing 6:15
  21:23 86:20
represents 39:19
repressed 40:17
repression 127:20
request 157:22
requested 47:13
  97:14
requests 16:25
require 52:8
requirement 45:5
research 12:15
  18:20 21:5,6 25:6
  25:6,12 26:17,20
  26:21,23 27:16
  28:5,7 29:10,13,14
  29:20,21,22 31:20
  32:2 33:3,7 34:15

34:23,25 35:4,5,6
35:8,10 37:10,20
37:23 38:2,7,10,12
38:15,17,19 40:20
41:2,4 43:7 44:4
46:16,19 53:10
71:8,10,10 72:11
74:3,4 75:14 84:5
88:15 127:22
132:13 134:11
138:22 142:2,3
143:5,8 144:21
145:19 147:24
254:8 260:20,22
261:25 264:21,25
265:12,19 327:16
333:20 334:3
336:23
**researched** 32:17
**researcher** 33:20
51:15 76:15,20
327:21
**researchers** 31:21
43:15 221:19
**researching** 30:19
**resemblance**
332:11
**reserved** 248:4
**reside** 8:13 74:14
**resisted** 229:20
**resolve** 42:21
87:22 297:8
323:18 331:4
**resolved** 300:20
309:24
**resolves** 87:23
**resources** 178:9
**respect** 68:15
137:19 144:16
167:18 168:4
197:13 259:16

279:5
**respected** 163:7
327:15
**respects** 318:4
**respond** 19:20
109:15
**responded** 43:25
**responding** 20:14
29:17 34:8 131:5
**response** 118:22
242:25 274:16
**responses** 242:25
261:20
**responsibilities**
113:19 144:14
312:8
**responsibility**
33:19 53:13
**responsible** 20:4
21:7 73:5 74:9
257:14
**responsive** 133:22
184:15 247:16
**rest** 193:20,23
198:8,24 200:2,5
252:7
**restart** 207:16
**restate** 97:12
196:22 202:6
324:25
**restroom** 319:3
**result** 53:2 86:12
167:3 276:20
277:22
**resulted** 85:5,10
85:16 88:25 89:11
283:16
**results** 16:5 85:6
85:17,24 86:9,19
89:2,12 140:8
165:22 316:20

**resume** 17:7
**retained** 5:22 78:5
78:23 80:7 187:17
187:19,21 313:25
**retardation** 17:25
18:3,4 154:18
171:14 173:15
**rethink** 314:14
**rethought** 48:22
49:15
**retraction** 312:17
**retrieval** 127:18
**return** 139:20
255:9
**returning** 51:11
57:23 107:18
201:14 292:24
328:22
**reuptake** 54:23
**reversible** 141:8
**revictimization**
271:25 272:4,9
275:5 276:25
278:5
**revictimized**
272:18 273:16
277:18,21
**review** 15:13 30:2
46:8,20 47:17
96:13 108:10,19
153:3 227:8,15,19
229:8 259:15
263:13 267:17
269:9,13 313:11
317:25
**reviewed** 17:2
37:21 49:19 50:4
58:7 101:11,23
102:3 109:7
116:15 135:20
137:7,25 138:13

181:18 207:25
230:16 253:11
266:24 269:11
271:5 316:21
329:21 331:24
**reviewing** 238:12
252:24 313:12
329:9,9
**revolutionary**
135:9,13
**richard** 1:14
**rid** 207:16
**ride** 224:4
**ridiculous** 32:22
312:23 336:20
**riggio** 1:21 4:11
5:13 7:19 59:23
60:14 61:4 62:9
62:18 66:6 67:21
67:22 80:21 81:24
83:12 89:5,7,15
94:19,25 95:6,8,17
96:4 98:10 100:16
105:16 106:25
180:18 188:21
189:2 192:3 195:7
195:21 197:5
198:15 200:12
201:17 213:4,14
221:3 228:25
230:2 231:8
245:10 255:18,21
269:20 270:22
271:23 275:8,15
276:19 278:16
280:15 284:15,17
286:13 289:9
315:8,23 316:24
318:14 321:8
325:6 326:14
330:14 331:8

| | | | |
|---|---|---|---|
| **riggio's** 62:9 64:17 65:8 81:4,9,17,21 82:15 86:22,24 89:7,19,24,25 90:6 90:21 92:2 96:12 99:9 190:15 215:10 282:13 285:22 288:24 | 294:15 296:12,13 298:20 299:5 302:15,15,22 303:24 307:10,14 307:18 308:15 309:16 310:21 311:7 314:11 325:25 331:16 | **roe's** 236:10 304:3 **role** 141:17 156:12 253:20,21 254:7,7 254:8,10,10,12,13 254:16,18 258:25 259:13,22 260:4 301:21 309:3,4 | 123:10 |
| | | | **s** |
| | | **rolled** 15:5 26:25 | **s** 5:10 10:15 339:6 |
| **right** 8:21 10:13 15:6,14 16:10,14 18:16 23:19 24:12 24:21 29:24 30:20 32:3 35:21 39:22 40:23 41:3 48:5 58:23 63:12 67:16 75:4,15 76:8 77:6 80:17 82:22,25 83:10 89:8,21,25 90:8 91:23 92:4 94:3 102:18,23 103:7 108:8 120:21 129:15,19 154:7 166:7 174:23 180:21 181:22 182:2 183:21 184:5 185:2 186:7 190:19 191:7 192:2 212:23 213:12,18 215:25 219:4,7 220:7 227:17 236:14 242:11 243:10 246:6,18 247:3,3 250:17,24 266:24 269:22 271:14,18 272:12 273:4 277:5 278:13 280:16 282:10 290:2,7 291:6 293:2,6,18,22 | **righteousness** 136:20 **risk** 14:10,13 15:10,22 21:15 147:13 153:19 155:6 156:19 171:10,15 272:9 275:3 278:16 300:7,8 301:3,7,11 305:19 **risky** 272:22 **rita** 1:11 **river** 69:7 **road** 19:22 **roadblock** 20:16 **roadblocks** 19:24 **robbery** 170:10,11 **roberts** 1:10 219:9 219:15 230:11,24 231:2,5,6,12,24,24 232:9,12 240:13 242:9 244:18 245:7 332:14 **robots** 72:5,7 **robust** 39:19 51:21 154:19 **rocket** 164:25 **roe** 232:22,25 234:23 236:17 237:13,18 240:9 241:11 304:12 306:5 | **rolling** 17:20 **rolls** 15:9 **rooftop** 171:11 **room** 7:7 76:19,25 96:17,25 98:2 139:7 205:23 237:22 **rooms** 209:8 331:23 **rossetti** 175:2 180:14 **round** 262:4 **row** 169:2,12 **rudimentary** 120:9 **rules** 2:11 **run** 24:7 33:11 165:3 261:11 **running** 79:25 **rush** 275:18 **russano** 32:9 61:23 75:19,21 141:25 163:19 203:4 227:19 239:10 258:21 261:19 266:13 268:20 270:14 **russano's** 49:21 50:6,15 142:15 199:14 202:21 227:19 319:15 **russell** 3:7 7:13 47:10 70:18 | **sack** 129:4 **safe** 214:14 264:17 **safest** 43:11 **sake** 79:7 **salad** 235:19,24 **sales** 113:17 **sample** 12:8 14:7 14:11,15,20 15:16 15:24 16:3 19:15 21:8 22:5,17 23:25 24:8 25:18 33:17 51:19 52:2 53:5 58:7,10 85:23 86:11 159:19 160:9,11 161:9,16 165:18 165:24 171:22 172:22 177:23 178:23 179:19 317:2 **samples** 30:25,25 **san** 177:22 **sanders** 175:15 **sarcastic** 230:19 230:24 232:7 **sat** 77:3 107:23 **satisfied** 243:3 **saunders** 184:11 184:22 **saw** 20:16,23 237:10 247:23 248:16 269:3 281:4,18 **saying** 31:18 33:25 34:12 36:7 40:9 40:15 43:20 45:24 46:18 49:7,8 64:4 65:6 72:12 74:2 |

75:17 87:12 93:14
94:5 100:15 111:5
126:11 129:24
135:21 189:23
203:23 208:23
209:10,12,21
212:20 227:22
233:8 234:23
235:8,11 237:18
242:14 243:21,23
245:16 246:21,24
247:6 248:10,17
248:23 249:4,11
250:9 274:21,22
275:8,12,15,20,25
276:24 278:14,20
279:4 283:25
286:18,24 298:14
320:16 321:12
325:14 326:2
**says** 19:20 72:15
84:25 178:17
179:22 206:4,11
208:7 211:13
233:21 234:13
238:24 255:13
261:10 264:23
265:3,18 266:7
287:16 294:17,21
294:24 295:17,22
296:4 297:3,7,10
298:18 299:19
305:21
**scahill** 3:16
**scenario** 52:19
66:24 67:5 132:19
217:14
**scenarios** 63:9,14
64:4
**scene** 59:14 60:15
68:15 179:14

203:8 205:2
206:10 212:22
217:10 220:14,20
221:7 223:20
224:20 225:25
246:5 250:16
252:14 318:14,18
**schizophrenia**
204:2 216:12,14
**schizophrenic**
300:23
**school** 18:16
260:24 264:24
**science** 37:17
39:23,24,25 40:6,7
40:12,16 47:9
49:25 50:12,17,21
56:22 62:21 74:20
76:11 115:11,19
116:19 135:11,11
148:25 149:2
151:5 329:16
**sciences** 39:10,20
40:3 147:11
150:16 262:2
335:17
**scientific** 46:4,6
49:14 101:5
135:10 195:2
309:25 310:4,17
**scientist** 20:2
39:22,24 42:6
165:2
**scientist's** 70:5
**scientists** 42:5
46:22 47:19
**scissors** 213:6
**scooter** 336:7
**score** 25:20,21
26:2

**scratch** 25:24
**screening** 120:9
**screws** 33:15
**scrubbed** 63:17
79:13
**scrutinized** 55:23
270:19
**scrutiny** 63:20
84:14 170:15
**scuffing** 20:17
**scully** 2:9 7:11 8:3
338:4,22
**se** 72:23 75:7
77:13
**seal** 17:9
**sealed** 163:5
**second** 82:20
88:20 168:19,24
177:13 183:10
192:18 223:17
296:9
**seconds** 253:24
**secret** 300:11,13
**sectors** 57:3
**see** 10:22 15:11
19:17 22:15 23:15
25:21,23 34:11
42:15,16 52:15
58:2 63:3,19 64:7
64:11 70:17 72:19
72:20 73:4 74:2
79:12,15 85:2
86:6 87:15 89:16
104:21 117:25
118:2,7 119:18
139:23 149:9,24
150:14 154:12,13
154:14 164:22
168:16 171:19,21
174:14,15 188:15
196:12 204:11

219:14 223:17,22
229:22 230:5
237:7,15 246:11
248:9,13 253:16
270:13 272:10
280:25 285:7
289:6,19 295:15
295:16,22 296:8
325:10,20
**seeing** 26:13,14
42:14 152:10
173:2,3 236:3
**seek** 258:5
**seeking** 323:3
**seen** 84:10 101:9
168:5,6 172:2,4,7
172:8,11,19
237:24 259:6
328:12 333:15,19
333:23 334:13
**sees** 21:8 328:8
**segment** 249:23
**selected** 179:5
**selection** 179:4
**selective** 54:23
186:2
**selectivity** 164:8
**self** 33:2 54:4 76:3
121:15 202:23
230:15 231:25
232:14 240:12
261:23 288:3
305:7 307:4
**sell** 112:18
**send** 140:15 227:8
**senior** 152:7
**sense** 119:10 150:5
156:6 203:18
206:12,12,14
208:9,16,18,20,21
211:12,14,17,19

226:22 235:16
236:11,20 239:13
239:14,19,20
243:6 261:14,18
262:12,13,18
321:5
**sensitive** 6:4 97:5
**sent** 181:19 227:7
227:9
**sentence** 71:3
198:22 224:18
**sentenced** 255:14
**separate** 265:21
265:22
**separated** 250:4
**sequitur** 246:7
248:3 249:24
**sequiturs** 248:25
**sergeant** 1:12,15
1:16 226:10 242:8
**seri** 101:13,16,22
101:25 102:9
**serial** 302:18
**serious** 75:25
128:24 154:19,24
159:17,20 160:5
166:6 176:18,20
180:19 266:13,15
266:19 306:23
309:20 314:4
336:13
**seriously** 230:18
260:16 261:3
312:5
**serological** 84:5
88:15
**serotonin** 54:23
**service** 311:14
**serving** 261:23
288:3

**set** 26:18 250:5
257:25 268:18,22
315:8 338:8,18
**setting** 69:4 134:3
137:14 141:2,5
142:11 202:18
204:25 263:17
265:5 281:8
333:24
**settings** 137:17
**seven** 100:3
314:11
**seventh** 84:24
193:2
**sex** 66:6,10 80:22
82:3 87:20 93:10
93:18 94:20,25
96:4 98:5 110:18
110:21,22 111:19
195:22 197:5
200:13 201:17
213:14 221:3
249:13,14,20,21
272:17 283:3
294:22 305:25
306:22 315:9
323:13 331:12
**sexual** 41:19 59:20
59:25 60:5 64:23
64:25 65:7 83:5
83:13 95:7 98:11
110:25 111:7,14
111:16 112:19
113:10,11 192:5,7
195:5,13 202:13
246:18 247:10,12
247:13 249:5
253:7 256:7 284:4
286:15,20,22
287:14 300:16
302:2,14,22

303:12,14 306:17
330:15
**sexually** 40:24
204:18 206:4
272:16,22 330:16
**shake** 144:2,4
**shaking** 190:3
**shame** 327:8
**sheet** 339:2
**sheriff** 1:19
**sheriff's** 1:15,16
1:16,17,18 4:5
**shift** 288:6
**shiny** 26:13
**shirt** 215:17,21
**shmuck** 312:21
**shocked** 218:25
**short** 55:20 321:2
**shorter** 300:4
**shorthand** 2:9
**shorthanded**
190:11
**shortly** 14:17
21:13 53:24 267:4
311:12
**shoulder** 20:25
**shouts** 171:11
**show** 24:5 88:5
174:9 217:18
294:8
**showed** 335:19
**showing** 82:12
84:3 88:11 182:24
**side** 9:20 19:22
20:19 56:20,25
62:24 63:4,19
64:8 78:6,22
79:16 80:4,6
122:12 206:21,22
209:9 329:4

**sideways** 169:4
**sign** 109:12 281:22
**signature** 338:20
**signed** 109:14
294:17
**significance** 52:14
53:8 154:17
176:22 256:12,16
**significant** 52:6
56:11 58:15 178:2
318:3,9,11 329:15
**signs** 20:16,17
**silly** 265:19
**similar** 15:20
150:20 151:7,10
236:10 320:25
**similarly** 332:4
**simple** 45:25 50:2
**simply** 131:11
163:25 167:7
180:2 211:12
263:11
**simulate** 265:4
**simulations**
138:21 139:25
140:21
**sincere** 93:18
**single** 15:13 25:22
50:10 85:11
174:18 283:16
289:21 290:4
**singular** 45:10
266:19
**sir** 8:20 10:13,18
10:24 13:5,17
34:4 37:9 38:4
58:19 67:19 81:2
84:17 85:2 86:6,8
87:25 89:6,16
94:17 95:5 103:25
116:5 121:11

[sir - speaks]

Page 49

124:11 136:4
138:11 145:7
148:7 151:24
161:7 166:3,4
176:12 180:10
182:5 183:5,8
187:5 188:5 192:2
196:13,20 223:14
223:22 224:14
230:5 231:3
252:24 253:5
265:20 272:10
278:14 289:6,7
293:2,7,9 294:11
295:19 299:7
302:13 307:11
316:13 318:7
330:13
sit 95:16 156:20
163:20 164:6,11
221:21 222:23,25
271:20 330:5
sitting 76:19
135:15 209:2
218:8 222:21
244:2 318:24
situation 56:10
128:19 131:6,20
situations 272:22
six 88:6 100:3,4
171:23 182:11,11
sixth 5:16 88:14
192:25 225:11
size 12:9 14:11,20
15:16 16:2,3
22:17 51:19 52:3
53:5 58:10 165:19
165:25 172:22
sizes 15:24 329:7
skirt 213:5 215:11
216:25 217:9

slammed 128:5
slaughtered
279:21
sleeping 239:2
sleeves 26:25
slides 150:24
151:7
slip 257:16
sloth 126:19
slow 65:22 188:24
slurred 298:5
small 14:7,15
15:17 21:8 22:16
53:5 56:5 58:10
152:5 171:6
172:22 175:8
200:17
smaller 12:8 14:20
15:24
smart 169:15
smell 302:11
smelled 302:4,7
smudge 20:20,20
20:22
snorted 336:19
snorting 335:20
soap 79:15
social 39:22,23
40:3,6 77:14
135:10 221:18
261:25 264:22
sole 183:6 279:13
solution 152:2
solutions 151:21
solve 152:13
somebody 28:14
30:3 58:22 59:11
61:8 64:2,14
66:16 76:22 83:8
94:15,20 95:7
96:4 106:12

118:13 141:15
158:12 160:12
163:13 164:12
166:25 167:8
169:12,21 180:11
189:24 190:5
199:5 201:18
209:11 213:14
215:2 218:8,13
221:4 236:6
237:25 238:24
240:19 256:10
264:8,24 265:4
285:17 296:22
302:17 305:21
312:20 315:9
320:11,24
somebody's 128:5
253:2,16
someone's 211:11
254:19
soon 310:25 311:4
sooner 311:19
sorry 30:18 57:14
65:24 84:24 88:20
124:17 150:12
159:3 188:25
194:2 224:22
229:15 262:23
278:24 286:2
296:9 314:7
332:15
sort 20:6 23:4
36:13 42:22 64:5
69:3 78:23 79:10
120:15 149:20
155:13,20 160:19
168:17 205:16
208:15 214:25
223:2 226:21
229:6 233:12

259:9 320:3
sorts 189:16
sought 110:21
sound 16:9 185:2
230:17
sounded 292:7
sounds 49:3
215:19
source 28:8 33:7
79:22 94:24 167:4
214:10
sources 33:13,14
36:15 227:5
269:16,19
south 3:11,17
space 225:5
spaces 264:17
spanish 235:17,18
spanning 285:23
speak 12:22 48:8
69:17 146:8,17,21
146:22 151:13
167:16 216:20
235:18 243:17
244:11 252:2
264:9 270:4,19
277:14 283:2
334:9
speaker 146:7
248:8
speaking 9:5 32:9
33:24 45:9 118:9
146:19 156:23
159:2 175:6,7
203:20 207:20
218:17 235:17,19
235:25 249:9,9
300:6 303:10
308:7
speaks 45:4 98:22
98:23 194:11

218:20 269:24
270:2 320:3 327:7
**specialist** 91:12
100:13
**specific** 31:4,6,9
44:25 98:22 104:3
115:15 117:10
124:7 132:6
133:12 145:18
147:20 158:4
217:15 225:15
326:24
**specifically** 17:22
18:2 38:21 71:18
137:13 147:12
151:17 176:19
179:19 205:12
226:4 238:11
239:3 293:20
307:24 336:10
**specifics** 257:6
**specimen** 246:5
248:4
**speckled** 32:14
**speculation** 70:7
279:2 282:18
284:25
**speech** 236:9
298:3,5
**spend** 143:15
**spent** 181:24,25
**sperm** 189:5,7,14
190:2,10
**spheres** 295:2
**spherical** 262:4
**spoke** 107:23
150:5 152:20
175:16 176:21
331:11,12,13
**spoken** 147:2

**spread** 114:16
**squared** 210:24
**ssri** 54:22
**ssris** 54:17 55:5
**staffed** 169:16
**stage** 109:10
303:19 320:10
**staged** 320:15
**stages** 121:7
**staging** 121:13
**stairs** 305:22,22
**stalf** 3:19 7:15,15
47:10 50:7 62:10
62:13 66:20 70:11
70:17 87:4 90:9
90:24 92:5 95:3
95:19 96:7 97:16
98:17 99:15
100:18 104:11
105:18 106:2
107:3 108:12
123:8 134:23
136:17 167:10
187:9 190:17
192:11,14 197:9
200:19,25 201:23
213:8,23 214:22
221:8 224:7,23
226:13 228:5
229:12 236:15
240:5 242:4 253:9
256:14 282:4,16
292:11 299:14
302:23 304:6,17
306:9 307:15
308:16 311:23
314:19 315:18
317:6 328:13
330:9
**stalling** 123:6

**stamped** 182:19
**standard** 18:21
83:7 316:18
**standpoint** 17:23
152:12,12,23
174:24 234:8
304:10,11 310:2
**stands** 323:25
**start** 62:20 94:8
164:12 192:16
267:12
**started** 53:6
162:20 267:4,13
267:13 329:17
**starting** 165:19
**state** 2:10 19:21
20:2,23,25 54:21
151:13,16 152:8
152:17 209:7,11
226:25 316:7
326:13 338:5
**state's** 1:18,20
148:23
**stated** 288:25
324:19
**statement** 46:25
48:23 49:7,8
77:21 105:8
114:10,17 169:20
176:13 213:3
216:5 231:25
232:15 245:3
246:15 247:12
248:19 249:12,16
250:6 252:6,8
307:20,21 324:23
**statements** 33:2
54:4 202:23
215:25 230:16
240:12 261:6,15
293:18,21 298:23

305:7,8 307:5
**states** 1:2 6:25
289:16
**stating** 293:4
**statistical** 18:9,19
19:8,11 21:21
23:17,20 24:6,14
27:9 33:11 51:20
52:5,8,12
**statistics** 18:15,18
18:19,24 24:5
**status** 61:9 117:7
117:20 120:2,3,7
120:13 295:23
296:3,19
**stays** 193:11 300:4
**step** 78:19 91:22
308:2
**steps** 262:3
**stop** 317:12
**stopped** 19:24
150:8,11
**storage** 125:25
126:9,12
**stories** 119:25
**story** 24:25 97:3
117:8 119:7,17,22
119:23 248:6
**strange** 41:3
248:10 250:20
**stranger** 275:10
275:11
**strategy** 274:17,18
**street** 3:5,17 4:6
4:12 8:15 156:22
171:2 302:20
**stress** 138:4
273:20
**stretch** 215:3
**strident** 259:7
261:8

strike 59:4 88:4
  124:21 207:9
  308:12
stripping 242:24
strong 59:18
  112:19
strongly 66:3,25
  67:3 217:25
struck 19:22 61:5
struggle 69:12
  318:19
student 32:19
  38:17 44:15
  140:10 143:3
  144:5 258:24
  259:13,21 260:4
  260:21,23 314:5
students 32:24
  35:4,6,10 44:16
  138:21 139:3,25
  140:21,22 141:19
  143:2 144:11
  151:5
studied 73:10,11
  84:9 131:17 133:3
  133:15 159:15
studies 12:18
  31:23 32:18 37:13
  38:18 43:22 47:16
  49:18 50:3 115:22
  116:9,12,16 135:6
  138:13 140:20
  143:8 144:5
  306:11
study 10:19,25
  11:6,7,12 12:11
  13:18 17:6,7,7,16
  17:17 19:2,12
  21:6 24:19 26:11
  38:23,25 43:5,14
  44:4,12 46:19

48:14,21 50:15
  58:4 76:23 99:3
  134:12,20 135:3
  138:19 142:9
  150:8 163:4 165:2
  165:10 180:5
  272:12,14
studying 10:20
  39:4,14 138:23
  144:8
stuff 48:12 68:16
  100:23 157:19
  174:3 258:22
  336:23
stupid 266:10
style 164:8 235:9
  236:25
subject 19:7 336:4
subjects 142:3
  143:8
submerged 52:16
submission 140:11
submissive 290:19
  290:23 291:10
submit 46:5
  165:13,13
submitted 182:9
subpoena 2:12
subscribed 337:20
  339:22
substance 13:14
  44:9 175:7 301:2
  303:7
substantive 33:7
  42:10
substantively
  148:14 150:19,20
  151:9
substituting 299:7
  301:19

subtext 150:24
successful 320:13
sue 316:24 321:8
  325:6 326:14
sufficient 13:4,25
  21:17,25 24:17,18
  51:19 52:2 176:25
  228:23 230:23
sufficiently 24:9
suffused 154:15
suggest 65:16 98:5
  172:25 304:16
suggested 64:24
  195:3 234:23
  235:6
suggestibility
  73:11 304:20
suggestible 73:20
  73:22,24 303:23
  304:10
suggesting 67:17
  273:8 319:10,12
suggestion 301:24
suggests 98:10
suicidal 295:13
suicided 175:25
suit 255:18,22,24
  256:4,6 257:2,4
  290:25
suite 3:6,12,18 4:6
  4:12 8:15
summarize 222:2
  222:3
summary 13:12
  13:15 51:22 77:21
  103:7,10 105:12
  241:19
super 73:20
superman 293:22
  294:24 298:14,18
  299:19

supplement
  117:17
support 102:12
  171:18 221:14
  276:18 334:18
supportable 51:21
supported 37:17
  334:6
supporting 289:16
supportive 60:20
  66:3
supports 60:7
supposed 69:6
  96:22 109:11
supposedly 275:11
  278:18
supposition
  131:16
suppression
  127:20
sure 8:24 9:2
  23:11 37:15 47:14
  54:15 64:18 65:2
  65:2 66:2 68:9
  74:22 78:16 90:17
  111:4 120:22
  128:8 129:16
  138:3 142:18
  146:18 148:22
  152:14 161:13
  166:8 172:6
  173:11 178:15
  180:22 190:25
  199:9 226:15
  229:10 239:7
  243:21 256:2
  257:21 268:3
  290:11 298:2
  310:22,24 315:4
  317:16 320:7,24
  321:16 325:3

[sure - temporal]

327:17
**surprise** 68:13
**surroundings**
276:10
**susan** 1:21 4:11
7:19 62:8,9 89:7
100:16 213:4
315:23
**suspect** 11:21,25
14:23 17:24 53:12
62:3,5 72:2,17
132:18,21,23
153:8 155:12,13
159:16 161:18
178:3 179:17
220:21 259:3,10
259:12,22 264:3,4
264:10 306:25
**suspects** 12:4
15:13,14 22:19
72:9 152:25 155:4
163:21 220:15
262:6,23 263:15
331:22
**suspicious** 280:13
295:3
**sustain** 128:19
**sustained** 138:16
287:17 289:11
**swab** 64:16 65:5
66:13,14 80:20
81:4,18 86:22
88:3 89:19 90:6
90:21 92:2,22
93:25 94:22 98:15
99:9 188:16
189:25 190:15
285:6,8
**swabbing** 85:15
89:10

**swabbings** 86:22
**swabs** 85:5,10
88:25 283:15
**swear** 7:11
**swift** 108:7,11,18
109:3,8,11 110:2
110:10,16 122:10
334:25
**sworn** 8:7 337:20
338:8 339:22
**symptom** 269:23
**symptoms** 160:15
171:8 212:17
238:6 270:10
280:22 281:6
286:6 288:12
**syndrome** 327:18
334:4
**synergy** 159:13
**system** 322:5
**systematic** 44:12
47:4 134:11
**systematically**
133:15

**t**

**t** 5:10
**table** 48:2 268:12
**tactics** 72:17
**take** 10:7 11:23
23:9 38:22,24
47:4,5,11 52:18
54:6,16 61:17
62:24 78:23 84:7
97:2 126:15,17,23
127:24 128:4
136:13 141:18
157:10 164:25
165:3 166:25
170:7 209:20
215:13 254:21
266:19 288:7

292:9 312:4,4
331:20 332:25
336:25 337:2
**takeaway** 231:24
239:9,9 241:19
250:12
**taken** 2:8 18:17
36:14 51:8 57:20
66:13 80:21
107:15 112:6
139:17 166:19
177:16 186:11,12
201:11 206:17
222:5 230:17
231:17 255:6
260:16 261:3
292:21 302:10
328:19
**takes** 30:4 132:6
268:12 296:2
**talk** 38:11 75:7
129:12 171:16
174:4 183:21
243:14 268:13
271:25
**talked** 38:9 48:14
173:25 175:17
263:5 273:16
295:6 326:17,19
**talking** 42:23 71:8
74:8,9 80:11
103:2,6,11 105:5
120:18,20 121:10
126:9 129:13,17
129:21 135:13
138:6 141:13,15
159:21,22 165:6,8
172:23,24 175:10
176:3 243:16
249:12,19,21
263:12 270:7

271:16 280:6,7
293:10 305:18,20
**talks** 272:14
**tape** 201:5
**target** 112:14
**task** 151:14
**taught** 17:14,15
116:18,20,22,24
117:2 313:17
**teach** 32:18
**teacher** 141:15
**teaches** 19:19
**teaching** 21:3
116:22
**tear** 218:10
**technique** 92:22
93:25
**teeing** 258:21
**tell** 9:17 14:2
25:25 28:23 39:18
49:17 78:17 95:16
99:20 115:6,18
118:15 119:17
124:11 130:16
134:10,13 143:9
145:25 152:21
156:12 173:18,22
174:4,5 178:10
186:14 197:2,15
218:11 219:22
226:3 235:20
238:10 239:15,19
287:18 325:13
**telling** 53:21
172:10,17 277:19
312:3
**tells** 322:25
**temple** 281:20
**temporal** 123:19
123:25 124:13,15
125:6

[ten - three]                                                Page 53

| | | | |
|---|---|---|---|
| **ten** 10:8 15:3,3 | **testing** 68:20 | 211:7 215:6 | 304:19 309:8 |
| 16:8 17:2 18:20 | 106:16 119:20 | 222:20 235:8 | 315:4 317:24 |
| 152:5 157:14,19 | 195:3,4 246:6 | 236:20 243:24 | 324:18 327:5 |
| 165:9 240:13 | 270:20 271:8,18 | 266:15 296:21 | 332:6,8,13,20 |
| 256:6 | 271:22 | 299:21 309:6 | 333:2 334:22,24 |
| **tenth** 193:5 | **tests** 117:15 119:6 | 312:18 320:10 | 336:21 |
| **term** 37:23,25 | **thank** 136:19 | 328:12 329:7 | **thinking** 103:21 |
| 43:9 77:19 | 198:7 316:16 | 335:21 336:20 | 168:10 189:9 |
| **terms** 32:10 39:4 | 330:7 | **think** 11:9 13:13 | 202:10 210:9,12 |
| 74:25 105:6 109:4 | **theatrical** 325:17 | 16:11,12 21:11 | 211:9,11,18 |
| 109:17,24 169:3 | **themes** 202:13 | 22:6 23:8 24:23 | 237:14 246:12 |
| 203:21 206:13 | 204:19 206:5 | 32:13 41:21 42:19 | 249:3 301:14,21 |
| 216:8 334:2,11 | **theoretical** 203:21 | 43:2,11 45:4 50:2 | **third** 131:21 |
| **terribly** 265:11 | **theoretician's** | 53:8 59:22 60:18 | 178:18 192:19 |
| **terrific** 75:24 | 254:9 | 62:19 68:11 74:12 | 303:21 332:18 |
| **terse** 243:2 | **theories** 42:24,25 | 74:23 77:12,20 | **this's** 65:12 |
| **test** 80:9 119:14 | 199:15 | 78:4 80:5 87:17 | **thomas** 1:10,19 |
| 269:21 270:15,23 | **theory** 27:15,15 | 105:16 106:10 | **thought** 58:10 |
| **tested** 68:19 | 167:13 320:25 | 116:17 125:18 | 78:12 156:2 |
| **testified** 8:9 83:16 | **thereof** 179:9 | 126:22,23 130:17 | 166:16 179:11 |
| 190:4 220:13 | **thibodeax** 174:21 | 134:25 135:8 | 227:20 233:4 |
| 245:15 | 313:22 | 136:22,23 140:3 | 238:25 252:6 |
| **testifying** 17:11 | **thin** 203:24 234:8 | 140:13 143:20 | 265:4 297:4 |
| 266:3,4 | **thing** 9:3 41:15 | 144:16 157:6,17 | 336:15 |
| **testimony** 38:22 | 131:21 160:20 | 158:10 162:24 | **thoughtful** 48:20 |
| 51:10 57:22 84:20 | 168:24 196:23 | 167:13,14 168:20 | **thoughts** 210:6 |
| 90:11,13 92:8 | 205:9 218:7 227:3 | 170:18 183:16 | 297:9 |
| 103:19 106:13 | 245:20 265:3 | 184:7,8,13 186:8 | **thousand** 181:21 |
| 107:17 139:19 | 266:7 277:2 328:3 | 198:2 202:4 208:3 | **threat** 17:19 299:4 |
| 156:24 174:25 | 333:8 335:18,25 | 212:2 214:14 | **threatening** |
| 176:17 177:18 | **things** 21:5 25:19 | 215:6,20 217:11 | 152:24 |
| 191:10 201:13 | 26:9,14 36:18 | 221:11 222:24 | **threats** 154:5 |
| 220:12,24 226:7 | 41:22 49:7,9 | 223:5 226:8,15,21 | **three** 17:16 21:10 |
| 226:11,12 238:23 | 52:11,15 56:22 | 227:25 231:21 | 21:11 22:4,16 |
| 242:7,14 253:12 | 79:11 113:20 | 233:9,19 238:16 | 39:21 53:16,20,21 |
| 253:23 255:8 | 117:25 120:17 | 238:22 239:3 | 72:15 74:15 85:14 |
| 283:20 284:24 | 129:18 141:20 | 240:7 242:6 | 86:25 89:9 91:6 |
| 285:5 286:17 | 145:19 154:8 | 261:17 265:18 | 93:22 101:16,18 |
| 290:22 292:23 | 157:4,8 167:15 | 266:12 270:6 | 101:19 117:21,24 |
| 304:3 328:21 | 178:25 191:11 | 281:11 282:21 | 120:4 125:8 134:9 |
| 329:22 338:7,10 | 203:23 208:8 | 284:17 286:13 | 134:21 135:16,18 |

| | | | |
|---|---|---|---|
| 135:25 137:4 | 204:12 206:10 | topically  151:9 | traumatized |
| 138:10,14 158:8 | 216:22 228:14 | topics  149:19 | 277:16 |
| 178:8 184:17,20 | 231:20 238:25 | tortoise  74:6,7 | treatment  160:14 |
| 192:5 195:22 | 240:19 243:23,23 | toss  35:18 | 296:24 |
| 197:6 200:13 | 244:10 264:17 | total  182:24 | tremendous  79:20 |
| 201:19 208:25 | 267:8,10,12,14,20 | totally  73:24 | 258:12 |
| 213:15 221:4 | 269:12 273:24 | touched  253:8 | trial  60:11 101:18 |
| 265:20 284:9,20 | 274:10 276:13 | 317:24 326:12 | 101:19 135:2,5 |
| 295:2 315:10 | 278:7 287:23 | tout  55:16 | 229:11,14 |
| 331:16,18 | 288:21 292:16 | touting  335:13 | tribune  29:5 |
| threshold  268:22 | 293:16,17 297:21 | trace  85:4,9,14,22 | tried  255:13 |
| threw  63:2 124:18 | 310:13,15 312:14 | 88:23 89:9 283:14 | 258:20 265:2 |
| throwing  42:23 | 313:6 320:21 | track  124:18 | trier  310:15 |
| 94:2 | 321:2 326:16 | tracking  103:5 | trooper  19:21 20:5 |
| thrown  48:19 49:2 | 335:3 337:16 | tractor  20:18 | trooper's  21:2 |
| 79:14 260:25 | times  8:21,23 | traffic  274:12 | trouble  166:17,21 |
| ticket  277:3 | 21:10 22:16 23:5 | trailer  20:18 | 207:6 233:5,7 |
| tie  113:5 | 56:4,6 97:17 | trained  220:13 | 240:14 |
| tighten  238:4 | 117:21 128:6 | training  18:14 | truck  21:7 |
| till  137:2 | 149:4 176:6,8 | 145:8,12,22 146:5 | true  57:25 80:8 |
| tilt  60:15 | 202:12 204:3 | 147:2,8 149:5 | 130:4 208:14 |
| tilting  60:19 | 206:16 236:19,21 | 220:20 | 280:14,14 320:17 |
| time  2:8 6:17 7:6 | 265:20 329:13 | transcript  136:11 | 338:9 |
| 9:5 10:2 13:25 | 331:22 | 338:9 | truism  170:17 |
| 22:11 35:22 36:6 | timewise  195:12 | transcripts  220:4 | truly  165:12 |
| 47:11 49:4 53:14 | timing  256:3 | transfer  67:20,22 | 211:18,20 |
| 54:3 55:17,20 | tissue  20:17 | 68:2 69:14,18 | trust  316:5 |
| 63:25 81:25 82:17 | title  152:3 | transmitted  195:5 | try  9:9 20:3 34:5 |
| 93:10 117:12 | today  6:16 95:16 | transpired  118:20 | 34:11 78:3,4 |
| 119:13,21 120:15 | 115:5 164:24 | 226:22 | 222:18,19 227:21 |
| 123:6 126:15,18 | 176:13 221:22 | trauma  126:4,7,8 | 237:3 238:13 |
| 126:22,22,24 | 225:5 271:21 | 126:12 127:19,23 | 239:22 251:7 |
| 127:2,4,14 134:25 | told  14:16 21:12 | 127:24,24 128:4 | 253:6 315:24 |
| 135:4 139:13 | 87:25 90:3 91:25 | 271:14 274:17 | trying  19:18 29:15 |
| 146:19,22,24,25 | 142:4 157:18 | 283:6 286:5,6,7,11 | 30:5 74:24 92:16 |
| 147:7 152:18 | 172:15 265:7 | 286:12,25 287:2 | 135:23 136:5 |
| 163:9,10 165:5 | 295:8 311:18 | 287:16 288:10 | 183:15,22 209:23 |
| 177:24 180:7 | tonight  298:11,12 | 326:19 327:18 | 215:5 216:17 |
| 181:16,23,25 | topic  147:3 149:6 | 334:4 | 237:5,6 239:23 |
| 198:19 199:4 | 149:7 249:17,19 | traumatic  116:25 | 242:2 250:13 |
| 201:7 203:8 204:8 | | 257:19 322:20 | 274:23 276:20 |

285:20 290:21
324:15 326:2
**tunnel** 199:2
**turn** 6:7 82:20
84:23 88:17
180:23 223:14
272:16 294:11
**turned** 267:7
**turning** 169:3
**two** 25:22 39:16
55:14 60:2 62:4
68:10 74:11 85:9
85:25 87:16 91:16
98:20 100:20
118:16 146:12,14
159:13 167:15
171:16 179:13
184:5,7,8,12,14
185:2,12,15
200:17 205:5
224:2,3 240:20
253:24 265:2
270:8 310:17
318:9
**type** 19:8 213:5
302:14,21
**types** 31:6 271:13
**typical** 113:10
215:23 306:16,19
306:21,21
**typically** 306:15
**typing** 189:25

**u**

**uh** 88:22 101:12
294:13,16 295:5
295:24
**ultimately** 12:20
48:22 186:22
319:9 324:2
**um** 66:12 71:5
85:13,18,21 86:5

181:2 182:23
207:23 232:20
258:15 295:21
297:18
**unable** 169:24
**unanimously**
334:5
**unblacked** 183:25
**uncertain** 11:19
14:10
**unclear** 68:11
**unclothed** 318:16
**uncommon** 209:14
**unconscious** 121:6
259:2,11
**undercut** 168:13
**underrepresented**
172:18,21 173:12
176:15
**understand** 9:14
9:16,18 11:20
13:7 21:6 34:9,12
43:19 45:8 52:5
52:13 74:24 87:11
89:6 90:18 97:6
123:5 126:17
139:3 152:11
161:13 166:8
205:9 211:3
227:21,22 232:18
232:23 233:10,11
234:24 235:2,9,15
235:16,25 236:12
236:13 237:2,9,19
241:23,24,25
324:17 334:5
**understanding**
12:19 21:17 22:2
28:12 53:9 93:4
190:8,14,21 230:7
233:7,9 250:10

311:15
**understood** 9:22
9:24 13:9 57:7
248:17
**undertake** 119:4
**undertaken** 140:7
**underwear** 81:9
81:14,22 86:23,24
89:24 94:23 98:15
99:9
**undetected** 274:4
**undisclosed** 87:20
91:9,17
**undisputed** 176:25
**unfaithful** 65:17
83:17
**unfortunate** 322:8
**unfortunately**
337:9
**uniform** 21:2 72:8
**unique** 160:21
**unit** 208:25 295:7
**united** 1:2 6:25
**universal** 128:15
170:17
**universally** 33:24
**universe** 23:22
24:10 29:8 40:14
76:7 115:13
277:21 291:9
**unkempt** 294:25
**unknown** 1:18
14:13 113:13
171:22 332:17
**unlubricated**
300:6
**unmistakably**
318:20
**unpredictable**
203:19

**unproven** 49:9
**unravelled** 240:17
**unrealistic** 59:22
114:8
**unrelated** 85:25
87:16
**unreliable** 48:4
**unremarkable**
291:23 323:15
**unresolved** 206:20
**unsteady** 298:7,13
**unsupported**
230:3 231:10
**unsure** 289:2
**unwittingly** 274:9
276:13
**upside** 169:4
**urged** 152:23
**urinated** 234:10
247:7
**urinating** 234:9
**urine** 69:13
252:23 318:16
**use** 33:3 43:9 79:7
113:17 138:20
176:13 213:6
258:16 274:16
275:6 278:3,4
300:16
**useful** 86:14
**useless** 132:14
165:11 262:16
**uses** 46:3
**usually** 60:6
**utility** 143:19
**utilizing** 31:15
**utterly** 25:7

**v**

**v** 339:3
**vac** 85:23

**vacuum** 158:19
**vacuumings** 81:13
  86:23
**vaginal** 60:12,25
  64:16 65:5 66:14
  80:20 81:4,17
  85:5 86:22 88:3
  88:24 89:19 90:6
  90:21 92:2 94:22
  98:14 99:9 188:16
  189:25 190:15
  285:7
**vaginally** 282:3
  289:4
**valid** 13:24 51:16
**validity** 52:9
  269:24 270:3
**value** 75:3,4 78:24
  79:6 80:7 93:3
  139:23 140:3
  142:23 143:4
  144:7,9,12 209:21
  233:22 245:17,22
  246:14 319:8,22
**vantage** 157:4
  194:19
**variable** 128:12
  203:8
**variables** 154:4
  203:15
**variably** 105:2
**variant** 179:9
**variety** 75:5
  117:15 122:16
  157:8 242:18
  273:15 331:17
**vectors** 62:4
**veering** 210:25
**vehicle** 132:17
**vein** 11:4

**ventures** 236:4
**venturing** 93:23
**venues** 270:18
**veracity** 205:21
**verbiage** 121:24
  291:2
**verify** 118:21
**veritext** 6:15,20
  8:3 339:2
**versus** 6:23 61:2
  99:21,22 214:5
  287:10 325:5
**vice** 336:8
**victim** 111:14
  229:25 231:7
  257:10 258:4
  274:22 302:3
**victim's** 64:15
  65:5 81:13 86:16
  215:17,21 216:25
**victimization**
  273:14 274:25
  277:23,25
**victimized** 112:3
  272:8 273:19
**victims** 110:24
  111:7 112:12
  114:13 258:5
  272:15
**videoconference**
  3:14 4:8,14
**videographer** 4:17
  6:2 51:2,11 57:15
  57:23 107:9,18
  139:11,20 201:6
  201:14 254:23
  255:9 292:17,24
  328:14,22 337:14
**videotape** 223:2,8
**videotaped** 1:24
  2:5 221:23

**videotapes** 163:21
  163:24 164:4,6,12
**videotaping**
  221:15,22
**view** 314:18
  321:13
**violated** 289:5
**violence** 54:18
  55:6,13 204:19
  301:3,8
**violent** 55:20
  112:14,25 148:24
  202:12 206:5
  209:16
**virtue** 131:3 132:4
  168:12 268:19
  277:15 278:18
  279:14 328:11
**visible** 76:10
**vision** 199:2
**visit** 281:18
**visited** 203:11
**vivid** 236:24
**vlahakis** 4:8 7:21
  7:21 87:9 92:9
  202:2
**vocalization** 235:7
**voice** 45:20
**voices** 295:4
  301:14
**voluntarily** 155:2
  175:21 294:18
**voluntary** 175:14
**vouch** 320:17
**vulnerabilities**
  12:3 72:17 305:17
  305:19
**vulnerability**
  11:22,25 14:23
  17:24 72:2,25
  73:14,22 74:8

  202:10
**vulnerable** 73:19
  113:3 166:22
  170:23 272:18
  275:9,16 277:12
  285:23 286:9

**w**

**w** 8:6
**wacker** 3:11
**wag** 102:24
**wait** 9:4,10 94:8
  136:20 137:2
  292:11 297:2,2,2,2
**waiting** 164:5
**wake** 49:15 77:15
**walk** 20:18 226:18
  226:23,25 227:13
  241:12,22 244:22
  248:5
**walking** 196:18
  203:7 212:22
**wall** 48:19 49:2
**walsh** 1:13 226:16
  227:14 242:8
**walsh's** 226:11
**want** 27:2 35:12
  44:8 46:24 49:23
  50:9,24 51:18
  54:12 63:5 65:16
  68:2 75:10,19
  80:9 90:17 97:19
  97:21,22 102:25
  110:15 134:18
  136:10 137:18
  138:2 139:2
  143:13 155:23
  158:9 163:19
  172:14 187:3
  198:10 199:8
  203:21 207:15
  209:13 241:16

261:11 267:25
292:15 313:10
317:12,23 322:22
329:12 336:15
**wanted** 94:12
145:20 226:21
328:25
**wants** 41:16 56:23
314:3
**wash** 63:16 79:12
80:2
**washes** 63:3
**wastebasket**
238:13,18 239:5
**watch** 164:7
222:25
**watching** 264:9
**water** 79:14
278:10
**way** 9:17 26:19,25
30:21,22 31:20
34:22 36:7,9 42:7
42:10 47:5,15
65:19 73:18 80:9
86:9,12 95:14
96:21 97:20
104:21 105:23
113:10 133:10,19
134:16 153:3
155:13 157:5,7
159:8,11 162:25
165:14 168:6,7,14
174:6 190:11
204:20 206:18,22
206:22 209:19
210:4 211:9,10
214:2,16,25
217:21 218:21
236:18 237:8
239:14 243:6
245:13 248:21

256:19 257:5
260:2 261:4
263:19 266:2
269:4,9 270:16
273:23 276:10
277:5 296:2
300:17 307:24
313:18 316:4
320:20 323:5,15
325:22 326:4,4,4
328:6 330:25
338:15
**ways** 12:3 75:5
217:23
**we've** 10:6 73:11
115:4 200:10
244:2 308:7
**weak** 85:6,16,24
88:25 89:11
**wearing** 213:6
**website** 162:23
178:14,25
**week** 19:5 108:24
112:23
**weeks** 118:16
**weighing** 330:24
**welner** 1:24 2:5
5:5 7:5 8:12
182:19 315:22
337:17 339:5,21
**went** 25:22,24
164:20 179:7
182:10,11 212:8
224:3 227:12
233:23,23 238:7,8
238:24 240:2
252:11 267:10
312:2 319:3
322:24 335:25
**west** 4:12 8:14

**whacked** 279:9
**whatsoever**
242:11 276:18
**whereabouts**
117:11
**whereof** 338:17
**wherewithal**
169:13
**whispering** 6:5
**white's** 84:19
283:19
**wife** 175:25 313:4
**willing** 66:17
186:19
**wing** 212:9
**winning** 74:7
**wiped** 20:21,22
**wise** 328:7
**withdraw** 276:21
**withdrawn** 273:21
276:9
**witness** 2:6 5:3 7:4
7:12 8:7 31:12
35:23 37:7 47:25
57:13 65:24 82:23
88:19 103:23
136:8,19 188:25
197:19,22 199:18
199:23 200:3,7
206:11 207:11
215:15 223:16
232:17 278:24
315:17 324:16
326:8 328:25
336:6 338:7,11,17
339:5
**witness's** 90:11
92:7
**witnessed** 279:15
**witnesses** 32:7
61:7 288:18

**woman** 298:9,15
298:19
**women** 166:14
204:20 272:15
293:6 294:19,22
295:8 296:7,16
**wonder** 249:2
**wondered** 203:13
**word** 216:6 235:19
235:24 290:23
311:3
**worded** 290:25
292:2
**wording** 232:22
291:18
**words** 241:16
270:12 291:18
**work** 24:13 25:4
26:16 27:19 28:24
29:12 39:3 40:22
70:25 76:19,24
142:24,25 143:2,2
143:3,4,6 148:17
156:5 163:4
168:23 182:3,4
205:17 223:25
224:3,12,16 225:3
225:4 251:18
265:14 267:4,9
273:23,24 275:10
275:12,23 276:13
276:20 277:5
333:14,16,23,25
334:23 336:17
**worked** 25:9 30:8
96:24 133:16
159:8 164:8
167:24,25 168:2
171:24 174:18
177:2,5 179:21
181:14 187:25

[worked - zoloft]

208:25 225:2
237:21 327:24
**working** 25:17
26:6 150:8 181:24
183:18 225:17
239:25 264:18
**works** 116:7
259:24 260:3
337:11
**workup** 168:5,6
**world** 25:6,7 40:7
40:8 140:19 262:2
262:5,7
**worn** 240:20
**worry** 209:21
**wow** 76:15
**wrestle** 57:10
**write** 27:23 36:2,3
44:24 225:23
229:19 255:17
259:7 260:10
271:10 285:21
303:21
**writes** 41:24
**writing** 41:7,19
44:2 45:23 259:16
**written** 44:21
46:12,13 71:17
204:24 216:2,4
228:3 245:3
**wrong** 32:3 34:16
37:12,24 79:2
180:2 239:15
242:14 244:6
265:7 278:6,8
286:19
**wronged** 257:22
**wrongful** 151:17
151:25 152:9
187:15,18,22
188:2 258:10

**wrongfully** 166:13
166:22 257:18,22
258:2
**wrote** 28:6 30:17
38:23,24 43:25
48:13 78:12,13
103:11 110:19
190:13,20,23
231:11 248:19
330:2

**x**

**x** 1:5,23 5:2,10
55:18 267:12

**y**

**y** 86:10,10 87:12
**yeah** 56:6 58:13
66:9 71:5 90:17
101:12,15 110:8
116:4 121:12
123:3 128:21,24
137:9 139:2
146:15,15 148:22
170:10 171:14
188:18 212:24
216:13 227:18
230:20 248:17
252:11 262:20
283:11,17 285:4
294:16 296:18,23
296:23 297:15,25
303:13 306:2
311:22,25 321:16
321:24 331:24
**year** 18:16 108:7
216:11
**years** 16:8 17:2
18:20 47:23 48:18
76:21 119:16
122:8 127:13
157:19 165:9

171:25 173:24
184:5,6,7,8,12,14
184:17,17 185:2
185:12,15 209:2
224:2,3 255:14
303:19
**yesterday** 108:3
164:24
**yield** 51:21
**yielded** 178:13
195:4
**yields** 137:22
**york** 2:2,2,10 6:15
6:21,21 8:15,15
151:13,16 152:8
152:17 338:6
339:2
**ystr** 85:6,16 86:9
86:12 89:2,11

**z**

**zero** 120:14 242:9
**zoloft** 56:4

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2014.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.