IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| Carl Chatman, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 14 CV 2945 |
| City of Chicago, *et al.*, | ) | |
| | ) | Judge John Z. Lee |
| Defendants | ) | |

**PLAINTIFF'S MOTION TO BAR MICHAEL WELNER**
**<u>FROM TESTIFYING AT TRIAL</u>**

Jon Loevy                             Elizabeth Wang
Russell Ainsworth               LOEVY & LOEVY
LOEVY & LOEVY               2060 Broadway, Ste. 460
311 N. Aberdeen St., 3rd Fl.   Boulder, CO 80302
Chicago, IL 60607               O: 720.328.5642
O: 312.243.5900

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION .................................................................................................................... 1

ARGUMENT .......................................................................................................................... 3

Legal Standard ....................................................................................................................... 3

    I.       Welner Is Not Qualified to Question Dr. Russano's Opinions ....................................... 4

    II.      Welner's Opinion Concerning the Science upon which Russano Relied Is
             Inadmissible because It Is a Legal Question for the Court's Resolution pursuant to
             Daubert and Rule 702 ................................................................................................... 7

    III.    Welner Did Not Employ a Reliable Methodology or Reliably Apply any
             Methodology to the Facts or Data ................................................................................. 8

             A.  Opinion 1 ....................................................................................................... 10

             B.  Opinion 2 ....................................................................................................... 12

             C.  Opinion 3 ....................................................................................................... 14

             D.  Opinions 4 through 7 ..................................................................................... 18

             E.  Opinions 8 and 9 ........................................................................................... 18

    IV.    Welner's Opinions Should Be Excluded under Rule 403 ............................................ 20

CONCLUSION ...................................................................................................................... 20

## TABLE OF AUTHORITIES

*Bourelle v. Crown Equip. Corp.*, 220 F.3d 532 (7th Cir. 2000) ........................................9

*Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765 (7th Cir. 2014).........................3

*Caine v. Burge*, 2013 WL 1966381 (N.D. Ill. May 10, 2013)............................................1, 12, 19

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)........................................3, 7

*Edmonds v. State*, 955 So.2d 787 (Miss. 2007) ........................................5, 11

*Gayton v. McCoy*, 593 F.3d 610 (7th Cir. 2010) ........................................4, 6

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ..............................................8

*Good Shepherd Manor Foundation, Inc. v. City of Momence*, 323 F.3d 557 (7th Cir. 2003).......14

*Harris v. City of Chicago*, 2017 WL 2436316 (N.D. Ill. June 5, 2017) ............................... *passim*

*Harris v. Thompson*, 698 F.3d 609 (7th Cir. 2012) ........................................12

*Hayes v. Raytheon Co.*, 23 F.3d 410, 1994 WL 143000 (7th Cir. 1994)........................................8

*Higgins v. Koch Dev. Corp.*, 794 F.3d 697 (7th Cir. 2015)........................................3

*Kluppelberg v. Burge*, 2016 WL 6821138 (N.D. Ill. Sept. 16, 2016)............................1, 12, 19, 20

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ................................................5, 7

*Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698 (7th Cir. 2009) ....................................3

*Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748 (7th Cir. 2010) ........................................8

*Padilla v. Hunter Douglas Window Coverings, Inc.*, 14 F. Supp. 3d 1127 (N.D. Ill. 2014).......5, 9

*Salgado by Salgado v. General Motors Corp.*, 150 F.3d 735 (7th Cir. 1998)................................8

*Scott v. City of Chicago*, 2010 WL 3034254 (N.D. Ill. Aug. 3, 2010) ....................................2, 12

*Smith v. Ford Motor Co.*, 215 F.3d 713 (7th Cir. 2000)........................................7, 8

*Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753 (7th Cir. 2013)........................................14

*United States v. Benson*, 941 F.2d 598 (7th Cir. 1991) ................................................14

*United States v. Hall*, 93 F.3d 1337 (7th Cir. 1996) ....................................................................2, 17

*United States v. Hall*, 974 F. Supp. 1198 (C.D. Ill. 1997) ................................................................2

*United States v. Mamah*, 332 F.3d 475 (7th Cir. 2003) ....................................................................9

*United States v. Noel*, 581 F.3d 490 (7th Cir. 2009) ........................................................................8

*United States v. Palomino*, 2014 WL 2581347 (N.D. Ill. June 9, 2014) .......................................14

*Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416 (7th Cir. 2005) ..............17

## INTRODUCTION

Defendants have retained Dr. Michael Welner, a forensic psychiatrist, to rebut the opinions of Plaintiff's expert Dr. Melissa Russano. In order to understand why Dr. Welner's opinions are inadmissible, Plaintiff first summarizes Dr. Russano's opinions. Dr. Russano, an experimental psychologist with training in social and cognitive psychology, will testify about the reasons why individuals may falsely confess to a crime that they did not commit, the situational and personal risk factors that make a false confession more likely, the interrogation methods that increase the risk of false confessions, whether any of these factors or methods existed in this case, and what factors indicate the reliability or unreliability of the written confession in this case. *See* Ex. A (Russano report with appendices). Dr. Russano is a social scientist whose primary areas of research and expertise are "interviewing, interrogations, and confessions, in the police, military and human intelligence domains." *Id.* at 1. She has been "conducting research in the area of interrogations and confessions since 2002," has "published numerous scholarly peer-reviewed articles and chapters on these topics," and "created one of the most oft-used and influential laboratory paradigms for studying true and false confessions." *Id.*; *see also id.* (CV and List of Publications) at 45-57. In fact, she has received significant funding from the Departments of Justice and Defense for her research on interrogations and confessions via the High-Value Detainee Interrogation Group. *Id.* at 1.

Not only is Dr. Russano indisputably qualified to render her opinions, but similar opinions have been admitted repeatedly in false confession cases in this district. *See Harris v. City of Chicago*, 2017 WL 2436316 (N.D. Ill. June 5, 2017) (denying, in significant part, defendants' motion to bar the opinions of false confession expert Dr. Richard Leo); *Caine v. Burge*, 2013 WL 1966381 (N.D. Ill. May 10, 2013) (same); *Kluppelberg v. Burge*, 2016 WL

1

6821138 (N.D. Ill. Sept. 16, 2016) (denying, in significant part, defendants' motion to bar the opinions of false confession expert Dr. Richard Ofshe); *Scott v. City of Chicago*, 2010 WL 3034254 (N.D. Ill. Aug. 3, 2010) (same). Indeed, in *United States v. Hall*, 93 F.3d 1337, 1345 (7th Cir. 1996), the Seventh Circuit held that it was error for the district court to exclude the testimony of Dr. Ofshe because "Dr. Ofshe's testimony, assuming its scientific validity, would have let the jury know that a phenomenon known as false confessions exists, how to recognize it, and how to decide whether it fit the facts of the case being tried." *See also United States v. Hall*, 974 F. Supp. 1198, 1205 (C.D. Ill. 1997), *aff'd*, 165 F.3d 1095 (7th Cir. 1999) ("[T]he science of social psychology, and specifically the field involving the use of coercion in interrogations, is sufficiently developed in its methods to constitute a reliable body of specialized knowledge under Rule 702.").

Defendants' expert, Dr. Welner, questions Dr. Russano's opinions. Ex. B (Welner report). But Dr. Welner's opinions are inadmissible for several reasons. First, Dr. Welner is not qualified to opine on the research underlying Dr. Russano's opinions. He may be a credentialed forensic psychiatrist, but he has zero experience in the field of interrogations or confessions or even as a social scientist. He has done no research, study, or experiments. Second, whether Dr. Russano's opinions are methodologically sound is a question for this Court to resolve under Rule 702 and *Daubert*. In any event, Dr. Welner's critiques of Dr. Russano have no substance whatsoever; he does little more than level personal attacks on Dr. Russano and other social scientists who research the psychology of false confessions. Third, Dr. Welner's opinions are not based on a reliable methodology, and he does not reliably apply a methodology to the facts. His report reads like a legal brief and he makes wholly unsubstantiated assertions. Fourth, Dr.

2

Welner's opinions are inadmissible under Rule 403 because any probative value is substantially outweighed by the danger of unfair prejudice.

For these reasons, the Court should exercise its vital "gatekeeping role" under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993), and exclude Dr. Welner's testimony in its entirety.

## ARGUMENT

### Legal Standard

The Federal Rules of Evidence permit expert opinion testimony only to the extent that the expert's "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," and then only if the testimony is "based on sufficient facts or data" and "the product of reliable principles and methods" which the expert has "reliably applied." Fed. R. Evid. 702. Expert testimony is admissible only if the expert's methodology is scientifically reliable and if the testimony will be useful to the trier of fact. *Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 704 (7th Cir. 2015). The trial judge occupies a "gatekeeping role" and must scrutinize proffered expert testimony to ensure it satisfies each requirement of Rule 702. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93, 597 (1993). The proponent of the expert evidence bears the burden of establishing, by a preponderance of the evidence, that the requirements set forth in Rule 702 and *Daubert* have been satisfied. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Furthermore, "Rule 703 requires the expert to rely on 'facts or data,' as opposed to subjective impressions." *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 772 (7th Cir. 2014).

3

## I.    Welner Is Not Qualified to Question Dr. Russano's Opinions

"Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). Although Dr. Welner lists nine "questions" that he answered in this case, the subject matter of his testimony is essentially: (1) the research underpinning Dr. Russano's opinions is inadequate; (2) the "psychiatric evidence" does not show that Riggio falsely accused Plaintiff; (3) the investigators were not handicapped by tunnel vision; (3) there were no situational or personal risk factors that contributed to a risk of false confession by Plaintiff; (4) there is no evidence that certain interrogation methods cause false confessions; (5) Plaintiff was not fed details during the walk-through; and (6) there is no methodology for analyzing the reliability of Plaintiff's post-admission narrative (i.e., the confession). Ex. B. Dr. Welner is not qualified because he has no experience, knowledge, skill, or education in the social science of interrogations or false confessions. In order to understand why Dr. Welner is not qualified, some discussion of Dr. Russano's qualifications and background may be helpful.

Dr. Russano is an experimental psychologist whose primary area of research is interrogations and confessions. *See* Ex. A at 1. She has published extensively in this field, conducted experiments, and participated in interrogation training of law enforcement officers. *Id.* 1, 45-57. In fact, she has received over $1.35 million in funding from the Departments of Justice and Defense to study interrogations and confessions via the High-Value Detainee Interrogation Group. *Id.* at 1. As part of her research, she created a laboratory paradigm for studying interrogations and confessions. Ex. C (Russano Rodriguez Dep.) at 41:13-46:3. This paradigm has been used by many other researchers, and the information learned from the use of this

4

paradigm has started to influence recommendations and the state of knowledge about interrogations and confessions. *Id.* at 48:9-50:5; *see also id.* at 50:13-51:7. Researchers use Dr. Russano's paradigm by modeling the process of interrogation and identifying factors that cause true confessions to occur. *Id.* at 52:5-10. She has taken the data that she has learned and used it to help train law enforcement professionals on how to obtain true confessions. *Id.* at 53:1-8.

Dr. Welner, by contrast, has basically no experience or training in the field of interrogations and confessions. *See* Ex. D (Welner CV). His CV reflects a single, one-year research project that he conducted on the topic, in 2004-2005. *Id.* at 2. That is it. Dr. Welner has never provided any training to law enforcement or anyone else on how to conduct interrogations. Ex. E (Welner Dep.) at 144:8-23. Nor has he conducted any studies in the field to determine whether there are, for instance, certain interrogation techniques that are more likely to increase the risk of false confession. *See* Ex. D. He has not published anything on the topic, much less anything peer-reviewed.[1] *Id.* at 14-25; *see also Edmonds v. State*, 955 So.2d 787 (Miss. 2007) (Diaz, J., concurring) (stating that Dr. Welner would not qualify as an expert in the field of false confessions and observing, "Dr. Welner testified at the *Daubert* hearing that he has never published a peer-reviewed article on false confessions."). Under Rule 702 and *Daubert*, the Court must decide "whether this particular expert had sufficient specialized knowledge to assist the jurors in deciding the particular issues in this case." *Kumho*, 526 U.S. at 156. Although Dr. Welner is a pedigreed forensic psychiatrist, there is no evidence that he is a recognized expert in the field of interrogations or false confessions or that he has any particular expertise or experience in that field at all. *See Padilla v. Hunter Douglas Window Coverings, Inc.*, 14 F.

---

[1] Dr. Welner lists one publication called "Confession Evidence & the Gudjonsson Scales" in a publication titled *Empire State Prosecutor*. This appears to be a training publication for prosecutors and there is no indication that this publication was a peer-reviewed research article.

Supp. 3d 1127, 1134 (N.D. Ill. 2014) (Lee, J.) (barring expert who had no particular expertise in the field in which he was providing opinions). In performing its gatekeeping function, the Court must determine not just whether "an expert witness is qualified in general, but whether his qualifications provide a foundation for [him] to answer a specific question." *Gayton*, 593 F.3d at 617 (internal quotation and citation omitted).

Judge St. Eve's recent decision in *Harris v. City of Chicago* barring the defense "expert" Paul Cassell is instructive. In *Harris*, the plaintiff alleged that she was wrongfully convicted in part due to a false confession that Chicago police officers obtained from her. The plaintiff disclosed Dr. Richard Leo as an expert on false confessions (to give opinions similar to Dr. Russano's in this case), and the defendants disclosed former federal district court judge Paul Cassell. *Harris*, 2017 WL 3142755, at *1. Judge St. Eve permitted Dr. Leo to testify but barred in significant part the proposed testimony of Cassell:

> Although Professor Cassell's work experience established that he has knowledge of false confessions and coercive interrogations in the context of the criminal justice system, there is no indication in the record that Professor Cassell has researched the specialized area of coercive interrogations and false confessions drawing on the principles of rational decision making, perception, and interpersonal influence, or that he has systematically analyzed documented factors that correlate with false confessions. Further, Professor Cassell has not trained as a social scientist nor contributed to the study of coercive interrogation and false confessions that would allow him to rebut Dr. Leo's testimony based on the science of social psychology. Indeed, Professor Cassell admits that he does not have formal training in psychology, sociology, or social psychology and that he has never conducted scientific experiments in relation to false confessions.

*Id.* at *4; *see also* Ex. C at 70:13-23. The same analysis applies here. Dr. Welner has no training, experience, or expertise in the subject matters on which he proposes to testify—interrogations and false confessions. He has not described any such qualifications in his expert report as required by Rule 26(a)(2)(B), *see* Ex. B, and his CV does not reflect any such qualifications. *See* Ex. D. Specifically, Dr. Welner is unqualified to opine on all of the questions, (1) through (9),

6

that he lists in his report. *See* Ex. B at 9-17, 21-30. This Court should conclude, as Judge St. Eve did with respect to Professor Cassell, that Dr. Welner's "opinions about the psychological techniques used during Plaintiff's interrogations are beyond his expertise" and bar Dr. Welner from testifying. *Id.*

**II.** **Welner's Opinion Concerning the Science upon which Russano Relied Is Inadmissible because It Is a Legal Question for the Court's Resolution pursuant to *Daubert* and Rule 702**

In Dr. Welner's report, he states that he has been asked to answer nine "forensic psychiatric" questions. Ex. B at 2. Questions 1, 2, and 9 are, respectively, "What is the basis of behavioral science opinion on disputed confessions?," "How are false confessions established, as a foundation for behavioral science opinion?", and "Is there research or other study or foundation to have established a methodology for the analysis of a 'post-admission narrative?" *Id.* at 2, 9-17, 29-30.

Even if Dr. Welner were qualified to opine on these questions—which he is not—none of these opinions are properly the subject of expert testimony. As Judge St. Eve recently held in rejecting a similar defense expert's opinions concerning a plaintiff's false confession expert, "Professor Cassell's opinion concerning the science upon which Dr. Leo relied is not only a legal conclusion for the Court's resolution pursuant to *Daubert* and Rule 702, but the Court soundly rejected Defendant Officers' argument that Dr. Leo's opinion was not based on reliable science in the Court's June 5, 2017 ruling, as have other courts in this district." *Harris v. City of Chicago*, 2017 WL 3142755 (N.D. Ill. July 25, 2017) (citing cases). The task of evaluating whether there is a sufficient foundation or methodology to Dr. Russano's opinions is part of this Court's gatekeeping function under *Daubert. See Daubert*, 509 U.S. at 595; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir.

7

2000). It is not the permissible subject of testimony by Dr. Welner. Moreover, as discussed below, Dr. Welner does not himself use any methodology in critiquing Dr. Russano's opinions, and it is inadmissible for that reason.

### III. Welner Did Not Employ a Reliable Methodology or Reliably Apply any Methodology to the Facts or Data

Rule 702 requires than an expert "explain the 'methodologies and principles' that support his opinion; he cannot simply assert a 'bottom line.'" *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010); *United States v. Noel*, 581 F.3d 490, 497 (7th Cir. 2009) (same). To that end, expert reports must be "detailed and complete" and explain "how and why the expert reached a particular result." *Salgado by Salgado v. General Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998) (internal quotation marks omitted). Even a qualified expert must base his conclusions on sound reasoning, and the soundness of the analysis underlying the expert's conclusions is a factual question for the Court to resolve. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718-19 (7th Cir. 2000). An expert who fails to offer a sufficient rationale for his or her conclusions should be excluded from testifying because "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Hayes v. Raytheon Co.*, 23 F.3d 410, 1994 WL 143000, at *4 (7th Cir. 1994). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connecting to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Thus, "[i]t is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support.

8

… The court is not obligated to admit testimony just because it is given by an expert." *United States v. Mamah*, 332 F.3de 475, 478 (7th Cir. 2003) (internal citations omitted).

Dr. Welner does not provide any support for any of his general attacks on the social science research underpinning Dr. Russano's opinions. *See* Ex. B at 9-17 (Opinions 1 & 2), 29-30 (Opinion 9). When a retained expert discloses his written report, that report must contain not only "a complete statement of all opinions the witness will express" but also "the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). In other words, an expert can't just list his conclusions; he has to show his work. This is vital, because district courts are charged with policing the admissibility of expert opinions, and "experts' work is admissible only to the extent that it is reasoned, uses the methods of the discipline, and is founded on data." *Bourelle v. Crown Equip. Corp.*, 220 F.3d 532 539 (7th Cir. 2000). "Talking off the cuff—deploying neither data nor analysis—is not acceptable methodology." *Id*.

Furthermore, as a threshold matter, Dr. Welner's report reads like a legal brief. It is full of sweeping, generalized assertions that lack citation to any research or authority whatsoever and contains personal attacks on the research community of social scientists to which Dr. Russano belongs, referring to them as a "coterie." *See* Ex. B at 12. As this Court has observed, this is inappropriate: "As a preliminary matter, the Court notes that even a casual reading of Statler's expert report reveals that it 'reads less like an expert's unbiased assessment and more like counsel's closing argument.'" *Padilla*, 14 F. Supp. 3d at 1138 (citation omitted). While "inflammatory language alone" would not render an expert's opinions inadmissible, it "certainly highlights the importance of the trial judge's role as the 'gatekeeper' under *Daubert*." *Id.*

9

### A.    Opinion 1

In Opinion 1, Dr. Welner makes a number of unsupported assertions that there is no research on whether certain interrogation practices increase the risk of or are likely to cause false confessions. *See* Ex. B at 10-11 (bulleted list). But he doesn't cite anything for these assertions, and Dr. Russano cited numerous studies to support her opinions that certain interrogation practices increase the risk of false confessions, and that certain personal and situational risk factors increase the risk of false confessions. *See*, *e.g.*, Ex. A at 7-8, 14-28, 37-43 (full list of references); *see also* Ex. C at 69:1-23, 80:20-81:24. Thus, despite Dr. Welner's unsupported assertions otherwise, there is research on these topics, and it has been widely accepted in this district.

Dr. Welner does not actually provide any critique of the studies cited by Dr. Russano for her opinion that certain interrogation techniques—such as minimization, which was used in this case—increase the likelihood of false confessions. *See* Ex. B at 10-11, 25. Instead, he simply asserts the "work has not been done" (*id.* at 11) when, clearly, according to the seven pages of research cited by Dr. Russano (Ex. A at 37-43), it has. Indeed, Dr. Welner could not cite to any studies contradicting the studies upon which Dr. Russano relied:

> Q.    So you know of no published study that refutes the conclusions that are currently being drawn by, whether you call the research community or the people publishing in the field of false confessions, whatever term you use?
> A.    There are many conclusions asserted and I think the safest answer is no.

Ex. E at 43:4-12. Dr. Welner could not provide any citation to any research that contradicts the conclusions Dr. Russano made in her report. Instead of providing anything of substance, Dr. Welner provided empty, meaningless broadsides against Dr. Russano's whole field of study:

> Q.      Can you tell me if there are any published studies in the peer-reviewed journal that refute any of the conclusions on contentions made in Dr. Russano's report disclosed in this case?
>
> A.      I probably would want to look at the report. Judging how little an area of science this is, I think the simply answer is no.

*Id.* at 49:17-50:2. Dr. Welner could not cite anything, even though he agreed that if Dr.

Russano's conclusions and theories were wrong, they could be disproven through study:

> Q.      Sir, would you agree with me that if the current research is extrapolating from poor data and reaching conclusions that are wrong, that could be demonstrated by conducting studies with better data—
>
> A.      Sure.
>
> Q.      —and researching conclusions that are supported by the science?
>
> A.      Certainly.

*Id.* at 37:9-18. When given the opportunity to explain what methodology he used to reach the

specific opinions on page 12 of his report, he could not provide any. *Id.* at 258:13-261:12. Dr.

Welner also makes meaningless personal attacks on the integrity of researchers in the field of

false confessions: "In actuality, the body of literature addressing disputed confessions is heavily

influenced by a small coterie of police interrogation critics who publish polemics making broad

but unsubstantiated pronouncements based on published studies that provide little data one can

actually apply to casework."[2] Ex. B at 12. In his report, he provides one critique of one study.[3]

*Id.* at 12-13. He provides no critiques of any of the other studies, experiments, or research upon

---

[2] This criticism is ironic coming from Dr. Welner, who has made at least $362,178 in the last two years alone as an expert for the City of Chicago in wrongful conviction cases. Ex. E at 184:19-185:10.

[3] This study, "Inside interrogation: "the lie, the bluff, and false confessions," by Perrillo and Kassin, is only one of many cited by Dr. Russano. *See* Ex. A at 37-43. And even if there was something methodologically wrong with this study, or reasons why its conclusions could not be used to study "real-world" interrogations, Dr. Welner has failed to explain it. Instead, he is content to simply call the study "useless[ ]" and "vacuous," claiming that it "renders psychology a laughingstock in the criminal courts." Ex. B at 13-14. (Dr. Welner also claims, again, without any citation to anything, that the research community studying false confessions is "minute," but this is untrue. *See Edmonds*, 955 So.2d 801 ("an amicus brief filed with the Court of Appeals states that the number of experts [in the field of false-confession research] is at least 60, and in 1992 there were nearly 800 articles relating to false confessions and police interrogations.").)

11

which Dr. Russano relied. For instance, he asserts—without citation, as usual—that false confession experts such as Dr. Ofshe and Dr. Saul Kassin have been "repeatedly excluded in subsequent *Daubert* and *Frye* hearings." *Id.* at 14. This is not true, especially in this district. *See Harris*, 2017 WL 2436316, at *6-*16; *Caine*, 2013 WL 1966381, at *3-*4; *Kluppelberg*, 2016 WL 6821138, at *4-*5; *Scott*, 2010 WL 3034254, at *5-*6. As Judge St. Eve observed in *Harris*, "numerous federal courts" have "conclud[ed] that the science of psychology in relation to police coercion in interrogations is sufficiently developed to constitute a reliable body of specialized knowledge." *Harris*, 2017 WL 2436316, at *7. In Harris's *habeas* case, the Seventh Circuit cited approvingly to the social science research on false confessions. *See Harris v. Thompson*, 698 F.3d 609, 632 & n.12 (7th Cir. 2012).

There are scenarios where a competing expert might attack another expert's methodology on the basis that their statistics are flawed or their research methods are improper. But baldly asserting that laboratory studies have no relevance to real world interrogation techniques—when the available research, the Department of Defense, and the Department of Justice say otherwise—is not a permissible opinion under *Daubert*.

In sum, Dr. Welner's first opinion is not based on any methodology or reliable application of any methodology to the facts, and it is inadmissible.

### B.    Opinion 2

In Opinion 2, Dr. Welner asserts:

> False confessions are established by physical evidence that demonstrates conclusively a person could not have committed the crime in question, either as a direct participant or as an accessory. … Examples of such physical evidence include DNA that implicates another totally unrelated person, and during a time course in which no other encounter could have taken place.

12

Ex. B at 15; *see also id.* at 21 ("false confessions are established by physical findings rather than the statements themselves, or the limited substance of such statements"). Dr. Welner provides zero explanation for why physical evidence would be the only way that a false confession could be established. *Id.* He cites to no research, experiments, studies, or anything else to support his assertion. And, perhaps more significant, *there was such physical evidence in this case*—male DNA (YSTR results) that was not Plaintiff's or Riggio's husband's was found on Riggio's underwear and on her vaginal swab. *See* Ex. F (SERI Fourth Analytical Report) at 7; Ex. G (SERI Sixth Analytical Report) at 5. Dr. Welner admitted that such information would be indicative of innocence. Ex. E at 64:14-67:2, 80:19-25. But Dr. Welner was unaware of these facts because he was not provided this information. *Id.* at 81:1-90:16.

Dr. Welner also claims, "[m]uch rarer still are crimes that do not occur, for which (false) confessions are elicited. Among the case reports of established false confessions elicited by police interrogation, false confessions to crimes that never happened exist principally in the hypothetical." Ex. B at 15. Again, Dr. Welner does not cite any research, studies, or any source of any kind for this assertion, and it is not the kind of assertion that could possibly be based solely on his personal experience as a forensic psychiatrist.

The remainder of Dr. Welner's second opinion simply regurgitates the facts from the defense point of view and makes assertions about what the evidence supposedly shows that requires no expertise whatsoever. *See id.* at 16-17. For instance, Dr. Welner asserts: "Rape is not disproved by an absence of physical evidence," "[t]he absence of videotaped evidence of Mr. Chatman leaving the Daley Center does not resolve his movements one way or the other," Copeland (the sleeping deputy)'s testimony is "inconclusive to establish innocence," "[t]hat the Cook County State's Attorney's Office provided a Certificate of Innocence to Mr. Chatman does

13

not equate with scientific thresholds for demonstrating a person to have been involved." *Id.* at 16. These are simply legal arguments—arguments about what the evidence shows or what the jury should conclude from the evidence—disguised as "expert" testimony. Dr. Welner did not employ any methodology—any expertise—in making these arguments. Nor does his concluding assertion in Opinion 2 have any apparent basis in any methodology at all:

> The only way to demonstrate that no rape took place here is by an admission by Mrs. Riggio that no rape or attempted rape took place, or by videotaped or other clear physical evidence that demonstrates Mrs. Riggio staged a crime. The available physical evidence from this case does not resolve this question one way or another.

*Id.* at 17. An expert opinion, like this one, that simply tells the jury what conclusion to reach from the evidence is improper. *Good Shepherd Manor Foundation, Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003).

Moreover, Dr. Welner's opinions are not helpful to the jury. *United States v. Neushwander*, 2017 WL 4572212, at *3 ("An expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion.") (citing *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991)). "Expert testimony is permitted to assist the trier of fact with technical issues that laypeople would have difficulty resolving on their own. Expert testimony furthers this purpose only if the expert is in fact providing the jury with genuine expertise." *Stollings v. Ryobi Techs., Inc*., 725 F.3d 753, 765 (7th Cir. 2013); *see also United States v. Palomino*, 2014 WL 2581347, at *3 (N.D. Ill. June 9, 2014) (if a proffered expert opinion addresses matters that are 'truly in the realm of common sense, then [an expert's] testimony is superfluous and will provide no benefit to the trier of fact.").

## C.      Opinion 3

14

In his third opinion, Dr. Welner makes a whole variety of assertions, none of which are supported by any methodology or based on reliable application of a methodology to the facts. *See* Ex. B at 17-21.

As an initial matter, this section of Dr. Welner's report appears to be attempting to respond to a portion of Dr. Russano's opinion on tunnel vision, in which she states, "there is no indication that police or prosecutors seriously investigated Mrs. Riggio's overall credibility, especially in light of her previous 1979 allegation of sexual assault, which allegedly occurred under startling similar circumstances." Ex. A at 16.[4] In response, Dr. Welner provides reasons why a jury should believe Riggio, *see* Ex. B at 17-20, but as Dr. Russano made clear in her deposition, she is not assessing Riggio's credibility. Ex. C at 187:13-17. Nor does Dr. Russano give any opinion that Riggio was malingering. *See generally*, Ex. A. Thus, Dr. Welner's contrary opinion—that Dr. Russano did not conduct sufficient testing to reach an opinion about malingering (*see* Ex. B at 18)—is inadmissible because it does not help the jury resolve any fact in issue. Dr. Welner's critique is simply not responsive to any opinion of Dr. Russano's.

Second, sprinkled throughout Dr. Welner's third opinion are statements that simply give his assessment of what a jury should conclude from the evidence. For instance, he asserts: Riggio's treaters did not believe she was "disingenuous," so "how would expectations be any different for investigators?"; Riggio could not have staged the 2002 alleged sexual assault because she is not a "masochistic personality who sought her own humiliation"; and "[t]he 1979 rape complaint is not demonstrably false." Ex. B at 17, 19. These are simply not expert opinions.

---

[4] This is only a portion of Dr. Russano's overall opinion about investigators' tunnel vision in this case, which is: "there is no indication from police records that anyone other than Mr. Chatman was ever considered a suspect. In order to guard against the process of *confirmation bias*, investigators need to make a concerted effort to attend to information that may *not* confirm their hypothesis that the suspect actually committed the crime, rather than simply seek out and attend to confirming, inculpatory information." Ex. A at 15.

These are arguments that the defense lawyers can make to the jury about what the evidence shows. Another example is Dr. Welner's assertion that there is no "scientific study to show that rape, and being affected by rape, is limited to one experience per person," and that "[t]he notion that a person who was victimized in 1979 could not have been victimized a second time is unfounded." *Id.* at 18. Not only is this not responsive to any opinion that Dr. Russano is giving, but it is legal argument, not expert opinion. Dr. Welner cites to one study for his claim that "[t]hose who have been previously victimized are even described to be at greater risk of revictimization." *Id.* at 18. But Dr. Welner agreed that that study involved women who have been sexually assaulted who have PTSD and who turned to drugs, sex, or alcohol to cope and were thus more likely to be revictimized because they were less well able to defend themselves when incapacitated by drugs or alcohol. Ex. E at 272:4-273:4. There is no evidence that any of that applies to Riggio in any way. Moreover, Dr. Welner has no particular expertise in determining whether sex assault victims are vulnerable to repeat trauma. Thus, Dr. Welner's one citation does not support his conclusion, as applied to Riggio, and so his conclusion is not supported by the facts or data. *See* Fed. R. Evid. 702(d).

Third, he tries to explain Riggio's many inconsistent statements about how the alleged rape occurred by asserting that "[f]ragmentation of memory can take place in the aftermath of acute trauma" and she suffered a concussion after the assault. *Id.* at 17. But he is not a memory researcher and he is not qualified to render any opinions about the workings of human memory. Ex. E at 116:8-17, 125:13-24, 127:22-128:2. Moreover, his opinion about Riggio's faulty memory is based on his assumption that she suffered from a concussion. But Dr. Welner admits Riggio was not diagnosed with a concussion. *Id.* at 280:15-281:19. Thus, Dr. Welner's opinions

16

about Riggio's memory does not reliably apply a methodology to the facts—there is too great an

analytical gap between the data and the opinion offered. *Joiner*, 522 U.S. at 146.

Fourth, Dr. Welner asserts that "there are rapists with schizophrenia, and quite a few."

Ex. B at 20. This is not supported by any citation, and he provides no scientific or other basis for

this claim. He then claims, "it is my professional opinion that investigators' diligence into his

background would only have presented clinical evidence supporting the decision to prosecute

Mr. Chatman." *Id.* at 20-21. But Dr. Welner is not an expert on what constitutes sufficient

evidence to prosecute an individual (and Dr. Russano did not provide any such opinion in her

report). And, his only basis for this assertion is an incident in 1986 when Plaintiff was treated by

hospital personnel for delusions, including claiming that he was "Superman" and that he had

supposedly raped and killed women in front of a police officer. Ex. C at 293:2-299:13. This

incident, in which Plaintiff was clearly determined to be delusional by the hospital personnel

who treated him and then released him, deeming him not to be a threat to himself or others, does

not provide sufficient factual basis for Dr. Welner's opinion. *See* Fed. R. Evid. 702(d).

And finally, Dr. Welner claims, "There are many well-recognized reasons why suspects

offer self-incriminating statements and details do not coincide with evidence." Ex. B at 21. He

then gives a bulleted list. But neither his general assertion, nor the bulleted list, is supported by

any citation to any research, studies, or experiments. This Court is not obligated to accept Dr.

Welner's "say-so." *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 419

(7th Cir. 2005) ("As we so often reiterate: 'An expert who supplies nothing but a bottom line

supplies nothing of value to the judicial process.'") (citations omitted); *Hall*, 93 F.3d at 1344

("Conclusory statements without any explanation why the expert can contribute to the jury's

understanding of the subject are … subject to exclusion.").

### D.    Opinions 4 through 7

In opinions four through seven, Dr. Welner opines that tunnel vision is not a risk factor for false confessions, and there were no situational or personal risk factors or interrogation methods that increased the risk of false confession in this case. Ex. B at 21-27. But, as discussed above, these are not areas in which Dr. Welner has expertise. He has never conducted studies, research, or experiments in these areas. *See* Ex. D. Nor does he cite any studies to support his opinions. *See* Ex. B at 21-27. He also continues his pattern of making unsubstantiated broad claims, such as: "Mr. Chatman asserts that he confessed because he was physically abused. If he were to have been imperiled, his intellect as a risk factor for false confessions is irrelevant." *Id.* at 23. It is unclear why being physically assaulted or threatened would render "irrelevant" Mr. Chatman's risk factors of low IQ and mental illness. Dr. Welner does not provide any citation or support for his assertion.

Similarly, Dr. Welner asserts, "[i]t is my professional opinion that the length of his custody did not contribute to his decision to confess," "[i]solation is altogether irrelevant to confession …," and "[n]or do handcuffs, even prolonged periods in handcuffs, lead to false confessions." *Id.* at 24. In fact, Dr. Welner characterizes the issues of restraint, isolation, and prolonged custody as speaking more to the "aesthetics of hospitality." *Id.* These are unsubstantiated opinions that Dr. Welner is not qualified to give. Dr. Russano not only cited to numerous studies on these topics, but she explained why these risk factors were present in this case. Ex. A at 20; Ex. C at 123:1-124:19, 125:4-8.

### E.    Opinions 8 and 9

In opinion 8, Dr. Welner purports to answer the question, "What evidence is there, for or against, the contention that Mr. Chatman was fed details with which to incorporate into his

18

statement?" Ex. B at 27. On its face, this question is clearly not for an expert to answer. It's a question for the jury to answer when it considers whether the defendants fabricated Plaintiff's confession.

Furthermore, Dr. Welner appears to be attempting to respond to Dr. Russano's opinion that the walk-through of the Daley Center is "one of the most egregious examples of contamination [she] has ever seen." Ex. A at 31. Dr. Russano's opinion is that:

> One of the features that make false confession so compelling is that they often contain details about the crime that police have withheld from the public that only the true perpetrator would know. … However, non-public details in a confession are only an indicia of reliability if the details were not intentionally or unintentionally leaked to the suspect by investigators. If non-public details about the crime are leaked to a suspect, researchers refer to this as *contamination*. Contamination can be intentional … or unintentional. … Contamination is a known and recognized problem in proven false confession cases.

*Id.* at 30-31; Ex. C at 168:22-169:11. Dr. Russano's opinions are helpful to the jury because they help it determine a fact in issue—factors to consider when determining the reliability and voluntariness of Plaintiff's confession. *See Harris*, 2017 WL 2436316 ("in forming his opinion about indicia of reliability, [Dr. Leo] applied an approach common in his field in which he compared indicia of reliability and unreliability to Plaintiff's confession. He further testified that he is not opining that Harris gave a false confession, but that her confession contained indicia of unreliability."); *Caine*, 2013 WL 1966381, at *4 ("Dr. Leo will be permitted to testify to various factors that can cause false confessions, and to their presence in this case. Dr. Leo will also be permitted to generally testify that, based on his knowledge, experience, and study of confessions and police interrogations, false confessions frequently do not contain the type of crime scene knowledge that only a true perpetrator would have, and that some false confessions contain such detail because of police contamination."); *see also Kluppelberg*, 2016 WL 6821138, at *5. The

presence of contamination makes it more likely that the details in Plaintiff's confession did not come from him, but rather, from being exposed to the supposed crime scene. *See* Ex. C at 167:18-168:19.

In opinion 9, Dr. Welner attempts to challenge the methodology behind Dr. Russano's analysis of reliability or unreliability of the post-admission narrative (i.e., Plaintiff's confession). As discussed in cases such as *Harris*, *Caine*, and *Kluppelberg*, cited above, the methodology behind this kind of analysis is sound. Dr. Welner does not provide any support for his contrary assertions. Nor is he qualified to render any opinions on this topic, since he has no experience or expertise in the subject matter of interrogations and confessions.

## IV.    Welner's Opinions Should Be Excluded under Rule 403

Furthermore, Welner's opinions should be barred under Rule 403, which requires exclusion of relevant evidence when its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading a jury. Fed. R. Evid. 403. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 … exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595. There is a serious risk that the jury would give Dr. Welner's opinions undue weight due to his background as a forensic psychiatrist, even though his opinions are unreliable.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court bar Michael Welner from testifying at trial.[5]

---

[5] Dr. Welner should be barred entirely from testifying. Even if the Court allowed some opinions, he should be barred from testifying to opinions that he did not disclose in his report. *See*, *e.g.*, Ex. E at 324:1-326:11.

RESPECTFULLY SUBMITTED,

/s/ Elizabeth Wang
*One of Plaintiff's Attorneys*

Jon Loevy
Russell Ainsworth
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
O: 312.243.5900

Elizabeth Wang
LOEVY & LOEVY
2060 Broadway, Ste. 460
Boulder, CO 80302
O: 720.328.5642

21