**Melissa B. Russano, Ph.D.**
Roger Williams University
School of Justice Studies
One Old Ferry Road
Bristol, RI 02809
401-254-3878
Email: mrussano@rwu.edu

July 7, 2016

**Report for *Carl Chatman vs. City of Chicago, et al.***

## I. Introduction

On Friday, May 22, Mr. Russell Ainsworth formally retained me as an expert consultant on a case involving Mr. Carl Chatman. Mr. Chatman was convicted on March 4, 2004 of aggravated sexual assault and was sentenced to a maximum of 30 years in prison. On September 10, 2013, after a review of his case by the Cook County State's Attorney's Conviction Integrity Unit, Mr. Chatman's felony conviction was dismissed,[1] and he received a Certificate of Innocence from the Cook County Circuit Court on November 19, 2013.[2] I was asked to provide a written opinion and possible expert testimony in relation to the interrogation and confession of Mr. Chatman.

## II. Professional Qualifications

I am currently a Professor of Criminal Justice at Roger Williams University. I received my Bachelor of Arts degree in Psychology from the University of Virginia, and my Masters and Ph.D. in Psychology (with a legal psychology specialization) from Florida International University. I consider myself an experimental psychologist with training in social and cognitive psychology. My primary areas of research and expertise are interviewing, interrogations, and confessions, in the police, military and human intelligence domains. I have been conducting research in the area of interrogations and confessions since 2002, have published numerous scholarly peer-reviewed articles and chapters on these topics, and I created one of the most oft used and influential laboratory paradigms for studying true and false confessions.[3] I regularly give presentations to academics and practitioner audiences, and I have participated in interrogation training of law enforcement officers. Since 2007, I have received continuous funding (to date, over $1.35 million) for my research on interrogations and confessions from the U.S. Department of Defense and the U.S. Department of Justice via the High-Value Detainee Interrogation Group. I am being compensated $295 per hour for my work on this case as an expert consultant.

## III. Materials Reviewed

I have reviewed the following materials pertaining to this case:

---

[1] http://www.statesattorney.org/press_ChargesDismissedConvictionIntegrity.html

[2] http://www.loevy.com/blog/exoneree-receives-certificate-innocence/

[3] Russano, Narchet, Meissner & Kassin (2005)

EXHIBIT A

Deposition of Detective Jack Boock (2/4/2015)
Deposition of Officer Richard Griffin (11/3/2014)
Deposition of Officer Michael Karczewski (11/3/2014)
Deposition of Detective Barbara Midona (10/28/2014)
Deposition of Mr. Carl Chatman (2/26/2015; 5/7/2015)
Deposition of Assistant States Attorney Brian Holmes (12/12/2014)
Deposition of Detective Rita Mischka (10/17/2014)
Deposition of Detective John Roberts (12/4/2014)
Deposition of Mrs. Susan Riggio (10/7/2014)
Deposition and exhibits of Dr. Erick Neu (3/3/2015)
Deposition and exhibits of Dr. Phillip Pan (4/12/2015)
Deposition and exhibits of Dr. Charles Roe (6/5/2015)
Transcripts of Suppression Hearing (8/13/2003; 9/8/2003)
Suppression Hearing Testimony of Detective Jack Boock (8/13/2003)
Suppression Hearing Testimony of Detective John Roberts (8/13/2003)
Suppression Hearing Testimony of Dr. Phillip Pan (9/8/2003)
Suppression Hearing Testimony of Dr. Michael Stone (9/8/2003)
Suppression Hearing Testimony of Assistant States Attorney Brian Holmes (9/9/2003)
Motion to Suppress Confession (5/2/2003)
Opening Statements at Trial (1/28/2004)
Trial Testimony of Mrs. Susan Riggio (1/28/2004)
Trial Testimony of Ms. Jeannette Neibauer (1/28/2004)
Trial Testimony of Ms. Virginia Cernick (1/28/2004)
Trial Testimony of Dr. Brigham Temple (1/28/2004)
Trial Testimony of Sergeant Michael Cokely (1/28/2004)
Trial Testimony of Officer Richard Griffin (1/28/2004)
Trial Testimony of Officer Mary Cosgrove (1/28/2004)
Trial Testimony of Ms. Marla Fiorelli (1/28/2004)
Trial Testimony of Mr. Troy Nowak (1/29/2004)
Trial Testimony of Ms. Davere Jackson (1/29/2004)
Trial Testimony of Ms. Christi Fischer (1/29/2004)
Trial Testimony of Detective John Roberts (1/29/2004)
Trial Testimony of Assistant States Attorney Brian Holmes (1/29/2004)
Trial Testimony of Dr. Erick Neu (1/29/2004)
Closing Arguments at Trial (1/29/2004)
Transcript of Sentencing Hearing (3/4/2004)
Work Order (5/23/2002)
Sheriff of Cook County Court Services Department Memoranda (5/24/2002; 5/28/2002)
Mr. Carl Chatman's Written Confession Statement (5/25/2002)
Police GPRs
Police Supplemental Reports
Arrest Report
Arrest Supplementary Report
Chicago Police Department Inventory Sheets
Crime Scene Photos
Crime Scene Processing Reports

General Offense Case Reports
Documents related to the Office of Professional Standards' Investigation into Abuse Allegations
Plaintiff's Motion for Extension of Discovery, Expedited Discovery Responses Relating to Late-
   Disclosed *Brady* Material, and Removal of Confidentiality Designation
Memo from Mr. Charles Roe
Hinsdale Hospital Records (5/27/2002)
Querrey Memo (11/4/2005)
Appendix of Allegations of Kato's Use of Excessive Force during Interrogations
http://www.statesattorney.org/press_ChargesDismissedConvictionIntegrity.html
http://www.loevy.com/blog/exoneree-receives-certificate-innocence/
Complaint Investigation No. 02-05-053
SERI First Analytical Report
SERI Second Analytical Report
SERI Fourth Analytical Report

## IV. Background

Making a false confession is inherently counterintuitive in that being held criminally responsible for a crime you did not commit is fundamentally counter to one's self-interest. Most people cannot possibly imagine themselves confessing to a crime they did not commit (absent torture), and therefore, the phenomenon of false confessions is quite difficult for the majority of people (including jurors, attorneys, and laypersons) to understand. However, the existence of false confessions within the American and international legal systems is quite well-documented.[4] In the first 325 DNA exoneration cases documented by the Innocence Project, false confessions or admissions were given in approximately one out of every four cases (27%), making false confessions a leading cause of wrongful conviction in this country.[5] Out of the 1,623 exonerations documented by the National Registry of Exonerations,[6] false confessions played a role in 13% of those cases. Self-reported confession rates in community samples range from 1.2% to 13.8% and from 0% to 24% in samples of prisoners and those with serious mental illness,[7] and North American police investigators estimate that nearly 5% of innocent suspects provide false confessions.[8] Although not *the* leading cause of wrongful conviction, false confessions are particularly pernicious because of the power and nature of confession evidence. Confession evidence is widely considered to be one of the most powerful forms of evidence against a defendant, superseding damaging character evidence, eyewitness testimony/identifications, and even DNA evidence.[9] As such, when a false confession becomes

---

[4] Bedau & Radelet (1987); Drizin & Leo (2004); Kassin, Drizin, Grisso, Gudjonsson, Leo & Redlich (2010)

[5] http://www.innocenceproject.org/causes-wrongful-conviction

[6] http://www.law.umich.edu/special/exoneration/Pages/ExonerationsContribFactorsByCrime.aspx#

[7] See Gudjonsson (2010) for a review

[8] Kassin et al. (2007)

[9] Appleby & Kassin (2011); Kassin & Neumann (1997); It is not uncommon in cases of wrongful conviction for confession evidence to "trump" DNA evidence. For example, in the case of Mr. Jeffrey Deskovic, who served nearly 16 years for a rape and murder he did not commit, it was known at the time of trial that the semen found on the victim did not match Mr. Deskovic. Because of Mr. Deskovic's confession, the prosecution forged ahead with the criminal trial and 'explained away' the semen by suggesting that the victim must have had consensual sex with someone else prior to her rape and murder (see Leo & Drizin, 2010, also see http://www.westchesterda.net/Jeffrey%20Deskovic%20Comm%20Rpt.pdf).

evidence in a criminal trial, it becomes arguably the most damning evidence against a defendant possible, and it is highly likely to lead to wrongful conviction. In an examination of 125 documented cases of proven false confessions, of those cases that went to trial, false confessions led to wrongful convictions in 81% of the cases.[10] This phenomenon is due in large part to the fact that legal decision-makers (including jurors and police officers) are not able to reliably distinguish between true and false confessions.[11] This is because false confessions typically look quite similar to true confessions – compelling detailed narratives that seem to contain non-public facts about the crime that only the true perpetrator should know.

To understand the phenomenon of false confession and interrogations, researchers like myself rely on three primary bodies of literature: 1) case studies of documented wrongful conviction cases involving false confessions or admissions, 2) fundamental principles of developmental, social, clinical, developmental, and clinical psychology drawn from over 100 years of research on such topics as memory and communication, persuasion and compliance, suggestibility, decision-making, and learning and reinforcement principles, and 3) specific studies relevant to the topics of interviewing, interrogation and confession in the forensic context, including observational studies, survey research, field research, content analyses, and laboratory studies.[12] Taken together, these bodies of literature have sufficiently advanced our knowledge about this field to the extent that in 2010 the American Psychology-Law Society (a division of the American Psychological Association) published a White Paper which summarized the state of the knowledge at that time and represents generally accepted views and findings in the field.[13]

Most confessions, whether true or false, are a product of an interrogation. Police officers (and most other members of the criminal justice system) have two related goals: obtain true confessions from the guilty[14] while minimizing the number of false confessions procured from the innocent.[15] Researchers generally distinguish between three types of false confessions.[16] A *voluntary* confession is one in which an innocent person confesses to something he or she did not due absent any external pressures.[17] *Compliant* false confessions are ones in which innocent people confess to crimes they did not commit because they are acquiescing to the pressures of an external situation (e.g., they may want to escape an unpleasant interrogation or they believe that by confessing they will receive some benefit or avoid some threatened harm). Finally, an *internalized* false confession is one in which an actually innocent person confesses to a crime because he or she actually starts to question his or her own innocence.[18]

---

[10] Drizin & Leo (2004)

[11] Kassin, Meissner & Norwick (2005)

[12] Kassin (2007)

[13] Kassin et al. (2010)

[14] Confessions speed the process of justice in a number of ways. First, confessions are considered to be powerful evidence of guilt. Second, confessions encourage guilty pleas, thereby reducing the amount of time and resources that need to be dedicated to a case. Finally, as discussed, confessions admitted at trial are highly likely to lead to convictions.

[15] Not only can false confessions have potentially tragic consequences for an innocent suspect (i.e., wrongful conviction), but when this occurs the actual perpetrator remains at large.

[16] Kassin & Wrightsman (1985)

[17] The most commonly cited reason for providing a voluntary false confession is to protect someone else (see Gudjonsson, 2003; 2010).

[18] Internalized false confessions are almost always a product of highly suggestive interrogations, in which a suspect becomes convinced that his or her memory of not committing the offense is untrustworthy (e.g., due to the

Prior to the 1930s, the so-called "third degree" (i.e., the infliction of physical and mental pain) was commonplace in American interrogation rooms, as documented by the 1931 Wickersham Commission report.[19] Criticisms of these techniques centered not only on the concern that confessions procured via the "third degree" might be involuntary but also *unreliable* (i.e., could not be relied upon as truthful), and court rulings began limiting police officers' abilities to rely on such practices. Modern-day interrogations are now designed to be psychologically-based in nature. Although the type and amount of interrogation training detectives receive can vary considerably,[20] the *Reid Technique of Interviewing and Interrogation* (heretofore 'the Reid technique') has made an indelible impact on the process of interrogation in this country. Reid and associates purport to have trained more than 500,000 investigators (at a current rate of over 20,000 people a year), they assert that the Reid technique is the most widely used questioning technique in the world, and their textbook has been cited by the U.S. Supreme Court.[21] Many investigators who have not directly been Reid trained have likely been influenced by the method, given that interrogation skills are handed down from officer to officer via on-the-job training and observation.

The Reid technique is divided into two phases: a non-accusatorial pre-interrogation interview and a nine-step accusatorial interrogation.[22] The primary purpose of the non-accusatorial pre-interrogation interview is for the investigator to make a determination about whether the suspect is being truthful or deceptive. Reid and associates advocate the use of their 'Behavior Analysis Interview' or 'BAI', a structured interview approach that involves the use of what they call 'behavior-provoking' questions, which they claim elicit different verbal and non-verbal responses from truth-tellers and liars. The ability of investigators to reliably distinguish between true and false denials is of critical importance to the Reid technique because Reid advises that only "suspects whose guilt, in the opinion of the investigator, seems definite or reasonably certain" (p.185) should be subjected to the nine-step accusatorial phase. In other words, Reid assumes that investigators can systematically and reliably identify innocent persons during the pre-interrogation interview (via a pattern of verbal and non-verbal responses) – and therefore, few, if any, innocent persons should be subjected to their nine-step interrogation approach. However, this assumption is fundamentally flawed.

A wealth of scientific research indicates that people, including police officers, are *no better than chance* at detecting deceit (with an average accuracy rate of 53%).[23] Counterintuitively, police officers with more experience and more training in detecting deception tend to be *less* accurate at distinguishing between truth-tellers and liars. Despite low accuracy rates, however, police officers tend to exhibit over-confidence in their ability to detect deceit.[24] Poor performance at detecting deceit (and the accompanying over-confidence effect) is not particularly surprising from a research perspective. By and large, the cues that investigators are taught are indicators of deceit are in fact *not* reliable indicators of deceit. For example, Reid and

---

passage of time, alcohol/drug use, repression) and the suspect is also confronted with false evidence of his or her guilt (Gudjonsson, 2003; Kassin et al., 2010). Examples of documented cases of internalized false confessions include those of Michael Crowe, Marty Tankleff, and Peter Reilly.

[19] Leo (2004)

[20] Kassin et al. (2007)

[21] Inbau, Reid, Buckley & Jayne (2013); *Stansbury v. California* (1994)

[22] Inbau et al. (2013)

[23] Aamodt & Custer (2006); Granhag & Stromwall (2004); Memon, Vrij, & Bull (2003); Vrij (2008)

[24] Meissner & Kassin (2002, 2004)

associates (as well as other interrogation schools/manuals)[25] teach that certain non-verbal (e.g., lack of eye contact, grooming behaviors, closed posture, shifting in a chair) and verbal (e.g., offering specific denials, using qualifying phrases such as 'generally' or 'not often' or 'to the best of my knowledge', using indicators of so-called rehearsed language such as noncontracted denials, 'I did not kill her') responses are cues that a person is lying.[26] Unfortunately, such cues are *not* reliable indicators of deceit[27] – and relying on them can not only confuse investigators, but may in fact lead them to the incorrect conclusion. In one study examining the effectiveness of the BAI, truth-tellers exhibited more BAI indicators of deceit than liars, suggesting that the BAI may lead real-world investigators to not only identify truth-tellers as liars, but vice versa.[28] Taken together, this creates a potentially dangerous situation in which confident investigators use non-diagnostic cues to identify liars and proceed to the nine-step accusatorial phase comforted by the notion that the suspects they are interrogating are most likely or definitely guilty.

Given the mindset that only guilty persons are subjected to an accusatorial interrogation, most interrogation researchers agree that the fundamental goal of a U.S. law enforcement interrogation is to secure incriminating statements, an admission, or a full confession.[29] An accusatorial interrogation typically begins by isolating the suspect in small, windowless room, an environment that is designed to prime feelings of hopelessness and anxiety. The process of interrogation ultimately involves trying to convince a suspect that it is in his or her best interest to confess – in other words that the benefits of confessing outweigh the benefits of continued denial. In practice, this often means convincing suspects that the only reasonable way out of the situation they currently find themselves in is to admit wrongdoing. The Reid technique's nine-step approach involves firmly and directly accusing a suspect of having committed the crime and convincing him/her of the futility of denying it,[30] offering sympathy and developing and suggesting 'themes' that make it easier for the suspect to confess, shutting down denials and overcoming suspect objections, keeping the suspect focused on the interrogator and handling any signs of psychological withdrawal, presenting an 'alternative question' (in which two incriminating options are presented to the suspect, but one is face-saving), and finally securing an oral and then written confession statement.[31]

The 'theming' aspect of the interrogation process is particularly important. Theming typically involves providing face-saving excuses, rationalizations, or justifications for committing the crime that map on to the suspect's supposed preexisting rationalizations for

---

[25] Narchet, Coffman, Russano & Meissner (2004)

[26] Inbau et al. (2013)

[27] DePaulo, Lindsay, Malone, Muhlenbruck, Charlton & Cooper (2003)

[28] Vrij, Mann, & Fisher (2006)

[29] Kassin et al. (2010). However, the Reid manual does, in one place, assert that the primary purpose of an interrogation is to learn the truth, and it acknowledges that innocent persons may occasionally be interrogated. However, elsewhere in the manual, it states "the purpose for interrogation is to persuade a suspect who the investigator believes to be lying about involvement in a crime to tell the truth" (Inbau, Reid, Buckley & Jayne, 2001, p. 419). Given that the investigator believes the suspect is lying, the "truth" in this instance means a confession. In practice, most interrogation researchers agree that, in light of the process and flow of an interrogation itself (e.g., shutting down of denials, overcoming suspect objections), the practical goal of an interrogation is the elicitation of incriminating statements.

[30] In order to accomplish this, investigators may confront a suspect with true evidence of guilt, certain types of fabricated evidence of guilt, or investigators may bluff about evidence. The presentation of false evidence is a known risk factor for false confession (see Interrogation Techniques section of this report).

[31] Inbau et al. (2013)

6

committing the crime. These excuses, rationalizations, and justifications usually involve *minimization* strategies in which the interrogator downplays the moral seriousness of the crime (e.g., his behavior is common; his actions could have been much worse) or provides moral justifications for the suspect's behavior (e.g., he was provoked by the victim; he needed the money). Other themes may involve the use of *maximization* tactics, which are techniques/themes that tend to play up the seriousness of the situation (e.g., exaggerate the seriousness of the crime, the potential charges, or the seriousness of the suspect's intent). Of interest is the relationship of common theming approaches to the willingness of a suspect to confess. Reid and associates acknowledge that "every successful interrogation technique must offer the guilty person a real or perceived benefit to telling the truth."[32] The interrogation process is often portrayed as an opportunity for the suspect to tell 'his side of the story.' Reid and associates note that legally investigators are not permitted to tell a suspect that s/he will receive more lenient treatment by the criminal justice system if s/he confesses, however, they state that investigators hope that the suspect draws this conclusion on his or her own (and the themes are designed to encourage this).[33] In fact, Reid and colleagues are correct in their assumption that certain themes communicate information to suspects about their likely treatment within the criminal justice system. Research supports the notion that certain common minimization tactics are the functional equivalent of direct promises of leniency whereas certain common maximization tactics are the functional equivalent of direct threats of harsher punishment; in other words, certain minimization and maximization techniques that manipulate a suspect's perceptions of the consequences of confessing pragmatically imply leniency for confessing and harsher punishment for continued denial.[34] Moreover, minimization and maximization techniques that manipulate a suspect's perception of the consequences of confessing have been shown in experimental laboratory research to *increase the likelihood of false confessions* from the innocent and *decrease the likelihood of true confessions* from the guilty.[35]

Case studies, surveys of experienced investigators, and experimental laboratory research supports the notion that many Reid technique tactics are successful at eliciting admissions and confession from guilty people; however, it is also true, that that same body of literature suggests that certain elements of the Reid technique also are successful at eliciting admissions and confessions from *innocent* people.[36] For example, techniques such as direct positive confrontation, and the presentation of false evidence, particularly when coupled with minimization and maximization tactics that manipulate a suspect's perceptions of the consequences of denying or confessing, have been shown in laboratory experiments to elevate the risk of false confessions[37] – and these techniques are frequently present in documented cases of false confessions.[38] Reid and associates have long claimed the properly executed Reid

---

[32] Inbau et al. (2013, p. 368)

[33] The logic here is that the suspect will grasp on to the moral justification or excuse presented by the theme (e.g., My child is unruly and this is just a case of parental discipline taken too far), and the suspect will come to believe that since the investigator understands why s/he behaved the way s/he did, other people will similarly understand, and therefore, s/he will be treated more leniently (Inbau et al., 2013).

[34] Horgan, Russano, Meissner & Evans (2012); Kassin & McNall (1991); Russano et al. (2005)

[35] Horgan et al. (2012)

[36] For example, see Bedau & Radelet (1987); Drizin & Leo (2004); Horgan et al. (2012); Kassin et al. (2007); Kassin & Kiechel (1996); Klaver, Lee & Rose (2008); Narchet, Meissner & Russano (2011); Ofshe & Leo (1997a, 1997b); Perillo & Kassin (2011); Russano et al. (2005)

[37] Kassin & Kiechel (1996); Horgan et al. (2012); Narchet et al. (2011); Russano et al. (2005)

[38] Ofshe & Leo (1997a, 1997b)

technique will not cause an innocent person to confess, and that documented false confession cases attributed to the Reid technique are actually instances in which the technique was improperly performed or applied.[39] However, in a recent high-profile false confession case, a Reid employee at Reid headquarters participated in the interrogation and procurement of a false confession to the rape and murder of an 11-year-old girl from a Mr. Juan Rivera. Mr. Rivera was later exonerated and filed a civil suit for false arrest and malicious prosecution, against a number of entities, including John E. Reid and Associates. In March 2015, a 20 million dollar settlement was reached, of which Reid and Associates will pay two million.[40]

It is the opinion of this interrogation researcher that the goal for the criminal justice system ought to be to identify and use evidence-based, *diagnostic* interrogation approaches;[41] in other words, we want to identify and use techniques that increase the likelihood of true confessions while minimizing the likelihood of false confessions. Researchers have long been studying the factors associated with false confession, and there is a growing body of literature identifying *diagnostic* approaches that maximize the ratio of true to false confessions.[42] Taken together, the research on interrogations and confessions have allowed us to identify three major categories of risk for false confession: 1) investigative bias or 'tunnel vision', 2) individual suspect vulnerabilities, and 3) situational risk factors associated with the nature of the interrogation itself.[43] Investigative bias or 'tunnel vision' is the phenomenon in which investigators fall prey to *confirmation bias*[44] – that is, in the case of an suspect investigation, they hone in on a particular suspect, become convinced that s/he is guilty, focus in and attend to information that appears to support their belief in the suspect's guilt, and tend to ignore evidence to the contrary.[45] Individual suspect vulnerabilities refer to characteristics pertaining to the suspect that make them more vulnerable to providing a false confession, such as age, mental capacity, and psychological state at the time of the interrogation. Situational risk factors associated with the nature of the interrogation itself include such things as interrogation length and the specific interrogation tactics used.

## V. The Interrogation and Confession of Mr. Carl Chatman

On May 24th, 2002, Mrs. Susan Riggio, a judicial case coordinator, was allegedly sexually assaulted in her office on the 21st floor the Daley Center in Chicago. Although her account of the assault changed significantly over time,[46] during her 2014 deposition for this case, Mrs. Riggio testified that she arrived to work early that morning (around 7:00am), and after

---

[39] http://www.newyorker.com/magazine/2013/12/09/the-interview

[40] http://www.newyorker.com/news/news-desk/juan-rivera-and-the-dangers-of-coercive-interrogation

[41] Meissner, Hartwig & Russano (2010)

[42] Russano et al. (2005); Narchet et al. (2011); Horgan et al. (2012); Evans, Meissner, Ross, Houston, Russano & Horgan (2013)

[43] Meissner & Russano (2003)

[44] Meissner & Kassin (2002); Mortimer & Shepherd (1999); Narchet et al. (2011); Tavris & Aronson (2007); for an overview, see Trope & Liberman (1996)

[45] A belief in a suspect's guilt can also lead investigators to behave in ways that elicit what they interpret to be deceptive behavior from suspects, thereby confirming the investigator's belief in the suspect's guilt (Kassin, Goldstein & Savitsky, 2003; Narchet et al., 2011).

[46] For example, according the General Offense Case Report filed by Officer Koziel (Plaintiff 13569), immediately after the attack Mrs. Riggio stated she did not know if the perpetrator had penetrated her; at trial, however, she testified that she was penetrated both vaginally and anally.

approximately 20 minutes of work in her office, a Black man, who she immediately recognized as someone she had interacted with earlier in the week, appeared in her doorway with his pants unzipped and his penis in his hand. She testified that the man said "The judge fucked me, and I'm going to fuck you, bitch."[47] She alleges that she stood up as the perpetrator started walking toward her, but sat back down in her chair as he drew closer. She testified that the perpetrator then said "Have some AIDS bitch,"[48] and she covered her mouth and closed her eyes and felt the perpetrator press his penis against her hand.

At that point, she claims that her chair fell over, and the perpetrator began yelling at her to get up off the ground and trying to pull her up, while also kicking her on the stomach, hands, and arms. She says that she tried to beat him, they struggled, she was knocked down more than once, and she was able to eventually get up. She testified that she ripped the offender's jacket when she pulled herself up, and that she believed she bit his jacket on the shoulder. Once she was standing, Mrs. Riggio claims the perpetrator threw her face down on her desk, ripped her pantyhose, pulled her underwear to the side and anally penetrated her. While sodomizing her, she alleges that he was banging the left side of her head against the desk and keyboard while yelling "Bitch, bitch, bitch."[49] She stated that she then tried to urinate on him. She claims she was then able to stand up briefly, and then he pushed her back face down on the desk and penetrated her vagina, thrusting three times. The next thing she testified remembering was her whole body lying face up on the desk. She stated that "he told me to take my pants off so he can finish me off, bitch."[50] She claims she asked him if she could go to the bathroom (and that he refused), and at some point, she began yelling loudly "deputy, deputy" in the hopes of attracting attention from a deputy she remembered might be nearby.[51] She claims the perpetrator then told her "shut the fuck up or I'll put your lights out" while he brandished a pair of scissors near her face.[52] She testified that the last thing she remembers before being sat up on her desk by paramedics was urinating on her desk.[53]

According to police reports,[54] immediately after the assault Mrs. Riggio indicated that the perpetrator was a man who she had encountered earlier in the week.[55] The description of the perpetrator provided was a Black male, between the ages of 50 and 60, wearing a black knit cap, a shiny silver belt buckle, and a red Blackhawks jacket.[56] Ms. Jeannette Neibauer and Ms. Virginia Cernick (also court employees) provided similar descriptions of the man (i.e., Black male wearing a red Blackhawks jacket) who had interacted with them on 5/20/2002. A stop order

---

[47] Mrs. Riggio's 10/7/2014 deposition, p. 160

[48] Mrs. Riggio's 10/7/2014 deposition, p. 166

[49] Mrs. Riggio's 10/7/2014 deposition, p. 184

[50] Mrs. Riggio's 10/7/2014 deposition, p. 190

[51] In addition, Mrs. Riggio testified that she yelled and cried out multiple other times during the attack.

[52] Mrs. Riggio's 10/7/2014 deposition, p. 245

[53] However, in her 1/28/2004 trial testimony, Mrs. Riggio testified that she tried to urinate on her attacker after she was penetrated anally but before she was penetrated vaginally, and that the last thing she remembered was the perpetrator threatening her with the scissors.

[54] Plaintiff 13569

[55] According to testimony from Mrs. Riggio, Ms. Jeannette Neibauer and Ms. Virginia Cernick, Mr. Chatman had wandered into Courtroom 2101 on Monday, May 20, 2002 (see 1/28/2004 trial testimony). He first spoke with Ms. Neibauer, who escorted him into the side office where Mrs. Riggio and Ms. Cernick were working. According to Mrs. Riggio, Mr. Chatman was looking for assistance finding the Social Security Disability office to see a psychiatrist.

[56] Plaintiff 13621; City Def CC 012475

was issued with the perpetrator's general description, and shortly thereafter, at approximately 8:34am,[57] Mr. Chatman was arrested by Officer Richard Griffin at or around 151 W. VanBuren. Officer Griffin claims that Mr. Chatman matched the general description of the perpetrator, and that Mr. Chatman reversed direction once Officer Griffin made eye contact with him. When he asked Mr. Chatman what he had done earlier that day, Officer Griffin testified at trial that Mr. Chatman said he had been at the Daley Center to get a Rules of the Road book.[58]

After his arrest, Mr. Chatman was taken to the Harrison and Kedzie police station where he remained in police custody and was interrogated on and off for approximately the next 26 hours. No recordings were made of any of the interrogations, depriving fact-finders of the ability to review an objective record of events. However, according to Mr. Chatman,[59] after arriving at the Harrison and Kedzie station, a male and female police officer (based on police reports, most likely Detectives Jack Boock and Rita Mischka) interrogated him for approximately two hours.[60] Mr. Chatman repeatedly denied any knowledge of a rape and maintained his innocence. Starting at approximately 12:00 p.m., Mr. Chatman participated in a series of three live lineups. The victim made a positive identification of Mr. Chatman;[61] witnesses Ms. Neibauer and Ms. Cernick[62] were unable to positively identify Mr. Chatman as the man they had interacted with on May 20th, 2002. After the lineups, Detectives Boock and Mischka resumed interrogating Mr. Chatman, informing him that the victim had identified him from the lineup.[63] Mr. Chatman continued denying any knowledge of or involvement in the crime.

According to Detective Boock,[64] Mr. Chatman was then left alone, handcuffed, in the interview room from approximately 1:30 p.m. to 8:00-9:00 p.m. Detectives Boock and Mischka interrogated Mr. Chatman again (around 8:00-9:00 p.m. on March 24th), confronting him with the victim's account, the victim eyewitness identification, the tentative witness identification,[65] as well as the allegation that his alibi was untrue.[66] During this interrogation, Chatman reportedly

---

[57] Plaintiff 13235

[58] Officer Griffin's 1/29/2004 trial testimony

[59] See Mr. Chatman's 2/26/2015 and 5/7/2015 depositions and Documents related to the Office of Professional Standards' Investigation into Abuse Allegations (hereafter, 'OPS Report')

[60] OPS Report

[61] According to Detective Midona's 10/28/2014 deposition testimony, Detective Midona instructed Mrs. Riggio to "see if you can pick out the guy" from the lineup (pg. 163). This type of lineup instruction is well-documented as biased and causes a high rate of false identifications (see Steblay, 1997). The National Institute of Justice's guidelines for the collection and preservation of eyewitness evidence specifically cautions against the use of biased instructions (https://www.ncjrs.gov/pdffiles1/nij/178240.pdf).

[62] Ms. Cernick did indicate that she thought that Mr. Chatman resembled the man she had interacted with on 5/20/2002.

[63] OPS Report; see ASA Holmes' 12/12/2014 deposition; Detective Sup. Approval 106196

[64] Detective Boock's 2/4/2015 deposition

[65] Although Ms. Cernick did not positively identify Mr. Chatman from the lineup, she indicated that he seemed to resemble the man she had interacted with on Monday, May 20th. It would appear that this was represented as a tentative identification by Detectives Boock and Mischka when confronting Mr. Chatman (see ASA Holmes' 12/12/2014 deposition).

[66] ASA Holmes' 12/12/2014 deposition, Detective Sup. Approval 106196; Mr. Chatman had told officers that he had spent the night of 5/23/2002 at a homeless shelter named the Pacific Garden Mission. Where Mr. Chatman spent the night of May 23rd was critical because the prosecution alleged that perpetrator would had to have spent the night of the 23rd in the Daley Center since the Daley Center was closed to the public when the rape occurred. Detectives Thomas McGreal and Maria Pena interviewed Mr. Mark Pharr from the Pacific Garden Mission around 2:00 p.m. on 5/24/2002. According to Detective McGreal, Mr. Pharr indicated that he had not seen Mr. Chatman in

said "if the lady said I did it, then I did it."[67] Detective Boock said he relayed this information to Assistant States Attorney Brian Holmes, and ASA Holmes and Detectives Boock and Mischka interrogated Mr. Chatman again, during which time Chatman reiterated his earlier statement that if the victim indicated he did it, then he did.[68] At that point, ASA Holmes asked to speak to Mr. Chatman alone. Detective Boock estimated that ASA Holmes' interview of Mr. Chatman lasted 15 to 20 minutes (during which time Mr. Chatman remained handcuffed to the wall), and afterwards ASA Holmes indicated to Detective Boock that Mr. Chatman had not made any additional incriminating statements during that time.[69] The next official interrogation of Mr. Chatman occurred sometime around 10:00-10:30 p.m. by Detective John Roberts.

However, according to Mr. Chatman,[70] sometime before this interrogation by Detective Roberts, a Chinese-looking police officer (who he believed was referred to as Officer Kato[71]) entered the room and was verbally and physically abusive, all while Mr. Chatman remained handcuffed. Mr. Chatman says that the Chinese-looking police officer told Mr. Chatman that he knew Mr. Chatman had raped Mrs. Riggio and not to try to deny it. The officer than said "I am going to beat your butt" and hit Mr. Chatman on the left side of his temple (Mr. Chatman reported going numb for about a minute from the blow).[72] Mr. Chatman reported being "nervous and afraid," and that he agreed to say that he committed the rape so he would not suffer any more physical abuse.[73] According to Mr. Chatman, the Chinese-looking officer told him what to say and that is how he knew the details of the rape.[74]

Mr. Chatman's account of physical and verbal abuse is corroborated by an anonymous complaint filed with the Chicago Police Department's Office of Professional Standards. The original letter, sent via interoffice mail, was dated May 27, 2002, just days after the abuse incident.[75] In the letter, a detective from the Harrison and Kedzie station, alleges that on or about May 25th, Detective Kato (who the letter writer indicated was well known for his brutality towards suspects) beat a homeless man into confessing to raping a woman at the Daley Center. The anonymous officer indicated that Detective Kato hit the suspect and shouted "tell me you did it!" After the suspect denied involvement again, "Detective Kato hit the suspect with such a blow that last time that the suspect groaned from sheer pain and doubled over grasping for air."[76] At that point, the suspect asked Detective Kato what he wanted him to say, and Detective Kato said "I want you to say you raped that woman." According to the letter, Detective Kato laid out the victim's account of the rape word for word, and the suspect signed it (without even reading it).[77]

---

a few months, but that that did not mean Mr. Chatman did not spend the night of 5/23/2002 at the shelter since he could have entered the building after 10:00pm (and there would be no record of this).

[67] Detective Boock's 2/4/2015 deposition; ASA Holmes' 12/12/2014 deposition; Detective Sup. Approval 106196

[68] Detective Boock's 2/4/2015 deposition

[69] Detective Boock's 2/4/2015 deposition

[70] OPS Report Dr. Pan's 9/8/2003 testimony at suppression hearing; Dr. Pan's report

[71] OPS Report

[72] OPS Report

[73] OPS Report; Mr. Chatman's 2/26/2015 (pg. 278) and 5/7/2015 depositions

[74] OPS Report

[75] OPS Report; Interestingly, the complaint was not investigated until it was brought forward again on 2/23/2004.

[76] The anonymous detective indicates in the letter that he thought the blow would "kill him for sure" (OPS Report).

[77] The Office of Professional Standards interviewed Mr. Chatman in March of 2004 as part of their investigation into the abuse allegation. Despite the allegations of the anonymous detective (which Mr. Chatman knew nothing about until June 4th, 2015 – see Chatman Motion for Miscellaneous Relief), and Mr. Chatman's statement

According to Detective Roberts, during the interrogation than began around 10:00-10:30 p.m., Detective Roberts introduced himself, and after getting Mr. Chatman a cigarette that he requested, Mr. Chatman gave a detailed oral confession to raping Mrs. Riggio in response to Detective Roberts' request of Mr. Chatman to tell him what happened at the Daley Center. According to Detective Roberts, this interrogation lasted approximately 30 to 45 minutes. Detective Roberts then called ASA Holmes back to the police station, and at approximately 1:00 a.m. on May 25th, ASA Holmes conducted another 30 to 40 minute interview with Mr. Chatman during which Mr. Chatman repeated his confession to ASA Holmes.[78] Despite having purportedly given two detailed, complete oral confessions,[79] neither Detective Roberts nor ASA Holmes chose to ask Mr. Chatman to memorialize his confession in writing at that time. Instead, the decision was made to take Mr. Chatman to the Daley Center.

At approximately 2:00 a.m., Detective Roberts, Detective Barbara Midona, Sergeant Dennis Walsh, and ASA Holmes escorted a shackled Mr. Chatman to the Daley Center.[80] According the Detectives Roberts and Midona, Sgt. Walsh, and ASA Holmes, Mr. Chatman led them to each location he had been to within the Daley Center. They claim that Mr. Chatman showed them where he had entered the Daley Center on the southwest corner of the building and the 1st floor information booth he stopped at, and then directed them to the 6th floor (where he showed them the office he went in to inquire about filing a lawsuit and the bathroom stall he hid in for a while). He then purportedly led them up the escalator he had taken to the 7th floor, and then directed the group to take the 7th floor elevators to the 21st floor. They claim he showed them the locations where he hid (judge's bench) and slept in the courtroom (under a bench), and then he directed them to the office where he assaulted Mrs. Riggio. ASA Holmes and Detective Roberts asked all the others, namely Sergeant Walsh, Detective Midona, and Security Manager Mr. Charles Roe[81] to step outside of Mrs. Riggio's office, and ASA Holmes and Detective Roberts closed the door and remained in the office with Mr. Chatman for 10 to 20 minutes.[82] According to Detective Roberts, Mr. Chatman confessed again in the office where the assault allegedly occurred, giving the same account he had previously provided at the police station.[83]

---

indicating the abuse had occurred, the abuse allegation was determined to be unfounded. Interestingly, Detective Kato was never interviewed during the course of the investigation, nor were any other officers involved in the case or working that day, despite the fact that Chicago Police Department Attendance and Assignment Records indicate that Detective Kato was on duty on May 24, 2002 and May 25, 2002. In justifying the unfounded determination, the City of Chicago indicated that allegations of abuse had never been made prior to the interview of Mr. Chatman in March of 2004. However, this is false. Mr. Chatman told Dr. Pan, a psychiatrist conducting a fitness evaluation on him, about the abuse on January 16, 2003, and Mr. Chatman filed a pretrial motion to suppress his confession in May of 2003 in part on the basis that it was procured via physical abuse. It is also interesting to note that Detective Kato has a long history of alleged abuse of suspects in police custody, and specifically, during interrogations (by 2004, there were 23 reports of alleged abuse of suspects during interrogation by Detective Kato) (see Appendix of Allegations of Kato's Use of Excessive Force during Interrogations).

[78] Detective Boock's 2/4/2015 deposition. According to ASA Holmes' 1/29/2004 trial testimony, Detective Roberts was only present for small portions of this interview.

[79] Detective Roberts' 1/29/2004 trial testimony

[80] There was initially a delay in getting access to the building. While waiting for the Daley Center Security Manager, Mr. Charles Roe, to arrive, the police officers drove Mr. Chatman around to the locations Mr. Chatman allegedly went after leaving the Daley Center the morning of 5/24/2002.

[81] Another civilian was also present, however, I have been informed by Attorney Ainsworth that that person is now deceased.

[82] Detective Midona's 10/28/2014 deposition

[83] Detective Roberts' 1/29/2004 trial testimony

Afterwards, Chatman allegedly showed them the route he took to exit the building (again, via the southwest corner of the building).[84] ASA Holmes and Detectives Roberts and Midona indicated that Mr. Chatman took the initiative to direct them from location to location in the building.[85] However, this narrative is contradicted by Security Manager Mr. Roe. According to Mr. Roe,[86] Mr. Chatman was not directing the group where to go within the Daley Center. Mr. Roe claims that Mr. Chatman was "pretty incoherent" when he was brought to the Daley Center, to the extent that the Chicago Police Department "coached him on the route and the place he slept in the courtroom." He further states that "Mr. Chatman was directed physically where to go", and that "Mr. Chatman wasn't walking, taking the lead."[87] Mr. Roe stated that initially Chatman directed the group to the 2nd floor, but stated it did not look familiar, so Sergeant Walsh requested they go to the 6th floor to see if that looked familiar to Mr. Chatman. Mr. Roe further stated that the police pointed and directed the group to every location they visited in the Daley Center, not Mr. Chatman, and when they were in Courtroom 2101, the police pointed out the bench area where Mr. Chatman allegedly slept.[88]

On the way back to the police station, the officers picked up food from White Castle for Mr. Chatman, which he ate around 4:00 a.m. At around 4:30 a.m.,[89] Mr. Chatman indicated he was tired, and he was left alone to sleep in the interview room. By 9:30 a.m.,[90] Mr. Chatman was awake and eating breakfast. At approximately 10:00 a.m., ASA Holmes and Detective Roberts began questioning Mr. Chatman again, during which time he agreed to memorialize his oral confession in writing. Mr. Chatman's written statement (start time of 10:25 a.m.) was handwritten by ASA Holmes, and according to ASA Holmes and the statement itself, reflects a summary of what Mr. Chatman relayed to ASA Holmes.[91]

In summary, the written confession states that Mr. Chatman entered the Daley Center on Monday, May 20, 2002, to file a small claims lawsuit. He wandered into Courtroom 2101 and interacted with three White women, including Mrs. Riggio. The statement indicates that he was partially looking for information and partially looking for a woman to have sex with. After he left the Daley Center, he decided he wanted to have sex with Mrs. Riggio, so he entered the Daley Center on Thursday, May 23rd around 4:00-4:30 p.m. He stopped at the information booth, and then went up to the 6th floor to room 602. He then hid in a 6th floor bathroom for several hours, and then proceeded to walk up the escalators to the 7th floor. He then took the elevator from the 7th floor to the 21st floor and entered Courtroom 2101. He hid for a few hours near the judge's bench, and then slept for a few hours under a bench near the courtroom doors. The statement indicates that Mr. Chatman awoke when he heard someone opening a door, and he saw Mrs. Riggio opening the door to the office he had interacted with her in on Monday, May 20th. He then jumped up and rushed into the room. He said the woman was facing him when he entered the room, they struggled, and he put Mrs. Riggio on the table. He says he hit the woman's head on the desk four to five times, and then she fainted or passed out. At that point, he

---

[84] ASA Holmes' 12/12/2014 deposition
[85] ASA Holmes' 1/29/2004 trial testimony; Detective Midona's 10/28/2014 deposition; Detective Roberts' 12/4/2014 deposition
[86] Mr. Roe's 6/5/2015 deposition; Memo from Mr. Charles Roe
[87] Mr. Roe's 6/5/2015 deposition
[88] Mr. Roe's 6/5/2015 deposition
[89] Detective Roberts' 1/29/2004 trial testimony
[90] ASA Holmes' 1/29/2004 trial testimony
[91] Mr. Chatman's Written Statement (5/25/2002)

stated he ripped the woman's pantyhose, lifted the woman's burgundy skirt, pulled her panties to the side, and vaginally penetrated her, thrusting several times. The statement indicates that at that point Mrs. Riggio gasped for air, and Mr. Chatman grabbed a pair of scissors, and told the woman "Don't make me use these." Mr. Chatman stated he did not ejaculate inside the woman, and that the woman urinated on the table. He also stated he urinated a bit on himself and then into a cup, which he discarded into the garbage. He then put the scissors near the woman's crotch, picked some money up off the floor, and exited the Daley Center through the same doors he entered. The statement then details Mr. Chatman's activities after leaving the Daley Center up until his arrest, including stopping at the V.A. building to wipe some urine and semen off his pants. When he was arrested, Mr. Chatman was wearing his red Black Hawks jacket, which he indicated was the same one he was wearing on Monday, May 20th.

According to various police officers,[92] it was a Chicago Police Department policy in 2002 that suspects remained shackled when alone in a room. Given this policy and testimony by detectives,[93] it would appear that Mr. Chatman spent the majority of his time in custody shackled with handcuffs to a ring on the wall of the interview room. This time included hours-long stretches both when he was alone in the room as well as during some of his interrogations.[94] According to all of the detectives that interrogated him as well as ASA Holmes, Mr. Chatman was advised of his *Miranda* rights multiple times, and he voluntarily waived them. Chatman's written confession starts with a signed *Miranda* waiver.

## VI. Analysis of Interrogation and Confession of Mr. Chatman

### A) *Overview*

On September 10th, 2013, following an investigation by the State's Attorney's Conviction Integrity Unit,[95] Cook County State's Attorney Anita Alvarez announced that Mr. Chatman's felony conviction was being dismissed, and on November 19, 2013, Mr. Chatman was issued a Certificate of Innocence from Cook County.[96] This decision was based in part on the discovery of new information that there had been a Cook County Deputy Sheriff who had been sleeping in a nearby room while the alleged sexual assault occurred but who never heard Mrs. Riggio yelling or any other noise that indicated an assault was occurring. In addition, State's Attorney Alvarez indicated that Mrs. Riggio's account of the rape lacked credibility.[97]

As such, the following analysis of Mr. Chatman's interrogation and confession is predicated on Mr. Chatman's actual innocence, and the fact that a false confession was elicited from him, which in turn contributed significantly to his wrongful conviction. The first part of this analysis will entail analyzing the extent to which known risk factors for false confessions were present in this case, including investigative bias or 'tunnel vision', individual suspect vulnerabilities, and situational risk factors associated with the nature of the interrogation itself.

---

[92] See Detective Roberts' 12/4/2014 deposition; Detective Mischka's 10/17/2014 deposition; Detective Boock's 2/4/2015 deposition

[93] e.g., see Detective Boock's 2/4/2015 deposition

[94] However, according to Detective Roberts, Mr. Chatman was not shackled in the 4 to 5 hours that he slept in the early morning hours of 5/25/2002 (Detective Roberts' 12/4/2014 deposition).

[95] http://www.statesattorney.org/press_ChargesDismissedConvictionIntegrity.html

[96] http://www.loevy.com/blog/exoneree-receives-certificate-innocence/

[97] http://articles.chicagotribune.com/2013-09-10/news/chi-daley-center-rape-20130909_1_carl-chatman-2-cases-russell-ainsworth

The second part will involve an analysis of the post-admission narrative, namely the details that Mr. Chatman provided in his written statement. In order to evaluate the likelihood that any given confession or admission is reliable, researchers analyze the extent to whether the details contained in the post-admission narrative are 1) consistent with the facts of the case, 2) whether the post-admission narrative contained any non-public details about the crime,[98] which were known by the police at the time of the interrogation, but which were not leaked to the suspect by investigators,[99] and 3) whether the post-admission narrative contained details not known to police at the time the statement was taken but were later corroborated.[100]

### B) Presence of Known Risk Factors for False Confessions

a. ***Investigative Bias or 'Tunnel Vision'.*** Investigator tunnel vision is a well-established phenomenon, and the consequence of police honing in on a particular suspect, and ignoring potentially exculpatory evidence, can be grave for an innocent suspect.[101] Although not by name, immediately after the alleged assault, Mrs. Riggio branded Mr. Chatman as her attacker by identifying and providing a description of the man she had interacted with earlier in the week on 5/20/2002. Mr. Chatman was apprehended quickly thereafter, and there is no indication from police records that anyone other than Mr. Chatman was ever considered a suspect. In order to guard against the process of *confirmation bias*, investigators need to make a concerted effort to attend to information that may *not* confirm their hypothesis that the suspect actually committed the crime, rather than simply seek out and attend to confirming, inculpatory information. In this case, there were two fundamental questions: 1) did the assault actually occur?, and 2) if yes, was Mr. Chatman the actual perpetrator?

It would appear that investigator tunnel vision was a significant factor in the investigation of this case. Police investigators and prosecutors apparently gave little to no weight to evidence that pointed to the fact that the assault allegation may have been fabricated. This included knowledge that an immediate examination of Mrs. Riggio by medical personnel revealed absolutely no physical evidence of any kind of assault or trauma anywhere on her body[102] (despite claims of being violently kicked, having her head beaten against the desk, and her eventual claim of being forcibly raped both anally and vaginally), knowledge that there was no forensic evidence (e.g., semen, hair) establishing that an assault had occurred, and knowledge that there was no videotaped evidence of a likely perpetrator exiting the building shortly after the

---

[98] Non-public details of the crime generally refer to details about the crime that are known to police, but which the police intentionally withhold from the public and the suspect in order to test the reliability of a confession (Garrett, 2010).

[99] Reid and associates specifically train investigators to withhold certain evidence from the public and the suspect, and they stress that investigators must be careful not to reveal these details during the questioning process (Inbau et al., 2001, 2013).

[100] Inbau et al. (2001, 2013); This criteria is the gold-standard to assessing the reliability of a post-admission narrative. The classic example would be if in a homicide case the police had not recovered the murder weapon, the suspect detailed where he had hid it in the post-admission narrative, and the police were able to then locate the weapon.

[101] Meissner & Kassin (2002); Mortimer & Shepherd (1999); Narchet et al. (2011); Tavris & Aronson (2007); for an overview, see Trope & Liberman (1996)

[102] Detective Sup. Approval 106194; Dr. Brigham Temple's 1/29/2004 trial testimony

alleged attack (or videotaped evidence of a perpetrator entering the building the day before). In addition, the Daley Center Security Manager Mr. Roe informed Detective Maria Pena that a Cook County Deputy Sherriff had been sleeping in a room near where the alleged assault occurred at the time of the assault; after checking with her supervisors, Detective Pena informed Mr. Roe that there was no need to interview the deputy since they already had a suspect in custody.[103] Had they interviewed that deputy, they would have learned that he heard absolutely no noise related to the alleged violent assault.[104] Finally, there is no indication that police or prosecutors seriously investigated Mrs. Riggio's overall credibility, especially in light of her previous 1979 allegation of sexual assault, which allegedly occurred under startling similar circumstances.[105]

Police and prosecutors also apparently gave little to no weight to evidence that pointed to the fact that even if the assault had actually occurred, Mr. Chatman may have not been the actual perpetrator. For example, police knew at the time of Mr. Chatman's confession that there was absolutely no DNA or other forensic evidence linking Mr. Chatman to the crime scene.[106] They knew there was no videotaped footage capturing Mr. Chatman entering or exiting the Daley Center on March 23rd or March 24th (despite the fact that there was a camera positioned on the SW corner of the building where he allegedly entered/exited), and no security personnel had any recollection of seeing him enter and exit the building. Upon arrest, he was not wearing a black knit cap or a shiny belt buckle, which was part of the initial description on the General Offense Case Report.[107] With respect to his alibi in terms of where he spent the night of May 23rd, Mr. Mark Pharr from the Pacific Garden Mission indicated that he had not seen Mr. Chatman in months, but he could have entered the building after 10:00 p.m. on May 23rd. There is no indication in the police reports that police took steps to further investigate his alibi (by, for example, interviewing other persons who slept at the mission that night), but rather they interpreted Mr. Pharr's statement as evidence that Mr. Chatman had lied about his whereabouts. Armed with the belief that Mr. Chatman was the actual perpetrator, Mr. Chatman was subjected to prolonged custody and repeated accusatorial interrogations, in which his denials were repeatedly ignored and dismissed. After procuring a confession, police ignored red flags about the reliability of Mr. Chatman's confession. Good police practice involves trying to independently corroborate a suspect's admission or confession;[108] in this case, Mr. Chatman's confession did not contain any non-public corroborative details not already known to the police, it did not lead to any new evidence, and certain details of Chatman's statement that should have been able to be corroborated could not be.[109]

---

[103] Mr. Roe's 6/5/2015 deposition

[104] Complaint Investigation No. 02-05-053

[105] Mrs. Riggio's 10/7/2014 deposition; ASA Holmes' 12/12/2014 deposition

[106] 1/29/2004 trial testimony

[107] Plaintiff 13568

[108] Inbau et al. (2001, 2013)

[109] For example, Mr. Chatman claimed that he urinated into a cup and threw the cup into the garbage. Despite a thorough processing of the crime scene, no cup of urine was every recovered. In addition, Mr. Chatman's written confession indicated that after the assault, he went to the V.A. building and wiped urine and semen off of his

b. *Individual Suspect Vulnerabilities.* It is well-documented in the literature that certain characteristics make people more vulnerable to providing false confessions, due to in part to heightened suggestibility and lesser ability to cope with stress.[110] Mr. Chatman possessed two of the most significant of these types of vulnerabilities: cognitive impairment and mental illness.

**Intelligence.** Dr. Michael Stone, a clinical and forensic psychologist, administered the third edition of the Wechsler Adult Intelligence Scale (WAIS-III) to Mr. Chatman. Mr. Chatman scored a 68 on the full IQ scale, placing him in the mild mental retardation range.[111] Dr. Stone testified that this IQ score placed him in the 2nd percentile of the population for intelligence, meaning that 98% of adults his age have a higher level of cognitive functioning than him.[112] Dr. Stone also administered the Wide Range Achievement test, and the results of that assessment were that Mr. Chatman's read at approximately the 3rd grade level. Based on his global assessment of Mr. Chatman, Dr. Stone testified that he did not believe that Mr. Chatman could comprehend his *Miranda* rights and therefore could not make a knowing, voluntary, intelligent waiver of them.[113] Mr. Chatman's cognitive impairment is corroborated by several people who interacted with who called him 'slow' (Ms. Cernick; Ms. Neibauer, Detective Barbara Midona),[114] 'confused' (Ms. Cernick),[115] a 'slow talker' (Detective Barbara Midona),[116] or 'incoherent' (Mr. Roe).[117]

Persons with low intelligence or I.Q. are overrepresented among false confessors and are at greater risk for providing a false confession.[118] For example, in one study, the average IQ score of alleged false confessors was 80, a score significantly below the population average of 100.[119] Those with lower IQ, and particularly those who fall in the mental retardation range (defined as an IQ store of 70 or below),[120] are more easily influenced by others, are more likely accept blame for negative outcomes, and have more difficulty maintaining focus and

---

pants. However, records indicate that testing revealed that portions of his pants that contained sperm cells also contained female DNA that did not originate from the alleged victim.

[110] Drizin & Leo (2004); Gudjonsson (2003); Inbau et al. (2013); Kassin & Gudjonsson (2004); Kassin et al. (2010)

[111] Mr. Chatman's verbal IQ score was 72, which falls in the borderline range. Dr. Stone did not testify to Mr. Chatman's specific performance IQ, but stated that it fell in the mild mental retardation range (9/8/2003 suppression hearing testimony).

[112] Dr. Stone's 9/8/2003 suppression hearing testimony

[113] Dr. Stone's 9/8/2003 suppression hearing testimony; Dr. Phillip Pan, expert witness for the prosecution, testified on 9/8/2003 that based on his assessment, he believed Mr. Chatman could understand his *Miranda* rights; however, Dr. Pan did testify that Mr. Chatman indicated uncertainty about whether an indigent suspect had the right to have a lawyer present with him/her at the police station and that he needed to "educate" Mr. Chatman about various aspects of his legal rights (Dr. Pan's 4/12/15 deposition, pgs. 197-201)

[114] GPR 105514; Ms. Cernick's 1/28/2004 trial testimony; Detective Midona's 10/8/2014 deposition; Ms. Neibauer's 1/28/2004 trial testimony

[115] Ms. Cernick's 1/28/2004 trial testimony

[116] Detective Midona's 10/8/2014 deposition

[117] Memo from Mr. Charles Roe

[118] Drizin & Leo (2004); Garrett (2010); Gudjonsson (2003); Kassin et al. (2010); Leo (2008)

[119] Gudjonsson (1990)

[120] American Psychiatric Association (1994)

attention for long stretches of time.[121] People with lower IQ have a strong desire to please authority figures, are more likely to be acquiesce to leading questions, and they tend to prioritize short-term outcomes/needs over long-term ones.[122] They are generally quite poor at anticipating the long-term consequences of their decisions, particularly as it relates to the interrogation process.[123] Furthermore, *Miranda* comprehension is directly related to IQ; the lower the IQ, the less a person understands the meaning of his or her *Miranda* rights and how to apply them.[124] In one study of mildly mentally retarded individuals who were asked to paraphrase each of the five *Miranda* components, 50% could not paraphrase even one component correctly.[125]

**Mental State.** Even prior to May 2002, Mr. Chatman had an extensive, 20-year documented history of mental illness. This included having been diagnosed with schizophrenia at least eight different times and repeated diagnoses of alcohol dependence, and it he had a long history of psychiatric inpatient hospitalizations, outpatient treatments at psychiatric facilities, and prescriptions for psychotropic medications to treat his symptoms.

The psychological evaluation that occurred closest in time to Mr. Chatman's interrogation and confession occurred on May 26, 2002, the day after Mr. Chatman signed the written confession statement. According to medical records, Mr. Garnier, a technician at the Cook County jail, conducted an initial psychiatric intake evaluation of Mr. Chatman. Dr. Eric Neu, a licensed clinical psychologist who worked at the Cook County jail and who later evaluated Mr. Chatman on May 28, 2002, testified that after spending only 10 to 15 minutes with Mr. Chatman, Mr. Garnier was able to preliminarily diagnose Mr. Chatman with schizophrenia (without knowing about Mr. Chatman's history of schizophrenia diagnoses). Mr. Garnier also noted in his report that Mr. Chatman was disoriented with respect to what day it was, showed evidence of a loosening of associations (a symptom of disorganized speech in which a person strays off topic or makes irrelevant comments) and flight of ideas (a person bounces from topic to topic, without an obvious connection between the topics), and noted that Mr. Chatman exhibited poor hygiene, judgment, impulse control, and insight about his mental functioning and symptoms.[126] Dr. Neu's evaluation of Mr. Chatman two days later was consistent with that of Mr. Garnier's. Mr. Chatman made odd statements to Dr. Neu, showed signs of paranoia and delusions, disorganized, illogical, and disjointed speech, he did not know what month it was, and he had difficulty responding to questions. He was given a primary diagnosis of paranoid schizophrenia or schizoaffective disorder bipolar type, with a secondary diagnosis of substance abuse, and Dr. Neu recommended he remain in

---

[121] Everington and Fulero (1999); Perske (2004)

[122] e.g., Finlay & Lyons (2002); Leo (2008); Perlman, Ericson, Esses, & Isaacs (1994); Shaw & Budd (1982)

[123] Clare & Gudjonsson (1995); Everington & Fulero (1999); Fulero & Everington (2004); Gudjonsson (2003)

[124] Cloud, Shepherd, Barkoff & Shur (2002); Everington & Fulero (1999); Fulero & Everington (1995); O'Connell, Garmoe, & Goldstein (2005)

[125] O'Connell et al. (2005)

[126] Dr. Neu's 3/3/2015 deposition

the acute care unit indefinitely.[127] Mr. Chatman was prescribed Zyprexa, an anti-psychotic and mood stabilizer. Dr. Neu's Axis 5 Impression of Mr. Chatman (which represents a global assessment of functioning from 0 to 100) was 15, indicating someone suffering from very severe symptoms and impaired functioning.[128] Dr. Phillip Pan, a licensed forensic psychiatrist and expert witness for the prosecution, evaluated Mr. Chatman's psychological state in January of 2003. Dr. Pan agreed with a diagnosis of schizophrenia for Mr. Chatman. In addition, he agreed that it was likely that Mr. Chatman was experiencing looseness of association and flight of ideas on May 25, 2002 (the day of Mr. Chatman's written confession), given that those symptoms were present on May 26th and May 27th, and that the medical records from the Cook County jail imply that Mr. Chatman was probably not medication-compliant prior to May 26, 2002.[129] Taken together, it is clear that prior to and at the time of his interrogations and confession, Mr. Chatman suffered from severe symptoms of mental illness that would have significantly impaired his decision-making and communication abilities.

Like cognitive impairment, mental illness is a significant risk factor for making a false confession. Offenders with mental illness self-report than they have falsely confessed in their lifetime at nearly double the rate of offenders without mental illness,[130] people with mental illness are overrepresented in documented cases of false confessions,[131] and mental illness often co-morbidly occurs with substance abuse,[132] further elevating the risk of false confession.[133] People suffering from mental illness experience a wide range of debilitating symptoms, including reality distortion, poor judgment and decision-making, anxiety and stress, and difficulty in concentration. Moreover, those suffering from mental illness are unlikely to sufficiently comprehend their *Miranda* warnings.[134]

c. ***Situational Risk Factors.*** Situational risk factors are factors associated with the interrogation itself that increase the likelihood of a false confession. In the case of Mr. Chatman, a number of known situational risk factors were present.

---

[127] According to Dr. Neu, the recommendation to remain in acute care indefinitely is reserved for those patients experiencing the most severe symptoms, which he estimated to be ½ of 1% of all inmates at the Cook County jail.

[128] Dr. Neu's 3/3/2015 deposition

[129] Dr. Pan's 4/12/2015 deposition

[130] Redlich (2007)

[131] Drizin & Leo (2004); Garrett (2010); Gudjonsson (2003); Kassin et al. (2010); Leo (2008)

[132] Abram, Teplin & McClelland (2003)

[133] Sigurdsson & Gudjonsson (2001)

[134] Rogers et al. (2007); Also of interest is that it would appear that Mr. Chatman suffered from impaired eyesight (this is established by his request for glasses during intake at the Cook County Jail, his referral to an optometrist during intake, as well as by Dr. Pan's report that Mr. Chatman had great difficulty reading without glasses during his evaluation of him). There is no testimony or evidence that Mr. Chatman had in his possession or was provided with glasses during his detention and interrogation (in fact, photos of Mr. Chatman while presumably reviewing his written statement indicate that Mr. Chatman was not wearing glasses). Although ASA Holmes and Detective Roberts testified that Mr. Chatman had no difficulty reading his *Miranda* warnings out loud, or reading along as ASA Holmes read the written confession statement out loud (see ASA Holmes' 12/12/2014 deposition and Detective Roberts' 12/4/2014 deposition), this seems unlikely when you consider his reading level and cognitive abilities, coupled with impaired vision due to a lack of corrective glasses.

**Prolonged Custody, Isolation, and Interrogation.** Most police interrogations last between 30 minutes and 2 hours,[135] with law enforcement officers in the U.S. citing the mean interrogation length as 1.6 hours.[136] Law enforcement manuals, including the Reid manual, caution against prolonged interrogation, particularly in any cases involving physical coercion, citing it as a risk factor for coerced and/or false confessions.[137] At least one Reid-trained former investigator considers any interrogation lasting over 6 hours coercive.[138] Lengthy, prolonged detention and interrogation is commonplace in false confession cases, and therefore it is a known risk factor for false confessions. In one study of 125 proven false confessions, the average interrogation length was 16.3 hours, with 34% lasting between 6 and 12 hours, and 39% lasting between 12 and 24 hours.[139] Prolonged detention and interrogation is usually accompanied with isolation of the suspect from social support and contact with the outside world (e.g., friends, family members). The Reid manual specifically advises investigators to interrogate suspects in a small, barely furnished room, with nothing adorning the walls, and with minimal to no noise coming from the outside.[140] This environment helps heighten a suspect's sense of isolation and anxiety. Prolonged custody and isolation deprives suspects of their fundamental needs for affiliation and social support,[141] which are particularly critical in times of stress, such as during a prolonged accusatorial interrogation. Cumulatively, as time elapses, a suspect's need and desire to escape the aversive situation intensifies.

Mr. Chatman unquestionably experienced an unusually long period of isolation and detention. Mr. Chatman was arrested at 8:34 a.m. on May 24, 2002, and he was then immediately transported to the Harrison and Kedzie police station. He was held in an interview room, and interrogated on and off, for approximately the next 26 hours (the time noted on the May 25, 2002 written statement was 10:25 a.m.). The only breaks from his time in this interrogation room were the times he participated in the live lineups, bathroom breaks, a very brief period of time down in lock-up, and the middle-of-the-night trip to the Daley Center, during which time he remained in hand and leg shackles. It appears he spent the vast majority of the time he spent in the interview room shackled with handcuffs to a ring on the wall. According to Mr. Chatman,[142] police began interrogating him soon after he arrived at the station, and he was subjected to multiple rounds of interrogation throughout the day and evening on 5/24, the early morning hours of 5/25, and mid through late morning on 5/25. Because there are no electronic recordings of any of the interrogation sessions,[143] no one can definitively know exactly how long each session lasted and the cumulative total

---

[135] Baldwin (1993); Irving (1980); Leo (1996b); Wald et al. (1967)

[136] Kassin et al. (2007)

[137] Inbau et al. (2001, 2013)

[138] Blair (2005)

[139] Drizin & Leo (2004)

[140] Inbau et al. (2001, 2013)

[141] Baumeister & Leary (1996)

[142] OPS Report

[143] This is consistent with Inbau et al.'s recommended practice in 2002 (Inbau et al., 2001).

time that Mr. Chatman was subjected to interrogation. However, piecing together police reports, testimony and Mr. Chatman's accounts, it is clear to this expert that he experienced custody, isolation, and interrogation length that put him well-within the danger zone for providing a false confession[144] – all of which was even more perilous and worrisome given the vulnerabilities he faced with respect to his psychological state and intellect.

**Sleep deprivation.** Sleep deprivation is also a known risk factor for false confessions. Research has shown in a variety of contexts that being deprived of sleep depletes a person's cognitive resources to the point that people become error-prone, decision-making abilities become impaired, suggestibility to outside influence is heightened, and the ability to maintain focus and attention suffers.[145] In the interrogation context, sleep deprivation has long been considered powerful yet coercive technique (and historically a common tactic reported by victims of torture[146]), and it has been demonstrated in the laboratory to be a risk factor for false confessions.[147]

Although there is no record of the time that Mr. Chatman awoke on May 24, 2002, he was arrested at 8:34am. By his account, he had stopped at several locations before he was arrested. Mr. Chatman remained awake until at least 4:30 a.m. on 5/25/2002, when he indicated that he was tired and wanted to go to sleep. If one assumes that Mr. Chatman woke up at 7:00 a.m., this timeline suggests Mr. Chatman was awake for at least 21.5 hours, during which time he eventually capitulated and made several oral incriminating statements. Daley Center Security Manager Mr. Roe indicated that Mr. Chatman was "pretty incoherent" during the ~2:30 a.m. Daley Center walkthrough, a condition that could certainly be partially attributed to fatigue. Although Mr. Chatman was permitted to sleep on the bench or floor of the interview room for 4 to 5 hours in the early morning hours of May 25th, Detective Maria Pena indicated that when she brought him down to lock up later on May 25th, sometime after signing the written confession statement, "he was tired."[148] The fatigue and sleep deprivation that Mr. Chatman experienced on May 24th and May 25th likely depleted his emotional and cognitive resources to the point that it reduced his ability to continue maintaining his innocence and made him more susceptible to external pressure to falsely confess to the rape of Mrs. Riggio.

**Physical Abuse/Threats of Harm/Physical Discomfort.** Prior to the 1930's, physical abuse of suspects during interrogations was fairly routine.[149] However,

---

[144] It is also unclear the extent to which Mr. Chatman was provided with sufficient amounts to eat and drink between 8:34 a.m. and 4:00 a.m. Police records indicate he was provided with a White Castle meal around 4:00 a.m., and then some breakfast food (McDonald's a honey bun) around 9:30 a.m. on 5/25/2002. Of note, there is no official record or testimony of him being provided with food or drink before 4:00 a.m. on 5/25/2002.
[145] Blagrove (1996); Harrison & Horne (2000); Pilcher & Huffcut (1996)
[146] Suedfeld (1990)

[147] Frenda, Berkowitz, Loftus & Fenn (2016)
[148] Detective Midona's 10/28/2014 deposition, p. 18
[149] Leo (2004)

reform spurred on by the Wickersham Commission and case law decisions swept the country, and certainly by 2002, the courts, police training manuals, and legal guidelines had unequivocally declared physical abuse as inappropriate and illegal in the context of a police interrogation. The concern regarding physical abuse involved not only the issue of voluntariness (whether physical abuse causes a suspect's will to be overborne) but also *reliability* (the concern that physical abuse might lead to false confessions). The fact that a false confession can be procured through physical abuse should not come as a surprise to anyone; short-term consequences are more salient than distal ones, and human tends to focus on their immediate needs.[150] It is fundamental human nature to prioritize the short-term benefit of ending physical pain and/or avoiding future pain over the long-term consequences of falsely confessing to a crime one did not commit, especially in light of the fact that most innocent people believe that their actual innocence will become clear to investigators at a later time.[151] According to the Reid manual, "if physical coercion was involved, even a 30-minute interrogation may warrant" a claim of coercion or duress.[152] Similarly, threats of future physical abuse or harm is considered psychologically manipulative and coercive, and the courts have long recognized that confessions procured through threats of harm are not admissible in court.[153] Once again, the rationale for this is not simple because of voluntariness concerns, but over legitimate concerns that confessions procured in this manner may be unreliable (i.e., false).

Mr. Chatman has long alleged that he was physically abused by a Chinese-looking officer at the Harrison and Kedzie station. He first reported this during Dr. Pan's mental fitness evaluation of him in January of 2003. According to Dr. Pan, Mr. Chatman told him that he initially maintained his innocence but the police did not believe him. He indicated he had only confessed because the police would not let him go and because of police brutality. Specifically, he told Dr. Pan that a Chinese-looking officer had slapped him on the back of the head a couple of times, and he was "afraid of being beaten half to death" if he did not confess.[154] Mr. Chatman told Dr. Pan that he did not know what was in the written confession statement, so Dr. Pan had to paraphrase it for him.[155] In 2003, Mr. Chatman filed a motion to suppress his confession on the basis that it was procured partially via physical abuse.[156] Mr. Chatman also gave an account of this

---

[150] e.g., see Herrnstein (1970); Herrnstein, Rachlin & Laibson (1997); Rachlin (2000); for a discussion of individual differences, see Reynolds (2006)

[151] Kassin (2005) refers to this as the 'phenomenology of innocence.' Innocent persons believe that their innocence will eventually come to light, and so even if they make a false confession to benefit themselves in the short-term (e.g., to escape an unpleasant interrogation session), police investigators will eventually realize through further investigation and/or evidence that they are actually innocent. As a possible illustration of this phenomenon in this case, Mr. Chatman testified in his 5/7/2015 deposition that he told investigators that he urinated into a cup and threw the cup in the garbage so that they would realize he was innocent when they could not recover the cup from the crime scene.

[152] Inbau et al. (2001, p. 423)

[153] Leo (2004; 2008)

[154] Dr. Pan's 4/12/15 deposition, p. 192

[155] Dr. Pan's 4/12/15 deposition

[156] 5/2/2003 Motion to Suppress

abuse to an investigator with the Chicago Police Department's Office of Professional Standards during their reinvestigation of Mr. Chatman's case. He provided a similar statement to the one above, indicating that he was hit so hard on the side of his head that he briefly went numb from the blow, that he was threatened with more physical harm, and that he agreed to confess to avoid further abuse. He also reported that he believed the officer's name was "Officer Kato."[157]

As described elsewhere in this report, Mr. Chatman's account of physical and verbal abuse is corroborated by a complaint filed with the Chicago Police Department's Office of Professional Standards by an anonymous detective. The complaint was initially made just two days after Mr. Chatman's written confession, and it is important to note that Mr. Chatman had no knowledge of this complaint until June of 2015. The complaint alleged that Detective Kriston Kato had beaten a homeless man into confessing to raping a woman at the Daley Center on or about May 25th, 2002. According to the complaint letter, one blow was so severe that the complainant thought it would "kill him for sure."[158] Physical abuse and threats of future harm was a strong likely cause of Mr. Chatman's compliant false confession.

In addition to the physical abuse and threats of future harm that Mr. Chatman suffered, the conditions of his detention were likely physically uncomfortable, at best. Mr. Chatman remained seated on a hard bench, handcuffed to the wall for long stretches of time. He may have been unshackled during some interrogation sessions (but not all), but according to Detective Boock, Mr. Chatman was shackled continuously for at least one 7.5 hour stretch.[159] Any physical discomfort Mr. Chatman experienced while in custody would have likely lowered his ability to resist external pressures and provided an incentive to end the aversive situation he was in by telling investigators what they wanted to hear.

**Multiple Interrogators.** The use of multiple interrogators over time can be problematic in an interrogation room. According to the 4th edition of the Reid manual (the version available in 2002), "duress may be alleged if a tag-team approach is used during an interrogation, where one investigator questions the suspect for hours and is then relieved by a second 'fresh' investigator"[160], thereby acknowledging that interrogation by multiple interrogators over a lengthy period of time is a form of coercion. A fatigued suspect depleted of emotional and cognitive resources, faced with external pressure from multiple investigators, is at marked disadvantage in his or her ability to maintain his or her innocence over time, and is therefore at a heightened risk for providing a false confession.

There is no dispute that Mr. Chatman was interviewed by multiple detectives over a lengthy period of time. Official police reports confirm that over a 26-hour period, Mr. Chatman was interrogated and/or questioned by Detectives

---

[157] OPS Report
[158] OPS Report
[159] Detective Boock's 2/4/2015 deposition
[160] Inbau et al. (2001, pgs. 422-423)

Boock, Mischka, Roberts and ASA Holmes. In addition, Mr. Chatman was 'interrogated' by a Chinese-looking officer, whose most likely identity is Detective Kato.

Related to the notion of multiple interrogators is the issue of whether a suspect who makes an incriminating statement to one person is likely to make subsequent incriminating statements to other individuals. According to Mr. Chatman, he made an initial incriminating statement to the Chinese-looking officer who physically abused him and threatened him. According to Detective Roberts, Mr. Chatman's made his first incriminating statement during Detective Roberts' first interrogation of Mr. Chatman, around 10:30 p.m. on May 24th.[161] Mr. Chatman subsequently made incriminating statements a few hours later during questioning by ASA Holmes, during the Daley Center walk-through in the early morning hours of 5/25/2002, and he made a full verbal and written confession around 10:25 a.m. on May 25th. Mr. Chatman asserts that he agreed to confess because he was "nervous and afraid"[162] due to fear of further physical abuse, and because police would not believe anything other than he was guilty.

Some might argue that if a statement is coerced from a suspect by one person, and that person is subsequently interrogated by another person, that the coercion during the first interrogation session is no longer present, and therefore the second incriminating statement is voluntary (and likely reliable). This assumes an *attenuation of coercion* between the time the person suffered treatment that was coercive enough to elicit an involuntary (and in Mr. Chatman's case false) statement and subsequent interrogations/interviews. In Mr. Chatman's case, it is certainly questionable as to whether any real attenuation of coercion could have feasibly occurred between the time that he was physically abused and verbally threated and his subsequent confessions. During almost the entire time period in question, Mr. Chatman remained in police custody at the Harrison and Kedzie station, in the same room, where the abuse occurred. He remained shackled for the majority of that time. There is no reason to believe that Mr. Chatman should have assumed that he could have safely reported the abuse to other investigators or that the other investigators and questioners would not support one another and condone each other's behavior. There was also no reasonable reason for Mr. Chatman to doubt that a lack of cooperation on his part would lead to further abuse and harm.

Moreover, decades of basic social science research on persuasion, compliance and decision-making suggests that once people (who in general tend to be highly obedient to authority) have been persuaded to act in a certain way, they tend to act consistently over time.[163] For example, one prominent social psychologist coined the term for a well-established persuasion strategy, the *foot-in-the-door* effect[164] – in essence, if you can persuade a person to acquiesce or agree to a small concession or act, he or she will be more likely to agree to other acts in the future, even if those future acts come along with much weightier

---

[161] Detective Roberts' 12/4/2014 deposition
[162] Mr. Chatman's 2/26/2014 deposition (p. 278)
[163] For a review, see Cialdini (1993)
[164] Cialdini (2001)

consequences to that person. The fact that after Mr. Chatman made an initial (false) admission of guilt and subsequently confessed verbally and in writing to other persons is not at all surprising and is consistent with the social psychology of human behavior – especially given that his immediate detention circumstances had not changed in any significant way.

**Interrogation Tactics.** Moving beyond the physical abuse and verbal threats Mr. Chatman was subjected to, when trying to understand how Mr. Chatman came to falsely confess to rape he did not commit, it is informative to examine the other types of interrogation tactics used throughout the course of his multiple interrogations. Unfortunately, consistent with Reid training at the time,[165] none of Mr. Chatman's interrogators chose to electronically record the interrogation sessions nor did they take notes during the sessions. Given this, there is no objective record of the hours of questioning and persuasion techniques that ultimately led to Mr. Chatman's false confession. However, a careful reading of deposition transcripts and testimony establishes, at a minimum, that Mr. Chatman was subjected to a highly accusatorial interrogation process in which investigators asserted their confidence in his guilt, his repeated denials were ignored, and he was confronted with what turned out to be false evidence of his guilt.[166] The approach used seems quite consistent with the Reid technique (and Detective Roberts was Reid trained[167]) and other modern-day interrogation approaches.

Direct positive confrontation, in which an investigator directly accuses a suspect of guilt with a strong degree of certainly, is a common component of modern interrogation (and is the first step of the nine-step Reid interrogation technique).[168] It serves to ramp up a suspect's anxiety level, and coupled with the ignoring or shutting down of repeated assertions of innocence, it communicates the message that there is no point in trying to maintain one's innocence. For guilty suspects, the hope is that they will see the futility in continuing to lie to the investigator. For innocent suspects, however, it creates feelings of hopelessness and the feeling that protestations of their *actual* innocence are futile.

---

[165] The 2001 edition of the Reid manual generally expressed caution against electronic recording of interrogations. It also advised investigators not to take notes until the suspect was ready to make a fully inculpatory statement because taking notes might remind suspects of the legal consequences of confessing and therefore might make them less likely to confess (Inbau et al., 2001).

[166] Mr. Chatman was confronted with Mrs. Riggio's lineup identification, as well as the tentative identification made by Ms. Cernick. (He was also confronted with lying about his alibi, although in reality even though the alibi could not be corroborated, neither was it proved untrue – see footnote 74). At the time that police investigators confronted Mr. Chatman with the witness identification(s), they presumably believed that it was true evidence of guilt, even though it turns out it was not. However, the fact that detectives likely believed that they were presenting true (albeit generally unreliable) evidence of guilt in the form of a victim and witness identification does not change the material fact that the evidence was false. When considering the psychological consequences of this evidence presentation, Mr. Chatman, who *knew* he was innocent of this crime, was confronted with false evidence implicating him, and the dangers associated with this technique are as applicable in his case as in any one in which police knowingly present false evidence.

[167] Detective Roberts' 12/4/2014 deposition

[168] Inbau et al. (2001, 2013)

The presentation of false evidence of guilt is also a known, demonstrable risk factor for false confessions. Analyses of documented false confession cases in the U.S. indicate that the presentation of false evidence occurred in a large majority of these cases and contributed to the wrongful convictions of innocent suspects.[169] In addition, a wealth of research demonstrates that people are susceptible and vulnerable to false feedback in terms of their emotional state, judgment, memory, and decision-making processes.[170] Finally, laboratory studies of interrogation and confessions indicate that the presentation of false evidence increases the likelihood of false confession.[171]

According to Mr. Chatman, soon after his arrest he was interviewed for approximately two hours by a male and female detective (most likely Detectives Boock and Mischka), during which time he made repeated denials. Later that day (around 1:30 p.m.), after Mr. Chatman was identified by Mrs. Riggio in a lineup, Detectives Boock and Mischka interrogated Mr. Chatman again and confronted him with the fact that the alleged victim had identified him from the lineup, which constituted the presentation of false evidence. At around 8:00-9:00 p.m., Detectives Boock and Mischka continued interrogating Mr. Chatman, once again confronting him with the victim's account, the victim' eyewitness identification, Ms. Cernick's 'tentative' identification, as well as the allegation that his alibi was untrue.[172] During this interrogation, Chatman reportedly said "if the lady said I did it, I did it."[173] Detective Boock said he relayed this information to ASA Holmes, and ASA Holmes and Detectives Boock and Mischka interrogated Mr. Chatman again, during which time Chatman reiterated his earlier statement that if the victim indicated he did it, then he did.[174] An additional interrogation by ASA Holmes followed.[175]

Detective Roberts' interrogation of Mr. Chatman commenced at approximately 10:30 p.m. Sometime before this is when the physical abuse of Mr. Chatman most likely occurred. Detective Roberts asserts that, in essence, he simply asked Mr. Chatman to tell him what had happened at the Daley Center, and in response, Mr. Chatman provided a richly detailed, full confession.[176] In my opinion, given that Mr. Chatman has been declared factually innocent of raping Mrs. Riggio, Detective Roberts' version of events can only be accurate if Mr. Chatman had been provided all the details about the crime by the investigators who had previously interrogated Mr. Chatman (i.e., Detectives Boock, Mischka, and the Chinese-looking officer). In other words, since Mr. Chatman did not actually rape Mrs. Riggio, he had no true knowledge of the crime or crime scene. The details had to come from a police source. If Mr. Chatman in fact, as Detective Roberts alleges, provided all the details that were contained within his confession

---

[169] Drizin & Leo (2004); Leo & Ofshe (1998)

[170] Gudjonsson & Sigurdsson (1999); Kassin et al. (2007)

[171] Kassin & Kiechel (1996); Horselenberg, Merckelbach, & Josephs (2003); Horselenberg et al. (2006); Perillo & Kassin (2011); Redlich & Goodman (2003); Russano et al. (2005); Meyer & Youngjohn (1991); Nash & Wade (2009)

[172] ASA Holmes' 12/12/2014 deposition

[173] Detective Boock's 2/4/2015 deposition (p. 145); ASA Holmes' 12/12/2014 deposition

[174] Detective Boock's 2/4/2015 deposition

[175] Detective Boock's 2/4/2015 deposition

[176] Detective Roberts' 12/4/2014 deposition

during this initial interrogation session with him,[177] and Detective Roberts did not provide any details through his questioning, than those details had to have been provided by his previous interrogators. Mr. Chatman, in his account to the Chicago Police Department's Office of Professional Affairs and Conduct Office, did state that the Chinese-looking police officer who had physically abused him and who he believed was named Officer Kato had provided him details about the rape. In addition, ASA Holmes' testified in his deposition that when he briefly left the Harrison and Kedzie station earlier in the evening on May 24th (around 8:00-9:00pm), Detectives Boock and Mischka were in the process of confronting Mr. Chatman with what the witness had said (and presumably, in the process, providing details that Mr. Chatman later incorporated into this confession).[178]

On the other hand, it is also possible that Detective Roberts' recall of his interrogations of Mr. Chatman is faulty. On 5/26/2002, Mr. Chatman was experiencing a looseness of associations and flight of ideas, which makes communication difficult. The prosecution's expert, Dr. Pan, acknowledged that Mr. Chatman was likely experiencing those same symptoms on 5/24/2002 and 5/25/2002, the days he was interrogated.[179] Coupled with Mr. Chatman's low intellect, I find it difficult to believe that more direct, leading questions were not needed in order to elicit what turned out to be a richly detailed false confession. In addition, Mr. Chatman was exposed to a wealth of suggestive information during the Daley Center walk-through, and many of the details he provided in his written confession were likely a product of that experience.[180]

Given that the official record is silent due to a lack of electronic recording or detailed notes as to what other techniques Roberts' and others may have used during the interrogations of Mr. Chatman, it is difficult to comment on what other techniques may have contributed to the elicitation of Mr. Chatman's false confession. One fact that is acknowledged by Detective Roberts is that he had

---

[177] Detective Roberts testified that Mr. Chatman produced no new details about the crime during any subsequent interrogation nor during the Daley Center walk-through. This is interesting and noteworthy in and of itself, and perhaps should have served as warning or cue that Mr. Chatman's statement was unreliable. It is well-established that human memory is imperfect; even witnesses who are motivated to provide as much detail as possible to police about some event will not remember certain details the first time they tell their story. Simply asking a person to retell a story again almost always results in recall of additional details during the second (and subsequent) retellings. Mental and/or physical context reinstatement improves memory recall even more. (For a review of this literature and for information on an interviewing technique that relies on this principle to enhance memory, see Fisher & Geiselman, 1992). It is somewhat surprising that Mr. Chatman's failure to produce any additional details during subsequent interrogations and during a highly salient context reinstatement experience (i.e., the physical walkthrough of the crime scene) did not lead seasoned investigators to question Mr. Chatman's account (given their experience questioning other victims, witnesses, and suspects). The fact that Mr. Chatman's recall of details did not improve over time is inconsistent with the literature on how a person remembers and reports on past events that they actually experienced. On the other hand, it would *not* be surprising from a memory perspective that a person who is retelling a *false* story (i.e., one that does not originate from actual memory) would be quite consistent over time about the details of that story (given that there is no actual memory to retrieve new details from).
[178] ASA Holmes' 12/12/2014 deposition
[179] Dr. Pan's 4/12/15 deposition
[180] See the 'Analysis of the Post-Admission Narrative Confession' section of this report for a more detailed discussion of this issue.

undergone Reid training at some point in his career,[181] and that he acknowledged that it was possible that during an interrogation he would 'downplay the seriousness' of a crime in order to increase the likelihood of a suspect confessing. Downplaying the seriousness of a crime is a type of minimization tactic that manipulates a suspect's perception of the consequences of confessing (i.e., it communicates the message that there will be more lenient consequences because what the suspect allegedly did was not that big of a deal), which in turn increases the likelihood of false confession. In his statement to the Chicago Police Department's Office of Professional Standards during their reinvestigation of his case, Mr. Chatman indicated that the two people who took his confession statement were joking around and saying that Mr. Chatman was "just looking for someone to get my freak on."[182] This strikes me as an excellent example of minimizing the seriousness of the offense, both via the verbal content of the statement and the jovial manner in which it was delivered.

In sum, Mr. Chatman's detention and interrogation was a recipe for a false confession. Known risk factors for false confessions were plentiful in this case. Investigator tunnel vision led investigators to ignore potentially exculpatory evidence (including evidence that there may have been no crime at all), and armed with a firm belief in Mr. Chatman's guilt, a highly vulnerable individual (both in terms of cognitive ability and psychological health) was subjected to prolonged, coercive interrogation. The situational risk factors present in Mr. Chatman's case ranged from physical abuse to threats of harm to direct positive confrontation coupled with the presentation of false evidence to downplaying the seriousness of the crime. When considering the totality of the circumstances under which Mr. Chatman was interrogated, it is not at all surprising to this expert that in the face of all this that Mr. Chatman a false confession – in fact, what would have been surprising is if he had not.

*C) Analysis of the Post-Admission Narrative Confession*

After approximately 26 hours of detention and on-and-off interrogation, Mr. Chatman signed a written confession statement on 5/25/2002 at approximately 10:25 a.m. The statement was handwritten by ASA Holmes and reflects a summary of what Mr. Chatman relayed to ASA Holmes.[183] According to Holmes and Roberts, Mr. Chatman was given the opportunity to read the statement and point out errors, and there are initials next to corrections made. In addition, Mr. Chatman signed each page of the 9-page confession statement.

When conducting an analysis of the likely reliability of a post-admission narrative (i.e., in this case, the written confession statement), one should examine three key questions: 1) is the written confession consistent with the known facts of the case?, 2) did the written confession contain non-public details (i.e., details that were withheld by the police) that only the true perpetrator would know, *but which were not unintentionally or*

---

[181] Detective Roberts' 12/4/2014 deposition
[182] OPS Report (City Def CC 012464)
[183] Mr. Chatman's Written Statement (5/25/2002)

28

*intentionally leaked by investigators?*, and 3) did the written confession contain details not known to the police at the time of the confession but were later corroborated?

**Accuracy of Written Confession Statement.** Complicating the analysis of this case is the fact that Mr. Chatman was exonerated based in part on the Chicago Police Department's Office of Professional Standards' determination that the alleged victim Mrs. Riggio lacked credibility; in other words, it is not clear that Mrs. Riggio was assaulted on 5/24/2002 at all. Therefore, it is a bit more difficult to determine what 'truth' or 'known facts' Mr. Chatman's written statement should be compared against as it pertains to analyzing the reliability of his confession. For the purpose of this analysis, I use the victim's statement at trial to partially represent the 'known facts' of the case[184] (given that is the account used to convict Mr. Chatman) in order to assess the extent of the consistency between Mr. Chatman's written confession and 'known facts' of the case.

There were a number of inconsistencies between the signed written confession statement and the prosecution's account of the assault presented by Mrs. Riggio at trial. First, Mrs. Riggio testified that Mr. Chatman appeared in the doorway of her office approximately 20 minutes after she entered her office. According to the written confession statement, Mr. Chatman woke up to see Mrs. Riggio opening the door to her office, and he jumped up and rushed into the room. Second, according to Mrs. Riggio, Mr. Chatman appeared in the doorway with his pants unzipped and his penis in his hand, and he said "The judge fucked me, and I'm going to fuck you, bitch." She testified that she stood up as the perpetrator started walking toward her, but sat back down in her chair as he drew closer. She testified that the perpetrator then said "Have some AIDS bitch,"[185] and she covered her mouth and closed her eyes and felt the perpetrator press his penis against her hand. She claims that at that point her chair fell over, and the perpetrator began yelling at her to get up off the ground and trying to pull her up, while also kicking her on the stomach, hands, and arms, and that as she tried to get up, she was knocked down more than once. She also testified that she bit the offender's jacket on the shoulder. In contrast, none of these details appear in the signed written confession statement (and no evidence of a bite mark or Mrs. Riggio's saliva was found on the jacket). Mrs. Riggio testified that the perpetrator threw her face down on her desk and anally penetrated her. There is no mention of anal penetration at all in the written confession statement.[186] Mrs. Riggio testified that at one point when she was face up on the desk she began yelling loudly for a deputy and that is when the perpetrator threatened her with a pair of scissors by saying "shut the fuck up or I'll put your lights out."[187] In contrast, the written confession statement does not make any mention of the victim screaming for a

---

[184] However, recall that Mrs. Riggio's account of the assault changed quite significantly over time.
[185] Mrs. Riggio's 10/7/2014 deposition (p. 166)
[186] This is particularly noteworthy given that anal penetration was not alleged until Mrs. Riggio testified at Mr. Chatman's 2004 trial. The police had no knowledge of an allegation of anal penetration (given there was not one until nearly 20 months after the alleged assault), and therefore, the *absence* of this major detail in the written confession is especially telling.
[187] Mrs. Riggio's 10/7/2014 deposition (p. 245)

deputy, and indicates that it was after the victim gasped for air that Mr. Chatman brandished the scissors and said "Don't make me use these."[188]

The written confession statement indicated that Mr. Chatman urinated in a cup and disposed of the cup in a garbage can before leaving the Daley Center. Despite records that the crime scene was secured shortly after the crime and the building was thoroughly searched, no cup of urine was ever recovered; this is an important inconsistency between the written statement and known evidence (or lack thereof). In addition, ASA Holmes testified that Mr. Chatman indicated that he entered Daley Center on 5/24/2002 through the doors on the southwest corner of the building, and that he exited the same way on 5/25/2002.[189] However, there was no videotaped record or eyewitness testimony that corroborated this account of Mr. Chatman's entry and exit of the building. Finally, Mrs. Riggio described her attacker as wearing a black knit cap and a large shiny silver belt buckle;[190] however, when Mr. Chatman was arrested, he was not wearing a cap or a belt buckle (and there is no record of either of these items ever being recovered).

**Presence of Non-Public Details.** One of the features that make false confession so compelling is that they often contain details about the crime that police have withheld from the public that only the true perpetrator would know.[191] If the police withhold certain details from the public *and a suspect*, and a suspect is able to provide those details about a crime, this is an indicia of reliability; in other words, it is an indication that the suspect has guilty knowledge of the crime and is very likely the true perpetrator. Withholding certain details about the crime so that investigators can test the credibility of a suspect is standard police practice,[192] and when those details are present in a suspect's confession, it should rightfully increase an investigator's confidence that the confession being provided is true. However, non-public details in a confession are only an indicia of reliability if the details were not intentionally or unintentionally leaked to the suspect by investigators. If non-public details about the crime are leaked to a suspect, researchers refer to this as *contamination*.[193] Contamination can be intentional (e.g., purposefully telling a suspect 'we found a black rope around the victim's neck so we know she was strangled') or unintentional (e.g., unwittingly asking leading questions). Contamination can also occur by suspects overhearing other knowledgeable parties talking (e.g., victims, witnesses, investigators) or by being shown crime scene photos or other evidence. The fundamental problem when contamination occurs is that non-public details that have been leaked that appear in a confession narrative are no longer diagnostic, in that there is no way to tell after the fact whether the suspect knew those details because s/he is the actual perpetrator or because those details were leaked to him/her. This is particularly problematic when non-public details appear in false confession cases precisely

---

[188] Mr. Chatman's Written Statement (5/25/2002)
[189] ASA Holmes' 12/12/2014 deposition
[190] Plaintiff 13568; Plaintiff 13621; City Def CC 012475
[191] Garrett (2010)
[192] Inbau et al. (2001, 2013)
[193] See Leo (2008) and Leo & Drizin (2010) for an overview of the contamination error

because the non-public details are pointed to as strong indicators that the confession is true (in fact, police officers are trained to include specific details in the confession statements because it makes the statements more compelling to judges/juries).[194] Contamination is a known and recognized problem in proven false confession cases. An examination of 66 DNA exoneration cases between 1989 and 2014 involving false confessions indicates that contamination occurred in 94% of those cases. The non-public details in the confessions were used as evidence of the reliability of the suspects' confessions, and of those cases that went to trial, in all but one, police officers denied having revealed any of the non-public details to the suspects.[195]

Given that fact that Mr. Chatman is actually innocent, in this case, by definition, any details contained in the confession statement that coincide with 'known facts or evidence' **must** be a product of contamination (unless one suspends belief far enough to believe that Mr. Chatman is an incredibly lucky, or as the case may be, unlucky, guesser). Any details in the confession statement that corroborated Mrs. Riggio's account had to have been provided to or leaked to Mr. Chatman – because Mr. Chatman did not actually rape Mrs. Riggio, there is no other way he could have been privy to those details. Many of these details were likely leaked through during the interrogation process itself – the record clearly establishes that Mr. Chatman was confronted with the victim's account.[196] In addition, Mr. Chatman indicated in his statement to the Chicago Police Department Office of Professional Standards that the Chinese-looking police officer who abused him told him what to say and provided him with details, which was corroborated by the original complaint about the abuse made by the anonymous police detective.[197]

Moreover, **this case contains one of the most egregious examples of contamination I have ever seen** – namely, a walk-through and detailing of the alleged crime *at the crime scene itself*, prior to Mr. Chatman's confession being memorialized in writing. By taking Mr. Chatman to the Daley Center, the police investigators and ASA Holmes irreversibly contaminated Mr. Chatman's account by exposing him to rich visual and experiential details at the crime scene. Even if there is a question as to a suspect's guilt (which there is not in this case), the decision to take a suspect to a crime scene before documenting a suspect's confession is troubling and problematic, because there is no way to determine later if the details the suspect provided were known to him because he committed the actual offense or because he was exposed to those details during visit to the

---

[194] Inbau et al. (2001, 2013); Leo (2008)

[195] DeClue & Rogers (20015); Garrett (2010); Although it is possible that police officers may lie at trial about having revealed non-public details to suspects, it is also quite possible that police officers are unaware of the fact that they leaked non-public details to suspect (e.g., in the form of leading questions, reinforcement of certain responses, etc.), and therefore may truly believe they did not contaminate the suspect's confession.

[196] ASA Holmes' 12/12/2014 deposition; Also, in his 12/4/2014 deposition testimony, Detective Roberts admits, for example, that he would probably have asked Mr. Chatman about hitting Mrs. Riggio's head on the desk if Mr. Chatman did not volunteer it, suggesting a high likelihood that he may have asked other suggestive and leading questions while interrogation Mr. Chatman.

[197] OPS Report

crime scene. By ASA Holmes own admission,[198] he had never before and has never since taken a suspect to a crime scene, and certainly not prior to memorializing the suspect's confession in writing. Detective Roberts' testimony also suggests that the practice is extremely unusual; he could only remember one specific other case in which he took a suspect back to the crime scene, and that instance was to recover a specific piece of evidence.[199]

Another way to examine the issue of the reliability of the confession narrative is to ask whether any of the details contained in the written statement were *not known* to the police or ASA Holmes at the time the statement was taken. With the exception of urinating into the cup (a detail that was never corroborated), the answer to that question is *no*. At the time of the confession statement, Mrs. Riggio had provided five different statements about the alleged assault (to various law enforcement and medical personnel) – of note, these statements evolved quite significantly over time (and there were marked differences between her last statement on 5/25/2002 and her trial testimony on 1/8/2004). What is most informative to this analysis, however, is the extent to which the details police were aware of and believed to be true *at the time of the written statement* appear in that statement.

In short, the statement is quite consistent with police knowledge at the time the statement was taken. For example, by the time the statement was taken, police were aware that Mrs. Riggio had claimed that Mr. Chatman had entered her office and lifted Mrs. Riggio up on the desk in a sitting position,[200] before pushing her down until she was lying face-up on the desk and then banged her head on her desk repeatedly. She claimed he ripped her pantyhose, pushed her underwear to the side, vaginally penetrated her, and thrusted three times. She also claimed she urinated on the desk before passing out. Mr. Chatman's written statement reflects a quite consistent series of events, including that he only thrusted several times. Other details in the written statement (that were not provided directly by Mrs. Riggio), for example that Mrs. Riggio's skirt was burgundy, that he did not ejaculate inside her, and that he placed the scissors near the woman's crotch before leaving, might typically be indicators of reliability if the police otherwise had not been privy to this information; however, police records indicate that each of these details were known to the police at the time the statement was taken. For example, approximately one hour before the written statement was taken, at 9:30 a.m. on 5/25/2002, Detective Boock called the Illinois State Police and spoke with forensic biologist Ms. Marla Fiorelli. Detective Boock asked Ms. Fiorelli what color the victim's skirt was and whether the victim was wearing thigh high stockings or one-piece pantyhose. Ms. Fiorelli informed Detective Boock that the skirt was burgundy, and the pantyhose were one-piece.[201] The fact that Mr.

---

[198] ASA Holmes' 12/12/2014 deposition
[199] Detective Roberts' 12/4/2014 deposition
[200] Mrs. Riggio relayed this to Detective Midona and ASA Tracey Gleason during an interview at approximately 3:30pm on 5/24/2002 (see Detective Sup. Approval – Plaintiff 000948).
[201] If Mr. Chatman had in fact been guilty of assaulting Mrs. Riggio, these are details he likely should have known on his own. Although investigators may claim that they were simply trying to corroborate the details provided by Mr. Chatman, given that police knew the details prior to the written statement, there is no way to determine if Mr.

Chatman's written statement included that the victim's skirt was burgundy is especially noteworthy because, according to ASA Holmes, Mr. Chatman had earlier reported to Detective Roberts that the skirt was black. It was only after the verification from Ms. Fiorelli that the skirt was burgundy that Mr. Chatman's purported description of the skirt changed.[202] At the time the written statement was taken, police officers were also aware that there was no semen found on or inside Mrs. Riggio. At 7:45 p.m. on 5/24/2002, Ms. Fiorelli spoke with Detective Midona on the phone and informed her that no semen was found on the victim's clothes or body (and this was confirmed in a 10:45 a.m. call on 5/25/2002 with Detective Boock). In a clever way to explain away this lack of physical evidence, the statement indicated that Mr. Chatman did not ejaculate inside Mrs. Riggio. Finally, police officers also already knew from initial police reports that a pair of scissors was found near Mrs. Riggio's crotch, and Detective Boock asked Ms. Fiorelli whether there was any damage to the skirt at 10:45 a.m. on 5/25/2002 (she confirmed there was), essentially coinciding timing of Mr. Chatman's written statement. In sum, what appears to be knowledge of incriminating details in Mr. Chatman's written statement can all be explained by the process of contamination.

It is also informative to examine the details that were *not* known to police at the time of the written statement and were therefore *not* contained in the written statement (because no process of contamination could have occurred). Most notably, Mrs. Riggio testified at trial that the perpetrator tried to push his penis into her mouth, that the perpetrator violently kicked her when she fell to the ground, that as she tried to get up she was knocked down more than once, that she was thrown face down on the desk and anally raped, and that she yelled loudly and repeatedly for a deputy. Not a single one of these details were known to police at the time of the written statement, and not a single of these details appear in Mr. Chatman's written statement.

**<u>Details Unknown to Police But Later Corroborated.</u>** The gold standard for proof of corroboration is when a suspect provides details in his/her confession that were not known to police at the time of confession *and those details could later be corroborated*. No such proof of corroboration existed in Mr. Chatman's case. Not a single one of the details that had this potential – Mr. Chatman urinating in a cup and throwing the cup away, wiping semen and urine from his pants, the times and locations where he entered and exited the building – was corroborated. The cup of urine was never found; testing on his pants revealed that areas where semen was found also contained female DNA, which did not originate from the alleged victim; no security guard remembered seeing Mr. Chatman enter or exit the building, and Mr. Chatman did not appear on any security footage from any of the Daley Center cameras.

---

Chatman volunteered these details before investigators received the confirmatory information from the crime lab. However, given that Mr. Chatman is factually innocent, it is clear than any knowledge Mr. Chatman had of these details *had* to have been a product of contamination.

[202] ASA Holmes' 12/12/2014 deposition

Taken together, Mr. Chatman's a reliability analysis of Mr. Chatman's narrative confession statement reveals an absence of reliability indicators and instead suggests a fundamental lack of reliability. The circumstances under which it was taken were questionable and unusual at best. First, Detective Roberts and ASA Holmes claim that Mr. Chatman twice provided a full oral confession prior to the trip the Daley Center (and that he produced no new details about the incident either during the Daley Center walk-through or during the taking of his written statement). Despite providing what they say was a richly detailed full confession, ASA Holmes and Detective Roberts decided not to memorialize Mr. Chatman's confession in writing at that time,[203] and instead waited a full twelve hours after Mr. Chatman's initial verbal admission before securing the written statement. Moreover, the written statement itself is flawed. First, there are inconsistencies between the written statement and the evidence presented at trial that was used to convict Mr. Chatman. Second, the written statement contained details that were consistent with police knowledge at the time of the statement, and it did *not* contain details that were unknown to police at the time of the statement (a pattern symptomatic of false confession cases). This supports the contention that Mr. Chatman's written statement was a product of contamination, and given Mr. Chatman's actual innocence, it is the *only* explanation for how his written false confession could contain details about the alleged assault that he could not possibly have any knowledge of. The contamination almost certainly occurred both during the interrogation process itself as well as the highly suggestive visit to the crime scene (in which, according to Daley Center Security Manager Mr. Roe, Mr. Chatman had to be directed by police investigators as to his alleged movements throughout the building). Finally, there was not a single detail provided by Mr. Chatman that was not known to police at the time of the statement that could later be corroborated.

Another issue of note with respect to the analysis of the written confession statement is the presence of error corrections. There are multiple instances in Mr. Chatman's written statement where something is crossed out and/or corrected, and then Mr. Chatman, ASA Holmes, and Detective Roberts initialed next to the correction. Law enforcement officers are taught to intentionally insert mistakes into a confession statement so that the suspect can point out the error and make a correction. These corrections become a compelling argument to judges and juries that the suspect was a voluntary, active participant in providing the confession statement.[204] In essence, intentional insertion of errors is a psychological ploy to make a statement appear voluntary. Whether or not the errors made by ASA Holmes in the written confessions were intentional is unclear (given that most appeared to be trivial handwriting errors); however, one fact that is quite clear is that these error corrections were used by the prosecution during Mr. Chatman's 2003 suppression hearing as evidence that the statement was made knowingly and voluntarily. Specifically, Detective Roberts testified

---

[203] This decision contradicts conventional wisdom, even in 2002, about the timing for securing a written confession. Typically one would want to memorialize a confession as soon as possible, minimizing the likelihood that the suspect will change his or her story, invoke *Miranda*, or refuse to provide a written statement. According to the 2001 Reid manual, "It is essential that an oral confession be reduced to writing and be signed as soon as possible. The next morning, or even a few hours after the oral confession, may be too late, because the confessor may reflect upon the legal consequences of his confession and retract it. No time should be lost, therefore, in preparing for and obtaining a written, signed confession" (Inbau et al., 2001, p. 375).
[204] Inbau et al. (2001, 2013).

at that hearing that "Mr. Chatman would indicate that there was a mistake, the mistake was scratched out, the correction was entered and that item was initialed by myself, Mr. Chatman and Assistant State's Attorney Holmes."[205] The fact that the presence of error correction was relied upon as an indicator of the voluntariness of Mr. Chatman's confession is particularly disturbing given that ASA Holmes later contradicted Detective Holmes' claims. In his 2014 deposition, ASA Holmes testified that Mr. Chatman did not initiate any corrections at all in the written confession statement.[206]

Finally, Mr. Chatman's written confession contains statements that Mr. Chatman was not threatened in any way, that he had been provided food to eat, and that he had been treated well by ASA Holmes and the police. It is not uncommon for this type of language to be included in written confession statements as a way to sanitize the interrogation process – it is important to note, however, at least in false confession cases, that this language is typically inserted only at the end stages of an interrogation, at which point the suspect has already agreed to confess because s/he believes it to be in his or her best interest.[207] It is also not surprising to this expert that Mr. Chatman would be unwilling to report the physical abuse he had suffered previously. There is no compelling reason to think that Mr. Chatman believed he could have safely reported the abuse to ASA Holmes or Detective Roberts, given that he was being held by the same police department, under the same detention conditions, in the same room, in which the abuse occurred.

## VII. Conclusion

When Mr. Chatman was falsely identified (first via description and later from a lineup) by Mrs. Riggio, he quickly became the sole suspect in the alleged assault of Mrs. Riggio. Tunnel vision led investigators to focus on seemingly inculpatory evidence and ignore or minimize evidence that Mr. Chatman was not the perpetrator and/or evidence that the assault allegation was fabricated. Mr. Chatman, a cognitively challenged and mentally ill man, was subjected to an extended period of detention, during which time he was interrogated on and off for over 26 hours by multiple teams of interrogators. His repeated denials were ignored, and he was physically abused, threatened with violence, and confronted with false evidence of his guilt. In light of these circumstances, he eventually acquiesced and agreed to sign a confession statement handwritten by someone else, most likely because he came to believe that it was his only way out of the situation he found himself in.

Numerous known risk factors for false confession, supported by years of social science research, were present in Mr. Chatman's case, including evidence of investigator bias/tunnel vision, established individual suspect vulnerabilities, and questionable interrogation tactics (many of which contradicted acceptable police practice in 2002 and today).[208] The resulting

---

[205] Detective Roberts testimony at 8/13/2003 suppression hearing (p. A-39)

[206] ASA Holmes' 12/12/2014 deposition; This is particularly interesting in that Mr. Chatman also did not point out personally relevant substantive errors, such as the misspelling and mispronunciation of his wife's name, despite Detective Roberts' and ASA Holmes' claims that the entire statement was read aloud to Mr. Chatman as Mr. Chatman read along.

[207] Leo (2008)

[208] Physical abuse, threats of harm, prolonged interrogation, and contamination of the suspect's account violated standard police practice then and now (Inbau et al., 2001; 2013; Leo, 2008).

written confession statement not only lacked indicators of reliability, but was elicited under conditions and possessed characteristics that likely should have cued investigators that it was unreliable. Mr. Chatman's compliant false confession, like many false confessions, was convincing because it contained privileged information that seemed on the surface to be information that only the true perpetrator would know. Unfortunately, the probative value of that type of information is directly related to how that information was elicited. In this case, an innocent Mr. Chatman could only have been privy to those details via a process of contamination.

The opinions expressed in this report are based in part on the case specific materials I have reviewed. Should any new or additional information become available, my opinions about this case may change.

Sincerely,

Melissa B. Russano, Ph.D.

## VIII. References

Aamodt, M. G., & Custer, H. (2006). Who can best catch a liar? A meta-analysis of individual differences in detecting deception. *Forensic Examiner*, *15,* 6-11.

Abram, K. M., Teplin, L. A., & McClelland, G. M. (2003). Comorbidity of severe psychiatric disorders and substance use disorders among women in jail. *American Journal of Psychiatry, 160,* 1007–1010.

American Psychiatric Association. (1994). *Diagnostic and Statistical Manual of Mental Disorders-IV.* Washington, DC: American Psychiatric Association.

Appleby, S., & Kassin, S. (2011). *When confessions trump DNA: Relative impacts of self-report and DNA evidence on juror decisions.* Paper presented at the meeting of the American Psychology-Law Society, Miami, FL.

Baldwin, J. (1993). Police interview techniques: Establishing truth or proof? *British Journal of Criminology, 33,* 325–352.

Baumeister, R. F., & Leary, M. R. (1996). The need to belong: Desire for interpersonal attachments as a fundamental human motivation. *Psychological Bulletin, 117,* 497–529.

Bedau, H. A., & Radelet, M. L. (1987) Miscarriages or justice in potentially capital cases. *Stanford Law Review, 40,* 21-179.

Blagrove, M. (1996). Effects of length of sleep deprivation on interrogative suggestibility. *Journal of Experimental Psychology: Applied, 2,* 48–59.

Blair, J. P. (2005). A test of the unusual false confession perspective: Using cases of proven false confessions. *Criminal Law Bulletin, 41,* 127-144.

Cialdini, R. B. (2001). Influence: Science and practice (4th ed.). Needham Heights, MA: Allyn & Bacon.

Cialdini, R.B. (1993). *Influence: The psychology of persuasion* (Revised edition). New York: Quill.

Clare, I.C.H., & Gudjonsson, G.H. (1995). The vulnerability of suspects with intellectual disabilities during police interviews: A review and experimental study of decision-making. *Mental Handicap Research, 8*, 110-128.

Cloud, M., Shepherd, G.B., Barkoff, A.N., & Shur, J.V. (2002). Words without meaning: The Constitution, confessions, and mentally retarded suspects. *University of Chicago Law Review, 69*, 495-624.

DeClue, G., & Rogers, C. S. (2015). The Inside Information Checklist (IIC). *The Police Chief*, *82,* 50-56.

DePaulo, B. M., Lindsay, J. L., Malone, B. E., Muhlenbruck, L., Charlton, K. & Cooper, H. (2003). Cues to deception. *Psychological Bulletin, 129,* 74–118.

Drizin, S. A., & Leo, R. A. (2004). The problem of false confessions in the post-DNA world. *North Carolina Law Review, 82,* 891-1007.

Evans, J. R., Meissner, C. A., Ross, A. B., Houston, K. A., Russano, M. B., & Horgan, A. J. (2013). Obtaining guilty knowledge in human intelligence interrogations: Comparing accusatorial and information-gathering approaches with a novel experimental paradigm. *Journal of Applied Research in Memory and Cognition, 2,* 83-88.

Everington, C., & Fulero, S. (1999). Competence to confess: Measuring understanding and suggestibility of defendants with mental retardation. *Mental Retardation, 37,* 212–220.

Finlay, W., & Lyons, E. (2002). Acquiescence in interviews with people who have mental retardation. *Mental Retardation, 40,* 14-29.

Fisher, R. P., & Geiselman, R.E. (1992). *Memory enhancing techniques for investigative interviewing: The Cognitive Interview.* Springfield III: Charles C. Thomas.

Frenda, S. J., Berkowitz, S. R., Loftus, E. F., & Fenn, K. M. Sleep deprivation and false confessions. *Proceedings of the National Academy of Sciences, 113,* 2047-2050.

Fulero, S. M., & Everington, C. (2004). Mental retardation, competency to waive Miranda rights, and false confessions. In G.D. Lassiter (Ed.), *Interrogations, confessions, and entrapment* (pp. 163-179). New York: Kluwer Academic.

Garrett, B. L. (2010). The substance of false confessions. *Stanford Law Review, 62,* 1051-1119.

Granhag, P. A., & Strömwall, L. A. (2004). *The detection of deception in forensic contexts.* Cambridge, Cambridge University Press.

Gudjonsson, G. H. (2003). *The psychology of interrogations and confessions: A handbook.* Chichester, England: Wiley.

Gudjonsson, G. H. (1990). One hundred alleged false confession cases: Some normative data. *British Journal of Clinical Psychology, 29,* 249-250.

Gudjonsson, G. H. (2010). The psychology of false confessions: A review of the current evidence. In G. D. Lassiter & C. A. Meissner (Eds.) *Police Interrogations and False confessions: Current Research, Practice and Policy Recommendations* (pp. ???-???). ???

Gudjonsson, G. H., & Sigurdsson, J. F. (1999). The Gudjonsson Confession Questionnaire

Revised: Factor structure and its relationship with personality. *Personality and Individual Differences, 27*, 953-968.

Harrison, Y., & Horne, J. A. (2000). The impact of sleep deprivation on decision making: A review. *Journal of Experimental Psychology: Applied, 6,* 236–249.

Herrnstein, R. J. (1970). On the law of effect. *Journal of the Experimental Analysis of Behavior, 7,* 243–266.

Herrnstein, R. J., Rachlin, H., & Laibson, D. I. (Eds.). (1997). *The matching law: Papers in psychology and economics.* New York: Russell Sage Foundation.

Horgan, A. J., Russano, M. B., Meissner, C. A., & Evans, J. R. (2012). Minimization and maximization techniques: Assessing the perceived consequences of confessing and confession diagnosticity. *Psychology, Crime, & Law, 18,* 65-78.

Horselenberg, R., Merckelbach, H., & Josephs, S. (2003). Individual differences and false confessions: A conceptual replication of Kassin and Kiechel (1996). *Psychology, Crime and Law, 9,* 1-18.

Horselenberg, R., Merckelbach, H., Smeets, T., Franssens, D., Ygram Peters, G-J., & Zeles, G. (2006). False confessions in the lab: Do plausibility and consequences matter? *Psychology, Crime and Law, 12,* 61-75.

Inbau, F. E., Reid, J. E., Buckley, J. P., & Jayne, B. C. (2001). *Criminal interrogation and confessions* (4th ed.). Gaithersberg, MD: Aspen.

Inbau, F. E., Reid, J. E., Buckley, J. P., & Jayne, B. C. (2013). *Criminal interrogation and confessions* (5th ed.). Burlington, MA: Jones & Bartlett.

Irving, B. (1980). *Police interrogation. A case study of current practice. Research Studies No 2.* London: HMSO.

Kassin, S. M. (2007). Expert testimony on the psychology of confessions: A pyramidal model of the relevant science. In E. Borgida & S. Fiske (Eds.), *Psychological Science in Court: Beyond Common Knowledge* (pp. 195-218). Oxford, England: Blackwell Publishing.

Kassin, S. M. (2005). On the psychology of confessions: Does innocence put innocents at risk? *American Psychologist, 60,* 215–228.

Kassin, S. M., Drizin, S., Grisso, T., Gudjonsson, G., Leo, R., & Redlich, A. (2010). Police induced confessions: Risk factors and recommendations. *Law and Human Behavior, 34*, 3-38.

Kassin, S. M., Goldstein, C. J., & Savitsky, K. (2003). Behavioral confirmation in the

interrogation room: On the dangers of presuming guilt. *Law and Human Behavior, 27,* 187–203.

Kassin, S. M., & Gudjonsson, G. H. (2004). The psychology of confession evidence: A review of the literature and issues. *Psychological Science in the Public Interest, 5,* 35–69.

Kassin, S. M., & Kiechel, K. L. (1996). The social psychology of false confessions: Compliance, internalization, and confabulation. *Psychological Science, 7,* 125–128.

Kassin, S. M., Leo, R. A., Meissner, C. A., Richman, K. D., Colwell, L. H., Leach, A-M., & La Fon, D. (2007). Police interviewing and interrogation: A Self-report survey of police practices and beliefs. *Law and Human Behavior, 31,* 381-400.

Kassin, S. M., Meissner, C. A., & Norwick, R. J. (2005). "I'd know a false confession if I saw one": A comparative study of college students and police investigators. *Law and Human Behavior, 29,* 211-227.

Kassin, S. M., & McNall, K. (1991). Police interrogations and confessions: Communicating promises and threats by pragmatic implication. *Law and Human Behavior, 15,* 233–251.

Kassin, S. M., & Neumann, K. (1997). On the power of confession evidence: An experimental test of the ''fundamental difference'' hypothesis. *Law and Human Behavior, 21,* 469–484.

Kassin, S. M., & Wrightsman, L. S. (1985). Confession evidence. In S. Kassin & L. Wrightsman (Eds.), *The psychology of evidence and trial procedure* (pp. 67–94). Beverly Hills, CA: Sage.

Klaver, J., Lee, Z., & Rose, V. G. (2008). Effects of personality, interrogation techniques and plausibility in an experimental false confession paradigm. *Legal and Criminological Psychology, 13,* 71–88.

Leo, R. A. (2008). *Police Interrogation and American Justice*. Cambridge, MA: Harvard University Press.

Leo, R. A. (2004). The third degree and the origins of psychological interrogation in the United States. In G.D. Lassiter (Ed.), *Interrogations, confessions, and entrapment* (pp. 37-84). New York: Kluwer Academic.

Leo, R. A. & Drizin, S. A. (2010). The three errors: Pathways to false confession and wrongful conviction. In G. D. Lassiter & C. Meissner's (Eds.), *Police Interrogations and False Confessions: Current Research, Practice, and Policy Recommendations* (pp. 9-30). Washington, DC: APA.

Leo, R. A., & Ofshe, R. J. (1998). The consequences of false confessions: Deprivations of liberty

and miscarriages of justice in the age of psychological interrogation. *Journal of Criminal Law and Criminology, 88*, 429-496.

Meissner, C. A., Hartwig, M., & Russano, M. B. (2010). The need for a positive psychological approach and collaborative effort for improving practice in the interrogation room. *Law and Human Behavior, 34,* 43-45.

Meissner, C. A., & Kassin, S. M. (2002). "He's guilty!" Investigator bias in judgments of truth and deception. *Law and Human Behavior, 26,* 469–480.

Meissner, C. A., & Kassin, S. M. (2004). "You're guilty, so just confess!" Cognitive and confirmational biases in the interrogation room. In G. D. Lassiter. (Ed.), *Interrogations, confessions, and entrapment* (pp. 85–106). New York: Kluwer Academic.

Meissner, C. A., & Russano, M. B. (2003). The psychology of interrogations and false confessions: Research and recommendations. *Canadian Journal of Police & Security Services, 1,* 53-64.

Memon, A., Vrij, A. & Bull, R. (2003). Psychology and law: Truthfulness, accuracy and credibility (2nd ed.). Chichester: Wiley.

Meyer, R.G., & Youngjohn, J.R. (1991). Effects of feedback and validity expectancy on response in a lie detector interview. *Forensic Reports, 4*, 235-244.

Mortimer, A., & Shepherd, E. (1999). Frames of mind: Schemata guiding cognition and conduct in the interviewing of suspected offenders. In A. Memon and R. Bull (Eds), *Handbook of the psychology of interviewing* (p. 293-315). Chichester: Wiley.

Narchet, F. M., Coffman, K. A., Russano, M. B., & Meissner, C. M. (2004, November). *A comparative analysis of classic and modern day interrogation manual*s. Paper presented at the American Society of Criminology 2004 Annual Conference, Nashville, Tennessee.

Narchet, F. M., Meissner, C. M., & Russano, M. B. (2011). Modeling the effects of investigator bias on the elicitation of true and false confessions. *Law and Human Behavior, 35,* 452-465. doi: 10.1007/s10979-010-9257-x

Nash, R.A., & Wade, K.A. (2009). Innocent but proven guilty: Using false video evidence to elicit false confessions and create false beliefs. *Applied Cognitive Psychology, 23,* 624-637.

O'Connell, M. J., Garmoe, W., & Goldstein, N. E. S. (2005). Miranda comprehension in adults with mental retardation and the effects of feedback style on suggestibility. *Law and Human Behavior, 29,* 359–369.

Ofshe, R. J., & Leo, R. A. (1997a). The social psychology of police interrogation: The theory

and classification of true and false confessions. *Studies in Law, Politics, and Society, 16,* 189–251.

Ofshe, R. J., & Leo, R. A. (1997b). The decision to confess falsely: Rational choice and irrational action. *Denver University Law Review, 74,* 979–1122

Perillo, J. T., & Kassin, S. M. (2011). Inside interrogation: The lie, the bluff, and false confessions. *Law and Human Behavior, 35*, 327-337.

Perlman, N.B., Ericson, K., Esses, V., & Isaacs, B. (1994). The developmentally handicapped witness: Competency as a function of question format. *Law and Human Behavior, 18*, 171-187.

Perske, R. (2004). Understanding persons with intellectual disabilities in the criminal justice system: Indicators of progress? *Mental Retardation, 42,* 484–487

Pilcher, J. J., & Huffcut, A. (1996). Effects of sleep deprivation on performance: A meta-analysis. *Sleep, 19,* 318–326.

Rachlin, H. (2000). *The science of self-control.* Cambridge, MA: Harvard University Press.

Redlich, A. D. (2007). Double jeopardy in the interrogation room: Young age and mental illness. *American Psychologist, 62,* 609–611.

Redlich, A.D., & Goodman, G.S. (2003). Taking responsibility for an act not committed: The influence of age and suggestibility. *Law and Human Behavior, 27,* 141-156.

Reynolds, B. (2006). A review of delay-discounting research with humans: Relations to drug use and gambling. *Behavioural Pharmacology, 17,* 651-667.

Rogers, R., Harrison, K., Hazelwood, L, & Sewell, K., (2007). Knowing and intelligent: A study of Miranda warnings in mentally disordered defendants. *Law & Human Behavior, 31*, 401-418.

Russano, M. B., Meissner, C. M., Narchet, F. M., & Kassin, S. M. (2005). Investigating true and false confessions within a novel experimental paradigm. *Psychological Science, 16,* 481-486.

Sigurdsson, J. F., & Gudjonsson, G. H. (2001). False confessions: The relative importance of psychological, criminological and substance abuse variables. *Psychology, Crime and Law, 7,* 275–289.

Shaw, J.A., & Budd, E.D. (1982). Determinants of acquiescence and nay saying of mentally retarded persons. *American Journal of Mental Deficiency, 87*, 108-110.

Stansbury v. California, 511 U.S. 318 (1994).

Steblay, N. M. (1997). Social influence in eyewitness recall: A meta-analytic review of lineup instruction effects. *Law & Human Behavior, 21,* 283-297.

Suedfeld, P. (1990). *Psychology and torture.* Washington, DC: Hemisphere.

Tavris, C., & Aronson, E. (2007). *Mistakes were made (but not by me): Why we justify foolish beliefs, bad decisions and hurtful acts.* New York: Harcourt.

Trope, Y. & Liberman, A. (1996). Social hypothesis testing: Cognitive and motivational mechanisms. In E. Higgins & A. Kruglanski (Eds.) *Social psychology: Handbook of basic principles* (p. 239-270). Guilford Press: New York, NY.

Vrij, Mann, & Fisher (2006). An Empirical Test of the Behaviour Analysis Interview. *Law & Human Behavior, 30,* 329-345.

Vrij, A. (2008). *Detecting lies and deceit: Pitfalls and opportunities* (2nd ed.). Chichester: John Wiley and Sons.

Wald, M., Ayres, R., Hess, D. W., Schantz, M., & Whitebread, C. H. (1967). Interrogations in New Haven: The impact of Miranda. *The Yale Law Journal, 76,* 1519–1648.

**IX. Appendix**

A. Curriculum vita

B. List of publications

C. Testimony provided

Appendix A

CURRICULUM VITAE
MELISSA BETH RUSSANO

## CONTACT INFORMATION

Roger Williams University                 Telephone: 401-254-3878
School of Justice Studies                   Fax: 401-254-3431
One Old Ferry Road                      Email: mrussano@rwu.edu
Bristol, RI 02809

## EDUCATION

| | |
|---|---|
| 2004 | Ph.D. in Psychology<br>Florida International University<br>Dissertation Topic: *True and False Confessions to an Intentional Act: A Novel Experimental Paradigm* |
| 2001 | M.S. in Psychology<br>Florida International University<br>Thesis Topic: *Close Relationships, Equity Theory, and Forgiveness* |
| 1999 | B.A. in Psychology, Minor in Spanish<br>University of Virginia<br>Graduated with Highest Distinction<br>Distinguished Majors Thesis Topic: *Maternal versus Fetal Rights: Substance Use during Pregnancy* |

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2016 – Present | Professor of Criminal Justice<br>School of Justice Studies, Roger Williams University |
| 2010 – 2016 | Associate Professor of Criminal Justice<br>School of Justice Studies, Roger Williams University |
| 2004 – 2010 | Assistant Professor of Criminal Justice<br>School of Justice Studies, Roger Williams University |
| 2000 - 2002 | Graduate Research Assistant, Psychology & Law Laboratory, Department of Psychology, Florida International University; NSF Grant: *Investigator bias in identification procedures: Mechanisms and safeguards*; PIs: Margaret Bull Kovera, Ph.D., & Brian L. Cutler, Ph.D. |
| 1999 – 2000 | Teaching Assistant; Department of Psychology; Florida International University; Courses: Abnormal Psychology; Attitudes and Social Behavior |

GRANTS, AWARDS, & HONORS

| | |
|---|---|
| 2015-2016 | U.S. Department of Justice, Federal Bureau of Investigation ($98,063). *Training of Science-Based Methods of Interrogation: A Follow-Up Analysis* (PI with C. Meissner at Iowa State University). |
| 2015-2016 | U.S. Department of Justice, Federal Bureau of Investigation ($108,170). *Interpreter-Facilitated Interrogations: Identifying Strategies for Maximizing Success* (co-PI with K. Houston at Texas A&M International University). |
| 2014-2015 | U.S. Department of Justice, Federal Bureau of Investigation ($104,178). *Assessing Accusatorial vs. Informational-Gathering Approaches to HUMINT Collection via an Interpreter* (PI with K. Houston at Texas A&M International University). |
| 2013-2014 | U.S. Department of Justice, Federal Bureau of Investigation ($116,240). *Investigating Interpreter-Target Rapport and Interpreter Placement in the HUMINT Context* (co-PI with K. Houston at the University of Texas at El Paso). |
| 2012-2013 | U.S. Department of Justice, Federal Bureau of Investigation ($82,279). *Structured Interviews of Experienced Analysts and Linguists* (Principal Investigator). |
| 2011-2012 | U.S. Department of Justice, Federal Bureau of Investigation ($55,840). *Structured Interviews of High-Value Detainee Interrogators* (Principal Investigator). |
| 2010 - 2011 | U.S. Department of Justice, Federal Bureau of Investigation ($187,776). *Structured Interviews on Interrogative Practices/Efficacy Involving Interrogators across U.S. Military and Federal Agencies* (Principal Investigator). |
| 2008 – 2011 | U.S. Department of Defense ($413,359). *Phase 2: Development of Evidence-Based Methods that Improve the Diagnostic Value of Interrogative Information* (co-PI with C. Meissner at the University of Texas at El Paso). |
| 2007 – 2009 | U.S. Department of Defense ($191,390). *Phase 1: Development of Evidence-Based Methods that Improve the Diagnostic Value of Interrogative Information* (co-PI with C. Meissner at the University of Texas at El Paso). |
| 2006 | Roger Williams University Outstanding Woman on Campus |
| 2005 | Roger Williams University Justice System Training & Research Institute ($8,536). *Police interrogation practices: A survey of law enforcement* (co-PI with F. Narchet at the University of New Haven). |
| 2001 | American-Psychology Law Society (Division 41 of APA) Grant-in-Aid ($500). *Perceptions of interrogations and confessions within the criminal justice community: An experimental study of defense attorneys, prosecutors, and jurors.* |

46

2001            Florida International University Graduate Student Association Grant
                ($500). *Perceptions of interrogations and confessions within the criminal justice
                community: An experimental study of defense attorneys.*

<u>PUBLICATIONS</u>

Houston, K. A., Russano, M. B., Ricks, E. P. (revise and resubmit). "Any friend of
        yours is a friend of mine": Investigating the utilization of an interpreter in an
        investigative interview. *Psychology, Crime and Law.*

Narchet, F. M., Russano, M. B., Kleinman, S. M., & Meissner, C. M. (2015). A
        (nearly) 360° perspective of the interrogation process: Communicating with high-
        value targets. In G. Oxburgh, T. Myklebust, T. Grant & B. Milne (Eds.) ,
        *Communication in Investigative and Legal Contexts: Integrated Approaches from Forensic
        Psychology, Linguistics and Law Enforcement.* John Wiley & Sons, Ltd, Chichester, UK.
        doi: 10.1002/9781118769133.ch8

Russano, M. B., Narchet, F. M., & Kleinman, S. M. (2014). Analysts, interpreters
        and intelligence interrogations: Perceptions and insights. *Applied Cognitive
        Psychology, 28,* 829-846. doi:10.1002/acp.3070

Russano, M. B., Narchet, F. M., Kleinman, S. M., & Meissner, C. M. (2014).
        Structured interviews of experienced HUMINT interrogators. *Applied Cognitive
        Psychology, 28,* 847-859. doi:10.1002/acp.3069

Evans, J. R., Meissner, C. A., Ross, A. B., Houston, K. A., Russano, M. B., & Horgan,
        A. J. (2013). Obtaining guilty knowledge in human intelligence
        interrogations: Comparing accusatorial and information-gathering approaches
        with a novel experimental paradigm. *Journal of Applied Research in Memory and
        Cognition, 2,* 83-88. doi: 10.1016/j.jarmac.2013.03.002

Horgan, A. J., Russano, M. B., Meissner, C. A., & Evans, J. R. (2012). Minimization
        and maximization techniques: Assessing the perceived consequences of
        confessing and confession diagnosticity. *Psychology, Crime, & Law, 18,* 65-78.
        doi: 10.1080/1068316X.2011.561801

Narchet, F. M., Meissner, C. M., & Russano, M. B. (2011). Modeling the effects of
        investigator bias on the elicitation of true and false confessions. *Law and Human
        Behavior, 35,* 452-465. doi: 10.1007/s10979-010-9257-x

Evans, J. R., Meissner, C. A., Brandon, S. E., Russano, M. B., & Kleinman, S. M.
        (2010). Criminal versus HUMINT interrogations: The importance of
        psychological science to improving interrogative practice. *Journal of Psychiatry
        & Law, 38,* 215-249.

Meissner, C. A., Hartwig, M., & Russano, M. B. (2010). The need for a positive
        psychological approach and collaborative effort for improving practice in the
        interrogation room. *Law and Human Behavior, 34,* 43-45. doi: 10.1007/s10979-009-9205-9

Meissner, C. A., Russano, M. B., & Narchet, F. M. (2010). The importance of a
        laboratory science for improving the diagnostic value of confession evidence. In

G. D. Lassiter & C. Meissner's (Eds.), *Police Interrogations and False Confessions: Current Research, Practice, and Policy Recommendations* (pp. 111-126). Washington, DC: APA. doi: 10.1037/12085-007

Evans, J. R., Schreiber Compo, N., & Russano, M. B. (2009). Intoxicated witnesses and suspects: Procedures and prevalence according to law enforcement. *Psychology, Public Policy, and Law, 15,* 194-221. doi: 10.1037/a0016837

Russano, M. B. (2008). Juries and the dynamite charge. In B. L. Cutler's (Ed.), *Encyclopedia of Psychology and Law, Vol. 1,* 245-247. Sage Publications.

Russano, M. B., Dickinson, J. J., Greathouse, S. M., & Kovera, M. B. (2006). "Why don't you take another look at number three?" Investigator knowledge and its effects on eyewitness confidence and identification decisions. *Cardozo Public Law, Policy and Ethics Journal, 4,* 355-379.

Russano, M. B. (2006). "It's really in your best interest to cooperate…". [Review of the book *Interrogations, confessions and entrapment*]. *Applied Cognitive Psychology, 20,* 131-133.

Russano, M. B., Meissner, C. M., Narchet, F. M., & Kassin, S. M. (2005). Investigating true and false confessions within a novel experimental paradigm. *Psychological Science, 16,* 481-486. doi: 10.1111/j.0956-7976.2005.01560.x

Meissner, C. A., & Russano, M. B. (2003). The psychology of interrogations and false confessions: Research and recommendations. *Canadian Journal of Police & Security Services, 1,* 53-64.

Kovera, M. B., Russano, M. B., McAuliff, B. D. (2002). Assessment of the commonsense psychology underlying Daubert: Legal decision makers' abilities to evaluate expert evidence in hostile work environment cases. *Psychology, Public Policy, and Law, 8,* 180-200.

Russano, M., & Kovera, M. B. (2000). Supreme Court revisits Miranda warnings. *Monitor on Psychology, 31(3),* 7.

CONFERENCE PRESENTATIONS

Meissner, C. M., & Russano, M. B. (2016, May). *A field validation of the cognitive interview as a science-based approach to suspect interrogations.* Paper presented at the Fishschrift ~ Applied Cognition and the Cognitive Interview: A Conference in Honor of Dr. Ron Fisher, Miami, FL.

Houston, K. A., Russano, M. B., Alexander, J., & Garcia, S. (2016, March). *Assessing accusatorial vs. information-gathering approaches to HUMINT collection via an interpreter.* Paper presented at the American Psychology-Law Society Conference, Atlanta, GA.

Narchet, F. M., Russano, M. B., Yasuhara, K., Newcity, L., & Axelrod, R. (2015, November). *An analysis of modern-day police interrogation manuals.* Paper presented at the American Society of Criminology 2015 Annual Conference, Washington, D.C.

Meissner, C. A., & Russano, M. B. (2015, October). *A training validation and field assessment of science-based methods of interrogation*. Paper presented at the 5th Annual High-Value Detainee Interrogation Group Research Symposium, Washington, D.C.

Houston, K. A., Russano, M. B., & Ricks, P. (June, 2015). *What is rapport? Questions of measurement and definition*. Paper presented at the 2015 conference of the Society for Applied Research in Memory and Cognition, Victoria, Canada.

Houston, K. A., Russano, M. B., & Ricks, P. (2015, March). *Interpreter facilitated communication: Relationship dynamics and seating configuration*. Paper presented at the American Psychology-Law Society Conference, San Diego, CA.

Sneyd, D., & Russano, M. B. (2015, March). *Perceptions of revenge porn: The effect of gender, method of transmission, and revenge motivation*. Poster presented at the American Psychology-Law Society Conference, San Diego, CA.

Narchet, F. M., Russano, M. B., Kleinman, S. M., & Meissner, C. A. (2015, March). *A 360° degree perspective of the interrogative process: Factors associated with a successful interrogation*. Poster presented at the American Psychology-Law Society Conference, San Diego, CA.

Houston, K. A., Russano, M. B., & Ricks, E. (2014, October). *Interpreter-facilitated communication: Relationship dynamics and seating configuration*. Paper presented at the 4th Annual High-Value Detainee Interrogation Group Research Symposium, Washington, D.C.

Russano, M. B., Narchet, F. M., Kleinman, S. M., & Meissner, C. A. (2014, September). *Effectiveness of interrogation techniques: Perceptions of experienced interrogators, analysts and interpreters*. Poster presented at the 14th Annual Conference of the European Society of Criminology, Prague, Czech Republic.

Russano, M. B., & Narchet, F. M. (2014, March). *Letting them speak: Analyst and interpreter insights on the interview process*. Paper presented at the HIG Research Symposium, *Intelligence Interviewing: From Science to Practice*, Washington, D.C.

Russano, M. B., & Narchet, F. M. (2014, March). *Analysts and HUMINT interrogations: Role and perceptions*. Paper presented at the American Psychology-Law Society Conference, New Orleans, LA.

Russano, M. B., & Narchet, F. M. (2014, March). *Interpreters and HUMINT interrogations: Perceptions and insights*. Paper presented at the American Psychology-Law Society Conference, New Orleans, LA.

Russano, M. B., and Narchet, F. M. (2013, October). *Analysts and HUMINT Interrogations: Role and Perceptions*. Paper presented at the 3rd Annual High-Value Detainee Interrogation Group Research Symposium, Washington, D.C.

Russano, M. B., and Narchet, F. M. (2013, October). *Interpreters during HUMINT Interrogations: Perceptions and Insights*. Paper presented at the 3rd Annual High-Value Detainee Interrogation Group Research Symposium, Washington,

D.C.

Russano, M. B., and Narchet, F. M. (2013, March). *Interrogation practices and beliefs: Does high-value target experience matter?* Paper presented at the American Psychology-Law Society Conference, Portland, OR.

Russano, M. B., Narchet, F. M., Meissner, C., & Kleinman, S. M. (2012, March). *Structured interviews of expert military and intelligence interrogators: Training, rapport & lie detection.* Paper presented at the American Psychology-Law Society Conference, San Juan, Puerto Rico.

Russano, M. B., Narchet, F. M., Meissner, C. & Kleinman, S. M. (2011, November). *systematic study of interrogative practices across U.S. military and federal agencies.* Paper presented at the American Society of Criminology 2011 Annual Conference, Washington, D.C.

Russano, M. B., Narchet, F. M., & Correira, B. (2011, March). *Effect of crime type, citizenship status, ethnicity and location of interrogation on perceptions of enhanced interrogation.* Poster presented at the International Congress of Psychology & Law, Miami, FL.

Fountain, E. N., Schreiber Compo, N., Carlucci, M., & Russano, M. B. (2011, March). *Training to detect deception: Identifying physical signs of cognitive load.* Poster presented at the International Congress of Psychology & Law, Miami, FL.

Evans, J. R., Meissner, C. A., Russano, M. B. & Horgan, A. J. (2011, March). *The elicitation of guilty knowledge in intelligence interrogation settings: A novel experimental paradigm.* Paper presented at the International Congress of Psychology & Law, Miami, FL.

Evans, J. R., Meissner, C. A., & Russano, M. B. (2010, June). *The effectiveness of inquisitorial and accusatorial interrogation techniques at obtaining true and false confessions and information.* Paper presented at the European Association of Psychology and Law Conference, Gothenburg, Sweden.

Horgan, A. J., Russano, M. B., Meissner, C. A., & Evans, J. R. (2010, March). *"Should I just confess?": The perceived consequences of confessing and confession diagnosticity.* Paper presented at the American Psychology-Law Society Conference, Vancouver, BC.

Meissner, C.A., Russano, M. B., & Horgan, A. J. (2010, March). *The diagnostic efficacy of inquisitorial interrogative methods and their corollary benefit for credibility assessment.* Paper presented at the American Psychology-Law Society Conference, Vancouver, BC.

Narchet, F. M., & Russano, M. B. (2009, November). *The effect of crime type and citizenship on perceptions of torture.* Paper presented at the American Society of Criminology 2009 Annual Conference, Philadelphia, Pennsylvania.

Horgan, A. J., Russano, M. B., Meissner, C. A., Evans, J. R., & Michael, S. W. (2009,

March). *The ironic effects of the perception of consequences on beliefs about confession.* Poster presented at the 2009 American Psychology-Law Society Conference, San Antonio, TX.

Russano, M. B., & Narchet, F. M. (2008, March). *Police officers' beliefs about the interrogation process.* Poster presented at the 2008 American Psychology-Law Conference, Jacksonville, FL.

Narchet, F. M., Russano, M. B., & Griffin, J. (2008, March). *The effect of crime type on perceptions of "enhanced" interrogation techniques.* Poster presented at the 2008 American Psychology-Law Conference, Jacksonville, FL.

Peterson, E., & Russano, M. B. (2008, March). *The effect of false confession type of juror decision-making.* Poster presented at the 2008 American Psychology-Law Conference, Jacksonville, FL.

Russano, M. B., & Narchet, F. M. (2007, September). *The future of research on interrogations and confessions.* Paper presented at Interrogations & Confessions: A Conference Exploring Current Research, Practice and Policy, El Paso, TX.

Russano, M. B. (2007, June). *The psychology of police interrogations.* Paper presented at the 2007 Rhode Island Bar Association's Annual Meeting, Providence, RI.

Russano, M. B., & Narchet, F. M. (2007, March). Police officers' self-reported use of interrogation techniques. In J. Dickinson (Chair), *Police interrogations and confession evidence.* Symposium presented at Off the Witness Stand: Using Psychology in the Practice of Justice Conference, New York, NY.

Narchet, F. M., & Russano, M. B. (2007, March). Police officer training and perceptions of false confessions. In J. Dickinson (Chair), *Police interrogations and confession evidence.* Symposium presented at Off the Witness Stand: Using Psychology in the Practice of Justice Conference, New York, NY.

Russano, M. B., & Narchet, F. M. (2006, November). *Who's telling the truth? Police officers' perceptions of lying and truth-telling.* Paper presented at the American Society of Criminology 2006 Annual Conference, Los Angeles, CA.

Narchet, F. M., & Russano, M. B. (2006, June). *"Okay, I did it!": Theories of confession.* Paper presented at the Northeastern Association of Criminal Justice Sciences 2006 Annual Conference, Bristol, RI.

Russano, M. B., Shpurik, M., Kassin, S. M., & Berman, G. (2006, March). *An experimental study of defense attorneys' perceptions of interrogations and confessions.* Poster presented at the 2006 American Psychology-Law Society Conference, St. Petersburg, FL.

Mitchell, T. L., Russano, M. B., & Narchet, F. M. (2006, March). *The influence of race and crime on legal decision-making.* Poster presented at the 2006 American Psychology-Law Society Conference, St. Petersburg, FL.

Narchet, F. M., Meissner, C. M., & Russano, M. B. (2006, March). From the hot seat: An interrogation from the perspective of the suspect. Paper presented at the 2006 American Psychology-Law Society Conference, St. Petersburg, FL.

Russano, M. B., & Narchet, F. M. (2005, June). *The psychology of police interrogations and confessions.* Paper presented at the Northeastern Association of Criminal Justice Sciences 2005 Annual Conference, Bristol, RI.

Russano, M. B., Narchet, F. M., & Meissner, C. A. (2005, March). *Investigating the effects of presenting false evidence on true and false confessions.* Poster presented at the 2005 American Psychology-Law Society Conference, La Jolla, CA.

Narchet, F. M., Coffman, K. A., Russano, M. B., & Meissner, C. A. (2005, March). *A qualitative analysis of modern day police interrogation manuals.* Poster presented at the 2005 American Psychology-Law Society Conference, La Jolla, CA.

Narchet, F. M., Meissner, C. A., & Russano, M. B. (2005, March). *Modeling the role of investigator bias and interrogation techniques on the likelihood of confession.* Paper presented at the 2005 American Psychology-Law Society Conference, La Jolla, CA.

Russano, M. B., Narchet, F. M., & Meissner, C. M. (2004, November). *The effectiveness of three police interrogation techniques within a novel experimental paradigm.* Paper presented at the American Society of Criminology 2004 Annual Conference, Nashville, Tennessee.

Narchet, F. M., Coffman, K. A., Russano, M. B., & Meissner, C. M. (2004, November). *A comparative analysis of classic and modern day interrogation manual*s. Paper presented at the American Society of Criminology 2004 Annual Conference, Nashville, Tennessee.

Russano, M. B., Meissner, C.A., & Kassin, S. M. (2004, March). *True and false confessions to an intentional act: The effects of two common police tactics.* Paper presented at the American Psychology-Law Society 2004 Biennial Conference, Scottsdale, Arizona.

Russano, M. B., Meissner, C. A., & Kassin, S. M. (2003, July). *True and false confessions to an intentional act: Preliminary results from a novel paradigm.* Poster presented at the 2003 International Psychology & Law Conference, Edinburgh, Scotland.

Russano, M. B., Dickinson, J. J., Cass, S., Kovera, M. B., & Culter, B. (2002, March). *Testing the effects of lineup administrator knowledge in simultaneous and sequential lineups.* Poster presented at the American Psychology-Law Society 2002 Biennial Conference, Austin, Texas.

Russano, M. B., & Kovera, M. B. (2001, August). *Psychologists' evaluations of valid and flawed psychological science.* Poster presented at the 109th Annual Convention of the American Psychological Association, San Francisco.

Russano, M. B., & Land, D. J. (2000, March). *Maternal versus fetal rights: Substance use by pregnant women.* Poster presented at the 108th Annual Convention of the American Psychological Association, Washington, D.C.

INVITED TALKS/COLLOQUIA

Federal Bureau of Investigation, High-Value Detainee Interrogation Group (October, 2015). Washington, DC.

Federal Bureau of Investigation, Language Services Division (July, 2014). Washington, DC.

High-Value Detainee Interrogation Group, Federal Bureau of Investigation (August, 2012). Washington, DC.

High-Value Detainee Interrogation Group Research Committee, Federal Bureau of Investigation (February, 2012). Washington, DC.

Rhode Island's Working Group on Electronic Recording of Custodial Interrogations (September, 2011). Providence, RI.

High-Value Detainee Interrogation Group, Federal Bureau of Investigation (August, 2011). Washington, DC.

High-Value Detainee Interrogation Group, Federal Bureau of Investigation (March, 2011). Miami, FL.

Rhode Island Senate Judiciary Committee (March, 2007). Providence, RI.

Rhode Island House of Representatives Judiciary Committee (March, 2007). Providence, RI.

Rhode Island Public Defender Conference on False Confessions: Confessions – False & Otherwise: How to Spot and Deal with Them (June, 2006). Providence, RI

Rhode Island House of Representatives Judiciary Committee (March, 2006). Providence, RI.

Rhode Island Senate Judiciary Committee (April, 2006). Providence, RI.

Rhode Island Continuing Legal Education Program for Criminal Defense Attorneys (October, 2005). Providence, RI.

Purchase College (March, 2004)

Westfield State College (March, 2004)

San Francisco State University (February, 2004)

Penn State McKeesport (February, 2004)

TEACHING EXPERIENCE

Introduction to Psychology
Introduction to Criminal Justice

Research Methods in Psychology
Research Methods in Criminal Justice
Legal Psychology
Social Psychology
Human Behavior in Perspective
Drugs, Society & Behavior
Undergraduate Independent Research
Witnesses, Suspects and Investigative Interviewing [graduate level]
Psychology and the Legal System [graduate level]
Survey of Research Methods [graduate level]
Critical Issues in Criminal Justice [graduate level - team-taught]
Criminal Justice System Overview [graduate level - team-taught]

DEPARTMENTAL AND UNIVERSITY SERVICE

RWU Human Subjects Review Board (June 2014-Present)
RWU External Grants Policy Committee (Fall 2013- Present)
RWU Healthcare Advisory Committee (Fall 2012-Spring 2013)
Honors Advisory Council (Fall 2012 – Spring 2013)
School of Justice Studies Curriculum Committee (Fall 2004 – Present; Chair – Fall 2007 – Fall 2010)
Faculty Senate Steering Committee (Fall 2012 – Spring 2013)
University Academics Appeals Committee (Fall 2008)
School of Justice Studies Faculty Search Committee (Co-Chair; Fall 2008–Spring 2009)
RWU Associate Provost Search Committee (Fall 2008)
RWU Student Evaluation of Teaching Ad-Hoc Committee (Spring 2008 – Fall 2008)
Roger Williams 2020: Strategic Planning Taskforce 1 (May 2007 – November 2007)
School of Justice Studies Academic Standards Committee (Fall 2004 – Present; Chair - Fall 2009 – Spring 2011)
School of Justice Studies Faculty Search Committee (Fall 2006 – Spring 2007)
Faculty Senate (Fall 2005 – Fall 2008)
Faculty Senate Academic Standards and Polices (August 2008 – Spring 2011)
Faculty Senate Curriculum Committee (Fall 2005 – May 2008)
RWU Academic Technology Committee (Fall 2004 – Spring 2005)

PROFESSIONAL SERVICE

Ad-hoc reviewer for *Applied Cognitive Psychology*
Ad-hoc reviewer for *Applied Psychology in Criminal Justice*
Ad-hoc reviewer for *Criminal Justice and Behavior*
Ad-hoc reviewer for *Journal of Experimental Psychology: Applied*
Ad-hoc reviewer for *Law & Human Behavior*
Ad-hoc reviewer for *Psychological Reports: Perceptual and Motor Skills*
Ad-hoc reviewer for *Psychology, Crime and Law*

Ad-hoc reviewer for *Journal of Criminal Justice and Popular Culture*
Ad-hoc reviewer for *International Journal of Police Science and Management*
Ad-hoc reviewer for Worth Publishers (textbook reviews)
Ad-hoc reviewer for SAGE Publications (textbook reviews)
Ad-hoc reviewer for *National Science Foundation*
Ad-hoc reviewer for *Netherlands Foundation for Scientific Research*
Ad-hoc reviewer for *American Psychology-Law Society Early Career Professional Grants-in-Aid Program*
Student Editorial Board, *Law & Human Behavior* (2001-2002)

Program Chair for Interrogations, Confessions and Deception for the 2013 American-Psychology-Law Society Conference in Portland, OR
Ad-hoc reviewer for the American Psychology-Law Society 2002, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012 & 2014 conferences
Ad-hoc reviewer for the American Psychological Association 2004 and 2007 conferences

PROFESSIONAL AFFILIATIONS

Association for Psychological Science
American Psychology–Law Society

Appendix B

**List of Publications**

Narchet, F. M., Russano, M. B., Kleinman, S. M., & Meissner, C. M. (2015). A (nearly) 360° perspective of the interrogation process: Communicating with high-value targets. In G. Oxburgh, T. Myklebust, T. Grant & B. Milne (Eds.) , *Communication in Investigative and Legal Contexts: Integrated Approaches from Forensic Psychology, Linguistics and Law Enforcement.* John Wiley & Sons, Ltd, Chichester, UK. doi: 10.1002/9781118769133.ch8

Russano, M. B., Narchet, F. M., & Kleinman, S. M. (2014). Analysts, interpreters and intelligence interrogations: Perceptions and insights. *Applied Cognitive Psychology, 28,* 829-846. doi:10.1002/acp.3070

Russano, M. B., Narchet, F. M., Kleinman, S. M., & Meissner, C. M. (2014). Structured interviews of experienced HUMINT interrogators. *Applied Cognitive Psychology, 28,* 847-859. doi:10.1002/acp.3069

Evans, J. R., Meissner, C. A., Ross, A. B., Houston, K. A., Russano, M. B., & Horgan, A. J. (2013). Obtaining guilty knowledge in human intelligence interrogations: Comparing accusatorial and information-gathering approaches with a novel experimental paradigm. *Journal of Applied Research in Memory and Cognition, 2,* 83-88. doi: 10.1016/j.jarmac.2013.03.002

Horgan, A. J., Russano, M. B., Meissner, C. A., & Evans, J. R. (2012). Minimization and maximization techniques: Assessing the perceived consequences of confessing and confession diagnosticity. *Psychology, Crime, & Law, 18,* 65-78. doi: 10.1080/1068316X.2011.561801

Narchet, F. M., Meissner, C. M., & Russano, M. B. (2011). Modeling the effects of investigator bias on the elicitation of true and false confessions. *Law and Human Behavior, 35,* 452-465. doi: 10.1007/s10979-010-9257-x

Evans, J. R., Meissner, C. A., Brandon, S. E., Russano, M. B., & Kleinman, S. M. (2010). Criminal versus HUMINT interrogations: The importance of psychological science to improving interrogative practice. *Journal of Psychiatry & Law, 38,* 215-249.

Meissner, C. A., Hartwig, M., & Russano, M. B. (2010). The need for a positive psychological approach and collaborative effort for improving practice in the interrogation room. *Law and Human Behavior, 34,* 43-45. doi: 10.1007/s10979-009-9205-9

Meissner, C. A., Russano, M. B., & Narchet, F. M. (2010). The importance of a laboratory science for improving the diagnostic value of confession evidence. In G. D. Lassiter & C. Meissner's (Eds.), *Police Interrogations and False Confessions: Current Research, Practice, and Policy Recommendations* (pp. 111-126). Washington, DC: APA. doi: 10.1037/12085-007

Evans, J. R., Schreiber Compo, N., & Russano, M. B. (2009). Intoxicated witnesses and suspects: Procedures and prevalence according to law enforcement. *Psychology, Public Policy, and Law, 15,* 194-221. doi: 10.1037/a0016837

Russano, M. B. (2008). Juries and the dynamite charge. In B. L. Cutler's (Ed.), *Encyclopedia of Psychology and Law, 1,* 245-247. Sage Publications.

Russano, M. B., Dickinson, J. J., Greathouse, S. M., & Kovera, M. B. (2006). "Why don't you take another look at number three?" Investigator knowledge and its effects on eyewitness confidence and identification decisions. *Cardozo Public Law, Policy and Ethics Journal, 4,* 355-379.

Russano, M. B. (2006). "It's really in your best interest to cooperate…". [Review of the book *Interrogations, confessions and entrapment*]. *Applied Cognitive Psychology, 20,* 131-133.

Russano, M. B., Meissner, C. M., Narchet, F. M., & Kassin, S. M. (2005). Investigating true and false confessions within a novel experimental paradigm. *Psychological Science, 16,* 481-486. doi: 10.1111/j.0956-7976.2005.01560.x

Meissner, C. A., & Russano, M. B. (2003). The psychology of interrogations and false confessions: Research and recommendations. *Canadian Journal of Police & Security Services, 1,* 53-64.

Kovera, M. B., Russano, M. B., McAuliff, B. D. (2002). Assessment of the commonsense psychology underlying Daubert: Legal decision makers' abilities to evaluate expert evidence in hostile work environment cases. *Psychology, Public Policy, and Law, 8,* 180-200.

Russano, M., & Kovera, M. B. (2000). Supreme Court revisits Miranda warnings. *Monitor on Psychology, 31,* 7.

<u>Appendix C</u>

**Testimony Provided**

*State of New York vs. Claude Bird* (2014) – Trial Testimony (Attorney Toni Marie Angeli)