1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

CARL CHATMAN,                    )

     Plaintiff,               )

  vs.                            ) No. 14-CV-02945

CITY OF CHICAGO, et al.,       )

     Defendants.              )

     The discovery deposition of BRIGHAM R.

TEMPLE, M.D., taken in the above-entitled cause,

before Donna L. Belpedio, Certified Shorthand

Reporter in the State of Illinois, on

February 23, 2015, commenced at the hour of

11:01 o'clock a.m., terminated at the hour of

1:15 o'clock p.m., at 2100 Phingsten Road,

Glenview, Illinois, pursuant to notice.

Reported By:  Donna L. Belpedio, CSR

License No.:  084-003754

EXHIBIT 19

BRIGHAM R. TEMPLE, M.D.

```
 1   APPEARANCES:
 2      LOEVY & LOEVY, by
        MR. RUSSELL AINSWORTH
 3      312 North May, Suite 100
        Chicago, Illinois  60607
 4      (312) 243-5900
        russell@loevy.com
 5         Representing the Plaintiff,
 6
        BOLLINGER, CONNOLLY, KRAUSE LLC, by
 7      MS. RACHEL D. KILEY
        500 West Madison Street, Suite 2430
 8      Chicago, Illinois 60661
        (312) 253-6200
 9      rkiley@bollingertrials.com
           Representing the Defendant,
10         Susan Riggio;
11
        DYKEMA, by
12      MR. PAUL A. MICHALIK
        10 South Wacker Drive, Suite 2300
13      Chicago, Illinois  60606
        (312) 876-1700
14      pmichalik@dykema.com
           Representing the Defendant,
15         City of Chicago:
16
        HINSHAW & CULBERTSON LLP, by
17      MS. V. BRETTE BENSINGER
        222 North LaSalle Street, Suite 300
18      Chicago, Illinois 60601
        (312) 704-3000
19      bbensinger@hinshawlaw.com
           Representing the defendant,
20         Sheriff's Office:
21      BORKAN & SCAHILL, by
        MS. KRISTA E. STALF
22      20 South Clark Street, Suite 1700
        Chicago, Illinois 60603
23      (312) 580-1030
        KStalf@borkanscahill.com
24         Representing the City of Chicago
```

```
 1              I N D E X
 2   WITNESS                      EXAMINATION
 3   BRIGHAM R. TEMPLE, M.D.
 4     By MS. KILEY                  5
 5     By MR. AINSWORTH                   46
 6     By MR. MICHALIK                    88
 7     By MS. STALF                       95
 8     By MS. KILEY (FURTHER)             98
 9     By MR. AINSWORTH (FURTHER)        102
10     By MS. KILEY (FURTHER)            104
11
12
13
14            E X H I B I T S
15   NUMBER                    MARKED FOR ID
16   Temple Deposition Exhibit
17     No. 1                         5
18     No. 2                        13
19     No. 3                        40
20     No. 4                        59
21
22
23
24
```

```
 1   APPEARANCES: (Cont'd.)
 2
 3      LOWIS & GELLEN, by
        MR. JOSEPH E. COMER
 4      200 West Adams Street, Suite 1900
        Chicago, Illinois 60606
 5      (312) 364-2500
        jcomer@lowis-gellen.com
 6         Representing the deponent,
           Brigham Temple, M.D.
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1        MS. KILEY:  Just for purposes of the record,
 2   before we get started, it's ten after 11:00.
 3   The deposition was supposed to start at 11:00.
 4   We have waited for the State's Attorney's
 5   office.  We e-mailed them and we haven't heard
 6   anything, so we are going to get started.
 7        (Witness sworn.)
 8        BRIGHAM R. TEMPLE, M.D.,
 9   called as a witness herein, having been first
10   duly sworn, was examined and testified as
11   follows:
12             EXAMINATION
13   BY MS. KILEY:
14   Q.  Can you, please, state and spell your
15   name for the record?
16   A.  Brigham Robert Temple, B-r-i-g-h-a-m,
17   T-e-m-p-l-e.
18   Q.  And you're a medical doctor, correct?
19   A.  Yes.
20   Q.  What type of medicine do you practice?
21   A.  Emergency medicine.
22        (Whereupon, Temple Deposition
23         Exhibit No. 1 was marked for
24         identification.)
```

BRIGHAM R. TEMPLE, M.D.

BY MS. KILEY:

1 Q. Your counsel had tendered to us a copy
of your Curriculum Vitae which we've marked as
Dr. Temple Exhibit No. 1.

Q. If you could take a look at that and
let us know if it's current and up to date, sir.

A. Yes.

Q. Just to go through it a little bit,
where did you attend college?

A. Brigham Young University.

Q. What year did you graduate?

A. I'd have to look at my Curriculum Vitae
if you don't mind. So that would have been
1994.

Q. And then where did you attend medical
school?

A. I went to Medical College of
Pennsylvania.

Q. Where did you obtain your post-graduate
training?

A. I trained at Northwestern University
for emergency medicine training.

Q. In what states are you licensed to
practice medicine?

6

A. Illinois and California.

Q. And at one point you had your license
in Indiana; is that correct?

A. Correct.

Q. Has that since expired?

A. Yes.

Q. Are you board certified?

A. Yes.

Q. And what's your board certification?

A. American Board of Emergency Medicine.

Q. At what hospitals do you have
privileges?

A. The four NorthShore University Health
Systems hospitals. So that would be Evanston
Hospital, Skokie Hospital, Glenbrook Hospital,
Highland Park Hospital, as well as Provena or
now Presence St. Joseph Hospital which is in
Elgin, Illinois, and I also have staff
privileges at Riverside Medical Center in
Kankakee, Illinois.

MS. STALF: For the record, I just got a
message that Tom Nowinski will not be attending.

MS. KILEY: Okay.

7

BY MS. KILEY:

Q. And when did you start working for the
NorthShore University Health System network?

A. If you don't include the time that I
was here for residency because part of the
Northwestern training was here when it was
called Evanston Northwestern Health Care. So if
we just include when I started working as an
attending, that would have been in 2004.

Q. And I noticed on your CV that you're
currently the director of emergency
preparedness; is that right?

A. That's correct.

Q. And what does that entail?

A. So I oversee all of the disaster
management plans for our corporation as well as
helping to oversee grant funding for Region 10
in Illinois and helping to make plans for
various entities in conjunction with agencies
here in Region 10.

Q. How much of your time is spent
clinically in the emergency room?

A. So I'm about two-thirds clinical time
and one-third administrative time.

8

Q. And I'm assuming at some point you were
100 percent clinical time; is that correct?

A. Yes.

Q. So when did that change where you were
doing one-third administrative, two-thirds
clinical?

A. So that particular percentage has been
about two years now. Prior to that, I would
have some smaller percentage of administrative
time versus clinical time. I've been doing
administrative time for, I'm going to estimate,
the last six years.

Q. Have you held any teaching positions
during the course of your career?

A. Yes.

Q. What are those?

A. I had a clinical appointment at
Northwestern University as a clinical instructor
of emergency medicine.

I also held a position there as a
clinical assistant professor of emergency
medicine, and I currently have a clinical
assistant professor of emergency medicine
appointment at the University of Chicago.

9

3 (Pages 6 to 9)

BRIGHAM R. TEMPLE, M.D.

1    Q.  Is there anything in particular you
2  would teach with respect to emergency medicine
3  or would you just be kind of covering all areas?
4    A.  Pretty much all areas with a few
5  focused lectures.
6    Q.  As an emergency room physician, have
7  you had occasion to treat victims of sexual
8  assault?
9    A.  Yes.
10    Q.  Over the entire course of your career,
11  about how many victims of sexual assault would
12  you say you treated?
13    A.  I would estimate two or three per year.
14    Q.  So what would the total of that be
15  during the course of your entire career?
16    A.  Approximately thirty.
17    Q.  Would that also include your
18  post-graduate training?
19    A.  So when I gave that number, that just
20  included from the time I became an attending
21  physician.  So if we included the time that I
22  spent at Northwestern as a resident, then you
23  can probably add another two to three victims
24  per year.

10

1    Q.  So what would that total then be?
2    A.  Probably 40 as an estimate.
3    Q.  Have you ever assisted in the
4  collection of a sexual assault evidence
5  collection kit?
6    A.  Yes.
7    Q.  In general terms, what is a sexual
8  assault evidence collection kit?
9    A.  It's a kit that's put forth by the
10  state for the collection of samples from a
11  patient who is being evaluated for sexual
12  assault.  Those samples are then used for
13  forensic and DNA testing.
14    Q.  It's my understanding that the rape
15  kits have a number of steps that are involved in
16  the process; is that correct?
17    A.  Yes.
18    Q.  And what are some of those steps?
19    A.  Those steps would include collecting
20  samples from the patient in areas that might
21  yield some, once again, forensic or DNA
22  evidence.
23      That would include things like hair
24  samples, scraping of fingernails, examination of

11

1  genital areas and appropriate swabs and testing
2  as per -- you know, whatever is deemed fit by
3  the physician and the staff that are caring for
4  that patient.
5    Q.  In May of 2002, you were the emergency
6  room physician at Northwestern Memorial
7  Hospital; is that correct?
8    A.  Yes.
9    Q.  On May 24, 2002 you had an occasion to
10  see a patient Susan Riggio; is that correct?
11    MR. AINSWORTH:  Object to the form of the
12  question, leading, but I'll let this one go.
13      I'm just going to put you on notice
14  that if I do object to leading and you attempt
15  to have this transcript be played in front of
16  the jury should the good doctor not be available
17  for trial, then we would move to strike any
18  leading questions from your examination.
19    MS. KILEY:  This is all background and
20  foundational, but I'll rephrase the question.
21  BY MS. KILEY:
22    Q.  Do you recall testifying in a criminal
23  prosecution involving a sexual assault with
24  Susan Riggio?

12

1    A.  Yes, I do.
2    Q.  Do you have a recollection as to
3  whether or not you treated Susan Riggio on
4  May 24, 2002?
5    A.  Yes, I do.
6    Q.  Do you have an independent recollection
7  of her?
8    A.  No.
9    Q.  Is it safe to say then that you'll be
10  relying on your records today?
11    A.  Yes.
12        (Whereupon, Temple Deposition
13         Exhibit No. 2 was marked for
14         identification.)
15  BY MS. KILEY:
16    Q.  I've given you what is Group Exhibit
17  No. 2, which is a copy of your records,
18  pertaining to Susan Riggio.  If you can just
19  take a look at those and make sure that it
20  contains everything.
21    A.  So the packet of paperwork which you've
22  handed me does appear to contain a full
23  reproduction of the chart that was used at
24  Northwestern at the time that I was working

13

BRIGHAM R. TEMPLE, M.D.

1 there.
2     Q.  And why was Ms. Riggio presenting to
3 Northwestern Hospital?
4     A.  According to the chart, for reported
5 sexual assault.
6     Q.  Do you know how she was transported
7 there?
8     A.  I'd have to look at the chart to see.
9     Q.  Go ahead.
10    A.  So it appears that she was transported
11 by Chicago Fire Department.
12    Q.  What was her demeanor when you first
13 encountered her?
14    A.  To my recollection looking at the
15 chart, she seemed distraught when I saw her.
16    Q.  If I can turn your attention to Page
17 Number Plaintiff's 015479, there's a summary of
18 findings at the top.
19        Do you see that?
20    A.  Yes, I do.
21    Q.  Is that your handwriting or is that
22 someone else's?
23    A.  That would be my handwriting.
24    Q.  According to this, the patient was
                                                    14

1     Q.  If you go about halfway down the page,
2 it indicates that she was tearful and in a fetal
3 position.
4        Is that consistent with your
5 recollection of Ms. Riggio?
6        MR. AINSWORTH:  Object to the form of the
7 question.  Leading.  Also object to the
8 foundation as to the time.
9        THE WITNESS:  Yes.
10 BY MS. KILEY:
11    Q.  And that's your recollection of how
12 Ms. Riggio presented to you when you encountered
13 her at Northwestern Hospital, correct?
14    A.  Yes.
15        MR. AINSWORTH:  Objection, leading.
16 BY MS. KILEY:
17    Q.  What would have been your first steps
18 in terms of treating Ms. Riggio?
19    A.  I would have followed my standard
20 operating procedure; get a history from the
21 patient and find out what was wrong.  That would
22 be followed by a physical exam and then any
23 appropriate testing that needed to be done.
24    Q.  So in terms of getting a history from
                                                    16

1 visibly shaken and traumatized; is that right?
2        MR. AINSWORTH:  Object to leading.
3        THE WITNESS:  According to what I wrote
4 here, that was my impression at the time I saw
5 her.
6 BY MS. KILEY:
7     Q.  Is that what you mean by distraught?
8     A.  Yes.
9     Q.  Do you know what time you first saw
10 her?
11    A.  Once again, I'd have to look at the
12 chart.
13    Q.  Okay.
14    A.  So it was at 8:45 a.m.
15    Q.  Do you remember if she was crying when
16 you first saw her?
17    A.  I don't remember offhand.
18    Q.  If I can point your attention to
19 Plaintiff's 015474, this is the emergency
20 nursing flow sheet; is that right?
21    A.  Correct.
22    Q.  Is that something that you rely on in
23 the course of your treatment of Ms. Riggio?
24    A.  Yes.
                                                    15

1 her, what is it that she indicated to you?
2     A.  Once again, I'll have to refer back to
3 what I wrote in the chart.
4        MR. AINSWORTH:  Would you just list, doctor,
5 what page you're looking at?
6        THE WITNESS:  That would be 015470.  The top
7 section it says, Chief complaint/HPI which
8 stands for history of present illness.  Chief
9 complaint is abbreviated by CC.
10        So I wrote chief complaint:  Sexual
11 assault.  History of present illness:  50-year
12 old female.  Status-post sexual assault at work
13 by unknown assailant.  Possible vaginal
14 penetration by penis or finger.  Patient bit
15 assailant.
16 BY MS. KILEY:
17    Q.  Did she have any complaints that she
18 was reporting of?
19    A.  Not to my recollection.
20    Q.  If I can point your attention to
21 halfway down the page, review of systems, is
22 there anything there that would indicate that
23 she was complaining of anything?
24    A.  It does note that I put that she had a
                                                    17

BRIGHAM R. TEMPLE, M.D.

1  headache.
2      Q.  After getting a history from
3  Ms. Riggio, what would be the next thing that
4  you would do?
5      A.  My standard operating procedure would
6  be to do a physical exam.
7      Q.  In terms of sexual assault and the rape
8  kit collection, what would be the first step
9  involving a physical examination?
10     A.  So that would typically be done in
11  conjunction with a nurse who has been assigned
12  to take care of that patient.  So to my
13  recollection, I don't recall who that nurse
14  would be, but from my standard practice, then
15  there would have been a nurse in the room with
16  me during that physical exam, and then that exam
17  would be documented here in this chart as well
18  as that would be at the same time any evidence
19  that needed to be collected for the kit that
20  goes to the state would have been done at that
21  time.
22     Q.  So it would have been you and the nurse
23  in the room; is that right?
24     A.  Correct.

18

1      Q.  Would Ms. Riggio have to disrobe?
2      A.  Yes.
3      Q.  Would there be anything on the ground
4  for purposes of a rape collection kit when she's
5  disrobing?
6      A.  I'm not sure what you mean by that.
7      Q.  For example, is anything put on the
8  ground before she disrobes for you to collect
9  potential evidence?
10     A.  There is inside of the kit a paper
11  sheet that is provided.  I believe it's made of
12  paper.  So that when somebody who is undergoing
13  an evaluation for a rape kit, they then disrobe
14  and put their clothing on that, and then that
15  clothing is folded up on that and then placed
16  into a bag.
17     Q.  And then the exam itself, does that
18  take place on an examination table?
19     A.  There's a hospital bed that we use in
20  patient rooms in the emergency department, but
21  yes, you can refer to that as an examination
22  table.
23     Q.  What would the physical examination
24  consist of?

19

1      A.  So that would consist of a standard
2  head to toe exam.  And in the case of someone
3  who is reporting possible sexual assault, that
4  would also include a genital exam if that's
5  warranted.
6      Q.  Let me just back up a second.
7          Do you remember anything about her
8  clothing?
9      A.  No, I do not.
10     Q.  And the head to toe physical
11  examination that you described, can you tell us
12  specifically what you would have done with
13  respect to the physical examination and if it
14  would have been performed by you versus the
15  nurse?
16     A.  So the head to toe physical exam would
17  be performed by myself, and I would have
18  performed my standard exam looking for evidence
19  of any trauma.  So that would include an
20  examination from basically head to toe.
21     Q.  Are you just physically observing her
22  at this point to see if you see any bruises or
23  lacerations?
24     A.  No.  There would also be an appropriate

20

1  exam where I would be touching, looking for
2  areas that may be tender or swollen.
3      Q.  And where would that be?
4      A.  Anywhere on the patient's physical body
5  that needed to be examined.
6      Q.  And then the genital examination, what
7  would that consist of?
8      A.  So the genital examination would
9  include an external exam.  So typically having
10  the patient lay on their back in a bed that
11  allows them to expose the genital area.
12     Q.  Would Ms. Riggio have been put in
13  stirrups so to speak?
14     A.  Correct.
15     Q.  So that her legs are spread?
16     A.  Yes.
17     Q.  And what else would that external
18  examination consist of?
19     A.  Examining all the skin around that
20  area, looking for evidence of skin abrasion,
21  laceration, swelling, bruising, redness.
22          There would also be some visual
23  inspection to see if there was any samples of
24  fluids or bodily fluids that may need to be

21

BRIGHAM R. TEMPLE, M.D.

1  obtained.
2      Q.  Would a speculum be used for that
3  examination?
4      A.  That would be used for the internal
5  exam of the genitalia in a woman.
6      Q.  So what would the internal examination
7  consist of that you performed on Ms. Riggio?
8      A.  So that would include the insertion of
9  a speculum.
10     Q.  Which is what, doctor?
11     A.  A speculum is a medical apparatus
12 that's used to improve visualization of the
13 cervix which is part of the uterus inside the
14 vaginal canal.  So that would be inserted.  And
15 then visual inspection to look for evidence of
16 bleeding or discharge would be done and samples
17 per the kit would be then obtained.
18     Q.  What type of samples per the kit would
19 be obtained?
20     A.  So in the kit are provided some sterile
21 cotton swabs and samples of any fluids or tissue
22 in the vaginal canal.  So you place those into
23 the vagina and --
24     Q.  I'll stop you for a second.
                                                    22

1      How would you go about doing that?  Is
2  that a Q-tip?
3      A.  Cotton swabs.  So these are all
4  provided in the kit.
5      Q.  Was that done both vaginally and
6  rectally?
7      A.  So I don't know if it was done rectally
8  or not.  I would have to look and see if that
9  was something that was done.
10     Q.  If you could take a look to see if that
11 was done, doctor, I would appreciate that.
12     A.  So I don't believe this paperwork will
13 tell us that.  That would have to be done based
14 on the list of contents that was taken when that
15 rape kit was open.
16     Q.  Did you perform a rectal examination?
17     A.  I don't recall.
18     Q.  Is there anything in your notes that
19 would indicate that?
20     And go ahead and take your time and
21 look through that, doctor.
22     A.  So according to my documentation on the
23 physical exam on Page 015470, I document that
24 there is no signs of penetration.  So that would
                                                    23

1  tell me that I must have at least done a visual
2  examination of the patient's rectal area.
3      Q.  But in terms of whether or not you
4  swabbed the rectal area, there's no way to tell
5  as you sit here today; is that correct?
6      A.  Yes.
7      Q.  Besides the swabbing of the vaginal
8  area, what else would you have done in terms of
9  taking samples?
10     A.  So the rest of the samples are
11 typically collected by the nurse.  So that would
12 include there's a standard list that's provided
13 in the kit.  That would include oral swabs.
14     Q.  What would that consist of?  How would
15 a nurse go about doing that?
16     A.  She would have the patient open their
17 mouth and then she places cotton swabs and swabs
18 inside the cheek.
19     Q.  What else?
20     A.  Fingernail scrapings.
21     Q.  And how would the nurse go about doing
22 that?
23     A.  They're provided a tool in which to do
24 scraping underneath the fingernails and then
                                                    24

1  those scrapings are collected.
2      Q.  What else?
3      A.  Hair samples.  So a small sample of
4  hair is taken.
5      Q.  Is that hair from the head or the pubic
6  area or both?
7      A.  Typically both.
8      Q.  Approximately how many hairs are
9  typically taken from the head?
10     A.  I'm not sure.
11     Q.  Do you know how much hair is taken from
12 the pubic area?
13     A.  So I believe that area is just combed.
14     Q.  Does the patient do that or does the
15 nurse do that?
16     A.  The nurse does that.
17     Q.  Any other test that would have been
18 performed either by you or by the nurse on
19 Ms. Riggio?
20     A.  There's blood testing that's done.  As
21 well as part of the vaginal exam, there's
22 testing for screening for sexually transmitted
23 disease, specifically gonorrhea and chlamydia.
24     Q.  Are the STD testing or the sexually
                                                    25

BRIGHAM R. TEMPLE, M.D.

1 transmitted disease testing, are those always
2 done as a matter of course?
3     A.  Yes.
4     Q.  In order for someone to go through a
5 rape kit, is that something that they have to
6 consent to?
7     A.  Yes.
8     Q.  So here Ms. Riggio consented to
9 undergoing this process; is that right?
10     A.  I don't know if I have that form in
11 this packet.  There's a specific form that the
12 patient checks on and signs.
13     Q.  Well, the fact here, doctor, that you
14 did the rape kit, is that suggestive to you that
15 Ms. Riggio did, in fact, consent?
16     A.  Yes.  From a hospital standpoint, if we
17 perform the testing in-hospital, we always get
18 consent from the patient prior to doing so.
19     MR. AINSWORTH:  76.
20 BY MS. KILEY:
21     Q.  So doctor, if we can take a look at
22 Page 76, is that Ms. Riggio's consent form?
23     A.  It appears to be.
24     Q.  Doctor, based on your description to us

26

1 of the rape kit collection process, the external
2 examination, the internal examination with the
3 speculum, the collection of vaginal swabs, the
4 hair samples, the combing of the pubic hair, is
5 it fair to say that this is an intrusive
6 process?
7     MR. AINSWORTH:  Objection, leading.
8     THE WITNESS:  Can you rephrase?
9 BY MS. KILEY:
10     Q.  Do you believe that the rape kit
11 collection process is an intrusive process for
12 the patient?
13     MR. AINSWORTH:  Objection, leading.
14     THE WITNESS:  I'm not quite sure how to
15 answer that question.
16 BY MS. KILEY:
17     Q.  Do you think that a woman enjoys
18 getting probed with a speculum and cotton swabs
19 and having her pubic hair combed?
20     MR. AINSWORTH:  Objection, form, calls for
21 speculation, form, leading.
22     THE WITNESS:  Once again, I'm not sure I can
23 answer that question.
24

27

1 BY MS. KILEY:
2     Q.  I am able to read the majority of your
3 handwriting, but I do have one question for you
4 on it.  If you can turn to 015475.
5     A.  Because that's not my handwriting.
6     Q.  And this is the emergency nursing flow
7 sheet; is that right?
8     A.  Yes.
9     Q.  And this is something that you would
10 rely upon in your examination and treatment of
11 Ms. Riggio?
12     A.  Correct.
13     Q.  In the nursing narrative, do you know
14 what that says or are you able to read that?
15     A.  Which part?  From the top?
16     Q.  Yes.  Why don't we do all of it if you
17 can.
18     A.  I will give you my best interpretation.
19 I can't give you 100 percent accuracy here.
20     To me it says, Rape kit collected.
21 Ambulatory to bathroom which is the standard
22 abbreviation for BR.  Gait steady.  UA which
23 stands for urinalysis collected.  Blood obtained
24 and sent.  CPD, which I believe stands for

28

1 Chicago Police Department, remains with patient,
2 and then there's a signature at the end of that.
3     And then it appears there's a different
4 set of handwriting, and that first line I can't
5 really tell you what that says.
6     The next one says, Urine dip and pH
7 5.0.  Small leukocytes, positive nitrates.
8 Small blood.  Spec gravity 1.005.  And it's once
9 again signed with somebody's initials.
10     Q.  What does that mean, small leukocytes,
11 positive nitrates?  That whole last line that
12 you just read.
13     A.  That is part of a lab analysis of the
14 urine to look for evidence of infection.
15     Q.  And was there any infection?
16     A.  So the indication of small leukocytes
17 and positive nitrates could indicate that the
18 patient may have a urinary infection.
19     Q.  What was the next line after that?
20     A.  After which line?
21     Q.  Under the nitrates.
22     A.  Under the nitrates it says, Specific
23 gravity.  So it says small blood.  Small is on
24 the line after the nitrates.  And then blood.

29

8 (Pages 26 to 29)

BRIGHAM R. TEMPLE, M.D.

1 And then the next piece of information should
2 say specific gravity 1.005. Specific gravity
3 just gives you an idea about the concentration
4 of urine.
5    Q.   What does the small blood mean?
6    A.   It just means there's a small amount of
7 blood in there. That's a nonspecific finding.
8    Q.   So there was a small amount of blood
9 found in her urine; is that right?
10    A.   According to this.
11    Q.   According to your chart, was Ms. Riggio
12 still menstruating or did she have a medical
13 condition that would prevent her from
14 menstruating?
15    A.   She had a prior hysterectomy.
16    Q.   So that would mean that she was not
17 menstruating; is that correct?
18    A.   Correct.
19    Q.   She was not capable of menstruating?
20    A.   Correct.
21    Q.   What were the results of your
22 examination of Ms. Riggio?
23    A.   I have to look at the chart and see.
24 So can you rephrase your question in terms of

30

1 what you're looking for with the results?
2    Q.   In terms of whether or not there were
3 any signs of -- strike that.
4       I think you already told us that she
5 was visibly shaken, is that right, in terms of
6 her demeanor?
7    A.   Yes.
8    Q.   In terms of physical signs of trauma,
9 were there any physical signs?
10    A.   If I refer to my chart, I don't see
11 that there were any physical signs.
12    Q.   I think you told us earlier that you
13 performed about 30 to 40 rape kits in the course
14 of your career; is that correct?
15    A.   Yes.
16    Q.   Of those, how many of them have been
17 adult women?
18    A.   All of them.
19    Q.   In terms of your experience, finding
20 physical trauma to the vaginal or rectal area,
21 is that a common or uncommon finding?
22       MR. AINSWORTH: Objection, foundation.
23       THE WITNESS: It's an uncommon finding.
24

31

1 BY MS. KILEY:
2    Q.   And that's based on your training,
3 education and experience, as well as your
4 working as an emergency room physician over the
5 years and encountering sexual assault victims;
6 is that correct?
7       MR. AINSWORTH: Objection, leading.
8       THE WITNESS: Yes.
9 BY MS. KILEY:
10    Q.   When you say it's uncommon to find
11 trauma to the vaginal or rectal area, what do
12 you mean by that?
13    A.   It's uncommon to find bleeding or
14 lacerations or abrasions or swelling.
15    Q.   Based on your experience in examining
16 victims of sexual assault, about how frequently
17 statistically do you actually find evidence of
18 vaginal or rectal trauma?
19       MR. AINSWORTH: Objection, foundation.
20       THE WITNESS: This would be purely based on
21 my experience with those that I've examined, so
22 I would say less than 10 percent.
23 BY MS. KILEY:
24    Q.   Is that consistent with published

32

1 statistics and medical literature?
2       MR. AINSWORTH: Object to the foundation and
3 to the form of the question.
4       THE WITNESS: So the medical literature
5 would say that there are no signs of trauma in
6 sexual assault victims in anywhere between 70
7 and 90 percent of victims.
8 BY MS. KILEY:
9    Q.   In terms of the medical literature, is
10 there any article or publication, textbook that
11 you can point us to in particular?
12    A.   You can look at Tintinalli's Emergency
13 Medicine. It's a very common emergency medicine
14 textbook.
15    Q.   Based on your experience and what may
16 be contained in the medical literature, is it
17 even less likely to find signs of trauma to the
18 vaginal or rectal area in a female who is in her
19 50's and married and sexual active?
20    A.   That, I couldn't answer you.
21    Q.   Let me ask it this way. If a -- strike
22 that.
23       Have you ever examined children who
24 have been sexually penetrated with an object?

33

BRIGHAM R. TEMPLE, M.D.

1    A.   Yes.
2    Q.   Are you familiar with medical
3  statistics regarding children that have been
4  raped or sexually abused and penetrated with an
5  object?
6    A.   No, not offhand.
7    Q.   Based on your experience and education,
8  would a child who was sexually penetrated either
9  by an object or a man show more signs of
10 physical trauma than a female who has been
11 sexually active, an adult female?
12   MR. AINSWORTH:  Objection, foundation.
13   THE WITNESS:  That, I couldn't answer for
14 you.  I don't know those statistics.
15 BY MS. KILEY:
16   Q.   Fair enough.
17     As a medical physician, would that make
18 sense to you that a child who has not lost her
19 virginity would be more likely to show signs of
20 vaginal trauma than a woman, let's say, in her
21 50's who has been sexually active during her
22 life?
23   MR. AINSWORTH:  Objection, incomplete
24 hypothetical.  Calls for speculation.

34

1    Q.   What do you mean by gross signs of
2  trauma?
3    A.   Specifically I wrote down here no
4  scratch marks, no contusions, no tears, no
5  bleeding.  The typical things that we would
6  document if there were no signs of trauma.
7    Q.   Based on your education and experience
8  examining victims of sexual assault, is it
9  common or uncommon to see evidence of trauma to
10 other parts of a woman's body like the arms and
11 back?
12   MR. AINSWORTH:  Objection, form, calls for
13 speculation.  Objection, foundation.
14   THE WITNESS:  So the statistics that we
15 quote on the 70 to 90 percent, I think that's
16 just overall signs of trauma.  So it would not
17 be unusual for someone who is involved in a
18 sexual assault to have no visible signs of
19 trauma anywhere on their body.
20 BY MS. KILEY:
21   Q.   Is that also consistent with your
22 experience in treating 30 to 40 women of sexual
23 assaults?
24   MR. AINSWORTH:  Objection to the form of the

36

1    THE WITNESS:  I couldn't answer that.
2  BY MS. KILEY:
3    Q.   So in your experience and based on
4  what's contained in the medical literature, less
5  than 10 percent of sexual assault victims have
6  medical findings of trauma to their vaginal or
7  rectal region?
8    MR. AINSWORTH:  Objection, compound.
9  Misstates the witness' testimony and leading.
10   THE WITNESS:  So the 10 percent or less was
11 based on my experience.
12 BY MS. KILEY:
13   Q.   And then the literature would be 70 to
14 90 percent of the times that the women do not
15 show signs of physical trauma to their
16 genitalia?
17   A.   Correct.
18   Q.   Did Ms. Riggio show signs of trauma to
19 the other areas of her body?
20   A.   I'd have to look at the chart again,
21 but to my recollection, no.
22     So according to my documented physical
23 exam on Page 015470, I do not document that
24 there were any other gross signs of trauma.

35

1  question.  Incomplete hypothetical.
2    THE WITNESS:  Yes.
3  BY MS. KILEY:
4    Q.   I think you did tell us that she did
5  complain of a headache, correct?
6    A.   Yes.
7    Q.   Did you give her any medication for the
8  headache?
9    A.   I believe the chart shows she was given
10 Motrin.
11   Q.   Bruising or bumps, is that sometimes
12 something that can take some time to develop?
13   MR. AINSWORTH:  Object to the form of the
14 question.
15   THE WITNESS:  Yes.
16 BY MS. KILEY:
17   Q.   That's not uncommon based on your
18 experience?
19   MR. AINSWORTH:  Object to the form of the
20 question.
21   THE WITNESS:  Correct.
22 BY MS. KILEY:
23   Q.   In this case, was there any evidence of
24 semen found on the vaginal swabs?

37

BRIGHAM R. TEMPLE, M.D.

1      A.   So I can't say on your question because
2   we don't do the analysis of the vaginal swabs.
3          What I can speak to is on the physical
4   exam.  I documented that there was no evidence
5   of semen.
6      Q.   Is that a common or uncommon finding?
7      MR. AINSWORTH:  Object to the form of the
8   question.  Calls for speculation.
9      THE WITNESS:  Once again, I don't know if
10  that's common or uncommon.  I couldn't answer
11  that.
12  BY MS. KILEY:
13     Q.   During the course of your career, is it
14  fair to say that sometimes when you do the
15  examination of the vaginal region, sometimes you
16  find evidence of semen and sometimes you do not?
17     A.   Yes.
18     Q.   And could one of the factors in terms
19  of whether or not semen is found be whether or
20  not the male ejaculated?
21     MR. AINSWORTH:  Object to the form of the
22  question and leading.
23     THE WITNESS:  Yes.
24

                                              38

1   BY MS. KILEY:
2      Q.   And if the man did not ejaculate, would
3   it be less likely that there would be evidence
4   of semen on the vaginal swabs?
5      MR. AINSWORTH:  Objection, foundation.
6      THE WITNESS:  I can't say about the vaginal
7   swabs, but I can say on physical exam, yes.
8   BY MS. KILEY:
9      Q.   So in other words, on physical
10  examination of the female, if the male did not
11  ejaculate, then it would be less likely to find
12  semen?
13     MR. AINSWORTH:  Object to the form of the
14  question.
15     THE WITNESS:  On physical exam.
16  BY MS. KILEY:
17     Q.   Based on your experience, would you say
18  that it is very common to find a female who has
19  been assaulted and not find any semen in the
20  examination?
21     MR. AINSWORTH:  Object to the form of the
22  question.
23     THE WITNESS:  I couldn't answer that
24  question.

                                              39

1   BY MS. KILEY:
2      Q.   Doctor, I'm going to hand you what
3   we'll mark as Exhibit No. 3, which is your
4   criminal trial testimony, and I think you've
5   already told us earlier that you recall having
6   testified in the criminal trial of Ms. Riggio,
7   correct?
8      A.   Yes.
9      Q.   And you were obviously under oath in
10  that case, correct?
11     A.   Yes.
12          (Whereupon, Temple Deposition
13           Exhibit No. 3 was marked for
14           identification.)
15  BY MS. KILEY:
16     Q.   And turning your attention to
17  Page 14-Z, Lines 20 through 23, you were asked
18  the question, It's very common to find a female
19  who has been assaulted and not find any semen in
20  the examination, and your answer was, That's
21  correct.
22          I read that accurately?
23     A.   Yes.
24     Q.   Going back to Group Exhibit 2, which is

                                              40

1   your medical records, can you take a look at
2   Page 015480?
3          What is this document, doctor?
4      A.   This is a copy of the standardized form
5   that comes in a rape kit.
6      Q.   It looks like there's some numbered
7   questions here; is that right?
8      A.   Yes.
9      Q.   Number 7 is post-assault
10  hygiene/activity; is that right?
11     A.   Yes.
12     Q.   And it has a number of categories to be
13  checked off yes or no including urinated,
14  defecated, genital wipes/wash, shower, douche,
15  tampon, sponge, diaphragm, vomiting, things of
16  that nature, correct?
17     A.   Yes.
18     Q.   And why are those relevant to your
19  examination?
20     A.   If a patient has, for example, showered
21  or changed their clothes or cleaned their
22  genital area, it may be harder to get DNA
23  specimens.
24     Q.   And would that also be true if somebody

                                              41

11 (Pages 38 to 41)

**BRIGHAM R. TEMPLE, M.D.**

1  urinated before presented to the hospital?
2      MR. AINSWORTH: Object to the foundation.
3  Object to the form of the question. Calls for
4  speculation.
5      THE WITNESS: Possibly.
6  BY MS. KILEY:
7      Q. In fact, that's why the first question
8  under Number 7, post-assault hygiene/activity is
9  whether or not someone has urinated, yes or no?
10     MR. AINSWORTH: Object to the foundation.
11 Objection, calls for speculation as to the order
12 of these questions.
13     THE WITNESS: It's one of the questions
14 that's on there. I don't know why it's first.
15 BY MS. KILEY:
16     Q. But that's one of the things that it's
17 asking for, whether or not someone has urinated?
18     A. Correct.
19     Q. Because that's something you, as a
20 doctor, would what to know when you are
21 examining the patient and performing the rape
22 kit?
23     MR. AINSWORTH: Objection, form, leading.
24     THE WITNESS: I would say this is probably

    **42**

1  more helpful for the folks who are doing the
2  forensic analysis of the swabs.
3  BY MS. KILEY:
4      Q. But it is something that you would want
5  to ask the patient about?
6      A. Correct.
7      Q. And if I were to represent to you that
8  Ms. Riggio was found at the crime scene
9  basically in her urine, having lost her urine
10 during the attack, that's something that
11 potentially could eliminate or contaminate DNA?
12     MR. AINSWORTH: Objection to the form of the
13 question. Objection, foundation.
14     THE WITNESS: I couldn't answer that for
15 you.
16 BY MS. KILEY:
17     Q. But one of the reasons why the form has
18 this question is because it is certainly a
19 possibility that urination, showering or
20 douching could all impact the DNA testing?
21     MR. AINSWORTH: Objection to the form.
22 Objection to the foundation, calls for
23 speculation.
24     MR. COMER: Asked and answered.

    **43**

1      THE WITNESS: It's possible.
2  BY MS. KILEY:
3      Q. Based on your experience and education
4  having worked with 30 to 40 sexual assault
5  victims in the past, when they present to you,
6  they may be crying, correct?
7      A. It's possible.
8      MR. AINSWORTH: Objection.
9  BY MS. KILEY:
10     Q. And they may be visibly shaken?
11     A. It's possible.
12     Q. Just as Ms. Riggio was in this case?
13     A. Yes.
14     Q. And when they're in that state, and
15 then on top of that, they are naked and having
16 their pubic hairs combed and being swabbed, in
17 your experience and in your opinion, is it
18 possible that rape victims sometimes forget some
19 of the details?
20     MR. AINSWORTH: Object to the form of the
21 question.
22     THE WITNESS: That, I can't answer.
23 BY MS. KILEY:
24     Q. Is one of the reasons -- strike that.

    **44**

1      Back in 2002, why would you have
2  someone's fingernails swabbed if they did not
3  report to you that they had scratched the
4  assailant?
5      A. That's just the standard protocol that
6  the state has asked us to do.
7      Q. Did it have anything to do with the
8  fact that you wanted to do a comprehensive
9  examination because in your personal opinion
10 based on your experience, rape victims may have
11 a difficult time remembering every single detail
12 of the rape when they're presenting to you?
13     MR. AINSWORTH: Objection, leading.
14     THE WITNESS: That, I can't say.
15 BY MS. KILEY:
16     Q. I'm going to refer your attention to
17 Page 15-Z of your trial testimony, Lines 12
18 through 22. And doctor, you were asked --
19 actually, we'll start at Line 8.
20     You were asked, Do you do fingernail
21 scrapings in every case?
22     Answer: We usually do fingernail
23 scrapings in every case, yes.
24     Question: Even if there is not a

    **45**

BRIGHAM R. TEMPLE, M.D.

1 specific piece of information that tells you
2 that the victim scratched the offender?
3          Answer: Correct. The reason for that
4 is obviously in any kind of traumatic situation
5 like this, it's pretty hard to in the heat of
6 the moment, in my opinion, for people who
7 remember all the details that go on in this.
8 So, you know, just to be for completeness, we
9 take samples essentially underneath the
10 fingernails just in case there may have been
11 something that you know they didn't remember.
12          Doctor, is it your personal opinion
13 that in the heat of the moment people may not
14 remember all the details?
15      MR. AINSWORTH: Object to the form of the
16 question.
17      THE WITNESS: It's possible.
18      MR. AINSWORTH: Let me just finish my
19 objection. I also object to foundation.
20      MS. KILEY: I have no further questions.
21              EXAMINATION
22 BY MR. AINSWORTH:
23      Q. Doctor, I just want to go through a few
24 things that Ms. Kiley spoke about and then I

46

1 have a few additional questions.
2          You refer to the nursing flow sheet to
3 refresh your recollection as to whether
4 Ms. Riggio presented to you as tearful.
5          Do you remember doing that?
6      A. Yes.
7      Q. And the nursing flow sheet, if you want
8 to refer to it, indicated that Ms. Riggio
9 arrived at the hospital at 8:13; is that right?
10      A. Correct.
11      Q. And at that time at 8:13, the nurse
12 noted the words tearful and fetal position,
13 right?
14      A. Correct.
15      Q. Do you have any idea whether at 8:45
16 when you saw Ms. Riggio for the first time
17 whether she was tearful or in the fetal
18 position?
19      A. No. I have no -- I can't definitively
20 say that she was in that position at that time.
21      Q. And you can't tell us here today
22 whether or not at any point when you interacted
23 with Ms. Riggio whether she was tearful or not,
24 right?

47

1      A. Not to my independent recollection.
2 Only per the chart.
3      Q. And per the chart, there is nothing in
4 the chart that indicates to you while you were
5 interacting with her she was tearful at any
6 point?
7      A. Correct.
8      Q. When you conduct a physical examination
9 of a sexual assault victim, do you ask them
10 whether they suffered any trauma?
11      A. Yes.
12      Q. And you might not use the word trauma,
13 but how would you ask the patient whether or not
14 they had any type of injuries that you should be
15 aware of?
16      A. Just that. I would ask them if they
17 had any injuries or areas that were hurting.
18      Q. And regardless of the patient's answer,
19 do you do a thorough head to toe examination of
20 the person's body?
21      A. Yes.
22      Q. We'll start kind of upside down.
23          Did you notice any injury to the
24 victim's toes?

48

1      A. I would have to go back to the chart.
2      Q. Please do. I've got another version
3 that has larger typing if that would help you.
4      A. No. This is fine.
5          So I don't see any documentation that
6 she had any toe injuries.
7      Q. And specifically, you didn't observe
8 any injury to her right toe, correct?
9      A. There's no documentation that I did.
10      Q. Why do you include documentation of
11 what you observed during your examination?
12      A. So that we can try to document it and
13 address that if there's an injury.
14      Q. Is that a regular part of your job as a
15 physician to document what occurs with a
16 patient?
17      A. Yes.
18      Q. And you see a lot of patients, right?
19      A. I don't know how to qualify that.
20      Q. Well, you're an emergency room doctor.
21 You see a lot of different patients every day,
22 right?
23      A. I see, on average, about 30 patients
24 every time I come to the ER.

49

**BRIGHAM R. TEMPLE, M.D.**

1   Q.   And a lot of those are people you've
2   never seen before, right?
3   A.   Correct.
4   Q.   And all those people you may never see
5   again, right?
6   A.   Correct.
7   Q.   So it's hard to always remember what
8   happened in one of your interactions with your
9   patients, right?
10  A.   Maybe rephrase that question.
11  Q.   One of the reasons why you document is
12  an aid to your memory, right?
13  A.   That would be correct.
14  Q.   Another reason is to allow other
15  medical personnel who follow up on injuries that
16  your patients may have sustained so they can
17  have a record of what treatment you provided and
18  what injuries existed at the time that you saw
19  the patient; is that right?
20  A.   Yes.
21  Q.   If Ms. Riggio had complained of an
22  injury to her toe, would you have noted that in
23  your reporting?
24  A.   That would have been my typical

50

1   practice.
2   Q.   If you would have observed an injury to
3   her toe, you would have noted that in your
4   charting, right?
5   A.   Once again, that would have been my
6   typical practice.
7   Q.   During your physical examination, do
8   you manipulate the patient's joints to see if
9   they sustained any injury like if they have any
10  painful range of motion?
11  A.   So, during a musculoskeletal exam, I
12  typically do have people move their different
13  extremities and their joints to see if they have
14  pain associated with it.
15  Q.   So that would involve manipulating the
16  elbow; is that right?
17  A.   That is one of the joints, yes.
18  Q.   You're the doctor.  I'm just the
19  law-talking guy.
20      Would that also include manipulating
21  the shoulder?
22  A.   Typically, yes.
23  Q.   Did Ms. Riggio complain of any pain in
24  either of her shoulders?

51

1   A.   Not to my recollection from the chart.
2   Q.   If she complained of any pain to her
3   shoulders while manipulating her shoulders,
4   would you have noted that in your chart?
5   A.   Yes.
6   Q.   Did you observe any swelling or
7   tenderness in her shoulders when you manipulated
8   them?
9   A.   Not to my recollection.
10  Q.   If you had noted any swelling or
11  tenderness in Ms. Riggio's shoulders, would you
12  have noted that in your charting?
13  A.   Yes.
14  Q.   Did Ms. Riggio complain about any pain
15  in her teeth?
16  A.   Not to my recollection in the chart.
17  Q.   Did Ms. Riggio tell you that she had
18  pain in her groin muscle?
19  A.   Not to my recollection.
20  Q.   I forgot to ask you.
21      If Ms. Riggio had told you she had pain
22  in her teeth, would you have noted that in your
23  chart?
24  A.   Yes.

52

1   Q.   If Ms. Riggio had complained of pain in
2   her groin muscle, would you have noted that in
3   your chart?
4   A.   Yes.
5   Q.   Do you, as part of your head to toe
6   examination, do anything to try to identify
7   whether there's any pain in a patient's teeth?
8   A.   Typically after a traumatic event, I
9   will ask someone if they have pain in their
10  teeth, and then I'll look in their mouth to see
11  if there's any obvious signs of trauma.  I don't
12  necessarily manipulate all the teeth to see if
13  they're tender.
14  Q.   Understood.
15      If you had observed any obvious sign of
16  trauma to Ms. Riggio's teeth, would you have
17  noted that in the chart?
18  A.   Yes.
19  Q.   In regard to -- let me turn your
20  attention to Page 77 of Exhibit 2.  There is a
21  box marked text.
22      Whose handwriting is that, if you know?
23  A.   That's mine.
24  Q.   So you use this form when you're

53

14 (Pages 50 to 53)

**BRIGHAM R. TEMPLE, M.D.**

1 conducting the general exam as part of a sexual
2 assault kit?
3    A.  This is part of the state form that
4 goes into the kit.
5    Q.  Do you see the instructions under
6 general exam that it gives indication as to how
7 the form should be used, right?
8    A.  Correct.
9    Q.  And at the end of the second line of
10 those instructions it says -- well, the end of
11 the first line, it talks about the things that
12 you should note when you're conducting the exam.
13       And at the end of a long list of things
14 that you're supposed to be looking for, it
15 includes tenderness, right?
16    A.  You're looking at the second to last
17 line inside of that bottom box?
18    Q.  The top box.  My apologies.  I should
19 have done a better job of directing you.
20    A.  Correct.
21    Q.  It says, Be sure to note even the most
22 minor signs of trauma, right?
23    A.  Correct.
24    Q.  Do you follow this protocol when you

54

1 fill out this chart?
2    A.  Yes, I do.
3    Q.  And in order to determine whether
4 Ms. Riggio had suffered a head injury, you
5 manipulated her head, correct?
6       Sorry.  That's a bad question.
7    A.  Rephrase.
8    Q.  Manipulation is a bad word.
9       What do you call it when you probe with
10 your fingers to determine whether somebody has
11 tenderness on either side of the their --
12    A.  We palpate the head and scalp to see if
13 there's any areas of tenderness.
14    Q.  Did you palpate Ms. Riggio's head and
15 scalp to see if there are any areas of
16 tenderness?
17    A.  That would have been my standard
18 practice.
19    Q.  If Ms. Riggio complained of any
20 tenderness while you were palpating her head and
21 scalp, would you have noted that in your chart?
22    A.  Yes.
23    Q.  When you're conducting a history on the
24 patient, do you pay attention to the mechanism

55

1 of injury that a person is complaining of?
2    A.  I'm not quite sure I fully understand
3 your question, but when any patient comes in
4 after they've been involved in any trauma or
5 assault, I always ask them what was the
6 mechanism of injury, how did it happen.
7    Q.  And that's a useful question for you to
8 get an answer to, right?
9    A.  Correct.
10    Q.  Because that gives you information
11 about what kind of harm the patient may have
12 sustained and may inform your treatment decision
13 as well, right?
14    A.  Possibly.
15    Q.  Did you ask Ms. Riggio how she --
16 strike that.
17       Ms. Riggio didn't tell you that she
18 suffered an injury apart from the possible
19 sexual assault, correct?
20    A.  Well, I'd have to go back and look at
21 the chart.
22    Q.  She told you about headache, but take a
23 look at the chart and see if she told you about
24 any other symptom.

56

1    A.  Not to my recollection.
2    Q.  Did Ms. Riggio tell you that her head
3 had been banged repeatedly on a desk or a
4 foreign object?
5       MS. KILEY:  Objection, mischaracterizes
6 evidence.
7       THE WITNESS:  Not to my recollection.
8 BY MR. AINSWORTH:
9    Q.  If Ms. Riggio had told you that her
10 head had been banged repeatedly on either a desk
11 or a hard surface, would you have noted that in
12 your chart?
13       MS. KILEY:  Objection, mischaracterizes
14 evidence.
15       THE WITNESS:  Typically, yes.
16 BY MR. AINSWORTH:
17    Q.  Do you know why you're giving a
18 deposition today?  Do you know what this is all
19 about?
20       MR. COMER:  Aside from what we discussed
21 obviously.
22 BY MR. AINSWORTH:
23    Q.  Let me ask it a different way.
24       Sir, are you aware that Carl Chatman

57

BRIGHAM R. TEMPLE, M.D.

1  was convicted back in 2004 with sexual assault
2  of Susan Riggio?
3      A.  Yes.
4      Q.  Are you aware that in 2013 that
5  conviction was overturned?
6      A.  Yes.
7      Q.  And prior to 2015, so I'm leaving out
8  any conversations with your counsel.  So prior
9  to the year 2015, did you learn that Carl
10  Chatman's conviction had been overturned?
11      A.  Prior to my lawyer informing me?
12      Q.  Yes.
13      A.  The answer would be no.
14      Q.  So you didn't see any news coverage
15  about it?
16      A.  No.
17      Q.  Did Ms. Riggio tell you that she had
18  had another alleged sexual assault back in 1979
19  that was also an attack by -- strike that.
20          Did Ms. Riggio tell you that she had
21  been sexually assaulted before?
22      A.  Not to my recollection.
23      Q.  Did Ms. Riggio tell you that she had
24  been sexually assaulted before in another sexual
                                                    58

1  assault that did not leave any physical evidence
2  of an attack?
3      MS. KILEY:  Objection, mischaracterizes
4  evidence.
5      THE WITNESS:  Not to my recollection.
6      MS. KILEY:  And relevancy.
7      MR. AINSWORTH:  Let's mark this as Exhibit
8  No. 4.
9          (Whereupon, Temple Deposition
10          Exhibit No. 4 was marked for
11          identification.)
12  BY MR. AINSWORTH:
13      Q.  Directing your attention underneath
14  where it has the Number 4, this is a response by
15  Ms. Riggio to Interrogatories that were posed to
16  her about personal injuries that she sustained,
17  and under her answer where it states, As a
18  result of the occurrence, Plaintiff Jane Doe
19  experienced and continues to experience pain and
20  suffering as a result of head trauma, multiple
21  contusions, a sprained shoulder, pulled groin
22  muscles, damage to external and internal female
23  genitalia, emotional trauma, dental
24  complications pending, fractured tooth and
                                                    59

1  bridge repair and right toe pain which she
2  sustained as a result of the occurrence.
3          Do you see that, sir?
4      A.  Yes, I do.
5      MR. MICHALIK:  Object to the use of this
6  document as incomplete and lack of foundation.
7      MS. STALF:  Join.
8      MS. KILEY:  Join.
9  BY MR. AINSWORTH:
10      Q.  As part of your exam, sir, did you
11  observe any of the injuries that are listed in
12  that paragraph including head trauma, multiple
13  contusions, a sprained shoulder, pulled groin
14  muscles, damaged external and internal female
15  genitalia, dental complications, including a
16  fractured tooth or a right toe pain?
17      A.  Not to my recollection.
18      Q.  It's not always the easiest
19  conversation to have with a sexual assault
20  victim to have them talk about what injuries
21  they sustained or what sexual acts were
22  performed.
23          Is that fair to say?
24      A.  I have no difficulty in interviewing
                                                    60

1  any patient for any medical condition.
2      Q.  It's a clinical exam, right?
3      A.  What do you mean by that?
4      Q.  When you're speaking to a sexual
5  assault victim, you're trying to find out
6  information from that person that would direct
7  both how you're going to treat that person and
8  what evidence you may collect as part of the
9  sexual assault kit; is that right?
10      A.  Rephrase that one more time.
11      Q.  Let me give you a more --
12      A.  That's a run-on sentence.
13      Q.  Directing you to Page 80, there is a
14  list of questions that you would like answered
15  or need to be answered in order to properly fill
16  out the Illinois State Police, Division Forensic
17  Services, Forensic Laboratory Report, right?
18      A.  There is a list of questions that we
19  are asked to fill out when we do these forms,
20  correct.
21      Q.  And one of the things that you're
22  trying to find out is the methods employed by
23  the perpetrator.
24          For example, if you look under one,
                                                    61

BRIGHAM R. TEMPLE, M.D.

1  chief complaint of person providing history, do
2  you see that in the middle of the page?
3      A.  Yes.
4      Q.  Where it says to include physical
5  injuries and methods employed by perpetrator;
6  i.e., weapons, restraints, biting, threats?
7      A.  Correct.
8      Q.  One of the things that you're looking
9  for is if there is oral contact between the
10  victim and the perpetrator.  Those indicate to
11  you places of areas of the body of the victim
12  that should be swabbed for potential forensic
13  analysis at a later point; is that right?
14      A.  Correct.
15      Q.  So if the patient tells you that they
16  were kicked on their breast, you would then know
17  to swab the breast for collection of potential
18  evidence?
19      MS. KILEY:  Objection, leading.
20      THE WITNESS:  Correct.
21  BY MR. AINSWORTH:
22      Q.  And if Ms. Riggio had told you that her
23  hand made contact with the assailant's penis,
24  you would have known to swab her hand for the

                                              62

1  potential collection of biological evidence; is
2  that right?
3      MS. KILEY:  Objection, leading.
4  Mischaracterizes evidence.
5      THE WITNESS:  We would have followed the
6  standard protocol that's in the kit.
7  BY MR. AINSWORTH:
8      Q.  And that would include swabbing any
9  area that came into contact with the assailant's
10  tongue or his penis; is that right?
11      MS. KILEY:  Same objection.
12      THE WITNESS:  I refer you back to the kit to
13  see what they specify you do.
14  BY MR. AINSWORTH:
15      Q.  Did you ask Ms. Riggio what sexual acts
16  the assailant either attempted to perpetrate or
17  perpetrated upon her?
18      A.  Yes.
19      Q.  What did she tell you?
20      A.  According to the chart, the assailant
21  attempted vaginal penetration.
22      Q.  Did Ms. Riggio say anything about the
23  assailant's penis touching her hand?
24      A.  Not to my recollection.

                                              63

1      Q.  If Ms. Riggio had said that the
2  assailant's penis had touched her hand, you
3  would have noted that in the chart; is that
4  right?
5      A.  Correct.
6      Q.  Did Ms. Riggio say anything about
7  rectal penetration?
8      A.  She said that she was unsure according
9  to my documentation.
10      Q.  Did Ms. Riggio state that she was
11  kicked in her midsection by the assailant?
12      A.  Not to my recollection.
13      Q.  Did Ms. Riggio say that she was kicked
14  on her arms and her hands as she tried to
15  prevent the assailant from kicking her
16  midsection?
17      A.  Not to my recollection.
18      Q.  Did you observe any contusions or marks
19  or tenderness on Ms. Riggio's abdomen?
20      A.  I'll look back to my physical exam to
21  answer that.  And I document that she had no
22  abdominal tenderness on exam.
23      Q.  Did she also have no tenderness to her
24  chest area?

                                              64

1      A.  So according to my exam, there is no
2  specific documentation there that says that she
3  does not have chest wall tenderness.
4      Q.  If she had told you that she was
5  experiencing tenderness, would you have noted
6  that on your chart?
7      A.  Typically, yes.
8      Q.  Would you have examined her to find out
9  whether she had any chest wall tenderness?
10      A.  According to my documentation, she had
11  a chest exam.  There's no documentation that
12  says that she had any tenderness.
13      Q.  Did Ms. Riggio report any tenderness to
14  her arms or hands as a result of being kicked?
15      A.  Not to my recollection.
16      Q.  If she had reported any tenderness in
17  those areas, would you have noted that in your
18  chart?
19      A.  Yes.
20      Q.  And if you had observed any tenderness
21  or marks or injuries to her hands or arms, would
22  you have noted that in your chart?
23      A.  Yes.
24      Q.  When you talk to sexual assault

                                              65

BRIGHAM R. TEMPLE, M.D.

```
 1   victims, do you define the terms that you're
 2   using such as penetration?
 3       A.  I always ask the patient if they
 4   understand what I'm explaining to them and have
 5   them verbalize back to me that they understand.
 6       Q.  Why do you do that?
 7       A.  To make sure that they understand what
 8   I'm telling them.
 9       Q.  And do you ask specifically about
10   penetration, either vaginally or rectally, when
11   you're conducting an exam of a sexual assault
12   victim?
13       MS. KILEY:  Objection, form.
14           Are we talking about the medical
15   definition or the legal definition of
16   penetration?
17   BY MR. AINSWORTH:
18       Q.  Just the word that you use.
19       A.  So I follow all the standard questions
20   that the state form wants us to go through.
21       Q.  Does that include to find out whether
22   there's penetration?
23       A.  Correct.  That's one of the questions
24   that's asked.
                                              66
```

```
 1       Q.  And do you have the patient then tell
 2   you what they understand your meaning of
 3   penetration is so that you're satisfied that
 4   they do actually understand what you're asking
 5   them?
 6       A.  Correct.
 7       Q.  Did Ms. Riggio express any confusion as
 8   to what the word penetration means?
 9       A.  I don't have any independent
10   recollection of whether she did or she didn't.
11       Q.  If Ms. Riggio expressed confusion as to
12   what you meant by the word penetration in this
13   context, would you have explained to her what
14   you meant by the word penetration?
15       A.  Yes.
16       Q.  Sorry to jump around on you, but I'm
17   going to take you back to the beginning of this
18   packet, Page 70.
19           Down at the bottom of the page on the
20   left-hand side it says, Warm, dry for her skin.
21           Does that have any clinical
22   significance to you?
23       A.  That's a typical finding for a normal
24   skin exam.
                                              67
```

```
 1       Q.  So the person is not sweating?
 2       A.  Not if they're warm and dry.
 3       Q.  At the top it says HPI and then 50-year
 4   old woman.
 5           What's the next abbreviation there?
 6       A.  That's the symbol for female.
 7       Q.  After that.
 8       A.  Status-post.
 9       Q.  What does status-post mean after the
10   sexual assault?
11       A.  After an event.
12       Q.  There's a notation for a hysterectomy
13   with -- is it endometriosis?
14       A.  Correct.
15       Q.  That's an illness that can cause pain
16   during sexual relations; is that right?
17       A.  It's possible.
18       Q.  It's not something you're familiar
19   with?
20       A.  I do occasionally treat patients with
21   endometriosis, but I don't manage their
22   long-term care.
23       Q.  If you look at Page 74, there are a
24   number of observations by the nurses about
                                              68
```

```
 1   Ms. Riggio's -- well, for example, her airway
 2   was within normal limits, right?
 3       A.  I have to admit this form is a little
 4   hazy so -- it says airway within normal limits.
 5   Yes.
 6       Q.  Her neurological function was within
 7   normal limits, right?
 8       A.  It does say within normal limits.  Yes.
 9       Q.  The next one over says skin.  Do you
10   see that?
11       A.  Yes.
12       Q.  Within normal limits?
13       A.  Correct.
14       Q.  Patient's breathing was within normal
15   limits?
16       A.  Yes.
17       Q.  Next to that is musculoskeletal.  What
18   is that looking for?
19       A.  This is a nursing flow sheet, so you
20   would have to actually go through and ask the
21   nurse specifically what their protocol is for
22   this documentation because it's not my
23   documentation.
24       Q.  Understood, but you use this when
                                              69
```

BRIGHAM R. TEMPLE, M.D.

1   you're talking to the patient, right?
2      A.  Well, we use this to help us focus what
3   questions we need to.  And then in any patient
4   who has undergone an assault or trauma, I do my
5   own head to toe exam and review of systems.
6         So if you're asking me to comment on
7   the documentation by a nurse, you need to ask
8   that nurse.
9      Q.  Can you tell us why under psychological
10  it says NA?
11     A.  I can't because it's not my
12  documentation.
13     Q.  Can you tell us -- and then for
14  circulation it says within normal limits, right?
15        MR. MICHALIK:  Objection, foundation.
16        MS. STALF:  Join.
17        MS. BENSINGER:  Join.
18        MS. KILEY:  Join.
19        THE WITNESS:  Yes.  It does say within
20  normal limits.
21  BY MR. AINSWORTH:
22     Q.  Does that indicate to you there's no
23  issue that you need to be concerned about with
24  her circulation?

70

1      Q.  And to the right of that reads CPD
2   officer female at bedside.
3         Do you see that?
4      A.  Yes, I do.
5      Q.  Does that indicate to you female
6   Chicago police officer was present with
7   Ms. Riggio at 8:25?
8         MS. STALF:  Objection, form, foundation,
9   calls for speculation.
10        THE WITNESS:  It's possible.  That's what it
11  shows it should be.
12  BY MR. AINSWORTH:
13     Q.  Have you known the nurses to lie in
14  their nursing documentation?
15        MR. MICHALIK:  Object to form.
16        MS. STALF:  Join.
17        MS. BENSINGER:  Join.
18        MS. KILEY:  Join.
19  BY MR. AINSWORTH:
20     Q.  Why do you say it's possible?
21     A.  Well, it says here CPD, assuming that's
22  Chicago Police Department officer.  I don't know
23  if that means female officer.  I would say that
24  there's a good chance that this does mean that

72

1         MR. MICHALIK:  Objection.
2         MS. STALF:  Join.
3         THE WITNESS:  Typically, yes.
4   BY MR. AINSWORTH:
5      Q.  And then the next one is GI/GU and
6   GYNE; is that right?
7      A.  Yes.
8      Q.  GI is gastrointestinal, right?
9      A.  Yes.
10     Q.  What is GU?
11     A.  Genitourinary.
12     Q.  On the nursing flow sheet those are all
13  listed as within normal limits; is that right?
14     A.  That's what it says.
15     Q.  Does that indicate to you there is no
16  special pain or something in any of those areas?
17        MR. MICHALIK:  Objection.
18        MS. STALF:  Join.
19        THE WITNESS:  Once again, I can't interpret
20  what her documentation is.
21  BY MR. AINSWORTH:
22     Q.  Then under nursing documentation found
23  it says 8:25?
24     A.  Yes.

71

1   there was a female police officer who was at the
2   bedside.
3      Q.  The rape kit was started at 0835,
4   correct?
5      A.  Your guess is as good as mine.  Those
6   numbers run together.
7      Q.  And then on the next page is 0920, and
8   then in your reading I think you said rape kit
9   collected.  I read that as rape kit completed.
10        Would you agree with that?
11     A.  I can see where that would say
12  completed.
13     Q.  Is that about a typical amount of time
14  for a rape kit to be collected; that is, about
15  45 minutes?
16     A.  That's roughly the amount of time it
17  takes depending upon the patient.
18     Q.  0940 there's a notation, CPD remained
19  with patient, right?
20     A.  That's what I read there.
21     Q.  On the next page there is a listing of
22  Ms. Riggio's clothing.
23        Do you see that?
24     A.  Yes.

73

1     MR. MICHALIK:  For the record, we're talking
2  about 15476?
3     MR. AINSWORTH:  Probably.  I'm looking at my
4  own version.
5     MR. COMER:  Yes.
6  BY MR. AINSWORTH:
7     Q.  And it lists Ms. Riggio's nylon
8  underwear, bra, skirt, jacket and camisole as
9  being her items of clothing?
10    A.  Yes.
11    Q.  And all of those items of clothing
12 would have gone on to the sheet of paper that
13 was on the ground to collect them; is that
14 right?
15    A.  Yes.
16    Q.  And after those items were on the
17 ground, they would then be collected to turn
18 over to whoever it is who takes those clothes
19 away to be tested?
20    A.  Yes.  They would go into the appointed
21 bag that stays with the rape kit.  Yes.
22    Q.  So the clothing would not have been
23 collected before the rape kit was begun to be
24 collected; is that right?

74

1     A.  That's part of the collection.
2     Q.  Would you kindly flip forward two
3  pages?  At the top there is a --
4     MR. COMER:  When you say forward, I don't
5  know what you mean.  What page are you looking
6  at?
7     MR. MICHALIK:  15478.
8  BY MR. AINSWORTH:
9     Q.  At the top, there is the word
10 lithotomy?
11    A.  Correct.
12    Q.  What is that?
13    A.  That's the position in which she was in
14 during the exam.
15    Q.  The one that you described earlier?
16    A.  Correct.
17    Q.  Below that it says labia majora
18 maneuver?
19    A.  Correct.
20    Q.  And it says yes.  What is that?
21    A.  That means that there was some traction
22 placed on the labia in order to do a visual
23 inspection.
24    Q.  Why do you note whether that maneuver

75

1  was performed?
2     A.  Because it's requested to do so.
3     Q.  So you're just noting that you're
4  following the protocol; is that correct?
5     A.  Yes.
6     Q.  Down at the bottom it has an exam for
7  rectal exam or -- sorry.  It has a space for
8  notes of a rectal exam, correct?
9     A.  Yes.
10    Q.  And how did you perform the exam where
11 you noted that there were -- strike that.
12       Is that your handwriting where it says
13 no abnormalities, no tears, no bleeding?
14    A.  Correct.
15    Q.  How did you perform that examination to
16 determine whether there were abnormalities or
17 tears or bleeding?
18    A.  Well, standard exam would be visual
19 inspection.  I don't recall whether a digital
20 exam, meaning a finger exam, was done.
21    Q.  When you say visual inspection, what
22 does that entail?
23    A.  Looking at the area.
24    Q.  And what does an anoscopic exam mean?

76

1     A.  That's where you put a device in, an
2  anoscope, to take a look at the area inside of
3  the anus.
4     Q.  Was an anoscopic exam performed on
5  Ms. Riggio?
6     A.  Not to my recollection.
7     Q.  Do you know one way or another whether
8  it was done?
9     A.  I don't believe so.
10    Q.  Why don't you believe so?
11    A.  Because that's not a typical exam that
12 I would normally do unless we were concerned
13 about something more significant like a foreign
14 body being placed or things that we would need
15 to look internally.
16       And if I may add, if I had done an
17 anoscopic exam, I would have documented that in
18 my chart.
19    Q.  Would you have documented whether you
20 performed a digital examination?
21    A.  Typically, yes.
22    Q.  Why didn't you perform either a digital
23 or anoscopic exam on Ms. Riggio?
24    A.  Probably because I felt it was not

77

BRIGHAM R. TEMPLE, M.D.

1  indicated at that time.
2    Q.  If Ms. Riggio had told you that she had
3  been penetrated anally, would you have performed
4  either a digital or anoscopic exam?
5    A.  Not necessarily.
6    Q.  What would depend on whether you would
7  perform a digital or anoscopic exam?
8    A.  Some of the things that I said
9  previously.  If she had said she had been
10  penetrated with a foreign body and was concerned
11  it was still there; if she was having persistent
12  bleeding from her rectum, that would be an
13  indication to do so.
14    Q.  Do you know a nurse Jill Massucci?  Is
15  that her name?
16    A.  I haven't worked at Northwestern in a
17  long time.
18    Q.  Do you remember her?
19    A.  No, I don't.
20    Q.  Do you remember Virginia Agudelo?
21    A.  No.
22    Q.  Do you know whether any nurses, other
23  than those two, assisted in the collection of
24  the rape kit for Ms. Riggio?

78

1    A.  Not to my recollection.
2    Q.  If another nurse had assisted in the
3  collection of the rape kit, would they have
4  signed on this form?
5    A.  Typically, yes.
6    Q.  Do you know whether a nurse, other than
7  one of those two nurses, completed any of the
8  entries on the nursing flow sheet?
9    A.  That, I don't know.
10    Q.  If a nurse other than one of those two
11  had completed a portion of the nursing flow
12  sheet, were they supposed to indicate that?
13    A.  They would have put their initials next
14  to it, yes.
15    MS. STALF:  Russell, if you're at a good
16  breaking point, can we take a two-minute break?
17    MR. AINSWORTH:  Let's do that now.
18    THE WITNESS:  Let's just keep going.  I've
19  got other things I have to do today.  So screw
20  the break.  Let's just keep going.  I have to be
21  somewhere at 1:00.  Environmental services are
22  right down the hall.  They'll take care of it.
23    BY MR. AINSWORTH:
24    Q.  Sir, I did want to ask you another

79

1  question about 80.
2    In the bottom right-hand side, as part
3  of the list of questions, it has acts described,
4  and there's a question of masturbation, right?
5    A.  Correct.
6    Q.  There's a question about ejaculation,
7  right?
8    A.  Correct.
9    Q.  And then there's a question about other
10  sexual acts, correct?
11    A.  Yes.
12    Q.  And Ms. Riggio said there were no other
13  sexual acts other than those dealt with the
14  prior questions; is that right?
15    A.  According to my documentation, yes.
16    Q.  If she had indicated there were any
17  other sexual acts, would you have noted that?
18    A.  Yes.
19    Q.  And there's an indication that
20  Ms. Riggio bit her assailant, correct?
21    A.  Yes.
22    Q.  And then below that it has victim
23  licked/sucked assailant, and the answer is yes;
24  is that right?  Three down.

80

1    A.  Yes.
2    Q.  If yes, where?  Written there is left
3  shoulder, correct?
4    A.  Yes.
5    Q.  Is that your handwriting?
6    A.  Yes.
7    Q.  So Ms. Riggio indicated that the only
8  contact her mouth had with the assailant was the
9  assailant's left shoulder; is that right?
10    A.  According to my documentation.
11    Q.  If she had told you that she had oral
12  contact with the assailant anywhere other than
13  the left shoulder, would you have noted that?
14    A.  Yes.
15    Q.  Did Ms. Riggio express any specific
16  concerns about AIDS?
17    A.  Not to my recollection.
18    Q.  If Ms. Riggio had brought up any
19  comments by the assailant that he was HIV
20  positive, would you have noted that in your
21  chart?
22    A.  Typically, yes.
23    Q.  If the assailant had -- if the sexual
24  assault victim was telling you that the

81

21 (Pages 78 to 81)

BRIGHAM R. TEMPLE, M.D.

1  assailant had a sexual transmitted disease,
2  would you have noted that so that you would be
3  sure that that issue would be addressed by both
4  the patient and any medical professional seeing
5  that patient?
6      MS. KILEY:  Objection, mischaracterizes
7  evidence.
8      THE WITNESS:  Yes.
9  BY MR. AINSWORTH:
10     Q.  You haven't studied the instance of
11 sexual assault -- strike that.
12         You haven't performed any research
13 yourself into the area of how often sexual
14 assault victims are injured, correct?
15     A.  Have I done any original research?  Is
16 that you're asking me?
17     Q.  Yes.
18     A.  The answer to that is no.
19     Q.  You haven't published in that area,
20 right?
21     A.  That is right.
22     Q.  Are you aware of any literature outside
23 the textbook that you referenced talking about
24 the instance of injuries by sexual assault

82

1  victims?
2      A.  No.
3      Q.  You're not aware of studies published
4  in the Trauma Violence Abuse Journal or The
5  Journal of Trauma, Violence & Abuse?
6      A.  I don't specifically have knowledge of
7  that, whatever study you're referring to.
8      Q.  And you don't know about any studies
9  published in the American Journal of Obstetrics
10 & Gynecology on the subject of patterns of
11 genital injury and female sexual assault
12 victims?
13     A.  No.
14     Q.  You're not aware of any published
15 studies in the BJOG, an International Journal of
16 Obstetrics & Gynecology, on the subject of
17 female victims of rape and their genital
18 injuries?
19     A.  No.
20     Q.  Is it fair to say you're not an expert
21 in the area of the prevalence of female victims
22 of sexual assault and the injuries that they
23 sustained?
24     MS. KILEY:  Objection.

83

1      THE WITNESS:  I think it would be fair to
2  say that I understand the emergency medicine
3  literature associated with sexual assault
4  victims and the instance of injuries associated
5  with them.
6  BY MR. AINSWORTH:
7      Q.  From that textbook you referenced?
8      A.  From emergency medicine literature.
9      Q.  Any other literature that you're aware
10 of on that topic apart from the textbook?
11     A.  There are a number of other textbooks
12 that we all refer to.
13     Q.  What are they?
14     A.  Rosen's Emergency Medicine would be
15 another one.  Services like Up To Date gives all
16 the most recent information on things.
17         So there's a lot of different textbooks
18 that are out there.  There's also emergency
19 medicine journals, and those are the typical
20 sources that I use and my colleagues use to stay
21 up to date on any medical condition.
22     Q.  Do you know of any emergency medicine
23 journals that talk about the instance of female
24 sexual assault victims being injured as a result

84

1  of their attack?
2      A.  That I can quote you right here?
3      Q.  That you can tell me about.
4      A.  That I can quote you right here?
5      Q.  You don't have to quote it.
6      A.  I can't give you the exact reference
7  here, but I'm sure if you gave me a computer and
8  a chance to look that up, I can absolutely show
9  you emergency medical literature that would show
10 that information.
11     Q.  Of those 30 to 40 female sexual assault
12 victims that you examined, how many of them
13 sustained rectal penetration?
14     A.  That, I couldn't tell you.
15     Q.  Have any?
16     A.  Sustained rectal penetration?
17     Q.  Or reported sustaining rectal
18 penetration.
19     A.  Yes.
20     Q.  Do you have -- can you give me any
21 estimate as to how many of those?
22     A.  No.
23     Q.  Of those 30 to 40 people, how many of
24 them reported having their head repeatedly

85

BRIGHAM R. TEMPLE, M.D.

1   struck on a hard surface?
2       MS. KILEY:  Objection, mischaracterizes
3   evidence.  Form.
4       THE WITNESS:  I couldn't tell you.
5   BY MR. AINSWORTH:
6       Q.  Do you know of any?
7       A.  If any of them have received head
8   trauma?
9       Q.  Yes.
10      A.  Yes.
11      Q.  Are those among the 10 percent of the
12  sexual assault victims who sustained an injury
13  that you observed?
14      MS. KILEY:  Objection, relevance.
15      THE WITNESS:  Likely.
16  BY MR. AINSWORTH:
17      Q.  Why do you say likely?
18      A.  Why do I say likely?
19      Q.  Yes.
20      A.  Because they likely had signs.  I'd
21  have to go back and review their charts to give
22  you the specific details.  Thirty to 40 patients
23  over a 15-year period, for me to recall all the
24  specific details and give you a data like from a

86

1   database would not be entirely accurate.  So as
2   to not misspeak, I can only give you a
3   generality.
4       Q.  Did Ms. Riggio tell you that she had
5   suffered from acute Parkinson's disease in the
6   past?
7       A.  Not to my recollection.
8       Q.  Do you know what acute Parkinson's
9   disease is?
10      MS. KILEY:  Objection, relevance.
11      THE WITNESS:  I know what Parkinson's
12  disease is.
13  BY MR. AINSWORTH:
14      Q.  Have you ever heard of acute
15  Parkinson's disease?
16      MS. KILEY:  Same objection.
17      THE WITNESS:  I've not heard it phrased in
18  that way, but people do get acute symptoms of
19  Parkinson's disease.
20      MR. AINSWORTH:  Does anyone else have
21  questions for this witness while I look over my
22  notes?
23      MR. MICHALIK:  Yes, I do.
24

87

1                 EXAMINATION
2   BY MR. MICHALIK:
3       Q.  As quickly as I can, doctor, my name is
4   Paul Michalik and I represent the defendant,
5   City of Chicago, in this lawsuit.
6           Doctor, you did a residency in
7   emergency medicine?
8       A.  Yes.
9       Q.  You have practiced in emergency
10  medicine?
11      A.  Yes.
12      Q.  And you spent your whole career
13  practicing in emergency medicine, true?
14      A.  Yes.
15      Q.  You teach emergency medicine?
16      A.  Yes.
17      Q.  You are board certified in emergency
18  medicine?
19      A.  Yes.
20      Q.  And within all of that experience, you
21  read textbooks in emergency medicine?
22      A.  Yes.
23      Q.  You've had training and given training
24  in emergency medicine?

88

1       A.  Correct.
2       Q.  And, again, your entire career provides
3   experience in treating patients in emergency
4   medicine, true?
5       A.  Correct.
6       Q.  And treatment of sexual assault victims
7   would be considered to be within the field of
8   emergency medicine.  Is that also true?
9       A.  Yes.
10      Q.  If you could take a quick look at,
11  first off, Page 15480.  That's part of the State
12  of Illinois Forensic Laboratory Report?
13      A.  Yes.
14      Q.  Do you have that in front of you,
15  doctor?
16      A.  Yes, I do.
17      Q.  This is in your handwriting?
18      A.  Yes.
19      Q.  You were asked some questions about the
20  questions that are set forth on this document.
21          Do you remember those questions?
22      A.  Yes.
23      Q.  For purposes of completeness, I just
24  want to go through it.

89

BRIGHAM R. TEMPLE, M.D.

1    The victim reported to you -- did you
2  ask questions and then the victim provide you
3  answers?
4    A.  Correct.
5    Q.  So it was a question and answer format?
6    A.  Yes.
7    Q.  You asked her about penetration of her
8  vagina by a penis and she was unsure?
9    A.  Correct.
10   MR. AINSWORTH:  Object to the leading.
11 BY MR. MICHALIK:
12   Q.  Is that correct?
13   A.  Correct.
14   Q.  And did you ask her about penetration
15 of her vagina by a finger?
16   A.  Yes.
17   Q.  And what was her answer?
18   A.  Unsure.
19   Q.  Did you ask her about penetration of
20 her vagina by a foreign object?
21   A.  Yes.
22   Q.  What was her answer?
23   A.  No.
24   Q.  Did you ask her about the penetration

90

1 of her rectum by a penis?
2    A.  Yes.
3    Q.  What was her answer?
4    A.  Unsure.
5    Q.  Did you ask her about penetration of
6  her rectum by a finger?
7    A.  Yes.
8    Q.  What was her answer?
9    A.  Unsure.
10   Q.  Did you ask her about penetration of
11 her rectum by a foreign object?
12   A.  Yes.
13   Q.  What was her answer?
14   A.  No.
15   Q.  Did you ask her if there was any oral
16 copulation of the genitals?
17   A.  Yes, I did.
18   Q.  What was her answer?
19   A.  No.
20   Q.  And that was of her by the assailant?
21   A.  Correct.
22   Q.  And also of the assailant by her?
23   A.  Correct.
24   Q.  Did you ask the victim whether any

91

1 ejaculation occurred during the incident?
2    A.  Yes.
3    Q.  Did you ask her if any ejaculation
4  occurred inside her body?
5    A.  Yes.
6    Q.  What was her answer?
7    A.  Unsure.
8    Q.  Did you ask her if there was any
9  ejaculation that occurred outside of the
10 victim's body orifice?
11   A.  Yes.
12   Q.  And her answer was?
13   A.  Unsure.
14   Q.  Did you ask the victim generally what
15 had happened to her in this incident?
16   A.  Yes.
17   Q.  What did she tell you?
18   A.  That she had been sexually assaulted by
19 someone that she did not know, an unknown
20 assailant, and that she had been thrown on a
21 desk and that there had been attempted vaginal
22 penetration.
23   Q.  Did she tell you anything else?
24   A.  Well, according to the chart, it says

92

1 that there were no weapons used, there was no
2  biting, there were no restraints.
3    Q.  Is that something you asked the victim?
4    A.  Correct.
5    Q.  Why do you ask that of the victim?
6    A.  Because those are standard questions
7  that we ask as part of filling out this form.
8    Q.  That's something that the form asks
9  that you ask a sexual assault victim?
10   A.  Correct.
11   Q.  One last thing, doctor, and I'll be
12 finished.
13     If I could call your attention back to
14 the nursing flow sheet that you were asked all
15 those questions about, 15474.
16     I think you told us that this was
17 information that was compiled by a nurse upon
18 Ms. Riggio's admission to the emergency room?
19   A.  Correct.
20   Q.  Did the nurse indicate in her report
21 whether or not the victim lost consciousness
22 during the incident?
23   A.  She wrote down questionable loss of
24 consciousness.

93

BRIGHAM R. TEMPLE, M.D.

1    Q.   So according to this, it was unclear
2  one way or the other whether the victim lost
3  consciousness during the assault, correct?
4    A.   Correct.
5    Q.   Did she make any further observation
6  about the victim's ability to recall the events
7  that had occurred?
8    MR. AINSWORTH:  Objection, foundation.
9    THE WITNESS:  She wrote down here not sure
10 of events.
11 BY MR. MICHALIK:
12   Q.   What, if any, importance does that have
13 to you as a treating physician of a sexual
14 assault victim?
15   A.   Not sure how to answer that.  I mean, I
16 guess I would take any triage information that I
17 get from a nurse and I'm going to re-explore
18 that on my own.
19   Q.   And that would include the history that
20 the patient was providing?
21   A.   Correct.
22   Q.   And whether or not that patient was a
23 reliable historian regarding the incident?
24   A.   Correct.

94

1    Q.   Whether the patient was a reliable
2  historian or not, you would still ask the same
3  questions that were set forth in the forensic
4  questionnaire, correct?
5    A.   Yes.
6    Q.   The Illinois State paperwork?
7    A.   That is correct.
8    Q.   If the victim had been a victim of a
9  sexual assault that had occurred many years
10 earlier, would that have any relevance to your
11 examination of this patient on May 24, 2002?
12   A.   No.
13   MR. MICHALIK:  Thank you.
14   I have no further questions.
15   MS. BENSINGER:  I have no questions.
16        EXAMINATION
17 BY MS. STALF:
18   Q.   I'm Krista Stalf.  I represent the
19 Chicago police officers that have been named as
20 defendants.  I have just a couple questions.
21        Doctor, do you have any independent
22 recollection of seeing any Chicago police
23 officers at Ms. Riggio's bedside on 5-24?
24   A.   No.

95

1    Q.   Do you have any independent
2  recollection of seeing any Chicago police
3  officers in the emergency department that day?
4    A.   No.
5    Q.   Do you have any recollection of having
6  any conversation with any Chicago police
7  officers that day?
8    A.   No.
9    Q.   I want to talk a little bit about this
10 sheet of paper that was included as part of the
11 rape kit that we talked about a little earlier.
12        Is the sheet something that was
13 typically included in the rape kit?
14   A.   Yes.
15   Q.   What did the sheet look like?
16   A.   It's just kind of a folded up piece of
17 paper.  Blank.
18   Q.   Approximately how large was it when it
19 was unfolded?
20   A.   Maybe 3 feet by 3 feet.
21   Q.   Typically, who would be responsible for
22 folding the victim's clothing up in that sheet?
23   A.   The nurse.
24   Q.   And you said that that would then be

96

1  placed in a designated bag; is that correct?
2    A.   Yes.
3    Q.   Where would you obtain that designated
4  bag?
5    A.   Those come as part of the rape kit.
6    Q.   What does that bag look like?
7    A.   It's typically a brown paper bag, and
8  it has some identifying marks on it so that you
9  can put patient information.
10   Q.   Typically, who is responsible for
11 putting the patient's information on that brown
12 paper bag?
13   A.   The nurse.
14   Q.   Is that bag then sealed?
15   A.   Yes.
16   Q.   Typically, who seals the bag?
17   A.   The nurse.
18   Q.   Do you know if in this particular case
19 that piece of paper was folded up with this
20 victim's clothing in it?
21   A.   That, I don't know.
22   Q.   Did you ever see the designated bag
23 once it had been sealed in this case?
24   A.   Not to my recollection.

97

25 (Pages 94 to 97)

1    MS. STALF: That's all I have. Thank you.
2         FURTHER EXAMINATION
3  BY MS. KILEY:
4    Q.  I just have a few follow-up, doctor.
5         You were asked by counsel,
6  Mr. Ainsworth, if you would have explained to
7  Ms. Riggio what penetration meant if she had
8  asked you.
9         Do you remember that question?
10   A.  Yes.
11   MR. AINSWORTH: Object to the form of the
12  question. Mischaracterizes the witness'
13  testimony.
14  BY MS. KILEY:
15   Q.  Had she asked that question, what would
16  your definition of penetration be for her?
17   A.  So my definition of penetration for any
18  patient, not just for this patient, would have
19  been, had anything entered into her genital
20  area.
21   Q.  And you don't know whether or not she
22  asked that question one way or another?
23   A.  Correct.
24   Q.  If I can just refer you to your note,

98

1  depression.
2         Do you agree with that based on your
3  experience and training?
4    MR. AINSWORTH: Object to foundation.
5    THE WITNESS: Yes.
6  BY MS. KILEY:
7    Q.  When you're examining a rape victim in
8  the hospital, is it fair to say that his or her
9  focus may not be on the areas of physical pain
10  that they're feeling at the time of the
11  examination?
12   MR. AINSWORTH: Object to the form.
13   THE WITNESS: It's possible.
14  BY MS. KILEY:
15   Q.  So it would be possible for perhaps --
16  well, one of two things. A patient to
17  experience some pain later on. That's possible?
18   A.  Yes.
19   MR. AINSWORTH: Object to the form of the
20  question. Calls for speculation.
21  BY MS. KILEY:
22   Q.  And it would also be possible for a
23  patient perhaps to be experiencing pain at the
24  time you examined her but not focused on it

100

1  Page 15478, your external examination of her
2  genitalia, it says no bleeding, correct?
3    A.  Yes.
4    Q.  And this is based on your observation.
5  It doesn't include the fact that there was some
6  blood found in her urine; is that right?
7    MR. AINSWORTH: Object to the form of the
8  question.
9    THE WITNESS: Right.
10  BY MS. KILEY:
11   Q.  Can trauma be a competent source of
12  blood in the urine?
13   MR. AINSWORTH: Object to the form. Object
14  to foundation.
15   THE WITNESS: It's possible.
16  BY MS. KILEY:
17   Q.  And that's based on your education,
18  training and experience?
19   A.  Yes.
20   Q.  If you look at Page 15482, the
21  discharge instructions, Paragraph 3 says, Sexual
22  assault is the ultimate invasion of privacy. It
23  often causes severe psychological reaction. You
24  may feel shock, disbelief, fear, anger or

99

1  because she's thinking of the fact that she was
2  just raped?
3    MR. AINSWORTH: Object to the form of the
4  question. Calls for speculation.
5    THE WITNESS: It's possible.
6  BY MS. KILEY:
7    Q.  What area of the brain controls vision?
8    MR. COMER: Foundation.
9    THE WITNESS: Well, specifically the
10  occipital part of the brain.
11  BY MS. KILEY:
12   Q.  If I were to represent to you that
13  Ms. Riggio returned to Hinsdale Hospital on
14  May 27, 2002 with complaints of dizziness,
15  headache and seeing white spots, and a doctor
16  reported tenderness in the right parietal
17  occipital region, is that consistent with
18  potential trauma to that area or to the back of
19  the head?
20   MR. AINSWORTH: Objection.
21   MR. COMER: Form and foundation.
22   THE WITNESS: I can't say. I can't justify
23  any specific relation between those two.
24

101

BRIGHAM R. TEMPLE, M.D.

1  BY MS. KILEY:
2      Q.  But that area can impact vision,
3  correct?  That area of the brain?
4      MR. AINSWORTH:  Objection, foundation.
5      THE WITNESS:  Not externally.
6  BY MS. KILEY:
7      Q.  Do physicians typically just order
8  CT scans and X-rays?
9      MR. COMER:  Object to form.
10     THE WITNESS:  You need to be more specific.
11  I don't quite understand your question.
12  BY MS. KILEY:
13     Q.  Well, if a patient just came in and
14  said I have a headache, would you order a CT
15  scan of the brain for that person?
16     A.  No.
17     MR. COMER:  Object to form.
18     MS. KILEY:  I have no further questions.
19          FURTHER EXAMINATION
20  BY MR. AINSWORTH:
21     Q.  Sir, when you're defining penetration,
22  you don't define penetration to mean the
23  entirety of a penis has to be inserted into a
24  person's vagina or anus; is that right?

102

1      A.  The entirety of it?
2      Q.  Yes.
3      A.  No.
4      Q.  Motrin is Ibuprofen, right?
5      A.  That is correct.
6      Q.  And then my last question is on Page 80
7  again, the last line.
8          In that box of chief complaints where
9  you've written a narrative there, you talk about
10  attempted vaginal penetration.
11         Why is it that you didn't include
12  anything about any rectal penetration?
13     A.  That, I couldn't tell you.
14     Q.  Is it fair to say Ms. Riggio didn't
15  mention anything about being unsure about rectal
16  penetration until you went through the questions
17  at the bottom to specifically ask her about it?
18     A.  It's possible.
19     Q.  Is that how you fill out this form?
20  You first start with an overall question about,
21  you know, with a presenting problem in an
22  open-ended fashion to ask the patient what they
23  experienced?
24     MR. MICHALIK:  Objection, foundation.

103

1      THE WITNESS:  Typically, yes.
2  BY MR. AINSWORTH:
3      Q.  And then you go through the specific
4  questions that are required by the form at the
5  bottom?
6      A.  Correct.
7      Q.  And do you fill out this form as you're
8  going through it?
9      A.  Yes.
10     MR. AINSWORTH:  That's all the questions I
11  have.
12          FURTHER EXAMINATION
13  BY MS. KILEY:
14     Q.  What other medications did you provide
15  Ms. Riggio other than the Motrin?
16     A.  I think it's documented she had
17  received antibiotics for possible STD exposure.
18  The names of those antibiotics are provided in
19  the chart.
20     MS. KILEY:  No further questions.
21     THE WITNESS:  Waive.
22     (FURTHER DEPONENT SAITH NAUGHT.)
23
24

104

1  STATE OF ILLINOIS   )
2                      )  SS:
3  COUNTY OF COOK      )
4      I, Donna L. Belpedio, an Officer of the
5  Court, do hereby certify that heretofore,
6  to-wit, on February 23, 2015, personally
7  appeared before me, at 2100 Phingsten Road,
8  Glenview, Illinois, BRIGHAM R. TEMPLE, M.D., in
9  a cause now pending and undetermined in the
10  Circuit Court of Cook County, Illinois, wherein
11  CARL CHATMAN is the Plaintiff, and CITY OF
12  CHICAGO, et al., are the Defendants.
13     I further certify that the said witness
14  was first duly sworn to testify the truth, the
15  whole truth and nothing but the truth in the
16  cause aforesaid; that the testimony then given
17  by said witness was reported stenographically by
18  me in the presence of the said witness, and
19  afterwards reduced to typewriting by
20  Computer-Aided Transcription, and the foregoing
21  is a true and correct transcript of the
22  testimony so given by said witness as aforesaid.
23     I further certify that the signature to
24  the foregoing deposition was waived by counsel

105

BRIGHAM R. TEMPLE, M.D.

1  for the respective parties.

2     I further certify that the taking of this

3  deposition was pursuant to notice and that there

4  were present at the deposition the attorneys

5  hereinbefore mentioned.

6     I further certify that I am not counsel

7  for nor in any way related to the parties to

8  this suit, nor am I in any way interested in the

9  outcome thereof.

10     IN TESTIMONY WHEREOF:  I have hereunto

11  set my verified digital signature this

12  31st day of March, 2015.

13

14

15

16

17  _____

18  ILLINOIS CERTIFIED SHORTHAND REPORTER

19  LICENSE NO. 084-003754

20

21

22

23

24

106

BRIGHAM R. TEMPLE, M.D.

**A**

**abbreviated** 17:9
**abbreviation** 28:22
  68:5
**abdomen** 64:19
**abdominal** 64:22
**ability** 94:6
**able** 28:2,14
**abnormalities** 76:13
  76:16
**above-entitled** 1:10
**abrasion** 21:20
**abrasions** 32:14
**absolutely** 85:8
**Abuse** 83:4,5
**abused** 34:4
**accuracy** 28:19
**accurate** 87:1
**accurately** 40:22
**active** 33:19 34:11,21
**acts** 60:21 63:15 80:3
  80:10,13,17
**acute** 87:5,8,14,18
**Adams** 3:3
**add** 10:23 77:16
**additional** 47:1
**address** 49:13
**addressed** 82:3
**administrative** 8:24
  9:5,9,11
**admission** 93:18
**admit** 69:3
**adult** 31:17 34:11
**aforesaid** 105:16,22
**agencies** 8:19
**agree** 73:10 100:2
**Agudelo** 78:20
**ahead** 14:9 23:20
**aid** 50:12
**AIDS** 81:16
**Ainsworth** 2:2 4:5,9
  12:11 15:2 16:6,15
  17:4 26:19 27:7,13
  27:20 31:22 32:7,19
  33:2 34:12,23 35:8
  36:12,24 37:13,19
  38:7,21 39:5,13,21
  42:2,10,23 43:12,21

44:8,20 45:13 46:15
  46:18,22 57:8,16,22
  59:7,12 60:9 62:21
  63:7,14 66:17 70:21
  71:4,21 72:12,19
  74:3,6 75:8 79:17
  79:23 82:9 84:6
  86:5,16 87:13,20
  90:10 94:8 98:6,11
  99:7,13 100:4,12,19
  101:3,20 102:4,20
  104:2,10
**airway** 69:1,4
**al** 1:7 105:12
**alleged** 58:18
**allow** 50:14
**allows** 21:11
**Ambulatory** 28:21
**American** 7:10 83:9
**amount** 30:6,8 73:13
  73:16
**anally** 78:3
**analysis** 29:13 38:2
  43:2 62:13
**anger** 99:24
**anoscope** 77:2
**anoscopic** 76:24 77:4
  77:17,23 78:4,7
**answer** 27:15,23
  33:20 34:13 35:1
  38:10 39:23 40:20
  43:14 44:22 45:22
  46:3 48:18 56:8
  58:13 59:17 64:21
  80:23 82:18 90:5,17
  90:22 91:3,8,13,18
  92:6,12 94:15
**answered** 43:24
  61:14,15
**answers** 90:3
**antibiotics** 104:17,18
**anus** 77:3 102:24
**apart** 56:18 84:10
**apologies** 54:18
**apparatus** 22:11
**appear** 13:22
**APPEARANCES** 2:1
  3:1

**appeared** 105:7
**appears** 14:10 26:23
  29:3
**appointed** 74:20
**appointment** 9:17,24
**appreciate** 23:11
**appropriate** 12:1
  16:23 20:24
**Approximately**
  10:16 25:8 96:18
**area** 21:11,20 24:2,4
  24:8 25:6,12,13
  31:20 32:11 33:18
  41:22 63:9 64:24
  76:23 77:2 82:13,19
  83:21 98:20 101:7
  101:18 102:2,3
**areas** 10:3,4 11:20
  12:1 21:2 35:19
  48:17 55:13,15
  62:11 65:17 71:16
  100:9
**arms** 36:10 64:14
  65:14,21
**arrived** 47:9
**article** 33:10
**Aside** 57:20
**asked** 40:17 43:24
  45:6,18,20 61:19
  66:24 89:19 90:7
  93:3,14 98:5,8,15
  98:22
**asking** 42:17 67:4
  70:6 82:16
**asks** 93:8
**assailant** 17:13,15
  45:4 63:16,20 64:11
  64:15 80:20,23 81:8
  81:12,19,23 82:1
  91:20,22 92:20
**assailant's** 62:23 63:9
  63:23 64:2 81:9
**assault** 10:8,11 11:4
  11:8,12 12:23 14:5
  17:11,12 18:7 20:3
  32:5,16 33:6 35:5
  36:8,18 44:4 48:9
  54:2 56:5,19 58:1

58:18 59:1 60:19
  61:5,9 65:24 66:11
  68:10 70:4 81:24
  82:11,14,24 83:11
  83:22 84:3,24 85:11
  86:12 89:6 93:9
  94:3,14 95:9 99:22
**assaulted** 39:19
  40:19 58:21,24
  92:18
**assaults** 36:23
**assigned** 18:11
**assistant** 9:21,23
**assisted** 11:3 78:23
  79:2
**associated** 51:14 84:3
  84:4
**assuming** 9:1 72:21
**attack** 43:10 58:19
  59:2 85:1
**attempt** 12:14
**attempted** 63:16,21
  92:21 103:10
**attend** 6:9,15
**attending** 7:22 8:9
  10:20
**attention** 14:16 15:18
  17:20 40:16 45:16
  53:20 55:24 59:13
  93:13
**attorneys** 106:4
**Attorney's** 5:4
**available** 12:16
**average** 49:23
**aware** 48:15 57:24
  58:4 82:22 83:3,14
  84:9
**a.m** 1:14 15:14

**B**

**B** 4:14
**back** 17:2 20:6 21:10
  36:11 40:24 45:1
  49:1 56:20 58:1,18
  63:12 64:20 66:5
  67:17 86:21 93:13
  101:18
**background** 12:19

**bad** 55:6,8
**bag** 19:16 74:21 97:1
   97:4,6,7,12,14,16
   97:22
**banged** 57:3,10
**based** 23:13 26:24
   32:2,15,20 33:15
   34:7 35:3,11 36:7
   37:17 39:17 44:3
   45:10 99:4,17 100:2
**basically** 20:20 43:9
**bathroom** 28:21
**bbensinger@hinsh...**
   2:19
**bed** 19:19 21:10
**bedside** 72:2 73:2
   95:23
**beginning** 67:17
**begun** 74:23
**believe** 19:11 23:12
   25:13 27:10 28:24
   37:9 77:9,10
**Belpedio** 1:11,23
   105:4
**BENSINGER** 2:17
   70:17 72:17 95:15
**best** 28:18
**better** 54:19
**biological** 63:1
**bit** 6:8 17:14 80:20
   96:9
**biting** 62:6 93:2
**BJOG** 83:15
**Blank** 96:17
**bleeding** 22:16 32:13
   36:5 76:13,17 78:12
   99:2
**blood** 25:20 28:23
   29:8,23,24 30:5,7,8
   99:6,12
**board** 7:7,9,10 88:17
**bodily** 21:24
**body** 21:4 35:19
   36:10,19 48:20
   62:11 77:14 78:10
   92:4,10
**BOLLINGER** 2:6
**BORKAN** 2:21

**bottom** 54:17 67:19
   76:6 80:2 103:17
   104:5
**box** 53:21 54:17,18
   103:8
**BR** 28:22
**bra** 74:8
**brain** 101:7,10 102:3
   102:15
**break** 79:16,20
**breaking** 79:16
**breast** 62:16,17
**breathing** 69:14
**BRETTE** 2:17
**bridge** 60:1
**Brigham** 1:9 3:6 4:3
   5:8,16 6:10 105:8
**brought** 81:18
**brown** 97:7,11
**bruises** 20:22
**bruising** 21:21 37:11
**bumps** 37:11
**B-r-i-g-h-a-m** 5:16

**C**

**California** 7:1
**call** 55:9 93:13
**called** 5:9 8:7
**calls** 27:20 34:24
   36:12 38:8 42:3,11
   43:22 72:9 100:20
   101:4
**camisole** 74:8
**canal** 22:14,22
**capable** 30:19
**care** 8:7 18:12 68:22
   79:22
**career** 9:14 10:10,15
   31:14 38:13 88:12
   89:2
**caring** 12:3
**Carl** 1:4 57:24 58:9
   105:11
**case** 20:2 37:23 40:10
   44:12 45:21,23
   46:10 97:18,23
**categories** 41:12
**cause** 1:10 68:15
   105:9,16

**causes** 99:23
**CC** 17:9
**Center** 7:19
**certainly** 43:18
**certification** 7:9
**certified** 1:11 7:7
   88:17 106:18
**certify** 105:5,13,23
   106:2,6
**cervix** 22:13
**chance** 72:24 85:8
**change** 9:4
**changed** 41:21
**chart** 13:23 14:4,8,15
   15:12 17:3 18:17
   30:11,23 31:10
   35:20 37:9 48:2,3,4
   49:1 52:1,4,16,23
   53:3,17 55:1,21
   56:21,23 57:12
   63:20 64:3 65:6,18
   65:22 77:18 81:21
   92:24 104:19
**charting** 51:4 52:12
**charts** 86:21
**Chatman** 1:4 57:24
   105:11
**Chatman's** 58:10
**checked** 41:13
**checks** 26:12
**cheek** 24:18
**chest** 64:24 65:3,9,11
**Chicago** 1:7 2:3,8,13
   2:15,18,22,24 3:4
   9:24 14:11 29:1
   72:6,22 88:5 95:19
   95:22 96:2,6 105:12
**chief** 17:7,8,10 62:1
   103:8
**child** 34:8,18
**children** 33:23 34:3
**chlamydia** 25:23
**Circuit** 105:10
**circulation** 70:14,24
**City** 1:7 2:15,24 88:5
   105:11
**Clark** 2:22
**cleaned** 41:21

**clinical** 8:23 9:2,6,10
   9:17,18,21,22 61:2
   67:21
**clinically** 8:22
**clothes** 41:21 74:18
**clothing** 19:14,15
   20:8 73:22 74:9,11
   74:22 96:22 97:20
**colleagues** 84:20
**collect** 19:8 61:8
   74:13
**collected** 18:19 24:11
   25:1 28:20,23 73:9
   73:14 74:17,23,24
**collecting** 11:19
**collection** 11:4,5,8,10
   18:8 19:4 27:1,3,11
   62:17 63:1 75:1
   78:23 79:3
**college** 6:9,17
**combed** 25:13 27:19
   44:16
**combing** 27:4
**come** 49:24 97:5
**COMER** 3:3 43:24
   57:20 74:5 75:4
   101:8,21 102:9,17
**comes** 41:5 56:3
**commenced** 1:13
**comment** 70:6
**comments** 81:19
**common** 31:21 33:13
   36:9 38:6,10 39:18
   40:18
**competent** 99:11
**compiled** 93:17
**complain** 37:5 51:23
   52:14
**complained** 50:21
   52:2 53:1 55:19
**complaining** 17:23
   56:1
**complaint** 17:9,10
   62:1
**complaints** 17:17
   101:14 103:8
**complaint/HPI** 17:7
**completed** 73:9,12

BRIGHAM R. TEMPLE, M.D.

79:7,11
**completeness** 46:8
   89:23
**complications** 59:24
   60:15
**compound** 35:8
**comprehensive** 45:8
**computer** 85:7
**Computer-Aided**
   105:20
**concentration** 30:3
**concerned** 70:23
   77:12 78:10
**concerns** 81:16
**condition** 30:13 61:1
   84:21
**conduct** 48:8
**conducting** 54:1,12
   55:23 66:11
**confusion** 67:7,11
**conjunction** 8:19
   18:11
**CONNOLLY** 2:6
**consciousness** 93:21
   93:24 94:3
**consent** 26:6,15,18
   26:22
**consented** 26:8
**considered** 89:7
**consist** 19:24 20:1
   21:7,18 22:7 24:14
**consistent** 16:4 32:24
   36:21 101:17
**contact** 62:9,23 63:9
   81:8,12
**contain** 13:22
**contained** 33:16 35:4
**contains** 13:20
**contaminate** 43:11
**contents** 23:14
**context** 67:13
**continues** 59:19
**controls** 101:7
**contusions** 36:4
   59:21 60:13 64:18
**Cont'd** 3:1
**conversation** 60:19
   96:6

**conversations** 58:8
**convicted** 58:1
**conviction** 58:5,10
**Cook** 105:3,10
**copulation** 91:16
**copy** 6:2 13:17 41:4
**corporation** 8:16
**correct** 5:18 7:3,4
   8:13 9:2 11:16 12:7
   12:10 15:21 16:13
   18:24 21:14 24:5
   28:12 30:17,18,20
   31:14 32:6 35:17
   37:5,21 40:7,10,21
   41:16 42:18 43:6
   44:6 46:3 47:10,14
   48:7 49:8 50:3,6,13
   54:8,20,23 55:5
   56:9,19 61:20 62:7
   62:14,20 64:5 66:23
   67:6 68:14 69:13
   73:4 75:11,16,19
   76:4,8,14 80:5,8,10
   80:20 81:3 82:14
   89:1,5 90:4,9,12,13
   91:21,23 93:4,10,19
   94:3,4,21,24 95:4,7
   97:1 98:23 99:2
   102:3 103:5 104:6
   105:21
**cotton** 22:21 23:3
   24:17 27:18
**counsel** 6:2 58:8 98:5
   105:24 106:6
**County** 105:3,10
**couple** 95:20
**course** 9:14 10:10,15
   15:23 26:2 31:13
   38:13
**Court** 1:1 105:5,10
**coverage** 58:14
**covering** 10:3
**CPD** 28:24 72:1,21
   73:18
**crime** 43:8
**criminal** 12:22 40:4,6
**crying** 15:15 44:6
**CSR** 1:23

**CT** 102:8,14
**CULBERTSON** 2:16
**current** 6:6
**currently** 8:11 9:22
**Curriculum** 6:3,12
**CV** 8:10

**D**

**D** 2:7 4:1
**damage** 59:22
**damaged** 60:14
**data** 86:24
**database** 87:1
**date** 6:6 84:15,21
**day** 49:21 96:3,7
   106:12
**dealt** 80:13
**decision** 56:12
**deemed** 12:2
**defecated** 41:14
**defendant** 2:9,14,19
   88:4
**defendants** 1:8 95:20
   105:12
**define** 66:1 102:22
**defining** 102:21
**definition** 66:15,15
   98:16,17
**definitively** 47:19
**demeanor** 14:12 31:6
**dental** 59:23 60:15
**department** 14:11
   19:20 29:1 72:22
   96:3
**depend** 78:6
**depending** 73:17
**deponent** 3:5 104:22
**deposition** 1:9 4:16
   5:3,22 13:12 40:12
   57:18 59:9 105:24
   106:3,4
**depression** 100:1
**described** 20:11
   75:15 80:3
**description** 26:24
**designated** 97:1,3,22
**desk** 57:3,10 92:21
**detail** 45:11

**details** 44:19 46:7,14
   86:22,24
**determine** 55:3,10
   76:16
**develop** 37:12
**device** 77:1
**diaphragm** 41:15
**different** 29:3 49:21
   51:12 57:23 84:17
**difficult** 45:11
**difficulty** 60:24
**digital** 76:19 77:20
   77:22 78:4,7 106:11
**dip** 29:6
**direct** 61:6
**directing** 54:19 59:13
   61:13
**director** 8:11
**disaster** 8:15
**disbelief** 99:24
**discharge** 22:16
   99:21
**discovery** 1:9
**discussed** 57:20
**disease** 25:23 26:1
   82:1 87:5,9,12,15
   87:19
**disrobe** 19:1,13
**disrobes** 19:8
**disrobing** 19:5
**distraught** 14:15
   15:7
**DISTRICT** 1:1,2
**Division** 1:3 61:16
**dizziness** 101:14
**DNA** 11:13,21 41:22
   43:11,20
**doctor** 5:18 12:16
   17:4 22:10 23:11,21
   26:13,21,24 40:2
   41:3 42:20 45:18
   46:12,23 49:20
   51:18 88:3,6 89:15
   93:11 95:21 98:4
   101:15
**document** 23:23
   35:23 36:6 41:3
   49:12,15 50:11 60:6

BRIGHAM R. TEMPLE, M.D.

64:21 89:20
**documentation** 23:22
49:5,9,10 64:9 65:2
65:10,11 69:22,23
70:7,12 71:20,22
72:14 80:15 81:10
**documented** 18:17
35:22 38:4 77:17,19
104:16
**Doe** 59:18
**doing** 9:5,10 23:1
24:15,21 26:18 43:1
47:5
**Donna** 1:11,23 105:4
**douche** 41:14
**douching** 43:20
**Dr** 6:4
**Drive** 2:12
**dry** 67:20 68:2
**duly** 5:10 105:14
**DYKEMA** 2:11

**E**

**E** 2:21 3:3 4:1,14
**earlier** 31:12 40:5
75:15 95:10 96:11
**easiest** 60:18
**EASTERN** 1:3
**education** 32:3 34:7
36:7 44:3 99:17
**either** 25:18 34:8
51:24 55:11 57:10
63:16 66:10 77:22
78:4
**ejaculate** 39:2,11
**ejaculated** 38:20
**ejaculation** 80:6 92:1
92:3,9
**elbow** 51:16
**Elgin** 7:18
**eliminate** 43:11
**else's** 14:22
**emergency** 5:21 6:22
7:10 8:11,22 9:19
9:21,23 10:2,6 12:5
15:19 19:20 28:6
32:4 33:12,13 49:20
84:2,8,14,18,22
85:9 88:7,9,13,15

88:17,21,24 89:3,8
93:18 96:3
**emotional** 59:23
**employed** 61:22 62:5
**encountered** 14:13
16:12
**encountering** 32:5
**endometriosis** 68:13
68:21
**enjoys** 27:17
**entail** 8:14 76:22
**entered** 98:19
**entire** 10:10,15 89:2
**entirely** 87:1
**entirety** 102:23 103:1
**entities** 8:19
**entries** 79:8
**Environmental**
79:21
**ER** 49:24
**essentially** 46:9
**estimate** 9:11 10:13
11:2 85:21
**et** 1:7 105:12
**evaluated** 11:11
**evaluation** 19:13
**Evanston** 7:14 8:7
**event** 53:8 68:11
**events** 94:6,10
**evidence** 11:4,8,22
18:18 19:9 20:18
21:20 22:15 29:14
32:17 36:9 37:23
38:4,16 39:3 57:6
57:14 59:1,4 61:8
62:18 63:1,4 82:7
86:3
**exact** 85:6
**exam** 16:22 18:6,16
18:16 19:17 20:2,4
20:16,18 21:1,9
22:5 23:23 25:21
35:23 38:4 39:7,15
51:11 54:1,6,12
60:10 61:2 64:20,22
65:1,11 66:11 67:24
70:5 75:14 76:6,7,8
76:10,18,20,20,24

77:4,11,17,23 78:4
78:7
**examination** 4:2 5:12
11:24 12:18 18:9
19:18,21,23 20:11
20:13,20 21:6,8,18
22:3,6 23:16 24:2
27:2,2 28:10 30:22
38:15 39:10,20
40:20 41:19 45:9
46:21 48:8,19 49:11
51:7 53:6 76:15
77:20 88:1 95:11,16
98:2 99:1 100:11
102:19 104:12
**examined** 5:10 21:5
32:21 33:23 65:8
85:12 100:24
**examining** 21:19
32:15 36:8 42:21
100:7
**example** 19:7 41:20
61:24 69:1
**Exhibit** 4:16 5:23 6:4
13:13,16 40:3,13,24
53:20 59:7,10
**existed** 50:18
**experience** 31:19
32:3,15,21 33:15
34:7 35:3,11 36:7
36:22 37:18 39:17
44:3,17 45:10 59:19
88:20 89:3 99:18
100:3,17
**experienced** 59:19
103:23
**experiencing** 65:5
100:23
**expert** 83:20
**expired** 7:5
**explained** 67:13 98:6
**explaining** 66:4
**expose** 21:11
**exposure** 104:17
**express** 67:7 81:15
**expressed** 67:11
**external** 21:9,17 27:1
59:22 60:14 99:1

**externally** 102:5
**extremities** 51:13
**e-mailed** 5:5

**F**

**fact** 26:13,15 42:7
45:8 99:5 101:1
**factors** 38:18
**fair** 27:5 34:16 38:14
60:23 83:20 84:1
100:8 103:14
**familiar** 34:2 68:18
**fashion** 103:22
**fear** 99:24
**February** 1:13 105:6
**feel** 99:24
**feeling** 100:10
**feet** 96:20,20
**felt** 77:24
**female** 17:12 33:18
34:10,11 39:10,18
40:18 59:22 60:14
68:6 72:2,5,23 73:1
83:11,17,21 84:23
85:11
**fetal** 16:2 47:12,17
**field** 89:7
**fill** 55:1 61:15,19
103:19 104:7
**filling** 93:7
**find** 16:21 32:10,13
32:17 33:17 38:16
39:11,18,19 40:18
40:19 61:5,22 65:8
66:21
**finding** 30:7 31:19,21
31:23 38:6 67:23
**findings** 14:18 35:6
**fine** 49:4
**finger** 17:14 76:20
90:15 91:6
**fingernail** 24:20
45:20,22
**fingernails** 11:24
24:24 45:2 46:10
**fingers** 55:10
**finish** 46:18
**finished** 93:12

BRIGHAM R. TEMPLE, M.D.

**Fire** 14:11
**first** 5:9 14:12 15:9 15:16 16:17 18:8 29:4 42:7,14 47:16 54:11 89:11 103:20 105:14
**fit** 12:2
**flip** 75:2
**flow** 15:20 28:6 47:2 47:7 69:19 71:12 79:8,11 93:14
**fluids** 21:24,24 22:21
**focus** 70:2 100:9
**focused** 10:5 100:24
**folded** 19:15 96:16 97:19
**folding** 96:22
**folks** 43:1
**follow** 50:15 54:24 66:19
**followed** 16:19,22 63:5
**following** 76:4
**follows** 5:11
**follow-up** 98:4
**foregoing** 105:20,24
**foreign** 57:4 77:13 78:10 90:20 91:11
**forensic** 11:13,21 43:2 61:16,17 62:12 89:12 95:3
**forget** 44:18
**forgot** 52:20
**form** 12:11 16:6 26:10,11,22 27:20 27:21 33:3 36:12,24 37:13,19 38:7,21 39:13,21 41:4 42:3 42:23 43:12,17,21 44:20 46:15 53:24 54:3,7 66:13,20 69:3 72:8,15 79:4 86:3 93:7,8 98:11 99:7,13 100:12,19 101:3,21 102:9,17 103:19 104:4,7
**format** 90:5
**forms** 61:19

**forth** 11:9 89:20 95:3
**forward** 75:2,4
**found** 30:9 37:24 38:19 43:8 71:22 99:6
**foundation** 16:8 31:22 32:19 33:2 34:12 36:13 39:5 42:2,10 43:13,22 46:19 60:6 70:15 72:8 94:8 99:14 100:4 101:8,21 102:4 103:24
**foundational** 12:20
**four** 7:13
**fractured** 59:24 60:16
**frequently** 32:16
**front** 12:15 89:14
**full** 13:22
**fully** 56:2
**function** 69:6
**funding** 8:17
**further** 4:8,9,10 46:20 94:5 95:14 98:2 102:18,19 104:12,20,22 105:13,23 106:2,6

---

### G

**Gait** 28:22
**gastrointestinal** 71:8
**GELLEN** 3:2
**general** 11:7 54:1,6
**generality** 87:3
**generally** 92:14
**genital** 12:1 20:4 21:6,8,11 41:14,22 83:11,17 98:19
**genitalia** 22:5 35:16 59:23 60:15 99:2
**genitals** 91:16
**Genitourinary** 71:11
**getting** 16:24 18:2 27:18
**GI** 71:8
**give** 28:18,19 37:7 61:11 85:6,20 86:21 86:24 87:2

**given** 13:16 37:9 88:23 105:16,22
**gives** 30:3 54:6 56:10 84:15
**giving** 57:17
**GI/GU** 71:5
**Glenbrook** 7:15
**Glenview** 1:16 105:8
**go** 6:8 12:12 14:9 16:1 23:1,20 24:15 24:21 26:4 46:7,23 49:1 56:20 66:20 69:20 74:20 86:21 89:24 104:3
**goes** 18:20 54:4
**going** 5:6 9:11 12:13 40:2,24 45:16 61:7 67:17 79:18,20 94:17 104:8
**gonorrhea** 25:23
**good** 12:16 72:24 73:5 79:15
**graduate** 6:11
**grant** 8:17
**gravity** 29:8,23 30:2 30:2
**groin** 52:18 53:2 59:21 60:13
**gross** 35:24 36:1
**ground** 19:3,8 74:13 74:17
**Group** 13:16 40:24
**GU** 71:10
**guess** 73:5 94:16
**guy** 51:19
**GYNE** 71:6
**Gynecology** 83:10,16

---

### H

**H** 4:14
**hair** 11:23 25:3,4,5 25:11 27:4,4,19
**hairs** 25:8 44:16
**halfway** 16:1 17:21
**hall** 79:22
**hand** 40:2 62:23,24 63:23 64:2
**handed** 13:22

**hands** 64:14 65:14,21
**handwriting** 14:21 14:23 28:3,5 29:4 53:22 76:12 81:5 89:17
**happen** 56:6
**happened** 50:8 92:15
**hard** 46:5 50:7 57:11 86:1
**harder** 41:22
**harm** 56:11
**hazy** 69:4
**head** 20:2,10,16,20 25:5,9 48:19 53:5 55:4,5,12,14,20 57:2,10 59:20 60:12 70:5 85:24 86:7 101:19
**headache** 18:1 37:5,8 56:22 101:15 102:14
**Health** 7:13 8:3,7
**heard** 5:5 87:14,17
**heat** 46:5,13
**held** 9:13,20
**help** 49:3 70:2
**helpful** 43:1
**helping** 8:17,18
**hereinbefore** 106:5
**heretofore** 105:5
**hereunto** 106:10
**Highland** 7:16
**Hinsdale** 101:13
**HINSHAW** 2:16
**historian** 94:23 95:2
**history** 16:20,24 17:8 17:11 18:2 55:23 62:1 94:19
**HIV** 81:19
**hospital** 7:15,15,15 7:16,17 12:7 14:3 16:13 19:19 26:16 42:1 47:9 100:8 101:13
**hospitals** 7:11,14
**hour** 1:13,14
**HPI** 68:3
**hurting** 48:17

BRIGHAM R. TEMPLE, M.D.

**hygiene/activity**
41:10 42:8
**hypothetical** 34:24
37:1
**hysterectomy** 30:15
68:12

---

**I**

**Ibuprofen** 103:4
**ID** 4:15
**idea** 30:3 47:15
**identification** 5:24
13:14 40:14 59:11
**identify** 53:6
**identifying** 97:8
**Illinois** 1:2,12,16 2:3
2:8,13,18,22 3:4 7:1
7:18,20 8:18 61:16
89:12 95:6 105:1,8
105:10 106:18
**illness** 17:8,11 68:15
**impact** 43:20 102:2
**importance** 94:12
**impression** 15:4
**improve** 22:12
**incident** 92:1,15
93:22 94:23
**include** 8:4,8 10:17
11:19,23 20:4,19
21:9 22:8 24:12,13
49:10 51:20 62:4
63:8 66:21 94:19
99:5 103:11
**included** 10:20,21
96:10,13
**includes** 54:15
**including** 41:13
60:12,15
**incomplete** 34:23
37:1 60:6
**independent** 13:6
48:1 67:9 95:21
96:1
**Indiana** 7:3
**indicate** 17:22 23:19
29:17 62:10 70:22
71:15 72:5 79:12
93:20

**indicated** 17:1 47:8
78:1 80:16 81:7
**indicates** 16:2 48:4
**indication** 29:16 54:6
78:13 80:19
**infection** 29:14,15,18
**inform** 56:12
**information** 30:1
46:1 56:10 61:6
84:16 85:10 93:17
94:16 97:9,11
**informing** 58:11
**initials** 29:9 79:13
**injured** 82:14 84:24
**injuries** 48:14,17
49:6 50:15,18 59:16
60:11,20 62:5 65:21
82:24 83:18,22 84:4
**injury** 48:23 49:8,13
50:22 51:2,9 55:4
56:1,6,18 83:11
86:12
**inserted** 22:14
102:23
**insertion** 22:8
**inside** 19:10 22:13
24:18 54:17 77:2
92:4
**inspection** 21:23
22:15 75:23 76:19
76:21
**instance** 82:10,24
84:4,23
**instructions** 54:5,10
99:21
**instructor** 9:18
**interacted** 47:22
**interacting** 48:5
**interactions** 50:8
**interested** 106:8
**internal** 22:4,6 27:2
59:22 60:14
**internally** 77:15
**International** 83:15
**interpret** 71:19
**interpretation** 28:18
**Interrogatories**
59:15

**interviewing** 60:24
**intrusive** 27:5,11
**invasion** 99:22
**involve** 51:15
**involved** 11:15 36:17
56:4
**involving** 12:23 18:9
**in-hospital** 26:17
**issue** 70:23 82:3
**items** 74:9,11,16
**i.e** 62:6

---

**J**

**jacket** 74:8
**Jane** 59:18
**jcomer@lowis-gell...**
3:5
**Jill** 78:14
**job** 49:14 54:19
**Join** 60:7,8 70:16,17
70:18 71:2,18 72:16
72:17,18
**joints** 51:8,13,17
**Joseph** 3:3 7:17
**Journal** 83:4,5,9,15
**journals** 84:19,23
**jump** 67:16
**jury** 12:16
**justify** 101:22

---

**K**

**Kankakee** 7:20
**keep** 79:18,20
**kicked** 64:11,13
65:14
**kicking** 64:15
**Kiley** 2:7 4:4,8,10 5:1
5:13 6:1 7:23 8:1
12:19,21 13:15 15:6
16:10,16 17:16
26:20 27:9,16 28:1
32:1,9,23 33:8
34:15 35:2,12 36:20
37:3,16,22 38:12
39:1,8,16 40:1,15
42:6,15 43:3,16
44:2,9,23 45:15
46:20,24 57:5,13
59:3,6 60:8 62:19

63:3,11 66:13 70:18
72:18 82:6 83:24
86:2,14 87:10,16
98:3,14 99:10,16
100:6,14,21 101:6
101:11 102:1,6,12
102:18 104:13,20
**kind** 10:3 46:4 48:22
56:11 96:16
**kindly** 75:2
**kit** 11:5,8,9 18:8,19
19:4,10,13 22:17,18
22:20 23:4,15 24:13
26:5,14 27:1,10
28:20 41:5 42:22
54:2,4 61:9 63:6,12
73:3,8,9,14 74:21
74:23 78:24 79:3
96:11,13 97:5
**kits** 11:15 31:13
**know** 6:6 12:2 14:6
15:9 23:7 25:11
26:10 28:13 34:14
38:9 42:14,20 46:8
46:11 49:19 53:22
57:17,18 62:16
72:22 75:5 77:7
78:14,22 79:6,9
83:8 84:22 86:6
87:8,11 92:19 97:18
97:21 98:21 103:21
**knowledge** 83:6
**known** 62:24 72:13
**KRAUSE** 2:6
**Krista** 2:21 95:18
**KStalf@borkansc...**
2:23

---

**L**

**L** 1:11,23 105:4
**lab** 29:13
**labia** 75:17,22
**Laboratory** 61:17
89:12
**laceration** 21:21
**lacerations** 20:23
32:14
**lack** 60:6

**BRIGHAM R. TEMPLE, M.D.**

113

**large** 96:18
**larger** 49:3
**LaSalle** 2:17
**lawsuit** 88:5
**lawyer** 58:11
**law-talking** 51:19
**lay** 21:10
**leading** 12:12,14,18
15:2 16:7,15 27:7
27:13,21 32:7 35:9
38:22 42:23 45:13
62:19 63:3 90:10
**learn** 58:9
**leave** 59:1
**leaving** 58:7
**lectures** 10:5
**left** 81:2,9,13
**left-hand** 67:20
**legal** 66:15
**legs** 21:15
**let's** 34:20 59:7 79:17
79:18,20
**leukocytes** 29:7,10
29:16
**license** 1:24 7:2
106:19
**licensed** 6:23
**licked** 62:16
**licked/sucked** 80:23
**lie** 72:13
**life** 34:22
**limits** 69:2,4,7,8,12
69:15 70:14,20
71:13
**line** 29:4,11,19,20,24
45:19 54:9,11,17
103:7
**Lines** 40:17 45:17
**list** 17:4 23:14 24:12
54:13 61:14,18 80:3
**listed** 60:11 71:13
**listing** 73:21
**lists** 74:7
**literature** 33:1,4,9,16
35:4,13 82:22 84:3
84:8,9 85:9
**lithotomy** 75:10
**little** 6:8 69:3 96:9,11

**LLC** 2:6
**LLP** 2:16
**LOEVY** 2:2,2
**long** 54:13 78:17
**long-term** 68:22
**look** 6:5,12 13:19
14:8 15:11 22:15
23:8,10,21 26:21
29:14 30:23 33:12
35:20 41:1 53:10
56:20,23 61:24
64:20 68:23 77:2,15
85:8 87:21 89:10
96:15 97:6 99:20
**looking** 14:14 17:5
20:18 21:1,20 31:1
54:14,16 62:8 69:18
74:3 75:5 76:23
**looks** 41:6
**loss** 93:23
**lost** 34:18 43:9 93:21
94:2
**lot** 49:18,21 50:1
84:17
**LOWIS** 3:2

**M**

**Madison** 2:7
**majora** 75:17
**majority** 28:2
**male** 38:20 39:10
**man** 34:9 39:2
**manage** 68:21
**management** 8:16
**maneuver** 75:18,24
**manipulate** 51:8
53:12
**manipulated** 52:7
55:5
**manipulating** 51:15
51:20 52:3
**Manipulation** 55:8
**March** 106:12
**mark** 40:3 59:7
**marked** 4:15 5:23 6:3
13:13 40:13 53:21
59:10
**marks** 36:4 64:18
65:21 97:8

**married** 33:19
**Massucci** 78:14
**masturbation** 80:4
**matter** 26:2
**mean** 15:7 19:6 29:10
30:5,16 32:12 36:1
61:3 68:9 72:24
75:5 76:24 94:15
102:22
**meaning** 67:2 76:20
**means** 30:6 67:8
72:23 75:21
**meant** 67:12,14 98:7
**mechanism** 55:24
56:6
**medical** 5:18 6:15,17
7:19 22:11 30:12
33:1,4,9,16 34:2,17
35:4,6 41:1 50:15
61:1 66:14 82:4
84:21 85:9
**medication** 37:7
**medications** 104:14
**medicine** 5:20,21
6:22,24 7:10 9:19
9:22,23 10:2 33:13
33:13 84:2,8,14,19
84:22 88:7,10,13,15
88:18,21,24 89:4,8
**Memorial** 12:6
**memory** 50:12
**menstruating** 30:12
30:14,17,19
**mention** 103:15
**mentioned** 106:5
**message** 7:22
**methods** 61:22 62:5
**Michalik** 2:12 4:6
60:5 70:15 71:1,17
72:15 74:1 75:7
87:23 88:2,4 90:11
94:11 95:13 103:24
**middle** 62:2
**midsection** 64:11,16
**mind** 6:13
**mine** 53:23 73:5
**minor** 54:22
**minutes** 73:15

**mischaracterizes**
57:5,13 59:3 63:4
82:6 86:2 98:12
**misspeak** 87:2
**Misstates** 35:9
**moment** 46:6,13
**motion** 51:10
**Motrin** 37:10 103:4
104:15
**mouth** 24:17 53:10
81:8
**move** 12:17 51:12
**multiple** 59:20 60:12
**muscle** 52:18 53:2
**muscles** 59:22 60:14
**musculoskeletal**
51:11 69:17
**M.D** 1:10 3:6 4:3 5:8
105:8

**N**

**N** 4:1
**naked** 44:15
**name** 5:15 78:15 88:3
90:19
**named** 95:19
**names** 104:18
**narrative** 28:13
103:9
**nature** 41:16
**NAUGHT** 104:22
**necessarily** 53:12
78:5
**need** 21:24 61:15
70:3,7,23 77:14
102:10
**needed** 16:23 18:19
21:5
**network** 8:3
**neurological** 69:6
**never** 50:2,4
**news** 58:14
**nitrates** 29:7,11,17
29:21,22,24
**nonspecific** 30:7
**normal** 67:23 69:2,4
69:7,8,12,14 70:14
70:20 71:13
**normally** 77:12

BRIGHAM R. TEMPLE, M.D.

North 2:3,17
NORTHERN 1:2
NorthShore 7:13 8:3
Northwestern 6:21
  8:6,7 9:18 10:22
  12:6 13:24 14:3
  16:13 78:16
notation 68:12 73:18
note 17:24 54:12,21
  75:24 98:24
noted 47:12 50:22
  51:3 52:4,10,12,22
  53:2,17 55:21 57:11
  64:3 65:5,17,22
  76:11 80:17 81:13
  81:20 82:2
notes 23:18 76:8
  87:22
notice 1:16 12:13
  48:23 106:3
noticed 8:10
noting 76:3
Nowinski 7:22
number 4:15 10:19
  11:15 14:17 41:9,12
  42:8 59:14 68:24
  84:11
numbered 41:6
numbers 73:6
nurse 18:11,13,15,22
  20:15 24:11,15,21
  25:15,16,18 47:11
  69:21 70:7,8 78:14
  79:2,6,10 93:17,20
  94:17 96:23 97:13
  97:17
nurses 68:24 72:13
  78:22 79:7
nursing 15:20 28:6
  28:13 47:2,7 69:19
  71:12,22 72:14 79:8
  79:11 93:14
nylon 74:7

---

## O

oath 40:9
object 12:11,14 15:2
  16:6,7 33:2,24 34:5
  34:9 37:13,19 38:7

38:21 39:13,21 42:2
  42:3,10 44:20 46:15
  46:19 57:4 60:5
  72:15 90:10,20
  91:11 98:11 99:7,13
  99:13 100:4,12,19
  101:3 102:9,17
objection 16:15 27:7
  27:13,20 31:22 32:7
  32:19 34:12,23 35:8
  36:12,13,24 39:5
  42:11,23 43:12,13
  43:21,22 44:8 45:13
  46:19 57:5,13 59:3
  62:19 63:3,11 66:13
  70:15 71:1,17 72:8
  82:6 83:24 86:2,14
  87:10,16 94:8
  101:20 102:4
  103:24
observation 94:5
  99:4
observations 68:24
observe 49:7 52:6
  60:11 64:18
observed 49:11 51:2
  53:15 65:20 86:13
observing 20:21
Obstetrics 83:9,16
obtain 6:19 97:3
obtained 22:1,17,19
  28:23
obvious 53:11,15
obviously 40:9 46:4
  57:21
occasion 10:7 12:9
occasionally 68:20
occipital 101:10,17
occurred 92:1,4,9
  94:7 95:9
occurrence 59:18
  60:2
occurs 49:15
offender 46:2
offhand 15:17 34:6
office 2:20 5:5
officer 72:2,6,22,23
  73:1 105:4

officers 95:19,23
  96:3,7
Okay 7:23 15:13
old 17:12 68:4
once 11:21 15:11
  17:2 27:22 29:8
  38:9 51:5 71:19
  97:23
one-third 8:24 9:5
open 23:15 24:16
open-ended 103:22
operating 16:20 18:5
opinion 44:17 45:9
  46:6,12
oral 24:13 62:9 81:11
  91:15
order 26:4 42:11
  55:3 61:15 75:22
  102:7,14
orifice 92:10
original 82:15
outcome 106:9
outside 82:22 92:9
overall 36:16 103:20
oversee 8:15,17
overturned 58:5,10
o'clock 1:14,15

---

## P

packet 13:21 26:11
  67:18
page 14:16 16:1 17:5
  17:21 23:23 26:22
  35:23 40:17 41:2
  45:17 53:20 61:13
  62:2 67:18,19 68:23
  73:7,21 75:5 89:11
  99:1,20 103:6
pages 75:3
pain 51:14,23 52:2,14
  52:18,21 53:1,7,9
  59:19 60:1,16 68:15
  71:16 100:9,17,23
painful 51:10
palpate 55:12,14
palpating 55:20
paper 19:10,12 74:12
  96:10,17 97:7,12,19

paperwork 13:21
  23:12 95:6
paragraph 60:12
  99:21
parietal 101:16
Park 7:16
Parkinson's 87:5,8
  87:11,15,19
part 8:5 22:13 25:21
  28:15 29:13 49:14
  53:5 54:1,3 60:10
  61:8 75:1 80:2
  89:11 93:7 96:10
  97:5 101:10
particular 9:7 10:1
  33:11 97:18
parties 106:1,7
parts 36:10
patient 11:11,20 12:4
  12:10 14:24 16:21
  17:14 18:12 19:20
  21:10 24:16 25:14
  26:12,18 27:12 29:1
  29:18 41:20 42:21
  43:5 48:13 49:16
  50:19 55:24 56:3,11
  61:1 62:15 66:3
  67:1 70:1,3 73:17
  73:19 82:4,5 94:20
  94:22 95:1,11 97:9
  98:18,18 100:16,23
  102:13 103:22
patients 49:18,21,23
  50:9,16 68:20 86:22
  89:3
patient's 21:4 24:2
  48:18 51:8 53:7
  69:14 97:11
patterns 83:10
Paul 2:12 88:4
pay 55:24
pending 59:24 105:9
penetrated 33:24
  34:4,8 78:3,10
penetration 17:14
  23:24 63:21 64:7
  66:2,10,16,22 67:3
  67:8,12,14 85:13,16

**BRIGHAM R. TEMPLE, M.D.**

85:18 90:7,14,19,24
91:5,10 92:22 98:7
98:16,17 102:21,22
103:10,12,16
**penis** 17:14 62:23
63:10,23 64:2 90:8
91:1 102:23
**Pennsylvania** 6:18
**people** 46:6,13 50:1,4
51:12 85:23 87:18
**percent** 9:2 28:19
32:22 33:7 35:5,10
35:14 36:15 86:11
**percentage** 9:7,9
**perform** 23:16 26:17
76:10,15 77:22 78:7
**performed** 20:14,17
20:18 22:7 25:18
31:13 60:22 76:1
77:4,20 78:3 82:12
**performing** 42:21
**period** 86:23
**perpetrate** 63:16
**perpetrated** 63:17
**perpetrator** 61:23
62:5,10
**persistent** 78:11
**person** 56:1 61:6,7
62:1 68:1 102:15
**personal** 45:9 46:12
59:16
**personally** 105:6
**personnel** 50:15
**person's** 48:20
102:24
**pertaining** 13:18
**pH** 29:6
**Phingsten** 1:15 105:7
**phrased** 87:17
**physical** 16:22 18:6,9
18:16 19:23 20:10
20:13,16 21:4 23:23
31:8,9,11,20 34:10
35:15,22 38:3 39:7
39:9,15 48:8 51:7
59:1 62:4 64:20
100:9
**physically** 20:21

**physician** 10:6,21
12:3,6 32:4 34:17
49:15 94:13
**physicians** 102:7
**piece** 30:1 46:1 96:16
97:19
**place** 19:18 22:22
**placed** 19:15 75:22
77:14 97:1
**places** 24:17 62:11
**Plaintiff** 1:5 2:5
59:18 105:11
**Plaintiff's** 14:17
15:19
**plans** 8:16,18
**played** 12:15
**please** 5:14 49:2
**pmichalik@dykem...**
2:14
**point** 7:2 9:1 15:18
17:20 20:22 33:11
47:22 48:6 62:13
79:16
**police** 29:1 61:16
72:6,22 73:1 95:19
95:22 96:2,6
**portion** 79:11
**posed** 59:15
**position** 9:20 16:3
47:12,18,20 75:13
**positions** 9:13
**positive** 29:7,11,17
81:20
**possibility** 43:19
**possible** 17:13 20:3
44:1,7,11,18 46:17
56:18 68:17 72:10
72:20 99:15 100:13
100:15,17,22 101:5
103:18 104:17
**Possibly** 42:5 56:14
**post-assault** 41:9
42:8
**post-graduate** 6:19
10:18
**potential** 19:9 62:12
62:17 63:1 101:18
**potentially** 43:11

**practice** 5:20 6:24
18:14 51:1,6 55:18
**practiced** 88:9
**practicing** 88:13
**preparedness** 8:12
**presence** 7:17 105:18
**present** 17:8,11 44:5
72:6 106:4
**presented** 16:12 42:1
47:4
**presenting** 14:2
45:12 103:21
**pretty** 10:4 46:5
**prevalence** 83:21
**prevent** 30:13 64:15
**previously** 78:9
**prior** 9:8 26:18 30:15
58:7,8,11 80:14
**privacy** 99:22
**privileges** 7:12,19
**probably** 10:23 11:2
42:24 74:3 77:24
**probe** 55:9
**probed** 27:18
**problem** 103:21
**procedure** 16:20 18:5
**process** 11:16 26:9
27:1,6,11,11
**professional** 82:4
**professor** 9:21,23
**properly** 61:15
**prosecution** 12:23
**protocol** 45:5 54:24
63:6 69:21 76:4
**Provena** 7:16
**provide** 90:2 104:14
**provided** 19:11 22:20
23:4 24:12,23 50:17
104:18
**provides** 89:2
**providing** 62:1 94:20
**psychological** 70:9
99:23
**pubic** 25:5,12 27:4,19
44:16
**publication** 33:10
**published** 32:24
82:19 83:3,9,14

**pulled** 59:21 60:13
**purely** 32:20
**purposes** 5:1 19:4
89:23
**pursuant** 1:16 106:3
**put** 11:9 12:13 17:24
19:7,14 21:12 77:1
79:13 97:9
**putting** 97:11
**p.m** 1:15

___

**Q**

**qualify** 49:19
**question** 12:12,20
16:7 27:15,23 28:3
30:24 33:3 37:1,14
37:20 38:1,8,22
39:14,22,24 40:18
42:3,7 43:13,18
44:21 45:24 46:16
50:10 55:6 56:3,7
80:1,4,6,9 90:5 98:9
98:12,15,22 99:8
100:20 101:4
102:11 103:6,20
**questionable** 93:23
**questionnaire** 95:4
**questions** 12:18 41:7
42:12,13 46:20 47:1
61:14,18 66:19,23
70:3 80:3,14 87:21
89:19,20,21 90:2
93:6,15 95:3,14,15
95:20 102:18
103:16 104:4,10,20
**quick** 89:10
**quickly** 88:3
**quite** 27:14 56:2
102:11
**quote** 36:15 85:2,4,5
**Q-tip** 23:2

___

**R**

**R** 1:9 4:3 5:8 105:8
**RACHEL** 2:7
**range** 51:10
**rape** 11:14 18:7 19:4
19:13 23:15 26:5,14
27:1,10 28:20 31:13

**BRIGHAM R. TEMPLE, M.D.**

41:5 42:21 44:18
45:10,12 73:3,8,9
73:14 74:21,23
78:24 79:3 83:17
96:11,13 97:5 100:7
**raped** 34:4 101:2
**reaction** 99:23
**read** 28:2,14 29:12
40:22 73:9,20 88:21
**reading** 73:8
**reads** 72:1
**really** 29:5
**reason** 46:3 50:14
**reasons** 43:17 44:24
50:11
**recall** 12:22 18:13
23:17 40:5 76:19
86:23 94:6
**received** 86:7 104:17
**recollection** 13:2,6
14:14 16:5,11 17:19
18:13 35:21 47:3
48:1 52:1,9,16,19
57:1,7 58:22 59:5
60:17 63:24 64:12
64:17 65:15 67:10
77:6 79:1 81:17
87:7 95:22 96:2,5
97:24
**record** 5:1,15 7:21
50:17 74:1
**records** 13:10,17
41:1
**rectal** 23:16 24:2,4
31:20 32:11,18
33:18 35:7 64:7
76:7,8 85:13,16,17
103:12,15
**rectally** 23:6,7 66:10
**rectum** 78:12 91:1,6
91:11
**redness** 21:21
**reduced** 105:19
**refer** 17:2 19:21
31:10 45:16 47:2,8
63:12 84:12 98:24
**reference** 85:6
**referenced** 82:23

84:7
**referring** 83:7
**refresh** 47:3
**regard** 53:19
**regarding** 34:3 94:23
**regardless** 48:18
**region** 8:17,20 35:7
38:15 101:17
**regular** 49:14
**related** 106:7
**relation** 101:23
**relations** 68:16
**relevance** 86:14
87:10 95:10
**relevancy** 59:6
**relevant** 41:18
**reliable** 94:23 95:1
**rely** 15:22 28:10
**relying** 13:10
**remained** 73:18
**remains** 29:1
**remember** 15:15,17
20:7 46:7,11,14
47:5 50:7 78:18,20
89:21 98:9
**remembering** 45:11
**repair** 60:1
**repeatedly** 57:3,10
85:24
**rephrase** 12:20 27:8
30:24 50:10 55:7
61:10
**report** 45:3 61:17
65:13 89:12 93:20
**reported** 1:23 14:4
65:16 85:17,24 90:1
101:16 105:17
**Reporter** 1:12 106:18
**reporting** 17:18 20:3
50:23
**represent** 43:7 88:4
95:18 101:12
**Representing** 2:5,9
2:14,19,24 3:5
**reproduction** 13:23
**requested** 76:2
**required** 104:4
**research** 82:12,15

**residency** 8:5 88:6
**resident** 10:22
**respect** 10:2 20:13
**respective** 106:1
**response** 59:14
**responsible** 96:21
97:10
**rest** 24:10
**restraints** 62:6 93:2
**result** 59:18,20 60:2
65:14 84:24
**results** 30:21 31:1
**returned** 101:13
**review** 17:21 70:5
86:21
**re-explore** 94:17
**Riggio** 2:10 12:10,24
13:3,18 14:2 15:23
16:5,12,18 18:3
19:1 21:12 22:7
25:19 26:8,15 28:11
30:11,22 35:18 40:6
43:8 44:12 47:4,8
47:16,23 50:21
51:23 52:14,17,21
53:1 55:4,19 56:15
56:17 57:2,9 58:2
58:17,20,23 59:15
62:22 63:15,22 64:1
64:6,10,13 65:13
67:7,11 72:7 77:5
77:23 78:2,24 80:12
80:20 81:7,15,18
87:4 98:7 101:13
103:14 104:15
**Riggio's** 26:22 52:11
53:16 55:14 64:19
69:1 73:22 74:7
93:18 95:23
**right** 8:12 15:1,20
18:23 26:9 28:7
30:9 31:5 41:7,10
47:9,13,24 49:8,18
49:22 50:2,5,9,12
50:19 51:4,16 54:7
54:15,22 56:8,13
60:1,16 61:2,9,17
62:13 63:2,10 64:4

68:16 69:2,7 70:1
70:14 71:6,8,13
72:1 73:19 74:14,24
79:22 80:4,7,14,24
81:9 82:20,21 85:2
85:4 99:6,9 101:16
102:24 103:4
**right-hand** 80:2
**Riverside** 7:19
**rkiley@bollingertr...**
2:9
**Road** 1:15 105:7
**Robert** 5:16
**room** 8:22 10:6 12:6
18:15,23 32:4 49:20
93:18
**rooms** 19:20
**Rosen's** 84:14
**roughly** 73:16
**run** 73:6
**run-on** 61:12
**Russell** 2:2 79:15
**russell@loevy.com**
2:4

_____

**S**

**S** 4:14
**safe** 13:9
**SAITH** 104:22
**sample** 25:3
**samples** 11:10,12,20
11:24 21:23 22:16
22:18,21 24:9,10
25:3 27:4 46:9
**satisfied** 67:3
**saw** 14:15 15:4,9,16
47:16 50:18
**says** 17:7 28:14,20
29:5,6,22,23 54:10
54:21 62:4 65:2,12
67:20 68:3 69:4,9
70:10,14 71:14,23
72:21 75:17,20
76:12 92:24 99:2,21
**SCAHILL** 2:21
**scalp** 55:12,15,21
**scan** 102:15
**scans** 102:8

BRIGHAM R. TEMPLE, M.D.

**scene** 43:8
**school** 6:16
**scraping** 11:24 24:24
**scrapings** 24:20 25:1
  45:21,23
**scratch** 36:4
**scratched** 45:3 46:2
**screening** 25:22
**screw** 79:19
**sealed** 97:14,23
**seals** 97:16
**second** 20:6 22:24
  54:9,16
**section** 17:7
**see** 12:10 14:8,19
  20:22,22 21:23 23:8
  23:10 30:23 31:10
  36:9 49:5,18,21,23
  50:4 51:8,13 53:10
  53:12 54:5 55:12,15
  56:23 58:14 60:3
  62:2 63:13 69:10
  72:3 73:11,23 97:22
**seeing** 82:4 95:22
  96:2 101:15
**seen** 50:2
**semen** 37:24 38:5,16
  38:19 39:4,12,19
  40:19
**sense** 34:18
**sent** 28:24
**sentence** 61:12
**services** 61:17 79:21
  84:15
**set** 29:4 89:20 95:3
  106:11
**severe** 99:23
**sexual** 10:7,11 11:4,7
  11:11 12:23 14:5
  17:10,12 18:7 20:3
  32:5,16 33:6,19
  35:5 36:8,18,22
  44:4 48:9 54:1
  56:19 58:1,18,24
  60:19,21 61:4,9
  63:15 65:24 66:11
  68:10,16 80:10,13
  80:17 81:23 82:1,11

82:13,24 83:11,22
  84:3,24 85:11 86:12
  89:6 93:9 94:13
  95:9 99:21
**sexually** 25:22,24
  33:24 34:4,8,11,21
  58:21,24 92:18
**shaken** 15:1 31:5
  44:10
**sheet** 15:20 19:11
  28:7 47:2,7 69:19
  71:12 74:12 79:8,12
  93:14 96:10,12,15
  96:22
**Sheriff's** 2:20
**shock** 99:24
**Shorthand** 1:11
  106:18
**shoulder** 51:21 59:21
  60:13 81:3,9,13
**shoulders** 51:24 52:3
  52:3,7,11
**show** 34:9,19 35:15
  35:18 85:8,9
**shower** 41:14
**showered** 41:20
**showering** 43:19
**shows** 37:9 72:11
**side** 55:11 67:20 80:2
**sign** 53:15
**signature** 29:2
  105:23 106:11
**signed** 29:9 79:4
**significance** 67:22
**significant** 77:13
**signs** 23:24 26:12
  31:3,8,9,11 33:5,17
  34:9,19 35:15,18,24
  36:1,6,16,18 53:11
  54:22 86:20
**single** 45:11
**sir** 6:6 57:24 60:3,10
  79:24 102:21
**sit** 24:5
**situation** 46:4
**six** 9:12
**skin** 21:19,20 67:20
  67:24 69:9

**skirt** 74:8
**Skokie** 7:15
**small** 25:3 29:7,8,10
  29:16,23,23 30:5,6
  30:8
**smaller** 9:9
**somebody** 19:12
  41:24 55:10
**somebody's** 29:9
**someone's** 45:2
**sorry** 55:6 67:16 76:7
**source** 99:11
**sources** 84:20
**South** 2:12,22
**space** 76:7
**speak** 21:13 38:3
**speaking** 61:4
**Spec** 29:8
**special** 71:16
**specific** 26:11 29:22
  30:2,2 46:1 65:2
  81:15 86:22,24
  101:23 102:10
  104:3
**specifically** 20:12
  25:23 36:3 49:7
  66:9 69:21 83:6
  101:9 103:17
**specify** 63:13
**specimens** 41:23
**speculation** 27:21
  34:24 36:13 38:8
  42:4,11 43:23 72:9
  100:20 101:4
**speculum** 22:2,9,11
  27:3,18
**spell** 5:14
**spent** 8:21 10:22
  88:12
**spoke** 46:24
**sponge** 41:15
**spots** 101:15
**sprained** 59:21 60:13
**spread** 21:15
**SS** 105:2
**St** 7:17
**staff** 7:18 12:3
**Stalf** 2:21 4:7 7:21

60:7 70:16 71:2,18
  72:8,16 79:15 95:17
  95:18 98:1
**standard** 16:19 18:5
  18:14 20:1,18 24:12
  28:21 45:5 55:17
  63:6 66:19 76:18
  93:6
**standardized** 41:4
**standpoint** 26:16
**stands** 17:8 28:23,24
**start** 5:3 8:2 45:19
  48:22 103:20
**started** 5:2,6 8:8 73:3
**state** 1:12 5:14 11:10
  18:20 44:14 45:6
  54:3 61:16 64:10
  66:20 89:11 95:6
  105:1
**states** 1:1 6:23 59:17
**State's** 5:4
**statistically** 32:17
**statistics** 33:1 34:3
  34:14 36:14
**status-post** 17:12
  68:8,9
**stay** 84:20
**stays** 74:21
**STD** 25:24 104:17
**steady** 28:22
**stenographically**
  105:17
**step** 18:8
**steps** 11:15,18,19
  16:17
**sterile** 22:20
**stirrups** 21:13
**stop** 22:24
**Street** 2:7,17,22 3:3
**strike** 12:17 31:3
  33:21 44:24 56:16
  58:19 76:11 82:11
**struck** 86:1
**studied** 82:10
**studies** 83:3,8,15
**study** 83:7
**subject** 83:10,16
**suffered** 48:10 55:4

BRIGHAM R. TEMPLE, M.D.

118

56:18 87:5
**suffering** 59:20
**suggestive** 26:14
**suit** 106:8
**Suite** 2:3,7,12,17,22
  3:3
**summary** 14:17
**supposed** 5:3 54:14
  79:12
**sure** 13:19 19:6 25:10
  27:14,22 54:21 56:2
  66:7 82:3 85:7 94:9
  94:15
**surface** 57:11 86:1
**Susan** 2:10 12:10,24
  13:3,18 58:2
**sustained** 50:16 51:9
  56:12 59:16 60:2,21
  83:23 85:13,16
  86:12
**sustaining** 85:17
**swab** 62:17,24
**swabbed** 24:4 44:16
  45:2 62:12
**swabbing** 24:7 63:8
**swabs** 12:1 22:21
  23:3 24:13,17,17
  27:3,18 37:24 38:2
  39:4,7 43:2
**sweating** 68:1
**swelling** 21:21 32:14
  52:6,10
**swollen** 21:2
**sworn** 5:7,10 105:14
**symbol** 68:6
**symptom** 56:24
**symptoms** 87:18
**System** 8:3
**systems** 7:14 17:21
  70:5

**T**

**T** 4:14
**table** 19:18,22
**take** 6:5 13:19 18:12
  19:18 23:10,20
  26:21 37:12 41:1
  46:9 56:22 67:17
  77:2 79:16,22 89:10

94:16
**taken** 1:10 23:14
  25:4,9,11
**takes** 73:17 74:18
**talk** 60:20 65:24
  84:23 96:9 103:9
**talked** 96:11
**talking** 66:14 70:1
  74:1 82:23
**talks** 54:11
**tampon** 41:15
**teach** 10:2 88:15
**teaching** 9:13
**tearful** 16:2 47:4,12
  47:17,23 48:5
**tears** 36:4 76:13,17
**teeth** 52:15,22 53:7
  53:10,12,16
**tell** 20:11 23:13 24:1
  24:4 29:5 37:4
  47:21 52:17 56:17
  57:2 58:17,20,23
  63:19 67:1 70:9,13
  85:3,14 86:4 87:4
  92:17,23 103:13
**telling** 66:8 81:24
**tells** 46:1 62:15
**Temple** 1:10 3:6 4:3
  4:16 5:8,16,22 6:4
  13:12 40:12 59:9
  105:8
**ten** 5:2
**tender** 21:2 53:13
**tendered** 6:2
**tenderness** 52:7,11
  54:15 55:11,13,16
  55:20 64:19,22,23
  65:3,5,9,12,13,16
  65:20 101:16
**terminated** 1:14
**terms** 11:7 16:18,24
  18:7 24:3,8 30:24
  31:2,5,8,19 33:9
  38:18 66:1
**test** 25:17
**tested** 74:19
**testified** 5:10 40:6
**testify** 105:14

**testifying** 12:22
**testimony** 35:9 40:4
  45:17 98:13 105:16
  105:22 106:10
**testing** 11:13 12:1
  16:23 25:20,22,24
  26:1,17 43:20
**text** 53:21
**textbook** 33:10,14
  82:23 84:7,10
**textbooks** 84:11,17
  88:21
**Thank** 95:13 98:1
**thereof** 106:9
**thing** 18:3 93:11
**things** 11:23 36:5
  41:15 42:16 46:24
  54:11,13 61:21 62:8
  77:14 78:8 79:19
  84:16 100:16
**think** 27:17 31:4,12
  36:15 37:4 40:4
  73:8 84:1 93:16
  104:16
**thinking** 101:1
**thirty** 10:16 86:22
**thorough** 48:19
**threats** 62:6
**three** 10:13,23 80:24
**thrown** 92:20
**time** 8:4,21,23,24 9:2
  9:10,10,11 10:20,21
  13:24 15:4,9 16:8
  18:18,21 23:20
  37:12 45:11 47:11
  47:16,20 49:24
  50:18 61:10 73:13
  73:16 78:1,17
  100:10,24
**times** 35:14
**Tintinalli's** 33:12
**tissue** 22:21
**today** 13:10 24:5
  47:21 57:18 79:19
**toe** 20:2,10,16,20
  48:19 49:6,8 50:22
  51:3 53:5 60:1,16
  70:5

**toes** 48:24
**told** 31:4,12 40:5
  52:21 56:22,23 57:9
  62:22 65:4 78:2
  81:11 93:16
**Tom** 7:22
**tongue** 63:10
**tool** 24:23
**tooth** 59:24 60:16
**top** 14:18 17:6 28:15
  44:15 54:18 68:3
  75:3,9
**topic** 84:10
**total** 10:14 11:1
**touched** 64:2
**touching** 21:1 63:23
**to-wit** 105:6
**traction** 75:21
**trained** 6:21
**training** 6:20,22 8:6
  10:18 32:2 88:23,23
  99:18 100:3
**transcript** 12:15
  105:21
**Transcription**
  105:20
**transmitted** 25:22
  26:1 82:1
**transported** 14:6,10
**trauma** 20:19 31:8
  31:20 32:11,18 33:5
  33:17 34:10,20 35:6
  35:15,18,24 36:2,6
  36:9,16,19 48:10,12
  53:11,16 54:22 56:4
  59:20,23 60:12 70:4
  83:4,5 86:8 99:11
  101:18
**traumatic** 46:4 53:8
**traumatized** 15:1
**treat** 10:7 61:7 68:20
**treated** 10:12 13:3
**treating** 16:18 36:22
  89:3 94:13
**treatment** 15:23
  28:10 50:17 56:12
  89:6
**triage** 94:16

BRIGHAM R. TEMPLE, M.D.

**trial** 12:17 40:4,6
  45:17
**tried** 64:14
**true** 41:24 88:13 89:4
  89:8 105:21
**truth** 105:14,15,15
**try** 49:12 53:6
**trying** 61:5,22
**turn** 14:16 28:4
  53:19 74:17
**turning** 40:16
**two** 9:8 10:13,23 75:2
  78:23 79:7,10
  100:16 101:23
**two-minute** 79:16
**two-thirds** 8:23 9:5
**type** 5:20 22:18 48:14
**typewriting** 105:19
**typical** 36:5 50:24
  51:6 67:23 73:13
  77:11 84:19
**typically** 18:10 21:9
  24:11 25:7,9 51:12
  51:22 53:8 57:15
  65:7 71:3 77:21
  79:5 81:22 96:13,21
  97:7,10,16 102:7
  104:1
**typing** 49:3
**T-e-m-p-l-e** 5:17

**U**

**UA** 28:22
**ultimate** 99:22
**unclear** 94:1
**uncommon** 31:21,23
  32:10,13 36:9 37:17
  38:6,10
**undergoing** 19:12
  26:9
**undergone** 70:4
**underneath** 24:24
  46:9 59:13
**understand** 56:2 66:4
  66:5,7 67:2,4 84:2
  102:11
**understanding** 11:14
**Understood** 53:14
  69:24

**underwear** 74:8
**undetermined** 105:9
**unfolded** 96:19
**UNITED** 1:1
**University** 6:10,21
  7:13 8:3 9:18,24
**unknown** 17:13
  92:19
**unsure** 64:8 90:8,18
  91:4,9 92:7,13
  103:15
**unusual** 36:17
**upside** 48:22
**urinalysis** 28:23
**urinary** 29:18
**urinated** 41:13 42:1
  42:9,17
**urination** 43:19
**urine** 29:6,14 30:4,9
  43:9,9 99:6,12
**use** 19:19 48:12
  53:24 60:5 66:18
  69:24 70:2 84:20,20
**useful** 56:7
**usually** 45:22
**uterus** 22:13

**V**

**V** 2:17
**vagina** 22:23 90:8,15
  90:20 102:24
**vaginal** 17:13 22:14
  22:22 24:7 25:21
  27:3 31:20 32:11,18
  33:18 34:20 35:6
  37:24 38:2,15 39:4
  39:6 63:21 92:21
  103:10
**vaginally** 23:5 66:10
**various** 8:19
**verbalize** 66:5
**verified** 106:11
**version** 49:2 74:4
**versus** 9:10 20:14
**victim** 46:2 48:9
  60:20 61:5 62:10,11
  66:12 80:22 81:24
  90:1,2 91:24 92:14
  93:3,5,9,21 94:2,14

  95:8,8 100:7
**victims** 10:7,11,23
  32:5,16 33:6,7 35:5
  36:8 44:5,18 45:10
  66:1 82:14 83:1,12
  83:17,21 84:4,24
  85:12 86:12 89:6
**victim's** 48:24 92:10
  94:6 96:22 97:20
**Violence** 83:4,5
**Virginia** 78:20
**virginity** 34:19
**visible** 36:18
**visibly** 15:1 31:5
  44:10
**vision** 101:7 102:2
**visual** 21:22 22:15
  24:1 75:22 76:18,21
**visualization** 22:12
**Vitae** 6:3,12
**vomiting** 41:15
**vs** 1:6

**W**

**Wacker** 2:12
**waited** 5:4
**Waive** 104:21
**waived** 105:24
**wall** 65:3,9
**want** 43:4 46:23 47:7
  79:24 89:24 96:9
**wanted** 45:8
**wants** 66:20
**warm** 67:20 68:2
**warranted** 20:5
**way** 24:4 33:21 57:23
  77:7 87:18 94:2
  98:22 106:7,8
**weapons** 62:6 93:1
**went** 6:17 103:16
**West** 2:7 3:3
**we'll** 40:3 45:19
  48:22
**we're** 74:1
**we've** 6:3
**WHEREOF** 106:10
**white** 101:15
**wipes/wash** 41:14

**witness** 4:2 5:7,9 15:3
  16:9 17:6 27:8,14
  27:22 31:23 32:8,20
  33:4 34:13 35:1,9
  35:10 36:14 37:2,15
  37:21 38:9,23 39:6
  39:15,23 42:5,13,24
  43:14 44:1,22 45:14
  46:17 57:7,15 59:5
  62:20 63:5,12 70:19
  71:3,19 72:10 79:18
  82:8 84:1 86:4,15
  87:11,17,21 94:9
  98:12 99:9,15 100:5
  100:13 101:5,9,22
  102:5,10 104:1,21
  105:13,17,18,22
**woman** 22:5 27:17
  34:20 68:4
**woman's** 36:10
**women** 31:17 35:14
  36:22
**word** 48:12 55:8
  66:18 67:8,12,14
  75:9
**words** 39:9 47:12
**work** 17:12
**worked** 44:4 78:16
**working** 8:2,8 13:24
  32:4
**written** 81:2 103:9
**wrong** 16:21
**wrote** 15:3 17:3,10
  36:3 93:23 94:9

**X**

**X** 4:1,14
**X-rays** 102:8

**Y**

**year** 6:11 10:13,24
  58:9
**years** 9:8,12 32:5
  95:9
**yield** 11:21
**Young** 6:10

**0**

**015470** 17:6 23:23

BRIGHAM R. TEMPLE, M.D.

35:23
**015474** 15:19
**015475** 28:4
**015479** 14:17
**015480** 41:2
**0835** 73:3
**084-003754** 1:24
  106:19
**0920** 73:7
**0940** 73:18

---
**1**

**1** 4:17 5:23 6:4
**1.005** 29:8 30:2
**1:00** 79:21
**1:15** 1:15
**10** 2:12 8:17,20 32:22
  35:5,10 86:11
**100** 2:3 9:2 28:19
**102** 4:9
**104** 4:10
**11:00** 5:2,3
**11:01** 1:14
**12** 45:17
**13** 4:18
**14-CV-02945** 1:6
**14-Z** 40:17
**15-year** 86:23
**15-Z** 45:17
**15474** 93:15
**15476** 74:2
**15478** 75:7 99:1
**15480** 89:11
**15482** 99:20
**1700** 2:22
**1900** 3:3
**1979** 58:18
**1994** 6:14

---
**2**

**2** 4:18 13:13,17 40:24
  53:20
**20** 2:22 40:17
**200** 3:3
**2002** 12:5,9 13:4 45:1
  95:11 101:14
**2004** 8:9 58:1
**2013** 58:4
**2015** 1:13 58:7,9

105:6 106:12
**2100** 1:15 105:7
**22** 45:18
**222** 2:17
**23** 1:13 40:17 105:6
**2300** 2:12
**24** 12:9 13:4 95:11
**243-5900** 2:4
**2430** 2:7
**253-6200** 2:8
**27** 101:14

---
**3**

**3** 4:19 40:3,13 96:20
  96:20 99:21
**30** 31:13 36:22 44:4
  49:23 85:11,23
**300** 2:17
**31st** 106:12
**312** 2:3,4,8,13,18,23
  3:4
**364-2500** 3:4

---
**4**

**4** 4:20 59:8,10,14
**40** 4:19 11:2 31:13
  36:22 44:4 85:11,23
  86:22
**45** 73:15
**46** 4:5

---
**5**

**5** 4:4,17
**5-24** 95:23
**5.0** 29:7
**50's** 33:19 34:21
**50-year** 17:11 68:3
**500** 2:7
**580-1030** 2:23
**59** 4:20

---
**6**

**60601** 2:18
**60603** 2:22
**60606** 2:13 3:4
**60607** 2:3
**60661** 2:8

---
**7**

**7** 41:9 42:8
**70** 33:6 35:13 36:15
  67:18
**704-3000** 2:18
**74** 68:23
**76** 26:19,22
**77** 53:20

---
**8**

**8** 45:19
**8:13** 47:9,11
**8:25** 71:23 72:7
**8:45** 15:14 47:15
**80** 61:13 80:1 103:6
**876-1700** 2:13
**88** 4:6

---
**9**

**90** 33:7 35:14 36:15
**95** 4:7
**98** 4:8