# Transcript of Record
## Appeal to
## Court of Illinois
### APPELLATE
### FIRST District

**Circuit Court No.** 02 CR 14572

**Trial Judge** MICHAEL TOOMIN

**Reviewing Court No.** 04-0949

THE PEOPLE OF THE STATE OF ILLINOIS

vs.

CHATMAN, CARL

FILED APPELLATE COURT 1st DIST.
AUG 05 2009
STEVEN M. RAVID
CLERK

from
## CIRCUIT COURT
## of
## COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CRIMINAL DIVISION

FOUR OF SIX VOLUMES
REPORT OF PROCEEDINGS

DOROTHY BROWN,
Clerk of the Circuit Court

Per ___ DB/PR ___
Deputy

(Rev. 1/17/01) CCCR 0310

EXHIBIT S

Plaintiff 003215

FILED APPELLATE CT 1ST DIST
2005 DEC 28 PM
STEVEN M. RAVID
CLERK OF COURT

02CR014572/A008

EXHIBIT 20

1    THE COURT: Please be seated. I understand
2    the State has additional evidence at this time?
3    MR. RUBINSTEIN: Yes, sir.
4    THE COURT: You may proceed.
5    (Witness sworn.)
6    THE COURT: You may proceed.
7    MR. RUBINSTEIN: Thank you, your Honor.
8
9    BRIGHAM TEMPLE, M.D.,
10   called as a witness by the People of the State of
11   Illinois, having been first duly sworn, was examined
12   and testified as follows:
13
14   DIRECT EXAMINATION
15   BY MR. RUBINSTEIN
16       Q. Good afternoon, sir. In a loud voice,
17   please introduce yourself to the ladies and
18   gentlemen and spell both your first and last name.
19       A. My name is Brigham Temple, first name is
20   spelled B-r-i-g-h-a-m, last name is T-e-m-p-l-e.
21       Q. How are you employed, sir?
22       A. I'm a physician at Northwestern Memorial
23   Hospital here in Chicago.
24       Q. What area of Northwestern Memorial Hospital

```
 1    do you work in?
 2         A.   I work in the emergency department.
 3         Q.   How long -- are you a physician licensed to
 4    practice medicine in the State of Illinois?
 5         A.   Yes, I am.
 6         Q.   Are you board certified?
 7         A.   Yes, I am.
 8         Q.   How long have you been a physician in the
 9    State of Illinois?
10         A.   Going on four and a half years.
11         Q.   Where did you go to medical school?
12         A.   I went to Medical College of Pennsylvania
13    in Philadelphia.
14         Q.   Where did you do your undergraduate work?
15         A.   I went to Brigham Young University.
16         Q.   That's in Utah?
17         A.   That's correct.
18         Q.   I would like to direct your attention back
19    to the 24th of May, 2002, during the morning hours.
20    Do you remember where you were at that time?
21         A.   I was working in the emergency department
22    at Northwestern Memorial.
23         Q.   On that morning, the 24th of May, 2002, did
24    you see a patient named Susan Riggio?
```

4-Z

1  A. Yes, I did.

2  Q. Could you describe to us how the patient
3  Ms. Riggio presented to you?

4  A. Well, she was placed into one of the rooms
5  in our emergency department. And the initial triage
6  sheet indicated that she had presented for a sexual
7  assault.

8  And upon entering the room, she
9  appeared that she was visibly shaken. She was
10 crying at the time. That was how I would describe
11 her sort of demeanor and appearance upon entering
12 the room.

13 Q. When you walked into the room --

14 MR. BRANDSTRADER: Judge, if I might, could
15 I ask the doctor to keep his voice up. He is
16 trailing off at the end.

17 THE COURT: Yes, the acoustics are not all
18 that good.

19 THE WITNESS: Yes. Sorry about that.
20 BY MR. RUBINSTEIN:

21 Q. When you first went into treatment room and
22 saw Ms. Riggio, how did you begin your treatment?

23 A. Well, with every patient that's seen,
24 including Ms. Riggio, we always spend some time

1  asking the patient what brings them into the
2  emergency department, and the events that transpired
3  to have them seek emergency medical attention.
4      Q.  Did you then after getting that information
5  from Ms. Riggio, did you then go about doing a
6  sexual assault evidence collection kit?
7      A.  Yes.
8      Q.  What is a sexual assault evidence
9  collection kit?
10     A.  Well, a sexual assault evidence kit is
11 something that has been put together.  Usually, it's
12 done based off either state or county.  For here in
13 Cook County, there is a kit that has been set forth
14 by the state for collection of evidence.
15          So inside of the kit, there is a
16 certain procedure that is followed, along with
17 envelopes that are used to collect samples from the
18 patient, whether it be clothing, other samples from
19 physical exam for evidentiary reasons.
20     Q.  Did you do your physical examination of
21 Ms. Riggio before starting the evidence collection
22 kit or at the same time?
23     A.  We do it concurrently.  So at the same time
24 that we do the kit itself, we also do the physical

6-Z

```
 1   exam.  So we do that at that time.
 2        Q.  Could you take us through your work with
 3   the sexual assault evidence collection kit, your
 4   physical examination of the victim and tell us what
 5   you found?
 6        A.  Sure.  The kit is very well defined as to
 7   how we are to go about examining patients for
 8   evaluation of sexual assault.  The patient is first
 9   of all if -- when they present, if they are in the
10   same clothing that they were wearing at the time the
11   event occurred, there is a piece of paper that is
12   placed on the floor that is included in the kit.
13   They're asked to undress on that so the clothing can
14   then be essentially obtained and then used, you
15   know, for later forensic testing as needed.
16             After that, essentially a head to toe
17   physical examine is done with samples that are taken
18   as indicated inside of the kit.
19             So what we do essentially is a full
20   exam, including a genitalia exam which is an
21   important part of any type of sexual assault.
22             At that time there are certain samples
23   indicated inside the kit that need to be obtained.
24   For example, if someone has scratched the person
```

```
 1   that was -- in which they were engaged in this
 2   altercation or this event, you know, we will do
 3   scrapings under the nails.
 4              If there has been evidence of or not
 5   even evidence, but if there has been touching of the
 6   gentile area, we will take samples in and around the
 7   gentiles.  In a woman obviously, we will take
 8   samples from inside the vagina.  We will do samples
 9   around the rectum.  Same thing if it was a man who
10   had been sexually assaulted.  We would do the same
11   thing.  We would do a penile exam and so forth.
12   That is essentially how we proceeded on that
13   morning.
14              We went through the kit as outlined
15   and took the appropriate samples and sealed them in
16   envelopes for each of those areas.
17              Once they're sealed, they're signed by
18   the nurse who is helping with the exam, as well as
19   the physician, in this case myself.  And at that
20   point, they're placed into a box which when the exam
21   is completely done, it's sealed and signed by the
22   nurse and the physician, which in this case would be
23   myself.  So that they can then be given directly to
24   the police department or the sheriff's department,
```

```
 1    whoever is involved in it.
 2         Q.   Is the procedure that you just described
 3    for us also the same procedure that you used in this
 4    case?
 5         A.   Correct, yes.
 6         Q.   What were the results of your examination
 7    of Sue Riggio?
 8         A.   You know, when we did the examine, we
 9    didn't find a tremendous amount of physical signs of
10    trauma.  In particular, when we did the gentile
11    exam, we did not find any lacerations or tears which
12    means that there was no forceable sign of trauma at
13    the time.
14              Trauma means the destruction of
15    tissue.  That is probably the best way to describe
16    that.
17              We didn't find any cuts or bruises
18    anywhere.  You know, other than the fact that she
19    was visibly shaken, her physical exam was relatively
20    normal.
21         Q.   And you did both a vaginal and rectal exam?
22         A.   That's correct.
23         Q.   Over the course of your career as a
24    physician, how many sexual assault examinations have
```

1  you done?
2  A. Without giving you an actual number, I'm
3  going to estimate that it's approximately 60 sexual
4  assault victims that I have seen over the course of
5  four and a half years.
6  Q. How many of those 60 sexual assault victims
7  were adult women?
8  A. Roughly 50.
9  Q. Based on your experience as a physician and
10 having done about 50 examinations of adult female
11 sexual assault victims, how common or uncommon is it
12 to have a situation where there are no vaginal tears
13 or lacerations or visible injuries?
14 A. It's actually very common. Most women that
15 are sexually assaulted, in fact, very few of them
16 will have visible signs of trauma.
17          In my anecdotal experience, that means
18 based off the patients I have seen, I would say it's
19 probably only about five patients or less out of
20 those 50 had any visible signs of tearing,
21 abrasions, lacerations or trauma to the gentile
22 area, which would be very consistent with what we
23 see sort of in, you know, in published reports in
24 terms of the percentage of sexual assault victims

1      THE COURT:  You may.
2  BY MR. RUBINSTEIN:
3      Q.  Dr. Temple, I'm handing you a cardboard box
4  which is marked People's Exhibit No. 21 for
5  identification.  Could you tell us what that is?
6      A.  Sure.  This is the sexual assault evidence
7  collection kit that was done on Ms. Riggio which was
8  done, as stated here, May 24th, 2002.  And it was
9  done at Northwestern and signed by myself.
10     Q.  Other than the various stickers from the
11 State police lab, is this sexual assault evidence
12 collection kit in substantially the same condition
13 today as it was when you used it on the 24th of May,
14 2002?
15     A.  Yes.
16     Q.  Could you please open up the box and take a
17 look inside and just briefly go through with us the
18 various components inside the kit?
19     A.  Sure.  So these are sort of the envelopes
20 that are used for, you know, collection of samples.
21 They're done in sort of a step wise pattern so we do
22 a very methodical, meticulous exam to collect this.
23 Each of these envelopes is labeled with a particular
24 step so that we do this and get all the specimens as

Plaintiff 003225
00568

```
 1    that actually have physical signs of gentile trauma.
 2         Q.   What about evidence of trauma to other
 3    parts of the body like the head, arms, back, things
 4    like that, how common is it to see injuries of that
 5    nature in sexual assault victims?
 6         A.   It's also very uncommon and obviously it
 7    depends upon the full extent of whatever the, you
 8    know, the events of that assault were.  But most of
 9    the time, and when I say most of the time, we're
10    talking about once again less than ten percent of
11    people have visible signs of trauma associated with
12    this.
13              And in most people that have gentile
14    signs of trauma, less than 50 percent of those
15    people will have bodily signs of trauma.  So in
16    other words, damage to the body and other places
17    besides the gentile area.
18         Q.   I would like to now show you an exhibit
19    which I have marked as People's Exhibit No. 21 for
20    identification.
21              I have already shown this to the
22    defense lawyer.
23              Your Honor, may I approach the
24    witness?
```

11-Z

1  appropriate.

2          So this is the envelope that contained
3  the clothing that was taken at the time. That was
4  sort of the first part of the exam.

5          And then we've got oral specimens,
6  swabs that we do in the mouth --

7     Q.  How do you do those swabs?

8     A.  They're cotton swabs that are provided that
9  are essentially sterile, which means they have
10 previously been treated so that there is nothing
11 else on them, removing all potential contamination
12 which is just bacterial contamination.

13         Swabs inside the mouth are done, in
14 this case the examiner, who was me in this case,
15 using sterile gloves so there is no potential --
16 there is no way, for example, skin cells from my
17 hands could possibly enter into the mouth, are used
18 to essentially open the mouth and we swab the inside
19 of the mouth, usually in the cheek area.

20         And if there are any signs or in this
21 case if the person who had been assaulted maybe bit
22 the other person, we would then try to, you know,
23 swab the area where there might possibly be blood or
24 skin cells from that other person. That's pretty

13-Z

1 much how we take oral specimens.
2     Q.  Is the swabbing procedure similar when
3 you're talking about vaginal swabs or rectal swabs?
4     A.  Correct. We essentially examine the areas
5 and what we do is we use, once again, sterile swabs
6 to pick up samples of skin cells, semen, anything
7 that might be useful in doing DNA testing.
8     Q.  When you did the vaginal swabs in this
9 case, did you see any evidence of semen?
10     A.  No, no, we did not.
11     Q.  Is that something that you see in criminal
12 sexual assault cases, sometimes there is semen and
13 sometimes there isn't; is that fair to say?
14     A.  That's correct. A lot of that has to do
15 with obviously if it's a man who is the assailant,
16 you know, if there is no ejaculation or copulation,
17 then certainly there could be a sexual assault with
18 no evidence of semen, and that's actually very
19 common.
20     Q.  It's very common to find a female who has
21 been assaulted and not find any semen in the
22 examination?
23     A.  That's correct.
24     Q.  What are the other things that are here in

Plaintiff 003228
00570

1    People's Exhibit No. 21?
2       A. We do specimens underneath the fingernails
3    where we scrape underneath the fingernails, hair
4    combings. We take a little sample of pubic hair,
5    and we also do some blood samples. And like I said,
6    we do vaginal and rectal samples. That pretty much
7    encompasses what is in here.
8       Q. Do you do fingernail scrapings in every
9    case?
10       A. We usually do fingernail scrapings in every
11    case, yes.
12       Q. Even if there is not a specific piece of
13    information that tells you that the victim scratched
14    the offender?
15       A. Correct. The reason for that is obviously
16    in any kind of traumatic situation like this, it's
17    pretty hard to in the heat of the moment, in my
18    opinion, for people who remember all the details
19    that go on in this. So, you know, just to be for
20    completeness, we take samples essentially underneath
21    the fingernails just in case there may had been
22    something that you know they didn't remember.
23       Q. Thank you very much. I will take that
24    back.

15-Z

```
 1              I would just like to ask you the same
 2   question about the component parts of People's
 3   Exhibit No. 21, the envelopes inside.
 4              Are they all in substantially the same
 5   condition today as they were when you worked with
 6   them on May 24th, of 2002?
 7        A.    Yes.
 8              MR. RUBINSTEIN:  May I have one moment,
 9   Judge.
10              THE COURT:  Yes.
11              MR. RUBINSTEIN:  Thank you.  No further
12   questions.  Thank you, Dr. Temple.
13              MR. BRANDSTRADER:  May I, Judge?
14              THE COURT:  You may inquire.
15
16                    CROSS EXAMINATION
17   BY MR. BRANDSTRADER:
18        Q.    Doctor, is it fair to say that part of your
19   examination of an individual who comes and presents
20   in the emergency room is based on what that person
21   might tell you happened?
22        A.    All of the physical examine is based on --
23   correct.
24        Q.    Based on your conversation with the
```

16-Z

1  individual on May 24th, Ms. Riggio, you performed an
2  examination?
3      A.  That's correct.
4      Q.  And did she relate to you that she believed
5  she had been penetrated?
6      A.  That's correct.
7      Q.  Did she tell you where she thought she had
8  been penetrated?
9      A.  She thought she had vaginal penetration.
10     Q.  Did she mention rectal penetration?
11     A.  You know, I don't remember.  To my
12 recollection, I don't remember.
13     Q.  Did she say or tell you what she thought
14 she might had been penetrated with?
15     A.  She told me that she thought it might had
16 been either a finger or penis.
17     Q.  Based on your examination of Ms. Riggio
18 that day, did you note any evidence of trauma to the
19 rectum?
20     A.  No.
21     Q.  You testified you noticed no trauma to the
22 vagina?
23     A.  That's correct.
24     Q.  You noticed no abrasions?

17-Z

1        A.   Correct.

2        Q.   No tearing?

3        A.   Correct.

4        Q.   No bleeding?

5        A.   Correct.

6        Q.   No scraping?

7        A.   Correct.

8        MR. BRANDSTRADER: I have nothing further, Judge.

10       THE COURT: Anything else?

11       MR. RUBINSTEIN: Just one follow up question.

13

14               REDIRECT EXAMINATION

15 BY MR. RUBINSTEIN:

16        Q.   Dr. Temple, if I showed you a copy of step two of the evidence collection kit, would it refresh your memory about what Sue Riggio told you about rectal penetration?

20        A.   Sure. Yes, it would.

21       MR. RUBINSTEIN: I will mark this as People's Exhibit No. 22 for identification.

23       THE COURT: Very well.

24

Plaintiff 003232
00574

1  BY MR. RUBINSTEIN:
2      Q.  I'm now handing you People's Exhibit No. 22
3  for identification.  What is that page?
4      A.  This is actually the paperwork that goes
5  into the sexual assault kit.
6      Q.  Is that what's referred to as step 2?
7      A.  Correct.
8      Q.  Could you take a look at the area of that
9  that covers the issue of rectal penetration, read it
10 silently to yourself and then hand it back to me?
11     A.  Okay, yes.
12     Q.  Has looking at this report refreshed your
13 memory about what Ms. Riggio said about rectal
14 penetration?
15     A.  Yes.
16     Q.  What did she say?
17     A.  Apparently, per the sheet that I documented
18 at that time, she felt that she had rectal
19 penetration.
20         MR. RUBINSTEIN:  Nothing further.
21         MR. BRANDSTRADER:  I have nothing further
22 following that, Judge.
23         THE COURT:  Nothing further?
24         MR. BRANDSTRADER:  Nothing, Judge.

19-Z

```
 1              THE COURT:  Thank you, doctor.  You may
 2   step down.
 3                   (Witness excused.)
 4                   (Witness sworn.)
 5              THE COURT:  You may proceed.
 6              MS. MORRIS:  Thank you, Judge.
 7
 8                     MICHAEL COKELY,
 9   As a witness on behalf of the People of the State of
10   Illinois, having been first duly sworn, was examined
11   and testified as follows:
12
13                   DIRECT EXAMINATION
14   BY MS. MORRIS:
15       Q.  Sergeant Cokely, introduce yourself to the
16   ladies and gentlemen of the jury --
17       A.  Yes.
18       Q.  Tell us your name, spell your last name,
19   give your star number?
20       A.  My name is Mike Cokely, C-o-k-e-l-y, Star
21   No. 179, I'm a sergeant, Cook County Sheriff's
22   Office.
23       Q.  How long have you been employed by the Cook
24   County Sheriff's Office?
```

Plaintiff 003234
00576

```
 1        A.   Since October '98.
 2        Q.   How long have you been a sergeant in the
 3   Cook County Sheriff's Office?
 4        A.   Since December of '02.
 5        Q.   Where are you currently assigned?
 6        A.   I'm currently assigned in Maywood in the
 7   civil process division.
 8        Q.   What are your duties in Maywood in the
 9   civil process division?
10        A.   I supervise deputy sheriffs whose
11   responsibility it is to serve summonses by orders of
12   protections and various orders of the court.
13        Q.   You said you have been doing that since
14   December of 2002?
15        A.   Yes.
16        Q.   Drawing your attention back to May of 2002,
17   where were you assigned?
18        A.   I was assigned to the Daley Center.  I was
19   a deputy sheriff.  I was not promoted at that time.
20   My assignment was security at the Daley Center.  I
21   worked the front door, prisoner transports,
22   responding to incidents that occurred in the
23   facility.
24        Q.   On the 24th of May of 2002, approximately
```